DAILY COPY TRANSCRIPT

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

IN RE:  FEMA TRAILER          *    Docket MDL 1873 "N"
5   FORMALDEHYDE PRODUCTS         *
    LIABILITY LITIGATION          *    New Orleans, Louisiana
6                                 *
    THIS DOCUMENT IS RELATED TO:  *    May 17, 2010
7                                 *
    EARLINE CASTANEL V.           *    1:30 P.M.
8   RECREATION BY DESIGN, LLC     *
    DOCKET NO. 09-3251            *
9   * * * * * * * * * * * * * * * *

10                       DAY 1
                     AFTERNOON SESSION
11               JURY TRIAL BEFORE THE
               HONORABLE KURT D. ENGELHARDT
12             UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:          Watts Guerra Craft
                                 BY:  MIKAL C. WATTS, ESQ.
16                               Four Dominion Drive
                                 Building Three, Suite 100
17                               San Antonio, Texas  78257

18
                                 Reich & Binstock
19                               BY:  DENNIS C. REICH, ESQ.
                                 4265 San Felipe
20                               Suite 1000
                                 Houston, Texas  77027
21

22                               T. CHRISTOPHER PINEDO, ESQ.
                                 4550 Jericho Road
23                               Corpus Christi, Texas 78413

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAILY COPY TRANSCRIPT

1
   <u>APPEARANCES CONTINUED</u>:
2

3    For Recreation By Design:      Duplass, Zwain, Bourgeois
                                        & Morton
4                                   BY:  ANDREW D. WEINSTOCK, ESQ.
                                    3838 N. Causeway Blvd.
5                                   Suite 2900
                                    Metairie, Louisiana 70002
6

7
                                    Garrison Yount Forte & Mulcahy,
8                                     LLC
                                    BY:  MR. LYON H. GARRISON, ESQ.
9                                   BY:  MR. RANDALL C. MULCAHY, ESQ.
                                    BY:  MR. SCOTT P. YOUNT, ESQ.
10                                  909 Poydras Street
                                    Suite 1800
11                                  New Orleans, Louisiana  70112

12

13   Official Court Reporter:       Jodi Simcox, RMR, FCRR
                                    500 Poydras Street
14                                  Room HB-406
                                    New Orleans, Louisiana 70130
15                                  (504) 589-7780

16

17   Proceedings recorded by mechanical stenography, transcript

18   produced by computer.

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAILY COPY TRANSCRIPT

# I N D E X

                                                    Page


RANDALL RUSH
     Direct Examination                              158

MICHAEL GAUME
     Videotaped deposition                           213

ALBERT JARRELL
     Direct Examination                              242
     Cross-Examination                               245
     Redirect Examination                            259

GERALD MCGWIN
     Direct Examination                              264
     Cross-Examination                               272
     Redirect Examination                            285

GEORGE CORNISH
     Videotaped deposition                           294

DAILY COPY TRANSCRIPT

1

2                          **AFTERNOON SESSION**

3                            **(May 17, 2010)**

4                              * * * * *

5         **THE DEPUTY CLERK:**  All rise.

6         (WHEREUPON, the jury entered the courtroom.)

7         **THE COURT:**  All right.  You may be seated.  Thank you

8    all for being on time and ready to proceed.  We really

9    appreciate it.  And I told you we would try to be very

10   respectful of your time throughout the trial, and that's our

11   goal.  And I would expect all counsel to be prepared as well at

12   the appointed time.

13              All right, Mr. Watts, we are at the point of the

14   trial where the plaintiff can begin to call witnesses and

15   introduce evidence.  Do you have the first witness?

16         **MR. WATTS:**  I do, sir.  Under the adverse party rule,

17   we call the defendant Rec by Design by and through its

18   designated representative Randall Rush.

19         **THE COURT:**  All right.  Mr. Rush, would you come

20   forward, sir.  When you get behind this chair, please remain

21   standing, we'll administer the oath, and then you may be

22   seated.

23              While Mr. Rush is approaching, let me explain to

24   the jury that Mr. Rush, as we previously indicated, is here on

25   behalf of Recreation By Design, the defendant in the case;

DAILY COPY TRANSCRIPT

1  therefore, plaintiff, through Mr. Watts, is going to be able to

2  ask him leading questions -- in other words, cross-examine him

3  as an adverse witness -- at which time the counsel for the

4  defendant, Mr. Garrison -- are you handling this witness,

5  Mr. Garrison?

6          **MR. GARRISON:**  Actually, Mr. Mulcahy is.

7          **THE COURT:**  Okay.  Mr. Mulcahy will be able to ask

8  questions, which would typically be direct examination.  But my

9  point is that Mr. Rush will also be called to testify on the

10  defendant's case in chief.  So we're going to hear what he has

11  to say now in response to Mr. Watts' questions, and then he

12  will come back again and testify as part of the defendant's

13  case later in the week.

14          All right.  Let's go ahead and administer the

15  oath to Mr. Rush so he may be seated.

16          (WHEREUPON, **Randall Rush**, having been duly sworn,

17  testified as follows.)

18          **THE DEPUTY CLERK:**  Please state your full name and

19  correct spelling for the record.

20          **THE WITNESS:**  My name is Randall Rush, last name

21  spelling, Rush, R-U-S-H; first name Randall, R-A-N-D-A-L-L.

22                  **DIRECT EXAMINATION**

23  BY MR. WATTS:

24  **Q.**   Good afternoon, Mr. Rush.  My name is Mikal Watts.  I

25  introduced myself to you this morning for the first time; is

DAILY COPY TRANSCRIPT

1  that right?

2  A.   That's correct.

3  Q.   We have not had a chance to visit before, but you have

4  given a deposition in this case; is that right?

5  A.   Yes, sir.

6  Q.   Okay.  I'll tell you what I'd like to do is just hand you

7  a copy of that so that I don't have to walk back and forth.

8           MR. WATTS:  May I just give him this for future use?

9           THE COURT:  Yes.

10  BY MR. WATTS:

11  Q    Your deposition was taken on February 23rd of this year;

12  is that right, sir?

13  A    Yes.

14  Q.   Okay.  Good enough.

15           Now, I want to get some background information on

16  you, but before I do, let's see if we can just get some agreed

17  propositions out of way that I don't think are disputed.

18           Number one, you are the founder, president, and

19  corporate representative for Recreation By Design LLC; is that

20  right?

21  A.   Yes, I am.

22  Q.   You started that company in 1999?

23  A.   Yes, I have -- yes, I did.

24  Q.   Without getting into the details, you own other companies

25  that do travel trailers; fair?

DAILY COPY TRANSCRIPT

1  **A.**   It's fair.

2  **Q.**   Now, with respect to Rec by Design, it is an LLC for

3  limited liability purposes; right?

4  **A.**   That's correct.

5  **Q.**   Before Rec by Design, had you owned another company?

6  **A.**   Yes.  I had a company called Rush Industries with my

7  father.

8  **Q**   Okay.

9  **A**   That was back in the early '70s to '80s.  I had a company

10  called American Travel Systems, and then I came up with

11  Recreation By Design.

12  **Q.**   All right.  Fair enough.

13       Now, in terms of Rec by Design, you-all market

14  yourself as the world's largest builder of custom RVs; is that

15  right?

16  **A.**   Well, that's a marketing tool.  We possibly might not be

17  the largest builder, but we do a lot of custom building for

18  particular needs.

19  **Q.**   Well, to directly answer my question, do you market

20  yourself as the world's largest builder of custom RVs?

21  **A.**   We have a Web site that says that, yes.

22  **Q.**   Okay.

23       **MR. WATTS:**  May I approach, Your Honor?

24       **THE COURT:**  Yes.

25  BY MR. WATTS:

DAILY COPY TRANSCRIPT

1  **Q**    I want to hand you what's been marked as Exhibit 374.  It
2  was an exhibit in your deposition.
3          Is this the Web site that you were referring to
4  wherein you-all market yourself as the world's largest builder
5  of custom RVs?
6  **A**    Yes, it is.
7          **MR. WATTS:**  We would offer Exhibit 374.
8          **THE COURT:**  Any objection?
9          **MR. MULCAHY:**  No objection, Your Honor.
10          **THE COURT:**  Are these pre-admitted?
11          **MR. WATTS:**  These aren't.  There were certain ones
12  that were.
13          **THE COURT:**  Right.  Right.  This was not?
14          **MR. WATTS:**  This one is not.  I've got a list of
15  which ones are and which ones aren't.
16          **THE COURT:**  So ordered.  Do you want to show that to
17  the jury, please?
18          **MR. WATTS:**  Can you put up Exhibit 374?  If you
19  could, just highlight that black part right there.
20  **BY MR. WATTS:**
21  **Q.**   And there's where the language "The world's largest
22  builder of custom RVs" is; is that right?
23  **A.**   Yes.
24  **Q.**   Okay.  Thank you, sir.
25          Now, in addition to marketing yourself as the world's

DAILY COPY TRANSCRIPT

1   largest builder of custom RVs, you also market yourself as

2   having an expert engineering department; is that right?

3   **A.**   Yes.  That's through the years of my being involved in the

4   RV industry.

5            **MR. WATTS:**  May I approach, Your Honor?

6            **THE COURT:**  Yes.

7   BY MR. WATTS:

8   **Q.**   Let me show you what was marked as Exhibit 8 to your

9   deposition.  I marked it as Exhibit 368.  Is that the Internet

10  site where you market your expert engineering department?

11  **A.**   Yes, it is.

12           **MR. WATTS:**  We offer Exhibit 368.

13           **THE COURT:**  Any objection?

14           **MR. MULCAHY:**  No objection.

15           **THE COURT:**  All right.  So ordered.

16           **MR. WATTS:**  Thank you, Your Honor.

17                Can you put that one up as well?

18  BY MR. WATTS:

19  **Q.**   Now, as we look at this, it's kind of hard to see.

20           **MR. WATTS:**  Just pull up the first three lines there.

21  BY MR. WATTS:

22  **Q**    You see, "Our expert engineering department"?

23  **A.**   Yes.

24  **Q.**   That's on Rec by Design's Web site?

25  **A.**   Yes, it is.

DAILY COPY TRANSCRIPT

1  **Q.**   All right.  Now, I want to visit with you a little bit
2  about that engineering department.
3         Are you a licensed professional engineer in any state
4  in the United States?
5  **A.**   No, just long-term of being involved in the RV industry.
6  **Q.**   Did Rec by Design employ any licensed professional
7  engineers at the time that it manufactured these travel
8  trailers for Morgan?
9  **A.**   No.
10 **Q.**   Inside of this expert engineering department -- and again,
11 I know what sales, you know, is.  That's you; fair?
12 **A.**   What was the question?
13 **Q.**   When you market your company as having an expert
14 engineering department, that's referring to you individually?
15 **A.**   That refers to me and many of the people that's been
16 involved with my company over the years of experience that
17 they've been involved in building the RV products -- their
18 entire life also -- in our area.
19 **Q.**   Okay.  Now, in your deposition, did you agree, so when it
20 talks about "our expert engineering department," are we talking
21 about you with respect to Rec by Design?
22 **A.**   Yes.  I have the most knowledge within my own company of
23 the product and how it's built, that's correct.
24 **Q**   Now, when we asked for anybody else with knowledge from
25 the standpoint of expert engineering, you pointed us to George

DAILY COPY TRANSCRIPT

1   Cornish, who the jury will hear from; is that right?

2   **A.**   George Cornish is one of my production managers, and he

3   works under me.  He does exactly what I tell him on how to

4   build the product.

5   **Q.**   He is not a licensed engineer in any state in the United

6   States; true?

7   **A.**   He is a production manager, not an engineer; that's

8   correct.

9   **Q.**   Now, you also talk about research and development.  Do you

10  have an R&D department that has any engineers on staff?

11  **A.**   Are you talking certified engineers?

12  **Q.**   Yes, sir.

13  **A.**   No.  I do all of the research and development myself.  I

14  build the products.  We try them out.

15  **Q.**   Now, in addition to talking about your expert engineering

16  department, do you also market your company as providing the

17  most technical up-to-date safety-conscious products available?

18  **A.**   Yes, I do.  I use industry-standard parts.

19              **MR. WATTS:**  May I approach, Your Honor?

20              **THE COURT:**  Yes.

21  **BY MR. WATTS:**

22  **Q**   I want to show you what was marked as Exhibit 6 to your

23  deposition that I marked as 367 for the trial.

24              Is this a Web site page where Rec by Design markets

25  itself in the way that I've described?

DAILY COPY TRANSCRIPT

1    A.   Yes, sir, it is.

2           **MR. WATTS:**  Your Honor, we would offer Exhibit 367 at

3    this time.

4           **MR. MULCAHY:**  No objection.

5           **THE COURT:**  So ordered.

6           **MR. WATTS:**  Can you put Exhibit 367 up, please?

7    BY MR. WATTS:

8    Q.   Now, as we look at Exhibit 367 --

9           **MR. WATTS:**  If you could just highlight this first --

10   there we go.

11   BY MR. WATTS:

12   Q    "This allows us to research and develop the most technical

13   up-to-date safety-conscious products available to the

14   recreational vehicle industry at any given time."

15          Do you see that, sir?

16   A.   Yes, sir, I do.

17   Q.   First of all, do you agree that in 2005 Rec by Design

18   should have been concerned about safety then as well?

19   A.   Recreation By Design is always concerned about safety.

20   Q.   And it should be; right?

21   A.   Yes.

22   Q.   You would agree that Rec by Design has an obligation to

23   its customers to provide the most technical up-to-date

24   safety-conscious products available?

25   A.   Yes, I do.

DAILY COPY TRANSCRIPT

1  **Q.**   And you would agree that that statement was true in

2  2005 --

3  **A.**   Yes.

4  **Q.**   -- that Rec by Design owed a duty to its customers to

5  provide the most up-to-date safety-conscious products

6  available?

7  **A.**   Yes.

8  **Q.**   In addition to that, you also market yourself as using

9  time-tested construction techniques and high-quality materials;

10  true?

11  **A.**   That's correct.

12          **MR. WATTS:**  May I approach, Your Honor?

13          **THE COURT:**  Yes.

14  BY MR. WATTS:

15  **Q**   I'm going to show you what's been marked as Exhibit 12 to

16  your deposition.  I'll mark it as Exhibit 372 for purposes of

17  this trial.  This is the Internet page where you market Rec by

18  Design as having provided high-quality materials; true?

19  **A**   That's correct.

20  **Q.**   Thank you, sir.

21          **MR. WATTS:**  We would offer Exhibit 372 at this time.

22          **MR. MULCAHY:**  No objection.

23          **THE COURT:**  No objection, so ordered.

24          **MR. WATTS:**  Can we put 372 up, please.  If you would

25  highlight just the text in here.

DAILY COPY TRANSCRIPT

1  BY MR. WATTS:

2  Q.   All right.  "And built to last using time-tested

3  construction techniques and high-quality materials."  Do you

4  see that?

5  A.   Yes.

6  Q.   Do you agree that in 2005 Rec by Design owed its

7  customers -- the customers were entitled to rely upon you to

8  provide high-quality materials?

9  A.   Yes, I -- yes.

10  Q.   All right.  So as we look at how Rec by Design markets

11  itself, do you agree that your customers are entitled to

12  high-quality materials, the most up-to-date safety-conscious

13  products available --

14  A.   Yes.  I use industry-standard materials, that's correct --

15  Q.   That wasn't my question.

16  A.   -- and that is a high-quality material.

17  Q.   My question is:  Do you agree that you owed it to your

18  customers to provide high-quality materials that are the most

19  up-to-date safety-conscious products available?

20  A.   Yes, and I do.

21  Q.   All right.  Now, I want to talk to you about whether you

22  did or not in a minute, but I want to kind of paint a little

23  background for the jury about the way that you got involved

24  with respect to providing travel trailers for temporary

25  housing.  Number one, at the time that -- you received a phone

DAILY COPY TRANSCRIPT

1   call from somebody at Morgan Buildings & Spas asking whether

2   you could help provide some of these; is that right?

3   A.   Well, no, that's not -- my salesman received the phone

4   call.

5   Q.   Your salesman received the phone call.

6   A    And --

7   Q    Do you remember the name of your salesman, sir?

8   A.   The salesman is Al Hebert.

9   Q.   So Al receives a phone call from somebody at Morgan

10  Buildings and Spas asking whether you-all would be interested

11  in bidding on a contract, if you will, to provide travel

12  trailers?

13  A.   The phone call, yes, he received was about if we had the

14  capacity of building units.

15  Q    Now, Mr. Rush, approximately when would that phone call

16  have occurred?  Just month and year, if you could.

17  A.   I'm not exactly for sure on the month.  It was probably a

18  month after the hurricane disaster.

19  Q.   So sometime in the September/early October time frame?

20  A.   Probably September would be more correct.

21  Q.   Now, at the time that Al in your sales department receives

22  this phone call from Morgan Buildings and Spas, had you-all

23  ever engaged in providing emergency housing?

24  A.   No, we had not.

25  Q.   So you had no -- I don't want to say "experience," but you

DAILY COPY TRANSCRIPT

1   had no experience providing housing to FEMA; is that fair?

2   A.   I had never dealt with FEMA prior to that contract, that

3   would be correct.

4   Q.   All right.  You receive a phone call from Morgan.  Did you

5   have discussions with a gentleman by the name of James

6   Schilligo?

7   A.   Schilligo is correct.

8   Q.   And Guy Morgan?

9   A.   That's correct.

10  Q.   They both work for Morgan Buildings and Spas; is that

11  right?

12  A.   I believe they are both owners of Morgan Buildings and

13  Spas, to the best of my knowledge.

14  Q.   Now, when we get into Ms. Castanel's unit, would it be

15  fair that this is not just a carbon copy of units you had been

16  producing before; you produced something specifically for

17  Morgan.  Is that right?

18  A.   I build several-thousand different floor plans, and this

19  is one of the units that I supplied to her, was the parts out

20  of my normal floor plans with my normal product.

21  Q.   This was a particular model that was developed for Morgan,

22  though?

23  A.   This was products that, talking with Guy Morgan and Jim

24  Schilligo of what they wanted out of my product and what they

25  needed.

DAILY COPY TRANSCRIPT

1  **Q.**   But to directly answer my question:  This was a particular

2  model developed for Morgan; it was not an existing product.

3  True?

4  **A.**   Just about every product I build is different from each

5  other.  So, yes, it was a particular product.

6  **Q**   Okay.

7  **A**   My normal product is different also from --

8  **Q.**   Now, with respect to the relationship between Rec by

9  Design and Morgan, as I understand the agreement between the

10  parties, Rec by Design was going to cover any warranty issues

11  or problems with the travel trailers; is that right?

12  **A.**   That would be normal to say, yes.

13  **Q.**   So, in other words, you designed, manufactured, and sold

14  the travel trailer that was issued to Earline Castanel.  You

15  agree with that; right?

16  **A.**   Yes.

17  **Q.**   And by contract with Morgan, Rec by Design, as opposed to

18  Morgan, is contractually responsible for covering any warranty

19  issues that came up, any problems with a travel trailer; true?

20  **A.**   That would be true, yes.

21  **Q.**   Now, as I understand the paperwork, there was a production

22  order that was entered where you-all basically agreed to make

23  2600, and Morgan had a right to get 2400 more if they exercised

24  an option; is that right?

25  **A.**   Well, I don't believe it was a production order; I believe

DAILY COPY TRANSCRIPT

1  it was a purchase order.

2  **Q.**   A purchase order, okay.

3         Let me put up Exhibit No. 2 to your deposition, which

4  is Defense Exhibit No. 454.

5         **MR. WATTS:**  If you could just highlight the very top,

6  the title and what's above it.  There you go.

7  **BY MR. WATTS:**

8  **Q**   All right.  Do you see this says "Rec by Design," and it's

9  got a date of December the 1st of 2005, sir?

10 **A.**   Yes, I do.

11 **Q.**   Would it help you to have a paper copy to look at, or can

12 you see it okay?

13 **A.**   I can see it okay as long as it's enlarged there.

14 **Q.**   If you need it, let me know, but --

15 **A**   Okay.

16 **Q**   Good enough.

17        Now, this is a purchase order?

18 **A.**   No.  This is a sales order.

19 **Q.**   Sales order.

20 **A.**   And also a production order.

21 **Q.**   Now, it has a date on it of December 1st of 2005.  In

22 fact, the agreement for Rec by Design to provide travel

23 trailers was entered into before December the 1st; fair?

24 **A.**   That's correct.

25 **Q.**   And there was an expectation that you-all would develop

DAILY COPY TRANSCRIPT

1   2600 travel trailers from the time that the agreement was

2   reached in September of 2005 until sometime in December; is

3   that right?

4   A.   Well, build them, yes, in that time frame, and it could

5   have went over.

6   Q.   All right.  And that was going to be my next question.

7   Approximately what was the time frame in which Rec by Design

8   built and delivered 2600 trailers to Morgan?

9   A.   It could have been approximately three and a half to four

10  months.

11  Q    Three and a half to four months.  And in that three and a

12  half to four months, you-all built and delivered 2600 new

13  travel trailers; right?

14  A.   Yes.  Out of two different production plants, yes.

15  Q.   Now, as I understand it, at the time that you reached the

16  deal with Morgan, you had a production plant, but in order to

17  get capacity to build that much more, you opened up another

18  one; is that right?

19  A.   Well, if you'd look on the original production order -- or

20  the purchase order, I think the original order was for 1546.

21  Q.   Yes, sir.

22  A.   After speaking to Guy Morgan and Jim Schilligo, they asked

23  would it be possible if we could -- they had a very large

24  order, and if we could build any more than just the 1564 [sic]

25  units.  I said, well, if another plant was available, we could

DAILY COPY TRANSCRIPT

1   possibly open it up and set it up to build this particular
2   product.
3           And we did find another plant, and Morgan did
4   increase their purchase order to 2600 units.
5   Q    That's where I want to go next.
6           MR. WATTS:  If you would put up Exhibit 278, please.
7   BY MR. WATTS:
8   Q    As we look at Exhibit 278, this is a purchase order; is
9   that right?
10  A.   This is a purchase order from Morgan's, that's correct.
11  Q.   And a lot of people do deals of this size with big
12  lawyer-drawn contracts.  You-all did this through a one-page
13  purchase order; right?
14  A.   Well, I'm a small business.  I believe that -- you know,
15  in Morgan.  I had heard of them before.  They're a reputable
16  company.
17  Q.   That's fine.  But you did it through a one-page purchase
18  order; right?
19  A.   Yes, I did.
20  Q.   Now, if we could look at this one-page purchase order --
21          MR. WATTS:  Highlight in the middle, on the right
22  side, right around in here.
23  BY MR. WATTS:
24  Q    -- this is the document that showed that you-all were
25  committing yourself contractually to deliver 2600, and there's

DAILY COPY TRANSCRIPT

1  the X out of the 1594; is that right?

2  **A.**   Yes.  That was after I had the discussion with Guy Morgan

3  if we could produce more product for him.

4  **Q.**   And you signed okay and put your initials -- or your first

5  initial and your last name to signify we're going to deliver

6  2600; is that right?

7  **A.**   Yes.  We agreed that we would be able to try to provide

8  them with 2600 units, that's correct.

9  **Q.**   All right.  Now, somewhere else there's a -- right down at

10  the bottom, I think, that you're going to deliver 2600 units

11  between October of '05 and January of '06.  And then depending

12  upon whether Morgan wants you to deliver them, you're stating

13  that you're willing to go ahead and do another 2400 between

14  February and April of '06; is that right?

15  **A.**   Well, that was an option that Morgan was possibly -- could

16  have.  It wasn't nothing that they did have.  And they had

17  asked if I would continue to run product for them and what

18  could be the capacity if I would run it during that time frame.

19  **Q**   Okay.

20  **A**   And that's the additional amount that we both agreed upon

21  when we came up with the amount.

22  **Q.**   Now, as a matter of fact, in 2006, they didn't exercise

23  that option, so the 2400 in the second triage never happened;

24  is that right?

25  **A.**   No, sir.  We built the 2600 units.

DAILY COPY TRANSCRIPT

1  Q    Now, counsel, I think in the opening statement, said you

2  delivered 2600 new units, and then they pulled a bunch of Rec

3  Design units that were on dealership lots.  How many were

4  pulled off of dealership lots, if you know?

5  A.   I don't know how many was taken off the lots.  I couldn't

6  tell you that for sure.

7  Q.   All right.  At the time that you entered into this

8  purchase order, you had an understanding that these units would

9  be deployed to areas that were affected by the hurricanes

10 Katrina and Rita; is that right?

11 A.   Yes.  They were for the hurricane victims, yes.

12 Q.   You knew they would primarily be going to Louisiana,

13 Mississippi, and Texas?

14 A    That's correct.

15 Q    You knew that they were going to be utilized by FEMA and

16 issued to people with temporary housing needs; right?

17 A    Yes, that is correct.

18 Q.   All right.  Now, at the time that you began designing

19 these trailers, you knew that they would be used for emergency

20 housing purposes; correct?

21 A.   That was the intent of them, yes.

22 Q.   All right.  Now, to be fair, these trailers were not

23 designed to be lived in for more than a year; right?

24 A.   This particular trailer had features in it that would help

25 the people live in it for a longer period of time.

DAILY COPY TRANSCRIPT

1  **Q.** But my question is very specific, and that is: The

2  emergency housing units that Rec by Design manufactured under

3  this agreement with Morgan, they were not designed to be lived

4  in for more than a year. That's true, isn't it?

5  **A.** Again, the product was designed to help people live in a

6  better condition. It was a small unit. Being a year, I would

7  probably say that's quite a while.

8  **Q.** When you say "quite a while," you are agreeing that they

9  were not designed to be lived in for more than a year?

10 **A** Well --

11 **Q** That's what you told us in your deposition; right?

12 **A.** Well, there's a possibility, with the features that I put

13 in them, if the people wanted to, they could live in them for

14 longer than one year.

15 **Q.** Were they designed to be lived in for a matter of years?

16 **A.** No, not a matter of years, no.

17 **Q.** They were not designed as a full-time home in terms of the

18 engineering that went in them; right?

19 **A.** The size of them, no, I would say no.

20 **Q.** You-all put out an owner's manual with these.

21        **MR. WATTS:** Put up Plaintiff's Exhibit 274 and go to

22 Page 4 if you could.

23 **BY MR. WATTS:**

24 **Q** Now, as we look --

25        **MR. WATTS:** If you just highlight that very top

DAILY COPY TRANSCRIPT

1  paragraph up there.

2  **BY MR. WATTS:**

3  **Q**    In the owner's manual, your owner's manual states:  "Your

4  recreational vehicle has been designed for short-term camping

5  and recreational use.  It was not engineered to be used as a

6  permanent dwelling."  Is that right?

7  **A.**   As a travel trailer, correct.

8  **Q.**   All right.  And if you could go to the cover page.  This

9  is the owner's manual that was delivered with the travel

10  trailer; is that right?

11  **A.**   That is the owner's manual that was provided with each

12  travel trailer, that's correct.

13  **Q.**   Now, just for informational purposes, where did you-all

14  put it inside the travel trailer when you delivered it to

15  Morgan?

16  **A.**   When we would build a unit, all of the installation

17  instructions and any additional information we got was

18  installed in a kitchen drawer.

19  **Q.**   And the idea was that it would be in a place that, when

20  people moved into it, they could open that kitchen drawer and

21  read what was in the owner's manual; right?

22  **A.**   That's correct.  The end user is able to have the

23  information at their hands.

24  **Q**    Okay.  Now, I want to visit with you about the issue of

25  formaldehyde.  First, prior to the design and the development

DAILY COPY TRANSCRIPT

1   of the 2600 trailers for Morgan, you, as the president and

2   founder of Rec by Design, understood that formaldehyde can harm

3   human beings; true?

4   **A.**   In what way?

5   **Q.**   Well, in a way that you told us in your deposition.  Did

6   you understand that formaldehyde can harm humans?

7   **A.**   By a large consumption.

8   **Q.**   All right.  By a large consumption.  And we'll visit about

9   that in a little bit.  You had known that for more than ten

10  years prior to the engagement with Morgan for the FEMA project;

11  fair?

12  **A.**   Through MSDS sheets, correct.

13  **Q.**   Now, I want to visit with you -- when you say "MSDS

14  sheets," that is a Material Safety Data Sheet; is that right?

15  **A.**   That's correct.

16  **Q.**   All right.

17          **MR. WATTS:**  May I approach, Your Honor?

18          **THE COURT:**  Yes.

19  BY MR. WATTS:

20  **Q.**   You were shown an MSDS sheet in your deposition.  It was

21  Exhibit 25.  I've marked this as Exhibit 362.

22          Is this a copy of a Material Safety Data Sheet that

23  was delivered to Rec by Design with particleboard supply from

24  your suppliers?

25  **A.**   Yes, it is.

DAILY COPY TRANSCRIPT

1          **MR. WATTS:**  We would offer Exhibit 362.

2          **MR. MULCAHY:**  No objection.

3          **THE COURT:**  So ordered.

4          **MR. WATTS:**  Now, if you would put up Exhibit 362.

5   BY MR. WATTS:

6   **Q.**   I want to run through this with you just a little bit.

7          You were here during the opening statement; is that

8   right?

9   **A.**   Yes.

10  **Q.**   You heard me talk to the jury about the idea that, under

11  federal law, when somebody produces a product or a chemical

12  that has known hazards to human beings, they are obligated to

13  put those hazards into a Material Safety Data Sheet and deliver

14  that information with the product to whoever is going to use

15  it; right?

16  **A.**   Yes.  This particular sheet was used for my employees

17  through the OSHA standards.

18  **Q.**   Well, and that's where I was going next.  And the idea is

19  that, through the OSHA standards, if somebody is in a refinery,

20  for example, and they're working around some chemical, those

21  people need to know what could go wrong in terms of working

22  around that chemical; right?

23  **A.**   That's correct.

24  **Q.**   If somebody is a sandblaster or a painter and they're

25  using supplies, they get Material Safety Data Sheets, and

DAILY COPY TRANSCRIPT

1   that's the federal government's way of ensuring the safety of
2   workers so that they have the information of the known hazards
3   dealing with the products that they're dealing with; right?
4   A.   Yes.  It's governed by OSHA, that's correct.
5   Q.   Now, using the Material Safety Data Sheet, I want to go
6   through this just a little bit.  Let's start with Section 1 up
7   at the top.
8           Now, this is urea formaldehyde, UF bonded wood
9   products.  Let me start with that.
10          When I said in opening statement that it's not solid
11  wood, it's a bunch of wood chunks that are glued together, I'm
12  sure I oversimplified that, but that's what urea formaldehyde
13  is used to do in the wood-products industry; fair?
14  A.   Yes, that's correct.
15  Q.   All right.  So when somebody sends you a large supply of
16  particleboard, they're not only sending you wood scraps,
17  they're sending you glue that ties that wood scrap together
18  into particleboard; right?
19  A.   Particleboard was less than 5 percent of my product,
20  that's correct.
21  Q.   But a lot of your other product has this same urea
22  formaldehyde in it; true?
23  A.   It's possible.
24  Q.   All right.  And I'll visit with you about that in a little
25  bit.  But you, under the MSDS process, are required to identify

DAILY COPY TRANSCRIPT

1  whatever the chemical or the product is that may present the

2  hazard; true?

3  A.   That is what the vendor that supplies us the material

4  supplies us when they deliver the material prior to purchasing

5  it, correct.

6  Q.   And then the vendor is required not only to identify the

7  products but to identify the hazards -- if you go down -- that

8  go with that product.  Section 2, "Identify the Hazard"; right?

9  A.   Yes, it does.

10 Q.   All right.  Now, I want to visit with you about this

11 hazard identification, and it says, "These products may release

12 small quantities of formaldehyde in gaseous form.  Emissions

13 decrease through time as the board ages.  Exposure to

14 formaldehyde gas may cause eye, skin, and respiratory

15 irritation and may cause allergic sensitization in some

16 individuals."  Did I read that right?

17 A.   Yes.

18 Q.   "Prolonged exposure to formaldehyde may cause nasal

19 cancer."  Do you see that, sir?

20 A.   Yes, I do.

21 Q.   Now, I want to visit with you about this, but, again, the

22 purpose of this hazard identification is so that suppliers can

23 provide that to you, who is going to utilize this product, in

24 order to ensure the safety of your workers; right?

25 A.   Yes.

DAILY COPY TRANSCRIPT

1  **Q.**   All right.  A couple of sentences in here I want to ask

2  you about.

3          "These products may release small quantities of

4  formaldehyde in gaseous form."  How long had you been ordering

5  particleboard with urea formaldehyde in it at the time that you

6  began the project for Morgan in 2005?

7  **A.**   I have been using this material all along.  The material

8  that I use is an industry standard that meets HUD regulations.

9  **Q.**   What was my question?

10 **A.**   How long have I been using it?

11 **Q**   What's the answer to that?  How long had you been using

12 it, sir?

13 **A.**   I had been using it in the past, prior to the 2005.

14 **Q.**   Right, and I understand that, but how long before that --

15 **A.**   The industry's been using it for many years.

16 **Q**   How many years have you been using it is what I'm trying

17 to get to.

18 **A.**   Since 1999.

19 **Q.**   Since 1999, okay.  So since 1999, you have been receiving

20 particleboard with urea formaldehyde in it that came with

21 Material Safety Data Sheets; right?

22 **A.**   Yes.  When we receive new product, we receive that

23 information.

24 **Q.**   Now, it says, "These products may release small quantities

25 of formaldehyde in gaseous form."  That's something you've

DAILY COPY TRANSCRIPT

1  known, at least, since 1999; right?

2  **A.**   Correct.

3  **Q.**   "Emissions decrease through time as the board ages."

4  That's something that you've known since 1999; right?

5  **A.**   That's correct.

6  **Q.**   It is a fact when I tell the jury that you're going to

7  have more formaldehyde emissions when a product is new than you

8  will four years later, after almost all of its been off-gassed,

9  that's true; right?

10  **A**   Well, that's your opinion.

11  **Q.**   Well, do you agree with it?

12  **A**   It's a possibility.

13  **Q**   Okay.  There's only so much formaldehyde in the glue;

14  right?

15  **A**   I'm not an expert in formaldehyde.

16  **Q.**   We'll get it through -- with other people.

17         In terms of this next issue, "Exposure to

18  formaldehyde gas may cause eye, skin, and respiratory

19  irritation and may cause allergic sensitization in some

20  individuals," I know you're not an expert in formaldehyde, but

21  you knew this through the MSDS sheets since 1999; true?

22  **A**   Yes.  Most of this is talking about the wood dust that's

23  coming off of it.  The dust.

24  **Q.**   Well, actually, up here is the wood dust --

25  **A**   That's correct.

DAILY COPY TRANSCRIPT

1  Q     -- and they're talking about gaseous form here, and that's

2  my question.

3  A.    Right.  And that's part of the process of it.

4  Q.    Have you known that exposure to formaldehyde gas may cause

5  eye, skin, and respiratory irritation and may cause allergic

6  sensitization in some individuals, have you known that since

7  1999?

8  A.    Yes.

9  Q.    Prolonged exposure to formaldehyde may cause nasal cancer.

10  Had you known that since 1999?

11  A.    Yes, I have.

12  Q.    All right.  If we could go to the bottom, "Potential

13  Health Effects," last sentence:  "Exposure to formaldehyde gas

14  may cause eye, mucous membrane, and respiratory tract

15  irritation.  Repeated exposures may cause allergic skin and

16  respiratory sensitization (asthma) in some individuals."  That

17  has been in the Material Safety Data Sheets that have been

18  delivered to you since 1999; true?

19  A.    That's correct.

20  Q.    Now, if we could skip a few pages and go to the fourth

21  page, which is Bates-numbered 3665.  And one of the reasons

22  that this information is delivered to employers is so that the

23  employer, under OSHA, can provide personal protective equipment

24  to people working around this chemical; right?

25  A.    Correct.

DAILY COPY TRANSCRIPT

1  **Q.**    In terms of this personal protective equipment, there is

2  specific respiratory protection requirements under OSHA; right?

3  **A**    Yes, there is.

4  **Q.**    They recommend safety goggles and safety glasses when

5  you're working with this material; true?

6  **A.**    Yes.

7  **Q.**    Gloves and outer garments to reduce skin contact with this

8  material; right?

9  **A.**    Yes.

10  **Q.**    All right.  Now, in addition to the personal protective

11  equipment, do the MSDSs also provide toxicological information

12  to people working with urea formaldehyde?

13  **A**    Yes.

14          **MR. WATTS:**  If you go to Bates 3666, the next page,

15  down at the bottom.  Down where it says "Formaldehyde."  Right

16  here.

17  **BY MR. WATTS:**

18  **Q**    The toxicological information in Section 11 of the MSDS

19  says "Exposure to gaseous formaldehyde may cause irritation to

20  the nose, throat, as well as lead to respiratory disorders."

21  That's been in the MSDSs that have been provided to you since

22  1999; right?

23  **A**    Yes.

24  **Q.**    "Formaldehyde concentrations as low as 0.1 parts per

25  million have been reported to cause some irritation."  You've

DAILY COPY TRANSCRIPT

1   known that since 1999; true?

2   **A**    Yes.

3   **Q.**   "The level of irritation increases with airborne

4   concentration."  That's what's known as dose response; right?

5   **A**    Noticed as what?

6   **Q.**   Dose response.  Does that ring a bell with you at all, or

7   is that an expert issue?

8   **A.**   No, I don't know.

9   **Q.**   Okay.  But you've been told since 1999, through the MSDSs,

10  that the level of irritation increases with airborne

11  concentrations; right?

12  **A.**   Yes.

13  **Q.**   And since 1999, you knew that pre-existing respiratory

14  disorders may be aggravated by exposure; correct?

15  **A.**   Correct.

16  **Q.**   Do you know whether rhinosinusitis is a respiratory

17  disorder?

18  **A.**   No, I do not.

19  **Q**    Okay.

20  **A**    That's a medical term.

21  **Q.**   Now, "Recent epidemiological studies of workers exposed to

22  formaldehyde have provided sufficient evidence that

23  formaldehyde causes nasopharyngeal cancer in humans."  Do you

24  see that?

25  **A.**   Yes, I do.

DAILY COPY TRANSCRIPT

1  **Q.**   That's something that's been in the MSDSs since 1999;

2  true?

3  **A.**   Yes, I believe so.

4  **Q.**   Down at the bottom, the National Toxicology program

5  included formaldehyde in the annual report on carcinogens as

6  reasonably anticipated to be a carcinogen.  OSHA regulates

7  formaldehyde as a potential carcinogen."  That's something that

8  you've known since 1999?

9  **A**   That's correct.

10  **Q**   Now, one last issue.  Bates-numbered 3669.  In addition,

11  there's a Section 16 that provides a warning.

12          **MR. WATTS:**  And if we could blow up this warning.

13  **BY MR. WATTS:**

14  **Q**   It has a label text.  You see that, sir?

15  **A.**   Yes.

16  **Q.**   The MSDS provides a stock label that can be utilized by

17  persons who are utilizing this material in their products;

18  right?

19  **A.**   That's correct.

20  **Q.**   All right.  And one of the things that the MSDS provides

21  is a stock warning that says "Formaldehyde gas may cause

22  irritation to the nose, throat, as well as lead to respiratory

23  disorders.  The International Agency for Research on Cancer,

24  IARC, lists formaldehyde as a Group 1 carcinogen and is

25  included in the National Toxicology Program, NTP, annual report

DAILY COPY TRANSCRIPT

1    on carcinogens."

2              Did I read that correctly?

3    A.   Yes, you did.

4    Q.   Now, here's my question:  The MSDS provided your company

5    with a label form that could have been used to warn about

6    formaldehyde; fair?

7    A.   Yes.

8    Q.   All right.  That was in your possession during the time

9    that you-all were designing, manufacturing, and developing the

10   2600 trailers of which Earline Castanel's trailer is a part;

11   true?

12   A.   Yes.  But there's no documentation here saying not to use

13   this product in a travel trailer.

14   Q.   Well, my point was really:  It gives you a warning that

15   can go with the product if you use it.  You would agree with

16   that?

17   A.   It's possible, yes.

18   Q.   You did not provide this warning to the end user of the

19   product; true?

20   A.   MSDS sheets are mostly developed for the people that are

21   working around it and that are sawing it, sanding it, and

22   cutting it.

23   Q    But my question was --

24   A    So it's for my employees.

25   Q    But my question was:  You did not provide this warning

DAILY COPY TRANSCRIPT

1   with your product; fair?

2   **A.**   No.   I supplied it for my employees that used and worked

3   around this product.

4   **Q.**   So each of your employees was told that formaldehyde gas

5   may cause irritation to the nose, throat, as well as lead to

6   respiratory disorders; right?

7   **A.**   They all have the option to, which we inform them where

8   the MSDS sheets are, and they can read it at their discretion.

9   **Q.**   They had that information available to them?

10  **A.**   That's correct.

11  **Q.**   And it was made available to them by you?

12  **A.**   That's correct.

13  **Q.**   Each of your employees had available to them the

14  information that the International Agency for Research on

15  Cancer listed formaldehyde as a Group 1 carcinogen; right?

16  **A.**   Correct.

17  **Q.**   You provided that information to your employees; right?

18  **A.**   Yes, I did.

19  **Q.**   All right.   Both questions:   With respect to the

20  respiratory disorders that you informed your employees about,

21  did you provide any information to the end user of your travel

22  trailer?

23  **A.**   No, I did not.

24  **Q.**   With respect to the IARC, the International Agency for

25  Research on Cancer, concluding that formaldehyde was a Group 1

DAILY COPY TRANSCRIPT

1  carcinogen, did you provide any information with your trailer

2  that provided that information to the end user?

3  **A.**   No, I did not, because I --

4  **Q**   All right.  Now --

5  **A.**   Because --

6          **THE COURT:**  Well, wait a minute.  Let him go ahead

7  and finish.

8          **MR. WATTS:**  Oh, I'm sorry.  I was looking down at

9  my --

10          **THE WITNESS:**  My materials that I used met the

11  industry standard that was set by HUD, the building standards

12  for the housing, and that's the materials that I used.  And

13  they are all formaldehyde levels at a -- at a low level.

14  BY MR. WATTS:

15  **Q.**   Well, we're going to visit --

16  **A.**   The hardwoods, the particleboards.

17  **Q.**   We're going to visit about that in a little bit, but since

18  you brought up HUD...

19          In the 1970s, you were aware of no HUD regulations

20  with regard to manufacturing -- with regard to formaldehyde

21  emissions in manufactured homes; correct?

22  **A.**   I did not build manufactured homes, no.

23  **Q.**   So you were unaware of it; right?

24  **A.**   That's correct.

25  **Q.**   Prior to 2005, you were unaware of any of the HUD

DAILY COPY TRANSCRIPT

1  standards?

2  A    That's correct.  I knew there was end materials that they

3  met HUD standards.

4  Q    With respect to the HUD regulations as they relate to

5  formaldehyde content for manufactured housing, you were not

6  aware of those regulations in 2005.  That's true, isn't it?

7  A    I was aware of the materials that are used within our

8  industry meet HUD standards.  I am not --

9            MR. WATTS:  May I approach, Your Honor?

10            THE WITNESS:  I am not -- I'm not familiar with HUD

11  itself, that's correct.

12            THE COURT:  All right.  Did you need to approach?

13            MR. WATTS:  Not anymore.

14  BY MR. WATTS:

15  Q.   Just so that we're clear:  In 2005, when you manufactured

16  Ms. Castanel's travel trailer, you were not aware that HUD

17  regulations provided for X or Y or Z; right?

18  A.   That provided what?

19  Q.   You didn't know what they required; right?

20  A.   I knew that the HUD materials that was used was

21  low-emissions formaldehyde.

22  Q.   Okay.  So the HUD materials that were used were low

23  formaldehyde-emitting materials?

24  A.   That's correct.

25  Q.   Now, you first found out about this formaldehyde issue

DAILY COPY TRANSCRIPT

1   with respect to travel trailers when you got sued; right?

2   **A.**   Basically, yes.

3   **Q.**   You did not know anything about the HUD regulations in

4   terms of what they required until you got sued?

5   **A.**   What I knew about the HUD regulations is the material

6   listings that they have meet -- any materials that I used is

7   standard in the industry meets HUD regulations.

8   **Q.**   All right.  And we're going to visit about that, so let's

9   go to that.  But before we get to the materials:  Rec by Design

10  did no tests on its own products to determine the amount of

11  formaldehyde emissions coming from these travel trailers; true?

12  **A.**   No.  Because we use industry-standard materials that was

13  at minimum levels.

14  **Q**   We're going to get to the industry standard in a minute,

15  but my direct question is:  Did you do any testing?

16  **A.**   Formaldehyde testing --

17  **Q.**   Yes, sir.

18  **A.**   -- or systems testing?

19  **Q.**   Formaldehyde testing.

20  **A.**   No, I did not.

21  **Q.**   All right.  Did you ever discuss with anybody at Morgan,

22  the level of formaldehyde that was being emitted from your

23  product?

24  **A.**   No, I did not.  We didn't have a problem.

25  **Q.**   Did you ever give Morgan any information that was provided

DAILY COPY TRANSCRIPT

1  to you with the MSDSs?

2  **A.**   No, I did not.

3  **Q.**   Okay.  Did you ever talk to Morgan with respect to what

4  the MSDS says in terms of it causes respiratory problems?

5  **A.**   No, I did not.

6  **Q.**   Did you ever tell Morgan that the MSDS that you received

7  say it was a Class 1 carcinogen?

8  **A.**   No, because I believed it was at a low level.

9  **Q.**   Now, in addition to not talking to Morgan about

10  formaldehyde, you never had any contact with anybody at FEMA;

11  true?

12  **A.**   That's correct.  The only contact that we would have is

13  when we would get feedback from a driver that delivered a unit

14  to the yard that the people requested our units in particular.

15  **Q.**   All right.  But in terms of communication, it was all with

16  Morgan; right?

17  **A.**   Correct.

18  **Q.**   There was no specifications that FEMA gave you that they

19  wanted these to meet; right?

20  **A.**   That's correct.

21  **Q.**   All right.  You never discussed the formaldehyde issue

22  with anybody with the federal government, including FEMA;

23  right?

24  **A.**   At that time, no.

25  **Q.**   Rec by Design provided the federal government with no

DAILY COPY TRANSCRIPT

1   information with respect to the hazards of formaldehyde that it

2   had received from its own suppliers in the MSDSs; true?

3   **A.**    Correct.

4   **Q.**    FEMA gave you no specifications with respect to what kind

5   of wood you had to use; true?

6   **A.**    I did not see the FEMA specifications.

7   **Q.**    All right.  But my question is:  In terms of what you were

8   given, FEMA gave you no specifications that were reasonably

9   precise that said anything about how you had to do this

10  trailer; true?

11  **A.**    I had no specs from FEMA, that's correct.

12  **Q.**    In addition to no specs from FEMA, you got no reasonably

13  precise specifications from FEMA in terms of how they wanted

14  these built; right?

15  **A.**    Well, I dealt with Morgan Buildings and Spas, not FEMA.

16  **Q.**    All right.  The federal government, or FEMA, was not

17  involved in any of the design decisions that were made; right?

18  **A.**    That's correct.  Morgan and Spa and myself were.

19  **Q.**    You received no correspondence by way of an e-mail or a

20  letter from anybody at FEMA with respect to this order; true?

21  **A.**    That's correct.

22  **Q.**    Now, you I want to hand you what has been previously

23  marked as Plaintiff's Exhibit 279.  Let me just put it up on

24  the screen and visit with you about specifications.  This was

25  Exhibit 4 to your deposition.

DAILY COPY TRANSCRIPT

1          These were the specifications that you prepared on
2   Rec by Design letterhead by virtue of an oral telephone
3   conversation that you had with somebody at Morgan; is that
4   right?
5   **A.**    Yes.  Guy Morgan and Jim Schilligo, we sat down through
6   the phone conversations and went through what they were trying
7   to tell me that -- what the specs they needed.  That's correct.
8   **Q.**    The specifications, we could go through them one by one,
9   but we've already done that in your deposition.  There are no
10  specifications with respect to what kind of wood to use; true?
11  **A.**    That's correct.
12  **Q.**    There are no specifications with respect to what the
13  maximum level of formaldehyde emissions should be; true?
14  **A.**    That's correct.
15  **Q.**    There are no specifications that deal with wood type or
16  formaldehyde in any way, shape, form, or fashion; right?
17  **A.**    No.  So, I mean, we were using industry-standard material.
18  **Q.**    There is nothing in this specification that says use
19  industry-standard material; right?
20  **A.**    That's correct.
21  **Q.**    All right.  Now, with respect to a document that was
22  marked as Exhibit 5 to your deposition --
23          **MR. WATTS:**  It's Defense Exhibit 498.  If you could
24  put that up and just highlight the top here.  No, the very top,
25  so we get the title, please.  There we go.  Thank you.

DAILY COPY TRANSCRIPT

1   BY MR. WATTS:

2   **Q.**   Now, this says, "FEMA Model Travel Trailer Procurement

3   Specifications," dated August the 12th of 2004, and it's got a

4   specification number of HSFE04-04-Q-8000.  Is that right?

5   **A.**   Yes, it is.

6   **Q.**   You were asked about this exhibit in your deposition; is

7   that right?

8   **A.**   Yes, I believe so.

9   **Q.**   Your trailers do not comply with these specifications;

10  true?

11  **A.**   No.  Our unit is a different type.

12  **Q.**   So they do not comply with these specifications; right?

13  **A.**   That's correct.

14  **Q.**   All right.

15  **A.**   I have never seen these specifications here, so...

16  **Q.**   That was going to be my next question.  There were no

17  specifications with respect to anything that FEMA provided you

18  that you ever saw; right?

19  **A.**   No.  I dealt with Morgan.

20  **Q.**   All right.  Now, I hope to get back to this *industry*

21  *standard* issue for a second.  I think you told me --

22          **MR. WATTS:**  May I approach, Your Honor?

23          **THE COURT:**  Yes.

24  BY MR. WATTS:

25  **Q.**   I think you told me that the industry standard was low

DAILY COPY TRANSCRIPT

1  formaldehyde-emitting wood products; correct?

2  **A.**   That's correct.  At a certain level.

3  **Q.**   Now, you were asked about low formaldehyde-emitting wood

4  products extensively in your deposition; fair?

5  **A.**   That's correct.

6  **Q.**   You were unable to tell the lawyer asking you questions

7  whether the products that you used were low

8  formaldehyde-emitting materials or not; right?

9  **A.**   They were industry-standard materials that met HUD

10  regulations.

11  **Q.**   I tell you what, why don't we go to page 89, line 18.

12          **THE COURT:**  Which lines do you want, 18 through what?

13          **MR. WATTS:**  Through 22.

14          **THE COURT:**  Okay.

15          **MR. WATTS:**  May I approach, Your Honor?

16          **THE COURT:**  Well, let's let him go ahead and read

17  that.

18          **THE WITNESS:**  What page are you talking about?

19          **MR. WATTS:**  Page 89, lines 18 through 22.

20          **THE COURT:**  Let's let him take a look at those.

21          **MR. WATTS:**  Sure.

22          **THE WITNESS:**  Okay.  Page 89.  What was it?

23          **THE COURT:**  18 through 22.

24          **MR. WATTS:**  Through 21, actually.

25          **THE WITNESS:**  "None of the products identified there

DAILY COPY TRANSCRIPT

1   was low-emitting- or zero-emitting formaldehyde wood products,

2   are they?"

3              "I'm not sure."

4         **MR. WATTS:**  Now may I approach?

5         **THE COURT:**  Let's go ahead and -- do you have a

6   question for him or what?

7         **MR. WATTS:**  I do.  He was being shown a document.  I

8   want to show it to him.

9         **THE COURT:**  Okay.

10  BY MR. WATTS:

11  Q.   At the time you were asked that question, you were shown

12  page 25 of Exhibit 2 to your deposition, and this had a list of

13  all of the supplies of wood products that you put into these

14  travel trailers; right?

15  A.   This is a list here for cycle counting, and it has the

16  vendor and the material they bought from the vendor, that's

17  correct.

18  Q.   All right.  Thank you.

19       Now, when asked about this list of suppliers and the

20  materials that you bought from the vendor, there was no way for

21  you at the deposition to tell us whether this was low

22  formaldehyde-emitting or regular formaldehyde-emitting or not;

23  right?

24  A.   Well, the industry has a standard that they do have set by

25  the government -- I believe it's back in 1985 -- for a

DAILY COPY TRANSCRIPT

1  particular level of formaldehyde that is to be put in the

2  product that would be safe, and that is what I used.

3  Q.   My question is:  When you were asked that question at your

4  deposition, you said, "I can't be sure one way or the other";

5  right?

6  A.   I said I use industry-standard materials.

7  Q    You said, "I'm not for sure whether it was low

8  formaldehyde or not"; right?

9  A.   I'd like to see what the question was above it.

10  Q.   Sure.

11          "QUESTION:  None of the lumber products identified

12  there are low" --

13          THE COURT:  Wait, wait.  Let him take a look at it.

14          MR. WATTS:  Okay.  I'm sorry.

15          THE WITNESS:  It says, "Identified that are

16  low-emitting."

17  BY MR. WATTS:

18  Q    Okay.  Just to give the jury --

19  A    On these sheets, they're not identified, that's correct.

20  Q.   Now, in terms of the discussion that was had with you, if

21  you could go to page 90, you didn't recall that there were low

22  formaldehyde-emitting products available in 2005.  Isn't that

23  what you told us in your deposition at page 90, lines 8 through

24  10?

25  A.   No, I can't honestly say that.  I didn't recall that there

DAILY COPY TRANSCRIPT

1   was low formaldehyde-emitting products, no.

2   Q.   Okay.  You were asked again at Page 94, lines 11 through

3   13.  Here's my question to you:  When asked were you aware that

4   low-emitting formaldehyde wood products were available in 2005,

5   what was your answer?

6   A.   I believe I did not know that there was lower than what

7   was standard is what I was referring to.  I'm referring to the

8   standard industry's formaldehyde level.  The questions directed

9   that is there lower formaldehyde products out there.

10  Q.   "Were you aware that low-emitting formaldehyde wood

11  products were available in 2005?"  What was your answer at

12  page 94, line 13?

13  A.   "I did not realize there was that low of a product out

14  there."

15  Q.   Okay.  You also did not realize that, in 2005, there were

16  wall panels that emitted no formaldehyde that were available in

17  2005; true?

18  A.   I was not aware of that, correct.

19  Q.   You did not have a policy during the time that this travel

20  trailer was being built to use only low-emitting formaldehyde

21  wood products in your travel trailers.

22  A.   We used industry-standard materials that was available.

23  Q.   You didn't have a policy requiring low

24  formaldehyde-emitting wood products?

25  A.   Just industry standards, that's correct.

DAILY COPY TRANSCRIPT

1  **Q.**   Now, with respect to what you told this jury today, in

2  your deposition, you took the position that the industry now,

3  in 2010, has a standard requiring low formaldehyde-emitting

4  wood products.

5  **A.**   Lower form -- lower formaldehyde products, that's correct.

6  **Q.**   You told us that the standard today is a low formaldehyde

7  product; right?

8  **A.**   I believe so.

9  **Q.**   As far as you know, there was nothing preventing your

10  industry from using that product in 2005?

11  **A.**   I did not know the availability of that product.

12  **Q.**   But you now know that it was available, it was being

13  marketed, and it was being sold to manufacturers of travel

14  trailers just like you?

15  **A.**   No, I didn't know that.

16  **Q.**   You now know that?

17  **A.**   I now know that.

18  **Q.**   All right.  Now, we had a little bit of a discussion about

19  formaldehyde levels when a product is new versus four years

20  later with the formaldehyde being off-gassed, and you're not an

21  expert in that field; is that right?

22  **A.**   In formaldehyde, no.

23  **Q.**   But, generally, as an expert in the industry, with your

24  engineering expertise that you've touted your company as

25  having, you understand that formaldehyde emissions are highest

DAILY COPY TRANSCRIPT

1   when the product is newer, as opposed to lower when its older;

2   right?

3   A.   That's possible.

4   Q.   All right.  For example, you were in the courtroom when

5   your lawyer gave his opening statement; right?

6   A.   Correct.

7   Q.   And you remember the .050 parts per million that was

8   tested in January of 2010?

9   A.   Correct.

10  Q.   That would be four years and a month after this product

11  was manufactured; right?

12  A.   Okay.

13  Q.   Do you have any documentation or any knowledge that you

14  can share with us in terms of what the formaldehyde emission

15  curve is in terms of using up all the available formaldehyde?

16  A.   No, I don't.

17  Q.   Okay.  Would you agree with me conceptually that, if there

18  is .050 parts per million four years and a month after

19  something is manufactured, earlier on it's going to have a

20  higher level of formaldehyde?

21  A.   I wouldn't necessarily agree with that, no.

22  Q    Okay.

23  A    That's your assumption.

24  Q.   Let's put aside the pure assumption, and we'll leave that

25  to experts that are coming on both sides.

DAILY COPY TRANSCRIPT

1    **A.**   Okay.

2    **Q.**   But let's say for a hypothetical that, the minute it

3    leaves your yard, it's emitting formaldehyde at the level of

4    .050 parts per million.  Are you with me?

5    **A.**   Okay.

6    **Q.**   Now, the truth of the matter is, is that you, as an expert

7    in this area of travel trailers, know how to build a travel

8    trailer that will be three times lower than that; true?

9    **A.**   I don't understand the question.

10           **THE COURT:**  I don't think I do either.

11           **MR. WATTS:**  Let me try again.

12           **THE COURT:**  Rephrase it.

13   BY MR. WATTS:

14   **Q.**   You know how to build a travel trailer that will emit

15   formaldehyde below .015 parts per million?

16           **MR. MULCAHY:**  Objection, Your Honor.  I think he

17   might be getting into an area involved with a motion in limine.

18           **MR. WATTS:**  May we approach?

19           (WHEREUPON, the following proceedings were held at

20   the bench.)

21           **THE COURT:**  Let me let -- Randy, make your objection.

22           **MR. MULCAHY:**  The objection is that I think he might

23   be going into an area that was filed under the motion in limine

24   regarding newer standards in product manufacturing.

25           **MR. WATTS:**  Here is what I'm doing.  I'm going to get

DAILY COPY TRANSCRIPT

1   into industries, and I'm not going to get into the standard

2   being .015.  What I'm going to get into is that he knows how to

3   manufacture a product that will emit below .015.  End of issue.

4          **THE COURT:**  That's what I understood the question to

5   be.

6          **MR. WATTS:**  I know you're worried about where I'm

7   going.

8          **THE COURT:**  We're talking about the time he built

9   this one.

10         **MR. WATTS:**  He gives me that too.

11         **THE COURT:**  Are we clear on that, though?  That's

12  what we're asking about?

13         **MR. WATTS:**  I'll get there as well.

14         **THE COURT:**  But let me make sure that we're clear.

15  We're asking him that, at the time that he built this one, he

16  could have built one with a lower emission?

17         **MR. WATTS:**  Yes.

18         **THE COURT:**  Okay.  I think that's relevant, and I

19  think that he can answer that.

20                How much longer do you have with this witness?

21         **MR. WATTS:**  Can I walk back and give you an estimate?

22         **THE COURT:**  Sure.

23         **MR. WATTS:**  We're flying through this outline.

24         **THE COURT:**  That's okay.  Let's go ahead and proceed.

25                (WHEREUPON, the following proceedings were held in

DAILY COPY TRANSCRIPT

1  open court.)

2  **BY MR. WATTS:**

3  **Q.**   Sir, you, in 2005, had the technological capability to

4  deliver a travel trailer that emitted less than .015 parts per

5  million; that's true?

6  **A**   That's your assumption.

7  **Q.**   Well, in terms of driving down the level of formaldehyde

8  that's being emitted from products, one way to do it is to

9  utilize no formaldehyde-emitting woods.  Do you agree?

10  **A.**   That's your assumption that you're driving it down.

11  **Q.**   Okay.  Well, you use no formaldehyde-emitting woods;

12  right?

13  **A.**   And what would that be if you --

14  **Q.**   Well, do you use them or not?

15  **A.**   Well, I'm asking you.  You asked me do I know.

16          **THE COURT:**  Well, wait, wait.  First of all -- let's

17  back up a little bit.  First of all, let's concentrate on his

18  questions.  If you don't understand the question, then that's

19  fair enough.

20          **THE WITNESS:**  Okay.  That's fair.

21          **THE COURT:**  I want to make sure that I understand the

22  question, too, before you --

23          **THE WITNESS:**  Would you start over, please.

24          **THE COURT:**  Before you take a swing at it, let me

25  make sure that I understand it, and that way maybe -- we've got

DAILY COPY TRANSCRIPT

1  to ask questions that the jury understands, that I understand,
2  and then we'll get you to answer.  So let's back up a little
3  bit.
4           First of all, we're talking about at the time
5  that the trailer at issue in this case was manufactured.
6           MR. WATTS:  Yes, sir.
7           THE COURT:  We're not talking about today.  We're not
8  talking about last year.  We're talking about at the time that
9  this unit was manufactured.
10          MR. WATTS:  Yes, sir.
11 BY MR. WATTS:
12 Q   Let me rephrase the question.
13 A   Okay.
14 Q   I had a judge tell me I ask questions as bad as my haircut
15 once.  Let me just try again.
16          In terms of directionally, the methods that you knew
17 in 2005 about how to drive down formaldehyde emission levels,
18 number one and primarily is the choice of the woods that are
19 put in the travel trailer; true?
20 A.  That's a possibility.
21 Q.  In other words, if you don't supply a product that has
22 formaldehyde in it, you lower the formaldehyde rate; right?
23 A.  Well, I believe every product has formaldehyde in it.
24 Q   Well --
25 A   Are you talking about a particular level of formaldehyde

DAILY COPY TRANSCRIPT

1    that could possibly -- you could buy a product that would be

2    lower or more?

3    Q.   Start with that.

4    A    Well, there's --

5    Q    You could buy a product that has lower formaldehyde, you

6    knew that you could do that, in 2005?

7    A.   Yes, I heard it was out there.

8    Q.   The second thing that you can do is to supply travel

9    trailers with forced ventilation systems.  That will drive down

10   the formaldehyde emission levels as well; is that true?

11   A.   If the unit was developed with that, yes.

12   Q.   Okay.  Forced ventilation systems existed in 2005?

13   A.   Such as an exhaust fan?

14   Q.   You tell me.  You're the expert.

15   A.   Well, that's -- yes.

16   Q.   Now, in terms of forced ventilation systems, this travel

17   trailer did not have such a system as we have defined it?

18   A.   The travel trailer did have a ventilation system in it,

19   that's correct.

20   Q.   It did not have a forced ventilation system, as that

21   industry term is used?

22   A.   It had a power range hood that is a forced ventilation

23   system.  It did have one.

24   Q.   So in terms of bringing down the formaldehyde level, in

25   terms of what Rec by Design can do, it's really material

DAILY COPY TRANSCRIPT

1  selection; true?

2  **A.**   That's your assumption, yes.

3  **Q.**   Well, I don't want it to be my assumption.  What else

4  could you have done to drive down the formaldehyde level in

5  2005 besides change the woods you put in it?

6  **A.**   I used industry-standard materials.

7  **Q**   I didn't ask you that.

8  **A.**   That's -- well, that's what I'm telling you.  That's what

9  I used to build my products.

10  **Q**   What could you have done to lower the formaldehyde being

11  emitted from your products?

12          **MR. MULCAHY:**  Objection, Your Honor.  He's calling

13  for speculation back in 2005 on what could or would or should

14  have done --

15          **MR. WATTS:**  I think that's kind of what the case is

16  about.

17          **THE COURT:**  I think we're kind of chasing our tail

18  here.  I'm going to let you try to rephrase the question and

19  see if we can't move on from this.

20          **MR. WATTS:**  Sure.

21          **THE COURT:**  But I think we're kind of getting a

22  repetitive question and a repetitive answer, all of which we

23  have already heard.  So let's see if we can rephrase the

24  question, get the information we want, and then move on.

25

DAILY COPY TRANSCRIPT

1  BY MR. WATTS:

2  Q.   This was a unique design.  You've told us that.

3  A.   A design for Morgan, that's correct.

4  Q.   You made the choices to which wood products to use; right?

5  A.   Yes.  I used the wood products that I was using prior to

6  Katrina and after Katrina, that's correct.

7  Q.   And you made the choice from whom to buy the wood products

8  and whether it was low formaldehyde-emitting or not.

9  A    I bought the same products from the same vendors that I

10  did prior to Katrina as far as after Katrina, and I used the

11  same materials.

12  Q    Now, you said you bought the same products from the same

13  vendors that you had been buying from since 1999; right?

14  A    The date could be different, yes.

15  Q.   Now, on your custom-built trailers, they go to

16  dealerships; right?

17  A    Individuals, dealerships.

18  Q.   The door is opened up so that people can come in and look;

19  right?

20  A.   During production?

21  Q.   No.  While they're on the lot.

22  A.   That's correct.

23  Q.   They're aired out; right?

24  A.   That's your assumption.

25  Q.   They are not sealed for months on end before somebody

DAILY COPY TRANSCRIPT

1  moves in; right?

2  **A.**   There's a possibility it could be at the back of a

3  dealer's lot or somebody's not using it for a long period of

4  time.

5  **Q.**   It's not the policy to seal the travel trailers that you

6  had sold before; right?

7  **A.**   It's a policy to lock the door on them to keep them locked

8  up.

9  **Q.**   But in terms of sealing them -- do you know what the

10  difference between shutting the door and sealing a travel

11  trailer is?

12  **A.**   What would that be?

13  **Q.**   That's what I'm asking.  Do you know?

14  **A.**   No.

15  **Q.**   Okay.  Now, the owner's manual --

16          **MR. WATTS:**  May I approach, Your Honor?

17          **THE COURT:**  Yes.

18  **BY MR. WATTS:**

19  **Q.**   This owner's manual is 67, 68 pages long?

20  **A.**   Yes, that's correct.

21  **Q.**   Who designed the owner's manual at Rec by Design?

22  **A.**   What was the question?

23  **Q**   Who designed the content of the owner's manual at Rec by

24  Design?

25  **A.**   Usually, one of the people in the department of the CAD

DAILY COPY TRANSCRIPT

1    drawing, the engineer there, the layout person, and myself.

2    **Q.**    Okay.  This layout person in the CAD department, did that

3    person have any background in terms of safety systems

4    engineering or warnings information?

5    **A.**    No.  Just what the vendors had supplied us with is what we

6    used.

7    **Q.**    Now, counsel said that you didn't put a warning into the

8    owner's manual with respect to formaldehyde because -- and I

9    want to stop there.  You didn't put a warning with respect to

10   formaldehyde in this owner's manual at all; right?

11   **A.**    That's correct.

12   **Q.**    All right.  At the time that you made the decision not to

13   put the warning with respect to formaldehyde in the owner's

14   manual at all, we can be sure that you had been getting the

15   MSDSs with the warnings that we put before the jury for at

16   least six years; right?

17   **A.**    That's correct, yes.

18   **Q.**    All right.

19           **MR. WATTS:**  Mr. Rush, those are all my questions.

20   Thank you, sir.

21           **THE COURT:**  Thank you.

22               Mr. Mulcahy?

23           **MR. MULCAHY:**  Your Honor, we're not going to ask any

24   questions at this time.  We're going to be calling him in our

25   case in chief.

DAILY COPY TRANSCRIPT

1        **THE COURT:**  All right.  Fair enough.  The defendant

2   has reserved the right to recall Mr. Rush as part of their case

3   in chief.  You can step down, sir.  Thank you.

4        **THE WITNESS:**  Thank you.

5        **THE COURT:**  Next witness.

6        **MR. WATTS:**  Michael Gaume, G-A-U-M-E.  With the

7   possibility that I'm mispronouncing it, I apologize, Judge.

8        **THE COURT:**  Well, I think I've pronounced it

9   differently, and you may be right and I may be wrong.  We're

10  going to find out here.

11       **MR. WATTS:**  One of us is about to find in about three

12  seconds.

13       **THE COURT:**  I understand --

14       **MR. WATTS:**  This is 35 minutes long, sir.

15       **THE COURT:**  Thirty-five minutes long on a deposition.

16            Okay.  For all witnesses who testify by way of a

17  deposition, you are to treat them no differently than if they

18  were to come here and testify live.  On occasions when they did

19  testify, they were given the oath just as we do here in court.

20  All counsel were present for the deposition, and the testimony

21  that you're seeing here today is by the designation of the

22  respective attorneys.

23            So let's go ahead and hear what Mr. Gaume -- I

24  think that's how I pronounced him during the jury selection

25  process.  Let's hear his testimony.

DAILY COPY TRANSCRIPT

1    (WHEREUPON, the videotaped deposition of **Michael**

2    **Gaume** was played.)

3    Q.    Would you be kind enough to state your name for the

4    record, again.

5    A.    Michael Gaume.

6    Q.    And what is your current address?

7    A.    71288 Indiana Lake Drive, Union, Michigan.

8    Q.    What is your educational background, Mr. Gaume?

9    A.    I graduated from high school.

10   Q.    After high school, did you continue with any type of

11   formal education?

12   A.    Huh-uh, no.

13   Q.    Have you taken any continuing education courses?

14   A.    No.

15   Q.    What did you do upon graduation?  Did you go into the

16   service or did you --

17   A.    I worked for my father.

18   Q.    What type of business was your father in?

19   A.    He owned a company called Parkwood Homes.

20   Q.    And what type of business was that?

21   A.    Mobile home.

22   Q.    Okay.  Is Parkwood Homes still in existence?

23   A.    No, it's not.

24   Q.    Okay.  How long did you work for Parkwood Homes?

25   A.    Felt like all my life, but -- until I branched out on my

DAILY COPY TRANSCRIPT

1   own.

2   **Q.**   And what year would that have been?

3   **A.**   I went into business in 1994.

4   **Q.**   So is it fair to say, from '68 to '94, you worked for

5   Parkwood?

6   **A.**   Off and on, yes.

7   **Q.**   During the off times that you did not work for Parkwood,

8   who did you work for?

9   **A.**   I don't think I worked at all.  I was in the service, that

10  kind of thing.

11  **Q.**   Okay.  What was your job title when you left Parkwood?

12  **A.**   When you work for your father, I don't think you have a

13  job title.  I think you get all the grungy jobs in the world

14  there for a while.

15          At 14, I was painting frames.  He started me from the

16  bottom of the business, and I worked my way up.

17  **Q.**   Okay.  Well, what was it that you were doing when you last

18  worked for him?

19  **A.**   I was working in the plant.

20  **Q.**   And when you say "mobile homes," were there any particular

21  type of mobile homes that were being built by Parkwood at the

22  time in '94?

23  **A.**   It's a HUD-built house.

24  **Q.**   Did Parkwood build anything other than mobile homes?

25  **A.**   No.

DAILY COPY TRANSCRIPT

1  **Q.**   Do you remember what the production would have been in
2  '93 or '94, the number of homes?
3  **A**    You know, I really don't -- he only had five plants.  He
4  had a plant in Pennsylvania and Lufkin, Texas.  He had five --
5  three plants in Elkhart.  He was the one of the founders in the
6  mobile home business.
7  **Q**    Now, in 1994, you branched out on your own?
8  **A**    Uh-huh.
9  **Q**    And tell me what you did at that point.
10 **A**    I had four other partners.  We started our own mobile home
11 company.
12 **Q**    And the name was?
13 **A**    I just drew a blank.  I drew a blank.  God, I was the
14 president of it for years.  We were the 13th largest business
15 in the United States.
16 **Q**    13th largest --
17 **A**    Four Seasons Housing, I'm sorry.  My mind slipped.
18 **Q**    Now, was Four Seasons Housing solely a mobile home
19 manufacturer?
20 **A**    We were a HUD manufacturer, yes, sir.
21 **Q**    And how long was that company in existence, or is it still
22 in existence --
23 **A**    No, it's not anymore.  I retired in 2000 out of there.
24 **Q**    So between '94 and 2000, you were running that company?
25 **A**    I started out as the production man there.  We grew quite

DAILY COPY TRANSCRIPT

1  fast.  Then the last few years, they made me president.  And I
2  think the company went out of business a year ago.
3  Q    Okay.  Well, when you say you were president the last few
4  years, would that have been, like, '98, '99, 2000, pretty much?
5  A    Correct.
6  Q    Now, after that, did you ever return to some type of
7  employment?
8  A    I was on a five-year non-compete.
9  Q    Five-year non-compete.  So that means that, between 2000
10 and 2005, you could not be involved with the manufactured
11 housing industry; is that a fair statement or --
12 A    No.  I couldn't build a birdhouse.
13 Q    Okay.  Now, when did that expire?
14 A    Two-thousand -- I can't remember the month.  It was in --
15 it was just -- it -- early of 2005.
16 Q    Okay.  And at that point, did you decide to go back into
17 some sort of business?
18 A    I decided to start a little company, which we have now.
19 It's called Backroads Consulting.  And the overhead and
20 everything it takes to run a business on my back, so I became a
21 consultant for the mobile home business.
22 Q    Now, you say that you became a consultant to the
23 manufactured housing industry?
24 A    Correct.
25 Q    And also to the RV industry?

DAILY COPY TRANSCRIPT

1   **A**    Correct.

2   **Q**    Prior to 2005, had you ever worked for an RV manufacturer?

3   **A**    No, I had not.

4   **Q**    Okay.  But you held out -- held yourself out as a

5   consultant both in connection with manufactured housing and

6   RVs?

7   **A**    Correct.

8   **Q**    And if I wanted to, for instance, hire you in 2005, did

9   you have a brochure or any type of documentation that you could

10  furnish me with as to what your expertise or what you could

11  offer to me if I wanted to hire you?

12  **A**    I've been in the business all my life.  Everybody knew me.

13  Everybody affiliated with the business knows me.  I mean, they

14  know who I am and what I can do.

15  **Q**    Well, what can you do?  I'm trying to figure out --

16  **A**    I can go into your plant and straighten it up and get

17  your -- get your bottom line a lot better than what it was.

18  **Q**    You mean from a profit point of view?

19  **A**    Correct.

20  **Q.**   Would you be retained on a per-job basis, or would you go

21  into a plant and then not be able to devote any time to other

22  companies; or how exactly was the arrangement that you had --

23  **A.**   Yes.  Usually, when I go into a plant like that, I work on

24  a percentage.  And it goes 'till I'm done.  And I don't involve

25  myself with anything else.  That was it.

DAILY COPY TRANSCRIPT

1      And then Randy came to me, and I got involved with

2   Randy.

3   Q.   When you say "Randy," for the record, are you referring

4   to --

5   A.   Mr. Rush.

6   Q.   -- Randy Bush -- I mean, Randy Rush?

7   A.   Randy Rush, yes, sir.

8   Q.   And Randy Rush was affiliated and the owner of Recreation

9   By Design; is that correct?

10  A.   Correct.

11  Q.   And -- and what was the reason he came to you?

12  A.   He wanted me to help him build some FEMA houses.

13  Q.   So you would have been retained or hired by Randy Rush or

14  Recreation By Design sometime after August --

15  A.   It was --

16  Q.   -- 29?

17  A.   -- after Katrina, yes, sir.

18  Q.   Okay.  And you do recall that?

19  A.   Yes, I do.

20  Q.   Okay.  And tell me what it was that he asked you to do.

21  A    To run a plant for him.

22  Q.   Do you remember what percentage you charged him for that

23  arrangement?

24  A.   Yes.  It was 10 percent.

25  Q.   What was your understanding of what you were to be doing

DAILY COPY TRANSCRIPT

1  in connection with the running of that plant?

2  A.   Hiring people and making sure the product was built.

3  Q.   Now, we have previously heard about a Recreation By Design

4  plant that has been identified as plant No. 2.  Is that the

5  plant that you would have worked out of?

6  A.   Correct.

7  Q.   Do you know what your job title was, or did you have a job

8  title?

9  A.   I guess I was classified as plant manager.

10  Q.   And who did you answer to?

11  A.   To Randy Rush.

12  Q.   Did you answer to anyone else with Recreation By Design?

13  A.   No.

14  Q.   Did you actually get the plant up and running, or was it

15  already running?

16  A.   No.  It was a brand-new plant.

17  Q.   How long did it take you to get on line?

18  A.   Two weeks.

19  Q.   Did you become aware of how many travel trailers were to

20  be built out of that plant?

21  A.   I think Randy Rush gave me 700 or something like that

22  number, 714.  I -- it's been a long time.  I can't -- I'd have

23  to go back and look.

24  Q.   Do you have -- well, let me start -- I'm going to ask you

25  some questions, Mr. Gaume, about some -- some background in

DAILY COPY TRANSCRIPT

1   light of some issues that may come up in connection with your

2   testimony.

3          You are not and have never held yourself out to be a

4   structural engineer; is that correct?

5   **A.**   Correct.

6   **Q.**   And you are not and never held yourself out as a designer;

7   is that correct?

8   **A**    That's correct.

9   **Q.**   You are not and have never held yourself out as an

10  immunologist; is that correct?

11  **A.**   Correct.

12  **Q.**   You have not and have never held yourself out as a

13  hygienist?

14  **A.**   Correct.

15  **Q.**   As an allergist?

16  **A.**   That's correct.

17  **Q.**   As a psychologist?

18  **A.**   That's correct.

19  **Q.**   As a quality control specialist?

20  **A.**   Correct.

21  **Q.**   As a safety expert?

22  **A.**   That's correct.

23  **Q.**   As a -- as an oncologist?

24  **A.**   Correct.

25  **Q.**   And you do not have any expertise when it comes to

DAILY COPY TRANSCRIPT

1    formaldehyde; is that correct?

2    **A.**    Correct.

3    **Q.**    And you do not and have never held yourself out as an

4    expert in that area?

5    **A.**    Correct.

6    **Q.**    You do not and have not ever held yourself out as an

7    expert in HUD regulations; correct?

8    **A.**    Correct.

9    **Q.**    I'm going to show you a document that has previously been

10   produced and identified in connection with this case that has

11   the Bates numbers RBD05189 through RBD05250 and ask if you'd be

12   kind enough to look at it and -- so I can ask you some

13   questions, please.

14   **A.**    Okay.

15   **Q.**    Thank you.

16   **A.**    Okay.

17   **Q.**    Are you familiar with that document?

18   **A.**    Never seen it before.

19   **Q.**    I take it, then, that when you went to run plant No. 2 --

20   **A.**    Uh-huh.

21   **Q.**    -- at Recreation By Design, that no one at Recreation By

22   Design furnished you with an owner's manual; is that correct?

23   **A.**    That's correct.

24   **Q.**    Did you ever ask Mr. Rush or anyone else connected with

25   Recreation By Design to furnish you with an owner's manual?

DAILY COPY TRANSCRIPT

1  **A.**   No.

2  **Q.**   Did you ever indicate to anyone that an owner's manual is

3  something that you wanted to put together as a service to the

4  customers?

5  **A.**   No.

6  **Q.**   When you went to work for Recreation By Design as the

7  production manager at plant No. 2, did you have any interaction

8  with Morgan Buildings and Spas?

9  **A.**   No.

10  **Q.**   Did you ever hear of the name Morgan Buildings and Spas?

11  **A.**   Nope.

12  **Q.**   Did Mr. Rush ever tell you that the trailers were to be

13  sold to Morgan Buildings and Spas for the victims of Hurricane

14  Katrina?

15  **A.**   No.

16  **Q.**   Have you ever seen any owner's manuals for other

17  recreational vehicles?

18  **A.**   Not a recreational vehicle, no.

19  **Q.**   Now, when you were in the manufactured housing business,

20  you were familiar with owner's manuals for whatever product you

21  were selling; is that correct?

22  **A.**   Correct.

23  **Q.**   And did you have any input into those manuals?

24  **A.**   Yes, I did.

25  **Q.**   Did you ever or were you ever furnished with any documents

DAILY COPY TRANSCRIPT

1  by Mr. Rush or anyone else connected with Recreation By Design

2  pertaining to the particular travel trailers that plant No. 2

3  was to build?

4  **A.**   No.

5  **Q.**   Now, how did you at some point come to know exactly what

6  it was that was to be built at plant No. 2?

7  **A.**   Well, Randy and I would -- went out and built all the

8  templates.  He said, "This is how I want it built right here.

9  Okay?  Everyone is the same."  And that's what I built him.

10 **Q.**   Now, did Randy give you any documents that anyone had

11 provided to him, outside of Recreation --

12 **A.**   No.

13 **Q.**   -- by Design?

14 **A.**   No.

15 **Q.**   Did he give you any specs that might have been provided by

16 Morgan Buildings and Spas?

17 **A.**   No.

18 **Q.**   Did he give you any specs that might have been provided by

19 FEMA?

20 **A.**   No.

21 **Q.**   Did you ever hear him say, "These are FEMA specs, that we

22 must build these trailers to those specifications"?

23 **A.**   No.  Never -- never for Katrina trailers, no, sir.

24 **Q.**   Did you have an understanding as to what the travel

25 trailers were going to be used for?

224

DAILY COPY TRANSCRIPT

1   **A.**   Oh, yes.  I knew they were FEMA housing.

2   **Q.**   You knew they were FEMA housing?

3   **A.**   Correct.

4   **Q.**   And how did you come to know that?

5   **A.**   Well, Randy told me they were.

6   **Q.**   Had you ever built any FEMA housing before?

7   **A.**   No, sir.

8   **Q.**   You told us that Randy told -- came to you and said, "Here

9   are the specs, and this is how we're going to build these

10  trailers"; is that correct?

11  **A**   No.

12  **Q**   Okay.  Tell me --

13  **A**   He didn't give me any specs.

14  **Q.**   Okay.  Well, tell me how these trailers came --

15  **A.**   We went in -- we went in -- we went in, Recreation by

16  Design, we built jigs for the side walls; we built a jig for

17  the floor; we built jigs for the roof.  And that's how we built

18  the house, off of those jigs.

19  **Q**   And what exactly is a *jig* for the ladies and gentlemen of

20  the jury who may not be familiar with that term?

21  **A.**   A jig is an implement that -- say, you're building a side

22  wall.  It's a template that you build every one off of.  Kind

23  of like a mold.

24  **Q.**   Okay.  And that template, if you will, or that jig, is

25  made out of what?

DAILY COPY TRANSCRIPT

1  A.   Wood.

2  Q.   Do you know what type of wood was being used for those

3  jigs?

4  A.   Just standard wood that's used in the industry.

5  Q.   Okay.  When -- and I'm trying to understand exactly how

6  this occurred.  When these jigs were built, did Randy say, "I

7  want them built a certain width and a certain length," or how

8  did that come about --

9  A.   Randy laid everything out.  He had in his head how he

10 wanted these things built.

11 Q.   But it -- and -- and you were there when this was taking

12 place.  You helped --

13 A.   I helped him.

14 Q.   You helped him?

15 A.   Right.

16 Q   Okay.  So it's not as if he said, "Look, I got -- I have

17 these plans that were given to me by someone else.  I want you

18 to build to these plans"; correct?

19 A   I didn't see a plan, no, sir.

20 Q   Okay.  Now, prior to the building of these FEMA travel

21 trailers, had you ever built a travel trailer before?

22 A   No, sir.

23 Q   Did anyone ever tell you that the FEMA trailers were going

24 to be used as housing?

25 A   Yeah.  That was pretty much explanatory.

DAILY COPY TRANSCRIPT

1   Q    Okay.  My question was:  Did anyone ever tell you that

2   they were going to be used as housing?

3   A    Nobody ever came to me and said, "These are going to be

4   houses."

5   Q.   Did anyone ever mention the term *temporary housing* to you?

6   A.   No.

7   Q.   Do you have an understanding of what *temporary housing*

8   means?

9   A.   Correct.  Yes, I do.

10  Q.   Okay.  And what is your understanding of the term

11  *temporary housing*?

12  A.   *Temporary housing* would be something you would live in

13  frequently or use frequently, like a recreational vehicle.

14  Q.   And how do you describe *frequently*?

15  A.   On the weekends.

16  Q.   So, in other words, to go to a park or --

17  A.   You wouldn't go home every day to it.

18  Q.   It's not something that would have been designed to live

19  in for a number of years; correct?

20  A.   Correct.

21  Q.   I'm going to read a statement to you and ask you some

22  questions about it:  "Your recreational vehicle has been

23  designed for short-term camping and recreational use.  It was

24  not engineered to be used as a permanent dwelling."

25          Is that what you understand by *recreation vehicle*?

DAILY COPY TRANSCRIPT

1   A.   Yes.

2   Q.   And you agree with that statement?

3   A.   I agree with that statement.

4   Q.   Do you know what the "RVIA" stands for?

5   A.   Yes.  It's a building code.

6   Q.   But do you know what the acronym "RVIA" stands for?

7   A.   No, I don't.

8   Q.   Now, when is the first time that you ever heard the word

9   *formaldehyde*?

10  A.   I think in my early years when I had a business, it was

11  part of the content of the material we'd use for HUD housing,

12  through '94 to 2000.

13  Q.   And that would have been the first time that you ever

14  heard of the word *formaldehyde*?

15  A.   Yes.

16  Q    Now, when you say, "the content but not air," can you

17  clarify what you mean by that?

18  A    That's a standard by HUD.  When you buy supplies to build

19  a HUD house, you can't have over, I think it is, .3 parts per

20  billion in any material you use to build a HUD house.

21  Q    And you were aware of that as early as 1994?

22  A    Right.

23  Q.   And do you know why HUD had those requirements?

24  A.   No, I do not.

25  Q.   But you knew and understood that the materials that were

DAILY COPY TRANSCRIPT

1   to be utilized in connection with the structure that you were

2   building had to be HUD-compliant when it came to

3   formaldehyde --

4   A.   Yes.  It was --

5   Q.   -- formaldehyde content?

6   A.   It was in the code book.

7   Q.   Okay.  Now, when you went to work at Recreation By Design

8   to build the Katrina trailers, you were obviously aware of what

9   other codes said about formaldehyde; correct?

10  A.   It wasn't an issue.

11  Q.   Did you ever hear anyone say that they wanted the Katrina

12  trailers to be built with low formaldehyde-emitting products?

13  A.   No.

14  Q.   Have you ever heard the term "LFE"?

15  A.   No.

16  Q.   Do you know the difference in cost between low

17  formaldehyde-emitting and non low formaldehyde-emitting

18  products?

19  A.   No.

20  Q.   As the production manager at plant No. 2, did you at any

21  time while these travel trailers were being built, the Katrina

22  travel trailers, deal with any of the wood vendors?

23  A.   No.

24  Q.   Did you utilize wood or -- or plywood or any other

25  wood-aggregate components in building the Katrina trailers?

DAILY COPY TRANSCRIPT

1  A.   Yes.

2  Q.   Did you ever look at any of those items to determine

3  whether or not they had any type of a stamp on them?

4  A.   No.

5  Q.   Did you ever consult an MSDS in connection with the

6  materials that were being sent to you by the various suppliers?

7  A.   Randy handled all that.

8  Q.   Okay.  But you did not?

9  A.   I did not, no.

10 Q.   Do you know what an MSDS is?

11 A    Yes.

12 Q.   And what is that?

13 A.   It's the -- what is in the material, the --

14 Q.   And --

15 A.   -- makeup.

16 Q.   -- do you know the reason why MSDSs are issued with

17 certain types of materials?

18 A.   Yes.  It's for hazardous -- hazardous materials.

19 Q.   And when you were building your HUD-compliant homes, you

20 were aware of MSDSs and what they were talking about when it

21 came to hazardous materials; correct?

22 A.   Correct.

23 Q.   Do you know as we sit here today what the reading on any

24 of the component parts that were used on the Katrina trailers

25 would have been in connection with formaldehyde content?

DAILY COPY TRANSCRIPT

1  **A.**  No, I do not.

2  **Q.**  Did you ever ask, order, or instruct anyone to determine

3  what the levels of formaldehyde were in the component products

4  that were being utilized in connection with the construction of

5  Katrina trailers?

6  **A.**  No.

7  **Q**  Are you able to tell the jury what the content, the

8  formaldehyde content, would have been inside of Ms. Castanel's

9  trailer when it left the plant once it was built?

10  **A**  No.

11  **Q**  Can you tell the jury what the formaldehyde level would've

12  been on -- in any of the Recreation by Design trailers when

13  they left the plant?

14  **A**  No.

15  **Q**  Are you acquainted with a company by the name of BlueLinx?

16  **A**  Yes, I am.

17  **Q**  And what is BlueLinx, to your knowledge?

18  **A**  They were a supplier to us.

19  **Q**  And what type a supplier were they?

20  **A**  I really can't remember what we bought from them then,

21  what Randy bought from 'em.  I'm thinking it was plywood and

22  wood products.

23  **Q**  Do you know what the formaldehyde content of any plywood

24  or wood products would have been as it pertains to anything

25  that would have been supplied to you by BlueLinx?

DAILY COPY TRANSCRIPT

1   **A**    No.

2   **Q**    Do you know why wood manufacturers sell LFE wood?

3   **A**    No, I do not.

4   **Q**    Do you know whether or not competitors of Recreation by

5   Design used LFE wood for their component products when they

6   were building Katrina trailers?

7   **A**    No, I do not.

8   **Q**    So you cannot tell the jury, for instance, whether or not

9   other competitors in the industry were furnishing or utilizing

10  LFE products in their trailers that were being built for

11  Katrina victims?

12  **A**    No, sir.

13  **Q**    Now, going back to BlueLinx, are you aware that Recreation

14  by Design was purchasing and using BlueLinx's formaldehyde

15  bonded wood products in connection with the manufacturing of

16  their Katrina trailers?

17  **A**    I knew it was there, but, I mean, I wasn't -- I wasn't

18  aware that -- the formaldehyde content, no, sir.

19  **Q**    Okay.  But are -- my question is:  Are you aware that

20  Recreation by Design was purchasing and using BlueLinx's

21  formaldehyde bonded wood products in connection with the

22  manufacturing of the Katrina trailers?

23  **A**    I guess I have to say no to that because I didn't -- I

24  don't know where he was buying it at.

25  **Q**    Were you ever made aware that those products had been used

DAILY COPY TRANSCRIPT

1  by Recreation by Design since May of 2004?

2  **A**    No.

3  **Q.**   And assuming that Recreation By Design had been using

4  bonded wood products since May of 2004, that would predate your

5  going to work for them; is that correct?

6  **A.**   I guess it would, yes, sir.

7  **Q.**   At plant 2 for Recreation By Design, you knew that you

8  weren't making units for camping; you were making units that

9  were going to be eventually used for disaster or emergency

10  housing.  Is that right?

11  **A.**   I knew that they were built for Katrina, yes, sir.

12  **Q.**   And because of what you just said, am I correct that, in

13  connection with your work at Recreation By Design, you never

14  would have talked with FEMA about what materials were being

15  used in Recreation By Design units; is that right?

16  **A.**   Correct.

17  **Q.**   In '05 and '06 with Recreation By Design, you never would

18  have talked with FEMA about formaldehyde at all; right?

19  **A.**   No.

20  **Q.**   And you never would have talked with FEMA about any MSDS

21  sheets that Recreation By Design had or didn't have; right?

22  **A.**   Correct.

23  **Q.**   And it was Recreation By Design, either yourself or Randy

24  Rush, that was choosing what supplies to use in making these

25  units; is that right?

DAILY COPY TRANSCRIPT

1   A.   I had no control over supplies.

2   Q    But it was somebody at Recreation By Design making that

3   decision; is that right?

4   A.   Correct.

5   Q.   In connection with your work on these Katrina units, were

6   you ever aware of any kind of policy that these Recreation By

7   Design units had to be aired out before somebody could ever use

8   them?

9   A.   No, I was not.  I didn't know anything about it.

10  Q.   You didn't know anything -- to your knowledge, there was

11  no policy; is that right?

12  A.   No policy, wasn't, huh-uh.

13  Q.   Before one of these Katrina units that were built in

14  '05/'06 by Recreation By Design left your plants, plant No. 2,

15  would yourself or somebody have to say, "All right.  We've

16  looked at this unit.  It's good to go"?

17  A.   I looked at every one before it went out the door.

18  Q.   So before a unit would leave your plant No. 2, presumably

19  go off to whoever it was going to be used by for Katrina

20  relief, you'd be there saying, "This unit passes my

21  inspection"?

22  A.   Correct.

23  Q.   And if there was a problem with that unit, would you have

24  the authority to stop it and say, "We're not sending this one

25  out?"

DAILY COPY TRANSCRIPT

1    A.   That's correct.

2    Q.   All right.  I'm going to ask you a couple of questions

3    about the interior walls of these FEMA units.  Where two walls

4    came together and made a seam, how was that seam sealed?

5    A.   I don't believe it was sealed.

6    Q.   All right.  How were the wall -- the walls attached to the

7    trailer housing?

8    A.   With screws.

9    Q.   All right.  So it's safe to assume that that was not an

10   airtight seal; is that correct?

11   A.   I built to code.

12   Q.   I'm sorry.  What was the answer?

13   A.   I built to code.

14   Q.   Right.  And the codes didn't require you to put an

15   airtight seal on the beams inside of the walls; is that right?

16   A.   Correct.

17   Q.   Is it safe to say that you worked closely with Randy

18   during the production of these Katrina units?

19   A    Correct.

20   Q.   Did you build your units in accordance with industry

21   standards?

22   A.   Go ahead.  Correct.

23   Q.   Now, you were asked some questions regarding an owner's

24   manual that's sitting in front of you over there.  Who was it

25   at Recreation By Design that would have had knowledge and input

DAILY COPY TRANSCRIPT

1  into the owner's manual?

2  **A.**   Mr. Randy Rush.

3  **Q.**   The owner's manual is not something -- is the owner's

4  manual something you were asked to help prepare regarding these

5  Katrina units?

6  **A.**   No, sir.

7  **Q.**   Did you have any input as to length of time that the

8  residents that would wind up in these Katrina units would

9  remain in that housing?

10 **A.**   No, I did not.

11 **Q.**   You've been building, I guess, modular homes -- or not

12 modular homes -- HUD housing for many years; is that right?

13 **A.**   Pretty much the majority of my life, yes, sir.

14 **Q.**   And you've run other production -- and it's my

15 understanding that you've run other production lines in the

16 past?

17 **A.**   Yes.

18 **Q.**   Was it your role with Recreation By Design to run the

19 production line at plant 2?

20 **A.**   Yes, it was.

21 **Q.**   And is that what you did?

22 **A.**   That's what I did.

23 **Q.**   Did you ever receive any complaints by any of the workers

24 on your line regarding formaldehyde in those --

25 **A.**   No, I did not.

DAILY COPY TRANSCRIPT

1    **Q.**    -- units.

2              Were you proud of the product that you wound up

3    building for Recreation By Design?

4    **A.**    I'm proud of every product I build.

5    **Q.**    When you were asked a question earlier about the interior

6    walls, do you remember testifying that the seams were not

7    sealed?

8    **A.**    Correct.

9    **Q.**    Do you also remember testifying that you had looked at

10   every unit before it left the plant?

11   **A.**    Yes, sir.

12   **Q.**    Did you conduct -- strike that.

13             Did you do anything other than to look at every unit

14   before it left the plant?

15   **A.**    Could you clarify yourself?

16   **Q.**    Did you conduct any type of test to determine --

17   **A.**    No.

18   **Q.**    -- whether or not there were any pockets in the walls, the

19   interior walls, of a unit?

20   **A.**    No, sir.

21   **Q.**    Did you conduct any type of testing to determine the level

22   of formaldehyde inside the units?

23   **A.**    No, sir.

24   **Q.**    Did you conduct any type of stress test on the frames on

25   the units?

DAILY COPY TRANSCRIPT

1   A    No, sir.

2           **THE COURT:**  We're going to take a short break.  We

3   will start up again at 3:30.  I'm going to give you about 15

4   minutes.  We'll start up again at 3:30, and then we're going to

5   go ahead and finish for today.  In the meantime, as I will

6   always tell you, please don't discuss the case among

7   yourselves.

8           **THE DEPUTY CLERK:**  All rise.

9           (WHEREUPON, the jury exited the courtroom.)

10          **THE COURT:**  All right.  Mr. Watts, who do we have

11  here?  I've got my list here.  Obviously, this is kind of

12  ambitious, but who do we have --

13          **MR. WATTS:**  It is.  Probably what we're going to do

14  next is either Dr. McGwin or Albert Jarrell.  I've got to go

15  check flight schedules.  One of those two.

16          **MR. GARRISON:**  Your Honor, with regard to

17  Mr. Jarrell -- we talked about it this morning -- RBD does have

18  an objection.  So while the jury is out, I can state it for the

19  record.

20          **THE COURT:**  Is this consistent with the motion in

21  limine that was filed?

22          **MR. GARRISON:**  It was a motion to strike.  It's

23  consistent with that.

24          **THE COURT:**  I issued a ruling on that.  But if you

25  want to go ahead and add it onto the record, any other grounds.

238

DAILY COPY TRANSCRIPT

1   If it's something that I've already ruled on, that's fine.  If

2   it's something that I need to rule on, obviously, I'll hear

3   your objection.

4            **MR. GARRISON:**  I'd like for you to hear it, please.

5            **THE COURT:**  Go ahead.

6            **MR. GARRISON:**  Actually, we filed a motion to strike,

7   and at the time we filed a motion --

8            **THE COURT:**  You can have a seat.

9            **MR. GARRISON:**  May I proceed?

10           **THE COURT:**  Yes, go ahead.

11           **MR. GARRISON:**  We filed a motion to strike, and at

12  the time RBD had not had a chance to depose Mr. Jarrell.

13  Subsequent to that, we took his deposition.

14           Also, in the motion to strike, we did state

15  substantive objections.  But I just want to state this for the

16  record for this particular witness:  Mr. Jarrell has never

17  stepped foot in Ms. Castanel's unit.  He has never seen

18  Ms. Castanel's unit.  He testified in his deposition when

19  presented photos by the plaintiff's attorneys of what they

20  purported to be Ms. Castanel's unit.

21           He offered general testimony about units that he

22  had worked on, maintenance and what have you, while he worked

23  for three maintenance companies for three years.  With respect

24  to Recreation By Design, he talked in generalities about the

25  materials used, and he said they were made cheaply.

DAILY COPY TRANSCRIPT

1          But his testimony lacks foundation, it's

2  irrelevant, and it's highly speculative.

3          **THE COURT:**  Mr. Watts, what are we going to have from

4  Mr. Jarrell?

5          **MR. WATTS:**  We're going to follow your order that his

6  testimony is going to be limited to having smelled odors in RBD

7  trailers specifically, and he'll be able to point out how he

8  knew it was RBD trailers.

9          **THE COURT:**  Well, but what about this particular

10  type?

11          **MR. WATTS:**  Yes.

12          **THE COURT:**  There was a further specification in my

13  order that says "Those RBD trailers that were of the type in

14  which plaintiff resided."

15          **MR. WATTS:**  I took him through your order, and he's

16  prepared to give that testimony.

17          **THE COURT:**  And we're also not going to get him to

18  opine at all on what Mr. Garrison said about construction value

19  or quality --

20          **MR. WATTS:**  No.  It's just the smell.

21          **THE COURT:**  -- or anything like that.

22          **MR. WATTS:**  Yes, sir.  In fact, I'll go instruct him

23  right now.

24          **MR. GARRISON:**  In fact, Judge, he could only testify

25  that the photograph was a Recreation By Design photograph that

DAILY COPY TRANSCRIPT

1    he was shown because the plaintiffs gave it to him and

2    identified it as Ms. Castanel's --

3              **THE COURT:**  Does he know that these are RBD trailers.

4              **MR. WATTS:**  Yes.

5              **THE COURT:**  Are you going to be able to establish

6    that he --

7              **MR. WATTS:**  I will.

8              **THE COURT:**  -- knows that these are this particular

9    manufacturer, or did he just go in a bunch of them and say,

10   "Well, I think some of them are" --

11             **MR. WATTS:**  No.  He can establish that.

12             **MR. GARRISON:**  He went in a bunch of them.  Now, he

13   did say, based on the windows, an exterior photo, he said,

14   "Based on those windows, I think that's an RBD photo," but he

15   couldn't state that was Ms. Castanel's photograph.

16             **MR. WATTS:**  Well, no, we're not saying he was ever in

17   Ms. Castanel's trailer, and I don't think the Court's order

18   says we have to do that.  But it's of the same type as

19   Ms. Castanel's trailer, and he's prepared to testify about

20   that.

21             **THE COURT:**  I think this is going to be very, very

22   narrow testimony --

23             **MR. WATTS:**  It is.

24             **THE COURT:**  It's a very, very limited witness who is

25   going to be on the stand for a very, very short time if that's

DAILY COPY TRANSCRIPT

1   the nature of the testimony.

2           **MR. WATTS:**  Agreed.

3           **THE COURT:**  All right.

4           **MR. GARRISON:**  Thank you, Judge.

5           **THE COURT:**  All right.  Thank you.

6           **THE DEPUTY CLERK:**  All rise.  Court is in recess.

7           (WHEREUPON, the Court took a recess.)

8           **THE DEPUTY CLERK:**  All rise.

9           (WHEREUPON, the jury entered the courtroom.)

10          **THE COURT:**  All right.  You may be seated.  Let's go

11  ahead and finish up for today.

12              Mr. Watts, do you have your next witness?

13          **MR. WATTS:**  Yes.  Albert Jarrell.

14          **THE COURT:**  Mr. Jarrell, if you would come up, sir.

15  When you come up to the chair, please remain standing until you

16  take the oath, and then you may be seated.

17              (WHEREUPON, **Albert Jarrell**, having been duly sworn,

18  testified as follows.)

19          **THE DEPUTY CLERK:**  Please state your full name and

20  correct spelling for the record.

21          **THE WITNESS:**  My name is Albert Anthony Jarrell, Jr.,

22  A-L-B-E-R-T, A-N-T-H-O-N-Y, J-A-R-R-E-L-L.

23          **MR. WATTS:**  May I proceed, Your Honor?

24          **THE COURT:**  Yes, please.

25

DAILY COPY TRANSCRIPT

**DIRECT EXAMINATION**

1

BY MR. WATTS:

2

3   **Q.**   Mr. Jarrell, were you born here in New Orleans?

4   **A.**   Yes.

5   **Q.**   Where did you go to primary school, middle school, and

6   high school?  What town?

7   **A.**   Primary school was Lockett, middle school was John

8   Washington Carver, and then John Washington Carver Senior High,

9   and then Southern University.

10  **Q.**   Okay.

11  **A.**   And Orleans area vocational trade school.

12  **Q.**   All right.  After you got out of high school, did you go

13  into the military?

14  **A.**   Yes, I did.

15  **Q.**   What branch did you serve?

16  **A.**   In United States Air Force.

17  **Q.**   Did you do that over here in the States, or did you go to

18  Vietnam?

19  **A.**   I went to Vietnam on TDY from Takhli, Thailand.

20  **Q.**   When you got back, what was your first job?

21  **A.**   My first job was at Boeing as a developer prover,

22  installer, mechanic.

23  **Q.**   From the time of that first job until the time of your

24  retirement in 2002, did you work for a variety of different

25  companies that ultimately became AT&T?

DAILY COPY TRANSCRIPT

1   A.   Yes, I did.

2   Q.   All right.  Fair enough.

3        When did you retire?

4   A.   2002.

5   Q.   And how long were you retired before you got involved with

6   this issue of FEMA trailers?

7   A.   That was in 2006 when I started working for the trailers.

8   Q.   All right.  What was the name of the company that you went

9   to work for that caused you to have involvement with the FEMA

10  trailers?

11  A.   Del-Jen.

12  Q.   What did you do for Del-Jen that caused you to have

13  contact with these trailers?

14  A.   I was a maintenance person whereas I would go into the

15  trailers to make repairs.

16  Q.   Now, can you tell the jury what a PMI is?

17  A.   A PMI is a preventive maintenance inspection.

18  Q.   Did you have occasion to go into Recreation By Design

19  manufactured trailers of the same type as the trailer that

20  Earline Castanel had?

21          MR. MULCAHY:  Objection.

22          THE WITNESS:  Yes, I did.

23          MR. GARRISON:  May I approach?

24          THE COURT:  Yes.

25          (WHEREUPON, the following proceedings were held at

DAILY COPY TRANSCRIPT

1   the bench.)

2        **THE COURT:**  On the objection, as I understand it, is

3   that it was a leading question.  Okay.  You can make those

4   without coming to the bench, but you have to make them quick

5   because he already answered --

6        **MR. GARRISON:**  Right.

7        **THE COURT:**  -- even before you made the objection.

8        **MR. GARRISON:**  Right.

9        **THE COURT:**  I'll ask Mr. Watts not to lead the

10  witness at all, and let's be very, very -- we've already spent

11  about as much time on this witness --

12       **MR. GARRISON:**  Fourth-fifths done.

13       **THE COURT:**  -- than what I thought we would spend.

14  So let's get to the point.

15       (WHEREUPON, the following proceedings were held in

16  open court.)

17  **BY MR. WATTS:**

18  **Q.**   Now, when you went into Recreation By Design trailers of

19  the same type as Earline Castanel's trailer, can you describe

20  for the jury what you experienced upon entering that type of

21  trailer?

22  **A.**   Well, you could get the effects from the formaldehyde.

23  Your eyes would kind of burn and your throat would get a little

24  itchy, but the -- it would give you a breathing problem.

25  **Q.**   What did it smell like when you entered the Rec by Design

DAILY COPY TRANSCRIPT

1  trailers of the same type as Earline Castanel?

2  **A.**   To me, it reminded me of when I was in high school and I

3  dissected my first animal, the formaldehyde smell.  That's what

4  it smelled like to me.

5           **MR. WATTS:**  Okay.  Those are all of my questions.

6           **THE COURT:**  Okay.  Thank you.  Mr. Garrison.

7                    **CROSS-EXAMINATION**

8  BY MR. GARRISON:

9  **Q.**   Good afternoon, Mr. Jarrell.

10  **A.**   Hello.

11  **Q.**   What type of Recreation By Design trailer did Ms. Castanel

12  have?

13  **A.**   Her trailer was the basic, plain, white trailer.  She did

14  not have one of the fancy well-designed trailers.

15  **Q.**   Can you be more specific, please?

16  **A.**   It's just a plain trailer.  When I say a plain trailer,

17  it's got a white aluminum skin.  There's no insignias on it,

18  writing, or design.  And there's no awning that folds out.

19  **Q.**   You've never seen Ms. Castanel's trailer, have you, sir?

20  **A.**   I don't -- I don't -- I've never been to her trailer.

21  I've never been -- met Ms. Castanel and been in her -- inside

22  of her trailer that she lived in.

23  **Q.**   Yes, sir.  You've never seen Ms. Castanel's trailer; is

24  that correct, sir?

25  **A.**   I've seen pictures of trailers.

DAILY COPY TRANSCRIPT

 1  **Q.**   Yes, sir.  Let me ask you the question again:  Have you

 2  ever seen Ms. Castanel's actual FEMA trailer?

 3  **A.**   No, I don't think I've seen her actual trailer.

 4  **Q.**   So you don't have any firsthand knowledge about

 5  Ms. Castanel's FEMA trailer; isn't that correct?

 6  **A.**   No, I do not of her personal trailer.  I thought when you

 7  were asking me the question, you were asking me about

 8  Recreation By Design trailers.

 9  **Q.**   No, sir.  I'm asking you about Ms. Castanel's trailer.

10          You don't have any firsthand knowledge about

11  Ms. Castanel's trailer; isn't that correct?

12  **A.**   The lady sitting there, where she lived, I have never been

13  in her trailer.  I don't -- to my knowledge.

14  **Q.**   Yes, sir.

15          Now, you worked for Del-Jen, C. Martin, and B&I for a

16  total of ten years; is that correct, sir?

17  **A.**   That's right.

18  **Q.**   And you did maintenance work for those three companies;

19  correct?

20  **A.**   I did maintenance work and, on occasions, I did PMIs.

21  **Q.**   And the first time you ever went into a travel trailer was

22  when you started working for Del-Jen around 2006; correct?

23  **A.**   That's correct.

24  **Q.**   You are not an expert on travel trailers; correct?

25  **A.**   I'm not a certified expert as far as having a certificate

DAILY COPY TRANSCRIPT

1   as being just going to school on trailers.  I'm not -- I'm not
2   certified in that way.
3   Q.   Mr. Jarrell, do you recall giving your deposition?
4   A.   Yes.
5   Q.   Okay.  I'd like to refer to page 31, line 13.
6            THE COURT:  You have to give him a copy of it unless
7   there's one up there.
8            MR. GARRISON:  Yes, sir.
9            THE COURT:  Okay.
10           MR. GARRISON:  May I approach?
11           THE COURT:  Yes.  Give him page and lines, and give
12  him the opportunity to read it.
13           MR. GARRISON:  Yes, sir.
14  BY MR. GARRISON:
15  Q.   Page 13 -- I'm sorry, page 31, line 13.
16  A.   Are you talking about this right here?
17  Q.   Yes, sir.
18  A.   This question here?
19  Q.   I was going to ask you to read it aloud after you read it.
20  Page 31, line 13.
21  A.   "Do you consider yourself an expert on FEMA trailers?"
22           "No, I don't consider myself an expert on FEMA
23  trailers.  What I consider myself is somebody that learned a
24  lot about FEMA trailers when he was working on them."
25  Q.   Yes, sir.

DAILY COPY TRANSCRIPT

1  A.   Uh-huh.

2  Q.   So is your deposition correct that you're not an expert on

3  FEMA trailers?

4  A.   I'm not an expert, but I'm qualified to work on them.

5  Q.   Yes, sir.  There were over 60 manufacturers that sold

6  trailers to FEMA.  Did you know that?

7  A.   No, I did not know that there were 60 manufacturers.

8  Q.   When you worked for these maintenance companies for that

9  two-year period, you didn't keep any notes on the different

10  types of trailers; isn't that correct?

11  A.   That's not correct.  All the notes that I had on any FEMA

12  trailer that I worked on with maintenance or preventative

13  maintenance inspections was turned in on the job to the

14  supervisor.  They kept all the documentation.

15  Q.   Let me ask the question this way:  When you worked for

16  these maintenance companies, you didn't keep any personal notes

17  about the different characteristics of the different FEMA

18  trailers; correct?

19  A.   No, I didn't keep any personal notes for myself as to the

20  different characteristics about different trailers.

21        What I did in that manner, if I discovered something

22  that was pertaining and important to other people, I would go

23  back and inform the supervisor, and he would pass it to the

24  rest of the crew members so that, if they incurred the same

25  problem, they would have a quicker way of fixing it or taking

DAILY COPY TRANSCRIPT

1  care of it.

2  Q.   Yes, sir.  And I was asking you about notes.

3  A.   No.  We were not allowed to keep personal documentation of

4  government papers.

5  Q.   Yes, sir.  So you have no notes regarding the different

6  types of FEMA trailers that you went into when you were working

7  for these three companies?

8  A.   No written notes.

9  Q.   Do you have any training in formaldehyde, sir?

10  A.   No.

11  Q.   Were you ever involved in testing any of these -- any FEMA

12  units for formaldehyde levels?

13  A.   I never did any tests for formaldehyde.

14  Q.   You don't have any specific knowledge about formaldehyde

15  levels in Recreation By Design units, do you?

16  A.   Specific knowledge, when you say -- can you be a little

17  more precise about that?

18  Q.   You can't sit here today and tell us about the

19  formaldehyde levels in Recreation By Design units; correct?

20  A.   I cannot -- I cannot tell you how many parts per million

21  or anything of that nature.  The only thing I can tell you is

22  what I smelled and what the effects was on me.

23  Q.   You can't say if one particular brand of trailer had

24  stronger smells than other trailers; is that correct?

25  A.   Not fully.

DAILY COPY TRANSCRIPT

1  Q.   Is that a correct statement?

2  A.   Not fully.

3  Q.   Okay.

4  A.   Some trailers were stronger than others, especially

5  depending on the time of the year.

6  Q.   But you can't say --

7  A.   In the summertime --

8  Q.   I'm sorry.  I didn't mean to cut you off.

9  A.   In the summertime, it was intense and stronger than in the

10  fall.

11  Q.   And, sir, you are talking about trailers in general?

12  A.   When you say "trailers in general," I'm talking about the

13  trailer that we're talking about here, this particular trailer

14  and others of that nature.  They were all smelly with the

15  formaldehyde.

16  Q.   Okay.  And tell us what you mean by "this particular

17  trailer and others of that nature."

18  A.   What I mean is this:  Any trailer that was a plain, white

19  trailer and --

20  Q.   And --

21  A.   I didn't finish.

22  Q.   I'm sorry.  Go ahead.

23  A.   Any trailer that was a plain, white trailer, when you

24  entered that trailer, the formaldehyde was strong in them.

25  Before you entered the trailer, you knew what you were going to

DAILY COPY TRANSCRIPT

1   encounter because, when you looked at the outside of the

2   trailer when you pulled up, you knew, oh, this was going to be

3   another strong-smelling formaldehyde trailer, a smelly trailer.

4   **Q.**   And that was for all plain, white trailers?

5   **A.**   That's correct.

6   **Q.**   And many of the manufacturers made plain, white trailers?

7   **A.**   That's correct.

8   **Q.**   So you can't testify specifically about the formaldehyde

9   levels in the Recreation By Design trailers; isn't that

10  correct?

11  **A.**   That is not correct.  I know the difference in a Rec

12  trailer.  I know the difference in a Gulf Stream trailer.  I

13  know the difference in when I approached them.  And if you

14  asked me did I smell formaldehyde in a Recreation trailer, my

15  answer is yes.

16  **Q.**   But you can't say that the formaldehyde smell in a

17  Recreation By Design trailer, a plain, white trailer, was any

18  different than the other manufacturers who made plain, white

19  trailers; isn't that correct?

20  **A.**   No, not fully.  It depends on the time of the year.  It

21  depends on how hot the day is.  The hotter the day, the

22  stronger the smell is.

23  **Q.**   Well, I'm asking about a specific type of trailer, a

24  Recreation By Design trailer.  You talked about plain, white

25  trailers.

DAILY COPY TRANSCRIPT

1   A.   Uh-huh.

2   Q.   You can't distinguish one brand of plain, white trailers

3   as far as smell with another brand of plain, white trailers as

4   far as smell; is that correct?

5   A.   Not completely.  I'm trying to answer your question from

6   my experience, meaning this:  No matter what name trailer it

7   was, in the summertimes, the heat, the odor was stronger than

8   in the wintertime.

9            I don't quite understand -- I'm not confused.  I'm

10  listening to what you're saying --

11  Q.   No, sir, I'm not suggesting --

12  A.   -- and I'm trying to tell you what I experienced.

13  Q.   So your testimony is no matter what type of trailer it

14  was, in the summertime, you could smell the smell better in the

15  trailer; is that correct?

16  A.   I'm saying, when the heat is beaming, it's stronger in all

17  of those trailers.  The Rec, all of them.

18  Q.   Okay.

19  A.   You can't distinguish and say this one don't smell and

20  that one smelled.  The hotter it is, the more all of them

21  smell.

22  Q.   But you're not talking about Recreation By Design

23  trailers, specifically?

24  A.   Recreation By Design trailer emits an odor that, when you

25  walk into it in the summertime, your eyes will run, your throat

DAILY COPY TRANSCRIPT

1  will get a little itchy, and the air gets heavy, and you'll
2  have a little trouble breathing.
3  Q.  But there were other trailers that had that smell;
4  correct?
5  A.  There were other trailers too.
6  Q.  And you're talking about the plain, white trailer?
7  A.  I'm talking about the plain, white trailers.  I'm talking
8  about the Rec trailers.  And I'm trying to tell you the Rec did
9  the same thing as the other ones of that type.  To me, I'm
10  typing them.
11  Q.  Are you putting them into a category, the trailers?
12  A.  I'm putting Rec in -- I'm saying Rec smelled just like the
13  other ones smelled.
14  Q.  Thank you, sir.
15         And that was, you're talking about, in the heat of
16  the summer?
17  A.  In the heat of the summer, it's worse.
18  Q.  Do you recall giving a deposition on January 25th, 2010,
19  in the *Forest River* matter?
20  A.  I think I did.
21         **MR. GARRISON:**  May I approach?
22         **THE COURT:**  Yes.
23  BY MR. GARRISON:
24  Q.  Page 76, line 10, please read that.
25         And please read that for the jury.

DAILY COPY TRANSCRIPT

1  **A.**   Which part?

2  **Q.**   Line 10, and the answer.

3  **A.**   "You said that some trailers had a stronger smell than

4  others."

5        "ANSWER:  Huh?"

6  **Q.**   Yes, sir.  And read the next?

7  **A.**   "Did you ever correlate that type of trailer?"

8        "ANSWER:  Not really."

9  **Q.**   Okay.  Thank you, sir.

10        So based on your deposition testimony in January, you

11  never correlated smell with a particular type of trailer; is

12  that true?

13  **A.**   When I said "huh," I meant *yes*.  "Huh" does not mean *no*.

14  **Q.**   So on line 13 -- page 76, line 13.

15        "QUESTION:  Did you ever correlate that with the type

16  of trailer?

17        "Answer:  Not really."

18  **A.**   When you say "not really" --

19        **THE COURT:**  No, that's when you say "Not really."

20  He's reading from your deposition.

21        **THE WITNESS:**  Oh, okay.  Let's see this.

22  **BY MR. GARRISON:**

23  **Q.**   Yes, sir.  Do you agree with your deposition testimony?

24  **A.**   Let's see how this is worded exactly.

25  **Q.**   You can start with page 10.

DAILY COPY TRANSCRIPT

1   **A.**   "You said that some trailers had a stronger smell than

2   others."

3          "Huh."   *Yes*.

4          "Did you ever correlate that with the type of

5   trailers?"

6          "Not really."

7   **BY MR. GARRISON:**

8   **Q.**   Okay.  Thank you, sir.

9   **A.**   Uh-huh.

10  **Q.**   Do you know the VIN number on Ms. Castanel's trailer?

11  **A.**   I do not.

12  **Q.**   Do you know the model number of Ms. Castanel's trailer?

13  **A.**   I do not.

14  **Q.**   Do you know the style of trailer that Ms. Castanel had?

15  **A.**   Ms. Castanel had a plain trailer that has -- that type of

16  trailer is a plain trailer with a pop-out.

17  **Q.**   Can you be more specific about the style, the design?

18  **A.**   When you say "style" or "design," I don't really know what

19  you're looking for.  What I'm telling you is it's a plain

20  trailer with a pop-out.  Now, when you say "style," to me

21  "style" --

22  **Q.**   A certain model number or type?

23  **A.**   No, I -- no, no.  I don't -- we don't -- we do -- we did

24  not put together model numbers on trailers.  We don't -- we

25  don't say this is a model SA or model BA or something.  That's

256

DAILY COPY TRANSCRIPT

 1   not what we do.  We work on trailers.

 2   **Q.**  Yes, sir.

 3   **A.**  And there are too many trailers to know the different

 4   model numbers.

 5   **Q.**  So you don't know the model number of Ms. Castanel's unit;

 6   correct?

 7   **A.**  No.  I know the type of trailer it is.

 8   **Q.**  Isn't it true that you filed a lawsuit against a trailer

 9   manufacturer for formaldehyde-related claims?

10   **A.**  Yes.

11   **Q.**  And who was your attorney?

12   **A.**  Who was my attorney?

13   **Q.**  Yes, sir.

14   **A.**  Buzbee out of Houston, Texas.  Of Galveston.

15   **Q.**  And how did you get involved in this case, in the *Forest*

16   *River* case?

17   **A.**  In the *Forest River's* case?

18   **Q.**  Yes.  The case that went to trial three months ago.

19          **MR. WATTS:**  Your Honor, may we approach?

20          **THE COURT:**  Yes.

21          (WHEREUPON, the following proceedings were held at

22   the bench.)

23          **MR. GARRISON:**  I'll take away from it.

24          **THE COURT:**  First of all, do not mention, and I had a

25   specific order that we are not going to reference any other

DAILY COPY TRANSCRIPT

1    bellwether trials.

2              **MR. GARRISON:**  Yes, sir.

3              **THE COURT:**  Okay?  So stop talking about being

4    deposed in the *Forest River* matter.

5              **MR. GARRISON:**  Yes, sir.

6              **THE COURT:**  Secondly, Mikal, this is a waste of time.

7              **MR. WATTS:**  Judge, as soon as I get him on redirect.

8    I'm ready for the cross to end as well.

9              **THE COURT:**  He's wasting time.  We're wasting time.

10             **MR. WATTS:**  Yes, sir.

11             **MR. GARRISON:**  Yes, sir.

12             (WHEREUPON, the following proceedings were held in

13   open court.)

14   **BY MR. GARRISON:**

15   **Q.**   Now, did you get involved in this case to testify?

16   **A.**   Okay.  Do you mean how did I get directly involved in this

17   case or what led me to this case?

18   **Q.**   Did somebody contact you to testify in this case?

19   **A.**   All right.  This is how I got involved in all of this,

20   bring you up-to-date to where we are now.  I --

21             **THE COURT:**  Wait.  Stop.

22             **MR. WATTS:**  Your Honor, object on relevance.

23             **THE COURT:**  Yes.  I think we need to ask a little

24   more specific questions, because he's about to tell us --

25             **THE WITNESS:**  How I got here.

DAILY COPY TRANSCRIPT

1            **THE COURT:**  -- from soup to nuts --

2            **THE WITNESS:**  That's right.

3            **THE COURT:**  -- and we don't have time for that.

4            **MR. GARRISON:**  That's fine.

5            **THE COURT:**  Let's ask him a specific question he can

6    answer, and let's go.

7            **MR. GARRISON:**  That's fine.

8    BY MR. GARRISON:

9    **Q.**   Do you have any family members that have filed claims

10   against manufacturers for formaldehyde-related injuries?

11   **A.**   My wife did.  We were in the same trailer.  My son did

12   because he was in a trailer at the same property.  My

13   mother-in-law filed a lawsuit.  My brother-in-law.

14           Because we all lived in trailers at that time.  Every

15   family member that was close to me, we lived in proximity with

16   each other in our houses and trailers.  That's the only thing

17   we had to live in.

18   **Q.**   So several members of your family have also filed

19   lawsuits?

20   **A.**   Uh-huh.

21   **Q.**   Thank you, sir.

22           **THE COURT:**  Thank you.  Redirect?

23           **MR. WATTS:**  Very briefly.

24

25

DAILY COPY TRANSCRIPT

**REDIRECT EXAMINATION**

1

**BY MR. WATTS:**

2

**Q.**   Two issues, sir.  I think counsel was trying to ask you is

3

there something about the Rec by Design trailer characteristics

4

that enabled you to distinguish it from some other trailer?

5

**A.**   There is.  Several things.

6

**Q.**   Tell the jury what those are, just very briefly.

7

**A.**   Number one, on first observation of pulling up to the

8

trailer, the Rec by Design's windows are different than most

9

trailers.  The Rec by Design windows are something like the old

10

Jollicy ones used to be where they open up out like that.  Most

11

trailer windows slide left and right, or there's a bar you can

12

push out and hold the window open.

13

**Q.**   What else?

14

**A.**   Next thing about that trailer, when you go inside, to the

15

immediate right when you walk in, there's a long strip electric

16

heater that goes almost across the whole width of the trailer

17

in the front right there.

18

             The next -- the third thing about it that's

19

distinguishing from it, it's disgusting because it's like an

20

open bathroom, meaning the kitchen -- you're looking at the

21

kitchen.  You look to the left.  There's the bathtub.  Next to

22

it sits the commode.  There are no doors.

23

**Q.**   Okay.

24

**A.**   There's no privacy.

25

DAILY COPY TRANSCRIPT

1  **Q.**   What else?

2  **A.**   And the next thing about it, the converter and fuse panel

3  is located beneath the bed, to your left, and I have had to

4  change them out because people be horsing around and they break

5  them, and they fall through.

6  **Q.**   Okay.

7       **MR. WATTS:**  May I approach, Your Honor?

8       **MR. GARRISON:**  Your Honor, may I see the photographs?

9       **THE COURT:**  Yes.

10      **MR. GARRISON:**  Judge, I'm going to object to those

11  photographs.

12      **MR. WATTS:**  I'm not offering them.

13      **MR. GARRISON:**  May I approach?

14      **THE COURT:**  Come on up.

15      (WHEREUPON, the following proceedings were held at

16  the bench.)

17      **MR. GARRISON:**  Recreation By Design objects to these

18  photographs.  The witness has never seen the trailer.  I don't

19  see how he can identify these photographs.  He's got no

20  specific knowledge about Ms. Castanel's trailer.

21      **MR. WATTS:**  If I may respond.  These are

22  Mr. Smulski's photographs.  I asked counsel if he would agree

23  to admission through this witness.  He said no.  What I want to

24  do is get the witness to identify which photograph, and then

25  tomorrow -- I'm not going to show them to the jury.

DAILY COPY TRANSCRIPT

1      **THE COURT:**  Do we really need to do this?

2      **MR. WATTS:**  We do because he won't let me do the

3  photographs, and so I'm just going to get him to identify which

4  ones he flagged for me, and then we'll be done.

5      **THE COURT:**  By number?

6      **MR. WATTS:**  Yes, by number.  See, I've numbered the

7  bottom.  Here.  I've numbered each of them.  So he can give me

8  the number, and then tomorrow Smulski will --

9      **MR. GARRISON:**  Judge, it's going to go on another 40

10  minutes with this witness.

11      **MR. WATTS:**  It's not.

12      **THE COURT:**  Well, it's not going to be 40 minutes.

13      **MR. WATTS:**  Judge, it's going to be four minutes if

14  he'd let me do them.

15      **MR. GARRISON:**  He's never seen these photographs.

16      **MR. WATTS:**  He has seen them.

17      **THE COURT:**  Wait.  We've got two people talking at

18  once.

19      **MR. GARRISON:**  Judge, you can't show a witness

20  photographs of something he's never seen the day before trial

21  and then have that witness identify the photographs at trial.

22      **THE COURT:**  Well, first of all, if he recognizes

23  something in the photograph, he can identify something that he

24  has seen before even if he hasn't seen that particular

25  photograph.  The problem is he has said that he has not seen

DAILY COPY TRANSCRIPT

1   Ms. Castanel's trailer.

2           **MR. WATTS:**  No, it's the type of -- and all we're

3   doing, his last answer, I'm getting him to identify the

4   photographs of what he just said, and that's it and then we'll

5   be done.  I'm not going to show them to anybody --

6           **THE COURT:**  But what I'm concerned about is -- is

7   this -- is this her unit?

8           **MR. GARRISON:**  Yes, yes.

9           **THE COURT:**  Are all of these pictures of her unit?

10          **MR. GARRISON:**  Yes.

11          **THE COURT:**  He said he's never seen her unit.

12          **MR. GARRISON:**  Yes.  And he's going to comment on her

13  unit.

14          **MR. WATTS:**  No, he's not.  I'm going to ask him four

15  questions:  Does photograph No. 1 show the white without the

16  awning?  This is photograph No. 14, what does it show?  Get him

17  just to identify the five things that he just said.  And that

18  way we'll have something in the record that shows the

19  photograph as to what he was talking about.

20          **MR. GARRISON:**  But you're right, Judge, he's never

21  been in the unit.

22          **THE COURT:**  He hasn't seen her unit.  I think we're

23  kind of wasting time with him.

24          **MR. WATTS:**  Okay.

25          **THE COURT:**  He hasn't seen her unit.  This is not the

DAILY COPY TRANSCRIPT

1   best witness to do that with.

2           (WHEREUPON, the following proceedings were held in

3   open court.)

4   **BY MR. WATTS:**

5   **Q.**   Last question:  You mentioned the open bath next to the

6   kitchen, the heater strip, the converter under the bed, the

7   windows opening outward, and the pure white, no cover, no

8   awning; is that right?

9   **A.**   And the open toilet.

10  **Q.**   Are those all specific features of the type of trailer

11  that Ms. Castanel has that enable you to distinguish a Rec by

12  Design of this type from other trailers?

13  **A.**   Yes.

14          **MR. WATTS:**  Those are all my questions.

15          **THE COURT:**  Thank you, sir.  You can step down.

16              Next?

17          **MR. WATTS:**  Dr. Gerald McGwin.

18          **THE COURT:**  Dr. Gerald McGwin, if you would come

19  forward, sir.

20          (WHEREUPON, **Gerald McGwin**, having been duly sworn,

21  testified as follows.)

22          **THE DEPUTY CLERK:**  Please state your full name and

23  correct spelling for the record.

24          **THE WITNESS:**  Gerald McGwin, G-E-R-A-L-D, McGwin,

25  M-C-G-W-I-N.

DAILY COPY TRANSCRIPT

**DIRECT EXAMINATION**

BY MR. WATTS:

**Q.**   Dr. McGwin, you are an epidemiologist; is that right?

**A.**   Yes, sir.

**Q.**   What does the word *epidemiologist* mean?

**A.**   It's the study of the distribution and determinants of

diseases in populations.

**Q.**   Okay.  And we've got a PowerPoint up here so that you can

keep me on track.  When you say the "study of diseases in

populations," what are the uses of epidemiology?  I mean, why

do we have epidemiologists?

**A.**   Epidemiology is used to establish the risk factors for

diseases in human populations, and so if we're interested in

knowing whether a particular characteristic, exposure to a

chemical, consuming a particular type of food, puts you at

increased or decreased risk for developing cancer, heart

disease, having an injury, whatever the case may be.

         And the field of epidemiology is designed to design

research studies and analyze the data from those studies to

look at those relationships.

         **THE COURT:**  Counsel, this witness is being presented,

as I understand it, as an expert in the field of epidemiology;

is that correct?

         **MR. WATTS:**  Yes, sir.

         **THE COURT:**  Do we have a stipulation as to his

DAILY COPY TRANSCRIPT

1    expertise?

2                **MR. WEINSTOCK:**  We do, Your Honor.  We stipulate he's

3    an expert in the field of epidemiology.

4                **THE COURT:**  In light of the stipulation, the Court

5    will accept Dr. McGwin as an expert in the field of

6    epidemiology.

7                     We have experts.  As counsel has alluded to, we

8    will have expert testimony in this case.  When certain fields

9    require a heightened knowledge, such as epidemiology, we would

10   have a person, who we call an expert witness -- in this case,

11   it's Dr. McGwin -- who can come in and give opinion testimony

12   based upon their research and all of their knowledge.

13                    So the Court is going to accept Dr. McGwin as an

14   expert in the field of epidemiology.  Both parties agree as to

15   his expertise, so let's go ahead and move on to his testimony

16   in this case.

17                **MR. WATTS:**  Absolutely.

18   BY MR. WATTS:

19   **Q.**    Two questions on your background.  You're a professor?

20   **A.**    Yes, sir.

21   **Q.**    Where?

22   **A.**    University of Alabama at Birmingham.

23   **Q.**    And we call you "Dr. McGwin" because -- not because you're

24   a medical doctor -- you have a Ph.D. in what field?

25   **A.**    In epidemiology.

DAILY COPY TRANSCRIPT

1    **Q.**    All right.  Good enough.

2            Now, what were you asked to do in this case?

3    **A.**    I was asked to review the epidemiologic literature

4    regarding the relationship between formaldehyde and respiratory

5    problems.

6    **Q.**    And have you listed that literature in Table 1 to your

7    report?

8    **A.**    Yes, sir.

9    **Q.**    And as we go to this Table 1, just generally have at it,

10   tell us what the studies show.

11   **A.**    One by one or in --

12   **Q.**    Well, just take us through in an expedited fashion

13   generally what the studies told you.

14   **A.**    Okay.

15   **Q.**    When you looked at all the studies on formaldehyde and

16   respiratory problems in adults.

17   **A.**    In a nutshell, the majority of the studies demonstrate a

18   significant relationship between formaldehyde exposure and

19   respiratory problems.

20   **Q.**    Okay.  What is a dose-response relationship?

21   **A.**    Dose-response relationship is the more an individual is

22   exposed to something, so the more formaldehyde they're exposed

23   to, the more carrots they eat, the more of something they have,

24   the greater the risk of them acquiring given diseases.

25   **Q.**    Why is dose-response relationship important when you're

DAILY COPY TRANSCRIPT

1  looking at things epidemiologically?

2  **A.**   It's very important because it gives us a signal as to

3  whether a given risk-factor might actually cause that given

4  disease.

5  **Q.**   Okay.

6  **A.**   If you have more of something and that thing truly causes

7  the disease, then, in most situations, it should produce an

8  increased risk of that disease.

9  **Q.**   All right.  And lastly, on this slide, it says "a

10  biologically plausible explanation between formaldehyde and

11  respiratory symptoms."  What is biologic plausibility?

12  **A.**   As my mom would often say, it should make sense.

13           Many relationships that we look at, we want to be

14  sure that they have a foundation in science, that there's a

15  reason to believe that the given exposure may actually be

16  related to that given disease.  And so we're interested in not

17  only whether there's a relationship in large populations of

18  individuals, but we're interested in knowing whether there's a

19  biological basis for it.

20  **Q.**   Just so we're clear before we go to the studies, did the

21  majority of the studies that are available showing the

22  relationship between exposure to formaldehyde and respiratory

23  problems in adults, did they establish a causal relationship

24  between formaldehyde and respiratory problems?

25  **A.**   It's difficult, if not impossible, to draw a causal

DAILY COPY TRANSCRIPT

1   relationship for any one epidemiologic study.  The science is

2   observational and, by its nature, we don't randomize.  We don't

3   assign people to formaldehyde exposure, just as we don't assign

4   them to any type of exposure.

5           So individually the studies don't demonstrate a

6   causal relationship.  However, when we stand back and look at

7   the aggregate of those studies, all of them together, and weigh

8   the evidence, it's at that point that we can make a judgment as

9   to whether the relationship is causal.

10  Q.   And when you aggregate the studies, what does the

11  aggregated studies allow you to make a judgment?

12  A.   In this particular case, my expert opinion would be that

13  the studies do demonstrate a relationship between formaldehyde

14  exposure and respiratory problems.

15  Q.   Do the studies demonstrate a dose-response relationship?

16  A.   A number of the studies demonstrate a dose-response

17  relationship.

18  Q.   And does a biological plausibility exist?

19  A.   Yes, sir.

20  Q.   All right.  Now, I want to go to Table 1 just real

21  briefly.  You've got Hanrahan, Norsted, and then go down to the

22  bottom, Saijo and Lovreglio.

23          Here's my question:  Do you see on the right-hand

24  column, it says "Statistically Significant," and the answer is

25  "No" on those four studies?

DAILY COPY TRANSCRIPT

1  A.   Yes, sir.

2  Q.   And then we go to those four studies, and when you

3  aggregate them, what is the average sample size of those four

4  studies?

5  A.   If I trust your math, it's about 250.

6  Q.   Now, what is the relationship between sample size and the

7  ability to power a study such that you can reach a

8  statistically significant conclusion?

9  A.   As an epidemiologist, I'd love to have information on

10  everybody in the United States, but that's impossible.  And so

11  epidemiologic studies are done on samples of individuals, and

12  these studies are varying sizes, as you can see, in the "Sample

13  Size" column of the table there.

14       Sample size is important because, the larger the

15  sample, the better a signal that you're going to detect.  So

16  the larger the sample size, the more confidence you are going

17  to have in any association that you see.

18  Q.   Okay.  Now, with the 250.75 being the average sample size,

19  if our math is right, when we go to the Ritchie study in 1987,

20  the Broder study in '88, another Broder study in '88,

21  Krzyzanowski in '90, Liu in '91, Broder in '91, and Norback in

22  '95, do those all reach a statistically significant

23  relationship between formaldehyde exposure and respiratory

24  outcomes?

25  A.   Yes, sir, they do.

DAILY COPY TRANSCRIPT

1  **Q.**   Now, in terms of why those -- one, two three, four, five,

2  six -- seven reach a statistically significant relationship and

3  the other four don't, is there a difference in the sample size

4  for those seven versus the other four?

5  **A.**   Yes, sir.

6  **Q.**   Now, when we take Ritchie, Broder, Broder, Krzyzanowski,

7  Liu, Broder, and Norback and average out the sample size, what

8  does that sample size average out to?

9  **A.**   It's approximately 1600.

10 **Q.**   Okay.  And so 1600 versus 250, is that a significant

11 difference in the sample size?

12 **A.**   It's a meaningful difference.  We're concerned about

13 sample sizes, as I said, to obtain precise estimates in our

14 studies.  And there are a variety of considerations about

15 weighing the quality of an epidemiologic study, but sample size

16 is probably one of the most important characteristics.

17 **Q.**   Now, to be fair, a lot of these studies are what's called

18 self-reported studies; is that right?

19 **A.**   Yes, sir.

20 **Q.**   What is a self-reported study?

21 **A.**   Again, we don't have a wealth of resources always to

22 conduct these epidemiologic studies, and you often rely on

23 self-report, which is simply asking patients or study

24 participants about their health, and you rely on the fact that

25 those individuals have knowledge of their own health and can

DAILY COPY TRANSCRIPT

1   accurately report that information.

2   **Q.**   Okay.  Are these studies blinded in any way so that they

3   don't know whether they're in the high formaldehyde level or

4   the low formaldehyde level?

5   **A.**   It varies by study, but it would be unlikely that any

6   individual in any of these studies would know their specific

7   formaldehyde level.

8   **Q.**   So it takes the subjective response from all the different

9   people, and then you throw them into one or two categories, and

10  you compare the difference?

11  **A.**   That's a pretty good description.

12  **Q.**   All right.  Now, in terms of whether formaldehyde

13  increases respiratory symptoms, of the 11 studies that you

14  evaluated, what did the 11 studies show?

15  **A.**   Well, the 11 studies that I looked at all -- as we have

16  discussed, looked at the relationship between formaldehyde and

17  respiratory problems.  Four of them identified no statistically

18  significant association; whereas, the remainder did identify a

19  statistically significant association.

20  **Q.**   And the ones that did identify a statistically significant

21  association was the sample size, on average, 6.4 times larger

22  than the ones that did not?

23  **A.**   Again, if I trust your math, yes, that's correct.

24  **Q.**   All right.  And of the ones that the authors were able to

25  reach a statistically significant conclusion, what did those

DAILY COPY TRANSCRIPT

1  studies demonstrate?

2  **A.**    They studied -- they demonstrated that there was a

3  statistically significant association between increased

4  formaldehyde levels and respiratory symptoms or complaints.

5  **Q.**    So when you throw all the studies together and you look at

6  the preponderance of the studies, what conclusion can you offer

7  this jury?

8  **A.**    I'll give you the same answer that I gave previously; That

9  there's a causal relationship between formaldehyde exposure and

10  respiratory problems.

11          **MR. WATTS:**  Those are all my questions.  Thank you,

12  Judge.

13          **THE COURT:**  Okay.  Thank you, sir.  Cross?

14                    **CROSS-EXAMINATION**

15  **BY MR. WEINSTOCK:**

16  **Q.**    Dr. McGwin, Andy Weinstock for Recreation By Design.

17  We've met before, haven't we, Doctor?

18  **A.**    Yes, sir, we have.

19  **Q.**    Doctor, the studies you chose to cite, these are

20  cross-sectional studies; is that correct?

21  **A.**    I believe the majority were cross-sectional.

22  **Q.**    I think there were three sturdies by Broder that were

23  follow-up studies and...

24  **A.**    Yeah.  Well, as I mention in my report, those are three

25  manuscripts from a single study looking at various aspects.

DAILY COPY TRANSCRIPT

1   **Q.**   Right.  So when we put 11 studies up on the board, it's

2   really only nine populations that were studied; correct?

3   **A.**   That's -- that's somewhat correct.

4   **Q.**   Right.  And of those nine, four were not statistically

5   significant; correct?

6   **A.**   That's correct.

7   **Q.**   Explain to the jury what we mean by *statistical*

8   *significance* and why that's so important for epidemiologists.

9   **A.**   As I mentioned previously, epidemiologic studies are not

10  conducted across the entire United States.  We don't have

11  information on every single person in the United States, and so

12  we use samples.  When you have samples, you have to make

13  inferences to those -- to the larger populations.  So we use

14  statistics to say whether what we've observed is real or simply

15  due to chance, and the statistics is what we use to determine,

16  make that distinction, between whether the observed results are

17  true or whether they're simply due to chance.

18  **Q.**   And when we talk about a cross-sectional study or -- is

19  one of the limitations of a cross-sectional study the temporal

20  relationship?

21  **A.**   I would say that's the key limitation.

22  **Q.**   And when we say the *temporal relationship*, what we're

23  really saying is, when we study, when we take this

24  questionnaire, these self-reported symptoms, we're looking at

25  the formaldehyde levels at the same time; is that correct?

DAILY COPY TRANSCRIPT

1  A.    That's correct.

2  Q.    So you don't know which came first, the chicken or the

3  egg; the respiratory symptoms or the formaldehyde?  Correct?

4  A.    That's correct.

5  Q.    And that is the quintessential problem with

6  cross-sectional studies; is that correct?

7  A.    That's correct.

8  Q.    The studies -- well, strike that.

9        You were asked to find studies on respiratory

10  symptoms to exposure to formaldehyde; correct?

11  A.    Actually, I started off looking at general health

12  complaints related to formaldehyde and then drilled down to the

13  ones related to respiratory problems.

14  Q.    What is the definition of *respiratory problems* you used?

15  A.    Well, again, the studies varied in their own definitions

16  of respiratory problems, and so I selected out studies that

17  looked at anything from upper respiratory problems, such as

18  nasal -- nasal irritation, all the way down to lower

19  respiratory problems, such as asthma and a variety of other

20  different types of cough, productive sputum, et cetera.

21  Q.    Which of the studies that you reviewed focused on

22  exacerbation of preexisting symptoms versus onset?

23  A.    First of all, given that it was self-report, I don't think

24  any of them necessarily looked specifically at onset or the

25  incidence of symptoms, and I don't believe any of the studies

DAILY COPY TRANSCRIPT

1  looked specifically at exacerbation of symptoms.

2  **Q.**   Let's take a look at your studies.

3       **MR. WEINSTOCK:**  If I could get the ELMO.

4            You tell me it's right here, huh?  I'm getting

5  better all the time.

6  **BY MR. WEINSTOCK:**

7  **Q.**   Do you have any -- I know you're not here for specific

8  causation opinions.  Do you have any idea what symptoms

9  Ms. Castanel suffers?

10  **A.**   No, sir.

11  **Q.**   And nobody told you that the focus of this case, or

12  Ms. Castanel's case, was on sinus problems, did they?

13  **A.**   No, sir.

14  **Q.**   The first one focused on respiratory irritation; correct?

15  **A.**   Yes, sir.

16  **Q.**   You know, let me use the little fancy arrow.  That would

17  probably go better.

18            But this one wasn't statistically significant anyway;

19  correct?

20  **A.**   That's correct.

21  **Q.**   The next one, again, respiratory symptoms; right?

22  **A.**   Yes, sir.

23  **Q.**   Again, not statistically significant; right?

24  **A.**   Yes, sir.

25  **Q.**   I can cut to the chase here.  In fact, the only one that

DAILY COPY TRANSCRIPT

1  focused on the nasal condition was the -- looks like the
2  Norsted study; is that right?
3  **A.**   Uh-huh.  Well, no -- you're --
4  **Q.**   I'm moving it back and forth just to trick you.
5  **A.**   Yeah, you are.
6  **Q.**   No.  I can't get it all in on one.
7  **A.**   I think it's the Ritchie study, if I'm not mistaken.
8  **Q.**   It is the Ritchie study.
9  **A.**   Okay.
10 **Q.**   And the Ritchie study is the only study that focuses on
11 the nose; correct?  And nasal complaints; correct?
12 **A.**   Can you...
13          **THE COURT:**  Can you not get the entirety of this on
14 there?
15          **MR. WEINSTOCK:**  Now you've gone past my skill, Judge.
16          **THE COURT:**  If we have to keep sliding it back and
17 forth, it's kind of hard to follow because it's columns after
18 columns.
19          **MR. WEINSTOCK:**  Oh, man.  Watts is showing me up
20 again.  How did I clear this?
21          **THE COURT:**  All right.
22 **BY MR. WEINSTOCK:**
23 **Q.**   Now, my question is:  The only one of these studies
24 focused in on nasal complaints is the Ritchie study; correct?
25 **A.**   Yes, sir, I believe that's correct.

DAILY COPY TRANSCRIPT

1   **Q.**   And you just told this jury a few minutes ago you would

2   never render an opinion on causation from exposure based solely

3   on one study, didn't you?

4   **A.**   That's correct.

5   **Q.**   And as we sit here today, you can -- well, strike that.

6   As of the time that you gave your deposition on February 23rd,

7   2010, you cannot cite a single epidemiological paper that would

8   support an association between formaldehyde exposure and

9   exacerbation of respiratory problems; is that correct?

10  **A.**   That's correct.

11  **Q.**   Now, we've talked about cross-sectional studies very

12  briefly.  There are other types of studies in the

13  epidemiological world, aren't there?

14  **A.**   Yes, sir.

15  **Q.**   You have more tricks in your bag, more bullets in the gun,

16  other devices you can use; correct?

17  **A.**   That's correct.

18  **Q.**   And you would agree with me that one of the gold standards

19  of epidemiology is experimental studies; is that correct?

20  **A.**   Yes, I would agree with that.

21  **Q.**   And, in fact, this is not the first case you've ever

22  provided an opinion regarding formaldehyde, is it?

23  **A.**   That's correct.

24  **Q.**   In a previous case, you gave an opinion on formaldehyde in

25  non-cancer health effects, I believe, for a class certification

DAILY COPY TRANSCRIPT

1  in 2008.  Is that correct?

2  **A.**   I believe you're correct.

3  **Q.**   And in that case, instead of these cross-sectional

4  observational studies, you cited two experimental studies:  One

5  by Arts in 2006 and one by Lang in 2008.  Do you recall that?

6  **A.**   I'll take you at your word.

7         **MR. WEINSTOCK:**  If I can approach the witness with a

8  copy of the Lang paper.

9         **THE COURT:**  Sure.

10        **MR. WEINSTOCK:**  This conclusion right down here.

11  **BY MR. WEINSTOCK:**

12  **Q.**   Doctor, is it correct, in the Lang paper, they found that

13  "The results of the present study indicated eye irritation as

14  the most sensitive parameter"?

15  **A.**   That's what it says.

16  **Q.**   And so -- just so we understand what they found is from

17  the effects of formaldehyde, kind of the weakest link in the

18  chain, the thing that would be affected first would be eye

19  irritation; correct?

20  **A.**   Based on their study, yes, sir.

21  **Q.**   Based on their study.

22        And then it says "Minimal objective eye irritation

23  was observed at a level of .5 ppm."  Is that correct?

24  **A.**   Yes, sir, that's what it says.

25  **Q.**   And to be clear, .5 ppm is also 500 parts per billion; is

DAILY COPY TRANSCRIPT

1   that right?

2   **A.**   That's correct.

3   **Q.**   And that's ten times higher than 50 parts per billion or

4   .05 parts per million; correct?

5   **A.**   Yes, sir.

6   **Q.**   But it goes further.  It says, "Observed at a level of .5

7   ppm, but with peaks of 1 part per million"; correct?

8   **A.**   Yes, sir, that's what it says.

9   **Q.**   And then if we could skip down to the last sentence,

10  although the jury's welcome to read all of it, it was concluded

11  that the no-observed effect level for subjective and objective

12  eye irritation due to formaldehyde exposure was .5 ppm in a

13  case of constant exposure level and .3 ppm with peaks of .6 ppm

14  in short-term exposures; correct?

15  **A.**   Yes, sir, that's correct.

16  **Q.**   And what is a no-observed effect level, or what we call a

17  "NOAEL"?

18  **A.**   It's the level at which you observe no -- whatever effect

19  you're looking for.

20  **Q.**   So, at these levels, we see no effect; correct?

21  **A.**   In the --

22  **Q.**   According to this study.

23  **A.**   Yes, sir.

24  **Q.**   And this is a study of people who voluntarily subjected

25  themselves to formaldehyde exposure?

DAILY COPY TRANSCRIPT

1   **A.**   Yes, sir.

2   **Q.**   What we call an experimental study, which is part of the

3   gold standard of epidemiology?  I know I'm pushing you, but I'm

4   in the ball park; right?

5   **A.**   Right church, wrong pew.

6   **Q.**   And now if I could approach with one more study, the Arts

7   study we just discussed.

8           **MR. WEINSTOCK:**  We're not admitting these into

9   evidence.

10          **THE COURT:**  It's up to you.

11          **MR. WEINSTOCK:**  No, Your Honor.  I think by agreement

12  we're not admitting them.

13          **MR. WATTS:**  We just show the studies.  We're not

14  admitting them.

15          **THE COURT:**  Let's go ahead.

16          **MR. WEINSTOCK:**  If you could blow up the conclusion.

17  BY MR. WEINSTOCK:

18  **Q.**   Sensory irritation is first observed at levels of 1 part

19  per million and higher; correct?

20  **A.**   That's what it says, yes, sir.

21  **Q.**   1 part per million and higher; correct?

22  **A.**   Yes, sir.

23  **Q.**   "From both human and animal studies, it was concluded

24  that, at airborne levels for which the prevalence of sensory

25  irritation is minimal, both an incidence and degree, i.e.

DAILY COPY TRANSCRIPT

1  Below 1 ppm, risks of respiratory tract cancer are considered

2  to be negligibly low."  Correct?

3  A.   Yes, sir.

4  Q.   That's what they found.

5        And just so -- I want to be clear about this.  You

6  cited this study to me under the section in your paper on

7  non-cancer effect -- oh, I'm sorry, your report on the section

8  of non-cancer effects; correct?

9  A.   That's correct.

10 Q.   Because the last time I showed you this paper, Mr. Watts

11 jumped up and said, "Oh, Weinstock's talking about

12 carcinogenicity," but you cited this --

13       **MR. WATTS:**  Your Honor, may I approach?

14       **THE COURT:**  Yes.  Come on up.

15       (WHEREUPON, the following proceedings were held at

16 the bench.)

17       **MR. WATTS:**  Judge, my objection is we've been

18 instructed very specifically not to talk about last time.  You

19 warned Mr. Watts not to talk about class certification, and

20 Andy's gone through it twice.

21       **THE COURT:**  Well, I don't mind you referring to his

22 prior testimony, but to talk about the last time as an allusion

23 to a previous trial is troublesome, and you made reference to

24 an incident factor in a previous trial.

25       This jury, first of all, shouldn't care about a

DAILY COPY TRANSCRIPT

1  previous trial --

2          **MR. WEINSTOCK:**  I agree.

3          **THE COURT:**  -- and second of all, should not be privy

4  to anything that happened in a previous trial because we

5  specifically asked them if they knew anything about the case.

6                  So stay away from that.  If you want to refer to

7  prior testimony on a certain day, that's the way to reference

8  prior testimony.

9          **MR. WATTS:**  I just want the rule of the case from the

10  standpoint of, do I get to refer to his witness as "the last

11  time you were here with Mr. Weinstock," or are we going to just

12  say "your previous testimony," and that's going to be the end

13  of it?  I'm fine with saying that's the last time that's going

14  to happen.  That's cool.

15          **THE COURT:**  Well, my ruling is my ruling, and I will

16  remind counsel at the end of the day when the jury's left for

17  the day, that that's the way it's going to be.  And if we are

18  going to keep having violations of it, I'm either going to have

19  to issue a financial sanction or declare a mistrial.  And I

20  sure as heck don't want to do a mistrial.  So it's going to be

21  the former rather than the latter.

22          (WHEREUPON, the following proceedings were held in

23  open court.)

24  **BY MR. WEINSTOCK:**

25  **Q.**   Doctor, referring back to the Arts study, that's a paper

DAILY COPY TRANSCRIPT

1   you gave me to discuss the non-cancer effects of formaldehyde;
2   correct?
3   A.   I don't specifically remember giving it to you.
4   Q.   You cited it to me.  It's in your report.
5   A.   Yes, sir.
6   Q.   Okay.  You've also offered opinions in the past on the
7   effect -- the relationship between formaldehyde and cancer;
8   correct?
9   A.   That's correct.
10  Q.   And you would agree with me that, in 2004, IARC declared
11  formaldehyde to be a known carcinogen; correct?
12  A.   That's correct.
13  Q.   And they were the first agency in the world to declare
14  formaldehyde to be a known carcinogen at that point in time;
15  correct?
16  A.   Not necessarily aware that they were the first, but...
17  Q.   As a known carcinogen?
18  A.   Again, I'm not necessarily aware that they were the first
19  to --
20  Q.   Oh, I'm sorry.  You're not disagreeing with me; you just
21  don't know?
22  A.   That's correct.
23  Q.   Okay.  But you and I have gone over the Hauptmann paper
24  before, and you would agree that, when they found that -- the
25  finding was at 4,000 -- peak exposures above 4,000 parts per

284

DAILY COPY TRANSCRIPT

1  billion before there was an association between formaldehyde

2  exposure and cancer; correct?

3  A.   I believe --

4  Q.   Nasopharyngeal cancer.

5  A.   I believe that's correct.

6  Q.   I do not want to get into stuff that you're not prepared

7  to talk about.  Is it my understanding that you have not looked

8  at the more recent studies regarding issues about leukemia and

9  cancer and formaldehyde?

10 A.   That's correct.

11 Q.   I'm not going to sit here and hit you with stuff you have

12 not read and have not seen.  But in terms of 2004,

13 nasopharyngeal cancer, IARC's relationship was based on a peak

14 exposure above 4,000 parts per billion; correct?

15 A.   I believe that's correct.

16 Q.   And that's 80 times higher than 50 parts per billion;

17 correct?

18 A.   That's correct.

19 Q.   Doctor, part of the chart you gave us, part of your

20 analysis, included four studies that were not statistically

21 significant; correct?

22 A.   Correct.

23 Q.   And it's important to look at both those papers that show

24 positive associations or associations with statistical

25 significance and papers that show associations that don't show

DAILY COPY TRANSCRIPT

1  statistical significance; correct?

2  **A.**   Absolutely.

3  **Q.**   You would never just throw out four papers because they

4  didn't show what you were looking for, would you?

5  **A.**   No, sir.

6  **Q.**   Anybody that would throw those papers out and say they

7  have no meaning is not practicing epidemiology, are they?

8  **A.**   Well, it would certainly depend on the nature of the

9  papers.

10  **Q.**   If the sole reason for rejecting the paper was because

11  that paper did not show the association you were looking for,

12  you're not practicing epidemiology, are you?

13  **A.**   Yes, that would be a problem.

14  **Q.**   You're just practicing advocacy, aren't you?

15  **A.**   Yes, sir.

16          **MR. WEINSTOCK:**  That's all I have.  Thank you, Your

17  Honor.

18          **THE COURT:**  All right.  Thank you.

19              Redirect?

20          **MR. WATTS:**  Thank you, Your Honor.

21                          **REDIRECT EXAMINATION**

22  BY MR. WATTS:

23  **Q.**   Just three brief things, Doctor.  As we went through

24  Table 1, when you add all of those up, all of the subjects, I

25  count over 12,000 people that were in these different studies

DAILY COPY TRANSCRIPT

1  that you looked at.

2         You talk about the constant of aggregating.  Why do

3  you aggregate different studies?

4  A.   As I've said several times before, we don't have the

5  advantage of studying large -- infinitely large populations,

6  and so we like to aggregate the results of individual studies

7  as if all those individuals had participated in a single study,

8  and this is often referred to as a meta-analysis or a pooled

9  analysis.

10  Q.   And have you aggregated all these studies so that the

11  little ones that weren't statistically significant are thrown

12  in with the big ones that were?

13  A.   Well, we've obviously done it in a qualitative way.  I

14  mean, my report is a description of that.  We haven't done it

15  in a quantitative way.  That process is currently underway.

16  Q.   Okay.  But the bottom line is the qualitative aggregation

17  that you have done has allowed you to reach the conclusions

18  that you've described for the jury?

19  A.   Yes, sir.

20  Q.   All right.  Second issue.

21  A.   Can I --

22  Q.   The two papers that you cited to counsel previously, I

23  just want to visit with you a little bit about these:  Lang and

24  Arts.

25         Isabelle Lang, this is published in 2007; is that

DAILY COPY TRANSCRIPT

1   right?

2   A.   2008, I believe.

3   Q.   Okay.  Oh, it's available online in 2007, I understand.

4        Okay.  Here's my question:  The conclusion says

5   "minimal objective eye irritation was observed at a level of

6   0.5 parts per million with peaks of 1 part per million."

7   Right?

8   A.   Yes, sir, that's what it says.

9   Q.   Now, 0.5 parts per million, that is 500 parts per billion;

10  right?

11  A.   Yes, sir.

12  Q.   And when they say "with peaks," what is a peak?

13  A.   A peak is just a high point, and if they're administering

14  a variety of levels of formaldehyde to these individuals,

15  they're going to vary the dose as we were speaking about

16  earlier.

17  Q.   Now, when we talk about a minimal objective eye

18  irritation -- you've read through a lot of these studies;

19  correct?

20  A.   Yes, sir.

21  Q.   There's a difference between somebody who's starting to

22  blink an eye in response to a chemical substance as opposed to

23  somebody who has got burning eyes?

24  A.   I would think so.

25  Q.   When they talk in the Lang study about minimal eye

DAILY COPY TRANSCRIPT

1  irritation, a lot of these studies just look at eye blink and

2  response; right?

3  A.   A variety of subjective parameters.

4  Q.   All right.  And when they are saying "minimal objective

5  eye irritation was observed," that is at a level of 500 parts

6  per billion just to get the minimal eye blink; correct?

7  A.   I believe that's what it means.

8  Q.   But because it's dose-response, if you get a higher level

9  than the minimal objective eye irritation, you've seen in the

10  studies that you get more severe eye irritation.

11  A.   That would be the objective of studies such as this:  To

12  establish the basement and then perhaps the ceiling.

13  Q.   Sure.  So if somebody is just blinking their eyes, we know

14  they're, at least, 500 parts per billion exposure?

15  A.   In this particular study, yes.

16  Q.   But if somebody is exposed to a much higher level of

17  formaldehyde, such that their eyes might be burning, the

18  studies would show a dose-response relationship; right?

19  A.   Yes.  And it's probably also important to note that

20  there's going to be individual variety.

21  Q.   Yes.

22  A.   You could certainly have an individual who experiences

23  much more than minimal objective eye irritation at that .5 ppm

24  level.

25  Q.   Sure.

DAILY COPY TRANSCRIPT

1  A.   This is an average that they're reporting.

2  Q.   Now, if you go from the Lang study to the Arts study, the

3  Arts study says, "Sensory irritation is first observed at

4  levels of 1 part per million and higher"; right?

5  A.   Yes, sir.  That's what it says.

6  Q.   So we got Lang over here.

7        And 1 part per million, that would be 1,000 parts per

8  billion; right?

9  A.   That's correct.

10 Q.   So when we look at the Arts study, you've got sensory

11 irritation when you were up at 1,000 pars per billion; right?

12 A.   Yes, sir.

13 Q.   And, again, dose-response relationship, if you've got a

14 lot higher dose, the sensory response would be much more

15 severe?

16 A.   Supposedly so, yes, sir.

17 Q.   But in the two studies that counsel chose to ask you

18 about, if you're going to have minimal eye irritation due to

19 formaldehyde, that means your formaldehyde level was, at least,

20 500 parts per billion; right?

21 A.   Yes, sir.

22 Q.   And in the Arts study, if you're going to have sensory

23 irritation first observed, that means the formaldehyde level

24 was 1,000 parts per billion; right?

25 A.   That's correct.  We're, again, looking for a basement.

DAILY COPY TRANSCRIPT

1  **Q.**   All right.  You were in the courtroom when the last

2  witness just testified?

3  **A.**   I was, yes, sir.

4  **Q.**   Okay.  If somebody has burning eyes, and they can barely

5  breathe in response to this pungent smell that he testified

6  about, the studies Lang and Arts give us some idea of what the

7  basement of the level of exposure must have been when those

8  eyes were burning; right?

9  **A.**   The symptoms that were described when I was in the

10  courtroom would seem to be more than just minimal.  At least,

11  common sense would suggest that to myself.

12  **Q.**   So we know that the formaldehyde level was well above the

13  basements that are talked about in Lang and Arts?

14         **MR. WEINSTOCK:**  Objection, Your Honor.  May we

15  approach?

16         **THE COURT:**  Yes.

17         (WHEREUPON, the following proceedings were held at

18  the bench.)

19         **MR. WEINSTOCK:**  First, it's clear Mr. Jarrell was not

20  in Ms. Castanel's trailer.  More importantly, Mr. Jarrell

21  cannot tell us that the sensation he had was as a result from

22  formaldehyde.  To say that it's automatically

23  formaldehyde-related is a --

24         **MR. WATTS:**  Let me rephrase it.

25         **THE COURT:**  I've got to tell you, I have a lot of

DAILY COPY TRANSCRIPT

1   problems with Mr. Jarrell's testimony.  I thought it was

2   neither here nor there or -- and I don't think extrapolating

3   from his testimony with this witness is appropriate because I

4   just don't see the value in his testimony.

5          **MR. WATTS:**  I've got the others.  I'll move on.

6   Okay.

7          (WHEREUPON, the following proceedings were held in

8   open court.)

9   **BY MR. WATTS:**

10  **Q.**   This is two studies that talk about an irritant effect

11  threshold; right?

12  **A.**   Can I make one clarification?

13  **Q.**   Yes.

14  **A.**   The Arts paper actually isn't a study.  It's a review

15  paper.

16  **Q.**   Fair enough.

17  **A.**   Okay.

18  **Q.**   Lang and Arts both talk about irritant threshold; right?

19  **A.**   Yes, sir.

20  **Q.**   You've seen other papers talk about the irritant

21  threshold; is that right?

22  **A.**   I have, yes, sir.

23  **Q.**   All right.  And we'll talk about that with other

24  witnesses, but let me move on to another study.

25          Counsel asked you about IARC, that IARC first came

DAILY COPY TRANSCRIPT

1   out and said that formaldehyde was a known carcinogen in 2004.

2   Do you remember that question?

3   A.   Yes, sir.

4   Q.   Before they said that in 2004, in 1995 they said "probable

5   carcinogen"; right?

6   A.   Yes, sir.

7   Q.   In 2009, they looked at all the studies again, did they

8   not?

9   A.   I believe they did, yes, sir.

10   Q.   And they reiterated their clarification?

11   A.   Yes, sir, I believe --

12          MR. WEINSTOCK:  Objection, Your Honor.  I believe I

13   asked if he had reviewed those studies, and he had not.

14          MR. WATTS:  I thought you asked about the studies

15   about the IARC monograph.

16          THE COURT:  That was my understanding as well.  So

17   I'll overrule.

18   BY MR. WATTS:

19   Q.   I'm not asking -- you didn't read all the studies that

20   IARC read in between 2004 and 2009; right?

21   A.   No, sir.

22   Q.   But from the standpoint of IARC that was referenced by

23   counsel, after they reviewed all the world's literature between

24   2004 and 2009, what did they do?

25   A.   If you're asking me if I'm familiar with the progression

DAILY COPY TRANSCRIPT

1  of IARC's decision-making, the answer would be, yes, I'm

2  familiar with it.

3  **Q.**   What did they do between 2004 and 2009?

4  **A.**   I believe they upheld their original 2004 classification.

5  **Q.**   That it's a known carcinogen?

6  **A.**   Yes, sir.

7        **MR. WATTS:**  Those are all my questions.  Thank you,

8  Judge.

9        **THE COURT:**  Thank you, sir.  You can step down.

10            Mr. Watts, do we have --

11        **MR. WATTS:**  I've got one that fits perfect.

12        **THE COURT:**  Let's go ahead, and if we have someone

13  that will take a very short amount of time.

14        **MR. WATTS:**  I show it's 4:35.  I've got a 24-minute

15  one.  Would that work?  It gets us right to 5:00.  Or do you

16  want a shorter one?

17        **THE COURT:**  Do you have somebody that's shorter than

18  that?

19        **MR. WATTS:**  That's the shortest video that I've got.

20        **THE COURT:**  Let me ask the jury, then.  We can either

21  break for the day and pick up with that witness tomorrow, or we

22  can go ahead and take another witness now and get them out of

23  the way?  Does anybody have any strong feelings one way or the

24  other?  Anybody?

25            Do you feel like you can go another 25 minutes

DAILY COPY TRANSCRIPT

1  here, and we can get somebody in here that we don't have to

2  take on tomorrow?  Let's quickly do the 25-minute one.

3          **MR. WATTS:**  I've got a live witness I can do faster

4  than 25 minutes.  Dr. Paul Hewett.

5          **THE COURT:**  Dr. Hewett.

6          **MR. WATTS:**  I forgot I had him back there --

7  nevermind.  Let's go with the video.  I tried.

8          **THE COURT:**  This is Mr. George Cornish,

9  C-O-R-N-I-S-H.  He's been sworn in and counsel are present, and

10  here is his testimony.

11          (WHEREUPON, the videotaped deposition of **George**

12  **Cornish** was played.)

13  BY MR. WATTS:

14  **Q.**  Good morning, Mr. Cornish.  Would you please state your

15  full name for the record.

16  **A.**  George Raymond Cornish, Jr.

17  **Q.**  I'd like to explore your work experience subsequent to

18  your obtaining that diploma.  Would you kindly share with us

19  your work background?

20  **A.**  After high school?

21  **Q.**  Yes, sir.

22  **A.**  I did some typical restaurant jobs and that, but I worked

23  with my mom and dad at Royal Coach doing bus conversions.

24  Actually, grew up in it.

25  **Q.**  Okay.  Now, what exactly is Royal Coach?

DAILY COPY TRANSCRIPT

1   **A**   Royal Coach was a big bus converter, where they try to

2   make big preville buses into motor homes.

3   **Q**   And what -- you say you worked with your mom and dad.

4   Were they owners of --

5   **A.**   Yes, sir.

6   **Q.**   -- Royal Coach?

7   **A.**   Uh-huh.

8   **Q.**   What is your father's name?

9   **A.**   George Cornish, Sr.

10  **Q.**   And when did you actually start working for them on a

11  full-time basis?

12  **A.**   Let's see.  My mom and dad worked -- let me see.  My mom

13  and dad owned Royal, sold it in '86.  I worked as a -- you

14  know, as a young kid, sweeping floors, learning how to sand

15  cabinets, stain cabinets.  Just picking up after the guys and

16  watching and learning.

17          In '86, my folks sold it.  I worked for Double T

18  Manufacturing for a little bit.  And it was owned by Ken Tron.

19  I went back to work for him and worked at Royal there for a

20  year.

21          I worked with my dad at Freedom Coach.  He had

22  another company after my folks split up doing the same thing,

23  doing buses.

24  **Q**   And then who did you go work for after that?

25  **A.**   Let's see.  From Royal, I worked for Double T

DAILY COPY TRANSCRIPT

1  Manufacturing.

2  **Q.**   What exactly is Double T or was Double T Manufacturing?

3  **A.**   A cabinet shop.

4  **Q.**   And what sort of work did you do at this cabinet shop?

5  **A.**   I was production manager.

6  **Q.**   And what were those built out of?

7  **A**   They were built out of particle board; hardwood styles.

8  **Q**   Now, you mentioned Freedom Coach.  That was a company that

9  your father also owned?

10  **A**   Yeah, he was a part-owner in that, uh-huh.

11  **Q**   And what sort of business were they in?

12  **A**   Doing bus conversion, uh-huh.

13  **Q**   Who did you go to work for after that?

14  **A**   I worked for Dutch Park.

15  **Q**   And what was the business of Dutch Park?

16  **A**   They build park models.

17  **Q**   Park models?

18  **A**   Twelve-wide park models, uh-huh.

19  **Q**   And what was your job title with them at the time?

20  **A**   I was in charge of the cabinet shop.

21  **Q**   What were those cabinets made out of?

22  **A**   Some of them were wrap style; some of them were hardwood

23  styles.

24  **Q**   What is the first style that you mentioned?

25  **A**   A wrap style.

DAILY COPY TRANSCRIPT

1  **Q**   And what exactly is that?

2  **A**   It's just -- instead of a true hardwood, it's just like

3  a -- I don't want -- I don't know if I would use the word

4  *plywood* or whatever, but it's just wrapped with a -- like a

5  paper or vinyl.

6  **Q**   And underneath that, what exactly -- what is the material

7  underneath the --

8  **A**   That's what -- I --

9  **Q**   -- vinyl?

10  **A**   -- couldn't tell you what type of material it actually was

11  underneath.

12  **Q**   But it's some composite of --

13  **A**   Yeah.  It's some kind of just laminated wood.

14  **Q**   And who did you go to work for after that?

15  **A**   For Recreation by Design.

16  **Q**   Okay.  When did you first go to work for Recreation by

17  Design?

18  **A**   It's been, I think, eight -- eight, nine, years ago.

19  **Q**   Do you -- okay.  What position did you take after that?

20  **A**   Production manager.

21  **Q**   Do you remember what -- what year that would have been?

22  **A**   No, not exactly.

23  **Q**   But you would have been the production manager in 2005?

24  **A**   Yes, sir.

25  **Q**   Now, tell me exactly what your duties were as production

DAILY COPY TRANSCRIPT

1  manager in 2005?

2  **A**    To, basically, just oversee the line to make sure the

3  trailers were getting assembled properly and shipped out the

4  door.

5  **Q**    Who was the owner of Recreation by Design in 2005?

6  **A**    Randy Rush.

7  **Q**    And who would have been second in command?

8  **A**    I think Randy was everybody.  I mean, you know, it -- it's

9  Randy. I mean, there is no second command, to my knowledge, as

10  far as who would be next in line.

11  **Q**    Who else would have been along the same line as you, and

12  what would their title have been?

13  **A**    In management?

14  **Q**    Yes, sir.

15  **A**    Probably nobody.

16  **Q**    Okay.  So Randy Rush and you would have been management;

17  is that a fair statement?

18  **A**    Yep.

19  **Q**    For Recreation by Design?

20  **A**    Yes, sir.

21  **Q**    And this would have been for the year 2005?

22  **A**    Yes.

23  **Q**    Now, there is a gentleman whose last name is Gaume, I

24  believe it's pronounced.

25  **A**    Uh-huh.

DAILY COPY TRANSCRIPT

1    **Q**    But you do remember Mike Gaume?

2    **A**    I know the name, yeah.

3    **Q**    Okay.  And do you know what his job title was?

4    **A**    No, sir.

5    **Q**    Did he ever answer to you, to your knowledge?

6    **A**    No, sir.

7    **Q**    Do you know who he might have answered to?

8    **A**    Probably Randy.

9    **Q**    Have you taken any courses subsequent to your obtaining

10   the high school diploma?

11   **A**    No, sir.

12   **Q**    Do you hold yourself out as an engineer?

13   **A**    No, sir.

14   **Q**    And if someone were to say that you're an engineer, they

15   would be incorrect; is that correct?

16   **A**    That is correct.

17   **Q**    If Mr. Rush were to describe you as an engineer, would

18   that be correct or incorrect?

19   **A**    That would be incorrect.

20   **Q**    What did you have to do with the building or manufacturing

21   of cabinets at Double T Manufacturing?

22   **A**    I would take a print, and I would build a cabinet from it.

23   I actually had a crew of people.  I had a gentleman that would

24   run the saws to cut the parts.  I had people that did the

25   assembly.  I had people that did the packaging, and I had

DAILY COPY TRANSCRIPT

1   people that crated it for shipping.

2   **Q**   Okay.  And along with the different products that came

3   into the plant, did they have any type of documentation?

4   **A**   No, not to my knowledge.

5   **Q**   Okay. Do you know what an MSDS is?

6   **A**   Yes.

7   **Q**   Okay.  And what is that, for the record?

8   **A**   It's just a Material Data Sheet.

9   **Q**   And do you know the purpose of that data sheet?

10  **A**   Just for safety.

11  **Q**   And do you know for safety in connection with what?

12  **A**   With -- I don't know.  I mean, I can't answer that

13  correctly.

14  **Q**   Okay.  Have you ever read any of the MSDS that accompanied

15  the material?

16  **A**   No, sir.

17  **Q**   So even though, for instance, Double T Manufacturing would

18  receive MSDSs, you, as the production manager, would not

19  have --

20  **A**   No, sir.

21  **Q**   -- read what was contained in those MSDSs?

22  **A**   No, sir.

23  **Q**   Okay.  Did you ever discuss the contents of the MSDSs with

24  anyone?

25  **A**   No, sir.

DAILY COPY TRANSCRIPT

1  **Q**    Now, do you remember when the order for the Katrina
2  trailers came in?
3  **A**    No, I don't know really the exact date.
4  **Q**    Okay. Do you remember that an order for Katrina trailers,
5  in fact, came in?
6  **A**    Yes.
7  **Q**    Okay.  And do you remember that that order came from
8  Morgan Buildings and Spas?
9  **A**    I -- yeah, I think there was -- I think on our order form,
10  it said "Morgan" on it.
11  **Q**    Would that then -- and when I say "that," the dealing with
12  Morgan would have been strictly Randy Rush?
13  **A**    Yes, sir.
14  **Q**    So is it fair to state that Randy ran the show in
15  connection with that aspect of the business?
16  **A**    I would say so.
17  **Q**    Was it your understanding that the travel trailers were
18  going to be used by the victims of Hurricane Katrina?
19  **A**    Yes, sir.
20  **Q**    And -- and tell me how you learned of that.
21  **A**    I just told them we're going to -- you know, during normal
22  production of our regular trailers, and then we were told we're
23  going to build these trailers for FEMA, and they were people
24  that went through this catastrophe in New Orleans.  So we built
25  them.

DAILY COPY TRANSCRIPT

1   **Q**    Were the trailers that were built in connection with

2   Hurricane Katrina meant to be used for recreational purposes?

3   **A**    No, sir.

4   **Q**    And what were they meant to be used as?

5   **A**    Temporary housing.

6   **Q**    Okay.  And how do you define *temporary housing*?

7   **A**    I would say something that a person or persons could stay

8   in temporarily until they got on their feet or got back into a

9   home.

10  **Q**    Okay.  And is that -- is your understanding that that is

11  for an indeterminate period of time, or is it for a finite

12  period of time?

13  **A**    Depends on the person, I would guess.

14  **Q**    So someone could stay in the trailer that was built by

15  Recreation by Design for two years if they didn't find other

16  housing.  Is that your testimony?

17  **A**    Oh, I would say probably.  It's -- it has it -- they could

18  stay if they chose to.  Personally, I wouldn't want to live in

19  any trailer for two years.  But if need be...

20  **Q**    Why would you, George Cornish, not want to live in a -- a

21  trailer for two years?

22  **A**    Because it'd be awfully tiny.

23  **Q**    Well, I'll quote you -- cite you specifically to page 20,

24  line 1, of Mr. Rush's deposition.  So I ask you the question

25  again, sir.  If Mr. Rush were to testify under oath that the

DAILY COPY TRANSCRIPT

1    travel trailers that were built for the victims of Hurricane

2    Katrina were not designed to be lived in for a number of years,

3    will you disagree with that statement?

4    **A**    No.

5    **Q**    Okay.  What exactly is plant No. 2?

6    **A**    Plant 2 is just another building that they were -- RBD had

7    to help build these things.

8    **Q**    Okay.  And was this building, to your knowledge, used

9    specifically for the building of the Katrina trailers?

10   **A**    Yeah.  As far as my knowledge, yes.

11   **Q**    Was plant No. 2 in operation before the order came in for

12   these trailers?

13   **A**    Not to my knowledge.

14   **Q**    Did RBD, or Recreation by Design, have to ramp up with

15   more employees when this order came in?

16   **A**    Yes, sir.

17   **Q**    Who would have been the person in charge of plant No. 2

18   when these trailers were being built?

19   **A**    Randy --

20   **Q**    Randy?

21   **A**    -- Rush.

22   **Q**    So he took that on himself; is that correct?

23   **A**    Yeah.  We just didn't have the facility to be able to

24   produce the numbers that they needed.

25   **Q**    Have you ever heard of the word *formaldehyde* before?

DAILY COPY TRANSCRIPT

1   **A**    Yes, I have.

2   **Q**    When is the first time you have ever heard the word

3   *formaldehyde*?

4   **A**    Well, I honestly couldn't tell you.

5   **Q**    You never read or saw the word on any MSDS sheet that

6   would have been furnished to you -- and when I say "you," to

7   Double T Manufacturing -- when wood or plywood or wood

8   byproducts were sent to that plant?

9   **A**    No, sir.

10  **Q**    You never heard the word *formaldehyde* when you were --

11  went to work for Freedom Coach?

12  **A**    No, sir.

13  **Q**    Did you ever hear the word *formaldehyde* when you went to

14  work for Dutch Park?

15  **A**    No, sir.

16  **Q**    And up until the time that Recreation by Design built the

17  first travel trailer, the first Katrina travel trailer, you had

18  also never heard of the word *formaldehyde*?

19  **A**    No, sir.

20  **Q**    What is your recollection of what you first heard about

21  formaldehyde in travel trailers?

22  **A**    What I can recall, on the news, it said something about

23  that the trailers had formaldehyde in it, and people were being

24  irritated by it.

25  **Q**    And what was your response at the time when you first

DAILY COPY TRANSCRIPT

1  heard about it?

2  A    I really didn't have one.

3  Q    Okay.  Did you ever discuss the issue with Mr. Rush once

4  it hit the news?

5  A    No, sir.

6  Q    Did Mr. Rush ever have a company meeting to discuss with

7  you or any of the other employees the issue of formaldehyde in

8  trailers?

9  A    No, sir.

10  Q    Did you ever discuss it with any of your line employees,

11  the issue of formaldehyde in trailers?

12  A    No, sir.

13  Q    So as far as you know, the entire time that you worked for

14  Recreation by Design, the word *formaldehyde* was never a

15  discussion that took place by either the president, Mr. Randy

16  Rush, Mr. George Cornish, yourself, the production manager, or

17  anyone else?

18  A    As far as I know, yeah.

19  Q    Okay. Now, upon hearing the news about formaldehyde, do

20  you know whether or not Mr. Rush or anyone else at Recreation

21  by Devine -- by Design ever took any action to test for

22  formaldehyde in the products or the component parts that were

23  going into the Recreation by Design travel trailers?

24  A    No, sir.

25  Q    Okay. Did you ever suggest to Mr. Rush that Recreation by

DAILY COPY TRANSCRIPT

1    Design should somehow or another test to determine the extent

2    of formaldehyde content in its trailers?

3    **A**    No, sir.

4    **Q**    Did you ever hear Mr. Rush discuss with you or with anyone

5    else the fact that he wanted to test for the content of

6    formaldehyde in its Katrina travel trailers?

7    **A**    No, sir.

8    **Q**    Okay.  You are still employed by Recreation by Design?

9    **A**    I am.

10   **Q**    Okay.  When you were given the wood products to build

11   cabinets or to build any part of the trailer, did you have

12   occasion to look at any of the MSDS sheets that would have been

13   provided by the wood vendors?

14   **A**    No, sir.

15   **Q**    Would you please tell the jury if you have heard of the

16   term *LFE*?

17   **A**    No, sir.

18   **Q**    Do you know what *LFE* stands for?

19   **A**    No, sir.

20   **Q**    Are you aware of the fact that wood manufacturers sell LFE

21   wood?

22   **A**    No, sir.

23   **Q**    Do you know the difference in cost between LFE and non-LFE

24   material?

25   **A**    No, sir.

DAILY COPY TRANSCRIPT

1  Q    Did you ever have any discussion with Mr. Rush or anyone

2  else at Recreation by Design pertaining to the issue of LFE

3  wood products?

4  A    No, sir.

5  Q    Did Mr. Rush ever instruct you or anyone else at

6  Recreation by Design that you were to use LFE products?

7  A    Not to my knowledge.

8  Q    Were you ever made aware that Recreation by Design was

9  purchasing and using BlueLinx's formaldehyde bonded wood

10 products?

11 A    No, sir.

12 Q    Were you ever made aware that the BlueLinx's formaldehyde

13 bonded wood products had been used by Recreation by Design

14 since May of 2004?

15 A    No, sir.

16 Q    Now, sir, we already discussed the owner's manual, but you

17 indicated -- that had previously been identified as Cornish

18 No. 2 -- but you indicated that this is not a document that you

19 have read; is that correct?

20 A    That is correct, sir.

21 Q    Is it fair to state that at no time did Randy Rush, the

22 president and owner of Recreation by Design, ever instruct you

23 to familiarize yourself with the owner's manual?

24 A    Not to my knowledge.

25 Q    Okay.  And you never took it upon yourself to read the

DAILY COPY TRANSCRIPT

1    owner's manual?

2    **A**    No, sir.

3    **Q**    Now, you testified a moment ago that you were not the

4    production manager for plant No. 2 when the Katrina travel

5    trailers were being built; is that correct?

6    **A**    That is correct, sir.

7    **Q**    You don't distinguish between the dollars that you have --

8    in other words, whatever knowledge you had or didn't have about

9    formaldehyde has nothing to do with whether you worked at

10   plant 2 or plant 1; correct?

11   **A**    No, sir.

12   **Q**    Okay.  You just didn't -- you just didn't have any

13   knowledge.

14   **A**    I just didn't have the knowledge, no.

15   **Q**    So after the 2600 trailers were built for Morgan, then,

16   again, you-all went back to your regular --

17   **A**    Correct.

18   **Q**    -- contingent of workers?

19   **A**    Correct.

20   **Q**    Now, again, what -- what was your exact position title

21   during the 2005 time period at Recreation by Design?

22   **A**    Production manager.

23   **Q**    All right.  And were you the production manager at that

24   time period as well?

25   **A**    Yes.

DAILY COPY TRANSCRIPT

1  **Q**    And I believe you said that a production manager at

2  Recreation by Design oversees the line; is that right?

3  **A**    That is correct.

4  **Q**    Okay.  Your job specifically relates to the construction

5  of units; right?

6  **A**    That is correct.

7  **Q**    Do you do anything relative to the design of the units?

8  **A**    No, sir.

9  **Q**    That's somebody else at Recreation by Design?

10  **A**    Yes, sir.

11  **Q**    Were you the production manager or were you ever the

12  production manager for units that Recreation by Design made and

13  sold to Morgan during the 2005/2006 time frame for emergency

14  housing?

15  **A**    Yes, sir.

16  **Q**    And did you ever oversee these units being constructed?

17  **A**    Yes, sir.

18  **Q**    And that was in connection with your job as production

19  manager at Recreation by Design; right?

20  **A**    That's correct.

21  **Q**    Now, based upon -- based upon your work at Recreation by

22  Design during that 2005/2006 time frame, am I correct that

23  Recreation by Design would choose the products it would use in

24  constructing the units that were eventually sold to Morgan for

25  emergency housing?

DAILY COPY TRANSCRIPT

1  **A**    Best of my knowledge, yes.

2  **Q**    To your knowledge, do you know whether Recreation by

3  Design ever had a requirement that its units be aired out prior

4  to being used?

5  **A**    Not to my knowledge.

6  **Q**    And as the person -- as the production manager at

7  Recreation by Design while these units were being built, did

8  you ever voice any concerns about whether this product that was

9  being made for Morgan was safe for emergency housing?

10  **A**    No, sir.

11  **Q**    Okay.  Specifically talking about the units that

12  Recreation by Design made for Morgan in '05 and '06, to your

13  knowledge, is there anything about the way that those units

14  were built that would make them unsafe to live in for two

15  years?

16  **A**    Not to my knowledge.

17  **Q**    Do you keep copies of any building codes at the plant?

18  **A**    We have RVIA currently.

19  **Q**    All right.  Do you keep any copy -- copies of any other

20  building codes at the plant?

21  **A**    No, sir.

22  **Q**    Mr. Cornish, you said a few minutes ago that you had used

23  an RV?

24  **A**    Yes, sir.

25  **Q**    And you have used a Recreation by Design RV?

DAILY COPY TRANSCRIPT

1    **A**    Yes, sir.

2    **Q**    The supplies, the wood supplies, you were using for the

3    Morgan units, was it the same as what you were using prior --

4    for the prior production?

5    **A**    Yes, sir.

6    **Q**    Okay.  When a unit is finished with production, does it

7    leave your control as the production manager?

8    **A**    Yes.

9    **Q**    Okay.  It goes through a -- does it go through a final

10   inspection?

11   **A**    Yes.

12   **Q**    Okay.  Who's in charge of the final inspection?

13   **A**    In 2005?

14   **Q**    I'm sorry.  I was talking about the 2005 production runs,

15   yeah, the Morgan production run?

16   **A**    2005, Randy.

17   **Q**    That's Mr. Rush?

18   **A**    Yes.

19   **Q**    Okay. And that was outside your --

20   **A**    That was all him.  I --

21   **Q**    -- realm as production manager?

22   **A**    -- had nothing to do with it.

23   **Q**    Okay.  Is it your understanding these units were to be for

24   temporary housing?

25   **A**    Yes.

DAILY COPY TRANSCRIPT

1   **Q**    Did you have any input on how long a resident that would

2   come to live in one of these units would reside in the unit?

3   **A**    No.

4   **Q**    You don't have a degree in engineering?

5   **A**    No, sir, I do not.

6   **Q**    Okay.  How many years experience would you say you have in

7   the field of recreational vehicle building?

8   **A**    Let's see.  My mom and dad started Royal, I want to say,

9   in the mid -- mid '70s, '76, '77, maybe.  I grew up in it.

10  I've just been around it all my life.

11  **Q**    Okay.  During that time, have you been actively involved

12  in the building of units?

13  **A**    Yes.

14  **Q**    You were asked questions about LFE earlier.  Have you

15  heard of low formaldehyde-emitting material?

16  **A**    No, sir.

17  **Q**    Is it part of your duties for product -- is it part of

18  your duties as production manager to do product procurement?

19  **A**    No, sir.

20  **Q**    Okay.  Who is the person you believe that's in charge of

21  product -- when I say "procurement," I mean purchase --

22  ordering and purchasing.

23  **A**    Randy.

24  **Q**    That's outside the scope of your duties?

25  **A**    Correct.

DAILY COPY TRANSCRIPT

1  **Q**    Okay.  Recreation by Design units, are they built in
2  accordance with industry standards?
3  **A**    Yes.
4  **Q**    Okay.  In your opinion -- in your opinion, were the Morgan
5  units safe and habitable for occupancy?
6  **A**    Yes.
7  **Q**    No, please answer my question:  Can you say that the
8  travel trailers were, in fact, built to RVIA standards if that
9  was not something that was within your purview?
10 **A**    Probably not then.
11 **Q**    You were asked about quality control.  Quality control for
12 plant 2 was conducted by who?
13 **A**    I couldn't tell you.  Wasn't there.
14 **Q**    And did you even conduct quality control yourself for
15 plant 1?
16 **A**    No, sir.
17 **Q**    Do you know what is considered a -- a safe level of
18 formaldehyde?
19 **A**    No, sir.
20 **Q**    Do you know what the MSDS sheets say about formaldehyde --
21 **A**    No, sir.
22 **Q**    -- contained in the products?
23 **A**    No, I do not.
24 **Q**    You are not a hygienist?
25 **A**    No.

DAILY COPY TRANSCRIPT

1  **Q**   You are not an allergist?

2  **A**   No.

3  **Q**   You are not a psychologist?

4  **A**   Nope.

5  **Q**   You are not an oncologist?

6  **A**   No.

7  **Q**   So you can't sit here and tell this jury today what

8  constitutes a safe Katrina travel trailer; correct?

9          You can answer the question.

10  **A**   Technically, no.

11  **Q**   Okay.  And as the production manager -- production

12  manager, you were not told of any complaints from any of your

13  employees regarding formaldehyde?

14  **A**   No, sir.

15  **Q**   Okay.  Was Randy Rush the person in charge of quality

16  control for plant 1?

17  **A**   I would say so.

18  **Q**   As far as industry standards and compliance with industry

19  standards, would that be Randy Rush's job?

20  **A**   Yes.

21          **THE COURT:**  Okay.  Turn the lights on.

22              Thank you all very much for your attention and

23  your patience today.  I know it's been kind of a long day and a

24  lot of this is new to you, but we really do appreciate your

25  indulgence.  We would like to start tomorrow at 8:30 if that's

DAILY COPY TRANSCRIPT

1   okay with you-all.

2              Now, Mr. Naquin, you're coming from Thibodaux;

3   and Mr. Patterson, you're even a little bit farther away.  Is

4   it possible for us to start at 8:30?  Can you-all be here?

5              All right.  If you get here a little bit early,

6   for all of you-all, then we'll have some goodies in the jury

7   room for you.  When you do get to the courthouse, go straight

8   to the jury room until 8:30.  We will start promptly at 8:30.

9   As I said, we're very respectful of your time, so we will start

10  promptly at 8:30.  We'll take a mid-morning break, as we did

11  today; a lunch break; mid-afternoon; and we will break by

12  5:00 p.m., if not a little earlier, tomorrow.  We have an

13  ambitious schedule, but I think we'll cover a lot of ground

14  tomorrow.  We have today also.  So we will continue to endeavor

15  to do that.

16             In the meantime -- and you already know what I'm

17  going to say -- please do not discuss the case either amongst

18  yourselves or with anyone else for that matter.  You can tell

19  your spouse or anyone who asks that you have been selected to

20  serve on the jury here, but please don't discuss any of the

21  issues in the case amongst yourselves or with anyone else.  You

22  will get the case to deliberate.  And then after you're

23  discharged from jury service, you can talk to them with certain

24  limitations, which I'll tell you about at the end.

25             All right.  Thank you all again.  Have a good

316

DAILY COPY TRANSCRIPT

1   evening.  We will see you tomorrow morning.

2           **THE DEPUTY CLERK:**  All rise.

3           (WHEREUPON, the jury exited the courtroom.)

4           **THE COURT:**  Why don't you-all be seated for a second.

5   We have a few housekeeping matters.

6               On the issue of demonstrative exhibits and the

7   thing we talked about first thing in the morning, I am advised

8   that we have not received an opposition from either side

9   relative to objections to the demonstrative exhibits.  Those

10  were due at 4:00 p.m.

11          Have you-all -- I gather you-all have viewed each

12  other's and worked this out?

13          **MR. WATTS:**  I think that where we were -- and I

14  apologize for not telling that to the Court -- I agreed that

15  they could use the food things that you saw in the opening, and

16  so we withdrew that.

17              Andy and I agreed that we were going to get

18  together with respect to Patricia Williams.  There's three or

19  four in there that he's going to let me know which ones he's

20  got an objection to.  I told him there's way too many of them

21  anyway, so I'm likely to agree.  If we have a disagreement,

22  we'll let you know first thing.  She's not going on until

23  Wednesday.

24          **THE COURT:**  My ruling -- if any of those are subject

25  to a prior ruling, I would suggest that that be made

DAILY COPY TRANSCRIPT

1  applicable.

2       **MR. WATTS:**  I guess the short answer is we think

3  we're going to work it out.

4       **MR. GARRISON:**  Yes, sir.  I was under the impression

5  that we did work it out.  In addition to the --

6       **MR. WEINSTOCK:**  We'll be able to work it out, Your

7  Honor.

8       **THE COURT:**  All right.  Good.

9            Another reminder, which has come up a couple of

10  times here already today, and I would remind all counsel since

11  there was only one of you each up here at the time:

12            Number one, references to prior testimony should

13  be made simply by date:  Do you recall testifying on November,

14  whatever day, not in the *Fleetwood* matter or in the *Gulf Stream*

15  matter?  All right?  We have to be very careful when we refer

16  to prior testimony if it's prior testimony in this MDL.

17            This jury is here to hear this case.  There

18  should be no references whatsoever to any other proceedings in

19  the MDL other than this particular trial.  So you can refer to

20  prior statements, but you should do so by date as opposed to

21  class hearing, *Gulf Stream* trial, whichever.  So let's be clear

22  on that.

23            There was another issue, too, that had come up.

24  I think I had made a note when you were all up here to address

25  it at the end.  Mr. Watts, do you recall what that was?

DAILY COPY TRANSCRIPT

1    **MR. WATTS:**  Well, I didn't know which one you made a

2  note on, but I got one that came up while we were up there.

3    **THE COURT:**  Yes.

4    **MR. WATTS:**  Andy brought up leukemia, and I'm not

5  looking to try a full-blown deal, but I think in fairness, now

6  that that door has been opened, I should be able to read from

7  the line in the IARC monograph the jury's already heard about,

8  where they say, "We now think that there's sufficient evidence

9  to tie into leukemia as well."  Then to take one line and

10  whatever he wants to do to fix it, but I don't think he should

11  get to throw that out there and then I don't get to respond to

12  it.

13    **THE COURT:**  Andy?  It came -- the word came up, and I

14  don't know why it was even mentioned because it has been a

15  constant in the pretrial motion practice in each of the trials

16  we have had about what is and is not included with regard to

17  the plaintiff's complaint -- the plaintiff's medical condition.

18          It came up with regard to some questioning in

19  Dr. McGwin.  I don't know that it was a comment on it so much

20  as it was:  "Well, I'm not going to ask you about," which we

21  didn't need to say anyway, but we did get -- do you recall

22  that?

23    **MR. WEINSTOCK:**  I recall asking the question, Your

24  Honor, and I guess I'm --

25    **MR. GARRISON:**  Your Honor, I think Andy was saying

DAILY COPY TRANSCRIPT

1  we're not going to go into leukemia.  I don't see how that

2  opens the door.

3          **THE COURT:**  Well, and I'm not so sure that it does,

4  but I'm not -- it's not a license to begin saying, "Well, we're

5  not going into this and we're not going into that," and then

6  the jury's left with an open question in their mind of why and

7  to what extent that is applicable.

8          **MR. WATTS:**  And more importantly, the way he did it

9  was suggesting that the recent study said there's no link with

10 leukemia, when IARC has looked at the recent study and said

11 there is a link, so --

12         **THE COURT:**  Why don't you do this, why don't you

13 get -- of course, you're going to have to get with Jodi on

14 this, but that segment of the transcript.

15              I'm not to the point where I think the door has

16 been opened for further comment so much as it is an

17 admonishment that, if we are here to talk about Ms. Castanel's

18 medical condition, let's stick with that and not talk about

19 some theoretical conditions that we all agree are not

20 applicable and, in fact, the defendant has already objected to.

21              So, you know, let's look at the transcript and

22 see exactly what it is that was said, and if it's fair enough

23 to cover it again, I'll let you do that, but I'm not certain

24 that it has been.  I'm more concerned about for future

25 reference.

DAILY COPY TRANSCRIPT

1          **MR. WATTS:**  But what I'll do is I'll bring you the

2    transcript where it came up, and then I'll bring you the

3    proposed remedy.  It's not -- I'm not mad at Andy for doing it,

4    but I think with the one-line deal and the IARC deal that

5    was -- and I argued this in the last case that, you know,

6    leukemia is a cancer and, therefore, should be part of pure

7    cancer.  But in light of it coming up, I think I can handle it

8    with one line and then we leave it alone again.

9          **THE COURT:**  All right.  Let's take a look at it.  If

10   you-all want to talk about it in the morning, we'll talk about

11   it in the morning, assuming that Jodi can pull that for you

12   quickly.

13              What else?  Anything else on the record that we

14   need to cover?

15         **MR. WATTS:**  If I can turn on my e-mail, I'll e-mail

16   everybody here the order of presentation for tomorrow.  I've

17   got it --

18         **THE COURT:**  Is there anything else we need to cover

19   with the court reporter?

20         **MR. WATTS:**  No, sir.

21         **THE COURT:**  Off of the record.

22

23

24

25

DAILY COPY TRANSCRIPT

1              **(OFF THE RECORD)**

2                   *****

3                **CERTIFICATE**

4         I, Jodi Simcox, RMR, FCRR, Official Court Reporter

5    for the United States District Court, Eastern District of

6    Louisiana, do hereby certify that the foregoing is a true and

7    correct transcript, to the best of my ability and

8    understanding, from the record of the proceedings in the

9    above-entitled and numbered matter.

10

11

12                        S/ Jodi Simcox, RMR, FCRR
                          Jodi Simcox, RMR, FCRR
13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA