```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3     ***************************************************************

 4     IN RE:  FEMA TRAILER
       FORMALDEHYDE PRODUCTS
 5     LIABILITY LITIGATION
                                DOCKET MDL NO. 1873 "N"
 6                              NEW ORLEANS, LOUISIANA
                                TUESDAY, MAY 18, 2010, 8:30 A.M.
 7
       THIS DOCUMENT RELATES TO:
 8
       DOCKET NO. 09-3251,
 9     EARLINE CASTANEL v
       RECREATION BY DESIGN, LLC
10
       ***************************************************************
11
                         DAY 2, MORNING SESSION
12                  TRANSCRIPT OF JURY TRIAL PROCEEDINGS
             HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
13                   UNITED STATES DISTRICT JUDGE

14

15     APPEARANCES:

16
       FOR PLAINTIFF:          WATTS GUERRA CRAFT
17                             BY:  MIKAL C. WATTS, ESQUIRE
                               FOUR DOMINION DRIVE
18                             BUILDING THREE, SUITE 100
                               SAN ANTONIO TX 78257
19

20                             CHRIS PINEDO
                               ATTORNEY AT LAW
21                             802 N. CARANCAHUA, SUITE 2250
                               CORPUS CHRISTI TX  78470
22

23                             REICH & BINSTOCK
                               BY:  DENNIS C. REICH, ESQUIRE
24                             4265 SAN FELIPE, SUITE 1000
                               HOUSTON TX  77027
25
```

1  APPEARANCES CONTINUED:

2

3  FOR DEFENDANT:              GARRISON YOUNT FORTE & MULCAHY
                              BY:  LYON H. GARRISON, ESQUIRE
4                                  SCOTT P. YOUNT, ESQUIRE
                                   RANDALL C. MULCAHY, ESQUIRE
5                              909 POYDRAS STREET, SUITE 1800
                              NEW ORLEANS LA  70112
6

7                              DUPLASS ZWAIN BOURGEOIS MORTON
                              PFISTER & WEINSTOCK
8                              BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                   JOSEPH G. GLASS, ESQUIRE
9                              THREE LAKEWAY CENTER
                              3838 N. CAUSEWAY BOULEVARD
10                             SUITE 2900
                              METAIRIE LA  70002
11

12

13  OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
                              500 POYDRAS STREET, ROOM B406
14                             NEW ORLEANS LA  70130
                              (504) 589-7779
15

16  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
   PRODUCED BY COMPUTER.

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3    EXAMINATIONS                                        PAGE

4

5    **SANDRA DAVIS**.......................................... 326

6    DIRECT EXAMINATION BY MR. WATTS........................ 326

7    CROSS-EXAMINATION BY MR. GARRISON...................... 335

8    REDIRECT EXAMINATION BY MR. WATTS...................... 342

9    VIDEOTAPED DEPOSITION OF **ROBERT WOZNIAK**................ 345

10   **PAUL HEWETT**............................................ 363

11   VOIR DIRE EXAMINATION BY MR. WATTS..................... 363

12   DIRECT EXAMINATION BY MR. WATTS........................ 364

13   CROSS-EXAMINATION BY MR. YOUNT......................... 386

14   REDIRECT EXAMINATION BY MR. WATTS...................... 413

15   VIDEOTAPED DEPOSITION OF **KEVIN SOUZA**................... 422

16   **KENNETH LAUGHERY**...................................... 438

17   DIRECT EXAMINATION BY MR. WATTS........................ 439

18   CROSS-EXAMINATION BY MR. YOUNT......................... 447

19   REDIRECT EXAMINATION BY MR. WATTS...................... 467

20

21

22

23

24

25

1                           **P-R-O-C-E-E-D-I-N-G-S**

2                           MORNING SESSION

3                   TUESDAY, MAY 18, 2010, 8:30 A.M.

4                        (COURT CALLED TO ORDER)

5

6

7           THE COURT SECURITY OFFICER:  All rise.

8              (WHEREUPON, at this point in the proceedings, the jury

9    panel enters the courtroom.)

10          THE COURT:  Good morning.  You may be seated.  Thank you

11   all for being ready to work this morning.  Let's go ahead and get

12   started.

13              Mr. Watts, you have another witness for us to hear.

14   I mentioned we were going to cover a lot of ground today, and I

15   think from looking at the schedule that we intend to cover today,

16   it looks like we will, so let's go ahead and get started.

17          MR. WATTS:  Yes, sir.  Thank you.  At this time, the

18   plaintiffs call Sandra Davis to the stand.

19          THE COURT:  Sandra Davis.  If there is anyone else in

20   here who is a fact witness, if you would please step outside

21   while Ms. Davis is making her way up.

22              Ms. Davis, if you would come up here, please.  When

23   you get to this chair, remain standing.  You can take the oath

24   and have a seat.

25              If there are any other fact witnesses here, I would

1  ask that you please step outside.

2          THE DEPUTY CLERK:  Would you please raise your right

3  hand.  Do you solemnly swear that the testimony which you are

4  about to give will be the truth, the whole truth and nothing but

5  the truth, so help you God?

6          THE WITNESS:  I do.

7                          **SANDRA DAVIS**

8  was called as a witness and, after being first duly sworn by the

9  Clerk, was examined and testified on her oath as follows:

10          THE DEPUTY CLERK:  Please state your name and spell it

11  for the record, please.

12          THE WITNESS:  My name is Sandra C. Davis, S-a-n-d-r-a,

13  middle initial C, Davis, D-a-v-i-s.

14          MR. WATTS:  May I proceed, Your Honor?

15          THE COURT:  Yes.

16                      DIRECT EXAMINATION

17  BY MR. WATTS:

18  Q.   Sandra, I noticed on my cheat sheet list of witnesses, I

19  wrote down Sandra Castanel, and I did that because you're

20  Ms. Castanel's daughter; is that right?

21  A.   Correct.

22  Q.   Where did you grow up?

23  A.   In the Fifth Ward on St. Peter Street in New Orleans.

24  Q.   Is my client a good momma?

25  A.   Excuse me?

1  Q.   Is my client a good momma?

2  A.   Oh, yes, she is.

3  Q.   Tell the jury what kind of momma she was when you were

4  growing up.

5  A.   A good, loving mother.  Always took care of us, seeing that

6  we had everything that we needed.  Sent us to a good school,

7  Catholic school.  I didn't go to college, but my sisters and my

8  brother did.  She's a good, loving mother.

9  Q.   After you grew up, you obviously got married to somebody

10 named Davis?

11 A.   Correct.

12 Q.   When did you get married?

13 A.   That was December 19, 1975, in New Orleans.

14 Q.   Since the time that you got married, have you had children?

15 A.   Yes, one daughter.

16 Q.   I don't mean to date you, but how old is she?

17 A.   29.

18 Q.   Has she blessed you with any grand kids?

19 A.   I have two grandsons.  One will be a year old next month,

20 and the other will be seven years old in August.

21 Q.   Now, since the 1970s when you started your own family, have

22 you maintained a close and loving relationship with your mother?

23 A.   Yes.

24 Q.   Did you see her frequently before the storm?

25 A.   All the time.  I was living in the next block from my

1   mother, and I was with her just about every day.

2   Q.   Now, I was going to ask a stupid question, "Where do you

3   work," but I think your uniform tells us.  Tell us what you do.

4   A.   At the main post office.  I'm a mail handler.  I work at the

5   main post office on Loyola, and I'm a mail handler.

6   Q.   Now, during the time that your mother lived in the FEMA

7   trailer, would you go visit her?

8   A.   Yeah, I used to go visit her.

9   Q.   When would you go see your mother while she lived in the

10  FEMA trailer?

11  A.   Most of the time on Sunday, mostly every Sunday after

12  church, we go over there and I might go, like, sometimes once or

13  twice during the week.

14  Q.   So you spent time in this FEMA trailer?

15  A.   Yes, I did.

16  Q.   Can you describe for the jury when you would walk into this

17  FEMA trailer, what you experienced.

18  A.   Such as what, like, just how it looks or --

19  Q.   Did you notice anything about the trailer?

20  A.   Well, I noticed that from looking at it, it was wide, but

21  when I walked in, I would smell, like, a little new odor.  It was

22  more like a -- like a scent of a new car.

23  Q.   Was this smell strong or weak?

24  A.   No, it was strong.

25  Q.   How long did you notice this strong smell when you walked

1  into your mother's trailer?

2  A.   It was a while.  I noticed it for a while.

3  Q.   When you would go visit your mother and noticed this strong

4  smell when you walked into the trailer, did you ever go with your

5  sisters?

6  A.   Yeah.

7  Q.   Did you all discuss the issue of this smell?

8  A.   Yes, I did discuss it with my sisters.

9  Q.   Did your mom ever mention it to you?

10  A.   Yes, she did.

11  Q.   What would she say?

12  A.   She used to say it was like a funny odor, and she was saying

13  that -- when I would go up in there, she said it was like a funny

14  odor to her.

15        MR. GARRISON:  Your Honor, this is hearsay.

16        THE COURT:  Let's stick with what she observed.  I'm

17  going to sustain the objection.  Let's stick what she observed as

18  opposed to what her mother told her.

19                              EXAMINATION

20  BY MR. WATTS:

21  Q.   Don't tell me exactly what she said, but let me just ask

22  you:  In terms of her condition, she had sinus issues before she

23  moved in, correct?

24  A.   Correct.

25  Q.   Did you notice anything different about your mother's

1   condition after she moved into the trailer?

2   A.   Yes, I did.

3   Q.   Describe that for the jury.

4          MR. GARRISON:  Objection, Your Honor.  This calls for a

5   medical opinion.

6          MR. WATTS:  This is based on her rational perception.

7          THE COURT:  I'm going to overrule.  The jury understands

8   that the witness is not a medical doctor and this is not a

9   medical diagnosis.  It's just her impression of observing her

10  mother.  I'm going to let her answer based upon a lay opinion

11  based on personal observation.

12         MR. WATTS:  Thank you, Your Honor.

13                          EXAMINATION

14  BY MR. WATTS:

15  Q.   Ms. Davis, if you could, describe for the jury what you

16  noticed was different about your mother and her condition.

17  A.   Well, I know before the hurricane she had sinus problems,

18  but after she was in the trailer, she would always complain her

19  sinuses was getting worse.  And she would always tell me -- she

20  would do like this (indicating), she said -- she said, "I have a

21  hard time breathing," and she would feel, like, light-headed.

22  And she would always complain to me and tell me that she was

23  light-headed or she had problems breathing, and she would always

24  do like (indicating).  She would be light-headed and always had

25  problems breathing and her condition had gotten worse.

1    Q.    There was some discussion in opening statements -- and I

2    know you weren't in here -- about how frequently she was going to

3    the doctor.  Tell the jury who took your mother to the doctor

4    while she was in the trailer.

5    A.    I took her a couple of times and my step dad.

6    Q.    At the time that you were taking your mother to the doctor

7    while she was in the trailer, did you have any clue what was

8    causing that smell?

9    A.    No.  Not at the time.

10   Q.    At the time that you were taking your mother to the doctor

11   while she was in that trailer, until the very end, did y'all ever

12   talk about the issue of formaldehyde or know anything about it?

13   A.    Yes, we did.

14   Q.    When did you talk about it?

15   A.    That was, like, towards the end because at the time when we

16   were smelling it, I didn't know what it was, but then when we

17   started hearing things on the news, then we were figuring that's

18   probably what could be the cause.

19   Q.    Now, I want to talk to you about your mother.  You had a

20   brother that passed away back in the early 1970s; is that right?

21   A.    Right.

22   Q.    What did your brother pass away from?

23   A.    Cancer.

24   Q.    After she lived in this trailer and you all noticed this

25   strong smell when you would walk in the trailer for a while, and

1  then these news reports started happening, have you had occasion

2  to be around your mother when the issue of cancer has come up?

3  A.   Yes.

4  Q.   Tell the jury what you learned about what your mother feels.

5       MR. GARRISON:  Your Honor, this is hearsay and she's

6  talking about her mother's feelings.

7       THE COURT:  I think you have to rephrase the question.

8  I don't agree that it's necessarily hearsay.

9       MR. WATTS:  It's not hearsay.

10      THE COURT:  But I think you're going to have to rephrase

11 the question to the extent that you're asking about what her

12 mother feels.

13                        EXAMINATION

14 BY MR. WATTS:

15 Q.   Let me rephrase it.  What has your mother told you with

16 respect to the issue of cancer?

17      MR. GARRISON:  Objection; hearsay.

18      THE COURT:  I'm going to overrule.

19      THE WITNESS:  Can you repeat the question?

20                        EXAMINATION

21 BY MR. WATTS:

22 Q.   What has your mother told you when you all discussed this

23 issue of cancer?

24 A.   Oh, she was just saying that she was wondering if -- after

25 she heard about all the stuff on the news, she was wondering if

1    that would be causing her to have cancer.  And I knew she was

2    afraid and concerned about it.

3    Q.   Because of what happened to your brother?

4    A.   Right.

5              THE COURT:  Let's not lead the witness either.

6              MR. WATTS:  I apologize, Judge.

7                           EXAMINATION

8    BY MR. WATTS:

9    Q.   Just one other issue.  To be fair, nobody has diagnosed your

10   mother with cancer?

11   A.   Correct.

12   Q.   Based upon what you observed with respect to her sinus

13   condition, her respiratory condition, can you tell the jury

14   whether the problem stayed the same or got worse after she was in

15   the trailer?

16   A.   No, it had gotten worse -- after she was in the trailer, it

17   had gotten worse because she was complaining a lot more, and I

18   seen where it had gotten worse.

19   Q.   Now, Sandra, the jury has heard your mother has recently had

20   a surgery.

21   A.   Correct.

22   Q.   Were you involved with taking care of her when that

23   happened?

24   A.   Yes.

25   Q.   To be fair, you don't know why she needed the surgery.

1    That's for medical doctors, right?

2    A.   Excuse me?

3    Q.   Well, let me just try again.

4         Tell the jury about what happened to your mother when

5    she went through the surgery, what you observed.

6    A.   After the surgery or before the surgery or when are you

7    talking?

8    Q.   Let's start with before and then tell us --

9    A.   Well, before that, she was having, just like I say, a lot of

10   problems with her sinuses, and she was always complaining that

11   she couldn't breathe, she would stay dizzy a lot and

12   light-headed.

13        So she had to go and take some tests and I think a CAT

14   scan or whatever it was she had to take, and they said that she

15   had a bad, bad infection up in here (indicating), and it was -- I

16   forgot exactly what they call it, but it was really bad.  And I

17   was concerned about her health at the time.

18        So anyhow, she had to go and she had to stay overnight

19   in the hospital.  And they put something in her nose, whatever,

20   and whatever they had to do, scrape all the infection out.  They

21   said all of this was infected, so they scraped that out.  Then

22   she stood in the hospital.

23        And after the surgery -- well, she stood in the

24   hospital overnight.  After the surgery, she still had, like,

25   little minor problems.  Like right now, she's having problems

```
 1  with the dizziness.  But that's all I can --
 2  Q.   Has the surgery helped her?  Is she doing better?
 3  A.   She's doing a little better with the surgery, but, you know,
 4  just like a little dizziness right now.
 5  Q.   Sandra, those are all of my questions.
 6  A.   The doctor did tell her after the surgery --
 7       THE COURT:  Wait.  As long as you answer his questions,
 8  you're doing fine.
 9       MR. WATTS:  I'm all out of questions, so I'm going to
10  let him ask you questions.  Thank you, Sandra.
11       THE WITNESS:  You're welcome.
12       THE COURT:  Thank you.
13          Mr. Garrison.
14       MR. GARRISON:  Yes, sir.
15                      CROSS-EXAMINATION
16  BY MR. GARRISON:
17  Q.   Good morning, Ms. Davis.
18  A.   Good morning.
19  Q.   We met at your deposition.
20  A.   Correct.
21  Q.   Good to see you again.
22       Now, your mother received treatment for anxiety and
23  depression before Hurricane Katrina, right?
24  A.   Right.
25  Q.   And your mother received treatment for chronic sinuses
```

1    before Hurricane Katrina, correct?

2    A.    Correct.

3    Q.    Now, you testified about the odor in your mother's trailer.

4    A.    Correct.

5    Q.    And you described that as a new smell?

6    A.    Like it was a new smell, like a car smell.  It was a

7    peculiar odor to me.

8    Q.    You became concerned about that smell at some point; is that

9    correct?

10   A.    Right.  Correct.

11   Q.    You never offered to let your mother live at your place, did

12   you?

13   A.    No.

14   Q.    You don't know how long that odor lasted in the trailer, do

15   you?

16   A.    It was a while.  I don't know exactly how long, but I know

17   it was a while.

18   Q.    My question is:  You don't know how long that odor lasted in

19   the trailer; is that correct?

20   A.    No.

21   Q.    Is that a correct statement?

22   A.    Just said it was a while.

23   Q.    You found your mother's trailer comfortable on Sundays when

24   you went over to the trailer; is that correct?

25   A.    Meaning that I thought it was spacious and fulfilled her

1   needs, but it wasn't good for her health to -- I mean, it wasn't

2   good for her to live in, concerning her health.

3   Q.   When I asked you if you found the trailer comfortable, you

4   said "yes."

5   A.   Yes.  And what I was meaning, that it was spacious.  Because

6   I remember telling -- I think it's on the deposition where I was

7   telling you that I meant that it was spacious, that she had a lot

8   of room, because I knew she used to say, "Oh, there's a lot of

9   room" because I think it was, like, a handicap trailer where it

10   had a lot of space.  And at that time, that's what I was thinking

11   of.

12         But -- and I still say it was spacious and all, but

13   after everything was going on, I realized it wasn't a good place

14   for her to live in, concerning her.

15   Q.   But you agree that you described your mother's trailer as

16   comfortable?

17   A.   Like I said, for being spacious wise.

18   Q.   You never told your mother that she should move out of the

19   trailer at any time, did you?

20   A.   I don't think.  I don't recall that.

21   Q.   Did you ever notice any leaks in the trailer?

22   A.   No, I never noticed.

23   Q.   Now, your mother lived on St. Peter before

24   Hurricane Katrina, correct?

25   A.   Correct.

1   Q.   And that house flooded?

2   A.   Correct.

3   Q.   And after the hurricane, you and your mother went back to

4   that house on St. Peter, correct?

5   A.   Correct.

6   Q.   And that house was badly damaged due to the flood, correct?

7   A.   Correct.

8   Q.   Did your mother have any complaints about her sinuses when

9   she went into the house on St. Peter?

10  A.   What do you mean, that day or do you mean just after that,

11  ordinary?

12  Q.   Let me ask a better question.  When you and your mother went

13  into the house on St. Peter after it was damaged, did your mother

14  complain about her sinuses?

15  A.   Okay.  She always did complain about her sinuses.  Like I

16  say, after the hurricane, that was mostly her complaints.

17  Q.   Yes, ma'am.  So when your mother went into the damaged house

18  on St. Peter, she complained about her sinuses at that time as

19  well?

20  A.   I'm trying to find -- do you mean while she was in there?

21  Q.   Yes, ma'am.

22  A.   In the house at that particular -- I can't remember for that

23  particular one day.

24  Q.   As I understood your testimony, your mother told you that at

25  some point, she thought her trailer was causing her sinuses to

1    get worse; is that correct?

2    A.   Correct.

3    Q.   And you never told your mother to go to the doctor and tell

4    the doctor about the trailer?

5    A.   Yes, I did.  Time and time, I told her, "Why don't you go

6    see the doctor?"

7    Q.   And do you know if your mother went to the doctor and

8    described to the doctor that she thought the trailer was causing

9    her certain problems?

10   A.   She went to the doctor, but what she told the doctor, I

11   don't know.

12   Q.   Yes, ma'am.  You don't know the temperature at which your

13   mother kept her trailer, do you?

14   A.   Oh, no.

15   Q.   And every time you went to the trailer, your mother was

16   running the AC; is that correct?

17   A.   I remember they had it on sometimes.  I can't remember

18   exactly because that was something I wasn't paying attention to.

19   But I know sometimes she would have it on.

20   Q.   And sometimes when you went to the trailer, your mother

21   would have that screen door open; isn't that correct?

22   A.   Yeah.

23   Q.   You testified about your brother's cancer.  He died several

24   years ago; is that correct?

25   A.   Correct.

1  Q.   And I didn't catch your testimony about whether your mother

2  mentioned a fear of cancer to you at that time.  Did your mother

3  mention a fear of cancer to you when your brother passed away?

4  A.   No.

5  Q.   In fact, the first time your mother mentioned a fear of

6  cancer to you was when she had the CT scan back in December,

7  correct, in December of 2009?

8  A.   It was way after -- it was after the hurricane.

9  Q.   Okay.

10  A.   I mean, you know, it was way after she was out the trailer.

11  Q.   Yes, ma'am.  So the first time your mother mentioned her

12  fear of cancer to you was in December of 2009, after she had the

13  CT scan, correct?

14  A.   No.  I don't remember recalling no date.

15        MR. GARRISON:  Your Honor, may I approach?

16        THE COURT:  Yes.

17                          EXAMINATION

18  BY MR. GARRISON:

19  Q.   But it was way after your mother moved out of the FEMA

20  trailer that she mentioned her fear of cancer to you; is that

21  correct?

22  A.   It was after she moved out the FEMA trailer.

23  Q.   Yes, ma'am.  You mentioned your mother's surgery, and I

24  realize you're not a doctor.  You said the surgery was done to

25  move -- or remove a bad infection; is that correct?

1    A.    Correct.

2    Q.    And that's your understanding of what the doctor said, the

3    surgery was done for an infection?

4    A.    Correct.

5    Q.    And they were able to scrape out the infection, from what

6    you understood?

7    A.    Right.

8    Q.    You talked about some dizziness that your mother has.  You

9    do know your mother has had hypertension for a very long time; is

10   that correct?

11   A.    Correct.

12   Q.    Do you ever recall your mother having dizziness associated

13   with the hypertension?

14   A.    I guess that's what -- I guess it's all mixed -- I don't

15   understand.

16   Q.    Do you know if the dizziness your mother complained of was

17   related to hypertension?

18   A.    Oh, I don't know -- I don't recall.  I don't know.

19   Q.    You love your mother very much, don't you?

20   A.    I sure do.

21   Q.    And you want your mother to win this lawsuit, don't you?

22   A.    I sure do.

23         MR. GARRISON:  Thank you.

24         THE WITNESS:  You're welcome.

25         THE COURT:  Thank you.

1               Redirect?

2          MR. WATTS:  Sure.

3                    REDIRECT EXAMINATION

4    BY MR. WATTS:

5    Q.   Just a couple things, Sandra.

6          You've mentioned this peculiar, strong odor that lasted

7    a while.  Did you smell that odor when the screen door was open,

8    too?

9    A.   Yes.

10         MR. WATTS:  Those are all of my questions.

11         THE COURT:  Thank you, ma'am.  You can step down.

12              Next?

13         MR. WATTS:  Your Honor, next we have Robert Wozniak by

14   and through his videotaped deposition.  This is approximately

15   30 minutes long.

16         THE COURT:  Mr. Wozniak has been sworn in and counsel --

17         MR. MULCAHY:  Your Honor, may we approach real quick?

18         THE COURT:  Sure.

19              (WHEREUPON, at this point in the proceedings, a

20   conference was held at the bench.)

21         MR. WATTS:  We reached a deal that once the family

22   members testified, they could stay in the courtroom, but we

23   wanted to get your blessing before they do.

24         THE COURT:  Sure, as long as they are not going to be

25   recalled to the stand, even on rebuttal.  If I have that

1    assurance, then they can stay.

2          MR. MULCAHY:  And, Your Honor, the reason why I asked to

3    come up here was that Mr. Robert Wozniak was designated as a

4    Recreation By Design expert.  They are going to be playing the

5    video, and I just want to see if they are playing him as a fact

6    witness or if they're trying to play him -- are we going to

7    stipulate that he's an expert?

8          THE COURT:  Do we need to qualify him as an expert for

9    the jury or do we use one of --

10         MR. WATTS:  I don't believe so.  This is an agreed

11   transcript.

12         THE COURT:  Right.  But is his testimony being presented

13   as an expert in the field of "blank," that the jury needs to know

14   that in order to consider it or is he being offered simply for

15   fact testimony?

16         MR. MULCAHY:  No, sir.  He actually is asked his

17   qualifications during this transcript, and he's rendering an

18   opinion regarding whether the vehicle met industry standards and

19   codes.

20         MR. WATTS:  I don't think we ought to be telling the

21   jury why he's being qualified.  He's just being deposed.

22         THE COURT:  Was he hired as an expert in this case by

23   either side?

24         MR. MULCAHY:  Yes, sir.

25         THE COURT:  He was hired by you all as an expert.

1          MR. MULCAHY:  By Recreation By Design.

2          THE COURT:  Is there a stipulation that he's an expert

3   in the field of industry standards for the RV industry?  Is there

4   a stipulation in that regard?

5          MR. WATTS:  No.  I think we ought to just play it and

6   let the jury --

7          THE COURT:  But I instruct the jury on how to consider

8   expert testimony, and I think they need to know whether testimony

9   is being offered as an expert, who the Court accepts as an

10   expert, or whether it's a fact witness who they can consider

11   purely on the basis of credibility.

12          MR. MULCAHY:  And the line of questioning that goes

13   through this, and plaintiffs noticed and took his deposition, is

14   that you were hired by Recreation By Design to be an expert and

15   you went out and inspected this vehicle and you inspected other

16   portions of --

17          THE COURT:  Is that the first part of the testimony?

18   Because we can stop it and I can go ahead and hear argument on

19   whether or not he is or is not an expert.

20          MR. WATTS:  Why don't we just agree that he's being

21   called as an expert on recreational vehicles.

22          MR. MULCAHY:  That's fine.

23          THE COURT:  I'll go ahead and tell the jury that he

24   is --

25          MR. WATTS:  Not industry standards or anything like

1  that.

2          THE COURT:  An expert in the RV construction industry,

3  is that --

4          MR. WATTS:  That's fine.

5          MR. MULCAHY:  Yes, sir.

6              (WHEREUPON, at this point in the proceedings, the

7  bench conference was concluded.)

8          THE COURT:  This witness, Mr. Wozniak, is being called

9  as an expert, I believe, by defendants; is that correct?  You're

10  calling this witness at this time, but --

11         MR. WATTS:  He was hired by the defendants.  I'm calling

12  him on my case in chief to elicit testimony we have from the

13  deposition.

14         THE COURT:  Right.  He is, by stipulation, an expert in

15  the field of RV or travel trailer construction.

16         MR. WATTS:  There you go.  Yes, sir.

17         THE COURT:  As long as we know that.

18             So you'll hear some questions at the outset of his

19  testimony that relate to his experience in the field and his

20  qualifications, and then you'll hear his testimony relative to

21  this case.

22             (WHEREUPON, at this point in the proceedings, the

23  videotaped deposition of Robert Wozniak was played.)

24  Q.   Would you please state your full name for the record.

25  A.   Robert E. Wozniak.

1   Q.   And you have been retained by the defendant in this case,

2   that being Recreation By Design; is that correct?

3   A.   That's correct.

4   Q.   What was the first contact that you had with anyone

5   representing or with Recreation By Design?

6   A.   Randy Mulcahy contacted me.

7   Q.   Okay.  Did you know Mr. Mulcahy before he contacted you?

8   A.   No, I did not.

9   Q.   Did you ask him how he had obtained your name?

10  A.   Yes, I did.

11  Q.   Okay.  And what was his response?

12  A.   Through another law firm.

13  Q.   Do you know who the lawyer --

14  A.   Amanda Vonderhaar.

15  Q.   Okay.  And Amanda Vonderhaar was an attorney for

16  Fleetwood Enterprises; is that correct?

17  A.   Yes.

18  Q.   Did Mr. Mulcahy tell you anything about the case?

19  A.   We had made -- we've had many communications, and so there

20  has been some discussion about the case, yes.

21  Q.   But the initial phone conference, did he tell you anything

22  about the case?

23  A.   I'm sure he must have told me something about the case, yes.

24  Q.   Did you ask him to furnish you with any documentation or

25  information?

1  A.    Yes.

2  Q.    And were you, in fact, provided with any documentation or

3  information?

4  A.    Yes.

5  Q.    Now, in connection with the work that you did for

6  Mr. Mulcahy, have you had occasion to meet with anyone from

7  Recreation By Design?

8  A.    Yes, I have.

9  Q.    And who have you met with?

10  A.    I believe the name -- the gentleman's name is

11  Mr. George Cornish.

12  Q.    Do you know who Mr. Cornish is?

13  A.    It's my understanding he works in the production department

14  at Recreation By Design.

15  Q.    What was the contact that you had with Mr. Cornish?  Was it

16  a face-to-face contact or was it a telephone communication or

17  communications?

18  A.    It was face to face.

19  Q.    And where did you meet with him?

20  A.    In Elkhart, Indiana.

21  Q.    Do you have any mention of that in your report?

22  A.    No, I do not.

23  Q.    Do you have any mention of even taking a trip to Elkhart,

24  Indiana?

25  A.    Not in the report, no.

1  Q.   Did Mr. Cornish tell you what his role, if any, was in

2  connection with the FEMA trailers that were manufactured by

3  Recreation By Design?

4  A.   He indicated that he was, indeed, employed there in a

5  production capacity at the time that the unit was built.

6  Q.   And what did you learn about the Recreation By Design units

7  in general while you were at that Elkhart facility?

8  A.   That they were built as recreational vehicles, specifically

9  travel trailers.  I did not see any motor home production there.

10  Q.   Did you learn anything else?

11  A.   Well, that they're recreational vehicles.

12  Q.   Other than Mr. Cornish and the plant employees, did you meet

13  with anyone else while you were at the Recreation By Design plant

14  facility?

15  A.   No, I did not.

16  Q.   Is it fair to state that you did not meet a Mr. Randy Rush?

17  A.   I did not.

18  Q.   Is it fair to state that you did not meet a gentleman who's

19  last name is Gaume, G-a-u-m-e?

20  A.   I do not recognize that name.

21  Q.   Did Mr. Cornish tell you that he had any involvement,

22  whatsoever, in connection with the production of Ms. Castanel's

23  travel trailer?

24  A.   I do not recall that conversation, no.

25  Q.   You obtained a degree in mechanical engineering; is that not

1  correct, sir?

2  A.   That is correct.

3  Q.   And where did you obtain that degree from?

4  A.   From a place called General Motors Institute, which is now

5  known as Kettering University.

6  Q.   And where is Kettering University located?

7  A.   Flint, Michigan.

8  Q.   And what specifically was the degree that you obtained?

9  A.   A Bachelor's in mechanical engineering.

10  Q.   Now, subsequent to that, you have worked in engineering, if

11  you will, the field of engineering basically your entire work

12  life history; is that correct?

13  A.   That's correct.

14  Q.   After -- I believe you worked for General Motors from about

15  '69 to 1978; is that correct?

16  A.   That's correct.

17  Q.   And then at some point, you went to work for

18  Nissan Motor Manufacturing, correct?

19  A.   There was first Nissan Motor Corporation followed by

20  Nissan Motor Manufacturing.

21  Q.   Okay.  And Nissan Motor would have been 1978 to 1981?

22  A.   That's correct.

23  Q.   And Nissan Motor Manufacturing would have been from 1981 to

24  1983?

25  A.   That's correct.

1  Q.   Now, the bulk of your work life experience was with

2  Fleetwood Enterprises; is that not correct?

3  A.   That's correct.

4  Q.   And why don't you please share with the jury what

5  Fleetwood Enterprises was during the time that you worked for

6  them.

7  A.   Sure.  Fleetwood Enterprises was a corporation involved in

8  the manufacture and sales of two primary products, one being

9  manufactured housing, the other being recreational vehicles.

10  Q.   And you actually worked for Fleetwood Enterprises from 1983

11  to the year 2006?

12  A.   That's correct.

13  Q.   You did not work in the manufactured housing side?

14  A.   That's correct.

15  Q.   Your stint, if you will, during that 23-year period was in

16  the recreational vehicles side?

17  A.   That's correct.

18  Q.   And recreational vehicles specifically would include travel

19  trailers?

20  A.   That's correct.

21  Q.   And you know that this case involves a travel trailer in

22  which Ms. Castanel lived, correct?

23  A.   That's correct.

24  Q.   And in connection with your job history at

25  Fleetwood Enterprises, you became very familiar with the entire

1  operation of the manufacturing of travel trailers?

2  A.   That's correct.

3  Q.   You also became familiar with, for instance, the Fleetwood

4  owner's manual?

5  A.   That's correct.

6  Q.   And you probably had some input into the Fleetwood owner's

7  manual?

8  A.   Yes.

9  Q.   You actually had occasion to see the Castanel travel

10 trailer?

11 A.   Yes.

12 Q.   And the Castanel travel trailer was where when you saw it?

13 A.   In a -- what I believe is called a FEMA storage yard in

14 Lottie, Louisiana.

15 Q.   And were there any Recreation By Design attorneys present

16 during that inspection?

17 A.   Yes.

18 Q.   Now, the Lottie FEMA storage facility is a facility that has

19 literally thousands of trailers in storage?

20 A.   Yes.

21 Q.   When you arrived at the facility, you were directed to

22 Ms. Castanel's trailer, correct?

23 A.   Yes.

24 Q.   And you were aware that Ms. Castanel had received that

25 trailer because of the fact that she had lost her house during

1    Hurricane Katrina?

2    A.    That's my understanding, yes.

3    Q.    You actually conducted an inspection of that trailer?

4    A.    Yes.

5    Q.    And you looked at the frame, itself, on that trailer,

6    correct?

7    A.    Yes.

8    Q.    You did not and your report does not indicate that you

9    noticed any damage, whatsoever, to the frame of that trailer?

10   A.    I believe the report makes a statement about that there was

11   some rust that was evident on the trailer frame members.

12   Q.    But that would not be what is considered structural damage,

13   correct?

14   A.    That's correct.

15   Q.    So from an engineering point of view, you did not detect any

16   problems with the frame of the trailer, itself?

17   A.    That's correct.

18   Q.    When you met with the individuals at Recreation By Design's

19   plant in Elkhart, Indiana, did you look at the component parts of

20   the trailers that they were building?

21   A.    Yes.

22   Q.    And would you mind sharing, for the benefit of the jury,

23   what some of the wood component parts that they would use would

24   be?

25   A.    The wood parts that I observed were solid wood products and

1  Lauan products, plywood products, and the various different types

2  of woods that were used in the various different cabinets.

3  Q.   What exactly is Lauan?

4  A.   Lauan is a type of a plywood that is typically one-eighth of

5  an inch thick, according to my knowledge.

6  Q.   You also said that you saw some other plywood products; is

7  that correct?

8  A.   Yes.

9  Q.   And then you mentioned different woods that would be used in

10  the different cabinets.

11  A.   Yes.

12  Q.   And some of these would be what we call wood composites?

13  A.   From my memory, they looked like they were more of a solid

14  wood product.

15  Q.   Did you review vendor, meaning sales, documentation from any

16  of the wood manufacturers who would have supplied any of the wood

17  components to Recreation By Design for their travel trailers?

18  A.   No, I did not.

19  Q.   Did anyone prohibit you from asking to view or review those

20  types of records?

21  A.   No, they did not.

22  Q.   Now, have you ever heard the term "LFE"?

23  A.   Yes.

24  Q.   Would you mind telling the jury what LFE stands for.

25  A.   Well, my understanding of LFE is that it's low

1   formaldehyde-emitting.

2   Q.   Did you, during the course of your meeting with Mr. Cornish

3   and/or the other Recreation By Design employees, determine

4   whether or not they had a policy to use only LFE wood products?

5   A.   No, I did not.

6   Q.   Did you ask anyone with Recreation By Design whether or not

7   they purchased LFE products?

8   A.   No, I did not.

9   Q.   Did you ask anyone with Recreation By Design whether or not

10  they had a corporate policy to use only LFE products?

11  A.   No, I did not.

12  Q.   You mentioned earlier that you received the

13  Recreation By Design owner's manual.  Do you remember that?

14  A.   Yes, I do.

15  Q.   I'm going to now hand you the owner information manual and

16  ask you whether or not you recall there being any comment,

17  whatsoever, pertaining to formaldehyde in the

18  Recreation by Design owner's manual.

19  A.   I do not believe, in my review of the owner's manual, that I

20  found any comments about formaldehyde.

21  Q.   And that, then, would also mean that in your review of the

22  Recreation By Design owner's manual, that you also saw no

23  warnings pertaining to formaldehyde?

24  A.   I did not see any mention of formaldehyde.

25  Q.   Including warnings?

1   A.   Including warnings.

2   Q.   Now, isn't it a fact that Fleetwood had an owner's manual

3   that specifically had warnings about formaldehyde?

4   A.   For travel trailers, yes.

5   Q.   Okay.  And you know that that owner's manual that you have

6   in front of you for Recreation By Design is an owner's manual for

7   travel trailers also?

8   A.   Yes.

9   Q.   So you were aware of what those warnings stated with

10  reference to formaldehyde and its effect on people, correct?

11  A.   That's correct.

12  Q.   And that was before Katrina?

13  A.   Yes.

14  Q.   And you never asked Mr. Cornish or any of the employees of

15  Recreation By Design why their owner's manual contained no

16  warnings pertaining to formaldehyde?

17  A.   I did not have that discussion.

18  Q.   Sir, do you know what the term "off-gassing" means?

19  A.   I have read that term in preparation for this deposition,

20  yes.

21  Q.   But this is not the first time that you have heard the term

22  "off-gassing"; is that correct?

23  A.   That's correct.

24  Q.   And what exactly is off-gassing?

25  A.   Well, off-gassing has been identified in some of the

1    documents as a release of material from its parent composite.

2    Q.    Specifically release of materials from component wood

3    products that are part and parcel of travel trailers?

4    A.    That's been in some of the documents, yes.

5    Q.    And you were aware of that, again, before Katrina?

6    A.    Yes.

7    Q.    So you are, in fact, and were aware that wood products

8    off-gas formaldehyde?

9    A.    That they off-gas a variety of things, yes, including

10   formaldehyde.

11   Q.    I'm going to show you some photographs and ask you if you

12   can identify them.  I'm going to label these en globo as Wozniak

13   Number 5.  And they have previously been Bates labeled FEMA

14   207-000001 through 000008.

15          Do you recognize those photographs?

16   A.    They appear to be photographs of the Castanel unit, yes.

17   Q.    And that's, as you remember, the Castanel unit when you

18   actually made the -- a visit to Lottie, Louisiana?

19   A.    That's correct.

20   Q.    When you went to Lottie, Louisiana, did you actually have

21   occasion to not only walk around the trailer, but as you

22   mentioned earlier, you looked underneath at the frame of the

23   trailer?

24   A.    Yes, I did.

25   Q.    You also went inside the trailer?

1  A.    Yes, I did.

2  Q.    Now, that trailer, you determined had a December 2005

3  manufacturing date?

4  A.    Yes.

5  Q.    Now, are you aware of the fact that the hotter a structure

6  such as a travel trailer is, the more off-gassing of formaldehyde

7  occurs?

8  A.    That's been stated in reports of this, yes.

9  Q.    And you are certainly aware of that, correct?

10  A.    Yes.

11  Q.    Okay.  Now, you stated a moment ago that you were retained

12  to conduct an inspection of the Castanel travel trailer, correct?

13  A.    Correct.

14  Q.    And you know that this case is about formaldehyde in that

15  trailer, correct?

16  A.    Correct.

17  Q.    Do you have any idea what the level of formaldehyde would

18  have been in the Castanel travel trailer when it left the plant

19  in Elkhart, Louisiana?

20  A.    No, I do not.

21  Q.    Based on what you know as the chief engineer at

22  Fleetwood Enterprises for 23 years in the travel trailer

23  division, is it your understanding that formaldehyde and

24  formaldehyde-containing wood products, the content is higher when

25  a travel trailer is built, and that over time, that that content

1  gets smaller?

2  A.   That is my understanding.

3  Q.   And you have not seen anything to the contrary?

4  A.   That's correct.

5  Q.   You were asked in this case to look at the Castanel unit to

6  determine if it complied with industry codes and regulations,

7  correct?

8  A.   That's correct.

9  Q.   And what were your findings after you inspected the Castanel

10  unit and performed your investigation?

11  A.   As stated in the report, "This travel trailer was in

12  conformance with all codes and regulations promulgated by the

13  authorities having jurisdiction over this type of product at the

14  time it was manufactured."

15  Q.   Okay.  And what codes and regulations are you referring to?

16  A.   It's my belief that the primary codes that apply to this

17  travel trailer are the NFPA 1192 code for recreational vehicles

18  and the Federal Motor Vehicle Safety Standards that apply to

19  travel trailers.

20  Q.   Are there any -- for lack of a better term, any governing

21  agencies that apply those codes or oversee the application of

22  those codes?

23  A.   Yes, there are some government agencies, and there is also

24  an industry association that does the same thing.

25  Q.   Okay.  And could you explain to me what industry association

1  that would be?

2  A.   The industry association I'm referring to is the

3  Recreational Vehicle Industry Association, and I believe they are

4  headquartered in Reston, Virginia.

5  Q.   As far as your inspection of the Castanel unit, would it

6  have fallen under the auspices of the RVIA, the

7  Recreational Vehicle Industry Association, based upon

8  Recreation By Design's membership in RVIA?

9  A.   By "auspices," if you mean that they subscribe to the

10  unannounced inspections and the inspections to the ANSI -- to the

11  NFPA code, yes.

12  Q.   Okay.  And how about for this particular housing unit of

13  Ms. Castanel's, would that have been subject to the oversight of

14  the RVIA?

15  A.   It's my understanding, yes.

16  Q.   Okay.  And you also mentioned a code.  That's the NFPA 1192.

17  Did I understand that correct?

18  A.   That's correct.

19  Q.   And your understanding is that this travel trailer was in

20  conformance with the codes of the NFPA?

21  A.   With the exception of the FEMA-specific commodities that

22  were put into these trailers.

23  Q.   Okay.  And what type of commodities are you referring to?

24  A.   I would have to refer to a list that was provided to myself,

25  but it included things such as a residential refrigerator, lack

1  of a grey water holding tank or lack of a black water holding

2  tank, the system being all electric, the electric baseboards, the

3  electric range, things of that nature.

4  Q.   Do you remember the year that Ms. Castanel's unit was

5  manufactured?

6  A.   Yes, I do.

7  Q.   Okay.  When was that?

8  A.   December of 2005.

9  Q.   When Ms. Castanel's unit was manufactured in December of

10  2005, would the RVIA or the NFPA 1192 that you have mentioned

11  required warnings regarding formaldehyde in this type of unit?

12  A.   To the best of my understanding, no.

13  Q.   To your understanding, from your experience in the industry,

14  were there any -- any industry practices, standards, or

15  regulations that required notice of formaldehyde in travel

16  trailers in 2005?

17  A.   To the best of my knowledge, no.

18  Q.   And that would include any warnings -- and would that

19  include any warnings in the owner's manual?

20  A.   That is correct.

21  Q.   And would that include any warnings or stickers on or inside

22  a unit?

23  A.   That is correct.

24  Q.   You weren't -- were you asked to render an opinion regarding

25  formaldehyde and off-gassing in the Castanel unit?

1  A.   No, I was not.

2  Q.   Were you asked to do an inventory of the wood products in

3  the Castanel unit?

4  A.   No, I was not.

5  Q.   Have you ever been tendered as an expert regarding

6  formaldehyde off-gassing?

7  A.   No, I have not.

8  Q.   Is it your understanding that the materials utilized in the

9  Castanel unit and the construction of the Castanel unit complied

10 with codes and regulations promulgated by authorities over this

11 type of unit?

12 A.   Yes.

13 Q.   I see in your report that you were actively involved with

14 the Recreational Vehicle Industry Association at a point in time;

15 is that correct?

16 A.   Yes, I was involved with the Recreational Vehicle Industry

17 Association.

18 Q.   Could you explain your involvement with the Recreational

19 Vehicle Industry Association?

20 A.   Well, through the time of my employment with

21 Fleetwood Enterprises, I became an active member of the four

22 technical subcommittees that provided the majority of the input

23 for the NFPA codes.  I also served on a variety of ad hoc

24 subcommittees of the Technical Standards Steering Committee for

25 the Recreational Vehicle Industry Association, and then became a

1  member of the RVIA Standards Steering Committee and

2  Enforcement Board.

3              However, even prior to my employment with

4  Fleetwood Enterprises, I was involved with the

5  Recreational Vehicle Industry Association, an adventure where

6  when I worked for Nissan Motors, we actually built a recreational

7  vehicle and crash tested it in Japan, and I presented those

8  results to the Recreational Vehicle Industry Association.

9  Q.   And were you also a member of the National

10  Fire Protection Association?

11  A.   For the fire and life safety code for recreational vehicles,

12  yes.

13  Q.   And which code would that be?

14  A.   That would be the 1192 code.

15  Q.   And is that the code we spoke about earlier?

16  A.   Yes, it is.

17  Q.   And being a member of the Recreational Vehicle Industry

18  Association, that's RVIA, correct?

19  A.   That's correct.

20  Q.   And the National Fire Protection Association, that's NFPA;

21  is that right?

22  A.   That's correct.

23  Q.   And being a member of those organizations back in 2005, did

24  those organizations require travel trailer manufacturers to

25  utilize low formaldehyde-emitting or LFE materials?

1    A.    To the best of my knowledge, no.

2    Q.    As far as industry standards, did industry standards require

3    the use of LFE materials in 2005?

4    A.    To the best of my knowledge, no.

5              THE COURT:  Mr. Watts, who is next?

6              MR. WATTS:  Paul Hewett.

7              THE COURT:  Mr. Hewett.

8              THE DEPUTY CLERK:  Would you please raise your right

9    hand.  Do you solemnly swear that the testimony which you are

10   about to give will be the truth, the whole truth and nothing but

11   the truth, so help you God.

12             THE WITNESS:  I do.

13                          **PAUL HEWETT**

14   was called as a witness and, after being first duly sworn by the

15   Clerk, was examined and testified on his oath as follows:

16             THE DEPUTY CLERK:  Please state your name and spell it

17   for the record.

18             THE WITNESS:  My name is Paul Hewett, P-a-u-l,

19   H-e-w-e-t-t.

20             MR. WATTS:  May I proceed, Your Honor?

21             THE COURT:  Yes, please.

22                       VOIR DIRE EXAMINATION

23   BY MR. WATTS:

24   Q.    I notice that you have a Ph.D. after your name.  That means

25   I'm supposed to call you Dr. Hewett; is that right?

1  A.    You can if you wish.

2  Q.    When you have a Ph.D., that's not a medical doctor.  What is

3  it?

4  A.    I have a Ph.D. in industrial hygiene or occupational hygiene

5  from the University of Pittsburgh, obtained in 1991.

6  Q.    You also have a collar that's sticking up on the left side.

7  There you go.  You're good to go.

8           I'm sorry.  Answer that last question again.  You've

9  got a Ph.D. in what?

10  A.    Industrial hygiene from the University of Pittsburgh.

11  Q.    Have we prepared a PowerPoint presentation to kind of keep

12  me on track asking you these questions?

13  A.    Yes, we have.

14           THE COURT:  Do we have a stipulation insofar as his

15  expertise?  Are we going to go ahead and tender him?

16           MR. WATTS:  I tender him and I think we do.

17           THE COURT:  Tender him in field of --

18           MR. WATTS:  Industrial hygiene and statistics.

19           MR. MULCAHY:  No objection.

20           THE COURT:  The Court will therefore accept Dr. Hewett

21  as an expert in the field of industrial hygiene and statistics.

22                    DIRECT EXAMINATION

23  BY MR. WATTS:

24  Q.    Let's start with that.  What is the field of industrial

25  hygiene and how does statistics play into it?

1  A.    Industrial hygiene is an occupation involved in

2  anticipating, recognizing, evaluating, and controlling, and

3  recommending controls for occupational exposures.  And

4  "occupational exposures" -- and by that, I mean exposures to

5  toxic chemicals, gasses, and particulates that one finds in the

6  workplace.

7  Q.    I see you've got a Master's and a Ph.D. and you've taught on

8  this.  You've taught courses on statistics and data analysis.

9  Why do statistics and data analysis come into play in the field

10  of industrial hygiene?

11  A.    Industrial hygiene is all about -- not all about, but a

12  large part of it involves the measurement of airborne

13  concentrations to toxic gasses, vapors, and particulates.  And

14  those measurements have to be compared to exposure limits or

15  concentration limits.

16        And the best way to compare is to do a statistical

17  analysis of the data; from that statistical analysis, extract or

18  decision statistics and competence intervals, so on and so forth,

19  the things that statisticians calculate, and compare those to the

20  exposure limits to determine whether or not exposures are being

21  properly managed in the workplace by the employer.  By that, I

22  mean they're properly managed to be less than the exposure limit;

23  therefore, an excess risk to the employees does not exist or at

24  least it's minimized.

25  Q.    Okay.  You've already been tendered, but I want to ask you

1   about something that you worked at for 25 years, the National

2   Institute For Occupational Safety and Health.  Is that known as

3   NIOSH?

4   A.   Yes.  NIOSH is a federal agency in the Department of Health

5   and Human Services created in 1970 as a sister agency to the

6   Occupational Safety and Health Administration, which you know of

7   as OSHA.  NIOSH does research, and that research is translated by

8   OSHA into regulations.

9   Q.   Apparently, you did research well enough that you got some

10  Alice Hamilton Award while you were working at NIOSH.

11  A.   Actually, I got two, but the one I'm most proud of is that

12  one since it was an individual award, and that was regarding a

13  chapter that I wrote on the interpretation and use of

14  occupational exposure limits for chronic disease agents.

15  Q.   Now, this statistical analysis of formaldehyde measurements,

16  when you were at NIOSH, did NIOSH industrial hygienists perform

17  statistical analyses?

18  A.   Yes, you pretty much had to.  In our hazard evaluation

19  reports, in our epidemiological studies, in our technical

20  assistance studies, we collected a large amount of data, and that

21  data had to be analyzed statistically, reported statistically in

22  terms of tables and graphs and charts so that the consumer of

23  those reports could understand the basis for our recommendations.

24  Q.   Now, I want to go to this next slide, it's Table 1.  On the

25  column on the left side, it's got OSHA, that's the Occupational

1    Safety and Health Administration?

2    A.    Correct.

3    Q.    NIOSH, we know what that is.  What's the ACGIH?

4    A.    ACGIH is a professional organization, it's a nongovernmental

5    organization.  Its full name is American Conference of

6    Governmental Industrial Hygienists, but it's not a government

7    agency.

8    Q.    And then those are occupational exposure limits; is that

9    right?

10   A.    Yes.  The top part of the graph covers occupational exposure

11   limits and the lower part, general population limits.

12   Q.    Now, what's the difference between an occupational exposure

13   and a general population exposure?

14   A.    Well, occupational exposure limits are intended to be

15   applied to healthy adult workers, both male and female.  In

16   contrast, general population exposure limits are applied to the

17   general population, which covers a wide range of individuals,

18   both young, old, aged, infirm, compromised in their health, so on

19   and so forth.  You have an entire gamut of susceptibility, ages,

20   so on and so forth; whereas, you don't have that in the

21   workplace.  It's assumed that the workers are healthy adult

22   workers.

23   Q.    Now, not meaning to pick on my client, but a 79-year-old

24   woman with a history of rhinosinusitis, would she be in the

25   occupational group or the general population group?

1   A.   Well, you asked me a question, so I'll have to answer it
2   fully.  It depends.  If she's still working and she's in a
3   factory or she's in an office or any kind of environment where
4   she's exposed to toxic chemicals generated as part of the work
5   process, then she would be subject to the occupational exposure
6   limits, but outside of the workplace in the general scenarios and
7   exposure scenarios, outside, in homes, public office buildings,
8   for example, then she would be subject to these general
9   population guidelines.
10  Q.   Now, these general population guidelines, we have the World
11  Health Organization; is that right?
12  A.   Yes, sir.
13  Q.   And that's got .1 parts per million for 30 minutes.  And
14  then an ATSDR medical management guideline, explain what those
15  are.
16  A.   ATSDR stands for the Agency for Toxic Substances and Disease
17  Registry, this is a government agency.  It is part of the very
18  well-known Centers for Disease Control.  NIOSH, my past agency,
19  was a member as well.
20        One of their many job functions is producing
21  toxicological profiles, and they were asked in the late '90s by
22  EPA, the Environmental Protection Agency, to develop a
23  toxicological profile for formaldehyde.  And in that profile,
24  they recommended three risk management limits, and I have all
25  three of them here.  Then each one covers different time frames.

1    Should I go on?

2    Q.    Please.

3    A.    If you look at the bottom number, the .04 parts per million,

4    they intended that to be a risk management guideline for exposure

5    scenarios for the last 14 days or fewer -- or no more than 14

6    days.  The .03 middle limit parts per million was intended for

7    intermediate exposure scenarios where the exposures last between

8    15 days to a full year.  And then the .008 is a risk management

9    guideline to be applied to scenarios where the exposures are

10    expected to last longer than one year.

11    Q.    Okay.  Now, what were you asked to do in this case with

12    respect to a statistical analysis?  Take the jury through the

13    steps and what you did.

14    A.    Well, I was asked to do basically a statistical analysis of

15    the data that had been accumulated by various organizations

16    regarding formaldehyde exposure in a travel trailer similar to

17    the one Ms. Castanel occupied.

18          Now, this exercise is what's known as a retrospective

19    exposure assessment.  And so I should explain what that means

20    because it covers all what I do.

21          In occupational epidemiology -- and we had an

22    epidemiologist yesterday, Dr. McGwin, as I recall.  In

23    epidemiology, whenever you're doing an occupational study of

24    workers that were exposed in the distant past, one almost always

25    has to do a retrospective exposure assessment.  And the reason

1    you do that is because rarely, if ever, do you have an adequate

2    exposure database for all the workers in the study in question.

3            So one has to find data from various sources, from

4    similar occupations, from similar jobs, maybe reconstruct those

5    exposures by taking a task or an operation and reproducing it in

6    a controlled setting, or do some physical chemical modeling using

7    physical chemical equations that engineers develop.  And try

8    using all of that to estimate what the past exposures might have

9    been or probably were.

10           That's because we don't have any data from years and

11   decades past.  I'm involved in a couple projects right now where

12   we're doing that for companies.

13           Here we have a situation where the majority of the

14   people occupying those trailers were -- excuse me, their trailers

15   were never sampled by a government agency or by a trailer

16   manufacturers or by anybody else.

17           So we have thousands of units and each of those units

18   were occupied for many, many days, all the days of the year for

19   several years, so we have thousands upon thousands of exposure

20   days that could have been sampled but were not.  So we have to

21   take what we have and statistically analyze it and determine

22   whether or not or to apply that to those past exposures.

23           So that's what I'm doing.  I'm taking the best data

24   that we have and extrapolating it to other occupants of the

25   travel trailers.

1  Q.   All right.  And when you say "what we have" -- let me move

2  to the next page.  Is there a database that is maintained that

3  contains all of the different trailer measurements that you could

4  find?

5  A.   Yes, sir, there is.

6  Q.   Inside of that database, are you able to call up all of the

7  different Rec By Design trailers that have been tested?

8  A.   Yes, you can.

9  Q.   Did you do that?

10 A.   Yes, I did.

11 Q.   And is this page that we've got up on the screen just

12 basically kind of a data field list, if you will, of all the

13 different things that are in this database?

14 A.   Yes, it is.  It contains all the fields there.  There is

15 another slide as well.  There is many other fields in the

16 database that was supplied to me.

17 Q.   All right.  And so what did you do once all of this data got

18 into the database and you call up I want all of the test results

19 for Rec By Design?

20 A.   I extract all of the putative Recreation By Design cases,

21 and when I say a case, I mean a record in the file that has a

22 date collected, where it was collected, by whom and so on and so

23 forth, and what the measurement was.

24        I look at those to determine whether or not they are

25 all truly Recreation By Design.  In this particular case there

1   were four cases that had been misclassified.  So we started out,

2   I think, with 180 cases, and that was winnowed down to 176.

3         Now, of those 176, we have measurements that were

4   collected from units that were occupied at the time of the

5   sampling.  We measurement from units that were not occupied at

6   the time of sampling.  That is, they were no longer occupied.

7   They had been moved to a holding area and consultancies had gone

8   in and collected measurements in those trailers.

9         So I divide the data up into occupied versus

10  unoccupied.  There was statistical analysis of both data sets,

11  and that analysis includes graphs so one can get a visual

12  interpretation or feel for what data looked like relative to the

13  various risk management levels, such as the ATSDR limit for

14  chronic exposures greater than one year, and that limit is .008.

15        I also calculate the percent of the measurements above

16  the ATSDR limit.  I put confidence intervals around that

17  calculation because you have to, as a statistician or a data

18  analyst, determine the level of uncertainty you have in your

19  statistical estimates.

20        I also estimated mean exposures, the average exposure

21  for all the measurements, both occupied and unoccupied and for

22  each data source as well, and for the Morgan model versus all of

23  the other models.  So it was a wide range of statistical

24  analysis.

25  Q.   I want to take that last line and follow up with it.

1  Yesterday we had Mr. Rush on the stand and apparently there were

2  2,600 travel trailers that Rec By Design made for Morgan and then

3  they pulled the other Rec By Designs off of trailer lots and

4  dealer lots and this kind of thing.

5         Did you segregate those two so that we had the Morgan

6  dataset?

7  A.  Well, I kept them altogether in one phase of the analysis.

8  And then I separated them in another phase where I extracted the

9  Morgan units and analyzed the statistics for those units

10 specifically.

11 Q.  You said you started off with a dataset of 180.  I want to

12 show a graph, and what I see here is of the Morgan dataset, with

13 occupied travel trailers only, there were 46; is that right?

14 A.  That is correct.  There were 70, I don't want to go by

15 memory because it's always faulty, there were 71 occupied

16 trailers of all models, of those we have 46 Morgans.

17 Q.  So in other words, there were 71 Rec By Design of all

18 different types but 46 were the Morgan dataset?

19 A.  Correct.

20 Q.  I got you.  Now, if you could, looking at this slide

21 Number 7 that's up on the screen, tell the jury what this

22 histogram shows and what it means.

23 A.  This is what we call in statistics or anywhere else, for

24 that matter, a histogram.  It tells us something about the

25 distribution of exposures.  And let me take a few seconds to

1  explain the graph, and as I remember, I can touch this chart.

2            So the, what's called the X-axis -- that's not working.

3  Can I -- is there a pointer I can use?

4            MR. WATTS:  May I approach, Your Honor?

5            THE COURT:  Yes.

6            MR. WATTS:  Go ahead and use the laser I guess.

7            THE WITNESS:  The X-axis represents the formaldehyde

8  concentration.  Now, this is what we call a log axis.  That is

9  the divisions in it are separated by an order of magnitude or by

10  a factor of 10.  So you have .001 parts per million.  You've also

11  heard the phrase "parts per billion" used.  And so .001 parts per

12  million is 1 part per billion.

13            The next increment is .01 parts per million,

14  .1 parts per million, 1 and 10.  So you see it goes up by a

15  factor of 10.

16            And so up here we have 10,000 parts per billion,

17  1 part per billion.  Now we have two vertical lines, one is set

18  at .008 parts per million.  That's the ATSDR recommendation for

19  chronic exposures.  That's the risk management guideline for

20  chronic exposures.

21            Now, the histogram is showing us how many

22  measurements are in various ranges.  For example, we have, it

23  looks like one measurement that's between .001 and .1; whereas,

24  we have, it looks like 18 measurements that are between, that's

25  going to be about .07 and .1.  So it's giving us an idea

1   regarding the distribution of the measurements that were

2   collected in those 46 trailers.

3           And what we see is that all of them but one were at

4   or above .01 parts per million.  None of them were greater than

5   1 part per million.  None of them were -- well, as I said,

6   greater than 1 part per million.  So, in essence, it's a

7   distribution of exposures and gives us some idea regarding the

8   location of all those measurements.

9   Q.   Now, I want to put up the next slide and get you to explain

10  what this is showing.

11  A.    This is, again, a different way of looking at the Morgan

12  only occupied measurements.  This is a time series plot.  Now

13  we're plotting those exact same concentrations in relation to the

14  time in which they were collected.

15          Now, I know this is hard to read, but at the very low

16  end of the X-axis, the horizontal axis, we have 2006. -- right,

17  2006.01.  So that's year 2006, first month, and then the second

18  month and the third month and the fourth, all the way to the

19  twelfth month, starting at 2007 somewhere around here.

20          Now, what we see is that one measurement was collected

21  in the early days, in early 2006.  That was a measurement

22  collected by the Sierra Club.  The majority of the measurements

23  collected by all of the other agencies, vis-à-vis occupational

24  consultancies and government agencies, were collected mainly in

25  2007 and marching into 2008.

1            The other thing, again, is we have the concentration

2    axis in exactly the same format as before, .001, .01, .1,

3    1 part per million, up to 10 parts per million.  So you can see

4    the time which a measurement was collected, the magnitude of the

5    measurement and where those measurements lie relative to the

6    ATSDR recommendation of .008.

7    Q.   The second line is the NIOSH occupational exposure limit?

8    A.   That is correct.  The second line above that is the

9    occupational limit recommended by NIOSH for daily exposures to

10   formaldehyde.

11   Q.   Now, we have testimony in this case that most of the Morgans

12   were made between, I think, September and December 2005, and we

13   know that Ms. Castanel started in March of 2006.  So if we looked

14   at March of 2006, that would be somewhere around here, but the

15   samples start in this range here; is that right?

16   A.   That is correct.  The samples start late 2007.

17   Q.   And again, understanding that this is an assumption, if we

18   assume that everybody that was tested moved in in March of

19   2006 -- and I know that's not true, but just for the

20   assumption -- the majority of these samples that were taken are

21   between September of 2007 and November of 2008; is that right?

22   A.   That is correct.

23   Q.   So that means that these samples were all taken on average

24   from a year and a half to two and a half years after somebody

25   moved in, under my assumption, in March of 2006?

1   A.    That would be correct.

2   Q.    Now, what is Figure 11, Slide 9?

3   A.    Figure 11 contains all of the Recreation By Design

4   measurements from occupied travel trailers.  So it also contains

5   those 46 from Morgan trailers.  And it's by -- well, this is by

6   model.  And as you can see, the vast majority of the measurements

7   were collected from Morgan model trailers.

8   Q.    Now, you mentioned that you tried to get all of the

9   measurements from whatever different source.  Did you segregate

10  the sources of the measurements as well?

11  A.    Yes, I did.

12  Q.    Okay.

13  A.    So we have various sources.  And I can take a moment to

14  describe these, if that's what one wishes.

15  Q.    Well, I tell you what, just so that we have it in the

16  record, the sources are:  Bureau Veritas, DeVany Industrial

17  Consultants, the FEMA/CDC, some were self-tested with occupants,

18  Sierra Club.  What is the TES?

19  A.    Technical Environmental Services.

20  Q.    WD Scott Group is a consulting service?

21  A.    Right.

22  Q.    To be fair, DeVany, TES and WD Scott are consultants that

23  were hired by lawyers like me to do this testing; is that right?

24  A.    That is correct.  We have government agencies represented in

25  that chart.  Those would be the measurements from the

1   Bureau Veritas, which itself is an occupational consultancy that

2   was hired by FEMA to collect measurements in 2008.  FEMA/CDC

3   refers to measurements collected by Bureau Veritas for CDC, the

4   Centers for Disease Control, and these were collected in December

5   and January of 2007/2008.

6              And then the rest of them are occupational

7   consultancies with the exception of Sierra Club, which is a

8   public advocacy organization, and then we have self-sampled

9   measurements here labeled "occupant."

10  Q.   Now, if we look at the government's tests that were done by

11  Bureau Veritas and FEMA/CDC, those would be the same tests that

12  are referenced in this other plot showing tests taken a year and

13  a half to two and half years after March of '06, right?

14  A.   That's correct.

15  Q.   So looking at the data that was taken, does this allow us in

16  a statistical sense to see what the levels would be a year and a

17  half after somebody may have moved into these trailers, under my

18  assumption that everybody moved in in March, and I realize that's

19  not entirely true?

20  A.   The answer is a yes and a no.  Yes, it is very leading

21  information regarding what exposures would have been at earlier

22  points in time.

23             But we know various things.  We know, as we saw

24  yesterday from the material safety data sheet for some of the

25  products, that it states that exposures or levels tend to decline

1   with time.  We heard that this morning.  It's a well-known fact.

2   It's been published on quite frequently.

3            So one of the tenants of retrospective exposure

4   assessment is to -- if you're looking at exposures over a broad

5   span of time and you're trying to estimate exposures, given

6   whatever data you have, you evaluate whether or not there have

7   been any modifications or changes to exposures over time.

8            Now, in an occupational setting, and I've just done

9   this, that can refer to new engineering controls, degradation of

10  old engineering controls, increased production levels can

11  increase or decrease exposures in the past.  So one has to take

12  that into account, and in published occupational studies,

13  epidemiological studies, they do take this into account.

14           Here we are doing the same thing and we have to take

15  this into account ourselves.  What we know is that I can

16  calculate statistics on the data that we have, but that's on the

17  observed data.  Had we data from the earlier years, it is highly

18  likely, given all that we know, that the measurements in the

19  earlier years would have been higher and therefore the statistics

20  would tend to be higher.

21           MR. WATTS:  Now, Your Honor, may I approach?

22           THE COURT:  Yes.

23                          EXAMINATION

24  BY MR. WATTS:

25  Q.   I want to ask you a few questions.  First of all, we know

1   that in January of 2010 we have a test result four years and a

2   month or two after this thing was built, right?

3   A.   Correct.

4   Q.   And that test result four years after this was built was

5   about .05, as I recall, in the opening statements; is that right?

6   A.   That's what I recall.

7   Q.   So what your retrospective analysis does is we can get an

8   idea of what the range was a year and a half to two and a half

9   years after these trailers were built, right?

10  A.   Right.

11  Q.   So in this year and a half to two and a half year range, is

12  there a mean of what the level of formaldehyde was?

13  A.   The answer is, yes, since you pulled up the slide.  I did

14  calculate mean exposures for occupied and unoccupied units, and

15  here we have tables that contain the mean exposures for both all

16  the occupied units and the Morgan trailers only.

17  Q.   And the mean exposure for all of the Morgan trailers, what

18  is the mean?

19  A.   Well, I hate to do this, but there is various ways you can

20  calculate the mean for occupational environmental data.  The

21  standard way is to use a simple arithmetic mean.  So we'll use

22  that at this point.  The simple arithmetic mean for all of the

23  occupied are trailers, we have 71 occupied trailers, was

24  .081 parts per million.

25  Q.   .081 parts per million?

1    A.    Correct.

2    Q.    Now, yesterday there were some studies that were discussing

3    in terms of 500 parts per billion causing minimal eye irritation,

4    1,000 parts per billion causing sensory irritation and these

5    kinds of things.  And here is my question:  500 parts per billion

6    would be right here; is that right?

7    A.    Correct.

8    Q.    And 1,000 parts per billion would be up here; is that right?

9    A.    Right.

10   Q.    Now, you mentioned that in the data it is well known that

11   formaldehyde off-gasses?

12   A.    I don't know if I mentioned it off-gasses.  What I mentioned

13   was that the exposures do decrease and that process is generally

14   an off-gassing process.

15   Q.    And do the data reflect that the majority of the

16   formaldehyde that's contained in the wood will off-gas in the

17   first year or two of the wood?

18   A.    Do my data suggest that?

19   Q.    Not your data.  You don't have data in this first year,

20   right?

21   A.    No, I do not.

22         No, there is data that has been published in the forest

23   products literature that looks at off-gassing, and the majority

24   of the off-gassing does take place fairly early on.

25   Q.    So if, for example, you have sensory irritation and it's at

1  .05, just minor blinking of the eyes, instead of burning of the

2  eyes or something like that, we would know that your off-gassing

3  chart would go something like that?

4  A.   One could assume that that's how it would work.

5  Q.   Now, to be fair, there are no data, because there are no

6  tests that were done in the first year to year and a half; is

7  that right?

8  A.   Well, we have a single measurement collected by the

9  Sierra Club, which was .25, and that was collected in early --

10  that measurement was collected from a unit that was half a year

11  old.

12  Q.   So we have a Sierra Club data point right here?

13  A.   Yes, sir.

14  Q.   But to be fair, that's one data point and not statistically

15  significant by itself?

16  A.   Well, one data point by itself is questionable.

17  Q.   One more slide I want to ask you about.  This is Table 3 and

18  Table 9.  What does this show us?

19  A.   These two tables, the top one is directed -- is for all of

20  the occupied travel trailers, that includes the Morgan travel

21  trailer.  And the bottom table is for the Morgan model only.

22          And these tables contain the estimates or, rather, the

23  observed fraction or percent of the measurements that were above

24  the ATSDR and the NIOSH occupational limit, the ATSDR chronic

25  limit of .008 and NIOSH limit of .016.

1          And to let me explain, if that's the intent, let's look

2   at the top table, we have 71 measurements total.  Of the 71

3   measurements, 97 percent of them were greater than the ATSDR

4   limit.  Now, that 97 percent is an estimate of the true fraction

5   of all possible measurements that is above the ATSDR limit.

6          That being an estimate, we have to put confidence

7   intervals around that to determine how certain are we in that

8   particular estimate.

9          And so the next two columns give you the 99 percent

10  lower confidence limit and the 99 percent lower confidence limit.

11  The 99 percent lower confidence limit is 88.7, so I'm 99 percent

12  confident that the true percent above the ATSDR limit is 88.7.

13  I'm 99 percent confident it is that level or higher.

14         Now, may I, okay, go on?

15  Q.   Sure.

16  A.   Now, we have the total here but I also divided this up by

17  each of the data sources.  So you see the Bureau Veritas

18  contributed the majority of the measurements, that's a

19  consultancy hired by the government, and the other sources

20  contributed fewer measurements.

21         But in all cases we had either 100 percent or

22  95 percent of the measurements above the limit.  The lower

23  confidence limits vary depending upon the sample size.  As a

24  statistician I would look at the lower row and conclude that

25  97 percent of the measurements that were observed were above the

1   ATSDR limit.

2          When we go to the second table that's focused on the

3   Morgan model, and the statistics are virtually identical.

4   Virtually all of the measurements are above the ATSDR limit.

5          MR. WATTS:  May I approach, Your Honor?

6          THE COURT:  Yes.

7   BY MR. WATTS:

8   Q.   One last issue.  The odor threshold being .5, or 500 parts

9   per billion, if somebody smelled formaldehyde, would that be

10  above the ATSDR and the NIOSH limit?

11  A.   According to the information I have, and I'm not an expert

12  on odor detection, but according to the toxicological profile

13  published by the ATSDR in 1999 for the EPA, they indicate that

14  the odor threshold was between .5 and one part per million.

15         So if one is detecting -- one can infer that if one

16  detects a smell of formaldehyde that the concentrations are in

17  that range.

18  Q.   A year and a half to two and a half years after moving into

19  the trailer, the mean is .081.  Is that above the NIOSH limit?

20  A.   Yes, it is.

21  Q.   Is it above the ATSDR recommended guideline?

22  A.   Yes, it is.

23  Q.   The test that was taken four years after all of this

24  off-gassing took place, .05, is that level above the NIOSH limit?

25  A.   Yes, it is.

1    Q.    Is that level above the ATSDR recommended guideline?

2    A.    Yes, it is.

3    Q.    All right.

4          MR. WATTS:  Now it's time for me to sit down.  Those are

5    all of my questions.  Thank you.

6          THE COURT:  We're going to go ahead and take our

7    midmorning break about now.  If you all could be ready to come

8    back into the courtroom at ten after 10:00.  That gives you about

9    15 minutes.  Ten after 10:00 we'll go ahead and resume.

10             Please don't discuss anything about the case.

11             When you return, we will have Mr. Hewett back up

12   here on the stand and he will be cross-examined and we'll finish

13   up with his testimony.

14         THE COURT SECURITY OFFICER:  All rise.

15         (WHEREUPON, at this point in the proceedings, the jury

16   panel leaves the courtroom.)

17         THE COURT:  Who has got cross?  Mr. Yount.  Good.

18             We'll see you at ten after 10:00.

19         (WHEREUPON, at this point in the proceedings, the Court

20   was in recess.)

21         THE COURT SECURITY OFFICER:  All rise.

22         (WHEREUPON, at this point in the proceedings, the jury

23   panel enters the courtroom.)

24         THE COURT:  Dr. Hewett, you're still under oath and we

25   are about to start your cross-examination by Mr. Yount.

1           MR. YOUNT:  Thank you, Your Honor.  May I proceed?

2           THE COURT:  Yes, please do.

3                        CROSS-EXAMINATION

4    BY MR. YOUNT:

5    Q.   Good morning, Dr. Hewett.

6    A.   Good morning.

7    Q.   Where are you from?

8    A.   Originally?

9    Q.   Where do you live right now?

10   A.   Morgantown, West Virginia.

11   Q.   You're not down here by of the goodness of your heart.

12   You're getting paid to be here; is that correct?

13   A.   Yes, sir.

14   Q.   What is your hourly rate to testify at trial?

15   A.   $350 per hour.

16   Q.   And you charge a different rate for reviewing all of this

17   data, preparing these charts and meeting with the plaintiffs'

18   lawyers in this case; is that correct?

19   A.   That's correct.

20   Q.   And you got down here sometime yesterday or the day before

21   yesterday?

22   A.   The day before.

23   Q.   And you were here yesterday in court, correct?

24   A.   Yes, I was.

25   Q.   And are you charging the whole time you're sitting in court,

1   preparation and all that stuff?

2   A.    No.

3   Q.    You are not?

4   A.    No.

5   Q.    Before yesterday, had you ever had occasion to meet

6   Ms. Castanel?

7   A.    No, I did not.  Have not.

8   Q.    Did you get to meet her yesterday?

9   A.    No.

10  Q.    Now, you have met these plaintiffs' lawyers on many

11  occasions; is that correct?

12  A.    Yes.

13  Q.    Now, in connection with all the work that you've done on

14  Ms. Castanel's case, up until the time you prepared your report,

15  you never read her deposition, did you?

16  A.    I have not read her deposition.

17  Q.    Okay.  And you don't know anything about how she used her

18  travel trailer, do you?

19  A.    No, I do not.

20  Q.    You don't know what temperature she kept that trailer?

21  A.    I do not know what temperature she kept that trailer.

22  Q.    You don't know whether she kept her windows opened or closed

23  except for maybe what you heard on the witness stand earlier

24  today; is that correct?

25  A.    Correct.

1    Q.    You don't know whether she fried fish or cooked in that

2    trailer?

3    A.    I imagine she cooked in that trailer.  I think that's a safe

4    bet.

5    Q.    And you're aware that all of the activities that we talked

6    about, keeping your windows opened, keeping the temperature warm

7    or cold, those all have some sort of effect on the airborne

8    concentrations of formaldehyde in Ms. Castanel's trailer?

9    A.    That is correct.

10   Q.    Now, in connection with all the work that you've done in

11   this case, what you're trying to do as a statistician and an

12   industrial hygienist is to make projections about her trailer; is

13   that correct?

14   A.    Well, there is a yes and a no.  The no is that, as I stated

15   earlier, I do a statistical analysis of the data that was

16   collected or had been collected.  And then I had also done an

17   analysis to project backwards and try to estimate what exposures

18   might have been in those units in earlier days closer to time of

19   manufacture.

20   Q.    So we're talking about travel trailers in general, correct,

21   RBD travel trailers?

22   A.    RBD travel trailers and Morgan trailers specifically.

23   Q.    Incidentally, the statistics part of your expertise, that's

24   kind of a mathematics field?  Are you a mathematician?

25   A.    No, I'm not a mathematician.

1  Q.    But you are a statistician?

2  A.    I'm not a statistician.  I'm a data analyst.

3         What I mean by that is I distinguish myself from a

4  Ph.D. statistician or a Ph.D. mathematician, but that does not

5  mean that I don't have skills in those areas as anybody that is

6  trained in the sciences does.  And then over my career I've

7  enhanced those skills through additional training, through

8  additional applied work myself to the point where I am and

9  recognized data analyst within my field.

10  Q.    You would agree with me that if we wanted to get the best

11  results possible as to what the level of airborne formaldehyde

12  was in Ms. Castanel's trailer when she was living in it, the best

13  way to do that would be to measure it when she was living in it;

14  is that correct?

15  A.    In hindsight, yes.

16  Q.    Do you have any idea why Ms. Castanel did not test her

17  trailer for formaldehyde when she lived in it?

18  A.    You would have to ask Ms. Castanel why she did not test her

19  trailer.

20  Q.    Okay.  Now, it's been four and a third years since

21  Ms. Castanel moved into the trailer.  You would agree with that?

22  A.    Correct.

23  Q.    Do you have any idea why the plaintiffs' lawyers who are

24  representing Ms. Castanel did not have this travel trailer tested

25  until the defendants decided to have it tested?

1  A.   I do not have any idea why.

2  Q.   Now, you are aware that the plaintiffs' lawyers hired an

3  expert to perform testing of Ms. Castanel's trailer at the same

4  time that our experts did it?

5  A.   Yes, I am aware of that.

6  Q.   And you're aware that their results were actually lower in

7  connection with their airborne concentrations of formaldehyde

8  than the experts that we hired; is that correct?

9  A.   I'm not sure I'm aware of that.  What I'm aware of is that

10  their results were virtually identical.

11  Q.   Okay.  So the plaintiffs' lawyers' experts' test results

12  were about the same as ours; is that correct?

13  A.   That is correct.

14  Q.   All right.  Do you know the names of those experts?

15  A.   Well, for the plaintiffs --

16  Q.   That's what I want to know, the plaintiffs' experts.

17  A.   That would be WD Scott Group.  Who exactly participated in

18  the sampling exercise, that I do not know.

19  Q.   Now, you talked about data.  And you looked at a lot of data

20  in connection with the nice charts that you prepared; is that

21  correct?

22  A.   Correct.

23  Q.   Now, Mr. Watts actually beat me to the point, but a lot of

24  that data was gathered by experts hired by the plaintiffs'

25  lawyers; is that correct?

1   A.   A good deal of it.  The majority of it, as I indicated, was

2   collected by government agencies and other organizations.

3   Q.   So the majority, 51 percent?  Isn't that what majority

4   means?

5   A.   I can calculate it for you exactly.  It is not 51 percent.

6   Q.   Significant amount of that data was gathered by experts

7   hired by the plaintiffs' lawyers; is that correct?

8   A.   Right.  But more than 50 percent was gathered by other

9   organizations.

10   Q.   Now, this database, how do you get access to this database?

11   A.   Well, the database is maintained by Boston Chemical, which

12   is a consultancy hired by the plaintiffs, and access is gained

13   through the web site, password access only.

14   Q.   So this whole database is ultimately controlled by the

15   plaintiffs' lawyers in the case; is that right?

16   A.   The database is controlled by the plaintiffs.

17   Q.   Now, the data ends up in this database because it is

18   inputted by someone; is that correct?

19   A.   Well, in their database, yes, it is inputted by someone, an

20   alternate, say, file transfer, for example.  The majority of the

21   data or a huge chunk of the data came from governmental sources.

22   So they provided their data as spreadsheets, computer files, and

23   those are just simply merged with the plaintiffs' database.

24   Q.   The way it works basically is that sometime in the past

25   somebody goes out and does actual measurements, they record that

1  data, then that data is then put into a spreadsheet, that
2  spreadsheet is uploaded into the database; is that correct?
3  A.    That's the basic process.
4  Q.    Now, you have never read any of the source documentation; is
5  that correct?
6  A.    It's a yes and a no.  I'm sorry to have so many yes and no
7  answers.
8  Q.    That's okay.  We want accurate testimony, sir.
9  A.    For, I believe, all of the sources I have looked at
10  paperwork just to familiarize myself with the type of
11  documentation that originated the data.  For example, with the
12  data from the Sierra Club, I looked at a few of the data sheets
13  that had been provided to the PSC or to the Plaintiffs' Steering
14  Committee to determine, well, exactly in what form was this
15  information provided.  Was there a resident indicated?  You know,
16  so was the trailer unit occupied or not occupied.  Which
17  laboratory was utilized and is that an AIHA certified laboratory;
18  that is a laboratory that is accredited to provide -- accredited
19  in such a way that it is known that they provide accurate
20  results?
21        And I did that, I think, for every one of the data
22  sources.  So I have looked at some of the records.
23        Now, for two of the major sources of data, that's
24  Bureau Veritas and the Centers for Disease Control, there I did
25  not use the Plaintiffs' Steering Committee database.  I used the

1  data that was provided by those agencies, so the data came

2  directly from those agencies.  It was provided to me on a CD.

3  These represent the original files.

4          So I've looked at a few of the records, but probably in

5  answer to your question, I have not looked at 99.9 percent of the

6  records.

7  Q.    In fact, you are aware, though, that some of the -- I know

8  you've looked at some actual records where the data was recorded,

9  and you are aware that there are mistakes in that data?

10 A.    I'm aware there are mistakes in the database, yes.

11 Q.    And you would agree that as a scientist and an expert, your

12 opinions are only as good as the data upon which they are based;

13 is that correct?

14 A.    There is a yes and a no to that.

15 Q.    Okay.

16 A.    Okay.  If I have a small dataset, one, two, three or four

17 measurements, and one or two or three or four of those

18 measurements are defective in some way, improperly recorded or

19 whatever, then my conclusions are definitely going to reflect the

20 quality of that dataset.

21         However, if I have a large dataset, dozens upon dozens

22 upon dozens of measurements, then my conclusions and decisions

23 relative to that database become fairly robust or resistant to

24 any errors in the database.

25         Let me give you an example, which is going to play out

1    with everybody in this room.  A census is underway and a lot of

2    the data in that census is going to be incorrect.  Yet the census

3    is large enough that any mistakes, any transcription errors are

4    going to be -- have very little or no effect on the conclusions

5    of the census regarding distributions of populations and

6    ethnicities and how many people in this district and that

7    district, so on and so forth.

8            The same thing with this dataset.  We have a fairly

9    large dataset here.  Even if there are a few errors in there,

10   it's probably not unlikely to change my conclusions.

11   Q.   With respect to the Morgan travel trailers, similar to the

12   one that Ms. Castanel lived in, you look at what, 46?

13   A.   That's correct.

14   Q.   Let me ask you about --

15           MR. YOUNT:  May I approach, Your Honor?

16           THE COURT:  Yes.

17   BY MR. YOUNT:

18   Q.   -- this chart that you and Mr. Watts put together.  There is

19   one data point on this chart; is that correct?  Sierra Club.

20   A.   That's right.  Two data points.  You have the .05.

21   Q.   Are you aware that when the Sierra Club did its testing that

22   they put their measuring, the measuring devices to measure

23   airborne formaldehyde inside of wood cabinets in the trailer?

24   A.   I'm not aware that they did that.  They may have done it for

25   some of the measurements, but I'm not aware that that was a --

1   Q.   Now, you previously testified it would be not a good idea to

2   rely upon only one data point.  You told Mr. Watts that.

3   A.   I said if you only had one data point it can be

4   questionable, but it depends upon other circumstances.

5   Q.   Back to the Sierra Club.  If hypothetically speaking, if the

6   Sierra Club did not follow the same protocols as the other

7   testing companies and if they, in fact, tested by placing

8   monitors inside of wood cabinets instead of putting them out

9   where people are in the trailer, would you agree that that's

10  another reason why the Sierra Club data point might not be

11  reliable?

12  A.   Another reason, well, it might be a reason.

13  Q.   Okay.

14  A.   Yes.

15  Q.   Now, will you show Plaintiffs' Chart 8.

16          Now, under questioning from Mr. Watts, you explained

17  how this Y-axis over here is logarithmic; is that right?

18  A.   I don't know if I used the term *logarithmic,* but it is a

19  logarithmic axis, which we frequently use in science.

20  Q.   In other words, it's not really to scale like most people

21  would think about, correct?

22  A.   Most people think of in linear terms.  You would think of an

23  X-axis in terms of 0 to 10 parts per million in even increments,

24  so that would be one, two, three, four, five, six, seven, eight,

25  nine, ten, in nice even increments.

1          With occupational and environmental data, we tend to

2    use logarithmic axes to show all of the data.

3    Q.    So on this Y-axis here, the distance from here to there

4    represents the same amount as from here to there, correct?

5    A.    Yes.  Your marker went from .01 to .02, and that would be

6    the same distance as .02 to .03, as you indicated.

7    Q.    So in other words, you're not trying to be misleading, but

8    up here, .1 down to .9, that small area is the same distance

9    as -- that's the same distance as if you go back down from .01 to

10   .02.  Those are the -- no, up to the next one.  From there to

11   there.

12   A.    Well, I follow you.  But when you say the same distances,

13   the same distance on the logarithmic scale.  It's not the same

14   distance on the concentration scale.  Which is why we have --

15   this is truly a logarithmic scale, but we do is we put the

16   concentration units there so that you can get a feel for what the

17   log scale is supposed to tell you.

18   Q.    If this were a linear scale, this 1.000 would be way up

19   here; is that right?  It would be way off the chart if you did it

20   on a linear scale?

21   A.    If that was a linear scale, it would look entirely

22   different.  You'd start at zero and you would end up at ten and

23   you would have nine even increments in between.

24   Q.    Right.  And this number, 1, would be way up high.  It

25   wouldn't be able to fit on the screen unless you shrunk it down?

1   A.   I think we're conceptualizing this figure that's in your

2   mind differently.  I'm looking at it in my mind as having a lower

3   point at zero parts per million and the top is 10 parts per

4   million, just as we have in this chart.

5   Q.   It's not that significant, so I'll move on.

6        These two lines that you put on this chart, the NIOSH

7   standard and the ATSDR standard, those are standards that you put

8   on there because the plaintiffs' lawyers told you to; is that

9   correct?

10  A.   Actually, they did not tell me to put those lines on these

11  charts.  I did so because it's an appropriate way to compare the

12  data to limits that they suggested I compare the data to.

13  Q.   That they suggested you compare them to?

14  A.   Yes, sir.

15  Q.   You were not suggesting in your testimony today that those

16  are the applicable standards to consider in connection with

17  Ms. Castanel; is that correct?

18  A.   Well, that question has not, did not come up in direct, as I

19  recall.

20       THE COURT:  Go ahead and answer.

21       THE WITNESS:  My feeling is that the ATSDR limit is an

22  applicable standard for this scenario.  I don't know of a better

23  standard.

24       MR. YOUNT:  Your Honor, may we approach the bench?

25       (WHEREUPON, at this point in the proceedings, there was

1    a conference held at the bench.)

2         MR. GARRISON:  Your Honor, in the Alexander case it came

3    up.  He was instructed that he is not to give that opinion.

4         THE COURT:  I have the order from Alexander, which I

5    reviewed right before he started testifying.  The instruction,

6    the order was that it could not be suggested to the jury that

7    that was the legal -- the limit for liability to be assessed.

8              And I could pull it right now and show it to you.

9    So let's cover it and get the exact verbiage of what I said.

10        MR. WATTS:  Why did he ask the question?

11        MR. YOUNT:  Because you're suggesting that it's an

12   appropriate standard, and it's not.

13        THE COURT:  He asked the question so that the jury is

14   not left with the impression that it is.  Although you didn't ask

15   it that fashion, a reasonable juror could have accepted the

16   testimony with the only two levels that were demonstrated on your

17   direct, which were those two.

18        MR. WATTS:  We had the slide that had all five of them,

19   ACGIH, OSHA.  There was an earlier slide that had all of them,

20   the one with the occupational exposure limits.

21        THE COURT:  It's page 2 of the Court's ruling at

22   Document Number 12730.  It says here:  "The Court fully expects

23   that plaintiff's counsel, in his direct examination of Hewett,

24   will make it clear to the jury where those levels came from and

25   that those levels do not necessarily establish Forest Rivers' or

1    Shaw's liability in this case."

2             This was a prior ruling from the second bellwether

3    trial.

4             "The Court is also willing to give an appropriate

5    instruction to the jury.

6             "When Hewett testifies as to his analysis of the

7    formaldehyde levels comparative to these two particular

8    measurement standards; i.e., that failure to meet either of those

9    two standards does not necessarily establish grounds for

10   liability in this case.

11            "To be clear, ambient formaldehyde levels

12   established for a variety of regulatory purposes will not be

13   conveyed to the jury as the benchmark or threshold for the

14   establishment of legal liability."

15            I think that was the purpose of the question.  I

16   don't know why he said it wasn't asked on direct, but that's

17   immaterial.  But I think that's why the question was asked.

18            MR. YOUNT:  I'll ask for that limited instruction to be

19   given right now.

20            MR. WATTS:  Can I throw out another idea?  I've got no

21   problem with that, but I don't think the Court ought to make a

22   comment on the weight of the evidence as to which standard.  I

23   think that, you know, there were five of them they showed on one

24   slide, and that none of those standards -- in other words, I

25   think the instruction is appropriate with respect to all of them,

1   not necessarily one or two.

2           THE COURT:  That's the central issue in the case.

3           MR. WATTS:  Yes.  And I guess my point is I don't think

4   the Court ought to be granting a summary judgment in front of the

5   jury as to which standard it likes and doesn't.  So if you do it

6   as to all five, and say, these are all for your consideration.

7   Failure to meet one or the other, it doesn't establish legal

8   liability.  It's for you to decide.

9           MR. YOUNT:  I think it needs to be given right now.

10          MR. WATTS:  No, I have no problem with right now.

11          MR. YOUNT:  The witness knows he's not supposed to give

12  that answer.

13          MR. WATTS:  Wait a minute.  He said, "This did not come

14  up on direct."  And he looked over at you and then you said, "Go

15  ahead and answer the question."  It's not like he blurted it out.

16          My point is I don't have any problem -- and I think

17  I complied with your order specifically.  But what we ought to

18  do, as opposed to pin it down on these two standards, we ought to

19  do all the standards.  And put up the screen and say, look,

20  meeting or not meeting any one of these standards does not

21  necessarily impose liability, the weight, it's a decision for you

22  to make.

23          But I don't think it ought to be specific to ATSDR

24  and NIOSH.

25          THE COURT:  Were this case as simple as matching a

 1    measurement to a single benchmark standard we wouldn't be here.

 2            MR. WATTS:  We would have a HUD ruling.

 3            THE COURT:  Exactly.  Were this case that simple, but

 4    it's not.  And so we're dealing with a bunch of relative ambient

 5    air standards, which will ultimately be up to the jury to

 6    determine whether those standards, if not satisfied, constitute a

 7    defective product under the LPLA.

 8            MR. WATTS:  We have no problem with you giving that

 9    instruction, but we just think it ought to be as to every

10    standard talked about, not one or two.

11            THE COURT:  This came up in the very first bellwether

12    and the jury struggled with that as we have in this case.  That's

13    a central issue in the case.  Is the product defective because it

14    doesn't satisfy whichever standard you want to put on screen?

15            MR. WATTS:  Exactly.  If you're going to give the

16    instruction now, which we don't object to, I think you ought to

17    add that last sentence that you said.  What standard to apply,

18    the weight to give them is up to you.  It's -- the Court is not

19    giving you an instruction.

20            THE COURT:  I'm going to tell them now there is not a

21    single benchmark standard for a defective -- for this product

22    being defective or not.

23            MR. YOUNT:  I think you need to use it in terms of those

24    two standards he was just talking about because it was brought up

25    in response to that question.

1           THE COURT:  Those two and any other standard.

2           MR. YOUNT:  Okay.  That's fine.  It's got to be

3   specific.

4           THE COURT:  There is not a benchmark ambient air

5   measurement that would dictate whether this product was defective

6   or not.

7           MR. WATTS:  Right.  I'm fine with that.  As long as it's

8   generic.

9           THE COURT:  I'm going to tell them that.

10          (WHEREUPON, at this point in the proceedings, the bench

11  conference concluded.)

12          THE COURT:  We need to make clear, in light of this --

13  well, in particular the last question that was asked, but in

14  terms of the case itself, and it's appropriate for me to advise

15  the jury at this time that in case you haven't already figured

16  this out, there is not a benchmark ambient air level that if

17  satisfied or if not satisfied would dictate whether the product

18  at issue in this case is defective or not.

19          There are multiple standards, two of which this

20  witness was just asked about, and there are other standards which

21  you have heard about and will hear about during the course of the

22  trial that the attorneys will talk to both Dr. Hewett as well as

23  other experts about.

24          The case is not as simple as finding the standard

25  ambient air level that if satisfied means the product was not

1  defective or if not satisfied would mean that the product was

2  defective.  It's just not that simple.

3          Now, the attorneys are going to present to you,

4  through expert testimony, evidence about a variety of standards

5  and that is the exercise we're engaged in at this point.  So I

6  think that you have to accept the expert's testimony with that in

7  mind.

8          And the attorneys can question the witnesses about

9  any one of these standards at any point in time in order to argue

10  those to you as part of their closing argument or to highlight

11  all of the factors that you might consider in this case after I

12  give you the instructions as to the law regarding Louisiana

13  product liability provisions.

14          All right.  Go ahead, Mr. Yount.

15          MR. YOUNT:  Thank you, Your Honor.

16                          EXAMINATION

17  BY MR. YOUNT:

18  Q.   Dr. Hewett, in connection with the two lines that you have

19  drawn on the chart, one of those is the NIOSH REL; is that

20  correct?

21  A.   It's the NIOSH recommended exposure limit for formaldehyde

22  in occupational settings --

23  Q.   REL, recommended exposure level; is that correct?

24  A.   That is correct.

25  Q.   Now, you were actually at NIOSH when that was -- standard

1    was implemented; is that correct?

2    A.   Yes, I was.

3    Q.   I want to direct your attention --

4         MR. YOUNT:  May I approach the witness, please?

5         THE COURT:  Yes.

6                              EXAMINATION

7    BY MR. YOUNT:

8    Q.   -- to Exhibit 63.  And if you'd put that up on the board,

9    please.

10        Well, instead of approaching, I'll just do it from

11   here.  Will you zoom in on the exposure limit, the first sentence

12   under here.

13        And this is where is sets that exposure limit; is that

14   correct?  This line.

15   A.   Is that a question?

16   Q.   Is that correct, Dr. Hewett?

17   A.   Is that a question to me?

18   Q.   This is the document, is it not, where NIOSH establishes

19   this .016 ppm REL; is that correct?

20   A.   I'm not sure it is.  I mean, you'd have to show me what this

21   document is.  You just threw it up there and then enlarged

22   something.  And what is this document part of?

23   Q.   This is Exhibit 863.

24   A.   It's an extract from something, sir.

25   Q.   Do you not recognize this document?

1    A.   Well, I remember that NIOSH had -- NIOSH has thousands of

2    publications -- well, maybe hundreds.  And I remember they did a

3    series of health guidelines.  And, in fact, I think I had that on

4    my shelf at one time.  In fact, if you look at the date here,

5    1988, so this goes back quite some time.

6              You're representing to me that this is the first

7    instance of NIOSH recommending this standard.  Now, I will accept

8    your word on that, although you're not under oath.

9    Q.   So you would agree with me that this appears to be a NIOSH

10   publication --

11   A.   It is a NIOSH --

12   Q.   And this is the standard you're talking about, .016 parts

13   per million?  I mean, this is what you're talking about when you

14   draw that line on the chart, correct?

15   A.   Right.

16   Q.   Okay.  Will you look on the second page of the document up

17   at the top.  What does OSHA say up here about the REL, that first

18   full sentence?

19   A.   Well, I think this is NIOSH speaking, not OSHA.

20   Q.   Okay.

21   A.   "This REL represents the lowest reliably quantifiable

22   concentration at the present time."

23   Q.   That means that this was set there because that's the lowest

24   that they could measure for formaldehyde; is that correct?

25   A.   That is correct.

1  Q.   Now, the ATSDR standard.  Will you pull up Exhibit 628,

2  please.

3           Would you agree with me, sir, that in the last sentence

4  the ATSDR says that the exposure to a level above the MRL does

5  not mean that adverse health effects will occur?

6  A.   I agree that's what it states.

7  Q.   So, in other words, where you drew that line on your chart,

8  ATSDR says that if you're above that level, you're not

9  necessarily going to get bad adverse health effects, correct?

10 A.   That's true, but -- and I would amplify that and say that's

11 true for every exposure limit.  Just because you're above it one

12 time or two times does not necessarily mean that you will develop

13 the condition in question.

14          These are risk management guidelines.  The question is

15 how far are you above the limit and how often are you above that

16 limit?  Those are other considerations.

17 Q.   Let's look at your data sets compared to some of these other

18 standards that we've been talking about.  Will you pull up

19 Chart 8 with the additional lines on it.

20          Now, your original information, all these dots are your

21 original information, and then the black line here and the black

22 line here, those are your lines; is that correct?

23 A.   That's correct.

24 Q.   Now, this OSHA standard, this is a standard that comes from

25 your chart; is that correct?

1   A.    That comes from one -- my Table Number 1.

2   Q.    And what is the OSHA standard, again?  What is the level?

3   A.    The level is .75 parts per million as measured over an

4   eight-hour shift for healthy adult workers.

5   Q.    Tell me how many RBD travel trailers as measured exceeded

6   the OSHA standard.

7   A.    Well, that's a question and I will answer it, but I think

8   it's an incorrect comparison; but, nonetheless, the answer is

9   none of the measurements that were collected are above that

10  particular occupational limit.

11  Q.    Are you aware that the government, in 24 CFR Part 3280,

12  implemented a HUD safety standard?

13  A.    I have heard of the HUD standard.  I'm not aware it was

14  called a safety standard.  And I'm aware that it is a value of

15  .4 parts per million.  But what I'm not aware of and I have not

16  heard yet is the reference period, the measurement period, over

17  which one would collect a measurement to compare to that HUD

18  standard.

19          Now, let me give you an example.  The OSHA standard is

20  .75 parts per million as measured over an eight-hour work shift.

21  Over what period of time is the HUD standard measured?

22          It was developed and adopted in the '80s, so

23  undoubtedly it was a ceiling limit or a short-term exposure

24  limit, but I have not heard what it really is.  It is a number,

25  .4.

1          A standard, an exposure limit, a concentration limit

2    has a number, it has units, parts per million, parts per billion,

3    and it has a reference period.  Over what period of time do you

4    collect the measurement?

5          For ceiling standards, it is seconds to minutes.  For

6    short-term exposure limit it is 15 minutes.  For an eight-hour

7    time-weighted average occupational limit, it is eight hours.

8          Now, if we're going to compare this .4 to all of these

9    numbers which were collected using 60-minute to 24-hour samples,

10   the question is, is that a valid comparison.  So it's a number,

11   but what does it mean?  What is the reference period?

12   Q.   Let's talk about what it means.  Will you pull up

13   Exhibit 858, please.  Will you go up to the top, and will you

14   highlight what the title of this --

15         At the bottom of the -- don't take my word for it --

16   the bottom of the -- the title of the document, it says,

17   Manufactured Home Construction and Safety Standards, do you see

18   that?

19   A.   Yes, sir.

20   Q.   And you would agree that this a government regulation?

21   A.   It certainly has the appearance of one.

22   Q.   In other words, 24 CFR is the Code of Federal Regulations;

23   is that correct?

24   A.   That is correct.

25   Q.   Well, if you go to page 3 of this, and will you tell the

1    jury what the government decided that the targeted ambient level

2    should be in connection with manufactured housing?

3    A.    Do you want me to read this?

4    Q.    Yes, please read the first sentence.

5    A.    "The department has concluded that an indoor ambient

6    formaldehyde level of .4 parts per million provides reasonable

7    protection to manufactured home occupants."

8    Q.    Will you go back to the chart with the additional lines on

9    it, please.

10          So at least according to the HUD standard, here is the

11   line where you set to have reasonable protection from

12   formaldehyde exposure; is that correct?

13   A.    .4 parts per million as measured over what period of time?

14   Go back to your HUD standard and find that information and give

15   it to me, and I can answer that question.

16   Q.    So you don't like the HUD standard?

17   A.    It has nothing to do with whether I like the HUD standard.

18   Is it .4 parts per million as a ceiling limit, which it probably

19   undoubtedly was at that point in time, or is it an eight-hour

20   standard, is it a 24-hour standard, is it a two-week standard, is

21   it an annual standard?

22          Sir, you just cannot pull a number out of some document

23   and say that that is a valid number for comparing measurements

24   that were collected over a 60-minute to 24-hour period.

25   Q.    Dr. Hewett, you just read from the standard.  That's not

1   what I'm saying.  That's what the government is saying, isn't it?

2   A.    Somewhere in there, in the preamble to that standard -- do

3   you -- you know what a preamble is, sir?

4            THE COURT:  Wait, you're going to answer his questions.

5            THE WITNESS:  Okay.

6            THE COURT:  You need to listen to the question and

7   answer the question as directly and concisely as possible without

8   a lot of additional comment because there is going to be redirect

9   and you'll be able to be asked those questions.

10           So this is getting a little protracted because

11  we're digressing, so let's listen carefully to the question,

12  answer the question, and then we'll take another question.

13           THE WITNESS:  Can we have the question again, please?

14                          EXAMINATION

15  BY MR. YOUNT:

16  Q.    I'm not sure that I can recall it, so I'll just move on to

17  something else.

18           THE COURT:  Wait one second.  Let's pull it up.

19           I think we were talking about the -- actually, the

20  reason I intervened is because there was no question.  It became

21  a discussion of where the .4 came from insofar as it either being

22  pulled out of thin air or whether it was from the CFR, and then

23  the witness began talking about the preamble.  That's why I

24  intervened because there was not really a valid question on the

25  table, anyway.

1          I'm sure there was one at the outset, but we became

2     very distracted from that by the colloquy.  So either ask the

3     question you started with or move on to another question.

4                              EXAMINATION

5     BY MR. YOUNT:

6     Q.   Dr. Hewett, this .4 ppm standard comes from a governmental

7     regulation, the HUD safety standards; is that correct?

8     A.   It appears to.

9     Q.   Now, let's look at this chart.  Now, the purple line

10    reflects the Castanel trailer actual measurements taken on

11    January the 7th, 2010; you don't dispute that, do you?  That's

12    the .05 ppm measure that has been stipulated to among the

13    parties.

14    A.   Right.  It's almost on the .05 line.

15    Q.   And then this is another stipulated number between the

16    parties, the measurements that were taken on January 8, 2010, at

17    .2 parts per million; does that seem about right?

18    A.   It's just barely above .02.

19    Q.   And then this green line, which you would agree that it's

20    approximately .009 parts per million, which has been stipulated

21    by the parties as a measurement taken in the Castanel trailer on

22    January 4, 2010?

23    A.   I would agree that that is approximately .009.

24    Q.   So the Castanel trailer tested, actual tested, less than all

25    of these data points we see on your chart; is that correct?

1   A.   The numerical value is less than -- those three numerical

2   values are less than the majority of the measurements in that

3   chart.

4   Q.   Now, with respect to the HUD safety standard at .4, how many

5   RBD trailers contained in the data set exceeded that level?

6   A.   None, but this gets back to my contention, and I'll phrases

7   it in terms of apples versus oranges, and I think I can boil it

8   down to one phrase, if I can be permitted to do so.  If the HUD

9   safety standard is a ceiling limit, then none of those

10  measurements should be compared to it because those were

11  24-hour -- majority of them were 24-hour samples, or most of them

12  were 60-minute to 24-hour samples.

13          A ceiling limit should be compared to short-term

14  measurements that -- you know, collected over a period of minutes

15  to seconds.  It represents peak exposures.  A ceiling limit is

16  for controlling peak exposures.  None of those measurements are

17  designed to estimate peak exposure, so you're comparing apples to

18  oranges.  And I think that's the point I want to make, that until

19  we know something more about the HUD standard, whether or not

20  it's a ceiling limit or a daily limit or an annual limit, you're

21  comparing apples to oranges.

22  Q.   As an industrial hygienist, you've referred to the Code of

23  Federal Regulations in your work before, haven't you?

24  A.   Oh, absolutely.

25  Q.   Now, you talked about short term versus long term.  Were you

1  aware, sir, that the stipulated value of the .009, which is this

2  green line, that was the short-term test results?

3  A.   That was a short-term test result collected prior to

4  conditioning the unit, opening the unit up and conditioning it.

5  Q.   And, in fact, the .050 level, which is the purple line,

6  that's the one, the actual test results for a time-weighted

7  average; is that correct?

8  A.   That is a 60-minute sample collected at the beginning of the

9  post-conditioning period, collected when the ambient -- the

10  temperature inside the trailer was 58 degrees.

11  Q.   Was it a time-weighted average?

12  A.   Yes, a 60-minute time-weighted average.

13  Q.   And these actual data results reflected by the purple line,

14  the blue line and the green line, those did not make it as data

15  points in any of your charts; is that correct?

16  A.   Not in these charts.

17        I might mention that the data that was provided --

18        MR. YOUNT:  Judge, there is no pending question.

19        THE WITNESS:  I'm sorry.

20        THE COURT:  Yes, just answer the question and let's move

21  on to the next one.

22        MR. YOUNT:  That's all I have.  Thank you, Judge.  Thank

23  you, Dr. Hewett.

24                    REDIRECT EXAMINATION

25  BY MR. WATTS:

1  Q.   Is it important when reading a HUD standard to look at the

2  entire standard to see whether we're talking apples and oranges?

3  A.   I would think in this case it would be critical to do so.

4  And I mentioned the preamble before.

5        THE COURT:  Wait.  Wait.  Answer his question.  I mean,

6  that was not an invitation to just blurt out whatever you happen

7  to be thinking at the moment.  Let's stick with the questions.

8        THE WITNESS:  I'm sorry.

9                            EXAMINATION

10  BY MR. WATTS:

11  Q.   With respect to the HUD standard, do you know whether this

12  is a testing requirement for travel trailers or for a single

13  piece of particleboard?

14  A.   I do not know.

15  Q.   If the HUD standard required that a single piece of

16  particleboard be put in a short-term chamber unit, is that the

17  same thing as going into a travel trailer and testing, a

18  residential setting?

19        MR. YOUNT:  Objection, he just said he doesn't know

20  about the HUD standard.

21        MR. WATTS:  I'm not asking him --

22        THE COURT:  I'm going to let him answer that.  I don't

23  know how much further we can go with this, but I'll let him

24  answer this one and let's move on.

25                            EXAMINATION

1   BY MR. WATTS:

2   Q.   Is testing a single piece of particleboard in a short-term

3   chamber setting the same thing as testing a travel trailer with

4   wood all around it?

5   A.   Well --

6        MR. YOUNT:  Objection, there is no foundation.  He said

7   he doesn't know about the HUD standard.

8        MR. WATTS:  I didn't ask him about the HUD standard.

9        THE COURT:  He didn't ask him about the HUD standard.

10  I'm going to let him answer this one.  Let's go.

11       THE WITNESS:  Well, I was under the impression that

12  there is a HUD standard regarding emissions, and I guess this is

13  the HUD standard regarding emissions.

14            And in answer to your question, there is a

15  difference between testing emissions from a piece of

16  particleboard in a controlled setting and testing -- measuring

17  formaldehyde levels in a trailer.

18                        EXAMINATION

19  BY MR. WATTS:

20  Q.   You've been in some of these travel trailers, right?

21  A.   No, I have not.

22  Q.   You've seen design drawings of them?

23  A.   I have seen photographs and design drawings.

24  Q.   There is more than a single piece of particleboard in these

25  travel trailers, right?

1  A.    That is my understanding.

2  Q.    Now, I want to show you a document that's already in

3  evidence as Exhibit 4.  It's the Centers for Disease Control

4  Final Report on Formaldehyde Levels in FEMA Supplied Park Trailer

5  Models.

6              MR. YOUNT:  Judge, I object.  This is outside the scope

7  of redirect.

8              MR. WATTS:  It deals with what he was just asked about.

9              THE COURT:  Outside the scope of cross.

10             MR. YOUNT:  Cross, I'm sorry.

11             MR. WATTS:  It's dealing with what he was just asked

12  about.

13             MR. YOUNT:  I didn't ask about this document.

14             MR. WATTS:  It's a statement made in there that's

15  already in evidence that I want to ask this witness about in

16  response to an issue he brought up.

17             THE COURT:  Why don't y'all approach.

18             (WHEREUPON, at this point in the proceedings, there was

19  a conference held at the bench.)

20             MR. WATTS:  It's the first sentence.

21             THE COURT:  You're going to ask him about just this

22  phrase?

23             MR. WATTS:  Yes, sir.  Uh-huh.

24             MR. YOUNT:  I object.  This is outside the scope of

25  cross.

1          THE COURT:  No, I think it's covered on cross.  I'm

2     going to let him --

3          THE DEPUTY CLERK:  Judge, Exhibit 4 is not in evidence.

4          THE COURT:  This exhibit is not in evidence?

5          THE DEPUTY CLERK:  No, it's not.

6          MR. WATTS:  They told me it was.  It's one of the

7     nonobjected to from the CDC.

8          THE COURT:  Well, let's double check it because if it's

9     objected to, then we've got a problem.

10          MR. YOUNT:  I don't have a problem with the question

11     because he's an expert.  So it's not -- if it's not -- that

12     exhibit in evidence, I don't have a problem with him asking about

13     that.

14          THE COURT:  Just go ahead and ask him.

15          MR. WATTS:  I'll clear it up.

16          THE COURT:  I'm going to overrule the objection.

17                              EXAMINATION

18     BY MR. WATTS:

19     Q.   When the Centers for Disease Control issued it's final

20     report on formaldehyde levels, do you see where it says no

21     federal regulation or standard exists for formaldehyde levels in

22     residential settings?

23     A.   I remember that statement.

24     Q.   And the Court gave an instruction that there are a bunch of

25     different standards that we're talking about.  What you have done

1  is taken the data and been able to show how that are compares

2  with the NIOSH and the ATSDR; is that right?

3  A.   That is correct.

4  Q.   Now, you were asked a couple of questions about the

5  defendant did the testing and why didn't the plaintiff do it; do

6  you remember that?

7  A.   Yes.

8        MR. WATTS:  May I approach, Your Honor?

9        THE COURT:  Yes.

10                         EXAMINATION

11 BY MR. WATTS:

12 Q.   I think one of the stipulations in the case is that there

13 were 143,000 people put in these trailers.  Putting aside the

14 issue of the money that it costs to test, if you test back in

15 2010, are you going to get a level that shows when the

16 formaldehyde off-gassing is all complete, you'll have less

17 formaldehyde?

18 A.   Is there a question in there?

19 Q.   Sure.  If you test something four years after somebody has

20 lived in it, are you going to get a test result that reflects

21 what's left after the majority of the off-gassing is completed?

22 A.   Well, given that all that I have seen and read and all the

23 analysis that I've done, the conclusion would be that four years

24 after the date of manufacture you're at a very low level relative

25 to levels at earlier dates.

1   Q.   You were next asked about this database being controlled by

2   the plaintiffs.  A couple of questions about that.  If we look at

3   one of your slides, the data from Bureau Veritas, is that

4   controlled by the plaintiffs?

5   A.   No, it was not.

6   Q.   Who is it controlled by?

7   A.   Those data were collected by a consultancy hired by FEMA,

8   and the measurements were collected in 2008.

9   Q.   Now, with all due respect to the resources of Ms. Castanel,

10  why didn't she test her own trailer, of the 2600 trailers that

11  were manufactured by Rec by Design, did you identify any data

12  source that showed Rec by Design going out in the field and

13  testing the formaldehyde levels of its trailers after all this

14  broke?

15  A.   I'm not aware of any data source of Rec by Design

16  measurements.

17  Q.   Not one?

18  A.   Not one.

19  Q.   Until the one for this case four years after?

20  A.   That's correct, other than that.

21  Q.   Counsel asked you whether it was a good idea to rely upon

22  one data point.

23          MR. WATTS:  May I approach?

24          THE COURT:  Yes.  Use the microphone.

25                              EXAMINATION

1  BY MR. WATTS:

2  Q.   Is it a good idea to rely upon one data point four years

3  after somebody moved into a trailer?

4  A.   Given all that I know and the data analysis that I've done,

5  I would not want to rely upon that one single data point.  That

6  one single data point represents in and of itself or by itself a

7  retrospective exposure assessment.

8        I've done an alternative retrospective exposure

9  assessment based upon data collected from occupied trailers,

10  Recreation By Design trailers, where the measurements were

11  collected in time frames similar to or adjacent to that of the

12  occupancy of this particular trailer, collected by recognized

13  organizations, data analyzed in certified laboratories, and

14  looked at that to estimate the levels at the time those

15  measurements were collected and also to back extrapolate and

16  estimate earlier concentrations.  That is a --

17        MR. YOUNT:  Your Honor, I object.  We didn't talk about

18  back extrapolation at any time before right now.

19        THE COURT:  Well, I think he's explaining the answer

20  that -- to the question that's been asked, and I think the

21  question was a fair one, so I'll overrule it.  Go ahead.

22        THE WITNESS:  So I have done my retrospective exposure

23  assessment.

24        Now, I may not be the best data analyst in the

25  world, but I'm certainly the best you've got at this particular

1    moment.  And I would submit that my retrospective exposure

2    assessment, the data collected by all of these organizations, is

3    far more predictive of exposures in the early days and during

4    that time frame in which those measurements were collected than

5    that single measurement collected in the dead of winter in

6    January of 2010, four years after that trailer was manufactured.

7                    If we have nothing, no 170-some data points from

8    occupied and unoccupied trailers, that is the only measurement

9    that exists in the world, then it does mean something.  It tells

10   us that exposures are still -- formaldehyde is still being

11   emitted from that trailer four years after today; but, my

12   retrospective exposure assessment I would submit is far superior

13   and far more indicative of exposures early on.

14                              EXAMINATION

15   BY MR. WATTS:

16   Q.    Because it's between one-and-a-half and two-and-a-half years

17   after March of '06, right?

18   A.    Well, virtually no measurements were collected in those

19   early --

20   Q.    Sure.

21   A.    -- two years.

22   Q.    And so with the data that we've got, and we're limited to

23   what we have, we've got something that's four years old, we've

24   got your data that's a year-and-a-half, to two-and-a-half years

25   old, and then we can look at odor and irritant thresholds that

1    are in the studies to see what the levels might have been at the
2    time, right?  That's all we've got?
3    A.    That's all we've --
4    Q.    Okay.
5            THE COURT:  Let's not lead the witness, either.
6            MR. WATTS:  I quit, Judge.  Thank you.
7            THE COURT:  Thank you, Doctor, you can step down.
8                All right.  Who do we have next?
9            MR. WATTS:  Kevin Souza.
10           THE COURT:  Kevin Souza.  That is a witness who will
11   testify by way of video.
12           MR. WATTS:  Yes, sir.  It's about 29 minutes.
13           THE COURT:  29 minutes long.
14           (WHEREUPON, at this point in the proceedings, the
15   Videotaped Deposition of Kevin Souza was played.)
16   Q.    I'm Justin Woods.  We've met in the past, but would you
17   state your full name and address for the record, please?
18   A.    It's Kevin Souza.  And the address is 430 Market Street,
19   Winchester, Virginia.  I don't know the zip.
20   Q.    I know you've had multiple positions.  How long have you
21   been employed by FEMA?
22   A.    16 years.  I was a disaster assistance employee.  I've been
23   an emergency management program specialist.  I've been a
24   supervisory program specialist.  I've been an executive officer.
25   And I've been an acting division director.

1  Q.   I'm sorry?

2  A.   Acting division director.

3  Q.   Of what division?

4  A.   Individual assistance division.  Oh.  Let me restate that.

5  I was the acting deputy division director.

6  Q.   And was that the last position that you held prior to the

7  current position of enterprise coordinator, coordination of info?

8  A.   Yes.

9  Q.   Okay.  Is that position, acting deputy division director for

10 individual assistance, was that the position you held in August

11 of 2005?

12 A.   No.

13 Q.   When did you begin with that -- in that position?

14 A.   Probably -- approximately November of 2007.

15 Q.   So that was November 2007 through May of 2008?

16 A.   Approximately, yes.

17 Q.   Before that, you said you were an executive officer.

18 Executive officer of what?  What department?

19 A.   Actually, immediately prior to that position, I was a

20 supervisory program manager for the individual assistance program

21 management branch.

22 Q.   And what were the start and end dates of that position, the

23 supervisory program manager?

24 A.   Approximately September of 2005 to November of 2007.

25 Q.   Okay.  You say, These EHUs were purchased both off the lot

1  from existing inventories and directly from manufacturers.  FEMA

2  relied upon the vendors and manufacturers to use their expertise

3  to provide FEMA with safe and habitable housing units, housing

4  units that complied with industry standards and all applicable

5  regulatory requirements.

6          When you say that FEMA relied upon the vendors and

7  manufacturers to use their expertise to provide FEMA with safe

8  and habitable housing units, is there a document that you can

9  point us to or was there a request for proposals when FEMA

10 approached vendors or manufacturers to provide EHUs?

11 A.   There was a contract for the units that we purchased.

12 Q.   When you say that FEMA relied upon the vendors and

13 manufacturers to use their expertise, what particular expertise

14 was FEMA relying upon the vendors and manufacturers?

15 A.   Their expertise in manufacturing the units that we were

16 purchasing.

17 Q.   Were you relying upon -- on the vendors' and manufacturers'

18 expertise in the appropriateness and use of travel trailers or

19 mobile homes for emergency housing units?

20 A.   No.

21 Q.   You were relying upon the vendors and manufacturers just to

22 provide units that were safe and habitable?

23 A.   Yes.

24 Q.   And to use their expertise in determining what was a safe

25 and habitable housing?

1  A.   My recollection is that the contracts we used said the units

2  were supposed to be built to industry standards, and that we were

3  relying on them to build the units to industry standards.

4  Q.   You don't know -- you didn't know at the time, in August

5  2005, what the industry standards were, correct?

6  A.   Correct.

7  Q.   Do you now know what the industry standards are for either

8  that time period or the current -- or currently?

9  A.   Generally, I understand that the industry standards in

10 regard to formaldehyde was that there were no standards for

11 recreational vehicles.

12 Q.   Well, I'm trying to understand what you meant by this

13 statement, FEMA relied upon the vendors and manufacturers to use

14 their expertise to provide FEMA with safe and habitable housing

15 units, housing units that complied with industry standards and

16 all applicable regulatory requirements.  And you're saying that

17 you don't know -- or you didn't know at that time what the

18 industry standards were.  And today, you still don't know what

19 the industry standards are for travel trailers or recreational

20 vehicles?

21 A.   That's correct.

22 Q.   Do you feel comfortable sitting here today and testifying

23 and telling us exactly -- and affirming what you've -- the

24 statements you've made in this declaration as to what FEMA relied

25 upon when negotiating with vendors and manufacturers for

1  emergency housing units?

2  A.   Yes.

3  Q.   You go on to state, the last sentence in your declaration

4  says that, FEMA purchased these EHUs believing that they would

5  provide safe and habitable temporary emergency housing.  And you

6  feel comfortable today testifying that you knew, or you are

7  certain that FEMA purchased these EHUs believing that they would

8  provide safe and habitable housing?

9  A.   Yes.  And I'm going to elaborate and say that we had used

10  the EHUs previously, EHUs being, in this case, travel trailers.

11  We'd used them as early -- or as recently, I should say, as 2004.

12  And in our previous use of the units, we had no real reasons to

13  believe that units purchased off the lot would not be safe and

14  habitable as long as they met the industry standards that we had

15  purchased off the lot previously.

16       And so although I don't have any specific knowledge of

17  the standards as they existed back then, when I was told that we

18  were purchasing the units off the lot met -- to meet industry

19  standards, I had no reason to believe that they would not be safe

20  and habitable units as the units we had used previously in our

21  disaster operations.

22  Q.   Okay, but you do know that FEMA relied upon the vendors and

23  manufacturers in their expertise in -- to what industry standards

24  would have been in August or September of 2005?

25  A.   I believe that was written into the contract, yes.

1   Q.   Do you know the requirements involved in contractors

2   installing and maintaining EHUs?

3   A.   Generally.

4   Q.   Generally what do you know?

5   A.   Generally I know that we hired contractors to haul and

6   install the units.  Generally I know that they have to pick up

7   units at staging areas, transport them, install them on private

8   property, hook up basic utilities, and in some cases block and

9   strap the units.

10  Q.   You relied upon the contractors to properly install the

11  units, correct?

12  A.   .

13  Q.   You relied upon the contractors to properly maintain the

14  units, correct?

15  A.   Yes.

16  Q.   What do you understand to be the contractors' responsibility

17  in maintaining EHU's?

18  A.   Generally the contractors were to receive calls regarding

19  maintenance issues, anything from parts of the unit that were not

20  working properly to plugged toilets or other maintenance issues,

21  and they were to respond to those maintenance requests.

22  Q.   Were they to respond to concerns from residents regarding

23  odors in the unit?

24  A.   I know that they did, yes.

25  Q.   How did you come to the decision to make that recommendation

1  to -- for FEMA to conduct its own testing?

2  A.   I believe it's in the e-mail, but, essentially, I just

3  wanted to either put the issue to rest or remove people from

4  harm.

5  Q.   What specifically about that request for information made it

6  apparent to you that FEMA needed to conduct its own testing?

7  A.   There may have been -- I don't recall specifically.  There

8  may have been reference in there, in that e-mail or in a previous

9  recent e-mail to the Sierra Club testing.  And I did not want to

10  rely upon nonfederal testing to make decisions about how to move

11  forward.

12  Q.   Why would you not want to rely upon the Sierra Club testing?

13  A.   Well, to be honest, because I wasn't sure how their testing

14  was performed or potentially how biased the testing may have

15  been, and I wanted to reach out to the federal scientific

16  community to conduct our own testing.

17          I don't know if it was better, but I believed it was an

18  appropriate course of action.

19  Q.   But it still took -- once the decision was made, it still

20  took three months for anything to -- any testing to take place

21  based -- basically -- based upon the funding issues, the

22  logistics, the powering of units --

23  A.   And the scientific concerns was probably the larger of all

24  those you just mentioned.  We were instructed by EPA that in

25  order to get valid results, they needed to develop a testing

1   methodology that would be scientifically sound, and they needed

2   to have that methodology reviewed by other scientific peers

3   before they could actually begin the testing.

4   Q.   And in Section 11 of your declaration, the last sentence,

5   you say that, FEMA began to consider various response actions,

6   including the testing of individual units and the installation of

7   vent fans.  Can you tell me what went into the consideration of

8   the installation of vent fans as a possible response action?

9   A.   What I mean here was that I recalled conversations about

10  whether or not -- if there was formaldehyde in the units, whether

11  or not there were any structural changes we could make to a unit

12  to help ventilate them in terms of installation of vent fans.

13  Q.   Okay.  And was that a discussion that was had with the

14  manufacturers of the units regarding the possibility of

15  installation of vent fans?

16  A.   I believe there was.  I don't recall when and I don't recall

17  who.

18  Q.   But, obviously, installation of vent fans wasn't chosen as a

19  response action, correct?

20  A.   That's correct.

21  Q.   And why is that?

22  A.   My general recollection was that -- and, again, without the

23  context of when -- at this point, we weren't even sure we had a

24  problem; but, at some point I believe we decided that the vent

25  fan that would need to be installed would require major

1 structural changes to the unit in terms of cutting holes in the

2 units and external -- I think they characterized them as blowers,

3 and there were going to be major structural changes to the unit.

4 And so we were -- while we investigated whether or not we had an

5 issue, we tried to find other potential solutions like filters or

6 something else that may work.

7 Q.   But -- you talked about the alteration of the units, but it

8 was a possibility to install the vent fans?

9 A.   Again, it was a possibility to install the vent fans.

10 Q.   But, for some reason, there was a decision not to do such?

11 A.   Correct.

12         There was an e-mail from Rick Preston where he agreed

13 that testing should be done, but he wanted to make sure we had

14 a -- that the program side of the house had a course of action

15 laid out before we started.

16 Q.   What did you understand to be his concern for the program

17 side having a course of action set out?

18 A.   His concern, quite frankly, was already one of the program

19 concerns, which is, if we started testing with EPA and the

20 results came back requiring us to take action, what would that

21 action be?  His concern was pretty much that we have a plan of

22 action before we begin the concern.  At least that's how I

23 understood his concern.

24 Q.   So you understood his concern to wait, not perform testing

25 until there is an appropriate plan of action?

1    A.    I believe that was his concern, yes.

2    Q.    If you would, sir, if you'd turn to page 7 of your

3    declaration, section 18.  The second sentence, you say, Around

4    July 2006, FEMA prepared and distributed a formaldehyde brochure

5    to all EHU occupants about:  Formaldehyde, potential health

6    concerns often associated with formaldehyde, actions occupants

7    could take to reduce the levels of formaldehyde in their EHU, and

8    the need for occupants to consult a medical provider if they

9    start to have health concerns related to formaldehyde.

10           Can you -- and that's a description of that brochure,

11   but I'm trying to -- and I've seen several brochures.  I'm trying

12   to determine which particular one this is.  Is it a two-page

13   brochure?

14   A.    I think this one is the tri-fold brochure with a trailer on

15   the front.

16   Q.    Section 19, you say, In February 2007, ATSDR issued a report

17   and advised FEMA that the tests showed that ventilation would

18   reduce the baseline levels of formaldehyde in EHUs below

19   0.3 parts per million, the concentration level that ATSDR had

20   determined would be a threshold level of concern for sensitive

21   individuals.

22           So based upon this baseline level of formaldehyde in

23   EHUs of .3 parts per million as being the threshold level of

24   concern for sensitive individuals, FEMA then concluded that EHUs

25   remained a viable housing option, correct?

1    A.    When combined with ventilation, yes.

2    Q.    But FEMA took no steps to install the vent fans as we

3    discussed earlier, correct?

4    A.    That's correct.

5    Q.    So it was just normal ventilation meaning, i.e., opening up

6    windows?

7    A.    Right, because the -- at least to the best of my

8    recollection, the EPA testing methodology didn't have vent fans.

9    They just used ventilation in terms of opening windows and doors

10   and those sorts of things, the things that we recommended that

11   applicants do, and it was enough to lower it below these levels

12   of concern.

13   Q.    Did you, in fact, go to Louisiana right around the time

14   Hurricane Katrina hit the Gulf Coast?

15   A.    Yes, I was deployed to Katrina a day before or maybe two

16   days before the storm made landfall and was there until Christmas

17   of that year.

18   Q.    So when everybody was leaving right before, you were coming

19   into the storm zone; is that right?

20   A.    Yeah, that's correct.

21   Q.    And you said you stayed until about Christmas of 2005?

22   A.    Yes.

23   Q.    During your approximate four-month stay at the end of 2005

24   in Louisiana, what were your job duties while you were there?

25   A.    I had a couple.  I was the deputy housing area commander for

1  a brief period in the beginning of the response phase, and then

2  eventually ended up as a housing manager in the Louisiana joint

3  field office.

4  Q.   In any event, you oversaw probably thousands of travel

5  trailers being installed at the end of 2005?

6  A.   Yes.

7  Q.   And am I correct that during that period when those travel

8  trailers were presumably at their newest, no formaldehyde

9  complaints came to your desk as the FEMA representative down in

10 New Orleans?

11 A.   Not that I'm aware of, no.

12 Q.   When you became one of the FEMA point people in mid '06 on

13 the formaldehyde issue, did you learn then that there were no

14 governmental regulations on formaldehyde in residential indoor

15 air?

16 A.   Eventually, at some point in 2006, yes, I learned that.

17 Q.   And did you also learn at around the same time that there

18 were no government regulations on formaldehyde in travel trailers

19 specifically?

20 A.   Yes.

21 Q.   And did you also learn as a part of your investigation of

22 the issue that outside the area of government regulation, there

23 was really no medical or scientific consensus on what an

24 appropriate formaldehyde ambient air level ought to be in a

25 residential structure?

1  A.    I was told that.

2  Q.    Was one of the things you were trying to do in your

3  representation of FEMA in 2006 to get somebody to tell you what

4  the levels ought to be so that you would have a benchmark to look

5  at as to what was a safe or unsafe level in these travel

6  trailers?

7  A.    Yes.

8  Q.    You understood, as a result of your review of the ATSDR

9  consultation, health consultation, that .3 parts per million of

10  formaldehyde was a level of concern for sensitive individuals; is

11  that correct?

12  A.    Yes.

13  Q.    Did they ever tell you how many people are considered

14  sensitive individuals, by percentages or otherwise?

15  A.    I don't recall them ever telling me.

16  Q.    Did you assume from reading the ATSDR report that even at

17  levels above .3 parts per million, which was the sensitive

18  individual level, there were levels above that that lots of

19  people would have no problem with?

20  A.    I wouldn't characterize it that way.  I would say that based

21  on the results I got that I assumed that .3 was for sensitive

22  individuals, that above .3 was something that would not impact

23  nonsensitive individuals.

24  Q.    Okay.

25  A.    Does that make sense?

1    Q.    It does.

2    A.    Okay.

3    Q.    Did you also learn as a part of your background research

4    into -- into formaldehyde that it affects all people individually

5    and differently?

6    A.    Generally, yes.

7    Q.    I wanted to ask you a question or two about your declaration

8    that was marked as Souza Exhibit Number 2.  And particularly,

9    paragraph six.

10           Do you see that?

11   A.    Yes.

12   Q.    I wanted to understand a little bit about the sequence of

13   FEMA's mission.  Am I correct that FEMA's approach to the housing

14   issues was a three-part approach; that, initially, you would look

15   to solve immediate needs by putting people in emergency shelters,

16   hotels, motels, even tents, that sort of thing?  Was that the

17   initial response of FEMA?

18   A.    Yes.

19   Q.    And that after that, after the initial response, that's when

20   the travel trailers and the emergency housing units would come

21   into play, and you would look to transition people out of, for

22   example, tents and emergency shelters into travel trailers?

23   A.    Yes.

24   Q.    And that after that, you would be looking to transition

25   people out of travel trailers and into more permanent housing; is

1  that correct?

2  A.   Yes, that's correct.

3  Q.   Now, was that FEMA's plan of action from the beginning as

4  soon as Katrina made landfall?

5  A.   Yes.

6  Q.   And so you -- FEMA always envisioned travel trailers as a

7  temporary housing -- emergency housing option to bridge the gap

8  between living in a tent and moving into more permanent housing?

9  A.   Yes.

10  Q.   You were just asked some questions about FEMA's plan at the

11  time of the response and how this included sort of a three-prong

12  approach.  Were travel trailers FEMA's initial choice for the

13  temporary emergency housing, or were there alternative housing

14  methods that were considered?

15  A.   We had talked about using manufactured homes or mobile homes

16  as -- as the initial going-in position.

17  Q.   Was a decision made -- well, what was decided?

18  A.   The decision was made to use travel trailers as opposed to

19  mobile homes.

20  Q.   Were you involved with that decision-making process?

21  Actually, let me rephrase it.  Do you have -- did you -- do you

22  have knowledge of that decision-making process?

23  A.   Yes.

24  Q.   And how do you have that knowledge?

25  A.   As part of the housing area command, there were discussions

1   about what types of units we could use and where we could place

2   them.

3   Q.    And what is your understanding of why the decision was made

4   to use travel trailers as opposed to manufactured housing or

5   mobile homes as the primary temporary emergency housing response

6   for Hurricane Katrina victims and Hurricane Rita disaster

7   victims?

8   A.    My recollection was that we were going to use mobile homes;

9   but, because of the size of mobile homes and the quantity in

10  which we needed them, the areas available to us to put those

11  mobile homes were outside of the impacted areas.  In other words,

12  they were outside of the areas of New Orleans, and really not

13  even a practical solution in the immediate vicinity of

14  Baton Rouge.  They would have to be probably even further north

15  than that.

16        And when we made this proposal to the state, concerns

17  were raised that people wanted to live closer to their impacted

18  homes, if they were homeowners, so that they could begin making

19  immediate repairs.  There were concerns that rebuilding the

20  community in terms of businesses and economic stability and

21  reinvigorating the economy, that putting people that far away

22  from those impacted areas would not be a preferable solution.

23  Q.    Were there discussions about the effect that this may have

24  on the future demographics of New Orleans, population makeup of

25  New Orleans?

1    A.   There were discussions about demographics, but I don't

2    specifically recall whether or not they were in regards to the

3    mobile home or travel trailer discussion versus people moving out

4    of the state discussion.

5    Q.   Was there a concern that if you used mobile homes as opposed

6    to travel trailers, that many of the people, because they'd have

7    to be placed farther away from New Orleans or Baton Rouge, that

8    they may not eventually move back to New Orleans?

9    A.   Yes, there were those concerns.

10              (WHEREUPON, at this point in the proceedings, the

11   Videotaped Deposition of Kevin Souza concluded.)

12              THE COURT:  All right.  Mr. Watts, do we have someone we

13   can fit in prior to the lunch hour?

14              MR. WATTS:  We do.  Yes, sir.  We call Kenneth Laughery.

15              THE COURT:  This is Ken Laughery.  Then we'll take our

16   lunch break.

17              Mr. Laughery, if you'd come on up.  Please remain

18   standing up here until you take the oath, and then you may be

19   seated.

20              THE DEPUTY CLERK:  Would you please raise your right

21   hand.  Do you solemnly swear the testimony you are about to give

22   will be the truth, the whole truth and nothing but the truth, so

23   help you God?

24              THE WITNESS:  I do.

25                             **KENNETH LAUGHERY**

1   was called as a witness and, after being first duly sworn by the

2   Clerk, was examined and testified on his oath as follows:

3           THE DEPUTY CLERK:  Have a seat.  State your name and

4   spell it in the microphone.

5           THE WITNESS:  Kenneth Ronald Laughery, and the last name

6   is spelled L-A-U-G-H-E-R-Y.

7                              DIRECT EXAMINATION

8   BY MR. WATTS:

9   Q.   Dr. Laughery, you have a Ph.D. behind your name.  What is

10  your Ph.D. in ?

11  A.   Psychology.

12  Q.   Are you an expert in the fields of hazard communication and

13  warnings?

14  A.   Yes.

15          MR. WATTS:  We would tender the witness on that subject.

16          THE COURT:  Any objection?

17          MR. YOUNT:  No objection, Judge.

18          THE COURT:  The Court will accept this witness as an

19  expert in the field of -- state it, again.

20          MR. WATTS:  Hazard communication and warnings.

21          THE COURT:  -- hazard communication and warnings.

22                              EXAMINATION

23  BY MR. WATTS:

24  Q.   Dr. Laughery, you've provided a very thick CV that if I take

25  this jury through it, we won't get you out of here by lunch.

1   But, bottom line, you taught at Rice University.  Tell the

2   members of the jury what you did there at Rice for 27 years.

3   A.   I joined the faculty of Rice University in Houston in 1984

4   as a professor of psychology.

5            For three years -- I was there until I retired in 2002.

6   I still am what's called an emeritus professor of psychology.

7   That's a lifetime appointment that I'll have with the university.

8            I was chair of the psychology department for three

9   years.  While I was there, I directed a lot of graduate student

10  research, graduate student training.  I did what a university

11  professor does, I did a lot of research, published.

12  Q.   Did you publish, give speeches, edit books, do research on

13  the subject of warnings?

14  A.   Yes.

15  Q.   What is a warning?

16  A.   A warning can be thought of as a safety communication.  It's

17  giving people information they need to use a product safely or,

18  in fact, to perhaps decide not to use a product at all.

19  Basically it's a safety communication providing needed

20  information about safety issues, whether it's a product or an

21  environment situation, but, again, needed information.

22  Q.   What are the methods that are typically used to provide a

23  warning?

24  A.   There are several.  If we think about it in terms of

25  products, whether it's something you take off the shelf of the

1   hardware store or Walgreens pharmacy or a trailer or an

2   automobile, there are various ways that we communicate warnings.

3          One is labels.  We put signs, tags, labels on products

4   or environments.  We put them on the fence of the electrical

5   station, a sign.  That's a label.

6          Sometimes we have what we think of as ancillary kinds

7   of communications, manuals, owner's manuals in your vehicle, in

8   your trailer.  Package inserts that come in the box with the

9   medication off the counter from the Walgreens that it's in.  And

10  those aren't paste-on, stick-on, nail-on labels, but they are,

11  nevertheless, forms of safety communications.

12         Other times, we even may use verbal communications.

13  And this will often happen in purchasing some major kind of

14  product where the salesperson will give you safety information as

15  part of the information exchange about the product.

16         We see television commercials today for prescription

17  medication, and at the end of it, it will give you some

18  contraindications, don't use this if you're pregnant, don't -- or

19  side effects.  So those are verbal communications.  So those are

20  some techniques that we use for communicating safety --

21  Q.   Are there accepted principles that are looked at to see

22  whether or not a warning is necessary?

23  A.   Yes.

24  Q.   What are they?

25  A.   Let me mention three that are primary.  And the issue here

1  is, is a warning necessary?  If I'm buying a product and there

2  are safety issues associated with it -- or if I'm manufacturing a

3  product and going to put it in the marketplace and there are

4  safety issues associated with it, do I need to warn?

5        One consideration is, is there a hazard associated with

6  that product?  Is there something about that product, its use,

7  its characteristics, that creates a safety issue.

8  Q.   Okay.

9  A.   Obviously, I'm not for warning about hazards that don't

10  exist, and we have methodologies that are important and used

11  widely for assessing hazards that are called hazard analysis.

12  Things like -- there are labels for them:  Fault-free analysis,

13  failure modes analysis.  There are standard procedures for

14  determining whether or not hazards exist and, if so, then that's

15  one consideration, do I need to warn.

16  Q.   What's the second one?

17  A.   I want to say it one more time, I'm not for warning about

18  hazards that don't exist.

19  Q.   What's the second consideration?

20  A.   The second one is, is the hazard open and obvious.  And what

21  that really means is does the appearance of the product, the

22  function of the product itself communicate the hazard.

23        For example, I wouldn't argue that you need to give a

24  warning to somebody buying a chain saw that if they get their

25  fingers in the rotating blades, they have a problem.  That's an

1  open and obvious hazard.

2  Q.   What's the third consideration?

3  A.   The third consideration is whether or not people bring the

4  knowledge with them already to use it.  We grow up learning

5  things about electricity, for example, or some kinds of

6  mechanical.

7        So if I already know about something, then I may not

8  need to warn.  Or if I can expect, if I'm the manufacturer, that

9  the customers out there are going to bring that knowledge with

10 them, then I don't need to warn or I may not need to warn.  So

11 those are three things.

12 Q.   Let me visit with you about those three things real quick.

13 The next slide that we have says that formaldehyde is a health

14 hazard because it causes eye irritation, throat irritation, nasal

15 irritation and rhinosinusitis, asthma symptoms and cancer.  To be

16 fair, you're not an expert in any of those subjects.  This is

17 information that you're relying upon others to provide you; is

18 that right?

19 A.   That's correct.  That is not my expertise.

20 Q.   But that is the alleged hazard that, if true, needs to be

21 warned against?

22 A.   That's correct.

23 Q.   All right.  Let's go to the second, and that is whether or

24 not the hazard of formaldehyde is hidden.  What are your

25 conclusions in that regard?

1   A.   People don't -- you can't go inside a trailer or look in a

2   trailer and know about the formaldehyde hazard.  I mean, it's not

3   an open and obvious hazard in that regard.  The characteristics

4   of it, it's a toxic gas, but there is no way to know that from

5   looking at the trailer, from being in the trailer.  It's

6   something that it's not open and obvious.  It needs to be warned.

7   You need to be told about it.

8   Q.   And from your research, do people, on average -- and let's

9   take ourselves back to 2005, early 2006, not where we are now,

10  but back then did people, on average, know about the hazard of

11  formaldehyde?

12  A.   No.  I mean, it's a good example of a kind of hazard, a

13  category of hazard that would not be familiar to us.  It's not

14  something we'd learn about growing up, be familiar with that kind

15  of consideration.

16  Q.   Dr. Laughery, in the bottom of this slide, it says

17  Earline Castanel did not know anything about formaldehyde.  Would

18  that make her unusual at all at that point in time, or was she

19  just like everybody else?

20  A.   No, it would make her usual in that regard.

21  Q.   Now, with those three factors in mind, did you reach a

22  conclusion as to whether a warning with respect to formaldehyde

23  was necessary for the Rec by Design travel trailer because

24  formaldehyde is a health hazard that's hidden and it's something

25  that people do not know about?

1  A.    Yes, I did.

2  Q.    And what's that conclusion, sir?

3  A.    That it was important and necessary that there be adequate

4  warnings, an adequate warning system addressing the formaldehyde

5  hazards.

6  Q.    All right.  Now, with that necessary warning issue, did you

7  also examine whether or not there were any warnings provided?

8  A.    Yes.

9  Q.    Were there any warnings provided, you know, decal on the

10 trailer, a sign on the trailer, anything like that?

11 A.    No.  My understanding is there were no warnings, no

12 potential components of a warning system.  There was no signs,

13 labels, tags on the trailer that addressed formaldehyde.  There

14 was nothing in the owner's manual that presumably was supposed to

15 come with the trailer that said anything about formaldehyde.

16 There was no information exchange at the point the trailer was

17 delivered and occupied by Ms. Castanel about formaldehyde.

18         All of those potential media or mediums through which

19 the information could have been provided, it wasn't.

20 Q.    Was there any warning about formaldehyde in the owner's

21 manual?

22 A.    No.

23 Q.    Was there any warning provided by Rec by Design in any way,

24 shape, form or fashion?

25 A.    No.

1    Q.    Last issue.

2              MR. WATTS:  Your Honor, may I approach?

3              THE COURT:  Yes.

4                         EXAMINATION

5    BY MR. WATTS:

6    Q.    143,000 people, if you subtract 50,000 from that, how many

7    does that leave?

8    A.    93,000.

9    Q.    You have read, in fact, just heard that sometime in 2006 --

10   A.    I'm sorry, I can't hear you.

11   Q.    I'm sorry.  You just heard that sometime in 2006, FEMA

12   became aware of a hazard after these people were already in the

13   trailers, right?

14   A.    Yes.

15   Q.    And that they put out 50,000 flyers?

16   A.    Yes.

17   Q.    You've read Ms. Castanel's deposition?

18   A.    Yes.

19   Q.    Some people didn't get those flyers, right?

20   A.    That's my understanding.  And she did not.

21   Q.    In July of 2007, there was another flyer that went out; is

22   that right?

23   A.    Again, that's my understanding.

24   Q.    Is it your understanding that she moved out of the trailer

25   in August of 2007?

1  A.   Yes.

2        MR. WATTS:  Those are all of my questions.  Thank you,

3  sir.

4        THE COURT:  All right.  Thank you.

5           Mr. Yount, I won't hold you to it, but we would

6  like to take our lunch break.  How long do you think you'll be on

7  cross with this gentleman?

8        MR. YOUNT:  I'll do my best to get done by 12:00.

9        THE COURT:  Well, don't cut it short if you don't want

10  to.  We can either take a break now or come back, but I would

11  rather finish with the witness before we break.

12        MR. YOUNT:  I think we can do that.

13                        CROSS-EXAMINATION

14  BY MR. YOUNT:

15  Q.   Good morning, Dr. Laughery.

16  A.   Good morning.

17  Q.   We've never met before.  My name is Scott Yount.  I have the

18  pleasure of representing Recreation By Design who is here

19  represented by Mr. Rush, okay?

20  A.   Yes.

21  Q.   Now, Doctor, where are you from?  Where do you currently

22  live?

23  A.   I currently live in Janesville, Wisconsin, near Chicago.

24  Q.   Okay.  Now, you've be retired from Rice since 2002; is that

25  correct?

1    A.    Yes.

2    Q.    And since you've been retired, all of your income other than

3    Social Security is derived from consulting with attorneys in

4    litigation; is that correct?

5    A.    All of my earned income.  I get Social Security, and I also

6    get some retirement income, but earned income is all that.

7    Q.    Now, you've had a handful of cases with these lawyers

8    sitting at this table; is that correct?

9    A.    I think that's right, yes.

10   Q.    And then, in addition to formaldehyde litigation, you've

11   also worked with Mr. Watts on some litigation in the past, as

12   well; is that correct?

13   A.    That's correct.

14   Q.    Okay.  Now, we have plaintiffs on the one side and

15   defendants on the other side.  In connection with your litigation

16   work, you work virtually exclusively for the plaintiffs; is that

17   correct?

18   A.    Not exclusively, but it's a very substantial majority.

19   Probably 90 percent or a little more of the work that I do as an

20   expert witness is for plaintiffs.  That's where I get contacted.

21   Q.    And, in fact, in the last four years, you've worked for one

22   defendant in connection with litigation; isn't that correct?

23   A.    No, not quite.  I think what you're referring to is the --

24   in the times I've testified in court, it's been one for

25   defendants.  I've worked on some other cases but they either

1  settled or went away or didn't get that far.

2  Q.   Well, thank you for correcting me.

3            Now, you're charging these lawyers how much per hour to

4  testify?

5  A.   $400.

6  Q.   Now, you are aware, sir, that in connection with your

7  testimony in court, there have been two or three occasions where

8  the Court has not let you testify as an expert?

9  A.   There have been two that I'm aware of, possibly a third.

10 Q.   Now, in this case, I think Mr. Watts covered this, but

11 you're not being tendered as an expert engineer; is that correct?

12 A.   That's right.

13 Q.   You're not an industrial hygienist?

14 A.   I'm not.

15 Q.   You are not a toxicologist?

16 A.   I'm not.

17 Q.   Even though you are a doctor, you're not a medical doctor?

18 A.   That's correct.

19 Q.   And you are not an expert in wood products, are you?

20 A.   I am not.

21 Q.   Now, let's talk about warnings.  That's your bailiwick; is

22 that correct, warnings?

23 A.   Yes.

24 Q.   Okay.  Now, in connection with your work in warnings, isn't

25 it a fact, sir, that you have never written any warning with

1  respect to ventilation for use in the real world?

2  A.   That's true.

3  Q.   Okay.  And you've never written any warnings whatsoever

4  except for in this case with respect to formaldehyde; is that

5  correct?

6  A.   I think that's right.

7  Q.   And you've never written any warnings which were designed

8  for application on a consumer product such as a refrigerator, an

9  appliance or anything like that; is that correct?

10  A.   I wouldn't characterize them as consumer products.  I've

11  done a little bit of that kind of work, but I don't think any of

12  them would fit consumer products.

13  Q.   So you have done no such warnings; is that correct?

14  A.   Not -- not that appeared.  I've done countless warning

15  designs for research purposes, but I'm interpreting your question

16  as that actually appeared on a product.

17  Q.   I'm talking real world ended up on a product.

18  A.   Well, I'd like to think that the university is not part of

19  some other world.  University professors sometimes take exception

20  to that we don't live in the real world, but that's true.

21  Q.   And I apologize, I'm not asking a very good question.

22       The point I'm trying to make is, is that if we went to

23  a store, we wouldn't see any of your warnings on an appliance or

24  a product or anything like that?

25  A.   That's correct.

1   Q.   Now, in connection with trailers, you've never written a

2   manual for a travel trailer, have you?

3   A.   Not for a travel trailer.

4   Q.   And you've never written any warnings that were used on a

5   travel trailer or placed on a travel trailer, have you?

6   A.   That's correct.

7   Q.   Now, Doctor, I would like to direct your attention to Slide

8   Number 7 that we went over when Mr. Watts was asking you

9   questions.

10          Now, Doctor, it's my recollection that the purpose of

11   this slide was to explain that formaldehyde is something that you

12   need to warn about it because, otherwise, you're not going to

13   know it's there; is that correct?

14   A.   Yes.

15   Q.   Now, you would agree with me that in the context of the

16   warnings world, that the sense of smell is something where people

17   get a warning; is that correct?

18   A.   They may.  They may.  There are some examples of -- for

19   example -- well, things that we know about and that are familiar

20   to us from the odor can be a warning.  We put an odorant, it's

21   called ethyl mercaptan, in propane so people can smell it because

22   propane is an odorless gas that you can't see or smell, so we put

23   an odor in it as a warning.  So, yes, odors can serve as

24   warnings.

25   Q.   And, again, you brought up the example I was going to bring

1   up, propane natural gas.  When that comes out of the ground, it

2   doesn't smell like that, but it's added so a person, a consumer,

3   when they smell that, it will awaken their senses, and they'll

4   realize that something out of the ordinary is going on?

5   A.    Under one condition.  I mean, you have to know what the

6   smell means.  And one of the things that they do, that propane

7   companies do, is in monthly bills, they put something called a

8   sniff and smell card in with the delivery of propane.  You --

9   scratch and smell.  I'm sorry.  You scratch it, and it gives off

10  the odor, and that's a way of training people what the smell of

11  propane is like.  So we actually do some things to educate, to

12  let people know, if you smell that, that means you've got propane

13  in the air.

14  Q.    Okay.  And so it's your testimony that putting an advisory

15  in maybe a bill is something that's helpful for a consumer in

16  order to educate them about the smell in, hey, there is a smell,

17  there is a problem, I need to do something about it; isn't that

18  correct?

19  A.    Yeah.  I mean, if you want them to know that ethyl mercaptan

20  smell means you've got propane, you have to do that.

21  Q.    And, again, the point is not for the person to understand,

22  hey, I'm being exposed to ethyl mercaptan, or whatever the word

23  is, it's the, hey, there's a smell and it's something out of the

24  ordinary and I know need to react; I mean, that's really the

25  purpose, isn't it?

1   A.   It's more than that.  It's not just something out of the

2   ordinary, it's propane gas, and that's explosive, fire kind of

3   stuff.

4   Q.   Now, similar to the gas company putting something in a bill,

5   you're aware here that FEMA did send out flyers to people; is

6   that correct?

7   A.   Yes.

8   Q.   Now, Mr. Watts asked you some questions about whether

9   Ms. Castanel got a flyer or didn't get a flyer, but you really

10  don't know anything about that other than what you've been

11  provided by the plaintiff's lawyers; is that correct?

12  A.   Well, I read her testimony, her deposition testimony, and

13  she testified, as I recall, that she never saw or received the

14  flyer.

15  Q.   Well, Ms. Castanel hadn't been on the stand yet.  She'll be

16  on the stand, and we can cover that with her.

17          But, again, the point I'm trying to make is there is no

18  database that you're aware of that you could look at and, in

19  fact, did look at that says she did or did not get one; you don't

20  know one way or the other, do you?

21  A.   Only her deposition testimony.

22  Q.   Now, I think you said this earlier.  You are not in favor of

23  warning about hazards that don't exist, correct?

24  A.   Sure.

25  Q.   In other words, if something is not hazardous, there is no

1  need for a warning, correct?

2  A.   That's correct.

3  Q.   And in the real world, you would agree that a lot of

4  substances can be hazardous at a particular dose but they may not

5  be hazardous at a lower dose; is that a general principle that

6  you can agree with?

7  A.   Well, sure.  It makes sense to me.

8  Q.   In other words --

9  A.   And I'm not a toxicologist, as we've noted, but I -- that

10  obviously is true of lots of things.

11  Q.   Water.  Water is perfectly harmless when you drink it

12  normally, correct?  But, you can also drink so much of it that

13  you get water toxicity and die, right?

14  A.   I assume that's true, yeah.

15  Q.   And you don't think that Kentwood needs to put warnings on

16  the side of their bottle saying, hey, don't drink too much of

17  this because you might died; that's kind of overkill, isn't it?

18  A.   I agree.

19  Q.   Could you pull up Slide 6, please.

20       You earlier stated that these symptoms which are

21  allegedly caused by formaldehyde, that this information, again,

22  is coming from other experts, not from you, right?

23  A.   That's correct.

24  Q.   And so basically for the purposes of your testimony, you're

25  assuming that they cause injury, and that based upon that

1   assumption you have the conclusion that a warning needs to be

2   given; is that correct?

3   A.   That's correct.

4   Q.   And here, there is no information on dosages at all, is

5   there?

6   A.   No.

7   Q.   Okay.  So if, hypothetically, formaldehyde may cause these

8   symptoms at a very high level, but not at a level where FEMA

9   formaldehyde trailer residents are typically exposed, you would

10  agree that no warning is necessary, correct?

11  A.   I would agree with that except you slipped one word in there

12  that I -- I want to be careful what I'm agreeing with.  You said

13  typically exposed to, and I don't know how to interpret that.

14          I mean, if that's saying, unless 50 percent of them are

15  having a problem or unless 20 percent or 80 percent.  If --

16  certainly, if the levels of formaldehyde in the trailers are such

17  that they don't cause any of these problems, I'm not for warning

18  about it.  If they typically don't, but that means to a lot of

19  people they do, or in a lot of trailers they do, that's a

20  different issue.

21  Q.   Okay.  I don't want to get into statistics because I think

22  we've had enough of that for the day.  But background level, is

23  that a concept that you've heard about before?

24  A.   I'm sorry?

25  Q.   The word "background level"?

1   A.   I think so.

2   Q.   Okay.  In other words, I think that every expert -- there is

3   a lot of disagreement in this trial, but I think everybody, wood

4   experts, toxicologists, everybody is going to agree that there is

5   some background level for formaldehyde in the air everywhere;

6   assume that, please, to be true, okay?

7   A.   I've seen that.

8   Q.   And that, in fact, in cities, the formaldehyde background

9   level may be higher than out in the country; I mean, that makes

10  sense to you, doesn't it?

11  A.   Sure.

12  Q.   And, in fact, you've seen that in some of the literature you

13  reviewed; is that correct?

14  A.   I think so, yes.

15  Q.   Now, with respect to background levels in a city such as

16  New Orleans, you would agree with me that there is no obligation

17  that anybody warn the people that there is formaldehyde in the

18  air at background levels?

19  A.   I'm not aware of that.  Yeah, I mean, that makes sense.

20  Q.   In other words, who is going to do that?  I guess it would

21  be have to be the city, if it's at such a level that causes a

22  health problem?

23  A.   Well, if it's such a level that causes a health problem, I

24  would hope somebody addresses it, yeah.

25  Q.   Now, you don't know what the background level of

1  formaldehyde in the air in this room is or in the air outside on

2  Poydras Street, do you?

3  A.   I do not.

4  Q.   Now, let's talk a little bit about Ms. Castanel's trailer.

5  Sir, at the time you issued your report in this case, you had no

6  information as to what Recreation By Design or Randy Rush knew

7  about the dangerousness of formaldehyde; is that correct?

8  A.   At the time I wrote my report, that's correct.  I got

9  Randy Rush's deposition afterward.

10  Q.   And, again, we've established that if you do not know

11  something, you cannot warn about it; is that correct?

12  A.   I think so, yeah, if I understand the question.

13  Q.   Makes sense, right?

14  A.   Sure.

15  Q.   Now, I think you're probably aware that in this case, RBD

16  sold the travel trailers to Morgan Spas, which, in turn, sold

17  them to FEMA; are you aware of that fact?

18  A.   Yes.

19  Q.   Are you aware that Morgan Building and Spas accepted the RBD

20  trailers made by my client as is?

21  A.   That's my understanding from things I've seen.

22  Q.   In other words, it's your understanding that nobody at

23  Morgan said, hey, wait a second, there is no warning sticker on

24  this trailer, we're not going to accept it?  That didn't happen;

25  aren't I correct?

1    A.    Not that I'm aware of.

2    Q.    And in turn, when Morgan delivered these trailers to FEMA,

3    same thing, FEMA didn't say, hey, wait, Morgan, there is no

4    warning sticker on this trailer, we won't accept it; that didn't

5    happen, did it?

6    A.    No, it did not happen that I'm aware of.

7    Q.    Okay.  Now, in this case, you think that more than just a

8    warning sticker needs to be on this trailer; that's your opinion,

9    right?

10   A.    I'm sorry --

11   Q.    It's your opinion, at least at the time you issued your

12   report, that a warning sticker alone is not enough, but there

13   needs to be some sort of a system, a warning system put in place;

14   is that correct?

15   A.    That's correct.

16   Q.    Now, here the warning system that you believe should have

17   been employed would have been a warning sticker, maybe something

18   in the owner's manual, and then a third form of communication

19   which would be face-to-face interaction between somebody, and in

20   this case, Ms. Castanel, correct?

21   A.    Yeah.  Putting those properly together, yeah.

22         For example, what I mean by that would be when the

23   person comes to turn the trailer over, to give the keys to

24   Ms. Castanel, that's an opportunity to say -- give her the

25   owner's manual and point out that that there is important safety

1    information in there that she could read or should read, and it

2    addresses relevant things that concern her health.  That would be

3    how those things fit together, the verbal communication, the

4    owner's manual and then the label.  And walk-through could

5    include pointing out that there are labels on this trailer that

6    contain safety information.

7          So that's what I mean by a warning system; not

8    unrelated separate things, but things that work together to point

9    out what the hazard is and so on.

10   Q.   Now, Doctor, based upon what you know of the facts of this

11   case, you wouldn't expect Mr. Rush or his people to come down and

12   have that meeting with Castanel, you would expect either FEMA or

13   one of FEMA's subcontractors to do that; is that correct?

14   A.   Yes.

15   Q.   In other words, it wouldn't be reasonable to suggest the

16   manufacturer do it because there is a big chain in the way that

17   trailer got to Ms. Castanel?

18   A.   It depends on how the system is set up.  My understanding is

19   that the way the system was set up here is there was a

20   manufacturer of the trailer, there was an entity that delivered

21   the trailers, FEMA was responsible -- had its responsibilities

22   for contracting and so forth, so there was a variety of entities

23   involved in this.  And as to what the responsibilities were in

24   this instance, I think, as you described it, is, again, my

25   understanding of how it worked.

1   Q.   And so real world, what the real world would have suggested

2   here is that Shaw or its subcontractors should have had this

3   face-to-face interaction with Ms. Castanel; is that correct?

4   A.   Although I'd make it a little more -- more than that.   In

5   the real world, as you want to put it, there is -- Recreation By

6   Design is manufacturing and marketing these trailers.   It's their

7   trailers.   They are building them.   They are putting them out

8   there in the marketplace.

9         To see that they end up getting to the customers with

10   the proper information for their safe use is something that

11   Recreation By Design, whether it's General Motors and their cars

12   or these days Toyota and their cars, I mean, they have -- they

13   ought to have a concern to make sure that their products are

14   arriving at the customer with the information the customer

15   needed.   So whether or not Recreation By Design does it from a

16   safety point of view doesn't absolve them from being concerned

17   about whether it's being done properly.

18   Q.   Doctor, I'm not --

19   A.   I'm not trying to --

20   Q.   -- I'm not suggesting that at all.   What I'm talking about

21   is this warning system, this other part where you told -- you

22   testified earlier that somebody is supposed to have this

23   face-to-face meeting with Castanel.   That's what I'm talking

24   about.   We've already talked about the warning, and you've made

25   your opinions clear on that.

1              But it's your opinion -- it's your further opinion in

2    this case that Shaw or one of its subcontractors should have, in

3    this is face-to-face meeting with Castanel, warned her about

4    formaldehyde; that's your opinion, isn't it?

5    A.    Yes.  But I thought you had asked me about

6    Recreation By Design's role in that.

7    Q.    That's not what I asked.

8    A.    Okay.

9    Q.    So the answer to my question about Shaw and its

10   subcontractors is yes, they should have done that, they should

11   have warned Ms. Castanel about formaldehyde?

12   A.    Yeah.  In the manner that I suggested, integrating that

13   verbal communication with the other components of the warning

14   system, the product label pointed out during the walk-through,

15   the owner's manual turned over with comments, et cetera.

16   Q.    Now, in connection with your work on this case you did not

17   review the NFPA 1992 standards involving travel trailers, did

18   you, at least up until the time you issued your report?

19   A.    That's correct, I have not.

20   Q.    And up until the time you issued your report, you didn't

21   review the ANSI 119.5 standards, did you?

22   A.    I did not, that's correct.

23   Q.    And you didn't review the National Highway Transportation

24   safety standards, did you?

25   A.    I did not.

1  Q.   Now, in this case, though, you did prepare a warning which

2  you believe should have been stuck on the side of this travel

3  trailer; is that correct?

4  A.   No.

5  Q.   You did not?

6  A.   I don't know what you're referring to.

7  Q.   Would you go to page 5 of his report, please.  If you can

8  zoom in on --

9        This is your report, is it not, sir?  This is a page

10 from your report, correct?

11 A.   That's page 5 of the report.

12 Q.   In other words, this is a document that you prepared,

13 correct?

14 A.   Yes.

15 Q.   And up here, Linda Nelson.  Who is Linda Nelson?

16 A.   Linda Nelson is an attorney who first contacted me about

17 being involved in this litigation.

18 Q.   And it's your understanding that she's one of the lawyers

19 that represents the plaintiff, Ms. Castanel, correct?

20 A.   Yes.

21 Q.   Now, in paragraph 11, you're saying here that -- well, tell

22 me what you're saying here.

23 A.   Well, I'll read it.

24 Q.   Okay.

25 A.   Pursuant to federal law, the following "health notice" is

1  required to be displayed in manufactured housing.  Since travel

2  trailers, like manufactured housing, contain

3  formaldehyde-emitting composite wood products, a similar notice

4  should be prominently displayed in travel trailers.

5  Q.   So your opinion is, is that because a travel trailer is

6  similar to manufactured housing, that it would be appropriate, in

7  your line of work as a warnings expert, to go to the federal

8  regulations to see what kind of warning that should be put; is

9  that correct?

10  A.   Well, I think that --

11  Q.   That was a long question.  I apologize.

12  A.   Yeah, and you had asked me before whether I designed a

13  warning.  I didn't design this warning, and that's the sense in

14  which I said no to that question.

15        I think there is a warning that exists for manufactured

16  housing that addresses the formaldehyde hazard.  It seems quite

17  reasonable to me, in answer to your current question, that the

18  manufacturers of trailers, where there are formaldehyde hazards,

19  would go look and see what others are warning about for

20  formaldehyde problems.  That's the point that I was making in

21  that paragraph.

22  Q.   And the point is, is that that would be a reasonable thing

23  to do, correct?

24  A.   Yes.

25  Q.   Okay.  Now, can you back up.

1          This important health notice that you're referring to

2   comes from the Code of Federal Regulations 3280.309; is that

3   correct, sir?

4   A.   Yes, that's my understanding.

5   Q.   Now, were you here in the courtroom when the previous

6   expert, Dr. Hewett, was on the stand?

7   A.   Part of it.

8   Q.   Were you here when we had the discussion about the

9   applicability of the Code of Federal Regulations 3280?

10  A.   I don't believe so.

11  Q.   Well, let's take a look at Exhibit 858.

12          THE COURT:  Mr. Yount, how much further do you have with

13  this?  We need to take our lunch --

14          MR. YOUNT:  Certain less than 10 minutes, closer to

15  five.  I'll finish up.

16                          EXAMINATION

17  BY MR. YOUNT:

18  Q.   Dr. Hewett (sic), do you recognize this document as the one

19  that we had an extensive discussion with Dr. Hewett?

20  A.   I remember that it was up there on display, yes.

21  Q.   Now, this document, this is the same Code of Federal

22  Regulations that you drew the warning out that's contained in

23  your report; is that correct?

24  A.   Yeah.

25  Q.   Okay.  And can you go to the other page that's highlighted.

1    I think it's two pages later, maybe.

2            And, again, this is the same regulation that says that

3    indoor ambient formaldehyde level of .4 ppm provides a reasonable

4    protection for manufactured home occupants; is that correct, sir?

5    A.    That's what it says.

6    Q.    Now, Doctor, you're aware that manufactured housing is not

7    the only instance where we're going to be exposed to

8    formaldehyde; is that correct?

9    A.    Yes.

10   Q.    The evidence is going to show that a lot of things --

11           MR. YOUNT:  May I approach the witness, Your Honor?

12           THE COURT:  Yes.

13                              EXAMINATION

14   BY MR. YOUNT:

15   Q.    -- that a lot of things cause people to be exposed to

16   formaldehyde.  And these are just some of the things that are up

17   on the board, and I apologize.

18           Do you think that my client, Recreation By Design, owed

19   Ms. Castanel a warning to warn her that cooking fish in her

20   travel trailer could cause formaldehyde exposure in excess of

21   these regulations?

22   A.    No.  I don't think that's -- going to that extreme is

23   necessary.

24   Q.    Do you think that anybody owed Ms. Castanel an obligation to

25   place a warning somewhere that says that cooking chicken emits

1  formaldehyde at four parts per million?

2  A.   No.

3  Q.   Have you ever seen a warning on a soft drink bottle that

4  suggested it has formaldehyde in excess of 8.2 parts per million?

5  A.   No.

6  Q.   Now, in connection with your review of this case, you

7  received Ms. Castanel's deposition, but you also received her

8  plaintiff fact sheet; is that correct, sir?

9  A.   Yes.

10  Q.   Will me go to 403-11.

11        Now, this is a portion, I'm going to represent to you,

12  of Ms. Castanel's fact sheet.  That's Earline Castanel.

13        And if you go to the next page, page 12.  Go to the --

14  go to the next page.  I'm sorry, go to page 18.

15        And you will see, sir, that when Ms. Castanel filled

16  this out, she filled it out under the penalty of perjury; is that

17  correct, sir?

18  A.   Oh, it says that, yes.

19  Q.   And that's something that's important to you because you

20  want to know that what you're relying on is accurate, correct?

21  A.   Well, I want to know that it's as accurate as it can be.

22  Q.   Will you go back to page 11, please.

23        In response to the question about Ms. Castanel's

24  personal smoking and tobacco use, you see that she checked off

25  yes, past smoker of cigarettes, tobacco use or other chewing

1  tobacco; is that correct, sir?

2  A.   Yes.

3  Q.   Are you aware that there are warnings on cigarettes?

4  A.   Very much.

5  Q.   Are you aware that cigarettes that contain formaldehyde far

6  in excess of any levels we've talked about here today?

7  A.   I don't know what their levels of formaldehyde are.

8          MR. YOUNT:  Thank you, Your Honor.  Thank you, Doctor.

9          MR. WATTS:  Very briefly, could you put that back up,

10  please, and go to the very next question.  Page 12, please.

11                  REDIRECT EXAMINATION

12  BY MR. WATTS:

13  Q.   Right after that, the date on which the smoking and tobacco

14  use ended according to this, what is it?

15  A.   I'm sorry?

16  Q.   Highlight just the top.  Blow it up for us so we can see it,

17  like the way you did with that.

18          Yeah, 1950?

19  A.   1950.

20  Q.   I don't mean to date you, but, back in 1950, the only

21  warning on cigarettes, just what the doctor ordered?

22  A.   That was before the surgeon general's report and smoking

23  warnings that came out much later than that.

24  Q.   Secondly, you are aware that this plaintiff fact sheet has

25  been amended, and that this was in error?

1    A.    Yes.

2    Q.    Let's go to what you came to talk about.

3            MR. WATTS:  Just two issues real briefly, Your Honor.

4                              EXAMINATION

5    BY MR. WATTS:

6    Q.    First, if you don't know about something, you can't warn

7    about it; do you remember that question?

8    A.    Yes.

9    Q.    If you do know about something, and you have known about

10   something since 1999 because you've been getting MSDS sheets from

11   the wood suppliers, can you warn about something you know about?

12   A.    You certainly can.  And my understanding is those MSDS

13   sheets were available to Recreation By Design long before this

14   was made, this label.

15   Q.    The next issue is you shouldn't warn about something that

16   doesn't need to be warned about.  Were you in the courtroom when

17   Robert Wozniak testified as an expert for this defendant about

18   Fleetwood and what it did on warnings?

19   A.    No.

20   Q.    Are you aware that Fleetwood warns of formaldehyde in its

21   travel trailers?

22   A.    Yes.

23           MR. YOUNT:  Objection, Judge, relevant.

24           THE COURT:  I'm going to sustain that.

25           MR. WATTS:  It already came in.  I'll move on.

1    THE COURT:  Well, Fleetwood is not at issue.  And we

2    discussed this at pretrial, so we're not going to try the

3    Fleetwood issue here.

4    MR. WATTS:  No, no, no.

5                           EXAMINATION

6    BY MR. WATTS:

7    Q.   The point is, is that you --

8    THE COURT:  Wait, wait.  Let's move on.

9    MR. WATTS:  I am moving on.

10                          EXAMINATION

11   BY MR. WATTS:

12   Q.   Travel trailer manufacturers know how to put warnings in

13   owner'S manuals if they choose to do, right?

14   A.   Yes.

15   THE COURT:  Wait.  Now, we're leading the witness, too.

16   Let's just ask a question, let's finish up, and then we'll take a

17   lunch break.

18                          EXAMINATION

19   BY MR. WATTS:

20   Q.   Do you have an opinion as to whether Rec by Design should

21   have warned about formaldehyde in the manner that manufactured

22   housing defendants, Fleetwood, HUD, all of these other things

23   that you brought up?

24   A.   Yes, I do have that opinion.

25   MR. WATTS:  Those are all of my questions.  Thank you.

1          THE COURT:  Thank you, Doctor, you may step down.

2               We're going to go ahead and take our lunch break

3     now.  It's almost quarter after noon.  If you all can be back and

4     ready to go at 1:25.  We'll start up again at 1:25 p.m.

5               Please don't discuss the case amongst yourselves.

6     And if you -- again, if you are looking for a quick lunch, there

7     is food here in the building, in the Hale Boggs Building.  There

8     is also a bunch of places that I'm sure the CSO can point out to

9     you if necessary.  We'll see you at 1:25.

10          THE COURT SECURITY OFFICER:  All rise.

11          (WHEREUPON, at this point in the proceedings, the jury

12    panel leaves the courtroom.)

13                         *    *    *

14

15                    REPORTER'S CERTIFICATE

16        I, Cathy Pepper, Certified Realtime Reporter, Registered
      Merit Reporter, Registered Professional Reporter, Certified Court
17    Reporter of the State of Louisiana, Official Court Reporter for
      the United States District Court, Eastern District of Louisiana,
18    do hereby certify that the foregoing is a true and correct
      transcript, to the best of my ability and understanding, from the
19    record of the proceedings in the above-entitled and numbered
      matter.

20

21                              s/Cathy Pepper
                                Cathy Pepper, CRR, RMR, CCR
22                              Official Court Reporter
                                United States District Court

23

24

25

## $

**$350** [1] - 386:15
**$400** [1] - 449:5

## '

**'06** [3] - 378:13, 421:17, 433:12
**'69** [1] - 349:15
**'80s** [1] - 407:22
**'90s** [1] - 368:21

## 0

**0** [1] - 395:23
**0.3** [1] - 431:19
**000008** [1] - 356:14
**001** [4] - 374:10, 374:11, 374:23, 376:2
**008** [5] - 369:8, 372:14, 374:18, 376:6, 382:25
**009** [3] - 411:20, 411:23, 413:1
**01** [5] - 374:13, 375:4, 376:2, 396:5, 396:9
**016** [3] - 382:25, 404:19, 405:12
**02** [4] - 396:5, 396:6, 396:10, 411:18
**03** [2] - 369:6, 396:6
**04** [1] - 369:3
**05** [6] - 380:5, 382:1, 384:24, 394:20, 411:12, 411:14
**050** [1] - 413:5
**07** [1] - 374:25
**081** [3] - 380:24, 380:25, 384:19
**09-3251** [1] - 322:8

## 1

**1** [15] - 366:24, 368:13, 374:12, 374:14, 374:17, 374:23, 374:25, 375:5, 375:6, 376:2, 376:3, 396:8, 396:24, 407:1
**1,000** [2] - 381:4, 381:8
**1.000** [1] - 396:18
**10** [7] - 374:10, 374:14, 374:15, 376:3, 395:23,

397:3, 464:14
**10,000** [1] - 374:16
**100** [2] - 322:18, 383:21
**1000** [1] - 322:24
**10:00** [3] - 385:8, 385:9, 385:18
**11** [5] - 377:2, 377:3, 429:4, 462:21, 466:22
**119.5** [1] - 461:21
**1192** [4] - 358:17, 359:16, 360:10, 362:14
**12** [2] - 466:13, 467:10
**12730** [1] - 398:22
**12:00** [1] - 447:8
**14** [2] - 369:5
**143,000** [2] - 418:13, 446:6
**15** [3] - 369:8, 385:9, 408:6
**16** [1] - 422:22
**170-some** [1] - 421:7
**176** [2] - 372:2, 372:3
**18** [5] - 322:6, 325:3, 374:24, 431:3, 466:14
**180** [2] - 372:2, 373:11
**1800** [1] - 323:5
**1873** [1] - 322:5
**19** [2] - 327:13, 431:16
**1950** [3] - 467:18, 467:19, 467:20
**1970** [1] - 366:5
**1970s** [2] - 327:21, 331:20
**1975** [1] - 327:13
**1978** [2] - 349:15, 349:21
**1981** [2] - 349:21, 349:23
**1983** [2] - 349:24, 350:10
**1984** [1] - 440:3
**1988** [1] - 405:5
**1991** [1] - 364:5
**1992** [1] - 461:17
**1999** [2] - 384:13, 468:10
**1:25** [3] - 470:4, 470:9

## 2

**2** [4] - 322:11, 398:21, 411:17, 435:8
**2,600** [1] - 373:2
**20** [1] - 455:15
**2002** [2] - 440:5,

447:24
**2004** [1] - 426:11
**2005** [15] - 357:2, 360:8, 360:10, 360:16, 362:23, 363:3, 376:12, 423:11, 423:24, 425:5, 426:24, 432:21, 432:23, 433:5, 444:9
**2006** [14] - 350:11, 375:16, 375:17, 375:21, 376:13, 376:14, 376:19, 376:25, 431:4, 433:16, 434:3, 444:9, 446:9, 446:11
**2006.01** [1] - 375:17
**2007** [10] - 375:19, 375:25, 376:16, 376:21, 423:14, 423:15, 423:24, 431:16, 446:21, 446:25
**2007/2008** [1] - 378:5
**2008** [5] - 375:25, 376:21, 378:2, 419:8, 423:15
**2009** [2] - 340:7, 340:12
**2010** [8] - 322:6, 325:3, 380:1, 411:11, 411:16, 411:22, 418:15, 421:6
**207-000001** [1] - 356:14
**2250** [1] - 322:21
**23** [1] - 357:22
**23-year** [1] - 350:15
**24** [2] - 407:11, 408:22
**24-hour** [6] - 408:9, 409:20, 409:24, 412:11, 412:12
**25** [2] - 366:1, 382:9
**2600** [1] - 419:10
**27** [1] - 440:2
**29** [3] - 327:17, 422:12, 422:13
**2900** [1] - 323:10

## 3

**3** [7] - 382:17, 408:25, 431:23, 434:9, 434:17, 434:21, 434:22
**30** [2] - 342:15, 368:13
**326** [2] - 324:5, 324:6

**3280** [2] - 407:11, 464:9
**3280.309** [1] - 464:2
**335** [1] - 324:7
**342** [1] - 324:8
**345** [1] - 324:9
**363** [2] - 324:10, 324:11
**364** [1] - 324:12
**3838** [1] - 323:9
**386** [1] - 324:13

## 4

**4** [13] - 407:15, 407:25, 408:8, 409:6, 409:13, 409:18, 410:21, 411:6, 411:22, 412:4, 416:3, 417:3, 465:3
**403-11** [1] - 466:10
**413** [1] - 324:14
**422** [1] - 324:15
**4265** [1] - 322:24
**430** [1] - 422:18
**438** [1] - 324:16
**439** [1] - 324:17
**447** [1] - 324:18
**46** [6] - 373:13, 373:16, 373:18, 375:2, 377:5, 394:12
**467** [1] - 324:19

## 5

**5** [5] - 356:13, 384:8, 384:14, 462:7, 462:11
**50** [2] - 391:8, 455:14
**50,000** [2] - 446:6, 446:15
**500** [4] - 323:13, 381:3, 381:5, 384:8
**504** [1] - 323:14
**51** [2] - 391:3, 391:5
**58** [1] - 413:10
**589-7779** [1] - 323:14

## 6

**6** [1] - 454:19
**60-minute** [5] - 408:9, 409:24, 412:12, 413:8, 413:12
**628** [1] - 406:1
**63** [1] - 404:8

## 7

**7** [3] - 373:21, 431:2, 451:8
**70** [1] - 373:14
**70002** [1] - 323:10
**70112** [1] - 323:5
**70130** [1] - 323:14
**71** [5] - 373:15, 373:17, 380:23, 383:2
**75** [2] - 407:3, 407:20
**77027** [1] - 322:24
**78257** [1] - 322:18
**78470** [1] - 322:21
**79-year-old** [1] - 367:23
**7th** [1] - 411:11

## 8

**8** [3] - 395:15, 406:19, 411:16
**8.2** [1] - 466:4
**80** [1] - 455:15
**802** [1] - 322:21
**858** [2] - 408:13, 464:11
**863** [1] - 404:23
**88.7** [2] - 383:11, 383:12
**8:30** [2] - 322:6, 325:3

## 9

**9** [3] - 377:2, 382:18, 396:8
**90** [1] - 448:19
**909** [1] - 323:5
**93,000** [1] - 446:8
**95** [1] - 383:22
**97** [3] - 383:3, 383:4, 383:25
**99** [5] - 383:9, 383:10, 383:11, 383:13
**99.9** [1] - 393:5

## A

**A.M** [2] - 322:6, 325:3
**ability** [1] - 470:18
**able** [5] - 341:5, 371:6, 396:25, 410:9, 418:1
**above-entitled** [1] - 470:19
**absolutely** [1] - 412:24

**absolve** [1] - 460:16
**AC** [1] - 339:16
**accept** [6] - 364:20, 403:6, 405:7, 439:18, 457:24, 458:4
**accepted** [3] - 398:15, 441:21, 457:19
**accepts** [1] - 344:9
**access** [3] - 391:10, 391:12, 391:13
**according** [5] - 353:5, 384:11, 384:12, 409:10, 467:14
**account** [3] - 379:12, 379:13, 379:15
**accredited** [2] - 392:18
**accumulated** [1] - 369:15
**accurate** [4] - 392:8, 392:19, 466:20, 466:21
**ACGIH** [3] - 367:3, 367:4, 398:19
**acting** [4] - 422:25, 423:2, 423:5, 423:9
**action** [10] - 428:18, 429:8, 429:19, 430:14, 430:17, 430:20, 430:21, 430:22, 430:25, 436:3
**actions** [2] - 429:5, 431:6
**active** [1] - 361:21
**actively** [1] - 361:13
**activities** [1] - 388:5
**actual** [6] - 391:25, 393:8, 411:10, 411:24, 413:6, 413:13
**ad** [1] - 361:23
**add** [1] - 401:17
**added** [1] - 452:2
**addition** [1] - 448:10
**additional** [5] - 389:7, 389:8, 406:19, 409:8, 410:8
**address** [2] - 422:17, 422:18
**addressed** [1] - 445:13
**addresses** [3] - 456:24, 459:2, 463:16
**addressing** [1] - 445:4
**adequate** [3] - 370:1, 445:3, 445:4
**adjacent** [1] - 420:11

**Administration** [2] - 366:6, 367:1
**adopted** [1] - 407:22
**adult** [3] - 367:15, 367:21, 407:4
**adventure** [1] - 362:5
**adverse** [2] - 406:5, 406:9
**advise** [1] - 402:14
**advised** [1] - 431:17
**advisory** [1] - 452:14
**advocacy** [1] - 378:8
**affects** [1] - 435:4
**affirming** [1] - 425:23
**afraid** [1] - 333:2
**aged** [1] - 367:18
**agencies** [8] - 358:21, 358:23, 375:23, 375:24, 377:24, 391:2, 393:1, 393:2
**Agency** [2] - 368:16, 368:22
**agency** [6] - 366:4, 366:5, 367:7, 368:17, 368:18, 370:15
**agents** [1] - 366:14
**ages** [1] - 367:19
**ago** [2] - 339:24, 357:11
**agree** [21] - 332:8, 337:15, 344:20, 389:10, 389:21, 393:11, 395:9, 405:9, 406:3, 406:6, 408:20, 411:19, 411:23, 451:15, 454:3, 454:6, 454:18, 455:10, 455:11, 456:4, 456:16
**agreed** [2] - 343:10, 430:12
**agreeing** [1] - 455:12
**ahead** [14] - 325:11, 325:16, 344:18, 344:23, 364:15, 374:6, 385:6, 385:9, 397:20, 400:15, 403:14, 417:14, 420:21, 470:2
**AIHA** [1] - 392:17
**air** [12] - 401:5, 402:4, 402:16, 402:25, 410:22, 433:15, 433:24, 452:13, 456:5, 456:18, 457:1
**airborne** [5] - 365:12, 388:7, 389:11, 390:7, 394:23

**Alexander** [2] - 398:2, 398:4
**Alice** [1] - 366:10
**alleged** [1] - 443:20
**allegedly** [1] - 454:21
**allow** [1] - 378:15
**almost** [3] - 369:24, 411:14, 470:3
**alone** [1] - 458:12
**alteration** [1] - 430:7
**alternate** [1] - 391:20
**alternative** [2] - 420:8, 436:13
**altogether** [1] - 373:7
**Amanda** [2] - 346:14, 346:15
**ambient** [10] - 399:11, 401:4, 402:4, 402:16, 402:25, 409:1, 409:5, 413:9, 433:24, 465:3
**amended** [1] - 467:25
**American** [1] - 367:5
**amount** [3] - 366:20, 391:6, 396:4
**amplify** [1] - 406:10
**analyses** [1] - 366:17
**analysis** [20] - 365:8, 365:9, 365:17, 366:15, 369:12, 369:14, 372:10, 372:11, 372:24, 373:7, 380:7, 388:15, 388:17, 399:6, 418:23, 420:4, 442:11, 442:12, 442:13
**analyst** [4] - 372:18, 389:2, 389:9, 420:24
**analyze** [1] - 370:21
**analyzed** [3] - 366:21, 373:9, 420:13
**ancillary** [1] - 441:6
**ANDREW** [1] - 323:8
**annual** [2] - 409:21, 412:20
**ANSI** [2] - 359:10, 461:21
**answer** [25] - 330:10, 335:7, 364:8, 368:1, 378:20, 380:13, 393:5, 397:20, 400:12, 400:15, 407:7, 407:8, 409:15, 410:4, 410:7, 410:12, 413:20, 414:5, 414:22, 414:24, 415:10, 415:14, 420:19, 461:9,

463:17
**answers** [1] - 392:7
**anticipating** [1] - 365:2
**ANTONIO** [1] - 322:18
**anxiety** [1] - 335:22
**anyhow** [1] - 334:18
**anyway** [1] - 410:25
**apologize** [4] - 333:6, 450:21, 463:11, 465:17
**apparent** [1] - 428:6
**appear** [1] - 356:16
**appearance** [2] - 408:21, 442:21
**APPEARANCES** [2] - 322:15, 323:1
**appeared** [2] - 450:14, 450:16
**apples** [4] - 412:7, 412:17, 412:21, 414:2
**appliance** [2] - 450:9, 450:23
**applicability** [1] - 464:9
**applicable** [4] - 397:16, 397:22, 424:4, 425:16
**applicants** [1] - 432:11
**application** [2] - 358:21, 450:8
**applied** [4] - 367:15, 367:16, 369:9, 389:8
**apply** [5] - 358:16, 358:18, 358:21, 370:22, 401:17
**appointment** [1] - 440:7
**approach** [16] - 340:15, 342:17, 374:4, 379:21, 384:5, 394:15, 397:24, 404:4, 416:17, 418:8, 419:23, 435:13, 435:14, 436:12, 446:2, 465:11
**approached** [1] - 424:10
**approaching** [1] - 404:10
**appropriate** [9] - 397:11, 398:12, 399:4, 399:25, 402:14, 428:18, 430:25, 433:24, 463:6
**appropriateness** [1] -

424:18
**approximate** [1] - 432:23
**area** [4] - 372:7, 396:8, 432:25, 433:22, 436:25
**areas** [6] - 389:5, 427:7, 437:10, 437:11, 437:12, 437:22
**argue** [2] - 403:9, 442:23
**argument** [2] - 344:18, 403:10
**arithmetic** [2] - 380:21, 380:22
**arrived** [1] - 351:21
**arriving** [1] - 460:14
**aside** [1] - 418:13
**assessed** [1] - 398:7
**assessing** [1] - 442:11
**assessment** [8] - 369:19, 369:25, 379:4, 420:7, 420:9, 420:23, 421:2, 421:12
**assistance** [5] - 366:20, 422:22, 423:4, 423:10, 423:20
**associated** [5] - 341:12, 431:6, 442:2, 442:4, 442:5
**association** [3] - 358:24, 358:25, 359:2
**Association** [11] - 359:3, 359:7, 361:14, 361:17, 361:19, 361:25, 362:5, 362:8, 362:10, 362:18, 362:20
**assume** [5] - 376:18, 382:4, 434:16, 454:14, 456:6
**assumed** [2] - 367:21, 434:21
**assuming** [1] - 454:25
**assumption** [5] - 376:17, 376:20, 376:25, 378:18, 455:1
**assurance** [1] - 343:1
**asthma** [1] - 443:15
**AT** [1] - 322:20
**ATSDR** [28] - 368:14, 368:16, 372:13, 372:16, 374:18, 376:6, 382:24,

3

383:3, 383:5,
383:12, 384:1,
384:4, 384:10,
384:13, 384:21,
385:1, 397:7,
397:21, 400:23,
406:1, 406:4, 406:8,
418:2, 431:16,
431:19, 434:8,
434:16
**attention** [3] - 339:18,
404:3, 451:7
**attorney** [2] - 346:15,
462:16
**ATTORNEY** [1] -
322:20
**attorneys** [5] - 351:15,
402:22, 403:3,
403:8, 448:3
**August** [5] - 327:20,
423:10, 425:4,
426:24, 446:25
**auspices** [2] - 359:6,
359:9
**authorities** [2] -
358:13, 361:10
**automobile** [1] - 441:2
**available** [2] - 437:10,
468:13
**average** [8] - 372:20,
376:23, 408:7,
413:7, 413:11,
413:12, 444:8,
444:10
**awaken** [1] - 452:3
**Award** [1] - 366:10
**award** [1] - 366:12
**aware** [41] - 351:24,
355:9, 356:5, 356:7,
357:5, 357:9, 388:5,
390:2, 390:5, 390:6,
390:9, 393:7, 393:9,
393:10, 394:21,
394:24, 394:25,
407:11, 407:13,
407:14, 407:15,
413:1, 419:15,
433:11, 446:12,
449:6, 449:9, 453:5,
453:18, 456:19,
457:15, 457:17,
457:19, 458:1,
458:6, 465:6, 467:3,
467:5, 467:24,
468:20
**axes** [1] - 396:2
**axis** [10] - 374:2,
374:7, 374:8,
375:16, 376:2,
395:17, 395:19,

395:23, 396:3

# B

**B406** [1] - 323:13
**Bachelor's** [1] - 349:9
**background** [8] -
435:3, 455:22,
455:25, 456:5,
456:8, 456:15,
456:18, 456:25
**backwards** [1] -
388:17
**bad** [5] - 334:15,
334:16, 340:25,
406:9
**badly** [1] - 338:6
**bailiwick** [1] - 449:21
**barely** [1] - 411:18
**baseboards** [1] -
360:2
**based** [14] - 330:6,
330:10, 330:11,
333:12, 357:21,
359:7, 393:12,
420:9, 428:21,
431:22, 434:20,
454:25, 459:10
**baseline** [2] - 431:18,
431:22
**basic** [2] - 392:3,
427:8
**basis** [2] - 344:11,
366:23
**Bates** [1] - 356:13
**Baton** [2] - 437:14,
438:7
**beat** [1] - 390:23
**became** [9] - 336:8,
350:25, 351:3,
361:21, 361:25,
410:20, 411:1,
433:12, 446:12
**become** [1] - 393:23
**BEFORE** [1] - 322:12
**began** [2] - 410:23,
429:5
**begin** [4] - 423:13,
429:3, 430:22,
437:18
**beginning** [3] - 413:8,
433:1, 436:3
**behind** [1] - 439:9
**belief** [1] - 358:16
**bellwether** [2] - 399:2,
401:11
**below** [2] - 431:18,
432:11
**bench** [6] - 342:20,

345:7, 397:24,
398:1, 402:10,
416:19
**benchmark** [6] -
399:13, 401:1,
401:21, 402:4,
402:16, 434:4
**benefit** [1] - 352:22
**best** [13] - 360:12,
360:17, 363:1,
363:4, 365:16,
370:23, 389:10,
389:12, 420:24,
420:25, 432:7,
447:8, 470:18
**bet** [1] - 388:4
**better** [6] - 335:2,
335:3, 338:12,
358:20, 397:22,
428:17
**between** [13] - 367:12,
369:7, 374:23,
374:24, 376:12,
376:21, 384:14,
396:23, 411:15,
415:15, 421:16,
436:8, 458:19
**biased** [1] - 428:14
**big** [1] - 459:16
**bill** [2] - 452:15, 453:4
**billion** [10] - 374:11,
374:12, 374:16,
374:17, 381:3,
381:4, 381:5, 381:8,
384:9, 408:2
**bills** [1] - 452:7
**BINSTOCK** [1] -
322:23
**bit** [3] - 435:12,
450:11, 457:4
**black** [3] - 360:1,
406:21
**blades** [1] - 442:25
**blank** [1] - 343:13
**blessed** [1] - 327:18
**blessing** [1] - 342:23
**blinking** [1] - 382:1
**block** [2] - 327:25,
427:8
**blow** [1] - 467:16
**blowers** [1] - 430:2
**blue** [1] - 413:14
**blurt** [1] - 414:6
**blurted** [1] - 400:15
**Board** [1] - 362:2
**board** [2] - 404:8,
465:17
**Boggs** [1] - 470:7
**boil** [1] - 412:7
**books** [1] - 440:12

**Boston** [1] - 391:11
**bottle** [2] - 454:16,
466:3
**bottom** [6] - 369:3,
382:21, 408:15,
408:16, 440:1,
444:16
**BOULEVARD** [1] -
323:9
**BOURGEOIS** [1] -
323:7
**box** [1] - 441:8
**branch** [1] - 423:21
**break** [7] - 385:7,
438:16, 447:6,
447:10, 447:11,
469:17, 470:2
**breathe** [1] - 334:11
**breathing** [3] - 330:21,
330:23, 330:25
**bridge** [1] - 436:7
**brief** [1] - 433:1
**briefly** [2] - 467:9,
468:3
**bring** [3] - 443:3,
443:9, 451:25
**broad** [1] - 379:4
**brochure** [4] - 431:4,
431:10, 431:13,
431:14
**brochures** [1] - 431:11
**broke** [1] - 419:14
**brother** [5] - 327:8,
331:20, 331:22,
333:3, 340:3
**brother's** [1] - 339:23
**brought** [4] - 401:24,
416:16, 451:25,
469:23
**build** [1] - 425:3
**Building** [2] - 457:19,
470:7
**BUILDING** [1] - 322:18
**building** [3] - 352:20,
460:7, 470:7
**buildings** [1] - 368:7
**built** [8] - 348:5,
348:8, 357:25,
362:6, 380:2, 380:4,
380:9, 425:2
**bulk** [1] - 350:1
**bunch** [3] - 401:4,
417:24, 470:8
**bureau** [1] - 377:16
**Bureau** [6] - 378:1,
378:3, 378:11,
383:17, 392:24,
419:3
**burning** [1] - 382:1
**businesses** [1] -

437:20
**buying** [2] - 442:1,
442:24
**BY** [55] - 322:9,
322:17, 322:23,
323:3, 323:8,
323:15, 323:16,
324:6, 324:7, 324:8,
324:11, 324:12,
324:13, 324:14,
324:17, 324:18,
324:19, 326:17,
329:20, 330:14,
332:14, 332:21,
333:8, 335:16,
340:18, 342:4,
363:23, 364:23,
379:24, 384:7,
386:4, 394:17,
403:17, 404:7,
410:15, 411:5,
413:25, 414:10,
415:1, 415:19,
417:18, 418:11,
420:1, 421:15,
439:8, 439:23,
446:5, 447:14,
464:17, 465:14,
467:12, 468:5,
469:6, 469:11,
469:19

# C

**cabinets** [4] - 353:2,
353:10, 394:23,
395:8
**calculate** [6] - 365:19,
372:15, 379:16,
380:14, 380:20,
391:5
**calculation** [1] -
372:17
**CALLED** [1] - 325:4
**cancer** [13] - 331:23,
332:2, 332:16,
332:23, 333:1,
333:10, 339:23,
340:2, 340:3, 340:6,
340:12, 340:20,
443:15
**cannot** [2] - 409:22,
457:11
**capacity** [1] - 348:5
**car** [2] - 328:22, 336:6
**CARANCAHUA** [1] -
322:21
**card** [1] - 452:8
**care** [2] - 327:5,
333:22

**career** [1] - 389:6
**careful** [1] - 455:12
**carefully** [1] - 410:11
**cars** [2] - 460:11, 460:12
**case** [49] - 343:22, 345:12, 345:21, 346:1, 346:18, 346:20, 346:22, 346:23, 350:21, 357:14, 358:5, 369:11, 371:21, 371:25, 376:11, 385:10, 386:18, 387:14, 388:11, 391:15, 398:2, 399:1, 399:10, 400:2, 400:25, 401:3, 401:12, 401:13, 402:14, 402:15, 402:18, 402:24, 403:11, 414:3, 418:12, 419:19, 426:10, 449:10, 450:4, 457:5, 457:15, 458:7, 458:20, 459:11, 461:2, 461:16, 462:1, 466:6, 470:5
**cases** [7] - 371:20, 372:1, 372:2, 383:21, 427:8, 448:7, 448:25
**CASTANEL** [1] - 322:9
**Castanel** [46] - 326:19, 350:22, 351:9, 351:12, 351:24, 356:16, 356:17, 357:12, 357:18, 358:5, 358:9, 359:5, 360:25, 361:3, 361:9, 369:17, 376:13, 387:6, 389:16, 389:18, 389:21, 389:24, 394:12, 397:17, 411:10, 411:21, 411:24, 419:9, 444:17, 445:17, 453:9, 453:15, 458:20, 458:24, 459:12, 459:17, 460:3, 460:23, 461:3, 461:11, 462:19, 465:19, 465:24, 466:12, 466:15
**Castanel's** [15] - 326:20, 348:22,

351:22, 359:13, 360:4, 360:9, 387:14, 388:8, 389:12, 390:3, 446:17, 457:4, 466:7, 466:12, 466:23
**CAT** [1] - 334:13
**catch** [1] - 340:1
**category** [1] - 444:13
**Catholic** [1] - 327:7
**CATHY** [1] - 323:13
**Cathy** [2] - 470:16, 470:21
**caused** [1] - 454:21
**causes** [3] - 443:14, 456:21, 456:23
**CAUSEWAY** [1] - 323:9
**causing** [6] - 331:8, 333:1, 338:25, 339:8, 381:3, 381:4
**CCR** [2] - 323:13, 470:21
**CD** [1] - 393:2
**CDC** [2] - 378:3, 417:7
**ceiling** [7] - 407:23, 408:5, 409:18, 412:9, 412:13, 412:15, 412:20
**census** [4] - 394:1, 394:2, 394:5
**CENTER** [1] - 323:9
**Centers** [5] - 368:18, 378:4, 392:24, 416:3, 417:19
**central** [2] - 400:2, 401:13
**certain** [4] - 339:9, 383:7, 426:7, 464:14
**certainly** [5] - 357:9, 408:21, 420:25, 455:16, 468:12
**CERTIFICATE** [1] - 470:15
**certified** [2] - 392:17, 420:13
**Certified** [2] - 470:16, 470:16
**certify** [1] - 470:18
**cetera** [1] - 461:15
**CFR** [3] - 407:11, 408:22, 410:22
**chain** [2] - 442:24, 459:16
**chair** [2] - 325:23, 440:8
**chamber** [2] - 414:16, 415:3
**change** [1] - 394:10

changes [4] - 379:7, 429:11, 430:1, 430:3
**chapter** [1] - 366:13
**characteristics** [2] - 442:7, 444:3
**characterize** [2] - 434:20, 450:10
**characterized** [1] - 430:2
**charge** [1] - 386:16
**charging** [2] - 386:25, 449:3
**Chart** [2] - 395:15, 406:19
**chart** [16] - 374:1, 377:25, 382:3, 394:18, 394:19, 396:19, 397:4, 397:6, 403:19, 405:14, 406:7, 406:25, 409:8, 411:9, 411:25, 412:3
**charts** [6] - 366:22, 386:17, 390:20, 397:11, 413:15, 413:16
**cheat** [1] - 326:18
**check** [1] - 417:8
**checked** [1] - 466:24
**Chemical** [1] - 391:11
**chemical** [2] - 370:6, 370:7
**chemicals** [2] - 365:5, 368:4
**chewing** [1] - 466:25
**Chicago** [1] - 447:23
**chicken** [1] - 465:25
**chief** [2] - 345:12, 357:21
**children** [1] - 327:14
**choice** [1] - 436:12
**choose** [1] - 469:13
**chosen** [1] - 429:18
**CHRIS** [1] - 322:20
**CHRISTI** [1] - 322:21
**Christmas** [2] - 432:16, 432:21
**chronic** [6] - 335:25, 366:14, 372:14, 374:19, 374:20, 382:24
**chunk** [1] - 391:21
**church** [1] - 328:12
**cigarettes** [4] - 466:25, 467:3, 467:5, 467:21
**circumstances** [1] - 395:4
**cities** [1] - 456:8
**city** [2] - 456:15,

456:21
**clear** [5] - 398:24, 399:11, 402:12, 417:15, 460:25
**CLERK** [8] - 326:2, 326:10, 363:8, 363:16, 417:3, 417:5, 438:20, 439:3
**Clerk** [3] - 326:9, 363:15, 439:2
**client** [5] - 326:24, 327:1, 367:23, 457:20, 465:18
**close** [1] - 327:22
**closed** [1] - 387:22
**closer** [3] - 388:18, 437:17, 464:14
**closing** [1] - 403:10
**Club** [13] - 375:22, 377:18, 378:7, 382:9, 382:12, 392:12, 394:19, 394:21, 395:5, 395:6, 395:10, 428:9, 428:12
**clue** [1] - 331:7
**Coast** [1] - 432:14
**code** [7] - 358:17, 359:11, 359:16, 362:11, 362:13, 362:14, 362:15
**Code** [5] - 408:22, 412:22, 464:2, 464:9, 464:21
**codes** [10] - 343:19, 358:6, 358:12, 358:15, 358:16, 358:21, 358:22, 359:20, 361:10, 361:23
**cold** [1] - 388:7
**collar** [1] - 364:6
**collect** [3] - 378:2, 407:17, 408:4
**collected** [38] - 366:20, 371:22, 372:4, 372:8, 375:2, 375:14, 375:20, 375:22, 375:23, 375:24, 376:4, 377:7, 378:3, 378:4, 382:8, 382:9, 382:10, 388:16, 391:2, 407:9, 408:9, 409:24, 412:14, 413:3, 413:8, 413:9, 419:7, 419:8, 420:9, 420:11, 420:12, 420:15, 421:2, 421:4, 421:5, 421:18

college [1] - 327:7
**colloquy** [1] - 411:2
**column** [1] - 366:25
**columns** [1] - 383:9
**combined** [1] - 432:1
**comfortable** [5] - 336:23, 337:3, 337:16, 425:22, 426:6
**coming** [2] - 432:18, 454:22
**command** [1] - 436:25
**commander** [1] - 432:25
**comment** [3] - 354:16, 399:22, 410:8
**comments** [2] - 354:20, 461:15
**commercials** [1] - 441:16
**Committee** [4] - 361:24, 362:1, 392:14, 392:25
**commodities** [2] - 359:21, 359:23
**communicate** [2] - 441:2, 442:22
**communicating** [1] - 441:20
**communication** [9] - 347:16, 439:12, 439:20, 439:21, 440:16, 440:19, 458:18, 459:3, 461:13
**communications** [6] - 346:19, 347:17, 441:7, 441:11, 441:12, 441:19
**community** [2] - 428:16, 437:20
**companies** [2] - 370:12, 395:7, 452:7
**company** [1] - 453:4
**comparative** [1] - 399:7
**compare** [7] - 365:16, 365:19, 397:11, 397:12, 397:13, 407:17, 408:8
**compared** [4] - 365:14, 406:17, 412:10, 412:13
**compares** [1] - 418:1
**comparing** [3] - 409:23, 412:17, 412:21
**comparison** [2] - 407:8, 408:10
**competence** [1] -

365:18
complain [4] - 330:18, 330:22, 338:14, 338:15
complained [2] - 338:18, 341:16
complaining [2] - 333:17, 334:10
complaints [3] - 338:8, 338:16, 433:9
complete [1] - 418:16
completed [1] - 418:21
complied [5] - 358:6, 361:9, 400:17, 424:4, 425:15
component [3] - 352:19, 352:23, 356:2
components [3] - 353:17, 445:12, 461:13
composite [2] - 356:1, 463:3
composites [1] - 353:12
compromised [1] - 367:18
COMPUTER [1] - 323:16
computer [1] - 391:22
concentration [8] - 365:15, 374:8, 376:1, 396:14, 396:16, 405:22, 408:1, 431:19
concentrations [6] - 365:13, 375:13, 384:16, 388:8, 390:7, 420:16
concept [1] - 455:23
conceptualizing [1] - 397:1
concern [14] - 430:16, 430:18, 430:21, 430:22, 430:23, 430:24, 431:1, 431:20, 431:24, 432:12, 434:10, 438:5, 459:2, 460:13
concerned [4] - 333:2, 334:17, 336:8, 460:16
concerning [2] - 337:2, 337:14
concerns [8] - 427:22, 428:23, 430:19, 431:6, 431:9, 437:16, 437:19, 438:9

concisely [1] - 410:7
conclude [1] - 383:24
concluded [5] - 345:7, 402:11, 409:5, 431:24, 438:11
conclusion [4] - 418:23, 444:22, 445:2, 455:1
conclusions [5] - 393:19, 393:22, 394:4, 394:10, 443:25
condition [8] - 329:22, 330:1, 330:16, 330:25, 333:13, 406:13, 452:5
conditioning [3] - 413:4, 413:9
conduct [4] - 357:12, 428:1, 428:6, 428:16
conducted [1] - 352:3
Conference [1] - 367:5
conference [6] - 342:20, 345:7, 346:21, 398:1, 402:11, 416:19
confidence [6] - 372:16, 383:6, 383:10, 383:11, 383:23
confident [2] - 383:12, 383:13
conformance [2] - 358:12, 359:20
connection [18] - 347:5, 348:2, 348:22, 350:24, 387:13, 388:10, 390:7, 390:20, 397:16, 403:18, 409:2, 448:15, 448:22, 449:6, 449:24, 451:1, 461:16, 466:6
consensus [1] - 433:23
consider [6] - 343:14, 344:7, 344:10, 397:16, 403:11, 429:5
consideration [8] - 400:6, 429:7, 442:5, 442:15, 442:19, 443:2, 443:3, 444:15
considerations [1] - 406:16
considered [3] - 352:12, 434:13, 436:14

constitute [1] - 401:6
construction [3] - 345:2, 345:15, 361:9
Construction [1] - 408:17
consult [1] - 431:8
consultancies [3] - 372:7, 375:24, 378:7
consultancy [4] - 378:1, 383:19, 391:12, 419:7
Consultants [1] - 377:17
consultants [1] - 377:22
consultation [2] - 434:9
consulting [2] - 377:20, 448:3
consumer [6] - 366:22, 450:8, 450:10, 450:12, 452:2, 452:15
contact [3] - 346:4, 347:15, 347:16
contacted [4] - 346:6, 346:7, 448:20, 462:16
contain [5] - 380:15, 382:22, 459:6, 463:2, 467:5
contained [4] - 355:15, 381:16, 412:5, 464:22
containing [1] - 357:24
contains [4] - 371:3, 371:14, 377:3, 377:4
content [2] - 357:24, 357:25
contention [1] - 412:6
context [2] - 429:23, 451:15
CONTINUED [1] - 323:1
contract [2] - 424:11, 426:25
contracting [1] - 459:22
contractors [5] - 427:1, 427:5, 427:10, 427:13, 427:18
contractors' [1] - 427:16
contracts [1] - 425:1
contraindications [1] - 441:18
contrary [1] - 358:3
contrast [1] - 367:16

contributed [2] - 383:18, 383:20
Control [5] - 368:18, 378:4, 392:24, 416:3, 417:19
controlled [7] - 370:6, 391:14, 391:16, 415:16, 419:1, 419:4, 419:6
controlling [2] - 365:2, 412:16
controls [3] - 365:3, 379:9, 379:10
conversation [1] - 348:24
conversations [1] - 429:9
conveyed [1] - 399:13
cooked [2] - 388:1, 388:3
cooking [2] - 465:19, 465:25
coordination [1] - 423:7
coordinator [1] - 423:7
Cornish [8] - 347:11, 347:12, 347:15, 348:1, 348:12, 348:21, 354:2, 355:14
corporate [1] - 354:10
Corporation [1] - 349:19
corporation [1] - 350:7
CORPUS [1] - 322:21
correct [223] - 326:21, 327:11, 329:23, 329:24, 333:11, 333:21, 335:20, 336:1, 336:2, 336:4, 336:9, 336:10, 336:19, 336:21, 336:24, 337:24, 337:25, 338:2, 338:4, 338:5, 338:6, 338:7, 339:1, 339:2, 339:16, 339:21, 339:24, 339:25, 340:7, 340:13, 340:21, 340:25, 341:1, 341:4, 341:10, 341:11, 345:9, 346:2, 346:3, 346:16, 349:1, 349:2, 349:12, 349:13, 349:15, 349:16, 349:18, 349:22, 349:25,

350:2, 350:3, 350:12, 350:14, 350:17, 350:20, 350:22, 350:23, 351:2, 351:5, 351:22, 352:6, 352:13, 352:14, 352:17, 353:7, 355:10, 355:11, 355:22, 355:23, 356:19, 357:9, 357:12, 357:13, 357:15, 357:16, 358:4, 358:7, 358:8, 359:17, 359:18, 360:20, 360:23, 361:15, 362:18, 362:19, 362:22, 367:2, 373:14, 373:19, 376:8, 376:16, 376:22, 377:1, 377:24, 378:14, 380:3, 381:1, 381:7, 386:12, 386:18, 386:19, 386:23, 387:11, 387:24, 387:25, 388:9, 388:13, 388:20, 389:14, 389:22, 390:8, 390:12, 390:13, 390:21, 390:22, 390:25, 391:7, 391:18, 392:2, 392:5, 393:13, 394:13, 394:19, 395:21, 396:4, 397:9, 397:17, 403:20, 403:23, 403:24, 404:1, 404:14, 404:16, 404:19, 405:14, 405:24, 405:25, 406:9, 406:22, 406:23, 406:25, 408:23, 408:24, 409:12, 411:7, 411:25, 413:7, 413:15, 418:3, 419:20, 425:5, 425:21, 427:11, 427:14, 429:19, 429:20, 430:11, 431:25, 432:3, 432:4, 432:20, 433:7, 434:11, 435:13, 436:1, 436:2, 443:19, 443:22, 447:25, 448:4, 448:8, 448:12,

448:13, 448:17,
448:22, 449:11,
449:18, 449:22,
450:5, 450:9,
450:13, 450:25,
451:6, 451:13,
451:17, 452:18,
453:6, 453:11,
453:23, 454:1,
454:2, 454:12,
454:23, 455:2,
455:3, 455:10,
456:13, 457:7,
457:8, 457:11,
457:25, 458:14,
458:15, 458:20,
459:13, 460:3,
461:19, 461:22,
462:3, 462:10,
462:13, 462:19,
463:9, 463:23,
464:3, 464:23,
465:4, 465:8, 466:8,
466:17, 466:20,
467:1, 470:18
**Correct** [1] - 425:6
**correcting** [1] - 449:2
**costs** [1] - 418:14
**counsel** [3] - 342:16,
398:23, 419:21
**counter** [1] - 441:9
**countless** [1] - 450:14
**country** [1] - 456:9
**couple** [6] - 331:5,
342:5, 370:11,
418:4, 419:2, 432:25
**course** [5] - 354:2,
402:21, 428:18,
430:14, 430:17
**courses** [1] - 365:8
**Court** [16] - 344:9,
364:20, 385:19,
398:22, 399:4,
399:21, 400:4,
401:18, 417:24,
439:18, 449:8,
470:16, 470:17,
470:17, 470:22,
470:22
**court** [4] - 386:23,
386:25, 448:24,
449:7
**COURT** [101] - 322:1,
323:13, 325:4,
325:7, 325:10,
325:19, 326:15,
329:16, 330:7,
332:7, 332:10,
332:18, 333:5,
335:7, 335:12,

340:16, 341:25,
342:11, 342:16,
342:18, 342:24,
343:8, 343:12,
343:22, 343:25,
344:2, 344:7,
344:17, 344:23,
345:2, 345:8,
345:14, 345:17,
363:5, 363:7,
363:21, 364:14,
364:17, 364:20,
374:5, 379:22,
384:6, 385:6,
385:14, 385:17,
385:21, 385:24,
386:2, 394:16,
397:20, 398:4,
398:13, 398:21,
400:2, 400:25,
401:3, 401:11,
401:20, 402:1,
402:4, 402:9,
402:12, 404:5,
410:4, 410:6,
410:18, 413:20,
414:5, 414:22,
415:9, 416:9,
416:17, 416:21,
417:1, 417:4, 417:8,
417:14, 417:16,
418:9, 419:24,
420:19, 422:5,
422:7, 422:10,
422:13, 438:12,
438:15, 439:16,
439:18, 439:21,
446:3, 447:4, 447:9,
464:12, 465:12,
468:24, 469:1,
469:8, 469:15,
470:1, 470:10
**Court's** [1] - 398:21
**courtroom** [8] - 325:9,
342:22, 385:8,
385:16, 385:23,
464:5, 468:16,
470:12
**cover** [4] - 325:14,
325:15, 398:9,
453:16
**covered** [2] - 417:1,
449:10
**covers** [4] - 367:10,
367:17, 368:25,
369:20
**CRAFT** [1] - 322:16
**crash** [1] - 362:7
**created** [1] - 366:5
**creates** [1] - 442:7

**credibility** [1] - 344:11
**critical** [1] - 414:3
**CROSS** [6] - 324:7,
324:13, 324:18,
335:15, 386:3,
447:13
**cross** [8] - 385:12,
385:17, 385:25,
416:9, 416:10,
416:25, 417:1, 447:7
**CROSS-
EXAMINATION** [6] -
324:7, 324:13,
324:18, 335:15,
386:3, 447:13
**cross-examination** [1]
- 385:25
**cross-examined** [1] -
385:12
**CRR** [2] - 323:13,
470:21
**CSO** [1] - 470:8
**CT** [2] - 340:6, 340:13
**current** [3] - 423:7,
425:8, 463:17
**customer** [2] - 460:14
**customers** [2] - 443:9,
460:9
**cut** [1] - 447:9
**cutting** [1] - 430:1
**CV** [1] - 439:24

# D

**D-a-v-i-s** [1] - 326:13
**dad** [1] - 331:5
**daily** [2] - 376:9,
412:20
**damage** [2] - 352:9,
352:12
**damaged** [3] - 338:6,
338:13, 338:17
**dangerousness** [1] -
457:7
**data** [91] - 365:8,
365:9, 365:17,
366:20, 366:21,
369:15, 370:3,
370:10, 370:23,
371:12, 371:17,
372:9, 372:10,
372:12, 372:17,
372:22, 378:15,
378:24, 379:6,
379:16, 379:17,
380:20, 381:10,
381:15, 381:18,
381:19, 381:22,
382:5, 382:12,

382:14, 382:16,
383:17, 386:17,
388:15, 389:2,
389:9, 390:19,
390:24, 391:6,
391:17, 391:21,
391:22, 392:1,
392:11, 392:12,
392:21, 392:23,
393:1, 393:8, 393:9,
393:12, 394:2,
394:19, 394:20,
395:2, 395:3,
395:10, 396:1,
396:2, 397:12,
406:17, 411:25,
412:5, 413:13,
413:14, 413:17,
418:1, 419:3, 419:7,
419:11, 419:15,
419:22, 420:2,
420:4, 420:5, 420:6,
420:9, 420:13,
420:24, 421:2,
421:7, 421:22,
421:24
**database** [21] - 370:2,
371:2, 371:6,
371:13, 371:16,
371:18, 391:10,
391:11, 391:14,
391:16, 391:17,
391:19, 391:23,
392:2, 392:25,
393:10, 393:23,
393:24, 419:1,
453:18
**dataset** [9] - 373:6,
373:11, 373:12,
373:18, 393:16,
393:20, 393:21,
394:8, 394:9
**date** [8] - 327:16,
340:14, 357:3,
371:22, 405:4,
418:24, 467:13,
467:20
**dates** [2] - 418:25,
423:22
**daughter** [2] - 326:20,
327:15
**Davis** [9] - 325:18,
325:19, 325:21,
325:22, 326:12,
326:13, 327:10,
330:15, 335:17
**DAVIS** [1] - 326:7
**DAVIS.......................
................... [1] -
324:5

**DAY** [1] - 322:11
**days** [11] - 369:5,
369:6, 369:8,
370:18, 370:20,
375:21, 388:18,
421:3, 432:16,
460:12
**dead** [1] - 421:5
**deal** [2] - 342:21,
391:1
**dealer** [1] - 373:4
**dealing** [2] - 401:4,
416:11
**deals** [1] - 416:8
**decades** [1] - 370:11
**decal** [1] - 445:9
**December** [9] -
327:13, 340:6,
340:7, 340:12,
357:2, 360:8, 360:9,
376:12, 378:4
**decide** [2] - 400:8,
440:18
**decided** [4] - 389:25,
409:1, 429:24,
436:17
**decision** [10] - 365:18,
400:21, 427:25,
428:19, 430:10,
436:17, 436:18,
436:20, 436:22,
437:3
**decision-making** [2] -
436:20, 436:22
**decisions** [2] -
393:22, 428:10
**declaration** [5] -
425:24, 426:3,
429:4, 431:3, 435:7
**decline** [1] - 378:25
**decrease** [2] - 379:11,
381:13
**defective** [9] - 393:18,
401:7, 401:13,
401:21, 401:22,
402:5, 402:18,
403:1, 403:2
**defendant** [4] - 346:1,
418:5, 448:22,
468:17
**DEFENDANT** [1] -
323:3
**defendants** [6] -
345:9, 345:11,
389:25, 448:15,
448:25, 469:22
**definitely** [1] - 393:19
**degradation** [1] -
379:9
**degree** [3] - 348:25,

349:3, 349:8
**degrees** [1] - 413:10
**delivered** [3] - 445:17,
458:2, 459:20
**delivery** [1] - 452:8
**demographics** [2] -
437:24, 438:1
**demonstrated** [1] -
398:16
**DENNIS** [1] - 322:23
**department** [4] -
347:13, 409:5,
423:18, 440:8
**Department** [1] -
366:4
**deployed** [1] - 432:15
**deposed** [1] - 343:21
**DEPOSITION** [2] -
324:9, 324:15
**deposition** [14] -
335:19, 337:6,
342:14, 344:13,
345:13, 345:23,
355:19, 387:15,
387:16, 446:17,
453:12, 453:21,
457:9, 466:7
**Deposition** [2] -
422:15, 438:11
**depression** [1] -
335:23
**deputy** [3] - 423:5,
423:9, 432:25
**DEPUTY** [8] - 326:2,
326:10, 363:8,
363:16, 417:3,
417:5, 438:20, 439:3
**derived** [1] - 448:3
**describe** [4] - 328:16,
330:3, 330:15,
377:14
**described** [4] - 336:5,
337:15, 339:8,
459:24
**description** [1] -
431:10
**design** [3] - 415:22,
415:23, 463:13
**DESIGN** [1] - 322:9
**Design** [41] - 343:4,
344:1, 344:14,
346:2, 346:5, 347:7,
347:14, 348:3,
348:6, 348:13,
351:15, 353:17,
354:3, 354:6, 354:9,
354:13, 354:18,
354:22, 355:6,
355:15, 371:7,
371:19, 371:20,

371:25, 373:2,
373:17, 377:3,
419:11, 419:12,
419:15, 420:10,
444:23, 445:23,
447:18, 457:6,
460:6, 460:11,
460:15, 465:18,
468:13, 469:20
**Design's** [3] - 352:18,
359:8, 461:6
**designated** [1] - 343:3
**designed** [2] - 412:17,
450:7, 463:12
**Designs** [1] - 373:3
**designs** [1] - 450:15
**desk** [1] - 433:9
**detect** [1] - 352:15
**detecting** [1] - 384:15
**detection** [1] - 384:12
**detects** [1] - 384:16
**determine** [10] -
354:3, 358:6,
365:20, 370:21,
371:24, 372:18,
383:7, 392:14,
401:6, 431:12
**determined** [2] -
357:2, 431:20
**determining** [2] -
424:24, 442:14
**DeVany** [2] - 377:16,
377:22
**develop** [4] - 368:22,
370:7, 406:12,
428:25
**developed** [1] -
407:22
**devices** [1] - 394:22
**diagnosed** [1] - 333:9
**diagnosis** [1] - 330:9
**dictate** [2] - 402:5,
402:17
**die** [1] - 454:13
**died** [2] - 339:23,
454:17
**difference** [2] -
367:12, 415:15
**different** [17] - 329:25,
330:16, 353:1,
353:2, 353:9,
353:10, 368:25,
371:3, 371:7,
371:13, 373:18,
375:11, 377:9,
386:16, 396:22,
417:25, 455:20
**differently** [2] - 397:2,
435:5
**digressing** [1] -

410:11
**DIRE** [2] - 324:11,
363:22
**direct** [7] - 397:18,
398:17, 398:23,
399:16, 400:14,
404:3, 451:7
**DIRECT** [6] - 324:6,
324:12, 324:17,
326:16, 364:22,
439:7
**directed** [3] - 351:21,
382:19, 440:9
**directly** [3] - 393:2,
410:7, 424:1
**director** [4] - 422:25,
423:2, 423:5, 423:9
**disagreement** [1] -
456:3
**disaster** [3] - 422:22,
426:21, 437:6
**discuss** [4] - 329:7,
329:8, 385:10, 470:5
**discussed** [3] -
332:22, 432:3, 469:2
**discussing** [1] - 381:2
**discussion** [9] -
331:1, 346:20,
355:17, 410:21,
429:13, 438:3,
438:4, 464:8, 464:19
**discussions** [3] -
436:25, 437:23,
438:1
**disease** [1] - 366:14
**Disease** [6] - 366:16,
368:18, 378:4,
392:24, 416:3,
417:19
**display** [1] - 464:20
**displayed** [2] - 463:1,
463:4
**dispute** [1] - 411:11
**distance** [6] - 396:3,
396:6, 396:8, 396:9,
396:13, 396:14
**distances** [1] - 396:12
**distant** [1] - 369:24
**distinguish** [1] - 389:3
**distracted** [1] - 411:2
**distributed** [1] - 431:4
**distribution** [3] -
373:25, 375:1, 375:7
**distributions** [1] -
394:5
**DISTRICT** [3] - 322:1,
322:1, 322:13
**district** [2] - 394:6,
394:7
**District** [3] - 470:17,

470:22
**divide** [1] - 372:9
**divided** [1] - 383:16
**division** [7] - 357:23,
422:25, 423:2,
423:3, 423:4, 423:5,
423:9
**divisions** [1] - 374:9
**dizziness** [5] - 335:1,
335:4, 341:8,
341:12, 341:16
**dizzy** [1] - 334:11
**DOCKET** [2] - 322:5,
322:8
**doctor** [19] - 330:8,
331:3, 331:6,
331:10, 335:6,
339:3, 339:4, 339:6,
339:7, 339:8,
339:10, 340:24,
341:2, 364:2,
449:17, 467:21
**Doctor** [9] - 422:7,
447:21, 451:7,
451:10, 459:10,
460:18, 465:6,
467:8, 470:1
**doctors** [1] - 334:1
**Document** [1] -
398:22
**DOCUMENT** [1] -
322:7
**document** [13] -
404:18, 404:21,
404:22, 404:25,
405:16, 408:16,
409:22, 416:2,
416:13, 424:8,
462:12, 464:18,
464:21
**documentation** [5] -
346:24, 347:2,
353:15, 392:4,
392:11
**documents** [2] -
356:1, 356:4
**DOMINION** [1] -
322:17
**done** [21] - 340:24,
341:3, 378:10,
379:8, 382:6,
387:13, 388:10,
388:16, 394:24,
417:25, 418:23,
420:4, 420:8,
420:22, 430:13,
447:8, 450:11,
450:13, 450:14,
460:17, 461:10
**door** [2] - 339:21,

342:7
**doors** [1] - 432:9
**dosages** [1] - 455:4
**dose** [2] - 454:4, 454:5
**dots** [1] - 406:20
**double** [1] - 417:8
**down** [15] - 326:19,
342:11, 372:2,
385:4, 386:11,
386:20, 396:8,
396:9, 396:25,
400:18, 412:8,
422:7, 433:9,
459:11, 470:1
**dozens** [3] - 393:21,
393:22
**Dr** [18] - 363:25,
364:20, 369:22,
385:24, 386:5,
402:22, 403:18,
404:16, 409:25,
411:6, 413:23,
439:9, 439:24,
444:16, 447:15,
464:6, 464:18,
464:19
**draw** [1] - 405:14
**drawings** [2] - 415:22,
415:23
**drawn** [1] - 403:19
**drew** [2] - 406:7,
464:22
**drink** [4] - 454:11,
454:12, 454:16,
466:3
**DRIVE** [1] - 322:17
**due** [2] - 338:6, 419:9
**duly** [2] - 326:8,
363:14, 439:1
**DUPLASS** [1] - 323:7
**during** [13] - 328:6,
328:13, 343:17,
350:5, 350:15,
351:16, 351:25,
354:2, 402:21,
421:3, 432:23,
433:7, 461:14
**duties** [1] - 432:24

**E**

**e-mail** [4] - 428:2,
428:8, 428:9, 430:12
**EARLINE** [1] - 322:9
**Earline** [2] - 444:17,
466:12
**early** [10] - 331:20,
375:21, 381:24,
382:9, 421:3,

421:13, 421:19, 426:11, 444:9
**earned** [2] - 448:5, 448:6
**EASTERN** [1] - 322:1
**Eastern** [1] - 470:17
**economic** [1] - 437:20
**economy** [1] - 437:21
**edit** [1] - 440:12
**educate** [2] - 452:11, 452:16
**effect** [4] - 355:10, 388:7, 394:4, 437:23
**effects** [3] - 406:5, 406:9, 441:19
**EHU** [2] - 431:5, 431:7
**EHU's** [1] - 427:17
**EHUs** [10] - 423:25, 424:10, 426:4, 426:7, 426:10, 427:2, 431:18, 431:23, 431:24
**eight** [6] - 395:24, 407:4, 407:20, 408:6, 408:7, 409:19
**eight-hour** [4] - 407:4, 407:20, 408:6, 409:19
**eighth** [1] - 353:4
**either** [12] - 333:5, 343:23, 383:21, 399:8, 410:21, 411:2, 422:5, 425:7, 428:3, 447:10, 448:25, 459:12
**elaborate** [1] - 426:9
**electric** [3] - 360:2, 360:3
**electrical** [1] - 441:4
**electricity** [1] - 443:5
**elicit** [1] - 345:12
**Elkhart** [5] - 347:20, 347:23, 348:7, 352:19, 357:19
**emergency** [10] - 422:23, 424:19, 426:1, 426:5, 435:15, 435:20, 435:22, 436:7, 436:13, 437:5
**emeritus** [1] - 440:6
**emissions** [3] - 415:12, 415:13, 415:15
**emits** [1] - 465:25
**emitted** [1] - 421:11
**emitting** [3] - 354:1, 362:25, 463:3
**employed** [3] - 348:4, 422:21, 458:17

**employee** [1] - 422:22
**employees** [4] - 348:12, 354:3, 355:14, 365:23
**employer** [1] - 365:21
**employment** [2] - 361:20, 362:3
**en** [1] - 356:12
**end** [9] - 331:11, 331:15, 375:16, 396:22, 423:22, 432:23, 433:5, 441:17, 460:9
**ended** [1] - 433:2, 450:17, 467:14
**ends** [1] - 391:17
**Enforcement** [1] - 362:2
**engaged** [1] - 403:5
**ENGELHARDT** [1] - 322:12
**engineer** [2] - 357:21, 449:11
**engineering** [7] - 348:25, 349:9, 349:10, 349:11, 352:15, 379:9, 379:10
**engineers** [1] - 370:7
**enhanced** [1] - 389:7
**enlarged** [1] - 404:21
**enterprise** [1] - 423:7
**Enterprises** [9] - 346:16, 350:2, 350:5, 350:7, 350:10, 350:25, 357:22, 361:21, 362:4
**enters** [2] - 325:9, 385:23
**entire** [4] - 349:11, 350:25, 367:19, 414:2
**entirely** [2] - 378:19, 396:21
**entities** [1] - 459:22
**entitled** [1] - 470:19
**entity** [1] - 459:20
**environment** [2] - 368:3, 440:21
**environmental** [2] - 380:20, 396:1
**Environmental** [2] - 368:22, 377:19
**environments** [1] - 441:4
**envisioned** [1] - 436:6
**EPA** [5] - 368:22, 384:13, 428:24, 430:19, 432:8

**epidemiological** [2] - 366:19, 379:13
**epidemiologist** [1] - 369:22
**epidemiology** [2] - 369:21, 369:23
**equations** [1] - 370:7
**error** [1] - 467:25
**errors** [3] - 393:24, 394:3, 394:9
**ESQUIRE** [7] - 322:17, 322:23, 323:3, 323:4, 323:4, 323:8, 323:8
**essence** [1] - 375:6
**essentially** [1] - 428:2
**establish** [3] - 398:25, 399:9, 400:7
**established** [2] - 399:12, 457:10
**establishes** [1] - 404:18
**establishment** [1] - 399:14
**estimate** [9] - 370:8, 379:5, 383:4, 383:6, 383:8, 388:17, 412:17, 420:14, 420:16
**estimated** [1] - 372:20
**estimates** [2] - 372:19, 382:22
**et** [1] - 461:15
**ethnicities** [1] - 394:6
**ethyl** [3] - 451:21, 452:19, 452:22
**evaluate** [1] - 379:6
**evaluating** [1] - 365:2
**evaluation** [1] - 366:18
**event** [1] - 433:4
**eventually** [3] - 433:2, 433:16, 438:8
**everywhere** [1] - 456:5
**evidence** [8] - 399:22, 403:4, 416:3, 416:15, 417:3, 417:4, 417:12, 465:10
**evident** [1] - 352:11
**exact** [2] - 375:13, 398:9
**exactly** [13] - 329:21, 334:16, 336:16, 339:18, 353:3, 355:24, 376:2, 390:17, 391:5, 392:14, 401:3, 401:15, 425:23

**examination** [2] - 385:25, 398:23
**EXAMINATION** [46] - 324:6, 324:7, 324:8, 324:11, 324:12, 324:13, 324:14, 324:17, 324:18, 324:19, 326:16, 329:19, 330:13, 332:13, 332:20, 333:7, 335:15, 340:17, 342:3, 363:22, 364:22, 379:23, 386:3, 403:16, 404:6, 410:14, 411:4, 413:24, 414:9, 414:25, 415:18, 417:17, 418:10, 419:25, 421:14, 439:7, 439:22, 446:4, 447:13, 464:16, 465:13, 467:11, 468:4, 469:5, 469:10, 469:18
**EXAMINATIONS** [1] - 324:3
**examine** [1] - 445:7
**examined** [4] - 326:9, 363:15, 385:12, 439:2
**example** [14] - 368:8, 374:22, 381:25, 391:20, 392:11, 393:25, 407:19, 435:22, 442:23, 443:5, 444:12, 451:19, 451:25, 458:22
**examples** [1] - 451:18
**exceeded** [2] - 407:5, 412:5
**except** [3] - 387:23, 450:4, 455:11
**exception** [3] - 359:21, 378:7, 450:19
**excess** [4] - 365:23, 465:20, 466:4, 467:6
**exchange** [2] - 441:15, 445:16
**exclusively** [2] - 448:16, 448:18
**excuse** [2] - 334:2, 370:14
**Excuse** [1] - 326:25
**executive** [3] - 422:24, 423:17, 423:18
**exercise** [3] - 369:18,

390:18, 403:5
**exhibit** [2] - 417:4, 417:12
**Exhibit** [8] - 404:8, 404:23, 406:1, 408:13, 416:3, 417:3, 435:8, 464:11
**exist** [5] - 365:23, 442:10, 442:14, 442:18, 453:23
**existed** [1] - 426:17
**existing** [1] - 424:1
**exists** [3] - 417:21, 421:9, 463:15
**expect** [3] - 443:8, 459:11, 459:12
**expected** [1] - 369:10
**expects** [1] - 398:22
**experience** [3] - 345:19, 350:1, 360:13
**experienced** [1] - 328:17
**expert** [34] - 343:4, 343:7, 343:8, 343:13, 343:22, 343:25, 344:2, 344:8, 344:9, 344:10, 344:14, 344:19, 344:21, 345:2, 345:9, 345:14, 361:5, 364:21, 384:11, 390:3, 393:11, 403:4, 417:11, 439:12, 439:19, 443:16, 448:20, 449:8, 449:11, 449:19, 456:2, 463:7, 464:6, 468:17
**expert's** [1] - 403:6
**expertise** [12] - 364:15, 388:23, 424:2, 424:7, 424:13, 424:15, 424:18, 424:24, 425:14, 426:23, 443:19
**experts** [9] - 390:4, 390:8, 390:14, 390:16, 390:24, 391:6, 402:23, 454:22, 456:4
**experts'** [1] - 390:11
**explain** [8] - 358:25, 361:18, 368:14, 369:19, 374:1, 375:9, 383:1, 451:11
**explained** [1] - 395:16
**explaining** [1] -

9

420:19
**explosive** [1] - 453:2
**exposed** [7] - 368:4,
369:24, 452:22,
455:9, 455:13,
465:7, 465:15
**exposure** [41] -
365:14, 365:20,
365:22, 366:14,
367:8, 367:10,
367:12, 367:13,
367:14, 367:16,
368:5, 368:7, 369:4,
369:7, 369:16,
369:19, 369:25,
370:2, 370:19,
372:20, 376:7,
379:3, 380:17,
398:20, 403:21,
403:23, 404:11,
404:13, 406:4,
406:11, 407:23,
408:1, 408:6,
409:12, 412:17,
420:7, 420:8,
420:22, 421:1,
421:12, 465:20
**exposures** [31] -
365:3, 365:4,
365:20, 369:7,
369:9, 370:5, 370:8,
370:22, 372:14,
372:20, 373:25,
374:19, 374:20,
375:7, 376:9,
378:21, 378:25,
379:4, 379:5, 379:7,
379:11, 380:14,
380:15, 381:13,
388:17, 412:15,
412:16, 421:3,
421:10, 421:13
**extensive** [1] - 464:19
**extent** [1] - 332:11
**external** [1] - 430:2
**extract** [3] - 365:17,
371:20, 404:24
**extracted** [1] - 373:8
**extrapolate** [1] -
420:15
**extrapolating** [1] -
370:24
**extrapolation** [1] -
420:18
**extreme** [1] - 465:22
**eye** [2] - 381:3, 443:14
**eyes** [2] - 382:1, 382:2

# F

**face** [12] - 347:16,
347:18, 458:19,
460:3, 460:23, 461:3
**face-to-face** [5] -
347:16, 458:19,
460:3, 460:23, 461:3
**facility** [5] - 348:7,
348:14, 351:18,
351:21
**fact** [29] - 325:20,
325:25, 340:5,
343:5, 343:15,
344:10, 347:2,
351:25, 355:2,
356:7, 357:5, 379:1,
393:7, 395:7, 405:3,
405:4, 413:5,
432:13, 440:18,
446:9, 448:21,
449:25, 453:19,
456:8, 456:12,
457:17, 466:8,
466:12, 467:24
**factor** [2] - 374:10,
374:15
**factors** [2] - 403:11,
444:21
**factory** [1] - 368:3
**facts** [1] - 459:10
**faculty** [1] - 440:3
**failure** [3] - 399:8,
400:7, 442:13
**fair** [9] - 333:9,
333:25, 348:16,
348:18, 377:22,
382:5, 382:14,
420:21, 443:16
**fairly** [3] - 381:24,
393:23, 394:8
**fallen** [1] - 359:6
**familiar** [5] - 350:25,
351:3, 444:13,
444:14, 451:19
**familiarize** [1] -
392:10
**family** [2] - 327:21,
342:21
**fan** [1] - 429:25
**fans** [9] - 429:7, 429:8,
429:12, 429:15,
429:18, 430:8,
430:9, 432:2, 432:8
**far** [9] - 359:5, 363:2,
406:15, 421:3,
421:12, 421:13,
437:21, 449:1, 467:5
**fashion** [1] - 398:15,

445:24
**fault** [1] - 442:12
**fault-free** [1] - 442:12
**faulty** [1] - 373:15
**favor** [1] - 453:22
**fear** [5] - 340:2, 340:3,
340:5, 340:12,
340:20
**February** [1] - 431:16
**federal** [5] - 366:4,
417:21, 428:15,
462:25, 463:7
**Federal** [6] - 358:18,
408:22, 412:23,
464:2, 464:9, 464:21
**feelings** [1] - 332:6
**FELIPE** [1] - 322:24
**FEMA** [49] - 322:4,
328:6, 328:10,
328:14, 328:17,
340:19, 340:22,
348:2, 351:13,
351:18, 356:13,
359:21, 378:2,
416:4, 419:7,
422:21, 424:1,
424:3, 424:6, 424:7,
424:9, 424:12,
424:14, 425:13,
425:14, 425:24,
426:4, 426:7,
426:22, 428:1,
428:6, 429:5, 431:4,
431:17, 431:24,
432:2, 433:9,
433:12, 434:3,
435:17, 436:6,
446:11, 453:5,
455:8, 457:17,
458:2, 458:3,
459:12, 459:21
**FEMA's** [6] - 435:13,
436:3, 436:10,
436:12, 459:13
**FEMA-specific** [1] -
359:21
**FEMA/CDC** [3] -
377:17, 378:2,
378:11
**female** [1] - 367:15
**fence** [1] - 441:4
**few** [5] - 373:25,
379:25, 392:12,
393:4, 394:9
**fewer** [2] - 369:5,
383:20
**field** [15] - 343:13,
344:3, 345:15,
345:19, 349:11,
364:17, 364:21,

364:24, 365:9,
371:12, 388:24,
389:9, 419:12,
433:3, 439:19
**fields** [3] - 371:14,
371:15, 439:12
**Fifth** [1] - 326:23
**Figure** [1] - 377:2
**figure** [2] - 377:3,
397:1
**figured** [1] - 402:15
**figuring** [1] - 331:17
**file** [2] - 371:21,
391:20
**files** [2] - 391:22,
393:3
**filled** [2] - 466:15,
466:16
**filters** [1] - 430:5
**Final** [1] - 416:4
**final** [1] - 417:19
**findings** [1] - 358:9
**fine** [5] - 335:8,
344:22, 345:4,
402:2, 402:7
**fingers** [1] - 442:25
**finish** [4] - 385:12,
447:11, 464:15,
469:16
**Fire** [2] - 362:10,
362:20
**fire** [2] - 362:11, 453:2
**firm** [1] - 346:12
**first** [22] - 326:8,
340:5, 340:11,
344:17, 346:4,
349:19, 355:21,
363:14, 375:17,
379:25, 381:17,
381:19, 382:6,
401:11, 404:11,
405:6, 405:17,
409:4, 416:20,
439:1, 462:16, 468:6
**fish** [2] - 388:1, 465:19
**fit** [4] - 396:25, 438:13,
450:12, 459:3
**five** [5] - 395:24,
398:18, 399:23,
400:6, 464:15
**Fleetwood** [17] -
346:16, 350:2,
350:5, 350:7,
350:10, 350:25,
351:3, 351:6, 355:2,
357:22, 361:21,
362:4, 468:18,
468:20, 469:1,
469:3, 469:22
**Flint** [1] - 349:7

**flood** [1] - 338:6
**flooded** [1] - 338:1
**flyer** [4] - 446:21,
453:9, 453:14
**flyers** [3] - 446:15,
446:19, 453:5
**focused** [1] - 384:2
**fold** [1] - 431:14
**follow** [3] - 372:25,
395:6, 396:12
**followed** [1] - 349:19
**following** [1] - 462:25
**follows** [3] - 326:9,
363:15, 439:2
**food** [1] - 470:7
**FOR** [2] - 322:16,
323:3
**foregoing** [1] - 470:18
**Forest** [1] - 398:25
**forest** [1] - 381:22
**forgot** [1] - 334:16
**form** [3] - 392:14,
445:24, 458:18
**Formaldehyde** [1] -
416:4
**formaldehyde** [105] -
331:12, 354:1,
354:17, 354:20,
354:23, 354:24,
355:3, 355:10,
355:16, 356:8,
356:10, 357:6,
357:14, 357:17,
357:23, 357:24,
360:11, 360:15,
360:25, 361:6,
362:25, 366:15,
368:23, 369:16,
374:7, 376:10,
380:12, 381:11,
381:16, 384:9,
384:16, 388:8,
389:11, 389:17,
390:7, 394:23,
399:7, 399:11,
403:21, 405:24,
409:6, 409:12,
415:17, 417:20,
417:21, 418:16,
418:17, 419:13,
421:10, 425:10,
429:10, 431:4,
431:5, 431:6, 431:7,
431:9, 431:18,
431:22, 433:8,
433:13, 433:14,
433:18, 433:24,
434:10, 435:4,
443:13, 443:24,
444:2, 444:11,

444:17, 444:22,
444:24, 445:4,
445:13, 445:15,
445:17, 445:20,
448:10, 450:4,
451:11, 454:21,
455:7, 455:9,
455:16, 456:5,
456:8, 456:17,
457:1, 457:7, 461:4,
461:11, 463:3,
463:16, 463:18,
463:20, 465:3,
465:8, 465:16,
465:20, 466:1,
466:4, 467:5, 467:7,
468:20, 469:21
**FORMALDEHYDE** [1]
- 322:4
**formaldehyde-
containing** [1] -
357:24
**formaldehyde-
emitting** [3] - 354:1,
362:25, 463:3
**format** [1] - 376:2
**forms** [1] - 441:11
**FORTE** [1] - 323:3
**forth** [6] - 365:18,
367:19, 367:20,
371:23, 394:7,
459:22
**forward** [1] - 428:11
**foundation** [1] - 415:6
**four** [19] - 361:21,
372:1, 380:1, 380:4,
384:23, 389:20,
393:16, 393:17,
395:24, 418:19,
418:23, 419:19,
420:2, 421:6,
421:11, 421:23,
432:23, 448:21,
466:1
**FOUR** [1] - 322:17
**four-month** [1] -
432:23
**fourth** [1] - 375:18
**fraction** [2] - 382:23,
383:4
**frame** [6] - 352:5,
352:9, 352:11,
352:16, 356:22,
421:4
**frames** [1] - 368:25,
420:11
**frankly** [1] - 430:18
**free** [1] - 442:12
**frequently** [4] -
327:24, 331:2,

379:2, 395:19
**fried** [1] - 388:1
**front** [3] - 355:6,
400:4, 431:15
**fulfilled** [1] - 336:25
**full** [5] - 345:24, 367:5,
369:8, 405:18,
422:17
**fully** [2] - 368:2,
398:22
**function** [1] - 442:22
**functions** [1] - 368:20
**funding** [1] - 428:21
**funny** [2] - 329:12,
329:13
**furnish** [1] - 346:24
**future** [1] - 437:24

# G

**gained** [1] - 391:12
**gamut** [1] - 367:19
**gap** [1] - 436:7
**Garrison** [1] - 335:13
**GARRISON** [12] -
323:3, 323:3,
329:15, 330:4,
332:5, 332:17,
335:14, 335:16,
340:15, 340:18,
341:23, 398:2
**GARRISON...............
......** [1] - 324:7
**gas** [8] - 356:8, 356:9,
381:16, 444:4,
451:22, 452:1,
453:2, 453:4
**gasses** [4] - 365:5,
365:13, 381:11,
381:12
**gassing** [14] - 355:18,
355:22, 355:24,
355:25, 357:6,
360:25, 361:6,
381:14, 381:23,
381:24, 382:2,
384:24, 418:16,
418:21
**gathered** [3] - 390:24,
391:6, 391:8
**Gaume** [1] - 348:19
**GAUME** [1] - 348:19
**general** [12] - 348:7,
367:11, 367:13,
367:16, 367:17,
367:25, 368:6,
368:8, 368:10,
388:20, 429:22,
454:5

**General** [3] - 349:4,
349:14, 460:11
**general's** [1] - 467:22
**generally** [8] - 381:13,
425:9, 427:3, 427:4,
427:5, 427:6,
427:18, 435:6
**generated** [1] - 368:4
**generic** [1] - 402:8
**gentleman** [2] -
348:18, 447:7
**gentleman's** [1] -
347:10
**George** [1] - 347:11
**given** [7] - 379:5,
379:18, 399:19,
400:9, 418:22,
420:4, 455:2
**GLASS** [1] - 323:8
**globo** [1] - 356:12
**God** [3] - 326:5,
363:11, 438:23
**going-in** [1] - 436:16
**goodness** [1] - 386:11
**governing** [1] - 358:20
**government** [1] -
358:23, 367:6,
368:17, 370:15,
375:24, 377:24,
383:19, 391:2,
407:11, 408:20,
409:1, 410:1,
433:18, 433:22
**government's** [1] -
378:10
**Governmental** [1] -
367:6
**governmental** [1] -
391:21, 411:6,
433:14
**graduate** [2] - 440:9,
440:10
**grand** [1] - 327:18
**grandsons** [1] -
327:19
**granting** [1] - 400:4
**graph** [3] - 367:10,
373:12, 374:1
**graphs** [2] - 366:22,
372:11
**greater** [4] - 372:14,
375:4, 375:6, 383:3
**green** [3] - 411:19,
413:2, 413:14
**grew** [1] - 327:9
**grey** [1] - 360:1
**ground** [2] - 325:14,
452:1
**grounds** [1] - 399:9
**Group** [2] - 377:20,

390:17
**group** [2] - 367:25
**grow** [2] - 326:22,
443:4
**growing** [2] - 327:4,
444:14
**GUERRA** [1] - 322:16
**guess** [6] - 341:14,
374:6, 400:3,
415:12, 456:20
**guideline** [6] - 368:14,
369:4, 369:9,
374:19, 384:21,
385:1
**guidelines** [4] - 368:9,
368:10, 405:3,
406:14
**Gulf** [1] - 432:14

# H

**H-e-w-e-t-t** [1] -
363:19
**habitable** [9] - 424:3,
424:8, 424:22,
424:25, 425:14,
426:5, 426:8,
426:14, 426:20
**Hale** [1] - 470:7
**half** [17] - 376:24,
378:13, 378:17,
380:8, 380:11,
382:6, 382:10,
384:18, 421:16,
421:24
**Hamilton** [1] - 366:10
**hand** [4] - 326:3,
354:15, 363:9,
438:21
**handful** [1] - 448:7
**handicap** [1] - 337:9
**handler** [2] - 328:4,
328:5
**hard** [2] - 330:21,
375:15
**hardware** [1] - 441:1
**harm** [1] - 428:4
**harmless** [1] - 454:11
**hate** [1] - 380:19
**haul** [1] - 427:5
**hazard** [21] - 366:18,
439:12, 439:20,
439:21, 442:5,
442:11, 442:20,
442:22, 443:1,
443:14, 443:20,
443:24, 444:2,
444:3, 444:10,
444:12, 444:13,

444:24, 446:12,
459:9, 463:16
**hazardous** [3] -
453:25, 454:4, 454:5
**hazards** [7] - 442:9,
442:11, 442:14,
442:18, 445:5,
453:23, 463:18
**headed** [4] - 330:21,
330:23, 330:24,
334:12
**headquartered** [1] -
359:4
**Health** [5] - 366:2,
366:4, 366:6, 367:1,
368:11
**health** [17] - 334:17,
337:1, 337:2,
367:18, 405:3,
406:5, 406:9, 431:5,
431:9, 434:9,
443:13, 444:24,
456:22, 456:23,
459:2, 462:25, 464:1
**healthy** [3] - 367:15,
367:21, 407:4
**hear** [6] - 325:13,
344:18, 345:18,
345:20, 402:21,
446:10
**HEARD** [1] - 322:12
**heard** [14] - 332:25,
333:19, 353:22,
355:21, 374:11,
379:1, 387:23,
402:21, 407:13,
407:16, 407:24,
446:9, 446:11,
455:23
**hearing** [1] - 331:17
**hearsay** [5] - 329:15,
332:5, 332:8, 332:9,
332:17
**heart** [1] - 386:11
**held** [5] - 342:20,
398:1, 416:19,
423:6, 423:10
**help** [4] - 326:5,
363:11, 429:12,
438:23
**helped** [1] - 335:2
**helpful** [1] - 452:15
**hereby** [1] - 470:18
**Hewett** [19] - 363:6,
363:7, 363:18,
363:25, 364:20,
385:11, 385:24,
386:5, 398:23,
399:6, 402:22,
403:18, 404:16,

409:25, 411:6, 413:23, 464:6, 464:18, 464:19
**HEWETT** [1] - 363:13
**HEWETT....................**
**.....................** [1] - 324:10
**hidden** [1] - 443:24, 444:24
**high** [2] - 396:24, 455:8
**higher** [1] - 357:24, 379:19, 379:20, 383:13, 456:9
**highlight** [3] - 403:10, 408:14, 467:16
**highlighted** [1] - 464:25
**highly** [1] - 379:17
**Highway** [1] - 461:23
**hindsight** [1] - 389:15
**hired** [14] - 343:22, 343:25, 344:14, 345:11, 377:23, 378:2, 383:19, 390:2, 390:8, 390:24, 391:7, 391:12, 419:7, 427:5
**histogram** [3] - 373:22, 373:24, 374:21
**history** [3] - 349:12, 350:24, 367:24
**hit** [1] - 432:14
**hoc** [1] - 361:23
**hold** [1] - 447:5
**holding** [3] - 360:1, 372:7
**holes** [1] - 430:1
**Home** [1] - 408:17
**home** [4] - 348:9, 409:7, 438:3, 465:4
**homeowners** [1] - 437:18
**homes** [11] - 368:7, 424:19, 436:15, 436:19, 437:5, 437:8, 437:9, 437:11, 437:18, 438:5
**honest** [1] - 428:13
**Honor** [24] - 326:14, 329:15, 330:4, 330:12, 332:5, 340:15, 342:13, 342:17, 343:2, 363:20, 374:4, 379:21, 384:5, 386:1, 394:15, 397:24, 398:2,

403:15, 418:8, 420:17, 446:2, 465:11, 467:8, 468:3
**HONORABLE** [1] - 322:12
**hook** [1] - 427:8
**hope** [1] - 456:2
**horizontal** [1] - 375:16
**hospital** [3] - 334:19, 334:22, 334:24
**hotels** [1] - 435:16
**hotter** [1] - 357:5
**hour** [7] - 386:15, 407:4, 407:20, 408:6, 409:19, 438:13, 449:3
**hourly** [1] - 386:14
**hours** [1] - 440:8
**house** [9] - 338:1, 338:4, 338:6, 338:9, 338:13, 338:17, 338:22, 351:25, 430:14
**housing** [34] - 350:9, 350:13, 359:12, 409:2, 424:3, 424:8, 424:19, 424:25, 425:14, 425:15, 426:1, 426:5, 426:8, 431:25, 432:25, 433:2, 435:13, 435:20, 435:25, 436:7, 436:8, 436:13, 436:25, 437:4, 437:5, 463:1, 463:2, 463:6, 463:16, 465:6, 469:22
**Houston** [1] - 440:3
**HOUSTON** [1] - 322:24
**HUD** [23] - 401:2, 407:12, 407:13, 407:17, 407:21, 409:10, 409:14, 409:16, 409:17, 411:7, 412:4, 412:8, 412:19, 414:1, 414:11, 414:15, 414:20, 415:7, 415:8, 415:9, 415:12, 415:13, 469:22
**huge** [1] - 391:21
**Human** [1] - 366:5
**hundreds** [1] - 405:2
**hurricane** [4] - 330:17, 338:3, 338:16, 340:8
**Hurricane** [7] - 335:23, 336:1,

337:24, 352:1, 432:14, 437:6
**hygiene** [9] - 364:4, 364:10, 364:18, 364:21, 364:25, 365:1, 365:10, 365:11
**hygienist** [3] - 388:12, 412:22, 449:13
**hygienists** [1] - 365:16
**Hygienists** [1] - 367:6
**hypertension** [3] - 341:9, 341:13, 341:17
**hypothetically** [2] - 395:5, 455:7

---

**I**

---

**i.e** [2] - 399:8, 432:5
**idea** [11] - 357:17, 374:25, 375:7, 380:8, 389:16, 389:23, 390:1, 395:1, 399:20, 419:21, 420:2
**identical** [2] - 384:3, 390:10
**identified** [1] - 355:25
**identify** [2] - 356:12, 419:11
**imagine** [1] - 388:3
**immaterial** [1] - 399:17
**immediate** [3] - 435:15, 437:13, 437:19
**immediately** [1] - 423:19
**impact** [1] - 434:22
**impacted** [3] - 437:11, 437:17, 437:22
**implemented** [2] - 404:1, 407:12
**important** [6] - 414:1, 442:10, 445:3, 458:25, 464:1, 466:19
**impose** [1] - 400:21
**impression** [3] - 330:9, 398:14, 415:11
**improperly** [1] - 393:18
**IN** [1] - 322:4
**inch** [1] - 353:5
**incidentally** [1] - 388:23

**include** [5] - 350:18, 360:18, 360:19, 360:21, 459:5
**included** [2] - 359:25, 436:11
**includes** [2] - 372:11, 382:20
**including** [4] - 354:25, 355:1, 356:9, 429:6
**income** [4] - 448:2, 448:5, 448:6
**incorrect** [2] - 394:2, 407:8
**increase** [1] - 379:11
**increased** [1] - 379:10
**increment** [1] - 374:13
**increments** [3] - 395:23, 395:25, 396:23
**indeed** [1] - 348:4
**Indiana** [3] - 347:20, 347:24, 352:19
**indicate** [2] - 352:8, 384:13
**indicated** [4] - 348:4, 391:1, 392:15, 396:6
**indicating** [2] - 330:20, 334:15
**indicating)** [1] - 330:24
**indicative** [1] - 421:13
**individual** [6] - 366:12, 423:4, 423:10, 423:20, 429:6, 434:18
**individually** [1] - 435:4
**individuals** [8] - 352:18, 367:17, 431:21, 431:24, 434:10, 434:14, 434:22, 434:23
**indoor** [3] - 409:5, 433:14, 465:3
**Industrial** [2] - 367:6, 377:16
**industrial** [12] - 364:4, 364:10, 364:18, 364:21, 364:24, 365:1, 365:10, 365:11, 366:16, 388:12, 412:22, 449:13
**Industry** [9] - 359:3, 359:7, 361:14, 361:16, 361:19, 361:25, 362:5, 362:8, 362:17
**industry** [25] - 343:18, 344:3, 344:25,

345:2, 358:6, 358:24, 358:25, 359:2, 360:13, 360:14, 363:2, 424:4, 425:2, 425:3, 425:5, 425:7, 425:9, 425:15, 425:18, 425:19, 426:14, 426:18, 426:23
**infected** [1] - 334:21
**infection** [5] - 334:15, 334:20, 340:25, 341:3, 341:5
**infer** [1] - 384:15
**infirm** [1] - 367:18
**info** [1] - 423:7
**information** [25] - 346:25, 347:3, 354:15, 378:21, 384:11, 392:15, 406:20, 406:21, 409:14, 428:5, 440:17, 440:20, 440:21, 441:14, 441:15, 443:17, 445:16, 445:19, 454:21, 455:4, 457:6, 459:1, 459:6, 460:10, 460:14
**initial** [6] - 326:13, 346:21, 435:17, 435:19, 436:12, 436:16
**injury** [1] - 454:25
**input** [2] - 351:6, 361:22
**inputted** [2] - 391:18, 391:19
**inserts** [1] - 441:8
**inside** [7] - 356:25, 360:21, 371:6, 394:23, 395:8, 413:10, 444:1
**insofar** [2] - 364:14, 410:21
**inspected** [3] - 344:15, 358:9
**inspection** [4] - 351:16, 352:3, 357:12, 359:5
**inspections** [2] - 359:10
**install** [6] - 427:6, 427:7, 427:10, 430:8, 430:9, 432:2
**installation** [5] - 429:6, 429:8, 429:12, 429:15, 429:18
**installed** [2] - 429:25,

433:5
**installing** [1] - 427:2
**instance** [4] - 351:3, 405:7, 459:24, 465:7
**instead** [3] - 382:1, 395:8, 404:10
**Institute** [2] - 349:4, 366:2
**instruct** [1] - 344:7
**instructed** [2] - 398:3, 428:24
**instruction** [8] - 398:5, 399:5, 399:18, 399:25, 401:9, 401:16, 401:19, 417:24
**instructions** [1] - 403:12
**integrating** [1] - 461:12
**intend** [1] - 325:15
**intended** [3] - 367:14, 369:4, 369:6
**intent** [1] - 383:1
**interaction** [2] - 458:19, 460:3
**intermediate** [1] - 369:7
**interpret** [1] - 455:13
**interpretation** [2] - 366:13, 372:12
**interpreting** [1] - 450:15
**intervals** [3] - 365:18, 372:16, 383:7
**intervened** [2] - 410:20, 410:24
**inventories** [1] - 424:1
**inventory** [1] - 361:2
**investigated** [1] - 430:4
**investigation** [2] - 358:10, 433:21
**invitation** [1] - 414:6
**involved** [11] - 333:22, 350:7, 361:13, 361:16, 362:4, 365:1, 370:11, 427:1, 436:20, 459:23, 462:17
**involvement** [2] - 348:21, 361:18
**involves** [2] - 350:21, 365:12
**involving** [1] - 461:17
**irritant** [1] - 421:25
**irritation** [6] - 381:3, 381:4, 381:25, 443:14, 443:15
**issue** [24] - 329:7,

331:12, 332:2, 332:16, 332:23, 333:9, 384:8, 400:2, 401:13, 402:18, 416:16, 418:14, 428:3, 430:5, 433:13, 433:22, 441:25, 442:7, 445:6, 446:1, 455:20, 468:15, 469:1, 469:3
**issued** [6] - 417:19, 431:16, 457:5, 458:11, 461:18, 461:20
**issues** [9] - 329:22, 427:19, 427:20, 428:21, 435:14, 440:20, 442:2, 442:4, 468:3
**itself** [9] - 352:5, 352:16, 378:1, 382:15, 382:16, 402:14, 420:6, 442:22

**J**

**Janesville** [1] - 447:23
**January** [6] - 378:5, 380:1, 411:11, 411:16, 411:22, 421:6
**Japan** [1] - 362:7
**job** [3] - 350:24, 368:20, 432:24
**jobs** [1] - 370:4
**joined** [1] - 440:3
**joint** [1] - 433:2
**JOSEPH** [1] - 323:8
**Judge** [5] - 333:6, 413:22, 422:6, 439:17, 468:23
**JUDGE** [1] - 322:13
**judge** [3] - 413:18, 416:6, 417:3
**judgment** [1] - 400:4
**July** [2] - 431:4, 446:21
**jurisdiction** [1] - 358:13
**juror** [1] - 398:15
**jury** [37] - 325:8, 327:3, 328:16, 330:3, 330:7, 330:15, 331:3, 332:4, 333:13, 333:19, 334:4, 343:9, 343:13,

343:21, 344:6, 344:7, 344:23, 350:4, 352:12, 353:24, 369:12, 373:21, 385:15, 385:22, 398:6, 398:13, 398:24, 399:5, 399:13, 400:5, 401:5, 401:12, 402:15, 409:1, 439:25, 440:2, 470:11
**JURY** [1] - 322:12
**Justin** [1] - 422:16

**K**

**Katrina** [10] - 335:23, 336:1, 337:24, 352:1, 355:12, 356:5, 432:14, 432:15, 436:4, 437:6
**keep** [1] - 364:11
**keeping** [2] - 388:6
**Ken** [1] - 438:15
**KENNETH** [2] - 324:16, 438:25
**Kenneth** [2] - 438:14, 439:5
**Kentwood** [1] - 454:15
**kept** [5] - 339:13, 373:7, 387:20, 387:21, 387:22
**Kettering** [2] - 349:5, 349:6
**Kevin** [5] - 422:9, 422:10, 422:15, 422:18, 438:11
**KEVIN** [1] - 324:15
**keys** [1] - 458:23
**kids** [1] - 327:18
**kind** [13] - 327:3, 364:11, 368:3, 371:12, 373:4, 388:24, 441:13, 444:12, 444:14, 450:11, 453:2, 454:17, 463:8
**kinds** [3] - 381:5, 441:6, 443:5
**knowledge** [9] - 353:5, 360:17, 363:1, 363:4, 426:16, 436:22, 436:24, 443:4, 443:9
**known** [8] - 349:5, 366:2, 368:18, 369:18, 379:1, 381:10, 392:19,

468:9
**knows** [1] - 400:11
**KURT** [1] - 322:12

**L**

**L-A-U-G-H-E-R-Y** [1] - 439:6
**LA** [3] - 323:5, 323:10, 323:14
**label** [5] - 356:12, 441:5, 459:4, 461:14, 468:14
**labeled** [2] - 356:13, 378:9
**labels** [6] - 441:3, 441:10, 442:12, 445:13, 459:5
**laboratories** [1] - 420:13
**laboratory** [3] - 392:17, 392:18
**lack** [3] - 358:20, 359:25, 360:1
**laid** [1] - 430:15
**LAKEWAY** [1] - 323:9
**landfall** [2] - 432:16, 436:4
**large** [5] - 365:12, 366:20, 393:21, 394:3, 394:9
**larger** [1] - 428:23
**laser** [1] - 374:6
**last** [16] - 348:19, 364:8, 369:5, 369:7, 369:10, 372:25, 384:8, 401:17, 402:13, 406:3, 423:6, 426:3, 429:4, 439:5, 446:1, 448:21
**lasted** [3] - 336:14, 336:18, 342:6
**late** [2] - 368:21, 376:16
**Lauan** [3] - 353:1, 353:3, 353:4
**Laughery** [8] - 438:14, 438:15, 438:17, 439:5, 439:9, 439:24, 444:16, 447:15
**LAUGHERY** [1] - 438:25
**LAUGHERY**.............. ....................... [1] - 324:16
**LAW** [1] - 322:20
**law** [3] - 346:12, 403:12, 462:25

**lawsuit** [1] - 341:21
**lawyer** [1] - 346:13
**lawyers** [13] - 377:23, 386:18, 387:10, 389:23, 390:2, 390:25, 391:7, 391:15, 397:8, 448:7, 449:3, 453:11, 462:18
**lawyers'** [1] - 390:11
**lay** [1] - 330:10
**lead** [2] - 333:5, 422:5
**leading** [2] - 378:20, 469:15
**leaks** [1] - 337:21
**learn** [7] - 348:6, 348:10, 433:13, 433:17, 433:21, 435:3, 444:14
**learned** [2] - 332:4, 433:16
**learning** [1] - 443:4
**least** [6] - 365:24, 409:10, 430:22, 432:7, 458:11, 461:18
**leave** [1] - 446:7
**leaves** [2] - 385:16, 470:12
**leaving** [1] - 432:18
**left** [5] - 357:18, 364:6, 366:25, 398:14, 418:21
**legal** [3] - 398:7, 399:14, 400:7
**less** [6] - 365:22, 411:24, 412:1, 412:2, 418:16, 464:14
**level** [38] - 357:17, 372:18, 380:12, 383:13, 384:24, 385:1, 389:11, 402:16, 402:25, 403:23, 406:4, 406:8, 407:2, 407:3, 409:1, 409:6, 412:5, 413:5, 418:15, 418:24, 431:19, 431:20, 431:22, 431:23, 433:24, 434:5, 434:10, 434:18, 455:8, 455:22, 455:25, 456:5, 456:9, 456:21, 456:23, 456:25, 465:3
**levels** [27] - 372:13, 378:16, 378:25, 379:10, 398:16,

398:24, 398:25, 399:7, 399:11, 415:17, 417:20, 417:21, 418:25, 419:13, 420:14, 422:1, 431:7, 431:18, 432:11, 434:4, 434:17, 434:18, 455:16, 456:15, 456:18, 467:6, 467:7
**Levels** [1] - 416:4
**LFE** [8] - 353:22, 353:24, 353:25, 354:4, 354:7, 354:10, 362:25, 363:3
**LIABILITY** [1] - 322:5
**liability** [7] - 398:7, 399:1, 399:10, 399:14, 400:8, 400:21, 403:13
**lie** [1] - 376:5
**life** [3] - 349:12, 350:1, 362:11
**lifetime** [1] - 440:7
**light** [5] - 330:21, 330:23, 330:24, 334:12, 402:12
**light-headed** [4] - 330:21, 330:23, 330:24, 334:12
**likely** [1] - 379:18
**limit** [44] - 365:22, 369:6, 372:13, 372:14, 372:16, 376:7, 376:9, 382:24, 382:25, 383:4, 383:5, 383:10, 383:11, 383:12, 383:22, 384:1, 384:4, 384:10, 384:19, 384:24, 397:21, 398:7, 403:21, 404:11, 404:13, 406:11, 406:15, 406:16, 407:10, 407:23, 407:24, 408:1, 408:6, 408:7, 409:18, 412:9, 412:13, 412:15, 412:20
**limited** [2] - 399:18, 421:22
**limits** [14] - 365:14, 365:15, 365:20, 366:14, 367:8, 367:11, 367:14, 367:16, 368:6,

368:24, 383:23, 397:12, 398:20
**Linda** [3] - 462:15, 462:16
**line** [20] - 344:12, 372:25, 376:7, 376:8, 404:14, 405:14, 406:7, 406:21, 406:22, 409:11, 411:9, 411:14, 411:19, 413:2, 413:5, 413:13, 413:14, 440:1, 463:7
**linear** [4] - 395:22, 396:18, 396:20, 396:21
**lines** [7] - 374:17, 397:6, 397:10, 403:18, 406:19, 406:22, 409:8
**list** [3] - 326:18, 359:24, 371:12
**listen** [2] - 410:6, 410:11
**literally** [1] - 351:19
**literature** [2] - 381:23, 456:12
**LITIGATION** [1] - 322:5
**litigation** [6] - 448:4, 448:10, 448:11, 448:15, 448:22, 462:17
**live** [8] - 336:11, 337:2, 337:14, 386:9, 437:17, 447:22, 447:23, 450:20
**lived** [8] - 328:6, 328:9, 331:24, 337:23, 350:22, 389:17, 394:12, 418:20
**living** [4] - 327:25, 389:12, 389:13, 436:8
**LLC** [1] - 322:9
**located** [1] - 349:6
**location** [1] - 375:8
**log** [2] - 374:8, 396:17
**logarithmic** [6] - 395:17, 395:18, 395:19, 396:2, 396:13, 396:15
**logistics** [1] - 428:22
**look** [25] - 352:19, 358:5, 369:3, 371:24, 378:10, 383:1, 383:24,

394:12, 396:21, 400:19, 405:4, 405:16, 406:17, 411:9, 414:1, 419:2, 421:25, 434:4, 435:14, 435:21, 444:1, 453:18, 453:19, 463:19, 464:11
**looked** [15] - 352:5, 353:13, 356:22, 372:12, 376:13, 390:19, 392:9, 392:12, 392:22, 393:4, 393:5, 393:8, 400:14, 420:14, 441:21
**looking** [10] - 325:15, 328:20, 373:20, 375:11, 378:15, 379:4, 397:2, 435:24, 444:5, 470:6
**looks** [5] - 325:16, 328:18, 374:23, 374:24, 381:23
**lost** [1] - 351:25
**Lottie** [4] - 351:14, 351:18, 356:18, 356:20
**LOUISIANA** [2] - 322:1, 322:6
**Louisiana** [10] - 351:14, 356:18, 356:20, 357:19, 403:12, 432:13, 432:24, 433:2, 470:17, 470:17
**love** [1] - 341:19
**loving** [3] - 327:5, 327:8, 327:22
**low** [4] - 353:25, 362:25, 375:15, 418:24
**lower** [10] - 367:11, 383:10, 383:11, 383:22, 383:24, 390:6, 397:2, 421:11, 454:5
**lowest** [2] - 405:21, 405:23
**Loyola** [1] - 328:5
**LPLA** [1] - 401:7
**lunch** [8] - 438:13, 438:16, 439:25, 447:6, 464:13, 469:17, 470:2, 470:6
**LYON** [1] - 323:3

## M

**ma'am** [6] - 338:17, 338:21, 339:12, 340:11, 340:23, 342:11
**magnitude** [2] - 374:9, 376:4
**mail** [6] - 328:4, 328:5, 428:2, 428:8, 428:9, 430:12
**main** [2] - 328:4, 328:5
**maintain** [1] - 427:13
**maintained** [3] - 327:22, 371:2, 391:11
**maintaining** [2] - 427:2, 427:17
**maintenance** [3] - 427:19, 427:20, 427:21
**major** [2] - 392:23, 429:25, 430:3, 441:13
**majority** [16] - 361:22, 370:13, 375:22, 376:20, 377:6, 381:15, 381:23, 383:18, 391:1, 391:3, 391:20, 412:2, 412:11, 418:21, 448:18
**makeup** [1] - 437:24
**male** [1] - 367:15
**managed** [2] - 365:21, 365:22
**management** [9] - 368:14, 368:24, 369:4, 369:8, 372:13, 374:19, 406:14, 422:23, 423:21
**manager** [3] - 423:20, 423:23, 433:2
**manner** [2] - 461:12, 469:21
**manual** [19] - 351:4, 351:7, 354:13, 354:15, 354:18, 354:19, 354:22, 355:2, 355:5, 355:6, 355:15, 360:19, 445:14, 445:21, 451:2, 458:18, 458:25, 459:4, 461:15
**manuals** [3] - 441:7, 469:13
**manufacture** [3] -

350:8, 388:19, 418:24
**Manufactured** [1] - 408:17
**manufactured** [19] - 348:2, 350:9, 350:13, 358:14, 360:5, 360:9, 409:2, 409:7, 419:11, 421:6, 436:15, 437:4, 463:1, 463:2, 463:6, 463:15, 465:4, 465:6, 469:21
**manufacturer** [2] - 443:8, 459:16, 459:20
**manufacturers** [16] - 353:16, 362:24, 370:16, 424:1, 424:2, 424:7, 424:10, 424:13, 424:14, 424:21, 425:13, 425:25, 426:23, 429:14, 463:18, 469:12
**manufacturers'** [1] - 424:17
**Manufacturing** [3] - 349:18, 349:20, 349:23
**manufacturing** [5] - 351:1, 357:3, 424:15, 442:2, 460:6
**March** [7] - 376:13, 376:14, 376:18, 376:25, 378:13, 378:18, 421:17
**marching** [1] - 375:25
**marked** [1] - 435:8
**marker** [1] - 396:5
**Market** [1] - 422:18
**marketing** [1] - 460:6
**marketplace** [2] - 442:3, 460:8
**married** [3] - 327:9, 327:12, 327:14
**Master's** [1] - 365:7
**matching** [1] - 400:25
**material** [2] - 356:1, 378:24
**materials** [4] - 356:2, 361:8, 362:25, 363:3
**mathematician** [3] - 388:24, 388:25, 389:4
**mathematics** [1] - 388:24
**matter** [2] - 373:24, 470:19
**MAY** [2] - 322:6, 325:3

**McGwin** [1] - 369:22
**MDL** [1] - 322:5
**mean** [44] - 327:16, 337:1, 338:10, 338:20, 340:10, 354:21, 359:9, 365:4, 365:22, 371:21, 372:20, 380:12, 380:14, 380:15, 380:17, 380:18, 380:20, 380:21, 380:22, 384:19, 389:3, 389:5, 403:1, 404:20, 405:13, 406:5, 406:12, 408:11, 414:5, 421:9, 429:9, 444:2, 444:12, 452:5, 452:19, 452:24, 455:14, 456:9, 456:19, 458:22, 459:7, 460:12, 467:20
**meaning** [5] - 336:25, 337:5, 353:15, 367:23, 432:5
**means** [14] - 355:18, 363:24, 369:19, 373:22, 376:23, 391:4, 402:25, 405:23, 408:12, 442:21, 452:6, 452:12, 452:20, 455:18
**meant** [2] - 337:7, 425:12
**measure** [4] - 389:13, 394:22, 405:24, 411:12
**measured** [5] - 407:3, 407:5, 407:20, 407:21, 409:13
**measurement** [19] - 365:12, 371:23, 372:5, 374:23, 375:20, 375:21, 376:4, 376:5, 382:8, 382:10, 399:8, 401:1, 402:5, 407:16, 407:17, 408:4, 411:21, 421:5, 421:8
**measurements** [51] - 365:14, 366:15, 371:3, 372:3, 372:8, 372:15, 372:21, 374:22, 374:24, 375:1, 375:8, 375:12, 375:22,

376:5, 377:4, 377:6, 377:9, 377:10, 377:25, 378:2, 378:3, 378:9, 379:18, 382:23, 383:2, 383:3, 383:5, 383:18, 383:20, 383:22, 383:25, 384:4, 391:25, 393:17, 393:18, 393:22, 394:25, 407:9, 409:23, 411:10, 411:16, 412:2, 412:10, 412:14, 412:16, 419:8, 419:16, 420:10, 420:15, 421:4, 421:18
**measuring** [3] - 394:22, 415:16
**MECHANICAL** [1] - 323:15
**mechanical** [3] - 348:25, 349:9, 443:6
**media** [1] - 445:18
**medical** [9] - 330:5, 330:8, 330:9, 334:1, 364:2, 368:14, 431:8, 433:23, 449:17
**medication** [2] - 441:9, 441:17
**mediums** [1] - 445:18
**meet** [10] - 347:6, 347:19, 348:12, 348:16, 348:18, 387:5, 387:8, 399:8, 400:7, 426:18
**meeting** [7] - 354:2, 386:17, 400:20, 459:12, 460:23, 461:3
**member** [6] - 361:21, 362:1, 362:9, 362:17, 362:23, 368:19
**members** [3] - 342:22, 352:11, 440:2
**membership** [1] - 359:8
**memory** [2] - 353:13, 373:15
**mention** [7] - 329:9, 340:3, 347:21, 347:23, 354:24, 413:17, 441:25
**mentioned** [18] - 325:14, 340:2, 340:5, 340:11, 340:20, 340:23,

342:6, 353:9, 354:12, 356:22, 359:16, 360:10, 377:8, 381:10, 381:12, 414:4, 428:24
**mercaptan** [3] - 451:21, 452:19, 452:22
**merged** [1] - 391:23
**Merit** [1] - 470:16
**met** [9] - 335:19, 343:18, 347:9, 352:18, 387:10, 422:16, 426:14, 426:18, 447:17
**METAIRIE** [1] - 323:10
**methodologies** [1] - 442:10
**methodology** [3] - 429:1, 429:2, 432:8
**methods** [2] - 436:14, 440:22
**Michigan** [1] - 349:7
**microphone** [2] - 419:24, 439:4
**mid** [1] - 433:12
**middle** [2] - 326:13, 369:6
**midmorning** [1] - 385:7
**might** [9] - 328:12, 370:8, 388:18, 395:10, 395:12, 403:11, 413:17, 422:1, 454:17
**MIKAL** [1] - 322:17
**million** [35] - 368:13, 369:3, 369:6, 374:10, 374:12, 374:13, 374:14, 374:18, 375:4, 375:5, 375:6, 376:3, 380:24, 380:25, 384:14, 395:23, 397:3, 397:4, 405:13, 407:3, 407:15, 407:20, 408:2, 409:6, 409:13, 409:18, 411:17, 411:20, 431:19, 431:23, 434:9, 434:17, 466:1, 466:4
**mind** [6] - 352:22, 353:24, 397:2, 403:7, 444:21
**minimal** [1] - 381:3
**minimized** [1] - 365:24

**minor** [2] - 334:25, 382:1
**minute** [1] - 400:13
**minutes** [9] - 342:15, 368:13, 385:9, 408:5, 408:6, 412:14, 422:12, 422:13, 464:14
**misclassified** [1] - 372:1
**misleading** [1] - 396:7
**mission** [1] - 435:13
**mistakes** [3] - 393:9, 393:10, 394:3
**mixed** [1] - 341:14
**mobile** [9] - 424:19, 436:15, 436:19, 437:5, 437:8, 437:9, 437:11, 438:3, 438:5
**model** [5] - 372:22, 377:6, 377:7, 382:21, 384:3
**modeling** [1] - 370:6
**Models** [1] - 416:5
**models** [2] - 372:23, 373:16
**modes** [1] - 442:13
**modifications** [1] - 379:7
**mom** [1] - 329:9
**moment** [4] - 357:11, 377:13, 414:7, 421:1
**momma** [3] - 326:24, 327:1, 327:3
**money** [1] - 418:14
**monitors** [1] - 395:8
**month** [7] - 327:19, 375:17, 375:18, 375:19, 380:2, 432:23
**monthly** [1] - 452:7
**months** [1] - 428:20
**Morgan** [21] - 372:22, 373:2, 373:5, 373:9, 373:12, 373:18, 375:11, 377:5, 377:7, 380:16, 380:17, 382:20, 382:21, 384:3, 388:22, 394:11, 457:16, 457:19, 457:23, 458:2, 458:3
**Morgans** [2] - 373:16, 376:11
**Morgantown** [1] - 386:10
**morning** [9] - 325:10, 325:11, 335:17, 335:18, 379:1, 386:5, 386:6,

447:15, 447:16
**MORNING** [2] - 322:11, 325:2
**MORTON** [1] - 323:7
**most** [6] - 328:11, 366:11, 376:11, 395:20, 395:22, 412:11
**mostly** [2] - 328:11, 338:16
**motels** [1] - 435:16
**mother** [49] - 327:5, 327:8, 327:22, 328:1, 328:6, 328:9, 329:3, 329:18, 330:10, 330:16, 331:3, 331:6, 331:10, 331:19, 332:2, 332:4, 332:12, 332:15, 332:22, 333:10, 333:19, 334:4, 335:22, 335:25, 336:11, 337:18, 337:23, 338:3, 338:8, 338:12, 338:13, 338:17, 338:24, 339:3, 339:7, 339:13, 339:15, 339:20, 340:1, 340:2, 340:5, 340:11, 340:19, 341:8, 341:9, 341:12, 341:16, 341:19, 341:21
**mother's** [7] - 329:1, 329:25, 332:6, 336:3, 336:23, 337:15, 340:23
**motor** [1] - 348:9
**Motor** [6] - 349:18, 349:19, 349:20, 349:21, 349:23, 358:18
**Motors** [4] - 349:4, 349:14, 362:6, 460:11
**move** [12] - 337:18, 340:25, 371:1, 397:5, 410:16, 411:3, 413:20, 414:24, 428:10, 438:8, 468:25, 469:8
**moved** [12] - 329:23, 330:1, 340:19, 340:22, 372:7, 376:18, 376:25, 378:17, 378:18, 389:21, 420:3, 446:24

**moving** [4] - 384:18,
436:8, 438:3, 469:9
**MR** [154] - 324:6,
324:7, 324:8,
324:11, 324:12,
324:13, 324:14,
324:17, 324:18,
324:19, 325:17,
326:14, 326:17,
329:15, 329:20,
330:4, 330:6,
330:12, 330:14,
332:5, 332:9,
332:14, 332:17,
332:21, 333:6,
333:8, 335:9,
335:14, 335:16,
340:15, 340:18,
341:23, 342:2,
342:4, 342:10,
342:13, 342:17,
342:21, 343:2,
343:10, 343:16,
343:20, 343:24,
344:1, 344:5,
344:12, 344:20,
344:22, 344:25,
345:4, 345:5,
345:11, 345:16,
363:6, 363:20,
363:23, 364:16,
364:18, 364:19,
364:23, 374:4,
374:6, 379:21,
379:24, 384:5,
384:7, 385:4, 386:1,
386:4, 394:15,
394:17, 397:24,
398:2, 398:10,
398:11, 398:18,
399:18, 399:20,
400:3, 400:9,
400:10, 400:11,
400:13, 401:2,
401:8, 401:15,
401:23, 402:2,
402:7, 403:15,
403:17, 404:4,
404:7, 410:15,
411:5, 413:18,
413:22, 413:25,
414:10, 414:21,
415:1, 415:6, 415:8,
415:19, 416:6,
416:10, 416:11,
416:13, 416:14,
416:20, 416:23,
416:24, 417:6,
417:10, 417:15,
417:18, 418:8,
418:11, 419:23,

420:1, 420:17,
421:15, 422:6,
422:9, 422:12,
438:14, 439:8,
439:15, 439:17,
439:20, 439:23,
446:2, 446:5, 447:2,
447:8, 447:12,
447:14, 464:14,
464:17, 465:11,
465:14, 467:8,
467:9, 467:12,
468:3, 468:5,
468:23, 468:25,
469:4, 469:6, 469:9,
469:11, 469:19,
469:25
**MRL** [1] - 406:4
**MSDS** [2] - 468:10,
468:12
**MULCAHY** [11] -
323:3, 323:4,
342:17, 343:2,
343:16, 343:24,
344:1, 344:12,
344:22, 345:5,
364:19
**Mulcahy** [4] - 346:6,
346:7, 346:18, 347:6
**multiple** [2] - 402:19,
422:20
**must** [1] - 346:23

**N**

**nail** [1] - 441:10
**nail-on** [1] - 441:10
**name** [17] - 326:10,
326:12, 345:24,
346:9, 347:10,
348:19, 348:20,
363:16, 363:18,
363:24, 367:5,
422:17, 439:3,
439:5, 439:9, 447:17
**named** [1] - 327:10
**names** [1] - 390:14
**nasal** [1] - 443:14
**National** [3] - 362:9,
362:20, 366:1,
461:23
**natural** [1] - 452:1
**nature** [1] - 360:3
**near** [1] - 447:23
**necessarily** [7] -
332:8, 398:25,
399:9, 400:1,
400:21, 406:9,
406:12

**necessary** [8] -
441:22, 442:1,
444:23, 445:3,
445:6, 455:10,
465:23, 470:9
**need** [21] - 343:8,
344:8, 401:23,
402:12, 410:6,
429:25, 431:8,
440:17, 442:4,
442:15, 442:23,
443:8, 443:10,
444:7, 451:12,
452:17, 452:24,
454:1, 464:13,
468:16
**needed** [9] - 327:6,
333:25, 428:6,
428:25, 429:1,
437:10, 440:19,
440:21, 460:15
**needs** [10] - 337:1,
343:13, 400:9,
435:15, 443:20,
444:6, 454:15,
455:1, 458:8, 458:13
**negotiating** [1] -
425:25
**Nelson** [3] - 462:15,
462:16
**never** [15] - 336:11,
337:18, 337:22,
339:3, 355:14,
370:15, 387:15,
392:4, 447:17,
449:25, 450:3,
450:7, 451:1, 451:4,
453:13
**nevertheless** [1] -
441:11
**new** [5] - 328:21,
328:22, 336:5,
336:6, 379:9
**New** [9] - 326:23,
327:13, 433:10,
437:12, 437:24,
437:25, 438:7,
438:8, 456:16
**NEW** [3] - 322:6,
323:5, 323:14
**newest** [1] - 433:8
**news** [3] - 331:17,
332:1, 332:25
**next** [19] - 327:19,
327:25, 342:12,
342:13, 363:5,
366:24, 371:2,
374:13, 375:9,
383:9, 396:10,
413:21, 419:1,

422:8, 443:13,
466:13, 466:14,
467:10, 468:15
**NFPA** [8] - 358:17,
359:11, 359:16,
359:20, 360:10,
361:23, 362:20,
461:17
**nice** [2] - 390:20,
395:25
**nine** [2] - 395:25,
396:23
**NIOSH** [28] - 366:3,
366:4, 366:7,
366:10, 366:16,
367:3, 368:18,
376:7, 376:9,
382:24, 382:25,
384:10, 384:19,
384:24, 397:6,
400:24, 403:19,
403:21, 403:25,
404:18, 405:1,
405:7, 405:9,
405:11, 405:19,
418:2
**Nissan** [6] - 349:18,
349:19, 349:20,
349:21, 349:23,
362:6
**NO** [2] - 322:5, 322:8
**nobody** [2] - 333:9,
457:22
**none** [7] - 375:4,
375:5, 399:24,
407:9, 412:6, 412:9,
412:16
**nonetheless** [1] -
407:8
**nonfederal** [1] -
428:10
**nongovernmental** [1]
- 367:4
**nonobjected** [1] -
417:7
**nonsensitive** [1] -
434:23
**noon** [1] - 470:3
**normal** [1] - 432:5
**normally** [1] - 454:12
**north** [1] - 437:14
**nose** [1] - 334:19
**noted** [1] - 454:9
**nothing** [6] - 326:4,
363:10, 409:17,
421:7, 438:22,
445:14
**notice** [9] - 328:19,
328:25, 329:25,
337:21, 360:15,

363:24, 462:25,
463:3, 464:1
**noticed** [9] - 326:18,
328:20, 329:2,
329:3, 330:16,
331:24, 337:22,
344:13, 352:9
**November** [4] -
376:21, 423:14,
423:15, 423:24
**number** [9] - 369:3,
396:24, 407:24,
408:2, 408:10,
409:22, 409:23,
411:15
**Number** [6] - 356:13,
373:21, 398:22,
407:1, 435:8, 451:8
**numbered** [1] - 470:19
**numbers** [1] - 408:9
**numerical** [2] - 412:1

**O**

**oath** [7] - 325:23,
326:9, 363:15,
385:24, 405:8,
438:18, 439:2
**object** [4] - 401:16,
416:6, 416:24,
420:17
**objected** [1] - 417:9
**Objection** [1] - 414:19
**objection** [9] - 329:17,
330:4, 332:17,
364:19, 415:6,
417:16, 439:16,
439:17, 468:23
**obligation** [2] -
456:16, 465:24
**observation** [1] -
330:11
**observed** [8] - 329:16,
329:17, 333:12,
334:5, 352:25,
379:17, 382:23,
383:25
**observing** [1] - 330:9
**obtain** [1] - 349:3
**obtained** [4] - 346:9,
348:25, 349:8, 364:5
**obvious** [4] - 442:20,
443:1, 444:3, 444:6
**obviously** [4] - 327:9,
429:18, 442:9,
454:10
**occasion** [5] - 332:1,
347:6, 351:9,
356:21, 387:5

**occasions** [2] - 387:11, 449:7
**occupancy** [1] - 420:12
**occupant** [1] - 378:9
**occupants** [7] - 370:24, 377:17, 409:7, 431:5, 431:6, 431:8, 465:4
**occupation** [1] - 365:1
**occupational** [26] - 364:4, 365:3, 365:4, 366:14, 367:8, 367:10, 367:12, 367:14, 367:25, 368:5, 369:21, 369:23, 375:23, 376:7, 376:9, 378:1, 378:6, 379:8, 379:12, 380:20, 382:24, 396:1, 398:20, 403:22, 407:10, 408:7
**Occupational** [3] - 366:2, 366:6, 366:25
**occupations** [1] - 370:4
**occupied** [21] - 369:17, 370:18, 372:4, 372:5, 372:6, 372:9, 372:21, 373:13, 373:15, 375:12, 377:4, 380:14, 380:16, 380:23, 382:20, 392:16, 420:9, 421:8, 445:17
**occupying** [1] - 370:14
**occur** [1] - 406:5
**occurs** [1] - 357:7
**odor** [16] - 328:21, 329:12, 329:14, 336:3, 336:7, 336:14, 336:18, 342:6, 342:7, 384:8, 384:12, 384:14, 421:25, 451:20, 451:23, 452:10
**odorant** [1] - 451:20
**odorless** [1] - 451:22
**odors** [2] - 427:23, 451:23
**OF** [4] - 322:1, 322:12, 324:9, 324:15
**off-gas** [3] - 356:8, 356:9, 381:16
**off-gasses** [2] - 381:11, 381:12
**off-gassing** [14] -

355:18, 355:22, 355:24, 355:25, 357:6, 360:25, 361:6, 381:14, 381:23, 381:24, 382:2, 384:24, 418:16, 418:21
**offered** [3] - 336:11, 343:14, 344:9
**office** [5] - 328:4, 328:5, 368:3, 368:7, 433:3
**officer** [3] - 422:24, 423:17, 423:18
**OFFICER** [4] - 325:7, 385:14, 385:21, 470:10
**Official** [2] - 470:17, 470:22
**OFFICIAL** [1] - 323:13
**often** [3] - 406:15, 431:6, 441:13
**old** [8] - 327:16, 327:19, 327:20, 367:18, 379:10, 382:11, 421:23, 421:25
**once** [4] - 328:12, 342:21, 371:17, 428:19
**one** [100] - 327:15, 327:19, 333:9, 338:23, 343:9, 350:8, 353:4, 365:5, 366:11, 366:12, 368:20, 368:25, 369:10, 369:17, 369:24, 370:3, 372:11, 372:14, 373:7, 374:17, 374:23, 375:3, 375:20, 377:14, 379:3, 379:11, 382:4, 382:14, 382:16, 382:17, 382:19, 384:8, 384:14, 384:15, 392:21, 393:16, 393:17, 394:12, 394:19, 395:2, 395:3, 395:24, 396:10, 398:20, 399:23, 400:1, 400:7, 400:20, 400:10, 403:9, 403:19, 405:4, 406:11, 407:1, 407:17, 408:21, 410:18, 411:1, 412:8, 413:6,

413:21, 414:24, 415:10, 417:6, 418:12, 419:3, 419:17, 419:18, 419:19, 419:22, 420:2, 420:5, 420:6, 420:21, 421:16, 430:18, 431:12, 431:14, 433:12, 434:2, 441:3, 442:5, 442:15, 442:16, 442:17, 442:20, 448:14, 448:21, 448:24, 452:5, 452:6, 453:19, 453:20, 455:11, 459:13, 461:2, 462:18, 464:18
**one-and-a-half** [1] - 421:16
**one-eighth** [1] - 353:4
**open** [6] - 339:21, 342:7, 442:20, 443:1, 444:3, 444:6
**opened** [2] - 387:22, 388:6
**opening** [5] - 331:1, 380:5, 413:4, 432:5, 432:9
**operation** [2] - 351:1, 370:5
**operations** [1] - 426:21
**opinion** [13] - 330:5, 330:10, 343:18, 360:24, 398:3, 458:8, 458:11, 461:1, 461:4, 463:5, 469:20, 469:24
**opinions** [2] - 393:12, 460:25
**opportunity** [1] - 458:24
**opposed** [5] - 329:18, 400:18, 436:18, 437:4, 438:5
**option** [2] - 431:25, 436:7
**oranges** [4] - 412:7, 412:18, 412:21, 414:2
**ORDER** [1] - 325:4
**order** [8] - 343:14, 374:9, 398:4, 398:6, 400:17, 403:9, 428:25, 452:16
**ordered** [1] - 467:21
**ordinary** [4] - 338:11, 452:4, 452:24, 453:2
**organization** [3] -

367:4, 367:5, 378:8
**Organization** [1] - 368:11
**organizations** [7] - 362:23, 362:24, 369:15, 391:2, 391:9, 420:13, 421:2
**original** [3] - 393:3, 406:20, 406:21
**originally** [1] - 386:8
**originated** [1] - 392:11
**Orleans** [9] - 326:23, 327:13, 433:10, 437:12, 437:24, 437:25, 438:7, 438:8, 456:16
**ORLEANS** [3] - 322:6, 323:5, 323:14
**OSHA** [10] - 366:7, 366:8, 366:25, 398:19, 405:17, 405:19, 406:24, 407:2, 407:6, 407:19
**otherwise** [2] - 434:14, 451:12
**ought** [12] - 343:20, 344:5, 399:21, 400:4, 400:17, 400:18, 400:23, 401:9, 401:16, 433:24, 434:4, 460:13
**ourselves** [2] - 379:15, 444:9
**outset** [2] - 345:18, 411:1
**outside** [11] - 325:20, 326:1, 368:6, 368:7, 416:6, 416:9, 416:24, 433:22, 437:11, 437:12, 457:1
**overkill** [1] - 454:17
**overnight** [2] - 334:18, 334:24
**overrule** [4] - 330:7, 332:18, 417:16, 420:21
**oversaw** [1] - 433:4
**oversee** [1] - 358:21
**oversight** [1] - 359:13
**owed** [2] - 465:18, 465:24
**own** [5] - 327:21, 419:10, 428:1, 428:6, 428:16
**owner** [1] - 354:15
**owner's** [19] - 351:4, 351:6, 354:13, 354:18, 354:19,

354:22, 355:2, 355:5, 355:6, 355:15, 360:19, 441:7, 445:14, 445:20, 458:18, 458:25, 459:4, 461:15, 469:13

**P**

**p.m** [1] - 470:4
**Package** [1] - 441:8
**page** [17] - 371:2, 371:11, 398:21, 405:16, 408:25, 431:2, 431:12, 462:7, 462:9, 462:11, 464:25, 466:13, 466:14, 466:22, 467:10
**PAGE** [1] - 324:3
**pages** [1] - 465:1
**paid** [1] - 386:12
**panel** [4] - 325:9, 385:16, 385:23, 470:12
**paperwork** [1] - 392:10
**paragraph** [3] - 435:9, 462:21, 463:21
**parcel** [1] - 356:3
**parent** [1] - 356:1
**Park** [1] - 416:4
**Part** [1] - 407:11
**part** [24] - 344:17, 356:3, 365:12, 367:10, 367:11, 368:4, 368:17, 374:12, 374:17, 375:5, 375:6, 376:3, 384:14, 388:23, 403:10, 404:22, 433:21, 435:3, 435:14, 436:25, 441:15, 450:18, 460:21, 464:7
**participated** [1] - 390:17
**particleboard** [5] - 414:13, 414:16, 415:2, 415:16, 415:24
**particular** [13] - 338:22, 338:23, 359:12, 371:25, 383:8, 399:7, 402:13, 407:10, 420:12, 420:25, 424:13, 431:12,

454:4
**particularly** [1] - 435:8
**particulates** [2] -
365:5, 365:13
**parties** [3] - 411:13,
411:16, 411:21
**parts** [43] - 352:19,
352:23, 352:25,
368:13, 369:3,
369:6, 374:10,
374:11, 374:13,
374:14, 374:16,
374:18, 375:4,
376:3, 380:24,
380:25, 381:3,
381:4, 381:5, 381:8,
384:8, 395:23,
397:3, 405:12,
407:3, 407:15,
407:20, 408:2,
409:6, 409:13,
409:18, 411:17,
411:20, 427:19,
431:19, 431:23,
434:9, 434:17,
466:1, 466:4
**pass** [1] - 331:22
**passed** [2] - 331:20,
340:3
**password** [1] - 391:13
**past** [10] - 368:18,
369:24, 370:8,
370:11, 370:22,
379:11, 391:24,
422:16, 448:11,
466:25
**paste** [1] - 441:10
**paste-on** [1] - 441:10
**PAUL** [3] - 324:10,
363:13, 363:18
**Paul** [2] - 363:6,
363:18
**paying** [1] - 339:18
**peak** [3] - 412:15,
412:16, 412:17
**peculiar** [2] - 336:7,
342:6
**peers** [1] - 429:2
**penalty** [1] - 466:16
**pending** [1] - 413:18
**people** [37] - 355:10,
370:14, 394:6,
395:9, 395:20,
395:22, 418:13,
428:3, 433:12,
434:13, 434:19,
435:4, 435:15,
435:21, 435:25,
437:17, 437:21,
438:3, 438:6,

440:17, 443:3,
444:1, 444:8,
444:10, 444:25,
446:6, 446:12,
446:19, 451:16,
451:21, 452:10,
452:12, 453:5,
455:19, 456:17,
459:11, 465:15
**Pepper** [3] - 470:16,
470:21, 470:21
**PEPPER** [1] - 323:13
**per** [47] - 368:13,
369:3, 369:6,
374:10, 374:11,
374:12, 374:13,
374:14, 374:16,
374:17, 374:18,
375:4, 375:5, 375:6,
376:3, 380:24,
380:25, 381:3,
381:4, 381:5, 381:8,
384:9, 384:14,
386:15, 395:23,
397:3, 405:13,
407:3, 407:15,
407:20, 408:2,
409:6, 409:13,
409:18, 411:17,
411:20, 431:19,
431:23, 434:9,
434:17, 449:3,
466:1, 466:4
**percent** [21] - 372:15,
382:23, 383:3,
383:4, 383:9,
383:10, 383:11,
383:12, 383:13,
383:21, 383:22,
383:25, 391:3,
391:5, 391:8, 393:5,
448:19, 455:14,
455:15
**percentages** [1] -
434:14
**perception** [1] - 330:6
**perfectly** [1] - 454:11
**perform** [3] - 366:16,
390:3, 430:24
**performed** [2] -
358:10, 428:14
**perhaps** [1] - 440:18
**period** [14] - 350:15,
407:16, 407:21,
408:3, 408:11,
409:13, 409:24,
412:14, 413:9,
425:8, 433:1, 433:7
**perjury** [1] - 466:16
**permanent** [2] -

435:25, 436:8
**permitted** [1] - 412:8
**person** [3] - 452:2,
452:21, 458:23
**personal** [2] - 330:11,
466:24
**pertaining** [3] -
354:17, 354:23,
355:16
**Peter** [6] - 326:23,
337:23, 338:4,
338:9, 338:13,
338:18
**PFISTER** [1] - 323:7
**Ph.D** [9] - 363:24,
364:2, 364:4, 364:9,
365:7, 389:4, 439:9,
439:10
**pharmacy** [1] - 441:1
**phase** [3] - 373:7,
373:8, 433:1
**phone** [1] - 346:21
**photographs** [4] -
356:11, 356:15,
356:16, 415:23
**phrase** [3] - 374:11,
412:8, 416:22
**phrases** [1] - 412:6
**physical** [2] - 370:6,
370:7
**pick** [2] - 367:23,
427:6
**piece** [5] - 414:13,
414:15, 415:2,
415:15, 415:24
**pin** [1] - 400:18
**PINEDO** [1] - 322:20
**Pittsburgh** [2] - 364:5,
364:10
**place** [9] - 336:11,
337:13, 349:4,
381:24, 384:24,
428:20, 437:1,
458:13, 465:25
**placed** [2] - 438:7,
451:5
**places** [1] - 470:8
**placing** [1] - 395:7
**plaintiff** [4] - 418:5,
462:19, 466:8,
467:24
**PLAINTIFF** [1] -
322:16
**plaintiff's** [2] - 398:23,
453:11
**plaintiffs** [10] - 325:18,
344:13, 390:15,
391:12, 391:16,
419:2, 419:4,
448:14, 448:16,

448:20
**plaintiffs'** [11] -
386:17, 387:10,
389:23, 390:2,
390:11, 390:16,
390:24, 391:7,
391:15, 391:23,
397:8
**Plaintiffs'** [3] - 392:13,
392:25, 395:15
**plan** [4] - 430:21,
430:25, 436:3,
436:10
**plant** [4] - 348:12,
348:13, 352:19,
357:18
**play** [6] - 343:6, 344:5,
364:25, 365:9,
393:25, 435:21
**played** [2] - 345:23,
422:15
**playing** [2] - 343:4,
343:5
**pleasure** [1] - 447:18
**plot** [2] - 375:12,
378:12
**plotting** [1] - 375:13
**plugged** [1] - 427:20
**plywood** [3] - 353:1,
353:4, 353:6
**point** [56] - 325:8,
336:8, 338:25,
342:19, 345:6,
345:22, 349:17,
352:15, 361:14,
380:22, 382:12,
382:14, 382:16,
385:15, 385:19,
385:22, 389:8,
390:23, 394:19,
395:2, 395:3,
395:10, 397:3,
397:25, 400:3,
400:16, 402:10,
403:5, 403:9,
409:19, 412:18,
416:18, 419:22,
420:2, 420:5, 420:6,
422:14, 424:9,
429:23, 429:24,
433:12, 433:16,
438:10, 444:18,
445:16, 450:22,
452:21, 453:17,
458:25, 459:8,
460:16, 463:20,
463:22, 469:7,
470:8, 470:11
**pointed** [1] - 461:14
**pointer** [1] - 374:3

**pointing** [1] - 459:5
**points** [5] - 378:22,
394:20, 411:25,
413:15, 421:7
**policy** [2] - 354:4,
354:10
**population** [8] -
367:11, 367:13,
367:16, 367:17,
367:25, 368:9,
368:10, 437:24
**populations** [1] -
394:5
**portion** [1] - 466:11
**portions** [1] - 344:16
**position** [8] - 423:6,
423:7, 423:9,
423:10, 423:13,
423:19, 423:22,
436:16
**positions** [1] - 422:20
**possibility** [3] -
429:14, 430:8, 430:9
**possible** [4] - 383:5,
389:11, 410:7, 429:8
**possibly** [1] - 449:9
**post** [3] - 328:4,
328:5, 413:9
**post-conditioning** [1]
- 413:9
**potential** [4] - 430:5,
431:5, 445:12,
445:18
**potentially** [1] -
428:14
**powering** [1] - 428:22
**PowerPoint** [1] -
364:11
**Poydras** [1] - 457:2
**POYDRAS** [2] - 323:5,
323:13
**ppm** [4] - 404:19,
411:6, 411:12, 465:3
**practical** [1] - 437:13
**practices** [1] - 360:14
**preamble** [4] - 410:2,
410:3, 410:23, 414:4
**predictive** [1] - 421:3
**preferable** [1] - 437:22
**pregnant** [1] - 441:18
**preparation** [2] -
355:19, 387:1
**prepare** [1] - 462:1
**prepared** [5] - 364:11,
387:14, 390:20,
431:4, 462:12
**preparing** [1] - 386:17
**prescription** [1] -
441:16
**present** [3] - 351:15,

403:3, 405:22
**presentation** [1] -
364:11
**presented** [2] -
343:12, 362:7
**Preston** [1] - 430:12
**presumably** [2] -
433:8, 445:14
**pretrial** [1] - 469:2
**pretty** [2] - 366:18,
430:21
**previous** [3] - 426:12,
428:8, 464:5
**previously** [5] -
356:13, 395:1,
426:10, 426:15,
426:20
**primary** [4] - 350:8,
358:16, 437:5,
441:25
**principle** [1] - 454:5
**principles** [1] - 441:21
**private** [1] - 427:7
**problem** [15] - 333:14,
399:21, 400:10,
400:16, 401:8,
417:9, 417:10,
417:12, 429:24,
434:19, 442:25,
452:17, 455:15,
456:22, 456:23
**problems** [10] -
330:17, 330:23,
330:25, 334:10,
334:25, 339:9,
352:16, 455:17,
463:20
**procedures** [1] -
442:13
**proceed** [3] - 326:14,
363:20, 386:1
**proceedings** [14] -
325:8, 342:19,
345:6, 345:22,
385:15, 385:19,
385:22, 397:25,
402:10, 416:18,
422:14, 438:10,
470:11, 470:19
**PROCEEDINGS** [3] -
322:12, 323:15,
325:1
**process** [6] - 368:5,
381:13, 381:14,
392:3, 436:20,
436:22
**PRODUCED** [1] -
323:16
**producing** [1] -
368:20

**product** [26] - 353:14,
358:13, 401:7,
401:13, 401:21,
402:5, 402:17,
402:25, 403:1,
403:13, 440:17,
440:18, 440:20,
441:14, 441:15,
442:1, 442:3, 442:6,
442:21, 442:22,
450:8, 450:16,
450:17, 450:24,
461:14
**production** [5] -
347:13, 348:5,
348:9, 348:22,
379:10
**PRODUCTS** [1] -
322:4
**products** [21] - 350:8,
352:25, 353:1,
353:6, 354:4, 354:7,
354:10, 356:3,
356:7, 357:24,
361:2, 378:25,
381:23, 440:25,
441:3, 449:19,
450:10, 450:12,
460:13, 463:3
**Professional** [1] -
470:16
**professional** [1] -
367:4
**professor** [3] - 440:4,
440:6, 440:11
**professors** [1] -
450:19
**profile** [3] - 368:23,
384:12
**profiles** [1] - 368:21
**program** [8] - 422:23,
422:24, 423:20,
423:23, 430:14,
430:16, 430:18
**prohibit** [1] - 353:19
**project** [1] - 388:17
**projections** [1] -
388:12
**projects** [1] - 370:11
**prominently** [1] -
463:4
**promulgated** [2] -
358:12, 361:10
**prong** [1] - 436:11
**propane** [9] - 451:21,
451:22, 452:1,
452:6, 452:8,
452:11, 452:12,
452:20, 453:2
**proper** [1] - 460:10

**properly** [7] - 365:21,
365:22, 427:10,
427:13, 427:20,
458:21, 460:17
**property** [1] - 427:8
**proposal** [1] - 437:16
**proposals** [1] - 424:9
**Protection** [3] -
362:10, 362:20,
368:22
**protection** [3] - 409:7,
409:11, 465:4
**protocols** [1] - 395:6
**protracted** [1] -
410:10
**proud** [1] - 366:11
**provide** [11] - 392:18,
392:19, 424:3,
424:7, 424:10,
424:22, 425:14,
426:5, 426:8,
440:22, 443:17
**provided** [15] - 347:2,
359:24, 361:22,
391:22, 392:13,
392:15, 393:1,
393:2, 413:17,
439:24, 445:7,
445:9, 445:19,
445:23, 453:11
**provider** [1] - 431:8
**provides** [2] - 409:6,
465:3
**providing** [1] - 440:19
**provisions** [1] -
403:13
**PSC** [1] - 392:13
**psychology** [4] -
439:11, 440:4,
440:6, 440:8
**public** [2] - 368:7,
378:8
**publication** [1] -
405:10
**publications** [1] -
405:2
**publish** [1] - 440:12
**published** [5] - 379:2,
379:12, 381:22,
384:13, 440:11
**pull** [7] - 398:8, 406:1,
406:18, 408:12,
409:22, 410:18,
454:19
**pulled** [3] - 373:3,
380:13, 410:22
**purchased** [7] - 354:7,
423:25, 424:11,
426:4, 426:7,
426:13, 426:15

**purchasing** [3] -
424:16, 426:18,
441:13
**purely** [1] - 344:11
**purple** [3] - 411:9,
413:5, 413:13
**purpose** [3] - 399:15,
451:10, 452:25
**purposes** [3] - 399:12,
450:15, 454:24
**pursuant** [1] - 462:25
**put** [32] - 334:19,
359:22, 372:16,
375:9, 383:6, 392:1,
394:18, 394:22,
396:15, 397:6,
397:7, 397:10,
400:19, 401:14,
404:8, 414:16,
418:13, 428:3,
437:10, 441:3,
441:4, 442:3,
446:15, 451:20,
451:22, 452:7,
454:15, 458:13,
460:5, 463:8, 467:9,
469:12
**putative** [1] - 371:20
**putting** [8] - 395:8,
418:13, 435:15,
437:21, 452:14,
453:4, 458:21, 460:7

---

**Q**

**qualifications** [2] -
343:17, 345:20
**qualified** [1] - 343:21
**qualify** [1] - 343:8
**quality** [1] - 393:20
**quantifiable** [1] -
405:21
**quantity** [1] - 437:9
**quarter** [1] - 470:3
**questionable** [2] -
382:16, 395:4
**questioning** [2] -
344:12, 395:16
**questions** [11] - 335:5,
335:7, 335:9,
335:10, 342:10,
345:18, 364:12,
379:25, 385:5,
410:4, 410:9, 414:7,
418:4, 419:2,
436:10, 447:2,
451:9, 453:8, 469:25
**quick** [3] - 342:17,
443:12, 470:6

**quit** [1] - 422:6
**quite** [5] - 379:2,
405:5, 430:18,
448:23, 463:16

---

**R**

**raise** [3] - 326:2,
363:8, 438:20
**raised** [1] - 437:17
**RANDALL** [1] - 323:4
**Randy** [4] - 346:6,
348:16, 457:6, 457:9
**range** [7] - 360:3,
367:17, 372:23,
376:15, 380:8,
380:11, 384:17
**ranges** [1] - 374:22
**rarely** [1] - 370:1
**rate** [2] - 386:14,
386:16
**rather** [2] - 382:22,
447:11
**rational** [1] - 330:6
**RBD** [6] - 388:21,
388:22, 407:5,
412:5, 457:15,
457:19
**RE** [1] - 322:4
**reach** [2] - 428:15,
444:21
**reached** [1] - 342:21
**react** [1] - 452:24
**read** [15] - 355:19,
375:15, 387:15,
387:16, 392:4,
409:3, 409:4,
409:25, 418:22,
446:9, 446:17,
453:12, 459:1,
462:23
**reading** [2] - 414:1,
434:16
**ready** [3] - 325:11,
385:7, 470:4
**real** [11] - 342:17,
426:12, 443:12,
450:1, 450:17,
450:20, 454:3,
460:1, 460:5, 468:3
**realize** [3] - 340:24,
378:18, 452:4
**realized** [1] - 337:13
**really** [9] - 334:16,
395:20, 407:24,
410:24, 433:23,
437:12, 442:21,
452:24, 453:9
**Realtime** [1] - 470:16

**reason** [8] - 343:2, 369:25, 395:10, 395:12, 410:20, 426:19, 430:10
**reasonable** [7] - 398:15, 409:6, 409:11, 459:15, 463:17, 463:22, 465:3
**reasons** [1] - 426:12
**rebuilding** [1] - 437:19
**rebuttal** [1] - 342:25
**Rec** [11] - 371:7, 371:19, 373:2, 373:3, 373:17, 419:11, 419:12, 419:15, 444:23, 445:23, 469:20
**recalled** [2] - 342:25, 429:9
**recalling** [1] - 340:14
**receive** [1] - 427:18
**received** [7] - 335:22, 335:25, 351:24, 354:12, 453:13, 466:7
**recent** [1] - 428:9
**recently** [2] - 333:19, 426:11
**recess** [1] - 385:20
**recognize** [4] - 348:20, 356:15, 404:25, 464:18
**recognized** [2] - 389:9, 420:12
**recognizing** [1] - 365:2
**recollection** [5] - 425:1, 429:22, 432:8, 437:8, 451:10
**recommendation** [3] - 374:18, 376:6, 427:25
**recommendations** [1] - 366:23
**recommended** [7] - 368:24, 376:9, 384:21, 385:1, 403:21, 403:23, 432:10
**recommending** [2] - 365:3, 405:7
**reconstruct** [1] - 370:4
**record** [8] - 326:11, 345:24, 363:17, 371:21, 377:16, 391:25, 422:17, 470:19
**recorded** [2] - 393:8,

393:18
**RECORDED** [1] - 323:15
**records** [5] - 353:20, 392:22, 393:4, 393:6, 393:8
**RECREATION** [1] - 322:9
**Recreation** [34] - 343:4, 344:1, 344:14, 346:2, 346:5, 347:7, 347:14, 348:3, 348:6, 348:13, 351:15, 352:18, 353:17, 354:3, 354:6, 354:9, 354:13, 354:18, 354:22, 355:6, 355:15, 359:8, 371:20, 371:25, 377:3, 420:10, 447:18, 457:6, 460:5, 460:11, 460:15, 461:6, 465:18, 468:13
**Recreational** [9] - 359:3, 359:7, 361:14, 361:16, 361:18, 361:25, 362:5, 362:8, 362:17
**recreational** [11] - 344:21, 348:8, 348:11, 350:9, 350:16, 350:18, 358:17, 362:6, 362:11, 425:11, 425:19
**REDIRECT** [6] - 324:8, 324:14, 324:19, 342:3, 413:24, 467:11
**redirect** [3] - 342:1, 410:8, 416:7
**reduce** [2] - 431:7, 431:18
**refer** [2] - 359:24, 379:9
**reference** [5] - 355:10, 407:16, 408:3, 408:11, 428:8
**referenced** [1] - 378:12
**referred** [1] - 412:22
**referring** [6] - 358:15, 359:2, 359:23, 448:23, 462:6, 464:1
**refers** [1] - 378:3
**reflect** [2] - 381:15, 393:19

**reflected** [1] - 413:13
**reflects** [2] - 411:10, 418:20
**refrigerator** [2] - 359:25, 450:8
**regard** [4] - 344:4, 425:10, 443:25, 444:3, 444:20
**regarding** [16] - 343:18, 360:11, 360:24, 361:5, 366:12, 369:16, 375:1, 375:7, 378:21, 394:5, 403:12, 415:12, 415:13, 427:18, 427:22, 429:14
**regards** [1] - 438:2
**Registered** [2] - 470:16, 470:16
**Registry** [1] - 368:17
**regulation** [5] - 408:20, 411:7, 417:21, 433:22, 465:2
**regulations** [10] - 358:6, 358:12, 358:15, 360:15, 361:10, 366:8, 433:14, 433:18, 463:8, 465:21
**Regulations** [5] - 408:22, 412:23, 464:2, 464:9, 464:22
**regulatory** [3] - 399:12, 424:5, 425:16
**REICH** [2] - 322:23, 322:23
**reinvigorating** [1] - 437:21
**REL** [5] - 403:19, 403:23, 404:19, 405:17, 405:21
**relate** [1] - 345:19
**related** [2] - 341:17, 431:9
**RELATES** [1] - 322:7
**relation** [1] - 375:13
**relationship** [1] - 327:22
**relative** [6] - 345:20, 372:12, 376:5, 393:23, 401:4, 418:24
**release** [2] - 356:1, 356:2
**relevant** [2] - 459:2, 468:23
**reliable** [1] - 395:11

**reliably** [1] - 405:21
**relied** [8] - 424:2, 424:6, 424:12, 425:13, 425:24, 426:22, 427:10, 427:13
**rely** [6] - 395:2, 419:21, 420:2, 420:5, 428:10, 428:12
**relying** [6] - 424:14, 424:17, 424:21, 425:3, 443:17, 466:20
**remain** [2] - 325:23, 438:17
**remained** [1] - 431:25
**remember** [15] - 337:6, 338:22, 339:17, 340:14, 354:13, 356:17, 360:4, 374:1, 405:1, 405:2, 417:23, 418:6, 464:20, 468:7
**remove** [2] - 340:25, 428:3
**render** [1] - 360:24
**rendering** [1] - 343:17
**repairs** [1] - 437:19
**repeat** [1] - 332:19
**rephrase** [4] - 332:7, 332:10, 332:15, 436:21
**Report** [1] - 416:4
**report** [21] - 347:21, 347:25, 352:8, 352:10, 358:11, 361:13, 387:14, 417:20, 431:16, 434:16, 457:5, 457:8, 458:12, 461:18, 461:20, 462:7, 462:9, 462:10, 462:11, 464:23, 467:22
**reported** [1] - 366:21
**Reporter** [6] - 470:16, 470:16, 470:17, 470:22
**REPORTER** [1] - 323:13
**REPORTER'S** [1] - 470:15
**reports** [4] - 332:1, 357:8, 366:19, 366:23
**represent** [2] - 393:3, 466:11
**representation** [1] - 434:3

**representative** [1] - 433:9
**represented** [2] - 377:24, 447:19
**representing** [4] - 346:5, 389:24, 405:6, 447:18
**represents** [6] - 374:7, 396:4, 405:21, 412:15, 420:6, 462:19
**reproducing** [1] - 370:5
**request** [2] - 424:9, 428:5
**requests** [1] - 427:21
**require** [3] - 362:24, 363:2, 429:25
**required** [4] - 360:11, 360:15, 414:15, 463:1
**requirement** [1] - 414:12
**requirements** [3] - 424:5, 425:16, 427:1
**requiring** [1] - 430:20
**research** [9] - 366:7, 366:9, 435:3, 440:10, 440:11, 440:12, 444:8, 450:15
**resident** [1] - 392:15
**residential** [5] - 359:25, 414:18, 417:22, 433:14, 433:25
**residents** [2] - 427:22, 455:9
**resistant** [1] - 393:23
**resources** [1] - 419:9
**respect** [12] - 332:16, 333:12, 369:12, 394:11, 399:25, 412:4, 414:11, 419:9, 444:22, 450:1, 450:4, 456:15
**respiratory** [1] - 333:13
**respond** [2] - 427:21, 427:22
**response** [12] - 346:11, 401:25, 416:16, 429:5, 429:8, 429:19, 433:1, 435:17, 435:19, 436:11, 437:5, 466:23
**responsibilities** [2] - 459:21, 459:23
**responsibility** [1] -

427:16
**responsible** [1] - 459:21
**rest** [2] - 378:6, 428:3
**restate** [1] - 423:4
**Reston** [1] - 359:4
**result** [5] - 380:1, 380:4, 413:3, 418:20, 434:8
**results** [13] - 362:8, 371:18, 389:11, 390:6, 390:10, 390:11, 392:20, 413:2, 413:6, 413:13, 428:25, 430:20, 434:21
**resume** [1] - 385:9
**retained** [2] - 346:1, 357:11
**retirement** [1] - 448:6
**retrospective** [9] - 369:18, 369:25, 379:3, 380:7, 420:7, 420:8, 420:22, 421:1, 421:12
**return** [1] - 385:11
**review** [9] - 353:15, 353:19, 354:19, 354:21, 434:8, 461:17, 461:21, 461:23, 466:6
**reviewed** [3] - 398:5, 429:2, 456:13
**reviewing** [1] - 386:16
**rhinosinusitis** [2] - 367:24, 443:15
**Rice** [4] - 440:1, 440:2, 440:3, 447:24
**Rick** [1] - 430:12
**rise** [4] - 325:7, 385:14, 385:21, 470:10
**risk** [7] - 365:23, 368:24, 369:4, 369:8, 372:13, 374:19, 406:14
**Rita** [1] - 437:6
**Rivers'** [1] - 398:25
**RMR** [2] - 323:13, 470:21
**Robert** [5] - 342:13, 343:3, 345:23, 345:25, 468:17
**ROBERT** [1] - 324:9
**robust** [1] - 393:23
**role** [2] - 348:1, 461:6
**Ronald** [1] - 439:5
**room** [4] - 337:8,

337:9, 394:1, 457:1
**ROOM** [1] - 323:13
**rotating** [1] - 442:25
**Rouge** [2] - 437:14, 438:7
**row** [1] - 383:24
**ruling** [3] - 398:21, 399:2, 401:2
**running** [1] - 339:16
**Rush** [5] - 348:16, 373:1, 447:19, 457:6, 459:11
**Rush's** [1] - 457:9
**rust** [1] - 352:11
**RV** [3] - 344:3, 345:2, 345:15
**RVIA** [6] - 359:6, 359:8, 359:14, 360:10, 362:1, 362:18

## S

**s/Cathy** [1] - 470:21
**safe** [12] - 388:3, 424:3, 424:7, 424:22, 424:24, 425:14, 426:5, 426:8, 426:13, 426:19, 434:5, 460:10
**safely** [1] - 440:17
**safety** [20] - 362:11, 378:24, 407:12, 407:14, 411:7, 412:4, 412:9, 440:16, 440:19, 440:20, 441:11, 441:14, 441:20, 442:2, 442:4, 442:7, 458:25, 459:6, 460:16, 461:24
**Safety** [5] - 358:18, 366:2, 366:6, 367:1, 408:17
**sales** [2] - 350:8, 353:15
**salesperson** [1] - 441:14
**sample** [2] - 383:23, 413:8
**sampled** [3] - 370:15, 370:20, 378:8
**samples** [7] - 376:15, 376:16, 376:20, 376:23, 408:9, 412:11, 412:12
**sampling** [3] - 372:5, 372:6, 390:18

**SAN** [2] - 322:18, 322:24
**Sandra** [9] - 325:18, 325:19, 326:12, 326:18, 326:19, 333:19, 335:5, 335:10, 342:5
**SANDRA** [3] - 324:5, 326:7, 326:12
**satisfied** [5] - 401:6, 402:17, 402:25, 403:1
**satisfy** [1] - 401:14
**saw** [6] - 351:12, 353:6, 354:22, 378:23, 442:24, 453:13
**scale** [8] - 395:20, 396:13, 396:14, 396:15, 396:17, 396:18, 396:20, 396:21
**scan** [3] - 334:14, 340:6, 340:13
**scenario** [1] - 397:22
**scenarios** [5] - 368:6, 368:7, 369:5, 369:7, 369:9
**scent** [1] - 328:22
**schedule** [1] - 325:15
**school** [2] - 327:6, 327:7
**science** [1] - 395:19
**sciences** [1] - 389:6
**scientific** [4] - 428:15, 428:23, 429:2, 433:23
**scientifically** [1] - 429:1
**scientist** [1] - 393:11
**scope** [3] - 416:6, 416:9, 416:24
**SCOTT** [1] - 323:4
**Scott** [4] - 377:20, 377:22, 390:17, 447:17
**scrape** [2] - 334:20, 341:5
**scraped** [1] - 334:21
**scratch** [2] - 452:9
**screen** [7] - 339:21, 342:7, 371:11, 373:21, 396:25, 400:19, 401:14
**seat** [2] - 325:24, 439:3
**seated** [2] - 325:10, 438:19
**second** [13] - 375:17, 376:7, 376:8, 384:2,

399:2, 405:16, 410:18, 431:3, 442:16, 442:19, 442:20, 443:23, 457:23
**secondly** [1] - 467:24
**seconds** [3] - 373:25, 408:5, 412:15
**Section** [1] - 429:4
**section** [2] - 431:3, 431:16
**Security** [2] - 448:3, 448:5
**SECURITY** [4] - 325:7, 385:14, 385:21, 470:10
**see** [36] - 327:24, 328:9, 335:21, 339:6, 343:5, 348:9, 351:9, 354:24, 361:13, 365:7, 373:12, 374:14, 375:3, 375:20, 376:3, 377:6, 378:16, 383:17, 385:18, 408:17, 411:25, 414:2, 417:20, 422:1, 435:10, 441:16, 441:21, 450:23, 451:22, 460:9, 463:8, 463:19, 466:15, 466:24, 467:16, 470:9
**seeing** [1] - 327:5
**seem** [1] - 411:17
**segregate** [2] - 373:5, 377:9
**self** [2] - 377:17, 378:8
**self-sampled** [1] - 378:8
**self-tested** [1] - 377:17
**send** [1] - 453:5
**sense** [8] - 378:16, 434:25, 451:16, 454:7, 456:10, 456:19, 457:13, 463:13
**senses** [1] - 452:3
**sensitive** [6] - 431:20, 431:24, 434:10, 434:14, 434:17, 434:21
**sensory** [2] - 381:4, 381:25
**sent** [1] - 327:6
**sentence** [5] - 401:17, 404:11, 405:18, 406:3, 409:4,

416:20, 426:3, 429:4, 431:3
**separate** [1] - 459:8
**separated** [2] - 373:8, 374:9
**September** [4] - 376:12, 376:21, 423:24, 426:24
**sequence** [1] - 435:12
**series** [2] - 375:12, 405:3
**serve** [1] - 451:23
**served** [1] - 361:23
**service** [1] - 377:20
**Services** [2] - 366:5, 377:19
**SESSION** [2] - 322:11, 325:2
**set** [7] - 374:17, 405:23, 409:11, 412:5, 430:17, 459:18, 459:19
**sets** [3] - 372:10, 404:13, 406:17
**setting** [5] - 370:6, 379:8, 414:18, 415:3, 415:16
**settings** [2] - 403:22, 417:22
**settled** [1] - 449:1
**seven** [2] - 327:20, 395:24
**several** [4] - 339:23, 370:19, 431:11, 440:24
**shape** [1] - 445:24
**share** [1] - 350:4
**sharing** [1] - 352:22
**Shaw** [3] - 460:2, 461:2, 461:9
**Shaw's** [1] - 399:1
**sheet** [5] - 326:18, 378:24, 466:8, 466:12, 467:24
**sheets** [3] - 392:12, 468:10, 468:13
**shelf** [2] - 405:4, 440:25
**shelters** [2] - 435:15, 435:22
**shift** [2] - 407:4, 407:20
**short** [9] - 407:23, 408:6, 412:13, 412:25, 413:2, 413:3, 414:16, 415:2, 447:9
**short-term** [7] - 407:23, 408:6, 412:13, 413:2,

413:3, 414:16, 415:2
**show** [10] - 356:11, 373:12, 382:18, 395:15, 396:2, 398:8, 404:20, 416:2, 418:1, 465:10
**showed** [3] - 399:23, 419:12, 431:17
**showing** [3] - 374:21, 375:10, 378:12
**shows** [2] - 373:22, 418:15
**shrunk** [1] - 396:25
**sic** [1] - 464:18
**side** [12] - 343:23, 350:13, 350:16, 364:6, 366:25, 430:14, 430:17, 441:19, 448:14, 448:15, 454:16, 462:2
**Sierra** [13] - 375:22, 377:18, 378:7, 382:9, 382:12, 392:12, 394:19, 394:21, 395:5, 395:6, 395:10, 428:9, 428:12
**sign** [2] - 441:5, 445:10
**significant** [3] - 382:15, 391:6, 397:5
**signs** [2] - 441:3, 445:12
**similar** [8] - 369:16, 370:4, 394:11, 420:11, 453:4, 463:3, 463:6
**simple** [6] - 380:21, 380:22, 400:25, 401:3, 402:24, 403:2
**simply** [2] - 343:14, 391:23
**single** [10] - 382:8, 401:1, 401:21, 414:12, 414:15, 415:2, 415:24, 420:5, 420:6, 421:5
**sinus** [3] - 329:22, 330:17, 333:12
**sinuses** [8] - 330:19, 334:10, 335:25, 338:8, 338:14, 338:15, 338:18, 338:25
**sister** [1] - 366:5
**sisters** [3] - 327:7, 329:5, 329:8
**sit** [1] - 385:4
**site** [1] - 391:13

**sitting** [3] - 386:25, 425:22, 448:8
**situation** [2] - 370:13, 440:21
**six** [2] - 395:24, 435:9
**size** [2] - 383:23, 437:9
**skills** [2] - 389:5, 389:7
**Slide** [3] - 377:2, 451:7, 454:19
**slide** [12] - 366:24, 371:15, 373:20, 375:9, 380:13, 382:17, 398:18, 398:19, 399:24, 443:13, 444:16, 451:11
**slides** [1] - 419:3
**slipped** [1] - 455:11
**small** [2] - 393:16, 396:8
**smaller** [1] - 358:1
**smell** [27] - 328:21, 328:23, 328:25, 329:4, 329:7, 331:8, 331:25, 336:5, 336:6, 336:8, 342:7, 384:16, 451:16, 451:21, 451:22, 452:2, 452:3, 452:6, 452:8, 452:9, 452:10, 452:12, 452:16, 452:20, 452:23
**smelled** [1] - 384:9
**smelling** [1] - 331:16
**smoker** [1] - 466:25
**smoking** [3] - 466:24, 467:13, 467:22
**sniff** [1] - 452:8
**Social** [2] - 448:3, 448:5
**soft** [1] - 466:3
**sold** [2] - 457:16
**solemnly** [3] - 326:3, 363:9, 438:21
**solid** [2] - 352:25, 353:13
**solution** [2] - 437:13, 437:22
**solutions** [1] - 430:5
**solve** [1] - 435:15
**someone** [3] - 391:18, 391:19, 438:12
**sometime** [4] - 386:20, 391:24, 446:9, 446:11
**sometimes** [6] - 328:12, 339:17,

339:19, 339:20, 441:6, 450:19
**somewhere** [4] - 375:19, 376:14, 410:2, 465:25
**soon** [1] - 436:4
**sorry** [13] - 364:8, 392:6, 413:19, 414:8, 416:10, 423:1, 446:10, 446:11, 452:9, 455:24, 458:10, 466:14, 467:15
**sort** [4] - 388:7, 435:16, 436:11, 458:13
**sorts** [1] - 432:10
**sound** [1] - 429:1
**source** [5] - 372:22, 377:9, 392:4, 419:12, 419:15
**sources** [10] - 370:3, 377:10, 377:13, 377:16, 383:17, 383:19, 391:21, 392:9, 392:22, 392:23
**Souza** [6] - 422:9, 422:10, 422:15, 422:18, 435:8, 438:11
**SOUZA**................. [1] - 324:15
**space** [1] - 337:10
**spacious** [5] - 336:25, 337:5, 337:7, 337:12, 337:17
**span** [1] - 379:5
**Spas** [2] - 457:16, 457:19
**speaking** [2] - 395:5, 405:19
**specialist** [2] - 422:23, 422:24
**specific** [4] - 359:21, 400:23, 402:3, 426:16
**specifically** [12] - 348:8, 349:8, 350:18, 355:3, 356:2, 373:10, 388:22, 400:17, 428:5, 428:7, 433:19, 438:2
**speeches** [1] - 440:12
**spell** [3] - 326:10, 363:16, 439:4
**spelled** [1] - 439:6
**spent** [1] - 328:14
**spreadsheet** [2] -

392:1, 392:2
**spreadsheets** [1] - 391:22
**St** [6] - 326:23, 337:23, 338:4, 338:9, 338:13, 338:18
**stability** [1] - 437:20
**staging** [1] - 427:7
**stand** [8] - 325:18, 342:25, 373:1, 385:12, 387:23, 453:15, 453:16, 464:6
**standard** [56] - 380:21, 397:7, 397:22, 397:23, 398:12, 399:22, 400:5, 401:1, 401:10, 401:14, 401:17, 401:21, 402:1, 402:24, 403:25, 405:7, 405:12, 406:1, 406:24, 407:2, 407:6, 407:12, 407:13, 407:14, 407:18, 407:19, 407:21, 408:1, 409:10, 409:14, 409:16, 409:17, 409:20, 409:21, 409:25, 410:2, 411:6, 412:4, 412:9, 412:19, 414:1, 414:2, 414:11, 414:15, 414:20, 415:7, 415:8, 415:9, 415:12, 415:13, 417:21, 442:13
**standards** [42] - 343:18, 344:3, 344:25, 360:14, 363:2, 397:7, 397:16, 399:8, 399:9, 399:24, 400:18, 400:19, 400:20, 401:5, 401:6, 401:24, 402:19, 402:20, 403:4, 403:9, 406:18, 408:5, 411:7, 417:25, 424:4, 425:2, 425:3, 425:5, 425:7, 425:9, 425:10, 425:15, 425:18, 425:19, 426:14, 426:17, 426:19, 426:23, 461:17, 461:21,

461:24
**Standards** [4] - 358:18, 361:24, 362:1, 408:17
**standing** [2] - 325:23, 438:18
**stands** [2] - 353:24, 368:16
**start** [9] - 334:8, 364:24, 376:15, 376:16, 385:25, 396:22, 423:22, 431:9, 470:4
**started** [12] - 325:12, 325:16, 327:21, 331:17, 332:1, 372:1, 373:11, 376:13, 398:5, 411:3, 430:15, 430:19
**starting** [1] - 375:19
**State** [1] - 470:17
**state** [11] - 326:10, 345:24, 348:16, 348:18, 363:16, 422:17, 426:3, 437:16, 438:4, 439:3, 439:19
**statement** [5] - 336:21, 352:10, 416:14, 417:23, 425:13
**statements** [3] - 331:1, 380:5, 425:24
**States** [2] - 470:17, 470:22
**states** [2] - 378:25, 406:6
**STATES** [2] - 322:1, 322:13
**station** [1] - 441:5
**statistical** [11] - 365:16, 365:17, 366:15, 366:17, 369:12, 369:14, 372:10, 372:19, 372:23, 378:16, 388:15
**statistically** [4] - 366:21, 370:21, 382:14
**statistician** [6] - 372:17, 383:24, 388:11, 389:1, 389:2, 389:4
**statisticians** [1] - 365:19
**statistics** [13] - 364:18, 364:21, 364:25, 365:8,

365:9, 365:18, 373:9, 373:23, 379:16, 379:19, 384:3, 388:23, 455:21

**stay** [5] - 334:11, 334:18, 342:22, 343:1, 432:23

**stayed** [2] - 333:14, 432:21

**Steering** [4] - 361:24, 362:1, 392:13, 392:25

**STENOGRAPHY** [1] - 323:15

**step** [6] - 325:20, 326:1, 331:5, 342:11, 422:7, 470:1

**steps** [2] - 369:13, 432:2

**stick** [4] - 329:16, 329:17, 414:7, 441:10

**stick-on** [1] - 441:10

**sticker** [5] - 457:23, 458:4, 458:8, 458:12, 458:17

**stickers** [1] - 360:21

**sticking** [1] - 364:6

**still** [10] - 334:24, 337:12, 368:2, 385:24, 421:10, 425:18, 428:19, 440:6

**stint** [1] - 350:15

**stipulate** [1] - 343:7

**stipulated** [4] - 411:12, 411:15, 411:20, 413:1

**stipulation** [4] - 344:2, 344:4, 345:14, 364:14

**stipulations** [1] - 418:12

**stood** [2] - 334:22, 334:23

**stop** [1] - 344:18

**storage** [3] - 351:13, 351:18, 351:19

**store** [2] - 441:1, 450:23

**storm** [3] - 327:24, 432:16, 432:19

**strap** [1] - 427:9

**STREET** [2] - 323:5, 323:13

**Street** [3] - 326:23, 422:18, 457:2

**strong** [6] - 328:23, 328:24, 328:25,

329:3, 331:25, 342:6

**structural** [4] - 352:12, 429:11, 430:1, 430:3

**structure** [2] - 357:5, 433:25

**struggled** [1] - 401:12

**stuck** [1] - 462:2

**student** [2] - 440:9, 440:10

**studies** [6] - 366:19, 366:20, 379:12, 379:13, 381:2, 422:1

**study** [2] - 369:23, 370:2

**stuff** [3] - 332:25, 387:1, 453:3

**stupid** [1] - 328:2

**subcommittees** [2] - 361:22, 361:24

**subcontractors** [4] - 459:13, 460:2, 461:2, 461:10

**subject** [5] - 359:13, 368:5, 368:8, 439:15, 440:13

**subjects** [1] - 443:16

**submit** [2] - 421:1, 421:12

**subscribe** [1] - 359:9

**subsequent** [1] - 349:10

**substances** [1] - 454:4

**Substances** [1] - 368:16

**substantial** [1] - 448:18

**subtract** [1] - 446:6

**suggest** [2] - 381:18, 459:15

**suggested** [6] - 397:12, 397:13, 398:6, 460:1, 461:12, 466:4

**suggesting** [3] - 397:15, 398:11, 460:20

**SUITE** [5] - 322:18, 322:21, 322:24, 323:5, 323:10

**summary** [1] - 400:4

**Sunday** [2] - 328:11

**Sundays** [1] - 336:23

**superior** [1] - 421:12

**supervisory** [3] - 422:24, 423:20, 423:23

**supplied** [2] - 353:16, 371:16

**Supplied** [1] - 416:4

**suppliers** [1] - 468:11

**supposed** [6] - 363:25, 396:17, 400:11, 425:2, 445:14, 460:22

**surgeon** [1] - 467:22

**surgery** [13] - 333:20, 333:25, 334:5, 334:6, 334:23, 334:24, 335:2, 335:3, 335:6, 340:23, 340:24, 341:3

**susceptibility** [1] - 367:19

**sustain** [2] - 329:17, 468:24

**swear** [2] - 326:3, 363:9, 438:21

**sworn** [4] - 326:8, 342:16, 363:14, 439:1

**symptoms** [3] - 443:15, 454:20, 455:8

**system** [11] - 360:2, 445:4, 445:12, 458:13, 458:16, 459:7, 459:18, 459:19, 460:21, 461:14

# T

**table** [5] - 382:21, 383:2, 384:2, 410:25, 448:8

**Table** [4] - 366:24, 382:17, 382:18, 407:1

**tables** [4] - 366:22, 380:15, 382:19, 382:22

**tags** [2] - 441:3, 445:13

**tank** [2] - 360:1, 360:2

**targeted** [1] - 409:1

**task** [1] - 370:5

**taught** [3] - 365:7, 365:8, 440:1

**technical** [2] - 361:22, 366:19

**Technical** [2] - 361:24, 377:19

**techniques** [1] - 441:20

**telephone** [1] - 347:16

**television** [1] - 441:16

**temperature** [5] -

339:12, 387:20, 387:21, 388:6, 413:10

**temporary** [4] - 426:5, 436:7, 436:13, 437:5

**ten** [5] - 385:8, 385:9, 385:18, 395:25, 396:22

**tenants** [1] - 379:3

**tend** [3] - 378:25, 379:20, 396:1

**tender** [4] - 364:15, 364:16, 364:17, 439:15

**tendered** [5] - 361:5, 365:25, 449:11

**tent** [1] - 436:8

**tents** [2] - 435:16, 435:22

**term** [15] - 353:22, 355:18, 355:19, 355:21, 358:20, 395:18, 407:23, 408:6, 412:13, 412:25, 413:2, 413:3, 414:16, 415:2

**terms** [13] - 329:22, 366:22, 381:3, 395:22, 395:23, 401:23, 402:14, 412:7, 429:12, 430:1, 432:9, 437:20, 440:24

**TES** [2] - 377:18, 377:22

**test** [15] - 371:18, 380:1, 380:4, 384:23, 389:16, 389:18, 390:11, 413:2, 413:3, 413:6, 418:14, 418:19, 418:20, 419:10

**tested** [9] - 362:7, 371:7, 376:18, 377:17, 389:24, 389:25, 395:7, 411:24

**testified** [11] - 326:9, 336:3, 339:23, 342:22, 363:15, 395:1, 439:2, 448:24, 453:13, 460:22, 468:17

**testifies** [1] - 399:6

**testify** [4] - 386:14, 422:11, 449:4, 449:8

**testifying** [3] - 398:5, 425:22, 426:6

**testimony** [26] - 326:3, 338:24, 340:1,

343:12, 343:15, 344:8, 344:17, 345:14, 345:19, 345:20, 363:9, 376:11, 385:13, 392:8, 397:15, 398:16, 403:4, 403:6, 438:21, 449:7, 452:14, 453:12, 453:21, 454:24

**testing** [28] - 377:23, 390:3, 394:21, 395:7, 414:12, 414:17, 415:2, 415:3, 415:15, 415:16, 418:5, 419:13, 428:1, 428:6, 428:9, 428:10, 428:12, 428:13, 428:14, 428:16, 428:20, 428:25, 429:3, 429:6, 430:13, 430:19, 430:24, 432:8

**tests** [6] - 334:13, 378:10, 378:11, 378:12, 382:6, 431:17

**THE** [124] - 322:12, 325:7, 325:10, 325:19, 326:2, 326:6, 326:10, 326:12, 326:15, 329:16, 330:7, 332:7, 332:10, 332:18, 332:19, 333:5, 335:7, 335:11, 335:12, 340:16, 341:24, 341:25, 342:11, 342:16, 342:18, 342:24, 343:8, 343:12, 343:22, 343:25, 344:2, 344:23, 344:17, 344:23, 345:2, 345:8, 345:14, 345:17, 363:5, 363:7, 363:8, 363:12, 363:16, 363:18, 363:21, 364:14, 364:17, 364:20, 374:5, 374:7, 379:22, 384:6, 385:6, 385:14, 385:17, 385:21, 385:24, 386:2, 394:16, 397:20, 397:21,

398:4, 398:13,
398:21, 400:2,
400:25, 401:3,
401:11, 401:20,
402:1, 402:4, 402:9,
402:12, 404:5,
410:4, 410:5, 410:6,
410:13, 410:18,
413:19, 413:20,
414:5, 414:8,
414:22, 415:9,
415:11, 416:9,
416:17, 416:21,
417:1, 417:3, 417:4,
417:5, 417:8,
417:14, 417:16,
418:9, 419:24,
420:19, 420:22,
422:5, 422:7,
422:10, 422:13,
438:12, 438:15,
438:20, 438:24,
439:3, 439:5,
439:16, 439:18,
439:21, 446:3,
447:4, 447:9,
464:12, 465:12,
468:24, 469:1,
469:8, 469:15,
470:1, 470:10
**therefore** [3] - 364:20,
365:23, 379:19
**thick** [2] - 353:5,
439:24
**thin** [1] - 410:22
**thinking** [2] - 337:10,
414:7
**third** [6] - 375:18,
389:20, 443:2,
443:3, 449:9, 458:18
**THIS** [1] - 322:7
**thousands** [6] -
351:19, 370:17,
370:19, 405:1, 433:4
**three** [16] - 368:24,
368:25, 393:16,
393:17, 395:24,
412:1, 428:20,
435:14, 436:11,
440:5, 440:8,
441:25, 443:11,
443:12, 444:21,
449:7
**THREE** [2] - 322:18,
323:9
**three-part** [1] - 435:14
**three-prong** [1] -
436:11
**threshold** [5] - 384:8,
384:14, 399:13,

431:20, 431:23
**thresholds** [1] -
421:25
**threw** [1] - 404:21
**throat** [1] - 443:14
**throw** [1] - 399:20
**time-weighted** [4] -
408:7, 413:6,
413:11, 413:12
**title** [2] - 408:14,
408:16
**TO** [2] - 322:7, 325:4
**tobacco** [4] - 466:24,
466:25, 467:1,
467:13
**today** [10] - 325:14,
325:15, 387:24,
397:15, 421:11,
425:18, 425:22,
426:6, 441:16, 467:6
**together** [4] - 394:18,
458:21, 459:3, 459:8
**toilets** [1] - 427:20
**took** [8] - 327:5,
331:3, 331:5,
344:13, 384:24,
428:19, 428:20,
432:2
**top** [7] - 367:10,
382:19, 383:2,
397:3, 405:17,
408:13, 467:16
**total** [2] - 383:2,
383:16
**touch** [1] - 374:1
**towards** [1] - 331:15
**toxic** [4] - 365:5,
365:13, 368:4, 444:4
**Toxic** [1] - 368:16
**toxicity** [1] - 454:13
**toxicological** [3] -
368:21, 368:23,
384:12
**toxicologist** [2] -
449:15, 454:9
**toxicologists** [1] -
456:4
**Toyota** [1] - 460:12
**track** [1] - 364:12
**trailer** [127] - 328:7,
328:10, 328:14,
328:17, 328:19,
329:1, 329:4, 330:1,
330:18, 331:4,
331:7, 331:11,
331:24, 331:25,
333:15, 333:16,
336:3, 336:14,
336:19, 336:23,
336:24, 337:3,

337:9, 337:15,
337:19, 337:21,
338:25, 339:4,
339:8, 339:13,
339:15, 339:20,
340:10, 340:20,
340:22, 345:15,
348:23, 350:21,
351:10, 351:12,
351:22, 351:25,
352:3, 352:5, 352:9,
352:11, 352:16,
356:21, 356:23,
356:25, 357:2,
357:6, 357:12,
357:15, 357:18,
357:22, 357:25,
358:11, 358:17,
359:19, 362:24,
369:16, 370:15,
371:3, 373:3,
382:21, 384:19,
387:18, 387:20,
387:21, 388:2,
388:3, 388:8,
388:12, 389:12,
389:17, 389:19,
389:21, 389:24,
390:3, 392:16,
394:23, 395:9,
411:10, 411:21,
411:24, 413:10,
414:17, 415:3,
415:17, 419:10,
420:3, 420:12,
421:6, 421:11,
431:14, 438:3,
441:1, 441:8, 444:1,
444:2, 444:5,
444:23, 445:10,
445:13, 445:15,
445:16, 446:24,
451:2, 451:3, 451:5,
455:9, 457:4,
457:24, 458:4,
458:8, 458:23,
459:5, 459:17,
459:20, 462:3,
463:5, 465:20,
469:12
**TRAILER** [1] - 322:4
**Trailer** [1] - 416:4
**trailers** [78] - 348:2,
348:9, 350:19,
351:1, 351:19,
352:20, 353:17,
355:4, 355:7, 356:3,
358:19, 359:22,
360:16, 370:14,
370:25, 371:7,
372:8, 373:2,

373:13, 373:16,
375:2, 377:4, 377:5,
377:7, 378:17,
380:9, 380:16,
380:17, 380:23,
382:20, 388:20,
388:21, 388:22,
394:11, 407:5,
412:5, 414:12,
415:20, 415:25,
418:13, 419:10,
419:13, 420:9,
420:10, 421:8,
424:18, 425:19,
426:10, 433:5,
433:8, 433:18,
434:6, 435:20,
435:22, 435:25,
436:6, 436:12,
436:18, 437:4,
438:6, 446:13,
451:1, 455:16,
455:19, 457:16,
457:20, 458:2,
459:21, 460:6,
460:7, 461:17,
463:2, 463:4,
463:18, 468:21
**trained** [1] - 389:6
**training** [3] - 389:7,
440:10, 452:10
**transcript** [3] - 343:11,
343:17, 470:18
**TRANSCRIPT** [2] -
322:12, 323:15
**transcription** [1] -
394:3
**transfer** [1] - 391:20
**transition** [2] - 435:21,
435:24
**translated** [1] - 366:7
**transport** [1] - 427:7
**Transportation** [1] -
461:23
**travel** [72] - 345:15,
348:9, 348:23,
350:18, 350:21,
351:1, 351:9,
351:12, 353:17,
355:4, 355:7, 356:3,
357:6, 357:12,
357:18, 357:22,
357:25, 358:11,
358:17, 358:19,
359:19, 360:15,
362:24, 369:16,
370:25, 373:2,
373:13, 377:4,
382:20, 387:18,
388:20, 388:21,

388:22, 389:24,
394:11, 407:5,
414:12, 414:17,
415:3, 415:20,
415:25, 424:18,
425:19, 426:10,
433:4, 433:7,
433:18, 434:5,
435:20, 435:22,
435:25, 436:6,
436:12, 436:18,
437:4, 438:3, 438:6,
444:23, 451:2,
451:3, 451:5,
457:16, 461:17,
462:2, 463:1, 463:4,
463:5, 465:20,
468:21, 469:12
**treatment** [2] - 335:22,
335:25
**tri** [1] - 431:14
**tri-fold** [1] - 431:14
**trial** [4] - 386:14,
399:3, 402:22, 456:3
**TRIAL** [1] - 322:12
**tried** [2] - 377:8, 430:5
**trip** [1] - 347:23
**true** [13] - 376:19,
378:19, 383:4,
383:12, 406:10,
406:11, 443:20,
450:2, 450:20,
454:10, 454:14,
456:6, 470:18
**truly** [2] - 371:25,
396:15
**truth** [9] - 326:4,
326:5, 363:10,
363:11, 438:22
**try** [4] - 334:3, 370:7,
388:17, 469:2
**trying** [12] - 338:20,
343:6, 379:5,
388:11, 396:7,
425:12, 431:11,
434:2, 450:22,
453:17, 460:19
**TUESDAY** [2] - 322:6,
325:3
**turn** [4] - 431:2,
457:16, 458:2,
458:23
**turned** [1] - 461:15
**twelfth** [1] - 375:19
**twice** [1] - 328:13
**two** [43] - 327:19,
350:8, 366:11,
373:5, 374:17,
376:24, 378:13,
380:2, 380:8,

380:11, 381:17,
382:19, 383:9,
384:18, 392:23,
393:16, 393:17,
394:20, 395:24,
397:6, 398:16,
398:17, 399:7,
399:9, 400:1,
400:18, 401:10,
401:24, 402:1,
402:19, 403:18,
406:12, 409:20,
421:16, 421:21,
421:24, 431:12,
432:15, 435:7,
449:7, 449:9, 465:1,
468:3
**two-and-a-half** [2] -
421:16, 421:24
**two-page** [1] - 431:12
**two-week** [1] - 409:20
**TX** [3] - 322:18,
322:21, 322:24
**type** [6] - 353:4,
358:13, 359:23,
360:11, 361:11,
392:10
**types** [4] - 353:1,
353:20, 373:18,
437:1
**typically** [5] - 353:4,
440:22, 455:9,
455:13, 455:18

## U

**ultimately** [2] -
391:14, 401:5
**unannounced** [1] -
359:10
**uncertainty** [1] -
372:18
**under** [11] - 359:6,
376:25, 378:17,
385:24, 395:16,
401:7, 404:12,
405:8, 415:11,
452:5, 466:16
**underneath** [1] -
356:22
**understood** [5] -
338:24, 341:6,
430:23, 430:24,
434:8
**underway** [1] - 394:1
**undoubtedly** [2] -
407:23, 409:19
**uniform** [1] - 328:3
**unit** [26] - 348:5,

356:16, 356:17,
358:5, 358:10,
359:5, 359:12,
360:4, 360:9,
360:11, 360:22,
360:25, 361:3,
361:9, 361:11,
382:10, 392:16,
413:4, 414:16,
427:19, 427:23,
429:11, 430:1, 430:3
**UNITED** [2] - 322:1,
322:13
**United** [2] - 470:17,
470:22
**units** [42] - 348:6,
370:17, 372:4,
372:5, 373:9,
380:14, 380:16,
388:18, 396:16,
408:2, 424:3, 424:4,
424:8, 424:11,
424:15, 424:19,
424:22, 425:1,
425:3, 425:15,
426:1, 426:12,
426:13, 426:18,
426:20, 427:6,
427:7, 427:9,
427:11, 427:14,
428:22, 429:6,
429:10, 429:14,
430:2, 430:7,
435:20, 437:1
**university** [4] - 440:7,
440:10, 450:18,
450:19
**University** [6] - 349:5,
349:6, 364:5,
364:10, 440:1, 440:3
**unless** [3] - 396:25,
455:14, 455:15
**unlikely** [1] - 394:10
**unoccupied** [4] -
372:10, 372:21,
380:14, 421:8
**unrelated** [1] - 459:8
**unsafe** [1] - 434:5
**unusual** [1] - 444:18
**up** [79] - 325:21,
325:22, 326:22,
327:4, 327:9,
329:13, 332:2,
334:15, 343:3,
364:6, 371:6,
371:11, 371:18,
372:9, 372:25,
373:21, 374:14,
374:16, 375:9,
376:3, 380:13,

381:8, 383:16,
385:11, 385:13,
387:14, 391:17,
396:8, 396:10,
396:18, 396:22,
396:24, 397:18,
398:3, 400:14,
400:19, 401:5,
401:11, 401:18,
401:24, 404:8,
404:21, 405:16,
405:17, 406:1,
406:18, 408:12,
408:13, 410:18,
413:4, 416:16,
417:15, 427:6,
427:8, 432:5, 433:2,
438:17, 438:18,
443:4, 444:14,
450:17, 451:25,
452:1, 454:19,
459:18, 459:19,
460:9, 461:18,
461:20, 462:15,
463:25, 464:15,
464:20, 465:16,
467:9, 467:16,
469:16, 469:23,
470:4
**uploaded** [1] - 392:2
**usual** [1] - 444:20
**utilities** [1] - 427:8
**utilize** [1] - 362:25
**utilized** [2] - 361:8,
392:17

## V

**valid** [4] - 408:10,
409:23, 410:24,
428:25
**value** [3] - 407:14,
412:1, 413:1
**values** [1] - 412:2
**vapors** [1] - 365:13
**variety** [5] - 356:9,
361:23, 399:12,
403:4, 459:22
**various** [11] - 353:1,
353:2, 369:15,
370:3, 372:13,
374:22, 377:13,
378:23, 380:19,
429:5, 441:2
**vary** [1] - 383:23
**vast** [1] - 377:6
**vehicle** [4] - 343:18,
344:15, 362:7, 441:7
**Vehicle** [10] - 358:18,
359:3, 359:7,

361:14, 361:16,
361:19, 361:25,
362:5, 362:8, 362:17
**vehicles** [10] - 344:21,
348:8, 348:11,
350:9, 350:16,
350:18, 358:17,
362:11, 425:11,
425:20
**vendor** [1] - 353:15
**vendors** [9] - 424:2,
424:6, 424:10,
424:12, 424:14,
424:21, 425:13,
425:25, 426:22
**vendors'** [1] - 424:17
**vent** [10] - 429:7,
429:8, 429:12,
429:15, 429:18,
429:24, 430:8,
430:9, 432:2, 432:8
**ventilate** [1] - 429:12
**ventilation** [5] -
431:17, 432:1,
432:5, 432:9, 450:1
**verbal** [4] - 441:12,
441:19, 459:3,
461:13
**verbiage** [1] - 398:9
**Veritas** [7] - 377:16,
378:1, 378:3,
378:11, 383:17,
392:24, 419:3
**versus** [5] - 372:9,
372:22, 412:7,
412:25, 438:3
**vertical** [1] - 374:17
**viable** [1] - 431:25
**vicinity** [1] - 437:13
**victims** [2] - 437:6,
437:7
**video** [2] - 343:5,
422:11
**videotaped** [2] -
342:14, 345:23
**Videotaped** [2] -
422:15, 438:11
**VIDEOTAPED** [2] -
324:9, 324:15
**view** [3] - 352:15,
353:19, 460:16
**Virginia** [3] - 359:4,
386:10, 422:19
**virtually** [5] - 384:3,
384:4, 390:10,
421:18, 448:16
**vis-à-vis** [1] - 375:23
**visit** [5] - 328:7, 328:8,
329:3, 356:18,
443:12

**visual** [1] - 372:11
**VOIR** [2] - 324:11,
363:22
**Vonderhaar** [2] -
346:14, 346:15

## W

**wait** [12] - 335:7,
400:13, 410:4,
410:18, 414:5,
430:24, 457:23,
458:3, 469:8, 469:15
**Walgreens** [2] - 441:1,
441:9
**walk** [5] - 328:16,
331:25, 356:21,
459:4, 461:14
**walk-through** [2] -
459:4, 461:14
**walked** [3] - 328:21,
328:25, 329:4
**Ward** [1] - 326:23
**warm** [1] - 388:6
**warn** [12] - 442:4,
442:15, 443:8,
443:10, 451:12,
456:17, 457:11,
465:19, 468:6,
468:11, 468:15
**warned** [6] - 443:21,
444:6, 461:3,
461:11, 468:16,
469:21
**warning** [46] - 440:15,
440:16, 440:23,
441:22, 442:1,
442:9, 442:17,
442:24, 444:22,
445:4, 445:6,
445:12, 445:20,
445:23, 449:25,
450:14, 451:17,
451:20, 451:23,
453:23, 454:1,
455:1, 455:10,
455:17, 457:23,
458:4, 458:8,
458:12, 458:13,
458:16, 458:17,
459:7, 460:21,
460:24, 461:13,
462:1, 463:8,
463:13, 463:15,
463:19, 464:22,
465:19, 465:25,
466:3, 467:21
**warnings** [35] -
354:23, 354:25,
355:1, 355:3, 355:9,

355:16, 360:11, 360:18, 360:19, 360:21, 439:13, 439:20, 439:21, 440:13, 441:2, 445:4, 445:7, 445:9, 445:11, 449:21, 449:22, 449:24, 450:3, 450:7, 450:13, 450:23, 451:4, 451:16, 451:24, 454:15, 463:7, 467:3, 467:23, 468:18, 469:12

**warns** [1] - 468:20
**water** [5] - 360:1, 454:11, 454:13
**watts** [1] - 438:12
**Watts** [10] - 325:13, 363:5, 390:23, 394:18, 395:2, 395:16, 448:11, 449:10, 451:8, 453:8
**WATTS** [92] - 322:16, 322:17, 325:17, 326:14, 326:17, 329:20, 330:6, 330:12, 330:14, 332:9, 332:14, 332:21, 333:6, 333:8, 335:9, 342:2, 342:4, 342:10, 342:13, 342:21, 343:10, 343:20, 344:5, 344:20, 344:25, 345:4, 345:11, 345:16, 363:6, 363:20, 363:23, 364:16, 364:18, 364:23, 374:4, 374:6, 379:21, 379:24, 384:5, 384:7, 385:4, 398:10, 398:18, 399:20, 400:3, 400:10, 400:13, 401:2, 401:8, 401:15, 402:7, 413:25, 414:10, 414:21, 415:1, 415:8, 415:19, 416:8, 416:11, 416:14, 416:20, 416:23, 417:6, 417:15, 417:18, 418:8, 418:11, 419:23, 420:1, 421:15, 422:6, 422:9, 422:12,

438:14, 439:8, 439:15, 439:20, 439:23, 446:2, 446:5, 447:2, 467:9, 467:12, 468:3, 468:5, 468:25, 469:4, 469:6, 469:9, 469:11, 469:19, 469:25
**WATTS...................** [1] - 324:11
**WATTS...................** [3] - 324:8, 324:14, 324:19
**WATTS...................** . [3] - 324:6, 324:12, 324:17
**ways** [2] - 380:19, 441:2
**WD** [3] - 377:20, 377:22, 390:17
**weak** [1] - 328:23
**web** [1] - 391:13
**week** [2] - 328:13, 409:20
**weight** [3] - 399:22, 400:21, 401:18
**weighted** [4] - 408:7, 413:6, 413:11, 413:12
**WEINSTOCK** [2] - 323:7, 323:8
**welcome** [2] - 335:11, 341:24
**well-known** [2] - 368:18, 379:1
**West** [1] - 386:10
**whatsoever** [4] - 348:22, 352:9, 354:17, 450:3
**whereas** [2] - 367:20, 374:23
**WHEREUPON** [13] - 325:8, 342:19, 345:6, 345:22, 385:15, 385:19, 385:22, 397:25, 402:10, 416:18, 422:14, 438:10, 470:11
**whichever** [1] - 401:14
**whole** [5] - 326:4, 363:10, 386:25, 391:14, 438:22
**wide** [3] - 328:20, 367:17, 372:23
**widely** [1] - 442:11
**willing** [1] - 399:4
**win** [1] - 341:21
**Winchester** [1] -

422:19
**windows** [4] - 387:22, 388:6, 432:6, 432:9
**winnowed** [1] - 372:2
**winter** [1] - 421:5
**Wisconsin** [1] - 447:23
**wise** [1] - 337:17
**wish** [1] - 364:1
**wishes** [1] - 377:14
**witness** [25] - 325:13, 325:20, 326:8, 330:8, 333:5, 343:6, 344:10, 345:8, 345:10, 363:14, 387:23, 400:11, 402:20, 404:4, 410:23, 416:15, 422:5, 422:10, 439:1, 439:15, 439:18, 447:11, 448:20, 465:11, 469:15
**WITNESS** [17] - 326:6, 326:12, 332:19, 335:11, 341:24, 363:12, 363:18, 374:7, 397:21, 410:5, 410:13, 413:19, 414:8, 415:11, 420:22, 438:24, 439:5
**witnesses** [3] - 325:25, 326:18, 403:8
**woman** [1] - 367:24
**wondering** [2] - 332:24, 332:25
**wood** [21] - 352:23, 352:25, 353:12, 353:14, 353:16, 354:4, 356:2, 356:7, 357:24, 361:2, 381:16, 381:17, 394:23, 395:8, 415:4, 449:19, 456:3, 463:3, 468:11
**Woods** [1] - 422:16
**woods** [2] - 353:2, 353:9
**word** [5] - 405:8, 408:15, 452:22, 455:11, 455:25
**words** [14] - 373:17, 395:20, 396:7, 399:24, 406:7, 408:22, 437:11, 453:25, 454:8, 456:2, 456:20, 457:22, 459:15,

462:12
**workers** [6] - 367:15, 367:21, 367:22, 369:24, 370:2, 407:4
**workplace** [4] - 365:6, 365:21, 367:21, 368:6
**works** [2] - 347:13, 391:24
**world** [11] - 420:25, 421:9, 450:1, 450:17, 450:19, 450:20, 451:16, 454:3, 460:1, 460:5
**World** [1] - 368:10
**worse** [7] - 330:19, 330:25, 333:14, 333:16, 333:17, 333:18, 339:1
**Wozniak** [8] - 342:13, 342:16, 343:3, 345:8, 345:23, 345:25, 356:12, 468:17
**WOZNIAK...............** [1] - 324:9
**written** [6] - 426:25, 449:25, 450:3, 450:7, 451:1, 451:4
**wrote** [3] - 326:19, 366:13, 457:8

# X

**X-axis** [4] - 374:2, 374:7, 375:16, 395:23

# Y

**y'all** [2] - 331:11, 416:17
**Y-axis** [2] - 395:17, 396:3
**yard** [1] - 351:13
**year** [22] - 327:19, 350:11, 360:4, 369:8, 369:10, 370:18, 372:14, 375:17, 376:24, 378:12, 378:16, 380:8, 380:11, 381:17, 381:19, 382:6, 382:10, 384:18, 421:24, 432:17
**year-and-a-half** [1] - 421:24
**years** [31] - 327:20,

339:24, 357:22, 366:1, 370:10, 370:19, 376:24, 378:13, 379:17, 379:19, 380:1, 380:4, 380:9, 384:18, 384:23, 389:20, 418:19, 418:23, 419:19, 420:2, 421:6, 421:11, 421:16, 421:21, 421:23, 421:24, 422:22, 440:2, 440:5, 440:9, 448:21
**yesterday** [9] - 369:22, 373:1, 378:24, 381:2, 386:20, 386:21, 386:23, 387:5, 387:8
**young** [1] - 367:18
**YOUNT** [39] - 323:3, 323:4, 386:1, 386:4, 394:15, 394:17, 397:24, 398:11, 399:18, 400:9, 400:11, 401:23, 402:2, 403:15, 403:17, 404:4, 404:7, 410:15, 411:5, 413:18, 413:22, 414:19, 415:6, 416:6, 416:10, 416:13, 416:24, 417:10, 420:17, 439:17, 447:8, 447:12, 447:14, 464:14, 464:17, 465:11, 465:14, 467:8, 468:23
**Yount** [6] - 385:17, 385:25, 403:14, 447:5, 447:17, 464:12
**YOUNT...................** .. [2] - 324:13, 324:18
**yourselves** [1] - 470:5

# Z

**zero** [2] - 396:22, 397:3
**zip** [1] - 422:19
**zone** [1] - 432:19
**zoom** [2] - 404:11, 462:8
**ZWAIN** [1] - 323:7