```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3      ************************************************************

 4       IN RE:  FEMA TRAILER
         FORMALDEHYDE PRODUCTS
 5       LIABILITY LITIGATION
                                      DOCKET MDL NO. 1873 "N"
 6                                    NEW ORLEANS, LOUISIANA
                                      TUESDAY, MAY 18, 2010
 7       THIS DOCUMENT RELATES TO:

 8       DOCKET NO. 09-3251,
         EARLINE CASTANEL v
 9       RECREATION BY DESIGN, LLC

10      ************************************************************

11                     DAY II, AFTERNOON SESSION
                  TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12          HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                    UNITED STATES DISTRICT JUDGE
13

14
        APPEARANCES:
15

16      FOR PLAINTIFF:            WATTS GUERRA CRAFT
                                  BY:  MIKAL C. WATTS, ESQUIRE
17                                FOUR DOMINION DRIVE
                                  BUILDING THREE, SUITE 100
18                                SAN ANTONIO, TX 78257

19
                                  CHRIS PINEDO
20                                ATTORNEY AT LAW
                                  802 N. CARANCAHUA, SUITE 2250
21                                CORPUS CHRISTI, TX 78470

22
                                  REICH & BINSTOCK
23                                BY:  DENNIS C. REICH, ESQUIRE
                                  4265 SAN FELIPE, SUITE 1000
24                                HOUSTON, TX 77027

25
```

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR DEFENDANT:                GARRISON YOUNT FORTE & MULCAHY
                                    BY:  LYON H. GARRISON, ESQUIRE
 4                                       SCOTT P. YOUNT, ESQUIRE
                                         RANDALL C. MULCAHY, ESQUIRE
 5                                  909 POYDRAS STREET, SUITE 1800
                                    NEW ORLEANS, LA 70112
 6

 7                                  DUPLASS ZWAIN BOURGEOIS MORTON
                                    PFISTER & WEINSTOCK
 8                                  BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                         JOSEPH G. GLASS, ESQUIRE
 9                                  THREE LAKEWAY CENTER
                                    3838 N. CAUSEWAY BOULEVARD
10                                  SUITE 2900
                                    METAIRIE, LA 70002
11

12

13
      OFFICIAL COURT REPORTER:      KAREN A. IBOS, CCR, CRR
14                                  500 POYDRAS STREET, ROOM B406
                                    NEW ORLEANS LA 70130
15                                  (504) 589-7776

16      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
      PRODUCED BY COMPUTER.
17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2

3   WITNESSES FOR THE PLAINTIFF:              PAGE/LINE:

4

5   VIDEO DEPOSITION OF BRIAN McCREARY           474/19

6

7   STEPHEN SMULSKI
       Voir Dire Examination by Mr. Watts       481/1
       Direct Examination by Mr. Watts          481/25
8      Cross-Examination by Mr. Mulcahy         511/17
       Redirect Examination by Mr. Watts        530/3

9

10  VIDEO DEPOSITION OF MARK POLK                534/23

11

    ALEXIS MALLET, JR.
12
    Voir Dire Examination by Mr. Watts          543/23
13  Direct Examination by Mr. Watts             544/17
    Cross-Examination by Mr. Mulcahy            549/12

14

15  VIDEO DEPOSITION OF MARTIN McNEESE           556/14

16
    VIDEO DEPOSITION OF GUY BONOMO               575/12
17

18  VIDEO DEPOSITION OF STANLEY E. LARSON        589/23

19

20

21

22

23

24

25
```

```
 1                     P-R-O-C-E-E-D-I-N-G-S

 2                      AFTERNOON SESSION

 3                    TUESDAY, MAY 18, 2010

 4

 5        (OPEN COURT.)

 6        THE MARSHAL:  All rise.

 7        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

 8             THE COURT:  You may be seated.  Okay.  Mr. Watts, we were

 9   about to get to the next witness.

10             MR. WATTS:  Yes, sir, it's Brian McCreary.  Brian is

11   through his videotape deposition.  This is only eight minutes and

12   13 seconds long.

13             THE COURT:  Okay, let's go ahead and get Mr. McCreary's

14   testimony, and that is spelled M-C capital C-R-E-A-R-Y.  And he has

15   been sworn in and counsel are present.

16        (WHEREUPON, THE VIDEO DEPOSITION OF BRIAN McCREARY WAS

17        PLAYED.)

18   BY MR. PENTON:

19   Q.  Brian, what is your address, sir?

20   A.  Work address?

21   Q.  Yes, sir.

22   A.  National Emergency Training Center, 16825 South Seton Avenue,

23   Emmitsburg, Maryland.

24   Q.  Is that part of FEMA?

25   A.  Yes.
```

1  Q.  How long have you been with FEMA?

2  A.  Since August of 1992.

3  Q.  All right.  So, what is your education?

4  A.  I have a bachelor of science in mathematics.

5  Q.  All right.  And review for us real quickly, since 1992 the

6  types of jobs that you were -- that you've been in.  If you want,

7  you can state the position and the basic function, so I get an idea

8  of your work history with them.  Go ahead.

9  A.  I've been in contracting the whole time.  I was a contract

10 specialist initially with FEMA, and then gradually became a team

11 leader, and then section chief.

12 Q.  Okay.  What part of the contract program were you involved with

13 for Katrina/Rita?

14 A.  Simply the purchase of all of the units.

15 Q.  Okay.  Now, who made the decision on what percentage of

16 manufactured homes versus park models versus travel trailers that

17 would be used as the temporary housing units in this response?

18 A.  Logistics, with input from the folks on the ground and in

19 Louisiana.

20 Q.  And the folks on the ground, meaning whom?

21 A.  There was, I believe it was called -- well, I am not sure

22 now -- it was emergency housing command group or--

23 Q.  It was a FEMA group?

24 A.  Yes.

25 Q.  Do you know why travel trailers were decided upon at the

1   percentages they were as opposed to the other types of homes?

2   A.   It's my understanding that the manufactured homes could not be

3   used in most of the areas due to the fact that it was a flood

4   plain -- designated as a flood plain.

5   Q.   So has it been historical for FEMA not to put manufactured

6   homes in a flood plain?

7   A.   Yes, as far as -- my understanding is that it was -- it's

8   actually a FEMA policy.

9   Q.   And because it takes a more extensive, permanent setup,

10  correct?

11  A.   Yes.

12  Q.   Did any FEMA specifications require that the THU manufacturers

13  use low formaldehyde -- excuse me -- low formaldehyde-emitting

14  products in its construction?

15  A.   We had -- I remember nothing in our specifications that

16  directly speak to formaldehyde, but they -- in the mobile home

17  specifications, the manufacturers were required to comply with HUD

18  requirements.

19  Q.   But not the travel trailers, correct?

20  A.   Correct.

21  Q.   Do you know of any other specifications other than what you are

22  familiar with, this document I'm telling you about?

23  A.   Well, there was a one-page document that was for off-the-lot

24  purchases of travel trailers, which just indicated several

25  characteristics, the size and that type of thing, and then there

1  was a specification for the manufacturer of the trailers, and I

2  can't recall offhand how long that specification was.

3  Q.  So was your function solely to get a set number of travel

4  trailers ordered from the manufacturers --

5  A.  Yes, sir.

6  Q.  -- purchased by the government and that was the end --

7  beginning and end to your responsibility?

8  A.  Yes, sir.

9  Q.  Who in your department made the decision to purchase the volume

10  of trailers from each manufacturer?  For instance, who decided,

11  well, Gulf Stream would get, you know, 50,000 units and Fleetwood

12  would get 35,000 units, who made that decision?

13  A.  I did, as the contracting officer, in conjunction with -- well,

14  when we got the quotes in, we had -- James Kaczarowski was the

15  COTR.  He reviewed those and looked at specs, and we looked at

16  delivery times and that such, and determined how to split up the

17  awards.  The quantities.

18  Q.  And what criteria did you use to decide that?

19  A.  Mostly their delivery schedules.

20  Q.  So the faster they could deliver you a trailer, the more volume

21  you allowed them to have?

22  A.  And price.

23  Q.  And price?

24  A.  Yes.

25  Q.  So you didn't have a standard price for, say, a 24-foot trailer

1    or a 22-foot or whatever?

2    A.  No.  Each manufacturer or contractor quoted their price, and we

3    would accept it or -- you know.

4    Q.  Were you ever involved in the issue after installation on

5    maintenance and formaldehyde emissions?

6    A.  No, sir.

7    Q.  Mr. McCreary, can you tell us who within FEMA actually came up

8    with the specification which was provided to the governmental

9    contractors and manufacturers for production of these travel

10   trailers?

11   A.  David Porter.

12   Q.  Do you know, with respect to the manufacturers who were

13   involved in the Katrina and Rita relief efforts, which

14   manufacturers FEMA actually inspected the units built to FEMA's

15   specifications to ensure compliance?

16   A.  As far as inspection at the manufacturer, it's my knowledge

17   that the only one that I was aware of was Gulf Stream that we sent

18   representatives.  However, all units as they were being delivered

19   to FEMA at the staging areas were to be inspected.

20   Q.  And if a unit was accepted, was it your understanding that it

21   met the FEMA specifications produced by Mr. Porter for temporary

22   housing?

23   A.  Correct.

24   Q.  After the formaldehyde health issues have surfaced now, are you

25   still a contracting officer?

1    A.  I'm still a contracting officer, but the purchase of the units

2    was already -- you know, had already taken place, for the most

3    part.

4    Q.  Do you know by the -- what do you mean?

5    A.  Well, my activity was with purchasing the units.  By the time

6    the formaldehyde issue was raised, that -- the purchasing of the

7    units was pretty much over.  There were other, I believe a couple

8    more, procurements that were done, but I think the units were

9    already being delivered.

10   Q.  After 2005, can you tell me the types of temporary housing

11   units that have been contracted for purchase by FEMA?

12   A.  There were mobile homes which are called manufactured housing.

13   Q.  Meaning -- manufactured housing?

14   A.  Yes.

15   Q.  What else?

16   A.  There were travel trailers; there were park models, which are

17   just a larger travel trailer, pretty much.  There were also

18   purchases of what were called vogue homes and COGEM units that were

19   more of a compartmentalized type unit.

20   Q.  A modular type home?

21   A.  Yes.  That they put together.

22   Q.  Have the specifications changed since 2005?

23   A.  I haven't seen the new specs.

24   Q.  Do you know what type of THUs were purchased in response to the

25   hurricanes in this area, for instance, Ike?

```
 1   A.  The only one that I am aware --  I'm aware of awards for mobile
 2   homes; none for travel trailers.
 3   Q.  Is there any directive not to use travel trailers in the future
 4   by FEMA in response to housing needs, emergency housing needs?
 5   A.  I haven't seen any written, but it's my understanding that it's
 6   a last resort, based on an interview with Admiral Johnson that I
 7   heard.
 8   Q.  So you only order travel trailers as a last resort?
 9   A.  Yes, sir.
10      (CONCLUSION OF THE VIDEO DEPOSITION OF BRIAN McCREARY.)
11         MR. WATTS:  That concludes the offer of that witness.
12         THE COURT:  All right.
13         MR. WATTS:  Next we call Dr. Stephen Smulski.
14         THE COURT:  Dr. Smulski.
15         THE DEPUTY CLERK:  Raise your right hand, please.
16      (WHEREUPON, STEPHEN SMULSKI, WAS SWORN IN AND TESTIFIED AS
17      FOLLOWS:)
18         THE COURT:  Have a seat.  State your name and spell it
19   for the record, please.
20         THE WITNESS:  My name is Stephen Smulski, S-T-E-P-H-E-N,
21   S-M-U-L-S-K-I.
22                     VOIR DIRE EXAMINATION
23   BY MR. WATTS:
24   Q.  Dr. Smulski, you too have a Ph.D. after your name.  What is
25   your doctorate in?
```

1   A.  My doctorate is in the field called wood science and

2   technology.

3   Q.  And I would venture to say that most of us have never heard of

4   wood science and technology.  What does that entail?

5   A.  Wood science is the study of the anatomical, mechanical,

6   physical and chemical properties of wood.  Wood technology is the

7   application of those scientific principles to the manufacture, use

8   and in-service performance of wood products.

9   Q.  You told me a little bit about your educational background.

10          THE COURT:  One second, Mr. Watts, he is being tendered

11  as an expert obviously?

12          MR. WATTS:  Wood science and technology.

13          THE COURT:  Have we a stipulation, Counsel?

14          MR. MULCAHY:  No objection, your Honor.

15          THE COURT:  Okay, Mr. Mulcahy, you're going to handle

16  him, all right.

17          I'll let you go ahead and flush it out a little bit.  In

18  the interest of saving time, the court will accept Dr. Smulski as

19  an expert in the field of wood science and technology.

20          MR. WATTS:  Excellent.  Thank you, your Honor.

21                      DIRECT EXAMINATION

22  BY MR. WATTS:

23  Q.  Since you've been accepted, basically, if we go through your

24  professional career, it's been about wood, hasn't it?

25  A.  It has.  In a nutshell, when I began my career in 1985, I was

1    on the wood science faculty at the University of Massachusetts at
2    Amherst, I was there through 1992.
3            In 1992 I left the university to start my own company,
4    and what I've been doing for the past 18 years is working as a
5    consulting wood scientist.  My clients include people like
6    architects, designers, engineers, contractors, makers and sellers
7    of wood products, insurance companies, and occasionally attorneys.
8            And what I do as a consulting wood scientist, the
9    majority of my work I do in troubleshooting products over
10   troubleshooting performance problems with wood products that are
11   already in service, but more and more, I also work with architects
12   and designers and other clients up front to advise them how to
13   avoid problems with wood products.
14   Q.  Okay.  In addition to that, have you published over 100 -- 45
15   papers and 100 presentations on the subjects that you're going to
16   be talking about?
17   A.  I have.
18   Q.  One of those papers was published in 1987 entitled
19   "Formaldehyde Indoors, Use Reconstitute Wood Products with Lower
20   Emissions."  Did you publish that article some 23 years ago?
21   A.  I did.
22   Q.  Can you just generally take us through what the article did?
23   A.  That article looks at the current state of knowledge at that
24   time with the release of formaldehyde from what are known as wood
25   composite products.  And the three products that are at issue are

1    hardwood plywood, particle board, and medium-density fiberboard.

2    And the source of formaldehyde in those products is the urea

3    formaldehyde adhesive that's used to glue all of those little

4    pieces of wood together to produce the larger pieces.

5          The other part of that article describes a problem with

6    formaldehyde emissions that occurred in HUD code manufactured

7    housing in the 1970s and the early 1980s.  And by HUD code, what I

8    mean, HUD stands for -- that's the federal government Housing and

9    Urban Development, which writes rules and regulations for housing,

10   residential housing.

11         In the 1970s and 1980s, hardwood plywood, particle board,

12   and medium-density fiberboard that released formaldehyde were used

13   extensively in the construction of HUD-code housing.  Another name

14   for that is mobile homes or manufactured housing.  They were used,

15   for example, for the floor decking, for the walls, for the

16   ceilings, and for all of the built-in cabinetry as well.

17         There were complaints received from the owners of HUD

18   code manufactured homes being reported to the Consumer Product

19   Safety Commission about irritation to the eyes, to the nose, to the

20   throat, strong chemical or new-home odor in these manufactured

21   housing.  At that time that stimulated a lot of research into what

22   was the problem, what caused the problem, and more importantly what

23   can be done to prevent the problem.  And the problem was identified

24   as formaldehyde gas that was being released from the urea

25   formaldehyde resins again used in hardwood plywood, particle board

1    and medium-density fiberboard.

2           The solution to the problem was to use either alternative

3    materials that didn't emit formaldehyde at all and to provide

4    mechanical ventilation so that whatever formaldehyde was released

5    into the air would be vented outside of the building.

6    Q.  Does your article discuss these ways to reduce

7    formaldehyde-release emission rates?

8    A.  Yes, it does.

9    Q.  All right.

10          MR. WATTS:  Now, may I approach, your Honor?

11          THE COURT:  Yes.

12   BY MR. WATTS:

13   Q.  You used three terms.  You said that some fiberboard is

14   formaldehyde emitting.  What causes it to emit?

15   A.  Emissions are a result of the actual nature or chemistry of the

16   adhesive itself.  Urea formaldehyde adhesives, again, which are the

17   glues that are used to hold these little pieces of wood together to

18   create the larger products, are only water-resistant adhesives.

19   And that means when they're exposed to both high temperature and

20   high relative humidity, they will actually release formaldehyde

21   into the air.

22          And then in addition, to ensure that the adhesive

23   completely cures in the manufacture of these products, they would

24   add an excess amount of formaldehyde and that left-over, unreacted

25   formaldehyde would also escape from the product into the air inside

1  of the structure where it was being used.

2  Q.  Okay.  You also used a phrase when talking about an alternative

3  product of low formaldehyde emitting woods.  Is that what we've

4  been calling LFE?

5  A.  Yes, it is.

6  Q.  Okay.

7  A.  And the LFE generation of hardwood plywood, medium-density

8  fiberboard and particle board was developed in response to that

9  first formaldehyde problem HUD code manufactured housing.

10  Q.  The problem you identified back in the '70s and '80s?

11  A.  Correct.  These products have been in use, that is, the low

12  formaldehyde emitting or LFE products from about the mid 1980's

13  right through the present.

14  Q.  Now, you also used a phrase that some products do not emit

15  formaldehyde.  How long have these no formaldehyde emitting wood

16  products been commercially available?

17  A.  Depends on the product.  But again, for hardwood plywood,

18  medium-density fiberboard, and particle board, some of these

19  products are made without urea formaldehyde adhesives, that is,

20  with some alternative glue system that doesn't emit formaldehyde,

21  and these have generally been available, again, since the mid 1980s

22  onward.

23  Q.  You brought a couple of examples of wood pieces, what are

24  those?

25  A.  I did.  I thought these would be useful in case members of the

1    jury have never seen these particular wood products.  I realize

2    there's a little futility in me holding it up here, but this is a

3    product known as hardwood plywood, it's very thin, it's only an

4    eighth of an inch thick, and this is what was used for the walls

5    and ceiling panels in Mrs. Castanel's Recreation By Design trailer.

6              I don't know if we can show these to the jury if we may?

7    Q.  Why don't you just go to the next one and just show us what

8    you've got and we'll come back to them.

9    A.  Sure.  This is the second product, this is known as

10   medium-density fiberboard, and this was used typically in

11   Mrs. Castanel's trailer for cabinets and other types of built-in

12   furniture.

13   Q.  Okay.

14   A.  And then the third product is particle board, and this was also

15   used in Mrs. Castanel's trailer for, again, cabinets, countertops

16   and built-in furniture.

17   Q.  All right.

18             MR. WATTS:  Your Honor, may I publish these to the jury?

19             THE COURT:  Any objection, Counsel?

20             MR. MULCAHY:  No objection.

21             THE COURT:  Yes.  Go ahead, and starting with

22   Ms. Catalano, go ahead and hand them across and then back to

23   Mr. Patterson and we'll end up over here with Ms. Landry.  This

24   will just take a second while they take a look at it so they don't

25   miss something while they're looking at that.

1           MR. WATTS:  Sure.

2        (WHEREUPON, THE JURY VIEWS THE DEMONSTRATIVES.)

3           MR. WATTS:  Thank you.

4    BY MR. WATTS:

5    Q.  Now, let me just put one of these up on the ELMO because I want

6    to ask you a question about it.

7           We can see the shape of all of these little pieces of

8    chips, where do they come from?

9    A.  There are two sources, they can be the residue, that is,

10   sawdust and plainer shavings that are developed in the manufacture

11   of logs into lumber or logs into plywood, and then in some cases,

12   they come directly from small, crooked trees that are not useful

13   for producing either lumber or veneer.

14   Q.  Now, on the up side, this is a way that trash wood doesn't get

15   wasted, fair?

16   A.  Yes, this represents a very efficient utilization of our wood

17   resources.

18   Q.  But instead of just throwing away all of this trash wood to

19   make this particle board, how do they affix it together?

20   A.  The individual particles are actually sprayed with a liquid, at

21   that time, urea formaldehyde adhesive.  They're loosely laid into a

22   large mat and then that mat is consolidated into that little

23   three-quarter-inch thick panel that you saw under very high heat

24   and pressure.

25   Q.  Now, if you've got formaldehyde inside the wood, are there

DAILY COPY

1    certain factors that affect the emission rate of that formaldehyde

2    out of the wood into the breathing environment?

3    A.  Yes, there are.  There are five factors or five governing

4    principles that determine both the release of formaldehyde from a

5    wood product bonded with urea formaldehyde adhesive, as well as the

6    concentration of formaldehyde in the air inside a structure that's

7    built with these formaldehyde-releasing wood products.

8    Q.  Now, I want to visit with you about those five factors and have

9    you explain them to the jury.  What's the first factor that affects

10   the release of formaldehyde gas?

11   A.  The most important factor is the age and number of the

12   formaldehyde-emitting wood products.  And by number, I don't

13   necessarily mean a numerical count, one, two, three, what I really

14   mean is, once the total volume or mass of these wood products that

15   you're using in a structure.

16   Q.  In other words, if you're going to have a single piece of

17   plywood that's this big, call it seven inches wide, five inches

18   tall and three-quarters of an inch thick, that's going to have a

19   certain quantity of formaldehyde in it, correct?

20   A.  Correct.

21   Q.  But if you cover an entire travel trailer with this stuff,

22   you're going to have a lot more of these and you can just do the

23   math, right?

24   A.  Yes, you can.

25   Q.  So it's a question of both the age and the volume of the

1    formaldehyde in the wood?

2    A.  Yes.

3    Q.  Okay.

4    A.  And age is important because the -- both the formaldehyde

5    release is highest from newly-manufactured products, so the closer

6    you are to the time of manufacture, the greater the release of

7    formaldehyde.  Over time that release slows down and is released at

8    a lower level.

9    Q.  Now, I wanted to visit with you about that.  Is that a function

10   of the fact that there's only so much formaldehyde in the wood?

11   A.  Yes, you start out with a finite amount and it eventually comes

12   out over time.

13   Q.  And when you say that the formaldehyde emission rate is highest

14   when the product is new and then it slows down as it gets older, is

15   that substantiated with studies that have been done?

16   A.  Yes.  Again, as a result of the original formaldehyde problem

17   in manufactured housing in the 1970s and '80s, that stimulated a

18   huge amount of research to understand what was the source of

19   formaldehyde, how was it being emitted from wood products, at what

20   rate it was being emitted, how much time did it take for the

21   formaldehyde to be emitted, et cetera.

22   Q.  Okay.  Now, second factor, you say the volume of the air inside

23   the trailer.  Let's see if we can use the judge's courtroom as an

24   example.  Because we are in federal court instead of state court,

25   we tend to have august courtrooms.  How long would you say this

1    thing is?

2    A.  I would guess this is on the order of 50 or 60 feet by perhaps

3    40 by maybe a 20-foot ceiling.

4    Q.  Okay.  Does that give you a lot of volume of air inside this

5    courtroom?

6    A.  A huge volume of air.

7    Q.  Now, when we're talking about a travel trailer, you've

8    inspected Ms. Castanel's travel trailer?

9    A.  Yes, it's about, in round numbers, 8 feet wide, 30 feet long, 7

10   feet tall.

11   Q.  Kind of like the jury box.

12   A.  About as long, a little bit narrower.

13   Q.  Okay.  And so in terms of the volume of the air being an issue

14   if we were going to compare the two, if you have a given amount of

15   formaldehyde but more volume of air, what does that do to the

16   emission rate?

17   A.  Again, if you have the same amount of formaldehyde, if you're

18   releasing it into a much larger volume of air, you're going to have

19   greater dilution or lower concentration.  If you take that same

20   amount of formaldehyde and release it into a much smaller volume of

21   air, you're going to have a much higher concentration in the air.

22   Q.  Okay.  Let's go to the third factor that you've identified.

23   Ventilation of trailer air exchange rate.  Explain that to the jury

24   if you would.

25   A.  Sure.  What I mean by ventilation and air exchange rate is

1   movement of air in and out of the building.  All buildings leak to

2   one degree or another, air moves in and out of buildings on their

3   own.  If it didn't, of course we would suffocate, we don't, so we

4   know that's happening.

5          And what's important is, the ventilation rate or the air

6   exchange rate influences both the release of formaldehyde into the

7   air, as well as the concentration of formaldehyde that's in the

8   air.  And as the ventilation rate goes up, as the faster you

9   exchange the stale, contaminated air inside the structure with

10  fresh outdoor air, the lower the concentration of formaldehyde.

11         And the converse is true.  At a low ventilation rate,

12  formaldehyde vapors that are released tend to linger and accumulate

13  in the air and are only very slowly finally leaked to the outside.

14  Q.  Okay.  You've heard the concept of a forced ventilation system.

15  A.  Yes.

16  Q.  There are different kinds of ventilation systems that the

17  manufacturers can select, fair?

18  A.  There are.  In fact, Recreation by Design, in its owner's

19  manual, offers something called the Northern Breeze, which is a

20  roof-mounted powered fan to provide mechanical ventilation to move

21  formaldehyde-contaminated air out of the trailer and replace it

22  with fresh outdoor air.

23  Q.  Did Ms. Castanel's trailer come with a Northern Breeze?

24  A.  No, it didn't.  It neither had a Northern Breeze

25  mechanical-powered vent system, it didn't even have a roof vent.

1  Q.  In terms of the first three factors that you've identified, the

2  age and the number of the formaldehyde-emitting wood composite

3  products that are used in a trailer, the volume of air inside the

4  trailer, and the ventilation of the trailer of the air exchange

5  rate, are those all factors that manufacturer of the travel trailer

6  can control through design?

7  A.  Two of them are under the control of Recreation by Design and

8  that would be the age and number of formaldehyde-emitting products,

9  because Recreation by Design made that decision, they decided what

10  wood products they were going to use in that travel trailer and in

11  what volume they were going to use.

12        Ventilation of the trailers is also determined by the

13  designer, in this case Recreation by Design.  They determined would

14  there be a mechanical vent system or not, would there be a roof

15  vent or not.

16  Q.  And the volume of the air is a function of the size that was

17  selected, fair?

18  A.  Yes.

19  Q.  Okay.

20  A.  The volume of the trailer is largely outside of their control,

21  it is, after all, a travel trailer.  It can only be a certain width

22  because it has to fit in the lane width of a road; it can only be a

23  certain height, it has to be able to go under a bridge; it can only

24  be a certain length, you have to be able to turn corners with it.

25  So that's one factor that's largely beyond their control.

1   Q.  In terms of other factors that are beyond their control, what
2   about the temperature inside the trailer, how does the temperature
3   inside the trailer affect a formaldehyde emission rate?
4   A.  The temperature affects the release of formaldehyde in this
5   way:  As you raise the temperature of the air, you increase the
6   rate at which formaldehyde is released from the wood.  So the
7   warmer it is, the more formaldehyde that's released.  And the
8   converse is true:  As you lower the temperature, you lower the
9   release rate.
10  Q.  Where are you from?
11  A.  Massachusetts.
12  Q.  If we were going to run a travel trailer in Massachusetts as
13  versus Louisiana, difference in temperature is well-known, fair?
14  A.  Very different.  We have a more dry, cooler, moderate climate,
15  obviously I am not telling you anything you already don't know, you
16  have a hot and humid climate here.
17  Q.  But you have only got the Patriots and we have the Saints.
18  A.  That's right.
19  Q.  But anyway, the point of this is that, depending upon where
20  you're selling it, you have to understand what the conditions are
21  going to be that your product is going to, fair?
22  A.  Yes, with the design of any structure you have to consider
23  where is that structure located.  And by that, I mean what is the
24  local climate?  That's going to determine ventilation, insulation,
25  placement of vapor retarders, et cetera.

1  Q.  And the last factor was relative humidity inside the trailer.

2  Do you have an opinion as to whether New Orleans in the heat of the

3  summer is a fairly humid place?

4  A.  Well, I have the experience of having been down here several

5  times in the summer, and again, it's not news to you, you live in a

6  hot and humid climate.

7  Q.  And does the fact that these trailers were delivered to a hot

8  and humid climate play a role in why there was

9  formaldehyde-emission rates?

10 A.  It does play a role, and the role it plays is this:  As you

11 raise the relative humidity of the air, that is, as you increase

12 the amount of moisture that's in the air, you also increase the

13 release of formaldehyde.  So as the air gets more humid, more

14 formaldehyde is released from these wood products.  And the reverse

15 is true, as the air is cooler, or excuse me, the air is dryer, you

16 have less release of formaldehyde.

17         MR. WATTS:  May I approach, your Honor?

18         THE COURT:  Yes.

19 BY MR. WATTS:

20 Q.  We had a discussion with Dr. Hewitt with respect to what some

21 of the data shows about levels of formaldehyde, and he did a

22 retrospective analysis of tests that were done after folks were in

23 the unit between a year and a half and two and a half years.  My

24 question is this:  With respect to your testimony that the rate of

25 formaldehyde is significantly higher when it's new than later on,

1  is it a fact based upon your studies that that is true with respect

2  to formaldehyde, it emits faster earlier and slower later?

3  A.  Yes.  That is the classic shape of the formaldehyde release

4  curve.

5  Q.  And when you say the formaldehyde release curve, this is

6  something that's in the published literature?

7  A.  Yes.

8  Q.  And the formaldehyde release curve is putting a shape to what

9  phenomenon?

10  A.  Again, the release of formaldehyde over time, that is, how fast

11  is it occurring over time.

12  Q.  By the time you get to a year and a half after a travel trailer

13  is built, do the formaldehyde release curves that are in the

14  published literature suggest that the vast majority of the

15  formaldehyde has been released by that time?

16  A.  At around a year and a half, you are approaching what's called

17  the half-life point, which means approximately about half of it has

18  been released.

19  Q.  Okay.

20  A.  There is still another half to go over time.

21  Q.  Now, what is it about the formaldehyde release curve or the

22  physics involved that it says it's going to release it quickly at

23  the front and then plateau off, why does it slow down?

24  A.  My answer would be because that is just the behavior, I don't

25  think anyone has actually ever determined why that happens, but

1   that is the behavior that we see over and over again.  Rapid

2   release early on, and then finally slow down and plateau over time.

3   Q.  Now, I want to take these general principles that we've talked

4   about and talk about this trailer for a second.  First of all, what

5   is your understanding as to when this trailer was manufactured,

6   approximately?

7   A.  It was manufactured in December 2005.

8   Q.  You have reviewed the testimony of Recreation by Design's

9   cooperate representative Randall Rush in this courtroom; is that

10  right?

11  A.  Yes, I read it last night.

12  Q.  As a wood scientist, you've seen this material safety data

13  sheet that came from their file cabinets that was sent to them?

14  A.  Yes, this was part of the discovery materials.

15  Q.  And here is my question:  As a wood scientist, was it

16  well-known to people in the wood science industry, this

17  formaldehyde release issue?

18  A.  You said the wood science industry, I would broaden that to

19  just say the wood products industry in general.  This urea

20  formaldehyde adhesives have been in use for over 50 years, their

21  release from wood products has been known for over 50 years.  By

22  law, the manufacturers of wood products must provide material

23  data -- safety data sheets that state what the product is, what

24  hazardous materials are contained in that product, what the effects

25  are on persons if they breathe it in, if they get it on their skin,

 1   if they happen to accidentally ingest it, and a whole host of other

 2   information so that you can safely use these products.

 3           MR. WATTS:  May I approach, your Honor?

 4           THE COURT:  Yes.

 5   BY MR. WATTS:

 6   Q.  Now, I asked you about formaldehyde-emitting wood products, LFE

 7   and no formaldehyde-emitting wood products.  With the understanding

 8   that this product was manufactured in the fall of -- I mean, in the

 9   fall of 2005, do you have an opinion whether or not no

10   formaldehyde-emitting wood products were commercially available for

11   use in the travel trailer industry?

12   A.  In the fall of 2005, yes, hardwood plywood, medium-density

13   fiberboard and particle board manufactured with adhesives that do

14   not release formaldehyde have been available, again, since the mid

15   1980s.

16   Q.  All right.  And you probably read my discussion with Mr. Rush

17   about whether they had a policy to use LFE or not, do you remember

18   that?

19   A.  Yes.

20   Q.  Same question with LFE, was it commercially available for use

21   in the fall of 2005?

22   A.  Yes, it was.

23   Q.  In terms of preventing or reducing formaldehyde emissions,

24   which of these products is most suitable for that purpose?

25   A.  That would be the no formaldehyde-emitting products.

1    Q.  Do you have an opinion, as a wood scientist, as to whether the

2    incorporation of no formaldehyde emission wood products, if used in

3    this trailer, would have affected the utility of the product in any

4    substantial way?

5    A.  There is no difference in the properties or performance of

6    hardwood plywood, medium-density fiberboard and particle board made

7    with urea formaldehyde adhesive versus those made with alternative

8    adhesives that don't release formaldehyde.  They're one for one

9    substitution.

10   Q.  Now, I want to take you inside of Mrs. Castanel's trailer.  Did

11   you perform an inspection of that trailer?

12   A.  I did.

13   Q.  Did you take photographs?

14   A.  I did.

15         MR. WATTS:  May I approach, your Honor?

16         THE COURT:  Yes.

17   BY MR. WATTS:

18   Q.  I want to show you a series of photographs that is marked as

19   Exhibit 264.  They have been marked by me as photographs 1 through

20   77 in the lower right-hand corner.  Whose photographs are these?

21   A.  These are the photographs that I took.

22   Q.  Do these photographs fairly and accurately represent the

23   condition of the trailer at the time that you inspected it?

24   A.  They do.

25   Q.  Would the use of these photographs be of assistance in you

1  describing what you saw to the jury?

2  A.  Yes, I think, based on my 17 years experience as a college

3  professor, images can be sometimes more useful than words in

4  explaining things.

5              MR. WATTS:  We would offer Exhibit 264.

6              MR. MULCAHY:  No objection.

7              THE COURT:  Exhibit 264?

8              MR. WATTS:  Yes, sir.  Let me just put these down on the

9  screen for a second.

10 BY MR. WATTS:

11 Q.  What are we looking at in photograph number 1 here?

12 A.  This is the exterior of the Recreation By Design trailer that

13 Mrs. Castanel lived in that happens to be sitting in Lottie,

14 Louisiana, in a storage lot.

15 Q.  Is it all white without signs?

16 A.  Essentially, yes.

17 Q.  Does it not have an awning on it?

18 A.  Not that I recall.

19 Q.  I want to show you photograph number 14 that you took.  What is

20 this showing us?

21 A.  This is a photograph of the interior showing the kitchen area,

22 and on the left-hand side as you look a little farther deeper into

23 it you can see the bedroom area.

24 Q.  Is there any door separating the kitchen from the bedroom area?

25 A.  No.  There were no interior doors anywhere in the trailer, it's

1    completely open.

2    Q.   Is that a design that's different from trailers manufactured by

3    other manufacturers that separate it?

4    A.   It is.  I've seen them completely open, as well as those with

5    interior doors.

6    Q.   Okay.  What are we looking at in photograph number 27?

7    A.   You're looking, again, in the interior of the trailer, this is

8    what I would call the living space.  To the left is the little

9    bump-out area with a sofa, and then those are actually four kitchen

10   chairs.

11   Q.   Behind the kitchen chairs, is there a heater strip on the

12   floor?

13   A.   Appears to be the electric baseboard heater, yes.

14   Q.   Right down there where my finger is (INDICATING)?

15   A.   Yes.

16   Q.   I want to show you the photo that I've marked as Exhibit 35,

17   and let me pull this out so you can get some perspective.  What are

18   we looking at here?

19   A.   This is the bed support in the bedroom.

20   Q.   And the bed would go on top of this wooden support; is that

21   right?

22   A.   Yes.  What you're looking at is a hardwood plywood panel.

23   Q.   Under the bed support, do you see that white converter right

24   there (INDICATING)?

25   A.   Yes.

1   Q.  Is that a location that is specific to Rec by Design?

2   A.  I don't recall, to be honest with you.

3   Q.  All right.  The photograph that I've marked as Exhibit 66, if

4   you turn it sideways, what does this show?

5   A.  I am standing inside the trailer, and this is a photograph

6   showing the inside wall surface around the window opening.  The

7   thing that struck me here was that you can actually see inside the

8   wall.  What you're looking at is hardwood plywood, that is if I go

9   from left to right, you're looking at hardwood plywood, you're

10  looking at the wood framing inside the wall, and then finally the

11  window unit itself.

12  Q.  As you look at the windows, does this window open outward as

13  opposed to sliding side to side?

14  A.  I don't remember, but it does look like -- that there's a hinge

15  there.  If I remember, this is an egress window in the bedroom so

16  it has to open outward.

17  Q.  Photograph number 1, the window in the living room, does it

18  have a square shape?

19  A.  Yes.

20  Q.  Now, I want to take you back to the PowerPoint.  What do we

21  have up on the screen here?

22  A.  One of the two tasks that I was asked to do during my

23  inspection was to create an inventory of all of the

24  formaldehyde-emitting products that were used in the trailer,

25  again, hardwood plywood, medium-density fiberboard, and particle

 1   board.  What you're looking at here is the beginning of that

 2   inventory of formaldehyde-emitting wood products.

 3   Q.  And if we could, just take me through, we've got the walls and

 4   ceilings, are those formaldehyde-emitting wood products?

 5   A.  Yes, all of the wall panels, right wall, left wall, rear and

 6   front, are one-eighth inch hardwood plywood that emits

 7   formaldehyde.

 8   Q.  In the bedroom, are all of the components listed there

 9   formaldehyde-emitting wood products?

10   A.  Yes.

11        I skipped a part of your question there, the ceiling

12   panels are also one-eighth inch hardwood plywood that emits

13   formaldehyde.

14        And, yes, the platform for the bed is composed of

15   one-eighth inch hardwood plywood that emits formaldehyde.

16   Q.  With respect to the bedroom, the wall surrounding her bed, the

17   mattress support, is all of this formaldehyde-emitting wood

18   product?

19   A.  Yes.  What that Recreation By Design trailer essentially is,

20   it's a five-sided box, each of those five sides, the four walls and

21   the ceiling, is made from a formaldehyde-emitting composite

22   product.  It is then furnished with cabinets, vanity, countertop,

23   closet, et cetera, all of which are made from formaldehyde-emitting

24   wood composite products.

25   Q.  As we continue in the bedroom, the corner closet, what's the

1    corner closet made of?

2    A.  Again, it's made of hardwood plywood that emits formaldehyde.

3    Q.  And they're all listed there.

4          Wall-mounted cabinets that are in the bedroom, what are

5    they made of?

6    A.  Again, wood composite products that emit formaldehyde.

7    Q.  The night stand, what is it made of?

8    A.  Wood composite products that emit formaldehyde.

9    Q.  The slide-out area, whether it's the freestanding sofa, the

10   upper cabinets, the slide-out itself, do they contain wood

11   composite products that emit formaldehyde?

12   A.  Yes, they do, all the cabinets, the walls, the ceilings, all of

13   the built-ins are made from wood composite products that emit

14   formaldehyde.

15   Q.  In the kitchen, we saw a picture of the kitchen, what products

16   in the kitchen are made of wood composite products emitting

17   formaldehyde?

18   A.  Again, all of the built-ins:  the upper cabinets, the lower

19   cabinets, the countertop, the walls, the ceilings.

20   Q.  The walls here (INDICATING)?

21   A.  Yes.

22   Q.  The ceiling up here (INDICATING)?

23   A.  Yes.

24   Q.  The built-in cabinets (INDICATING)?

25   A.  Yes.

 1   Q.  The lower cabinets, upper cabinets?

 2   A.  All of the walls, all of the ceilings, all of the built-ins are

 3   all wood composite products that release formaldehyde.

 4   Q.  The stove end wall?

 5   A.  Yes.

 6   Q.  When we get to the bathroom, is the vanity made of wood

 7   composite products that emit formaldehyde?

 8   A.  Yes.

 9   Q.  The cabinet behind the toilet in the bathroom, same question.

10   A.  Same answer, yes.

11   Q.  The wardrobe in the bathroom?

12   A.  Yes, also made from wood composite products that emit

13   formaldehyde.

14           MR. WATTS:  May I approach, your Honor?

15           THE COURT:  Yes.

16   BY MR. WATTS:

17   Q.  I've marked your document as Plaintiffs' Exhibit 1000, to make

18   sure I don't trip a number.  Is Plaintiffs' Exhibit 1000 a summary

19   of the wood composite products that emit formaldehyde that are in

20   Mrs. Castanel's trailer?

21   A.  (WITNESS REVIEWS DOCUMENT.)  Yes, it is.

22           MR. WATTS:  We offer Plaintiffs' Exhibit 1000.

23           THE COURT:  Any objection?

24           MR. MULCAHY:  No objection, your Honor.

25           THE COURT:  All right.  So ordered.  1000.

1          MR. WATTS:  Thank you, your Honor.

2    BY MR. WATTS:

3    Q.  Now, in addition to the summary that you provided, have you

4    participated with an animation guru, if you will, in preparing an

5    animation of what this trailer looked like?

6    A.  I did.  I thought it would be helpful in explaining how the

7    trailer was constructed, what formaldehyde-emitting wood products

8    are used in the trailer, and how formaldehyde is released from

9    those products into the air inside the trailer to create some

10   animation stills.  These animation stills are based on photographs

11   that I took or on observations that I made during the inspection,

12   as well as on some measurements made by other members of the

13   inspection team.

14          I then worked personally with an animator who actually

15   created the stills himself but under my direction.

16          MR. WATTS:  Your Honor, as I mentioned, we have a

17   three-minute animation video that we would like to play at this

18   time, this will be the one time we play it as instructed by the

19   court.

20          THE COURT:  Counsel, you've seen it?

21          MR. MULCAHY:  Yes, your Honor.

22          THE COURT:  All right.  Go ahead.

23          MR. WATTS:  Go ahead.

24   BY MR. WATTS:

25   Q.  And, Mr. Smulski, as we go through it, if you can just kind of

1    narrate for us.

2         (WHEREUPON, THE ANIMATION WAS PLAYED.)

3         THE WITNESS:  Again, the point here is all of the wood

4    composite products used in the construction of this trailer emit

5    formaldehyde.

6         You're looking down on the trailer, these are the wall

7    panels, they actually have vinyl on the inside surface, that's what

8    you see when you're actually looking at them.  The key thing here

9    is the vinyl will slow down the release of formaldehyde but will

10   not stop it from happening.  The back side of those panels is

11   unfinished wood and that releases formaldehyde directly into the

12   wall cavities in the trailer.

13        Similarly, the hardwood plywood ceiling panels have no

14   vinyl on the rear, that releases formaldehyde into the ceiling

15   cavities and that formaldehyde is able to flow in and among the

16   ceiling trusses.  That formaldehyde that's in the walls and

17   ceilings then leaks into the living space through joints and

18   penetrations, electrical outlets, light fixtures, for example, with

19   the driving force being the natural temperature differences, air

20   pressure differences, and vapor pressure differences.  Some of

21   course can escape to the outside, there are seams in the metal

22   cladding or skin.

23        Again, interior view showing all of the cabinets, the

24   built-ins.  The red is highlighting the seams and penetrations, and

25   that's where formaldehyde in the walls and ceilings leaks into the

1    living space itself.

2         Again, all of the built-in cabinets, countertops,

3    closets, wardrobe, vanity, et cetera, all made from wood composite

4    products that release formaldehyde into the air inside the trailer.

5         And these of course are releasing that formaldehyde

6    directly into the air because they're fully inside the trailer.

7         We talked about how temperature and humidity can increase

8    formaldehyde release, that's what happens in the walls.  Again,

9    that formaldehyde then seeps into the living space through seams

10   and penetrations.

11        The key thing here is the air conditioning system in the

12   trailer is a recirculating system, that means it just takes the air

13   inside the trailer, cools it and dumps it back inside, so any

14   formaldehyde in the air is simply recirculated within the trailer

15   rather than being evacuated to the outside.

16        (WHEREUPON, THE ANIMATION CONCLUDED.)

17             MR. WATTS:  Okay.  Your Honor, may I approach?

18             THE COURT:  Yes.

19   BY MR. WATTS:

20   Q.  I am going to hand you what I'm marking as Plaintiffs' Exhibit

21   1001.  Are these the stills of the animation, the still shots of

22   the animation that you just took the jury through?

23   A.  (WITNESS REVIEWS DOCUMENTS.)  Yes, these are all excerpts from

24   the animation itself.

25             MR. WATTS:  We would offer Plaintiffs' Exhibit 1001.

 1          MR. MULCAHY:  No objection, your Honor.

 2          THE COURT:  Okay.  So ordered, 1001.

 3  BY MR. WATTS:

 4  Q.  All right.  Now, let me just flip through these because the

 5  jury has seen this.

 6          Now, I asked you about alternative wood composite

 7  products that were available in 2005, and you told me that no

 8  formaldehyde-emitting and low formaldehyde-emitting is available;

 9  is that right?

10  A.  Yes.

11  Q.  Have you brought documentation to show that in supply sheets

12  that there are manufacturers that offer this kind of wood?

13  A.  Yes.  This is the catalog, as you can see, from HPVA, that's

14  the Hardwood Plywood and Veneer Association, where to buy 2005.  So

15  if you were looking for a source for hardwood plywood for --

16  emitted no formaldehyde, you would go to this catalog.

17          What I've done here is highlighted in yellow 12 companies

18  in 2005 that were producing hardwood plywood that has no added

19  formaldehyde.

20  Q.  Okay.  And you've highlighted those there on the screen; is

21  that right?

22  A.  Yes, they're highlighted in yellow.

23  Q.  And just so that we have the record, it's Columbia Forest

24  Products, on the lower left-hand corner, and then what do we have

25  on the upper right-hand corner?

1   A.  There actually are four different manufacturing facilities for

2   Columbia Forest Products, that's North America's largest

3   manufacturer of hardwood plywood.

4   Q.  Okay.  And if we go to the next page, you have Greenline

5   Plywood Products, LT, twice over, does that mean there are two

6   different facilities?

7   A.  Two different manufacturing facilities, yes.

8   Q.  You're going to have to help me with the name of this next one,

9   Jiangsu?

10  A.  I'd say Jiangsu Senyaplywood Corporation.

11  Q.  J-I-A-N-G-S-U, Senyaplywood is spelled S-E-N-Y-A-P-L-Y-W-O-O-D,

12  right?

13  A.  Yes.

14  Q.  And then we have Pro Ply Custom Plywood, Incorporated; is that

15  right?

16  A.  Yes.

17  Q.  Veneer One, what does that company do?

18  A.  Again, they manufacturer hardwood plywood with no added

19  formaldehyde.

20  Q.  And Veracor Wood Products International?

21  A.  Same thing, hardwood plywood, no added formaldehyde.

22          MR. WATTS:  May I approach, your Honor?

23          THE COURT:  Yes.

24  BY MR. WATTS:

25  Q.  I am going to hand you what I've marked as Plaintiffs' Exhibit

1   1002.  Is this the 2005 where to buy hardwood plywood veneer and

2   engineering hardwood flooring catalog that you just referred to?

3   A.  Yes, it's an excerpt from that.

4   Q.  And the excerpt shows the different companies that manufacture

5   no formaldehyde-emitting woods?

6   A.  That's correct.

7           MR. WATTS:  We would offer Plaintiffs' Exhibit 1002.

8           MR. MULCAHY:  No objection, your Honor.

9           THE COURT:  All right.  So ordered.

10  BY MR. WATTS:

11  Q.  What is this slide meant to represent?

12  A.  This is a publication from what at that time, 1996 was when

13  this was published, was called the National Particle Board

14  Association, it's now called the Composite Panel Association.  What

15  this publication does is demonstrate that in 1996 you could

16  purchase particle board that was made from an alternate adhesive

17  that did not contain urea formaldehyde.

18  Q.  You have one other wood product over near you that we haven't

19  shown the jury, what is it?

20  A.  I do.  Again, I realize the futility of this.  But this is a

21  wood product, again, it's only an eighth of an inch thick, produced

22  in panel form.  It's called hard board.  You would know it as its

23  trade name of Masonite.  And this is produced with no added

24  formaldehyde.  Masonite was invented in 1923, it's been

25  commercially available since that time.  And this would be an

1    alternative material to, for example, hardwood plywood for walls

2    and ceilings, instead use hard board that doesn't emit

3    formaldehyde.

4    Q.  Is that just one example of the different products that were

5    available in 2005?

6    A.  Yes, this would be one manufacturer's product.

7              MR. WATTS:  Dr. Smulski, I think those are all of my

8    questions.  Thank you, sir.

9              THE COURT:  All right.  Thank you.  Cross, Mr. Mulcahy.

10             MR. WATTS:  Your Honor, may Ms. Castanel go to the

11   restroom?

12             THE COURT:  Yes.

13                         CROSS-EXAMINATION

14   BY MR. MULCAHY:

15   Q.  Good afternoon, Dr. Smulski, I'm Randall Mulcahy, we had the

16   pleasure of meeting a couple of times now, once was in Lottie,

17   Louisiana, this past January; isn't that right?

18   A.  Yes, hi.

19   Q.  Dr. Smulski just to lay it out there, formaldehyde is

20   everywhere, isn't it?

21   A.  It is present in trace amounts in the general environment, yes.

22   Q.  I mean, there's formaldehyde in this courtroom today; is that

23   right?

24   A.  Yes, there's a background level in the air.

25   Q.  And there's formaldehyde outside on the city streets; is that

1    correct?

2    A.  Yes, it is.

3    Q.  And many of the products that you look at in the Recreation By

4    Design unit, the materials that you've spoken about, the urea

5    formaldehyde-emitting materials, those are typical products that

6    you could find in the average American home; isn't that right?

7    A.  You would be able to find those in most homes, but the key

8    thing is, you would not see them used to the extent at which

9    they're used in the travel trailer.  In most people's home, for

10   example, we don't have hardwood plywood for walls and ceilings, we

11   have gypsum wall board, which doesn't emit formaldehyde.

12   Q.  Dr. Smulski, we saw some of your photographs earlier and I have

13   a select few of them in the set of your same bundle, and some of

14   these are going to look familiar to you, I'd like to show them to

15   you.

16           This is a photograph you took of the kitchen area,

17   correct?  That's the photograph of the kitchen area?

18   A.  Yes.

19   Q.  And this is the other side of the kitchen?

20   A.  Yes.

21   Q.  And I think this is a little better view of the kitchen upper

22   cabinets?

23   A.  Closer view, yes.

24   Q.  Lower cabinets?

25   A.  Yes.

1   Q.  And this is a vanity area toward the restroom area; is that

2   right?

3   A.  Right.  We need to turn that 90 degrees clockwise.

4   Q.  Sorry.

5   A.  Thank you.  Yes, this is a storage cabinet.

6   Q.  And if you recall, this area right here, is that an accordion

7   door that would separate the kitchen from the bathroom area across

8   this track (INDICATING)?

9   A.  I'm sorry, I missed the first part of your question.

10  Q.  Wasn't this an accordion-style door that would separate the

11  kitchen area from the bathroom area?

12  A.  Yes.

13  Q.  And this is a shot inside one of the cabinets opened; is that

14  right?

15  A.  Yes, that's over the kitchen table.

16  Q.  And this is toward the back or the living room area of the

17  trailer with some cabinets across the top of the trailer?

18  A.  Yes.

19  Q.  And we see a wall section pretty well from this, and we see

20  that it's covered in a wall covering, correct?

21  A.  That's right.  There's a vinyl wall covering.

22  Q.  And this shows a little bit different angle of the bathroom

23  area with the vanity we saw a minute ago, or the pantry we saw a

24  minute ago, correct?

25  A.  Yes, the pantry is on the left and the bath vanity on the

1    right.

2    Q.  And if you look along the roof lines, I am not sure how well,

3    let's see, we can see on this photo, but around the top of this

4    photo there's an edging between the top of the cabinets and a roof

5    line; is that right?

6    A.  Yes, there's a trim strip.

7    Q.  I think we can see it a little bit better in this photograph,

8    and the trim strip is the bright area you're talking at the top; is

9    that right?

10   A.  Right, at the wall/ceiling junction.

11   Q.  And we also see another accordion-style sliding door on the

12   opposite end of the bathroom separating it from the bedroom, right?

13   A.  Yes.

14   Q.  And this is a long view of the unit as we look down the hallway

15   through the restroom into the bathroom, right?

16   A.  Right, you're looking through the --

17   Q.  To the bedroom.

18   A.  -- through the bath into the bedroom.

19   Q.  Now, was it your understanding this is a handicap-accessible

20   unit?

21   A.  Yes.

22   Q.  And it had a wide walkway from the living room to the bedroom

23   for handicap access?

24   A.  Yes, as well as an entry door that was for handicap access.

25   Q.  And this is a closet in the bedroom?

1   A.  Yes, that's the corner closet.

2   Q.  And I believe this is underneath the bathroom sink area?

3   A.  Bathroom vanity, yes.

4   Q.  Now, from the photos that we've seen, all of the cabinets that

5   we've looked at here have a vinyl decorative covering; is that

6   right?

7   A.  That's right.  That's very typical.  All of the visible

8   surfaces, that is, the surfaces you can actually see when you were

9   standing inside the unit for aesthetic purposes have a vinyl

10  covering.

11  Q.  And you've rendered opinion before that these, this vinyl

12  covering can help retard the emission of formaldehyde about up to

13  90 percent, correct?

14  A.  Eighty percent and higher, yes, depending on the properties of

15  the material.

16  Q.  And we see that vinyl covering on the wall surfaces; is that

17  right?

18  A.  Yes.

19  Q.  And we see it on the cabinet surfaces?

20  A.  Yes.

21  Q.  And we see that there's -- and we saw that there was some seam

22  trim across the top of the walls and the cabinets to the ceiling,

23  right?

24  A.  Yes.

25  Q.  And the ceilings are also covered in some type of decorative

1  coating; is that right?

2  A.  Yes, they also have a vinyl surface.

3  Q.  And the areas that you're talking about that are primarily the

4  hardwood plywood, that's the walls and the ceiling panels; is that

5  right?

6  A.  Primarily wall and ceiling panels, but also many of the cabinet

7  walls and cabinet shelves are also hardwood plywood, as well as the

8  bed support.

9  Q.  And there were some, I guess for a lack of a better term, you

10  called it sawed lumber, is that right, that was in this unit?

11  A.  Yes, I referred to it as solid sawn lumber, yes.

12  Q.  Solid sawn lumber.  And that would be like the 2-by-2 stud in

13  the walls?

14  A.  That would be the wall studs, the ceiling trusses, the floor

15  framing, the bed support, basically the wood structure.

16  Q.  And those are what you would classify as not

17  formaldehyde-emitting materials, right?

18  A.  Yes.

19  Q.  And the flooring in this unit, that doesn't show up on your

20  list that was introduced as Exhibit 1000 earlier, that was also a

21  nonformaldehyde-emitting floor; is that right?

22  A.  That's correct.  That was soft wood plywood.

23  Q.  Now, earlier you mentioned that HUD is a federal agency that

24  regulates manufactured homes, correct?

25  A.  Yes.

1  Q.  Now, HUD sets a target ambient air level of .4 ppm; is that

2  right?

3  A.  That was a goal that was proposed in 1984.  It has never been

4  put in place because it could never be scientifically shown that

5  the use of, for example, low formaldehyde-emitting wood products

6  was related to the actual concentration of formaldehyde in the air.

7  Q.  But it's still a target ambient air level of .4?

8  A.  It's a number that somebody proposed, but it's a meaningless

9  number because there's no relationship between the use of low

10  formaldehyde-emitting wood products and the concentration of

11  formaldehyde in the air.  The concentration of formaldehyde in the

12  air is determined by the five factors.

13  Q.  But HUD does set some levels for the actual materials

14  themselves, correct?

15  A.  That's correct.  There are product standards, and that means

16  that when hardwood plywood, particle board are tested under a

17  standardized test procedure, they can emit no more than a certain

18  amount of formaldehyde specified by HUD.

19  Q.  And that would be .2 parts per million for certain materials?

20  A.  For hardwood plywood and .3 for particle board.

21  Q.  And it's your opinion that if materials meet those HUD levels,

22  then you consider those low formaldehyde-emitting or LFE materials,

23  correct?

24  A.  Yes.

25  Q.  Now, earlier we saw your article "Formaldehyde Indoors" that

1   you wrote back in 1987, is that right, the correct year, 1987?

2   A.  Yes, that's when it was published.

3   Q.  And in your article, we'll see a statement here where you

4   mention that formaldehyde is in multiple areas outside of just wood

5   materials.  You mention tobacco products, automobile and gas and

6   wood burning stoves, furnaces.  You also mention that it's in

7   drapery and upholstery fabrics, carpet pads, backings and permanent

8   press clothes are all sources of free formaldehyde, correct?

9   A.  That's correct.

10  Q.  Some of those materials were things that were inside

11  Ms. Castanel's unit, when it comes to carpets and some fabric

12  goods, correct?

13  A.  Likely, yes.

14  Q.  We also see in that same article that the use of a vinyl

15  protective overlay can reduce formaldehyde emissions by up to 90

16  percent, correct?

17  A.  Yes.

18  Q.  And that is the type of vinyl overlays we saw on the cabinets

19  and on the wall materials in Ms. Castanel's unit, right?

20  A.  Generically they'd be that type of overlay, yes.

21  Q.  Now, in 1987 when you did this article, you included some

22  information from a 1985 report from the Formaldehyde Analytical

23  Chemistry and Toxicology, and there we see that the concentrations

24  of indoor conventional home levels is .04 parts per million back in

25  1985; is that right?

1   A.  That's what -- again, that is not my table, although I

2   reproduced it here.  That, as the footnote indicates, is from the

3   American Chemical Society from a publication of theirs in 1985,

4   yes.

5   Q.  And you found that important to put in your paper or you

6   wouldn't have put that citation in your paper, right?

7   A.  Yes, it helped to create a context.

8   Q.  And we also see that for outdoor urban air, up to 80 parts per

9   million or .08 parts per million, was an outdoor urban area as in

10  1985 in this study, correct?

11  A.  That is what's reported there.  I have been asked about this

12  many times and I have done some more research on it, and I have two

13  publications with me here on the stand today from which I concluded

14  that that value is not typical for outdoor urban air in the United

15  States.  I don't know where that value came from or when it was

16  collected.

17  Q.  But you found it a reliable source to at least include it in

18  your paper in 1987, correct?

19  A.  Again, that is from the American Chemical Society in 1985.

20  Q.  And we also see some other levels on that particular exhibit,

21  .09 indoors, mobile home with no complaints, I assume that means no

22  complaints regarding formaldehyde emissions; is that right?

23  A.  Yes.  And that's because that at the .09 parts per million

24  concentration you are at the bottom of the threshold at which

25  people can smell it.  People can't smell formaldehyde, they're not

1    going to file a complaint.  But they're still breathing

2    formaldehyde, which is a cancer-causing gas.

3    Q.  Now in 1985, Ms. Castanel would have been about 55 years old;

4    does that sound about right?

5    A.  I don't know her age today, but I'll take it on face value.

6    Q.  I believe earlier today her counsel represented that she's 79

7    years old, so approximately 25 years ago she would have been 54,

8    55; is that about right?

9    A.  Sounds about right, yes.

10   Q.  So at least as of 1985, Ms. Castanel would have been living in

11   this environment for 55 years of her life, where many of these

12   levels we just saw such as the .04 for indoor conventional homes,

13   .08 for outdoor urban air, or at least as represented in your paper

14   in this citation of your paper, was some of the levels she would

15   have been exposed to for the first 55 years of her life; is that

16   right?

17   A.  Those are generic levels, I don't know how they would apply to

18   Mrs. Castanel's specific living situation.  And as I said, I've

19   concluded with further research that that -- the .08 for outdoor

20   urban air does not represent typical levels in outdoor urban air in

21   the United States.

22   Q.  Dr. Smulski, you've never worked in the travel trailer

23   industry?

24   A.  I have not.

25   Q.  You've never manufactured a travel trailer?

1   A.  No.

2   Q.  You've never worked for FEMA?

3   A.  That's correct.

4   Q.  And you never worked for any organization responsible for

5   responding to a natural disaster, correct?

6   A.  That's correct.

7   Q.  Can we get Exhibit 362.

8         Now, Dr. Smulski, is this the MSDS sheet we saw earlier

9   that you were talking to with Mr. Watts?

10  A.  It appears to be, yes.

11  Q.  If you look at top of that MSDS sheet, the top right-hand

12  corner, effective dates you'll see is September 6, 2006, correct?

13  A.  That's correct.  And below that is the date of the previous

14  MSDS released by BlueLinx May 10th, 2004.

15  Q.  So this shows that it superseded a prior notice by that same

16  corporation, correct?

17  A.  Yes.

18  Q.  If we scroll down on the list, you'll see that there's areas

19  regarding hazard identification, emergency overview, other

20  information on this MSDS sheet.  From what we can tell from this

21  2006 publication, this would not have related back to 1999, as it

22  superseded at least the 2004 publication, correct?  You wouldn't

23  know what was in the 1999 publication?

24  A.  I would agree with you in a technical sense, but I disagree

25  with you in the sense that the MSDS sheets have not changed over

1  time.  The same information has been presented in MSDS sheets over

2  time.

3  Q.  But you don't know for a fact what was in the 1999 series MSDS

4  sheet, correct?

5  A.  That's correct.

6  Q.  Nor would you know for a fact by looking at this particular one

7  what would have been superseded on a 2004 MSDS sheet?

8  A.  That's correct.  But we have to keep in mind that an MSDS sheet

9  is a form required to be filled out by the manufacturers of wood

10  products, and they are supplying the same information in 2006 as

11  they supplied in 2004 as they supplied in 1999.

12  Q.  Well, certainly they found a reason to supersede it in 2006

13  over the 2004 form, correct?

14  A.  They did.  And that may be, for example, your little box

15  covering it there because they may have added or subtracted from

16  their product list that appears at the very top.

17  Q.  Or they could have changed some of the information in the form,

18  you just don't know.

19  A.  That's correct.

20  Q.  Ms. Castanel's unit was built in the fall of 2005, right?

21  A.  December 2005 is the date to my understanding, yes.

22  Q.  And that was prior to the date on the MSDS sheet we saw

23  September 6, 2006, correct?

24  A.  Yes.

25  Q.  Now, you mentioned earlier in your five factors, you mentioned

1  temperature is one of the five factors.  And indoor temperature is

2  what we would be concerned with; is that right?

3  A.  That's right.  But you have to keep in mind you actually have

4  two indoor temperatures, you have indoor -- let me start at the

5  beginning.  Indoor begins from the inside surface of the metal

6  cladding through the living space to the inside surface of the

7  metal cladding on the other side.  So you have temperatures within

8  the wall cavity versus temperature within the living space.

9  Q.  Correct.  And inside the living space we control the

10  temperature and humidity with an air conditioning system; is that

11  correct?

12  A.  You can control the temperature, you cannot control the

13  relative humidity.

14  Q.  Well, if you at least have some -- a drip pipe off the air

15  conditioning system, you have condensation coming out of that drip

16  pipe, that is reducing humidity levels in that trailer; is that

17  right?

18  A.  That is one of the effects of cooling air below the dew point,

19  yes, you will slightly dehumidify it; but again, this is a

20  recirculating air conditioning system.

21  Q.  But bringing the temperature down, that's one of the components

22  that you have as increasing formaldehyde as the temperature goes

23  up, formaldehyde goes up, correct?

24  A.  That's correct.  And that would apply to the living space.

25  Where the action occurs inside a travel trailer is in the walls and

1    ceilings, that's why the unexposed raw wood on the rear of the wall

2    and ceiling panels is the most important source of formaldehyde.

3    And in fact, in that trailer, there's over 850 square feet of raw

4    exposed wood inside the walls and ceiling cavities.

5           And what happens is, as the sun bears down on the south

6    side of the travel trailer, it heats up that wall cavity well above

7    the outside temperatures, that stimulates the release of

8    formaldehyde into the wall cavity, into the ceiling cavities, and

9    then it seeps into the living space through joints and penetration,

10   onto the natural driving forces of temperature difference across

11   the wall, air pressure difference across the wall, formaldehyde

12   concentration across the wall --

13   Q.  Dr. Smulski.

14   A.  -- and that's how the formaldehyde in the walls and ceilings

15   gets into the living space.

16   Q.  And let's talk about that.  You talked about pressure

17   differentials coming across the walls.  If there's a breeze

18   outside, and there's almost typically a breeze in this area of New

19   Orleans, you're going to have at least a side that's receiving the

20   wind and a side that doesn't have wind, correct?

21   A.  That's right, you have a windward side with high pressure, and

22   a leeward side with lower pressure.

23   Q.  And on the side with the lower pressure is where your little

24   red arrows would be leaving the unit, correct, that you have on

25   your animation?

1    A.  It's going to depend on some other factors as well,

2    temperature, relative humidity, but air may be moving across those

3    walls in one direction or another, yes.

4    Q.  But the wind is going to have an effect on the pressures of the

5    unit, which can help the formaldehyde escape the shell of the unit

6    on the non-windward side, correct?

7    A.  Under certain conditions, yes.

8    Q.  How many windows did Ms. Castanel's unit have?

9    A.  Let's see.  Four that I can remember, possibly five.

10   Q.  Five windows sounds about correct?

11   A.  Four or five, we can look at the photos and confirm.

12   Q.  A screen door?

13   A.  It has an entry door, yes.

14   Q.  And you would agree with me that the windows are, in fact, a

15   form of ventilation for the travel trailer, correct?

16   A.  When they're open, and obviously, the degree to which they're

17   open.  If they're open one inch, that's going to be different than

18   if they're open one foot.

19   Q.  Do you know what temperature Ms. Castanel liked to keep the

20   unit, the temperature of the unit?

21   A.  I read in her deposition that she said about 60 degrees.

22   Q.  And keeping the temperature cool is one of the things we talked

23   about in your five factors, correct?

24   A.  That's right.

25   Q.  Now, you mentioned earlier you've never built a travel trailer,

1   correct?

2   A.   That's right.  But I have designed, built, repaired and

3   dismantled wood frame buildings my entire life, and a travel

4   trailer, as you've seen, is nothing more than a small wood frame

5   building; wood floors, wood walls, wood ceiling.

6   Q.   You never have been called upon a project to troubleshoot

7   because of problems with indoor air quality, have you?

8   A.   No, it's outside of my expertise.

9   Q.   And that would include you've never been brought into a project

10  to troubleshoot because of formaldehyde off-gassing, correct?

11  A.   That's correct.

12  Q.   Now, as far as not constructing a travel trailer, you haven't

13  constructed a travel trailer with the use of the alternative

14  materials you talked about here today, correct?

15  A.   I have not, no.

16  Q.   You haven't tested the properties of those materials in a

17  travel trailer at least in an actual environment, correct?

18  A.   I haven't, but I see no technical reasons why their alternate

19  materials are going to perform any differently in the travel

20  trailer than the low formaldehyde-emitting materials that were

21  actually used.

22  Q.   Now, some of the materials that you talked about that are low

23  formaldehyde- or lower formaldehyde-emitting and

24  nonformaldehyde-emitting materials, some of those would be bonded

25  isocyanate bonding material; is that correct?

1  A.  That's one of the nonformaldehyde-emitting alternative

2  adhesives, yes.

3  Q.  And the other material that you mentioned would be -- that you

4  mentioned would make a substitute for the hardwood plywood is the

5  Masonite or the hard board material that you referenced earlier,

6  right?

7  A.  Yes.

8  Q.  And you've never attempted to use that material in any travel

9  trailer-type environment to see how it would withstand in a travel

10  trailer environment, correct?

11  A.  I haven't personally, but it's used routinely in automobiles,

12  for example, door panels, ceiling panels.  You don't see it because

13  it's covered with foam and vinyl.

14  Q.  Dr. Smulski, you didn't do any testing of the formaldehyde

15  levels in the Castanel unit, correct?

16  A.  That's correct.  That's outside of my expertise.

17  Q.  Now, earlier, your exhibit number, I believe it is 1002, the

18  hardwood plywood 2005 publication, let me borrow the actual one.

19  You've checked off some of the providers there, and then there's

20  others that aren't provided because they do not provide, they don't

21  provide no formaldehyde-emitting materials, correct?

22  A.  Yes.

23  Q.  And one of those entities that we see here is Georgia Pacific,

24  correct?

25  A.  Yes.

1   Q.  And isn't Georgia Pacific one of the largest wood providers

2   there is?

3   A.  It is.

4   Q.  We don't see BlueLinx on your sheet, either, do we?

5   A.  No.  BlueLinx is actually a distributor for Georgia Pacific.

6   Q.  And you didn't see North American Forestry products either, did

7   you?

8   A.  Not on that list, no.

9   Q.  Dr. Smulski, on these alternative materials that you've opined

10  about that were available in 2005, you haven't made any study as to

11  how much of those materials was available, have you?

12  A.  I haven't, but wood products manufacturers like all companies

13  are in the business of making money, and if they are faced with an

14  order for a huge amount of hardwood plywood, they're going to find

15  a way to do it, they're going to add a second shift or a third

16  shift or subcontract out the work or go to a foreign supplier.

17          MR. MULCAHY:  Objection, it's non-responsive.

18          THE WITNESS:  Because they want to make the money.

19          THE COURT:  Stick with the question.  This, too, is

20  getting very protracted like our witness earlier.  Let's just stick

21  with the question and answer the question so we can get through

22  this and move onto the next witness.

23  BY MR. MULCAHY:

24  Q.  In 2005 you didn't make any study in the materials available in

25  2005 and to what quantity those materials were available, correct?

1   A.  That's correct.

2   Q.  And you don't know if there were enough materials available in

3   the quantities of the low formaldehyde and no formaldehyde-emitting

4   materials that you talked about that can satisfy the use of the

5   travel trailer industry; is that right?

6   A.  What we do know is that there was sufficient hardwood plywood

7   available to manufacture the travel trailers because they were, in

8   fact, manufactured, and all Recreation By Design had to do was

9   request that the company that applied the vinyl overlay to one

10  surface, apply that vinyl overlay to both surfaces for the purpose

11  of trapping that formaldehyde inside the product rather than

12  releasing it into the wall and ceiling cavity.

13  Q.  And I think you're answering differently than what I asked you.

14  But as far as the materials that you've mentioned, and we're not

15  talking about vinyl coating the existing materials that you see in

16  the Recreation by Design travel trailer, but the other materials

17  you haven't done a study to see if there was sufficient quantities

18  of those materials available in 2005 for an industry, correct?

19  A.  That's correct.

20          MR. MULCAHY:  Your Honor, I believe that's all the

21  questions I have.

22          THE COURT:  Thank you, Mr. Mulcahy.  Redirect?

23          MR. WATTS:  Just a couple of issues, your Honor.

24                      REDIRECT EXAMINATION

25  BY MR. WATTS:

1  Q.  Is Columbia Forest Products a small-time operation?

2  A.  No.  If you go on their web site, it builds itself as the

3  largest hardwood plywood manufacturer in North America.

4  Q.  Second issue, you said that you have two publications that you

5  brought with you showing what the level of outdoor formaldehyde in

6  the atmosphere is, what are they?

7       MR. MULCAHY:  Objection, your Honor, it's outside of what

8  was in his report, this is newly-added information.

9       THE COURT:  Well, he is going to be limited to what's in

10  his report whether it's covered on cross or not, but it's going to

11  be limited to the report.  Opinions expressed in the report.

12       So I am not quite sure what the next question is going to

13  be on this, but we may be -- you might want to double check that.

14  If it's not in his report, then we're not going to go there.

15  BY MR. WATTS:

16  Q.  Let me just ask you generally, the toxicological profile for

17  formaldehyde by the U.S. Department of Health and Human Services,

18  have you read that?

19  A.  Yes, I have.

20       MR. MULCAHY:  Objection, your Honor, that's improper

21  redirect, we didn't cover that.

22       MR. WATTS:  It's the subject that he brought up.

23       THE COURT:  Yeah, I thought it was covered on cross, I'll

24  let him ask.

25  BY MR. WATTS:

1   Q.  Has the government done studies and collected samples of

2   outdoor pollutions in major metropolitan cities in this country?

3   A.  Yes.  And they're summarized in that document you just

4   mentioned, the toxicological profile of formaldehyde written by the

5   Agency For Toxic Substances and Disease Registry.  In 1981 to 1984

6   formaldehyde levels in the outdoor air were measured in --

7             THE COURT:  Well, wait, let's stick with his question.

8   BY MR. WATTS:

9   Q.  What were the levels that were measured, for example, in

10  Houston?

11  A.  Thank you.  I don't recall the specific level in Houston, but

12  levels were measured in major cities throughout the United States,

13  including Houston; Riverside, California; Chicago, Illinois;

14  Pittsburgh, Pennsylvania; St. Louis, Missouri.

15  Q.  What were the levels?

16  A.  Staten Island.  And they ranged from 10 to 20 parts per

17  billion, that's for outdoor urban air.

18            MR. MULCAHY:  Objection, your Honor, that's outside of

19  the scope of his report.  I asked him specifically about what was

20  in the 1987 article that he had written and the levels that were in

21  there.  Everything that he's done since then and post his report is

22  something that's not covered.

23            THE COURT:  Well, first of all, he's already answered I

24  think.  To the extent you're asking me to strike his answer from

25  the record, I'll overrule that objection.  It's something that was

1   touched on on cross, so I think it's a fair enough question.  Go

2   ahead.

3           MR. WATTS:  May I approach, your Honor?

4           THE COURT:  Yes.

5   BY MR. WATTS:

6   Q.  Houston, Texas, a hot, muggy, southern city like New Orleans?

7   A.  Yes, it is.

8   Q.  What was the level that was measured in Houston, Texas, for the

9   outdoor air?

10  A.  The level was measured in March of 1984 at 3.8 parts per

11  billion.

12  Q.  And that was back in 1984 when Ms. Castanel was 55 years old,

13  right?

14  A.  Young woman, yes.

15  Q.  Had measurements been taken in a place called Kenner,

16  Louisiana?

17  A.  Yes.  The Environmental Protection Agency measured the

18  formaldehyde levels just up the road here in, again, outdoor air.

19  Those levels were measured for a six-month period from November

20  2005 to May 2006.  And the highest level that they measured at that

21  time was 15 parts per billion.

22  Q.  Last issue.  Counsel asked you about these MSDSs, and by golly,

23  this is a 2006.  Did you read the testimony of the corporate

24  representative of Rec By Design?

25  A.  Mr. Rush, yes.

1    Q.  With respect to each of the statements that were made in that

2    MSDS, did he agree with me that he knew that --

3                    THE COURT:  Wait.

4                    MR. MULCAHY:  Objection, your Honor, he's asking about

5    the testimony.

6                    THE COURT:  We're asking him whether he agreed with

7    something else?

8                    MR. WATTS:  Fair enough.  I plead guilty and quit, Judge.

9    I apologize.

10                   THE COURT:  Well, look, let's be careful from now on.

11   We're going to ask questions of a witness that are directed to what

12   a witness knows, not to make statements to get a witness to either

13   agree with or disagree with or say he was aware of or not aware of.

14                   MR. WATTS:  Let me try one more.

15                   THE COURT:  Well, I think we probably ought to go ahead

16   and close it down now.

17                   MR. WATTS:  Then I quit.

18                   THE COURT:  We're getting close to attorney-testifying

19   type questions and that's what we want to avoid.

20                   MR. WATTS:  You have my apology, I'm sorry.

21                   THE COURT:  Let's go ahead and finish.  If we're done

22   with Dr. Smulski, he can go ahead and step down.

23                   MR. WATTS:  We're done now.  Thank you, sir.

24                   THE COURT:  Thank you, sir.

25                   THE WITNESS:  Thank you, your Honor.

1          THE COURT:  Have you got a very brief --

2          MR. WATTS:  Fifteen minutes?

3          THE COURT:  Fifteen minutes, we'll go ahead and take a

4    short break after that.  Let's go ahead and take -- this is a

5    video?

6          MR. WATTS:  Yes, sir, it's of Mark Polk by and through

7    his videotaped deposition, and it's 15 minutes and 44 seconds.

8          THE COURT:  Okay, Mr. Polk, P-O-L-K?

9          MR. WATTS:  Yes, sir.

10         THE COURT:  Has been sworn in.

11      (WHEREUPON, THE VIDEO DEPOSITION OF MARK POLK WAS PLAYED.)

12   Q.  Okay.  And just so our transcript of this deposition is clear,

13   when you say "RVs," I assume you mean recreational vehicles; is

14   that --

15   A.  A recreation vehicle, yes.

16   Q.  Right.  Recreation vehicle.  Okay.

17   A.  Uh-huh.

18   Q.  And then do you consider these travel trailers, the FEMA travel

19   trailers, to be RVs?

20   A.  Every -- every type of recreation vehicle, from a pop-up, a

21   tent trailer, through a motorized diesel pusher is actually

22   classified as an RV, yes.

23   Q.  So what's really the definition of an RV versus some other type

24   of, I'll say, a mobile home?  What's the difference?

25   A.  It basically, it's a mobile vehicle that provides sleeping

1    quarters, kitchen facilities, bathroom facilities for the most

2    part, and used for recreation purposes.

3    Q.  All right.  Okay, let's -- I'd like to ask you about this

4    section "Ventilation in Travel Trailers" on page 3 that I'm looking

5    at.  And when you -- it's mentioned here in the first paragraph,

6    and I'm paraphrasing, that since you have been involved with RVs,

7    ventilation has been an important topic.  What -- what do you mean

8    by that?

9    A.  Basically, when you're dealing with a lot of recreation

10   vehicles that are small in size and compact, of course, if there's

11   any type of odor present in an RV in that small of a space, it's

12   going to be more pronounced than it would be if you're sitting in

13   this room.

14          So you have cooking odors, you have holding tank odors,

15   you have formaldehyde odors.  Whatever it is, it's -- it's going to

16   be more pronounced, so the requirement to ventilate an RV is a

17   little more than what you might be concerned with in your home,

18   that type of issues.  It comes up all the time.

19          So, you know, and then of course, when you're dealing

20   with LP gas and carbon monoxide poisoning, if an appliance in an RV

21   isn't vented outside, like the range burners in the oven, they're

22   not vented outside, so if you're -- if you're using the range

23   burners or you're using the oven and you're in a very, very small

24   compact space, there's a possibility exists for asphyxiation.  So

25   it's an important issue that when somebody comes in, a new consumer

1    purchases an RV and they're not familiar with how it works,

2    ventilation is one of the issues that I try to cover in my writing

3    and in our DVD productions on the importance of ventilation.

4    Q.  What -- you mentioned cooking and the appliances not being

5    ventilated to the outside; is that correct?

6    A.  Well, every -- every appliance, like the furnace -- most of the

7    gas appliances are vented to the outside, but with the exception of

8    the range burners and the oven.

9    Q.  Okay.  And so what's -- what would be the odor, the

10   formaldehyde odor?

11   A.  It's just a pungent odor, and it will irritate your eyes and it

12   may irritate your throat.  It depends on how strong it is.  Very

13   common in new RVs that were built and then they're set out on the

14   lot, they're closed up waiting for a dealer to put an order in, the

15   dealer orders a unit, driver brings it down to the dealer's

16   location, and you put it on your lot.  And the first time you walk

17   inside, that odor's present.  Because, again, we're talking about a

18   small, compact space, and it's more pronounced than it would be if

19   you just built a 2,000/3,000 square foot house.

20          So when we would -- when we would get a new unit and you

21   walked inside, you would -- you would get that odor.  And of course

22   in the other deposition, I mentioned that I instructed the sales

23   people that worked for me that -- to open windows and leave the

24   door open and open some overhead vents and just ventilate the unit.

25   And 99 percent of the time within a short period of time the odor

1   would dissipate and be gone.

2   Q.  And did you ever have situations where after the ventilation it

3   would be closed back up and then you'd go back in and notice the

4   odor again?

5   A.  I think if you're talking, you know, summertime in North

6   Carolina when the temperatures are in the high 90s and the units

7   are closed up on the lot, it's common to get that odor until you

8   really have a chance to let it air out.  I mean, we're talking we

9   go in in the morning, and if the weather was going to be nice, I

10  would just instruct the sales people to go out and open the doors

11  to the units, and it's really in an effort to make it more

12  friendly.  When the customers come on the lot, they can go out and

13  browse and look.  But at the same time, it's providing some

14  ventilation to help with that -- that initial off-gassing that's

15  common in the new unit.

16  Q.  Okay.  And in the first question, which is (a) you've got bold

17  in that paragraph, "Thoroughly air out your RV before each trip by

18  opening all of the windows to allow fresh air in and running the

19  air conditioner and/or fans."

20  A.  Uh-huh.

21  Q.  Okay.  And was that the advice you gave your customers as far

22  as the RVs they purchased?

23  A.  Yes.

24  Q.  All right.  What about when -- when you're living in a travel

25  trailer, how do you know when to ventilate your travel trailer?

1   A.  As far as formaldehyde goes?

2   Q.  Yeah, formaldehyde.

3   A.  That -- you would notice -- it's an irritant, if it's strong

4   enough.  I mean, the odor can be -- it can be minimal to where it's

5   not that noticeable, or it can be on the really high level where it

6   burns your eyes and it irritates your throat or the smell itself.

7   So you're going to know -- you're going to know.  You might not

8   know what it is, but you're going to know that something is

9   present.

10          And of course, through -- through working with RVs and

11  dealing with them every day, eventually you -- I came to know that

12  the odor in, mainly in new RVs, is the formaldehyde.  And then, of

13  course, the answer to that was to ventilate.

14          So early on with these new trailers, you know, the

15  possibility existed that people were living in them and didn't know

16  what the odor was.  But once it -- once it came about and the media

17  got ahold of it and everything, then FEMA did in fact come up with

18  a brochure, and they got that out to as many of the occupants as

19  they possibly could with guidance on what to do if you experience

20  that.

21          And that's the same guidance that I would offer a new

22  buyer that called me on the phone and said, "Hey, you know, we took

23  the unit camping last weekend and something was, you know,

24  irritating our eyes or there was this odor that we couldn't

25  explain."  And then that's -- that's what I would tell them, "It's

1   basically the formaldehyde off-gassing and what you need to do is

2   ventilate the unit."

3   Q.  And when you say "ventilate," I mean, you're talking about

4   opening the windows and doors?

5   A.  Well, there's a passive ventilation and there's mechanical

6   ventilation of -- you know, if it's fall time of the year, of

7   course you're not going to want to run your air conditioner, but

8   you could open a couple of windows and get some cross ventilation,

9   or you can open an overhead vent and allow some fresh air to come

10  in.

11          Any source of ventilation is going to help improve the

12  air quality inside the RV.

13  Q.  Okay.  And as far as that type of ventilation, do you have any

14  recommendation as to how long a resident of a travel trailer should

15  ventilate the unit?

16  A.  If that odor continues to persist, you need to continue to

17  ventilate.  It will be -- it will be stronger in high-humidity

18  situations and heat.  So if it's -- if it's summertime, you need to

19  run the air conditioner and leave a couple of windows cracked open.

20  In the wintertime, the odor tends to be not so pronounced or it's

21  not -- you don't notice the presence of it, so the requirement may

22  not be the same as it is during periods of heat versus periods, you

23  know, of cold.

24          But if the odor is present, you just need to continue to

25  ventilate it until it goes away and you don't notice it.  I mean,

1    if you walk in a used unit, you're not going to have that, so it's

2    just a matter of time until that -- you can get that gone, and it's

3    usually not that long.  Very rarely did we sell a unit and have

4    people say anything about it, because it was already taken care of

5    on the lot before the unit was sold.

6            Now, if we put a unit on the lot and somebody comes in

7    and buys it the third day that it's there, they're the ones that

8    might call and question what this odor is, and then that's what the

9    guidance that we would provide.

10   Q.  Have you personally ventilated a travel trailer by having the

11   windows open and the air conditioning running at the same time?

12   A.  Yes.

13   Q.  Okay.  Did -- did you have any issues with humidity within the

14   unit or condensation?

15   A.  RVs in general have issues with condensation.  You can pick up

16   almost any owner's manual from almost any RV manufacturer and

17   they're going to have, maybe not a chapter, but they're going to

18   have -- the topic of condensation is going to be discussed.  It's

19   just the -- it's just -- it's just something you deal with with

20   recreation vehicles when the cold -- when the warm air meets the

21   cold air and condensation on metal window frames, air conditioning

22   vents.  Just some are worse than others, and a lot of that's the

23   way the unit's built and the insulation and many different topics.

24           But, yeah, condensation is an issue that you're going to

25   deal with if you -- if you have an RV.

1    Q.  Okay.  But as far as running the air conditioner and opening

2    the windows, would that increase the amount of condensation that --

3    in the unit as opposed to just running the air conditioner with the

4    window closed?

5    A.  That's -- yeah, I don't know how to answer that.  I mean, if

6    it's -- if the -- if it's 90 percent humidity, relative humidity,

7    or what have you, and there's more moisture in the air and you have

8    the windows wide open, I guess it would -- it would probably add to

9    the condensation running the air conditioner.  If the humidity is

10   at a lower level and the windows are open, it may not get any or

11   very little.

12   Q.  Do you -- do you have any opinions as to how condensation would

13   impact the levels of formaldehyde gas within a travel trailer?

14   A.  No, I don't.

15            UNKNOWN LAWYER:  Objection to foundation.

16   Q.  Okay.  You don't?

17   A.  No.

18   Q.  Okay, well, let me -- let me ask you it this way:  If --

19   assuming the travel trailer is in an environment where you've got

20   high temperatures, in the 90 degree temperatures, high humidity, 80

21   to 90 percent-type humidity, do you think it's practical to achieve

22   (a), (b) and (c) or to actually implement (a), (b) and (c) of the

23   FEMA recommendations?

24            And I'm looking at page 5.  You list them as (a), (b),

25   (c), there on the -- in the FEMA brochure.

1    A.  I think -- I think I already answered that, or I thought I did.

2    We -- I tried to discuss the higher humidity, and of course opening

3    windows you're letting that warm air into the RV and you're running

4    the air conditioner and, you know, with the windows open, you're --

5    what I'm saying is, with the windows open, you're allowing the

6    warmer air in, but you're running the air conditioner and you're --

7    what you're doing is you're introducing fresh air.

8         Whether that's warm air or cold air, you're introducing

9    fresh air from outside.  It's going through the unit because

10   windows are open on both sides, and you're running a 15,000 BTU air

11   conditioner in a 300-square-foot house/trailer, so the unit is

12   going to cool down.  It might take longer if the windows are open,

13   but it's going to cool down in those temperatures.  And you're

14   letting fresh air go through the unit, so you're reducing the

15   formaldehyde off-gassing.

16        Whether it's logical to do all three, (a), (b), (c),

17   again, if you're trying to keep the warm air out, you probably

18   wouldn't open the windows.  But if you're trying to reduce

19   formaldehyde off-gassing, you open the windows, run the air

20   conditioner; that's the best way to deal with it.

21        THE COURT:  All right.  Let's go ahead and take a short

22   break.  We'll start again at 3:25 and we will break around the five

23   o'clock hour.

24        THE MARSHAL:  All rise.

25        (WHEREUPON, A RECESS WAS TAKEN.)

```
 1        (OPEN COURT.)

 2             THE MARSHAL:  All rise.

 3        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

 4             THE DEPUTY CLERK:  Court is in session.

 5             THE COURT:  All right.  You may be seated.

 6             All right.  Mr. Watts, you have another witness for us to

 7   hear at this point?

 8             MR. WATTS:  I do, sir, it's Alexis Mallet.

 9             THE COURT:  The gentleman that is standing up and making

10   his way up here.

11        (WHEREUPON, ALEXIS MALLET, JR., WAS SWORN IN AND TESTIFIED AS

12        FOLLOWS:)

13             THE DEPUTY CLERK:  Have a seat and state your name and

14   spell it for the record, please.

15             THE WITNESS:  My name is Alexis Mallet, Jr., A-L-E-X-I-S

16   M-A-L-L-E-T, Jr.

17             MR. WATTS:  May I proceed, your Honor?

18             THE COURT:  Yes, please do.

19                          VOIR DIRE EXAMINATION

20   BY MR. WATTS:

21   Q.  Mr. Mallet, the first page of the PowerPoint that we prepared

22   says you are a construction expert.  Just real briefly describe

23   your expertise, if you could.

24   A.  For the last 36 years I've owned and do own several

25   construction companies, general contracting firms, firms that deal
```

1   with insurance companies on damage repairs, reconstruction,

2   consulting in design and construction failure and that sort of

3   thing.  We are licensed general contractors, licensed mobile home

4   installation contractors, microbial remediation contractors.

5           MR. WATTS:  Your Honor, we would offer Mr. Mallet as an

6   expert in construction materials and processes.

7           THE COURT:  Any objection?

8           MR. MULCAHY:  No objection to construction materials and

9   processes.

10          THE COURT:  All right.  The court will accept him as an

11  expert in the offered field.

12          MR. WATTS:  Thank you, your Honor.

13                        DIRECT EXAMINATION

14  BY MR. WATTS:

15  Q.  I am going to flip through this real quickly since we've done

16  that process.

17          You're licensed here in the State of Louisiana?

18  A.  Yes, sir.

19  Q.  You're a member of all of the construction, manufacturing

20  housing groups that meet these industry groups; is that right?

21  A.  National Institute of Sciences, the investigative engineers

22  associations.

23  Q.  In addition, you have expertise in construction costs, material

24  costs, construction defects, building science, manufacturing

25  defects and construction means and methods; is that correct?

1   A.  Yes, sir.

2   Q.  I want to get to the meat of the matter.  Are you here today to

3   talk about construction alternatives that were available for the

4   Rec By Design travel trailer?

5   A.  Yes, sir.

6   Q.  This slide has four subjects, alternate wood products,

7   alternate insulation materials, installation of exterior vapor

8   retarder, and a better quality of workmanship.

9           Let me just ask you:  Have you done a great deal of work

10  yourself and together with other experts in analyzing the

11  construction techniques utilized for this trailer?

12  A.  Yes, sir.

13  Q.  Are you prepared to talk about all four of those subjects here

14  today?

15  A.  Yes, sir.

16  Q.  Have I told you that despite the fact that you've done work on

17  all four of them that I really want to concentrate with you on one,

18  and that's the alternative wood products?

19  A.  Yes, sir.

20  Q.  Okay.  I want to visit with you about that topic so that we can

21  get you out of here.  What are the alternative wood products that

22  were available that were made without formaldehyde based resins?

23  A.  I found a type of wood products, products that did not use

24  glues using urea formaldehyde materials, they were a heat and

25  compression type -- are a heat and compression type of material.

1   Q.  All right.  Now, you were in the courtroom when Mr. Smulski

2   just testified?

3   A.  Yes, sir.

4   Q.  He testified that these materials were available in 2005.  Have

5   you priced those materials?

6   A.  Yes, sir, I did.

7   Q.  Have you reached a conclusion as to whether there was any cost

8   reason not to incorporate the no formaldehyde emitting products

9   that he identified?

10  A.  No, sir.  There were no cost difference, any cost reasons not

11  to use those products.

12  Q.  Were those products commercially available in 2005 according to

13  your research?

14  A.  Yes, sir.  Those products were available for approximately the

15  last 80 years or so.

16  Q.  Were those products that he identified technologically feasible

17  for use in 2005?

18  A.  Yes, sir.  I've seen those products used in mobile homes, in

19  work trailers and that sort of condition, as well as commercial and

20  residential buildings.

21  Q.  In addition to technological feasibility, based upon your

22  research have you reached a conclusion as to whether they were

23  economically feasible for use in 2005 had Rec by Design chosen to

24  use them?

25  A.  Yes, they were.

1    Q.  One last issue I want to visit with you, and then I am going to

2    have counsel ask you questions.

3           I want to put up on the screen Plaintiff's Exhibit 1002.

4    Do you remember the questions that Mr. Smulski was asked about

5    these different companies?

6    A.  Yes.

7    Q.  Are you familiar with Columbia Forest Products?

8    A.  Yes, sir.

9    Q.  Is it one of the largest manufacturers of composite wood

10   products in the United States?

11   A.  To my knowledge, a very large corporation.

12   Q.  Based upon your research, was there any feasibility obstruction

13   to this kind of no formaldehyde-emitting being commercially

14   available in mass quantities for use in 2005?

15   A.  No, sir.  To my knowledge, in that time period there was

16   approximately five billion square feet of --

17           MR. MULCAHY:  Objection, your Honor.  May we approach?

18           THE COURT:  Yes.

19      (WHEREUPON, THE FOLLOWING BENCH CONFERENCES WAS HELD:)

20           MR. MULCAHY:  In his deposition he was asked specifically

21   about the quantities of materials available and the materials that

22   he had in his alternative design and he said I do not know, I

23   cannot give you an answer.

24           MR. WATTS:  I didn't ask -- I didn't try to get that

25   answer of five billion.

1        THE COURT:  Well, he said it, we can move on.  You can

2   either reask the question, he cut him off, or do you want me to

3   strike what he's already said?  If I strike it, it's going to be

4   highlighting it even further.

5        MR. WATTS:  I'll reask the question.

6        THE COURT:  Reask it and make it specific so he only

7   answers that.

8        (OPEN COURT.)

9   BY MR. WATTS:

10  Q.  Mr. Mallet, let me reask the question.  And that is that the

11  question was specific to Columbia Forest Products, and I asked you

12  whether it was one of the largest manufacturers of composite wood

13  products in the United States, and the yes or no answer is what?

14  A.  Yes, it is.

15  Q.  And based upon the companies that are listed as having no

16  formaldehyde emitting woods in Plaintiff's Exhibit 1002, have you

17  reached a conclusion as to whether or not there was a capacity to

18  provide sufficient no formaldehyde-emitting for the travel trailer?

19        MR. MULCAHY:  Objection, your Honor, this is the same

20  issue.

21        MR. WATTS:  I don't want to know what the capacity is, I

22  just want to know if it was sufficient or not.

23        THE COURT:  I think that was a different question, it

24  doesn't ask him to quantify numerically, as I understand the

25  question.

```
 1              MR. WATTS:  Yes, sir.
 2   BY MR. WATTS:
 3   Q.  Have you reached a conclusion, sir?
 4   A.  The answer is, yes, there was capacity.
 5              MR. WATTS:  Those are all of my questions, thank you,
 6   sir.
 7              THE COURT:  Okay.  Cross.
 8                         CROSS-EXAMINATION
 9   BY MR. MULCAHY:
10   Q.  Good afternoon, Mr. Mallet.  I'm Randy Mulcahy, we met a couple
11   of times before, including in Lottie, Louisiana; is that right?
12   A.  Yes, sir.  Good time in the freezing temperature there.
13   Q.  We got to spend a few days in Lottie.  I think we even said
14   "livin lavida Lottie"?
15   A.  A vacation spot itself.
16   Q.  Mr. Mallet, you've rendered an opinion today regarding
17   alternative wood materials, correct?
18   A.  Yes, sir.
19   Q.  In this litigation you were retained by plaintiff counsel in
20   early December of 2009, correct?
21   A.  I think that's correct, yes, sir.  For this litigation?
22   Q.  For this litigation?
23   A.  Yes, sir.
24              MR. MULCAHY:  And I would like to approach the witness,
25   your Honor?
```

1          THE COURT:  Sure.

2   BY MR. MULCAHY:

3   Q.  And I am going to show you an exhibit that's been marked Trial

4   Exhibit 583 and it's about nine pages.  And, Mr. Mallet, I would

5   like to ask you:  Is this a copy of your invoice that was attached

6   as Exhibit 2 to your deposition?

7   A.  Yes, sir, it is.

8          MR. MULCAHY:  Your Honor, I would like to offer, file and

9   introduce into evidence Exhibit 583, it's an eight page exhibit.

10         MR. WATTS:  No objection.

11         THE COURT:  Okay.  So ordered.

12         MR. MULCAHY:  I think I may have two copies together.

13         THE COURT:  583?

14         MR. MULCAHY:  583, your Honor.

15         THE COURT:  So ordered.

16  BY MR. MULCAHY:

17  Q.  So, Mr. Mallet, this is an eight-page invoice of yours, is that

18  correct, for services rendered by your company to plaintiff's

19  counsel regarding the Castanel unit?

20  A.  Yes, that's our invoice.  I don't know how many pages it is.

21  Q.  I'm sorry, it's actually nine pages.  And as of February 28th,

22  2001, I believe your deposition was taken the first week in March,

23  your company had invoiced a total of $54,956, correct?

24  A.  That's correct.

25  Q.  So almost $55,000?

1   A.  That's correct.  That included our services --

2   Q.  That's fine, I am just looking for your total amount that you

3   billed, and that was 55,000?

4   A.  That is correct.

5   Q.  And that's from First General Services?

6   A.  That is correct.  However, it includes the cost for our

7   mechanical engineers, our structural engineer, the testing facility

8   for the testing of the duct and the envelope, and the drafting

9   services.

10  Q.  I understand, Mr. Mallet.  And you're going into a list of all

11  of the different details inside your invoice.  But you were the one

12  coordinator who brought together various individuals and you

13  invoiced that particular amount; is that correct?

14  A.  That is correct.

15  Q.  Now, I asked you in your deposition just a few months ago about

16  alternative materials; is that right?

17  A.  Yes, sir.

18  Q.  And at that time I believe that you were showing me a Masonite

19  material; is that correct?

20  A.  Yes, sir, a fiberboard.

21  Q.  You don't know if that material was utilized in travel trailers

22  in 2005, right?

23  A.  I am not aware of all of the materials that are used in all of

24  the different travel trailers, no, sir.

25  Q.  You didn't know the weight of that material; is that correct?

1   A.  Not at that time.

2   Q.  And that's a hard board material that you're talking about

3   being an alternative material in place of the hardwood plywood; is

4   that right?

5   A.  That is correct.

6   Q.  And you did no analysis regarding the use of that material in a

7   travel trailer regarding the structural integrity of the Masonite

8   in place of a hardwood; is that correct?

9   A.  We didn't do an analysis of it, however we do know that they're

10  used in job site trailers, which are comparable and compatible with

11  travel trailers, as well as mobile homes.  And the method in which

12  we were going to --

13  Q.  Mr. Mallet, I don't want to cut you off, but I think you're

14  going a little far there.

15          First General Services of the South, that's a

16  construction company?

17  A.  Construction and consulting, yes, sir.

18  Q.  You've never built a travel trailer, right?

19  A.  No, sir.  I've never built one from the ground, however, we

20  have performed repairs, extensive repairs on travel trailers over

21  the years as part of the insurance claims.

22  Q.  And when you replace hardwood when you do those repairs --

23  A.  And --

24          THE COURT:  First of all, you can explain your answer but

25  we don't want to get into a narrative that goes afield of the

1    question.  If it's a yes or no question, it's either yes or no and

2    then you can give a very brief explanation, but try to stick to the

3    yes or no; and then let's try not to interrupt him if he's in the

4    middle of explaining for that particular question.

5         It's really not that hard to do.  Just don't go off into

6    something else that he is not asking you about, I think that's the

7    problem as we've heard, you're wanting to say something else that

8    he hasn't questioned you about.  So let's try to be as concise as

9    we can, both with the questions and with the answer.  All right?

10        MR. MULCAHY:  Yes.

11        THE COURT:  Go ahead and finish up what you were saying.

12        THE WITNESS:  And I've also worked with a travel trailer

13   dealer in the dealership and the maintenance department overseeing

14   that operation.

15   BY MR. MULCAHY:

16   Q.  You said you've done travel trailer repair?

17   A.  Yes, we have.

18   Q.  When you replace a piece of hardwood in a travel trailer, it's

19   my understanding you replace like with like, you replace that same

20   material with hardwood plywood; is that correct?

21   A.  That is correct.

22   Q.  And you don't try to use Masonite in place of that hardwood; is

23   that right?

24   A.  No, sir.  It would be difficult to try and match two different

25   type products in the same unit.  Not possible to match two

1  different products in the same unit.

2  Q.  Since you've never built a travel trailer out of the

3  alternative materials you're talking about here today, you've never

4  tested a travel trailer to see how it would perform with those

5  alternative materials, correct?

6  A.  No, not a travel trailer, but we have in the -- we know how it

7  performs in these job site trailers and in manufactured homes.

8  Q.  But specifically a travel trailer that would be utilized as a

9  travel trailer, you've not dealt with that particular application;

10  is that correct?

11  A.  Not as a travel trailer, that's correct.  But these job site

12  trailers are just another version of a travel trailer, and they are

13  utilized in those units.

14  Q.  You've never done air quality testing in any of those types of

15  units, have you, for formaldehyde?

16  A.  No, sir.

17  Q.  Nor have you tested a travel trailer through your entity for

18  formaldehyde emissions with alternative materials, correct?

19  A.  With alternative materials?

20  Q.  Correct.

21  A.  No, sir, we have not.  Part of what we proposed is

22  non-formaldehyde containing materials.

23  Q.  And in your deposition that I took a few months ago, when I

24  asked you about the availability of Masonite material, am I correct

25  in that you told that you had, you did not have the ability to

1    quantify if there was enough of that material on the market to

2    satisfy the travel trailer industry?

3    A.  I don't recall that statement.  Could you show that to me?

4              THE COURT:  Page and line.

5              MR. MULCAHY:  Let me find the actual page number, your

6    Honor.  Let me get his actual deposition.  Page 227, lines 15

7    through 19.

8              May I approach the witness?

9              THE COURT:  Yes.

10   BY MR. MULCAHY:

11   Q.  I am going to ask you to read lines 15 through 19.

12   A.  Which page?

13   Q.  Two hundred twenty-seven.

14             THE COURT:  Let's let him go ahead and read it and you

15   can ask the question.

16             THE WITNESS:  (WITNESS READS DOCUMENT.)  That is correct

17   for the year 2005.  I had previous years but not the year of 2005.

18   BY MR. MULCAHY:

19   Q.  So in the year 2005 you do not know how much of that material

20   was available for use in the travel trailer industry, correct?

21   A.  That's correct.  Only for the previous years.

22             MR. Mulcahy:  That's all the questions I have, your

23   Honor.

24             THE COURT:  All right.  Thank you.  Redirect?

25             MR. WATTS:  No, sir.

```
 1            THE COURT:  All right.  Thank you, sir.  You may step

 2    down.

 3            Mr. Watts, who is next?

 4            MR. WATTS:  Martin McNeese, your Honor.

 5            THE COURT:  Martin McNeese.

 6            MR. WATTS:  By and through his videotaped deposition, 33

 7    minutes and 25 seconds.

 8            THE COURT:  Okay.  Mr. McNeese has been sworn in to give

 9    testimony, counsel are present, and this is his testimony.  The

10    last name is spelled M-C-N-E-E-S-E, the first name is Martin.

11      (WHEREUPON, THE VIDEO DEPOSITION OF MARTIN McNEESE WAS

12      PLAYED:)

13    Q.  Do you recognize this document?

14    A.  I do.

15    Q.  And so just for the record, we're attaching as Exhibit 1 the

16    notice of deposition of Martin McNeese.

17            Mr. McNeese, can you state your full name for the record?

18    A.  It's Martin Edward McNeese.

19    Q.  And can you give us a little bit of background on your

20    education?  Did you attend college?

21    A.  I did attend college.  I graduated with an associate in science

22    electrical technology from the University of Texas in Arlington,

23    Texas.

24    Q.  And Mr. McNeese, who is your current employer?

25    A.  The Department of Homeland Security, Federal Emergency
```

1   Management Agency.

2   Q.  And in what capacity?  What's your current position?

3   A.  I am currently a program officer.

4   Q.  What was your previous position before your current one?

5   A.  I was an emergency management program specialist.

6   Q.  Roughly from what dates were you holding that position?

7   A.  From 2002 until September of last year.

8   Q.  And what were your duties or responsibilities as an emergency

9   program specialist?

10  A.  My responsibilities were to support the state and the region

11  and the citizens of the United States in delivering programs for

12  individual assistance under the Stafford Act.

13  Q.  And so were you in this position as an emergency management

14  program specialist when hurricanes Katrina and Rita were struck?

15  A.  I was.

16  Q.  Mr. McNeese, I'm handing you now what's been labeled as McNeese

17  Exhibit 2.  Is that your signature above your name?

18  A.  That is my signature.

19  Q.  And it's dated in handwriting, 5-8-09; is that correct?

20  A.  That's correct.

21  Q.  Mr. McNeese, I want to point you to paragraph 2 on -- my Greek

22  is kind of fuzzy, but I am guessing that that is page 1 at the

23  bottom.

24       It states:  On or about July 2006, Mr. Kevin Souza

25  requested that I serve as FEMA's primary point of contact, "POC",

1    for purposes of interacting with the United States Environmental

2    Protection Agency, "EPA", and Center for Disease Control, agency

3    for toxic substances and disease registry, ATSDR, for purposes of

4    facilitating their testing of temporary emergency housing units,

5    EHU, for formaldehyde.  Do you see where I am?

6    A.  I do.

7    Q.  And did I read that correctly?

8    A.  You did.

9    Q.  And at that time, in July of 2006, what did you believe that

10   project to be?

11   A.  I believed it to be to test the units for a baseline done --

12   well, to test the units for formaldehyde content and volatile

13   inorganic compounds and to find a -- out if there was a way to

14   reduce those levels in the units.

15   Q.  And when Mr. Souza requested that you serve as the primary

16   point of contact, what is your understanding of the reason why he

17   asked you to serve in that position?

18   A.  I'm actually very good at project management, and we have --

19   we've known each other for a long time, and so I'm -- it's my

20   opinion, not stated by him, that I was asked to do that because I

21   am very good at project management.

22   Q.  Not because you have any specific training or expertise in

23   formaldehyde or air quality control?

24   A.  I have none.

25   Q.  I'm sorry.  What was your answer?

A.  I said I have none.

Q.  It says:  Based upon my review of that report, I informed Mr. Souza on or about March slash -- February/March of 2007 that travel trailers in combination with ventilation remained a viable temporary emergency housing unit -- I'm sorry, housing option.

Did I read that correctly after I corrected myself?

A.  On the final correction, yes.

Q.  So what was your basis for informing Mr. Souza that the travel trailer in combination with ventilation remained a viable temporary -- temporary emergency housing option?

A.  The report actually stated, you know, graphically depicted and stated that the units could be brought down below what they'd identified as a level of concern for sensitive people.  And so if the trailers could be brought there, I felt that left them as a viable option.

Q.  So you're saying now, though, that whether or not the travel trailers were safe was not part of your consideration in determining whether or not they were a viable temporary housing option?

A.  Okay.  What I'm saying is that in the considering that the ventilation -- ventilation levels and what the ATSDR determined as a level of concern was not strictly a safety.  It was a -- that this was okay, that the units could be brought down, that they were looking at indoor air quality.

I am not saying that I was not concerned about the safety

1  of the units, because I will tell you right now on the record, the

2  number one thing we concern ourself with in housing is the safety

3  of the applicants.  But in the indoor air quality, I'm

4  predominantly looking at that report, and that report was not a

5  "safety report," it was an indoor air quality report.

6  Q.  So did you believe the task of EPA and ATSDR in terms of

7  determining whether venting was an effective response was to

8  determine whether or not it lowered the level of formaldehyde?

9  A.  No, I didn't believe that.

10      If the test -- the test that was given to EPA was to,

11  number 1, establish a baseline or establish a level of volatile

12  inorganic compounds and specifically formaldehyde, and number 2,

13  to -- because we weren't denying that there was formaldehyde in the

14  units, we knew there was -- to see if -- what the impact of venting

15  was on the formaldehyde levels.

16  Q.  In paragraph 6, or section 6, it states:  EPA completed its

17  processing of the test data in November.  And the data was provided

18  to FEMA's counsel, Rick Preston, who sent it on to ATSDR for

19  analysis.

20      Why did EPA's test results go through Rick Preston?

21  A.  It was agreed upon that they would be -- for the record, that

22  Rick would be the custodian of the data.

23  Q.  And why was he chosen for that task?

24  A.  You know, I don't remember at the time why we chose that.  We

25  wanted to control it, but I don't remember why we chose Rick.

1  Q.  When you say we wanted to control it, who is "we"?

2  A.  It would be EPA, FEMA, and ATSDR.  We wanted the results, you

3  know, the test -- that was raw data that we're talking about right

4  now, that it be channeled to where it wasn't pulled out of context

5  until it had been analyzed by ATSDR.

6  Q.  So when you say control, you mean that letting anyone else see

7  it until it had been interpreted by ATSDR?

8  A.  That's -- that is part of control, yes.

9  Q.  What is else is involve -- what else is involved in control?

10  A.  Just not to have the data released and to have -- the intent

11  was to have ATSDR analyze the data before anyone else analyzed the

12  data, and that was our protocol and that was the procedure we were

13  following.

14  Q.  So for lack of a better word, you wanted to make sure that the

15  raw data stayed confidential?

16  A.  That's one way to put it.  We wanted to make sure it stayed in

17  our control.

18  Q.  Mr. McNeese, I'm handing you what's been premarked Exhibit

19  McNeese 3, which is --

20          Mr. McNeese, I want to point you to the last, meaning the

21  first email in this email stream.  It's an email sent from you to

22  Edward Laundy, Sidney Melton and John Arno.  Do you see that?

23  A.  I do, if it's the one dated July 26.

24  Q.  July 26, 2006, at 9:22 A.M.

25  A.  Okay.

1   Q.  It states that:  In conjunction with HQ, we have developed the

2   attached flyer.

3           What was the purpose of the flyer being distributed in

4   July of 2006?

5   A.  It was to inform the residents of the travel trailers that

6   there was formaldehyde in the units to make sure that they had

7   positive knowledge of that and to recommend ways to reduce the

8   formaldehyde level.

9   Q.  This flyer though was distributed prior to the test results

10  from EPA and ATSDR being --

11  A.  That's correct.

12  Q.  I think it's just the ATSDR, but -- when you say though that

13  you were not trying to generate a lot of calls, what did you mean?

14  A.  What we meant -- what I meant was that we were actually trying

15  to get the information out to the applicants.  We weren't trying to

16  raise an alarm.  We were trying to pass information to them.

17          And as a result, the applicants already have numbers that

18  they can contact us.  We weren't trying to start a new series of

19  issues.

20  Q.  When you say you weren't trying to start a new series of

21  issues, what were the old issues that had been going on?

22  A.  Well, the standard day-to-day business of someone living in a

23  travel trailer.  They have maintenance issues, they call their

24  maintenance department.  If they have concerns with the applicant,

25  they have an 800 number they can call.  There's a whole series of

1   responsibilities we have to take care of people that are living in

2   mobile homes and travel trailers.

3   Q.  And so with this flyer, you wanted to give the occupants,

4   applicants positive knowledge that their trailers had formaldehyde,

5   but you did not want to generate a new series of issues?

6   A.  We wanted to provide the information that the travel trailers

7   had formaldehyde in them, that's correct.

8   Q.  Mr. McNeese, I've just handed you Exhibit McNeese 9.  The

9   second email on the page is an email from you to, among others,

10  Kevin Souza, Patrick Preston, David Chawaga, looks like yourself,

11  and Mary-Margaret Walker.  Do you see that?

12  A.  I do.

13  Q.  The email states:  As a followup to our formaldehyde call on

14  2/28, here is my draft of where we need to go based on the results

15  of the test.  As I said before, I think the test confirmed that we

16  do not have a major issue with the formaldehyde, but we are

17  probably too casual in our communications with our applicants

18  regarding proper ventilation.

19      How did the test confirm that you did not have a major

20  issue with the formaldehyde

21  A.  Well, based upon my interpretation at the time, you know, they

22  had a level of concern in the ATSDR report that the ventilation

23  methods were able to reduce to significantly below that level of

24  concern, so that was my interpretation of the report.

25  Q.  When you say that's your interpretation of the report, you,

1    however, have no independent personal knowledge or experience to

2    serve as a basis for that interpretation, do you?

3    A.  That's correct.

4    Q.  And so you believed that this report issued by ATSDR using the

5    .3 PPM level of concern confirmed that there was no major issue

6    with formaldehyde?

7    A.  That was my belief at the time, yes.

8    Q.  At the end of that paragraph, you also state that:  We are

9    probably too casual in our communications with our applicants

10   regarding proper ventilation.  What did you mean by "too casual in

11   your communications"?

12   A.  It was my opinion and my recommendation that we be more

13   aggressive in addressing ventilation of the travel trailers.

14            Right now, we had to put it in the flyer, but we weren't

15   using our recertified patient people that were meeting with them,

16   our maintenance people or any of our people to actually discuss

17   ventilation of the trailer.  I'm just saying that was my opinion

18   that we should be more aggressive in discussing that.

19   Q.  Did you ever voice that opinion to others in FEMA?

20   A.  This email is -- went to quite a few people in FEMA.

21   Q.  Once the CDC analysis of the EPA testing had concluded, what

22   was your understanding as to what was to be done with that

23   information?

24   A.  Actually -- I didn't actually have an understanding.  That was

25   one of the reasons I made recommendations before, because I had no

1    authority or jurisdictions once -- I was only in charge of the test

2    and not what would happen after that.

3    Q.   Uh-huh.

4    A.   And so I made recommendations and passed them to IA program

5    management to Kevin Souza in headquarters in the hopes that they

6    would implement training and additional information out in the

7    field to let people know what needed to be done with the results of

8    it.

9    Q.   When you say implement training, you mean just training of the

10   individuals in staging areas as to how to properly enter the units

11   or to properly vent the units?

12   A.   Actually, in the staging areas, plus in the -- for our own

13   people that were doing the lease-ins and stuff, because, you know,

14   there were some -- the obvious thing we saw was the initial high

15   level of formaldehyde that dropped with ventilation, is that if

16   everyone knew that, then we would be ventilating the units before

17   we allowed anyone to be placed in them.

18   Q.   Okay.  And you were asked about your -- the conclusions that

19   you drew as a result of those EPA tests.  Do you recall that?

20   A.   Yes, I do.

21   Q.   And you recall that your conclusion was that based on those

22   tests, you felt like travel trailers in combination with

23   ventilation were a viable option for emergency housing.  Correct?

24   A.   That's correct.

25   Q.   And you were asked a follow-up question as to whether you were

1   basing that solely on the ATSDR test or whether you had any

2   personal training or experience or knowledge.  Do you recall those

3   questions?

4   A.  I do.

5   Q.  Am I correct that you did, in fact, have some personal

6   experience while you were with FEMA with the use of travel trailers

7   in other disasters prior to Hurricane Katrina?

8   A.  That's correct, I have actually been working in housing

9   programs over the past -- over the years before Katrina.

10  Q.  And am I also correct that part of your experience would have

11  been working with travel trailers in hurricane disaster areas,

12  including the Gulf Coast in Florida?

13  A.  That's correct.

14  Q.  Is -- am I also correct that to the best of your knowledge and

15  experience working with travel trailers prior to Hurricane Katrina,

16  you weren't aware of any health concerns associated with

17  formaldehyde in the travel trailers; is that right?

18  A.  That's correct.  I was not.

19  Q.  And you dealt directly with occupants, didn't you, in those

20  other hurricane disaster areas from time to time?

21  A.  I did.

22  Q.  And again, prior to Hurricane Katrina, you weren't aware of any

23  complaints by occupants relating to formaldehyde or health effects

24  of living in these trailers?

25  A.  Actually I was not aware of any.

1   Q.  In your discussions with EPA and ATSDR in 2006 with about the

2   testing protocol concerns being raised about testing occupied units

3   because of the formaldehyde that could be introduced by the

4   occupants?

5   A.  I do recall the discussions of testing occupied units, and it

6   wasn't only for formaldehyde but because of -- it would have taken

7   an extensive study -- or -- study or effort to develop a protocol

8   for testing occupied units, because there are volatile inorganic

9   compounds introduced, including formaldehyde from the occupants, or

10  could be, so I do remember those discussions, yes.

11  Q.  And that would include items they brought into the travel

12  trailer such as bedding, furnishings, clothing, that sort of thing?

13  A.  Well, that -- that was the discussion from EPA and CDC and the

14  experts was that there are items that contain formaldehyde that

15  could be brought in.  I don't remember the specific items, though.

16  Q.  Do you also recall a discussion that activities could increase

17  formaldehyde inside occupied units, such as cooking and cleaning

18  and that sort of thing?

19  A.  I do remember discussions along that line.

20  Q.  When we looked at McNeese number 7, I don't know if you have

21  that in front of you.

22  A.  Okay.

23  Q.  I wanted to ask you a question about item 3, status of EPA

24  testing efforts.  Is this text in McNeese number 7 yours?  Did you

25  type all of this?

1   A.  Actually, all of the typing is not mine, because the headings

2   appear to be from questions that someone else was asking.

3   Q.  Do you recall where that information came from on the first

4   page of McNeese number 7?

5   A.  The information that -- in the body?

6   Q.  Below the first three lines, yes, sir.

7   A.  Well, I would have generated the responses to the questions,

8   but I don't -- I am not -- I don't know if I actually typed -- had

9   questions on them.

10  Q.  Okay.  So when you reference, for example, under number 1 that

11  there were, as of October 2006 approximately 50 complaints in

12  Mississippi and approximately 20 in Louisiana --

13  A.  That's correct.

14  Q.  -- was that information that you had obtained from some source?

15  A.  Yes, sir, it is.

16  Q.  Okay.  Would you -- and are you aware of the total number of

17  travel trailers that were deployed after Hurricane Katrina and

18  Hurricane Rita in the Gulf Coast area?

19  A.  Actually, the count that I had was about 118,000 travel

20  trailers.

21  Q.  So this information indicates that a year after the storm, for

22  every one complaint that you had about formaldehyde, there were

23  thousand s literally of people who had not complained; is that

24  right?

25  A.  That could be interpreted that way, yes.

1    Q.  Is that also support for your conclusion that the formaldehyde

2    in the travel trailers was a relatively small problem that could be

3    managed and that for the vast majority of people, travel trailers

4    were, in fact, a good, viable option for temporary emergency

5    housing?

6    A.  Actually, in my conclusion that it was a viable emergency

7    housing units, I was predominantly not looking at the vast universe

8    or the large universe of the travel trailers, because if there was

9    a problem in any of them, then there was a problem in all of them.

10          What I was looking at was the level of sensitivity ATSDR

11   gave us, and the fact that we could come considerably below that

12   with ventilation, and that was what it was based on

13   Q.  Let me ask you also about McNeese number 7.  There's a

14   reference in the second paragraph here to the -- what's been

15   described to us in other depositions as the swapout program or the

16   swapping out of newer units for older units.  Do you see that

17   discussion there on McNeese 7 under number 2?

18   A.  Yes.

19   Q.  Was it your conclusion that the program at this time of

20   swapping out a newer trailer for an older trailer with people who

21   had complained an adequate response that was, in fact, effective in

22   addressing the complaints of those individuals?

23   A.  It was my feeling that that was, in fact, a valid program and a

24   valid process, realizing that if people did not want to do that, we

25   would put them in a hotel or somewhere else.

1          I mean, that was always the other option that went with

2    it, but the ones we swapped out with older units, we never to my

3    knowledge got a complaint back from them, so.

4    Q.  And the older units would be, for example, the units from 2004

5    hurricanes in Florida?

6    A.  Or from any other disasters, but prior to Katrina-type units,

7    yes.

8    Q.  So some of the swapout units were, in fact, from the 2004

9    hurricanes in Florida; is that right?

10   A.  That's probably true, yes.

11   Q.  And you're not aware of any follow-up problems in those 2004

12   units once they were swapped out from the formaldehyde standpoint?

13   A.  I am not aware of any, that's correct.

14   Q.  Also on McNeese 7, you refer under number 3 to the fact that it

15   is a given that the materials used in the construction of mobile

16   homes and travel trailers in addition to other residential

17   structures contain formaldehyde.  Do you see that?

18   A.  I do.

19   Q.  It was no surprise to you that there was some formaldehyde in

20   these travel trailers, was it?

21   A.  No, it was not.

22   Q.  And, in fact, you're generally aware that there is also

23   formaldehyde not only in travel trailer s but in mobile homes and

24   in stick-built residential structures; is that right?

25   A.  That's correct.

1  Q.  In some of the documents that we looked at this morning, I

2  noted that you made references to the fact that there were no

3  standards, residential indoor air standards that FEMA could look to

4  for guidance.  Do you recall having that concern at the time?

5  A.  I do --

6  Q.  Can you elaborate on what --

7  A.  -- recall that.

8  Q.  -- what your reaction was to learning that there were, in fact,

9  no standards that FEMA could look to regarding residential indoor

10  air quality and formaldehyde?

11  A.  Well, it was quite awhile ago, but the main challenge -- the

12  main challenge we had was that it didn't give us a baseline for

13  determining what was good and what was bad, so that was one of the

14  reasons we had to do the EPA testing, was so that we could at least

15  establish what is a baseline of what is in the units, you know.

16       But it's not really FEMA's job to set an indoor air

17  quality standard for anyone or an external air quality standard

18  since we're not a standard-making company.

19  Q.  Was that something that you wished you had had when this whole

20  business started, was a standard that you could look to and

21  evaluate these trailers against?

22  A.  Well, it would at least have given us a gauge of whether the

23  units were in compliance with something or not, whereas today

24  they're totally in compliance with a voluntary standards at this

25  point in time.

1   Q.  And were you generally aware then that for the specifications

2   to which these travel trailers were built didn't say anything about

3   formaldehyde or formaldehyde levels or formaldehyde testing?

4   A.  In general, that's correct, yes.

5           And we were trying to find out, number 1, what the level

6   of formaldehyde in the units was, and number 2, if there were

7   procedures that could reduce that level.

8           And my statements to being concerned for one for all is

9   that if, if we, in fact, we cannot bring the units to the level of

10  people that are sensitized to formaldehyde, then that would have

11  been a challenge across the board.

12  Q.  If, in fact -- at this time period, if, in fact, FEMA had been

13  made aware that the level of concern was substantially lower -- let

14  us say that .008 PPM level -- and that ventilation didn't reduce it

15  below that level, would there have been alternative housing in the

16  Gulf Coast area that you could have put all of 118,000 families in?

17  Could you have left these people in New Orleans?

18  A.  In all honesty, we would not have been able to house them.  We

19  would have done what needed to be done, but that would have

20  probably been a reverse of the procedure that brought them into the

21  housing in the Gulf, which would -- the only thing we would do then

22  and today would be to have to send them to other states to find

23  enough housing to -- or elsewhere in the state.

24  Q.  And as -- in your position as the chief of IA for the Louisiana

25  TRO at this time, were you aware of what that condition for

1   housing -- local housing conditions were?

2   A.  As far as availability of housing, I was aware of that, yes.

3   Q.  Okay.  And to the best of your recollection, did Mr. Preston

4   ever direct or instruct what type of units should be tested for

5   formaldehyde as part of the test protocol?

6   A.  He didn't direct -- for the types of units, even though he was

7   engaged in the occupied versus unoccupied when he was on those

8   calls when we were discussing that with EPA and CDC, because Rick

9   was of the opinion, along with headquarters and the rest of FEMA,

10  that tests would originally include occupied and unoccupied.

11          So -- but that's the extent that he was involved in the

12  units, you know.

13  Q.  So your recollection, as you sit here today, is that

14  Mr. Preston was advocating the testing of both occupied and

15  unoccupied units?

16  A.  Along with -- not alone, but along with IA program management

17  and headquarters, yes.

18  Q.  And in fact, as I understand it, what you're saying is that

19  FEMA's position in those conversations or discussions is, we wanted

20  to test both occupied and unoccupied units?

21  A.  That's correct.

22  Q.  And obviously what was tested eventually was unoccupied

23  never-housed units?

24  A.  That's correct.

25  Q.  Do you have any idea following hurricanes Katrina and Rita how

1   many individuals were transitioned through the federal government

2   through evacuation processes to other cities or states?

3   A.  Roughly 700,000 at one point.

4   Q.  7100,000 people roughly in your estimation were displaced prior

5   to hurricanes Katrina and Rita?

6           I'm sorry.  Transitioned following Hurricane Rita and

7   Katrina through the government relocation or transition program?

8   A.  That's correct.

9   Q.  Now, you also testified that in 2006, when you became involved

10  in the EPA testing, you knew that there was a concern about

11  formaldehyde.  Correct?

12  A.  I knew that there was a concern when I became involved, yes.

13  Q.  But you also testified that you were still actively engaged in

14  placing people -- occupants in units, correct?

15  A.  That's correct.

16  Q.  During that concern?

17  A.  That's correct.

18      (CONCLUSION OF THE VIDEO DEPOSITION OF MARTIN E. McNEESE.)

19          THE COURT:  Okay.  All right.  Next, Mr. Watts.

20          MR. WATTS:  Yes, Judge, next we have Guy Bonomo by and

21  through videotape deposition, 21 minutes and 31 seconds long.

22          THE COURT:  And that would probably bring us to the end

23  of the day, or is there someone --

24          MR. WATTS:  We can throw another video on if you want,

25  but --

1          THE COURT:  I hate to have something overnight unless

2     there's something we can finish.

3          Let's go ahead and play Mr. Bonomo's deposition, we'll

4     see where we are.  That may be the end of the day.  You might want

5     to look while we're playing this and see if there's something else

6     that can be done.

7          This gentleman is, first name Guy, last name Bonomo,

8     B-O-N-O-M-O, he has been sworn in to give testimony.

9       (WHEREUPON, THE VIDEO DEPOSITION OF GUY BONOMO WAS PLAYED.)

10    Q.  I'll try and go through it.  Section 2 of your declaration, it

11    says, "As part of my duties and responsibilities, I am familiar

12    with the formaldehyde flyer that FEMA distributed in the summer of

13    2006.  I have read the document and assigned the identification

14    number FEMA 8-0000132 FEMA 08-00014.

15         And for identification purposes, could you please tell me

16    whether or not this is indeed the flyer you are referring to in

17    your declaration.

18    A.  There's the old travel trailer.  (WITNESS REVIEWS DOCUMENT.)

19    Yes.

20    Q.  Okay.  I'm going to mark as Bonomo -- you can have that.

21    A.  Okay.

22    Q.  Well, actually -- as Bonomo?

23         MR. MILLER:  Four.

24    BY MR. WOODS:

25    Q.  Four -- thank you -- this particular flyer.

DAILY COPY

1          Now, our main concern today is this particular flyer.

2  And I want to talk about the process in which this particular flyer

3  was distributed to individuals that were a part of your "footprint"

4  in Orleans, Jefferson, Plaquemines, St. Bernard, and St. Tammany

5  Parish.

6          Can you tell me, sir, was there a formalized plan that

7  dealt with the distribution of this particular flyer to travel

8  trailer residents?

9  A.  Yes.

10  Q.  Who was responsible for the formulation of the distribution

11  plan?

12  A.  I believe OGC and people above my pay grade, sir.

13  Q.  Okay.  OGC refers to Office of General Counsel?

14  A.  Correct.

15  Q.  When you say you coordinated and oversaw this distribution,

16  exactly what do you mean by that?

17  A.  Well, the word came down from upstairs that we had this -- we

18  had this issue, and we game-planned, you know, real quickly how we

19  were going to attack it, and I reached out to some of my main

20  supervisors, and we devised a plan and we got some spreadsheets out

21  of FRRATS and we went out and did it.

22  Q.  Okay.

23  A.  You know, once the flyers were printed up -- I mean, I'm

24  oversimplifying, but that's basically what took place.

25  Q.  So when you say it came down, again, are you talking about from

1  OGC?

2  A.  No.  From my boss.  My boss, George Smith, was my immediate

3  supervisor, and whoever informed him of it.  I mean, we had to

4  mitigate the problem somewhat and get the word out.

5  Q.  Okay.  Let's delve into that.  First of all, who is George

6  Smith?

7  A.  He was the IA section chief.  He was my boss.

8  Q.  And when you say that we had to "mitigate matters," what do you

9  mean by that?

10  A.  Well, I mean, to, you know, get some public awareness out there

11  to the people that were in the emergency housing units.  You know,

12  we were as surprised as the applicants, you know.  We had no idea.

13  I didn't personally.

14  Q.  You had no idea about what?

15  A.  That there was a formaldehyde issue.  So we wanted to get the

16  word out there.  I mean, it was very serious and we took it very

17  serious.

18  Q.  What was your understanding as to what the issues were

19  concerning formaldehyde?

20  A.  My understanding, at that particular time, was that some of the

21  trailers were emitting an odor, and it was bothering some people.

22  They were having respiratory problems.  It was very intermittent,

23  you know.  You know, it just kind of broke loose all at one once.

24  Q.  What process or what checks and balances were in place to

25  ensure that delivery was actually taking place?

1   A.  Well, spreadsheets were produced out of FRRATS and the

2   supervisors were provided the spreadsheets, which they in turn gave

3   to the boots on the ground people.  And as the flyers were

4   distributed, the names were checked off -- not the names, the

5   addresses.  For instance, there was group parks, private sites,

6   commercial sites.

7   Q.  Who would be -- who would have those records where it would

8   show checkoff of addresses when the fryers were delivered?

9   A.  Well, we didn't just have FEMA people doing this.  There was a

10  lot of parks that fell under the responsibility of some of our

11  contractors, Fluor, Shaw and Hill.  Where they are right now, I

12  have no idea, sir.

13  Q.  Okay.  Outside of actual parks, trailer parks, that were set

14  up --

15  A.  Uh-huh.

16  Q.  -- what about private residences, what were the flyers

17  distributed to --

18  A.  I'm sorry, recertification folks.

19  Q.  That would not have been done by any of the contractors such as

20  Fluor?

21  A.  You know, who knows -- I don't know.  Could be.

22  Q.  Okay.

23  A.  You can drink my water if you want.  Can I say something?

24  Q.  Sure.

25  A.  You have to understand -- I just want to make this clear.  You

1    know, there was 50,000 or more temporary housing units in and

2    around that footprint.  So there was things that went on that

3    were -- you know what I mean?  You know, I don't know.

4    Q.  Yeah, hard to keep track of.

5    A.  Yeah.  Just a little bit.

6    Q.  Section 5 of your declaration says:  "To ensure that the

7    recertification advisors delivered the formaldehyde flyers, my

8    supervisors conducted random spot-checks, and I monitored the

9    supervisors to ensure that they were conducting spot-checks."

10        Do you have any records that reflect that you random

11    spot-checks?

12    A.  I do not.

13    Q.  Does anyone have any records that you are aware of that would

14    reflect the random spot-checks?

15    A.  No one I know.  I would hope so.  But no one I would

16    specifically know.

17    Q.  You say you would hope so.  Who would you hope would have those

18    records?

19    A.  I would hope OGC would have them or somebody in Individual

20    Assistance.  I mean, I don't know.

21    Q.  Okay.  Section 6 of your declaration says:  "The delivery of

22    formaldehyde flyer to occupied travel trailers in New Orleans and

23    the surrounding parish was completed in September of 2006."  So

24    does it take approximately from -- your declaration basically

25    states that, I believe, the flyers were distributed in the

1    beginning of the summer of 2006.

2    A.  I believe that the reason it took that long was because a lot

3    of the recert advisors distributed the flyer during their normal

4    monthly visit.

5    Q.  So it wasn't a situation where there was a directive that these

6    flyers needed to be delivered immediately?  They were to be

7    delivered on the next regularly scheduled visit?

8    A.  Well, first of all, we did the group parks and the commercial

9    parks first because we had a captive audience, and we got a lot

10   more bang for our buck.  Obviously, you start where you have the

11   most trailers.

12         We did not have the physical capability or the personnel

13   to do every trailer and all of the private sets all at once.  So

14   obviously, somebody made the decision, let's just do it during our

15   monthly visit.

16   Q.  Okay.  When you said you were deployed to New Orleans in

17   October of 2005, you ran the travel trailer and mobile home

18   footprint, correct?

19   A.  My responsibility was the DHOPS chief, and I was responsible

20   for travel trailers and mobile homes in the New Orleans' footprint.

21   Q.  But there weren't -- were there actually mobile homes deployed

22   in the New Orleans footprint?

23   A.  Yeah, we had some mobile homes.  Well, when I say the New

24   Orleans' footprint, I mean Plaquemines, St. Bernard; yes, sir,

25   there were.

1    Q.  I only ask that because I know there were some concerns about

2    flood plains and whether or not mobile homes could be used in flood

3    plains.

4    A.  Uh-huh.

5    Q.  So there were some used in Louisiana, mobile homes?

6    A.  Yes, sir.

7    Q.  Sir, can you please state your full name, and spell your last

8    name.

9    A.  Guy Nicholas Bonomo, B-O-N-O-M-O.

10   Q.  Sir, I want to direct you to the summer of 2006.  Were you

11   employed by the Federal Emergency Management Agency in the summer

12   of 2006?

13   A.  Yes, sir, I was.

14   Q.  And where were you based at that time?

15   A.  Out of the New Orleans TRO, which is located in Algiers.

16   Q.  And what was your position?

17   A.  I was the individual deputy section chief.

18   Q.  And as the individual deputy section chief, what were your

19   duties and responsibilities?

20   A.  To oversee all temporary housing.

21   Q.  And by temporary housing, what are you referring to?

22   A.  Travel trailers and mobile homes and park models.

23   Q.  Is this the emergency housing that FEMA gave to disaster

24   victims?

25   A.  Yes, sir.

```
1    Q.  And that included travel trailers?

2    A.  Yes, sir.

3    Q.  Would it be fair to say that any travel trailer that was within

4    Orleans Parish or New Orleans fell under -- fell within the scope

5    of your responsibility?

6    A.  Yes, it would.

7    Q.  How many people reported to you at that time?

8    A.  Over 300.

9    Q.  Do you know what the phrase "recertification advisor" refers

10   to?

11   A.  Yes, sir, I do.

12   Q.  Does recertification advisor -- did they fall under your

13   supervision?

14   A.  Yes.

15   Q.  What is a recertification advisor?

16   A.  It's our boots-on-the-ground folks that go out and visit the

17   travel trailers where the applicants are living to try to establish

18   and help them establish a permanent housing solution.

19   Q.  How many recertification advisors fell under your command in

20   the summer of 2006?

21   A.  Too many to count, sir.  Hundreds.

22   Q.  Did you directly supervise these persons or were there

23   intermediaries who supervised them?

24   A.  Intermediaries.

25   Q.  And how many intermediary supervisors were there?
```

1    A.   Half a dozen to a dozen.

2    Q.   And the supervisors, then, reported to you?

3    A.   Correct.

4    Q.   I want to refer you to the document which has been marked as

5    Exhibit No. 4, Bonomo No. 4, and assigned Bates number FEMA 0800013

6    through 14, and ask you, to you recognize that document?

7    A.   Yes, I do.

8    Q.   What is that document, sir?

9    A.   It's the formaldehyde flyer that we had sent out and posted on

10   all of the temporary housing unit doors.

11   Q.   Is that a true and accurate copy of the formaldehyde flyer that

12   was distributed to travel trailer occupants?

13   A.   Yes, it is.

14   Q.   Was this formaldehyde brochure, Important Information for

15   Travel Trailer Occupants, distributed to all occupied travel

16   trailers in your footprint?

17   A.   Yes, sir.  To the best of my knowledge.

18   Q.   When I say "your footprint," what is that area?

19   A.   Orleans, St. Bernard, Plaquemines, Jefferson and St. Tammany.

20   Q.   When you were -- were you provided with copies of Exhibit 4,

21   the Important Information for Travel Trailer Occupants to

22   distribute to the travel trailer occupants?

23   A.   Yes, I was.

24   Q.   Who provided those to you?

25   A.   I don't remember.

```
 1   Q.  At that time -- if you look at Exhibit No. 5.
 2   A.  Uh-huh.  George Smith.
 3   Q.  It indicates on the second page, George Smith, 50,000 copies.
 4   Does that refresh your recollection?
 5   A.  Yeah.  I guess it would have to come from my boss.
 6   Q.  And these brochures, where were they initially stored?
 7   A.  In my office.
 8   Q.  And did that take up a substantial amount of space in your
 9   office?
10   A.  They were touching the ceiling.
11   Q.  And what did you do with those 50,000 brochures?
12   A.  We had a meeting with my supervisors and they distributed them
13   out to their recert advisors.  And took them out of my office.
14   Q.  The formaldehyde flyer, Exhibit No. 4, did you review that
15   document at the time?
16   A.  Yes, I did.
17   Q.  And were you aware that if you go to the second page of that
18   document, Exhibit No. 4, FEMA 0800014, the second column, the last
19   sentence of that says:  "People who suspect they are sensitive to
20   formaldehyde should closely work with a doctor to see if
21   formaldehyde is causing their symptoms."
22   A.  Uh-huh.
23   Q.  Were you aware of that?
24   A.  Yes, I was.
25   Q.  And this is what the occupants were being told when this was
```

1    being distributed to them?

2    A.  That's correct, sir.

3    Q.  It also indicates in the third column the "four things that the

4    occupants should do to reduce their exposure to formaldehyde in the

5    trailers."  Do you see that?

6    A.  Uh-huh.

7    Q.  "Increase ventilation, keep indoor temperature moderate, lower

8    the humidity, and do not smoke inside;" is that right?

9    A.  That is correct.

10   Q.  And this was what was distributed to the occupants sometime in

11   the summer of 2006; is that right?

12   A.  That is correct, sir.

13   Q.  Now, you indicate, I believe -- it's your understanding that

14   this -- the delivery of this formaldehyde flyer was completed to

15   all of the occupants by September of 2006; is that right?

16   A.  Unh-unh.

17   Q.  I'm sorry.  You have to say yes or no.

18   A.  Yes.  Sorry.

19   Q.  Having looked at Exhibit No. 5, that document, it indicates --

20   having read that, does that refresh your recollection of the dates

21   that the distribution of that flyer would have commenced?

22   A.  Yes.  Yes.

23   Q.  And what is your recollection as to when the distribution of

24   the flyer would have commenced?

25   A.  Sometime -- it happened rather quickly.  So if the flyers were

1    received -- the brochures were received on August the 2nd or 3rd,

2    I'm sure we tackled it quite readily, within a few days.

3    Q.  Exhibit No. 5 is an email from Mr. Martin McNeese; is that

4    right?

5    A.  That's correct.

6    Q.  And in that email, Mr. McNeese indicates that, "The brochures

7    were received on August 2nd or 3rd and we began distribution

8    immediately in Louisiana."

9    A.  Correct.

10   Q.  Did you begin distribution of the brochures immediately upon

11   receipt?

12   A.  Yes.

13   Q.  Now, when these brochures were received, were you aware of what

14   instructions were given to the recertification persons regarding

15   delivery of the brochures to occupied trailers?

16   A.  I'm somewhat aware.  I mean, there was -- we really didn't have

17   a plan, a written down plan.  I mean, they were flyers.  It was

18   pretty straightforward.  Let's get them to your people with boots

19   on the ground and attack this.

20   Q.  Why don't you walk us through what a recertification advisor

21   would do to deliver something such as the formaldehyde flyer,

22   Exhibit No. 4?

23   A.  Well, if, in fact, the applicant was home, they were hand the

24   flyer; if they weren't, they were either taped to the door, left on

25   the doorstep, some way.

1    Q.  And were the flyers just -- were they left -- paper copy just

2    taped to the door, or were they put in any protective covering?

3    A.  No.  We put them in a plastic sleeves to keep them out of the

4    weather.

5    Q.  And in summer in New Orleans it rains quite often; is that

6    fair?

7    A.  That's correct.

8    Q.  To the best of your recollection, do you have enough plastic

9    sleeves to deliver all of these flyers to all of the doors and

10   attach them without getting wet?

11   A.  Yes, we did.

12   Q.  Were any steps taken by yourself or your supervisors to check

13   or determine whether the recertification advisors actually

14   delivered flyers to the private occupier, the resident?

15   A.  Yeah.  We did spot-checks.

16   Q.  And how do you know that your supervisors did spot-checks?

17   A.  Well, I actually went out in the field a few times myself.  We

18   had checkers checking on the checkers.

19   Q.  Was that something you thought was necessary and appropriate to

20   do?

21   A.  Absolutely.  This is a very serious situation, yes.

22   Q.  And the recertification advisors, how often would the

23   recertification advisors meet with a travel trailer occupant?

24   A.  Once every 30 days.

25   Q.  And when they were delivering these flyers, do you know whether

1  they made a special visit to the travel trailer occupants or did

2  they just deliver it to the normal regular visit to the occupied

3  trailers?

4  A.  The group sites and commercial sites were done immediately.  We

5  didn't have enough personnel on the ground to do all of the private

6  sites.  So that was handled in their monthly recertification, yes.

7  Q.  Now, I gather from the discussion here that it was FEMA's goal

8  to deliver a copy of Exhibit No. 4 to all the occupied travel

9  trailers?

10  A.  Correct.

11  Q.  You're aware that the process that FEMA had in place to affect

12  that delivery; is that right?

13  A.  That's correct.

14  Q.  And to the best of your knowledge, was that process followed?

15  A.  Yes.  I'd like to add one thing to that, something I just

16  remembered.  We also dropped off hundreds and hundreds of flyers to

17  all of the DRCs that were still open in all of the footprints.

18  Q.  What is the DRC?

19  A.  That's a disaster recovery center.  So when you walk into a

20  disaster recovery center there's tons of paperwork that tells you

21  about mitigation and what to do, how to apply to SBA, and the

22  flyers were on all of those tables.

23  Q.  Were recertification advisors given any instructions regarding

24  what to tell travel trailer occupants if they complained about

25  odors, indoor air qualities, or formaldehyde?

 1   A.  Yes.  I believe they were told to open the windows and let the

 2   trailer vent.

 3   Q.  And who were they -- that's what they were instructed to tell

 4   the occupant?

 5   A.  Yes.  I believe so.

 6       (CONCLUSION OF THE VIDEO DEPOSITION OF GUY BONOMO.)

 7           MR. WATTS:  Judge, that concludes our offer of this

 8   witness.

 9           THE COURT:  All right.

10           MR. WATTS:  I found one if that's 11 minutes, if that

11   helps.

12           THE COURT:  That would still get us out about ten minutes

13   early.  So let's go ahead and take that 11 minutes instead of hold

14   it over tomorrow.  And then we'll go ahead and break about ten

15   minutes early.

16           MR. WATTS:  Okay.  We have Stanley Larson by and through

17   his video-taped deposition excerpt, it's 11 minutes and 56 seconds.

18           THE COURT:  Stanley Larson?

19           MR. WATTS:  Yes, sir.

20       (WHEREUPON, THE VIDEO DEPOSITION OF STANLEY E. LARSON WAS

21       PLAYED.)

22   Q.  Mr. Larson, my name is Tara Gilbreath of Gainsberg Benjamin.

23   We represent the plaintiffs in this case.

24           I'm going to show -- well, first, can you state your full

25   name for the record?

1    A.  Stanley Edward Larson.

2    Q.  Prior to December of '08, with whom were you employed?

3    A.  FEMA, also.

4    Q.  In what capacity?

5    A.  Disaster assistance employee, however, a different role.

6    Q.  And what role was that?

7    A.  It was in the New Orleans for Katrina.  And I had many roles

8    there.  My last role was DHOPS as field operations.

9    Q.  How long were you assigned to the DHOPS unit?

10   A.  My whole time in New Orleans.

11   Q.  Can you give me approximate dates of when you began in that

12   capacity?

13   A.  I started there late September of '05.  Except for a couple of

14   short breaks going to different disasters, I stayed there up until

15   November of last year.

16   Q.  And specifically relating to your DHOPS field operations, what

17   are your job duties in that role?

18   A.  It was multiple.

19   Q.  Can you give me a general description?

20   A.  Field operations is all field operations within the trailers.

21   So site inspections, install QA on the contractors.  My other

22   duties were is I took care of all of the data that was coming in

23   from the inspectors, a wide range.  Whatever they needed me to do.

24   Q.  Do you know if these -- the distributors of the fryer traveled

25   in pairs or alone?

1    A.  They were to do this alone.

2    Q.  And were they responsible -- the distributors responsible for

3    reporting their distribution to you or to their own supervisor?

4    A.  The -- the offices split up the list that I sent them to each

5    of the inspectors.  And then the inspector would come back to the

6    person that issued their list to them and report back to them.

7    Q.  And so once they reported back to them, I assume that their

8    supervisors then forwarded that information to you?

9    A.  Yes.

10   Q.  Were there any steps ever taken to follow-up or to confirm that

11   certain flyers were, in fact, distributed?

12   A.  As far as?

13   Q.  As far as confirming that what a distributor actually did

14   distribute the flyers he was assigned to, he or she was assigned

15   to?

16   A.  The local area offices for each of our projects had to do kind

17   of a quality assurance, but I don't know what they did that was

18   there.

19   Q.  But it was required that each office follow-up in a quality

20   assurance manner to indicate -- to assure that the reporting was

21   accurate?

22   A.  For every project, yes.

23   Q.  Is it possibility that there were inaccuracies in the reporting

24   of what flyers were distributed and not distributed?

25   A.  Yes.  Always possibilities, yeah.

1   Q.  It's possible that someone could -- strike that.

2           And you relied on the supervisors of the distributors to

3   give you correct and accurate information as to which flyers were

4   distributed and to where, correct?

5   A.  Yes.

6   Q.  And you relied on those in creating your database?

7   A.  Not in creating it, no.

8   Q.  Bad words in creating.  But you relied on them and on their

9   information that they're giving to you to complete your database,

10  to fill in the information?

11  A.  Yes.

12  Q.  That's what you entered into your database?

13  A.  That's what I updated just from their reports.

14  Q.  And you've already testified that you relied on the FRRATS

15  database also in creating and inputting information into your

16  database, correct?

17  A.  To create the list, yes.

18  Q.  And in both -- both ways -- well, strike that.

19          Isn't it possible, then, that there are inaccuracies in

20  your database?

21  A.  There's always possibilities, yes, depending on what you pull

22  in for information.

23  Q.  First of all, can you please state your name and spell your

24  last name.

25  A.  My name is Stanley Edward Larson, L-A-R-S-O-N.

1    Q.   And how long have you been employed by FEMA?

2    A.   Since the beginning of 06.

3    Q.   So from approximately January 2006 to present?

4    A.   It was somewhere around March, I think that I became a DAE.

5    Q.   So from March 2006 to present, you've been employed by FEMA as

6    a DAE?

7    A.   Yes.

8    Q.   What is a DAE?

9    A.   A disaster assistance employee.

10   Q.   And generally, can you explain to the jury what the duties and

11   responsibilities of a disaster assistance employee, DAE is?

12   A.   It can range from a lot of different things.  Every job within

13   a disaster recovery and response.  So from logistics to housing to

14   individual assistance, depending on what they need us to do.

15   Q.   And from March 2006, did you work on FEMA's response to

16   Hurricane Katrina?

17   A.   Yes.

18   Q.   I want to focus your attention to July 2007.  In July 2007,

19   where were you based?

20   A.   At the TRO in Algiers.

21   Q.   And when you say TRO, what does that refer to?

22   A.   Transitional recovery office.

23   Q.   In July 2007 did you have a specific job position or title,

24   such as that?

25   A.   My official title was DHOPS management specialist.

1    Q.  And what were your duties and responsibilities generally as a

2    DHOPS -- let me step back.  What does DHOPS refer to?

3    A.  Direct housing operations.

4    Q.  And as a direct housing operations management specialist in

5    July of 2007, what were your general duties and responsibilities?

6    A.  Field work within DHOPS.  Anything that dealt with the

7    trailers, basically, was DHOPS' function.  I also worked in the

8    office building databases to track what the employees were doing,

9    the inspectors, and to make sure that we didn't miss any of the

10   trailers.

11   Q.  Are you familiar with something called Project Operation

12   Impact?

13   A.  Yes.

14   Q.  Did you have any involvement in the Project Operation Impact?

15   A.  I performed the reporting features and distribution features in

16   the database to deliver the flyers.

17   Q.  What was Operation Impact?

18   A.  We were to deliver a formaldehyde flyer to all of the trailer

19   units that were still on the ground in the State of Louisiana.

20   Q.  And this project I understand was completed between July 21st

21   and July 25th, 2007?

22   A.  That's about right.

23   Q.  And how many flyers, formaldehyde flyers, were delivered to

24   occupied or travel trailers during that time period?

25   A.  Without looking at my report, I couldn't give you an exact

1  number, but it was high 40 -- 40,000, somewhere around there.

2  Q.  And how many days did it take FEMA to deliver all of those

3  flyers?

4  A.  Again, without my report I can't say for sure, but it was four,

5  five, maybe six days at the most.

6  Q.  Can you explain your duties and responsibilities relating to

7  the Operation Impact project?

8  A.  I was to generate a database of addresses to the units that

9  were still deployed in Louisiana.  I got that information from

10  FRRATS.  And design a reporting tool within the database to -- to

11  receive back the information that the flyers have been delivered.

12  And also create a distribution system for the inspectors to receive

13  their work and send it back.

14  Q.  You use the acronym FRRATS.  That's F-R-R-A-T-S?

15  A.  Yes.

16  Q.  What does FRRATS refer to?

17  A.  It's a database that we used in Katrina to issue work orders

18  for installation of trailers, the maintenance of trailers,

19  deactivation of trailers.  It was the tool that we used to get the

20  contractors to go where they needed to go to work on trailers.

21  Q.  Sir, I'm handing you a document which has been marked Larson

22  Exhibit 3, and it's assigned identification numbers FEMA 09-000388.

23  It's a one-page document, and I'll ask you to look at that.

24  A.  (WITNESS REVIEWS DOCUMENT.)

25  Q.  Are you familiar with the document marked Exhibit No. 3?

```
 1  A.  Yes.  It looks like the flyer that we were to deliver.

 2  Q.  Is that a true and accurate copy of the July 2007 flyer?

 3  A.  It looks like it, yes.

 4  Q.  Were you familiar with that flyer back in July 2007?

 5  A.  Yes.

 6  Q.  It is a large voluminous document about four inches thick.

 7  It's assigned Bates numbers FEMA 162-000016 through -- I don't know

 8  why this is out of order.  There we go, okay -- through 916, and

 9  ask you to look through that document very briefly.

10  A.  (WITNESS REVIEWS DOCUMENT.)

11  Q.  Do you recognize the document marked Exhibit No. 4?

12  A.  Yeah.  It looks like a copy of the table that I used in the

13  database to track the formaldehyde flyer.

14  Q.  Was it necessary for the information reported in this document

15  to be accurate?

16  A.  Yes.

17  Q.  Why?

18  A.  We didn't want to miss any of the trailers.  Our goal given to

19  us was to hit them all.  And also we didn't want to go back to

20  trailers over and over again, so we wanted to make sure that we

21  were marking down that we delivered them.

22  Q.  Was this document maintained in the normal course and scope of

23  your duties as an employee of FEMA?

24  A.  Yes.

25      (CONCLUSION OF THE VIDEO DEPOSITION OF STANLEY E. LARSON.)
```

1          THE COURT:  Okay.  Let's go ahead and turn the lights up.

2     We're going to go ahead and adjourn for today.  I will remind you

3     again, as always, not to discuss the case, either amongst

4     yourselves or anyone else until you get the case to deliberate.

5          We will start again tomorrow at 8:30 sharp.  I think we

6     are on course to follow the schedule that I previously described to

7     you.  So I realize the day might be a little long and this

8     sometimes gets kind of tedious, but we do appreciate your interest

9     and your patience and we'll pick up at 8:30 tomorrow and try to get

10    in as much as we can tomorrow in order to stay on course and finish

11    as planned.

12         All right.  Let's go ahead and adjourn for today.

13         THE MARSHAL:  All rise.

14       (WHEREUPON, THE JURY EXITED THE COURTROOM.)

15         THE COURT:  Why don't you be seated for a second here.

16    Is there anything that we need to cover on the record at this

17    point?  Housekeeping matters, documents?

18         MR. YOUNT:  Judge, I do have one housekeeping matter.

19    It's my understanding that tomorrow morning the plaintiffs are

20    going to be presenting the testimony of Dr. Miller.  As your Honor

21    will recall, we had a lot of pretrial motions about Dr. Miller and

22    about this whole surgery issue.

23         THE COURT:  Right.

24         MR. YOUNT:  And I just want to clarify for the court that

25    your prior rulings with respect to the scope of the expert report

```
 1    remain the same.  In other words, in his deposition and in his
 2    report he has two opinions:  Exacerbation of rhinosinusitis and
 3    fear of cancer.  We have not deposed Dr. Miller again, but we did
 4    do Dr. Gautreaux but we did not do Dr. Miller again.  And I would
 5    just ask for a ruling from the court that Dr. Miller will not
 6    mention surgery and that's not going to be forced down my throat
 7    during his testimony tomorrow, just exacerbation of rhinosinusitis.
 8              MR. WATTS:  It's exactly as I said in the pretrial, he
 9    gets to exacerbation of sinusitis and then Dr. Gautreaux comes in
10    and says because of the exacerbation.
11              THE COURT:  That's my understanding.  And I have not --
12    there's nothing that I recall in any pretrial ruling that's changed
13    any of my prior orders with regard to those witnesses.  So we
14    should all be on the same page.  If anybody has any doubt about it,
15    we can get you copies of the orders.
16              MR. WATTS:  We're clear.
17              THE COURT:  I think we are.
18              MR. WATTS:  One other issue -- I wanted to bring up two
19    issues:  No. 1, we think we have an agreement with Andy with
20    respect to the demonstrative issue with Dr. Williams.
21              MR. WEINSTOCK:  We're down to one slide that I haven't
22    seen yet, I think we'll be able to work it out.
23              MR. WATTS:  We're down to one slide and that's what I
24    wanted to bring up.
25              THE COURT:  Okay.  Good.
```

1          MR. WATTS:  The issue of the mention of leukemia, I had

2     suggested that we have a limited issue, and that is that we present

3     you with that one page of the 2009 IARC that in the previous trial

4     stopped at nasal pharyngeal that we add that one line to say there

5     is now sufficient evidence with respect to leukemia we mentioned it

6     once, we don't make a federal case out of it, to use a bad joke.

7     And so we're going to submit that to Andy, and we will do it

8     through Williams but then that will be the extent of it.

9          THE COURT:  Why don't you go ahead and do that.  And,

10    Andy, let me know.  I have the transcript here, it's page 284 from

11    yesterday, I have it up here and I do have some concerns about it

12    having been mentioned yesterday with the other witness.

13         MR. WATTS:  What I think we've agreed to is Dr. Williams

14    had a letter that mentioned a whole cornucopia of types of cancer,

15    we're going to take that one out and substitute the IARC into that

16    page and instruct her to limit it to those two things.

17         THE COURT:  Okay.

18         MR. WATTS:  And the one other thing I wanted, it's five

19    o'clock, I've been trying to give everybody order of trial

20    presentation right after court, I'll do it again today, but I

21    really need to know who they're going to call.

22         THE COURT:  Our conversation yesterday was that today,

23    this evening or I should say probably within the next couple of

24    hours I would hope, counsel --

25         MR. GARRISON:  That's correct, we had the discussion.

DAILY COPY

1          THE COURT:  -- that you were going to go ahead and

2     provide a roster, tentative roster of who the defendant would be

3     calling.  So why don't we go ahead and do that.  What time do you

4     think you can get that to plaintiff's counsel?

5          MR. GARRISON:  Yesterday I mentioned maybe nine o'clock,

6     we're going to go back to the office and meet and we'll send it out

7     by email.  Eight o'clock?

8          MR. WATTS:  How about two hours from now?

9          THE COURT:  Can we say by seven?

10         MR. GARRISON:  Sure, we can sit down and do it.

11         THE COURT:  That'll give you a couple of hours to do it.

12         MR. GARRISON:  Sure, we can do it.

13         THE COURT:  You ought to have a pretty good idea who it's

14    going to be.

15         MR. GARRISON:  We do.

16         THE COURT:  And like I said, I won't hold you to it, as

17    long as we know who is on it that is going to testify.  You may

18    have some people who you choose not to call, which is what happened

19    on the prior cases that we've had.

20         MR. GARRISON:  Now, this is for Thursday, correct, your

21    Honor?

22         THE COURT:  This is for the Thursday.

23         MR. GARRISON:  Looks like the plaintiffs are going to use

24    the rest of Wednesday.

25         THE COURT:  Yes, they had indicated that they would

1    probably go through Wednesday on their presentation and from the

2    roster I have here, that looks like that's a pretty good bet.  So

3    this would be starting on Thursday morning.

4         MR. GARRISON:  Yes, sir.

5         THE COURT:  You might want to have a videotape or whoever

6    just on the outside chance we finish early tomorrow.

7         MR. WATTS:  There is no chance we'll finish early

8    tomorrow.

9         MR. GARRISON:  We'll start with a deposition on Thursday.

10        THE COURT:  So be ready Thursday to begin calling

11   witnesses and fill all of Thursday on the hours along that we're

12   covering on regular workdays and all of Friday.  And if you finish

13   early Friday in the afternoon, we can always break and come back

14   Monday for closing arguments.

15        If you don't finish by Friday, then we're going to have

16   to try to get as much done Monday morning as possible and hopefully

17   still get to closing arguments, charging the jury, and giving the

18   case to the jury on Monday afternoon.

19        MR. GARRISON:  Well, Judge, I can tell you now that we

20   have a witness, an expert witness coming in Friday morning.  So it

21   looks like we'll be doing closing on Mondays, is that what you're

22   telling us?

23        THE COURT:  No, that's fine.  Monday is what we planned

24   on.  My contingency here is if we do not finish your case by Monday

25   late in the day, then we may have to roll into Tuesday, which I

1    really would prefer not to do, but we can always do that as long as

2    we -- the game plan is to still get the case to the jury early

3    enough Monday for the jury to give it serious deliberation, which I

4    think is deserves.

5         MR. GARRISON:  Yes, sir, we would like to do it as soon

6    as possible as well.  But with this expert coming in Friday, there

7    is the chance that we might end up finishing it 3:30, four o'clock

8    on Thursday, and I hope that doesn't present a problem.

9         THE COURT:  What would you have left?  See, that's why we

10   need your roster here.  What would you have left on Friday?

11        MR. GARRISON:  Dr. Wegener.

12        THE COURT:  Would that be it?  We're talking about trying

13   to get this case to the jury on Friday.

14        MR. GARRISON:  And Dr. French would follow Dr. Wegener.

15        THE COURT:  Okay.

16        MR. GARRISON:  That's the day he's available as well and

17   we've been trying to work with his schedule.

18        THE COURT:  And Mr. Rush who we would see again on

19   Thursday probably?

20        MR. GARRISON:  That's correct.  We'd see at least

21   Mr. Rush and three or four other witnesses live and we'll have some

22   video depositions, not many though.

23        THE COURT:  Well, the thing that we need to think about,

24   we really need your roster soon in order to anticipate whether or

25   not we can possibly finish the case early enough in the day on

1    Friday to close and deliberate on Friday afternoon.

2            MR. GARRISON:  We'll get that out in an hour and a half,

3    two hours.

4            THE COURT:  What happened on the last case, and I'm

5    certainly not faulting anyone because it was a game-time decision.

6            MR. WATTS:  I am, I stayed up all night getting ready.

7            THE COURT:  It was an in-game decision that was made not

8    to call certain witnesses, and as it so happens we brought the jury

9    back, they heard about an hour or 90 minutes of testimony and that

10   was the end of the day because nobody was ready to do closing

11   arguments for the following day.

12           In the event that you have one or two witnesses on Friday

13   that are going to take maybe an hour and a half, we might could go

14   with closing arguments and --

15           MR. GARRISON:  That's a possibility.

16           MR. YOUNT:  I think that's our goal, Judge.  What is a

17   reasonable time that we need to be done evidence on Friday in order

18   to get the case to the jury?

19           THE COURT:  You hate to give the jury the case at three

20   or four o'clock on a Friday afternoon because -- that's probably

21   the worst time to give it to them because they're going to be in a

22   hurry to get out.  If we can get the case, do closing arguments and

23   get the case to the jury by lunchtime or shortly after lunchtime.

24           In other words, if you have a witness or two that we can

25   cover maybe up to around 11 o'clock, then it's doable to get the

1  case to the jury by Friday.

2          MR. GARRISON:  Yes, sir.

3          THE COURT:  If you're going to be into the afternoon on

4  Friday, then I just assume finish and send them home at 1:30 or two

5  o'clock rather than start this whole procedure, give them the case

6  at 3:30 or four when they're going to be thinking about going home.

7          MR. WATTS:  Let me just throw out the following

8  proposition, because I've been bragging to you about how we're

9  trying to turn this into the micro trail.  If there's Wegener and

10  French and we can figure out the amount of time between 8:30 and 11

11  o'clock and split it even, I'll agree to limit crosses as short as

12  their directs so we can be done by 11.  I think we been talking

13  about wanting to argue on Friday, so I'll make that deal.

14          MR. GARRISON:  I think we'll try, I don't want to

15  commit --

16          THE COURT:  I am not asking you to because we still have

17  a lot of water to go under the bridge.

18          MR. GARRISON:  We'll try and work and streamline our

19  witnesses.

20          MR. WATTS:  I'm just throwing the offer out.  You do what

21  you need to do to try your case, but if you want the assurance,

22  I'll give it.

23          THE COURT:  We still need to have a jury charge

24  conference as well.  Can we have a draft of the jury charges by

25  tomorrow?

1          THE LAW CLERK:  Yes.  The only thing I am waiting on is

2     the word perfect of the stipulations --

3          MR. WATTS:  Which is coming to you right after court,

4     Chris is going to get it to you, and we apologize.

5          THE LAW CLERK:  That and the verdict form.

6          THE COURT:  I really did kind of digress as to what I was

7     going to talk about after we went off of the record.

8          Is there anything else we need to cover on the record and

9     then we'll finish the conversation.  Anything else on the record?

10         MR. WATTS:  I don't think so.

11         THE COURT:  Okay.

12       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

13

14                          *  *  *  *  *  *

15

16                      REPORTER'S CERTIFICATE

17

18       I, Karen A. Ibos, CCR, Official Court Reporter, United
      States District Court, Eastern District of Louisiana, do hereby
19    certify that the foregoing is a true and correct transcript, to the
      best of my ability and understanding, from the record of the
20    proceedings in the above-entitled and numbered matter.

21

22                      Karen A. Ibos, CCR, RPR, CRR
                         Official Court Reporter

23

24

25

DAILY COPY