```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3      ***************************************************************

 4      IN RE:  FEMA TRAILER
        FORMALDEHYDE PRODUCTS
 5      LIABILITY LITIGATION
                                     DOCKET MDL NO. 1873 "N"
 6                                   NEW ORLEANS, LOUISIANA
                                     WEDNESDAY, MAY 19, 2010, 8:30 A.M.
 7

 8      THIS DOCUMENT RELATES TO:

        DOCKET NO. 09-3251,
 9      EARLINE CASTANEL v
        RECREATION BY DESIGN, LLC
10

        ***************************************************************
11
                            DAY 3, MORNING SESSION
12                  TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
13                    UNITED STATES DISTRICT JUDGE

14

15      APPEARANCES:

16

17      FOR PLAINTIFF:        WATTS GUERRA CRAFT
                              BY:  MIKAL C. WATTS, ESQUIRE
18                            FOUR DOMINION DRIVE
                              BUILDING THREE, SUITE 100
19                            SAN ANTONIO TX 78257

20                            CHRIS PINEDO
                              ATTORNEY AT LAW
21                            802 N. CARANCAHUA, SUITE 2250
                              CORPUS CHRISTI TX  78470
22

23                            REICH & BINSTOCK
                              BY:  DENNIS C. REICH, ESQUIRE
24                            4265 SAN FELIPE, SUITE 1000
                              HOUSTON TX  77027
25
```

1   APPEARANCES CONTINUED:

2

3   FOR DEFENDANT:            GARRISON YOUNT FORTE & MULCAHY
                             BY:  LYON H. GARRISON, ESQUIRE
4                                 SCOTT P. YOUNT, ESQUIRE
                                  RANDALL C. MULCAHY, ESQUIRE
5                            909 POYDRAS STREET, SUITE 1800
                             NEW ORLEANS LA  70112
6

7                            DUPLASS ZWAIN BOURGEOIS MORTON
                             PFISTER & WEINSTOCK
8                            BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                  JOSEPH G. GLASS, ESQUIRE
9                            THREE LAKEWAY CENTER
                             3838 N. CAUSEWAY BOULEVARD
10                           SUITE 2900
                             METAIRIE LA  70002
11

12

13  OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
                                500 POYDRAS STREET, ROOM B406
14                              NEW ORLEANS LA  70130
                                (504) 589-7779
15

16  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
    PRODUCED BY COMPUTER.

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2

3    EXAMINATIONS                                          PAGE

4

5    **DR. LAWRENCE MILLER**..................................  610

6    VOIR DIRE EXAMINATION BY MR. REICH.....................  610

7    TRAVERSE EXAMINATION BY MR. YOUNT......................  619

8    FURTHER VOIR DIRE EXAMINATION BY MR. REICH.............  644

9    DIRECT EXAMINATION BY MR. REICH........................  652

10   CROSS-EXAMINATION BY MR. YOUNT.........................  682

11   REDIRECT EXAMINATION BY MR. REICH......................  710

12   **PATRICIA WILLIAMS, M.D.**..............................  714

13   DIRECT EXAMINATION BY MR. REICH........................  715

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P-R-O-C-E-E-D-I-N-G-S**

2                         MORNING SESSION

3                WEDNESDAY, MAY 19, 2010, 8:30 A.M.

4                    (COURT CALLED TO ORDER)

5

6

7          THE COURT SECURITY OFFICER:  All rise.

8          (WHEREUPON, at this point in the proceedings, the jury

9   panel enters the courtroom.)

10         THE COURT:  Good morning.  Thank you all for being on

11  time.  You may be seated.  Let's go ahead and pick up right where

12  we left off.  I think today, assuming we can cover what we had

13  scheduled for today, we should be on schedule for the balance of

14  the trial.  So let's go ahead and, Mr. Watts -- or Mr. Reich, if

15  you would like to go ahead and call the next witness, we'll go

16  ahead and start right in.

17         MR. REICH:  Thank you, Your Honor.  The plaintiff will

18  call Dr. Lawrence Miller.

19         THE COURT:  Dr. Miller.  If you would come forward, sir.

20  Have a seat.

21         THE DEPUTY CLERK:  Would you please raise your right

22  hand.  Do you solemnly swear that the testimony which you are

23  about to give will be the truth, the whole truth and nothing but

24  the truth, so help you God?

25         THE WITNESS:  Yes.

**DR. LAWRENCE MILLER**

was called as a witness and, after being first duly sworn by the

Clerk, was examined and testified on his oath as follows:

       THE DEPUTY CLERK:  State your name and spell it for the

record, please.

       THE WITNESS:  Lawrence Miller, L-a-w-r-e-n-c-e,

M-i-l-l-e-r.

VOIR DIRE EXAMINATION

BY MR. REICH:

Q.   Good morning, Dr. Miller.  You traveled here yesterday,

correct?

A.   I did.

Q.   Where did you come from?

A.   From Boston.

Q.   You've been in Boston for quite a number of years, correct?

A.   A little over 30 now, a while.

Q.   Is there a time that you lived down here in this great city?

A.   Yes, I lived here during the late 1980s.  I taught and did

research at LSU Medical Center.

Q.   Tell us a little bit about your experience at LSU Medical

Center.  Why did you come down here?

A.   Well, my wife's family lives not far from New Orleans, so

that was the primary reason, and it was also an excellent medical

center.

Q.   Where is your wife from?

1   A.   She grew up in Memphis, but her family lives right across

2   the Mississippi border, just north of the Louisiana border.

3   Q.   And when you came down here, were you involved in the

4   founding of a particular medical service at LSU?

5   A.   I was.

6   Q.   And can you describe that, please, to the ladies and

7   gentlemen of the jury.

8   A.   I've had a longstanding interest in effects of chemicals on

9   the human body and have an advanced degree in that area.  And

10  when I got to LSU, there was no formal arrangement for taking

11  care of patients who had exposures, so I founded the

12  environmental and occupational health service at LSU.

13  Q.   Let's go to your CV, which is Exhibit Number 229.  And if we

14  could just blow up the first half of the page.  Let's very

15  quickly go through it.

16       You attended Harvard College, correct?

17  A.   That's correct.

18  Q.   And you graduated Magna Cum Laude, and you were in the

19  Phi Beta Kappa Honorary Society?

20  A.   Yes, sir.

21  Q.   And tell us a little bit about what you did in your next

22  school, which was Cambridge University.  That's in England,

23  correct?

24  A.   I spent a year in England studying there.

25  Q.   What did you study there?

1  A.   I spent a year in England, I studied there, and I studied a

2  variety of various areas, but mostly understanding foundations of

3  scientific knowledge.

4  Q.   And then you finally went to medical school and you attended

5  medical school at Harvard, correct?

6  A.   Yes, I did.

7  Q.   And you entered at the Massachusetts General Hospital.

8         Is the Massachusetts General Hospital a teaching

9  hospital of Harvard?

10 A.   It is.  Very large teaching hospital.

11 Q.   Do you still have privileges at Mass General?

12 A.   I do.  I've had privileges pretty much since that time.

13        THE COURT:  Mr. Reich, I don't want to purposefully cut

14 you short.  If you would like to have the jury familiarized with

15 this, it's fine, but do we have a stipulation as to his

16 expertise?

17        MR. YOUNT:  I guess it depends on what the tender is.

18        MR. REICH:  Your Honor, the tender would be internal

19 medicine, pharmacology, and pulmonology.  Dr. Miller is board

20 certified in all three areas.

21        MR. YOUNT:  Judge, there is no stipulation, and we would

22 like to voir dire this witness.  With respect to the pulmonology,

23 I think that's irrelevant.

24        THE COURT:  Let me just make sure the jury understands

25 what we're doing here, then.

1             This witness has been tendered as an expert, as

2     Mr. Reich just indicated.  He's going to be, first of all,

3     qualified as an expert, so Mr. Reich is going to be able to

4     elicit testimony from him about all of his grounds for expertise,

5     and then Mr. Yount, on behalf of the defendant, is going to be

6     able to question him or cross-examine him about his

7     qualifications only.  Mr. Reich can go ahead and redirect, and

8     then the Court will determine whether it accepts him in any or

9     all of the fields in which he's tendered.  Then we will get to

10    his testimony about this case in particular, which we'll start

11    again with the direct, cross, and redirect.

12             So right now we're in the process of qualifying him

13    as an expert in the fields that Mr. Reich just mentioned.

14        MR. REICH:  If I may continue with the qualification

15    process, Your Honor.

16        THE COURT:  Please do.

17                          EXAMINATION

18    BY MR. REICH:

19    Q.   Dr. Miller, let's talk for a moment about some of the work

20    that you have done.  You interned at Mass General Hospital and

21    you were a clinical fellow at Harvard Medical School.  What were

22    the areas of medicine that you focused on back then?

23    A.   Well, the first three years of training, you focus on

24    internal medicine.  That's just taking care of adults.  Then I

25    subsequently spent two years studying pulmonary medicine,

1    diseases of the airways and the lungs.  And then I spent another

2    two years studying pharmacology.  That's the effects of drugs and

3    chemicals on the body.

4    Q.    And you were also a research fellow.  During that period of

5    time, did you have an opportunity to do research in laboratories?

6    A.    I did.

7    Q.    And did you have opportunities to write papers?

8    A.    I did.

9    Q.    And, in fact, were papers that you had done back in the

10   early '80s published?

11   A.    They were.

12   Q.    And have you published papers throughout your career?

13   A.    I've published about a hundred scientific newspapers in my

14   career, yes.

15   Q.    Let me ask you about an incident that I think may be raised.

16         Was there a time when you were a fellow when a

17   complaint was raised concerning some research you had done?

18   A.    About 28 years ago, yes.  I had a dispute with a fellow

19   researcher.

20   Q.    And was that dispute ultimately resolved?

21   A.    It was resolved.  I moved over to Tufts University and he

22   went back to Israel, where he was from.

23   Q.    And, in fact, was there some type of disciplinary action

24   taken?

25   A.    Only that it was clear to me I should probably move to a

1  different medical school, which I did.

2  Q.   After that, did you continue, though, to maintain your

3  affiliation with Harvard?

4  A.   I did.  I continued throughout my affiliation with Harvard

5  Medical School.

6  Q.   In fact, have you had opportunities to teach Harvard medical

7  students over the years?

8  A.   Harvard medical students, so-called residents, a wide

9  variety of students at Harvard.

10 Q.   And in fact, isn't it true that your wife has been a

11 professor of medicine at Harvard?

12         MR. YOUNT:  Objection; relevancy.

13         THE COURT:  His wife is not here to testify.  Let's talk

14 about him.

15                         EXAMINATION

16 BY MR. REICH:

17 Q.   And then you went to Tufts.  Could we have the next page,

18 please.

19         I see you have an MPH.  Can you explain to the ladies

20 and gentlemen of the jury what an MPH is?

21 A.   It stands for Master's of Public Health.  It's a degree that

22 requires two years of study.  And it's primarily looking at

23 diseases of populations.  In medicine, we look at diseases of

24 individuals.  In public health, you look at groups of people.

25 And my particular concentration was called environmental health,

1    which is kind of a newer name for toxicology.  It's effects of

2    chemicals in the body.

3    Q.    Did you study the principles of toxicology as you were

4    getting that degree?

5    A.    I did.

6    Q.    And do you consider yourself a toxicologist as well as a

7    Doctor of Medicine?

8    A.    I do.

9    Q.    And you've held a variety of positions over the years, and I

10   see that in '87 -- in 1988, you were an assistant professor of

11   medicine and pharmacology at LSU Medical Center, New Orleans,

12   Louisiana; director environmental and occupational health

13   service, LSU Medical Center.

14            When you held that position, did you actually see

15   patients?

16   A.    I did.

17   Q.    And can you describe generally what sorts of patients you

18   saw and what services you rendered?

19   A.    It was a variety of patients.  Again, we set up this service

20   to look at patients who had environmental exposures.  So

21   sometimes they were workers who had been exposed on the job.

22   Sometimes they were people like you and me who had exposures in

23   their homes or they thought they had exposures in other

24   situations and came to be evaluated.

25   Q.    And during the period, '88 through '92, you were at

1   Tufts University, assistant to associate professor,
2   department of pharmacology, and associate director of division of
3   clinical pharmacology, Tufts New England Medical Center.  What
4   was the principal area of your focus during that time period?
5   A.   I was teaching and doing research, primarily doing research
6   on effects of drugs and chemicals.  I was working a lot on the
7   brain and in some other areas of the body as well.
8   Q.   Now, you are board certified by the American Board of
9   Medical Specialties, correct?
10  A.   I am.
11  Q.   And can you identify the three areas of medicine in which
12  you received board certification.
13  A.   I'm board certified in internal medicine, which is diseases
14  of adults; in pulmonary medicine, which is diseases of the lungs;
15  and clinical pharmacology, which is, as I mentioned, the effects
16  of drugs and chemicals on the body.
17  Q.   Now, when you were teaching in Louisiana, did you have a
18  license to practice medicine from the State of Louisiana?
19  A.   I did.
20  Q.   And if we could go to the next page, please.
21       You have received quite a number of awards over the
22  years.  Are there any awards that you consider to be particularly
23  significant?
24  A.   Well, you're always happy when you get recognized.  I was
25  particularly happy to get the two Young Investigator Awards --

1    from the Society of Pharmacology.  To my knowledge, nobody else

2    has ever received both.

3    Q.   If we may go back to the page below.

4         You've held a number of positions as board of

5    directors.  In addition to practicing medicine, teaching, seeing

6    patients, have you had an opportunity to become involved in the

7    business side of medicine?

8    A.   I have.

9    Q.   And can you describe for the jury some of the work that

10   you've done particularly in recent years.

11   A.   Sure.  For the last 15 -- a little bit more than 15 years,

12   I've been involved in companies, starting companies, developing

13   companies in medical areas.  We have a number of companies.  I'm

14   on the board now of one antibiotic company, for example, that is

15   very promising.  So we're trying to develop new drugs.  We hope

16   they will be effective and will work.

17   Q.   Was there a period in your life where you put on gloves,

18   used a stethoscope, got in your scrubs, and do the day-to-day

19   type of work that a clinical physician does?

20   A.   I continued to see patients throughout the 1990s, up until

21   about five years ago.  Five years ago, I simply had become too

22   busy and something had to give.

23   Q.   Do you still keep current with the medical literature, if

24   there is new procedures developed in your areas of medicine, new

25   medications, et cetera?

1  A.   I do.  And I go to the hospital and go to grand rounds.  I

2  try to stay as current as I can.

3  Q.   And do you have contact with medical students and teach

4  them?

5  A.   Less often, but occasionally I'll give a lecture or do a

6  seminar for the medical students, which I still very much enjoy.

7  Q.   And from time to time, you've allowed attorneys to hire you

8  for your expertise in the areas in which you can render opinions,

9  correct?

10  A.   That's correct.

11  Q.   And you've done so in this case, correct?

12  A.   Yes.

13  Q.   And how long ago were you contacted to get involved in this

14  formaldehyde case?

15  A.   Oh, I guess it's the better part of a year ago.

16        MR. REICH:  Your Honor, I would offer Dr. Miller with

17  regard to his expertise in internal medicine, pharmacology,

18  pulmonology, and generally, I guess, the subject would be

19  environmental medicine, environmental health.

20        THE COURT:  Counsel, do you want to question this

21  witness?

22        MR. YOUNT:  I do, Your Honor.  Thank you very much.

23                    TRAVERSE EXAMINATION

24  BY MR. YOUNT:

25  Q.   Good morning, Dr. Miller.

1    A.    Good morning.

2    Q.    My name is Scott Yount.  We've never met before, have we?

3    A.    We have not.

4    Q.    I have the pleasure of representing Mr. Randall Rush and his

5    company, RBD, in this case.

6              What is otolaryngology?

7    A.    It's sometimes called ENT or ear, nose, and throat.  It's

8    diseases of exactly the ears, nose, and throat.

9    Q.    You are not board certified in otolaryngology; is that

10   correct?

11   A.    I am not.

12   Q.    In the American Board of whatever, they do recognize such a

13   specialty; is that correct?

14   A.    That's a surgical specialty, not a medical specialty.

15   Q.    And you're not a board-certified surgeon either; is that

16   correct?

17   A.    I am not.

18   Q.    When is the last time you performed any type of surgery?

19   A.    Probably when I was a resident.  That's a long time ago.

20   Q.    Now, under questioning from Mr. Reich, you talked about your

21   licensure in the state of Louisiana.  And you recognize what the

22   LSBME is; is that correct?

23   A.    I do.

24   Q.    That's the Louisiana State Board of Medical Examiners; is

25   that correct?

1    A.    Yes, it is.

2    Q.    Now, their records reflect that you allowed your license to

3    lapse in 1989; is that correct?

4    A.    That's correct.

5    Q.    And then you got what they call a visiting physician

6    temporary permit in July of 2009.  Does that sound right?

7    A.    I think that's right.  I don't remember the exact date.

8    Q.    What was the purpose of that?

9    A.    To examine a patient relating to the formaldehyde exposures.

10   Q.    And then you did the same thing again in January of 2010; is

11   that correct?  You got the same visiting physician permit?

12   A.    That was for Ms. Castanel, yes.

13   Q.    Now, you don't consider yourself Ms. Castanel's treating

14   physician; is that correct?

15   A.    I am not.

16   Q.    Now, you did tell the jury that you quit seeing patients

17   about five years ago?

18   A.    That's correct.

19   Q.    That brings us to about 2005, correct?

20   A.    Correct.

21   Q.    So from 1999 until 2005, though, you would agree that you

22   spent about 10 percent of your time seeing patients, and the rest

23   of the time doing other things; is that correct?

24   A.    It varied from month to month.  Some months was more.  But I

25   would say over all, it was about right.

1    Q.    Ten percent.  And again, as you testified, that's because
2    you were too busy with Mediphase; is that correct?
3    A.    With other responsibilities.  I was teaching as well.
4    Q.    Tell the jury what Mediphase is, if you could pull up the
5    Mediphase web page.
6    A.    Sure.  Mediphase is a company that invests in healthcare
7    companies who are particularly interested in developing new
8    drugs.
9            MR. REICH:  Is there an exhibit number?
10           MR. YOUNT:  No exhibit number.  This is demonstrative
11   impeachment for this witness.
12                        EXAMINATION
13   BY MR. YOUNT:
14   Q.    This is your web site, correct, Mediphase?
15   A.    That's correct.
16   Q.    And this is the company where you do venture capital
17   investing in other businesses, correct?
18   A.    In healthcare specifically.
19   Q.    Now, I heard when you were testifying you said something
20   about you were trying to develop drugs.  You weren't trying to
21   suggest to the jury that you were doing the research and
22   development on those drugs, you, personally?
23   A.    You're correct.  We're helping the company -- build the
24   companies that do the drug development.
25   Q.    You try to raise money so that they can develop drugs,

1    correct?

2    A.    A bit more than that.  We work with the companies.  I'm a

3    board chairman, for example, of one company.  I'm over there

4    usually twice a week.

5    Q.    You're not in the lab developing these drugs, are you?

6    A.    I am not.

7    Q.    Will you go to his CV, please.  Go to Page 4, please.

8              Again, you would agree that this is Page 4 of your CV;

9    is that correct?

10   A.    That's correct.

11   Q.    Tell the jury what the American College of Physicians is.

12   A.    That's an organization of physicians who are certified in

13   internal medicine.

14   Q.    That's a legitimate medical organization, correct?  That's

15   not résumé fluff?

16   A.    It's a real organization that you join.

17   Q.    But, yeah, I mean, people put organizations on their résumés

18   and it's really no big deal.

19             That's a legitimate one, correct?

20   A.    I would call it that, yes.

21   Q.    And how long have you been a member of the American College

22   of Physicians?

23   A.    I don't recall.  It's been a while.

24   Q.    But you're still a current member?

25   A.    I believe --

624

1  Q.    As far as you know?

2  A.    I believe I paid my dues.

3  Q.    Doctor, I'm going to show you a document which comes from a

4  publication of the American College of Physicians.  Will you tell

5  me what the title of this document is?

6              MR. REICH:  May I have the exhibit number, please.

7              MR. YOUNT:  There is no exhibit number.

8              THE COURT:  Do you have a copy you can give to counsel

9  while you put them on?

10              MR. YOUNT:  I don't, Judge.

11              THE COURT:  Show it to him before you put it up there.

12              MR. REICH:  Do you have the full document?

13              MR. YOUNT:  That is the full document.

14                              EXAMINATION

15  BY MR. YOUNT:

16  Q.    Dr. Miller, can you read the title of this document to the

17  jury, please.

18  A.    It's says "Guidelines For the Physician Expert Witness."

19  Q.    And are you familiar with this document?

20  A.    I believe I looked at it years ago, but it's been quite some

21  time.

22  Q.    If you can, will you -- you would agree with me, sir, that

23  this document is from an American College of Physicians

24  publication, correct?

25  A.    It appears to be.  I don't recall this specific one.

1    Q.    You would agree with me that this document says that a

2    physician expert witness, which would be you, or at least you're

3    being offered as a physician expert in this case, correct?

4    A.    That's correct.

5    Q.    Now, the American College of which you are a member says

6    that you should be familiar with the clinical practice of the

7    specialty and should be actively involved in the clinical

8    practice of the specialty or the subject matter of the case for

9    three of the previous five years at the time of the testimony.

10   Do you see that?

11   A.    I do.

12   Q.    You don't qualify for that, do you?

13   A.    I disagree.  It says -- I'm just reading it now.  It says,

14   "the subject matter of the case for three of the previous five

15   years."  I've certainly been involved in the subject matter of

16   this case.

17   Q.    And that's through your work with Mediphase?

18   A.    And my work teaching, going to the hospital.  I'm still

19   involved in medicine.

20   Q.    So you've been involved in the clinical practice of medicine

21   for three of the previous five years?

22   A.    No.  I specifically said, "the subject matter of this case,"

23   the second phrase there.

24   Q.    So you don't quarrel that this is a legitimate guideline.

25   It's your position, though, that you qualify for this guideline?

1   A.   Let me point -- this is a guideline.  There are lots of

2   guidelines that are put out there.  Different societies have

3   different guidelines.

4   Q.   Do you or do you not quarrel with these guidelines?

5   A.   I don't think it's my position to quarrel with the

6   guidelines.  They are what they are.

7   Q.   And it's your testimony you meet these guidelines?

8   A.   It is.

9   Q.   Now, I want to talk about this Harvard inquiry a little bit,

10  which I think you said caused you to leave the school.

11  A.   Well, I moved to Tufts University School of Medicine, yes.

12          THE COURT:  Mr. Yount?

13          MR. YOUNT:  Yes.

14          MR. REICH:  Your Honor, we will renew a previous

15  objection that the incident was 25 years of age.

16          THE COURT:  We can redirect on it.  I'm going to let him

17  ask about it.  It was brought out on his direct, so let's go

18  ahead and cover it.

19                          EXAMINATION

20  BY MR. YOUNT:

21  Q.   Dr. Miller, can you identify this document for the jury?

22  A.   I see it's from 1985.

23  Q.   Can you tell the jury what this document reflects?

24  A.   And I mentioned earlier, while I was a fellow 28 years ago,

25  I had a dispute with another researcher about who should get

1  credit for a particular article that could not be resolved.

2  Q.   When you had this dispute -- this was actually investigated

3  by the medical school; is that correct?

4  A.   That's correct.

5  Q.   You had an opportunity to explain your side of the story to

6  them, didn't you?

7  A.   I did.

8  Q.   And the Harvard Medical School found that there was an

9  allegation of misconduct in connection with your research; is

10 that correct?

11 A.   That's correct.

12 Q.   And they further found that you had failed in one paper to

13 authenticate your findings and data in a manner generally

14 recognized as required of all members of the scientific

15 laboratory.  That's what they found; is that correct?

16 A.   That's correct.

17 Q.   And they further found that your conduct with regard to this

18 research had been unacceptable; is that correct?

19 A.   That is correct.

20          MR. REICH:  Your Honor, under the Rule of Optional

21 Completeness, may we have the last paragraph read to the jury?

22          THE COURT:  Well, I'm going to let you go ahead and

23 cover that on redirect.  You'll get an opportunity to make a note

24 of that.  I'll certainly allow you to do that on redirect.

25                         EXAMINATION

1    BY MR. YOUNT:

2    Q.    Now, although you haven't seen patients for five years and

3    10 percent of your practice in the previous five years was

4    patients, you have had occasions to get into the courtroom as an

5    expert witness; is that correct?

6    A.    Occasionally, yes.

7    Q.    And you understand that the process we're going through

8    right now is to have the chance for the Court to listen to your

9    qualifications and determine whether you should be accepted as an

10   expert witness, correct?

11   A.    Yes.

12   Q.    Now, you've been through this process before, haven't you?

13   A.    I have.

14   Q.    And, in fact, there has been occasion where courts have

15   decided that, no, Dr. Miller should not be allowed to testify in

16   this courtroom because he is not qualified in the subject area;

17   is that correct?

18   A.    I think there has been one instance, but I don't follow the

19   legal aspects of the matter.  I'm a physician and scientist.

20   Q.    One instance, and you're aware that that's the

21   *Christophersen* case?

22   A.    That's correct.

23   Q.    And you understand that that's a case rendered by the

24   United States Fifth Circuit Court of Appeals, which is a court

25   that has appellate jurisdiction over this court?

1          MR. REICH:  Your Honor, I think this goes beyond proper

2     voir dire of the witness.  I was going to cover this issue in my

3     direct examination of Dr. Miller.

4          THE COURT:  We're trying to qualify him as an expert in

5     the fields that are offered.  So I think it has to do with

6     bearing on his acceptance.  Certainly whether or not he's been

7     accepted previously in any given field or at all is pertinent to

8     the inquiry at this time.

9          MR. REICH:  Then I will further object on the basis of

10    the age of the incident, which was 25 or so years.

11         THE COURT:  I understand that.  We're going to cover all

12    of that and the jury will do with it what it will, but I'm going

13    to allow him to ask about it and allow you to cover it on

14    redirect in terms of qualifying.

15         MR. YOUNT:  Thank you, Your Honor.

16                              EXAMINATION

17    BY MR. YOUNT:

18    Q.    And I'll point out the dates of this case.  This is the

19    *Christophersen* case, and this is August of 1991.  Do you see

20    that?

21    A.    I do.

22    Q.    And this is the one that you're familiar with, correct?

23    A.    I am.

24    Q.    Are you aware, sir, that what the Court said about your

25    testimony, here the Court of Appeal is commending that the

630

1  district court found that the basis of your opinion was

2  insufficiently reliable.  Are you aware of that, sir?

3  A.    That's what it says.

4  Q.    Are you further aware that the Court said -- do you remember

5  the facts of this case, by the way?

6  A.    Only in a general sense.  It's 20 years ago.

7  Q.    You don't disagree that you concluded that the plaintiff's

8  exposure to nickel and cadmium had caused him cancer that

9  resulted in his death?  That sounds right?

10 A.    What was the question?

11 Q.    Does this fact pattern sound right to you?

12 A.    In general terms.  Again, I don't recall the details.

13 Q.    Here it says the district court undertook an in-depth review

14 of your basis for your opinions and determined that your opinion

15 should be excluded, correct?  That's what it says?

16 A.    That's what it says.

17 Q.    Now, this case, the *Christophersen* case dealt with dosages,

18 right?

19 A.    No.  The specific issue dealt with a disease called small

20 cell carcinoma.  And the question is, when it came down to it, is

21 that a localized disease in the lung or is that a systemic

22 disease?  My opinion was that it was a systemic disease, and I'm

23 happy to say that it's been proved out very clearly in the

24 literature in the last 20 years.  It is widely accepted that it

25 is now a systemic disease.

1  Q.   Let's see what the Court says.  The Court says that you did

2  not use accurate dosage and exposure information in this case.

3  That's what it says, correct?

4  A.   That's what it says.

5  Q.   And you do agree that dosage information is important for

6  you to ultimately make a determination as to whether Ms. Castanel

7  sustained any damages or injuries because of formaldehyde

8  exposure?

9  A.   Assuming part of the issue is here, yes.

10 Q.   A significant part.

11 A.   Let's call it a part of the issue that we'll discuss.

12 Q.   And here again, this is the same -- Fifth Circuit found that

13 Dr. Miller's opinion, that's you, is based upon critically

14 incomplete or grossly inaccurate dosage or duration data.

15       Are you aware that that Court of Appeals said that

16 about your opinions?

17 A.   I am.

18 Q.   Now, you're pretty sure this is the only time a court has

19 ever done this to you?

20 A.   That's the only one I'm aware of.  There may be others.

21       MR. REICH:  Your Honor, I've been handed a ruling on a

22 motion for partial summary judgment on a 1990 case that I have

23 never seen before.  It would take time to study it.  I really

24 don't want to delay the court proceeding.  And I have no idea

25 whether it's relevant to any issue that we're dealing with right

1  now.  It would take some analysis.

2       THE COURT:  If it's case law or material that's

3  available to all counsel, then as far as I'm concerned it was

4  available prior to trial and could have been reviewed prior to

5  trial in connection with the testimony of an expert who was

6  retained by counsel.  So I don't see any reason -- you're

7  suggesting that we take a break now.

8       MR. REICH:  I'm not.

9       THE COURT:  Well, are you suggesting that I not allow

10  him to use it because it has not been reviewed?

11       MR. REICH:  I'm just wondering if we could have an

12  opportunity to review it and continue on to another matter, and

13  then we'll get back to it.  It just takes time to read, and I

14  can't tell if it's a published ruling of a court or unpublished.

15       THE COURT:  Do you have something you want to do in the

16  next few minutes here, Mr. Yount, that we could cover with this

17  witness?  We've got to do this now.  And this was available, and

18  counsel was not obligated -- because it was in part of a court

19  record, counsel is not obligated to produce case law and things

20  that are available regarding an expert witness, I would think.

21       MR. YOUNT:  Judge, I really don't have much more

22  voir dire.  I have one very short area after I complete these

23  other matters where he's been excluded.  So there really is

24  nothing else for me to do with this witness other than this

25  during the voir dire section.

1          THE COURT:  Mr. Reich, we'll give you a couple of

2    minutes here, but --

3          MR. REICH:  I truly apologize.  I've never seen it

4    before.

5               (WHEREUPON, at this point in the proceedings, there

6    was a brief pause.)

7          MR. REICH:  Your Honor, if I could address both of these

8    matters, both *Christophersen* --

9          THE COURT:  Why don't you come on up.  Let's go ahead

10   and talk about it up here so we can get past this.

11              (WHEREUPON, at this point in the proceedings, a

12   conference was held at the bench.)

13         MR. REICH:  I was just handed an opinion in a case

14   styled *Allen v. Agrico Chemical Company*, which appears to be a

15   Middle District of Louisiana ruling on a motion for partial

16   summary judgment involving multiple plaintiffs in the asbestos

17   case.  A number of experts were excluded in the *Viterbo v. Dow*

18   *Chemical Company* decided along with -- which is an '89 case, and

19   a number of other cases, '88, all of these were cases that were

20   decided under the *Fry*, U.S. Supreme Court decision where there

21   was a different standard of admissibility which actually was a

22   more narrow standard of admissibility than the current one the

23   Supreme Court has established for the determination of

24   admissibility of scientific evidence in federal court.

25              The *Christophersen* case likewise falls under *Fry*,

1   which was a different standard of admissibility than is

2   applicable.

3           THE COURT:  We've already covered *Christophersen*.

4           MR. REICH:  I'll put that aside, Your Honor.

5               The problem with the standard that was applied was

6   that it was a narrow construction of Rule 702 of the Federal

7   Rules of Evidence, and the purpose of *Daubert* was to permit

8   minority scientific opinions to become admissible if they were

9   otherwise reliable.  I think the legal framework here is just the

10  ruling that was made may have been different under the *Daubert*

11  standard, and it would be highly prejudicial.  So when you look

12  at the Rule 403 aspect of the prejudicial impact and the

13  probative value, we think there is undue prejudice in allowing

14  such an old decision decided under a different evidentiary

15  principle than what would ordinarily apply in today's federal

16  courts.

17          THE COURT:  But the purpose of the exclusion in this

18  *Viterbo* case from the Middle District is his opinion is

19  unreliable and not supported by admissible or reliable evidence,

20  so the evidentiary rule, I would think, would be consistent.  The

21  evidentiary rule employed in connection with the opinion would

22  still be the same.  I don't see where *Fry* has an impact on the

23  factors set forth in this opinion for the exclusion.

24          MR. REICH:  There may be some question about whether or

25  not there was a physical examination involving plaintiffs, and I

1   didn't want to take the time in front of the jury to read the

2   whole thing.  And I believe that under today's rules, federal

3   judges -- and I know there is case law today that says it's not

4   necessary for a physician in all instances to do a hands-on

5   examination of a patient in order for his opinions to become

6   admissible.  He had looked apparently at some of the patients,

7   but not all of them and there was an exclusion of multiple

8   experts without a really detailed analysis of why he was being

9   excluded.

10          So we think that under both the current standard as

11   well as the 403 analysis, it would be inappropriate to allow this

12   to be a basis of impeachment.  It's going to just create a side

13   issue in this case and that would require me to do rebuttal by

14   talking about cases in which he has been accepted and we're

15   spending too much time on this.

16          I could say the Louisiana Supreme Court has

17   approved his dose estimation technique in that *CSX* case years

18   back, and I'm trying to avoid that.

19          THE COURT:  I understand that, but when an expert is

20   hired, he or she brings to court a whole history of testifying,

21   and all of that is relevant to acceptance, not only acceptance as

22   an expert, but also the weight that the jury wants to give.  As

23   far as I'm concerned, he's going to be admitted for internal

24   medicine, pulmonary medicine, and clinical pharmacology.  He's

25   board certified.  I'm not going to sit here and say somebody

 1   who's board certified isn't going to be permitted to testify as

 2   an expert in those fields.

 3             You also mentioned environmental health and

 4   environmental medicine.

 5             MR. REICH:  That's his MPH.

 6             THE COURT:  Those are kind of nebulous terms that seem

 7   to me to be sort of an umbrella for several other disciplines,

 8   and I'll make that ruling.  But I do think that the jury can

 9   factor all of this in, in terms of what weight they would like to

10   give to this testimony.

11             So I'm going to go ahead and let him ask questions

12   about this case.

13             MR. YOUNT:  Here are the other two cases.

14             THE COURT:  Look, I understand what you guys do because

15   I used to do it myself, but I assume that when an expert is

16   hired, he or she is taken to the woodshed by the counsel hiring

17   him, and I'm sure you all did.

18             MR. YOUNT:  No, we do that.

19             THE COURT:  I'm not in any way suggesting that you

20   didn't.  I'm sure you did probably more detail than I ever did.

21   But the expert lives with all of the prior testimony and

22   experience they bring to the table, both positive and negative.

23   One side gilds the lily and the other side, you know, tries to

24   tear it down.  I think that's what we're doing here.  But I don't

25   think it's unfair to ask him about a prior case and I don't see

1   any reason why this one is so distinguishable that it can't be

2   used in this case.  These are things that were all available.

3   This is not something that was available only to counsel for the

4   defendant.

5          MR. REICH:  Right.  Do you want to talk about these

6   two cases as well?

7          MR. YOUNT:  I plan on asking him about them.  He said he

8   was only excluded one time.

9          MR. REICH:  That's all he was aware of probably.

10  Because lawyers don't often tell.  And a lot of these are

11  district court opinions.  I don't know which ones are published,

12  and that's a problem, they don't always show up in legal research

13  on-line.

14         THE COURT:  Isn't that how you all found it?

15         MR. YOUNT:  Yes.  Actually, it is, Judge.

16         THE COURT:  I hate to say it, but everything is on-line

17  now.

18         MR. REICH:  You have a better researcher than me.

19             I'm familiar with this case.  I was in the

20  companion case and his testimony was accepted.

21             Which one is this one?  I can't tell from this

22  opinion the basis for the exclusion.  Sometimes experts are

23  excluded because the data that other experts use is faulty, and I

24  don't know if it was his fault or others.  I've seen that happen.

25  It's a cascading effect where the guy on the top of the pyramid

1  is relying on everybody else, and really, if they can just focus

2  on their own work.

3          THE COURT:  That was the Hewett issue I think that was

4  brought out yesterday, that he was relying on data collected by

5  others.  It was not a problem.

6          MR. REICH:  All right.

7          (WHEREUPON, at this point in the proceedings, the

8  bench conference was concluded.)

9          MR. YOUNT:  May I proceed, Your Honor?

10          THE COURT:  Yes.  Please do.

11                          EXAMINATION

12  BY MR. YOUNT:

13  Q.    Dr. Miller, I apologize for the delay.  We were talking

14  about possible other opinions other than the one that you were

15  aware of where you were excluded.  And do you recall giving

16  testimony in the Middle District of Louisiana, which is up in

17  Baton Rouge in federal court up there in a case entitled

18  *Richard Allen v. Agrico Chemical Company*?

19  A.    I think you'll have to remind me what that case is about.  I

20  don't recall the names.

21  Q.    Well, I will submit to you it was a case where you were

22  proffered as an expert.  And I'm going to ask you, if you are

23  aware, sir, that the Court, the judge, found that the foundation

24  for your opinion was unreliable and not supported by admissible

25  or reliable evidence, your opinion was based almost entirely from

1    what other people told you?  Does that refresh your recollections

2    to that case?

3    A.   It does not.

4    Q.   Do you think it's appropriate to give testimony in a case

5    without seeing the plaintiff?

6    A.   I can't answer about this specific case.  I don't recall the

7    details.  My guess is it's at least 20 years ago.

8    Q.   Was it appropriate 20 years ago to testify as to medical

9    causation in a case without having seen the plaintiff?

10   A.   It depends on the circumstances.  This appears to be a case

11   involving multiple people.  I don't recall the circumstances

12   beyond that.

13   Q.   You will agree with me, sir, that when you tried to offer

14   that opinion, this Court, this federal judge found that your

15   opinion was not grounded on reliable and admissible evidence and

16   was unsupported by the facts?  That's what the Court said about

17   your opinion, didn't it?

18   A.   That's what it says.

19   Q.   Now, again, how about the case *Berry v. Armstrong Rubber*

20   *Company*?

21   A.   I don't recall the details of that.

22   Q.   It's a CERCLA case.  You know what CERCLA is, right?

23   A.   I do.

24   Q.   Tell the jury what CERCLA is.

25   A.   I don't recall what the specific acronym stands for.  Maybe

1   you could remind me.

2   Q.   It's an environmental case, right?

3   A.   Right, but I can't remember what C-E-R-C-L-A exactly stands

4   for.

5   Q.   This is a case again from the U.S. Fifth Circuit Court of

6   Appeals with appellate jurisdiction over this court, and this is

7   an opinion dated May 3rd, 1993.

8           Does this refresh your recollection that you provided

9   testimony in United States District Court for the Southern

10  District of Mississippi?

11  A.   I don't recall the case at this point.  It's almost 20 years

12  ago.

13  Q.   And again, this would be you, Dr. Lawrence Miller, a medical

14  doctor, correct?

15  A.   Correct.

16  Q.   And in this opinion, the Fifth Circuit Court of Appeals

17  concluded that you reached conclusions that the district court

18  found unsupported by accepted methodology.  Do you see that?

19  A.   I do.

20  Q.   What does "methodology" mean?

21  A.   I don't know what they are speaking about.  I would have to

22  read the details.

23  Q.   What does "methodology" mean?

24  A.   It's just the methods.

25  Q.   The methods by which an expert, like yourself, comes up with

1   their opinions, correct?

2   A.   Presumably.  Again, without reading that whole context, I

3   can't tell you for sure.

4   Q.   When you leave here today, I'll give you these opinions, if

5   you want to read them.

6   A.   Sure.

7   Q.   With respect to methodology, you did employ methodology in

8   this case, correct?

9   A.   You employ the same approach that you take in every

10  scientific case, yes.

11  Q.   I guess the point is, is methodology is not a concept that's

12  foreign to you?

13  A.   No.  But it depends on a specific instance.

14  Q.   And lastly, you've provided testimony in courts in the state

15  of Arizona; is that correct?

16  A.   I don't recall.

17  Q.   I'm going to show you the first page of an opinion by the

18  Superior Court of Arizona, Maricopa County.  I believe that's the

19  greater Phoenix area.

20  A.   I believe so, yes.

21  Q.   Does this refresh your recollection that you provided

22  testimony in a case called *Lofgren v. Motorola*?

23  A.   I don't recall the details at this point, no.

24  Q.   But this is you, correct?

25  A.   I don't know.

1  Q.   And in this court, this Court concluded that you attempted

2  to extrapolate your conclusion relating to cancer, and the Court

3  found that this was a clearly unacceptable scientific approach to

4  a causation conclusion.

5        Now, it's your testimony you were not aware that this

6  Court said that about your opinions?

7  A.   That's correct.

8  Q.   And also, this Court said, even assuming that you had

9  followed -- excuse me, that even assuming that you had been

10 qualified to offer an opinion and had followed proper scientific

11 methodology in forming it, which he did not -- in other words,

12 you agree with me that this suggests that the Court concluded you

13 did not follow proper scientific methodology; is that correct,

14 sir?

15 A.   It appears to be what it said.  Without reading it, I can't

16 give you any further information on it.

17 Q.   Now, you would agree with me, sir, in connection with

18 Ms. Castanel's case, you were the only doctor -- and by "doctor,"

19 I mean medical doctor, Ph.D. -- who is going to give any opinion

20 that Ms. Castanel sustained injury as a result of formaldehyde

21 exposure?

22 A.   I don't know what the other experts will testify about, no.

23 Q.   Are you aware of any other doctor who is going to reach that

24 conclusion?

25        THE COURT:  Wait.  We're trying to qualify him now to

1  find out his expertise before we get into what it is he's going

2  to testify about in this case.  So I think we're --

3          MR. YOUNT:  This is my last question, Judge.

4          THE COURT:  You're moving on.  So go ahead.

5                         EXAMINATION

6  BY MR. YOUNT:

7  Q.   Can I get an answer to that question?

8          THE COURT:  No.  You can ask it in connection with his

9  testimony about this case, which we're not covering right now.

10  We're very narrowly considering whether he's an expert in the

11  proffered fields and whether the Court is going to accept him as

12  an expert in the proffered fields.  You can ask him that when you

13  get a chance to cross-examine him, assuming that the Court

14  accepts him, at that opportunity.

15          MR. YOUNT:  The purpose for the question is I do think

16  it's relevant and the case law supports that it's relevant that

17  if you're the only doctor who's giving an opinion, that that goes

18  to qualifications and not so much to the substance.

19          THE COURT:  I understand.  Go ahead and ask your next

20  question, and let's go.

21          MR. YOUNT:  That was my last question, Your Honor, so

22  I've completed my voir dire questioning of him.  And we would

23  renew our objection to the proffered fields.

24          THE COURT:  Thank you.

25                  Redirect?

1        MR. REICH:  Yes, Your Honor.  May I have the document

2   that you showed to the jury regarding the Harvard matter?

3                May I proceed, Your Honor?

4            THE COURT:  Yes.

5                    FURTHER VOIR DIRE EXAMINATION

6   BY MR. REICH:

7   Q.   Dr. Miller, you were shown a document dated April 8, 1985,

8   an inquiry concerning certain research by you when you were at

9   the Harvard Medical School.  And I would like the jury to see the

10  last paragraph.

11               Let's take a look at it.  "Neither the questioned

12  paper, nor the manuscript was published.  The committee found no

13  basis to question the integrity of published research.  Care of

14  patients was not involved in the allegation against Mr. Miller.

15  The Harvard committee did not review or pass judgment in any way

16  upon Dr. Miller's clinical practice or care of patients."

17               So were you allowed to continue to see patients?

18  A.   I did continue to see patients, yes.

19  Q.   And have you continued your relationship with Harvard

20  Medical School?

21  A.   I've continued to be a faculty member at Harvard Medical

22  School.

23  Q.   You also are a person who has privileges at the teaching

24  hospital at Harvard, correct?

25  A.   I am.

1  Q.   Now, with regard to the guidelines for physician expert

2  witnesses, apparently there is two criteria involved.  Should be

3  actively involved in the clinical practice of the specialty or

4  the subject matter of the case for three of the previous five

5  years at the time of the testimony.

6         Have you been actively involved in the subject matter

7  of formaldehyde for the past year or more?

8  A.   I continue to be involved in the clinical pharmacology and

9  the effects of drugs and chemicals on the body, yes.

10 Q.   With regard to this *Christophersen* case involving your

11 opinion concerning whether or not small cell carcinoma is a

12 systemic phenomenon, let's take a look at the language of the

13 opinion that was challenged quite a number of years ago.

14        "The critical portion of Dr. Miller's opinion as it

15 relates to causation is as follows:  The same sorts of chemicals

16 and exposures that are associated with small cell carcinoma in

17 the lung are likely to be associated with small cell carcinoma

18 elsewhere in the body."

19        That particular opinion was excluded by the

20 Fifth Circuit, correct?

21 A.   My understanding, yes.

22 Q.   And did you believe at that point in time when you rendered

23 that opinion, you were at the forefront of scientific knowledge

24 in this particular subject matter?

25 A.   I did.  There was, at that point, some new genetic

1  information looking at the genes involved in small cell

2  carcinoma.

3  Q.   Has that opinion been generally accepted by the scientific

4  community today?

5  A.   Yes.  There is much more genetics now than there was

6  20 years ago.  There is much more genetic information that

7  confirms that now.

8  Q.   In fact, the direction of medicine has moved in the

9  direction of genetic studies, correct?

10  A.   That's correct.

11  Q.   With regard to the Arizona case, this *Lofgren* case, do you

12  recall that that was a companion case to a case that I was

13  handling in Arizona involving children who had developed

14  non-Hodgkin's lymphoma from exposure to TCE?

15  A.   Well, only very generally, yes.

16  Q.   In that particular case, which was out in Phoenix, you

17  served as an expert witness to determine whether there was a

18  causal connection between the TCE contaminated water, which was a

19  solvent in the water, and the non-Hodgkin's lymphoma developed by

20  certain children?

21          MR. YOUNT:  Objection; leading.

22          THE COURT:  The last couple have been leading, and

23  although one of them was not as objectionable because it was by

24  way of information, but you are leading him, so let's not lead

25  the witness.

1                         EXAMINATION

2    BY MR. REICH:

3    Q.   And perhaps to refresh your recollection because I don't

4    think you'll recall, do you recall that my particular case was in

5    federal court and the *Lofgren* case was a different matter?

6              THE COURT:  If he doesn't recall, he doesn't recall.

7    You don't get to testify to fill in his memory.  If you've got

8    something for him to look at to refresh his memory, you can, but

9    let's not substitute your memory for his.  He's already said he

10   doesn't recall when Mr. Yount asked him about that particular

11   case.

12                        EXAMINATION

13   BY MR. REICH:

14   Q.   Do you remember having involvement in that particular case?

15   That's the case that I was involved in, not the case that you

16   were just shown.

17             MR. YOUNT:  Objection; leading.

18             THE COURT:  This is a different question.  I'm going to

19   let him answer.

20             THE WITNESS:  I do remember we were together on a case

21   involving TCE exposure and kids.  That's about all I remember at

22   this point.

23                        EXAMINATION

24   BY MR. REICH:

25   Q.   That was back in the 1990s?

1    A.    Probably 20 years ago.

2    Q.    In that particular case, isn't it true that you were never

3    excluded?

4          MR. YOUNT:  Objection; leading.

5          THE COURT:  You asked him a leading question.  You're

6    telling him what his recollection is going to be and then getting

7    him to agree with it.  If he doesn't remember, he doesn't

8    remember.

9          MR. YOUNT:  Judge, the damage is done.  He told him the

10   answer he wants.

11         THE COURT:  I'm instructing Mr. Reich, if you ask him

12   another leading question, we're going to finish and I'm going to

13   go ahead and rule.  So don't ask him a leading question.  Let's

14   continue.

15                              EXAMINATION

16   BY MR. REICH:

17   Q.    In that particular case in which you were involved in, did

18   you render causation opinions?

19   A.    I believe I did, but I don't recall the details, as we sit

20   here.

21   Q.    Do you know if your dose estimation techniques which you

22   presented in a well-known case involving a CSX derailment

23   probably in the late '80s or so in which butadiene was released

24   into a community, do you recall providing expert witness

25   testimony in that case?

```
 1          MR. YOUNT:  Objection, Your Honor.  It's leading and
 2   it's also outside of the scope of the cross-examination on the
 3   voir dire.
 4          MR. REICH:  It's a rebuttal.
 5          THE COURT:  I'm going to allow him to answer.  I don't
 6   think it's leading.
 7          THE WITNESS:  I do recall that case, yes.
 8                           EXAMINATION
 9   BY MR. REICH:
10   Q.   And in that particular case, did you develop some dose
11   estimation techniques that were ultimately utilized?
12          THE COURT:  Again, we're getting close to reminding him
13   what he did so that he can say, "Yeah, I recall it."  Why don't
14   you just ask him what he did in that case and maybe he can
15   explain it, rather than you leading.
16                           EXAMINATION
17   BY MR. REICH:
18   Q.   Do you recall what you did in that case?
19   A.   Yeah.  Again, in general terms -- it's quite some time ago.
20   In general terms, I evaluated the source of exposure and the
21   amount of exposure, that is, the dose from a tank car spill in
22   New Orleans.
23   Q.   And do you know if the Supreme Court of Louisiana ultimately
24   made any determination with respect to your dose estimation
25   analysis that you had performed at the trial of that case?
```

1    A.    My understanding is that dose estimation was accepted.    I

2    don't know any more details than that.

3         MR. REICH:    At this point, Your Honor, we would again

4    re-urge our proffer of Dr. Miller as an expert in the areas of

5    pharmacology, internal medicine, pulmonology and environmental

6    health science.

7         THE COURT:    The issue before the Court right now is a

8    narrow one; although, what we have covered is pertinent to it,

9    but the issue for me to decide at this point is simply whether

10   this witness, Dr. Miller, can be accepted with regard to the

11   fields in which he's been offered.    And those are internal

12   medicine, pulmonary medicine, I believe, and clinical

13   pharmacology, if I'm not mistaken.    Is that correct, Mr. Reich?

14        MR. REICH:    That's correct, Your Honor.

15        THE COURT:    And also environmental health or

16   environmental medicine.    That was the terminology that Mr. Reich

17   used.

18             The Court, in determining whether or not he is an

19   expert and whether or not he has expertise in those fields, does

20   not pass on the issue of whether his opinion in this case, if the

21   Court accepts him, which he's going to give, is one which the

22   jury will accept.    That opinion will be subject to

23   cross-examination.    The jury can accept the opinion of any expert

24   in this case, in whole or in part, or can reject the opinions.

25   It's the province of the jury to reject any opinion that it hears

1    during the course of this case.  The jury can accept or reject

2    the testimony of any witness it hears during the course of this

3    case if it determines that that testimony is not credible or not

4    otherwise reliable.

5              In this case, I simply have to decide whether

6    Dr. Miller is an expert in the field of internal medicine.  He's

7    board certified.  I think his résumé and his professional history

8    support the fact that he is an expert in the field of internal

9    medicine; likewise, pulmonary medicine and clinical pharmacology.

10   He has board certifications in those fields.  And so for purposes

11   of his tender as an expert, I'm going to accept him in those

12   fields.

13             Now, we didn't really bring out, and all I can rely

14   upon in this case is what was brought out on the direct, cross

15   and, redirect, insofar as the fields of environmental health and

16   environmental medicine are concerned, maybe I don't have the full

17   picture based on what's been presented here, but it seems to me

18   that those terms as they've been used here this morning are more

19   or less umbrella terms for a number -- they are inclusive of a

20   number of disciplines that include the ones that I've already

21   accepted him in, but we really haven't spent time questioning

22   those out.  I don't see any reason, nor do I find the record

23   sufficient for me to accept him in a field that seems to me to be

24   a bit nebulous at this point in the field of environmental health

25   or environmental medicine, but I don't think I have to accept him

1  in those fields in order for him to render the opinions that he

2  intends to render in this case.

3         MR. REICH:  Your Honor, I'll withdraw that proffer

4  because I think there probably is overlap among the disciplines.

5  It's more of an interdisciplinary type of thing.

6         THE COURT:  That's what my appreciation of it was, and I

7  don't think that I can accept him in those fields on the record

8  that you've made here this morning.  He may be an expert in those

9  fields, and maybe that's something that I can hear more about and

10  agree with you that he's an expert, but I don't see on the record

11  here that that's been established.

12         But I can accept him and he's board certified in

13  the fields of internal medicine, pulmonary medicine, and clinical

14  pharmacology.  So his opinion will be offered in those fields.

15  And again, now that the Court has accepted him as an expert, it

16  will be for you, the jury, to hear his opinions as they are

17  brought out on direct examination and as they are subject to

18  cross-examination, and determine, in light of all that you have

19  heard, both from this witness and throughout the trial, whether

20  or not you accept that opinion as a valid opinion and one upon

21  which you can rely.

22         So let's go ahead and hear what he has to say about

23  this particular case.

24                    DIRECT EXAMINATION

25  BY MR. REICH:

1    Q.   Dr. Miller, in doing your preparatory work on this case, you

2    reviewed literature, medical literature, correct?

3    A.   I did.

4    Q.   And can you generally describe to the ladies and gentlemen

5    of the jury the types of materials that you sought out and

6    reviewed.

7    A.   Obviously, this case involves exposure to formaldehyde, so I

8    reviewed textbooks related to exposure to formaldehyde, I did

9    what we called literature search, looking for articles in the

10   medical and scientific literature related to formaldehyde.  Those

11   are the two major areas that I looked into.

12   Q.   Did you utilize, for example, the ATSDR, which is the Agency

13   for Toxic Substances and Disease Registry toxicological profile,

14   which is Exhibit Number 628?  If I may just have the cover page

15   brought up, please.

16   A.   I did review this.  This is a report from a federal agency

17   from 1999.

18   Q.   And is it a United States Government publication?

19   A.   Yes, it is.

20   Q.   Was it, in fact, published in 1999?

21   A.   Correct.

22   Q.   Was it a peer-reviewed publication?

23   A.   The ATSDR, like most of the federal agencies, has its own

24   committee or review board, yes.

25   Q.   And can you generally describe the kind of information that

1  you find in the toxicological profile on formaldehyde.

2         MR. YOUNT:  Your Honor, objection.  May we approach the

3  bench?

4         THE COURT:  Yes.

5            (WHEREUPON, at this point in the proceedings, a

6  conference was held at the bench.)

7         MR. YOUNT:  Your Honor, I object.  We're talking about

8  toxicology.  They are bringing Dr. Williams as a toxicologist.  I

9  assume they are going to cover all of these studies with her, and

10 I think it's a waste of the jury's time to go through this

11 literature when Dr. Williams is going to do it.

12        MR. REICH:  Your Honor, all of the experts in this

13 litigation have used the formaldehyde tox profile, including the

14 defense physicians who are not toxicologists.  Dr. Miller happens

15 to be a toxicologist, but he sort of wrote the bible on

16 formaldehyde.  But I just want to offer it into evidence because

17 all of the other defendants agreed to it and this is the first

18 time we received an objection.  That's why I'm going through

19 this.

20        THE COURT:  I'll let you touch on it because he may have

21 looked at it in connection with his report, but I don't think you

22 can spend a lot of time.  He's not been offered in the field of

23 toxicology.

24        MR. REICH:  I just want to get it admitted into

25 evidence.  I can do it now or I can do it through Dr. Williams.

1          THE COURT:  It has not been offered yet, but the witness

2     can identify it and indicate that it's something he consulted.

3     But it's not been offered yet.  You can offer it through him, but

4     Williams may be the better one to offer it.  She's the

5     toxicologist.

6          MR. REICH:  I just want to get it out of the way.  I'll

7     either offer it through Williams, in which case I'm sure it will

8     come in, but I prefer to offer it now just to get a couple of key

9     documents out of the way.  They are the ATSDR tox profile and the

10    CDC July 2008 report.  I'm not going to be offering a bunch of

11    articles.  I'm just going to do the bare bones approach.

12         THE COURT:  If you want to ask him if he looked at it,

13    that's fine, but he's not the toxicologist.

14         MR. YOUNT:  So let's not summarize them.  Let's just

15    identify he looked at it and go.

16         THE COURT:  Let's get to his opinion.

17              (WHEREUPON, at this point in the proceedings, the

18    bench conference was concluded.)

19                              EXAMINATION

20    BY MR. REICH:

21    Q.   Dr. Miller, was the toxicological profile for formaldehyde a

22    document that you referenced in connection with developing the

23    opinions for this case?

24    A.   I did.

25    Q.   And is there a great deal of information in it that deals

1   with the toxicological aspects of formaldehyde?

2            MR. YOUNT:  Objection.  Leading.

3            THE COURT:  I'm going to overrule.  Let's go.

4                         EXAMINATION

5   BY MR. REICH:

6   Q.   I'm sorry, did you answer the question?

7   A.   I'm sorry, I did not.

8            Yes, it's a long report, yes.

9   Q.   Let's take a look now at --

10           MR. REICH:  And we're going to offer Exhibit 628.

11           MR. YOUNT:  We do object.  We think this needs to be

12   dealt with during Dr. Williams' testimony.

13           THE COURT:  Let's postpone it until then.  Let's go.

14                         EXAMINATION

15   BY MR. REICH:

16   Q.   Let's take a look now at Exhibit Number 4.  And are you

17   familiar with this document, the final report on formaldehyde

18   levels in FEMA-supplied travel trailers, park models, and mobile

19   homes from the Centers for Disease Control and Prevention,

20   July 2008?

21   A.   I am.  I reference it in my report.

22   Q.   And can you just generally explain what type of information

23   you utilized from that report?

24   A.   Well, without going into too much detail, the CDC, which is

25   an federal agency, examined a number of -- sampled a number of

1    trailers, actually, a fairly large number, just about 520, to

2    look at formaldehyde release in so-called FEMA trailers.  And

3    this is a detailed report on what they found.

4    Q.    And in addition to these government publications, did you

5    also look at a number of research papers that had been published

6    in the various medical journals?

7    A.    I did.  I looked at several hundred research papers.

8    Q.    And could you generally describe what was important about

9    those research papers for the work that you were doing in this

10   case?

11   A.    Again, very briefly, there are two kinds of papers, as there

12   often are in the literature.  There are papers dealing with

13   animals and papers dealing with people, and this is, of course,

14   related to formaldehyde exposure.  And I was specifically

15   interested in effects in animal models because you can do

16   experiments there.

17          And then also effects in humans where you don't do

18   experiments, but you look at people who have been exposed to

19   formaldehyde and see what happened.

20   Q.    Now, what was the nature of the assignment that you were

21   given in this case?

22   A.    My assignment was to speak to and examine Ms. Castanel and

23   to give an opinion on whether her illness or illnesses were

24   related to her formaldehyde exposure in the FEMA trailer.

25   Q.    Did you have an opportunity to conduct a physical

1   examination of Ms. Castanel?

2   A.   I did.

3   Q.   And when did you do that?

4   A.   That was in the middle of -- I don't remember the exact date

5   right now.  The middle of January of this year.

6   Q.   And when you met with her, did you happen to take a medical

7   history?

8   A.   I did.

9   Q.   And what is the purpose of a medical history?

10  A.   To understand from the patient how they are feeling, what

11  problems they have had, if the problems are getting better or

12  worse, what medicines they take.  To really get a full

13  understanding of someone's health.

14  Q.   Did you have an opportunity also to review medical records

15  of Ms. Castanel?

16  A.   I did.  I reviewed all the records that were supplied to me.

17  Q.   And can you identify the doctors whose records you reviewed?

18  A.   Gosh, there were a number.  There was a Dr. Bowers.  There

19  was a Dr. Hoang, a Dr. Gautreaux.  A couple of others I don't

20  recall -- names as we sit here.

21  Q.   You also did a physical examination of her.  Tell the ladies

22  and gentlemen a little bit about the physical examination.

23  A.   The physical examination was generally unremarkable for

24  someone her age.

25  Q.   How old is she?

1   A.   79 at that point.  And all of us, when we're 79, if we get

2   that far, we will have some infirmities.  But overall her

3   physical examination was more or less normal for someone of

4   her stated age.

5   Q.   You mentioned you took a history.  Why is it important to

6   take a history?

7   A.   Well, again, you need to understand from the patient's point

8   of view how they feel, what's happened to them.  And I need to

9   emphasize, the physical exam you need to do, but only some things

10  you can find on an exam.  A history, I think most physicians will

11  agree, is much more valuable, to understand what the patient

12  actually says.

13  Q.   Can you relate to the ladies and gentlemen what history she

14  gave you and what you considered to be significant about the

15  history?

16  A.   Well, I think I'll try to be brief and not talk about

17  everything we discussed.  I was obviously very much interested in

18  potential effects of formaldehyde and her major illnesses.

19          And one of the major problems she described to me was a

20  sinus problem, her sinus and nasal congestion.  In medicine we

21  call rhinosinusitis.  Rhino just means nose.

22          And this was a problem, one of her most significant

23  problems as she talked to me.  And it started back, at least

24  going back to the early 2000s.  She wasn't sure of the exact

25  date.  And it was mild at first, sort of an annoyance as she

1    described it to me.

2          Once she moved into the FEMA trailer, it became

3    substantially worse.  She began to get real pain in her face,

4    which is not unusual for patients with rhinosinusitis, because

5    the sinuses are back right behind the face.  And it became more

6    frequent.

7          She had been taking medicine throughout this time and

8    she had to take more medicine.  When she left the trailer, it got

9    a bit better.  The episodes weren't quite as severe and weren't

10   quite as frequent, but it was substantially worse than it had

11   been before she had gotten into the trailer.

12         It was clearly a problem for her.  It was bothering

13   her, making her feel unhappy.

14         So we talked about that in some detail.

15         We talked about her high blood pressure.  I won't go

16   into that right here.

17         We talked about her the psychological health, and which

18   was, I think, I would have to describe as fair.  She was

19   clearly -- she described herself as becoming discouraged and

20   somewhat fearful.  And then a couple of times during our

21   discussion she began to cry, and this was spontaneously.  I

22   didn't -- obviously, I prefer not to have patients cry.  And that

23   was when she was discussing the possible effects of formaldehyde

24   and whether she might get cancer, which she was very concerned

25   about.

1          Those, I think, were the main topics we discussed.  We
2    went over others, but they are less relevant.
3    Q.   With regard to cancer, is formaldehyde a known human
4    carcinogen?
5    A.   Yes, it is.
6    Q.   Was her history, what she told you orally, was it
7    corroborated by the medical records?
8    A.   Yes, very much so.  Like many people, Ms. Castanel didn't go
9    to a doctor every time she felt a little bit sick, but she had a
10   number of physician visits over the years, maybe even more for
11   the rhinosinusitis.
12         She had seen both her primary care doctor and a
13   specialist, Dr. Gautreaux, for that, and -- that illness and had
14   been diagnosed with chronic sinusitis as far back as 2004.  There
15   was also a question as to whether she had an allergic component
16   to her sinusitis, and it's mentioned a couple of times.  It's
17   very difficult to tell which is allergic and which is due to
18   other causes, but that is certainly in the records.
19         And then the symptoms are described in some detail as
20   she described them to me.
21   Q.   Had she been seen on a regular basis, to your knowledge, or
22   at least whenever she had a sinus ailment, a local physician?
23   A.   She had several physicians.  And, again, I think she wasn't
24   a person who would go in every time, but when it became more
25   painful and more problematic, she would go see her doctor.

1  Q.   And those records, as far as you were able to determine,

2  went back to the early 2000 period?

3  A.   That's correct.

4  Q.   And she started seeing a Dr. Gautreaux, who was a local

5  physician here?

6  A.   I believe he is an otolaryngologist.  We say ENT because

7  it's easier.  An ENT physician, I think, as far back as 2002.

8  Q.   Now, let's assume the jury has heard that Ms. Castanel lived

9  in the trailer from the approximate time March of 2006 until

10 about August of 2007.  Were you able to determine whether she had

11 doctor visits before, during and after she had lived in the

12 trailer?

13 A.   Yes, she did.

14 Q.   Did she see Dr. Gautreaux before she moved into the travel

15 trailer?

16 A.   Yes, she did.

17 Q.   And did she see him while she was in the travel trailer?

18 A.   I believe so, yes.

19 Q.   And afterwards?

20 A.   Yes.

21 Q.   In fact, you've looked at all of his medical records,

22 correct?

23 A.   To my knowledge, they are complete, yes.

24 Q.   Right.  And did you also see some medical records from a

25 Dr. Hoang, I believe it's H-O-A-N-G, who is a doctor in Pearland,

1  Texas, which is near Houston, after she had evacuated because of

2  Katrina?

3  A.   I saw there was some very limited records, but I did review

4  them.

5  Q.   Did he treat her for the same types of conditions?

6  A.   Same illnesses, yes, sir.

7  Q.   Sinusitis, rhinitis, that sort of stuff?

8  A.   That's correct.

9         MR. REICH:  If I can approach the board, Your Honor.

10        THE COURT:  Sure.

11                        EXAMINATION

12  BY MR. REICH:

13  Q.   Let's talk about these two terms that you've mentioned.  The

14  first one is sinusitis.  What is sinusitis from a medical

15  standpoint?

16  A.   The term specifically means inflammation of the lining of

17  the sinuses.  And the sinuses are the cavities behind the face.

18  Q.   And exactly where are the sinuses located?

19  A.   There are different sinuses.  Some are behind the forehead.

20  Some are behind the cheek bones.  Some are behind the center of

21  the nose.  They are behind the front of the face and the top

22  portion of the face.  They don't extend much below here

23  (indicating).

24  Q.   Can sinusitis become a painful and disabling condition?

25  A.   It can.

1   Q.   And what are the treatments for sinusitis?

2   A.   Well, you try various things.  First you have to have a

3   better understanding of the cause.  If you think it's an

4   infection, for example, you probably might use antibiotics.

5        If you think it's for other reasons, you try to use

6   anti-inflammatory agents or agents that will dry up the

7   secretions.  And if medical therapy doesn't work, sometimes

8   surgical procedures are done if the sinusitis becomes

9   sufficiently severe.

10  Q.   Let's talk about the other term that you mentioned,

11  rhinitis.  If I spell anything wrong, let me know.  What is

12  rhinitis?

13  A.   The definition is inflammation of the lining of the nose.

14  The tissues that line the nose.

15  Q.   Now, if a person has rhinosinusitis -- is it rhino?

16  A.   Like rhinoceros.

17  Q.   Okay.  What is that?

18  A.   That's -- it's a combination.  That's an inflammation of the

19  tissues that line the nose and the tissues that line the sinuses.

20  Q.   And do you know if Ms. Castanel had in her medical records

21  where she had both conditions?

22  A.   She did.

23  Q.   And is it possible to have both conditions simultaneously?

24  A.   It's not uncommon, because, remember, the nose is connected

25  to the sinuses.  So it's, in fact, quite common to have both.

1  Q.   Now, Dr. Miller, sinusitis and rhinitis, can you generally

2  describe what the potential causes are for those conditions?

3  A.   When we do what's called a differential diagnosis, if a

4  patient has an illness and try to understand potential causes,

5  it's broad.  I mentioned a couple of them a moment ago.  It can

6  be -- there can be an infection.  There can be allergies.  There

7  can be exposures to something that cause inflammation, because,

8  obviously, when you inhale air, it goes into your nose and then

9  into your sinuses.  So those are probably the major causes.

10          There are some unusual causes.  There are some genetic

11  diseases.  There are some very unusual conditions that I don't

12  think we need to speak about.

13  Q.   Let's talk for a moment about this issue of specific

14  causation.  Specific causation involves an analysis that you are

15  able to do, correct?

16  A.   Correct.

17  Q.   And tell the ladies and gentlemen of the jury what you have

18  to do in order to make a specific causation determination,

19  whether a particular source, for example, in this type of case

20  where we're alleging it was formaldehyde involved, was a cause,

21  in fact, of Ms. Castanel's conditions, particularly her rhinitis

22  and sinusitis.

23  A.   There is much more direction, legal direction establishing a

24  specific causation than there was 20 years ago.

25          Again, to simplify it a little bit, you look --

1          MR. YOUNT:  Your Honor, I object to him giving testimony

2     about the legal developments.  He's a medical doctor.

3          THE COURT:  Let's make sure -- why don't you rephrase

4     the question so that we know that he's within his field of

5     expertise.

6                                EXAMINATION

7     BY MR. REICH:

8     Q.   Within your field of expertise, Dr. Miller, can you describe

9     how you go about determining whether some type of external

10    factor, such as a chemical exposure, is or is not related a

11    person's health conditions?

12    A.   You look for what I think is often call a completed exposure

13    pathway.  There is a completed exposure pathway.  There is a

14    source of contamination or pollution.  There is a route by which

15    that can be delivered.  There is a circumstance in which a person

16    can be exposed and then there is the actual exposure.

17              If a contamination occurs and there is nobody around,

18    well, that's not a completed exposure pathway.  If a person is

19    there to be exposed, that will complete the pathway.

20    Q.   And did you, in fact, determine whether or not there was any

21    type of completed exposure pathway in Ms. Castanel's situation?

22    A.   I did.  There was a completed exposure pathway for

23    formaldehyde in the FEMA trailer.

24    Q.   And can you go through the elements that you've just

25    outlined for this jury and show them how this exposure pathway

1    was, in fact, completed in your opinion.

2    A.    Sure.  Again, I suspect you've heard testimony about

3    formaldehyde being released from trailer components.  That's

4    present and is released.  The CDC report we've talked about

5    earlier talks about that in detail.

6          Then the -- it's released.  Then it can get into the

7    air.  That's the second step.  You can imagine if the components

8    were buried underground, no one would be exposed, but, obviously,

9    they are not.  So that gets into the air inside the trailer.

10         Then if a person, such as Ms. Castanel, is in the

11   trailer and she is breathing, as we all, of course, do, she

12   breathes the -- the formaldehyde in the air.  And that completes

13   the exposure pathway.

14   Q.    Is formaldehyde a respiratory irritant?

15   A.    It is.

16   Q.    And as a respiratory irritant, what type of effects can

17   formaldehyde have on a person's lungs?

18   A.    Well, just focusing on the respiratory for a minute,

19   irritant, that's what it means, it actually can irritate the

20   lining of the nose, of the respiratory tract going down into the

21   lungs.

22   Q.    You mentioned that you referenced the CDC report.  Did that

23   have some test data from 519 random trailers?

24         MR. YOUNT:  Objection, Judge.  This goes to general

25   causation.  He's here to talk about Ms. Castanel.

1           MR. REICH:  It's referenced in his report.

2           THE COURT:  I think it is part of his opinion in this

3    case.  I'll overrule.

4               Go ahead.

5           THE WITNESS:  Yes, the CDC tested a fairly large number

6    of trailers to look at the amount of formaldehyde involved in the

7    exposure pathway.

8                         EXAMINATION

9    BY MR. REICH:

10   Q.   And did the CDC report have any range of exposures that were

11   determined to have existed in this randomly selected group of

12   trailers?

13   A.   It did in there.

14            And they are listed here.

15   Q.   Was there also an average exposure level for travel

16   trailers, to your knowledge?

17   A.   That's correct.

18   Q.   And what was that level?

19   A.   As noted here, 81 parts per billion.

20   Q.   Do you know what time of year the testing was actually done

21   on these FEMA trailers?

22   A.   I don't recall the month.  The testing was done in the

23   winter.

24   Q.   And is there any significance to the fact that the testing

25   was done in the winter in terms of the concentration levels?

A.    Yes.  And again, the CDC report discusses this in some
detail.  In colder temperatures there is less formaldehyde
released.  Formaldehyde is released in warmer weather, in hot
weather, so there a significant difference.  You get more
formaldehyde if you measure in either a warmer climate or during
a warmer season.

Q.    Do you know if the testing was done a year or later after
the trailers had been manufactured?

A.    Testing was done, I think, about four years after the
trailers were manufactured.

Q.    And is that significant to any of the opinions that you have
in this case?

A.    It is.  Again, it's discussed in that CDC report.

      You get -- formaldehyde, we would say scientifically,
the release level decayed; that is, there is much more release
early on, especially in the first six months or so, and then
still a high level of release in the first year and a half after
the trailers are manufactured, and then it begins to drop off
pretty substantially.

      So four years out you're measuring levels that are
almost certainly a lot lower than they were even a couple years
previously.

Q.    When you took the history of Ms. Castanel, did she mention
to you whether she was able to detect any type of odors when she
moved into the trailer?

1   A.   She -- when she moved in she said she detected a smell and

2   she described it as somehow, a couple of different ways, as a new

3   smell.  But there was an odor she could detect pretty much

4   immediately when she moved in.

5   Q.   There has been some prior testimony in this case already

6   that the jury has heard about something called an odor threshold.

7   What is an odor threshold?

8   A.   It's the threshold for chemical, in this case, formaldehyde,

9   where humans can actually smell it.  How much has to be in the

10  air before we can smell that chemical.

11  Q.   Do you know what the odor threshold is on average for

12  persons with respect to formaldehyde?

13  A.   Well, there is a very broad range.  And different

14  publications you'll see different numbers.  A common number

15  people quote is 500 parts per billion, but you'll see quotes much

16  lower than that.

17  Q.   Is 500 parts per billion the same as .5 parts per million?

18  A.   That's correct.

19  Q.   Now, this might be a good opportunity.  Can you explain to

20  the ladies and gentlemen what the difference is between parts per

21  million and parts per billion?

22  A.   Sure.  It's a -- there is a thousand multiplier in there.

23  If you have 1 part per million, that's the same as a thousand

24  parts per billion.  So if you want to convert parts per billion

25  to million, you just multiply by a thousand.

1  Q.   And can you explain what parts per million actually means.

2  If you have 1 part per million, it's one part of what per

3  million?  Explain that.

4  A.   It's what we call a volume measurement.  That is, if you're

5  measuring a volume of something, how much there is, like a gas or

6  a liquid.  It's, if you have divided it up into the million

7  pieces and one of them is the substance, that's 1 part per

8  million.

9  Q.   Now, you mentioned that formaldehyde is a respiratory

10 irritant.  Would that be an upper respiratory or a lower

11 respiratory?

12 A.   There is evidence for both.

13 Q.   Let's talk for a moment about upper respiratory irritation.

14 Because wouldn't you agree that the upper respiratory system is

15 really what would be at issue in Ms. Castanel's case?

16 A.   Yes.  I've talked about the nose and the sinuses, which are

17 the upper respiratory, as opposed to the lungs, which are the

18 lower respiratory.

19 Q.   Is there a body of medical literature that links

20 formaldehyde exposure to a condition known as rhinitis?

21 A.   There is.  There is an extensive literature both in animals

22 and in humans.

23 Q.   And both rhinitis and sinusitis affect the upper respiratory

24 tract?

25 A.   That's correct.

1    Q.    Do you believe, based upon your review of the medical

2    literature and your knowledge and background, that both rhinitis

3    and sinusitis can be caused by exposures to formaldehyde?

4    A.    That's correct.  They both can be caused.

5    Q.    Now, did you try to kind of ballpark what the exposure

6    levels may have been in the trailer in order to determine whether

7    she was getting enough of a dose of formaldehyde to either cause

8    or aggravate any conditions that she may have ultimately

9    sustained?

10          MR. YOUNT:  Objection.  Lack of foundation.  He's not an

11   expert in those fields.

12          MR. REICH:  I think we've laid a predicate, Your Honor.

13          THE COURT:  Go ahead and try to lay the predicate.

14          Let's see what his next couple of questions are

15   going to be.  If he hadn't laid the predicate, then I want to see

16   you all up here on it.

17                         EXAMINATION

18   BY MR. REICH:

19   Q.    Dr. Miller, have you researched levels of formaldehyde that

20   have been shown to cause upper respiratory tissue injury?

21   A.    Yes, I have.  In many, essentially all the scientific papers

22   I mentioned earlier, the exposure levels are discussed.

23   Q.    Have you seen exposure levels of formaldehyde that are at

24   certain points, either above 100 or below 100, that have been

25   correlated with upper respiratory injury?

1  A.   That's correct.  In both cases there are good correlations,

2  again, both in animals and in humans.

3  Q.   For either above 100 parts per billion or below 100 parts

4  per billion?

5  A.   That's correct.

6  Q.   And have you attempted to do an estimate based upon some of

7  the things that you've looked at, the CDC report on travel

8  trailers that were emitting formaldehyde and measured, the odor

9  threshold information that you are aware of, the detection of

10  smell factors of that ilk?  Do you have enough data to kind of

11  ballpark whether or not the exposure levels to which Ms. Castanel

12  was subjected were sufficient to cause her sinusitis, rhinitis or

13  to aggravate them?

14          MR. YOUNT:  Objection, Your Honor.  May we approach?

15          THE COURT:  Yes.

16          (WHEREUPON, at this point in the proceedings, there was

17  a conference held at the bench.)

18          MR. YOUNT:  Your Honor, the basis of my objection is

19  he's not qualified to render this opinion.  Moreover, he's trying

20  to backdoor, get backdoor opinion testimony by saying, well, if

21  she had the symptoms, then, therefore, she must have been exposed

22  to an excessive level.  That's inappropriate and it's improper.

23          The experts on toxicology can testify about levels.

24  He can't.

25          THE COURT:  Dennis, I'll let you respond, but I have

1   some other questions, too.  Go ahead.

2          MR. REICH:  Your Honor, we're not trying to backdoor

3   anything.  What we're doing is showing that the literature shows

4   that respiratory injury, respiratory tract injury can occur from

5   exposures below 100 parts per billion or above 100 parts per

6   billion and that he has reviewed sufficient information to

7   determine that the exposure levels were, in fact, sufficient to

8   exacerbate rhinitis and sinusitis.  That's the essence of the --

9   essence of his opinion.

10          THE COURT:  A couple things.  First of all, I know we

11   talked at the pretrial conference, and I think you and Mikal both

12   indicated that this was sort of a two-expert text, that one

13   expert's opinion would start and end and then almost like passing

14   a baton, and that was there was some limit as to what Miller

15   would testify to, but it had to be considered in juxtaposition

16   with what Williams was going to testify to.  And I think we're

17   getting close to the Williams testimony here, so I'm kind of

18   concerned about that.

19          But even more fundamental than that, where is that

20   opinion in his written opinion?  That was my concern when we

21   first waded into this area.

22          MR. REICH:  In his written opinion he indicates that he

23   reviewed the CDC report and the exposure levels were such that

24   Ms. Castanel did have an exacerbation of her rhinosinusitis.

25          THE COURT:  Well, on page 3 of the report he discussed

1    the CDC report; however, the only mention he makes of

2    Ms. Castanel's case is, and I'll quote:  "In the case of

3    Ms. Castanel, the formaldehyde data indicated the presence of a

4    completed exposure pathway, that is, a source of contamination, a

5    means by which contamination becomes present in the environment,

6    a source of exposure, routes of exposure and an exposed

7    population."

8              But it seems to me the question is asking him to go

9    further than that, unless I'm missing something.

10        MR. REICH:  Well, I think by the completed exposure

11   pathway, it's part of the specific causation and she satisfies

12   it, which includes the source of contamination, the degree of

13   contamination.  I think -- I think it falls within this exposure

14   pathway prong.

15             Then the other prong that I haven't gotten to yet

16   is the differential diagnosis prong where he rules out other

17   causes.  That's all part of the specific causation analysis.

18        THE COURT:  I understand that, and it may well be, but

19   it's got to be in his report in the type of detail that I think

20   you're asking him about.  And clearly he can testify as to what I

21   just read.

22        MR. YOUNT:  Which he already has.

23        THE COURT:  I think he has.  This is his opinion here,

24   unless I'm missing -- I believe if you look on page 4 of the

25   report.

1          MR. YOUNT:  And, Judge, he's testified that he doesn't

2     know what her levels are in her trailer, and he's stuck with that

3     testimony.

4          MR. REICH:  I disagree.  He is in a position to ballpark

5     it.  He believes that the levels were sufficient to cause upper

6     respiratory tract injury.

7          THE COURT:  He's going to ballpark the levels in her

8     trailer?

9          MR. REICH:  No, he knows from the CDC report.

10          THE COURT:  That's the ATSDR, that is on the top of

11     page 5 of his report, but he doesn't talk about the levels in her

12     trailer.  That's not in his report.

13          MR. REICH:  No.  Nobody knows the levels in her trailer.

14          THE COURT:  Well, I know, but that's what we spent all

15     the time with Hewett on yesterday is trying to get a best guess.

16          MR. YOUNT:  This is the specific causation, not general.

17          MR. REICH:  Right.  I realize it's specific causation.

18          MR. YOUNT:  He can assume it.  If he can assume it, he

19     can assume it.

20          MR. REICH:  All right.  Let's do that.

21          THE COURT:  I'm going to sustain the objection.

22          MR. REICH:  I'll do it through a hypothetical.

23          THE COURT:  How much further do you have, because we're

24     about to take a break?

25          MR. REICH:  Do you want to take the break now then?  Or,

1    I mean, I have probably, I would say, another 15, 20 minutes,

2    15 minutes.

3            THE COURT:  If you can do 15 minutes, let's go ahead and

4    finish up the 15 minutes and we'll take a short break.

5            MR. REICH:  I'm not saying I'm through, but I'm close.

6            THE COURT:  Let's see if we can finish up on direct.

7            (WHEREUPON, at this point in the proceedings, the bench

8    conference concluded.)

9            THE COURT:  We're going to try to go ahead and finish up

10   with the direct exam of this witness before we take a break, and

11   hopefully that will not be in too long a period of time from my

12   conversation with counsel.

13           Go ahead, Mr. Reich.

14                            EXAMINATION

15   BY MR. REICH:

16   Q.   Dr. Miller, I want you to assume that Ms. Castanel was able

17   to detect a new trailer type of smell; that the exposures were at

18   least equal to or greater than the test data that was

19   demonstrated in the CDC July 2008 report; that she had lived in

20   the trailer for over a year, from March of 2006 through August of

21   2007; that she stayed in the trailer most hours of the day.

22           Under those kinds of conditions, do you have an opinion

23   whether she had sufficient formaldehyde exposure to cause or to

24   aggravate sinusitis and rhinitis?

25   A.   Yes, that would be sufficient for what I described as the

1  completed exposure pathway to then be associated and correlated

2  with disease, in this case, the rhinosinusitis.

3  Q.   Now, let's talk about something called differential

4  diagnosis.  What does that mean?

5  A.   I mentioned that a few minutes ago.  It's when you find a

6  condition in a patient, you -- it's essentially a list of

7  possible causes, and then you try to exclude some and include

8  others to see what you believe the cause of the illness is.

9  Q.   And did you, in fact, as part of your work in this case, do

10  a differential diagnosis to determine what causes were likely to

11  be involved with regard to any aggravation of her rhinitis and

12  sinusitis?

13  A.   I did.  And I think I mentioned a few of them just a few

14  minutes ago, such as allergies, such as chemical exposures.

15  Q.   And what did you determine, number one, with respect to

16  chemical exposures, prior chemical exposures, if any?

17  A.   There did not seem a history of significant chemical

18  exposures.  It was an unlikely cause.

19  Q.   And tell the ladies and gentlemen what you know about her

20  prior occupation.

21  A.   Way back she had worked, she briefly had done some work in a

22  factory, but for well over 30 years she had worked as a

23  housekeeper.

24  Q.   For some parish priests?

25  A.   That's correct.  And did not work with any, no significant

1  chemical exposures then.

2  Q.   And with respect to allergies, as far as you know, was there

3  any allergic component to her health status?

4  A.   Well, it's mentioned in her records at least once that this

5  might be an allergic rhinitis.  There didn't seem to be any

6  laboratory documentation.  It's the sort of thing that looking --

7  again, I don't want to get too detailed, but looking at a

8  specific type of cell called an eosinophil, E-O-S-I-N-O-P-H-I-L,

9  you could, in fact, determine that.  But I didn't see evidence

10 that that was performed.

11 Q.   And are there any other factors, besides the formaldehyde,

12 that you looked at in determining whether they may have accounted

13 for any aggravation of her rhinitis or sinusitis?

14 A.   You are always concerned about infections, and there didn't

15 seem to be -- appear to be a history of chronic infections.

16 Again, I mentioned some unusual illnesses, and I won't go into

17 them, but we looked for evidence of those and there did not seem

18 to be evidence of those either.

19 Q.   In weighing all of these factors, were you able to determine

20 what was the most probable or likely factor that accounted for

21 the history and findings that you made; namely, that she had an

22 aggravation of rhinitis and sinusitis from living in the trailer?

23 A.   Yes, I did.  Her exposure to formaldehyde in the trailer was

24 the most likely cause of the exacerbation or aggravation.  I want

25 to be clear, she had some sinusitis before she moved into the

680

1  trailer, but it got a lot worse.

2  Q.  Now, is an exacerbation a serious situation in some

3  instances?

4  A.  It certainly can be, and I think it was in this case.  She

5  described to me --

6        MR. YOUNT:  Your Honor, objection.  May we approach?

7        (WHEREUPON, at this point in the proceedings, there was

8  a conference held at the bench.)

9        MR. YOUNT:  Your Honor, the basis for my objection is we

10  covered this yesterday.  He's getting close to the surgery word.

11        MR. REICH:  I'm not going to discuss surgery.

12        MR. YOUNT:  He's already said it once, and I don't think

13  he can say it again.

14        THE COURT:  I thought it seemed like he was the brink of

15  maybe not --

16        MR. REICH:  I instructed him not to use the word

17  "surgery."

18        THE COURT:  Maybe not your question, but it seemed like

19  he was on the brink of about to say that.  Be careful with the

20  questioning, and if he's been instructed --

21        MR. REICH:  I have instructed him.

22        THE COURT:  I'm going to strike it in front of the jury

23  if he says it.  Let's be careful.  See if you can ask the

24  questions in a way --

25        MR. REICH:  I've already informed him twice.  Can I warn

1  him again?

2          THE COURT:  I would rather not let the jury see you

3  confer with him.

4          MR. REICH:  All right.  I won't do it then.

5          THE COURT:  Let's go.

6          (WHEREUPON, at this point in the proceedings, the bench

7  conference concluded.)

8                              EXAMINATION

9  BY MR. REICH:

10  Q.   Can an exacerbation of sinusitis be as serious as new onset

11  of sinusitis?

12  A.   It can.

13  Q.   You mentioned that Ms. Castanel spontaneously broke down

14  crying on two occasions when you took her history, correct?

15  A.   I did.  Yes.

16  Q.   And she had some type of fear of cancer; is that true?

17  A.   That's what it turned out to be when I asked her why she was

18  so upset.  She was worried that the exposure in the trailer could

19  lead to her developing cancer.

20  Q.   Is that type of fear, based upon the medical knowledge that

21  you're familiar with and your reliance upon perhaps other

22  experts, such as toxicologists in this case, rational?

23  A.   I believe it is, yes.

24          MR. REICH:  I pass the witness, Your Honor.

25          THE COURT:  We're going to go ahead and take a short

 1    break here.  We'll come back with cross-examination of

 2    Dr. Miller.

 3              If you all would be ready to come back in the

 4    courtroom at 10:25.  That gives you about 15 minutes.  Please

 5    don't discuss the case amongst yourself during the break.

 6              THE COURT SECURITY OFFICER:  All rise.

 7              (WHEREUPON, at this point in the proceedings, the jury

 8    panel leaves the courtroom.)

 9              THE COURT:  All right.  Counsel, 10:25.

10              (WHEREUPON, at this point in the proceedings, a brief

11    recess was taken.)

12              THE COURT SECURITY OFFICER:  All rise.

13              (WHEREUPON, at this point in the proceedings, the jury

14    panel enters the courtroom.)

15              THE COURT:  You may be seated.

16              Mr. Yount, you are going to begin your

17    cross-examination of Dr. Miller?

18              MR. YOUNT:  Yes.  Thank you, Your Honor.

19              THE COURT:  Let's go ahead and get started.

20                        CROSS-EXAMINATION

21    BY MR. YOUNT:

22    Q.   Dr. Miller, I would like to direct your attention to --

23    well, first of all, pull this chart up.

24              Do you remember, sir, under direct examination, it was

25    your testimony that these numbers came from actual test results

1  some four years after Katrina; is that correct?

2  A.   Approximately, yes.

3  Q.   Will you go to Exhibit 4, please.

4        And again, you also testified that it's a big deal, the

5  time delay is a big deal, right?

6  A.   It's an important factor.

7  Q.   Doctor, this is a document upon which you were referring

8  when you and your attorney came up with this slideshow; is that

9  correct?

10 A.   That's correct.

11 Q.   What does it actually say with respect to the measurements?

12 What are the dates when these measurements were taken?

13 A.   It's says December 2007 and January 2008.

14 Q.   And you heard the -- it's actually a stipulated fact that

15 Ms. Castanel moved out of her trailer in when; the summer of

16 2007, correct?

17 A.   That's correct.

18 Q.   So we're really talking about these measurements being taken

19 four to five months after she moved out of her trailer; is that

20 correct?

21 A.   After she moved out, yes.

22 Q.   So when you said four years, you were wrong, correct?

23 A.   No, I was talking about the manufacture of the trailers.

24 Perhaps you didn't hear me properly.

25 Q.   You're probably right.  I probably just misunderstood you.

1   Because, in fact, these readings taken by CDC were taken four to

2   five months after Ms. Castanel moved out of the trailer; is that

3   correct?

4   A.   That's correct.

5   Q.   Now, you also talked about -- can you back it out, please --

6   the numbers, and you came up with, let's see, 81 parts per

7   billion, concentrations up to 590.  You would agree with me, sir,

8   that, in fact, there were levels as low as 3 parts per billion

9   when the CDC did that sampling; is that correct?

10  A.   That's correct.

11  Q.   So this is a range, somewhere at three, correct?

12  A.   Correct.

13  Q.   And again, 3 parts per billion is .003 parts per million?

14  A.   That's correct.

15  Q.   And then the number you wanted to talk about was the

16  590 parts per billion, right?

17  A.   That's one of the numbers on that slide, yes.

18  Q.   But you don't know whether there was one at 590 or a bunch

19  at 590, do you?

20  A.   I would have to look back at the report.  I don't recall the

21  distribution as we sit here.

22       MR. REICH:  Your Honor, under occupational completeness,

23  can we have the full paragraph read to the jury?

24       MR. YOUNT:  Your Honor, he can do whatever he wants on

25  redirect of the witness.

1          THE COURT:  Let's go ahead and cover it on redirect.

2    Make a note of it and we'll cover it on redirect.

3                      EXAMINATION

4    BY MR. YOUNT:

5    Q.   Doctor, I want to talk a little bit about your understanding

6    and knowledge of formaldehyde.

7          Sir, you would agree with me that prior to becoming

8    engaged in the FEMA trailer litigation, you'd never seen a

9    patient who claimed to be injured by formaldehyde?

10   A.   Not to my recollection, no.

11   Q.   So you agree with me?

12   A.   Again, I can only tell you my recollection.  I have seen

13   lots of patients over the years.

14   Q.   Not in the last five years, though, have you?

15   A.   Correct.

16   Q.   Now, you've also never treated a patient with cancer caused

17   by exposure to formaldehyde; is that correct?

18   A.   I've treated patients with cancer.  Often, you can't be

19   certain what causes the cancer.

20   Q.   Doctor, are you aware of a single patient who you treated

21   with cancer caused by exposure to formaldehyde?

22   A.   Not as we sit here, no.

23   Q.   And that's the same response you gave when you gave your

24   deposition, correct?  You didn't remember then either, did you?

25   A.   I don't believe I gave a deposition in this case, did I?

1  Q.   I think you did.

2        MR. REICH:  I don't believe so.

3                          EXAMINATION

4  BY MR. YOUNT:

5  Q.   Now, could you go to 887, please.

6        You testified on direct examination that formaldehyde

7  is everywhere, correct?

8  A.   I'm not sure that question came up, but it is widely in the

9  environment.

10 Q.   And you would agree with me, sir, there is everyday

11 formaldehyde in soft drinks?

12 A.   There is a formaldehyde level, there is formaldehyde in

13 multiple foods, yes.

14 Q.   Including soft drinks?

15 A.   Correct.

16 Q.   And there is formaldehyde in fresh vegetables, correct?

17 A.   Yes, but I want to be clear, formaldehyde in food is quite

18 different from formaldehyde in the air.

19 Q.   I'm sure your attorney can cover that on redirect

20 examination.

21 A.   Well, I need to try to be as precise as I can.

22 Q.   Thank you.  And there is formaldehyde in coffee, correct?

23 A.   I would say the same thing.  It's quite different in foods

24 or liquids.

25 Q.   Well, let's talk about that difference.  Tell me about that

1  difference.  The difference is when it comes in contact with

2  water, it turns into a different substance; is that correct?

3  A.    No, it gets complex with other substances.  It's a term they

4  call "bioavailable."  Once it's complex, it's not free to cause

5  damage, essentially.

6  Q.    There is formaldehyde in a library, correct?

7  A.    It depends on which place, but there is formaldehyde in the

8  environment, yes.

9  Q.    Including a library, correct?

10 A.    In any air, there is likely to be some level of

11 formaldehyde.

12 Q.    Doctor, you're the expert, not me.  Do you agree with me

13 that there is formaldehyde in a library?

14 A.    There probably is.  Talking about specific rooms -- that

15 doesn't help me.  I don't know about which library.

16 Q.    Now, you would agree with me, sir, that you do not know the

17 level of formaldehyde in Ms. Castanel's trailer at any time?

18 A.    To my knowledge, there was none measured.

19 Q.    Are you aware, sir, that actual measurements of

20 Ms. Castanel's trailer were taken?

21 A.    I have not seen reports of specific numbers.

22 Q.    My question was, were you aware that they were taken.

23 A.    No.

24 Q.    Okay.  Would it surprise you, sir, if the lowest level

25 tested was .009, 9 parts per billion?

1  A.   No, not at all.

2  Q.   Now, you saw Ms. Castanel on one time, one occasion,

3  correct?

4  A.   That's correct.

5  Q.   And that was on January 19th, 2010, correct?

6  A.   I believe that's correct.

7  Q.   All right.  And you saw her here in New Orleans?

8  A.   I did.

9  Q.   And again, you got the visiting credentials which would

10  allow you to do that, correct?

11  A.   Correct.

12  Q.   And you saw her for about an hour and a half?

13  A.   Give or take.  I don't remember the exact amount of time.

14  Q.   And her attorneys were present at least for part of that

15  meeting?

16  A.   Certainly to introduce me to her, yes, and briefly in the

17  room.  But obviously not during the examination.

18  Q.   I'm sorry.  Did you say yes, the attorney was there?

19  A.   Briefly, yes.

20  Q.   Which attorney?

21  A.   You know, I don't recall.

22  Q.   Now, of the one-and-a-half hours, you actually did a

23  physical exam for Ms. Castanel for about 15 minutes; is that

24  correct?

25  A.   I don't recall as we sit here.  That wouldn't be uncommon.

1    The exam is usually pretty quick.

2    Q.    Now, like a lot of doctors, you took some handwritten notes

3    when you did your physical of her; is that correct, and took the

4    history?

5    A.    I did.

6    Q.    When you gave your deposition, you had lost those notes; is

7    that correct?

8    A.    I don't recall that, but we have the notes in my office,

9    yes.

10   Q.    My question was not whether you have them now.  My question

11   was, at the deposition, had you lost those notes at the time we

12   were taking your deposition?

13   A.    I don't recall that we lost them, but I did not have them in

14   my possession at that point.

15   Q.    It's your testimony you weren't able to find them at the

16   time of the deposition?

17   A.    Correct.

18   Q.    Now, the medical records that you reviewed concerning

19   Ms. Castanel were records that you got from her attorneys; is

20   that correct?

21   A.    That's correct.

22   Q.    You didn't have any role in going to these doctors, her

23   treating physicians and getting medical records from them, did

24   you?

25   A.    I did not.

1   Q.   And you did not speak with any of her treating physicians;

2   is that correct?

3   A.   That's correct.

4   Q.   You understand that under the law, you would be allowed to

5   do that if the attorneys wanted to let you do that, correct?

6           MR. REICH:  Objection.  Legal.

7           THE COURT:  Again, if you're asking -- and you had

8   objected previously about a legal opinion.  If you're asking him

9   what the law allows or doesn't allow, then I'll sustain the

10  objection.  If you want to rephrase it so that it doesn't call

11  for him to make an assessment of the law, then that's fine.

12          MR. YOUNT:  I apologize, Judge.  It was just a bad

13  question.

14          THE COURT:  Go ahead and rephrase it.

15                          EXAMINATION

16  BY MR. YOUNT:

17  Q.   Dr. Miller, you would agree that there are occasions when

18  you see a patient like Ms. Castanel, that you have talked to

19  treating physicians, correct?

20  A.   Occasionally, yes.

21  Q.   And you didn't do that in this case; is that correct?

22  A.   That's correct.

23  Q.   You didn't think that it was necessary to do so?

24  A.   I was not asked to do so.  I do so when I'm asked to do so.

25  Q.   Who would you expect to ask you to do that?

1  A.   The attorneys.

2  Q.   Okay.  Now, you talked about a lot of the records that you

3  reviewed.  You also reviewed some reports; is that correct?

4  A.   Correct.

5  Q.   And one of the reports that you reviewed was from a

6  Dr. Shwery; is that correct?

7  A.   I did, yes.

8  Q.   I think you said one of the more important things that you

9  do when you examine a patient like Ms. Castanel is to take a

10  history; is that correct?

11  A.   That's correct.

12  Q.   Now, would you agree with me, sir, that on occasion you have

13  gotten a history from a plaintiff like Ms. Castanel and it has

14  been different than what was reflected in the medical records?

15  A.   That's common with many patients.

16  Q.   And you would also agree with me, sir, that when such a

17  circumstance arises where you have the plaintiff telling you one

18  thing and the medical records reflecting something else, that

19  oftentimes those medical records, which may have been several

20  years ago, may have a more accurate history than what they are

21  saying some five years after the complaint?

22  A.   You know, it depends very much on the situation.  This is

23  common with lots of different patients, not just in plaintiff

24  situations.

25  Q.   Well, you don't see patients, so you see plaintiffs?

1  A.   I've seen thousands upon thousands of patients over the

2  years, sir.

3  Q.   Okay.  So it's your belief, as a medical doctor, that you're

4  going to believe what the plaintiff is telling you in 2010 about

5  her history -- in other words, her history, something that

6  happened five, ten years ago, you think that that's more accurate

7  than what it may say in the medical records which were

8  contemporaneously recorded some five, ten years ago?

9  A.   That's not what I said.  I said it depends on the situation.

10  In some cases, patients have a very good recollection, and the

11  medical records aren't always completely accurate, as you know.

12  Q.   So it's your job, as a medical expert, to determine which is

13  more truthful, the history as recorded on records or the

14  plaintiff when they are sitting in your office for 15 minutes and

15  you're talking to them?

16  A.   It's my job as a doctor to put that information together and

17  understand what's happening to a patient.

18  Q.   You get to pick and choose?

19  A.   You try to take all the information you have and put it

20  together.

21  Q.   Okay.

22        MR. YOUNT:  May I approach, please?

23        THE COURT:  Yes.

24                          EXAMINATION

25  BY MR. YOUNT:

1   Q.    Doctor, you would agree with me, sir, that Ms. Castanel gave

2   you a history of sinusitis, rhinitis and rhinosinusitis; is that

3   correct?

4   A.    She described her symptoms.  She doesn't necessarily use

5   medical terminology, but yes.

6   Q.    You used the medical terminology.  But as written on the

7   board, that's what you came up with; is that correct?

8   A.    That's correct.

9   Q.    And how far does this history date back to?

10  A.    At least to the early 2000s.

11  Q.    So you're comfortable with early 2000?

12  A.    2000s, whether it's 2000, 2001, 2002.

13  Q.    You're good with that?

14  A.    I am.

15  Q.    Okay.  Now, in terms of the differential diagnosis for her

16  sinusitis, rhinitis and rhinosinusitis back in the early 2000s,

17  in your opinion what was the cause of it then?

18  A.    Well, again, it's -- you go through the same differential

19  diagnosis, and at that point a lot of the time you say you can't

20  be clear.  There might have been an allergic component at that

21  time.  There might have been an infectious component.  We have

22  less information about it than we do right now.

23  Q.    So maybe it's allergies.  We'll put a question mark.  And

24  then what else, an infectious process?

25  A.    An infectious process is always possible.

1  Q.   And we'll put question marks by there.

2       What about formaldehyde back in the early 2000s?

3  A.   To my knowledge, she had not had substantial exposure to

4  formaldehyde at that point.

5  Q.   So we won't put formaldehyde on here?

6  A.   I would not.

7  Q.   Did you ever figure out what -- or do you have an opinion as

8  to what the source of the allergies was?  Was it a hay fever, was

9  it oak pollen, was it household chemical?  I know you said that

10 she did some cleaning and was probably exposed to some household

11 cleansers.  Did you come to any conclusion as to what might have

12 caused her allergies?

13 A.   Well, again, I'm relying on what's in the records for

14 something almost 10 years ago, and there isn't sufficient

15 information to make a determination.

16 Q.   In other words, it wasn't in the records, and it wasn't in

17 what she told you --

18 A.   That's correct.

19 Q.   -- in January of this year?

20 A.   That's correct.

21 Q.   So you're going to pass on the specific cause of the

22 allergies and the infection?

23 A.   Right.  And, again, I want to be clear.  When we do a

24 differential diagnosis, we do it now, we don't do a differential

25 diagnosis as something that happened 10 years ago.  We don't have

1    the information.

2    Q.    But doctors who were treating her at the time who we're

3    going to hear from, hopefully, in this case, they went through a

4    differential diagnosis at that time, correct?

5    A.    I would expect that, yes.

6    Q.    Did you see anything in the records which would reflect a

7    differential diagnosis of Ms. Castanel's sinusitis, rhinitis, or

8    rhinosinusitis back in the early 2000s?

9    A.    The records were fairly brief.  Again, as I said earlier,

10   allergies were mentioned in one instance, maybe a couple of

11   instances.

12   Q.    I'm sorry?

13   A.    Allergies were mentioned as one possibility.

14   Q.    And today's date is 5/19/2010.

15        Dr. Miller, you would agree with me that Ms. Castanel

16   had significant -- a significant number of office visits for

17   problems with sinusitis prior to Hurricane Katrina?

18   A.    She did.

19   Q.    This is a chart that was shown to the jury in opening

20   argument.  And I'm not going to ask you to compare these dates to

21   the records of Dr. Gautreaux, who we're hopefully going to hear

22   from, Dr. Bowers, who we're going to hear from, but --

23        And if you'd flip through them slowly, please.

24        -- this goes through 2004, and here is Katrina.  And

25   then you also talk about Dr. Hoang who was in Houston, correct?

1  A.    That's correct.

2  Q.    And then she moved into the FEMA trailer and had -- one,

3  two, three -- four visits for sinusitis then --

4        And then go to the last one, where she continues to

5  treat, including after when she was selected as a plaintiff.

6  Okay.  Thank you.

7        You don't dispute what those charts represent, that she

8  had consistent treatment for sinusitis both before Katrina,

9  between the time Katrina hit and the time she moved into the

10  trailer and then afterwards, do you?

11  A.    That's what I stated earlier.

12  Q.    So you're comfortable with the information contained on

13  those charts?

14  A.    And I haven't looked at the detail, but the general

15  statement I agree with.

16  Q.    Now, the other issue other than this rhinosinusitis was

17  anxiety and depression; is that correct?

18  A.    Well, specifically, I talked about her anxiety about the

19  development of cancer.

20  Q.    Okay.  You would agree with me that she told you that she

21  had problems with anxiety and depression before she ever moved

22  into a FEMA trailer?

23  A.    Correct.

24  Q.    And, in fact, she had problems with anxiety and depression,

25  although she didn't use those words, before Hurricane Katrina?

1  A.   That's correct.

2  Q.   Now, one thing that's significant in the history that she

3  gave you is the absence of any notation of eye irritation.  You

4  would agree with me, sir, that she did not tell you that she had

5  eye irritation when she was living in that FEMA trailer?

6  A.   I want to look back in my notes.  I don't recall it.

7  Q.   Do you have notes that you can look back on?

8  A.   I have my report.  I don't have my actual notes.

9  Q.   Why don't you go ahead and look at your report, and if you

10  want we can refresh your recollection with the deposition.

11              THE COURT:  Let's let him look at the report first.

12              THE WITNESS:  I don't note eye irritation, no.

13                            EXAMINATION

14  BY MR. YOUNT:

15  Q.   And you would agree, sir, that when Ms. Castanel was giving

16  her history, one of her daughters was present, correct?

17  A.   That's correct.

18  Q.   And the daughter's role there was to help her remember some

19  things that she may not remember?

20  A.   Primarily, yes.

21  Q.   The daughter was an active participant in the history?

22  A.   The daughter didn't say very much, but she was present.

23  Q.   Do you remember which one of the daughters it was?

24  A.   No, I don't as we sit here.

25  Q.   And when -- this daughter, in addition to Ms. Castanel, did

1  not say anything about eye irritation, did she?

2  A.   Not that I recall, no.

3  Q.   Now, in the history section you also note the absence of any

4  other reports by Ms. Castanel of having been exposed to

5  chemicals; is that correct, sir?

6  A.   That's correct.

7  Q.   Why is that significant?

8  A.   Again, it's part of the history and part of the differential

9  diagnosis of were there other exposures that might have

10  contributed to her rhinosinusitis.

11  Q.   So, in other words, if she had said, you know what,

12  Dr. Miller, I remember I was exposed to chemicals around the same

13  time I was living in the trailer, that would be significant to

14  you because that would be an additional item -- or an additional

15  possible cause of her exacerbation of rhinosinusitis?

16  A.   That's certainly one possibility, yes.

17  Q.   And, again, your diagnosis of exacerbation of rhinosinusitis

18  is based solely on the history that you took of her and your

19  review of her medical records, correct?

20  A.   That's correct.

21  Q.   So, again, if her history was positive for other chemical

22  exposures which caused irritation, that would at least be equally

23  plausible as a cause for the exacerbation of rhinosinusitis as

24  would formaldehyde exposure; is that correct?

25  A.   No, it is not.

1    Q.    It's not?

2    A.    No.  Of course, you can't --

3    Q.    Because -- because she's not suing?

4    A.    Let me finish, please.

5              THE COURT:  Let him finish.

6              THE WITNESS:  I would like to finish.  No.  It depends

7    on the chemical.  It depends on the exposure.  You can't just

8    talk about chemical exposures.  If you have something specific in

9    mind, I would be happy to talk about it.

10                                EXAMINATION

11   BY MR. YOUNT:

12   Q.    Well, I guess the point is you need to know either -- what

13   the chemical is that she was exposed to, right?

14   A.    Correct.

15   Q.    At a minimum, you'd need to know whether it caused her any

16   problems?

17   A.    And you need to understand the circumstances in which she

18   might have been exposed.

19   Q.    But if she had problems which caused breathing problems,

20   that's something you'd want to know, right?

21   A.    I'd need to know more detail than what you're describing

22   here.

23   Q.    Is it significant that this is a formaldehyde lawsuit and

24   there is no other chemical lawsuit; is that significant to your

25   determination?

1  A.   Not to me.  I'm looking for causes of her illness.

2  Q.   You're looking for the truth, right?

3  A.   I don't think I need to answer that, sir.

4       MR. REICH:  Objection, Your Honor.  This is

5  argumentative.

6       THE WITNESS:  Yeah.

7                        EXAMINATION

8  BY MR. YOUNT:

9  Q.   Doctor --

10       THE COURT:  Wait, wait.  Is there an objection?  I saw

11  you stand up, and then I didn't quite hear what you said, but

12  then we kind of moved on --

13       MR. REICH:  I just said argumentative objection.  All

14  right.

15       THE COURT:  If there is nothing for me to rule on, we'll

16  just move on to the next question.

17       MR. REICH:  We can move on.

18                        EXAMINATION

19  BY MR. YOUNT:

20  Q.   Now, Doctor, you told me you reviewed Dr. Shwery's report.

21  And if we could, I'd like to bring that up on the screen.

22  Page 4, please.  Well, let's go to the first page first.

23       Now, Doctor, you recognized Dr. Shwery as someone who

24  performed a physical examination -- I mean, I'm sorry, a

25  psychological examination on Earline Castanel; is that correct?

1  A.   That's correct.

2  Q.   All right.  And you would further agree with me, sir, that

3  Dr. Shwery was hired by the plaintiff's lawyers to examine

4  Ms. Castanel?

5  A.   Correct.

6  Q.   And in your experience -- I know you're not a psychologist

7  or a psychiatrist, correct?

8  A.   Correct.

9  Q.   But you do know that they do some of the same things that

10  doctors do?

11  A.   Certainly in the psychological realm, yes.

12  Q.   And one of the things they do is take a history, correct?

13  A.   Correct.

14  Q.   And in their business, a history is just as important as it

15  is in your practice; is that correct?

16  A.   I believe so, yes.

17  Q.   Will you go to Page 4, please.

18          Now, you see here, Doctor, where Dr. Shwery notes that

19  Ms. Castanel reports that she quit her job two years ago when the

20  conditions at the rectory were aggravating her breathing

21  problems.  Do you see that, sir?

22  A.   I do.

23  Q.   She further states that sheetrock dust was prevalent as the

24  rectory and the church were being repaired, and she found she

25  could not tolerate the excessive sheetrock dust.  Do you see

1    this, sir?

2    A.    I do.

3    Q.    Now, the history of working at a rectory, that's consistent

4    with the history that you've got; isn't it, sir?

5    A.    It is.

6    Q.    And when we're talking about in terms of timing, the timing

7    here two years ago, and we're talking about an examination which

8    took place in December, so that puts us right back into 2007; is

9    that correct, sir?

10   A.    Correct.

11   Q.    All right.  She didn't tell you about her breathing problems

12   after being exposed to dust at the rectory when she gave you a

13   history; did she, sir?

14   A.    She did not.

15   Q.    And neither did her daughter or her attorneys who were

16   present at that thing?

17   A.    Well, I didn't ask the attorneys, but her daughter did not

18   as well.

19   Q.    Doctor, let's go to your physical examination of

20   Ms. Castanel, which took about 15 minutes.

21   A.    And I don't recall the exact time for Ms. Castanel, but

22   that's not an uncommon period.

23   Q.    We can go to your deposition.  Can we just agree that it's

24   15 minutes for purposes of these questions?

25   A.    That's a reasonable time.

1  Q.   In your report, sir, you noted that your review of her

2  symptoms was negative; is that correct, sir?

3  A.   Well, it's a bit more detailed than that.  Would you like me

4  to read it?

5  Q.   No, I would not.

6         MR. REICH:  Your Honor, he's entitled to explain his

7  answer.

8         THE COURT:  Well, if you're going to withdraw the

9  question, let's move on to another question.

10        MR. REICH:  Is the question being withdrawn?

11        THE COURT:  Otherwise, if that's part of the answer,

12  then he can go ahead and answer it.

13           Mr. Yount.

14        MR. YOUNT:  I'll withdraw the question.  I'll ask a

15  different one.

16                              EXAMINATION

17  BY MR. YOUNT:

18  Q.   You would agree, sir, that your physical examination of the

19  plaintiff was unremarkable?

20  A.   That's correct.

21  Q.   And you examined Ms. Castanel's nose; is that correct, sir?

22  A.   I did externally, yes.

23  Q.   And you saw nothing remarkable on your examination of her

24  nose; is that correct, sir?

25  A.   Again, you can see very little without specific instruments.

1    Q.    You can see very little, and, in fact, you saw nothing?

2    A.    I saw nothing abnormal, again, without the instruments you

3    would need to make a detailed examination.

4    Q.    Incidentally, what type of doctor would have those

5    instrumentations?

6    A.    Usually, an otolaryngologist.

7    Q.    That's the ENT, correct?

8    A.    That's correct.

9    Q.    Did you not perform that type of examination because you

10   didn't have the tools, or were you not qualified to do it?

11   A.    No, I've done nasal examinations, but I did not have the

12   equipment to do so.

13   Q.    Now, upon examination of the nose area and nasal region, you

14   saw no structural changes; is that correct, sir?

15   A.    Again, externally, yes.  You have to limit that to what you

16   were able to examine.

17   Q.    Well, you looked in her nose, too, didn't you?

18   A.    Yes, but you can only -- from -- using an otoscope, you can

19   only see a few millimeters.

20   Q.    You would agree, sir, that there was no way to tell whether

21   she had any damage to the cells of her nasal cavity or her

22   sinuses because there was no biopsy at the time you saw her; is

23   that correct, sir?

24   A.    That's correct.

25   Q.    And you would agree that a biopsy would be one way to see

1  cell changes; is that correct, sir?

2  A.   That's correct.

3  Q.   And formaldehyde is one of those substances where you might

4  see those changes; is that correct, sir?

5  A.   Yes.  It certainly causes cellular changes, yes.

6  Q.   And the gold standard of how to see those cellular changes

7  is a biopsy or pathology; is that correct, sir?

8  A.   If you thought that was indicated for that patient.  If it's

9  not appropriate, you don't do it.

10 Q.   And in your circumstance it wasn't appropriate?

11 A.   That's correct.

12 Q.   So when you saw her, she was -- you noted she was healthy

13 for her age?

14 A.   I did.

15 Q.   And she just didn't have any problems when you were seeing

16 her, correct?

17 A.   Well, she had symptoms.  I mean, that's different from --

18 I'm not sure what you mean by problems.

19 Q.   Well, on physical examination it was unremarkable?

20 A.   Right.  She did not have evident abnormalities.

21 Q.   Now, what you told this jury earlier, that you thought she

22 had a legitimate fear of cancer because of exposure to

23 formaldehyde, that's your opinion in this case, correct, sir?

24 A.   Legitimate based on the effects of formaldehyde, yes.

25 Q.   Now, how long has she had this fear of cancer?

1   A.   I couldn't give you a clear answer to that.  I don't know.

2   Q.   And you would agree with me that your opinion on her fear of

3   cancer is based on her history?

4   A.   Well, I'm not sure how else you get fear but by asking

5   somebody.  Maybe I don't understand your question.

6   Q.   Well, I think you do, and I think you answered it, that

7   that's how you got that opinion?

8   A.   I don't know of any other way.

9   Q.   There is no test you can do?

10  A.   I'm not sure that there is a test for fear.  I don't believe

11  there is.

12  Q.   Doctor, you're the expert, not me, so I'm asking you.

13  A.   Okay.

14  Q.   It's history, correct?

15  A.   That's correct.

16  Q.   All right.  Now, were you aware that Ms. Castanel's son had

17  died of cancer?

18  A.   I was.

19  Q.   And were you aware, sir, that Ms. Castanel had had some

20  polyps removed by her gastroenterologist?

21  A.   Yes, I believe that's my report, as well.

22  Q.   And polyps can be a precursor for cancer, correct?

23  A.   That's correct.

24  Q.   And you're further aware that at some point in her recent

25  history she had a questionable mammogram; is that correct?

1   A.   Correct.  I don't know what the follow-up was, though.

2   Q.   But, at least at the time, it was questionable?

3   A.   Correct.

4   Q.   Now, you would agree with me, sir, that those three things

5   we talked about, her son dying of cancer, polyps, and a

6   questionable mammogram, they have nothing to do with

7   formaldehyde; is that correct, sir?

8   A.   Not to my knowledge, no.

9   Q.   So you agree with what I said?

10  A.   I gave you the answer.

11  Q.   That's yes?

12  A.   I said to my knowledge they are not related.  I haven't

13  looked into them in detail.

14  Q.   Okay.  Now, you would also agree -- well, never mind.

15       Cigarette smoking, I think we can agree that cigarette

16  smoking causes cancer?

17  A.   It does.

18  Q.   The surgeon general reports that?

19  A.   Quite a while ago.

20  Q.   Very little question about that, isn't there?

21  A.   You're correct.

22  Q.   How about secondhand smoke?

23  A.   Secondhand smoke certainly increases the risk, yes, of

24  certain cancers.

25  Q.   You're aware that there is formaldehyde in cigarettes; is

1  that correct?

2  A.   In cigarette smoke, yes.

3  Q.   And it's not only formaldehyde when you actually smoke a

4  cigarette, but secondhand smoke contains formaldehyde, as well,

5  sir?

6  A.   That's correct.

7  Q.   And, in fact, the surgeon general now recognizes secondhand

8  smoke as a cause of cancer; is that correct, sir?

9  A.   Yes, it is.

10         MR. YOUNT:  Excuse me one second.

11            Thank you, Your Honor.  A couple more questions of

12  this witness.

13                        EXAMINATION

14  BY MR. YOUNT:

15  Q.   What is your hourly rate for testifying?

16  A.   $300 per hour.

17  Q.   And what was your hourly rate for examining Ms. Castanel at

18  the request of the plaintiffs?

19  A.   $600 per hour.

20  Q.   You used to advertise, didn't you, for your services as a

21  litigation expert, didn't you?

22  A.   A long, long time ago.

23  Q.   I'm sorry?

24  A.   A long, long time ago.

25  Q.   Can you pull up that article from the *National Law Journal*.

1          In fact, sir, this is an advertisement that you ran in

2    the *National Law Journal*, which is a publication for lawyers; is

3    that correct, sir?

4    A.    That was probably 25 years ago.  I don't recall specific

5    dates.

6    Q.    That's a yes?

7    A.    Correct, and I'm mentioning the date.

8          MR. REICH:  So the record is clear, Your Honor, I want

9    to make sure, because there is other things on that page, that

10   the reference is only to that small section that says,

11   "Toxicology, medical consultations" --

12         THE COURT:  Yes, I think that's all he's referring to.

13         MR. REICH:  I just to want make sure it's clear on the

14   record.

15         THE COURT:  Is that correct, Counsel?

16         MR. YOUNT:  That's correct.  I'm just pointing to this

17   one article for Dr. Miller.

18         MR. REICH:  And it says New Orleans.

19                          EXAMINATION

20   BY MR. YOUNT:

21   Q.    And, sir, you've worked with these plaintiffs' lawyers on

22   occasion before, haven't you?

23   A.    I have.

24   Q.    You've done considerable work for Dennis Reich; is that

25   correct, sir?

1  A.    There have been a number of cases, yes.

2  Q.    Can you approximate that for me?

3  A.    I cannot.

4         MR. YOUNT:  Thank you, sir.  Thank you, Your Honor.

5         THE COURT:  Redirect.

6                         REDIRECT EXAMINATION

7  BY MR. REICH:

8  Q.    When you did the differential diagnosis and concluded that

9  Ms. Castanel sustained an exacerbation of rhinitis and sinusitis

10 from formaldehyde exposure, did you use the same methodology on

11 her that you use on other patients who are not involved in a

12 lawsuit?

13 A.    Yes, it doesn't matter.  You approach a patient the same way

14 whether they are in a lawsuit or not.

15         MR. REICH:  May I have that food chart that you showed

16 the jury?

17                 If I may approach and use it, please.

18                          EXAMINATION

19 BY MR. REICH:

20 Q.    Dr. Miller, take a look at this chart that's been shown to

21 the jury before.  Let's take a look at some of the items that

22 appear on the right side, fresh vegetable, 8.17 ppm, maybe some

23 juices, coffee, they all apparently have some level of

24 formaldehyde.  Is there any difference between eating

25 formaldehyde that comes through a food product versus inhaling it

1   in the form of vapor?

2   A.   Well, as I think I mentioned earlier, they are completely

3   different.  If it's in food or liquids, it's complex with other

4   chemicals and it's not what we call bioavailable, it's not

5   available to cause damage, as opposed to in the air where it is

6   available to cause damage.

7   Q.   Is there any detoxifying mechanisms in the body that would

8   be more likely to affect food when formaldehyde is in food rather

9   than in the air?

10  A.   Sure.  And even if it were to become available somehow, when

11  you eat it goes directly to the liver, which detoxifies the

12  formaldehyde and other chemicals, whereas, if it's in the air, it

13  doesn't go to the liver first, it goes to the body first, and

14  that's the problem.

15  Q.   Is the liver a pretty good filter?

16  A.   Most of our livers are very, very efficient.

17  Q.   Let's take a look, please, at the CDC report.  There was an

18  exhibit that was shown to the jury Bates stamped 2206.  Could I

19  have that page put up, please, from the CDC report.  I believe

20  that's Exhibit Number 4.  It's 2206.  And if we could highlight

21  the next paragraph up and blow it up.

22        "There was some discussion in the examination of

23  Dr. Miller about this range, 3 to 590 ppb, so let's take a look

24  at the next sentence.  Formaldehyde levels varied by trailer

25  type, but all types tested had some levels greater than a

1   100 ppb, the level at which health effects have been described in

2   sensitive persons."  Would you agree with that statement?

3   A.    I would.

4   Q.    And if we could also go to Bates stamp in the same exhibit,

5   PSC last four digits 2211, 2211.  And if we could highlight,

6   please, or blow up the second paragraph where there is a

7   discussion of some studies.

8           "Additional studies have found health effects at

9   100 ppb in sensitive persons chronically exposed to formaldehyde.

10  Typically, olfactory recognition occurs around 500 ppb, leaving

11  the average exposure from a home below this level."  Would you

12  agree with that statement?

13  A.    That's correct.

14  Q.    Okay.  Let's go to the following statement.  "Sensitive and

15  sensitized persons can experience symptoms without detecting odor

16  and thus receive little or no warning of exposure."  Is that an

17  accurate statement?

18  A.    It is.  As I mentioned earlier, there is a wide variation in

19  order threshold.  The 500 is more or less average.

20  Q.    So you've heard about the story of the canary in the mine,

21  right?

22  A.    I have.

23  Q.    What's the purpose of the canary?

24  A.    To be sensitive to the odor of dangerous gasses.

25  Q.    So if a person is like a canary but doesn't have a good

1   sense of smell, can they suffer adverse health effects from

2   formaldehyde exposure before they reach an odor threshold for

3   them?

4   A.   Oh, certainly.  And, again, it's widely known that as we age

5   our olfactory, our sense of smell, deteriorates.

6   Q.   Is there anything about the cross-examination, the

7   discussion of the differential diagnosis about exposure to

8   potential dust that causes you to change your opinion that it was

9   the formaldehyde that Ms. Castanel experienced on a day in, day

10  out basis for over a year that caused her to have an exacerbation

11  of rhinosinusitis?

12        MR. YOUNT:  Objection.  It's leading, and it also

13  misstates the witness' testimony.

14        THE COURT:  I'm going to ask you to rephrase the

15  question.

16                    EXAMINATION

17  BY MR. REICH:

18  Q.   Having gone through the cross-examination where all of these

19  factors were pointed out in your differential diagnosis, was

20  there anything in that cross-examination or any point that you

21  had not previously considered that would cause you to change your

22  opinion with respect to the cause of Ms. Castanel's exacerbation

23  of rhinosinusitis?

24  A.   There was not.  And I did want to be clear, I'm not saying

25  that formaldehyde was the only factor, there may be others, but I

1   am saying that formaldehyde was a significant factor.

2   Q.   And by significant factor, are you saying that it was more

3   likely than not that formaldehyde exacerbated her rhinosinusitis?

4   A.   That's the conclusion in my report, yes.

5   Q.   And is that opinion based upon reasonable medical

6   probability or within a reasonable degree of medical certainty?

7   A.   Yes, it is.

8            MR. REICH:  I pass the witness, Your Honor.

9            THE COURT:  Thank you, Doctor.  You can step down.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  All right.  Mr. Reich, who do we have next?

12           MR. REICH:  Dr. Patricia Williams.

13           THE COURT:  Dr. Williams.

14           THE DEPUTY CLERK:  Please raise your right hand.  Do you

15   solemnly swear that the testimony you are about to give will be

16   the truth, the whole truth and nothing but the truth, so help you

17   God?

18           THE WITNESS:  I do.

19           THE DEPUTY CLERK:  Have a seat.  State your name and

20   spell it for the record, please.

21                   **PATRICIA WILLIAMS, M.D.**

22   was called as a witness and, after being first duly sworn by the

23   Clerk, was examined and testified on her oath as follows:

24           THE WITNESS:  Patricia M. Williams, P-A-T-R-I-C-I-A,

25   middle initial M, Williams, W-I-L-L-I-A-M-S.

DIRECT EXAMINATION

BY MR. REICH:

Q.   Good morning, Dr. Williams.

      MR. REICH:  May I proceed, Your Honor?

      THE COURT:  Yes.

EXAMINATION

BY MR. REICH:

Q.   Where do you live?

A.   I live in Metairie, Louisiana.

Q.   Have you been a life-long resident of the State of
Louisiana?

A.   Yes.

      THE COURT:  Mr. Reich, let me interrupt.  She's being
tendered as an expert, I understand, in this case?

      MR. REICH:  Yes, in toxicology, Your Honor.

      THE COURT:  Is there a stipulation as to her expertise?

      MR. WEINSTOCK:  There is, Your Honor.  We would
stipulate she's an expert in the field of toxicology.

      THE COURT:  All right.  The Court will therefore accept
Dr. Williams as an expert in the field of toxicology.  If you
would like to ask her a few very brief questions about her
background to go ahead flesh that out, I'll allow you to do that.
But, in the interest of time, we can get to her opinion in this
case since she's already been admitted.

EXAMINATION

BY MR. REICH:

Q.   I'll try to go through this relatively quickly.  I need to get back onto the Elmo for a moment.

Tell us how you are currently employed.

A.   I currently serve as a tenured associate professor in the department of -- well, in the Pontchartrain Institute for Environmental Sciences at the University of New Orleans.  I am the coordinator for toxicology research laboratories.

Q.   And I notice that you have a Board certification, Diplomate of the American Board of Toxicology.  What is that all about?

A.   Well, that is a -- there are only 2,000 of us in the world. It is a competency exam.  If you call yourself a toxicologist and you are a diplomate or Board certified by the American Board of Toxicology, you have proven your competency with three half days of examinations, rigorous, and also review of all of your practice of toxicology before being allowed to sit for the exam, and you must recertify every five years.

Q.   I see that you also have served in the capacity as a laboratory director, correct?

A.   Correct.  I have another Board certification by the American Society of Clinical Pathologists for the performance and interpretation of laboratory procedures; and, that, along with my Bachelor's degree in medical technology and my doctoral degree in anatomy, allows me to comply with federal law as a laboratory director.  And I have served in my other capacity with the

1   department of medicine.  I did run a medical surveillance

2   laboratory for detection of early warning signs of developing

3   disease from chemically-exposed individuals.

4   Q.   I want to keep this brief, but just tell the jury a little

5   bit about some of the academic positions that you've held at such

6   places as LSU Health Science Center, LSU Medical Center in

7   Shreveport, Louisiana.

8   A.   Well, in 2005, I moved to the University of New Orleans, the

9   Pontchartrain Institute for Environmental Sciences.  Ten years

10  prior to that, I served as an associate professor of medicine in

11  the department of medicine of LSU Medical Center in Shreveport,

12  and my title was director of the occupational toxicology outreach

13  program.  And my job duties were to work with physicians in

14  communities throughout the state to prevent disease from chemical

15  exposure and to teach medical students and residents about the

16  environmental and occupational etiology, because it's not a

17  regular part of the medical school curriculum.

18  Q.   And, in fact, you have received a number of grants where you

19  have been funded, correct?

20  A.   Correct.

21  Q.   And have some of these grants been from governmental

22  agencies or organizations?

23  A.   Right.  I guess the most famous one was Grand Bois, a study

24  of a group of Cajun Native American people in Grand Bois,

25  Louisiana, living next to a hazardous oil field waste site --

1   nonhazardous oil field waste site that is hazardous.

2           And I was asked to by the Governor and Secretary of

3   State, who was then Bobby Jindal, who is now our Governor, and

4   funded by them to -- and the Legislature to perform this study to

5   see if there were some early warning signs of developing disease

6   from heavy metals, solvents, as well as radioactivity.

7   Q.   And did these studies, in fact, involve medical surveillance

8   of children and women, including pregnant women?

9   A.   Yes.  We used the mobile health unit from Chabert Medical

10  Center and went into the community once a month for one year and

11  did blood, urine samples, some nail samples, and looked at all

12  the parameters to see if I saw any early warning signs of

13  developing disease.

14  Q.   Did some of the evaluation involve what was called

15  nonhazardous oil field waste type material?

16  A.   Yes, that's the federal designation.  And it's nonhazardous

17  oil field waste, the drilling mud that comes up when they are

18  drilling.  And it's from the core of the earth, so it has a lot

19  of benzene, it has a lot of heavy metals, and it also has radium

20  226 and 228.

21  Q.   Let's talk for a moment about the field of toxicology.  What

22  is toxicology all about?

23  A.   Well, it's a study of the adverse effects of chemicals or

24  toxicants on -- health effects on humans and, also, on animals.

25  Q.   Now, before you, is that a picture of or depiction of the

1  formaldehyde molecule?

2  A.   It is.

3  Q.   And can you describe what you have identified as a reactive

4  electrophile; what is that?

5  A.   Well, this is a small molecule that is deficient in

6  electrons.  And I know that's a technical term, but this is a

7  negatively-charged particle.  And so because this small molecule

8  is out of balance, it is going to be very reactive and combine

9  with other molecules in a cell or in a tissue.

10  Q.   Can the formaldehyde molecule cause tissue damage?

11  A.   Yes, it can.  And it is so reactive and it comes in -- you

12  saw the word ultimate toxicant -- it comes in reactive.  Not all

13  toxicants do that.  Some of them have to be made toxic by the

14  body before they'll react, but this comes in reactive.

15  Q.   What are cross links?

16  A.   This is its mechanism of action.  The yellow spots there

17  that say CH2 on the diagram was CH2O, was the formaldehyde

18  molecule, but it has reacted by forming cross links, chemical

19  links, covalent bonds, with adjacent atoms, and now it's a

20  permanent part of a bigger substance.  And so at this point it

21  cannot be removed.

22  Q.   Let's talk about exposure to formaldehyde.  Now, people can

23  breathe formaldehyde, correct?

24  A.   Yes.

25  Q.   And when that happens, is it partitioned off into different

1  areas of the body?

2  A.   Well, 93 percent of it is absorbed in the nasal passages,

3  and then from there it goes into the bloodstream.  And, of

4  course, our whole volume of blood circulates every minute, the

5  whole volume of blood, so there it can go into other

6  compartments.

7         40 percent is eliminated as CO2 through expiration when

8  you exhale.  17 percent is excreted as formic acid in the urine.

9  It's water soluble, so it's going to come out in the urine.  Five

10  percent is limited as formic acid in the feces.  And 35 to

11  39 percent remains in the tissues bound, as we saw the diagram

12  with little yellow molecules, attached to the tissues.

13  Q.   Now, is formaldehyde highly reactive with respiratory

14  tissue?

15  A.   Very.

16  Q.   And even though it can react with your respiratory tissue,

17  are you saying that formaldehyde can still remain in the body?

18  A.   Yes.

19  Q.   Explain the respiratory tract, and if you can identify for

20  the jury, you know, some of the important features of this

21  diagram with respect to formaldehyde inhalation.

22  A.   Do we have a pointer or something?

23  Q.   Yes.

24  A.   Would you repeat your question just so I'm on target for

25  you.

1  Q.   If you can show the ladies and gentlemen some of the
2  important features that are illustrated in this diagram of the
3  respiratory tract with respect to formaldehyde.  Just sort of
4  trace its pathway, what happens.
5  A.   This is the nasal cavity, which formaldehyde will come into.
6  And, of course, the -- as you are inhaling, the air flow will
7  pull it down into the trachea, which is the beginning of the
8  respiratory airway, and then go down into the bronchus and then
9  tubes that sort of branch like branches of a tree in your lung
10 until you get down to the very tiny branches which terminate in
11 little sacs, air sacs, that are about the size of the tip of
12 straight pin that you would use sewing or hemming.  That's about
13 the size of them.  So the air flow is going to come in through
14 the nose, and it's going to flow down into the respiratory tubes
15 and into the lung.
16 Q.   Can gaseous formaldehyde cause injury to respiratory tissue?
17 A.   Yes.
18 Q.   What is the normal epithelium of the respiratory tract?
19 A.   That is the normal tissue, which is a group of cells, that
20 normally lines the tubes, the blue tubes that I showed you.  And
21 the normal epithelium of the respiratory tract has real
22 functions.  We need it there in the normal structure that it is.
23 Q.   Can you tell the ladies and gentlemen of the jury what
24 stratified squamous epithelium is?
25 A.   Well, this is the type of epithelium that you have on the

1  back of your hand, on your skin, on your feet, outside your nose,

2  and it wraps into what we call the vestibule of the nose.  If you

3  took a cotton swab, a Q-Tip, you would be in the vestibule of the

4  nose.  And so this is the normal structure of that particular

5  epithelium.  It stops right when you go past where you could put

6  that Q-Tip.

7  Q.   And the next picture shows something called pseudostratified

8  ciliated columnar epithelium.  What is that?

9  A.   That is what begins after, beyond the space where you could

10  put that Q-Tip in.  That lines the entire respiratory tract all

11  the way down until it gets close to the little sacs in the lungs.

12  And it's very distinctive and important.

13       You see these little cilia, hair-like, finger-like

14  projections, and they have a reason for that.  It works.  It

15  beats like the rows of a boat, you know, an oar or something, in

16  beating it up, so that when large particles, large particles five

17  microns or bigger, get into the respiratory tract, the trachea

18  and the bronchus, it can get them out because they are protecting

19  the lung, the delicate lung tissue, and those would be the big

20  particles.  You would get them out, you would cough them up, spit

21  them up or swallow them.

22       And these are, of course, the cells, and interspersed

23  in here are cells that produce mucous, and the mucous is needed

24  to trap things like bacteria or those particles that the cilia

25  can work them up and get them out of your respiratory tract.

1  Q.   Now, when a person breathes formaldehyde, can that have an

2  effect on the cilia?

3  A.   Yes, it does.

4  Q.   And is there something called a mucociliary elevator?

5  A.   That is what I just described.  Big term.  Muco, mucous;

6  ciliary, the little --

7  Q.   Hairs.

8  A.   -- projections; elevator, meaning pulls it up.  You get into

9  a dust environment, you might find yourself going (indicating).

10 Your mucociliary elevator is pulling those particles up to get

11 them out of your body.  You'll either spit them out, blow your

12 nose or swallow.

13 Q.   And if a person breathes in either too much formaldehyde or

14 is too much of an exposure, what effect can that have on the

15 cilia itself?

16 A.   Well, it can totally destroy this normal respiratory

17 epithelium, totally destroy it.  And then you have lost your

18 body's defense against many things once it is destroyed.

19 Q.   Now, we have another slide called pseudostratified ciliated

20 columnar epithelium.  That's similar to what you previously

21 described, right?

22 A.   It is the same.

23 Q.   And posterior nasal cavity, trachea, bronchia, bronchioles

24 entering the lung.  Why don't you explain a little bit about the

25 trachea, bronchia and bronchioles.  And I believe had just seen

1  an earlier picture.  Are you going from larger pipes to smaller

2  ones?

3  A.   Right, like the branches of a tree.  Turn a tree upside

4  down, and the trunk of the tree would be trachea.  And then you

5  get branches that are smaller that would be similar to the

6  bronchus, although there are two primary bronchus, and then you

7  have many branches off of that, which would be eventually

8  branching down until they are very tiny, and we call them the

9  bronchioles.

10  Q.   Now, we have two illustrations here.  One shows the normal

11  respiratory epithelium, which is the top view.  And then you have

12  a bottom view, and I don't know if the jury can see the full

13  slide but I think it says invasive squamous cell carcinoma with

14  keratin formation and malignant transformation.  Can you explain

15  the difference between the top diagram or photo and the second

16  one?

17  A.   This is from Dr. Holstrom's article where he took

18  formaldehyde and exposed rats to them and showed that it could

19  make a cancer.  This is an animal study.

20      And so this is what the normal respiratory epithelium

21  in the animal would look like, look like before he exposed him to

22  formaldehyde.  This is the invasive squamous cell carcinoma.

23      Now, it's no longer that respiratory epithelium.  It

24  looks more like what's on the outside of the nose.  It's lost its

25  properties of the nice cilia respiratory epithelium, and it's

1    become more like what's on the back of your hand.

2            But when you see this keratinizing formation, you know

3    what keratin is, it's a big word but everybody has used

4    Pretty Feet or some type of foot razor to take that thick dead

5    skin off.  Well, that's what we have here.  So the epithelial now

6    lining the trachea and bronchus has now changed to something

7    that's not normally there.  And then it's gone further.  It has

8    formed a cancer.

9    Q.   The Holstrom study, did that involve exposure of

10   formaldehyde to, in the first instance, animals?

11   A.   This is the animal study.  That was the first study that

12   Dr. Holstrom did.

13   Q.   All right.  Let's go to the next slide.  Does this slide

14   show what can happen to humans?

15   A.   Yes.

16   Q.   Can you explain it, please?

17   A.   This is Dr. Holstrom's, another article that he did where he

18   took workers that were exposed to formaldehyde.  He had workers

19   in a chemical plant, and then he had workers in another plant

20   that had chemicals and dust, wood dust.

21           But this photograph is from the chemical workers and

22   showed that over time working in a formaldehyde environment,

23   their respiratory epithelium was changed, altered, destroyed and

24   is now that stratified squamous epithelium that doesn't work very

25   well in the respiratory tract.

1  Q.   And do you know approximately what the exposure levels were

2  to the formaldehyde for this study?

3  A.   The lowest levels of the workers was 40 parts per billion.

4  Q.   40 ppb?

5  A.   Correct.

6  Q.   Would that be the same as .4 ppm?

7  A.   No, .040 ppm.

8  Q.   Now, you indicate above the picture of the histological

9  changes, you say, "Basis for ATSDR chronic MRL of 8 ppb."  The

10  jury has already heard about this chronic MRL of 8 ppb from

11  Dr. Hewett, but what is meant here in this slide where you say,

12  "Basis for ATSDR chronic MRL"?

13  A.   The Agency for Toxic Substances and Disease Registry is a

14  federal agency that reviews all of the literature and then

15  selects an article to a derive a concentration level at which if

16  humans are exposed to that concentration or below you would not

17  expect adverse health effects.

18        They used Dr. Holstrom's article on humans and

19  developed a minimal risk level of 8 parts per billion for chronic

20  exposure.  That's one year or more.  So that if you are exposed

21  at more than 8 parts per billion over a year, health effects

22  could exist; 8 parts per billion or less, according to ATSDR, you

23  would not expect to see them.

24  Q.   So were these minimum risk levels that are written up in the

25  ATSDR, were they derived from actual studies of either animals or

1  persons?

2  A.   Right.  And this one was derived from humans.

3         MR. REICH:  Your Honor, I believe this would be a good

4  time to introduce the ATSDR toxicological profile, Number 628.

5         THE COURT:  Any objection?

6         MR. WEINSTOCK:  Your Honor, there is no objection to

7  that.  We had an agreement that we would use these studies and

8  these papers for cross-examination, for direct, to let the jury

9  see it, but that it would not be in the record.

10        THE COURT:  It would not be introduced into evidence.

11             Counsel --

12        MR. REICH:  Yeah, sure.

13        THE COURT:  -- approach, please.

14        (WHEREUPON, at this point in the proceedings, there was

15  a conference held at the bench.)

16        MR. WATTS:  The agreement was the same as it's been in

17  the other cases; and, that is, is that the individual studies may

18  be utilized, but the government documents, the CDC, the ATSDR,

19  the toxicological profile have come into evidence in all three

20  cases.  We anticipated doing the same thing here.

21        THE COURT:  Didn't we have it in the other cases?

22        MR. WEINSTOCK:  We did.  And I thought it was a mistake

23  that we stipulated it in.  And I certainly was not hearing right.

24  I think it's the same principle problem.  It's a 600-page

25  document.  The last thing I want, and I think the last thing

 1  plaintiffs want, is this document goes into the jury room.  We're

 2  going to talk about three or four pages.  If they want to

 3  introduce the specific pages they talk about, I have problem with

 4  that; but, to send, essentially, a treatise into the jury room is

 5  a mistake.

 6          MR. WATTS:  I tell you what we'll do.  We'll take that

 7  agreement.  We'll admit it; but, then when we get to the end of

 8  the case, we'll get to the excerpts and we'll do the excerpts

 9  because I'm all inspect favor of less is more.

10          MR. WEINSTOCK:  I have no problem with that.

11          THE COURT:  I can't see introducing a bunch of

12  extraneous material that's immaterial to the case.

13          MR. WATTS:  Right, right.  But let's agree to admit it,

14  and then we'll go back and do an excerpt.

15          MR. WEINSTOCK:  On that basis, I would agree.

16          (WHEREUPON, at this point in the proceedings, the

17  conference held at the bench concluded.)

18          THE COURT:  The Court is going to admit the exhibit, and

19  it will be numbered accordingly; however, the only portions that

20  will go into evidence will be the portions that you see here in

21  court.

22          In other words, this is a very lengthy document.

23  Rather than introduce the entirety of the document, we are going

24  to make certain that when you all get the exhibits in the jury

25  room as part of your deliberations, you won't need to get all of

1    the other parts of that document that are not covered here in

2    court.

3                    Go ahead, Mr. Reich.

4                         EXAMINATION

5    BY MR. REICH:

6    Q.   Is there a section in the ATSDR, Dr. Williams, that deals

7    with these histological changes that appear in your slides, for

8    example, from Holstrom and other authors?

9    A.   Yes, it's in the appendix.  It's the calculations for the

10   minimal risk level and descriptions.

11   Q.   Right.  In addition to the appendix, though, is there some

12   text in the ATSDR that deals with some of these various studies?

13   A.   Yes, the calculations are in the appendix.  The text is also

14   discussing it.

15   Q.   Let's go to the next slide.  Boysen.  Now, Boysen is also

16   referenced in the ATSDR, true?

17   A.   Correct.

18   Q.   Explain the significance of this slide.

19   A.   Well, this is another example, different study, of nasal

20   mucosa in workers exposed to formaldehyde.  And this is

21   Dr. Boysen, where he also shows, upon exposure over time the

22   respiratory epithelium is destroyed and replaced with a

23   stratified squamous epithelium, which would be more

24   representative of what's on the outside of the nose or in the

25   vestibule of the nose.

1    Q.    Now, do you recall what the exposure levels that were cited

2    in Dr. Boysen's study that resulted in damaged epithelium?

3    A.    Yes, that was 500 parts per billion, or 0.5 parts per

4    million.

5    Q.    And the Holstrom study was less than a hundred parts per

6    billion, true?

7    A.    It was 40 parts per billion.

8    Q.    Let's talk for a moment about damage to respiratory

9    epithelium observed through biopsy of workers.  The first point,

10   loss of cilia, you've already discussed that with the jury,

11   correct?

12   A.    Yes, I have.

13   Q.    Now, let's talk about hyperplasia.  You have something known

14   as goblet cell hyperplasia.  What in the world is that?

15   A.    That's a good name, a histologist's name for mucous

16   secreting cell.  And I did talk to the jury about how mucous is

17   secreted.  It's necessary to trap particles, bacteria, allergens

18   in the tubes, the trachea, the bronchus, and then the cilia can

19   move it up on the mucociliary elevator.

20   Q.    Now, can exposure to formaldehyde cause goblet cell

21   hyperplasia?

22   A.    Yes.  And the problem with that is you get so much mucous

23   that it traps the bacteria or the antigens or the particles, the

24   dust particles or other particles.  It actually holds it longer

25   in the respiratory tree, the trachea and the bronchus, which is

1   not a good thing because the cilia are having trouble moving

2   something that thick, and so it can lead to increased infections

3   from bacteria that remain in there a longer period of time.

4   Bacteria like to divide; give them more time to divide, they

5   will.  And so it can cause a lot of problems.

6   Q.   So you're saying that if a person has infected sinuses and

7   have been exposed to formaldehyde, can the formaldehyde be a

8   factor with respect to the infected sinuses?

9   A.   Yes, it can.

10  Q.   Let's talk about the next item, replacement of normal

11  respiratory epithelium with cuboidal or squamous cell metaplasia.

12  That's a lot of words there.  Why don't we talk first of all

13  about squamous cell metaplasia.

14          You've already talked about squamous cell.  Is that

15  like the type of skin on the back of your hand or the bottom of

16  your feet?

17  A.   Yes.

18  Q.   Is there also something known as squamous cell cancer?

19  A.   Yes.

20  Q.   And what is that?

21  A.   That would be going into dysplasia cell, would be an

22  abnormal.  And I showed that with the rat study, but that can

23  also occur in the humans, where you have a dysplastic, it's an

24  abnormal tissue.  From there, it can go into a proliferation of

25  abnormal cells that will go on to form a cancer.

1  Q.   And I think you have a succinct definition here.  Maybe this
2  will help expedite the process and clarify things.  Metaplasia
3  equals normal tissue in abnormal place.  Describe that.
4  A.   Well, that's what I've been showing, where you have
5  stratified squamous epithelium, which is really on the outside of
6  your nose or your feet or in the vestibule, is now replaced.  And
7  I showed you pictures of the pretty pseudostratified ciliated
8  columnar epithelium with the little cilia projections.  It's not
9  a -- it's a normal tissue, but it's in the wrong place, and it
10  totally destroys the ability of the respiratory tract to get rid
11  of particles and bacteria and antigens.
12  Q.   And I think you just gave an explanation of the second part
13  after the semi-colon, correct; cannot perform normal function of
14  respiratory epithelium?
15  A.   Correct.
16  Q.   And, again, this was a study that formed the basis for the
17  minimal risk level for the ATSDR, correct?
18  A.   Right, this is what was observed in Dr. Holstrom's study of
19  humans, and this is what ATSDR used as the endpoint to say and to
20  calculate that 8 parts per billion.
21  Q.   Let's talk for a moment about toxicity.  There was previous
22  discussion about toxicity with respect to, like, water, aspirin
23  and formaldehyde.  Are all of them comparable in terms of their
24  toxicity?
25  A.   Oh, no, no.

1    Q.    Why is that?

2    A.    Well, you can have a misuse or an improper use, such as with

3    water.  Water molecule is not toxic; but, physiologically, you

4    can have an abnormal use or an abnormal taking in of the water,

5    such as in drowning or -- where it will cause death or adverse

6    health effects.

7           Another example would be a woman who went on TV and

8    drank five liters -- five gallons of water to win a PlayStation

9    for one of her sons and she died because she just put so much

10   water in her stomach that all of her electrolytes moved in.

11          So you can have a misuse of anything, really.  But the

12   water molecule is certainly not toxic.  We need it throughout our

13   body.

14          Aspirin is a medicine, and the aspirin, salicylic acid,

15   gets its mechanism of action by stopping platelets from -- it has

16   several actions, but stopping platelets from putting out -- they

17   are like little tiny fragments of cells.  You can't see them

18   physically.  Very, very tiny, smaller than one red blood cell.

19   And when the aspirin stops that platelet from changing into --

20   sort of like an octopus, when cut your hand, blood comes out, you

21   get a scab.  That's -- you thank the platelet for that.  It puts

22   outs these little projections, and it grabs the torn ends of the

23   skin and makes a bridge and catches anything it can coming out to

24   stop, to plug up the leak.

25          Well, if you take too much aspirin, then you can cause

1    bleeding internally because you're stopping your normal platelet

2    function just to keep the normal integrity inside your body.  So

3    the aspirin can be toxic.  Any medication can have a toxic dose

4    if it used incorrectly.

5            Formaldehyde is toxic.  It comes in as a reactive

6    electrophile.  It's toxic in itself.  It's a highly reactive

7    molecule, and it has to be -- it's just, whatever it hits, it can

8    attach to.

9            You saw the picture of the sort of chicken wire

10   structure, and when it does that, if it's DNA that it attaches

11   to, it destroys the integrity of the DNA and makes a mutant.  And

12   if that mutant DNA isn't repaired, then it goes into daughter

13   cells and we have the beginning of a cancer formation.  Or it can

14   attach to cell membranes and destroy the cell and cause it to

15   break or break open.

16   Q.   Let's talk for a moment about these factors that you've

17   identified that influence toxicity as it relates to exposure.

18   And you list three, route of administration, duration and

19   frequency of exposure.  What are the different kinds of ways in

20   which formaldehyde can enter the human body?

21   A.    Inhalation is the primary toxic route because it's coming

22   into our airways.  And, of course, our lungs have a lot of blood

23   vessels around those little tiny air sacs, and so it can go

24   straight into the blood and then travel around the whole body

25   before it's going to meet portions of our body, anatomical

1   portions that have the enzymes to degrade it.

2            There are some enzymes in the blood itself, so it can

3   begin its detoxification right then and there.  But it can go to

4   other sites, whereas ingestion would be another route of

5   administration.  And, of course, if it is -- if it would be free

6   formaldehyde, if it's in dust or something, and the cilia are

7   moving it up, then it's going to be ingested.

8            Now, you have enzymes in the stomach that detoxify

9   formaldehyde.  And then you have the blood flow as it comes from

10  the gut, our intestines, goes to the liver.  And the liver is a

11  huge, powerful organ that detoxifies.  It detoxifies -- lots of

12  enzymes there.  So that's better because you've got two areas

13  coming in through ingestion that can detoxify the chemical before

14  it goes throughout the body.

15  Q.   Dr. Williams, if we can just briefly talk about these

16  remaining two items, frequency of exposure and duration.  These

17  are factors that would be toxicologically important, correct?

18  A.   Extremely important.  Duration of exposure and how often,

19  for instance, you walk into a fabric shop and for some reason

20  they have unpacked a lot of fabric and your eyes can feel it, you

21  might be there maybe 15 minutes two or three times a year to buy

22  fabric.  That's about what I do.  However, if you're living in a

23  trailer with continuous formaldehyde exposure, your duration is

24  continuous and for a longer term.  So, basically, that is very

25  important.

1          We do have repair mechanisms in our body; but, if

2    you've got something continuously coming in, then your chances of

3    having that DNA mutation are greater than if you have a spot

4    exposure that the cell can then recover and be repaired.

5          So it makes a big difference.  Duration and frequency

6    of exposure, very important toxicologically.

7    Q.    I think you've basically covered the routes of exposure, the

8    sites, gastrointestinal tract, lungs and skin.  I think we've

9    covered them.

10          Let's talk for a moment about --

11          MR. WEINSTOCK:  Your Honor, at this point we'd object

12    not to what Mr. Reich is about to ask, but we've already heard

13    from Dr. Miller about bioavailability of formaldehyde in food,

14    and I think we've covered all of that.

15          MR. REICH:  As long as it's not a subject of

16    cross-examination, I'll agree not to cover it.

17          MR. WEINSTOCK:  Obviously, if I said we've already

18    covered it --

19          MR. REICH:  Okay.  We'll move on.

20          THE COURT:  We don't want to be repetitive.  And we're

21    getting protracted on some of these witnesses.  They are taking

22    much longer than I think any of us anticipated, so let's try to

23    move this along.

24                              EXAMINATION

25    BY MR. REICH:

1    Q.    I will do that.

2          With respect to bioavailability, the principles have

3    been identified in various publications, such as the World Health

4    Organization, Environmental Health Criteria 89, correct?

5    A.    Correct.

6    Q.    Units of measurement, this illustration serves what purpose?

7    A.    Well, sometimes you see, as, for instance, here, you see

8    parts per million in food and clothing store, various foods,

9    coffee, and that could be very confusing.  Because that parts per

10   million is actually weight of formaldehyde for the weight of the

11   food.  That is probably almost completely biologically

12   unavailable.  So you have to keep in mind what you're really

13   looking at.

14         Whereas, when we talk about what's in our air, we're

15   talking about weight per volume of air.  So it's like comparing

16   apples and oranges, and you shouldn't get confused with that.

17         When you're comparing free formaldehyde, you're looking

18   at how much by weight is in a volume of air.  Whereas, when you

19   are looking at the bound and unavailable formaldehyde in foods,

20   you're looking at milligrams per kilogram of that food, not what

21   the person is being exposed to.  Because it is bound and

22   unavailable or in liquids.

23         So it can get very confusing, but keep that --

24   determine that they are apples and oranges.  They are not the

25   same.

1   Q.   What you're saying is there's a difference between

2   measurements that are weight over weight versus weight over

3   volume?

4   A.   Correct.

5   Q.   Let's talk about the general causation of cancer.  Was there

6   someone who lived a number of years ago by the name of

7   Sir Bradford Hill?

8   A.   Yes.

9   Q.   Who was Sir Bradford Hill?

10  A.   He was a British physician.  He devised some guidelines to

11  help originally physicians to determine the causality of a toxic

12  compound with a cancer or health effects.  And so those have

13  stood the test of time and been kind of reused over and over

14  again and adopted actually by the Federal Judiciary Center as the

15  primary considerations that you must make when rendering a causal

16  opinion, as I do as an expert witness.

17  Q.   In rendering a causal opinion, do you consider all of these

18  factors, strength of association of disease, cancer and exposure,

19  consistency, dose response or biological gradient, temporality,

20  biological plausibility, coherence and experimental evidence?

21  A.   Yes.

22  Q.   In fact, the organization such as the International Agency

23  for Research on Cancer, which the jury has heard the acronym

24  IARC, do they use the same types of factors that we've just

25  identified in the prior slide?

1  A.    Yes.

2  Q.    IARC, tell the jury a little bit about IARC and what they

3  do.

4  A.    Well, IARC is a -- the International Agency for Research on

5  Cancer, referred to as IARC, is a body within the World Health

6  Organization of renown experts who meet periodically to review

7  all of the scientific data and to classify chemicals or toxicants

8  as carcinogenic or not carcinogenic or no evidence of

9  carcinogenicity or definite evidence of carcinogenicity, being

10 carcinogenic, or somewhere in between.

11 Q.    What is a Group 1 carcinogen?

12 A.    That is a known human carcinogen.  That is the top gradation

13 or evaluation that IARC makes.  If something is a known human

14 carcinogen, it can, it is known to cause cancer in humans.

15 Q.    Not all carcinogens are known human carcinogens, true?

16 A.    Well, they can have possible carcinogens, potential

17 carcinogens and then not classifiable.

18 Q.    If you look at this slide, for example, you will see the

19 evolution of formaldehyde with respect to its cancer

20 classification, correct?

21 A.    Correct.

22 Q.    And it went through a process going back to 1980 with

23 laboratory studies, correct?

24 A.    Correct.

25 Q.    And then it became a probable human carcinogen, at least

1    classified by the EPA, in 1987?

2    A.    In 1987, yes, it was a probable.

3    Q.    What is the National Toxicology Program?

4    A.    It's a program that looks at data, scientific publications,

5    and also makes -- and it also does a lot of independent research,

6    animal studies to devise, derive an opinion as whether something

7    is anticipated to be a carcinogen.

8    Q.    And what year was formaldehyde designated as a known human

9    carcinogen?

10   A.    Well, not on here, NIOSH called it a known human carcinogen

11   in 1990, and OSHA referred to it as a human carcinogen in 1987.

12   Q.    Do you believe, based upon all of the studies that have been

13   done, including the current ones, that there is any legitimate

14   scientific controversy as to whether formaldehyde is a known

15   human carcinogen?

16   A.    No.

17   Q.    In fact, there have been studies as recently as this year,

18   true?

19   A.    Correct.

20   Q.    All right.  And these are the different categories of

21   carcinogens that you have already told the jury about?

22   A.    Yes.

23   Q.    That's what, DNA?

24   A.    Yes.  That's a diagram of DNA.

25   Q.    And that's a double helix?

1  A.   That's correct.

2  Q.   Now, let's talk for a moment about causal evidence of

3  carcinogenicity based upon actual data, and you'll note that all

4  of these exposure concentrations tend to be, well, are, less than

5  100 parts per billion, correct?

6  A.   Correct.

7  Q.   And you have some journal articles.  Are all of these

8  peer-reviewed journals, scientific journals?

9  A.   Yes.

10 Q.   Can you generally describe to jury what you're trying to

11 depict in this causal evidence of carcinogenicity chart?

12 A.   The slide that was just taken off on the DNA shows

13 cross-links, DNA protein cross-links.  Right here and here

14 (indicating).  That's where the formaldehyde has connected the

15 strands of the DNA.

16       Now, the DNA is like this (indicating).  And when a

17 cell is going to make daughter cells, copy and split the DNA, it

18 comes apart.  And enzymes will travel along both of those arms of

19 the DNA and make an accurate copy of the DNA so the daughter

20 cells will be replica of the momma cell.

21       When formaldehyde makes these cross-links here and here

22 (indicating), that can't happen.  And what happens is an error in

23 the DNA copy which becomes a mutation that will go into the

24 daughter cells.  And that cell can go on with that mutation, if

25 it's not repaired, can go on and form a cancer cell.

1   Q.   Now, when a person is kept in a confined space and is

2   subjected to continuous formaldehyde exposure, what does that do

3   with regard to ability of the body to repair itself and avoid

4   mutations that you have described this process?

5          MR. WEINSTOCK:  Your Honor, I'm going to object.  That

6   was asked and answered in part of her -- one of her prior

7   answers.

8          THE COURT:  Yes, I think we've cover it.

9                            EXAMINATION

10  BY MR. REICH:

11  Q.   Micronuclei, sister-chromatid exchange, increase of a comet

12  tail and the DNA protein cross-links that are demonstrated from

13  exposures to concentrations less than 100 parts per billion, are

14  all of these studies important in determining increased risk of

15  cancer from formaldehyde exposure?

16  A.   Yes.

17         MR. WEINSTOCK:  Your Honor, I'm going to object, and I

18  would like to approach on this question.

19         THE COURT:  Come on up.

20         (WHEREUPON, at this point in the proceedings, there was

21  a conference held at the bench.)

22         MR. WEINSTOCK:  It's been very clear throughout this

23  case that no one has cancer and no one has an increased risk of

24  cancer.  No one is going to get cancer.  They have not made that

25  clear and they have not set forth that evidence.

1          That's a specific causation opinion and she's a

2   general causation expert.

3          MR. REICH:  Your Honor, increased risk of cancer is

4   being presented in a general causation context.  The issue is

5   whether continuous exposure to formaldehyde, I'm not saying that

6   with respect to Ms. Castanel, but just continuous exposure to

7   formaldehyde, does that increase a risk of cancer because of the

8   mechanisms that are described in these papers.

9          THE COURT:  Why don't you rephrase it and make clear

10  that -- and I know you can do it on cross as well and you will do

11  it on cross, but why don't you make it clear that we're not

12  talking about Ms. Castanel, we're talking generally speaking as a

13  general scientific proposition.  That's what her general

14  causation opinion is.

15          Are we almost there?

16          MR. REICH:  Yeah, almost there.  Yeah, we'll be through

17  at lunchtime.

18          (WHEREUPON, at this point in the proceedings, the bench

19  conference concluded.)

20                            EXAMINATION

21  BY MR. REICH:

22  Q.   Now, Dr. Williams, if you'll listen to my question closely,

23  I'm not asking you about Ms. Castanel specifically, I'm asking

24  you in terms of general causation, does continuous exposure to

25  formaldehyde, for example, in a confined space, given the

1  articles that you have identified and the mechanisms in play

2  demonstrate the potential for an increased risk of cancer?

3  A.   Yes.  The continuous exposure would prevent, if it's hitting

4  the same cell, if formaldehyde continues to come in, new

5  molecules hit the same cell, you have no break in the time, in

6  the exposure.  And so it lessens the chance of the cell being

7  repaired.

8  Q.   Does this slide have anything to do with the effects of

9  cumulative exposure, in other words, exposure over periods of

10  time and how that has an effect on risk?

11  A.   Yes.  In many of the journal articles, instead of just

12  listing a concentration, which is a one dimensional, you can

13  compare things to a concentration of formaldehyde, but a more two

14  dimensional and a better way of looking at it is, what is the

15  duration and the concentration.

16      So scientists use concentration times time to give a

17  mathematical representation of what over time.  And this is over,

18  if someone would be exposed to 80 parts per billion for 16 hours

19  a day.  And I put it in minutes, 960 minutes.  Over time or a

20  year, you get a measure, a mathematical measure of parts per

21  million minutes per year of 28,032, and at 300 parts per billion,

22  105,120.

23      So you can use this concentration times time to

24  differentiate from that quick trip to the fabric shop or that

25  quick trip to the library, you would come down to something in

1  the thousand or two thousand over a year, depending on how many

2  quick trips.

3          So it's a mathematical way that scientists use to

4  factor in concentration times time to give you a duration, to

5  give a more accurate representation of what are we really looking

6  at in this study or that study.

7  Q.  Let's take a look for a moment at this passage from IARC.

8  Is this abstracted from a recent publication?

9  A.  Right.  IARC has reviewed many of the chemicals in terms of

10  mechanistic data.  Mechanistic means formaldehyde can attach to

11  components of the DNA or the cell itself and exhibit its toxic

12  action.

13          So they have reviewed formaldehyde and basically came

14  up with these two, two of the findings they came up with.  There

15  is sufficient evidence in humans of nasopharyngeal carcinoma and

16  the Group 1 classification is supported by strong mechanistic

17  evidence.

18          In addition, the epidemiological evidence on leukemia

19  has become stronger and new mechanistic studies support a

20  conclusion of sufficient evidence in humans caused by

21  formaldehyde.

22  Q.  Was there one particular study that strengthened the

23  conclusion that formaldehyde causes -- or can cause leukemia?

24  A.  Yes.  The Hauptmann article --

25          MR. WEINSTOCK:  Objection, Your Honor.  May we approach?

1          THE COURT:  Come on up.

2          (WHEREUPON, at this point in the proceedings, there was

3     a conference held at the bench.)

4          MR. WEINSTOCK:  This is a direct violation of the

5     agreement I reached with Mr. Watts last night, and Mr. Reich was

6     on the e-mails.  They wanted this one sentence.  She was going to

7     talk about this one sentence.  The word "Hauptmann" never

8     appeared and now he's pursuing some additional information about

9     leukemia.

10          THE COURT:  I wasn't on the e-mail exchange.  But if

11     there is an agreement, then we need to --

12          MR. WEINSTOCK:  That was clearly the agreement.

13          MR. REICH:  I understand the agreement.  I understand

14     the agreement is we have one reference to leukemia in our

15     PowerPoint presentation.  I'm simply asking her about the one

16     study that gave rise to this statement that she's talking about.

17     She has ten pages in her report that was timely filed on

18     leukemia.  I am not going to go into a discourse on leukemia.

19          THE COURT:  If you ask her what time it is, and she's

20     going to tell you how to build a clock.

21          MR. REICH:  I know.  She's explaining the basis for that

22     statement and then I quit.

23          THE COURT:  Ask her a yes or no.

24          MR. WEINSTOCK:  If you are going to go into Hauptmann

25     with her, and then it's going to change Dr. Cole dramatically.

 1    He's going to have to address this whole leukemia piece.

 2          THE COURT:  Tell me what this agreement was.  You all

 3    told me yesterday at the end of the day that you thought you had

 4    an agreement.  I'm not a party to it and you're asking me to

 5    interpret and rule on it and enforce it.

 6          MR. WEINSTOCK:  Because of the question I asked

 7    Dr. McGwin, they were going to put up one slide.  We agreed to

 8    this slide.  And that was it.  And now we're going well beyond

 9    the slide and asking for the basis of this slide.

10          THE COURT:  We can't be doing that.

11          MR. WEINSTOCK:  Do you acknowledge that was the

12    agreement?

13          MR. REICH:  I agreed we would have one slide.  And I

14    asked her, is there a particular development in the literature

15    that gave rise to this statement.  And that's the question.

16          THE COURT:  I think she's going to -- that's the problem

17    is that you open a door and we get into all kinds of junk.

18          MR. REICH:  We might need this to shorten the trial and

19    shorten the process, because legitimately she could talk about

20    leukemia because she got it into her report.  Unlike the *Wright*

21    case, where the report came about after the expert disclosure

22    cutoff date because the studies occurred, like, in October of

23    2009 and we didn't get a copy of it until after the date.  That's

24    a different thing.

25                I'm trying to accommodate the Court by making this

1   a very efficient trial.  And I asked her one question and I just

2   wanted an answer and then I'm through.

3           THE COURT:  I think we've lost what efficiency we had

4   achieved over the last couple days.

5               Ask her a yes or no question.  And let's get her to

6   answer it.

7           MR. REICH:  All right.  That's fine.

8           (WHEREUPON, at this point in the proceedings, the bench

9   conference concluded.)

10                          EXAMINATION

11  BY MR. REICH:

12  Q.  Dr. Williams, if you could answer this question yes or no,

13  did the Hauptmann study, which you mentioned, serve as a basis

14  for IARC making this statement:  "In addition, the

15  epidemiological evidence on leukemia has become stronger and new

16  mechanistic studies support and a conclusion of sufficient

17  evidence in humans"?

18  A.  Yes.

19          MR. REICH:  I pass the witness, Your Honor.

20          THE COURT:  We're going to go ahead and take a lunch

21  break now.

22              Dr. Williams, if you could be up here when we

23  resume.

24              Let us start at 1:15, please.  If you could be back

25  prepared, and do not discuss the case amongst yourself or with

1 anyone else during the lunch break.

2          THE COURT SECURITY OFFICER:  All rise.

3          (WHEREUPON, at this point in the proceedings, the jury

4 panel leaves the courtroom.)

5          THE COURT:  All right.  Counsel, you may want to relook

6 at that schedule that we prepared, and you may also want to --

7 it's kind of early to say this, but you might want to clear your

8 calendars for Saturday the rate we're going.

9          MR. WATTS:  Judge, we're still resting today.

10          THE COURT:  We still have a lot of ground to cover.  I

11 hope you're right.

12          MR. WATTS:  I've told the Court and I've told them,

13 we're going to use as much time as we have today and we'll kick

14 out FEMA depositions.  Let them play them or otherwise curtail

15 them.

16          THE COURT:  I'm not suggesting that you curtail your

17 presentation, although I appreciate it if you streamline it, but

18 we have gotten kind of bogged down.  And I haven't stopped

19 anybody because you all have covered a lot of ground with these

20 witnesses, but it's taken a lot longer than I think you and I

21 have anticipated.

22          MR. WATTS:  I agree with the Court, and I still say

23 we're going to rest today.

24          THE COURT:  Okay.  All right.

25          (WHEREUPON, at this point in the proceedings, the Court

1   was in luncheon recess.)

2                              *    *    *

3

4

5

6                    REPORTER'S CERTIFICATE

7

8       I, Cathy Pepper, Certified Realtime Reporter, Registered

9   Merit Reporter, Registered Professional Reporter, Certified Court

10  Reporter of the State of Louisiana, Official Court Reporter for

11  the United States District Court, Eastern District of Louisiana,

12  do hereby certify that the foregoing is a true and correct

13  transcript, to the best of my ability and understanding, from the

14  record of the proceedings in the above-entitled and numbered

15  matter.

16

17

18                         _s/Cathy Pepper_____

19                         Cathy Pepper, CRR, RMR, CCR

20                         Official Court Reporter

21                         United States District Court

22

23

24

25

**$**

**$300** [1] - 708:16
**$600** [1] - 708:19

**'**

**'80s** [2] - 614:10, 648:23
**'87** [1] - 616:10
**'88** [2] - 616:25, 633:19
**'89** [1] - 633:18
**'92** [1] - 616:25

**0**

**0.5** [1] - 730:3
**003** [1] - 684:13
**009** [1] - 687:25
**040** [1] - 726:7
**09-3251** [1] - 606:8

**1**

**1** [5] - 670:23, 671:2, 671:7, 739:11, 745:16
**10** [4] - 621:22, 628:3, 694:14, 694:25
**100** [11] - 606:18, 672:24, 673:3, 674:5, 712:1, 712:9, 741:5, 742:13
**1000** [1] - 606:24
**105,120** [1] - 744:22
**10:25** [2] - 682:4, 682:9
**15** [12] - 618:11, 677:1, 677:2, 677:3, 677:4, 682:4, 688:23, 692:14, 702:20, 702:24, 735:21
**16** [1] - 744:18
**17** [1] - 720:8
**1800** [1] - 607:5
**1873** [1] - 606:5
**19** [2] - 606:6, 609:3
**1980** [1] - 739:22
**1980s** [1] - 610:18
**1985** [2] - 626:22, 644:7
**1987** [3] - 740:1, 740:2, 740:11
**1988** [1] - 616:10
**1989** [1] - 621:3
**1990** [2] - 631:22,

740:11
**1990s** [2] - 618:20, 647:25
**1991** [1] - 629:19
**1993** [1] - 640:7
**1999** [3] - 621:21, 653:17, 653:20
**19th** [1] - 688:5
**1:15** [1] - 748:24

**2**

**2,000** [1] - 716:11
**20** [9] - 630:6, 630:24, 639:7, 639:8, 640:11, 646:6, 648:1, 665:24, 677:1
**2000** [3] - 662:2, 693:11, 693:12
**2000s** [6] - 659:24, 693:10, 693:12, 693:16, 694:2, 695:8
**2001** [1] - 693:12
**2002** [2] - 662:7, 693:12
**2004** [2] - 661:14, 695:24
**2005** [3] - 621:19, 621:21, 717:8
**2006** [2] - 662:9, 677:20
**2007** [5] - 662:10, 677:21, 683:13, 683:16, 702:8
**2008** [4] - 655:10, 656:20, 677:19, 683:13
**2009** [2] - 621:6, 747:23
**2010** [5] - 606:6, 609:3, 621:10, 688:5, 692:4
**2206** [2] - 711:18, 711:20
**2211** [1] - 712:5
**2250** [1] - 606:21
**226** [1] - 718:20
**228** [1] - 718:20
**229** [1] - 611:13
**25** [3] - 626:15, 629:10, 709:4
**28** [2] - 614:18, 626:24
**28,032** [1] - 744:21
**2900** [1] - 607:10

**3**

**3** [5] - 606:11, 674:25,

684:8, 684:13, 711:23
**30** [1] - 610:16, 678:22
**300** [1] - 744:21
**35** [1] - 720:10
**3838** [1] - 607:9
**39** [1] - 720:11
**3rd** [1] - 640:7

**4**

**4** [9] - 623:7, 623:8, 656:16, 675:24, 683:3, 700:22, 701:17, 711:20, 726:6
**40** [4] - 720:7, 726:3, 726:4, 730:7
**403** [2] - 634:12, 635:11
**4265** [1] - 606:24

**5**

**5** [2] - 670:17, 676:11
**5/19/2010** [1] - 695:14
**500** [6] - 607:13, 670:15, 670:17, 712:10, 712:19, 730:3
**504** [1] - 607:14
**519** [1] - 667:23
**520** [1] - 657:1
**589-7779** [1] - 607:14
**590** [5] - 684:7, 684:16, 684:18, 684:19, 711:23

**6**

**600-page** [1] - 727:24
**610** [2] - 608:5, 608:6
**619** [1] - 608:7
**628** [3] - 653:14, 656:10, 727:4
**644** [1] - 608:8
**652** [1] - 608:9
**682** [1] - 608:10

**7**

**70002** [1] - 607:10
**70112** [1] - 607:5
**70130** [1] - 607:14
**702** [1] - 634:6
**710** [1] - 608:11
**714** [1] - 608:12

**715** [1] - 608:13
**77027** [1] - 606:24
**78257** [1] - 606:18
**78470** [1] - 606:21
**79** [2] - 659:1

**8**

**8** [7] - 644:7, 726:9, 726:10, 726:19, 726:21, 726:22, 732:20
**8.17** [1] - 710:22
**80** [1] - 744:18
**802** [1] - 606:21
**81** [2] - 668:19, 684:6
**887** [1] - 686:5
**89** [1] - 737:4
**8:30** [2] - 606:6, 609:3

**9**

**9** [1] - 687:25
**909** [1] - 607:5
**93** [1] - 720:2
**960** [1] - 744:19

**A**

**A.M** [2] - 606:6, 609:3
**ability** [3] - 732:10, 742:3, 750:13
**able** [10] - 613:3, 613:6, 662:1, 662:10, 665:15, 669:24, 677:16, 679:19, 689:15, 704:16
**abnormal** [7] - 704:2, 731:22, 731:24, 731:25, 732:3, 733:4
**abnormalities** [1] - 705:20
**above-entitled** [1] - 750:14
**absence** [2] - 697:3, 698:3
**absorbed** [1] - 720:2
**abstracted** [1] - 745:8
**academic** [1] - 717:5
**accept** [11] - 643:11, 650:22, 650:23, 651:1, 651:11, 651:23, 651:25, 652:7, 652:12, 652:20, 715:19
**acceptance** [3] - 629:6, 635:21

**accepted** [11] - 628:9, 629:7, 630:24, 635:14, 637:20, 640:18, 646:3, 650:1, 650:10, 651:21, 652:15
**accepts** [3] - 613:8, 643:14, 650:21
**accommodate** [1] - 747:25
**according** [1] - 726:22
**accordingly** [1] - 728:19
**accounted** [2] - 679:12, 679:20
**accurate** [7] - 631:2, 691:20, 692:6, 692:11, 712:17, 741:19, 745:5
**achieved** [1] - 748:4
**acid** [3] - 720:8, 720:10, 733:14
**acknowledge** [1] - 747:11
**acronym** [2] - 639:25, 738:23
**action** [4] - 614:23, 719:16, 733:15, 745:12
**actions** [1] - 733:16
**active** [1] - 697:21
**actively** [3] - 625:7, 645:3, 645:6
**actual** [6] - 666:16, 682:25, 687:19, 697:8, 726:25, 741:3
**addition** [6] - 618:5, 657:4, 697:25, 729:11, 745:18, 748:14
**additional** [4] - 698:14, 712:8, 746:8
**address** [2] - 633:7, 747:1
**adjacent** [1] - 719:19
**administration** [2] - 734:18, 735:5
**admissibility** [4] - 633:21, 633:22, 633:24, 634:1
**admissible** [5] - 634:8, 634:19, 635:6, 638:24, 639:15
**admit** [3] - 728:7, 728:13, 728:18
**admitted** [3] - 635:23, 654:24, 715:24
**adopted** [1] - 738:14
**adults** [2] - 613:24,

617:14
**advanced** [1] - 611:9
**adverse** [4] - 713:1,
718:23, 726:17,
733:5
**advertise** [1] - 708:20
**advertisement** [1] -
709:1
**affect** [2] - 671:23,
711:8
**affiliation** [2] - 615:3,
615:4
**afterwards** [2] -
662:19, 696:10
**age** [6] - 626:15,
629:10, 658:24,
659:4, 705:13, 713:4
**agencies** [2] - 653:23,
717:22
**Agency** [4] - 653:12,
726:13, 738:22,
739:4
**agency** [2] - 653:16,
656:25, 726:14
**agents** [2] - 664:6
**aggravate** [3] - 672:8,
673:13, 677:24
**aggravating** [1] -
701:20
**aggravation** [4] -
678:11, 679:13,
679:22, 679:24
**ago** [33] - 614:18,
618:21, 619:13,
619:15, 620:19,
621:17, 624:20,
626:24, 630:6,
639:7, 639:8,
640:12, 645:13,
646:6, 648:1,
649:19, 665:5,
665:24, 678:5,
678:14, 691:20,
692:6, 692:8,
694:14, 694:25,
701:19, 702:7,
707:19, 708:22,
708:24, 709:4, 738:6
**agree** [43] - 621:21,
623:8, 624:22,
625:1, 631:5,
639:13, 642:12,
642:17, 648:7,
652:10, 659:11,
671:14, 684:7,
685:7, 685:11,
686:10, 687:12,
687:16, 690:17,
691:12, 691:16,
693:1, 695:15,

696:15, 696:20,
697:4, 697:15,
701:2, 702:23,
703:18, 704:20,
704:25, 706:2,
707:4, 707:9,
707:14, 707:15,
712:2, 712:12,
728:13, 728:15,
736:16, 749:22
**agreed** [3] - 654:17,
747:7, 747:13
**agreement** [1] -
727:7, 727:16,
728:7, 746:5,
746:11, 746:12,
746:13, 746:14,
747:2, 747:4, 747:12
**Agrico** [2] - 633:14,
638:18
**ahead** [28] - 609:11,
609:14, 609:15,
609:16, 613:7,
626:18, 627:22,
633:9, 636:11,
643:4, 643:19,
648:13, 652:22,
668:4, 672:13,
674:1, 677:3, 677:9,
677:13, 681:25,
682:19, 685:1,
690:14, 697:9,
703:12, 715:22,
729:3, 748:20
**ailment** [1] - 661:22
**air** [17] - 665:8, 667:7,
667:9, 667:12,
670:10, 686:18,
687:10, 711:5,
711:9, 711:12,
721:6, 721:11,
721:13, 734:23,
737:14, 737:15,
737:18
**airway** [1] - 721:8
**airways** [2] - 614:1,
734:22
**allegation** [2] - 627:9,
644:14
**alleging** [1] - 665:20
**Allen** [2] - 633:14,
638:18
**allergens** [1] - 730:17
**allergic** [5] - 661:15,
661:17, 679:3,
679:5, 693:20
**allergies** [9] - 665:6,
678:14, 679:2,
693:23, 694:8,
694:12, 694:22,

695:10, 695:13
**allow** [9] - 627:24,
629:13, 632:9,
635:11, 649:5,
688:10, 690:9,
715:22
**allowed** [6] - 619:7,
621:2, 628:15,
644:17, 690:4,
716:16
**allowing** [1] - 634:13
**allows** [2] - 690:9,
716:24
**almost** [8] - 638:25,
640:11, 669:21,
674:13, 694:14,
737:11, 743:15,
743:16
**altered** [1] - 725:23
**American** [11] - 617:8,
620:12, 623:11,
623:21, 624:4,
624:23, 625:5,
716:10, 716:13,
716:20, 717:24
**amount** [3] - 649:21,
668:6, 688:13
**analysis** [4] - 632:1,
635:8, 635:11,
649:25, 665:14,
675:17
**anatomical** [1] -
734:25
**anatomy** [1] - 716:24
**ANDREW** [1] - 607:8
**animal** [5] - 657:15,
724:19, 724:21,
725:11, 740:6
**animals** [6] - 657:13,
671:21, 673:2,
718:24, 725:10,
726:25
**annoyance** [1] -
659:25
**answer** [5] - 639:6,
643:7, 647:19,
648:10, 649:5,
656:6, 700:3, 703:7,
703:11, 703:12,
706:1, 707:10,
748:2, 748:6, 748:12
**answered** [2] - 706:6,
742:6
**answers** [1] - 742:7
**anti** [1] - 664:6
**anti-inflammatory** [1]
- 664:6
**antibiotic** [1] - 618:14
**antibiotics** [1] - 664:4
**anticipated** [4] -

727:20, 736:22,
740:7, 749:21
**antigens** [2] - 730:23,
732:11
**ANTONIO** [1] - 606:18
**anxiety** [4] - 696:17,
696:18, 696:21,
696:24
**apart** [1] - 741:18
**apologize** [3] - 633:3,
638:13, 690:12
**Appeal** [1] - 629:25
**Appeals** [2] - 628:24,
631:15, 640:6,
640:16
**appear** [3] - 679:15,
710:22, 729:7
**APPEARANCES** [2] -
606:15, 607:1
**appeared** [1] - 746:8
**appellate** [2] - 628:25,
640:6
**appendix** [3] - 729:9,
729:11, 729:13
**apples** [2] - 737:16,
737:24
**applicable** [1] - 634:2
**applied** [1] - 634:5
**apply** [1] - 634:15
**appreciate** [1] -
749:17
**appreciation** [1] -
652:6
**approach** [13] - 641:9,
642:3, 654:2,
655:11, 663:9,
673:14, 680:6,
692:22, 710:13,
710:17, 727:13,
742:18, 745:25
**appropriate** [4] -
639:4, 639:8, 705:9,
705:10
**approved** [1] - 635:17
**approximate** [2] -
662:9, 710:2
**April** [1] - 644:7
**area** [7] - 611:9, 617:4,
628:16, 632:22,
641:19, 674:21,
704:13
**areas** [12] - 612:2,
612:20, 613:22,
617:7, 617:11,
618:13, 618:24,
619:8, 650:4,
653:11, 720:1,
735:12
**argument** [1] - 695:20
**argumentative** [2] -

700:5, 700:13
**arises** [1] - 691:17
**Arizona** [4] - 641:15,
641:18, 646:11,
646:13
**arms** [1] - 741:18
**Armstrong** [1] -
639:19
**arrangement** [1] -
611:10
**article** [4] - 627:1,
708:25, 709:17,
724:17, 725:17,
726:15, 726:18,
745:24
**articles** [5] - 653:9,
655:11, 741:7,
744:1, 744:11
**asbestos** [1] - 633:16
**aside** [1] - 634:4
**aspect** [1] - 634:12
**aspects** [2] - 628:19,
656:1
**aspirin** [6] - 732:22,
733:14, 733:19,
733:25, 734:3
**assessment** [1] -
690:11
**assignment** [2] -
657:20, 657:22
**assistant** [2] - 616:10,
617:1
**associate** [4] - 617:1,
617:2, 716:5, 717:10
**associated** [3] -
645:16, 645:17,
678:1
**association** [1] -
738:18
**assume** [7] - 636:15,
654:9, 662:8,
676:18, 676:19,
676:24
**assuming** [5] -
609:12, 631:9,
642:8, 642:9, 643:13
**AT** [1] - 606:20
**atoms** [1] - 719:19
**ATSDR** [15] - 653:12,
653:23, 655:9,
676:10, 726:9,
726:12, 726:22,
726:25, 727:4,
727:18, 729:6,
729:12, 729:16,
732:17, 732:19
**attach** [3] - 734:8,
734:14, 745:10
**attached** [1] - 720:12
**attaches** [1] - 734:10

**attempted** [2] - 642:1, 673:6
**attended** [2] - 611:16, 612:4
**attention** [1] - 682:22
**ATTORNEY** [1] - 606:20
**attorney** [4] - 683:8, 686:19, 688:18, 688:20
**attorneys** [7] - 619:7, 688:14, 689:19, 690:5, 691:1, 702:15, 702:17
**August** [3] - 629:19, 662:10, 677:20
**authenticate** [1] - 627:13
**authors** [1] - 729:8
**available** [9] - 632:3, 632:4, 632:17, 632:20, 637:2, 637:3, 711:5, 711:6, 711:10
**average** [4] - 668:15, 670:11, 712:11, 712:19
**avoid** [2] - 635:18, 742:3
**awards** [2] - 617:21, 617:22
**Awards** [1] - 617:25
**aware** [19] - 628:20, 629:24, 630:2, 630:4, 631:15, 631:20, 637:9, 638:15, 638:23, 642:5, 642:23, 673:9, 685:20, 687:19, 687:22, 706:16, 706:19, 706:24, 707:25

## B

**B406** [1] - 607:13
**Bachelor's** [1] - 716:23
**backdoor** [3] - 673:20, 674:2
**background** [2] - 672:2, 715:22
**bacteria** [6] - 722:24, 730:17, 730:23, 731:3, 731:4, 732:11
**bad** [1] - 690:12
**balance** [2] - 609:13, 719:8
**ballpark** [4] - 672:5,

673:11, 676:4, 676:7
**bare** [1] - 655:11
**based** [12] - 631:13, 638:25, 651:17, 672:1, 673:6, 681:20, 698:18, 705:24, 706:3, 714:5, 740:12, 741:3
**Basis** [2] - 726:9, 726:12
**basis** [15] - 629:9, 630:1, 630:14, 635:12, 637:22, 644:13, 661:21, 673:18, 680:9, 713:10, 728:15, 732:16, 746:21, 747:9, 748:13
**Bates** [2] - 711:18, 712:4
**baton** [1] - 674:14
**Baton** [1] - 638:17
**bearing** [1] - 629:6
**beating** [1] - 722:16
**beats** [1] - 722:15
**became** [4] - 660:2, 660:5, 661:24, 739:25
**become** [9] - 618:6, 618:21, 634:8, 635:6, 663:24, 711:10, 725:1, 745:19, 748:15
**becomes** [3] - 664:8, 675:5, 741:23
**becoming** [2] - 660:19, 685:7
**BEFORE** [1] - 606:12
**began** [2] - 660:3, 660:21
**begin** [2] - 682:16, 735:3
**beginning** [2] - 721:7, 734:13
**begins** [2] - 669:18, 722:9
**behalf** [1] - 613:5
**behind** [6] - 660:5, 663:17, 663:19, 663:20, 663:21
**belief** [1] - 692:3
**believes** [1] - 676:5
**below** [7] - 618:3, 663:22, 672:24, 673:3, 674:5, 712:11, 726:16
**bench** [15] - 633:12, 638:8, 654:3, 654:6, 655:18, 673:17, 677:7, 680:8, 681:6,

727:15, 728:17, 742:21, 743:18, 746:3, 748:8
**benzene** [1] - 718:19
**Berry** [1] - 639:19
**best** [2] - 676:15, 750:13
**Beta** [1] - 611:19
**better** [8] - 619:15, 637:18, 655:4, 658:11, 660:9, 664:3, 735:12, 744:14
**between** [7] - 646:18, 670:20, 696:9, 710:24, 724:15, 738:1, 739:10
**beyond** [4] - 629:1, 639:12, 722:9, 747:8
**bible** [1] - 654:15
**big** [7] - 623:18, 683:4, 683:5, 722:19, 723:5, 725:3, 736:5
**bigger** [2] - 719:20, 722:17
**billion** [2] - 668:19, 670:15, 670:17, 670:21, 670:24, 673:3, 673:4, 674:5, 674:6, 684:7, 684:8, 684:13, 684:16, 687:25, 726:3, 726:19, 726:21, 726:22, 730:3, 730:6, 730:7, 732:20, 741:5, 742:13, 744:18, 744:21
**BINSTOCK** [1] - 606:23
**bioavailability** [2] - 736:13, 737:2
**bioavailable** [2] - 687:4, 711:4
**biological** [2] - 738:19, 738:20
**biologically** [1] - 737:11
**biopsy** [4] - 704:22, 704:25, 705:7, 730:9
**bit** [15] - 610:20, 611:21, 618:11, 623:2, 626:9, 651:24, 658:22, 660:9, 661:9, 665:25, 685:5, 703:3, 717:5, 723:24, 739:2
**bleeding** [1] - 734:1
**blood** [10] - 660:15,

718:11, 720:4, 720:5, 733:18, 733:20, 734:22, 734:24, 735:2, 735:9
**bloodstream** [1] - 720:3
**blow** [4] - 611:14, 711:21, 712:6, 723:11
**blue** [1] - 721:20
**Board** [8] - 617:8, 620:12, 620:24, 716:9, 716:10, 716:13, 716:20
**board** [17] - 612:19, 617:8, 617:12, 617:13, 618:4, 618:14, 620:9, 620:15, 623:3, 635:25, 636:1, 651:7, 651:10, 652:12, 653:24, 663:9, 693:7
**board-certified** [1] - 620:15
**boat** [1] - 722:15
**Bobby** [1] - 718:3
**body** [23] - 611:9, 614:3, 616:2, 617:7, 617:16, 645:9, 645:18, 671:19, 711:7, 711:13, 719:14, 720:1, 720:17, 723:11, 733:13, 734:2, 734:20, 734:24, 734:25, 735:14, 736:1, 739:5, 742:3
**body's** [1] - 723:18
**bogged** [1] - 749:18
**Bois** [2] - 717:23, 717:24
**bonds** [1] - 719:19
**bones** [2] - 655:11, 663:20
**border** [2] - 611:2
**Boston** [2] - 610:14, 610:15
**bothering** [1] - 660:12
**bottom** [2] - 724:12, 731:15
**BOULEVARD** [1] - 607:9
**bound** [3] - 720:11, 737:19, 737:21
**BOURGEOIS** [1] - 607:7
**Bowers** [2] - 658:18, 695:22
**Boysen** [2] - 729:15

**boysen** [1] - 729:21
**Boysen's** [1] - 730:2
**Bradford** [2] - 738:7, 738:9
**brain** [1] - 617:7
**branch** [1] - 721:9
**branches** [5] - 721:9, 721:10, 724:3, 724:5, 724:7
**branching** [1] - 724:8
**break** [12] - 632:7, 676:24, 676:25, 677:4, 677:10, 682:1, 682:5, 734:15, 744:5, 748:21, 749:1
**breathe** [1] - 719:23
**breathes** [3] - 667:12, 723:1, 723:13
**breathing** [4] - 667:11, 699:19, 701:20, 702:11
**bridge** [1] - 733:23
**brief** [6] - 633:6, 659:16, 682:10, 695:9, 715:21, 717:4
**briefly** [5] - 657:11, 678:21, 688:16, 688:19, 735:15
**bring** [3] - 636:22, 651:13, 700:21
**bringing** [1] - 654:8
**brings** [2] - 621:19, 635:20
**brink** [2] - 680:14, 680:19
**British** [1] - 738:10
**broad** [2] - 665:5, 670:13
**broke** [1] - 681:13
**bronchia** [2] - 723:23, 723:25
**bronchioles** [3] - 723:23, 723:25, 724:9
**bronchus** [7] - 721:8, 722:18, 724:6, 725:6, 730:18, 730:25
**brought** [5] - 626:17, 638:4, 651:14, 652:17, 653:15
**build** [2] - 622:23, 746:20
**BUILDING** [1] - 606:18
**bunch** [3] - 655:10, 684:18, 728:11
**buried** [1] - 667:8
**business** [2] - 618:7, 701:14

**businesses** [1] - 622:17
**busy** [2] - 618:22, 622:2
**butadiene** [1] - 648:23
**buy** [1] - 735:21
**BY** [65] - 606:9, 606:17, 606:23, 607:3, 607:8, 607:15, 607:16, 608:6, 608:7, 608:8, 608:9, 608:10, 608:11, 608:13, 610:9, 613:18, 615:16, 619:24, 622:13, 624:15, 626:20, 628:1, 629:17, 638:12, 643:6, 644:6, 647:2, 647:13, 647:24, 648:16, 649:9, 649:17, 652:25, 655:20, 656:5, 656:15, 663:12, 666:7, 668:9, 672:18, 677:15, 681:9, 682:21, 685:4, 686:4, 690:16, 692:25, 697:14, 699:11, 700:8, 700:19, 703:17, 708:14, 709:20, 710:7, 710:19, 713:17, 715:2, 715:7, 716:1, 729:5, 736:25, 742:10, 743:21, 748:11

**C**

**cadmium** [1] - 630:8
**Cajun** [1] - 717:24
**calculate** [1] - 732:20
**calculations** [2] - 729:9, 729:13
**calendars** [1] - 749:8
**CALLED** [1] - 609:4
**Cambridge** [1] - 611:22
**canary** [3] - 712:20, 712:23, 712:25
**cancer** [37] - 630:8, 642:2, 660:24, 661:3, 681:16, 681:19, 685:16, 685:18, 685:19, 685:21, 696:19, 705:22, 705:25, 706:3, 706:17,

706:22, 707:5, 707:16, 708:8, 724:19, 725:8, 731:18, 731:25, 734:13, 738:5, 738:12, 738:18, 739:14, 739:19, 741:25, 742:15, 742:23, 742:24, 743:3, 743:7, 744:2
**Cancer** [2] - 738:23, 739:5
**cancers** [1] - 707:24
**cannot** [3] - 710:3, 719:21, 732:13
**capacity** [2] - 716:18, 716:25
**capital** [1] - 622:16
**car** [1] - 649:21
**CARANCAHUA** [1] - 606:21
**carcinogen** [10] - 661:4, 739:11, 739:12, 739:14, 739:25, 740:7, 740:9, 740:10, 740:11, 740:15
**carcinogenic** [3] - 739:8, 739:10
**carcinogenicity** [4] - 739:9, 741:3, 741:11
**carcinogens** [5] - 739:15, 739:16, 739:17, 740:21
**carcinoma** [8] - 630:20, 645:11, 645:16, 645:17, 646:2, 724:13, 724:22, 745:15
**care** [5] - 611:11, 613:24, 644:13, 644:16, 661:12
**career** [2] - 614:12, 614:14
**careful** [2] - 680:19, 680:23
**cascading** [1] - 637:25
**case** [114] - 613:10, 619:11, 619:14, 620:5, 625:3, 625:8, 625:14, 625:16, 625:22, 628:21, 628:23, 629:18, 629:19, 630:5, 630:17, 631:2, 631:22, 632:2, 632:19, 633:13, 633:17, 633:18, 633:25, 634:18,

635:3, 635:13, 635:17, 636:12, 636:25, 637:2, 637:19, 637:20, 638:17, 638:19, 638:21, 639:2, 639:4, 639:6, 639:9, 639:10, 639:19, 639:22, 640:2, 640:5, 640:11, 641:8, 641:10, 641:22, 642:18, 643:2, 643:9, 643:16, 645:4, 645:10, 646:11, 646:12, 646:16, 647:4, 647:5, 647:11, 647:14, 647:15, 647:20, 648:2, 648:17, 648:22, 648:25, 649:7, 649:10, 649:14, 649:18, 649:25, 650:20, 650:24, 651:1, 651:3, 651:5, 651:14, 652:2, 652:23, 653:1, 653:7, 655:7, 655:23, 657:10, 657:21, 665:19, 668:3, 669:12, 670:5, 670:8, 671:15, 675:2, 678:2, 678:9, 680:4, 681:22, 682:5, 685:25, 690:21, 695:3, 705:23, 715:14, 715:24, 728:8, 728:12, 742:23, 747:21, 748:25
**cases** [11] - 633:19, 635:14, 636:13, 637:6, 673:1, 692:10, 710:1, 727:17, 727:20, 727:21
**Castanel** [42] - 621:12, 631:6, 642:20, 657:22, 658:1, 658:15, 661:8, 662:8, 664:20, 667:10, 667:25, 669:23, 673:11, 674:24, 675:3, 677:16, 681:13, 683:15, 684:2, 688:2, 688:23, 689:19, 690:18, 691:9, 691:13,

693:1, 695:15, 697:15, 697:25, 698:4, 700:25, 701:4, 701:19, 702:20, 702:21, 706:19, 708:17, 710:9, 713:9, 743:6, 743:12, 743:23
**CASTANEL** [1] - 606:9
**Castanel's** [12] - 621:13, 642:18, 665:21, 666:21, 671:15, 675:2, 687:17, 687:20, 695:7, 703:21, 706:16, 713:22
**catches** [1] - 733:23
**categories** [1] - 740:20
**Cathy** [2] - 750:8, 750:19
**CATHY** [1] - 607:13
**causal** [5] - 646:18, 738:15, 738:17, 741:2, 741:11
**causality** [1] - 738:11
**causation** [19] - 639:9, 642:4, 645:15, 648:18, 665:14, 665:18, 665:24, 667:25, 675:11, 675:17, 676:16, 676:17, 738:5, 743:1, 743:2, 743:4, 743:14, 743:24
**caused** [12] - 626:10, 630:8, 672:3, 672:4, 685:16, 685:21, 694:12, 698:22, 699:15, 699:19, 713:10, 745:20
**causes** [14] - 661:18, 665:2, 665:4, 665:9, 665:10, 675:17, 678:7, 678:10, 685:19, 700:1, 705:5, 707:16, 713:8, 745:23
**CAUSEWAY** [1] - 607:9
**cavities** [1] - 663:17
**cavity** [3] - 704:21, 721:5, 723:23
**CCR** [2] - 607:13, 750:19
**CDC** [18] - 655:10, 656:24, 667:4, 667:22, 668:5, 668:10, 669:1, 669:13, 673:7,

674:23, 675:1, 676:9, 677:19, 684:1, 684:9, 711:17, 711:19, 727:18
**cell** [30] - 630:20, 645:11, 645:16, 645:17, 646:1, 679:8, 705:1, 719:9, 724:13, 724:22, 730:14, 730:16, 730:20, 731:11, 731:13, 731:14, 731:18, 731:21, 733:18, 734:14, 734:6, 741:17, 741:20, 741:24, 741:25, 744:4, 744:5, 744:6, 745:11
**cells** [10] - 704:21, 721:19, 722:22, 722:23, 731:25, 733:17, 734:13, 741:17, 741:20, 741:24
**cellular** [2] - 705:5, 705:6
**Center** [10] - 610:19, 610:21, 616:11, 616:13, 617:3, 717:6, 717:11, 718:10, 738:14
**CENTER** [1] - 607:9
**center** [2] - 610:24, 663:20
**Centers** [1] - 656:19
**CERCLA** [4] - 639:22, 639:24, 640:3
**certain** [6] - 644:8, 646:20, 672:24, 685:19, 707:24, 728:24
**certainly** [14] - 625:15, 627:24, 629:6, 661:18, 669:21, 680:4, 688:16, 698:16, 701:11, 705:5, 707:23, 713:4, 727:23, 733:12
**certainty** [1] - 714:6
**CERTIFICATE** [1] - 750:6
**certification** [3] - 617:12, 716:9, 716:20
**certifications** [1] - 651:10
**certified** [11] - 612:20, 617:8, 617:13,

620:9, 620:15, 623:12, 635:25, 636:1, 651:7, 652:12, 716:13
**Certified** [2] - 750:8, 750:9
**certify** [1] - 750:12
**cetera** [1] - 618:25
**CH2** [1] - 719:17
**CH2O** [1] - 719:17
**Chabert** [1] - 718:9
**chairman** [1] - 623:3
**challenged** [1] - 645:13
**chance** [3] - 628:8, 643:13, 744:6
**chances** [1] - 736:2
**change** [3] - 713:8, 713:21, 746:25
**changed** [2] - 725:6, 725:23
**changes** [7] - 704:14, 705:1, 705:4, 705:5, 705:6, 726:9, 729:7
**changing** [1] - 733:19
**charged** [1] - 719:7
**chart** [5] - 682:23, 695:19, 710:15, 710:20, 741:11
**charts** [2] - 696:7, 696:13
**cheek** [1] - 663:20
**chemical** [19] - 666:10, 670:8, 670:10, 678:14, 678:16, 678:17, 679:1, 694:9, 698:21, 699:7, 699:8, 699:13, 699:24, 717:14, 719:18, 725:19, 725:21, 735:13
**Chemical** [3] - 633:14, 633:18, 638:18
**chemically** [1] - 717:3
**chemically-exposed** [1] - 717:3
**chemicals** [15] - 611:8, 614:3, 616:2, 617:6, 617:16, 645:9, 645:15, 698:5, 698:12, 711:4, 711:12, 718:23, 725:20, 739:7, 745:9
**chicken** [1] - 734:9
**children** [3] - 646:13, 646:20, 718:8
**choose** [1] - 692:18
**CHRIS** [1] - 606:20

**CHRISTI** [1] - 606:21
**Christophersen** [7] - 628:21, 629:19, 630:17, 633:8, 633:25, 634:3, 645:10
**chromatid** [1] - 742:11
**chronic** [6] - 661:14, 679:15, 726:9, 726:10, 726:12, 726:19
**chronically** [1] - 712:9
**church** [1] - 701:24
**cigarette** [4] - 707:15, 708:2, 708:4
**cigarettes** [1] - 707:25
**cilia** [10] - 722:13, 722:24, 723:2, 723:15, 724:25, 730:10, 730:18, 731:1, 732:8, 735:6
**ciliary** [1] - 723:6
**ciliated** [3] - 722:8, 723:19, 732:7
**Circuit** [5] - 628:24, 631:12, 640:5, 640:16, 645:20
**circulates** [1] - 720:4
**circumstance** [3] - 666:15, 691:17, 705:10
**circumstances** [3] - 639:10, 639:11, 699:17
**cited** [1] - 730:1
**city** [1] - 610:17
**claimed** [1] - 685:9
**clarify** [1] - 732:2
**classifiable** [1] - 739:17
**classification** [2] - 739:20, 745:16
**classified** [1] - 740:1
**classify** [1] - 739:7
**cleaning** [1] - 694:10
**cleansers** [1] - 694:11
**clear** [14] - 614:25, 679:25, 686:17, 693:20, 694:23, 706:1, 709:8, 709:13, 713:24, 742:22, 742:25, 743:9, 743:11, 749:7
**clearly** [6] - 630:23, 642:3, 660:12, 660:19, 675:20, 746:12
**CLERK** [4] - 609:21, 610:4, 714:14, 714:19

**Clerk** [2] - 610:3, 714:23
**climate** [1] - 669:5
**Clinical** [1] - 716:21
**clinical** [14] - 613:21, 617:3, 617:15, 618:19, 625:6, 625:7, 625:20, 635:24, 644:16, 645:3, 645:8, 650:12, 651:9, 652:13
**clock** [1] - 746:20
**close** [5] - 649:12, 674:17, 677:5, 680:10, 722:11
**closely** [1] - 743:22
**clothing** [1] - 737:8
**CO2** [1] - 720:7
**coffee** [3] - 686:22, 710:23, 737:9
**coherence** [1] - 738:20
**colder** [1] - 669:2
**Cole** [1] - 746:25
**collected** [1] - 638:4
**College** [6] - 611:16, 623:11, 623:21, 624:4, 624:23, 625:5
**colon** [1] - 732:13
**columnar** [3] - 722:8, 723:20, 732:8
**combination** [1] - 664:18
**combine** [1] - 719:8
**comet** [1] - 742:11
**comfortable** [2] - 693:11, 696:12
**coming** [4] - 733:23, 734:21, 735:13, 736:2
**commending** [1] - 629:25
**committee** [3] - 644:12, 644:15, 653:24
**common** [4] - 664:25, 670:14, 691:15, 691:23
**communities** [1] - 717:14
**community** [3] - 646:4, 648:24, 718:10
**companies** [7] - 618:12, 618:13, 622:7, 622:24, 623:2
**companion** [2] - 637:20, 646:12
**Company** [4] - 633:14,

633:18, 638:18, 639:20
**company** [6] - 618:14, 620:5, 622:6, 622:16, 622:23, 623:3
**comparable** [1] - 732:23
**compare** [2] - 695:20, 744:13
**comparing** [2] - 737:15, 737:17
**compartments** [1] - 720:6
**competency** [2] - 716:12, 716:14
**complaint** [2] - 614:17, 691:21
**complete** [3] - 632:22, 662:23, 666:19
**completed** [10] - 643:22, 666:12, 666:13, 666:18, 666:21, 666:22, 667:1, 675:4, 675:10, 678:1
**completely** [3] - 692:11, 711:2, 737:11
**completeness** [1] - 684:22
**Completeness** [1] - 627:21
**completes** [1] - 667:12
**complex** [3] - 687:3, 687:4, 711:3
**comply** [1] - 716:24
**component** [4] - 661:15, 679:3, 693:20, 693:21
**components** [3] - 667:3, 667:7, 745:11
**compound** [1] - 738:12
**COMPUTER** [1] - 607:16
**concentration** [10] - 615:25, 668:25, 726:15, 726:16, 744:12, 744:13, 744:15, 744:16, 744:23, 745:4
**concentrations** [3] - 684:7, 741:4, 742:13
**concept** [1] - 641:11
**concern** [1] - 674:20
**concerned** [2] - 632:3, 635:23, 651:16, 660:24, 674:18,

679:14
**concerning** [4] - 614:17, 644:8, 645:11, 689:18
**concluded** [12] - 630:7, 638:8, 640:17, 642:1, 642:12, 655:18, 677:8, 681:7, 710:8, 728:17, 743:19, 748:9
**conclusion** [8] - 642:2, 642:4, 642:24, 694:11, 714:4, 745:20, 745:23, 748:16
**conclusions** [1] - 640:17
**condition** [3] - 663:24, 671:20, 678:6
**conditions** [10] - 663:5, 664:21, 664:23, 665:2, 665:11, 665:21, 666:11, 672:8, 677:22, 701:20
**conduct** [2] - 627:17, 657:25
**confer** [1] - 681:3
**conference** [15] - 633:12, 638:8, 654:6, 655:18, 673:17, 674:11, 677:8, 680:8, 681:7, 727:15, 728:17, 742:21, 743:19, 746:3, 748:9
**confined** [2] - 742:1, 743:25
**confirms** [1] - 646:7
**confused** [1] - 737:16
**confusing** [2] - 737:9, 737:23
**congestion** [1] - 659:20
**connected** [2] - 664:24, 741:14
**connection** [8] - 627:9, 632:5, 634:21, 642:17, 643:8, 646:18, 654:21, 655:22
**consider** [4] - 616:6, 617:22, 621:13, 738:17
**considerable** [1] - 709:24
**considerations** [1] - 738:15
**considered** [3] -

659:14, 674:15,
713:21
**considering** [1] -
643:10
**consistency** [1] -
738:19
**consistent** [3] -
634:20, 696:8, 702:3
**construction** [1] -
634:6
**consultations** [1] -
709:11
**consulted** [1] - 655:2
**contact** [2] - 619:3,
687:1
**contacted** [1] - 619:13
**contained** [1] - 696:12
**contains** [1] - 708:4
**contaminated** [1] -
646:18
**contamination** [6] -
666:14, 666:17,
675:4, 675:5,
675:12, 675:13
**contemporaneously**
[1] - 692:8
**context** [2] - 641:2,
743:4
**continue** [7] - 613:14,
615:2, 632:12,
644:17, 644:18,
645:8, 648:14
**continued** [4] - 615:4,
618:20, 644:19,
644:21
**CONTINUED** [1] -
607:1
**continues** [2] - 696:4,
744:4
**continuous** [7] -
735:23, 735:24,
742:2, 743:5, 743:6,
743:24, 744:3
**continuously** [1] -
736:2
**contributed** [1] -
698:10
**Control** [1] - 656:19
**controversy** [1] -
740:14
**conversation** [1] -
677:12
**convert** [1] - 670:24
**coordinator** [1] -
716:8
**copy** [5] - 624:8,
741:17, 741:19,
741:23, 747:23
**core** [1] - 718:18
**CORPUS** [1] - 606:21

**correct** [214] - 610:11,
610:15, 611:16,
611:17, 611:23,
612:5, 617:9, 619:9,
619:10, 619:11,
620:10, 620:13,
620:16, 620:22,
620:25, 621:3,
621:4, 621:11,
621:14, 621:18,
621:19, 621:20,
621:23, 622:2,
622:14, 622:15,
622:17, 622:23,
623:1, 623:9,
623:10, 623:14,
623:19, 624:24,
625:3, 625:4, 627:3,
627:4, 627:10,
627:11, 627:15,
627:16, 627:18,
627:19, 628:5,
628:10, 628:17,
628:22, 629:22,
630:15, 631:3,
640:14, 640:15,
641:1, 641:8,
641:15, 641:24,
642:7, 642:13,
644:24, 645:20,
646:9, 646:10,
650:13, 650:14,
653:2, 653:21,
662:3, 662:22,
663:8, 665:15,
665:16, 668:17,
670:18, 671:25,
672:4, 673:1, 673:5,
678:25, 681:14,
683:1, 683:9,
683:10, 683:16,
683:17, 683:20,
683:22, 684:3,
684:4, 684:9,
684:10, 684:11,
684:12, 684:14,
685:15, 685:17,
685:24, 686:7,
686:15, 686:16,
686:22, 687:2,
687:6, 687:9, 688:3,
688:4, 688:5, 688:6,
688:10, 688:11,
688:24, 689:3,
689:7, 689:17,
689:20, 689:21,
690:2, 690:3, 690:5,
690:19, 690:21,
690:22, 691:3,
691:4, 691:6,
691:10, 691:11,

693:3, 693:7, 693:8,
694:18, 694:20,
695:4, 695:25,
696:1, 696:17,
696:23, 697:1,
697:16, 697:17,
698:5, 698:6,
698:19, 698:20,
698:24, 699:14,
700:25, 701:1,
701:5, 701:7, 701:8,
701:12, 701:13,
701:15, 702:9,
702:10, 703:2,
703:20, 703:21,
703:24, 704:7,
704:8, 704:14,
704:23, 704:24,
705:1, 705:2, 705:4,
705:7, 705:11,
705:16, 705:23,
706:14, 706:15,
706:22, 706:23,
706:25, 707:1,
707:3, 707:7,
707:21, 708:1,
708:6, 708:8, 709:3,
709:7, 709:15,
709:16, 709:25,
712:13, 716:19,
716:20, 717:19,
717:20, 719:23,
726:5, 729:17,
730:11, 732:13,
732:15, 732:17,
735:17, 737:4,
737:5, 738:4,
739:20, 739:21,
739:23, 739:24,
740:19, 741:1,
741:5, 741:6, 750:12
**correlated** [2] -
672:25, 678:1
**correlations** [1] -
673:1
**corroborated** [1] -
661:7
**cotton** [1] - 722:3
**cough** [1] - 722:20
**Counsel** [2] - 709:15,
749:5
**counsel** [11] - 619:20,
624:8, 632:3, 632:6,
632:18, 632:19,
636:16, 637:3,
677:12, 682:9,
727:11
**County** [1] - 641:18
**couple** [14] - 633:1,
646:22, 655:8,

658:19, 660:20,
661:16, 665:5,
669:21, 670:2,
672:14, 674:10,
695:10, 708:11,
748:4
**course** [10] - 651:1,
651:2, 657:13,
667:11, 699:2,
720:4, 721:6,
722:22, 734:22,
735:5
**Court** [42] - 613:8,
628:8, 628:24,
629:24, 629:25,
630:4, 631:1,
631:15, 633:20,
633:23, 635:16,
638:23, 639:14,
639:16, 640:5,
640:9, 640:16,
641:18, 642:1,
642:2, 642:6, 642:8,
642:12, 643:11,
643:13, 649:23,
650:7, 650:18,
650:21, 652:15,
715:19, 728:18,
747:25, 749:12,
749:22, 749:25,
750:9, 750:10,
750:11, 750:20,
750:21
**court** [18] - 628:24,
628:25, 630:1,
630:13, 631:18,
631:24, 632:14,
632:18, 633:24,
635:20, 637:11,
638:17, 640:6,
640:17, 642:1,
647:5, 728:21, 729:2
**COURT** [130] - 606:1,
607:13, 609:4,
609:7, 609:10,
609:19, 612:13,
612:24, 613:16,
615:13, 619:20,
624:8, 624:11,
626:12, 626:16,
627:22, 629:4,
629:11, 632:2,
632:9, 632:15,
633:1, 633:9, 634:3,
634:17, 635:19,
636:6, 636:14,
636:19, 637:14,
637:16, 638:3,
638:10, 642:25,
643:4, 643:8,
643:19, 643:24,

644:4, 646:22,
647:6, 647:18,
648:5, 648:11,
649:5, 649:12,
650:7, 650:15,
652:6, 654:4,
654:20, 655:1,
655:12, 655:16,
656:3, 656:13,
663:10, 666:3,
668:2, 672:13,
673:15, 673:25,
674:10, 674:25,
675:18, 675:23,
676:7, 676:10,
676:14, 676:21,
676:23, 677:3,
677:6, 677:9,
680:14, 680:18,
680:22, 681:2,
681:5, 681:25,
682:6, 682:9,
682:12, 682:15,
682:19, 685:1,
690:7, 690:14,
692:23, 697:11,
699:5, 700:10,
700:15, 703:8,
703:11, 709:12,
709:15, 710:5,
713:14, 714:9,
714:11, 714:13,
715:5, 715:13,
715:16, 715:19,
727:5, 727:10,
727:13, 727:21,
728:11, 728:18,
736:20, 742:8,
742:19, 743:9,
746:1, 746:10,
746:19, 746:23,
747:4, 747:10,
747:16, 748:3,
748:20, 749:2,
749:5, 749:10,
749:16, 749:24
**courtroom** [7] - 609:9,
628:4, 628:16,
682:4, 682:8,
682:14, 749:4
**courts** [3] - 628:14,
634:16, 641:14
**covalent** [1] - 719:19
**cover** [15] - 609:12,
626:18, 627:23,
629:2, 629:11,
629:13, 632:16,
653:14, 654:9,
685:1, 685:2,
686:19, 736:16,
742:8, 749:10

**covered** [9] - 634:3, 650:8, 680:10, 729:1, 736:7, 736:9, 736:14, 736:18, 749:19

**covering** [1] - 643:9

**CRAFT** [1] - 606:16

**create** [1] - 635:12

**credentials** [1] - 688:9

**credible** [1] - 651:3

**credit** [1] - 627:1

**criteria** [1] - 645:2

**Criteria** [1] - 737:4

**critical** [1] - 645:14

**critically** [1] - 631:13

**CROSS** [2] - 608:10, 682:20

**cross** [22] - 613:6, 613:11, 643:13, 649:2, 650:23, 651:14, 652:18, 682:1, 682:17, 713:6, 713:18, 713:20, 719:15, 719:18, 727:8, 736:16, 741:13, 741:21, 742:12, 743:10, 743:11

**cross-examination** [10] - 649:2, 650:23, 652:18, 682:1, 682:17, 713:6, 713:18, 713:20, 727:8, 736:16

**CROSS-EXAMINATION** [2] - 608:10, 682:20

**cross-examine** [2] - 613:6, 643:13

**cross-links** [4] - 741:13, 741:21, 742:12

**CRR** [2] - 607:13, 750:19

**cry** [2] - 660:21, 660:22

**crying** [1] - 681:14

**CSX** [2] - 635:17, 648:22

**cuboidal** [1] - 731:11

**Cum** [1] - 611:18

**cumulative** [1] - 744:9

**current** [6] - 618:23, 619:2, 623:24, 633:22, 635:10, 740:13

**curriculum** [1] - 717:17

**curtail** [2] - 749:14, 749:16

**cut** [2] - 612:13, 733:20

**cutoff** [1] - 747:22

**CV** [3] - 611:13, 623:7, 623:8

# D

**damage** [7] - 648:9, 687:5, 704:21, 711:5, 711:6, 719:10, 730:8

**damaged** [1] - 730:2

**damages** [1] - 631:7

**dangerous** [1] - 712:24

**data** [12] - 627:13, 631:14, 637:23, 638:4, 667:23, 673:10, 675:3, 677:18, 739:7, 740:4, 741:3, 745:10

**date** [8] - 621:7, 658:4, 659:25, 693:9, 695:14, 709:7, 747:22, 747:23

**dated** [2] - 640:7, 644:7

**dates** [4] - 629:18, 683:12, 695:20, 709:5

**Daubert** [2] - 634:7, 634:10

**daughter** [9] - 697:21, 697:22, 697:25, 702:15, 702:17, 734:12, 741:17, 741:19, 741:24

**daughter's** [1] - 697:18

**daughters** [2] - 697:16, 697:23

**DAY** [1] - 606:11

**day-to-day** [1] - 618:18

**days** [2] - 716:14, 748:4

**dead** [1] - 725:4

**deal** [4] - 623:18, 655:25, 683:4, 683:5

**dealing** [3] - 631:25, 657:12, 657:13

**deals** [3] - 655:25, 729:6, 729:12

**dealt** [3] - 630:17, 630:19, 656:12

**death** [2] - 630:9, 733:5

**decayed** [1] - 669:15

**December** [2] - 683:13, 702:8

**decide** [2] - 650:9, 651:5

**decided** [4] - 628:15, 633:18, 633:20, 634:14

**decision** [2] - 633:20, 634:14

**defendant** [2] - 613:5, 637:4

**DEFENDANT** [1] - 607:3

**defendants** [1] - 654:17

**defense** [2] - 654:14, 723:18

**deficient** [1] - 719:5

**definite** [1] - 739:9

**definition** [2] - 664:13, 732:1

**degrade** [1] - 735:1

**degree** [7] - 611:9, 615:21, 616:4, 675:12, 714:6, 716:23

**delay** [3] - 631:24, 638:13, 683:5

**deliberations** [1] - 728:25

**delicate** [1] - 722:19

**delivered** [1] - 666:15

**demonstrate** [1] - 744:2

**demonstrated** [2] - 677:19, 742:12

**demonstrative** [1] - 622:10

**DENNIS** [1] - 606:23

**Dennis** [2] - 673:25, 709:24

**department** [4] - 617:2, 716:6, 717:1, 717:11

**depict** [1] - 741:11

**depiction** [1] - 718:25

**deposition** [8] - 685:24, 685:25, 689:6, 689:11, 689:12, 689:16, 697:10, 702:23

**depositions** [1] - 749:14

**depression** [3] - 696:17, 696:21, 696:24

**depth** [1] - 630:13

**DEPUTY** [4] - 609:21, 610:4, 714:14, 714:19

**derailment** [1] - 648:22

**derive** [2] - 726:15, 740:6

**derived** [2] - 726:25, 727:2

**describe** [12] - 611:6, 616:17, 618:9, 653:4, 653:25, 657:8, 660:18, 665:2, 666:8, 719:3, 732:3, 741:10

**described** [14] - 659:19, 660:1, 660:19, 661:19, 661:20, 670:2, 677:25, 680:5, 693:4, 712:1, 723:5, 723:21, 742:4, 743:8

**describing** [1] - 699:21

**descriptions** [1] - 729:10

**DESIGN** [1] - 606:9

**designated** [1] - 740:8

**designation** [1] - 718:16

**destroy** [3] - 723:16, 723:17, 734:14

**destroyed** [3] - 723:18, 725:23, 729:22

**destroys** [2] - 732:10, 734:11

**detail** [10] - 636:20, 656:24, 660:14, 661:19, 667:5, 669:2, 675:19, 696:14, 699:21, 707:13

**detailed** [5] - 635:8, 657:3, 679:7, 703:3, 704:3

**details** [7] - 630:12, 639:7, 639:21, 640:22, 641:23, 648:19, 650:2

**detect** [3] - 669:24, 670:3, 677:17

**detected** [1] - 670:1

**detecting** [1] - 712:15

**detection** [2] - 673:9, 717:2

**deteriorates** [1] - 713:5

**determination** [6] - 631:6, 633:23, 649:24, 665:18, 694:15, 699:25

**determine** [16] -

**derailment** [1] - 648:22

613:8, 628:9, 646:17, 652:18, 662:1, 662:10, 666:20, 672:6, 674:7, 678:10, 678:15, 679:9, 679:19, 692:12, 737:24, 738:11

**determined** [2] - 630:14, 668:11

**determines** [1] - 651:3

**determining** [4] - 650:18, 666:9, 679:12, 742:14

**detoxification** [1] - 735:3

**detoxifies** [3] - 711:11, 735:11

**detoxify** [2] - 735:8, 735:13

**detoxifying** [1] - 711:7

**develop** [4] - 618:15, 622:20, 622:25, 649:10

**developed** [4] - 618:24, 646:13, 646:19, 726:19

**developing** [6] - 618:12, 622:7, 623:5, 655:22, 681:19, 717:2, 718:5, 718:13

**development** [4] - 622:22, 622:24, 696:19, 747:14

**developments** [1] - 666:2

**devise** [1] - 740:6

**devised** [1] - 738:10

**diagnosed** [1] - 661:14

**diagnosis** [15] - 665:3, 675:16, 678:4, 678:10, 693:15, 693:19, 694:24, 694:25, 695:4, 695:7, 698:9, 698:17, 710:8, 713:7, 713:19

**diagram** [6] - 719:17, 720:11, 720:21, 721:2, 724:15, 740:24

**died** [2] - 706:17, 733:9

**difference** [9] - 669:4, 670:20, 686:25, 687:1, 710:24, 724:15, 736:5, 738:1

**different** [26] - 615:1,

626:2, 626:3,
633:21, 634:1,
634:10, 634:14,
647:5, 647:18,
663:19, 670:2,
670:13, 670:14,
686:18, 686:23,
687:2, 691:14,
691:23, 703:15,
705:17, 711:3,
719:25, 729:19,
734:19, 740:20,
747:24
**differential** [14] -
665:3, 675:16,
678:3, 678:10,
693:15, 693:18,
694:24, 695:4,
695:7, 698:8, 710:8,
713:7, 713:19
**differentiate** [1] -
744:24
**difficult** [1] - 661:17
**digits** [1] - 712:5
**dimensional** [2] -
744:12, 744:14
**Diplomate** [1] - 716:9
**diplomate** [1] - 716:13
**dire** [6] - 612:22,
629:2, 632:22,
632:25, 643:22,
649:3
**DIRE** [4] - 608:6,
608:8, 610:8, 644:5
**direct** [12] - 613:11,
626:17, 629:3,
651:14, 652:17,
677:6, 677:10,
682:22, 682:24,
686:6, 727:8, 746:4
**DIRECT** [4] - 608:9,
608:13, 652:24,
715:1
**direction** [4] - 646:8,
646:9, 665:23
**directly** [1] - 711:11
**director** [5] - 616:12,
617:2, 716:19,
716:25, 717:12
**directors** [1] - 618:5
**disabling** [1] - 663:24
**disagree** [3] - 625:13,
630:7, 676:4
**disciplinary** [1] -
614:23
**disciplines** [3] -
636:7, 651:20, 652:4
**disclosure** [1] -
747:21
**discouraged** [1] -

660:19
**discourse** [1] - 746:18
**discuss** [4] - 631:11,
680:11, 682:5,
748:25
**discussed** [6] -
659:17, 661:1,
669:13, 672:22,
674:25, 730:10
**discusses** [1] - 669:1
**discussing** [2] -
660:23, 729:14
**discussion** [5] -
660:21, 711:22,
712:7, 713:7, 732:22
**Disease** [3] - 653:13,
656:19, 726:13
**disease** [11] - 630:19,
630:21, 630:22,
630:25, 678:2,
717:3, 717:14,
718:5, 718:13,
738:18
**diseases** [7] - 614:1,
615:23, 617:13,
617:14, 620:8,
665:11
**dispute** [5] - 614:18,
614:20, 626:25,
627:2, 696:7
**distinctive** [1] -
722:12
**distinguishable** [1] -
637:1
**distribution** [1] -
684:21
**District** [8] - 633:15,
634:18, 638:16,
640:9, 640:10,
750:11, 750:21
**district** [4] - 630:1,
630:13, 637:11,
640:17
**DISTRICT** [3] - 606:1,
606:1, 606:13
**divide** [1] - 731:4
**divided** [1] - 671:6
**division** [1] - 617:2
**DNA** [16] - 734:10,
734:11, 734:12,
736:3, 740:23,
740:24, 741:12,
741:13, 741:15,
741:16, 741:17,
741:19, 741:23,
742:12, 745:11
**DOCKET** [2] - 606:5,
606:8
**Doctor** [11] - 616:7,
683:7, 685:5,

687:12, 693:1,
700:20, 700:23,
701:18, 702:19,
706:12, 714:9
**doctor** [18] - 624:3,
640:14, 642:18,
642:19, 642:23,
643:17, 661:9,
661:12, 661:25,
662:11, 662:25,
666:2, 685:20,
692:3, 692:16,
700:9, 704:4
**doctoral** [1] - 716:23
**doctors** [5] - 658:17,
689:2, 689:22,
695:2, 701:10
**DOCUMENT** [1] -
606:7
**document** [20] -
624:3, 624:5,
624:12, 624:13,
624:16, 624:19,
624:23, 625:1,
626:21, 626:23,
644:1, 644:7,
655:22, 656:17,
683:7, 727:25,
728:1, 728:22,
728:23, 729:1
**documentation** [1] -
679:6
**documents** [2] -
655:9, 727:18
**DOMINION** [1] -
606:17
**done** [17] - 613:20,
614:9, 614:17,
618:10, 619:11,
631:19, 648:9,
664:8, 668:20,
668:22, 668:25,
669:7, 669:9,
678:21, 704:11,
709:24, 740:13
**door** [1] - 747:17
**dosage** [3] - 631:2,
631:5, 631:14
**dosages** [1] - 630:17
**dose** [9] - 635:17,
648:21, 649:10,
649:21, 649:24,
650:1, 672:7, 734:3,
738:19
**double** [1] - 740:25
**Dow** [1] - 633:17
**down** [17] - 610:17,
610:21, 611:3,
630:20, 636:24,
667:20, 681:13,

714:9, 721:7, 721:8,
721:10, 721:14,
722:11, 724:4,
724:8, 744:25,
749:18
**DR** [2] - 608:5, 610:1
**Dr** [75] - 609:18,
609:19, 610:10,
612:19, 613:19,
619:16, 619:25,
624:16, 626:21,
628:15, 629:3,
631:13, 638:13,
640:13, 644:7,
644:16, 645:14,
650:4, 650:10,
651:6, 653:1, 654:8,
654:11, 654:14,
654:25, 655:21,
656:12, 658:18,
658:19, 661:13,
662:4, 662:14,
662:25, 665:1,
666:8, 672:19,
677:16, 682:2,
682:17, 682:22,
690:17, 691:6,
695:15, 695:21,
695:22, 695:25,
698:12, 700:20,
700:23, 701:3,
701:18, 709:17,
710:20, 711:23,
714:12, 714:13,
715:3, 715:20,
724:17, 725:12,
725:17, 726:11,
726:18, 729:6,
729:21, 730:2,
732:18, 735:15,
736:13, 743:22,
746:25, 747:7,
748:12, 748:22
**dramatically** [1] -
746:25
**drank** [1] - 733:8
**drilling** [2] - 718:17,
718:18
**drinks** [2] - 686:11,
686:14
**DRIVE** [1] - 606:17
**drop** [1] - 669:18
**drowning** [1] - 733:5
**drug** [1] - 622:24
**drugs** [10] - 614:2,
617:6, 617:16,
618:15, 622:8,
622:20, 622:22,
622:25, 623:5, 645:9
**dry** [1] - 664:6

**due** [1] - 661:17
**dues** [1] - 624:2
**duly** [2] - 610:2,
714:22
**DUPLASS** [1] - 607:7
**duration** [8] - 631:14,
734:18, 735:16,
735:18, 735:23,
736:5, 744:15, 745:4
**during** [14] - 610:18,
614:4, 616:25,
617:4, 632:25,
651:1, 651:2,
656:12, 660:20,
662:11, 669:5,
682:5, 688:17, 749:1
**dust** [9] - 701:23,
701:25, 702:12,
713:8, 723:9,
725:20, 730:24,
735:6
**duties** [1] - 717:13
**dying** [1] - 707:5
**dysplasia** [1] - 731:21
**dysplastic** [1] - 731:23

## E

**e-mail** [1] - 746:10
**e-mails** [1] - 746:6
**ear** [1] - 620:7
**EARLINE** [1] - 606:9
**Earline** [1] - 700:25
**early** [13] - 614:10,
659:24, 662:2,
669:16, 693:10,
693:11, 693:16,
694:2, 695:8, 717:2,
718:5, 718:12, 749:7
**ears** [1] - 620:8
**earth** [1] - 718:18
**easier** [1] - 662:7
**Eastern** [1] - 750:11
**EASTERN** [1] - 606:1
**eat** [1] - 711:11
**eating** [1] - 710:24
**effect** [4] - 637:25,
723:2, 723:14,
744:10
**effective** [1] - 618:16
**effects** [22] - 611:8,
614:2, 616:1, 617:6,
617:15, 645:9,
657:15, 657:17,
659:18, 660:23,
667:16, 705:24,
712:1, 712:8, 713:1,
718:23, 718:24,
726:17, 726:21,

733:6, 738:12, 744:8
**efficiency** [1] - 748:3
**efficient** [2] - 711:16, 748:1
**either** [12] - 620:15, 655:7, 669:5, 672:7, 672:24, 673:3, 679:18, 685:24, 699:12, 723:11, 723:13, 726:25
**electrolytes** [1] - 733:10
**electrons** [1] - 719:6
**electrophile** [2] - 719:4, 734:6
**elements** [1] - 666:24
**elevator** [4] - 723:4, 723:8, 723:10, 730:19
**elicit** [1] - 613:4
**eliminated** [1] - 720:7
**Elmo** [1] - 716:3
**elsewhere** [1] - 645:18
**emitting** [1] - 673:8
**emphasize** [1] - 659:9
**employ** [2] - 641:7, 641:9
**employed** [2] - 634:21, 716:4
**end** [3] - 674:13, 728:7, 747:3
**endpoint** [1] - 732:19
**ends** [1] - 733:22
**enforce** [1] - 747:5
**engaged** [1] - 685:8
**ENGELHARDT** [1] - 606:12
**England** [4] - 611:22, 611:24, 612:1, 617:3
**enjoy** [1] - 619:6
**ENT** [4] - 620:7, 662:6, 662:7, 704:7
**enter** [1] - 734:20
**entered** [1] - 612:7
**entering** [1] - 723:24
**enters** [2] - 609:9, 682:14
**entire** [1] - 722:10
**entirely** [1] - 638:25
**entirety** [1] - 728:23
**entitled** [3] - 638:17, 703:6, 750:14
**environment** [5] - 675:5, 686:9, 687:8, 723:9, 725:22
**Environmental** [3] - 716:7, 717:9, 737:4
**environmental** [17] - 611:12, 615:25, 616:12, 616:20,

619:19, 636:3, 636:4, 640:2, 650:5, 650:15, 650:16, 651:15, 651:16, 651:24, 651:25, 717:16
**enzymes** [5] - 735:1, 735:2, 735:8, 735:12, 741:18
**EOSINOPHIL** [1] - 679:8
**eosinophil** [1] - 679:8
**EPA** [1] - 740:1
**epidemiological** [2] - 745:18, 748:15
**episodes** [1] - 660:9
**epithelial** [1] - 725:5
**epithelium** [22] - 721:18, 721:21, 721:24, 721:25, 722:5, 722:8, 723:17, 723:20, 724:11, 724:20, 724:23, 724:25, 725:23, 725:24, 729:22, 729:23, 730:2, 730:9, 731:11, 732:5, 732:8, 732:14
**equal** [1] - 677:18
**equally** [1] - 698:22
**equals** [1] - 732:3
**equipment** [1] - 704:12
**error** [1] - 741:22
**especially** [1] - 669:16
**ESQUIRE** [7] - 606:17, 606:23, 607:3, 607:4, 607:4, 607:8, 607:8
**essence** [2] - 674:8, 674:9
**essentially** [4] - 672:21, 678:6, 687:5, 728:4
**established** [2] - 633:23, 652:11
**establishing** [1] - 665:23
**estimate** [1] - 673:6
**estimation** [5] - 635:17, 648:21, 649:11, 649:24, 650:1
**et** [1] - 618:25
**etiology** [1] - 717:16
**evacuated** [1] - 663:1
**evaluated** [2] - 616:24, 649:20
**evaluation** [2] -

718:14, 739:13
**eventually** [1] - 724:7
**everyday** [1] - 686:10
**everywhere** [1] - 686:7
**evidence** [25] - 633:24, 634:19, 638:25, 639:15, 654:16, 654:25, 671:12, 679:9, 679:17, 679:18, 727:10, 727:19, 728:20, 738:20, 739:8, 739:9, 741:2, 741:11, 742:25, 745:15, 745:17, 745:18, 745:20, 748:15, 748:17
**Evidence** [1] - 634:7
**evident** [1] - 705:20
**evidentiary** [3] - 634:14, 634:20, 634:21
**evolution** [1] - 739:19
**exacerbate** [1] - 674:8
**exacerbated** [1] - 714:3
**exacerbation** [10] - 674:24, 679:24, 680:2, 681:10, 698:15, 698:17, 698:23, 710:9, 713:10, 713:22
**exact** [5] - 621:7, 658:4, 659:24, 688:13, 702:21
**exactly** [3] - 620:8, 640:3, 663:18
**exam** [7] - 659:9, 659:10, 677:10, 688:23, 689:1, 716:12, 716:16
**EXAMINATION** [58] - 608:6, 608:7, 608:8, 608:9, 608:10, 608:11, 608:13, 610:8, 613:17, 615:15, 619:23, 622:12, 624:14, 626:19, 627:25, 629:16, 638:11, 643:5, 644:5, 647:1, 647:12, 647:23, 648:15, 649:8, 649:16, 652:24, 655:19, 656:4, 656:14, 663:11, 666:6, 668:8, 672:17, 677:14, 681:8, 682:20,

685:3, 686:3, 690:15, 692:24, 697:13, 699:10, 700:7, 700:18, 703:16, 708:13, 709:19, 710:6, 710:18, 713:16, 715:1, 715:6, 715:25, 729:4, 736:24, 742:9, 743:20, 748:10
**examination** [34] - 629:3, 634:25, 635:5, 649:2, 650:23, 652:17, 652:18, 658:1, 658:21, 658:22, 658:23, 659:3, 682:1, 682:17, 682:24, 686:6, 686:20, 688:17, 700:24, 700:25, 702:7, 702:19, 703:18, 703:23, 704:3, 704:9, 704:13, 705:19, 711:22, 713:6, 713:18, 713:20, 727:8, 736:16
**examinations** [2] - 704:11, 716:15
**EXAMINATIONS** [1] - 608:3
**examine** [7] - 613:6, 621:9, 643:13, 657:22, 691:9, 701:3, 704:16
**examined** [4] - 610:3, 656:25, 703:21, 714:23
**Examiners** [1] - 620:24
**examining** [1] - 708:17
**example** [10] - 618:14, 623:3, 653:12, 664:4, 665:19, 729:8, 729:19, 733:7, 739:18, 743:25
**excellent** [1] - 610:23
**excerpt** [1] - 728:14
**excerpts** [2] - 728:8
**excessive** [2] - 673:22, 701:25
**exchange** [2] - 742:11, 746:10
**exclude** [1] - 678:7
**excluded** [9] - 630:15, 632:23, 633:17,

635:9, 637:8, 637:23, 638:15, 645:19, 648:3
**exclusion** [4] - 634:17, 634:23, 635:7, 637:22
**excreted** [1] - 720:8
**excuse** [2] - 642:9, 708:10
**exhale** [1] - 720:8
**Exhibit** [6] - 611:13, 653:14, 656:10, 656:16, 683:3, 711:20
**exhibit** [8] - 622:9, 622:10, 624:6, 624:7, 711:18, 712:4, 728:18, 745:11
**exhibits** [1] - 728:24
**exist** [1] - 726:22
**existed** [1] - 668:11
**expect** [4] - 690:25, 695:5, 726:17, 726:23
**expedite** [1] - 732:2
**experience** [4] - 610:20, 636:22, 701:6, 712:15
**experienced** [1] - 713:9
**experimental** [1] - 738:20
**experiments** [2] - 657:16, 657:18
**Expert** [1] - 624:18
**expert** [43] - 613:1, 613:3, 613:13, 625:2, 625:3, 628:5, 628:10, 629:4, 632:5, 632:20, 635:19, 635:22, 636:2, 636:15, 636:21, 638:22, 640:25, 643:10, 643:12, 645:1, 646:17, 648:24, 650:4, 650:19, 650:23, 651:6, 651:8, 651:11, 652:8, 652:10, 652:15, 672:11, 674:12, 687:12, 692:12, 706:12, 708:21, 715:14, 715:18, 715:20, 738:16, 743:2, 747:21
**expert's** [1] - 674:13
**expertise** [9] - 612:16,

613:4, 619:8, 619:17, 643:1, 650:19, 666:5, 666:8, 715:16

**experts** [9] - 633:17, 635:8, 637:22, 637:23, 642:22, 654:12, 673:23, 681:22, 739:6

**expiration** [1] - 720:7

**explain** [13] - 615:19, 627:5, 649:15, 656:22, 670:19, 671:1, 671:3, 703:6, 720:19, 723:24, 724:14, 725:16, 729:18

**explaining** [1] - 746:21

**explanation** [1] - 732:12

**exposed** [24] - 616:21, 657:18, 666:16, 666:19, 667:8, 673:21, 675:6, 694:10, 698:4, 698:12, 699:13, 699:18, 702:12, 712:9, 717:3, 724:18, 724:21, 725:18, 726:16, 726:20, 729:20, 731:7, 737:21, 744:18

**exposure** [78] - 630:8, 631:2, 631:8, 642:21, 646:14, 647:21, 649:20, 649:21, 653:7, 653:8, 657:14, 657:24, 666:10, 666:12, 666:13, 666:16, 666:18, 666:21, 666:22, 666:25, 667:13, 668:7, 668:15, 671:20, 672:5, 672:22, 672:23, 673:11, 674:7, 674:23, 675:4, 675:6, 675:10, 675:13, 677:23, 678:1, 679:23, 681:18, 685:17, 685:21, 694:3, 698:24, 699:7, 705:22, 710:10, 712:11, 712:16, 713:2, 713:7, 717:15, 719:22,

723:14, 725:9, 726:1, 726:20, 729:21, 730:1, 730:20, 734:17, 734:19, 735:16, 735:18, 735:23, 736:4, 736:6, 736:7, 738:18, 741:4, 742:2, 742:15, 743:5, 743:6, 743:24, 744:3, 744:6, 744:9

**exposures** [20] - 611:11, 616:20, 616:22, 616:23, 621:9, 645:16, 665:7, 668:10, 672:3, 674:5, 677:17, 678:14, 678:16, 678:18, 679:1, 698:9, 698:22, 699:8, 742:13

**extend** [1] - 663:22

**extensive** [1] - 671:21

**external** [1] - 666:9

**externally** [2] - 703:22, 704:15

**extraneous** [1] - 728:12

**extrapolate** [1] - 642:2

**extremely** [1] - 735:18

**eye** [4] - 697:3, 697:5, 697:12, 698:1

**eyes** [1] - 735:20

## F

**fabric** [4] - 735:19, 735:20, 735:22, 744:24

**face** [5] - 660:3, 660:5, 663:17, 663:21, 663:22

**fact** [29] - 614:9, 614:23, 615:6, 615:10, 628:14, 630:11, 646:8, 651:8, 653:20, 662:21, 664:25, 665:21, 666:20, 667:1, 668:24, 674:7, 678:9, 679:9, 683:14, 684:1, 684:8, 696:24, 704:1, 708:7, 709:1, 717:18, 718:7, 738:22, 740:17

**factor** [9] - 636:9, 666:10, 679:20,

683:6, 713:25, 714:1, 714:2, 731:8, 745:4

**factors** [9] - 634:23, 673:10, 679:11, 679:19, 713:19, 734:16, 735:17, 738:18, 738:24

**factory** [1] - 678:22

**facts** [2] - 630:5, 639:16

**faculty** [1] - 644:21

**failed** [1] - 627:12

**fair** [1] - 660:18

**fairly** [3] - 657:1, 668:5, 695:9

**falls** [2] - 633:25, 675:13

**familiar** [6] - 624:19, 625:6, 629:22, 637:19, 656:17, 681:21

**familiarized** [1] - 612:14

**family** [2] - 610:22, 611:1

**famous** [1] - 717:23

**far** [10] - 610:22, 624:1, 632:3, 635:23, 659:2, 661:14, 662:1, 662:7, 679:2, 693:9

**fault** [1] - 637:24

**faulty** [1] - 637:23

**favor** [1] - 728:9

**fear** [7] - 681:16, 681:20, 705:22, 705:25, 706:2, 706:4, 706:10

**fearful** [1] - 660:20

**features** [2] - 720:20, 721:2

**feces** [1] - 720:10

**federal** [12] - 633:24, 634:15, 635:2, 638:17, 639:14, 647:5, 653:16, 653:23, 656:25, 716:24, 718:16, 726:14

**Federal** [2] - 634:6, 738:14

**Feet** [1] - 725:4

**feet** [3] - 722:1, 731:16, 732:6

**FELIPE** [1] - 606:24

**fellow** [5] - 613:21, 614:4, 614:16, 614:18, 626:24

**felt** [1] - 661:9

**FEMA** [12] - 606:4, 656:18, 657:2, 657:24, 660:2, 666:23, 668:21, 685:8, 696:2, 696:22, 697:5, 749:14

**FEMA-supplied** [1] - 656:18

**fever** [1] - 694:8

**few** [6] - 632:16, 678:5, 678:13, 704:19, 715:21

**field** [15] - 629:7, 651:6, 651:8, 651:23, 651:24, 654:22, 666:4, 666:8, 715:18, 715:20, 717:25, 718:1, 718:15, 718:17, 718:21

**fields** [18] - 613:9, 613:13, 629:5, 636:2, 643:11, 643:12, 643:23, 650:11, 650:19, 651:10, 651:12, 651:15, 652:1, 652:7, 652:9, 652:13, 652:14, 672:11

**Fifth** [5] - 628:24, 631:12, 640:5, 640:16, 645:20

**figure** [1] - 694:7

**filed** [1] - 746:17

**fill** [1] - 647:7

**filter** [1] - 711:15

**final** [1] - 656:17

**finally** [1] - 612:4

**findings** [3] - 627:13, 679:21, 745:14

**fine** [4] - 612:15, 655:13, 690:11, 748:7

**finger** [1] - 722:13

**finger-like** [1] - 722:13

**finish** [7] - 648:12, 677:4, 677:6, 677:9, 699:4, 699:5, 699:6

**first** [24] - 610:2, 611:14, 613:2, 613:23, 641:17, 654:17, 659:25, 663:14, 664:2, 669:16, 669:17, 674:10, 674:21, 682:23, 697:11, 700:22, 711:13, 714:22, 725:10,

725:11, 730:9, 731:12

**five** [20] - 618:21, 621:17, 625:9, 625:14, 625:21, 628:2, 628:3, 645:4, 683:19, 684:2, 685:14, 691:21, 692:6, 692:8, 716:17, 720:9, 722:16, 733:8

**flesh** [1] - 715:22

**flip** [1] - 695:23

**flow** [4] - 721:6, 721:13, 721:14, 735:9

**fluff** [1] - 623:15

**focus** [3] - 613:23, 617:4, 638:1

**focused** [1] - 613:22

**focusing** [1] - 667:18

**follow** [3] - 628:18, 642:13, 707:1

**follow-up** [1] - 707:1

**followed** [2] - 642:9, 642:10

**following** [1] - 712:14

**follows** [3] - 610:3, 645:15, 714:23

**food** [10] - 686:17, 710:15, 710:25, 711:3, 711:8, 736:13, 737:8, 737:11, 737:20

**foods** [4] - 686:13, 686:23, 737:8, 737:19

**foot** [1] - 725:4

**FOR** [2] - 606:16, 607:3

**forefront** [1] - 645:23

**foregoing** [1] - 750:12

**forehead** [1] - 663:19

**foreign** [1] - 641:12

**form** [3] - 711:1, 731:25, 741:25

**formal** [1] - 611:10

**FORMALDEHYDE** [1] - 606:4

**formaldehyde** [135] - 619:14, 621:9, 631:7, 642:20, 645:7, 653:7, 653:8, 653:10, 654:1, 654:13, 654:16, 655:21, 656:1, 656:17, 657:2, 657:14, 657:19, 657:24, 659:18, 660:23, 661:3,

665:20, 666:23, 667:3, 667:12, 667:14, 667:17, 668:6, 669:2, 669:3, 669:5, 669:14, 670:8, 670:12, 671:9, 671:20, 672:3, 672:7, 672:19, 672:23, 673:8, 675:3, 677:23, 679:11, 679:23, 685:6, 685:9, 685:17, 685:21, 686:6, 686:11, 686:12, 686:16, 686:17, 686:18, 686:22, 687:6, 687:7, 687:11, 687:13, 687:17, 694:2, 694:4, 694:5, 698:24, 699:23, 705:3, 705:23, 705:24, 707:7, 707:25, 708:3, 708:4, 710:10, 710:24, 710:25, 711:8, 711:12, 711:24, 712:9, 713:2, 713:9, 713:25, 714:1, 714:3, 719:1, 719:10, 719:17, 719:22, 719:23, 720:13, 720:17, 720:21, 721:3, 721:5, 721:16, 723:1, 723:13, 724:18, 724:22, 725:10, 725:18, 725:22, 726:2, 729:20, 730:20, 731:7, 732:23, 734:5, 734:20, 735:6, 735:9, 735:23, 736:13, 737:10, 737:17, 737:19, 739:19, 740:8, 740:14, 741:14, 741:21, 742:2, 742:15, 743:5, 743:7, 743:25, 744:4, 744:13, 745:10, 745:13, 745:21, 745:23
**formation** [3] - 724:14, 725:2, 734:13
**formed** [2] - 725:8, 732:16

**formic** [2] - 720:8, 720:10
**forming** [2] - 642:11, 719:18
**FORTE** [1] - 607:3
**forth** [2] - 634:23, 742:25
**forward** [1] - 609:19
**foundation** [2] - 638:23, 672:10
**foundations** [1] - 612:2
**founded** [1] - 611:11
**founding** [1] - 611:4
**FOUR** [1] - 606:17
**four** [9] - 669:9, 669:20, 683:1, 683:19, 683:22, 684:1, 696:3, 712:5, 728:2
**fragments** [1] - 733:17
**framework** [1] - 634:9
**free** [3] - 687:4, 735:5, 737:17
**frequency** [3] - 734:19, 735:16, 736:5
**frequent** [2] - 660:6, 660:10
**fresh** [2] - 686:16, 710:22
**front** [3] - 635:1, 663:21, 680:22
**Fry** [3] - 633:20, 633:25, 634:22
**full** [6] - 624:12, 624:13, 651:16, 658:12, 684:23, 724:12
**function** [2] - 732:13, 734:2
**functions** [1] - 721:22
**fundamental** [1] - 674:19
**funded** [2] - 717:19, 718:4
**FURTHER** [2] - 608:8, 644:5

**G**

**gallons** [1] - 733:8
**GARRISON** [2] - 607:3, 607:3
**gas** [1] - 671:5
**gaseous** [1] - 721:16
**gasses** [1] - 712:24
**gastroenterologist** [1] - 706:20

**gastrointestinal** [1] - 736:8
**Gautreaux** [5] - 658:19, 661:13, 662:4, 662:14, 695:21
**General** [4] - 612:7, 612:8, 612:11, 613:20
**general** [15] - 630:6, 630:12, 649:19, 649:20, 667:24, 676:16, 696:14, 707:18, 708:7, 738:5, 743:2, 743:4, 743:13, 743:24
**generally** [13] - 616:17, 619:18, 627:13, 646:3, 646:15, 653:4, 653:25, 656:22, 657:8, 658:23, 665:1, 741:10, 743:12
**genes** [1] - 646:1
**genetic** [4] - 645:25, 646:6, 646:9, 665:10
**genetics** [1] - 646:5
**gentlemen** [10] - 611:7, 615:20, 653:4, 658:22, 659:13, 665:17, 670:20, 678:19, 721:1, 721:23
**gilds** [1] - 636:23
**given** [3] - 629:7, 657:21, 743:25
**GLASS** [1] - 607:8
**gloves** [1] - 618:17
**goblet** [2] - 730:14, 730:20
**God** [2] - 609:24, 714:17
**gold** [1] - 705:6
**gosh** [1] - 658:18
**Government** [1] - 653:18
**government** [2] - 657:4, 727:18
**governmental** [1] - 717:21
**Governor** [2] - 718:2, 718:3
**grabs** [1] - 733:22
**gradation** [1] - 739:12
**gradient** [1] - 738:19
**graduated** [1] - 611:18
**grand** [1] - 619:1
**Grand** [2] - 717:23, 717:24

**grants** [2] - 717:18, 717:21
**great** [2] - 610:17, 655:25
**greater** [4] - 641:19, 677:18, 711:25, 736:3
**grew** [1] - 611:1
**grossly** [1] - 631:14
**ground** [2] - 749:10, 749:19
**grounded** [1] - 639:15
**grounds** [1] - 631:3
**Group** [2] - 739:11, 745:16
**group** [3] - 668:11, 717:24, 721:19
**groups** [1] - 615:24
**GUERRA** [1] - 606:16
**guess** [8] - 612:17, 619:15, 619:18, 639:7, 641:11, 676:15, 699:12, 717:23
**guideline** [3] - 625:24, 625:25, 626:1
**Guidelines** [1] - 624:18
**guidelines** [7] - 626:2, 626:3, 626:4, 626:6, 626:7, 645:1, 738:10
**gut** [1] - 735:10
**guy** [1] - 637:25
**guys** [1] - 636:14

**H**

**hair** [1] - 722:13
**hair-like** [1] - 722:13
**hairs** [1] - 723:7
**half** [5] - 611:14, 669:17, 688:12, 688:22, 716:14
**hand** [6] - 609:22, 714:14, 722:1, 725:1, 731:15, 733:20
**handed** [2] - 631:21, 633:13
**handling** [1] - 646:13
**hands** [1] - 635:4
**hands-on** [1] - 635:4
**handwritten** [1] - 689:2
**happy** [4] - 617:24, 617:25, 630:23, 699:9
**Harvard** [18] - 611:16, 612:5, 612:9,

613:21, 615:3, 615:4, 615:6, 615:8, 615:9, 615:11, 626:9, 627:8, 644:2, 644:9, 644:15, 644:19, 644:21, 644:24
**hate** [1] - 637:16
**Hauptmann** [4] - 745:24, 746:7, 746:24, 748:13
**hay** [1] - 694:8
**hazardous** [2] - 717:25, 718:1
**health** [23] - 611:12, 615:24, 615:25, 616:12, 619:19, 636:3, 650:6, 650:15, 651:15, 651:24, 658:13, 660:17, 666:11, 679:3, 712:1, 712:8, 713:1, 718:9, 718:24, 726:17, 726:21, 733:6, 738:12
**Health** [5] - 615:21, 717:6, 737:3, 737:4, 739:5
**healthcare** [2] - 622:6, 622:18
**healthy** [1] - 705:12
**hear** [8] - 652:9, 652:16, 652:22, 683:24, 695:3, 695:21, 695:22, 700:11
**heard** [10] - 622:19, 652:19, 662:8, 667:2, 670:6, 683:14, 712:20, 726:10, 736:12, 738:23
**HEARD** [1] - 606:12
**hearing** [1] - 727:23
**hears** [2] - 650:25, 651:2
**heavy** [2] - 718:6, 718:19
**held** [12] - 616:9, 616:14, 618:4, 633:12, 654:6, 673:17, 680:8, 717:5, 727:15, 728:17, 742:21, 746:3
**helix** [1] - 740:25
**help** [6] - 609:24, 687:15, 697:18, 714:16, 732:2,

738:11
**helping** [1] - 622:23
**hemming** [1] - 721:12
**hereby** [1] - 750:12
**herself** [1] - 660:19
**Hewett** [2] - 638:3,
676:15, 726:11
**high** [2] - 660:15,
669:17
**highlight** [2] - 711:20,
712:5
**highly** [3] - 634:11,
720:13, 734:6
**Hill** [2] - 738:7, 738:9
**hire** [1] - 619:7
**hired** [3] - 635:20,
636:16, 701:3
**hiring** [1] - 636:16
**histological** [2] -
726:8, 729:7
**histologist's** [1] -
730:15
**history** [39] - 635:20,
651:7, 658:7, 658:9,
659:5, 659:6,
659:10, 659:13,
659:15, 661:6,
669:23, 678:17,
679:15, 679:21,
681:14, 689:4,
691:10, 691:13,
691:20, 692:5,
692:13, 693:2,
693:9, 697:2,
697:16, 697:21,
698:3, 698:8,
698:18, 698:21,
701:12, 701:14,
702:3, 702:4,
702:13, 706:3,
706:14, 706:25
**hit** [2] - 696:9, 744:5
**hits** [1] - 734:7
**hitting** [1] - 744:3
**HOANG** [1] - 662:25
**Hoang** [3] - 658:19,
662:25, 695:25
**Hodgkin's** [2] -
646:14, 646:19
**holds** [1] - 730:24
**Holstrom** [4] - 725:9,
725:12, 729:8, 730:5
**Holstrom's** [4] -
724:17, 725:17,
726:18, 732:18
**home** [1] - 712:11
**homes** [2] - 616:23,
656:19
**Honor** [53] - 609:17,
612:18, 613:15,

619:16, 619:22,
626:14, 627:20,
629:1, 629:15,
631:21, 633:7,
634:4, 638:9,
643:21, 644:1,
644:3, 649:1, 650:3,
650:14, 652:3,
654:2, 654:7,
654:12, 663:9,
666:1, 672:12,
673:14, 673:18,
674:2, 680:6, 680:9,
681:24, 682:18,
684:22, 684:24,
700:4, 703:6,
708:11, 709:8,
710:4, 714:8,
714:10, 715:4,
715:15, 715:17,
727:3, 727:6,
736:11, 742:5,
742:17, 743:3,
745:25, 748:19
**HONORABLE** [1] -
606:12
**Honorary** [1] - 611:19
**hope** [2] - 618:15,
749:11
**hopefully** [3] - 677:11,
695:3, 695:21
**Hospital** [3] - 612:7,
612:8, 613:20
**hospital** [5] - 612:9,
612:10, 619:1,
625:18, 644:24
**hot** [1] - 669:3
**hour** [3] - 688:12,
708:16, 708:19
**hourly** [2] - 708:15,
708:17
**hours** [3] - 677:21,
688:22, 744:18
**household** [2] - 694:9,
694:10
**housekeeper** [1] -
678:23
**HOUSTON** [1] -
606:24
**Houston** [2] - 663:1,
695:25
**huge** [1] - 735:11
**human** [11] - 611:9,
661:3, 734:20,
739:12, 739:13,
739:15, 739:25,
740:8, 740:10,
740:11, 740:15
**humans** [15] - 657:17,
670:9, 671:22,

673:2, 718:24,
725:14, 726:16,
726:18, 727:2,
731:23, 732:19,
739:14, 745:15,
745:20, 748:17
**hundred** [3] - 614:13,
657:7, 730:5
**Hurricane** [2] -
695:17, 696:25
**hyperplasia** [3] -
730:13, 730:14,
730:21
**hypothetical** [1] -
676:22

# I

**IARC** [9] - 738:24,
739:2, 739:4, 739:5,
739:13, 745:7,
745:9, 748:14
**idea** [1] - 631:24
**identified** [5] - 719:3,
734:17, 737:3,
738:25, 744:1
**identify** [6] - 617:11,
626:21, 655:2,
655:15, 658:17,
720:19
**ilk** [1] - 673:10
**illness** [5] - 657:23,
661:13, 665:4,
678:8, 700:1
**illnesses** [4] - 657:23,
659:18, 663:6,
679:16
**illustrated** [1] - 721:2
**illustration** [1] - 737:6
**illustrations** [1] -
724:10
**imagine** [1] - 667:7
**immaterial** [1] -
728:12
**immediately** [1] -
670:4
**impact** [2] - 634:12,
634:22
**impeachment** [2] -
622:11, 635:12
**important** [14] - 631:5,
657:8, 659:5, 683:6,
691:8, 701:14,
720:20, 721:2,
722:12, 735:17,
735:18, 735:25,
736:6, 742:14
**improper** [2] - 673:22,
733:2

**IN** [1] - 606:4
**in-depth** [1] - 630:13
**inaccurate** [1] -
631:14
**inappropriate** [2] -
635:11, 673:22
**incident** [3] - 614:15,
626:15, 629:10
**incidentally** [1] -
704:4
**include** [2] - 651:20,
678:7
**includes** [1] - 675:12
**including** [6] - 654:13,
686:14, 687:9,
696:5, 718:8, 740:13
**inclusive** [1] - 651:19
**incomplete** [1] -
631:14
**incorrectly** [1] - 734:4
**increase** [2] - 742:11,
743:7
**increased** [5] - 731:2,
742:14, 742:23,
743:3, 744:2
**increases** [1] - 707:23
**independent** [1] -
740:5
**indicate** [2] - 655:2,
726:8
**indicated** [4] - 613:2,
674:12, 675:3, 705:8
**indicates** [1] - 674:22
**indicating** [1] - 741:22
**indicating)** [4] -
663:23, 723:9,
741:14, 741:16
**individual** [1] - 727:17
**individuals** [2] -
615:24, 717:3
**infected** [2] - 731:6,
731:8
**infection** [3] - 664:4,
665:6, 694:22
**infections** [3] -
679:14, 679:15,
731:2
**infectious** [3] -
693:21, 693:24,
693:25
**infirmities** [1] - 659:2
**inflammation** [4] -
663:16, 664:13,
664:18, 665:7
**inflammatory** [1] -
664:6
**influence** [1] - 734:17
**information** [18] -
631:2, 631:5,
642:16, 646:1,

646:6, 646:24,
653:25, 655:25,
656:22, 673:9,
674:6, 692:16,
692:19, 693:22,
694:15, 695:1,
696:12, 746:8
**informed** [1] - 680:25
**ingested** [1] - 735:7
**ingestion** [2] - 735:4,
735:13
**inhalation** [2] -
720:21, 734:21
**inhale** [1] - 665:8
**inhaling** [2] - 710:25,
721:6
**initial** [1] - 714:25
**injured** [1] - 685:9
**injuries** [1] - 631:7
**injury** [7] - 642:20,
672:20, 672:25,
674:4, 676:6, 721:16
**inquiry** [2] - 626:9,
629:8, 644:8
**inside** [2] - 667:9,
734:2
**insofar** [1] - 651:15
**inspect** [1] - 728:9
**instance** [7] - 628:18,
628:20, 641:13,
695:10, 725:10,
735:19, 737:7
**instances** [3] - 635:4,
680:3, 695:11
**instead** [1] - 744:11
**Institute** [2] - 716:6,
717:9
**instructed** [3] -
680:16, 680:20,
680:21
**instructing** [1] -
648:11
**instrumentations** [1] -
704:5
**instruments** [2] -
703:25, 704:2
**insufficiently** [1] -
630:2
**integrity** [3] - 644:13,
734:2, 734:11
**intends** [1] - 652:2
**interdisciplinary** [1] -
652:5
**interest** [2] - 611:8,
715:23
**interested** [3] - 622:7,
657:15, 659:17
**internal** [6] - 612:18,
613:24, 617:13,
619:17, 623:13,

635:23, 650:5, 650:11, 651:6, 651:8, 652:13
**internally** [1] - 734:1
**International** [2] - 738:22, 739:4
**interned** [1] - 613:20
**interpret** [1] - 747:5
**interpretation** [1] - 716:22
**interrupt** [1] - 715:13
**interspersed** [1] - 722:22
**intestines** [1] - 735:10
**introduce** [4] - 688:16, 727:4, 728:3, 728:23
**introduced** [1] - 727:10
**introducing** [1] - 728:11
**invasive** [2] - 724:13, 724:22
**investigated** [1] - 627:2
**Investigator** [1] - 617:25
**investing** [1] - 622:17
**invests** [1] - 622:6
**involve** [3] - 718:7, 718:14, 725:9
**involved** [20] - 611:3, 618:6, 618:12, 619:13, 625:7, 625:15, 625:19, 625:20, 644:14, 645:2, 645:3, 645:6, 645:8, 646:1, 647:15, 648:17, 665:20, 668:6, 678:11, 710:11
**involvement** [1] - 647:14
**involves** [2] - 653:7, 665:14
**involving** [7] - 633:16, 634:25, 639:11, 645:10, 646:13, 647:21, 648:22
**irrelevant** [1] - 612:23
**irritant** [4] - 667:14, 667:16, 667:19, 671:10
**irritate** [1] - 667:19
**irritation** [6] - 671:13, 697:3, 697:5, 697:12, 698:1, 698:22
**Israel** [1] - 614:22
**issue** [14] - 629:2, 630:19, 631:9,

631:11, 631:25, 635:13, 638:3, 650:7, 650:9, 650:20, 665:13, 671:15, 696:16, 710:4
**item** [2] - 698:14, 731:10
**items** [2] - 710:21, 735:16
**itself** [5] - 723:15, 734:6, 735:2, 742:3, 745:11

## J

**January** [5] - 621:10, 658:5, 683:13, 688:5, 694:19
**Jindal** [1] - 718:3
**job** [5] - 616:21, 692:12, 692:16, 701:19, 717:13
**join** [1] - 623:16
**JOSEPH** [1] - 607:8
**journal** [2] - 741:7, 744:11
**Journal** [2] - 708:25, 709:2
**journals** [3] - 657:6, 741:8
**judge** [5] - 612:21, 638:23, 639:14, 648:9, 749:9
**Judge** [7] - 624:10, 632:21, 637:15, 643:3, 667:24, 676:1, 690:12
**JUDGE** [1] - 606:13
**judges** [1] - 635:3
**judgment** [3] - 631:22, 633:16, 644:15
**Judiciary** [1] - 738:14
**juices** [1] - 710:23
**July** [4] - 621:6, 655:10, 656:20, 677:19
**junk** [1] - 747:17
**jurisdiction** [2] - 628:25, 640:6
**jury** [57] - 609:8, 611:7, 612:14, 612:24, 615:20, 618:9, 621:16, 622:4, 622:21, 623:11, 624:17, 626:21, 626:23, 627:21, 629:12, 635:1, 635:22,

636:8, 639:24, 644:2, 644:9, 650:22, 650:23, 650:25, 651:1, 652:16, 653:5, 662:8, 665:17, 666:25, 670:6, 680:22, 681:2, 682:7, 682:13, 684:23, 695:19, 705:21, 710:16, 710:21, 711:18, 717:4, 720:20, 721:23, 724:12, 726:10, 727:8, 728:1, 728:4, 728:24, 730:10, 730:16, 738:23, 739:2, 740:21, 741:10, 749:3
**JURY** [1] - 606:12
**jury's** [1] - 654:10
**juxtaposition** [1] - 674:15

## K

**Kappa** [1] - 611:19
**Katrina** [7] - 663:2, 683:1, 695:17, 695:24, 696:8, 696:9, 696:25
**keep** [5] - 618:23, 717:4, 734:2, 737:12, 737:23
**kept** [1] - 742:1
**keratin** [2] - 724:14, 725:3
**keratinizing** [1] - 725:2
**key** [1] - 655:8
**kick** [1] - 749:13
**kids** [1] - 647:21
**kilogram** [1] - 737:20
**kind** [10] - 616:1, 636:6, 653:25, 672:5, 673:10, 674:17, 700:12, 738:13, 749:7, 749:18
**kinds** [4] - 657:11, 677:22, 734:19, 747:17
**knowledge** [13] - 612:3, 618:1, 645:23, 661:21, 662:23, 668:16, 672:2, 681:20, 685:6, 687:18, 694:3, 707:8, 707:12

known [13] - 648:22, 661:3, 671:20, 713:4, 730:13, 731:18, 739:12, 739:13, 739:14, 739:15, 740:8, 740:10, 740:14
**knows** [2] - 676:9, 676:13
**KURT** [1] - 606:12

## L

**LA** [3] - 607:5, 607:10, 607:14
**lab** [1] - 623:5
**laboratories** [2] - 614:5, 716:8
**laboratory** [7] - 627:15, 679:6, 716:19, 716:22, 716:24, 717:2, 739:23
**lack** [1] - 672:10
**ladies** [10] - 611:6, 615:19, 653:4, 658:21, 659:13, 665:17, 670:20, 678:19, 721:1, 721:23
**laid** [2] - 672:12, 672:15
**LAKEWAY** [1] - 607:9
**language** [1] - 645:12
**lapse** [1] - 621:3
**large** [5] - 612:10, 657:1, 668:5, 722:16
**larger** [1] - 724:1
**last** [15] - 618:11, 620:18, 627:21, 630:24, 643:3, 643:21, 644:10, 646:22, 685:14, 696:4, 712:5, 727:25, 746:5, 748:4
**lastly** [1] - 641:14
**late** [2] - 610:18, 648:23
**Laude** [1] - 611:18
**Law** [2] - 708:25, 709:2
**LAW** [1] - 606:20
**law** [8] - 632:2, 632:19, 635:3, 643:16, 690:4, 690:9, 690:11, 716:24
**Lawrence** [3] - 609:18, 610:6,

640:13
**LAWRENCE** [3] - 608:5, 610:1, 610:6
**lawsuit** [4] - 699:23, 699:24, 710:12, 710:14
**lawyers** [4] - 637:10, 701:3, 709:2, 709:21
**lay** [1] - 672:13
**lead** [3] - 646:24, 681:19, 731:2
**Leading** [1] - 656:2
**leading** [12] - 646:21, 646:22, 646:24, 647:17, 648:4, 648:5, 648:12, 648:13, 649:1, 649:6, 649:15, 713:12
**leak** [1] - 733:24
**least** [11] - 625:2, 639:7, 659:23, 661:22, 677:18, 679:4, 688:14, 693:10, 698:22, 707:2, 739:25
**leave** [2] - 626:10, 641:4
**leaves** [2] - 682:8, 749:4
**leaving** [1] - 712:10
**lecture** [1] - 619:5
**left** [2] - 609:12, 660:8
**legal** [7] - 628:19, 634:9, 637:12, 665:23, 666:2, 690:6, 690:8
**Legislature** [1] - 718:4
**legitimate** [6] - 623:14, 623:19, 625:24, 705:22, 705:24, 740:13
**legitimately** [1] - 747:19
**lengthy** [1] - 728:22
**less** [12] - 619:5, 651:19, 659:3, 661:2, 669:2, 693:22, 712:19, 726:22, 728:9, 730:5, 741:4, 742:13
**lessens** [1] - 744:6
**leukemia** [9] - 745:18, 745:23, 746:9, 746:14, 746:18, 747:1, 747:20, 748:15
**level** [16] - 668:15, 668:18, 669:15, 669:17, 673:22,

686:12, 687:10, 687:17, 687:24, 710:23, 712:1, 712:11, 726:15, 726:19, 729:10, 732:17
**levels** [23] - 656:18, 668:25, 669:20, 672:6, 672:19, 672:22, 672:23, 673:11, 673:23, 674:7, 674:23, 676:2, 676:5, 676:7, 676:11, 676:13, 684:8, 711:24, 711:25, 726:1, 726:3, 726:24, 730:1
**LIABILITY** [1] - 606:5
**library** [5] - 687:6, 687:9, 687:13, 687:15, 744:25
**license** [2] - 617:18, 621:2
**licensure** [1] - 620:21
**life** [2] - 618:17, 715:10
**life-long** [1] - 715:10
**light** [1] - 652:18
**likely** [7] - 645:17, 678:10, 679:20, 679:24, 687:10, 711:8, 714:3
**likewise** [2] - 633:25, 651:9
**lily** [1] - 636:23
**limit** [2] - 674:14, 704:15
**limited** [2] - 663:3, 720:10
**line** [5] - 637:13, 637:16, 664:14, 664:19
**lines** [2] - 721:20, 722:10
**lining** [4] - 663:16, 664:13, 667:20, 725:6
**links** [8] - 671:19, 719:15, 719:18, 719:19, 741:13, 741:21, 742:12
**liquid** [1] - 671:6
**liquids** [3] - 686:24, 711:3, 737:22
**list** [2] - 678:6, 734:18
**listed** [1] - 668:14
**listen** [2] - 628:8, 743:22
**listing** [1] - 744:12
**literature** [14] -

618:23, 630:24, 653:2, 653:9, 653:10, 654:11, 657:12, 671:19, 671:21, 672:2, 674:3, 726:14, 747:14
**liters** [1] - 733:8
**LITIGATION** [1] - 606:5
**litigation** [3] - 654:13, 685:8, 708:21
**live** [2] - 715:8, 715:9
**lived** [6] - 610:17, 610:18, 662:8, 662:11, 677:19, 738:6
**liver** [5] - 711:11, 711:13, 711:15, 735:10
**livers** [1] - 711:16
**lives** [3] - 610:22, 611:1, 636:21
**living** [2] - 679:22, 697:5, 698:13, 717:25, 735:22
**LLC** [1] - 606:9
**local** [2] - 661:22, 662:4
**localized** [1] - 630:21
**located** [1] - 663:18
**Lofgren** [3] - 641:22, 646:11, 647:5
**longstanding** [1] - 611:8
**look** [30] - 615:23, 615:24, 616:20, 634:11, 636:14, 644:11, 645:12, 647:8, 656:9, 656:16, 657:2, 657:5, 657:18, 665:25, 666:12, 668:6, 675:24, 684:20, 697:6, 697:7, 697:9, 697:11, 710:20, 710:21, 711:17, 711:23, 724:21, 739:18, 745:7
**looked** [15] - 624:20, 635:6, 653:11, 654:21, 655:12, 655:15, 657:7, 662:21, 673:7, 679:12, 679:17, 696:14, 704:17, 707:13, 718:11
**looking** [13] - 615:22, 646:1, 653:9, 679:6,

679:7, 700:1, 700:2, 737:13, 737:17, 737:19, 737:20, 744:14, 745:5
**looks** [2] - 724:24, 740:4
**loss** [1] - 730:10
**lost** [6] - 689:6, 689:11, 689:13, 723:17, 724:24, 748:3
**LOUISIANA** [2] - 606:1, 606:6
**Louisiana** [16] - 611:2, 616:12, 617:17, 617:18, 620:21, 620:24, 633:15, 635:16, 638:16, 649:23, 715:9, 715:11, 717:7, 717:25, 750:10, 750:11
**low** [1] - 684:8
**lower** [4] - 669:21, 670:16, 671:10, 671:18
**lowest** [2] - 687:24, 726:3
**LSBME** [1] - 620:22
**LSU** [10] - 610:19, 610:20, 611:4, 611:10, 611:12, 616:11, 616:13, 717:6, 717:11
**lunch** [2] - 748:20, 749:1
**luncheon** [1] - 750:1
**lunchtime** [1] - 743:17
**lung** [7] - 630:21, 645:17, 721:9, 721:15, 722:19, 723:24
**lungs** [8] - 614:1, 617:14, 667:17, 667:21, 671:17, 722:11, 734:22, 736:8
**lymphoma** [2] - 646:14, 646:19
**LYON** [1] - 607:3

## M

**M-i-l-l-e-r** [1] - 610:7
**M.D** [1] - 714:21
**M.D............................
....** [1] - 608:12
**Magna** [1] - 611:18
**mail** [1] - 746:10

**mails** [1] - 746:6
**main** [1] - 661:1
**maintain** [1] - 615:2
**major** [4] - 653:11, 659:18, 659:19, 665:9
**malignant** [1] - 724:14
**mammogram** [2] - 706:25, 707:6
**manner** [1] - 627:13
**manufacture** [1] - 683:23
**manufactured** [3] - 669:8, 669:10, 669:18
**manuscript** [1] - 644:12
**March** [2] - 662:9, 677:20
**Maricopa** [1] - 641:18
**mark** [1] - 693:23
**marks** [1] - 694:1
**Mass** [2] - 612:11, 613:20
**Massachusetts** [2] - 612:7, 612:8
**Master's** [1] - 615:21
**material** [3] - 632:2, 718:15, 728:12
**materials** [1] - 653:5
**mathematical** [3] - 744:17, 744:20, 745:3
**matter** [13] - 625:8, 625:14, 625:15, 625:22, 628:19, 632:12, 644:2, 645:4, 645:6, 645:24, 647:5, 710:13, 750:15
**matters** [2] - 632:23, 633:8
**MAY** [2] - 606:6, 609:3
**McGwin** [1] - 747:7
**MDL** [1] - 606:5
**mean** [9] - 623:17, 640:20, 640:23, 642:19, 677:1, 678:4, 700:24, 705:17, 705:18
**meaning** [1] - 723:8
**means** [6] - 659:21, 663:16, 667:19, 671:1, 675:5, 745:10
**meant** [1] - 726:11
**measure** [3] - 669:5, 744:20
**measured** [2] - 673:8, 687:18
**measurement** [2] -

671:4, 737:6
**measurements** [5] - 683:11, 683:12, 683:18, 687:19, 738:2
**measuring** [2] - 669:20, 671:5
**MECHANICAL** [1] - 607:15
**mechanism** [2] - 719:16, 733:15
**mechanisms** [4] - 711:7, 736:1, 743:8, 744:1
**mechanistic** [5] - 745:10, 745:16, 745:19, 748:16
**medical** [53] - 610:23, 611:4, 612:4, 612:5, 615:1, 615:6, 615:8, 618:13, 618:23, 619:3, 619:6, 620:14, 623:14, 627:3, 639:8, 640:13, 642:19, 653:2, 653:10, 657:6, 658:6, 658:9, 658:14, 661:7, 662:21, 662:24, 663:14, 664:7, 664:20, 666:2, 671:19, 672:1, 681:20, 689:18, 689:23, 691:14, 691:18, 691:19, 692:3, 692:7, 692:11, 692:12, 693:5, 693:6, 698:19, 709:11, 714:5, 714:6, 716:23, 717:1, 717:15, 717:17, 718:7
**Medical** [16] - 610:19, 610:20, 613:21, 615:5, 616:11, 616:13, 617:3, 617:9, 620:24, 627:8, 644:9, 644:20, 644:21, 717:6, 717:11, 718:9
**medication** [1] - 734:3
**medications** [1] - 618:25
**Medicine** [2] - 616:7, 626:11
**medicine** [41] - 612:19, 613:22, 613:24, 613:25, 615:11, 615:23,

616:11, 617:11, 617:13, 617:14, 617:18, 618:5, 618:7, 618:24, 619:17, 619:19, 623:13, 625:19, 625:20, 635:24, 636:4, 646:8, 650:5, 650:12, 650:16, 651:6, 651:9, 651:16, 651:25, 652:13, 659:20, 660:7, 660:8, 717:1, 717:10, 717:11, 733:14
medicines [1] - 658:12
Mediphase [6] - 622:2, 622:4, 622:5, 622:6, 622:14, 625:17
meet [3] - 626:7, 734:25, 739:6
meeting [1] - 688:15
member [4] - 623:21, 623:24, 625:5, 644:21
members [1] - 627:14
membranes [1] - 734:14
memory [3] - 647:7, 647:8, 647:9
Memphis [1] - 611:1
mention [2] - 669:23, 675:1
mentioned [22] - 613:13, 617:15, 626:24, 636:3, 659:5, 661:16, 663:13, 664:10, 665:5, 667:22, 671:9, 672:22, 678:5, 678:13, 679:4, 679:16, 681:13, 695:10, 695:13, 711:2, 712:18, 748:13
mentioning [1] - 709:7
Merit [1] - 750:9
met [2] - 620:2, 658:6
Metairie [1] - 715:9
METAIRIE [1] - 607:10
metals [2] - 718:6, 718:19
metaplasia [3] - 731:11, 731:13, 732:2
methodology [9] - 640:18, 640:20, 640:23, 641:7,

641:11, 642:11, 642:13, 710:10
methods [2] - 640:24, 640:25
microns [1] - 722:17
micronuclei [1] - 742:11
Middle [3] - 633:15, 634:18, 638:16
middle [3] - 658:4, 658:5, 714:25
might [14] - 660:24, 664:4, 670:19, 679:5, 693:20, 693:21, 694:11, 698:9, 699:18, 705:3, 723:9, 735:21, 747:18, 749:7
Mikal [1] - 674:11
MIKAL [1] - 606:17
mild [1] - 659:25
Miller [37] - 609:18, 609:19, 610:6, 610:10, 612:19, 613:19, 619:16, 619:25, 624:16, 626:21, 628:15, 629:3, 638:13, 640:13, 644:7, 644:14, 650:4, 650:10, 651:6, 653:1, 654:14, 655:21, 665:1, 666:8, 672:19, 674:14, 677:16, 682:2, 682:17, 682:22, 690:17, 695:15, 698:12, 709:17, 710:20, 711:23, 736:13
MILLER [1] - 610:1
Miller's [3] - 631:13, 644:16, 645:14
MILLER.....................
............... [1] - 608:5
milligrams [1] - 737:20
millimeters [1] - 704:19
million [14] - 670:17, 670:21, 670:23, 670:25, 671:1, 671:2, 671:3, 671:6, 671:8, 684:13, 730:4, 737:8, 737:10, 744:21
mind [3] - 699:9, 707:14, 737:12
mine [1] - 712:20

minimal [3] - 726:19, 729:10, 732:17
minimum [2] - 699:15, 726:24
minority [1] - 634:8
minute [2] - 667:18, 720:4
minutes [17] - 632:16, 633:2, 677:1, 677:2, 677:3, 677:4, 678:5, 678:14, 682:4, 688:23, 692:14, 702:20, 702:24, 735:21, 744:19, 744:21
misconduct [1] - 627:9
missing [2] - 675:9, 675:24
Mississippi [2] - 611:2, 640:10
misstates [1] - 713:13
mistake [2] - 727:22, 728:5
mistaken [1] - 650:13
misunderstood [1] - 683:25
misuse [2] - 733:2, 733:11
mobile [2] - 656:18, 718:9
models [2] - 656:18, 657:15
molecule [8] - 719:1, 719:5, 719:7, 719:10, 719:18, 733:3, 733:12, 734:7
molecules [3] - 719:9, 720:12, 744:5
moment [12] - 613:19, 665:5, 665:13, 671:13, 716:3, 718:21, 730:8, 732:21, 734:16, 736:10, 741:2, 745:7
momma [1] - 741:20
money [1] - 622:25
month [4] - 621:24, 668:22, 718:10
months [4] - 621:24, 669:16, 683:19, 684:2
moreover [1] - 673:19
MORNING [2] - 606:11, 609:2
morning [7] - 609:10, 610:10, 619:25, 620:1, 651:18, 652:8, 715:3
MORTON [1] - 607:7

most [8] - 653:23, 659:10, 659:22, 677:21, 679:20, 679:24, 711:16, 717:23
mostly [1] - 612:2
motion [2] - 631:22, 633:15
Motorola [1] - 641:22
move [7] - 614:25, 700:16, 700:17, 703:9, 730:19, 736:19, 736:23
moved [19] - 614:21, 626:11, 646:8, 660:2, 662:14, 669:25, 670:1, 670:4, 679:25, 683:15, 683:19, 683:21, 684:2, 696:2, 696:9, 696:21, 700:12, 717:8, 733:10
moving [3] - 643:4, 731:1, 735:7
MPH [3] - 615:19, 615:20, 636:5
MR [208] - 608:6, 608:7, 608:8, 608:9, 608:10, 608:11, 608:13, 609:17, 610:9, 612:17, 612:18, 612:21, 613:14, 613:18, 615:12, 615:16, 619:16, 619:22, 619:24, 622:9, 622:10, 622:13, 624:6, 624:7, 624:10, 624:12, 624:13, 624:15, 626:13, 626:14, 626:20, 627:20, 628:1, 629:1, 629:9, 629:15, 629:17, 632:8, 632:11, 632:21, 633:3, 633:7, 633:13, 634:4, 634:24, 636:5, 636:13, 636:18, 637:5, 637:7, 637:9, 637:15, 637:18, 638:6, 638:9, 638:12, 643:3, 643:6, 643:15, 643:21, 644:1, 644:6, 646:21, 647:2, 647:13, 647:17, 647:24,

648:4, 648:9, 648:16, 649:1, 649:4, 649:9, 649:17, 650:3, 650:14, 652:3, 652:25, 654:2, 654:7, 654:12, 654:24, 655:6, 655:14, 655:20, 656:2, 656:5, 656:10, 656:11, 656:15, 663:9, 663:12, 666:1, 666:7, 667:24, 668:1, 668:9, 672:10, 672:12, 672:18, 673:14, 673:18, 674:2, 674:22, 675:10, 675:22, 676:1, 676:4, 676:9, 676:13, 676:16, 676:17, 676:18, 676:20, 676:22, 676:25, 677:5, 677:15, 680:6, 680:9, 680:11, 680:12, 680:16, 680:21, 680:25, 681:4, 681:9, 681:24, 682:18, 682:21, 684:22, 684:24, 685:4, 686:2, 686:4, 690:6, 690:12, 690:16, 692:22, 692:25, 697:14, 699:11, 700:4, 700:8, 700:13, 700:17, 700:19, 703:10, 703:14, 703:17, 708:10, 708:14, 709:8, 709:13, 709:16, 709:18, 709:20, 710:4, 710:7, 710:15, 710:19, 713:12, 713:17, 714:8, 714:12, 715:2, 715:7, 715:15, 715:17, 716:1, 727:3, 727:6, 727:12, 727:16, 727:22, 728:6, 728:10, 728:13, 728:15, 729:5, 736:11, 736:15, 736:17, 736:19, 736:25, 742:5, 742:10, 742:17, 742:22, 743:3,

743:16, 743:21,
745:25, 746:4,
746:12, 746:13,
746:21, 746:24,
747:6, 747:11,
747:13, 747:18,
748:7, 748:11,
748:19, 749:9,
749:12, 749:22
**MRL** [3] - 726:9,
726:10, 726:12
**muco** [1] - 723:5
**mucociliary** [3] -
723:4, 723:10,
730:19
**mucosa** [1] - 729:20
**mucous** [6] - 722:23,
723:5, 730:15,
730:16, 730:22
**mud** [1] - 718:17
**MULCAHY** [2] - 607:3,
607:4
**multiple** [4] - 633:16,
635:7, 639:11,
686:13
**multiplier** [1] - 670:22
**multiply** [1] - 670:25
**must** [3] - 673:21,
716:17, 738:15
**mutant** [2] - 734:11,
734:12
**mutation** [3] - 736:3,
741:23, 741:24
**mutations** [1] - 742:4

**N**

**nail** [1] - 718:11
**name** [7] - 610:4,
616:1, 620:2,
714:19, 730:15,
738:6
**namely** [1] - 679:21
**names** [2] - 638:20,
658:20
**narrow** [3] - 633:22,
634:6, 650:8
**narrowly** [1] - 643:10
**nasal** [8] - 659:20,
704:11, 704:13,
704:21, 720:2,
721:5, 723:23,
729:19
**nasopharyngeal** [1] -
745:15
**National** [3] - 708:25,
709:2, 740:3
**Native** [1] - 717:24
**nature** [1] - 657:20

**near** [1] - 663:1
**nebulous** [2] - 636:6,
651:24
**necessarily** [1] - 693:4
**necessary** [3] - 635:4,
690:23, 730:17
**need** [17] - 659:7,
659:8, 659:9,
665:12, 686:21,
699:12, 699:15,
699:17, 699:21,
700:3, 704:3, 716:2,
721:22, 728:25,
733:12, 746:11,
747:18
**needed** [1] - 722:23
**needs** [1] - 656:11
**negative** [2] - 636:22,
703:2
**negatively** [1] - 719:7
**negatively-charged**
[1] - 719:7
**never** [8] - 620:2,
631:23, 633:3,
648:2, 685:8,
685:16, 707:14,
746:7
**New** [8] - 610:22,
616:11, 617:3,
649:22, 688:7,
709:18, 716:7, 717:8
**NEW** [2] - 606:6,
607:5, 607:14
**new** [11] - 618:15,
618:24, 622:7,
645:25, 670:2,
677:17, 681:10,
744:4, 745:19,
748:15
**newer** [1] - 616:1
**newspapers** [1] -
614:13
**next** [16] - 609:15,
611:21, 615:17,
617:20, 632:16,
643:19, 672:14,
700:16, 711:21,
712:14, 714:11,
717:25, 722:7,
725:13, 729:15,
731:10
**nice** [1] - 724:25
**nickel** [1] - 630:8
**night** [1] - 746:5
**NIOSH** [1] - 740:10
**NO** [2] - 606:5, 606:8
**nobody** [3] - 618:1,
666:17, 676:13
**non** [2] - 646:14,
646:19

**non-Hodgkin's** [2] -
646:14, 646:19
**none** [1] - 687:18
**nonhazardous** [3] -
718:1, 718:15,
718:16
**normal** [15] - 659:3,
721:18, 721:19,
721:21, 721:22,
722:4, 723:16,
724:10, 724:20,
731:10, 732:3,
732:9, 732:13,
734:1, 734:2
**normally** [2] - 721:20,
725:7
**north** [1] - 611:2
**nose** [24] - 620:7,
620:8, 659:21,
663:21, 664:13,
664:14, 664:19,
664:24, 665:8,
667:20, 671:16,
703:21, 703:24,
704:13, 704:17,
721:14, 722:1,
722:2, 722:4,
723:12, 724:24,
729:24, 729:25,
732:6
**notation** [1] - 697:3
**note** [5] - 627:23,
685:2, 697:12,
698:3, 741:3
**noted** [3] - 668:19,
703:1, 705:12
**notes** [8] - 689:2,
689:6, 689:8,
689:11, 697:6,
697:7, 697:8, 701:18
**nothing** [8] - 609:23,
632:24, 700:15,
703:23, 704:1,
704:2, 707:6, 714:16
**notice** [1] - 716:9
**Number** [5] - 611:13,
653:14, 656:16,
711:20, 727:4
**number** [27] - 610:15,
617:21, 618:4,
618:13, 622:9,
622:10, 624:6,
624:7, 633:17,
633:19, 645:13,
651:19, 651:20,
656:25, 657:1,
657:5, 658:18,
661:10, 668:5,
670:14, 678:15,
684:15, 695:16,

710:1, 717:18, 738:6
**numbered** [2] -
728:19, 750:14
**numbers** [5] - 670:14,
682:25, 684:6,
684:17, 687:21

**O**

**oak** [1] - 694:9
**oar** [1] - 722:15
**oath** [2] - 610:3,
714:23
**object** [7] - 629:9,
654:7, 656:11,
666:1, 736:11,
742:5, 742:17
**objected** [1] - 690:8
**objection** [26] -
615:12, 626:15,
643:23, 646:21,
647:17, 648:4,
649:1, 654:2,
654:18, 656:2,
667:24, 672:10,
673:14, 673:18,
676:21, 680:6,
680:9, 690:6,
690:10, 700:4,
700:10, 700:13,
713:12, 727:5,
727:6, 745:25
**objectionable** [1] -
646:23
**obligated** [2] - 632:18,
632:19
**observed** [2] - 730:9,
732:18
**obviously** [7] - 653:7,
659:17, 660:22,
665:8, 667:8,
688:17, 736:17
**occasion** [4] - 628:14,
688:2, 691:12,
709:22
**occasionally** [3] -
619:5, 628:6, 690:20
**occasions** [3] - 628:4,
681:14, 690:17
**occupation** [1] -
678:20
**occupational** [5] -
611:12, 616:12,
684:22, 717:12,
717:16
**occur** [2] - 674:4,
731:23
**occurred** [1] - 747:22
**occurs** [2] - 666:17,

712:10
**October** [1] - 747:22
**octopus** [1] - 733:20
**odor** [8] - 670:3,
670:6, 670:7,
670:11, 673:8,
712:15, 712:24,
713:2
**odors** [1] - 669:24
**OF** [2] - 606:1, 606:12
**offer** [9] - 619:16,
639:13, 642:10,
654:16, 655:3,
655:4, 655:7, 655:8,
656:10
**offered** [7] - 625:3,
629:5, 650:11,
652:14, 654:22,
655:1, 655:3
**offering** [1] - 655:10
**office** [3] - 689:8,
692:14, 695:16
**OFFICER** [4] - 609:7,
682:6, 682:12, 749:2
**OFFICIAL** [1] - 607:13
**Official** [2] - 750:10,
750:20
**often** [6] - 619:5,
637:10, 657:12,
666:12, 685:18,
735:18
**oftentimes** [1] -
691:19
**oil** [4] - 717:25, 718:1,
718:15, 718:17
**old** [2] - 634:14,
658:25
**olfactory** [2] - 712:10,
713:5
**on-line** [2] - 637:13,
637:16
**once** [6] - 660:2,
679:4, 680:12,
687:4, 718:10,
723:18
**one** [73] - 618:14,
623:3, 623:19,
624:25, 627:12,
628:18, 628:20,
629:22, 631:20,
632:22, 633:22,
636:23, 637:1,
637:8, 637:21,
638:14, 646:23,
650:8, 650:21,
652:20, 655:4,
659:19, 659:22,
663:14, 667:8,
671:2, 671:7,
674:12, 678:15,

684:17, 684:18, 688:2, 688:22, 691:5, 691:8, 691:17, 695:10, 695:13, 696:2, 696:4, 697:2, 697:16, 697:23, 698:16, 701:12, 703:15, 704:25, 705:3, 708:10, 709:17, 717:23, 718:10, 724:10, 724:16, 726:20, 727:2, 733:9, 733:18, 742:6, 742:23, 742:24, 744:12, 745:22, 746:6, 746:7, 746:14, 746:15, 747:7, 747:13, 748:1

**one-and-a-half** [1] - 688:22

**ones** [4] - 637:11, 651:20, 724:2, 740:13

**onset** [1] - 681:10

**open** [2] - 734:15, 747:17

**opening** [1] - 695:19

**opinion** [61] - 630:1, 630:14, 630:22, 631:13, 633:13, 634:18, 634:21, 634:23, 637:22, 638:24, 638:25, 639:14, 639:15, 639:17, 640:7, 640:16, 641:17, 642:10, 642:19, 643:17, 645:11, 645:13, 645:14, 645:19, 645:23, 646:3, 650:20, 650:22, 650:23, 650:25, 652:14, 652:20, 655:16, 657:23, 667:1, 668:2, 673:19, 673:20, 674:9, 674:13, 674:20, 674:22, 675:23, 677:22, 690:8, 693:17, 694:7, 705:23, 706:2, 706:7, 713:8, 713:22, 714:5, 715:23, 738:16, 738:17, 740:6, 743:1, 743:14

**opinions** [16] - 619:8,

630:14, 631:16, 634:8, 635:5, 637:11, 638:14, 641:1, 641:4, 642:6, 648:18, 650:24, 652:1, 652:16, 655:23, 669:11

**opportunities** [2] - 614:7, 615:6

**opportunity** [9] - 614:5, 616:8, 627:5, 627:23, 632:12, 643:14, 657:25, 658:14, 670:19

**opposed** [2] - 671:17, 711:5

**Optional** [1] - 627:20

**orally** [1] - 661:6

**oranges** [2] - 737:16, 737:24

**order** [5] - 635:5, 652:1, 665:18, 672:6, 712:19

**ORDER** [1] - 609:4

**ordinarily** [1] - 634:15

**organ** [1] - 735:11

**organization** [4] - 623:12, 623:14, 623:16, 738:22

**Organization** [2] - 737:4, 739:6

**organizations** [2] - 623:17, 717:22

**originally** [1] - 738:11

**ORLEANS** [3] - 606:6, 607:5, 607:14

**Orleans** [7] - 610:22, 616:11, 649:22, 688:7, 709:18, 716:7, 717:8

**OSHA** [1] - 740:11

**otherwise** [4] - 634:9, 651:4, 703:11, 749:14

**otolaryngologist** [2] - 662:6, 704:6

**otolaryngology** [2] - 620:6, 620:9

**otoscope** [1] - 704:18

**outlined** [1] - 666:25

**outreach** [1] - 717:12

**outs** [1] - 733:22

**outside** [4] - 649:2, 722:1, 724:24, 729:24, 732:5

**overall** [1] - 659:2

**overlap** [1] - 652:4

**overrule** [2] - 656:3, 668:3

**own** [2] - 638:2,

653:23

# P

**Page** [4] - 623:7, 623:8, 700:22, 701:17

**PAGE** [1] - 608:3

**page** [13] - 611:14, 615:17, 617:20, 618:3, 622:5, 641:17, 653:14, 674:25, 675:24, 676:11, 700:22, 709:9, 711:19

**pages** [3] - 728:2, 728:3, 746:17

**paid** [1] - 624:2

**pain** [1] - 660:3

**painful** [2] - 661:25, 663:24

**panel** [4] - 609:9, 682:8, 682:14, 749:4

**paper** [2] - 627:12, 644:12

**papers** [12] - 614:7, 614:9, 614:12, 657:5, 657:7, 657:9, 657:11, 657:12, 657:13, 672:21, 727:8, 743:8

**paragraph** [5] - 627:21, 644:10, 684:23, 711:21, 712:6

**parameters** [1] - 718:12

**parish** [1] - 678:24

**park** [1] - 656:18

**part** [23] - 619:15, 631:9, 631:10, 631:11, 632:18, 650:24, 668:2, 670:23, 671:2, 671:7, 675:11, 675:17, 678:9, 688:14, 698:8, 703:11, 717:17, 719:20, 728:25, 732:12, 742:6

**partial** [2] - 631:22, 633:15

**participant** [1] - 697:21

**particle** [1] - 719:7

**particles** [10] - 722:16, 722:20, 722:24, 723:10, 730:17, 730:23, 730:24,

732:11

**particular** [18] - 611:4, 613:10, 615:25, 627:1, 645:19, 645:24, 646:16, 647:4, 647:10, 647:14, 648:2, 648:17, 649:10, 652:23, 665:19, 722:4, 745:22, 747:14

**particularly** [5] - 617:22, 617:25, 618:10, 622:7, 665:21

**partitioned** [1] - 719:25

**parts** [36] - 668:19, 670:15, 670:17, 670:20, 670:21, 670:24, 671:1, 673:3, 674:5, 684:6, 684:8, 684:13, 684:16, 687:25, 726:3, 726:19, 726:21, 726:22, 729:1, 730:3, 730:5, 730:7, 732:20, 737:8, 737:9, 741:5, 742:13, 744:18, 744:20, 744:21

**party** [1] - 747:4

**pass** [6] - 644:15, 650:20, 681:24, 694:21, 714:8, 748:19

**passage** [1] - 745:7

**passages** [1] - 720:2

**passing** [1] - 674:13

**past** [3] - 633:10, 645:7, 722:5

**Pathologists** [1] - 716:21

**pathology** [1] - 705:7

**pathway** [14] - 666:13, 666:18, 666:19, 666:21, 666:22, 666:25, 667:13, 668:7, 675:4, 675:11, 675:14, 678:1, 721:4

**patient** [14] - 621:9, 635:5, 658:10, 659:11, 665:4, 678:6, 685:9, 685:16, 685:20, 690:18, 691:9, 692:17, 705:8, 710:13

**patient's** [1] - 659:7

**patients** [26] - 611:11, 616:15, 616:17, 616:19, 616:20, 618:6, 618:20, 621:16, 621:22, 628:2, 628:4, 635:6, 644:14, 644:16, 644:17, 644:18, 660:4, 660:22, 685:13, 685:18, 691:15, 691:23, 691:25, 692:1, 692:10, 710:11

**PATRICIA** [3] - 608:12, 714:21, 714:24

**Patricia** [2] - 714:12, 714:24

**pattern** [1] - 630:11

**pause** [1] - 633:6

**Pearland** [1] - 662:25

**peer** [2] - 653:22, 741:8

**peer-reviewed** [2] - 653:22, 741:8

**people** [11] - 615:24, 616:22, 623:17, 639:1, 639:11, 657:13, 657:18, 661:8, 670:15, 717:24, 719:22

**PEPPER** [1] - 607:13

**Pepper** [3] - 750:8, 750:18, 750:19

**per** [44] - 668:19, 670:15, 670:17, 670:20, 670:21, 670:23, 670:24, 671:1, 671:2, 671:7, 673:3, 673:4, 674:5, 684:6, 684:8, 684:13, 684:16, 687:25, 708:16, 708:19, 726:3, 726:19, 726:21, 726:22, 730:3, 730:5, 730:7, 732:20, 737:8, 737:9, 737:15, 737:20, 741:5, 742:13, 744:18, 744:20, 744:21

**percent** [8] - 621:22, 622:1, 628:3, 720:2, 720:7, 720:8, 720:10, 720:11

**perform** [3] - 704:9, 718:4, 732:13

**performance** [1] - 716:21

**performed** [4] - 620:18, 649:25, 679:10, 700:24

**perhaps** [3] - 647:3, 681:21, 683:24

**period** [8] - 614:4, 616:25, 617:4, 618:17, 662:2, 677:11, 702:22, 731:3

**periodically** [1] - 739:6

**periods** [1] - 744:9

**permanent** [1] - 719:20

**permit** [3] - 621:6, 621:11, 634:7

**permitted** [1] - 636:1

**person** [12] - 644:23, 661:24, 664:15, 666:15, 666:18, 667:10, 712:25, 723:1, 723:13, 731:6, 737:21, 742:1

**person's** [2] - 666:11, 667:17

**personally** [1] - 622:22

**persons** [5] - 670:12, 712:2, 712:9, 712:15, 727:1

**pertinent** [2] - 629:7, 650:8

**PFISTER** [1] - 607:7

**Ph.D** [1] - 642:19

**Pharmacology** [1] - 618:1

**pharmacology** [13] - 612:19, 614:2, 616:11, 617:2, 617:3, 617:15, 619:17, 635:24, 645:8, 650:5, 650:13, 651:9, 652:14

**phenomenon** [1] - 645:12

**Phi** [1] - 611:19

**Phoenix** [2] - 641:19, 646:16

**photo** [1] - 724:15

**photograph** [1] - 725:21

**phrase** [1] - 625:23

**physical** [13] - 634:25, 657:25, 658:21, 658:22, 658:23, 659:3, 659:9, 688:23, 689:3, 700:24, 702:19,

703:18, 705:19

**physically** [1] - 733:18

**physician** [14] - 618:19, 621:5, 621:11, 621:14, 625:2, 625:3, 628:19, 635:4, 645:1, 661:10, 661:22, 662:5, 662:7, 738:10

**Physician** [1] - 624:18

**Physicians** [4] - 623:11, 623:22, 624:4, 624:23

**physicians** [9] - 623:12, 654:14, 659:10, 661:23, 689:23, 690:1, 690:19, 717:13, 738:11

**physiologically** [1] - 733:3

**pick** [2] - 609:11, 692:18

**picture** [6] - 651:17, 718:25, 722:7, 724:1, 726:8, 734:9

**pictures** [1] - 732:7

**piece** [1] - 747:1

**pieces** [1] - 671:7

**pin** [1] - 721:12

**PINEDO** [1] - 606:20

**pipes** [1] - 724:1

**place** [4] - 687:7, 702:8, 732:3, 732:9

**places** [1] - 717:6

**plaintiff** [10] - 609:17, 639:5, 639:9, 691:13, 691:17, 691:23, 692:4, 692:14, 696:5, 703:19

**PLAINTIFF** [1] - 606:16

**plaintiff's** [2] - 630:7, 701:3

**plaintiffs** [5] - 633:16, 634:25, 691:25, 708:18, 728:1

**plaintiffs'** [1] - 709:21

**plan** [1] - 637:7

**plant** [2] - 725:19

**platelet** [3] - 733:19, 733:21, 734:1

**platelets** [2] - 733:15, 733:16

**plausibility** [1] - 738:20

**plausible** [1] - 698:23

**play** [2] - 744:1,

749:14

**PlayStation** [1] - 733:8

**pleasure** [1] - 620:4

**plug** [1] - 733:24

**point** [43] - 609:8, 626:1, 629:18, 633:5, 633:11, 638:7, 640:11, 641:11, 641:23, 645:22, 645:25, 647:22, 650:3, 650:9, 651:24, 654:5, 655:17, 659:1, 659:7, 673:16, 677:7, 680:7, 681:6, 682:7, 682:10, 682:13, 689:14, 693:19, 694:4, 699:12, 706:24, 713:20, 719:20, 727:14, 728:16, 730:9, 736:11, 742:20, 743:18, 746:2, 748:8, 749:3, 749:25

**pointed** [1] - 713:19

**pointer** [1] - 720:22

**pointing** [1] - 709:16

**points** [1] - 672:24

**pollen** [1] - 694:9

**pollution** [1] - 666:14

**polyps** [3] - 706:20, 706:22, 707:5

**Pontchartrain** [2] - 716:6, 717:9

**population** [1] - 675:7

**populations** [1] - 615:23

**portion** [2] - 645:14, 663:22

**portions** [4] - 728:19, 728:20, 734:25, 735:1

**position** [4] - 616:14, 625:25, 626:5, 676:4

**positions** [3] - 616:9, 618:4, 717:5

**positive** [2] - 636:22, 698:21

**possession** [1] - 689:14

**possibility** [2] - 695:13, 698:16

**possible** [7] - 638:14, 660:23, 664:23, 678:7, 693:25, 698:15, 739:16

**posterior** [1] - 723:23

**postpone** [1] - 656:13

**potential** [6] - 659:18,

665:2, 665:4, 713:8, 739:16, 744:2

**powerful** [1] - 735:11

**PowerPoint** [1] - 746:15

**POYDRAS** [2] - 607:5, 607:13

**ppb** [7] - 711:23, 712:1, 712:9, 712:10, 726:4, 726:9, 726:10

**ppm** [3] - 710:22, 726:6, 726:7

**practice** [2] - 617:18, 625:6, 625:8, 625:20, 628:3, 644:16, 645:3, 701:15, 716:16

**practicing** [1] - 618:5

**precise** [1] - 686:21

**precursor** [1] - 706:22

**predicate** [3] - 672:12, 672:13, 672:15

**prefer** [2] - 655:8, 660:22

**pregnant** [1] - 718:8

**prejudice** [1] - 634:13

**prejudicial** [2] - 634:11, 634:12

**preparatory** [1] - 653:1

**prepared** [2] - 748:25, 749:6

**presence** [1] - 675:3

**present** [6] - 667:4, 675:5, 688:14, 697:16, 697:22, 702:16

**presentation** [2] - 746:15, 749:17

**presented** [3] - 648:22, 651:17, 743:4

**pressure** [1] - 660:15

**presumably** [1] - 641:2

**pretrial** [1] - 674:11

**pretty** [7] - 612:12, 631:18, 669:19, 670:3, 689:1, 711:15, 732:7

**Pretty** [1] - 725:4

**prevalent** [1] - 701:23

**prevent** [2] - 717:14, 744:3

**Prevention** [1] - 656:19

**previous** [7] - 625:9, 625:14, 625:21, 626:14, 628:3,

645:4, 732:21

**previously** [5] - 629:7, 669:22, 690:8, 713:21, 723:20

**priests** [1] - 678:24

**primarily** [3] - 615:22, 617:5, 697:20

**primary** [5] - 610:23, 661:12, 724:6, 734:21, 738:15

**principal** [1] - 617:4

**principle** [2] - 634:15, 727:24

**principles** [2] - 616:3, 737:2

**privileges** [3] - 612:11, 612:12, 644:23

**probability** [1] - 714:6

**probable** [3] - 679:20, 739:25, 740:2

**probative** [1] - 634:13

**problem** [12] - 634:5, 637:12, 638:5, 659:20, 659:22, 660:12, 711:14, 727:24, 728:3, 728:10, 730:22, 747:16

**problematic** [1] - 661:25

**problems** [15] - 658:11, 659:19, 659:23, 695:17, 696:21, 696:24, 699:16, 699:19, 701:21, 702:11, 705:15, 705:18, 731:5

**procedures** [3] - 618:24, 664:8, 716:22

**proceed** [3] - 638:9, 644:3, 715:4

**proceeding** [1] - 631:24

**proceedings** [22] - 609:8, 633:5, 633:11, 638:7, 654:5, 655:17, 673:16, 677:7, 680:7, 681:6, 682:7, 682:10, 682:13, 727:14, 728:16, 742:20, 743:18, 746:2, 748:8, 749:3, 749:25, 750:14

**PROCEEDINGS** [3] - 606:12, 607:15, 609:1

**process** [10] - 613:12, 613:15, 628:7, 628:12, 693:24, 693:25, 732:2, 739:22, 742:4, 747:19
**produce** [2] - 632:19, 722:23
**PRODUCED** [1] - 607:16
**product** [1] - 710:25
**PRODUCTS** [1] - 606:4
**Professional** [1] - 750:9
**professional** [1] - 651:7
**professor** [5] - 615:11, 616:10, 617:1, 716:5, 717:10
**proffer** [2] - 650:4, 652:3
**proffered** [4] - 638:22, 643:11, 643:12, 643:23
**profile** [7] - 653:13, 654:1, 654:13, 655:9, 655:21, 727:4, 727:19
**Program** [1] - 740:3
**program** [2] - 717:13, 740:4
**projections** [4] - 722:14, 723:8, 732:8, 733:22
**proliferation** [1] - 731:24
**promising** [1] - 618:15
**prong** [3] - 675:14, 675:15, 675:16
**proper** [3] - 629:1, 642:10, 642:13
**properly** [1] - 683:24
**properties** [1] - 724:25
**proposition** [1] - 743:13
**protecting** [1] - 722:18
**protein** [2] - 741:13, 742:12
**protracted** [1] - 736:21
**proved** [1] - 630:23
**proven** [1] - 716:14
**provided** [3] - 640:8, 641:14, 641:21
**providing** [1] - 648:24
**province** [1] - 650:25
**PSC** [1] - 712:5
**pseudostratified** [3] -

722:7, 723:19, 732:7
**psychiatrist** [1] - 701:7
**psychological** [3] - 660:17, 700:25, 701:11
**psychologist** [1] - 701:6
**Public** [1] - 615:21
**public** [1] - 615:24
**publication** [6] - 624:4, 624:24, 653:18, 653:22, 709:2, 745:8
**publications** [4] - 657:4, 670:14, 737:3, 740:4
**published** [9] - 614:10, 614:12, 614:13, 632:14, 637:11, 644:12, 644:13, 653:20, 657:5
**pull** [4] - 622:4, 682:23, 708:25, 721:7
**pulling** [1] - 723:10
**pulls** [1] - 723:8
**pulmonary** [6] - 613:25, 617:14, 635:24, 650:12, 651:9, 652:13
**pulmonology** [4] - 612:19, 612:22, 619:18, 650:5
**purpose** [7] - 621:8, 634:7, 634:17, 643:15, 658:9, 712:23, 737:6
**purposefully** [1] - 612:13
**purposes** [2] - 651:10, 702:24
**pursuing** [1] - 746:8
**put** [17] - 618:17, 623:17, 624:9, 624:11, 626:2, 634:4, 692:16, 692:19, 693:23, 694:1, 694:5, 711:19, 722:5, 722:10, 733:9, 733:21, 747:7
**puts** [2] - 702:8, 733:21
**putting** [1] - 733:16
**pyramid** [1] - 637:25

**Q**

**Q-Tip** [3] - 722:3, 722:6, 722:10
**qualification** [1] - 613:14
**qualifications** [3] - 613:7, 628:9, 643:18
**qualified** [5] - 613:3, 628:16, 642:10, 673:19, 704:10
**qualify** [4] - 625:12, 625:25, 629:4, 642:25
**qualifying** [2] - 613:12, 629:14
**quarrel** [3] - 625:24, 626:4, 626:5
**questionable** [3] - 706:25, 707:2, 707:6
**questioned** [1] - 644:11
**questioning** [4] - 620:20, 643:22, 651:21, 680:20
**questions** [7] - 636:11, 672:14, 674:1, 680:24, 702:24, 708:11, 715:21
**quick** [4] - 689:1, 744:24, 744:25, 745:2
**quickly** [2] - 611:15, 716:2
**quit** [3] - 621:16, 701:19, 746:22
**quite** [12] - 610:15, 617:21, 624:20, 645:13, 649:19, 660:9, 660:10, 664:25, 686:17, 686:23, 700:11, 707:19
**quote** [2] - 670:15, 675:2
**quotes** [1] - 670:15

**R**

**radioactivity** [1] - 718:6
**radium** [1] - 718:19
**raise** [3] - 609:21, 622:25, 714:14
**raised** [2] - 614:15, 614:17
**ran** [1] - 709:1

**RANDALL** [1] - 607:4
**Randall** [1] - 620:4
**random** [1] - 667:23
**randomly** [1] - 668:11
**range** [4] - 668:10, 670:13, 684:11, 711:23
**rat** [1] - 731:22
**rate** [3] - 708:15, 708:17, 749:8
**rather** [4] - 649:15, 681:2, 711:8, 728:23
**rational** [1] - 681:22
**rats** [1] - 724:18
**razor** [1] - 725:4
**RBD** [1] - 620:5
**RE** [1] - 606:4
**re** [1] - 650:4
**re-urge** [1] - 650:4
**reach** [2] - 642:23, 713:2
**reached** [2] - 640:17, 746:5
**react** [2] - 719:14, 720:16
**reacted** [1] - 719:18
**reactive** [8] - 719:3, 719:8, 719:11, 719:12, 719:14, 720:13, 734:5, 734:6
**read** [9] - 624:16, 627:21, 632:13, 635:1, 640:22, 641:5, 675:21, 684:23, 703:4
**reading** [3] - 625:13, 641:2, 642:15
**readings** [1] - 684:1
**ready** [1] - 682:3
**real** [3] - 623:16, 660:3, 721:21
**realize** [1] - 676:17
**really** [15] - 623:18, 631:23, 632:21, 632:23, 635:8, 638:1, 651:13, 651:21, 658:12, 671:15, 683:18, 732:5, 733:11, 737:12, 745:5
**realm** [1] - 701:11
**Realtime** [1] - 750:8
**reason** [6] - 610:23, 632:6, 637:1, 651:22, 722:14, 735:19
**reasonable** [3] - 702:25, 714:5, 714:6
**reasons** [1] - 664:5
**rebuttal** [2] - 635:13,

649:4
**receive** [1] - 712:16
**received** [5] - 617:12, 617:21, 618:2, 654:18, 717:18
**recent** [3] - 618:10, 706:24, 745:8
**recently** [1] - 740:17
**recertify** [1] - 716:17
**recess** [2] - 682:11, 750:1
**recognition** [1] - 712:10
**recognize** [2] - 620:12, 620:21
**recognized** [3] - 617:24, 627:14, 700:23
**recognizes** [1] - 708:7
**recollection** [8] - 640:8, 641:21, 647:3, 648:6, 685:10, 685:12, 692:10, 697:10
**recollections** [1] - 639:1
**record** [10] - 610:5, 632:19, 651:22, 652:7, 652:10, 709:8, 709:14, 714:20, 727:9, 750:14
**recorded** [2] - 692:8, 692:13
**RECORDED** [1] - 607:15
**records** [28] - 621:2, 658:14, 658:16, 658:17, 661:7, 661:18, 662:1, 662:21, 662:24, 663:3, 664:20, 679:4, 689:18, 689:19, 689:23, 691:2, 691:14, 691:18, 691:19, 692:7, 692:11, 692:13, 694:13, 694:16, 695:6, 695:9, 695:21, 698:19
**recover** [1] - 736:4
**RECREATION** [1] - 606:9
**rectory** [4] - 701:20, 701:24, 702:3, 702:12
**red** [1] - 733:18
**redirect** [13] - 613:7, 613:11, 626:16,

627:23, 627:24, 629:14, 643:25, 651:15, 684:25, 685:1, 685:2, 686:19, 710:5
**REDIRECT** [2] - 608:11, 710:6
**reference** [3] - 656:21, 709:10, 746:14
**referenced** [4] - 655:22, 667:22, 668:1, 729:16
**referred** [2] - 739:5, 740:11
**referring** [2] - 683:7, 709:12
**reflect** [2] - 621:2, 695:6
**reflected** [1] - 691:14
**reflecting** [1] - 691:18
**reflects** [1] - 626:23
**refresh** [6] - 639:1, 640:8, 641:21, 647:3, 647:8, 697:10
**regard** [9] - 619:17, 627:17, 645:1, 645:10, 646:11, 650:10, 661:3, 678:11, 742:3
**regarding** [2] - 632:20, 644:2
**region** [1] - 704:13
**Registered** [2] - 750:8, 750:9
**Registry** [2] - 653:13, 726:13
**regular** [2] - 661:21, 717:17
**Reich** [18] - 609:14, 612:13, 613:2, 613:3, 613:7, 613:13, 620:20, 633:1, 648:11, 650:13, 650:16, 677:13, 709:24, 714:11, 715:13, 729:3, 736:12, 746:5
**REICH** [114] - 606:23, 606:23, 609:17, 610:9, 612:18, 613:14, 613:18, 615:16, 619:16, 622:9, 624:6, 624:12, 626:14, 627:20, 629:1, 629:9, 631:21, 632:8, 632:11, 633:3, 633:7, 633:13, 634:4, 634:24, 636:5,

637:5, 637:9, 637:18, 638:6, 644:1, 644:6, 647:2, 647:13, 647:24, 648:16, 649:4, 649:9, 649:17, 650:3, 650:14, 652:3, 652:25, 654:12, 654:24, 655:6, 655:20, 656:5, 656:10, 656:15, 663:9, 663:12, 666:7, 668:1, 668:9, 672:12, 672:18, 674:2, 674:22, 675:10, 676:4, 676:9, 676:13, 676:17, 676:20, 676:22, 676:25, 677:5, 677:15, 680:11, 680:16, 680:21, 680:25, 681:4, 681:9, 681:24, 684:22, 686:2, 690:6, 700:4, 700:13, 700:17, 703:6, 703:10, 709:8, 709:13, 709:18, 710:7, 710:15, 710:19, 713:17, 714:8, 714:12, 715:2, 715:4, 715:7, 715:15, 716:1, 727:3, 727:12, 729:5, 736:15, 736:19, 736:25, 742:10, 743:3, 743:16, 743:21, 746:13, 746:21, 747:13, 747:18, 748:7, 748:11, 748:19
**REICH.............** [1] - 608:8
**REICH...................** [1] - 608:6
**REICH.....................** [1] - 608:11
**REICH........................** [2] - 608:9, 608:13
**reject** [3] - 650:24, 650:25, 651:1
**relate** [1] - 659:13
**related** [6] - 653:8, 653:10, 657:14, 657:24, 666:10, 707:12
**relates** [2] - 645:15,

734:17
**RELATES** [1] - 606:7
**relating** [2] - 621:9, 642:2
**relationship** [1] - 644:19
**relatively** [1] - 716:2
**release** [4] - 657:2, 669:15, 669:17
**released** [6] - 648:23, 667:3, 667:4, 667:6, 669:3
**relevancy** [1] - 615:12
**relevant** [5] - 631:25, 635:21, 643:16, 661:2
**reliable** [6] - 630:2, 634:9, 634:19, 638:25, 639:15, 651:4
**reliance** [1] - 681:21
**relook** [1] - 749:5
**rely** [2] - 651:13, 652:21
**relying** [3] - 638:1, 638:4, 694:13
**remain** [2] - 720:17, 731:3
**remaining** [1] - 735:16
**remains** [1] - 720:11
**remarkable** [1] - 703:23
**remember** [17] - 621:7, 630:4, 640:3, 647:14, 647:20, 647:21, 648:7, 648:8, 658:4, 664:24, 682:24, 685:24, 688:13, 697:18, 697:19, 697:23, 698:12
**remind** [2] - 638:19, 640:1
**reminding** [1] - 649:12
**removed** [2] - 706:20, 719:21
**render** [5] - 619:8, 648:18, 652:1, 652:2, 673:19
**rendered** [3] - 616:18, 628:23, 645:22
**rendering** [2] - 738:15, 738:17
**renew** [2] - 626:14, 643:23
**renown** [1] - 739:6
**repair** [2] - 736:1, 742:3
**repaired** [5] - 701:24, 734:12, 736:4,

741:25, 744:7
**repeat** [1] - 720:24
**repetitive** [1] - 736:20
**rephrase** [5] - 666:3, 690:10, 690:14, 713:14, 743:9
**replaced** [2] - 729:22, 732:6
**replacement** [1] - 731:10
**replica** [1] - 741:20
**report** [37] - 653:16, 654:21, 655:10, 656:8, 656:17, 656:21, 656:23, 657:3, 667:4, 667:22, 668:1, 668:10, 669:1, 669:13, 673:7, 674:23, 674:25, 675:1, 675:19, 675:25, 676:9, 676:11, 676:12, 677:19, 684:20, 697:8, 697:9, 697:11, 700:20, 703:1, 706:21, 711:17, 711:19, 714:4, 746:17, 747:20, 747:21
**Reporter** [4] - 750:8, 750:9, 750:10, 750:20
**REPORTER** [1] - 607:13
**REPORTER'S** [1] - 750:6
**reports** [6] - 687:21, 691:3, 691:5, 698:4, 701:19, 707:18
**represent** [1] - 696:7
**representation** [2] - 744:17, 745:5
**representative** [1] - 729:24
**representing** [1] - 620:4
**request** [1] - 708:18
**require** [1] - 635:13
**required** [1] - 627:14
**requires** [1] - 615:22
**research** [17] - 610:19, 614:4, 614:5, 614:17, 617:5, 622:21, 627:9, 627:18, 637:12, 644:8, 644:13, 657:5, 657:7, 657:9, 716:8, 740:5
**Research** [1] - 738:23,

739:4
**researched** [1] - 672:19
**researcher** [3] - 614:19, 626:25, 637:18
**resident** [2] - 620:19, 715:10
**residents** [2] - 615:8, 717:15
**resolved** [3] - 614:20, 614:21, 627:1
**respect** [2] - 612:22, 641:7, 649:24, 670:12, 678:15, 679:2, 683:11, 713:22, 720:21, 721:3, 731:8, 732:22, 737:2, 739:19, 743:6
**respiratory** [42] - 667:14, 667:16, 667:18, 667:20, 671:9, 671:10, 671:11, 671:13, 671:14, 671:17, 671:18, 671:23, 672:20, 672:25, 674:4, 676:6, 720:13, 720:16, 720:19, 721:3, 721:8, 721:14, 721:16, 721:18, 721:21, 722:10, 722:17, 722:25, 723:16, 724:11, 724:20, 724:23, 725:24, 725:23, 725:25, 729:22, 730:8, 730:25, 731:11, 732:10, 732:14
**respond** [1] - 673:25
**response** [2] - 685:23, 738:19
**responsibilities** [1] - 622:3
**rest** [2] - 621:22, 749:23
**resting** [1] - 749:9
**result** [1] - 642:20
**resulted** [2] - 630:9, 730:2
**results** [1] - 682:25
**resume** [1] - 748:23
**retained** [1] - 632:6
**reused** [1] - 738:13
**review** [12] - 630:13, 632:12, 644:15, 653:16, 653:24,

658:14, 663:3, 672:1, 698:19, 703:1, 716:15, 739:6
**reviewed** [18] - 632:4, 632:10, 653:2, 653:6, 653:8, 653:22, 658:16, 658:17, 674:6, 674:23, 689:18, 691:3, 691:5, 700:20, 741:8, 745:9, 745:13
**reviews** [1] - 726:14
**rhinitis** [19] - 663:7, 664:11, 664:12, 665:1, 665:21, 671:20, 671:23, 672:2, 673:12, 674:8, 677:24, 678:11, 679:5, 679:13, 679:22, 693:2, 693:16, 695:7, 710:9
**rhino** [2] - 659:21, 664:15
**rhinoceros** [1] - 664:16
**rhinosinusitis** [17] - 659:21, 660:4, 661:11, 664:15, 674:24, 678:2, 693:2, 693:16, 695:8, 696:16, 698:10, 698:15, 698:17, 698:23, 713:11, 713:23, 714:3
**Richard** [1] - 638:18
**rid** [1] - 732:10
**rigorous** [1] - 716:15
**rise** [6] - 609:7, 682:6, 682:12, 746:16, 747:15, 749:2
**risk** [11] - 707:23, 726:19, 726:24, 729:10, 732:17, 742:14, 742:23, 743:3, 743:7, 744:2, 744:10
**RMR** [1] - 607:13, 750:19
**role** [2] - 689:22, 697:18
**ROOM** [1] - 607:13
**room** [4] - 688:17, 728:1, 728:4, 728:25
**rooms** [1] - 687:14
**Rouge** [1] - 638:17
**rounds** [1] - 619:1
**route** [4] - 666:14,

734:18, 734:21, 735:4
**routes** [2] - 675:6, 736:7
**rows** [1] - 722:15
**Rubber** [1] - 639:19
**Rule** [3] - 627:20, 634:6, 634:12
**rule** [5] - 634:20, 634:21, 648:13, 700:15, 747:5
**Rules** [1] - 634:7
**rules** [2] - 635:2, 675:16
**ruling** [5] - 631:21, 632:14, 633:15, 634:10, 636:8
**run** [1] - 717:1
**Rush** [1] - 620:4
**résumé** [2] - 623:15, 651:7
**résumés** [1] - 623:17

**S**

**s/Cathy** [1] - 750:18
**sacs** [4] - 721:11, 722:11, 734:23
**salicylic** [1] - 733:14
**sampled** [1] - 656:25
**samples** [2] - 718:11
**sampling** [1] - 684:9
**SAN** [2] - 606:18, 606:24
**satisfies** [1] - 675:11
**Saturday** [1] - 749:8
**saw** [16] - 616:18, 663:3, 688:2, 688:7, 688:12, 700:10, 703:23, 704:1, 704:2, 704:14, 704:22, 705:12, 718:12, 719:12, 720:11, 734:9
**scab** [1] - 733:21
**schedule** [2] - 609:13, 749:6
**scheduled** [1] - 609:13
**School** [7] - 613:21, 615:5, 626:11, 627:8, 644:9, 644:20, 644:22
**school** [7] - 611:22, 612:4, 612:5, 615:1, 626:10, 627:3, 717:17
**science** [1] - 650:6
**Science** [1] - 717:6

**Sciences** [2] - 716:7, 717:9
**scientific** [18] - 612:3, 614:13, 627:14, 633:24, 634:8, 641:10, 642:3, 642:10, 642:13, 645:23, 646:3, 653:10, 672:21, 739:7, 740:4, 740:14, 741:8, 743:13
**scientifically** [1] - 669:14
**scientist** [1] - 628:19
**scientists** [2] - 744:16, 745:3
**scope** [1] - 649:2
**Scott** [1] - 620:2
**SCOTT** [1] - 607:4
**screen** [1] - 700:21
**scrubs** [1] - 618:18
**search** [1] - 653:9
**season** [1] - 669:6
**seat** [2] - 609:20, 714:19
**seated** [2] - 609:11, 682:15
**second** [6] - 625:23, 667:7, 708:10, 712:6, 724:15, 732:12
**secondhand** [4] - 707:22, 707:23, 708:4, 708:7
**Secretary** [1] - 718:2
**secreted** [1] - 730:17
**secreting** [1] - 730:16
**secretions** [1] - 664:7
**section** [4] - 632:25, 698:3, 709:10, 729:6
**SECURITY** [4] - 609:7, 682:6, 682:12, 749:2
**see** [59] - 615:19, 616:10, 616:14, 618:20, 625:10, 626:22, 629:19, 631:1, 632:6, 634:22, 636:25, 640:18, 644:9, 644:17, 644:18, 651:22, 652:10, 657:19, 661:25, 662:14, 662:17, 662:24, 670:14, 670:15, 672:14, 672:15, 677:6, 678:8, 679:9, 680:23, 681:2, 684:6, 690:18,

691:25, 695:6, 701:18, 701:21, 701:25, 703:25, 704:1, 704:19, 704:25, 705:4, 705:6, 716:18, 718:5, 718:12, 722:13, 724:12, 725:2, 726:23, 727:9, 728:11, 728:20, 733:17, 737:7, 739:18
**seeing** [6] - 618:5, 621:16, 621:22, 639:5, 662:4, 705:15
**seem** [5] - 636:6, 678:17, 679:5, 679:15, 679:17
**selected** [2] - 668:11, 696:5
**selects** [1] - 726:15
**semi** [1] - 732:13
**semi-colon** [1] - 732:13
**seminar** [1] - 619:6
**send** [1] - 728:4
**sense** [3] - 630:6, 713:1, 713:5
**sensitive** [4] - 712:2, 712:9, 712:14, 712:24
**sensitized** [1] - 712:15
**sentence** [3] - 711:24, 746:6, 746:7
**serious** [2] - 680:2, 681:10
**serve** [2] - 716:5, 748:13
**served** [4] - 646:17, 716:18, 716:25, 717:10
**serves** [1] - 737:6
**service** [4] - 611:4, 611:12, 616:13, 616:19
**services** [2] - 616:18, 708:20
**SESSION** [2] - 606:11, 609:2
**set** [3] - 616:19, 634:23, 742:25
**several** [5] - 636:7, 657:7, 661:23, 691:19, 733:16
**severe** [2] - 660:9, 664:9
**sewing** [1] - 721:12
**sheetrock** [2] - 701:23, 701:25
**shop** [2] - 735:19,

744:24
**short** [4] - 612:14, 632:22, 677:4, 681:25
**shorten** [2] - 747:18, 747:19
**show** [7] - 624:3, 624:11, 637:12, 641:17, 666:25, 721:1, 725:14
**showed** [7] - 644:2, 710:15, 721:20, 724:18, 725:22, 731:22, 732:7
**showing** [2] - 674:3, 732:4
**shown** [6] - 644:7, 647:16, 672:20, 695:19, 710:20, 711:18
**shows** [5] - 674:3, 722:7, 724:10, 729:21, 741:12
**Shreveport** [2] - 717:7, 717:11
**Shwery** [4] - 691:6, 700:23, 701:3, 701:18
**Shwery's** [1] - 700:20
**sick** [1] - 661:9
**side** [6] - 618:7, 627:5, 635:12, 636:23, 710:22
**significance** [2] - 668:24, 729:18
**significant** [17] - 617:23, 631:10, 659:14, 659:22, 669:4, 669:11, 678:17, 678:25, 695:16, 697:2, 698:7, 698:13, 699:23, 699:24, 714:1, 714:2
**signs** [3] - 717:2, 718:5, 718:12
**similar** [2] - 723:20, 724:5
**simplify** [1] - 665:25
**simply** [4] - 618:21, 650:9, 651:5, 746:15
**simultaneously** [1] - 664:23
**single** [1] - 685:20
**sinus** [3] - 659:20, 661:22
**sinuses** [12] - 660:5, 663:17, 663:18, 663:19, 664:19, 664:25, 665:9,

671:16, 704:22,
731:6, 731:8
**sinusitis** [28] - 661:14,
661:16, 663:7,
663:14, 663:24,
664:1, 664:8, 665:1,
665:22, 671:23,
672:3, 673:12,
674:8, 677:24,
678:12, 679:13,
679:22, 679:25,
681:10, 681:11,
693:2, 693:16,
695:7, 695:17,
696:3, 696:8, 710:9
**sister** [1] - 742:11
**sister-chromatid** [1] -
742:11
**sit** [8] - 635:25,
648:19, 658:20,
684:21, 685:22,
688:25, 697:24,
716:16
**site** [3] - 622:14,
717:25, 718:1
**sites** [2] - 735:4, 736:8
**sitting** [1] - 692:14
**situation** [4] - 666:21,
680:2, 691:22, 692:9
**situations** [2] -
616:24, 691:24
**six** [1] - 669:16
**size** [2] - 721:11,
721:13
**skin** [5] - 722:1, 725:5,
731:15, 733:23,
736:8
**slide** [17] - 684:17,
723:19, 724:13,
725:13, 726:11,
729:15, 729:18,
738:25, 739:18,
741:12, 744:8,
747:7, 747:8, 747:9,
747:13
**slides** [1] - 729:7
**slideshow** [1] - 683:8
**slowly** [1] - 695:23
**small** [8] - 630:19,
645:11, 645:16,
645:17, 646:1,
709:10, 719:5, 719:7
**smaller** [3] - 724:1,
724:5, 733:18
**smell** [8] - 670:1,
670:3, 670:9,
670:10, 673:10,
677:17, 713:1, 713:5
**smoke** [6] - 707:22,
707:23, 708:2,

708:3, 708:4, 708:8
**smoking** [2] - 707:15,
707:16
**so-called** [2] - 615:8,
657:2
**societies** [1] - 626:2
**Society** [3] - 611:19,
618:1, 716:21
**soft** [2] - 686:11,
686:14
**solely** [1] - 698:18
**solemnly** [2] - 609:22,
714:15
**soluble** [1] - 720:9
**solvent** [1] - 646:19
**solvents** [1] - 718:6
**someone** [5] - 658:24,
659:3, 700:23,
738:6, 744:18
**sometimes** [6] -
616:21, 616:22,
620:7, 637:22,
664:7, 737:7
**somewhat** [1] -
660:20
**somewhere** [2] -
684:11, 739:10
**son** [2] - 706:16, 707:5
**sons** [1] - 733:9
**sorry** [6] - 656:6,
656:7, 688:18,
695:12, 700:24,
708:23
**sort** [10] - 636:7,
654:15, 659:25,
663:7, 674:12,
679:6, 721:3, 721:9,
733:20, 734:9
**sorts** [2] - 616:17,
645:15
**sought** [1] - 653:5
**sound** [2] - 621:6,
630:11
**sounds** [1] - 630:9
**source** [7] - 649:20,
665:19, 666:14,
675:4, 675:6,
675:12, 694:8
**Southern** [1] - 640:9
**space** [3] - 722:9,
742:1, 743:25
**speaking** [2] - 640:21,
743:12
**specialist** [1] - 661:13
**Specialties** [1] - 617:9
**specialty** [6] - 620:13,
620:14, 625:7,
625:8, 645:23
**specific** [22] - 624:25,
630:19, 639:6,

639:25, 641:13,
665:13, 665:14,
665:18, 665:24,
675:11, 675:17,
676:16, 676:17,
679:8, 687:14,
687:21, 694:21,
699:8, 703:25,
709:4, 728:3, 743:1
**specifically** [6] -
622:18, 625:22,
657:14, 663:16,
696:18, 743:23
**spell** [3] - 610:4,
664:11, 714:20
**spend** [1] - 654:22
**spending** [1] - 635:15
**spent** [7] - 611:24,
612:1, 613:25,
614:1, 621:22,
651:21, 676:14
**spill** [1] - 649:21
**spit** [2] - 722:20,
723:11
**split** [1] - 741:17
**spontaneously** [2] -
660:21, 681:13
**spot** [1] - 736:3
**spots** [1] - 719:16
**squamous** [10] -
721:24, 724:13,
724:22, 725:24,
729:23, 731:11,
731:13, 731:14,
731:18, 732:5
**stamp** [1] - 712:4
**stamped** [1] - 711:18
**stand** [1] - 700:11
**standard** [7] - 633:21,
633:22, 634:1,
634:5, 634:11,
635:10, 705:6
**standpoint** [1] -
663:15
**stands** [3] - 615:21,
639:25, 640:3
**start** [4] - 609:16,
613:10, 674:13,
748:24
**started** [3] - 659:23,
662:4, 682:19
**starting** [1] - 618:12
**state** [5] - 610:4,
620:21, 641:14,
714:19, 717:14
**State** [5] - 617:18,
620:24, 715:10,
718:3, 750:10
**statement** [9] -
696:15, 712:2,

712:12, 712:14,
712:17, 746:16,
746:22, 747:15,
748:14
**STATES** [2] - 606:1,
606:13
**States** [5] - 628:24,
640:9, 653:18,
750:11, 750:21
**states** [1] - 701:23
**status** [1] - 679:3
**stay** [1] - 619:2
**stayed** [1] - 677:21
**STENOGRAPHY** [1] -
607:15
**step** [2] - 667:7, 714:9
**stethoscope** [1] -
618:18
**still** [11] - 612:11,
618:23, 619:6,
623:24, 625:18,
634:22, 669:17,
720:17, 749:9,
749:10, 749:22
**stipulate** [1] - 715:18
**stipulated** [2] -
683:14, 727:23
**stipulation** [3] -
612:15, 612:21,
715:16
**stomach** [2] - 733:10,
735:8
**stood** [1] - 738:13
**stop** [1] - 733:24
**stopped** [1] - 749:18
**stopping** [3] - 733:15,
733:16, 734:1
**stops** [2] - 722:5,
733:19
**store** [1] - 737:8
**story** [2] - 627:5,
712:20
**straight** [2] - 721:12,
734:24
**strands** [1] - 741:15
**stratified** [4] - 721:24,
725:24, 729:23,
732:5
**streamline** [1] -
749:17
**STREET** [2] - 607:5,
607:13
**strength** [1] - 738:18
**strengthened** [1] -
745:22
**strike** [1] - 680:22
**strong** [1] - 745:16
**stronger** [2] - 745:19,
748:15
**structural** [1] - 704:14

**structure** [3] - 721:22,
722:4, 734:10
**stuck** [1] - 676:2
**students** [6] - 615:7,
615:8, 615:9, 619:3,
619:6, 717:15
**studied** [2] - 612:1
**studies** [17] - 646:9,
654:9, 712:7, 712:8,
718:7, 726:25,
727:7, 727:17,
729:12, 739:23,
740:6, 740:12,
740:17, 742:14,
745:19, 747:22,
748:16
**study** [23] - 611:25,
615:22, 616:3,
631:23, 717:23,
718:4, 718:23,
724:19, 725:9,
725:11, 726:2,
729:19, 730:2,
730:5, 731:22,
732:16, 732:18,
745:6, 745:22,
746:16, 748:13
**studying** [3] - 611:24,
613:25, 614:2
**stuff** [1] - 663:7
**styled** [1] - 633:14
**subject** [12] - 619:18,
625:8, 625:14,
625:15, 625:22,
628:16, 645:4,
645:6, 645:24,
650:22, 652:17,
736:15
**subjected** [2] -
673:12, 742:2
**submit** [1] - 638:21
**subsequently** [1] -
613:25
**substance** [4] -
643:18, 671:7,
687:2, 719:20
**Substances** [2] -
653:13, 726:13
**substances** [2] -
687:3, 705:3
**substantial** [1] - 694:3
**substantially** [3] -
660:3, 660:10,
669:19
**substitute** [1] - 647:9
**succinct** [1] - 732:1
**suffer** [1] - 713:1
**sufficient** [11] -
651:23, 673:12,
674:6, 674:7, 676:5,

677:23, 677:25,
694:14, 745:15,
745:20, 748:16
**sufficiently** [1] - 664:9
**suggest** [1] - 622:21
**suggesting** [4] -
632:7, 632:9,
636:19, 749:16
**suggests** [1] - 642:12
**suing** [1] - 699:3
**SUITE** [5] - 606:18,
606:21, 606:24,
607:5, 607:10
**summarize** [1] -
655:14
**summary** [2] - 631:22,
633:16
**summer** [1] - 683:15
**Superior** [1] - 641:18
**supplied** [2] - 656:18,
658:16
**support** [3] - 651:8,
745:19, 748:16
**supported** [3] -
634:19, 638:24,
745:16
**supports** [1] - 643:16
**Supreme** [4] - 633:20,
633:23, 635:16,
649:23
**surgeon** [3] - 620:15,
707:18, 708:7
**surgery** [4] - 620:18,
680:10, 680:11,
680:17
**surgical** [2] - 620:14,
664:8
**surprise** [1] - 687:24
**surveillance** [2] -
717:1, 718:7
**suspect** [1] - 667:2
**sustain** [2] - 676:21,
690:9
**sustained** [4] - 631:7,
642:20, 672:9, 710:9
**swab** [1] - 722:3
**swallow** [2] - 722:21,
723:12
**swear** [2] - 609:22,
714:15
**sworn** [2] - 610:2,
714:22
**symptoms** [6] -
661:19, 673:21,
693:4, 703:2,
705:17, 712:15
**system** [1] - 671:14
**systemic** [4] - 630:21,
630:22, 630:25,
645:12

**T**

**table** [1] - 636:22
**tail** [1] - 742:12
**talks** [1] - 667:5
**tank** [1] - 649:21
**target** [1] - 720:24
**taught** [1] - 610:18
**TCE** [3] - 646:14,
646:18, 647:21
**teach** [3] - 615:6,
619:3, 717:15
**teaching** [8] - 612:8,
612:10, 617:5,
617:17, 618:5,
622:3, 625:18,
644:23
**tear** [1] - 636:24
**technical** [1] - 719:6
**technique** [1] - 635:17
**techniques** [2] -
648:21, 649:11
**technology** [1] -
716:23
**temperatures** [1] -
669:2
**temporality** [1] -
738:19
**temporary** [1] - 621:6
**ten** [5] - 622:1, 692:6,
692:8, 717:9, 746:17
**tend** [1] - 741:4
**tender** [3] - 612:17,
612:18, 651:11
**tendered** [3] - 613:1,
613:9, 715:14
**tenured** [1] - 716:5
**term** [6] - 663:16,
664:10, 687:3,
719:6, 723:5, 735:24
**terminate** [1] - 721:10
**terminology** [1] -
650:16, 693:5, 693:6
**terms** [15] - 629:14,
630:12, 636:6,
636:9, 649:19,
649:20, 651:18,
651:19, 663:13,
668:25, 693:15,
702:6, 732:23,
743:24, 745:9
**test** [4] - 667:23,
677:18, 682:25,
706:9, 706:10,
738:13
**tested** [3] - 668:5,
687:25, 711:23
**testified** [6] - 610:3,
622:1, 676:1, 683:4,

686:6, 714:23
**testify** [11] - 615:13,
628:15, 636:1,
639:8, 642:22,
643:2, 647:7,
673:23, 674:15,
674:16, 675:20
**testifying** [3] - 622:19,
635:20, 708:15
**testimony** [32] -
609:22, 613:4,
613:10, 625:9,
626:7, 629:25,
632:5, 636:10,
636:21, 637:20,
638:16, 639:4,
640:9, 641:14,
641:22, 642:5,
643:9, 645:5,
648:25, 651:2,
651:3, 656:12,
666:1, 667:2, 670:5,
673:20, 674:17,
676:3, 682:25,
689:15, 713:13,
714:15
**testing** [5] - 668:20,
668:22, 668:24,
669:7, 669:9
**Texas** [1] - 663:1
**text** [3] - 674:12,
729:12, 729:13
**textbooks** [1] - 653:8
**THE** [143] - 606:12,
609:7, 609:10,
609:19, 609:21,
609:25, 610:4,
610:6, 612:13,
612:24, 613:16,
615:13, 619:20,
624:8, 624:11,
626:12, 626:16,
627:22, 629:4,
629:11, 632:2,
632:9, 632:15,
633:1, 633:9, 634:3,
634:17, 635:19,
636:6, 636:14,
636:19, 637:14,
637:16, 638:3,
638:10, 642:25,
643:4, 643:8,
643:19, 643:24,
644:4, 646:22,
647:6, 647:18,
647:20, 648:5,
648:11, 649:5,
649:7, 649:12,
650:7, 650:15,
652:6, 654:4,

654:20, 655:1,
655:12, 655:16,
656:3, 656:13,
663:10, 666:3,
668:2, 668:5,
672:13, 673:15,
673:25, 674:10,
674:25, 675:18,
675:23, 676:7,
676:10, 676:14,
676:21, 676:23,
677:3, 677:6, 677:9,
680:14, 680:18,
680:22, 681:2,
681:5, 681:25,
682:6, 682:9,
682:12, 682:15,
682:19, 685:1,
690:7, 690:14,
692:23, 697:11,
697:12, 699:5,
699:6, 700:6,
700:10, 700:15,
703:8, 703:11,
709:12, 709:15,
710:5, 713:14,
714:9, 714:10,
714:11, 714:13,
714:14, 714:18,
714:19, 714:24,
715:5, 715:13,
715:16, 715:19,
727:5, 727:10,
727:13, 727:21,
728:11, 728:18,
736:20, 742:8,
742:19, 743:9,
746:1, 746:10,
746:19, 746:23,
747:2, 747:10,
747:16, 748:3,
748:20, 749:2,
749:5, 749:10,
749:16, 749:24
**therapy** [1] - 664:7
**therefore** [2] - 673:21,
715:19
**they've** [1] - 651:18
**thick** [2] - 725:4, 731:2
**THIS** [1] - 606:7
**thousand** [5] - 670:22,
670:23, 670:25,
745:1
**thousands** [2] - 692:1
**THREE** [2] - 606:18,
607:9
**three** [15] - 612:20,
613:23, 617:11,
625:9, 625:14,
625:21, 645:4,

684:11, 696:3,
707:4, 716:14,
727:19, 728:2,
734:18, 735:21
**threshold** [7] - 670:6,
670:7, 670:8,
670:11, 673:9,
712:19, 713:2
**throat** [2] - 620:7,
620:8
**throughout** [9] -
614:12, 615:4,
618:20, 652:19,
660:7, 717:14,
733:12, 735:14,
742:22
**timely** [1] - 746:17
**timing** [2] - 702:6
**tiny** [5] - 721:10,
724:8, 733:17,
733:18, 734:23
**tip** [1] - 721:11
**Tip** [2] - 722:3, 722:6,
722:10
**tissue** [11] - 672:20,
719:9, 719:10,
720:14, 720:16,
721:16, 721:19,
722:19, 731:24,
732:3, 732:9
**tissues** [5] - 664:14,
664:19, 720:11,
720:12
**title** [3] - 624:5,
624:16, 717:12
**TO** [2] - 606:7, 609:4
**today** [8] - 609:12,
609:13, 635:3,
641:4, 646:4, 749:9,
749:13, 749:23
**today's** [3] - 634:15,
635:2, 695:14
**together** [3] - 647:20,
692:16, 692:20
**tolerate** [1] - 701:25
**took** [11] - 659:5,
669:23, 681:14,
689:2, 689:3,
698:18, 702:8,
702:20, 722:3,
724:17, 725:18
**tools** [1] - 704:10
**top** [6] - 637:25,
663:21, 676:10,
724:11, 724:15,
739:12
**topics** [1] - 661:1
**torn** [1] - 733:22
**totally** [3] - 723:16,
723:17, 732:10

**touch** [1] - 654:20
**tox** [2] - 654:13, 655:9
**toxic** [10] - 719:13, 733:3, 733:12, 734:3, 734:5, 734:6, 734:21, 738:11, 745:11
**Toxic** [2] - 653:13, 726:13
**toxicant** [1] - 719:12
**toxicants** [3] - 718:24, 719:13, 739:7
**toxicity** [4] - 732:21, 732:22, 732:24, 734:17
**toxicological** [6] - 653:13, 654:1, 655:21, 656:1, 727:4, 727:19
**toxicologically** [2] - 735:17, 736:6
**toxicologist** [6] - 616:6, 654:8, 654:15, 655:5, 655:13, 716:12
**toxicologists** [2] - 654:14, 681:22
**Toxicology** [4] - 709:11, 716:10, 716:14, 740:3
**toxicology** [13] - 616:1, 616:3, 654:8, 654:23, 673:23, 715:15, 715:18, 715:20, 716:8, 716:16, 717:12, 718:21, 718:22
**trace** [1] - 721:4
**trachea** [8] - 721:7, 722:17, 723:23, 723:25, 724:4, 725:6, 730:18, 730:25
**tract** [14] - 667:20, 671:24, 674:4, 676:6, 720:19, 721:3, 721:18, 721:21, 722:10, 722:17, 722:25, 725:25, 732:10, 736:8
**TRAILER** [1] - 606:4
**trailer** [38] - 657:24, 660:2, 660:8, 660:11, 662:9, 662:12, 662:15, 662:17, 666:23, 667:3, 667:9, 667:11, 669:25, 672:6, 676:2, 676:8,

676:12, 676:13, 677:17, 677:20, 677:21, 679:22, 679:23, 680:1, 681:18, 683:15, 683:19, 684:2, 685:8, 687:17, 687:20, 696:2, 696:10, 696:22, 697:5, 698:13, 711:24, 735:23
**trailers** [13] - 656:18, 657:1, 657:2, 667:23, 668:6, 668:12, 668:16, 668:21, 669:8, 669:10, 669:18, 673:8, 683:23
**training** [1] - 613:23
**transcript** [1] - 750:13
**TRANSCRIPT** [2] - 606:12, 607:15
**transformation** [1] - 724:14
**trap** [2] - 722:24, 730:17
**traps** [1] - 730:23
**travel** [7] - 656:18, 662:14, 662:17, 668:15, 673:7, 734:24, 741:18
**traveled** [1] - 610:10
**TRAVERSE** [2] - 608:7, 619:23
**treat** [2] - 663:5, 696:5
**treated** [3] - 685:16, 685:18, 685:20
**treating** [5] - 621:13, 689:23, 690:1, 690:19, 695:2
**treatise** [1] - 728:4
**treatment** [1] - 696:8
**treatments** [1] - 664:1
**tree** [5] - 721:9, 724:3, 724:4, 730:25
**trial** [7] - 609:14, 632:4, 632:5, 649:25, 652:19, 747:18, 748:1
**TRIAL** [1] - 606:12
**tried** [1] - 639:13
**tries** [1] - 636:23
**trip** [2] - 744:24, 744:25
**trips** [1] - 745:2
**trouble** [1] - 731:1
**true** [8] - 615:10, 648:2, 681:16, 729:16, 730:6, 739:15, 740:18,

750:12
**truly** [1] - 633:3
**trunk** [1] - 724:4
**truth** [7] - 609:23, 609:24, 700:2, 714:16
**truthful** [1] - 692:13
**try** [14] - 619:2, 622:25, 659:16, 664:2, 664:5, 665:4, 672:5, 672:13, 677:9, 678:7, 686:21, 692:19, 716:2, 736:22
**trying** [11] - 618:15, 622:20, 629:4, 635:18, 642:25, 673:19, 674:2, 676:15, 741:10, 747:25
**tubes** [5] - 721:9, 721:14, 721:20, 730:18
**Tufts** [5] - 614:21, 615:17, 617:1, 617:3, 626:11
**turn** [1] - 724:3
**turned** [1] - 681:17
**turns** [1] - 687:2
**TV** [1] - 733:7
**twice** [2] - 623:4, 680:25
**two** [24] - 613:25, 614:2, 615:22, 617:25, 636:13, 637:6, 645:2, 653:11, 657:11, 663:13, 674:12, 681:14, 696:3, 701:19, 702:7, 724:6, 724:10, 735:12, 735:16, 735:21, 744:13, 745:1, 745:14
**two-expert** [1] - 674:12
**TX** [3] - 606:18, 606:21, 606:24
**type** [22] - 614:23, 618:19, 620:18, 652:5, 656:22, 665:19, 666:9, 666:21, 667:16, 669:24, 675:19, 677:17, 679:8, 681:16, 681:20, 704:4, 704:9, 711:25, 718:15, 721:25, 725:4, 731:15

**types** [4] - 653:5, 663:5, 711:25, 738:24
**typically** [1] - 712:10

**U**

**U.S** [2] - 633:20, 640:5
**ultimate** [1] - 719:12
**ultimately** [5] - 614:20, 631:6, 649:11, 649:23, 672:8
**umbrella** [2] - 636:7, 651:19
**unacceptable** [2] - 627:18, 642:3
**unavailable** [3] - 737:12, 737:19, 737:22
**uncommon** [3] - 664:24, 688:25, 702:22
**under** [12] - 620:20, 627:20, 633:20, 633:25, 634:10, 634:14, 635:2, 635:10, 677:22, 682:24, 684:22, 690:4
**underground** [1] - 667:8
**undertook** [1] - 630:13
**undue** [1] - 634:13
**unfair** [1] - 636:25
**unhappy** [1] - 660:13
**unit** [1] - 718:9
**United** [5] - 628:24, 640:9, 653:18, 750:11, 750:21
**UNITED** [2] - 606:1, 606:13
**units** [1] - 737:6
**University** [9] - 611:22, 614:21, 617:1, 626:11, 716:7, 717:8
**unless** [2] - 675:9, 675:24
**unlike** [1] - 747:20
**unlikely** [1] - 678:18
**unpacked** [1] - 735:20
**unpublished** [1] - 632:14
**unreliable** [2] - 634:19, 638:24
**unremarkable** [3] - 658:23, 703:19,

705:19
**unsupported** [2] - 639:16, 640:18
**unusual** [4] - 660:4, 665:10, 665:11, 679:16
**up** [51] - 609:11, 611:1, 611:14, 616:19, 618:20, 622:4, 624:11, 633:9, 633:10, 637:12, 638:16, 638:17, 640:25, 653:15, 664:6, 671:6, 672:16, 677:4, 677:6, 677:9, 682:23, 683:8, 684:6, 684:7, 686:8, 693:7, 700:11, 700:21, 707:1, 708:25, 711:19, 711:21, 712:6, 718:17, 722:16, 722:20, 722:21, 722:25, 723:8, 723:10, 726:24, 730:19, 733:24, 735:7, 742:19, 745:14, 746:1, 747:7, 748:22
**upper** [8] - 671:10, 671:13, 671:14, 671:17, 671:23, 672:20, 672:25, 676:5
**upset** [1] - 681:18
**upside** [1] - 724:3
**urge** [1] - 650:4
**urine** [3] - 718:11, 720:8, 720:9
**utilize** [1] - 653:12
**utilized** [3] - 649:11, 656:23, 727:18

**V**

**valid** [1] - 652:20
**valuable** [1] - 659:11
**value** [1] - 634:13
**vapor** [1] - 711:1
**variation** [1] - 712:18
**varied** [2] - 621:24, 711:24
**variety** [4] - 612:2, 615:9, 616:9, 616:19
**various** [6] - 612:2, 657:6, 664:2, 729:12, 737:3, 737:8
**vegetable** [1] - 710:22

**vegetables** [1] - 686:16
**venture** [1] - 622:16
**versus** [2] - 710:25, 738:2
**vessels** [1] - 734:23
**vestibule** [4] - 722:2, 722:3, 729:25, 732:6
**view** [3] - 659:8, 724:11, 724:12
**violation** [1] - 746:4
**visiting** [3] - 621:5, 621:11, 688:9
**visits** [4] - 661:10, 662:11, 695:16, 696:3
**Viterbo** [2] - 633:17, 634:18
**VOIR** [4] - 608:6, 608:8, 610:8, 644:5
**voir** [6] - 612:22, 629:2, 632:22, 632:25, 643:22, 649:3
**volume** [7] - 671:4, 671:5, 720:4, 720:5, 737:15, 737:18, 738:3

**W**

**W-I-L-L-I-A-M-S** [1] - 714:25
**waded** [1] - 674:21
**wait** [3] - 642:25, 700:10
**walk** [1] - 735:19
**wants** [3] - 635:22, 648:10, 684:24
**warmer** [3] - 669:3, 669:5, 669:6
**warn** [1] - 680:25
**warning** [4] - 712:16, 717:2, 718:5, 718:12
**waste** [5] - 654:10, 717:25, 718:1, 718:15, 718:17
**water** [11] - 646:18, 646:19, 687:2, 720:9, 732:22, 733:3, 733:4, 733:8, 733:10, 733:12
**Watts** [2] - 609:14, 746:5
**WATTS** [8] - 606:16, 606:17, 727:16, 728:6, 728:13, 749:9, 749:12, 749:22

**ways** [2] - 670:2, 734:19
**weather** [2] - 669:3, 669:4
**web** [2] - 622:5, 622:14
**WEDNESDAY** [2] - 606:6, 609:3
**week** [1] - 623:4
**weighing** [1] - 679:19
**weight** [9] - 635:22, 636:9, 737:10, 737:15, 737:18, 738:2
**WEINSTOCK** [18] - 607:7, 607:8, 715:17, 727:6, 727:22, 728:10, 728:15, 736:11, 736:17, 742:5, 742:17, 742:22, 745:25, 746:4, 746:12, 746:24, 747:6, 747:11
**well-known** [1] - 648:22
**whereas** [4] - 711:12, 735:4, 737:14, 737:18
**WHEREUPON** [21] - 609:8, 633:5, 633:11, 638:7, 654:5, 655:17, 673:16, 677:7, 680:7, 681:6, 682:7, 682:10, 682:13, 727:14, 728:16, 742:20, 743:18, 746:2, 748:8, 749:3, 749:25
**whole** [10] - 609:23, 635:2, 635:20, 641:2, 650:24, 714:16, 720:4, 720:5, 734:24, 747:1
**wide** [2] - 615:8, 712:18
**widely** [1] - 630:24, 686:8, 713:4
**wife** [3] - 610:25, 615:10, 615:13
**wife's** [1] - 610:22
**Williams** [18] - 654:8, 654:11, 654:25, 674:16, 674:17, 714:12, 714:13, 714:24, 714:25, 715:3, 715:20, 729:6, 735:15,

743:22, 748:12, 748:22
**WILLIAMS** [2] - 608:12, 714:21
**Williams'** [1] - 656:12
**win** [1] - 733:8
**winter** [2] - 668:23, 668:25
**wire** [1] - 734:9
**withdraw** [3] - 652:3, 703:8, 703:14
**withdrawn** [1] - 703:10
**Witness** [1] - 624:18
**witness** [28] - 609:15, 610:2, 612:22, 613:1, 619:21, 622:11, 625:2, 628:5, 628:10, 629:2, 632:17, 632:20, 632:24, 646:17, 646:25, 648:24, 650:10, 651:2, 652:19, 655:1, 677:10, 681:24, 684:25, 708:12, 714:8, 714:22, 738:16, 748:19
**WITNESS** [11] - 609:25, 610:6, 647:20, 649:7, 668:5, 697:12, 699:6, 700:6, 714:10, 714:18, 714:24
**witness'** [1] - 713:13
**witnesses** [3] - 645:2, 736:21, 749:20
**woman** [1] - 733:7
**women** [2] - 718:8
**wondering** [1] - 632:11
**wood** [1] - 725:20
**woodshed** [1] - 636:16
**word** [5] - 680:10, 680:16, 719:12, 725:3, 746:7
**words** [8] - 642:11, 692:5, 694:16, 696:25, 698:11, 728:22, 731:12, 744:9
**workers** [8] - 616:21, 725:18, 725:19, 725:21, 726:3, 729:20, 730:9
**works** [1] - 722:14
**world** [2] - 716:11,

730:14
**World** [2] - 737:3, 739:5
**worried** [1] - 681:18
**worse** [4] - 658:12, 660:3, 660:10, 680:1
**wraps** [1] - 722:2
**Wright** [1] - 747:20
**write** [1] - 614:7
**written** [4] - 674:20, 674:22, 693:6, 726:24
**wrote** [1] - 654:15

**Y**

**year** [20] - 611:24, 612:1, 619:15, 645:7, 658:5, 668:20, 669:7, 669:17, 677:20, 694:19, 713:10, 718:10, 726:20, 726:21, 735:21, 740:8, 740:17, 744:20, 744:21, 745:1
**years** [56] - 610:15, 613:23, 613:25, 614:2, 614:18, 615:7, 615:22, 616:9, 617:22, 618:10, 618:11, 618:21, 621:17, 624:20, 625:9, 625:15, 625:21, 626:15, 626:24, 628:2, 628:3, 629:10, 630:6, 630:24, 635:17, 639:7, 639:8, 640:11, 645:5, 645:13, 646:6, 648:1, 661:10, 665:24, 669:9, 669:20, 669:21, 678:22, 683:1, 683:22, 685:13, 685:14, 691:20, 691:21, 692:2, 692:6, 692:8, 694:14, 694:25, 701:19, 702:7, 709:4, 716:17, 717:9, 738:6
**yellow** [2] - 719:16, 720:12
**yesterday** [5] - 610:10, 638:4, 676:15, 680:10,

747:3
**Young** [1] - 617:25
**YOUNT** [72] - 607:3, 607:4, 612:17, 612:21, 615:12, 619:22, 619:24, 622:10, 622:13, 624:7, 624:10, 624:13, 624:15, 626:13, 626:20, 628:1, 629:15, 629:17, 632:21, 636:13, 636:18, 637:7, 637:15, 638:9, 638:12, 643:3, 643:6, 643:15, 643:21, 646:21, 647:17, 648:4, 648:9, 649:1, 654:2, 654:7, 655:14, 656:2, 656:11, 666:1, 667:24, 672:10, 673:14, 673:18, 675:22, 676:1, 676:16, 676:18, 680:6, 680:9, 680:12, 682:18, 682:21, 684:24, 685:4, 686:4, 690:12, 690:16, 692:22, 692:25, 697:14, 699:11, 700:8, 700:19, 703:14, 703:17, 708:10, 708:14, 709:16, 709:20, 713:12
**Yount** [7] - 613:5, 620:2, 626:12, 632:16, 647:10, 682:16, 703:13
**YOUNT.....................** [1] - 608:7
**YOUNT.....................** **..** [1] - 608:10
**yourself** [7] - 616:6, 621:13, 640:25, 682:5, 716:12, 723:9, 748:25

**Z**

**ZWAIN** [1] - 607:7