1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4
IN RE:  FEMA TRAILER          *
5   FORMALDEHYDE PRODUCTS         *
LIABILITY LITIGATION          *
6                                *
**THIS DOCUMENT RELATES TO:**     *   Docket MDL 1873
7                                *
Earline Castanel               *   New Orleans, Louisiana
8                                *
    versus                      *   May 19, 2010, 1:15 p.m.
9                                *
Recreation by Design, LLC       *
10                                *
Case No. 09-CV-3251-N           *
11  * * * * * * * * * * * * * * *

12

13              DAY 3, AFTERNOON SESSION
JURY TRIAL BEFORE THE
14          HONORABLE KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE
15

16  <u>APPEARANCES</u>:

17
For the Plaintiff:            Reich & Binstock, LLP
18                                BY:  DENNIS C. REICH, ESQ.
4265 San Felipe, Suite 1000
19                                Houston, Texas  77027

20
For the Plaintiff:            Watts Guerra Craft, LLP
21                                BY:  MIKAL C. WATTS, ESQ.
4 Dominion Drive
22                                Building 3, Suite 100
San Antonio, Texas  78257
23

24  For the Plaintiff:            T. CHRISTOPHER PINEDO, ESQ.
802 N. Carancahua, Suite 2250
25                                Corpus Christi, Texas 78470

DAILY COPY

1   APPEARANCES:

2

3   For the Defendant:          Duplass Zwain Bourgeois
                                   Morton Pfister & Weinstock, APLC
                                BY:  ANDREW W. WEINSTOCK, ESQ.

4                                   JOSEPH G. GLASS, ESQ.
                                3838 N. Causeway Blvd., Suite 2900

5                               Metairie, Louisiana 70002

6

7   For the Defendant:          Garrison, Yount, Forte
                                   & Mulcahy, LLC

8                               BY:  LYON H. GARRISON, ESQ.
                                     SCOTT P. YOUNT, ESQ.
                                     RANDALL C. MULCAHY, ESQ.

9                               909 Poydras Street, Suite 1800
                                New Orleans, Louisiana 70112

10

11  Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room HB-406

12                              New Orleans, Louisiana 70130
                                (504) 589-7778

13

14

15

16

17

18
    Proceedings recorded by mechanical stenography; transcript

19  produced by computer.

20

21

22

23

24

25

DAILY COPY

1                        <u>I N D E X</u>

2                                                      <u>PAGE</u>

3

Patricia Williams
4        Cross-Examination                            754
         Redirect Examination                         787
5

6    Joseph M. Gautreaux
         Direct Examination                           792
7        Cross-Examination                            806

8
Christopher DeRosa (by Deposition)                    826
9

10   Earline Castanel
         Direct Examination                           861
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAILY COPY

1      **AFTERNOON SESSION**

2      **(May 19, 2010)**

3          **THE DEPUTY CLERK:**  All rise.

4              Court is in session.

5          **THE COURT:**  You may be seated.  Thank you all again

6      for being on time.  We will pick up with the cross-examination

7      of Dr. Williams.  Dr. Williams is still under oath.

8              Mr. Weinstock, you may proceed.

9              (WHEREUPON **Patricia Williams**, having been duly sworn,

10     testified as follows.)

11                  **CROSS-EXAMINATION**

12     BY MR. WEINSTOCK:

13     Q.   Hi, Dr. Williams.  Andy Weinstock on behalf of Recreation

14     by Design.  You and I haven't met before.

15     A.   No.

16     Q.   Good afternoon.

17              Doctor, is it correct that you have only been a

18     board-certified toxicologist for four years?

19     A.   2006.

20     Q.   So that's four years?

21     A.   Just about.  A little bit more.

22     Q.   Is it also correct you have never published any study on

23     formaldehyde?

24     A.   Not published it, no.  I have worked with formaldehyde.

25     Q.   You have also never participated in a peer-reviewed

DAILY COPY

1  article on formaldehyde; is that correct?

2  **A.**    That's correct.  I have used formaldehyde in peer-reviewed

3  articles.

4  **Q.**    You would agree with me that you follow -- and you told us

5  on direct -- Sir Bradford Hill's points of consideration?

6  **A.**    That's correct.

7  **Q.**    One of those is consistency; is that right?

8  **A.**    That's correct.

9  **Q.**    In consistency, we are looking for repeated observations

10  of an association in different populations; correct?

11  **A.**    In different populations or different studies looking at

12  the population differently.

13  **Q.**    So what we want to see is studies on several populations

14  that demonstrate an association; correct?

15  **A.**    As I said, yes, but also you have populations that are

16  updated with new members in the population, which is also

17  valid.

18  **Q.**    We need to see more than one paper on a topic; correct,

19  Doctor?

20  **A.**    Correct.

21  **Q.**    Would you agree that your epidemiological method is as

22  follows:  "All I looked for were epidemiological studies, and I

23  looked for those that would prove an association"?

24  **A.**    To make a causal opinion, I look for those studies that

25  make a causal association in more than one study; but I do, as

1    I further testified, look for what we call biological
2    gradients, which would be the equivalent of a dose-response in
3    humans, that you're not going to increase a dosage as you can
4    in animals.  Those may not have a 2.0 or greater association --
5              **MR. WEINSTOCK:**  Your Honor, I asked her a specific
6    question.
7              **THE COURT:**  Dr. Williams, you have to listen to the
8    question.  Answer the question concisely and as specifically as
9    you can, and then we will move on to the next question.
10   **BY MR. WEINSTOCK:**
11   **Q.**   I didn't ask about biological gradients.  I didn't ask
12   about risk factors of 2.0.  I asked about your methodology.
13             Is it correct that all you look for are those studies
14   that would prove an association?
15   **A.**   No, that's not all I look for.
16   **Q.**   Have you ever testified otherwise?
17   **A.**   Part of the question that you asked --
18             **THE COURT:**  Wait, wait, wait.
19             **THE WITNESS:**  Well, no.  I think if you take it out
20   of context, it may seem that way, but no, that is not all I
21   look for.
22             **THE COURT:**  The question was:  Have you ever
23   testified otherwise?
24             **THE WITNESS:**  No.  I look at all seven criteria, not
25   just for studies that are showing a positive association.

1   **BY MR. WEINSTOCK:**

2   **Q.**   The deposition you gave in a case of *Beverly Jo Akers v.*

3   *Ciba-Geigy* in August of 2003, do you remember that case?

4   **A.**   Yes, I do.

5           **MR. WEINSTOCK:**  May I approach, Your Honor?

6           **THE COURT:**  Yes.  Give him page and line.

7           **MR. WEINSTOCK:**  Page 132 through 133.

8           **THE WITNESS:**  Okay.  Go ahead.

9           **MR. WEINSTOCK:**  I'm sorry.  131 through 132.

10  **BY MR. WEINSTOCK**

11  **Q.**   Did you not say:

12          "Question:  You did not include in your report any of

13          the negative or any of the scientific literature that does

14          not show an association between aluminum and pancreatic

15          cancer?

16          "Answer:  Right.  Epidemiology -- negative studies in

17          epidemiology do not give data, proof.  They do not prove

18          the null.  This is the cardinal rule of epidemiology.  All

19          I looked for were epidemiologic studies, and I looked for

20          those that would prove an association."

21          Was that your testimony?

22  **A.**   That is my testimony, yes, and it's basically -- the

23  question was "Did you include them in your report?"  I did not

24  include them in my report, but I did look at them.

25  **Q.**   In fact, Doctor, to you, since epidemiology is a design,

1   negative studies are meaningless; correct?

2   **A.**   In proving -- as you just read, only when it comes to

3   proving the null.  You cannot prove a negative with

4   epidemiology.  It's written in the form of a negative:  "There

5   is no increase in cancer due to this chemical exposure."  You

6   can only disprove the null by showing there are increased

7   cancers.  You cannot have a negative study and say you have

8   proved that there's no increased cancers.

9   **Q.**   Negative studies are meaningless; correct, Doctor?  That's

10  your answer?

11  **A.**   Insofar as cannot prove the null, that is my answer.

12  **Q.**   So the answer to my question is, yes, negative studies are

13  meaningless?

14  **A.**   Only in regard to proving the null, the negative, that

15  there are no increases in cancers.

16  **Q.**   Have you ever answered that question without adding in the

17  null, that negative studies are meaningless?

18  **A.**   I may have, but usually someone is reporting or discussing

19  it in terms of proving the null, the negative.

20          That's the basis of epidemiology.  They make a

21  negative statement something cannot prove that increased

22  cancers occur, and then you design the experiment and try to

23  disprove it, but you cannot prove it.

24  **Q.**   Doctor, just so we are clear:  If we had two studies, two

25  epidemiological studies, one that showed an association and one

 1   that showed no association, you would go with the one and

 2   disregard the one that showed no association; correct?

 3   **A.**   I would go with the one that showed the strong association

 4   as epidemiological evidence of a causal association.  I could

 5   not use the one that did not show an association to prove that

 6   there is an increase in cancer because it wouldn't have the

 7   proof there.

 8   **Q.**   In fact, if we had ten studies and one showed an

 9   association and nine did not, you would disregard the nine and

10   just go with the one; correct?

11   **A.**   I would do the same thing that the International Agency

12   for Research on Cancer would do --

13                **THE COURT:**  Wait, wait, wait, wait.

14                **MR. WEINSTOCK:**  Can you answer my question.

15                **THE COURT:**  You have to answer the question,

16   Dr. Williams.  Look, if you are not going to do that, then you

17   are going to have to step down.

18                **THE WITNESS:**  All right.  What is the question?

19                **THE COURT:**  If I have to ask you to step down, then

20   we are going to disregard all of your testimony from the time

21   you began.  So you need to listen carefully.

22                This is now, again, about the third time I have

23   had to say you have got to listen to the question carefully,

24   answer the question concisely, answer only that question

25   concisely, and we will move on to another question.  We have

1  got to follow that, or we are not going to be able to conduct

2  the trial.  So follow that instruction.

3  **BY MR. WEINSTOCK:**

4  **Q.**  We have ten studies:  One shows an association and nine do

5  not.  You would cite the one and disregard the nine; correct?

6  **A.**  No.

7  **Q.**  Have you ever testified otherwise?

8  **A.**  I think I have already answered that.

9       **MR. WEINSTOCK:**  May I approach, Your Honor?

10      **THE COURT:**  Yes.

11 **BY MR. WEINSTOCK:**

12 **Q.**  Testimony you gave on September 14, 2009:

13      "If we have ten studies -- one shows a positive

14 association; nine show no association -- you would disregard

15 the nine and go with the one; correct?"

16 **A.**  My answer is:  "Correct.  For proof of causation at the

17 2.0."  For proof of causation, that is correct.

18 **Q.**  Now, to take this one step further, if we had a million

19 studies -- one showed an association; 999,999 showed no

20 association -- you would go with the one and disregard the

21 999,999 studies; correct?

22 **A.**  No.

23 **Q.**  Have you ever testified otherwise?

24 **A.**  No.  For proof of causation, I have always said that I

25 would only use the positive studies.

DAILY COPY

1  **Q.**   So the answer is yes?

2  **A.**   No.  Your question was:  "Would you disregard all the

3  other studies?"  There are other things in other studies, such

4  as animal experimentation and other things, that are very

5  important.

6          **MR. WEINSTOCK:**  May I approach, Your Honor?

7          **THE COURT:**  Yes.

8  BY MR. WEINSTOCK:

9  **Q.**   Again on September 14, 2009:

10         "Question:  If we had a million studies -- one shows

11         a positive association; 999,999 show no association -- you

12         would disregard the 999,999 and just go with the one;

13         correct?

14         "Answer:  For proof of causation, correct."

15  **A.**   For proof of causation, correct.

16  **Q.**   That's because, for your purposes, negative studies are

17  meaningless; correct?

18  **A.**   No, it is not for my purposes.  It is what all of the

19  experts who founded some of the methodology in epidemiology

20  published:  That because of the inaccurate nature of

21  epidemiology, the hypothesis is in the negative form.

22         So you can only disprove the negative form; such as,

23  this chemical does cause increased cancer.  You cannot -- does

24  not cause an increase in cancer.  You can only disprove it by

25  showing an increase in cancer.  You cannot, when you have a

1    negative study, say you have proved that this toxicant cannot

2    cause cancer.

3    **Q.**   Have you ever testified otherwise?

4    **A.**   I think I've answered that.

5          **MR. WEINSTOCK:**  May I approach, Your Honor?

6          **THE COURT:**  Yes.

7    **BY MR. WEINSTOCK:**

8    **Q.**   This was in December of 2008:

9          "Question:  Negative studies do not prove the null,

10         but are they meaningless?

11         "Answer:  I think you have to be extremely careful in

12         giving meaning to a negative study.  To me, they do not

13         offer any information.  If that's a definition of

14         *meaningless*, I certainly think you cannot draw any

15         conclusions from that.  So, in that regard, yes, I would

16         say they were meaningless."

17         Was that your testimony?

18   **A.**   That is correct.

19   **Q.**   In fact, you consider negative studies so meaningless that

20   you put them on your references list because you reviewed them

21   and then you throw them in the trash; correct?

22   **A.**   I don't throw them in the trash.  I certainly have

23   negative studies that I consider, but I do have collections of

24   negative studies that I put them together.  They cannot be used

25   to prove causation.

1    **Q.**    Have you ever testified otherwise?

2    **A.**    I don't know.  I don't recall.

3              **MR. WEINSTOCK:**  May I approach, Your Honor?

4              **THE COURT:**  Yes.

5    BY MR. WEINSTOCK:

6    **Q.**    Reading:

7              "Question:  You did not cite a single negative study

8         in your paper?

9              "Answer:  Oh, I think I did.  Yes, I think I did

10        because, when I was going through my stuff, I pitched

11        them, but they were on my references list.  There are

12        some."

13             Correct?

14   **A.**    That's correct.  I have a file for negative studies.

15   **Q.**    You put them on your references list and then you pitch

16   them; correct?

17   **A.**    Yes.  I read them, put them on my reference list to know

18   that I have considered them, and then put them with the

19   negative studies unless there's something else that I want to

20   use from it for a report.

21   **Q.**    According to you, IARC follows the exact same methodology

22   you do?

23   **A.**    Yes.  IARC says you must have positive strength of

24   association for an epi study.  However, they also say that if

25   there is additional information that shows a biological

                              DAILY COPY

1   gradient, it is not a negative study.

2   **Q.**   Would you agree with the following statement:  "When

3   several epidemiological studies show little or no indication of

4   an association between an exposure and cancer, the judgment may

5   be made that, in the aggregate, they show evidence of lack of

6   carcinogenicity"?

7   **A.**   Yes.

8   **Q.**   That's a correct statement; correct?

9   **A.**   That's correct.

10  **Q.**   That negative papers can show lack of evidence of

11  carcinogenicity; correct?

12  **A.**   Yes.  I believe I've just been saying that.

13          **MR. REICH:**  Your Honor, may I have a page and line

14  reference to that IARC because there's additional context that

15  I'd like to look at.

16          **MR. WEINSTOCK:**  Well, I wasn't going to impeach her

17  with it because she agreed with it, but I would be happy to go

18  over page 17.

19          **THE COURT:**  Go ahead and give it to him.

20          **MR. REICH:**  Page 17?

21          **MR. WEINSTOCK:**  Page 17.

22  BY MR. WEINSTOCK:

23  **Q.**   "When several epidemiological studies show little or no

24  indication of an association between an exposure and cancer,

25  the judgment may be made that, in the aggregate, they show

1    evidence of lack of carcinogenicity."

2         I read that correctly?

3    A.   Yes.

4    Q.   That comes from IARC; correct?

5    A.   That is correct.

6    Q.   That's IARC's position on negative studies; correct?

7    A.   That is correct.

8         MR. REICH:   Under optional completeness, I would ask

9    that the rest be read.

10        MR. WEINSTOCK:   I'll let the jury look at it while

11   I'm talking to her.   She's always told me that, but I've never

12   seen what else is relevant about this paper.

13        THE COURT:   Again, we can cover it on redirect.

14   Let's finish cross and then we can redirect and be done, and

15   we'll move on to the next witness.

16   BY MR. WEINSTOCK:

17   Q.   Now, you consider that a very dangerous statement, don't

18   you?

19   A.   A dangerous statement?   No, but it's an incomplete

20   statement.   There's more in the paragraph.

21        MR. WEINSTOCK:   May I approach, Your Honor?

22        THE COURT:   Yes.

23   BY MR. WEINSTOCK:

24   Q.   Your testimony in October of 2008, I'm not going to read

25   it again.   The jury has heard it twice now.   "I think that's a

1   very dangerous statement."  Was that not your response?

2   **A.**   The first part of that question, that is the response, but

3   the first part of the question you didn't read clarifies in

4   terms of carcinogenicity or capable of causing cancer.

5         **MR. WEINSTOCK:**  For fairness, Your Honor, if she

6   believes there's some difference, I will read the entire

7   question.

8   **BY MR. WEINSTOCK:**

9   **Q.**   Reading:

10         "Question:  And using that same scenario in terms of

11         carcinogenicity, would you agree with the following

12         statement:  When several epidemiological studies show

13         little or no indication of an association between exposure

14         and cancer, the judgment may be made in the aggregate that

15         they show evidence of a lack of carcinogenicity?"

16         "Answer:  I think that's a very dangerous statement."

17         Correct?

18   **A.**   That is correct.

19   **Q.**   You went on to say that it was bad science and you

20   wouldn't practice it; right?

21   **A.**   I don't think that's on exact quote.  I would have to read

22   it.

23         **MR. WEINSTOCK:**  May I approach, Your Honor?

24         **THE COURT:**  Yes.

25

1  BY MR. WEINSTOCK:

2  Q.   You just started there.  You went off on a tangent:

3          "Question:  And the statement I just read is

4      completely wrong?

5          "Answer:  The statement you just read, you see many

6      times in many, you know, publications, but it is not -- it

7      is not scientifically correct.  You cannot use a negative

8      study to prove the null hypothesis.

9          "Question:  It's bad science; correct?

10         "Answer:  It can be tragic science, and we know that.

11     And thalidomide is one of many.

12         "Question:  So tragic is worse than bad?

13         "Answer:  We know it can be tragic science from the

14     thalidomide experience, and there are others.

15         "Question:  It's bad science and you wouldn't

16     practice it?

17         "Answer:  It's not an acceptable statistical

18     conclusion."

19         Was that your testimony?

20 A.   That is correct.  Thalidomide had negative studies.

21 Q.   I did not ask about thalidomide.  I asked if that was your

22 testimony.

23 A.   Yes, that is my testimony.

24 Q.   Does this case involve thalidomide?  No.

25         Okay.  So IARC, the statement I read, according to

1  you, is bad, tragic science; correct?

2  **A.**   No, not IARC.  The statement in there dealt with

3  thalidomide negative studies, which showed no adverse effects,

4  birth defects.

5  **Q.**   Now we can talk about biological gradient.  Dose makes the

6  poison; correct?  Does the dose make the poison?

7  **A.**   Yes.  Dose is regulated.  Concentration of dose can

8  determine whether something is beneficial or detrimental.

9  **Q.**   In fact, we covered this to some degree, but if you drank

10  too much water, you can get hyperhydration and die; correct?

11  **A.**   That is correct.

12  **Q.**   Formaldehyde is ubiquitous?  It's everywhere; correct?

13  **A.**   That is correct.

14  **Q.**   Background levels in industrialized cities are as high as

15  16 parts per billion; correct?

16  **A.**   That is correct.

17  **Q.**   Is that the same level as the NIOSH REL?

18  **A.**   That is correct.

19  **Q.**   Does that mean, to protect ourselves in a heavily

20  industrialized city, we should all walk around with scuba gear

21  to make sure we are not exposed to a level that's equivalent to

22  the NIOSH REL?

23  **A.**   No.  The NIOSH REL is for workers in a workplace on a

24  daily basis for many, many years, and they -- that is their

25  recommended exposure level.

1    **Q.**    So workers in a workplace, who work in an industrialized

2    city with a background level of 16 parts per billion, should

3    walk around in scuba gear because NIOSH tells them to; correct?

4    **A.**    NIOSH does not tell them that.

5    **Q.**    The ATSDR MRL, which we have talked about earlier today,

6    you said the chronic level is 8 parts per billion.  It's half

7    of the NIOSH REL; correct?

8    **A.**    That is correct.

9    **Q.**    And that's not an occupational standard; right?

10   **A.**    That is correct.

11   **Q.**    That's just a recommendation; right?  It's not a legal

12   standard to any knowledge; right?

13   **A.**    That's correct.  It has no legal enforcement.

14   **Q.**    So those of us who live in heavy industrialized cities

15   should walk around in scuba gear to make sure we are not above

16   the ATSDR MRL; correct?

17   **A.**    No.  The NIOSH regulations takes into account that a

18   worker is using personal protective equipment --

19   **Q.**    Doctor, I asked about the ATSDR MRL.

20   **A.**    Well, I'm not finished my -- you asked about a comparison

21   of the two.  NIOSH takes into consideration that personal

22   protective equipment would be worn and ventilation controls

23   would be made; whereas, with the residents, you would have none

24   of that.

25   **Q.**    Certainly, Doctor, NIOSH does not -- I'm sorry.  ATSDR

1   does not mean to say that, if you exceed the 8 parts per
2   billion MRL, health effects will occur; correct?
3   **A.**   No, they do not give a guarantee.  They are just giving a
4   guideline of above you would not -- at that level and below,
5   you would not expect health effects.
6   **Q.**   In fact, not that they don't give a guarantee, they
7   specifically say on page 1 of Appendix A that exposure to a
8   level above the MRL does not mean adverse health effects will
9   occur; correct?
10  **A.**   Correct.
11  **Q.**   You talked a little bit with Mr. Reich about that MRL and
12  where it comes from; right?
13  **A.**   Correct.
14  **Q.**   You said -- and I believe that's correct -- it comes from
15  the Holmstrom paper.  I'm sorry -- yes, Holmstrom.  That's
16  right.
17  **A.**   They did use the Holmstrom to calculate the 8 parts per
18  billion.
19  **Q.**   In fact, NIOSH is nice enough -- I'm sorry.  ATSDR is nice
20  enough to give us a worksheet that explains how they calculated
21  the MRL; correct?
22  **A.**   That is correct.
23  **Q.**   And you said that the findings were as low as .04 parts
24  per million, or 40 parts per billion; correct?
25  **A.**   I said that the exposure levels began at 40 parts per

1    billion.

2    **Q.**    The exposure levels.  Now, let's talk about what the LOAEL

3    was, not the exposure levels but the place where they actually

4    thought they might have a finding.  What is a LOAEL, Doctor?

5    **A.**    I didn't understand --

6    **Q.**    Well, strike that.  What is a LOAEL?

7    **A.**    A LOAEL is the lowest observed adverse effects level in a

8    particular study.

9    **Q.**    The LOAEL used in this MRL is not .04; it's .24.  Correct?

10   **A.**    That's correct.

11   **Q.**    That was for workers exposed over 10.4 years; is that

12   correct?

13   **A.**    1 to 36 years.

14   **Q.**    The average worker was exposed for 10.4 years; correct?

15   **A.**    That was an average.

16   **Q.**    The average?  That was the question.

17             Doctor, ATSDR then took that .24 and divided by a

18   factor of 3 and then by a factor of 10 to get the MRL; correct?

19   **A.**    That is correct.

20   **Q.**    And that's because the ATSDR MRL is just a device for

21   public safety, to try to be as safe as possible?  As they say,

22   it's not a level at which they expect the minute you go over it

23   as a threshold you will get injured; correct?

24   **A.**    That is correct.

25   **Q.**    Doctor, you need formaldehyde for normal human metabolism;

1    correct?

2    **A.**    That is correct.

3    **Q.**    So when you said earlier we need water, we also need

4    formaldehyde; correct?

5    **A.**    That's correct.

6    **Q.**    In fact, what would happen to a human if they didn't have

7    any formaldehyde?

8    **A.**    We would not have synthesis of purines.  We would not have

9    synthesis of some of our amino acids.  It's a normal metabolic

10   process, and it's handled very carefully by the body in those

11   metabolic processes.

12   **Q.**    In fact, the body would generate formaldehyde; correct?

13   **A.**    It does.  It's an intermediate in the generation of some

14   of these essential amino acids.

15   **Q.**    And you talked a bit with Mr. Reich about how well the

16   body handles formaldehyde; correct?

17   **A.**    Yes, I did.

18   **Q.**    In fact, in your very own report, you cite to us a study

19   that shows that, after exposing rats to 14.4 parts per million

20   of formaldehyde, the blood levels were indistinguishable from

21   those before the exposure; correct?

22   **A.**    That is correct.

23   **Q.**    The human body has an amazing ability to handle these

24   things, doesn't it?

25   **A.**    Well, that reflects how it handles what's in the blood.

1    That does not reflect what has attached to the tissue on the

2    way to get there, which has been deposited as it travels

3    through the blood.  That's just what is in the blood, and the

4    erythrocytes themselves have the alcohol dehydrogenase 3 and

5    bond to break it down.  So what's traveling in the blood is

6    handled very well.

7    Q.    Doctor, is it correct that we have approximately 2.5 parts

8    per million of formaldehyde in our blood right now?

9    A.    We have 2.61 plus or minus 0.14 micrograms per gram of

10   blood in our bodies.

11   Q.    Those molecules are indistinguishable from formaldehyde

12   that comes from outside the body?

13   A.    Indistinguishable as a molecule, yes, that's correct.

14   Q.    Doctor, is it correct that, according to you, one molecule

15   of formaldehyde can cause cancer?

16   A.    According to the nonlinear threshold model that the EPA

17   uses, they recognize that -- and scientists, toxicologists

18   recognize that, theoretically, one molecule can attach to a

19   DNA; theoretically, it may not be repaired; and theoretically,

20   it can remain and cause cancer.  The risk is not zero but

21   extremely small.

22   Q.    But, Doctor, I didn't ask about EPA, and you're not here

23   for the EPA.  I asked for your opinion.  In your opinion, can

24   one molecule of formaldehyde cause cancer?

25   A.    In my opinion, the theoretical nonthreshold linear model

1    is correct.

2    Q.    It's the same molecule whether it comes from

3    particleboard, whether it comes from cigarette smoke, whether

4    it comes from human breath; and it's the same molecule whether

5    your body makes it itself.  Correct?

6    A.    That is correct.

7    Q.    Does antibacterial soap contain formaldehyde?

8    A.    It may.

9    Q.    Does latex paint?

10   A.    It may.

11   Q.    It may or it does?

12   A.    Well, it may.  Some brands have moved to remove

13   formaldehyde, especially since the 2004 finding of it as a

14   Group 1 human carcinogen.

15   Q.    Doctor, question:  Latex paint contains formaldehyde?

16   What is your answer?

17   A.    Yes, it may.

18   Q.    Shampoos contain formaldehyde?

19   A.    Some may.

20   Q.    Paper products contain formaldehyde?

21   A.    Yes, some may.

22   Q.    Because wood contains formaldehyde.  Not just pressboard,

23   wood contains formaldehyde.

24   A.    Yes.

25   Q.    Doctor, you're aware that in office buildings that permit

1   smoking, the level of formaldehyde is as high as 600 parts per
2   billion; correct?

**A.**   There can be a high environmental tobacco smoke depending
on how many smokers would happen to be in a particular area.

**Q.**   Doctor, question:  Are you aware that in office buildings
that permit cigarette smoke, the levels can be as high as 600
parts per billion?

**A.**   I don't recall that number specifically, so I cannot
address that number specifically.

            **MR. WEINSTOCK:**  May I approach, Your Honor?

            **THE COURT:**  Yes.

**BY MR. WEINSTOCK:**

**Q.**   September 14, 2009:

            "Question:  And you're aware that in office buildings
        that allow smoking, the levels of formaldehyde are as high
        as 600 parts per billion?

            "Answer:  Yes."

**A.**   I do not recall it at this time, but it's -- as I said, it
can be as high as that.

**Q.**   Does that refresh your recollection?

**A.**   That does refresh my recollection.

**Q.**   So the answer to my question now is yes; correct?

**A.**   Yes.

**Q.**   Cigarette smoke contains formaldehyde?

**A.**   Yes.

DAILY COPY

1  **Q.**   In fact, in your report, you reference the fact that

2  cigarette smoke inside a travel trailer can raise the

3  formaldehyde levels; correct?

4  **A.**   Yes.

5  **Q.**   Is it correct that mainstream cigarette smoke contains as

6  much as 214 parts per million according to the Surgeon

7  General's 1979 report?

8  **A.**   I don't recall that particular number so I cannot say, but

9  the levels can be very high from that 1979 report because we

10  had a difference in the tobacco and lack of filters.  So it

11  doesn't surprise me.  It could very well be there.  I don't

12  recall that particular number.

13  **Q.**   Fair enough.  If somebody smoked in the '50s and the '60s,

14  though, this number would be in the ballpark; correct?

15  **A.**   It could be.

16  **Q.**   I'm in the ballpark; correct?

17  **A.**   For that time period, with the cigarettes that were being

18  produced.

19  **Q.**   Despite the formaldehyde in cigarette smoke and despite

20  the fact that one molecule of formaldehyde can cause cancer,

21  according to you, you would say that when you smoke less than

22  ten cigarettes a day, there is no increased cancer risk;

23  correct?

24  **A.**   At levels below ten cigarettes a day, the dose-response in

25  scientific articles is difficult to demonstrate.  At five or

1  below, you cannot demonstrate a causal association with

2  cigarettes per day.

3  Q.   So just so I'm understanding correctly, a molecule that

4  comes off particleboard can cause cancer; but up to nine

5  cigarettes a day for an entire year that a person voluntarily

6  puts in their mouth, that doesn't harm a thing?

7  A.   I never said that.  I said that -- you asked about can you

8  demonstrate.  Epidemiology cannot demonstrate a causal

9  association for five cigarettes or less a day for lung cancer.

10            It's very difficult.  There are a few studies that go

11  up to 19.  But 10 cigarettes a day, there are many studies that

12  cannot demonstrate a causal association of cigarette smoke with

13  lung cancer.  It is generally accepted, above 10 cigarettes a

14  day, that epidemiology can generate the causal association of

15  smoking with lung cancer.

16  Q.   So there are studies that show no association; is that

17  correct?

18  A.   There are studies that the dose-response cannot be

19  demonstrated at five or below --

20  Q.   And you shared --

21  A.   -- cigarettes a day.

22  Q.   You shared those studies with me, didn't you?

23  A.   I have them in my affidavit.

24  Q.   In your supplemental report?

25  A.   That's correct.

1   **Q.**   It comes from IARC, doesn't it?

2   **A.**   That's correct.

3   **Q.**   Lo and behold, IARC is reporting on negative data;

4   correct?

5   **A.**   Yes.  And they're showing no causal association.  Anything

6   one or below is the same as background.  So it is exactly what

7   I said:  A negative study cannot show causal association.

8   **Q.**   So now that we are dealing with something that an

9   individual might have voluntarily chosen to do as opposed to a

10  travel trailer manufacturer putting a formaldehyde product in

11  play, all of a sudden negative studies have a lot of meaning to

12  you, don't they?

13  **A.**   Negative studies cannot show a causal association unless

14  they are above the background.

15  **Q.**   What chart did you take this from in IARC?

16  **A.**   I don't remember the number.  It's IARC Volume 83, 2004.

17  **Q.**   I brought a copy.  You have identified it as the

18  case-control studies; is that correct?

19  **A.**   These are case-control studies on tobacco smoking and lung

20  cancer.

21          **MR. WEINSTOCK:**  May I approach, Your Honor?

22          **THE COURT:**  Yes.

23  BY MR. WEINSTOCK:

24  **Q.**   Would you agree that comes from Table 2.1.1.1?

25  **A.**   No.

1   **Q.**   I apologize.  I have the wrong one.

2   **A.**   This is not the right chart at all.

3   **Q.**   You're right.  You are absolutely right.

4           How about Table 2.1.1.5?

5   **A.**   I see four of the five -- I assume the fifth is somewhere

6   in there -- from that particular chart.

7   **Q.**   From this particular chart, you went ahead and cited five

8   studies; correct?

9   **A.**   That's correct.

10  **Q.**   You didn't cite all the positive studies, did you?

11  **A.**   I didn't cite -- I cited all the studies that I felt were

12  relevant on the filter tips to demonstrate the difference in a

13  filter-tip cigarette from a nonfilter-tip cigarette with its

14  delivery of carcinogenic substances.

15  **Q.**   Doctor, you're familiar with the Bernstein reports on

16  filter-tip cigarettes?

17  **A.**   I don't recall.  I think I do recall Bernstein.

18  **Q.**   Do you recall what Dr. Bernstein concluded about

19  filter-tip cigarettes?

20  **A.**   I don't recall.

21          **MR. WEINSTOCK:**  May I approach, Your Honor?

22          **THE COURT:**  Yes.

23  BY MR. WEINSTOCK:

24  **Q.**   "The current data, therefore, suggests that particle

25  disposition pattern of the smoke within the lung would not

DAILY COPY

1  change significantly when compared to lower delivery or

2  ventilated cigarettes or at the higher delivery or

3  nonventilated cigarettes even if compensation occurs."

4          Correct?

5  A.   That is his statement.  Yes, it's correct.

6  Q.   Doctor, you said you were taught that below 10 cigarettes

7  a day would not cause lung cancer; correct?

8  A.   No, I did not say I was taught.

9  Q.   You never said you were taught that by Dr. Phil Cole?

10 A.   Well, Dr. Phil Cole did teach that.  Maybe I did.

11 Q.   Who is Dr. Phil Cole?

12 A.   He is an epidemiologist.

13 Q.   Doctor, I might have written my notes down, and I don't

14 want to misquote you, but I did want to go over this quickly.

15         You said in 1987 NIOSH -- I thought you said -- found

16 formaldehyde to be a known human carcinogen, but you would

17 agree they found it to be a potential occupational carcinogen;

18 correct?

19 A.   No.  I said in 1987 OSHA --

20 Q.   OSHA.

21 A.   -- called it a carcinogen.

22         In 1990, in the NIOSH pocket handbook of toxic

23 substances, they designated it as a carcinogen.

24 Q.   A potential human carcinogen?

25 A.   No, a carcinogen.

DAILY COPY

1    **Q.**    Without definition; correct?

2    **A.**    Excuse me?

3    **Q.**    Well, so the jury understands, these agencies all have

4    their own acronyms.  For example, *suspected human carcinogen*,

5    that means it shows cancer in laboratory animals; correct?

6    **A.**    It may be.  That may be one of the designations, to call

7    it suggested.

8    **Q.**    *Reasonably anticipated to be a carcinogen*, not the same as

9    *known human carcinogen*; correct?

10   **A.**    Correct.  Different levels of degree of scientific

11   evidence.

12   **Q.**    IARC was the first agency to declare formaldehyde to be a

13   known human carcinogen; correct?

14   **A.**    No.  OSHA and NIOSH, in 1987 and 1990, declared it a human

15   carcinogen.

16   **Q.**    No, a carcinogen; correct?

17   **A.**    A human carcinogen, correct.

18   **Q.**    A carcinogen with no further definition; correct?

19   **A.**    They don't do the types of definition that the

20   International Agency for Research on Cancer do.

21            **MR. WEINSTOCK:**  Would you pull up Exhibit 362.

22   **BY MR. WEINSTOCK:**

23   **Q.**    This is an MSDS that came out earlier in the trial.  It's

24   dated 2006 at the top, and it amends one that was written in

25   2006.

DAILY COPY

1              You would agree with me that formaldehyde was listed
2    by IARC as a known human carcinogen in 2004 for the first time;
3    correct?
4    **A.**   For the first time that IARC listed it, yes.
5    **Q.**   And certainly that is not something that would have been
6    known in 1999 or would have been on an MSDS in 1999, that IARC
7    had called it a known human carcinogen at that time; correct?
8    **A.**   The fact that IARC?  IARC only did that in 2004, as I said
9    before.
10   **Q.**   My question is specific to this document, referring to
11   IARC and to what this document could not have said in 1999.  It
12   would not have said this in 1999 because in 1999 IARC had not
13   declared formaldehyde to be a known human carcinogen; correct?
14   **A.**   That is correct.
15   **Q.**   That's all I'm asking on that point.
16              Who is Dr. Judd Shellito?
17   **A.**   Dr. Shellito is a pulmonary doctor, a pulmonary
18   respiratory physician, a pulmonologist.
19   **Q.**   In fact, Dr. Shellito prepared a report working with you?
20   **A.**   No.
21   **Q.**   I'm sorry.  Working with you as a group, not directly with
22   you.
23   **A.**   No, I did not work with him on his report.
24   **Q.**   I'm not suggesting you have.  If you have interpreted my
25   question that way, I apologize.

1          You were another expert working on the case with him,

2    and you reviewed his report that he prepared separately and you

3    prepared yours separately; correct?

4    **A.**   After they were submitted, yes.

5    **Q.**   You would agree with Dr. Shellito -- I'll mispronounce it

6    all day long -- that unlike other pulmonary toxics, there's no

7    latent interval between first exposure and development of

8    nonmalignant disease related to formaldehyde; correct?

9    **A.**   Wait.  I'm looking to what you're pointing to.

10   **Q.**   I'm sorry.  At the bottom.

11   **A.**   Which line?

12   **Q.**   At the bottom.

13   **A.**   The last sentence?

14   **Q.**   Yes.

15   **A.**   Or the last sentence of the paragraph?

16   **Q.**   The last section.

17   **A.**   I'm sorry.  I'm trying to figure out --

18   **Q.**   I apologize.

19          **THE COURT:**  I don't see it either.  Point right to

20   it.  Right there.

21          **THE WITNESS:**  Okay.

22          **MR. WEINSTOCK:**  I'm in the wrong section.  Sorry.  I

23   apologize.  I can't find it, so I will move on.

24   **BY MR. WEINSTOCK:**

25   **Q.**   Now, if we can return to the Holmstrom paper very briefly,

784

1   and I will conclude on those points.  Holmstrom, which was the

2   paper we talked about earlier, was the paper used by ATSDR to

3   set the minimal MRL; correct?

4   A.   Correct.

5   Q.   In Holmstrom, they did nasal biopsies of the workers;

6   correct?

7   A.   That is correct.

8   Q.   They graded the scores on those biopsies from high for

9   carcinoma, on the high end, and normal respiratory epithelium

10  on the low end; correct?

11  A.   No.  Are you referring to this chart right here?

12  Q.   Yes.  "Histological Characteristics."

13  A.   Okay.  Would repeat your question because --

14  Q.   Maybe I'll say it, hopefully, in a better way.

15  A.   Yes.

16  Q.   On the one end of the spectrum -- and they had a point

17  score system -- normal respiratory epithelium would be a zero;

18  correct?

19  A.   Correct.

20  Q.   Carcinoma would be an 8; correct?

21  A.   Correct.

22  Q.   They took biopsies and scored those biopsies?

23  A.   Right.

24  Q.   For individuals that had a zero, they had normal

25  epithelium, normal respiratory epithelium.  They did not show

1   evidence of injury from formaldehyde; correct?

2   A.   For the few that had zero, yes.

3   Q.   But if you got a biopsy back and you got scored a zero,

4   you didn't have any evidence of injury from formaldehyde;

5   correct?

6   A.   That's right.  There were three out of 70-something, I

7   believe.

8   Q.   Your epithelium would look like this; right?  The one on

9   top.

10  A.   That's a rat epithelium, yes.

11  Q.   How about this one, then?  Is this the good one or the bad

12  one?  That's the bad stuff; right?

13  A.   That's the metaplasia.  That's the abnormal tissue as

14  identified by Dr. Holmstrom.

15  Q.   I lost my picture of the good-looking tissue, but you

16  would have good-looking tissue; right?  You would have no

17  evidence of damage to your epithelium; right?

18  A.   Is your question a follow-up to the zero?

19  Q.   If your biopsy was normal; correct?

20  A.   If it was a zero -- three of them were zero out of

21  70-something -- they would have the normal respiratory

22  epithelium, yes.

23  Q.   You shared with Mr. Reich this chart as well; correct?

24  A.   That is correct.

25  Q.   How was this determined, tissue descriptions?  Were these

DAILY COPY

1    biopsies also?

2    **A.**   Well, you did take blood from the workers and look at the

3    DNA in their blood.  I wouldn't refer to that as a biopsy, but

4    it is a blood sample of body tissue.

5    **Q.**   How many of these individuals developed cancer?

6    **A.**   The study didn't follow that out.

7    **Q.**   So we don't know?

8    **A.**   The study did not get that information.

9    **Q.**   How many of the workers in the Holmstrom paper developed

10   cancer?

11   **A.**   I would have to look at the chart to see how many.  I

12   don't recall.  I don't know that it was followed out.  They

13   were doing the biopsies.

14   **Q.**   If I told you zero, would you agree with that?

15   **A.**   There was no follow-up to follow these individuals.

16   **Q.**   So what you have shown this jury, what these slides look

17   like, what these tissue samples look like, do not necessarily

18   result in cancer, at least not according to those papers,

19   because those people were not followed.  Correct?

20   **A.**   That is correct.

21   **Q.**   And the ones that had zeros, who had normal respiratory

22   epithelium, didn't look like any of these pictures of unhealthy

23   tissue you were showing us; correct?

24   **A.**   They would not have had the unhealthy -- the distorted

25   metaplasia.

1        **MR. WEINSTOCK:**  Thank you for your time,

2  Dr. Williams.

3        **THE COURT:**  Thank you.  Redirect?

4        **MR. REICH:**  Very briefly, Your Honor.

5                    **REDIRECT EXAMINATION**

6  **BY MR. REICH:**

7  **Q.**   Dr. Williams, you recall the fairly lengthy examination of

8  you about the significance of negative studies?

9  **A.**   Yes.

10 **Q.**   You were shown page 17 of the IARC manual, International

11 Agency for Research on Cancer.  This is Volume 88.  Let me show

12 the ladies and gentlemen of the jury the page reference.

13        You were initially asked the question:  "If several

14 epidemiological studies show little or no indication of

15 association between an exposure and cancer, the judgment may be

16 made that, in the aggregate, they show evidence of lack of

17 carcinogenicity."  If you read from the next sentence all the

18 way to the bottom of the paragraph, are there a bunch of

19 conditions imposed on that statement?

20 **A.**   Yes.

21 **Q.**   Okay.  Tell the jury what those conditions are.  Can you

22 read that from there.

23 **A.**   Oh, you want me to read it?  All right.

24 **Q.**   Either read it or paraphrase it.

25 **A.**   "Such a judgment requires, first of all, that the studies

1    giving rise to it meet to a sufficient degree the standards of

2    design and analysis described above.  Specifically, the

3    possibility that bias, confounding, or misclassification of

4    exposure or outcome could explain the observed results should

5    be considered and excluded with reasonable certainty.

6              "In addition, all studies that are judged to be

7    methodologically sound should be consistent with a relative

8    risk of unity, meaning one, for any observed level of exposure

9    and, when considered together, should provide a pooled estimate

10   of relative risk which is at or near unity and has a narrow

11   confidence interval due to sufficient population size.

12             "Moreover, no individual study nor the pooled results

13   of all the studies should show any consistent tendency for the

14   relative risk of cancer to increase with increasing level of

15   exposure.  It is important to note that evidence of lack of

16   carcinogenicity obtained in this way from several

17   epidemiological studies can apply only to the type of cancer

18   studied and to the dose levels and intervals between first

19   exposure and observation of disease that are the same as or

20   less than those observed in all the studies.

21             "Experience with human cancer indicates that in some

22   cases the period from first exposure to the development of

23   clinical cancer is seldom less than 20 years.  Studies with

24   latent periods substantially shorter than 30 years cannot

25   provide evidence for lack of carcinogenicity."

1  **Q.**   I'm not going to ask you about everything there.   There's

2  a lot of conditions.   The last sentence, I think, is

3  particularly significant.   So you have negative studies, and

4  the latency period is less than 30 years.   What does that mean?

5  **A.**   It means the study may not have had enough time from time

6  of first exposure to when you would expect to find the cancer

7  that you're studying.

8          So you can have a lot of negative studies in a period

9  of time before the cancer exhibits itself enough for the

10  diagnosis to be made.   So that you may have negative studies,

11  but there may indeed be a cancer in progress that has not yet

12  reached its latent period, the end of its latent period and

13  will exhibit itself.

14  **Q.**   I'm going to show you a document from Exhibit 628, which I

15  think is the same as Exhibit 33.

16          Do you recall you were asked about background levels

17  of formaldehyde in ambient air, and Mr. Weinstock pointed out

18  there was one particular city or location where the level was

19  the same as the NIOSH 16 parts per billion benchmark?   Do you

20  recall that?

21  **A.**   Yes.

22          **MR. WEINSTOCK:**   Objection, Your Honor.   That

23  mischaracterized my question that I asked several times.   The

24  term was *heavily industrialized cities*, a direct quote from

25  ATSDR, not *one particular city*.

1      **THE COURT:**  I don't think he mentioned a particular,

2    so go ahead and rephrase the question.

3    **BY MR. REICH:**

4    **Q.**  You heard the question that Mr. Weinstock just asked you

5    involving an industrialized city with a level of 16 parts per

6    billion, equivalent to the NIOSH formaldehyde benchmark.  Do

7    you recall that question?

8    **A.**  Yes.

9    **Q.**  Ambient levels in the largest study in the

10   United States -- let me show you from ATSDR.  Are you familiar

11   with data here showing that out of 60,703 census tracts in the

12   contiguous United States, the average long-term background

13   concentration estimated for formaldehyde was .2 ppb?  .2 parts

14   per billion, is that a small number or a large number?

15   **A.**  A very small number.  That's less than 1 part per billion.

16   It's 2/10ths parts per billion.

17   **Q.**  For this other study here, a survey of ambient

18   measurements of hazardous air pollutants, a medium formaldehyde

19   concentration of 2.5 parts per billion was found for a total of

20   1,358 samples collected at 58 different locations.

21          What does this data tell you about background levels

22   of formaldehyde in some of these larger studies that have

23   looked at many, many different locations?

24   **A.**  That they are extremely low.

25   **Q.**  You were asked about when formaldehyde was classified as a

1    carcinogen.  As a known human carcinogen, you answered the

2    question with respect to IARC; correct?

3    **A.**    Correct.

4    **Q.**    And that was in 2004?

5    **A.**    That is correct.

6    **Q.**    In your report, you include a passage where you talk about

7    the OSHA standard, and you mentioned the OSHA standard

8    1910.1048.  That was a 1990 reference; correct?

9    **A.**    Correct.

10   **Q.**    In the OSHA standard, "Carcinogenicity:  Formaldehyde has

11   the potential to cause cancer in humans.  Repeated and

12   prolonged exposure increases the risk."

13           Do you agree with that statement?

14   **A.**    Correct.

15   **Q.**    "In humans, formaldehyde exposure has been associated with

16   cancers of the lung, nasopharynx, oropharynx, and nasal

17   passages."  Is that --

18   **A.**    That is correct.

19   **Q.**    -- still a true statement?

20   **A.**    That is correct.

21   **Q.**    Okay.  That has been born out by subsequent studies since

22   1990?

23   **A.**    Yes.

24           **MR. REICH:**  I have no further questions, Your Honor.

25           **THE COURT:**  Thank you, Dr. Williams.

DAILY COPY

 1            Mr. Reich, who is next?

 2            **MR. REICH:**  Dr. Gautreaux.

 3            (WHEREUPON **Joseph M. Gautreaux**, having been duly

 4    sworn, testified as follows.)

 5            **THE DEPUTY CLERK:**  Please state your full name and

 6    correct spelling for the record.

 7            **THE WITNESS:**  Joseph Marion Gautreaux III,

 8    G-A-U-T-R-E-A-U-X.

 9                        **DIRECT EXAMINATION**

10    BY MR. REICH:

11    **Q.**   Dr. Gautreaux, where do you reside?

12    **A.**   In Metairie.

13    **Q.**   Are you a physician?

14    **A.**   Yes, sir.

15    **Q.**   What type of physician are you?

16    **A.**   Otolaryngologist.

17    **Q.**   Are you board-certified in otolaryngology?

18    **A.**   Yes, sir.

19    **Q.**   Where did you go to medical school?

20    **A.**   LSU Medical School.

21    **Q.**   What year did you graduate?

22    **A.**   '76.

23    **Q.**   Can you generally tell the ladies and gentlemen of the

24    jury a little bit about your practice and what you have done in

25    your practice over the years.

                          DAILY COPY

1    **A.**    General otolaryngology, sinus surgery, ear surgery, throat

2    surgery, and general allergy.

3    **Q.**    You have had an opportunity to treat Ms. Castanel over the

4    years; is that correct?

5    **A.**    Yes, sir.

6    **Q.**    Approximately when did you first begin to see her?  Do you

7    recall?

8    **A.**    I don't have the exact -- it was in the 1990s, late 1990s.

9    Some of my records were lost during the storm, but the

10    recordable records that I have from 2002.

11    **Q.**    Can you generally tell the ladies and gentlemen about the

12    kind of treatment and services that you rendered to her.

13    **A.**    Ms. Castanel would come to the office for almost always

14    nasal problems, nasal congestion, nasal pain, facial pain.

15            **MR. WEINSTOCK:**  I have had marked for identification

16    Gautreaux Exhibits 349, 352, 353, 390, and 391.  They have been

17    previously tendered to counsel.

18            **THE COURT:**  Do you seek to introduce those?

19            **MR. REICH:**  We will offer them into evidence.

20            **MR. GARRISON:**  I've seen these.  As long as she -- I

21    do recognize the exhibit numbers.  We have no objection.

22            **THE COURT:**  And they are, Mr. Reich?

23            **MR. GARRISON:**  I know you wouldn't put anything new

24    in it.  I suspect they don't have any new office visits that I

25    haven't seen.

1          **THE COURT:**  Repeat those numbers again.  Those will
2    be in evidence.
3          **MR. REICH:**  Thank you, Your Honor.
4          **THE COURT:**  Just repeat them real quickly.
5          **MR. REICH:**  349, 352, 353, 390, 884.  I do have one
6    marked 380, which I failed to mention before, but it's part of
7    the records.  It's a phone message.  It's Exhibit 5 in the
8    deposition.
9          **THE COURT:**  So ordered.  Let's go.
10   **BY MR. REICH:**
11   **Q.**   Dr. Gautreaux, when you began treating Ms. Castanel, tell
12   us a little bit about the conditions that she had, your
13   diagnosis, and your treatment.
14   **A.**   Well, I would see her periodically for basically the same
15   symptoms every time, which was either ear congestion or nasal
16   congestion or throat infection.  Mostly, it was related to
17   nasal congestion or symptoms of sinusitis:  Nasal pain, fever.
18   **Q.**   Going back to the '90s -- you say your records begin
19   somewhere around 2002 -- up until the time she moved into the
20   trailer, approximately March of 2006, were you able to manage
21   her condition through treatment?
22   **A.**   I don't know if I would call it "manage."  I mean, she was
23   always on the same regime of medicines:  Nasal steroid sprays,
24   antihistamines, and frequently antibiotics.
25   **Q.**   But was she responding to the medications, typically?

795

1    A.    I mean, I would have -- I would see her about every three
2    months, so I would assume, yes.
3    Q.    And then there's a period of time when she saw you -- and
4    I have the visits notated:  March 13, 2006; October 31, 2006;
5    and April 10, 2007 -- for throat infections and sinus
6    infections.  That was during the time she lived in the trailer.
7    Do you recall her seeing you during those time periods?  If you
8    need to look at any records or any charts, you're welcome to do
9    so.
10   A.    I need the charts.
11          MR. REICH:  May I approach?
12          THE COURT:  Yes.
13   BY MR. REICH:
14   Q.    I'll give you the entirety of your records here.
15   A.    Okay.
16   Q.    Have you found some of the dates that I gave you a moment
17   ago with the entries of your --
18   A.    Would you repeat those dates.
19   Q.    Yes.  The dates are during the time she moved into the
20   trailer.  July 20, 2006; October 31, 2006, for sinus infection;
21   April 10, 2007, for sinus infection; June 18, 2007, for
22   rhinitis.  Well, that's due to pollen.
23   A.    What was the date in 2006 that you stated?
24   Q.    The date in 2006, sir, was October 31, 2006.  Do you see
25   the entry?

1  A.    Yes.

2  Q.    What does the entry say?

3  A.    October 31, 2006, it says:  "Right ear and stuffy nose."

4  That was the nurse's note at the top.

5  Q.    Okay.

6  A.    I saw her.  She had a wax impaction bilaterally, but I

7  also treated her for sinusitis by giving her an injection of

8  Lincocin; and prescribing Cefzil, which is an antibiotic; and

9  Zyrtec; and also giving her a shot of Kenalog.  So she received

10  two injections, one antibiotic and one steroid, and some

11  antibiotics and antihistamines by mouth.

12  Q.    Was that a typical treatment?

13  A.    It got to be a typical treatment for her, yes.

14  Q.    Why were you giving her injections?

15  A.    To try to relieve the infection and also the congestion.

16  Q.    Then take a look at the entry for April 10, 2007, and tell

17  the ladies and gentlemen of the jury what it says.

18  A.    She had, again, problems with wax in her right ear, but

19  she also had another sinus infection.  I gave her another

20  Kenalog injection and another prescription for Cefzil and

21  Zyrtec.

22  Q.    Then on August 21, 2007, or approximately then,

23  Ms. Castanel moved out of the trailer.  After that, you saw her

24  again on September 18, 2007, with a sinus infection.  Can you

25  find that entry, please.

1    **A.**    That was August of 2008, you said?

2    **Q.**    2007.  That was September 18, 2007.

3    **A.**    Okay.  She had another wax impaction.  At that time, she

4    had pretty nasty nasal congestion, so I put an ephedrine pack

5    in her nose for a little while to try to relieve the pressure

6    in her nose.  I also prescribed some eardrops for her ear.  I

7    gave her a different antibiotic this time, cephalexin, and

8    basically for the same problem:  Sinus infection.

9             **MR. REICH:**  May I approach the easel, Your Honor, to

10   make it a little easier?

11            **THE COURT:**  Yes.

12   **BY MR. REICH:**

13   **Q.**    Let me write down the dates after she moved out of the

14   trailer.  You have 9-18-07, sinus; 4-9-08, which is sinusitis;

15   4-24-08, nasopharyngitis.

16            What is nasopharyngitis?

17   **A.**    The nasopharynx is the area behind the nose where it

18   enters into the pharynx and above the palate.  So it's a small

19   area above the palate, posterior to the nasal cavities.  That's

20   where the eustachian tube is and --

21   **Q.**    Is that where, like, the ear canal can get plugged up?

22   **A.**    Yes.  You could get a different type of -- that wouldn't

23   be a wax problem, no.  That would be the eustachian tube

24   blocking the middle ear.

25   **Q.**    What happens when a person has pharyngitis?  What are the

1   symptoms?

2   **A.**   Sore throat.

3   **Q.**   From the sinusitis, can that be a painful condition?

4   **A.**   Yes.

5   **Q.**   4-28-08, nasopharyngitis again.  8-20-08, again

6   nasopharyngitis.  You have an undated entry, sinusitis.  Now,

7   let's just cover these.

8          There's more.  There's approximately one more entry,

9   and then there's an Ochsner Clinic entry, and then -- one, two,

10  three, four -- five more entries where you saw her for

11  pharyngitis, nasal congestion, nasosinusitis, then you took an

12  X-ray.  That was -- one, two, three, four -- five events going

13  from July 21, 2009 to December 28, 2009.

14          During this period of time, if you could just sort of

15  look at your entries, can you tell the ladies and gentlemen of

16  the jury the kinds of treatment that you performed.

17  **A.**   Pretty much always an antihistamine of some sort and a

18  steroid injection, almost always an antibiotic.  I think it got

19  to the point where Ms. Castanel was asking for the antibiotics.

20  **Q.**   Was there a point when you determined that management

21  through medication was no longer working?

22  **A.**   Yes.

23  **Q.**   Tell the jury about how you made that decision to perhaps

24  try something else.

25  **A.**   Well, all these -- I wanted to do surgery on Ms. Castanel,

1    but because of her age I was reluctant to do it.  So I just,

2    for the most part, decided to try to treat her medically.  But

3    it appeared that I couldn't clear up her problem medically, so

4    we X-rayed her sinuses, and I found what I thought I was going

5    to find.

6    **Q.**   What did you find?

7    **A.**   Chronically blocked sinuses.  Let me look at the X-rays.

8         Complete opacification of the right frontal sinus

9    extending to opacify the right frontal ethmoid recess.  There

10   is mild mucosal thickening in the inferior frontal sinus

11   opacifying.  There is mild/moderate patchy opacities in the

12   ethmoid air cells bilaterally.

13        There is mild mucosal thickening in the right

14   sphenoid sinus.  The left sphenoid sinus is clear.  There is

15   slight narrowing of the sphenoethmoid recess.  There is mild

16   mucosal thickening within the left maxillary antrum, with a

17   patchy -- narrowing the left ostiomeatal complex, although it

18   is patent.

19        Moderate mucosal thickening of the right maxillary

20   antrum, most pronounced inferiorly, with opacity extending

21   along the infundibulum, obstructing the right ostiomeatal

22   complex.  Then the nasal cavity, there is slightly leftward

23   deviation of the nasal septum and secretions in --

24        **THE COURT:**  Is there some way we can expedite this?

25

1  BY MR. REICH:

2  Q.    Doctor, I wanted the jury to get a sense of your report,

3  but can you describe in layman's terms the severity of her

4  condition at that point in time.

5  A.    It was a surgical -- at this point, my impression from the

6  radiology report was that it was no longer a medical problem.

7  It needed to be corrected surgically.

8  Q.    In fact, did you perform surgery?

9  A.    Yes.

10  Q.    When was the surgery?

11  A.    March 31, 2010.

12  Q.    Just very recently you did the surgery?

13  A.    Yes.

14  Q.    Now, did you determine whether or not there had been any

15  change in the course of her condition or an exacerbation of her

16  condition at any point in time which warranted your change in

17  the medical management of her condition from giving medication

18  to making a decision to do surgery?

19  A.    It was my opinion that the medical management of her

20  sinusitis was a failure and that, because of her age, I had no

21  choice but to go ahead and do the procedure now.  I thought

22  waiting any longer would be a detriment because of her age.

23  Q.    Did you determine whether or not her condition worsened

24  after she had either moved into the trailer or left the

25  trailer?  We are talking about the period of March 8, 2006,

801

1    when she moved in, to August of 2007, when she moved out, and

2    thereafter.

3    **A.**   I know Earline felt more pain.  She was complaining of

4    more pain.  She was looking for some alternative treatment at

5    that point.

6    **Q.**   You made the decision to do this surgery.  Can you explain

7    the surgical procedure very briefly to the jury.

8    **A.**   The surgical procedure was done under general anesthesia.

9    It was called a FESS, which is functional endoscopic sinus

10   surgery.

11          It's computer-guided.  You take a CAT scan of the

12   sinuses and then feed it into a computer that you use in the

13   operating room to help.  Tips of all the instruments can be

14   identified on the computer screen as you introduce them into

15   the nose.  So you pretty much know exactly where you are during

16   the procedure by locating the tip of the instrument and what

17   sinus, how far back you are.  I mean, only 7.5 centimeters back

18   and you're at the base of the brain, so you have to be very

19   careful.

20          So using the image-guided surgery, we opened up these

21   areas of obstruction and took some biopsies.  I thought I was

22   going to see a fungal sinusitis, to be honest with you, but we

23   didn't find that.  She just had chronically thickened mucosa

24   and, actually, no frank pus.  There was no pus in her sinuses,

25   just chronically thickened mucosa and obstructed opacity of

1    ostia.  Ostia are the openings that drain each sinus.

2            The frontal sinus is the sinus that was most blocked.

3    It's above the eyes.  We have to be real careful going into the

4    frontal sinus intranasally because, if you damage that opening,

5    you can get some scarring and make the problem worse.  We were

6    able to introduce a scope up into the most inferior portion of

7    the frontal sinus through her nose and able to remove some

8    tissue that I felt was blocking that opening.

9            Then we debrided the ethmoid sinuses on that side

10   that were all swollen and inflamed.  The ethmoid sinuses are

11   real small sinuses, almost like a honeycomb or a bee's nest,

12   just real small, small aerated sinuses altogether.  It doesn't

13   take much to block those sinuses.  So we cleaned that out by

14   removing most of the sinus walls and just making a big sinus

15   cavity there that would promote drainage.

16           Then we went underneath the canine -- in the canine

17   fossa, introduced the scope under her lip into the sinus, where

18   we could look into that sinus and find where it was obstructed.

19   And then by working through her nose and observing what we were

20   doing through the sinus, we opened up that maxillary sinus

21   opening.  And that was pretty much it.

22   **Q.**   You're not a toxicologist, are you?

23   **A.**   No, sir.

24   **Q.**   You're not a epidemiologist?

25   **A.**   No, sir.

1   **Q.**   You don't hold yourself out as a person who tries to make
2   associations or determine relationships between exposure to
3   chemicals and injuries, do you?
4   **A.**   No.
5   **Q.**   You have not attempted to do that in this case, have you?
6   **A.**   No.
7   **Q.**   Would you defer to others who may be more knowledgeable in
8   toxicology and epidemiology and environmental sciences than
9   yourself?
10  **A.**   Yes.
11  **Q.**   Now, did you believe that the surgery that you performed
12  was reasonable and necessary under the circumstances?
13  **A.**   Yes.
14  **Q.**   In accordance with contemporary standards in the state of
15  Louisiana and in the United States?
16  **A.**   Yes.
17  **Q.**   Certainly there is a charge for that surgery.  Do you have
18  your billing records before you?
19  **A.**   I didn't bring that.
20  **Q.**   It may be in one of the exhibits.  If you look at
21  Exhibit 391, it should be marked with a sticky, and that should
22  have your billing record.
23  **A.**   I don't have a sticky.
24  **Q.**   What was the total charge for the surgical procedures
25  performed, Doctor?

1    **A.**    These are Ochsner charges.

2    **Q.**    What are the Ochsner charges?

3    **A.**    The Ochsner charges are $27,438 --

4            **MR. GARRISON:**  Objection, Your Honor.  It's hearsay.

5            **THE COURT:**  He has got to testify as to what he knows

6    he charged for the surgery.  There may be things in there he --

7    he's already said that's Ochsner, but unless that's the same as

8    what he would charge --

9    **BY MR. REICH:**

10   **Q.**    Do you have hospital privileges at Ochsner?

11   **A.**    Yes.

12   **Q.**    What were the kind of services that Ochsner charged for

13   approximately $27,000?

14   **A.**    Room charges, pharmacy charges, medical supplies,

15   laboratory and operating room services, anesthesia, treatment

16   in observation room.

17   **Q.**    Are you familiar with the typical charges for those kinds

18   of services in the New Orleans area?

19   **A.**    No.

20   **Q.**    Do those charges seem to be reasonable to you for the

21   kinds of services rendered?

22           **MR. GARRISON:**  Objection, Your Honor.  He just

23   testified he was not --

24           **THE COURT:**  He said he wasn't familiar.

25           **THE WITNESS:**  I don't know what the hospital charges

DAILY COPY

1   are.

2   **BY MR. REICH:**

3   **Q.**   What about your own charges?  Approximately what do you

4   charge for this type of surgery?

5   **A.**   I use a CPT codebook to charge.  We take the CPT codes for

6   the procedures that we perform, and we take the Southern

7   average because there are different averages for every area of

8   the country for sinus surgery.

9   **Q.**   Give me a ballpark.

10  **A.**   Maybe $3,000.

11  **Q.**   For your charges yourself?

12  **A.**   Yes.

13  **Q.**   That would not include the hospital charges; correct?

14  **A.**   Yes.

15  **Q.**   Do you believe those charges are reasonable and customary

16  for the New Orleans area?

17          **MR. GARRISON:**  Objection, Your Honor.

18          **MR. REICH:**  I'm not talking about Ochsner.  I'm

19  talking about his surgical charges.

20          **THE COURT:**  His?  Okay.

21  **BY MR. REICH:**

22  **Q.**   I'm limiting it to your surgical charges, Dr. Gautreaux.

23  Do you believe they are reasonable and customary for the

24  New Orleans, Louisiana area?

25  **A.**   Yes.

1    **Q.**    Do you believe that Ms. Castanel is doing better now that
2    she has had the surgery?
3    **A.**    Yes.
4    **Q.**    When was the last time you saw her?
5    **A.**    About two weeks ago.
6              **MR. REICH:**  Okay.  Very good.  Thank you,
7    Dr. Gautreaux.
8                   I pass the witness.
9              **THE COURT:**  Thank you.
10                  Mr. Garrison.
11                        **CROSS-EXAMINATION**
12   BY MR. GARRISON:
13   **Q.**    How are you doing?  I met you at your deposition.
14   **A.**    Yes.
15   **Q.**    Good to see you again.
16   **A.**    Thank you.
17   **Q.**    If I understood your testimony, your records that you have
18   show that you started treating Ms. Castanel in May of 2002;
19   correct?
20   **A.**    Yes.
21   **Q.**    You treated her before that, but those records are lost?
22   **A.**    Yes.
23   **Q.**    We have some prescription records.
24             **MR. GARRISON:**  May I approach?
25             **THE COURT:**  Yes.

**BY MR. GARRISON:**

**Q.**   This is Exhibit 416.  You are free to look through it.
I'm going to ask you some questions about prescriptions
briefly, so I wanted to give you the exhibit or the evidence
which relates to this chart.

          This chart shows that you prescribed medication
starting on October 30, 1994, to Ms. Castanel throughout the
'90s, and there's another page.  The next page starts 1998 and
goes to January 2002.  Go back to the first page, please.

          In any event -- and you're free to check the
prescriptions in the exhibit, but it shows you prescribed
decongestants and allergy medication to Ms. Castanel on a
regular basis through the '90s; is that correct?

**A.**   Yes.

**Q.**   The decongestant, what would that be prescribed for?

**A.**   To help promote sinus drainage.

**Q.**   We just went through the other page.  You don't have any
reason to disagree with the information on this prescription
chart, do you?

**A.**   No.

**Q.**   In efforts to streamline this, I will just come get the
exhibit.  Your records pick up with May 6, 2002; is that
correct?

**A.**   Can you hold it for a second?  I just need my glasses real
quick.

1  **Q.**   In fact, Doctor, instead of going through your records

2  date by date, what I would like to do is pull up another

3  exhibit, a demonstrative aid.

4        **MR. GARRISON:**  Scott, can you pull up the sinus

5  treatment chart, please.

6  **BY MR. GARRISON:**

7  **Q.**   You can look on your screen.

8  **A.**   I apologize.

9  **Q.**   We'll run through this very quickly.  In 2002, Doctor,

10 based on your records, you treated Ms. Castanel on two

11 occasions for her sinuses; correct?

12 **A.**   Yes.

13 **Q.**   In 2003, based on your records, you treated Ms. Castanel

14 on three occasions for her sinuses; correct?

15 **A.**   Yes.

16 **Q.**   Let's go to 2004.  In 2004, you treated Ms. Castanel, it

17 looks like, on two occasions, but there might be another visit

18 on the next page.

19       **MR. GARRISON:**  So we have to flip over, Scott.  Next

20 page.  We have to go back and make that a three, three visits

21 in 2004, because we have a visit on the top of page 2, in 2004.

22 Thank you.

23 **BY MR. GARRISON:**

24 **Q.**   Let's go to the next page, please.  Let's analyze 2005.

25       Did you know that Ms. Castanel treated in Texas, when

1    she evacuated for Hurricane Katrina, with an internist for her

2    sinuses?

3    **A.**   No.

4    **Q.**   Well, we'll put the visits for 2005 because she was in

5    Texas with Dr. Hoang.  That looks like two visits.

6            We are focusing on the treatment for sinuses with

7    Dr. Gautreaux.  Ms. Castanel treated with you on February 13,

8    2006.  That's before she moved in the FEMA trailer for her

9    sinuses.

10           Let's go down to the light-blue time frame.  It looks

11   like Ms. Castanel treated with you on October 31, 2006, and

12   April 10, 2007.  Let's see.  Let's stick with years.  For 2006,

13   it looks like Ms. Castanel treated with you twice.

14   **A.**   Yes.

15   **Q.**   In February and October; is that correct?  For sinuses.

16   **A.**   Okay.  February is 2006.  What was your question?

17   **Q.**   I'm just getting you to confirm these dates of treatment.

18   **A.**   Yes.

19   **Q.**   During the time Ms. Castanel was in the trailer from

20   March 11, 2006 to July 2007, it looks like she treated with you

21   on two occasions for her sinuses; is that right?

22   **A.**   Yes.

23   **Q.**   Let's flip over to the next page.  There's also a visit in

24   2007 for rhinitis.  Let's go to 2008.

25           Based on your records, it looks like Ms. Castanel

1   treated with you on three occasions in 2008; is that correct?

2   **A.**   Yes.

3   **Q.**   Now, plaintiff's counsel put some dates in 2008 on the

4   board, and one of those dates involves a visit at Ochsner for

5   high blood pressure and dizziness.  If you want to take the

6   time to look -- I don't think it involves treatment for

7   sinuses, but you are free to take your time if you feel the

8   need to do so.

9   **A.**   When was the visit?  What date was that visit?

10          **MR. REICH:**  August 2, 2009.

11  **BY MR. GARRISON:**

12  **Q.**   Yes.  That was the treatment at Ochsner.  Doctor, have you

13  been able to find it?

14  **A.**   No.

15          **MR. GARRISON:**  Dennis, do you agree that that visit

16  on August 2 was treatment at Ochsner for dizziness?

17          **MR. REICH:**  With further notation:  "By history, her

18  head felt congested."

19          **MR. GARRISON:**  By history?

20          **MR. REICH:**  Yes.

21          **THE COURT:**  Are we still waiting for him to find

22  this?

23          **MR. GARRISON:**  Yes, sir.  We can move on.

24          **THE COURT:**  Let's do something.

25          **MR. GARRISON:**  Let's move on.  And, Scott, let's go

DAILY COPY

1    backwards.

2    **BY MR. GARRISON:**

3    **Q.**   I want to focus on the time frame from 2002 to 2008.  In

4    2002 --

5            **MR. GARRISON:**  Go back one more, please.

6    **BY MR. GARRISON:**

7    **Q.**   In 2002, Ms. Castanel treated for sinuses with

8    Dr. Gautreaux on two occasions.

9            In 2003, Ms. Castanel treated with Dr. Gautreaux for

10   her sinuses on three occasions.

11           2004, Ms. Castanel treated with Dr. Gautreaux for her

12   sinuses on three occasions.

13           2005, she treated in Texas, shortly after the

14   hurricane, on two occasions.

15           In 2006, we have two occasions for sinus treatment.

16           Let's go to the next page.  Then we skip 2007, I

17   believe, but in 2008 we have three treatments, notwithstanding

18   the Ochsner visit, but three treatments with you for

19   Ms. Castanel for her sinuses.

20           From the time period 2002 to 2008, do you see any

21   significant increase in Ms. Castanel's treatment for sinuses?

22   **A.**   Not according to the visits.

23   **Q.**   Do you know when Ms. Castanel lived in the FEMA trailer?

24   **A.**   No, I do not.

25   **Q.**   You performed the endoscopic procedure on March 31, 2010;

DAILY COPY

1   correct?

2   A.   Yes.

3   Q.   Ms. Castanel never once told you, as her treating

4   physician for over 15 years, that she thought her FEMA trailer

5   was causing problems for her sinuses; isn't that correct?

6   A.   Correct.

7   Q.   Ms. Castanel has treated with you for chronic sinusitis

8   for a very long time; correct?

9   A.   She was being treated for sinusitis.  I didn't make the

10  diagnosis of chronic sinusitis -- I didn't commit to the

11  diagnosis of chronic sinusitis until I got the X-ray report.

12  Q.   Do you recall giving your deposition?

13  A.   Yes.

14  Q.   Page 123, line 11:

15       "Question:  And Ms. Castanel has had chronic

16       sinusitis for many years; is that correct?

17       "Answer:  Yes."

18  A.   Yes.

19  Q.   So you agree with that testimony?

20  A.   Yes.

21  Q.   What is meant by *chronic*?

22  A.   The chronic sinusitis is a sinus infection that just

23  doesn't stop.  Not necessarily a sinus infection, but just

24  symptoms of chronic nasal congestion -- pain, pressure -- that

25  just cannot be treated medically.

1  **Q.**   It's a long-term condition; correct?

2  **A.**   Yes.

3  **Q.**   Ms. Castanel's diagnosis has not changed in the last 10

4  years; is that correct?

5  **A.**   No.

6  **Q.**   That's not correct?

7  **A.**   Her problem got worse in the last few months by her

8  description of an increasing pain.

9  **Q.**   Well, let me ask you this way:  Ms. Castanel's diagnosis

10  did not change after Hurricane Katrina; correct?

11  **A.**   Her diagnosis of chronic sinusitis did not change, but her

12  symptoms worsened.  In the realm of chronic sinusitis, her

13  symptoms worsened.

14  **Q.**   Yes, sir.  I'm asking about diagnosis.  Isn't it true that

15  Ms. Castanel's diagnosis of chronic sinusitis did not change

16  after Hurricane Katrina?

17  **A.**   Yes.

18  **Q.**   You did not diagnose any new symptoms -- new symptoms --

19  for Ms. Castanel since Hurricane Katrina; correct?

20  **A.**   I would say her pain -- her actual amount of pain that she

21  was experiencing was increasing.

22           **MR. GARRISON:**  May I approach?

23           **THE COURT:**  Yes.

24  BY MR. GARRISON:

25  **Q.**   Do you recall giving your deposition on January 20, 2010,

1  Doctor?

2  **A.**   Yes.

3  **Q.**   This is page 54, line 19:

4         "Question:  Did you diagnose any new symptoms or

5      conditions for Ms. Castanel after Hurricane Katrina?

6         "Answer:  No."

7         This was taken on January 20, 2010.  Do you agree

8  with that?

9  **A.**   Read it to me again.

10 **Q.**   Let's see.  Page 54, line 19:

11        "Question:  Did you diagnose any new symptoms or

12     conditions for Ms. Castanel after Hurricane Katrina?

13        "Answer:  No."

14 **A.**   I agree with that.

15 **Q.**   Isn't it true that you ordered the CAT scan you testified

16 about a few minutes ago because of the increase in office

17 visits by Ms. Castanel in 2009?

18 **A.**   I ordered it because of the amount of pain that she was

19 having.

20        **MR. GARRISON:**  May I approach?

21        **THE COURT:**  Yes.

22 BY MR. GARRISON:

23 **Q.**   Do you recall giving a deposition on January 20, 2010?

24 **A.**   Yes.

25 **Q.**   Page 63, line 13:

815

1       "Question:  And why did you determine it would be

2       appropriate to do a CAT scan of the nasal or sinus

3       passages of Ms. Castanel?

4       "Answer:  I ordered the sinus views to get an idea of

5       what was going on on the sinuses based on the increased

6       frequency of visits to the office."

7       Do you agree with that?

8   A.   Yes.

9   Q.   So it was the increase in Ms. Castanel's visits to the

10  office in late 2009 that prompted you to order a CAT scan;

11  correct?

12  A.   It was the chronicity of the visits.

13  Q.   Do you know when Ms. Castanel filed her lawsuit in this

14  case?

15  A.   No, I do not.

16  Q.   Now, you have treated Ms. Castanel for congestion on an

17  ongoing basis for over 15 years; correct?

18  A.   Yes.

19  Q.   Chronic sinusitis can cause drainage problems like

20  Ms. Castanel had; correct?

21  A.   Yes.

22  Q.   In fact, drainage problems are common with sinusitis; is

23  that correct?

24  A.   Yes.

25  Q.   When someone has drainage problems in their sinuses, that

1    can cause additional infections; correct?

2    **A.**   What do you mean?

3    **Q.**   In other words, if someone has a problem with mucus

4    staying in their sinuses, they are more prone to infections?

5    **A.**   In their sinuses?

6    **Q.**   Yes, sir.

7    **A.**   Yes.

8    **Q.**   Isn't it true that Ms. Castanel probably had an increase

9    in her sinus infections due to the sinus drainage problem?

10   **A.**   No.

11            **MR. GARRISON:**  May I approach?

12            **THE COURT:**  Yes.

13            **THE WITNESS:**  Would you repeat that question again.

14   BY MR. GARRISON:

15   **Q.**   Isn't it true that Ms. Castanel probably had more

16   infections, sinus infections, due to the drainage problems in

17   her sinuses?

18   **A.**   Yes.

19   **Q.**   Throughout most of your treatment of Ms. Castanel,

20   antibiotics were successful in treating her sinus condition;

21   isn't that correct?

22   **A.**   Well, how do you describe *successful*?

23   **Q.**   Helping to resolve the condition.

24   **A.**   I didn't know if it was.

25            **MR. GARRISON:**  May I approach, Your Honor?

1          **THE COURT:**  Yes.

2   BY MR. GARRISON:

3   **Q.**   Page 84, line 3.  I'll give you a chance to read it.

4   **A.**   It's kind of a broad question.  Are you asking me if it

5   relieved her symptoms from visit to visit?

6   **Q.**   Well, let me --

7   **A.**   I would say yes.  Did it stop her problem?  I would say

8   no.

9   **Q.**   Well, let me ask the question for the jury.  Page 84,

10  line 3:

11          "Question:  I will ask a different question.  Were

12      antibiotics successful in treating Ms. Castanel's

13      condition or conditions over the course of your treatment

14      of Ms. Castanel?

15          "Answer:  Yes.

16          "Question:  And would that suggest that the concerns

17      for which you treated Ms. Castanel were caused by

18      bacteria?

19          "Answer:  Yes."

20          Do you agree with that?

21  **A.**   I agree that it was relieving her symptoms with each

22  visit, but then she would return.

23  **Q.**   And that could have been due to new infections; correct?

24  **A.**   It was probably due to the killing of the bacteria in the

25  sinus but not the drainage problem, not relieving the drainage

DAILY COPY

1    problem.

2    **Q.**   And when you refer to the killing of the bacteria, you're

3    talking about the antibiotics killing the bacteria?

4    **A.**   Correct.

5    **Q.**   Because she still had that problem with the clogging, she

6    was more prone to new infections; is that correct?

7    **A.**   Yes.

8    **Q.**   Doctor, you don't have any particular knowledge about the

9    effects of formaldehyde; correct?

10   **A.**   Correct.

11   **Q.**   Let's talk about irritants for just a few minutes.  If

12   someone is exposed to an irritant, you would expect the person

13   to have a reaction to that irritant at the time of exposure;

14   correct?

15   **A.**   I'm not an expert in irritants.

16          **MR. GARRISON:**  May I approach?

17          **THE COURT:**  Yes.

18   BY MR. GARRISON:

19   **Q.**   Page 118, line 1, and I will let you read it.

20   **A.**   Where is it at?  Okay.  Yes.

21   **Q.**   Let me ask the question for the jury.

22   **A.**   Sure.

23   **Q.**   Reading:

24          "Question:  If someone is exposed to an irritant, is

25          it typical for that person to have a reaction at the time

1      of exposure?

2           "Answer:  Yes."

3           Do you agree with that?

4  **A.**   Yes.

5  **Q.**   So if someone is removed from the irritant and they're no

6  longer exposed to the irritant, then that person should not

7  have symptoms from that irritant; correct?

8  **A.**   You're asking me a question that is --

9  **Q.**   If you don't know the answer, that's a correct answer.

10 **A.**   I don't know.

11 **Q.**   If Ms. Castanel's sinus symptoms in 2009 and 2010 were

12 related to infections, those infections would not be related to

13 exposure to bacteria in 2007; correct?

14 **A.**   Repeat the question.

15 **Q.**   If Ms. Castanel's sinus symptoms in 2009 and 2010 were

16 related to infections, those infections in 2009 and 2010 would

17 not be related to exposure to bacteria in 2007?

18 **A.**   Most likely not.

19 **Q.**   Isn't it true the severity of Ms. Castanel's sinusitis

20 symptoms did not change after Hurricane Katrina?

21 **A.**   She complained of more pain in the latter months.

22 **Q.**   What do you mean by "the latter months"?  Recently?

23 **A.**   Yes.  I think that's why she accepted the surgery.

24      **MR. GARRISON:**  May I approach?

25      **THE COURT:**  Yes.

DAILY COPY

1    **BY MR. GARRISON:**

2    **Q.**    Page 81, line 19.  I'll let you read it first.  Now, this

3    was taken in January.

4            **THE COURT:**  Give him a page and line and let him read

5    it or you read it.

6            **MR. GARRISON:**  I'll read it.  Let me read it.

7            **THE COURT:**  Let's go because this is taking a heck of

8    a long time.

9            **MR. GARRISON:**  And I apologize.

10           **THE COURT:**  Yes.  Well, we need to move on.

11           **MR. GARRISON:**  Yes, sir.

12   **BY MR. GARRISON:**

13   **Q.**    Page 81, line 19:

14           "Question:  Did the severity, in fact, the severity

15       of Ms. Castanel's condition actually change in terms of

16       her symptoms?

17           "Answer:  No."

18   **A.**    Would you read the sentence before that.

19   **Q.**    Plaintiff's counsel asked you about the severity of

20   Ms. Castanel's condition, sinusitis, after the hurricane, and

21   you responded to his question about the frequency of visits.

22   And then I asked:

23           "Question:  Did the severity, in fact, the severity

24       of Ms. Castanel's condition actually change in terms of

25       her symptoms?

1        "Answer:  No."

2   A.   The answer was no in terms of after Katrina.  If you read

3   the question before that, you asked me that question in terms

4   of what happened after Katrina.

5   Q.   Yes, sir.  And I was talking about the severity of the

6   symptoms, and the other attorney was referring to frequency of

7   visits.

8   A.   I was talking about her severity increased in the last few

9   months.  The question before said something about right after

10  Katrina.

11  Q.   Well, this deposition was taken in January of 2010.

12  A.   I understand, but there was a lot of time between Katrina

13  and the last few months.

14  Q.   Yes, sir.  As of January 2010, did the severity of

15  Ms. Castanel's sinus condition actually change in terms of her

16  symptoms?

17  A.   That's not the question you asked me before that when you

18  said about Katrina.

19  Q.   Well, I want to move this along.

20  A.   Okay.

21  Q.   I don't want to argue with you.

22       Now, you performed the endoscopic procedure on

23  March 31, 2010, to drain Ms. Castanel's sinuses; correct?

24  A.   Yes.

25  Q.   And that procedure was successful; correct?

822

1    A.    Yes.

2    Q.    For that procedure, you went in through the nostril with

3    the scope and you were able to do what you needed to do;

4    correct?

5    A.    Yes.

6    Q.    You didn't have to cut Ms. Castanel's skin or face;

7    correct?

8    A.    No.  Well, I did have to puncture a hole into her mucosa

9    to enter into the maxillary sinus.  So I did enter into her

10   tissues but not her skin.

11   Q.    Yes, sir.  You didn't do a surgical cut?

12   A.    No.

13   Q.    The procedure is considered minimally invasive; correct?

14   A.    Correct.

15   Q.    Is the procedure typically done on an outpatient basis?

16   A.    Yes.

17   Q.    I understand Ms. Castanel made a good recovery.

18   A.    She had to stay that night because her blood pressure went

19   up, but she went home the next morning and has done fine since

20   then.

21   Q.    Oh.  She had some blood pressure issues, so she stayed the

22   night?

23   A.    Yes.

24   Q.    Ms. Castanel has made a good recovery?

25   A.    Yes.

1  **Q.**  Does Ms. Castanel have any restrictions from this

2  procedure?

3  **A.**  No, not from her sinus surgery.  She still is having a

4  little problems with her blood pressure.

5  **Q.**  Ms. Castanel had blood pressure problems for a long time

6  before this procedure; correct?

7  **A.**  Yes.

8  **Q.**  And Ms. Castanel has no disability; correct?

9  **A.**  Correct.

10  **Q.**  Presently, there's no indication that Ms. Castanel will

11  need any specific future medical treatment for her sinuses?

12  **A.**  I can't answer that, no, sir.

13  **Q.**  Did you review the pathology report that was performed

14  after the surgery?

15  **A.**  Yes.

16  **Q.**  Did the information on the pathology report correlate with

17  the diagnosis of chronic sinusitis?

18  **A.**  Yes.

19  **Q.**  During the endoscopic procedure, did you see any evidence

20  of cancer?

21  **A.**  No.

22  **Q.**  You can't say with any reasonable degree of medical

23  probability that the endoscopic procedure in 2010 is related to

24  exposure in a FEMA trailer in 2007; correct?

25        **MR. REICH:**  Objection:  No foundation.  The doctor

1   has previously answered he is not an expert in this area.

2            THE COURT:  Well, see if you can lay a foundation for

3   him to be able to answer that question.

4   BY MR. GARRISON:

5   Q.   You have already testified you have no knowledge about the

6   effects of formaldehyde; correct?

7   A.   Correct.

8   Q.   You mentioned earlier in your testimony that you always

9   wanted to do sinus surgery on Ms. Castanel, but you were

10  reluctant because of her age; is that right?

11  A.   I didn't say I wanted -- always wanted to do sinus

12  surgery.  I said that I didn't want to do sinus surgery, if I

13  could help it, because of her age.

14  Q.   But did you think she had been a candidate for sinus

15  surgery for a long time due to her chronic sinus problems?

16  A.   I was able to manage it medically until recently.

17  Q.   There's no way you can say with any reasonable degree of

18  medical certainty that Ms. Castanel's endoscopic procedure is

19  related to any exposure in 2007?

20           MR. REICH:  Objection, Your Honor.  It's clear,

21  number one, there's no foundation; number two, the doctor has

22  testified he would defer to toxicologists and others who have

23  expertise on this issue.

24           THE COURT:  I think that's what he has testified to,

25  I think.

1          **MR. GARRISON:**  No further questions.

2          **THE COURT:**  Any redirect?

3          **MR. REICH:**  No.  Thank you, Your Honor.

4          **THE COURT:**  Thank you, Doctor.  You can step down.

5              We are going to take a 15-minute break.  It's

6  3:20 or thereabouts.  If you-all could be ready at 3:35, we

7  will come back and conclude for the day.

8          **THE DEPUTY CLERK:**  All rise.

9          (WHEREUPON the jury exited the courtroom.)

10          **THE COURT:**  Counsel, why don't you approach.  It's

11  not on the record.

12          (WHEREUPON the Court took a brief recess.)

13          **THE DEPUTY CLERK:**  All rise.

14          **THE COURT:**  You may be seated.

15              Let's go ahead and finish up for today.

16  Mr. Watts.

17          **MR. WATTS:**  Christopher DeRosa by videotaped

18  testimony.

19          **THE COURT:**  The last name is spelled D-E-R-O-S-A, and

20  he has been sworn in to give testimony.  All counsel are

21  present, and here is his videotaped testimony.

22          (WHEREUPON **Christopher DeRosa**, having been duly

23  sworn, testified by video deposition as follows.)

24

25

1                          **EXAMINATION**

2   **BY MR. WATTS:**

3   **Q.**   Good morning, Dr. DeRosa.

4   **A.**   Morning.

5   **Q.**   You are here today represented by your own counsel;

6   correct?

7   **A.**   Yes, I am.

8   **Q.**   What is your occupation?

9   **A.**   My occupation is as an environmental health scientist.

10  **Q.**   Are you currently employed?

11  **A.**   I am self-employed.

12  **Q.**   What is the extent of your formal education?

13  **A.**   Well, I've had a B.A. degree from Ohio Wesleyan

14  University; a master's degree in ecology from Miami University

15  of Ohio; a doctoral degree from the same institution in

16  biology; and a postdoctoral appointment at the University of

17  Virginia in molecular biology.

18  **Q.**   Would you summarize your employment history starting with

19  the first employment following the conferral of your PhD.

20  **A.**   That would be with the University of Virginia, as I

21  mentioned, as a postdoctoral appointment.

22           Then I had a practicum.  I was appointed as assistant

23  professor there for a number of years and then had an

24  opportunity to join EPA in the late '70s, early '80s, where I

25  was employed as a staff scientist and as a team leader.

1              Following that, I was employed by the University of

2    Maine in the early '80s and then returned to EPA in

3    approximately 1984, where I was then branch chief and,

4    following that, acting director of the environmental criteria

5    and assessment office within the office of research and

6    development in Cincinnati, Ohio.  At that time, following the

7    time spent as acting director, I came to CDC/ATSDR in '91.

8    Q.   Just so the jury understands, what do the initials "CDC"

9    and the initials "ATSDR" stand for?

10   A.   Centers for Disease Control and Prevention and the Agency

11   for Toxic Substances and Disease Registry.

12   Q.   And these are agencies of the federal government?

13   A.   They are within the Department of Health & Human Services.

14   Q.   What positions did you hold there?

15   A.   I was the deputy associate administrator for science

16   initially.  I then became the acting director for the division

17   of toxicology within ATSDR, which was later, following the

18   reorganization, the division of toxicology and environmental

19   medicine.  I held that position until October of 2007.

20   Q.   And was that your last position with ATSDR?

21   A.   No, it was not.  Following my removal from the position as

22   director, I was reassigned as the assistant director for

23   toxicology and risk analysis within the office of the director

24   of the Agency for Toxic Substances Disease Registry and the

25   National Center for Environmental Health, which are both within

1   the Centers for Disease Control and Prevention, Health & Human

2   Services.

3   **Q.**   And was that your last position with the federal

4   government?

5   **A.**   It was.

6   **Q.**   When did that position end?

7   **A.**   I resigned my position effective June 17 of this year,

8   2009, although that's still subject of some discussion.

9   **Q.**   So you were the director of the division of toxicological

10  and environmental medicine at ATSDR for how long?

11  **A.**   Roughly 16 years.

12  **Q.**   Now, the ATSDR is a division of CDC?

13  **A.**   No.  Actually, it's one of eight independent agencies of

14  the Public Health Service.  It is the primary agency charged

15  with implementing the health mandates of the Comprehensive

16  Emergency Response, Compensation, and Liability Act of 1984 as

17  amended by the Superfund Amendments and Reauthorization Act of

18  1984.

19  **Q.**   Doctor, based on your education, training, and your work

20  experience, have you developed expertise in regard to the

21  health effects and exposure risks associated with toxic

22  chemicals and substances?

23  **A.**   Yes, I have.

24  **Q.**   Have you authored or coauthored any peer-reviewed

25  publications dealing with the human health effects and exposure

1    risks associated with toxic substances?

2    **A.**    Yes, I have.

3    **Q.**    How many?

4    **A.**    It depends on how one counts, but roughly 200

5    peer-reviewed journal articles, another number of peer-reviewed

6    abstracts published in literature, as well as book chapters and

7    several texts.

8    **Q.**    Have you served on the editorial boards of any

9    professional journals?

10   **A.**    Yes.  Approximately 10 or more professional journals.

11   **Q.**    Does the ATSDR maintain a toxicological profile on various

12   toxic chemicals and on formaldehyde in particular?

13   **A.**    Yes.

14   **Q.**    When you were at the ATSDR, were your opinions about the

15   potential health effects of formaldehyde articulated in the

16   agency's toxicological profile on formaldehyde?

17   **A.**    The opinions proffered in the document represented a

18   result of a two-year effort to review the world's literature in

19   broad areas of exposure in toxicology and epidemiology.  It was

20   peer-reviewed independently and also open to public comment.

21   Those comments are all part of the public record, and formal

22   disposition of those comments is provided there.

23          My responsibility was to assume authority or

24   responsibility for the final sign-off on all of the

25   toxicological profiles since I became director in 1991.  It's a

DAILY COPY

1  delegated authority from the department to the administrator to
2  the assistant administrator, and then that was delegated to me.
3          So it was my responsibility to provide the final
4  approval of all the conclusions, both qualitatively and
5  quantitatively, presented in the documents generated by the
6  division of toxicology and environmental medicine.
7  **Q.**   When and how did you first become aware that FEMA was
8  providing travel trailers to citizens who had been displaced
9  from their homes as a result of hurricanes Katrina and Rita in
10  2005?
11  **A.**   I think it was shortly thereafter I became aware of the
12  news reports that that was being done.
13  **Q.**   And when and how did you first become aware of concerns
14  being expressed about the level of formaldehyde in those
15  trailers?
16  **A.**   My sense was that that would be in late 2005 or early
17  2006, but more than likely late 2005.  There were a reports in
18  the press regarding citizen complaints about the trailers.
19  **Q.**   What, if anything, was ATSDR asked to do in connection
20  with those concerns?
21  **A.**   I was in my office one afternoon late in the evening.  I
22  was contacted by a representative of FEMA to review a fact
23  sheet that they had developed that was predicated upon a
24  document that we had developed addressing the health issues
25  associated with formaldehyde and I, at his request, reviewed

1    and provided comment on that document.

2    **Q.**    Now, when you use the terms *long-term* and *short-term*

3    *exposure*, what do you have in mind in terms of duration of

4    time?

5    **A.**    Well, with respect to the agency's own programs, acute or

6    short-term exposure would be 1 to 14 days, longer-term

7    exposures would be from 15 days up to a year, and longer-term

8    exposures would be through lifetime.

9    **Q.**    What effects do you remember the fact sheet referring to?

10   **A.**    Irritation of the eyes, mucosa, nasal mucosa, throat.

11   **Q.**    Did you know at the time you were asked to look at this

12   fact sheet anything about the duration of occupancy or

13   residency for those FEMA trailers?

14   **A.**    My assumption there would be that it was a matter of

15   months at that point.

16   **Q.**    But even looked at as a trailer residency for a matter of

17   months, you felt that the fact sheet should refer to exposure

18   greater than short-term exposures?

19   **A.**    I did.

20   **Q.**    Why is that?

21   **A.**    There are a number of reasons:  One is that, as a matter

22   of federal government policy, there is no safe level of

23   exposure to a recognized carcinogen.  That's based on a

24   theoretical term, and it's a policy position.  It's not

25   necessarily a scientific position on my part, although I

DAILY COPY

1    understand the underlying reason for that and I accept the
2    premise of that.
3    **Q.**    And formaldehyde is a recognized carcinogen?
4    **A.**    It is.
5    **Q.**    What other reasons were there for you to believe there
6    should be reference to more than short-term exposure in the
7    fact sheet?
8    **A.**    Because formaldehyde is a recognized sensitizer, which
9    indicates that it may be associated with responses at
10   increasingly lower level of exposures over time.  Individuals
11   become sensitized to the effect and, upon subsequent exposures,
12   may be exhibiting symptoms at lower and lower levels.
13   **Q.**    Now, in addition to this contact you had with FEMA about
14   the fact sheet, did your division at ATSDR also become involved
15   in the evaluations of the possible levels of formaldehyde in
16   the FEMA trailers?
17   **A.**    They did.
18   **Q.**    Tell us how that began and what that consisted of.
19   **A.**    My understanding was that our staff were contacted by EPA.
20   I think it was Sam Coleman at EPA who requested that they be
21   involved with some ongoing discussions with FEMA regarding the
22   levels of formaldehyde in the trailers.
23   **Q.**    Did you understand that the discussions and evaluation in
24   those evaluative meetings after early June of '06 dealt with
25   data being collected in unoccupied travel trailers?

1   A.   Yes.

2   Q.   At the time you understood that, did you know that there

3   were citizens in travel trailers that had been issued by FEMA?

4   A.   I did.

5   Q.   What was your understanding as to why unoccupied travel

6   trailers were being at that point evaluated for formaldehyde

7   levels?

8          MR. MILLER:  Objection:  Foundation.

9          THE WITNESS:  Occupied trailers would obviously be

10  subject to a number of confounding factors that could not be

11  necessarily controlled for in terms of lifestyle, in terms of

12  how the trailers were being ventilated by the occupants, and

13  what they might be bringing into the trailers, so that looking

14  at unoccupied trailers was a way of perhaps getting around some

15  of those issues.

16  BY MR. WATTS:

17  Q.   Was it your recommendation to look at unoccupied trailers?

18  A.   No, it was not.

19  Q.   Do you know of any scientist within the ATSDR who made

20  that recommendation?

21  A.   No, not specifically.

22  Q.   And you're aware that there did come a time when CDC

23  conducted an analysis of occupied trailers; 519, in fact?

24  You're aware of that?

25  A.   Yes.

DAILY COPY

834

1    Q.    All right.  Let me make sure we understand your testimony.
2    You have talked about ongoing discussions to evaluate levels of
3    formaldehyde in unoccupied trailers; correct?
4    A.    Uh-huh.
5    Q.    Now, that was specifically with respect to data that was
6    being collected in 96 unoccupied units?  Is that your
7    recollection?
8    A.    Yes.
9    Q.    That analysis of that data of formaldehyde levels in 96
10   unoccupied units resulted in a February '07 health consultation
11   report?
12   A.    Yes, it did.
13   Q.    And that in the health consultation report itself, which
14   came out in February of '07, the discussion was limited to
15   short-term exposure?
16   A.    Yes, it was.
17   Q.    Again based on your experience about how health
18   consultation reports are used?
19   A.    My assumption of consultations such as this would be to
20   provide health-based information to a sister agency that
21   perhaps did not have a level of expertise in the area
22   commensurate with the need.
23   Q.    Give me an example of a sister agency that might utilize a
24   report like this.
25   A.    Well, typically, we would provide reports such as this to

1    EPA, to state agencies, health agencies, environmental

2    agencies, other agencies such as Department of Defense, NASA,

3    Department of Energy.

4    **Q.**   And, in fact, in October of '07, a revised health

5    consultation report did issue?

6    **A.**   Yes.

7    **Q.**   Eight months later?

8    **A.**   Yes.

9    **Q.**   Please refer to DeRosa 75, Bates-stamped 75, and that was

10   a letter requesting that CDC investigate the formaldehyde

11   issue.

12   **A.**   Yes.

13   **Q.**   Does the discussion in tab A state in the first full

14   paragraph that "The Department of Health and Human Resources

15   has determined that formaldehyde may reasonably be anticipated

16   to be a human carcinogen based on limited evidence in humans

17   and sufficient evidence in lab animals"?

18   **A.**   Yes, it does.

19   **Q.**   Sir, you reviewed this tab A attachment to the letter

20   after it was made an attachment to the letter?

21   **A.**   Yes.  Right.  Yes.  The only thing I had reviewed prior to

22   the letter being sent out was the letter itself.

23   **Q.**   Do you, based on your knowledge and experience, agree with

24   the statements about formaldehyde, specifically the

25   carcinogenic nature of formaldehyde, in that paragraph under

DAILY COPY

1    the caption "Background of Formaldehyde"?

2    **A.**    In part, yes, I do.  In part, I do not, because IARC is

3    not cited in terms of its most recent conclusions regarding

4    formaldehyde, because it is now classified as a known

5    carcinogen as opposed to probable.

6    **Q.**    *IARC* again stands for --

7    **A.**    The International Agency for Research on Carcinogens.

8    **Q.**    Is that a government agency?

9    **A.**    That is a subdivision in Lyons, France, of the World

10   Health Organization.

11   **Q.**    When did IARC classify formaldehyde as a known carcinogen?

12   **A.**    I believe the original draft came out in 2004, and it was

13   final in 2005.

14   **Q.**    Looking again at tab A, in the table given for Adverse

15   Health Effects of Intermediate Exposure to Formaldehyde, do you

16   see a listing of health effects from inhalation?

17   **A.**    Yes, I do.

18   **Q.**    Do you, based on your knowledge and experience, agree with

19   the content of that table?

20   **A.**    It is customary for me to review such information and, in

21   the context of the statements made regarding cancer above, that

22   there is by way of policy, as I mentioned earlier, no safe

23   level of exposure to a carcinogen irrespective of the time or

24   duration of exposure.

25            Based on insights regarding the mechanism of toxic

DAILY COPY

1   action of formaldehyde in the environmental health community,

2   it's quite conceivable that even a short-term exposure to

3   elevated levels of formaldehyde may result in a carcinogenic

4   effect.

5   **Q.**   My question right now, though, is:  Looking at tab A, do

6   you, based on your knowledge and experience as an environmental

7   health scientist with specific expertise as to formaldehyde,

8   take issue with the scientific accuracy of what is set forth in

9   tab A?

10  **A.**   The citation is from the National Research Council, 1981.

11  That would indicate to me that it's approximately 30 years out

12  of date.  I would, before relying on that document, refer to

13  more recent literature, which I believe will point to, would

14  point to, does point to some different exposure levels

15  associated with some of the effects noted.

16  **Q.**   Look at the paragraph after the table.  It states:

17  "Inhalation exposure of months to one year or longer is

18  expected to increase the incidence of symptoms of upper

19  respiratory tract and eye irritation," and there's a reference

20  to ATSDR 1999.  Do you see that?

21  **A.**   I'm --

22  **Q.**   It's the sentence that follows the box.

23  **A.**   Oh, yes, I see it.  Yes.

24  **Q.**   First, do you agree with the statement; and, second, can

25  you tell us what the ATSDR reference there is.

1  **A.**   I agree with that statement, and the reference is the
2  agency's toxicology profile released in 1999.
3  **Q.**   What are the ATSDR health guidance values for short-term,
4  intermediate, and long-term exposure to formaldehyde?
5  **A.**   For long-term exposure, it's .008 parts per million; for
6  intermediate exposure, it's .03 parts per million; and for
7  acute exposure, it's .04 parts per million.
8  **Q.**   And again define *long*, *intermediate*, and *short-term* as
9  used by those references.
10  **A.**   1 to 14 days in a case of short-term or acute; longer-term
11  or intermediate is greater than 14 days and up to 365 days; and
12  longer-term is 365 days and beyond.
13  **Q.**   In the analysis of the 96 unoccupied units that was
14  performed, I think you said, under the direction of Little and
15  Wright --
16  **A.**   Yes.
17  **Q.**   -- what was the reference value, ppm value used?
18  **A.**   My recollection is it was .3 parts per million.
19  **Q.**   So not .04 for short-term, not .03 for intermediate, not
20  .008230 long-term, but .3 ppm was used for that study?
21  **A.**   For that evaluation, .3 parts per million was used.  It
22  was a value derived from a series of documents called "Managing
23  Hazardous Materials Incidents" intended for first responders
24  and health-care providers in emergency events.  It's a level at
25  which sensitized individuals would begin to exhibit symptoms

1    upon entry and up to three hours after entry into the trailer.

2    Q.    All right.  We were talking about the use of .3 ppm by

3    Little in the analysis of the EPA data from the 96 unoccupied

4    trailers.  And you know that, according to Mr. Little, he

5    picked that because it was the lowest actual effect level that

6    he could find in the toxicological literature.  Are you aware

7    of that?

8    A.    That's what he indicated in his testimony.

9    Q.    Do you agree with him that .3 ppm is the lowest actual

10   effect level found in the toxicological literature?

11   A.    No, I don't.

12   Q.    Why not?

13   A.    Because there's extensive documentation about effects

14   occurring below that level, including the underlying effect

15   levels associated with some of the health guidance values that

16   I have mentioned to you earlier.

17   Q.    Do you agree that the potential or known real effects of

18   exposure to formaldehyde have got nothing to do with the MRLs

19   established by the ATSDR?

20   A.    I don't agree with that, no.

21   Q.    Why not?

22   A.    Because the uncertainty factors that are applied are based

23   on effect levels.  And the uncertainty factors are determined

24   based on a long-standing protocol of dividing by 10 dating back

25   to the mid '50s, when first invoked by FDA.  It's not based on

1    the fact that we have 10 digits; it's based on the fact that

2    most biological phenomena are logarithmically distributed.

3            So dividing by 10, you encompass 95 percent of the

4    variability of a given parameter.  And in the case of

5    uncertainty factors, there are four such values used typically:

6    One is to extrapolate from an adverse effect level to an effect

7    level that's considered not to be -- or considered not to be

8    adverse in terms of its health effect; one is for extrapolating

9    from a subchronic exposure to a chronic exposure; and there is

10   the one that's used to extrapolate from animals to humans at a

11   factor of 10 on the presumption that humans are the most

12   sensitive; and then another factor of 10 based on

13   interindividual human variability.

14           So that's where I came to the point where they can

15   range, typically, from 10 on up to 1,000.  Typically, if we

16   have a value of 10,000, we would not use that study if we felt

17   that that much of it -- that large an uncertainty factor were

18   needed.

19           But, again, these are predicated upon the premise

20   that you're accounting for known differences in sensitivity

21   based either on the duration, species of exposure, type of

22   effect, and interindividual human variability.

23   Q.   Mr. Little has explained that he didn't use the ATSDR

24   chronic MRL as a reference in his analysis of the EPA data

25   because he understood that MRL to be based on average exposure

1    time of about 10 years.

2    **A.**    Yes.  That was an exposure study.  The workers were

3    exposed on average of 10.8 years.

4    **Q.**    So do you agree with Mr. Little that the chronic exposure

5    reference in the MRLs is inapplicable in a case such as this

6    for analysis of the formaldehyde levels in these trailers?

7    **A.**    No, I don't.

8    **Q.**    Well, why not?  I mean, no one has lived in the trailers

9    for 10 years.  Why isn't Little correct about that?

10   **A.**    Because it's tied to the concept of physiologic time.  A

11   lifetime study in rodents is considered to be two years,

12   possibly longer, depending on the protocol that is being used.

13   The lifetime exposure in humans is typically considered to be

14   70 years.  But, generally speaking, a two-year study in rodents

15   or other bioassays would be considered to be consistent with a

16   70-year life expectancy.

17           Again, there are a lot of assumptions and issues of

18   science that are tied up in that, but it's the issue of

19   physiologic time and the fact that a 10-year exposure involving

20   workers, a 2-year exposure, or a 1-year exposure or more would

21   be considered to be adequate for the purposes of a risk

22   assessment.

23   **Q.**    And a year or more exposure is considered chronic in

24   reference to the MRL levels?

25   **A.**    That's correct.

1  **Q.**   Mr. Little, in sworn testimony in reference to his

2  analysis of this EPA data, has testified that, in terms of the

3  cancer risk associated with formaldehyde exposure, it involves

4  "many, many years of exposure" -- and specifically 10, 20

5  years -- and for that reason he did not consider it applicable

6  here because people had not lived in these trailers that long.

7  What is your response to that?

8  **A.**   I think Mr. Little is confusing the latency period for

9  most cancers with the time required for exposure to elicit a

10  carcinogenic response.  With the exception of leukemias, a

11  latency period of 10 to 20 years is not unheard of and is

12  typical, in fact.

13          However, again, the prevailing policy of the

14  federal -- science policy of the federal government is that

15  there is no safe level of exposure to a carcinogen irrespective

16  of the duration of exposure.  This is based on the premise of a

17  study done with ionizing radiation in the late '70s and early

18  '80s where they exposed large numbers of rodents to doses of

19  radiation and were unable to find a dose at which a

20  carcinogenic response was not elicited.  It's called the

21  mega-mouse study for those who are interested.

22          But, at any rate, that has formed the backbone of

23  science policy within the U.S. federal government since that

24  time, and it's the premise of all cancer risk assessments done

25  by the federal government.

DAILY COPY

843

1   **Q.**   Were you aware back in June or July what FEMA was asking
2   CDC and ATSDR and EPA to do?
3   **A.**   I was, just as it says, aware that they were interested in
4   doing some sampling.
5   **Q.**   Were you aware of what type of sampling, how many units
6   they were trying to sample?
7   **A.**   No.
8   **Q.**   Do you know whether FEMA was asking for occupied or
9   unoccupied units to be sampled?
10  **A.**   It says here that it's unclear as to what they were going
11  to do.
12  **Q.**   And you were aware that the ATSDR ER -- that would be Joe
13  Little and Scott Wright -- had an opportunity to review the EPA
14  sampling plan?
15  **A.**   Yes.  That would be standard practice.  That is done in
16  many of these types of situations in consultation with EPA.
17  They generally would have the lead, and we would be involved at
18  their request.
19          So apparently there was an agreement by ATSDR and EPA
20  to go forward with the sampling, and it may be that they agreed
21  to do so based on the fact that it's now clear that they are
22  doing sampling on unoccupied trailers.
23          So there seems to be a bit of a flip-flop back and
24  forth between the two paragraphs because they are talking about
25  due to the large number of other formaldehyde sources in other

DAILY COPY

1  products in the home and individual lifestyle, but then they go

2  on in the next paragraph to say that they are looking at

3  unoccupied trailers.

4  **Q.**   Now, sir, what has been marked Exhibit 16 is an e-mail

5  from Rich Nicholls dated February 2, 2007, and you are cc'd on

6  this; correct?

7  **A.**   Yes, I am.

8  **Q.**   If you go to the second page there, it says, "On 2/1,

9  ERT" -- what does "ERT" stand for?

10  **A.**   Emergency response team.

11  **Q.**   "Emergency response team finalized the formaldehyde health

12  consultation for the Federal Emergency Management Agency

13  (FEMA).  This consultation discusses the evaluation of EPA data

14  generated from sampling of FEMA manufactured homes during the

15  time period of September 19 through October 7, 2006.  A total

16  of 96 new, never-occupied homes were tested at a location in

17  the Greater New Orleans/Baton Rouge area.

18         "In summary, the opening of windows and vents was

19  effective in reducing formaldehyde concentrations below levels

20  of health concern.  Running the heating, ventilation, and

21  air-conditioning systems did not provide adequate air exchanges

22  to adequately reduce the formaldehyde concentration."

23         And this was sent to you on February 2, 2007;

24  correct?

25  **A.**   That's correct.

1   **Q.**   Were you aware that on May 3, 2007, FEMA submitted to

2   ATSDR/CDC a news release that they were going to issue relating

3   to formaldehyde in trailers?

4   **A.**   Not to my knowledge.

5   **Q.**   So you were not aware that FEMA requested ATSDR to review

6   the following statement:

7           "According to the Department of Health & Human

8   Services, Agency for Toxic Substances and Disease Registry

9   (ATSDR), the average concentration of formaldehyde per day in

10  the units using open-window ventilation dropped below 0.3 ppm

11  after four days of ventilation and remained low for the rest of

12  the test period.  Average per-day levels in the test group of

13  trailers using air-conditioning only, with one open static vent

14  in the bathroom, remained above 0.3 ppm for all but two days of

15  the test period.  The level for health concerns for sensitive

16  individuals was referenced by ATSDR at 0.3 ppm and above."

17          Were you aware that FEMA passed that by CDC/ATSDR in

18  May of 2007?

19  **A.**   No.

20  **Q.**   Sir, this is a document that -- a paper that I think was

21  written by John Risher and yourself.

22  **A.**   Yes.

23  **Q.**   This article is entitled:  "Precision Uses and Limitations

24  of Public Health Guidance Values."

25  **A.**   Uh-huh.

DAILY COPY

1   **Q.**   Is that right?

2   **A.**   Yes.

3   **Q.**   And "public health guidance values," that refers to MRLs,

4   minimum risk levels; right?

5   **A.**   It includes those, yes.

6   **Q.**   What are RFDs?

7   **A.**   That's EPA's analogous value to a minimal risk level.

8   It's a reference dose.

9   **Q.**   MRLs, what is that?

10  **A.**   That's minimal risk levels.

11  **Q.**   And ADIs?

12  **A.**   ADIs are acceptable daily intakes, who were originally

13  coined by FDA and subsequently used by EPA but then changed to

14  *reference doses* as opposed to *ADIs* for reasons that are

15  probably not worth talking about.

16          But they are all, you know, derived in the same

17  fashion by the identification with toxicity thresholds such as

18  a no observed adverse effect level or a low adverse effect

19  level, divided by an uncertainty factor, which is inversely

20  proportional to our confidence in the database:  The higher the

21  confidence, the lower the uncertainty factor.

22  **Q.**   Let me read what you wrote here:

23          "Too often, however, RFDs, RFCs, MRLs, and ADIs are

24  construed as rigid threshold limits above which toxicity is

25  likely to occur.  The truth, however, is that these values

DAILY COPY

1    actually represent levels of a potential toxicant that are

2    highly unlikely to represent any threat to human health over a

3    particular/specified duration of daily exposures.  The more

4    frequently these levels are exceeded and the greater the

5    exceedance, the more likely some toxic manifestation is to

6    occur.

7            "These guidance/reference values are most definitely

8    not threshold values for the onset of toxicity in any exposed

9    population.  Health guidance values must be thought of in the

10   context of their intended role as mere screening or trigger

11   values in which they serve as a tool for assisting in the

12   determination of whether further evaluation of a given

13   potential exposure scenario is warranted"

14           That's what you wrote; is that correct?

15   **A.**   Yes, that's what we wrote.  And I would point out, too,

16   that that probably should be stated at the time those values

17   were derived based on available information.

18   **Q.**   If you go to the next page of your paper and you go about

19   three-quarters of the way down, it starts:  "These MRLs . . ."

20   It's the third full paragraph, about halfway through it.

21   **A.**   Yes.

22   **Q.**   You wrote there:  "These MRLs" -- and that's referring to

23   the minimal risk levels, when you were talking today, the

24   health guidance values that the ATSDR issues; is that right?

25   **A.**   Yes.

1  Q.    "These MRLs are intended to be used by public health

2  officials trained in health risk assessment and only to

3  identify substances of concern at hazardous waste or other

4  sites of environmental contamination.  Despite their occasional

5  misunderstanding and consequent misuse by well-meaning risk

6  assessors who view them as a panacea of health risk

7  determination, these values provide a scientifically sound

8  basis for decisions in an environmental health risk assessment

9  process."

10  A.    That's correct.

11  Q.    They are not a cause/effect, are they?

12  A.    There's no implication that they are a cause or an effect.

13  Q.    If we go to one of those sections at page 5 of the report,

14  118, Bates-labeled paragraph 2, in the middle of the paragraph,

15  it says:  "Many products used every day around the house also

16  contain formaldehyde."  Is that accurate?

17  A.    Yes, it is.

18  Q.    Such as fingernail polish; is that accurate?

19  A.    Yes, it is.

20  Q.    Fingernail hardeners?

21  A.    Yes.

22  Q.    Antiseptics; is that accurate?

23  A.    Yes.

24  Q.    Medicines?

25  A.    These are all clearly stated points, and that's quite

1  true.

2  **Q.**    Cosmetics?

3  **A.**    That's also true.

4  **Q.**    Dish-washing liquids?

5  **A.**    All these things are, in some instances, true.

6  **Q.**    Do cigarettes off-gas formaldehyde?

7  **A.**    Yes, they do.

8  **Q.**    Tobacco?  Other tobacco products?

9  **A.**    When combusted, yeah.

10 **Q.**    Formaldehyde is a simple carbon, a one-molecule carbon?

11 **A.**    Its chemical formula is HCHO.

12 **Q.**    One carbon?

13 **A.**    One carbon.

14 **Q.**    There is a fair amount of formaldehyde in me right now;

15 yes?

16 **A.**    It has a relatively short half-life in the body.  It is a

17 by-product of metabolism in very small amounts.

18 **Q.**    Would you agree with the statement that it occurs

19 naturally in the blood?

20 **A.**    Yes.

21 **Q.**    "The incomplete combustion of hydrocarbon fuels can

22 contribute to the level of formaldehyde in outdoor air."  Do

23 you agree with that statement?

24 **A.**    Fuels.  There's a difference between a hydrocarbon and a

25 hydrocarbon-based fuel.

DAILY COPY

1   **Q.**   Fair enough.  Do you agree with the statement --

2   **A.**   Yes, I do.

3   **Q.**   -- in the 2007 report?

4   **A.**   Yes.

5   **Q.**   "Urban air concentrations during heavy traffic or severe

6   inversions can range up to 0.8 ppm"?

7   **A.**   Yes.  And that's the analogy I just made in terms of a hot

8   day in Atlanta along I-75.

9   **Q.**   80 parts per billion?  .08 ppm is 80 parts per billion?

10  **A.**   That would be 80 parts per billion.

11  **Q.**   Next page, top of the first paragraph.  Halfway through

12  the paragraph, it starts with:  "Conventional Homes . . ."

13          "Conventional Homes overall had a concentration of

14  formaldehyde ranging from less than .02 to .4 ppm."

15  **A.**   Yeah.  That's a very dated reference.

16  **Q.**   It's the Hawthorne paper of 1985; correct?

17  **A.**   Right.

18  **Q.**   The one you liked.

19          "Since the mid 1980s, plywood and particle board

20  manufacturing methods have changed to reduce formaldehyde

21  emissions."  Is that accurate?

22  **A.**   That's accurate.

23  **Q.**   Next sentence:  "Home construction methods have also

24  changed to reduce the use of UFFI."  Is that accurate?

25  **A.**   What's the acronym *UFFI*?

851

1   **Q.**   Urea formaldehyde foam insulation.

2          Is that accurate, or do you know?

3   **A.**   Yes, that's accurate.

4   **Q.**   Urban background from .0008 to .068 ppm; is that correct?

5   **A.**   Yes.

6   **Q.**   I appreciate it.  Buildings in which smoking is not

7   permitted, as you said, the range was from nondetect to as high

8   as .22 parts per million?

9   **A.**   Yes.

10  **Q.**   220 parts per billion?

11  **A.**   I think we have established that, yes.

12  **Q.**   Buildings in which smoking is permitted, from nondetect to

13  .6 ppm?

14  **A.**   That's correct.

15  **Q.**   Or 600 parts per billion?

16  **A.**   That also would be correct.

17  **Q.**   It's a lot higher; agreed?

18  **A.**   It's higher.

19  **Q.**   The intermediate MRL is .03.  .6 is a lot higher than .03;

20  correct?

21  **A.**   It's higher.

22  **Q.**   Would you have concerns if it was above .008 parts per

23  billion -- parts per million?

24  **A.**   In an office setting?

25  **Q.**   Office setting, eight hours a day, over 65.

DAILY COPY

1   **A.**   Okay.

2   **Q.**   No breaks.

3   **A.**   The MRL is intended for lifetime of exposure, 24 hours a

4   day, 7 days a week.  It's different than an occupational

5   exposure.  And you're asking me to compare apples and oranges,

6   and that is inappropriate.

7   **Q.**   I appreciate you giving me the information because you

8   just told me stuff I didn't understand.

9   **A.**   That's okay.  That's fine.  I'm happy to.

10  **Q.**   When we say "24/7," we are talking about 24 hours a day, 7

11  days a week, 52 weeks a year; correct?

12  **A.**   Yes.

13  **Q.**   If we can flip to the next page, here we have the ATSDR

14  MRLs; correct?

15  **A.**   Yes, that's correct.

16  **Q.**   And let's start with the first one.  Chronic is .008 ppm?

17  **A.**   Uh-huh.

18  **Q.**   Yes?

19  **A.**   Yes, that's correct.

20  **Q.**   And it says:  "The chronic inhalation MRL was derived from

21  a human study."

22  **A.**   Yes.

23  **Q.**   "After 7.3 years exposure" --

24  **A.**   Yes.

25  **Q.**   -- "the lowest observable adverse effect level (LOAEL) was

1   .24 ppm."  Correct?

2   **A.**   That's what it says, yes.

3   **Q.**   Which caused lesions in nasal mucosa; correct?

4   **A.**   Yes.

5   **Q.**   Then it says:  "Divided by a safety factor of 30 yielded

6   the MRL of .008."  Correct?

7   **A.**   Yes.

8   **Q.**   The next one is the intermediate level, .03.

9   **A.**   Uh-huh.

10  **Q.**   "Intermediate inhalation MRL was derived from a monkey

11  study.  After exposure for 26 weeks, 7 days per week, 22 hours

12  per day, the no observable adverse effect level (NOAEL) was .98

13  ppm."  Correct?

14  **A.**   Yes.

15  **Q.**   "Divided by a safety factor of 30 yielded an MRL of .03"?

16  **A.**   Right.

17  **Q.**   "The acute MRL of .04, the acute inhalation MRL was

18  derived from a human study.  After a two-hour exposure,

19  LOAEL" -- again, lowest observable adverse effect level -- "was

20  .4 ppm, which caused increased white blood cells in nasal" --

21  **A.**   -- "lavage" --

22  **Q.**   -- "fluid, accompanied by increased itching, sneezing, and

23  congestion.  Dividing by a safety factor of 9 yielded the MRL

24  of .04."

25  **A.**   Yes.

1   **Q.**   As we look at those three MRLs, the lowest observable

2   effect was found to be .24; correct?

3   **A.**   Yes.  Let's see.  Let me just check that.

4            Yes, that's correct.

5   **Q.**   Did I understand you correctly that, for some people, they

6   are susceptible of injury even below the MRL?

7   **A.**   It's quite conceivable that they could be, yes.

8            The MRL is defined and the RFD similarly is defined

9   as an estimate that may span an order of magnitude.  That means

10  it could go either direction.  So .008 could be .00008 or it

11  could be .08 if it spans an order of magnitude.

12  **Q.**   Because there are some people that might be injured at

13  .0008?  Yes?

14  **A.**   .008 ppm may be an issue for some individuals.  And it may

15  be that our estimate could be off either way by an order of

16  magnitude, that the variability with some of these estimates

17  may span an order of magnitude.  That's an acknowledgment of

18  the uncertainty in the scientific database.

19           These are sometimes construed as artificially precise

20  numbers.  And that's why talking about whether or not you have

21  a concern about this level or that level will cause me to

22  hesitate because I know the inherent plasticity of the database

23  and the assessments that will be done at different points in

24  time by different individuals looking at different scenarios.

25  **Q.**   When you address the concept of formaldehyde exposure, you

1  do not talk about cumulative dose, do you?

2  **A.**  No, you don't.

3  **Q.**  And why is that?

4  **A.**  Because it's readily -- as I mentioned earlier, its

5  half-life in the body is about one-and-a-half minutes.

6  **Q.**  Correct.  It's not a bioaccumulant; is that correct?

7  **A.**  That's correct.

8  **Q.**  All right.  And you are familiar with studies of

9  individuals who have been challenged with levels of

10  formaldehyde as high as 3 parts per million, and then their

11  blood levels are studied shortly thereafter and there's been no

12  elevation of formaldehyde in the bloodstream; is that correct?

13  **A.**  There may be a transient elevation.  It depends on how

14  long after the exposure the analysis was done.  But within

15  one-and-a-half minutes, half of it is going to be gone.

16          And the point being that the damage induced by

17  formaldehyde is not based on its residency time in the body but

18  upon its intense reactivity with biologic tissues, which result

19  in DNA damage and, therefore, an accumulation of hits over

20  time, irrespective of the level of exposure.

21  **Q.**  I was just asking you if you were familiar with studies

22  that showed that exposure to gaseous formaldehyde insofar as

23  any sort of DNA cross-link exposure is concerned and any damage

24  caused -- or, quote, damage -- whether or not that is not

25  repaired within a matter of hours.

856

1   **A.**    In some cases, it may be; in others, it may not be.  The

2   repair mechanisms within the body induced by -- lesions induced

3   by formaldehyde will vary from one individual to another.  And

4   the degree to which the exposure is continuous, versus an

5   episodic exposure, will also have an effect.

6   **Q.**    Are you aware of any exposures that show any DNA

7   cross-link damage as a result of exposure to gaseous

8   formaldehyde below levels of exposure of .2 ppm?

9   **A.**    I believe the Thrasher and Kilburn article cites several

10  studies, but I would have to check.

11  **Q.**    But insofar as being a -- the general category of *known* as

12  opposed to *probable* or *likely*, or whatever the adverb might be

13  that precedes the word *carcinogen*, the only agency that has

14  come out and declared formaldehyde a carcinogen is IARC; is

15  that correct?

16  **A.**    The only agency that has come out and called it a *known*

17  *human carcinogen* is IARC.

18  **Q.**    With respect to the classification of formaldehyde insofar

19  as nasopharyngeal cancer is concerned, that IARC report is

20  predicated primarily on what paper?  Do you know?

21  **A.**    There were a number of studies.  The occupational studies

22  that were conducted.

23  **Q.**    The NCI occupational study authored primarily in 2003 by

24  Hauptmann; correct?

25  **A.**    I believe that's correct, yes.

DAILY COPY

1  **Q.**    Have you read that paper?

2  **A.**    I believe I have.

3  **Q.**    Do you know the threshold where there was an excess of the

4  standard -- for the standard mortality ratio, an excess of

5  deaths upon which the Hauptmann report concludes that it is a

6  human carcinogen?

7  **A.**    I believe there was a high-exposure group versus a

8  low-exposure group in the cohorts that were studied.  I do not

9  recall what the exposure ranges were in that study.

10  **Q.**    Would it surprise you to know that that exposure range was

11  in excess of 4 parts per million?

12  **A.**    No.  It's typically the case that, because of difficulty

13  in identifying toxic effects in chemicals, high-dose levels are

14  used.  It's a maximum tolerated dose.  It's a longstanding

15  protocol based on the national toxicology bioassay program and

16  also on the bioassay program of the Ramazzini Institute in

17  Italy that you scale back from the maximum tolerated dose on a

18  logarithmic basis so that you have a dose stand that is more

19  likely to illustrate the shape of the dose-response function.

20  **Q.**    Do you remember what the arithmetic mean of exposure

21  within the travel trailers and manufactured houses was in the

22  July 2008 CDC report of the 519 trailers?

23  **A.**    I believe it was on the order of 150 -- well, I'm not

24  going to speculate.  I'm sorry.

25  **Q.**    If it were 0.078 ppm, would that be far below 4 parts per

1  million?

2  **A.**   Yes.

3  **Q.**   Are you aware of any study of formaldehyde in exposure of

4  the elderly that shows that with respect to the airborne

5  formaldehyde that elderly are more susceptible to gaseous

6  concentrations of formaldehyde?

7  **A.**   I don't have a specific reference, if that's what you're

8  asking for, but -- I don't have that specific reference.

9  **Q.**   You were asked a question a moment ago about certain types

10  of techniques that might be used to reduce formaldehyde levels

11  in the trailer.  One such method was to open the windows and

12  perhaps vents.  You said that was somewhat effective.

13         Do you recall whether the level was reduced below the

14  ATSDR minimum risk level for chronic exposures, the level of

15  .008 ppm?

16  **A.**   No.  As I recall, the levels were reduced to between .1

17  and .2 parts per million.

18  **Q.**   So that would be above the minimum risk level for chronic

19  exposures to formaldehyde?

20  **A.**   Yes.  But I'm a pretty quick study when I have been

21  through these chemicals, and I have been through a range of

22  these chemicals, on behalf of the Office of Science and

23  Technology in the White House, ranging from mercury, PCBs to

24  dioxin, and have worked on behalf of the National Research

25  Council and the National Academy of Sciences on a number of

859

1    different chemicals.  So I have quickly come up-to-speed on the

2    chemical at hand, at issue.

3              It's the overall guiding principles of the science

4    rather than the quantitation, rather than the specific

5    parameters of a given study.  It's based on what one takes from

6    the body of knowledge over time that is important.

7    **Q.**    You just mentioned the NTP.  Is that the National

8    Toxicology Program?

9    **A.**    Yes.

10   **Q.**    Did the National Toxicology Program make a determination

11   with respect to the carcinogenic classification of

12   formaldehyde?

13   **A.**    Yes, it did.

14   **Q.**    What was the classification?

15   **A.**    The classification was actually done by the NTP executive

16   committee.  It's chaired by the National Toxicology Program.

17   The executive committee is comprised of representatives from

18   agencies such as ATSDR.  I was a representative, until about a

19   year or two ago, since about 1993.

20             And, you know, there is a very rigorous review

21   process.  There are a number of different subject matter

22   working groups that then forward their recommendations on up to

23   the executive committee, and then it's for us to determine

24   whether we agree with a recommended classification.

25             In the case of formaldehyde, it's currently listed as

1   reasonably anticipated to be a human carcinogen in the tenth

2   report on carcinogens that was released several years ago.  And

3   my sense is that while one cannot predict that the lead of IARC

4   will be followed, in the case of EPA and the department, as it

5   reevaluates formaldehyde because of the growing body of

6   information, particularly in light of the recently released NCI

7   bioassay which was specifically designed to address some of the

8   limitations of the Hauptmann study that was cited earlier and

9   which is now coming back to me as I get closer to this -- but

10  the limitations of that study were taken into account that

11  there was one particular cohort of workers that really skewed

12  the 2003 report.  That was not the case in the most recent

13  evaluation.  It wasn't just one group of workers that showed

14  somewhat skewed or high incidences of nasopharyngeal cancer.

15          So, again, the point is that we have become more

16  refined and more focused in terms of the types of issues that

17  are addressed in these studies as the limitations are brought

18  to bear and brought to light, and that's -- the strength of the

19  scientific method is it's self-correcting by virtue of repeated

20  testing.

21          **MR. WATTS:**  That concludes that offer, Your Honor.

22  Your Honor, our last witness is Earline Castanel.

23          (WHEREUPON **Earline Castanel**, having been duly sworn,

24  testified as follows.)

25          **THE DEPUTY CLERK:**  Please state your full name and

861

1    correct spelling for the record.

2          **THE WITNESS:**  My name is Earline Castanel:

3    E-A-R-L-I-N-E, C-A-S-T-A-N-E-L.

4                    **DIRECT EXAMINATION**

5    **BY MR. WATTS:**

6    **Q.**   Earline, could you grab that mic and pull it closer to

7    you.

8    **A**    Like that.

9    **Q**    Try to talk into that mic so everybody can hear you.

10   Okay?

11   **A.**   Hello.

12   **Q.**   There you go.  Ms. Castanel, I don't mean to embarrass

13   you, but how old a woman are you?

14   **A.**   79.

15   **Q.**   All right.  When will you turn 80?

16   **A.**   Huh?

17   **Q.**   When do you turn 80?

18   **A.**   August 10.

19   **Q.**   Born and raised here in the South?

20   **A.**   Yes.

21   **Q.**   Have you lived in the same house pretty much all your

22   life?

23   **A.**   Yes.

24   **Q.**   For the record, what was the address of that house that

25   you lived in before it got flooded in Katrina?

1  **A.**    2925 St. Peter Street.

2  **Q.**    I want to visit with you just a little bit about Katrina

3  but not much.  Was your house flooded as a result of what

4  happened down here?

5  **A.**    Yes.

6  **Q.**    After your house was flooded, where were you evacuated?

7  **A.**    To Texas.

8  **Q.**    How long were you in Texas?

9  **A.**    I don't know exactly how long, but I know it was a while.

10 **Q.**    Did you miss your home?

11 **A.**    Yeah.

12 **Q.**    Did you want to come back?

13 **A.**    Yeah.

14 **Q.**    Because you wanted to come back home, did you make an

15 application for a temporary housing unit with FEMA?

16 **A.**    Yes.

17 **Q.**    Was there a time that they notified you that one was

18 available for you?

19 **A.**    Yes.

20 **Q.**    Did you come back to New Orleans as they were working on

21 the repairs to your home?

22 **A.**    Yes.

23          **MR. WATTS:**  Your Honor, may I approach?

24          **THE COURT:**  Yes.

25

DAILY COPY

863

BY MR. WATTS:

Q.    Ms. Castanel, Plaintiff's Exhibit 403 is what's known as a plaintiff fact sheet, and it goes on for 18 pages.  Do you see that?

A.    Uh-huh.

Q.    You signed it at the end; is that right?

A.    Yes.

Q.    You have to talk loud.

A.    Yes.

Q.    Okay.  Now, I want to ask you some questions about that.

        MR. WATTS:  Your Honor, I have conferred with counsel.  We have agreed that 403 and 405 would be admitted in evidence.

        MR. GARRISON:  That's correct.

        THE COURT:  So ordered.

        MR. WATTS:  Can you put 403 up on the screen just so we can take the jury through this.

BY MR. WATTS:

Q     Now, this is kind of a legal document that everybody got together and, I think, negotiated and the Court blessed it, for history, and then a plaintiff like you had to fill it out.  Did you know that?

A.    Yes.

Q.    In terms of this lawsuit, if you would go to page 3, please.

1        **MR. WATTS:**  Highlight Section B there at the top of
2  the page.  There you go.
3  BY MR. WATTS:
4  Q    One of the things is you had to state the name and the
5  address of the attorney representing you, and there's a Jerry
6  Meunier with the Gainsburgh, Benjamin, David, Meunier &
7  Warshauer firm here in New Orleans.  Do you see that, ma'am?
8  A.    Yes.
9  Q.    Now, did you type this up yourself?
10  A.    No.
11  Q.    How did it happen?  I know you travel with your daughters
12  a lot.  Do they help you with things like this?
13  A.    Well, we was riding and I seen a sign on Canal Street.
14  And I just stopped and went up in there, and I told them I
15  needed a place to stay and find out about the trailer.
16  Q.    Well, I think we are getting confused with where we are.
17  Let me go back.
18        Back in 2006, you told people you wanted to get a
19  trailer; is that right?
20  A.    Yes.
21  Q.    And I think the records in this case reflect you moved in
22  sometime in March of 2006.  Does that sound about right?
23  A.    Yeah, about right.
24  Q.    And that you moved out in August of 2007.  We have records
25  on all this.  Do you remember all those dates specifically?

1   A.   I don't remember those dates exactly.

2   Q.   Would you agree you were in the trailer well over a year?

3   A.   Huh?

4   Q.   Were you in the trailer well over a year?

5   A.   Oh, yeah.

6   Q.   Okay.  Now, I'm looking at this plaintiff fact sheet.  If

7   we can look down at the bottom section, please.  In this

8   plaintiff fact sheet, it says:

9        "During the time that you lived in your FEMA trailer,

10  did you experience or report to a physician any of the

11  following symptoms?  If yes, place a checkmark by the symptom

12  that you experienced."

13       Do you see all those symptoms that are X'd?

14  A.   Yes.

15  Q.   "Irritation to the eyes."  Did you experience irritation

16  to the eyes while you were in the trailer?

17  A.   Well, I didn't really have anything with my eyes then.

18  Q.   At the start?

19  A.   At the start.

20  Q.   When did you have problems with your eyes?

21  A.   Well, everything started around -- about the second or the

22  third week that I was in the trailer.

23  Q    All right.

24  A    I started having problems mostly with my sinus.

25  Q    Okay.

1   **A**    I always had sinus, but that's when it got worse.

2   **Q.**   Now, we've got some weather records I'll talk to some

3   other guys about, but as you went into the trailer in the

4   spring and you got closer to the summer, did it got hotter?

5   **A.**   Yep.

6   **Q.**   As it got hotter, did your problems get more significant?

7   **A.**   Yes.  I couldn't breathe hardly.

8   **Q.**   When you first moved into the trailer -- you've heard some

9   of these witnesses -- did you have that new smell that they

10  were describing?

11  **A.**   Well, when I first walked in, I didn't smell anything; but

12  the second time I went in there, it smelled like something new,

13  like, you know, new furniture or a new car.

14  **Q.**   You didn't know what it was, though?

15  **A.**   No, I didn't know what it was.

16  **Q.**   You mentioned you started having some problems with your

17  eyes a couple weeks in?

18          **MR. GARRISON:**  Objection, Your Honor.  I was trying

19  to give him leeway.  He's really leading.

20          **THE COURT:**  He is recounting something she already

21  said, but there has been a little bit of leading.

22          **MR. WATTS:**  I agree, and let me try again.

23  BY MR. WATTS:

24  **Q.**   You already told us that, a couple of weeks in, you

25  started having problems with your eyes.  Describe that for us.

1   What were the problems?

2   **A.**   Well, my eye would get, like, teary and my nose was

3   getting stopped up more and more.  I was scared to go to sleep

4   at night because I would be so stopped up.  I couldn't hardly

5   breathe.

6   **Q.**   All right.  Now, on your plaintiff fact sheet, it says:

7   "Tearing of the eyes."  Did you have that?

8   **A.**   I guess that's what you would call it.

9   **Q.**   "Irritation to the nasal membranes inside the nose."

10  Where were you getting stopped up?

11  **A.**   All up in here, up in here (INDICATING).

12  **Q.**   It says:  "Irritation or itching of the skin."  Tell us

13  what problems you had with your skin.

14  **A.**   Well, my arm, I had, like, little lumps on it, like, you

15  know, some kind of mark.  And after that, the skin would fall

16  off, and it would leave like a little light-color mark.

17  **Q.**   You checked:  "Rashes on skin."  Is that what you were

18  describing those marks?

19  **A.**   I wouldn't know what you would call it, but it was there.

20  It was, like, a little blister.  And then after that, it would

21  dry up and it would just come, you know --

22  **Q.**   So the skin would dry up and then fall off?

23  **A.**   Yeah.

24  **Q.**   You have already described this irritation or swelling of

25  your eyelids.  That's what you were describing before; right?

1  **A.**    Yeah, my eyes.  It wasn't my eyelash.

2  **Q.**    Did you have headaches?

3  **A.**    Yeah, I had headaches.

4  **Q.**    Were the headaches worse when it was hot?

5  **A.**    Well, when it was getting hot in that trailer, that's when

6  I was really getting stopped up.

7  **Q**    Okay.

8  **A**    And, you know, all up in here (INDICATING) was hurting me.

9  **Q.**    You checked:  "Nausea."  Explain that for the jury.

10  **A.**    Well, I didn't really feel real nauseated, but I didn't

11  feel good, I know that.  I didn't feel good.

12  **Q.**    Describe the feeling.  When you say you were just feeling

13  not so good, what do you mean?

14  **A.**    I just felt bad.  And then after, I would get so stopped

15  up, look like I just couldn't catch my breath.

16  **Q.**    Is that what made you -- the difficulty in breathing and

17  shortness of breath, was that --

18  **A**    Yeah.

19  **Q**    -- what you are describing for us?

20  **A.**    Yes.

21          **THE COURT:**  I know he is going off of the fact sheet

22  and leading a little bit, but I think it's -- because we have

23  the fact sheet, I think maybe it's making us a little -- it's

24  saving us some time, but try not to lead the witness.

25          **MR. WATTS:**  I will.

1              Let's go to the next page.  Now, go ahead and

2 highlight the top.

3 BY MR. WATTS:

4 Q    You checked:  "Tightness of the chest."  Describe what

5 happened with you.

6 A.   Well, when I couldn't breathe, when my nose would be

7 stopped up like that (INDICATING), I would be going like that

8 (INDICATING) to try to catch air.

9 Q.   What happened with your throat?

10 A.   Well, sometimes I would have a little sore throat.  I

11 guess it was from me just breathing and talking through -- you

12 know, I couldn't breathe through my nose --

13 Q    Okay.

14 A    -- and my throat would get, like, dry.  It would get dry.

15 Q.   It says:  "Hoarseness and upper respiratory tract

16 infection."  Upper respiratory tract infection is kind of a

17 medical issue.  We should rely on your doctors for that; fair?

18 A.   Yes.

19 Q.   "Worsening of allergies that you had previous to living in

20 the trailer."  Did you have allergies before the trailer?

21 A.   I had allergies before the trailer, my sinus, but I didn't

22 have it like that.  You know, I would go to the doctor once in

23 a while.  But after I was in there two or three weeks, that's

24 when I really started suffering with it.  Until after I got

25 out, I was still suffering with it --

1    **Q**    Okay.

2    **A**    -- until I had my surgery.

3    **Q.**   All right.  You checked:  "Dizziness."  How would you feel

4    it would cause you to be dizzy?

5    **A.**   I guess feel like I'm going to fall and get dizzy.  I

6    would get stopped up like that.  I would just get so dizzy --

7    **Q**    All right.

8    **A**    -- I'd just feel like I was going to fall out.

9    **Q.**   You mentioned that you had these allergies and sinus

10   issues before you moved in the trailer.

11   **A.**   Yeah.

12   **Q.**   All these other things that you checked, the problems with

13   your eyes and your throat and your stuffiness, did you have any

14   of those problems before you have moved into the trailer?

15   **A.**   Not like that.  It was after I moved in that trailer I

16   started having all that.  I'd have a little headache sometime,

17   you know, and my sinus, but nothing like after I was in that

18   trailer.

19   **Q.**   Did you talk to anybody about these problems that you were

20   having in the trailer?

21   **A.**   No.  All of the sudden, I was seeing it on television.

22   And then when I would feel bad like that, whenever my daughters

23   would pass, I would tell them, "Oh, I don't feel good.  I'm

24   stopped up."

25   **Q.**   Now, I want to ask you about another issue.  There's been

871

1  some testimony in this case about some flyers that FEMA put

2  out.  I think there was one --

3              **MR. WATTS:**  They're 520 and 521.

4              **MR. GARRISON:**  We'll consent.

5  **BY MR. WATTS:**

6  **Q.**    520 I think is the flier that FEMA put together in 2006.

7  Did you ever get any flyers from FEMA?

8  **A.**    I didn't get anything.  I didn't see nothing, not anything

9  in the trailer that I could look at and just see, you know,

10 what was going on.

11 **Q.**    All right.  You're not making any complaint that -- you

12 have seen these depositions here in court and everything.  You

13 just say you didn't get it; is that fair?

14 **A.**    I didn't get it.

15 **Q.**    Now, in late July of 2007, Exhibit 521, for the record, is

16 another flier that went out, and that was right before you

17 moved out in August; is that right?

18 **A.**    Well, if one came out, I don't know nothing about it.  All

19 I know, a couple of times I had to -- during the summer, when

20 the air-conditioning went out, water was dripping in there.

21 They came out and looked at the air-conditioning.  The man came

22 back.  The next time he said he was going to put a new one.  I

23 ain't never seen him yet.  I moved out the trailer, and they

24 still never put another air-conditioning in.

25 **Q.**    Would that be in the summer of 2007?

DAILY COPY

1  A.    Yes.

2  Q.    Now, this flier was put out in late July 2007, and you

3  moved out in August 2007; is that right?

4  A.    Yeah.

5  Q.    Here's my question:  When you first moved into the

6  trailer, did you know anything about formaldehyde?

7  A.    No.

8  Q.    For that first year you lived in the trailer, did you know

9  anything about formaldehyde?

10  A.    No.  I started learning about it on television.

11  Q    Okay.

12  A    Because if I knew anything about it, I wouldn't have went

13  in there.

14  Q.    Well, let me ask you about that.  You moved out in August

15  of 2007.  How close to when you moved out did you first learn

16  about this formaldehyde issue?

17  A.    Oh, I would say a couple months.

18  Q.    Sometime that summer of 2007?

19  A.    Yeah.

20  Q.    Now, after you learned about the formaldehyde issue, was

21  your house almost ready?

22  A.    It was almost ready, so I moved in before it was

23  completed.

24  Q.    Did you move in before it was completed because you wanted

25  to get out of the trailer?

1    A.   Yes.  I was afraid.

2              MR. WATTS:  All right.  May I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MR. WATTS:

5    Q.   Now, before you saw these advertisements in the summer of

6    2007, right before you moved out of your trailer, had you ever

7    been shown any warning:  "Formaldehyde in your trailer may

8    cause respiratory problems"?  Did you know that?

9    A.   I didn't know that.

10   Q.   Was there ever a warning placed inside your trailer that

11   you saw that said, "Warning:  Formaldehyde in your trailer may

12   cause respiratory problems"?

13   A.   I didn't see anything, not even in the cabinet.

14   Q    Okay.

15   A    When I walked in the door, they had a little cabinet

16   above.  I looked in there.  They didn't have nothing.  I looked

17   all on the bottom, and I didn't see nothing.

18   Q.   Sometimes there's stickers that are placed on products

19   that have one.  You didn't have any sticker that said a warning

20   about formaldehyde?

21   A.   They had nothing up in there.

22   Q.   Before the summer of 2007, had you ever seen a warning

23   that said, "Formaldehyde in your trailer may cause cancer"?

24   A.   The only time I seen that was on television, and that's

25   when I started getting worried.

1    **Q.**    Is that when you started making plans to get out?

2    **A.**    That's right.

3    **Q.**    Here's my question:  If you had walked into the trailer in

4    March of 2006 and seen a sticker on the wall that said,

5    "Warning:  Formaldehyde in your trailer may cause respiratory

6    problems and cancer," tell this jury what you would have done.

7    **A.**    I would have stayed with my daughter, one of them.  I

8    wouldn't sit up in there.

9    **Q.**    You have daughters that live around here; right?

10   **A.**    Yeah.  I have daughters that live by me in New Orleans.

11   **Q.**    One of your daughters had an apartment at the time?

12   **A.**    One of them -- I had two of them had apartments.

13   **Q.**    Two of them had apartments.  Would they have taken you in?

14   **A.**    Sure.

15   **Q.**    If you had been warned that there was formaldehyde in your

16   trailer that may cause respiratory problems and cancer, would

17   you have ever moved in the trailer?

18   **A.**    No way.

19   **Q.**    Now, during that first year when you were in the trailer,

20   before the summer of 2007, if you had been warned during that

21   first year that there was formaldehyde in your trailer that may

22   cause respiratory problems and cancer, what would you have

23   done?

24   **A.**    I wouldn't have went up in there.  I would have slept at

25   my daughters', went to one of my daughters'.

1  **Q.**   In the summer of 2007, you saw some television stories
2  about this respiratory and cancer issues?
3  **A.**   Right.
4  **Q.**   At that point in time, even though your house wasn't
5  completely ready, what did you do?
6  **A.**   I started moving out.
7  **Q.**   Earline, I have one more issue I want to visit with you
8  about.  I told the jury about this in opening statement.  When
9  you went to the lawyers to fill out this plaintiff fact sheet,
10  you didn't type in this information, did you?
11  **A.**   I didn't type, no.
12  **Q.**   Okay.  Somebody at one of the lawyers' office typed it in;
13  fair?
14  **A.**   Yes.
15  **Q.**   Now, there's something in here that I want to just ask you
16  about.  On page 11 of 18, it asks about personal smoking,
17  tobacco use history, and it says:  "Past smoker of cigarettes,
18  cigars, pipe tobacco, or used chewing tobacco/snuff."  That's
19  checked, and then it says that the smoking use ended in 1950
20  after having smoked two a day for a year.  Do you see that?
21  **A.**   I never smoked.  I never smoked, never drink.  Until now,
22  I still don't smoke and drink.
23  **Q.**   Now, you mentioned earlier that your daughters help you a
24  lot; right?
25  **A.**   Yes.

876

| | |
|---|---|
| 1 | **Q.**   What I want to ask you about is we have talked -- how many |
| 2 | kids do you have that are alive right now? |
| 3 | **A.**   Three. |
| 4 | **Q.**   We have talked to all three of them. |
| 5 | **A.**   Uh-huh. |
| 6 | **Q.**   You heard me tell the jury.  A couple of them said they |
| 7 | thought you smoked when you were a kid.  Do you remember -- |
| 8 | when they were kid. |
| 9 | **A.**   Yeah, but -- that's my -- by my sister living -- my mother |
| 10 | and my sister was all living, you know, in the same house, but |
| 11 | it was a double home. |
| 12 | **Q**   Okay. |
| 13 | **A**   And they used to be sitting on the porch smoking.  I |
| 14 | didn't smoke, me. |
| 15 | **Q.**   And, again, you're under oath, swearing before God and |
| 16 | country.  You never smoked? |
| 17 | **A.**   I never smoked.  I swear. |
| 18 | **Q.**   Now, after we got going in this case and your case was set |
| 19 | for trial, lawyers met with you, and you went through this fact |
| 20 | sheet again, did you tell us that that information about the |
| 21 | cigarettes was wrong? |
| 22 | **A.**   Yes. |
| 23 | **Q.**   Did you tell us you wanted us to change it? |
| 24 | **A.**   Whoever it was, I told them.  I said, "You can erase that |
| 25 | because I never smoked, and I don't smoke now." |

1  Q.   Okay.  As we look at Exhibit 405, this is the amended fact

2  sheet.  Did we fix it as you instructed us to do so, to say

3  that you never smoked cigarettes?

4  A.   Right.

5  Q.   Now, just so we are clear, this fact sheet has a

6  certification that says that everything in here is true and

7  correct.  Do you see that?

8  A.   Yep.

9  Q.   Now, is it a fact that your answer to the first fact

10  sheet, however it got typed in, you found out it was wrong and

11  so you corrected it?

12  A.   Yeah.  I told them it was wrong.

13  Q.   Now, we have got your medical records going back a number

14  of years.  Have you always told your doctors that you never

15  smoked?

16  A.   Yeah.  When I go to a doctor, "Do you smoke?"  "Do you

17  drink?"  "No."

18  Q.   Okay.  Because you never have?

19  A.   No, I never have.

20       MR. WATTS:  Your Honor, I think I'll pass the

21  witness.  It's about five 'til 5:00.  Whatever your preference

22  is.

23       THE COURT:  Well, we are getting close to 5:00.  I

24  take it the cross-examination, Mr. Garrison, is going to take

25  us beyond 5:00?

DAILY COPY

1          MR. GARRISON:  I'll be brief.

2          THE COURT:  You will?  Okay.  Does anybody have a

3    problem with a few more minutes if we finish up with this

4    testimony?

5          MR. GARRISON:  Well, I don't want to make that

6    promise.

7          MR. WATTS:  Well, she'll be here tomorrow if he wants

8    to do it then.  Either way is fine.

9          MR. GARRISON:  I tend to talk sometimes.

10          THE COURT:  Let's go ahead --

11          THE WITNESS:  He can talk now if he wants.

12          THE COURT:  I understand that and I appreciate that,

13    Ms. Castanel.  Let me ask the jury.

14               I made a commitment to you-all that we would

15    break at 5:00, give or take a few minutes.  Does anybody have a

16    problem staying a few minutes more or would you prefer -- we

17    can pick up tomorrow with Ms. Castanel.

18               Let's go ahead and break for the day.  I'm kind

19    of getting the sense that maybe we should go ahead and break.

20    Tomorrow morning, let's very briefly do the cross and any

21    redirect that's necessary, and then we will go from there.

22               Thank you all for your attention today.  Please

23    don't discuss the case with anyone, including amongst

24    yourselves, between now and tomorrow morning when you come in.

25          THE DEPUTY CLERK:  All rise.


                          DAILY COPY

1          (WHEREUPON the jury was excused for the evening.)

2          THE COURT:  Why don't you be seated.  Is there

3  anything we need to cover on the record before Toni shuts down

4  for today?

5          MR. WATTS:  Yes, Your Honor, just the agreement that

6  we have reached.  I'm not sure whether it was on the record or

7  not when we talked with you.

8          MR. GARRISON:  On the depositions of the two

9  daughters, with respect to --

10         MR. WATTS:  Kim and Laverne; right?

11         MR. GARRISON:  Yes.

12         MR. WATTS:  Yeah, that we've agreed that --

13         THE COURT:  I'm not aware of it, so let's go ahead

14  and put that on the record.

15         MR. WATTS:  Yeah.  Even though they are in the

16  Louisiana area and we could bring them and everything like

17  that, to save time, we have reached a stipulation that we are

18  not going to apply the unavailability rule, if it's okay with

19  you.  We will just read some limited --

20         THE COURT:  It's fine with me as long as all parties

21  agree.

22         MR. WATTS:  Right.  We are going to allow the

23  defendants to read limited portions of both the depositions --

24  we will get them counter cuts tonight -- on the issue of

25  smoking.

 1             **THE COURT:**  Those need to be read in, or are those
 2  videos?
 3             **MR. WATTS:**  We are just going to read them in.
 4             **MR. GARRISON:**  They didn't have videos.
 5             **MR. WATTS:**  Oh, that's why they need to be read?
 6             **MR. YOUNT:**  They are about five minutes a piece.
 7             **MR. WATTS:**  Yeah.  Now, I've already looked at them
 8  and I don't have a problem.  I'm just going to add a few
 9  things, but we wanted to alert you.
10             **THE COURT:**  You want to call them on the defendant's
11  case in chief?
12             **MR. GARRISON:**  Yes, sir.
13             **THE COURT:**  We also had, that we did not get to
14  today, a few witnesses of the FEMA variety.  What do we want to
15  do with them?  Are they still on tap?
16             **MR. WATTS:**  Our agreement with that is I think they
17  are planning on playing Joseph Little for sure.  They are going
18  to read over the others and see whether they want to or not.
19  It's up to them.
20             **THE COURT:**  Little is 36 minutes as cut now.  You're
21  going to check these other three?
22             **MR. MULCAHY:**  Yes, sir.  Your Honor, we'll probably
23  be using David Garratt, and we'll be looking at the other two.
24             **THE COURT:**  Anything else to put on the record?
25             **MR. YOUNT:**  Yes, Judge, one thing.  In Ms. Castanel's

1   direct examination, when she was going over the fact sheet, she

2   testified about skin itchiness and rashes and blisters, my

3   recollection of the testimony.  Your Honor has previously

4   entered an order pursuant to a motion in limine on, I believe,

5   Patricia Williams that those claims were not going to be a part

6   of this case.

7            **MR. WATTS:**  If that happened, I apologize.  I

8   completely missed it.

9            **MR. YOUNT:**  And so I think the best way to handle it

10  is either we can cover it in cross -- but it may be very

11  difficult; she may not know -- or if you can just say or if

12  Mr. Watts wants to say at the beginning --

13           **MR. WATTS:**  I'll tell you what we did.  I think it

14  was the last charge.  We dropped a line into the charge that

15  said it's not included, and I will agree to that.  And,

16  frankly, I apologize.  I missed it.

17           **THE COURT:**  Either that or, if you want to, check the

18  transcript and cover it on redirect, maybe establish that that

19  is not an element in the case.

20           **MR. WATTS:**  Okay.  Would you remind me about that in

21  the morning?  I'll take care of it that way.  And, again, I

22  apologize.  I missed the order.  I'm sorry.

23           **THE COURT:**  Well, quite honestly, it doesn't ring a

24  bell in particular out of the things she talked about, but

25  check the transcript.  If it is, you can go back and just get

1   her to state that that's not --
2            MR. WATTS:  Can I lead her with that?
3            THE COURT:  Yes.  I mean, if it's something that's
4   undisputed.
5            MR. WATTS:  I'll take care of it.
6            THE COURT:  I know you were trying to save some time
7   because we had the fact sheet up there.  So technically,
8   although it was leading, it was already established on paper,
9   and it did save us some time.
10           MR. WATTS:  I told Lyon I appreciated the indulgence.
11           THE COURT:  Yes.  I did too.  Technically, it was
12  objectionable, but we already have it on paper.
13                All right.  Anything else on the record?
14           MR. WATTS:  The one other issue is I had sent the
15  e-mail last night making the same offer I did in the *Wright*
16  trial, that we don't have to make motions for directed verdict
17  now.  You can go right into your evidence, and then I'll
18  stipulate on the record that you can do it at the end of the
19  case; that it will be timely, considered to have been done at
20  the close of my case; and that the plaintiffs hereby stipulate
21  to waive any appellate point on appeal to the extent that was
22  supposed to be done at the close of the plaintiff's case
23  instead of the close of the case.
24           MR. YOUNT:  We accept the stipulation to the extent
25  that, if we have a break, if we make it an appropriate time to

1    go ahead and do it and get it over with, I would rather do

2    that.

3            **THE COURT:**  Well, it depends on how long -- what I

4    have been doing is entertaining back-and-forth argument on it;

5    in other words, argument, opposition, and reply.  That's the

6    way I have been handling them because they have to do

7    sometimes -- sometimes, not all the time -- but sometimes they

8    have to do with the jury instructions, issues that come up on

9    jury instructions.

10            So that may be a little more time-consuming than

11   simply doing it during a break, a 15- or 20-minute break.  Or

12   even during the lunch hour; it may leave little time for

13   you-all to get lunch.

14            What I would propose to do is, since we do have

15   a stipulation, is that assuming the plaintiff rests sometime

16   early tomorrow --

17            **MR. WATTS:**  As soon as we are done with Ms. Castanel.

18            **THE COURT:**  -- and we have some time on Friday

19   afternoon -- I'm feeling confident that we probably are not

20   going to get to closings on Friday at this point.  I could be

21   wrong, but yesterday we were hopeful.  Today, I think it's a

22   pretty good bet that we are going to be well into Friday with

23   the testimony.  We can do it Friday afternoon when we let the

24   jury go for the weekend.  I can go ahead and hear those Friday

25   afternoon, assuming it's going to be sometime between 3:00 and

1    5:00.

2                MR. YOUNT:  That makes sense.

3                MR. WATTS:  I thought it worked well last time doing

4    it all together.

5                THE COURT:  Yes, I thought so too.  We still need to

6    have a jury charge conference as well.  I think Amanda now has

7    the draft, although there are things in the draft that are

8    contingent on having an evidentiary basis for giving an

9    instruction.  I think we have flagged the things that we think

10   are not yet established but we anticipate might be subject to

11   inclusion --

12               MR. WATTS:  Okay.

13               THE COURT:  -- but the evidentiary basis is yet to be

14   seen, primarily because it pertains to the defense's case.

15               So we'll give those to you, and we'll try to

16   have the jury charge conference -- I can't do it at

17   5:00 tomorrow, but maybe we can come in early on Friday and

18   take a good whack at it.  If we have to, we can work through

19   the lunch hour, or even at the end of the day after your motion

20   practice on Friday.

21               MR. WATTS:  Okay.

22               MR. GARRISON:  All right.

23               THE COURT:  Anything else on the record?  Thank you,

24   Toni.

25               (WHEREUPON the Court was in recess for the evening.)

DAILY COPY

1                          * * *

2                     **CERTIFICATE**

3          I, Toni Doyle Tusa, CCR, FCRR, Official Court

4    Reporter for the United States District Court, Eastern District

5    of Louisiana, do hereby certify that the foregoing is a true

6    and correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                              s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
12                              Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25