```
 1
 2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 3

 4    ****************************************************************

 5     IN RE:  FEMA TRAILER
       FORMALDEHYDE PRODUCTS
 6     LIABILITY LITIGATION
                                    DOCKET MDL NO. 1873 "N"
 7                                  NEW ORLEANS, LOUISIANA
                                    THURSDAY, MAY 20, 2010
 8     THIS DOCUMENT RELATES TO:

 9     DOCKET NO. 09-3251,
       EARLINE CASTANEL v
10     Recreation By Design, LLC

11    ****************************************************************

12                      DAY IV, AFTERNOON SESSION
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
13             HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                      UNITED STATES DISTRICT JUDGE
14

15    APPEARANCES:
16

17     FOR PLAINTIFF:                WATTS GUERRA CRAFT
                                     BY:  MIKAL C. WATTS, ESQUIRE
18                                   FOUR DOMINION DRIVE
                                     BUILDING THREE, SUITE 100
19                                   SAN ANTONIO, TX 78257

20
                                     CHRIS PINEDO
21                                   ATTORNEY AT LAW
                                     802 N. CARANCAHUA, SUITE 2250
22                                   CORPUS CHRISTI, TX 78470

23
                                     REICH & BINSTOCK
24                                   BY:  DENNIS C. REICH, ESQUIRE
                                     4265 SAN FELIPE, SUITE 1000
25                                   HOUSTON, TX 77027
```

1

2    APPEARANCES CONTINUED:

3

4    FOR DEFENDANT:                    GARRISON YOUNT FORTE & MULCAHY
                                       BY:  LYON H. GARRISON, ESQUIRE
5                                           SCOTT P. YOUNT, ESQUIRE
                                            RANDALL C. MULCAHY, ESQUIRE
6                                      909 POYDRAS STREET, SUITE 1800
                                       NEW ORLEANS, LA 70112
7

8                                      DUPLASS ZWAIN BOURGEOIS MORTON
                                       PFISTER & WEINSTOCK
9                                      BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                            JOSEPH G. GLASS, ESQUIRE
10                                     THREE LAKEWAY CENTER
                                       3838 N. CAUSEWAY BOULEVARD
11                                     SUITE 2900
                                       METAIRIE, LA 70002
12

13

14
     OFFICIAL COURT REPORTER:          KAREN A. IBOS, CCR, CRR
15                                     500 POYDRAS STREET, ROOM B406
                                       NEW ORLEANS LA 70130
16                                     (504) 589-7776

17     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.
18

19

20

21

22

23

24

25

1                    I N D E X

2

3    WITNESSES FOR THE DEFENDANT:                PAGE/LINE:

4

5    VIDEO DEPOSITION OF DR. THANG HOANG         1032/3

6

7    RANDALL RUSH

8      Direct Examination By Mr. Mulcahy         1046/19
       Cross-Examination By Mr. Watts            1070/2
9      Redirect Examination By Mr. Mulcahy       1082/14

10

11   VIDEO DEPOSITION OF TRAVIS MORRIS           1085/18

12
     VIDEO DEPOSITION OF MICHAEL LAPINSKI        1099/1
13

14   VIDEO DEPOSITION OF GEOFFREY COMPEAU        1123/5

15
     VIDEO DEPOSITION OF BRIAN BOYLE             1164/21
16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2                  (THURSDAY, MAY 20, 2010)

3

4        (OPEN COURT.)

5            THE MARSHAL:  All rise.

6        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

7            THE COURT:  You may be seated.  Let's continue on

8   through, we're making pretty good progress.  Mr. Yount.

9            MR. YOUNT:  Thank you, Judge.  Before we call our next

10  witness, we would like to offer into evidence some exhibits that

11  were used with some previous witnesses.

12           THE COURT:  Okay.

13           MR. YOUNT:  First would be Exhibit 628-914, which was

14  used with Dr. Williams and Dr. Hewett.

15           MR. WATTS:  No objection.

16           THE COURT:  What's the number?

17           MR. YOUNT:  628-914.

18           THE COURT:  All right.

19           MR. YOUNT:  The next one is 628-920 through 922, which

20  was used with Williams.

21           MR. WATTS:  Yeah, no objection.

22           THE COURT:  All right.

23           MR. YOUNT:  The next one is previously marked as Exhibit

24  858, which is the HUD standard, which was used with a lot of the

25  witnesses yesterday.
```

DAILY COPY

```
 1              MR. WATTS:  No objection.

 2              THE COURT:  All right.

 3              MR. YOUNT:  The next is Exhibit 583, which is the bill of

 4   Dr. --

 5              MR. WATTS:  No objection.

 6              MR. YOUNT:  -- Mallet, the witness Mallet.

 7              THE COURT:  Mr. Mallet, right?

 8              MR. YOUNT:  This was not previously identified, but this

 9   is now identified as Exhibit 1100, which is Dr. Miller's inquiry

10   document from Harvard Medical School.

11              MR. WATTS:  No objection.

12              THE COURT:  All right.

13              MR. YOUNT:  1101 is Dr. Miller's ad in the *National Law*

14   *Journal.*

15              MR. WATTS:  No objection.

16              MR. YOUNT:  Exhibit 1102 is the guidelines for the

17   position expert witness of the American College of Physicians.

18              MR. WATTS:  No objection.

19              MR. YOUNT:  1103 is the front page and the fourth page of

20   the expert report of Dr. Shwery, which was used in connection with

21   Dr. Miller.

22              MR. WATTS:  We would ask the whole report come in.

23              THE COURT:  Yes, I think it would be appropriate to put

24   that one in if Shwery -- well, Shwery is not going to testify.

25              MR. YOUNT:  Judge, she is not going to testify.  And the
```

1    only -- it was used for impeachment purposes with Dr. Miller just

2    on a limited basis, and so I don't think it would be appropriate to

3    put the whole report in.

4            MR. WATTS:  We want the whole report in or not at all.

5            THE COURT:  I am going to sustain the objection on that

6    one.  It's not a document that Dr. Miller himself generated.  If he

7    looked at it and commented on it is one thing, but he can't

8    authenticate it, he said he was familiar with it.

9            MR. YOUNT:  Okay, we'll withdraw that proffer then,

10   Judge.

11           THE COURT:  All right.

12           MR. YOUNT:  And then Exhibit 104 is the Allan opinion

13   used in connection with Dr. Miller; 1105 is the Kristoferson

14   opinion, which rejected Dr. Miller as an expert; 1106 is the Berry

15   opinion.

16           MR. WATTS:  No objection.

17           THE COURT:  All right.  So ordered.  And all of those

18   have been shown to the jury in connection with previous testimony;

19   is that correct?

20           MR. WATTS:  I think so, yes, sir.

21           THE COURT:  Okay.  All right.

22           MR. YOUNT:  And then, Judge, for our next witness, it's

23   Dr. Hoang, who is going to be video and it's pretty short.

24           THE COURT:  This is Dr. -- I hope I'm pronouncing the

25   name correctly.  I'll spell it first, T-H-A-N-G is the first name,

1  H-O-A-N-G is the last name.  I suppose it's pronounced Thang Hoang,

2  M.D.  Dr. Hoang.

3       (WHEREUPON, THE VIDEO DEPOSITION OF DR. THANG HOANG WAS

4       PLAYED.)

5  BY MR. GARRISON:

6  Q.  Let's go through your CV, please, Doctor.  Tell the jury a

7  little bit about your education, please.

8  A.  I completed high school at Angleton High School.  I went to

9  college for undergraduate at University of Texas in Austin,

10 completed my bachelor's in biochemistry at -- in 1993.  I completed

11 my medical education at University of Texas at Houston in 1997, and

12 I completed my internal medicine and pediatrics residency in 2001

13 at University of Texas at Houston.

14 Q.  I see from your curriculum vitae that you're board certified.

15 A.  Yes, I'm board certified in internal medicine and also

16 pediatrics.

17 Q.  Please tell the jury what board certification entails.

18 A.  Board certification entails completing medical school,

19 completing a residency in the respective field of internal medicine

20 and pediatrics, and then sitting in for a -- and passing the

21 American board for the internal medicine and for pediatrics.

22 Q.  All righty.  And tell the jury about your practice, please.

23 A.  We are an internal medicine and pediatric clinic here in

24 Pearland, Texas, a primary care clinic.  We see patients of all

25 ages, from newborn to old age, for primary care issues.

1  Q.  In your practice as an internal medicine doctor, do you also

2  treat patients for anxiety?

3  A.  Yes, we do.

4  Q.  In your practice as an internal medicine doctor, do you also

5  treat patients for depression?

6  A.  Yes, we do.

7  Q.  In the course of your medical practice, did you have occasion

8  to treat Ms. Earline Castanel?

9  A.  Yes, I did.  She filled out a new patient information sheet on

10  October 25th of 2005.

11  Q.  And that's filled out by the patient?

12  A.  The patient and/or their family member.

13  Q.  Yes, sir.  Also, there's a health history form that's part of

14  your chart; is that correct?

15  A.  Yes.

16  Q.  And who is that filled out by?

17  A.  That's filled out by me.

18  Q.  And is that based on a conversation with the patient?

19  A.  That's based on a conversation with the patient, getting their

20  medical history and medication history.

21  Q.  Now, in the case of Ms. Earline Castanel, you didn't have the

22  opportunity to review any of her medical records from New Orleans;

23  is that correct?

24  A.  That is correct.

25  Q.  And do you know if she was over here after Hurricane Katrina as

1  an evacuee?

2  A.  Yes, she stated that.

3  Q.  Okay.  And under Allergies, Ms. Castanel indicated -- what are

4  those two words, I can't make out your handwriting?

5  A.  Sulfa and penicillin.

6  Q.  And you have "swelling" in parentheses.

7  A.  I wrote that in, it causes -- she had stated it causes her to

8  have swelling, if -- as an allergy to those medicine.

9  Q.  The next document in your record is a Patient Summary; is that

10  correct?

11  A.  Yes.

12  Q.  Who prepared the Patient Summary?

13  A.  Oh, going back -- I thought you were talking about the medical

14  history page as what I filled out.  She fills that out; and what I

15  was talking about is the Patient Summary is what I fill out.

16  Q.  Fair enough.  And I think you just clarified that.  So the

17  Patient Summary, that's what you fill out as the doctor; is that

18  correct?

19  A.  Yes.

20  Q.  All right.  And you listed or obtained a verbal history from

21  the patient to fill out this Patient Summary?

22  A.  Yes.

23  Q.  And under Problems, were those problems that were told to you

24  by Ms. Castanel?

25  A.  Yes.

1  Q.  And what did you list under Problems?

2  A.  Number one is hypertension; number two is hyperlipidemia;

3  number three is GERD, which is Gastroesophageal Reflux Disease;

4  number four is allergies, which is allergic rhinitis; number five

5  is anxiety and depression.

6  Q.  All right.  And again, Ms. Castanel told you about these

7  issues, correct?

8  A.  Yes.

9  Q.  And the medications on the medication list, were those

10 medications that Ms. Castanel told you that she was taking?

11 A.  Yes, except for the last two.  Those are the ones that I

12 started her on.  The medications Depo-Estradiol; Verapamil, 180

13 milligrams once a day; Lipitor, ten milligrams once a day;

14 Protonix, 40 milligram once a day; and Zyrtec, as needed for

15 allergies, and Flonase, as needed for allergies.  Those are the

16 medications she was previously on.

17 Q.  And that's what she told you?

18 A.  Yes, that's correct.

19 Q.  You told us what the Zyrtec is for, that's for allergies,

20 correct?

21 A.  Yes.

22 Q.  And the Flonase is for allergies as well?

23 A.  Yes.  The Protonix is for heartburn or reflux; Lipitor is for

24 hyperlipidemia or heartburn, yes; Verapamil is for blood pressure

25 or hypertension.

1    Q.  Now, when was the first time that you had a visit with

2    Ms. Castanel?

3    A.  We first saw her on October 25th of 2005.

4    Q.  What were her complaints on that date?

5    A.  She had -- the note says she saw her PCP in New Orleans last

6    week; she had complained of some nervousness, anxiety and

7    palpitation for the last few days, secondary to the recent stress

8    with the hurricane; and she stated she has a meeting with the

9    insurance adjuster and also has -- also had allergies, which she

10   was continuing on her Zyrtec with itchy eyes.

11   Q.  What does PCP mean in that sentence?

12   A.  PCP is her primary care physician in New Orleans.

13   Q.  And you have under Complaints, is that first notation -- what

14   is that?

15   A.  Oh, chief complaint, this is her - she had sinus.

16   Q.  All right.

17   A.  Shakes a lot, nausea -- nausea a little.

18   Q.  I understand.

19         Now, under the next section, HPI, you noted anxiety and

20   nervousness as a result of the hurricane; is that right?

21   A.  That is correct.

22   Q.  And is that what the patient told you?

23   A.  Yes.

24   Q.  Also, there's a notation regarding allergies.  Do you recall

25   what Ms. Castanel told you specifically about her allergies?

1   A.  She was -- she was allergic to penicillin, which caused her to

2   have swelling, and also to sulfas, which caused her to have

3   swelling.

4   Q.  As well as the systems that she was having on this day, October

5   25th, 2005, it was itchy eyes, correct?

6   A.  She was having nervousness, anxiety, palpitations, also -- also

7   allergies.  Allergies is more than likely runny nose and itchy

8   eyes.

9   Q.  Yes, sir.  With respect -- and now she's asking more specific

10  questions.  With respect to the symptoms related to her allergies,

11  Ms. Castanel was complaining of itchy eyes and a runny nose.

12  A.  Yes, that's correct.

13  Q.  Now, do you know if Ms. Castanel told you what she thought she

14  may have been exposed to to cause these symptoms, the itchy eyes

15  and the runny nose?

16  A.  Not specifically.

17  Q.  All right.  And did you perform a physical examination on

18  October 25th, 2005?

19  A.  Yes.

20  Q.  What were your findings?

21  A.  She had some mild congestion, but her throat was clear.  No

22  sign of any infection, and the rest of the exam were okay.

23  Q.  And by mild congestion, that's something you noticed when you

24  did your physical examination; is that correct?

25  A.  Yes, a little runny nose.

1   Q.  Yes, sir.  And the plan at this point was what?

2   A.  The -- she had complaints of palpitations, so we checked an EKG

3   to make sure she doesn't have any cardiac problems.  We gave --

4   with that we -- for her allergic rhinitis or her runny nose, we

5   gave her, we told her to continue on her Zyrtec and mainly add her

6   Flonase, to start taking that once a day in the nose, and with that

7   we gave her some Cortisporin Otic drops for her itchy, itchy ears

8   is what it was.

9   Q.  Are the itchy ears also related -- I'm sorry, are the itchy

10  ears also related to her allergies?

11  A.  Yes.

12  Q.  And the Flonase, that's a spray?

13  A.  That's a nasal spray.

14  Q.  What does that do for the patient?

15  A.  It's a nasal steroid spray to help decrease inflammation for

16  allergies.

17  Q.  And what was your diagnosis after that October 25th, 2005,

18  visit?

19  A.  Anxiety and allergic rhinitis, and we also gave her a low dose

20  of Xanax, 0.25 milligrams, to be taken three times a day as needed

21  for anxiety.

22  Q.  What was the basis of Ms. Castanel's anxiety diagnosis?

23  A.  At the time, I had thought that was situational anxiety,

24  secondary to the stressors from the hurricane and the -- where she

25  was displaced; and so we prescribed the Xanax for her situational

1   anxiety.

2   Q.  Fair enough.  The next visit looks like December 5th, 2005.

3   A.  Yes.

4   Q.  What were Ms. Castanel's complaints on that date?

5   A.  She had come in with complaints of coughing, sore throat, for

6   the last three days; there was no fever or chills, no phlegm.  She

7   also reports she's been depressed with decreased appetite,

8   secondary to the hurricane.

9   Q.  And the patient told you that she was depressed on December

10   5th, 2005?

11   A.  Yes.

12   Q.  Is depression different from anxiety?

13   A.  Yes.

14   Q.  Did the patient give you any other specifics about her

15   depression?

16   A.  I don't recall.

17   Q.  Did you conduct a review of Ms. Castanel's systems?

18   A.  Yes.

19   Q.  And what were your findings?

20   A.  Pertinent positive.  She had some coughing, runny nose, some

21   post nasal drainage, and she was feeling sad.

22   Q.  Did you perform a physical examination on December 5th, 2005?

23   A.  Yes, I did.

24   Q.  What were your findings on physical exam?

25   A.  Physical exam, she had some congestion, no throat infection,

1    her or pharynx was clear, and everything else was -- her blood

2    pressure and her temperature were okay, and everything else was

3    unremarkable.

4    Q.  And what was your diagnosis on December 5th, 2005?

5    A.  I diagnosed her with upper respiratory infection, gave her some

6    cough and cold medicine, the Biotussin, one teaspoon three times a

7    day as needed for her cough and congestion.  For her depression, we

8    discussed about depression medicines and proceeded to start her on

9    Prozac, 20 milligrams once a day for her depression symptoms.

10   Q.  Now, if I recall correctly, you gave Ms. Castanel Xanax on

11   October 25th, 2005 for her -- for her anxiety.  Correct?

12   A.  For situational anxiety, yes.

13   Q.  And then for her depression on December 5th, 2005, you gave

14   Ms. Castanel Prozac.

15   A.  Yes.

16   Q.  Okay.  So those are two different medications?

17   A.  That is correct.

18   Q.  And I guess they accomplish different things?

19   A.  Yes.  The Xanax helps with anxiety, short-term situational

20   anxiety.  The Prozac helps with -- it's a selective serotonin

21   reuptake inhibitor to help with more depression.

22   Q.  Is the Prozac prescribed in those cases where the depression

23   might be more long-term?

24   A.  Yes.

25   Q.  And you felt it was appropriate to prescribe Prozac for

1    Ms. Castanel on December 5th, 2005?

2    A.  Yes.

3    Q.  When was Ms. Castanel's next visit with you, Doctor?

4    A.  She had come back on January 3rd, 2006.

5    Q.  What were Ms. Castanel's complaints on that date?

6            MR. REICH:  I'm sorry, what was the date?

7            THE WITNESS:  January 3rd, 2006.

8            MR. REICH:  All right.  Thank you.

9    Q.  What were Ms. Castanel's complaints on January 3rd, 2006?

10   A.  She had coughing and congestion for three days, no fever or

11   chills.  She stated she hadn't started on her Prozac but had

12   improved symptoms of her depression; she needed refills of her

13   blood pressure and cholesterol medicines, and also needed her

14   Depo-Estradiol shot, injection.

15   Q.  Do you know what the complaint about the back of the head was

16   about from Ms. Castanel, any -- any other notes or --

17   A.  The -- she had -- she was complaining of headaches, headaches

18   in the back of her head.

19   Q.  And did you conduct a review of systems on January 3rd, 2006?

20   A.  Yes.

21   Q.  And what were your findings?

22   A.  She had complained of coughing, runny nose, drainage and --

23   post nasal drainage, and also headaches.

24   Q.  And did you conduct a physical examination on January 3rd,

25   2006?

1    A.  Yes, I did.

2    Q.  What were your findings?

3    A.  Other than having some congestion in her nose, everything else

4    was okay.  Card-vascular, gastro -- GI, neurological exam were all

5    non-contributory.

6    Q.  Did Ms. Castanel have congestion in her nose on January 3rd,

7    2006?

8    A.  Yes.

9    Q.  And what was your diagnosis on January 3rd, 2006?

10   A.  Because of the congestion and coughing for three days, I

11   diagnosed her with an upper respiratory infection.  We had given

12   her a Z-Pak, which is azithromycin course for five days; that's an

13   antibiotic.  We also gave her a Kenalog, which is a steroid shot,

14   to help with the congestion for allergies.  And we recommended her

15   to continue on her Zyrtec once a day for her allergies.

16   Q.  Explain what a Z-Pak does for us, please, Doctor.

17   A.  A Z-Pak is azithromycin, which is a macro antibiotic that

18   helps -- that is commonly prescribed for upper respiratory

19   infections, some bronchitis, to help clear up any bacterial upper

20   respiratory infections.

21   Q.  And on this date, January 3rd, 2006, I see you also diagnosed

22   allergies, in addition to the upper respiratory tract infection,

23   correct?

24   A.  Yes.

25   Q.  And what was the basis of your allergies diagnosis?

1  A.  Mainly what -- she is still having congestion.

2  Q.  Ms. Castanel had congestion on all three visits, correct?

3  A.  Yes.

4  Q.  And what were -- were Ms. Castanel's complaints of congestion

5  consistent on all three visits with you?

6  A.  Yes.

7  Q.  What were your diagnoses on January 3rd, 2006?

8  A.  Number one, upper respiratory infection; number two, allergies;

9  number three, hypertension; and number four, hyperlipidemia.

10          A/P is assessment and plan.

11  Q.  Assessment and plan.

12  A.  We prescribed a Z-Pak for five days for upper respiratory

13  infection.  We gave hear Kenalog, which is a steroid injection, for

14  her allergies, and we told her to continue on her Zyrtec once a day

15  for her allergies, which is the Zyrtec is an antihistamine to help

16  with chronic allergies.

17          We refilled her blood pressure medicine Verapamil, 180

18  milligrams once a day.  We refilled her Lipitor, her cholesterol

19  medicine, ten milligrams once day; and we refilled her Protonix, 40

20  milligrams once a day, for her chronic high blood pressure, high

21  cholesterol and her heartburn.

22  Q.  Tell the jury about the steroid shot.  How is that

23  administered?  Where -- where do you give the shot to the patient?

24  A.  We give that to them in the gluteus maximus muscle, which is

25  the buttock area.  That's intramuscular, injected into the muscle,

1    to help with any inflammation and allergies.

2    Q.  And please explain the purpose of the steroid shot.

3    A.  The steroid is to mainly help with any severe allergies or a

4    lot of -- persistent congestion, to try to help to decrease the

5    inflammation and the swelling in the nose.

6    Q.  Did Ms. Castanel have swelling in the nose on all three visits?

7    A.  She had signs of congestion, which is -- leads to the

8    assumption that she had allergies.

9    Q.  And did Ms. Castanel consistently have symptoms of allergies at

10   all three visits with you?

11   A.  Yes.

12   Q.  And the steroid shot was given in efforts to reduce the

13   swelling in the -- in the nasal region; is that correct?

14   A.  Yes, for -- for allergies.

15   Q.  Would you tell us about some of the irritants, in your

16   experience, that cause people to have allergic symptoms?

17   A.  In general, any allergens, any dust, dirt in the air; could be

18   due to any pollens, tree pollen, flower pollen; could be due to any

19   mold, mold spores; or it could be due to any animal dander, cat/dog

20   dander, or the common allergy that causes allergic rhinitis.

21   Q.  During the course of treatment in October of 2005, December

22   2005, and January 2006, did it appear to you that Ms. Castanel was

23   having consistent systems and irritation with respect to her

24   allergies?

25   A.  Yes.

1    BY MR. REICH:

2    Q.  Dr. Hoang, when was the last time that you actually saw

3    Ms. Castanel?

4    A.  The January 3rd, 2006 visit.

5    Q.  Do you know whether formaldehyde can exacerbate allergies?

6    A.  Could possibly.

7    Q.  Is formaldehyde, to your knowledge, a respiratory irritant?

8    A.  Could possibly.

9    Q.  As far as the psychological diagnoses that were rendered, do

10   you have any specialized training in diagnosing psychological

11   conditions?

12   A.  We are trained in our medical school and residency to treat

13   common anxiety and common depression.  Whether it be situational

14   anxiety or general -- general or major depression, and so that's

15   within the scope of my practice.

16   Q.  And did you reach your conclusions concerning diagnoses of

17   depression and anxiety based upon a history that Ms. Castanel

18   provided to you?

19   A.  Yes.

20   Q.  Did she report to you about any type of drinking or smoking?

21   Did you make those inquiries?

22   A.  She had written under social history not applicable or none.

23   Q.  So you did find that -- did you find that Ms. Castanel had

24   infections at two of the visits with you, first in December of 2005

25   and the second in January of 2006?

```
 1   A.  Yes.

 2   Q.  Would the cause of upper respiratory tract infections be

 3   bacteria?

 4   A.  Or viral.  Could be bacterial or viral.

 5   Q.  Right.  So it could be a cold or it could be from bacteria?

 6   A.  Yes.

 7       (CONCLUSION OF VIDEO DEPOSITION OF DR. THANG HOANG.)

 8           THE COURT:  All right.  Let's move on to the next one.

 9           MR. MULCAHY:  Yes, your Honor, it will be Randall Rush.

10           THE COURT:  Mr. Rush, if you will come back up, and the

11   jury will recall that we did hear from Mr. Rush earlier a couple of

12   days ago.

13           Mr. Rush, you're still under oath.  I know you've been in

14   the courtroom throughout the proceedings.  So you can go ahead and

15   have a seat and we'll pick up with questioning for you on the

16   defendant's case in chief.

17           THE WITNESS:  Thank you.

18                           DIRECT EXAMINATION

19   BY MR. MULCAHY:

20   Q.  Good afternoon, Mr. Rush.

21   A.  Good afternoon.

22   Q.  We heard from you the other day regarding your involvement in

23   Recreation by Design, correct?

24   A.  Yes, that's correct.

25   Q.  And you're the president and corporate representative for
```

 1   Recreation By Design?

 2   A.  Yes, I am.

 3   Q.  Have you always been the president of Recreation By Design?

 4   A.  Yes, I have.

 5   Q.  Is Recreation By Design a family-owned business?

 6   A.  Yes, it is.  It's my children and my wife and I own it.

 7   Q.  And how long has Recreation By Design been in business?

 8   A.  Since 1999.

 9   Q.  And if I use the phrase RBD, you understand I'm talking about

10   Recreation By Design?

11   A.  Yes, I will.

12         THE COURT:  Counsel, one thing that we don't want to do

13   is plow ground that was already plowed when he was up here before,

14   so if we can pick up with where that testimony left off.

15         MR. MULCAHY:  Yes, your Honor, I was just trying to lay a

16   little foundation regarding him and his business practice.

17         THE COURT:  We heard that a couple of days ago generally

18   about his background.  If there are additional things you would

19   like to bring out, you can, but I just don't want to go through the

20   questions that we've already heard him answer.

21         MR. MULCAHY:  Yes, sir.  I would like to explore a little

22   bit about his training and knowledge.

23   BY MR. MULCAHY:

24   Q.  Mr. Rush, if you would, tell us a little bit about your

25   experience in the RV industry.

1  A.  Well, my father was in the business prior to me joining the

2  company.  But about when I was 14 years old, I started helping him

3  build truck campers and then it evolved into travel trailers and

4  continued on from there.

5  Q.  How many years have you been actively involved in building

6  travel trailers?

7  A.  Travel trailers, I'd probably say 35 years I built travel

8  trailers.

9  Q.  During that 35 years, can you estimate about how many travel

10 trailers you may have built?

11 A.  It's only an estimate, ten, 15,000 of them.

12 Q.  Now, from what I understood the other day that you testified,

13 Recreation By Design builds custom travel trailers as one of its

14 niche market; is that correct?

15 A.  Yes, that's the niche of our company, that's correct.

16 Q.  But in 2006 -- I'm sorry -- in 2005, you received a call from

17 Morgan Buildings & Spas to build some units for them; is that

18 right?

19 A.  Yes.

20 Q.  And if you would, tell us briefly about how that occurred.

21 A.  The conversation with Morgan?

22 Q.  Yes, if you'll tell the jury a little bit about the

23 conversation you had with Morgan Buildings & Spas to build units

24 for them.

25 A.  Well, we had got a phone call, and they actually needed some

1    travel trailers for the hurricane relief victims down here and

2    that's how it started.

3    Q.  And what type of units did you build for Morgan?

4    A.  It was like a handicap assist, it wasn't a full ADA unit or

5    anything like that, but it came up where we put larger doorways in

6    it so that a wheelchair could get through, we put wider hallways in

7    it so that you could roll down the hallway.  We actually got a

8    wheelchair and made sure it would fit in the areas.  We put grab

9    bars in the stool area and shower area for anybody that would need

10   them.

11   Q.  Did Morgan provide you any specifications regarding these

12   units?

13   A.  No.  The specifications were the verbal specifications that I

14   went over with Guy Morgan and Jim Shaligo, the people at Morgan.

15   Q.  If we can go to Exhibit 279.

16          And I believe we've seen this exhibit before.  Are these

17   certain features that were inside the Morgan unit that Recreation

18   By Design built for Morgan?

19   A.  Yes.  After the conversations I had with the Morgan group down

20   there, these are the specifications that we agreed upon that need

21   to come in the units that I produced for them.

22   Q.  Did Morgan give you any particular diagrams or schematics to

23   use to build a unit for them?

24   A.  No.  No, they did not.

25   Q.  Did you come up with your own diagrams and schematics for

1  Morgan?

2  A.  Well, yeah, with a library of parts being a custom builder,

3  what we would do is, once we produce a cabinet or something like

4  that, we put it in our library of parts.  And through our CAD

5  department, what we do is take particular parts and put them, place

6  them on the floor plan of the unit to create the floor plan of

7  stuff that we had used before and that's how we were able to create

8  what they wanted and give them the features they wanted with the

9  handicap assist and the wider doorways and hallways and stuff like

10  that.

11  Q.  Did you send any type of diagrams to Morgan, or did you do

12  something else about the type of unit you were going to build for

13  them?

14  A.  Well, what we did is, once I got through the conversation of

15  the way they wanted the unit is, I built them, we actually created

16  a drawing for them and sent them the drawing.

17  Q.  Did you build them any type of prototype product?

18  A.  Yes.  I actually built a prototype of the size and basically

19  the floor plan of what they wanted, and then actually had it

20  shipped down there and went down there and showed them the product.

21  Q.  Did Morgan have the opportunity to look over or inspect this

22  product?

23  A.  Yeah.  Actually, Guy Morgan, the owner of Morgan Buildings &

24  Spa, and I believe it was Jim Shaligo (PHONETIC) came out and

25  looked at the unit, and like this and like that, and then said,

1    well, would you be able to put a pop-out, or I call them a

2    slide-out on the side of it so we can put the sofa and have

3    additional room, and we said, yes, that would be no problem.

4    Q.  Can we have Exhibit 455.

5         Is this the floor plan of the Castanel unit, which would

6    be similar to the unit you just described that you showed Morgan?

7    A.  Yes, that's the actual unit that we built for Morgan.  The

8    original one did not have the assist manual slide, it did not have

9    that on it.

10   Q.  You're talking about this area right here (INDICATING)?

11   A.  That's correct, yes.

12   Q.  And would you call this a particular design, is it a galley

13   design or does it have a particular name for this design?

14   A.  Well, it's more of an open design, something that would work

15   for somebody that was -- could possibly be in a wheelchair that

16   would help them, assist them from the living room to the bedroom

17   and through the bathroom area.

18   Q.  Was this essentially one big room?

19   A.  Yes, yes.

20   Q.  And I think we'd seen some photos through Dr. Smulski earlier,

21   were there partitions that could open and close near the bathtub

22   and the toilet area?

23   A.  Yes.  It was actually what is known as an accordion door that

24   opened and closed and would snap off on one side.  You could have

25   it open on one side and closed on the other or have it closed on

1   both sides.

2   Q.  Could you pull up Exhibit 264, number 14, and is this an inside

3   view of that particular floor plan?

4   A.  Yes, that happens to be the kitchen area.

5   Q.  I am going to --

6           MR. MULCAHY:  Your Honor, may I approach?

7           THE COURT:  Yes.

8           MR. MULCAHY:  Hand you a pointer, Mr. Rush.

9           THE COURT:  By the way, I'm told that screen does work.

10  I don't think the witnesses were touching it hard enough yesterday.

11  Try it and see.

12          THE WITNESS:  Okay.

13  BY MR. MULCAHY:

14  Q.  Now, we talked the other day with Dr. Smulski, we talked about

15  some vinyl coverings that are in the unit.  Could you point out

16  some of the areas where you had vinyl coverings on the wood

17  products in this photo we're looking at?

18  A.  Yes.  Mostly all of my areas that you see here on the walls,

19  the cabinet doors, the wood around all of the cabinets, cabinet

20  doors down here, the back wall, the ceiling, that's all a vinyl

21  type of material that's over the hardwood plywood.

22  Q.  If we can have photo number 15.  Same group.

23          And is this the opposite side of the kitchen?

24  A.  Yes, it is.  That's where the table and the refrigerator area

25  is, that's correct.

1    Q.  And were the table and refrigerator, were those features that

2    were provided by Recreation By Design with this unit?

3    A.  Yes, they were.

4    Q.  And is that a traditional travel trailer refrigerator?

5    A.  No.  That is a house-type refrigerator, a 15-cubic-foot, a

6    frost-free refrigerator.  That was some of the features that RBD

7    put in there.  They put a freestanding electric range in, a large

8    kitchen sink in and a house-type toilet.  That's not really common

9    in your average travel trailer, them features there.

10   Q.  We can look at number 18.

11          And what are we looking at here?

12   A.  This is actually going down the hallway, going into the

13   bathroom/bedroom area.

14   Q.  And are those more vinyl-covered cabinet areas?

15   A.  Yeah, those are additional cabinet doors and drawers below and

16   more of the vinyl on the back wall back in that area (INDICATING).

17   Q.  Photo 19.

18          And is this inside, looking inside one of your cabinets?

19   A.  Yes, it is.  This is -- there's the back side of the cabinet

20   door.  This actually back here is a side wall that protrudes down

21   floor to ceiling.  Again, the vinyl ceiling trim and then the vinyl

22   on the end of the cabinet.

23   Q.  Is the vinyl -- or is the back wall, is that covered in vinyl

24   also?

25   A.  Yes.  The back wall has the same vinyl from floor to ceiling,

1    and then along this particular edge here is a rubber sealant that

2    goes across the top (INDICATING).

3    Q.  Number 27.

4              What are we looking at here?

5    A.  That is standing back probably by the refrigerator area,

6    looking towards the front of the unit.

7    Q.  And we're looking at, I guess, is that the nose of the trailer

8    or is that the rear of the trailer?

9    A.  That's actually the nose of the trailer.  There's a large

10   baseboard heater in the very front, the pop-out is on the left side

11   up there.

12   Q.  What are the little strips that I am seeing along the wall and

13   ceiling panel?

14   A.  Known in our industry, we call them a batten, but they're a

15   trim that would cover the seam of the -- where panels normally come

16   in 48-inch width and that's a seam that was at 48 inches.

17   Q.  What material are these panels made of?

18   A.  It's a hardwood plywood-type material.

19   Q.  Is that also a veneer?

20   A.  Yes, it is.

21   Q.  And would I find this in the average home?

22   A.  Well, you'll find it in furniture, there's a lot of home

23   furniture that has veneer.  A lot of your kitchen cabinet s,

24   bathroom cabinets, stuff like that is made of veneer.  A passage

25   door that might be going into a bedroom or bathroom would possibly

1    be a veneer door.

2    Q.  And how are these panels installed?

3    A.  Well, actually the panels are, when they're put on, there's a

4    wood frame that's made out of a two-by-two, two-by-four or truss

5    rafters or whatever.  And the panels are cut, and they're glued

6    onto the side walls or front and back walls, what we call with a

7    white, like an Elmer's Glue type, it's a white wood glue.

8    Q.  Are they nailed or stapled at all to the walls?

9    A.  Yeah, once we put them on, once we square the product up, we

10   staple them to the panel to the wood.

11   Q.  And is the batten strips you were saying earlier, that goes

12   over the seam?

13   A.  Yes, it does, yes.  Even in the seam areas, there's a white

14   wood glue put underneath of that when that application is done.

15   Q.  And how are the battens, are they stapled in place?

16   A.  The battens on stapled in place.  And then what we would do on

17   the batten, we would put a seam of caulk down them, along top of

18   the cabinets and on the battens.

19   Q.  When Morgan inspected the unit that you took down to them, did

20   they tell you that they approved the unit or did they -- other than

21   the pop-out, any other suggestions to make to the unit?

22   A.  They approved the unit, they liked it very much.  They thought

23   it was real roomy.  The ceilings are high, and I think there was,

24   particularly in this unit it's a seven-foot-tall ceiling, and they

25   asked us, the only change they wanted was to put the pop-out or

1    slide-out in it.

2    Q.  Other than that, were you advised that this unit met Morgan's

3    requirements?

4    A.  Yes.

5    Q.  And did you start producing units for Morgan based upon that

6    prototype and that meeting you had with Morgan?

7    A.  Yes, we did.

8    Q.  Now, we've seen some photos of your unit, let's see if we can

9    find one more that shows that wall.  If you can pull up number 21,

10   22.

11              Is that a long view looking from the living room area

12   that you were just in toward the bedroom?

13   A.  Yes, that would be a view standing approximately by the

14   refrigerator looking towards the back of the unit, that's correct.

15   Q.  Are we looking at the same type of vinyl coverings in this area

16   that we saw in the other areas of the trailer?

17   A.  Yes, that's correct.

18   Q.  Now, you had your discussions with Morgan and you built this

19   unit for them.  Was there any discussion as to how long they

20   anticipated end users would live in these units?

21   A.  No, it was just discussed that they were temporary housing for

22   the Katrina hurricane victims.

23   Q.  The materials that we just looked at on the ceiling and on the

24   walls, that's the hardwood plywood, correct?

25   A.  That's correct.

1  Q.  How much particle board would you have inside your unit?

2  A.  Well, possibly the slide-out floor, a couple of other items in

3  there, probably 5 percent.

4  Q.  Were mostly the materials on the wall and the ceiling, that was

5  the hardwood plywood?

6  A.  That's correct.

7  Q.  And how about the framing behind that, what type of materials

8  were those?

9  A.  Behind the panels?

10  Q.  Correct.

11  A.  That would be a pine material, like a two-by-two, two-by-four.

12  Q.  And were those studs?

13  A.  Yes, that's what -- everything is set on 16-inch centers,

14  that's kind of standard in our industry.

15  Q.  Now, the materials that you purchased for this unit, the wood

16  materials that you're describing, did you use your normal suppliers

17  for the units that you built for Morgan?

18  A.  Yes.  We didn't really know where this was going and, you know,

19  we wanted to be as much help as possible.  I used my existing

20  materials that I had prior to because I carry inventory, and we

21  continued on through using the materials while we built the relief

22  trailers.  And still use it today, even though we might change a

23  color of the vinyl.  I mean, that's something we do every year or

24  two.

25  Q.  Were these the same materials that you would use in one of your

1    custom units?

2    A.  Yes, yes, exactly.  These are what I was using prior to.

3    Q.  And I am primarily talking about the wood type of materials?

4    A.  Oh, yeah, the studding and stuff like that, yeah, absolutely.

5    Q.  Now, the jury heard you testify on Monday, I believe it was

6    this week, so a few days removed, but in 2006, prior to 2006, did

7    you know what the abbreviation LFE meant?

8    A.  No, I did not.

9    Q.  And by that, in 2005, did you have any type of company policy

10   or specifications to use LFE-designated materials?

11   A.  No, I did not.

12   Q.  Although you didn't know what the term or the phrase LFE meant,

13   what type of materials were you purchasing in 2005?

14   A.  Well, we were purchasing industry-standard materials.  Within

15   our industry it's big but it's not huge.  The mobile home industry,

16   the modular home industry, the RV industry, we use all of the same

17   type of materials, and that's what the materials that we use is

18   shared amongst the other manufacturers.

19   Q.  Do you know if these materials would be what is known as

20   HUD-compliant materials?

21   A.  Yes, that's part of the process of the manufacturing housing, I

22   believe, has to be HUD compliant.

23   Q.  And is there any particular level that HUD sets for

24   formaldehyde emissions from HUD-compliant materials?

25   A.  Yes, there are levels, yes.

1  Q.  And do you know what the levels would be for a hardwood

2  plywood?

3  A.  I believe it is .2 parts per million.

4  Q.  And how about for particle board?

5  A.  It would be .3 parts per million.

6  Q.  And is it your understanding that the walls and ceiling

7  panelling in the Morgan-style units would have been with

8  HUD-compliant materials?

9  A.  Yes, it's pretty much industry-standard materials.

10  Q.  Now, as to constructing this, in constructing your product,

11  constructing the travel trailer, are there industry standards for

12  that?

13  A.  Yes, there is.

14  Q.  And did Recreation By Design comply with industry standards

15  when it built its units?

16  A.  Yes, we do.

17  Q.  Does Recreation By Design have any particular type of quality

18  control procedures in place?

19  A.  Yeah.  We have a unique quality control procedure, and what I

20  do is, I pick a particular employee that is going to be my quality

21  control person that only answers to me.  In my past, before, if you

22  have your production manager that overrides your inspector,

23  sometimes things get away.  So I actually make the inspector that

24  I've appointed report directly to me so that things don't get out

25  of hand.

1060

1   Q.  Now, the other day we heard Mr. Mike Gaume testify by video, do

2   you remember that?

3   A.  Yes.  Mike Gaume, yes.

4   Q.  Mike Gaume, I think we've all said it a million different ways.

5   Was Mr. Gaume your production manager at the particular plant?

6   A.  Yes, he was the production manager at plant 2.

7   Q.  And is it your understanding plant 2 is where the Castanel unit

8   would have been constructed?

9   A.  Yes, that's what the documents show.

10  Q.  Did you work closely with Mr. Gaume in overseeing production at

11  plant number 2?

12  A.  Yes.  I've worked with Mike, we actually help build all of the

13  patterns that he had talked about in his deposition.  We

14  actually -- I created waterlines, plumbing systems, stuff like that

15  for him, made patterns so that -- this is what we're going to go

16  by, Mike, this is how the product is going to be built, and that's

17  the way it was built.

18  Q.  And based upon what you were telling me earlier, would

19  Mr. Gaume have been in charge of quality control at plant number 2

20  or would it have been yourself or someone else?

21  A.  No, I am actually in charge of all of the quality control in

22  both my plants, and I have individuals that answer to me.

23  Q.  Would that individual have not answered to Mr. Gaume as the

24  quality control person?

25  A.  He works with Mr. Gaume or Mike Gaume, he works with him, but

1  what my quality control guy will -- says goes.

2  Q.  At any time during the production of the Morgan units at plant

3  2 -- well, let's step back a little bit.  What time frame were the

4  Morgan units produced in plant 2?

5  A.  It would be in the '05 range, maybe possibly September,

6  October, through January.  Somewhere in that range, I am not

7  exactly sure on the dates.

8  Q.  At any time during that frame of time that you're manufacturing

9  these units, did any of your quality control personnel at plant 2

10  advise you that there was an issue of formaldehyde in the units?

11  A.  No, they did not.

12  Q.  Would they go through the units upon completion, how did that

13  work as far as their involvement?

14  A.  Well, on the inspector at the end of the production line would

15  go through the units, inspect, make sure all of the loose parts was

16  put in there, all the paperwork was put in there, and make sure

17  that everything -- we had a process before that, which we call a

18  red tag, where they would go in and mark any things that wasn't

19  done properly, and by the time it got to that station it was fixed

20  or it was not released.

21  Q.  Would your quality control person had the authority to come to

22  you to discuss any complications that they thought they had with

23  the unit at all?

24  A.  Yes, absolutely.  I have an open-door policy.  I mean, I am a

25  hands on the operation.

1    Q.  Prior to 2006, was Recreation By Design ever aware of any

2    concerns regarding the use of formaldehyde-emitting materials to

3    actually build these travel trailers?

4    A.  No, we were not.

5    Q.  You told me earlier you used your ordinary suppliers; is that

6    right?

7    A.  That's correct.

8    Q.  Did any of your suppliers, did they know that you were going to

9    be building travel trailers?

10   A.  Well, yeah, that's my business, it's always been my business.

11   Q.  Were you ever informed that the materials that you were

12   purchasing should not have been used to construct the travel

13   trailer?

14   A.  No, I use industry-standard material.

15   Q.  Were you ever advised that if you needed to place a warning on

16   your end product because of the use of these materials?

17   A.  Such as?

18   Q.  For formaldehyde, I'm sorry, for formaldehyde.

19   A.  No.

20   Q.  Do you know if there were concerns regarding formaldehyde

21   emissions in RVs in general in 2005?

22   A.  No, there was not.

23   Q.  The travel trailers?

24   A.  That's correct.

25   Q.  How about campers?

1    A.  No concern.

2    Q.  Are you aware of any standards that would regulate the levels

3    of formaldehyde emissions in travel trailers prior to 2006?

4    A.  No, there are none.

5    Q.  Were you aware of any standards regarding the -- regulate the

6    type of wood materials that could be used in travel trailers

7    regarding formaldehyde emissions prior to 2006?

8    A.  No.

9    Q.  Did any of the codes and standards that you used in

10   constructing your units require formaldehyde testing travel

11   trailers prior to 2006?

12   A.  No, they did not.

13   Q.  Were there any industry standards that required the use of LFE

14   materials prior to 2006?

15   A.  No, there's not.

16   Q.  Now, you said that you have roughly built ten, 15,000 units you

17   think in your long history in the RV industry?

18   A.  Yes, at least that, yes.

19   Q.  During that time, have you had any complaints regarding

20   formaldehyde emissions in any of the units that you're aware of?

21   A.  No, I have not.

22   Q.  How about of any of the people working with you, have they had

23   complaints regarding formaldehyde emissions?

24   A.  No.

25   Q.  And how about any end users or customers of these travel

1   trailers?

2   A.  No.

3   Q.  Has anyone ever informed you prior to 2006 you should use

4   different materials in the construction of your travel trailers?

5   A.  No, they have not.

6   Q.  Did Morgan make any particular requests for special types of

7   wood or wood products to be used in your travel trailer?

8   A.  No, they did not.

9   Q.  Is safety a concern of Recreation By Design?

10  A.  Yes, safety is always a concern.

11  Q.  And do you have any measures in place regarding safety and safe

12  use of your units?

13  A.  Well, yes, I mean, in particular units we use LP gas, we use

14  different phases of electric.  There's, I think in our -- we have

15  over 40 different warning signs in our manual.

16  Q.  On the hardwood plywood that you discussed earlier, you said it

17  was a type of veneer.  Is this something that I can purchase at a

18  normal lumber store?

19  A.  Well, veneer plywood is something that you can buy pretty much

20  anywhere, in like a Home Depot or Lowe's or something like that.

21  The veneer and plywood, I have a decorative vinyl on it that you

22  might not be able to find that particular color, but there is, yes,

23  it's available just about anywhere.

24  Q.  Have you ever purchased a veneer or a hardwood plywood from a

25  Home Depot or a Lowe's?

1   A.  Yes, I have.

2   Q.  Did you receive any warning from Home Depot or Lowe's regarding

3   the use of those materials for construction purposes?

4   A.  No, I did not.

5   Q.  Why did RBD choose to use hardwood plywood for its walls and

6   ceiling panelling?

7   A.  Well, it's lightweight to start with, it's easy to work with.

8   There's a lot of sawing and cutting that goes on and routing within

9   our industry, and it works very good for that.  It's -- bonds very

10  good to the studding that we use behind it.

11  Q.  Is it a lightweight material?

12  A.  Yes, it is.

13  Q.  Is it flexible?

14  A.  Yes, it's very flexible.

15  Q.  Does RBD do the vinyl coating itself or is it purchased that

16  way?

17  A.  No, that's purchased.  What a vendor will do is bring in the

18  material, their inventory, and then as you place your order, they

19  will put your particular vinyl.  I mean, the vinyl that I use was

20  vinyl that I had picked out that I was going to run in my products.

21  Q.  When RBD purchases its wood supplies, in this case its hardwood

22  plywood, do you happen to know how old those materials are when RBD

23  receives them?

24  A.  No.  I know that they have a regular ordering program.  I mean,

25  they could be several months old.

1  Q.  Now, you were here the other day when Dr. Smulski testified,

2  correct?

3  A.  Yes, I was.

4  Q.  And you heard regarding alternative materials, correct?

5  A.  Yes, I did.

6  Q.  Now, in 2005, prior to 2006, had you ever heard the terms

7  non-formaldehyde-emitting materials?

8  A.  No, I did not.  I was not aware of that.

9  Q.  Were you aware of Masonite in 2005?

10  A.  Yes, in general.

11  Q.  Did you know that -- make a connection from Masonite being a

12  non-formaldehyde-emitting material back in 2005?

13  A.  No, I did not.

14  Q.  Now, would Masonite make a suitable substitution for the

15  hardwood plywood in the travel trailer?

16  A.  Masonite is a very hard product, it would -- and that's a very

17  heavy product.  A quarter-inch piece of Masonite might weigh almost

18  30 pounds, where a piece of veneer panelling would weigh

19  approximately ten pounds.  And in order to fasten it to the

20  studding, the glue would not stick to it properly.  You would have

21  to drill holes in it to fasten it to the studding because it would

22  crack real easy, it's very easy to crack.

23  Q.  Does the weight issue of baseline present a problem as it

24  regards to travel trailer?

25  A.  Yes, I mean, the axles and tires and stuff that we put on have

1   a gross weight; yes, it would, it would be a -- could possibly put

2   us overweight.

3   Q.  And by overweight, do you mean the vehicle weight?

4   A.  That's correct.

5   Q.  Is Masonite a flexible material, the way that you described the

6   hardwood plywood?

7   A.  No.  Masonite is very stiff.  I mean, you can get fracture

8   cracks on it.  Recreational vehicles flexes and moves and stuff,

9   and the rooms come out, you're going down the highway.  Masonite

10  would tend to crack or develop problems.

11  Q.  Have you ever tried to use Masonite in one of your vehicles?

12  A.  Back in the early '80s my father and I, when we had our

13  business together, used it.  The problem, you know, once you make

14  your cut on it, it's opened up, and we had some -- we'd put it in

15  the bathroom area because I think the pattern was like, looked like

16  ceramic tile.  But where we had cut it and fastened it, we had

17  problems with it.  Once it gets moisture in it, it starts coming

18  apart.

19  Q.  Did you have any bowing or warping problems with Masonite?

20  A.  Yes, the thickness of what we used, it did bow.

21  Q.  Now, Dr. Smulski also mentioned possibly wrapping the hard

22  board-- I'm sorry, the hardwood plywood that we saw on the walls

23  and ceilings of the unit with the vinyl on both sides.  Is that an

24  acceptable way to use that material?

25  A.  Not really.  The problem that you would have when you would go

1   to glue and fasten the two-sided vinyl material to your studding,

2   the glue will not stick to vinyl.  It's a water-based white, like

3   Elmer's glue, will not stick to the vinyl, and I would have trouble

4   with the fastening of it.

5   Q.  And is hardwood veneer, is that a finished surface on both

6   surfaces, on both the front and back?

7   A.  Well, there's a good side and a bad side.  Just like plywood

8   that you use for flooring, one side has what they call sanded plug

9   and the other side is like, they grade it like A and B face.  And

10  the vinyl is put on the A face or B face, whatever grade it is, so

11  that you don't see the plugs and you get a nice look of a vinyl.

12        When you put it on both sides, if you're not very careful

13  in the production part of it, your employee could put the wrong

14  side up, the unit gets all put in, the cabinets in, and here

15  through the vinyl you can see a plug.  I mean, and it tends to

16  stick together when it's stacked in a pile, the way we receive it.

17  Q.  Now, let's move on to a different subject and let's talk a

18  little bit about ventilation.  What type of ventilation did the

19  Morgan units have?

20  A.  Well, as far as power, we had a 110-volt range hood above the

21  range that would suck the air or whatever they're cooking out the

22  exhaust vent and outside.  We had approximately, I believe it was

23  five windows that amounted to 20 to 25 square feet of windows, that

24  would be like having a five-by-five or four-by-five whole

25  completely in the side of the trailer.  I had a large screen door

1   on the front, I had what we call in our industry jealousy crank-out

2   windows.  Some of the people use sliding windows, but you weren't

3   able to keep them open during a rain.  With the jealousy window, it

4   will open up and you can get ventilation in a rainy condition.

5   Q.  Are you aware of any forced-air mechanical ventilation system

6   that was available in 2005 that would have allowed condition-forced

7   air into the unit?

8   A.  No, I was not.

9   Q.  How about the northern breeze, I think you were asked about a

10  northern breeze that was in your owner's manual?

11  A.  The northern breeze is an option that we put on our travel

12  trailers that's usually is a 12-volt system.  This particular unit

13  that we built is strictly 110-volt.  The vents are more of an

14  RV-type vent, they're not really that reliable that I would want to

15  put them on something like that.

16  Q.  Did Morgan request any particular extra ventilation on the

17  units when you came up with your list of specifications?

18  A.  No, they were happy with the amount of windows and stuff that

19  we had had placed in there for them.

20  Q.  Prior to this litigation, had you ever received any complaints

21  regarding formaldehyde in your units?

22  A.  No, I have not.

23          MR. MULCAHY:  Thank you, Mr. Rush.  I pass the witness.

24          THE COURT:  Thank you, Mr. Mulcahy.  Cross.  Again, I

25  don't want to cover what we covered previously.

```
 1                        CROSS-EXAMINATION
 2   BY MR. WATTS:
 3   Q.  Last question.  Prior to this litigation, no complaints, what
 4   time period were you first aware that you were being brought into
 5   this litigation?
 6   A.  It could possibly have been 2009, I am not for sure.
 7   Q.  Let me just ask you.  Counsel took you through some
 8   photographs, and the plan showed that this was a handicap assist
 9   travel trailer; is that right?
10   A.  Partially handicap assist, that's correct.
11   Q.  Now, the reason you built a handicap assist travel trailer is
12   to provide housing for people that are likely to be in wheelchairs.
13   A.  Well, possibly, or some other type of impairment they might
14   have.
15   Q.  When Morgan called you, they asked for a certain number of
16   wheelchair-accessible travel trailers, right?
17   A.  Yes, they did.
18   Q.  How many did they ask for?
19   A.  Well, there was -- I believe it was 1541.  What they done was,
20   they had a contract, I believe, they asked me for 1540 I believe,
21   something like that.
22   Q.  So of the 2600 that were made pursuant to the contract, 1540
23   and change were wheelchair assists.
24   A.  Yes, that's correct.
25   Q.  And you understood the reason they were asking for that, down
```

1    here in Louisiana like anywhere else where you might have a

2    disaster, some of the people that have housing needs are old,

3    infirmed and in wheelchairs, right?

4    A.  Well, yes, and it made it accessible for them, yes.

5    Q.  So you understood with respect to wheelchair assist travel

6    trailers like the one that Earline Castanel got, that it was

7    expected that elderly people would be in those trailers.

8    A.  No, it wasn't expected that elderly people would be in the

9    trailers, no.

10   Q.  Just people in wheelchairs.

11   A.  Well, people with impairments, that's correct.

12   Q.  People who were medically challenged already?

13   A.  Not necessarily.  I mean, we made it accessible for somebody

14   that would -- that could have been impaired, I don't know if you

15   would want to call it medically, that's your term.

16   Q.  Did you understand when you filled this order for 1540

17   wheelchair-assist travel trailers that the people who went in them

18   were likely to have more medical problems than your general people

19   in the population, that's why we wanted the wheelchair assist?

20           MR. MULCAHY:  Objection, your Honor.  I know we've talked

21   about it being a handicap unit but not regarding knowledge of what

22   he would expect.

23           THE COURT:  I'm going to let him answer.  I think based

24   upon the questions that have been asked us up to this point, I

25   think it's a logical question.  Go ahead and let him answer.

1        THE WITNESS:  Would you ask me the question again,

2   please.

3   BY MR. WATTS:

4   Q.  Did you understand when you filled an order for 1541

5   wheelchair-assist travel trailers that the people who were going to

6   go in those travel trailers were likely to have more medical

7   problems than the general population?

8   A.  Not necessarily.  I mean, there are people in wheelchairs that

9   are basically fine except, you know, they might have lost a limb.

10  Q.  And there are others that aren't basically fine.

11  A.  That's a possibility.

12  Q.  Now, counsel asked you some questions about Morgan.  You

13  understood at the time that Morgan is not a manufacturer of travel

14  trailers.

15  A.  That's correct.

16  Q.  Basically, what they do is they distribute travel trailers

17  manufactured by others, right?

18  A.  That's correct.

19  Q.  In terms of the manufacturing process of travel trailers, you

20  would consider yourself to have more expertise in that regard than

21  the people over at Morgan; you are the one that did it, right?

22  A.  Well, I build to industry standards, that's correct.

23  Q.  Now, I want to try to pin down what it is that you're saying

24  about this industry standards issue.  Number one, as I

25  understand --

```
 1              MR. WATTS:  May I approach, your Honor?

 2              THE COURT:  Yes.

 3   BY MR. WATTS:

 4   Q.  You did not know what the phrase LFE meant in 2005, right?

 5   A.  No, I did not.

 6   Q.  If I had come up to you in 2005 and had just written down LFE,

 7   you wouldn't know what it stood for, right?

 8   A.  That's correct.

 9   Q.  You had never seen LFE on any of the wood that came in to your

10   facility.

11   A.  That's correct.

12   Q.  You worked around wood that came in through your suppliers,

13   over and over and over again for years, right?

14   A.  Yes, that's correct.

15   Q.  You put your hands on the wood, right?

16   A.  Occasionally, yes.

17   Q.  You worked with wood that was covered with vinyl and not

18   covered with vinyl, right?

19   A.  As like a pine two-by-four, two-by-six, whatever?

20   Q.  Sure.

21   A.  Yes.

22   Q.  Let me just ask you:  You said that the way you got the vinyl

23   on was, you would go to your suppliers and tell them what color you

24   wanted or something like; is that right?

25   A.  On the vinyl.
```

1   Q.  Would you go to their plants?

2   A.  No, they would bring it out, the sales staff would bring it

3   out, the samples.

4   Q.  Now, here is my question:  On any, on any piece of wood that

5   you worked with up to 2005, you never saw an LFE stamp on the wood,

6   right?

7   A.  Not to my knowledge.

8   Q.  Are you aware that if you have low formaldehyde-emitting wood,

9   it comes with an LFE stamp?

10  A.  No, I don't.  2005, no.

11  Q.  So just so that we're clear, none of the wood that you used in

12  the fall of 2005 to make these 2600 units, no piece of wood that

13  you saw had an LFE stamp on it.

14  A.  No, the material I use was the industry-standard material.

15  Q.  That wasn't my question.  It's a very specific question.  None

16  of the wood that you used to build these 2600 trailers had an LFE

17  stamp on it, any of it.

18  A.  No.  And it was not required.

19  Q.  So we can be certain that all of the wood that went into

20  Earline Castanel's trailer did not have an LFE stamp on it, right?

21  A.  That could be correct.

22  Q.  That is correct; that's what you just told us, right?

23  A.  That's correct.

24  Q.  Did you in the direct examination say that you were HUD

25  compliant?

```
 1   A.  No, I did not.  I said the materials that are in the industry
 2   standard.
 3   Q.  Let's visit about that.  Counsel asked you some questions about
 4   the HUD standard, and this is in evidence, I forget what the number
 5   is, you just introduced it --
 6            THE COURT:  858.
 7            MR. WATTS:  858, okay, thank you.
 8   BY MR. WATTS:
 9   Q.  I just want to make sure I'm clear.  You were not aware of any
10   HUD standard in 2005; we covered that on Monday, right?
11   A.  That's correct.
12   Q.  You don't know whether this notice of proposed rule making was
13   ever implemented; is that right?
14   A.  I assume it was.
15   Q.  You assume it was, but you don't know whether that happened.
16   A.  No, that's correct.
17   Q.  Let me just ask you.  In the rule making that your lawyer put
18   into evidence, this is a standard for manufactured housing; do you
19   see that?
20   A.  Yes, I do.
21   Q.  Are you -- you understand that manufactured housing, in order
22   to comply with this proposed rule, they have to put a formaldehyde
23   warning stamp and display it in the kitchen?
24   A.  Yes.  In the HUD, that's correct, in manufactured housing.
25   Q.  Were you aware of that in 2005?
```

1  A.  No, I was not.

2  Q.  What we do know is, is that by 2005 you were getting those

3  MSDSs that had a proposed warning in the back?

4       MR. MULCAHY:  Objection, your Honor, we didn't discuss

5  MSDSs on direct.

6       THE COURT:  I am going to overrule.

7       MR. WATTS:  Segue, yeah, right?  Do you remember the

8  question?

9       THE WITNESS:  Ask me the question again, please.

10      THE COURT:  Wait one second.  We don't have this number

11  as having been admitted.  Is there any objection to this being

12  admitted?

13      MR. YOUNT:  No objection, Judge, it's probably

14  mislabeled.

15      MR. WATTS:  If they just put it in, I apologize if it's

16  the wrong number, that's why I was guessing.

17      THE COURT:  Okay.  All right.

18  BY MR. WATTS:

19  Q.  I think my question was before the objection that you remember

20  in 2005 there was that MSDS that had the proposed warning that was

21  provided?

22      MR. MULCAHY:  Objection again, your Honor, MSDS has been

23  talked about.  Can we have a side bar?

24      MR. WATTS:  I thought you already ruled on this.

25      THE COURT:  I did, I overruled the objection.  We are not

1    going to talk about it again, he is referring to it in order to ask

2    the next question.

3              MR. WATTS:  The next question.

4              MR. MULCAHY:  I am just talking about the dates that he

5    is referring to.  May we approach, your Honor?

6              THE COURT:  Come on up.

7         (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

8              MR. MULCAHY:  The basis of my objection is that the same

9    MSDS that you had in 2005, and I believe that that's been shown now

10   through Dr. Smulski and some other witnesses, so it's 2006 MSDS,

11   and that's the basis of my objection.

12             MR. WATTS:  And he testified he had been getting them

13   since 1999.

14             THE COURT:  So why don't we just make clear that whatever

15   he got at the time of the question you're asking, which I think is

16   late 2005?

17             MR. WATTS:  Yes, sir, I'll take care of it.

18             THE COURT:  Which is the manufacturing date.

19        (OPEN COURT.)

20   BY MR. WATTS:

21   Q.  At the time that you were receiving MSDSs in late 2005, they

22   had a proposed warning with respect to formaldehyde that was

23   provided in the MSDS, right?

24   A.  That's correct.

25   Q.  Now, you said in your direct testimony, in 2005 there were no

1    standards regulating the type of woods, right?

2    A.  In the RV industry, that's correct.

3    Q.  In the travel trailer industry?

4    A.  That's correct.

5    Q.  In terms of the industry standard, do you know whether the

6    industry standard with respect to travel trailers requires an LFE

7    stamp on low formaldehyde-emitting wood?

8    A.  I don't know about the stamp, I know the industry does not

9    require the low formaldehyde materials.

10   Q.  That wasn't my question.  My question is, do you know whether

11   it's the industry practice when you deliver low

12   formaldehyde-emitting wood as opposed to regular

13   formaldehyde-emitting wood, it's supposed to have an LFE stamp on

14   it?

15            MR. MULCAHY:  Objection, lack of foundation.

16            MR. WATTS:  That's why I asked do you know.

17            THE COURT:  Well, he is asking him if he knows that.

18   BY MR. WATTS:

19   Q.  Do you?

20   A.  No, I don't.  No.

21   Q.  Were you trying to suggest to this jury that it was not

22   feasible to use no formaldehyde-emitting wood in 2005?

23   A.  No.

24   Q.  You agree that in 2005 it was feasible for you to use no

25   formaldehyde-emitting wood had you chosen to do so.

1  A.  I was not aware of that.

2  Q.  That wasn't my question.

3  A.  Well, I am not aware of it.

4  Q.  Had you chosen to do so, if you had known about it, you agree

5  that it would have been feasible for you to have used no

6  formaldehyde-emitting wood in 2005?

7  A.  What type of wood?

8  Q.  No formaldehyde-emitting wood that's listed on 12 different

9  suppliers.

10  A.  Well, what you had showed me or what I had seen and I think it

11  was Smulski's testimony was Masonite.

12  Q.  Well, I think that was one example of 12 different --

13  A.  And Masonite is not acceptable in my industry.

14  Q.  Let me just see if we can follow-up.

15  A.  Okay.

16  Q.  Masonite is something you heard of it, right?

17  A.  Masonite is a brand name that is -- it's just it's not the

18  product, it's a brand name.

19  Q.  Okay.  Here is my question, and to be honest with you, we

20  brought it because everybody has heard of it.  But are you aware of

21  all of the other different offerings of no formaldehyde-emitting

22  wood that were available in 2005?

23  A.  Not within my industry, no.

24  Q.  So you've been in this lawsuit for how long?

25  A.  A year, year and a half.

```
 1   Q.  In that year, year and a half, have you called up Columbia

 2   Forest Products and asked to see any of their no

 3   formaldehyde-emitting wood?

 4   A.  So this is after 2006 you're talking about?

 5   Q.  Yeah, I'm just asking, while you've been here, before you

 6   testified.

 7            MR. MULCAHY:  Objection, your Honor, relevance.

 8            THE COURT:  I will sustain that one.  I think we need to

 9   focus on the time period for this particular product.

10            MR. WATTS:  Yes, sir.

11   BY MR. WATTS:

12   Q.  Focussing on the time period that this particular problem --

13   product, we can agree that no formaldehyde-emitting wood was

14   commercially available for you to use.

15            MR. MULCAHY:  Objection, your Honor, foundation.

16   BY MR. WATTS:

17   Q.  If you know.

18            THE COURT:  If he knows, he can answer.

19            THE WITNESS:  No.  In the 2005 range is what you're

20   talking about?

21   BY MR. WATTS:

22   Q.  Yes, sir.  The date we're -- the issue is where to buy hardwood

23   plywood.  Did you get information from suppliers about what their

24   offerings were?

25   A.  No, I did not get information from the existing vendors that I
```

1    use, no.

2    Q.  What vendors did you use?

3    A.  Pardon?

4    Q.  What vendors did you use?

5    A.  We used Robert Weed Plywood, BlueLinx.

6    Q.  Anybody else?

7    A.  They were the basic ones that I used, they are the ones in the

8    industry.

9    Q.  Did you ever have presentations from these other 12 examples of

10   companies?

11   A.  I have not heard of some of them.

12   Q.  What about the ones you've heard of, you've heard of Columbia

13   Forest Products, haven't you?

14   A.  No, I have not.

15   Q.  You haven't heard of Columbia Forest Products?

16   A.  No, I have not.

17   Q.  Oh, okay.

18          You told the jury there was no forced-air system

19   available in 2005 that would have allowed conditioned air to be

20   forced in?

21   A.  Not that I was knowledgeable of.

22   Q.  That's an important distinction, and let me see if we can go

23   about it this way:  You were not knowledgeable of LFE wood in 2005,

24   either.  My question is a little different than that, and that is,

25   is it your testimony that in 2005 there was no

1   commercially-available ventilation system that provided forced air?

2   A.  Not that was standard in the industry, that's correct.

3   Q.  That was a little different, not that was standard in the

4   industry, that's not my question.  My question was, was there a

5   forced-air ventilation system commercially available in 2005?

6   A.  Not that I am aware of.

7   Q.  Not that you were aware of, okay.  Now, you're not saying that

8   it didn't exist, you're just saying you didn't know about it.

9   A.  I didn't know about it.

10          MR. WATTS:  Those are all of my questions.  Thank you,

11  sir.

12          THE COURT:  Okay.  Thank you.  Redirect.

13                      REDIRECT EXAMINATION

14  BY MR. MULCAHY:

15  Q.  Mr. Rush, are you aware of any travel trailer manufacturers

16  that are used forced-air ventilation systems in 2005?

17  A.  No, I am not.

18  Q.  And it's your testimony today that, as of 2005, you were not

19  familiar with the term LFE; is that right?

20  A.  That is correct.

21  Q.  But you were purchasing industry-standard materials; is that

22  right?

23          MR. WATTS:  Objection, leading.

24          THE WITNESS:  That is correct.

25          THE COURT:  Let's not lead the witness.

1              MR. MULCAHY:  Yes, sir.

2   BY MR. MULCAHY:

3   Q.  You heard testimony the other day regarding the Masonite

4   material, correct?

5   A.  Yes.

6   Q.  And you're familiar with -- are you familiar with Masonite

7   through your years of working in the construction industry?

8   A.  Yes, yes, I am, it's a type of hard board panel.

9   Q.  And is that one of the materials that's been identified as a

10  non-formaldehyde-emitting material?

11  A.  Yes, it was, that's correct.

12  Q.  And did you hear Mr. Mallet testify the other day regarding the

13  use of that material as an alternative to the hardwood plywood in

14  your existing units?

15  A.  Yes, that's what his recommendation was, yes.

16  Q.  And it's -- and is it your testimony today that that's just a

17  non-acceptable type of material to utilize in a travel trailer?

18              THE COURT:  Let's not lead the witness.

19              THE WITNESS:  Like I had said earlier, I mean-

20              THE COURT:  Wait one second.

21  BY MR. MULCAHY:

22  Q.  Is it your testimony --

23              THE COURT:  Let's not ask him is this your testimony.

24  Let's ask him a question and then he'll give us his testimony.

25  BY MR. MULCAHY:

1  Q.  Would Masonite be an acceptable alternative to hardwood plywood

2  in your travel trailers?

3  A.  No.  Masonite -- and I gave you the reasons it's not acceptable

4  in my product.

5  Q.  In 2005, were you purchasing materials from vendors that

6  supplied other travel trailer manufacturers?

7  A.  Yes, I did, that was -- yes.

8  Q.  Were you purchasing the industry-standard materials, to your

9  best recollection?

10  A.  Yes.  Yes, I did.

11  Q.  Were these the same materials that you were utilizing prior to

12  2006 in your custom-made trailers?

13  A.  Yes.  Like I had explained earlier, the existing materials that

14  I used prior to the Katrina disaster, yes.

15  Q.  And what type of custom trailers customers would you have?

16  A.  Well, you know, the web site that you seen earlier is, you

17  know, we build a lot for the movie industry, we build what they

18  call star trailers or three-suite trailers or whatever.  And we've

19  had some pretty big people, pretty big names of people that have

20  stayed in our units.  Julia Roberts had made a movie and they used

21  one of our units.  Madonna had made some kind of, I don't know if

22  it was a video or whatever, and they used our units.

23  Q.  Did you ever receive any complaints from those customers

24  regarding formaldehyde in your units?

25  A.  No, I have not had a complaint.

1   Q.  Does RBD build safe units?

2   A.  Yes, they do.  We're very safe units.

3   Q.  Is this a rocket ship we're talking about?

4   A.  No.  It's basic construction.  I mean, it's similar of what a

5   house would be built, there's just different components used.

6           MR. MULCAHY:  That's all the questions I have, your

7   Honor.

8           THE COURT:  Okay.  Thank you, you can step down, sir.

9   Thank you.

10          THE WITNESS:  Thank you.

11          THE COURT:  All right.  Who do we have next?

12          MR. GARRISON:  We have a video, Judge.  It is Travis

13  Morris, and we have a length of 17 minutes, 25 seconds.

14          THE COURT:  Why don't we go ahead and take that one and

15  then we'll go ahead and take a short break.

16          This is Travis Morris, M-O-R-R-I-S, and he has been sworn

17  in, counsel are present, and here is his testimony.

18      (WHEREUPON, THE VIDEO OF TRAVIS MORRIS WAS PLAYED.)

19  Q.  Mr. Morris, are you employed by FEMA?

20  A.  Yes, sir.

21  Q.  And by FEMA, you understand I'm referring to the Federal

22  Emergency Management Agency?

23  A.  Yes, sir.

24  Q.  And when did you first start working for the Federal Emergency

25  Management Agency?

1   A.   In October of 2005.

2   Q.   And what was your position at that time?

3   A.   Community relation specialists.

4   Q.   Were you also designated as a disaster assistance employee?

5   A.   Yes, sir.

6   Q.   And is that also referred to as a DAE?

7   A.   Correct.

8   Q.   And as a disaster assistance employee, is that part of the FEMA

9   ready reservist program?

10   A.   Yes, it is.

11   Q.   What is the ready reservist program?

12   A.   We're employees that, basically, get about 24 hours notice, and

13   we respond to whatever the requirement is for.

14   Q.   In October when -- in October 2005 when you first started

15   working for FEMA as a community relation specialist, what disaster

16   were you assigned to respond to?

17   A.   It was Hurricane Wilma in the Fort Lauderdale area of Florida.

18   Q.   And did there come a time when you went to work and responded

19   to the Hurricane Katrina and the Hurricane Rita disasters?

20   A.   In previous employment with the American Red Cross, yes, sir.

21   Q.   And when did you first start working for the -- well, when were

22   you working for the Red Cross in response to Hurricane Rita and

23   Hurricane Katrina?

24   A.   In August of 2005.

25   Q.   And how long did you work for the Red Cross in response to

1    Hurricane Rita and Hurricane Katrina?

2    A.  Until October of 2005.  My employment with FEMA.

3    Q.  And what was your duties and responsibilities for the Red

4    Cross?

5    A.  I was a response technology team member, and I was a site lead.

6    I was responsible for all the setup of time maintenance of

7    communications equipment, of databases, and also the dispensable --

8    dispensing and accounting for non-parishable property for the

9    American Red Cross.

10   Q.  Where were you based when you were working for the Red Cross?

11   A.  New Orleans.

12   Q.  Were you in New Orleans when the hurricane struck?

13   A.  Yes, sir.

14   Q.  Were you there during the immediate aftermath of the hurricane?

15   A.  Yes, sir.

16   Q.  Were you -- did you remain in New Orleans until October of

17   2005?

18   A.  I remained in the locality, yes.

19   Q.  Now, did there come a time when, in your employment for FEMA,

20   you were tasked to respond to Hurricane Rita and Hurricane Katrina?

21   A.  Later on in August of 2006 I was pulled out to New Orleans for

22   a DHOPS project.

23   Q.  You used the phrase DHOPS, is that D-H-O-P-S?

24   A.  Correct, disaster housing operations.

25   Q.  I'm sorry, what was that, sir?

```
 1   A.  Disaster housing operations.

 2   Q.  And what was your position when you were activated in -- for

 3   purposes of responding to Hurricane Katrina and Rita?

 4   A.  As a DHOPS inspector?

 5   Q.  I'll get to this in a minute.  Where were you based?

 6   A.  Initially out of the Gretna, Louisiana, office.  Gretna is a

 7   smaller city within the city of New Orleans.

 8   Q.  And then later on, where -- did that change?

 9   A.  I was roaming around statewide for a while there, and then some

10   time around February or March of 2007, I was called to the Harahan

11   office in New Orleans.

12   Q.  As a DHOPS inspector, what were your duties and

13   responsibilities?

14   A.  To regularly put eyes on DHOPS' assets, travel trailers, park

15   models and mobile homes, to determine their occupied status and

16   also the general condition and any maintenance items that may be

17   needed.

18   Q.  I want to draw your attention to July 2007.  At that time where

19   were you based?

20   A.  I was in Harahan.

21   Q.  And were you working the DHOPS office out of Harahan?

22   A.  Yes, sir.

23   Q.  And what were your responsibilities in July of 2007, generally?

24   A.  Generally, again, to put eyes on every unit within our area of

25   responsibility, to speak with any inhabitants, to determine an
```

1    occupied or unoccupied status, general condition of the unit, and

2    also to relay back any maintenance items, issues, park issues.

3    Q.  Did you ever have any responsibility relating to distribution

4    of a FEMA formaldehyde flyer in July of 2007?

5    A.  Yes, I did.

6    Q.  And what were your duties and responsibilities relating to the

7    distribution of that flyer?

8    A.  Every morning we would be given a list in a specific area and

9    we would plan out our day, route that list; so in an orderly

10   fashion, we could proceed through and actually get out to every

11   area unit that we were tasked with.

12   Q.  Was the distribution of this formaldehyde flyer a high

13   priority?

14   A.  Yes, it was.

15   Q.  And how did you become aware or learn that it was a

16   high-priority mission?

17   A.  We were told this is what we would be doing.

18   Q.  And how many days did you work on distributing this flyer to

19   trailer occupants?

20   A.  Over a period of about four days or so.

21   Q.  Did you actually -- were you actually responsible for

22   delivering the flyer to trailer occupants or trailers?

23   A.  Yes, sir.

24   Q.  Over the course of these four days, approximately how many

25   flyers did you deliver?

```
 1   A.  Quite a few, really.  Quite a few.

 2   Q.  What's your -- I know that this was a long time ago.  What is

 3   your best estimate of how many that you delivered?

 4   A.  Would a range be acceptable?

 5   Q.  Yeah.  That would be fine.

 6   A.  I would say anywhere between -- all the way from 100 up to a

 7   couple hundred.

 8   Q.  What was the geographic footprint, the area that you delivered

 9   these flyers to?

10   A.  My area was mainly the area of east New Orleans, 90, over off

11   of Chef Menteur Highway.

12   Q.  I asked you earlier about whether this was a high-priority

13   mission.  Who related to you that this was a high-priority mission?

14   A.  Our office manager, Leo Baufman.

15   Q.  And what did Mr. Baufman tell you?

16   A.  That this was a high-priority project that needed to be done

17   yesterday.

18   Q.  Now, when you delivered these formaldehyde flyers, were you

19   work individually or did you work with other employees and deliver

20   them as a team?

21   A.  Individually.

22   Q.  Take me through the process of delivering a flyer to a travel

23   trailer.

24   A.  We would start off in the morning.  Again, we would be given a

25   list of units that needed coverage within our area, we would sort
```

1   out and route the units in a logical fashion so we could proceed

2   through, and we would get in the car and we would go until it was

3   done.  We would get on-site.

4           When we approached the unit, we would knock a few times,

5   stop, look, listen, and, you know, just determine if anyone was in

6   there.  If someone answered the door, we would talk to them and let

7   them know that this was information that they needed and gave them

8   the contact information if they had any questions or concerns.  And

9   we would go on to the next one.

10  Q.  And what would you do in the event that the trailer was not

11  occupied at the time that you arrived at the site?

12  A.  We would leave the flyer there.

13  Q.  And where would you place the flyer?

14  A.  Usually, we would double it over and put it into the door edge,

15  and I would put it as far up, as close to the drop edge of the door

16  as I could.

17  Q.  Why would you do that?

18  A.  That way when someone came home it was right in their face.

19  You know, there was basically no way they could look at the door

20  and miss the flyer.

21  Q.  Did you take any precautions to prevent the flyer from getting

22  wet in case it rained or anything like that?

23  A.  Well, putting it up there close towards the drip edge would

24  offer it a little protection.

25  Q.  In your estimation, for the units that you delivered it where

1   they were unoccupied, would there have been any way for an occupant

2   when they arrived home to have missed seeing that?

3   A.  It would be highly unlikely.

4   Q.  Why do you say that?

5   A.  Again, because of the placement.  You know, I would try to put

6   it right there.  An average-height person, it would generally be at

7   eye level as they were directly looking at the door.

8   Q.  If they opened the door, would it then fall down?

9   A.  Yes, sir, it would.

10  Q.  I'm going to hand you a document, which we'll mark as Exhibit

11  Number 1.  And has previously been marked as Larson Exhibit Number

12  3.  And this document is also assigned Bates numbers at the very

13  top up here, FEMA 09-000388, and in the bottom right-hand corner,

14  Larson_EX-000007.  Do you recognize the document which is marked as

15  Exhibit number 1?

16  A.  Yes, sir, I do.

17  Q.  Is this document a true and accurate copy of the formaldehyde

18  flyer that you distributed in July 2007?

19  A.  Yes, it is.

20  Q.  Now, this formaldehyde flyer is labeled at the top:  Important

21  Formaldehyde Information For FEMA Housing Occupants; is that

22  correct?

23  A.  Yes, it is.

24  Q.  Now, did you yourself have any involvement with the preparation

25  of this formaldehyde flyer?

1  A.  No, sir.

2  Q.  What would you relate or information would you relate to the

3  occupied units when you delivered this formaldehyde flyer, Exhibit

4  number 1?

5  A.  Well, that the information was there, and if it was causing any

6  problem for the family that these were the numbers to call with

7  questions and concerns.

8  Q.  And this formaldehyde flyer had a telephone number on it; is

9  that correct?

10  A.  Correct.

11  Q.  When you referred to the number to call, was that the numbers

12  that you would have referred them to?

13  A.  Yes, it is.

14  Q.  And this formaldehyde flyer had three basic headings in there:

15  Why are you receiving this information; what is formaldehyde; and

16  how might formaldehyde affect me and my family.  Is that correct?

17  A.  Yes, sir.

18  Q.  In the first paragraph what FEMA informed the occupants is that

19  FEMA is providing this information to help you and your family

20  better understand what formaldehyde is and how it could affect

21  living in health conditions in your FEMA-provided housing unit.  We

22  are also providing you with a phone number, where you can receive

23  additional information about formaldehyde and discuss your disaster

24  housing situation with a FEMA specialist, and that's referencing a

25  phone number down below.  Is that right?

1    A.  Correct.

2    Q.  It also said -- explains, what is formaldehyde in the second

3    paragraph; is that right?

4    A.  Yes, sir.

5    Q.  And that explained to the occupants who received this flyer:

6    Formaldehyde is a common indoor air pollutant that can be found in

7    nearly all homes and buildings.  It is a colorless gas that is

8    released into the home from a variety of indoor sources.

9    Formaldehyde can also be found in a variety of materials used in

10   home construction and products for every day living.  Did I read

11   that correctly?

12   A.  Yes, you did.

13   Q.  So was there ever a time in any of your responsibilities of

14   going out to these trailers and delivering any type of information,

15   was there ever a time when you would go back a second time in order

16   to make sure the resident received that information?

17   A.  For this particular project, it was -- we came in and we had to

18   get it done by yesterday.  So if it was assigned to us again the

19   next day, as I said with, you know, the still to-do list, we would

20   go back.  But I couldn't really say that any concerted effort was

21   made that I know of.

22        Now, I mean, in my particular case, we were just basically

23   kind of worker bees, just getting it as we were going along.  So if

24   it came back up, yes, we would go back there, but as -- no.

25   Q.  After you would leave a flyer if an occupant was not there, did

1    you ever have any mechanism for checking to see whether or not that

2    occupant actually received the flyer?

3    A.  As a matter of routine, again, one of the other things that was

4    part of our responsibility with the occupied and unoccupied status,

5    we would go back, and if it sat on the door or taped to the door

6    for a few months, you know, it was noted, and -- I'm not sure if

7    that really answers your question.

8    Q.  Well, I think it kind of answered it.  Let me see if I

9    understood correctly.  You're saying that if you happened to note

10   that a flyer, such as this one but not exclusive of this, if a

11   flyer was still there, you would note it, but it wasn't a matter of

12   practice for you to go back and check to make sure that any flyer

13   had been received?

14   A.  As far as we were concerned, you know, we were checking.  You

15   know, obviously, if there is a flyer still taped up on a door after

16   a couple of weeks, I can only speak for myself.  I kept fairly good

17   notes at the time, I don't have them anymore.  But I would take

18   notes, you know, dog dishes buried in three inches of mud and

19   things like that.  So a lot of these it was fairly obvious if no

20   one was residing there, so it was just, again, matters of routine.

21   Q.  Were you ever specifically asked any questions about

22   formaldehyde?

23   A.  No.  It's a problem that kind of popped up all at once.

24   Q.  Let me back up.  When did this all of a sudden pop up, to use

25   your words?

1    A.  Out of the blue?

2    Q.  Yeah, out of the blue, right.

3    A.  About July.

4    Q.  Of 2007?

5    A.  Yes, ma'am.

6    Q.  And at that time, did it appear that this was a widespread

7    concern among occupants?

8    A.  Once people started finding out, you know, one, that they would

9    get, you know, money for a CDC and a FEMA inspector to come in and

10   look at it, and after they found out that they could either get

11   turned to different housing or a larger housing unit -- I don't

12   want to drift too much on this, but the folks that had previously

13   asked you, you know, every two or three days if you could move them

14   out of a travel trailer and into a mobile home, all of a sudden

15   they had formaldehyde.  You know, no other problems in the world,

16   but all of a sudden, once it's found out that this is a, kind of a

17   silver bullet to get out of the travel trailer, all of a sudden,

18   the folks did have formaldehyde problems.

19   Q.  And I have just a few more questions.  You had stated that your

20   supervisor in the Harahan office was Leo Baufman is his name?

21   A.  Yes, ma'am.

22   Q.  That he said that this project needed to be done yesterday?

23   A.  Yes, ma'am.

24   Q.  What did he mean by that?  What did you understand him to mean

25   by that?

1    A.  This was very high priority, had to be done now.

2    Q.  Mr. Morris, if you had had the flyer that is shown in Exhibit 1

3    prior to July 2007, could you have delivered it?

4    A.  Yes, absolutely.

5    Q.  Did you believe that those occupants who expressed concern

6    about formaldehyde had a legitimate concern?

7    A.  Absolutely.  We'd investigate it, and, you know, go in there

8    and poke around because, you know, if someone has a concern about

9    something, you know, you can't dismiss anything outright.

10   Q.  When you said you'd go in and poke around and investigate for

11   formaldehyde, what would you do?

12   A.  It was very unscientific and, again, you know, without the

13   training or the background to really accomplish it, we would go in

14   and, you know, we'd look, listen and feel, and, you know, just kind

15   of use our own nose and eyes to, you know, be a weather gauge for

16   that.

17        (CONCLUSION OF VIDEO DEPOSITION OF TRAVIS MORRIS.)

18        THE COURT:  All right.  Let's go ahead and turn the

19   lights up.

20        Counsel, we can go ahead and take a short break now if I

21   am looking at our schedule correctly.  Are we still on the same

22   schedule for the balance of the day?

23        MR. GARRISON:  Yes, sir.  The next video is 45 minutes,

24   so...

25        THE COURT:  Okay.  Let's go ahead and take -- it's about

```
 1    2:45, if you all can be ready at three o'clock, we'll come back and
 2    we'll finish up for the day.
 3              THE MARSHAL:  All rise.
 4         (WHEREUPON, THE JURY EXITED THE COURTROOM.)
 5              THE COURT:  Okay.  So we have Lapinski, Compeau and
 6    Boyle, am I saying that correct?
 7              MR. WATTS:  If my math is right, that ends at about 503.
 8    If those links are right, we get to about 503.
 9              MR. GARRISON:  Approximately.
10              THE COURT:  All right.  Good.  Let's go ahead and have
11    those cued up and we'll start them as soon as we come back in.
12              MR. WATTS:  Okay.
13              MR. GARRISON:  Yes, sir.  All right.
14         (WHEREUPON, A RECESS WAS TAKEN.)
15         (OPEN COURT.)
16              THE MARSHAL:  All rise.
17         (WHEREUPON, THE JURY ENTERED THE COURTROOM.)
18              THE COURT:  Okay.  I am advised that the next three
19    witnesses are all going to be presented by way of video.  So let's
20    go ahead and do that.  That will bring us right up to the five
21    o'clock hour.  This next witness is?
22              MR. GARRISON:  Lapinski.
23              THE COURT:  Michael Lapinski, L-A-P-I-N-S-K-I.  Let's get
24    his testimony, I believe his testimony is about 45 minutes, so
25    let's go ahead and start him.
```

1        (WHEREUPON, THE VIDEO DEPOSITION OF MICHAEL LAPINSKI WAS

2        PLAYED.)

3   Q.  The way I want to start is just getting some background

4   information.  What degrees do you hold?

5   A.  I have a bachelor's degree in government from the United States

6   Coast Guard Academy, a master's degree in journalism, strategic

7   communications from the University of Maryland, and a master's

8   degree in national resource strategy from the National Defense

9   University.

10  Q.  What was your start date with FEMA, month --

11  A.  June 2007.

12  Q.  And you're currently there?

13  A.  Yes, sir.

14  Q.  And prior to FEMA, where were you employed?

15  A.  By the Coast Guard since 1974.

16  Q.  Through 2007?

17  A.  Correct.

18  Q.  And you were an officer in the Coast Guard?

19  A.  Yes, sir.

20  Q.  What was your rank when you were retired?

21  A.  On retirement, I was a captain.

22  Q.  All right.  A federal coordinating officer the position you

23  currently hold?

24  A.  Yes, sir.

25  Q.  So that's a position you've held since June 2007; is that

1  correct?

2  A.  Correct.

3  Q.  Let's talk about that particular position.  What are your

4  general job duties?

5  A.  Generally, a federal coordinating officer is the individual

6  that's appointed by the President when the President makes a

7  disaster declaration for a specific state.  In the President's

8  response, it will include a named federal coordinating officer.

9  Q.  How many federal coordinating officers exist within FEMA?

10  A.  Right now there are about 40.

11  Q.  Mr. Lapinski, I'm going to show you a document which we'll

12  attach to this deposition as Lapinski 2.  In your declaration,

13  Mr. Lapinski, in paragraph 1 it does identify you as a federal

14  coordinating officer, but it goes on to say that from August 2007

15  through June 2008, that you were the official responsible --

16  official responsible for coordinating FEMA's response to

17  formaldehyde concerns in temporary emergency housing units.

18          How did you become involved in being the official

19  responsible for coordinating FEMA's response to formaldehyde

20  concerns in EHUs in August of 2007?

21  A.  That assignment is consistent with what a federal coordinating

22  officer does, which is work in the interagency environment to learn

23  how other agencies acting on their own authorities can work to a

24  unified federal purpose.

25  Q.  Uh-huh.

1    A.  And so that was my role, is to work with other federal agencies

2    and see what resources they could bring to bear to work on this

3    national problem.

4    Q.  You further state that as a result of my duties and

5    responsibilities, I am familiar with FEMA's actions taken in

6    response to formaldehyde concerns in EHUs between the time of May

7    2007 and June 2008.  That's the last sentence of section 1.  You

8    didn't become the official responsible until August 2007, but yet

9    you say that you were familiar with FEMA's actions beginning in May

10   of 2007.

11        Could you explain to me how you were familiar with FEMA's

12   actions between May and August of 2007 when you became the federal

13   coordinating officer?

14   A.  Yes, sir.  I knew -- I applied to become a federal coordinating

15   officer with FEMA back in 2006, and the hiring process took until

16   the spring of 2007; but by April of 2007, I knew that I was going

17   to be joining FEMA and becoming a federal coordinating officer.

18        These issues hit a fairly high profile in May of 2007.

19   And naturally being, you know, wanting to know everything I could

20   about the organization I was joining and what the challenges were

21   with the organization, followed that from a non-official --

22   non-appointed position, but just followed what was going on in the

23   media from -- starting in May 2007.

24        And when I started with FEMA, obviously, the housing

25   mission is a big part of what I knew I was going to be getting

1    into, and so watched through the news clips and other internal

2    information what was going on with the situation

3    Q.  Okay.  But that's not the question I asked.  The question that

4    I'm asking is, were you aware that there were complaints about

5    formaldehyde emissions in temporary emergency housing units?

6    A.  Well, that is what I got from my read of the media and my

7    observation of the media, yes, sir.

8    Q.  You say, "Therefore, FEMA engaged DHS, OHA, CDC, National

9    Center for Environmental Health, and the National Institute for

10   Occupational Safety and Health, to develop a strategy to determine

11   actual indoor air quality conditions in occupied units, to

12   determine a scientifically valid target for air quality improvement

13   and to assess engineering solutions that could achieve those

14   levels."

15           I'm going to concentrate, sir, on the last -- that

16   statement, beginning "to develop a strategy."

17           I want to understand or get from you your understanding

18   of the various roles of the agencies involved in developing a

19   strategy to determine actual indoor air quality conditions in

20   occupied units.

21   A.  Sure.  One thing that I knew is that FEMA wasn't a public

22   health agency and wasn't an environmental quality agency, and that

23   somewhere in the interagency the federal government should be able

24   to assist, somebody should step forward to assist FEMA in helping

25   develop a way ahead in developing a solution.

1    The folks that -- what had been put into place before I

2  came in with FEMA is a partnership with health and Human Services

3  through CDC.  And on behalf of DHS, the secretary asked DHS OHA --

4  the Office of Health Affairs -- to work with FEMA; and DHS, Office

5  of Health Affairs was coordinating any federal way ahead between

6  FEMA on this specific issue and the CDC, National Center for

7  Environmental Health, and NIOSH from their perspectives and all of

8  the things that they've learned over the years in trying to manage

9  the formaldehyde issue and indoor air quality

10 Q.  You further state that "and to assess engineering solutions

11 that could achieve those levels."  Do you know if there was an

12 engineering solution developed that could achieve "those levels"?

13 A.  What I subsequently learned is that earlier, FEMA had partnered

14 with elements of the Centers for Disease Control and the

15 Environmental Protection Agency to look at what historically had

16 been recommended to mitigate issues of indoor air quality; and that

17 the historical treatment was ventilation and temperature

18 moderation.

19 Q.  In section 4 of the declaration, if you go down to the second

20 to last sentence, it begins, "in addition."  It's fourth up --

21 A.  Yes, sir.

22 Q.  -- from the bottom.

23     "In addition, a formaldehyde fact sheet was prepared and

24 distributed to all EHU occupants.  The fact sheet identified the

25 telephone number for the formaldehyde call center, discussed

1    mitigation strategies, and encouraged occupants to call if they had

2    concerns."

3            And in this particular section deals with a dedicated

4    formaldehyde call center being established.  But hat I want to

5    know, sir, is could you describe for me this formaldehyde fact

6    sheet that was prepared and distributed to all EHU occupants and

7    what information was contained in that fact sheet?

8    A.  What I know was in the fact sheet, and if I had a copy of the

9    fact sheet I could -- as you could see it, I could explain what was

10   on there.  But what I know to be on there and what was important

11   that was on there that it was hand delivered to everybody on that

12   date that occupied a FEMA provided temporary housing unit; key in

13   there are the points that I made in the declaration that it had a

14   phone number to call if you had any questions at all.  I knew that

15   screeners were doing case management and going out and visiting

16   people and explaining if they had any questions about what was

17   contained in the fact sheet.

18           That the mitigation strategies that were discussed were

19   the state of -- the body of knowledge to that point of what had

20   been approved for mitigation strategies or accepted as mitigation

21   strategies, which as I said was ventilate and moderate.

22           And the point that if, you know, people had any concerns

23   for their health or safety as a result of occupying a temporary

24   housing unit, that they call.

25   Q.  So this was because no agency would public health

1   responsibility or authority had provided guidance or standards on

2   what concentration of formaldehyde constituted a safe level?  Is

3   that what you're identifying as one of the concerns?  And then

4   secondarily, federal interagency leadership wanted to review and

5   assess contingency plans in the event the government had to

6   immediately evacuate all occupants from EHUs?

7   A.  Yes.  And the issue is, as I had described earlier, is

8   understanding what the housing market was in the geographic areas

9   where FEMA had emergency housing unit occupants, is that if there

10  was an over-reaction or an under-reaction, what were the options,

11  where were these people going to be able to live or be sheltered?

12        And I mean, it's a compound question that you asked.

13  There's the issue of whether it's appropriate that FEMA is

14  producing public health guidance on behalf of the federal

15  government by preparing documents that we're giving out to people.

16  Q.  In section 7, you go on to state that, "Testing of a

17  statistically significant representative sample (519) across all

18  strata of EHU began in December of 2007.  In February 2008, CDC

19  issued the initial results from testing of these occupied units.  A

20  flyer reflecting those results was prepared and distributed to EHU

21  occupants, and FEMA continued its efforts to relocate EHU occupants

22  to more permanent housing or alternate temporary emergency housing

23  such as hotels."

24        Again, sir, if you could look at this binder and identify

25  for me, please, that particular flyer.

1  A.  The flyer that I referenced in that part of the declaration is

2  at tab 23 of the binder that you have provided me.

3  Q.  Thank you.

4      MR. WOODS:  And for the record, this will be labeled as

5  Lapinski 4.  It is Bates labeled FEMA 09-000390 through FEMA

6  09-000391.

7  BY MR. WOODS:

8  Q.  Sir, can you tell me exactly how this flyer was disseminated to

9  trailer occupants in February of 2008?

10  A.  My understanding - and it's -- I emphasize it's my

11  understanding -- I didn't distribute them or wasn't responsible for

12  distributing them -- because they were distributed through the Gulf

13  Coast Recovery Office and delivered -- hand delivered to each

14  emergency housing unit; as well as in general areas where housing

15  units were located, it was posted, it was made available, it was

16  provided to members of the media.

17      In group sites, it was visibly posted in addition to

18  individually delivered.

19  Q.  Do you recall any of the individuals that -- medical or

20  scientific experts that were a part of that panel?

21  A.  Dr. Bill Lang from the Department of Homeland Security Office

22  of Health Affairs; Dr. Merritt Lake from the same office Gary

23  Noonan from the Centers for Disease Control, NCEH; and his boss, I

24  believe, was Mike McGeehin, Dr. Mike McGeehin would have been the

25  individuals that I knew that were on the expert panel.

1    Q.  And in layman's terms, what is your understanding as to what

2    that panel was tasked to do?

3    A.  In layman's terms, from my perspective, what I was hoping that

4    the panel was able to do was to get together and determine what an

5    acceptable level of formaldehyde in indoor air quality would be in

6    any application.

7    Q.  And were they able to do that?

8    A.  No, sir.

9    Q.  What is your understanding as to why they were unable to do

10   such?

11   A.  There was no consensus of opinion nor any empirical data to

12   support identifying a single indoor air quality number and

13   labelling that as safe.

14   Q.  Did this panel meet in person to discuss this particular issue?

15   A.  I wasn't there.  I know that members of the panel met.  Whether

16   people phoned in, I don't know what the conduct of the panel was,

17   and I was not there.

18   Q.  Were there minutes taken and recorded when there were meetings

19   assembled by this panel?

20   A.  There may have been.  That's a question that in my opinion only

21   CDC could answer as the lead agency for the expert panel.

22   Q.  So you never received any copies of the minutes.  Did you

23   receive reports from the panel?

24   A.  The only reports that I received from the panel were in phone

25   conversations and in conversations with individual members that

1    were on the panel advising on courses of action and initiatives

2    that FEMA was working in this area.

3    Q.  In those phone conversations that you had with panel members,

4    what was your understanding as to why they were unable to reach a

5    consensus?

6    A.  My understanding is that there was not data to support a --

7    identify a number as a safe level or unsafe level, that it lacked

8    research.

9    Q.  In the second paragraph in this email you say the risk is

10   drawing fire, that we are again studying something that we know

11   causes at a minimum irritation and respiratory ailment, and that we

12   aren't moving people more rapidly.  How did you become aware that

13   at a minimum you were dealing with something you know caused

14   irritation and respiratory ailment?

15   A.  That's just straight from the literature on formaldehyde.  If,

16   in fact, what we were keeling with was formaldehyde, literature,

17   the body of knowledge is full of indications that high levels of

18   formaldehyde lead to irritation and respiratory ailment.

19   Q.  When you say high levels, what is your understanding as to what

20   a high level is?

21   A.  Again, the documents that I read and the guidance that I saw

22   doesn't indicate what high levels were.

23        Much of what's out there indicates that there's a wide

24   variety and that it's personal dependent on what level makes them

25   symptomatic.  And what they say is that some people have a

```
 1    tremendous tolerance and some people have a limited tolerance; and

 2    without a physician making a personal evaluation at an individual

 3    level, numbers don't mean anything.

 4    Q.  But you did testify that the conversations -- for lack of a

 5    better term -- began with CDC in I believe June of 2008?

 6    A.  May of 2007.

 7    Q.  I'm sorry.  May of 2007.

 8    A.  Right.

 9    Q.  But the actual testing didn't occur until December of 2007.  So

10    that, sir, is a six-month period.  Would you agree with me that

11    there probably -- that the criticism that they're talking about is

12    the time between that May 2007 and the actual testing beginning in

13    December of 2007?

14    A.  Without seeing the document, I couldn't tell you whether that

15    was the focus of the DHS IG's conclusion.

16    Q.  Okay.  It goes on to say, "Instead of addressing this issue

17    while the study was being conducted, FEMA officials had CDC stop

18    the contract before testing began.  This caused another two-month

19    delay.  The formaldehyde testing was finally conducted in late

20    December 2007 and early January 2008.  Because of the delays, the

21    test results may have underestimated the extent of formaldehyde

22    exposure that residents had experienced in the trailers.  Most of

23    the units were two years old by the time of the testing, and the

24    testing was conducted during the winter months when formaldehyde

25    levels are lowest."
```

1        If you agree with me and trust that I've read that

2   accurately -- and you can, if you'd like -- hearing those

3   statements, what would be your response?  And are they accurate

4   statements?

5   A.  There are a lot of variables.  And again, I am not an expert in

6   this area.  There are a lot of variables in how formaldehyde is

7   off-gassed; and no clear indication that month of the year is a

8   major contributing factor.

9   Q.  The second paragraph says, "I marked in yellow highlight the

10  areas where we need some more work.  I think waiting to 1.0 PPM for

11  urgent action is too high.  I will call Larry Reed to see what the

12  unoccupied readings were.  But it seems .75 is high enough to spur

13  urgent action, as even cautious people would reasonably be expected

14  to remain inside for eight hours at a stretch, and we can accept

15  the OSHA exposure limitations."

16       What scientific basis did you have at that point on

17  October 29, 2007 that you thought waiting to 1.0 PPM for urgent

18  action would be too high?

19  A.  Scientific basis, none.  1.0 parts per million is a high level,

20  is an extraordinarily high level, it's above the OSHA standards;

21  and at this point, and what we were doing, is trying to provide

22  meaningful information to occupants based on what the formaldehyde

23  level reading was in their temporary housing unit, what we were --

24  how we were going to deal with that specific case.

25       And there was some talk about at what level do you

1    manditory take the unit away from somebody, when do we consider it

2    to be dangerous.  And what I can reconstruct from what you provided

3    me here is that Dr. Lang was talking about a 1.0 parts per million,

4    which is a tremendously high number, as a tripping point for where

5    you would mandatorily not allow somebody to stay in the unit.

6         And all I'm saying back to him is that if we're going to

7    link this back to some other standard that exists federally, below

8    that is a .75 standard that is the OSHA standard for eight-hour

9    exposure, and that it should not in my case in my estimation be

10   higher than the OSHA standard.  That would not be defensible.

11        So that's the point I'm making in this document here, is

12   just that for the tipping point for mandatorily moving somebody

13   from a housing unit should be lower than what he had originally

14   proposed.

15   Q.  What's your understanding of how long an EHU is supposed to be

16   used by an occupant?

17   A.  Eighteen months is what -- by the rulemaking that guides our

18   operations.  Typically, at the other end of the spectrum is six

19   months; that if somebody is going to move to a more permanent

20   housing solution within six months, then an EHU wouldn't be

21   indicated.

22   Q.  You write back to David Garratt, Mary Margaret Walker and Todd

23   Wells and say, "I have felt all along, but especially after this

24   weekend's exchange, we are responding to these queries in entirely

25   the wrong manner.

1          You say, "FEMA doesn't need to test.  We want Katrina

2   victims out of travel trailers.  We have acknowledged that there

3   may be elevated levels of formaldehyde.  The industry and their

4   consumers have known this for years."

5          At this point when you were saying that the industry and

6   their consumers have known this for years, what information or what

7   background did you have to make such a statement?

8   A.  Anecdotal information that I had seen from people that owned

9   travel trailers and -- including a next door neighbor that's owned

10  travel trailers for years, and what they told me.  Also from what I

11  have read in web sites, industry-related web sites that acknowledge

12  that when you get a travel trailer, there is an odor of

13  construction material that's inside, and that adequate ventilation

14  before use is recommended.

15  Q.  What is your understanding of what testing was done by FEMA

16  itself?

17  A.  What testing was done by FEMA itself?

18  Q.  Uh-huh.

19  A.  FEMA did unoccupied unit testing to test the effectiveness of

20  ventilation.

21  Q.  When was that testing performed?  FEMA itself, as the agency,

22  did this test?  It's your understanding that FEMA did that testing?

23  A.  FEMA commissioned -- and I've have to go pull some materials

24  back to get the exact answer to this -- but, I'm not sure whether

25  it was EPA or somebody back in 2006 that led to a subsequent

DAILY COPY

1    recommendation on -- that netted the -- and then when that testing

2    came back and showed the effectiveness of combining ventilation

3    with temperature moderation, after the initial report and the

4    empirical data, that was given to CDC, who did secondary analysis

5    and produced a Spring 2007 -- February 2007 report that was

6    subsequently re-evaluated by CDC for another report that came out

7    in October 2007.  It was posted to a CDC web site in October of

8    2007.

9    Q.  I just want to be clear that FEMA itself as an agency didn't --

10   never conducted testing, but it was always another agency, EPA, or

11   CDC that conducted the actual testing?

12   A.  Agreed.  Yes, sir.

13         At this point in time it's November 2007, so many of the

14   individuals had been in travel trailers for two years.

15   Q.  So it was just a time concern, it was time for them to go?

16   A.  Well, multiple reasons.  One is that temporary housing isn't

17   intended to be an 18-month program.  But we don't throw people out

18   of temporary housing because the clock strikes 18 months.

19   Q.  When you say -- you did mention psychological concerns of

20   individuals living in these units, and I assume that's based upon

21   the size, the small size of the travel trailers; but there are

22   other issues that individuals became concerned about.

23         And would you agree with me that their concerns about

24   formaldehyde emissions also tended to make it a difficult situation

25   psychologically?

1   A.  There are a whole host of reasons why psychologically -- and

2   from my experience as an emergency manager and disaster manager is

3   that people that have been displaced from a natural disaster have a

4   whole host of things that we need to get them -- work to get them

5   professional help and case management, and their temporary housing

6   unit is just one of them.

7           And any element of the temporary housing unit has the

8   potential to contribute.  But just being a disaster survivor has

9   tremendous implications, in losing your job, losing your social

10  support.

11  Q.  I had a question I wanted to ask you about your understanding

12  of FEMA's history in using travel trailers that you learned after

13  you came on board with FEMA.  Are you aware of the fact that FEMA

14  successfully used travel trailers to respond to natural disasters

15  including on the Gulf Coast going all the way back to Hurricane

16  Andrew in 1992?

17  A.  Yes, sir.

18  Q.  Are you generally aware of the fact that there were no

19  scientific formaldehyde complaints in any of those prior years

20  prior to Hurricane Katrina?

21  A.  My only experience in that was a question that I heard in a

22  congressional hearing that alluded to the fact that there were no

23  specific formaldehyde complaints coming out of the disaster housing

24  we provided in Florida in the four hurricanes in 2004.

25  Q.  Okay.  And you're not personally aware from your experience at

1  FEMA of any such complaints from the Florida disaster; is that

2  right?

3  A.  I'm not personally aware, no, sir.

4  Q.  Mr. Lapinski, the document I've given you is a five-page

5  document including emails that's Bates stamp FEMA 17-013906 through

6  17-013910.  And I'd like to direct your attention to your email of

7  January 18, 2008, that begins on the bottom of the first page and

8  carries over to the top of page 2, and I'd like to ask you to read

9  for us the statement that you made on the bullet point at the top

10  of page 2.

11  A.  And this is in response to -- I've got to look and see what the

12  initial -- what instigated this.  It looks like a Washington Post

13  article; and --

14  Q.  What did you say there at the top of page 2?

15  A.  "The trailers absolutely served their purpose.  When there were

16  no roofs under which families could take shelter, FEMA provided an

17  alternative to camps, gymnasiums, and homelessness -- an

18  alternative that gave people privacy and dignity and enabled them

19  to begin the road to a normal life again."

20  Q.  Could you elaborate a little bit on that view, sir, in terms of

21  the trailers having served their purpose in your view, considering

22  the alternatives?

23  A.  They were temporary housing units.  They were mobile.  We could

24  get -- there was a market that had them available, while there was

25  not a market that had any available disaster housing on the Gulf

```
 1   Coast.
 2            And so the purpose is to have, you know, from a federal
 3   coordinating officer and from a FEMA's administrator's perspective
 4   is to have something that people can go to to get them out of camps
 5   and get them out of gymnasiums and get them out of congregate
 6   shelters and establish some level of privacy and some level of
 7   security and some level of being able to secure their personal
 8   belongings that they didn't have in a congregate shelter; but
 9   recognizing that it was short of whatever their long-term solution
10   was.
11            And so, temporary, yes.  Housing yes.  Units, yes.  They
12   satisfied what we needed from them.
13   Q.  I wanted to ask you a question about your declaration on page 2
14   of 5, paragraph 4; and in that paragraph, you referenced steps that
15   were taken to relocate occupants who called and wanted alternate
16   temporary housing.  Do you see that?
17   A.  Yes, sir.
18   Q.  And then I'm looking forward in your declaration at -- in
19   paragraph 7 at the top of page 4, you say, FEMA continued its
20   efforts to relocate EHU occupants to more permanent housing or
21   alternate temporary emergency housing such as hotels."  Do you see
22   that?
23   A.  Yes, sir.
24   Q.  And then further down in paragraph 9 you talk about the fact
25   that many of the emergency housing unit occupants, for a variety of
```

1    reasons, refused to relocate.  Could you explain to me that

2    process, the resistance that FEMA met in attempting to relocate

3    emergency housing unit residents into more permanent housing?

4    A.  I think what's in the declaration is a point about people --

5    there were a host of different situations that people were in who

6    found themselves in temporary housing or emergency housing units,

7    and there's a difference between temporary housing units that are

8    placed on private sites, group sites, and commercial sites; and we

9    tracked those very carefully.

10        Temporary housing units that are placed on private sites

11   generally means that they're placed in the applicant's driveway or

12   an adjacent piece of property, and they enabled the people to have

13   some place to retreat but perhaps go on and make repairs to their

14   primary residence and do that in the after hours.  In some cases

15   insurance money had run out and so there were no contractors to do

16   that, they were having to do their own work whenever they could.

17        There were people very naturally that were halfway back

18   into their home but not 100 percent of the way back into their

19   home.  And to say, you know, to terminate the temporary housing

20   program for them and tell them to move to a hotel or a motel, the

21   nearest one of which may be 25 or 30 or 50 miles away, would be a

22   very difficult position for the government to take.

23        And so people by this point, a lot of people were using

24   temporary housing units as an adjunct to their primary and had

25   concerns for security of their primary and how far they had

1    recovered and they're 90 percent or 80 percent recovered or some

2    percent recovered, and just needed an adjunct, whether that's for

3    plumbing or for cooking or something to get them back over into an

4    ideal solution, which is our number one preference, is people move

5    back into their pre-disaster housing using assistance and insurance

6    money to rebuild their home in their community.

7            That's our number one housing objective.  And to the

8    extent that temporary housing as an adjunct served that purpose,

9    that was a good thing.  And that's what we're talking about there

10   Q.  Can you describe for me some of the incentive programs you

11   talked about in your testimony earlier where you attempted to, in

12   your words, incentivize people living in travel trailers to get out

13   of travel trailers and move to more permanent housing?

14   A.  There were incentive programs that were within the policy

15   ability of FEMA to manage.  Some of them included moving expenses,

16   paying moving expenses to get people so that they wouldn't be

17   limited to trying to move somewhere within the community that their

18   temporary housing unit was; if they wanted to move to another state

19   to be able to guarantee them transportation back and forth, to have

20   some sort of a settlement period into their new environment.

21           There were people that were displaced and given temporary

22   housing in adjacent states and there were programs set up to help

23   them make a permanent housing there.

24           Looking at waivers for having to have deposits for

25   utilities to get started, if they were going to go to an apartment;

1    guaranteeing security deposits and things like that for people that

2    were hard to place, so that nobody was trapped into emergency

3    housing as the long-term solution.

4           So it was an economic reason, or a social reason, or

5    something that, you know, a landlord would not want to take a

6    Katrina survivor, we tried to identify what those programs were and

7    overcome them with programs of our own.

8    Q.  Is it fair to say that by 2007, when you got involved, anybody

9    who wanted to move out of a travel trailer had the opportunity to

10   move out of a travel trailer?

11          And I'm specifically looking at your affidavit.  If you

12   can look at it, that might help you answer.  In paragraph 5 on page

13   3 of 5.

14   A.  Yes, sir.

15   Q.  You say, "From mid-July 2007 onward, EHU occupants that

16   conducted the FEMA formaldehyde call center have been offered

17   alternate temporary emergency housing and persons that requested

18   alternate housing have been promptly relocated, again usually

19   within seven to ten days."  Do you see that?

20   A.  Yes, sir.

21   Q.  Does that refresh you that by that point in 2007, anybody who

22   expressed a desire to move out of their travel trailer would be

23   given an opportunity to move some place else?

24   A.  Their case would be handled and would be handled visibly.

25          If they wanted to move out, they were being tracked; and

1    so through the instrument that I had, we were getting high level

2    attention to those people that were in that category, that had

3    requested a move; and requiring us -- I mean, we were documenting

4    our need for better case management to enable -- but also, you

5    know, understanding the realities we were under, with the lack of a

6    housing market in the reasonable commuting distance from where they

7    were in their temporary housing unit.

8    Q.  But is the statement correct in your declaration that usually

9    within seven to ten days, you were able to promptly relocate

10   persons who requested alternative housing?

11   A.  Yes, sir.  By some form of alternate housing.

12   Q.  Okay.

13   A.  It wasn't necessarily the long-term solution.  But if they were

14   unsatisfied with the specific unit they were in, then provide them

15   a range of alternatives from which to choose.

16   Q.  And is the same true for people who were -- had a formaldehyde

17   concern or any other concern about living in an emergency housing

18   unit?

19   A.  Yes, sir.  As I've said before, from the day you put somebody

20   into a temporary housing unit, your goal is to get them to their

21   long-term solution.  So you didn't have to have an articulatable

22   breathing problem or claim, and there was no number of indoor air

23   quality or anything like that that you needed to present as

24   justification for us to offer you an alternative.  You needed to do

25   was want the alternative.

1  Q.  And was it your understanding that like you and like FEMA, that

2  the industry, the manufacturers, really wanted a federal standard

3  that they could point to and be able to comply with and have that

4  guidance and assurance?

5  A.  Yes.  I think that that would be again -- this is my opinion --

6  I know that Ms. Farrell was interested in knowing the direction

7  that this was going.  We had talked back and forth several times on

8  the phone and by emails as to whether CDC was coming up with

9  something.

10       I know that there were RVIA conventions and annual

11  meetings that were taking place and hoping to get some information,

12  you know, in order to be able to present that information at a

13  meeting had high interest to the manufacturers.

14       But ultimately, we've proven that no standard has yet

15  been developed.

16  Q.  And from looking at your -- some your writings and some of what

17  we've talked about today, you felt like the establishment of that

18  standard ought to be a public health sponsored and driven standard

19  that could then be communicated out to all these various

20  stakeholders?

21  A.  I agree with that statement, yes, sir.

22  Q.  And you felt like that standard ought to come from some branch

23  of the federal government?

24  A.  If it had come from some branch of the federal government, it

25  would have made my job easier, yes; as opposed to the alternative

1    which is coming individually from each of the 50 states or from

2    individual cities.

3             So, yes, a federal standard would make the temporary

4    housing mission more manageable for us and would probably help

5    create a uniform standard across the United States.  Yes, sir.

6    Q.  And you would agree that that would be helpful to the

7    manufacturers as well to have an actual standard that they're

8    requested to meet in their contracts rather than no standard at

9    all?

10   A.  It would be a helpful tool in better defining contracts for

11   future procurement of temporary housing units for emergency housing

12   for FEMA, yes, sir.

13   Q.  But again, as we sit here today, you and FEMA never did get a

14   federally mandated safe level or unsafe level as a result of this

15   blue ribbon scientific panel that was put together?

16   A.  No, sir.

17        (CONCLUSION OF VIDEO DEPOSITION OF MICHAEL LAPINSKI.)

18             THE COURT:  Who is next?

19             MR. GARRISON:  Next witness is Geoffrey Compeau with

20   Shaw, that's a 58 minute video.

21             THE COURT:  If you all want to stand while we're here in

22   the break at this time before we start this one.

23             We're going to stay in here, just if they want to stand

24   and stretch.

25             This is Geoffrey Compeau.

1        MR. GARRISON:  Yes, sir.

2        THE COURT:  Let's go ahead and tee that one up.  Spelled,

3   first name G-E-O-F-F-R-E-Y, last name C-O-M-P-E-A-U, and here is

4   his testimony.

5        (WHEREUPON, THE VIDEO DEPOSITION OF GEOFFREY COMPEAU WAS

6        PLAYED.)

7   Q.  Are you currently employed?

8   A.  Yes, I am.

9   Q.  Who are you employed by?

10  A.  I am employed Shaw Environment & Infrastructure.

11  Q.  And today are you appearing as a representative on behalf of

12  Shaw Environmental, Incorporated?

13  A.  Shaw Environmental & Infrastructure, Incorporated.

14  Q.  And your testimony to those subject matters is on behalf of

15  Shaw; is that right?

16  A.  That's correct.

17  Q.  Now, it's my understanding that Shaw is what is called an

18  IA/TAC or an individual assistance/technical assistance contractor;

19  is that right?

20  A.  That is correct.

21  Q.  And it was an IA/TAC contractor for purposes of responding for

22  Hurricane Katrina and Rita?

23  A.  Hurricanes Katrina, Rita, and Wilma, also.

24  Q.  And one of the responsibilities under that contract was to

25  haul, install and maintain temporary emergency housing units, is

1    that correct?

2    A.  That's correct.

3    Q.  For responding to Hurricanes Rita, and Hurricanes Katrina, what

4    was the start date of your duties and responsibilities to haul,

5    install and maintain temporary emergency housing units?

6    A.  The start date for the contract?

7    Q.  When you started hauling and installing and maintaining

8    temporary emergency housing units, the best estimate?

9    A.  The best estimate would be roughly, I believe, the middle of

10   October, early to mid October.

11   Q.  And when did your responsibilities for hauling, installing and

12   maintaining temporary emergency housing units end?

13   A.  For hauling, installing and maintaining?

14   Q.  Yes.

15   A.  For hauling and installing, the contract basically went through

16   the end, roughly the end of 2006, and for operating and maintaining

17   those units, it went through roughly June of 2006.

18   Q.  I want to ask you to turn to the document which is marked as

19   Exhibit 2.  It's about an inch thick, and it's assigned Bates

20   numbers Shaw 000373 through 550.  Do you have that document in

21   front of you?

22   A.  I do.

23   Q.  And I believe we have agreed with all counsel, with Shaw's

24   counsel, that this is a true and accurate copy of the contract

25   between Shaw and FEMA for the IA/TAC services that Shaw provided to

1    the government.

2    A.  Yes.

3    Q.  And with that said, I want to ask you to turn to the page

4    number or Bates No. Shaw 000480 of Exhibit No. 2.  Do you have that

5    in front of you?

6    A.  I do.

7    Q.  And that's entitled "Exhibit 7, Travel Trailer Installation."

8    By "Exhibit 7" that's Exhibit 7 to the contract, which for purposes

9    of the deposition is marked Exhibit 2, correct?

10   A.  Correct.

11   Q.  Are you familiar with the "Travel Trailer Installation," which

12   is marked as Exhibit 7 to the contract?

13   A.  Yes, I am.

14   Q.  And why are you familiar with that?

15   A.  It was used as the basis for how we determined what we would do

16   to install the travel trailers, how we would create a scope for

17   selection of subcontractors to install travel trailers, and

18   ultimately what we would use to QC and determine what our

19   construction -- the contractor's construction was complete and, in

20   fact, our quality control was correct relative to the directions of

21   this exhibit.

22   Q.  Now, did this installation require Shaw to block and level

23   travel trailers?

24   A.  Yes, it did.

25           Basically we included this in their scope, and they

1    followed through with the installation of the trailer based on the

2    details of the scope.

3    Q.  Did Shaw actually do the blocking and leveling itself through

4    its own employees or did it always use subcontractors?

5    A.  By the vast majority -- we may have installed a few trailers

6    ourselves, the but vast majority of our trailers were installed by

7    subcontractors.

8    Q.  Now, Section 2.1.2 of Exhibit 7 of the contract, which is

9    Exhibit 2, refers to blocking and levelling; is that correct?

10   A.  Yes, it does.

11   Q.  And that is set forth in Exhibit 2, Shaw 000480 through 81; is

12   that right?

13   A.  Yes, it is.

14   Q.  Now, does this provision explain how Shaw or its subcontractors

15   should go about blocking and levelling the unit?

16   A.  Yes.  For the most part, yes, it does.

17   Q.  Okay.  And does it explain how -- well, does it explain -- who

18   made the determination of how to jack the unit so that it was

19   placed on blacks and leveled?

20   A.  We relied on the experience of our subcontractors to use their

21   best judgment in how to lift the trailer or jack the trailer, so

22   that the piers could be installed.

23   Q.  And that's, I guess, where I was getting confused.  This

24   document, basically what FEMA specified was that the trailer had to

25   be placed on six piers; is that correct?

1    A.  That's correct.

2    Q.  And, in fact, gave very detailed specifications of the nature

3    of those piers; is that right?

4    A.  That's correct.

5    Q.  And in addition, it indicated that the weight of the trailer

6    must be transferred onto the concrete piers or the piers and that

7    the piers must be vertically aligned and tightly shimmed with

8    wooden wedges, correct?

9    A.  That's correct.

10   Q.  But how a unit was actually jacked and raised and placed on

11   those piers was left to the discretion of Shaw or its

12   subcontractors?

13   A.  That's correct.

14   Q.  Now, I want to ask you to turn to Exhibit No. 10 as well -- or

15   Exhibit No. 2, which is the contract, and Exhibit 10, which is

16   contained inside of Exhibit 2, that starts at Bates No. Shaw 000505

17   and is headed "Maintenance - Temporary Housing Units."

18   A.  I put that out of order.  Somehow I don't have ten after eight.

19   Let me take a quick look here.  Here we are.  Excuse me.  I have

20   Exhibit 10.

21   Q.  Okay.  And Exhibit 10 refers to "Maintenance-Temporary Housing

22   Units"; is that correct?

23   A.  That's correct.

24   Q.  And it has some general specifications set forth there; is that

25   right?

1    A.  Yes.

2    Q.  Okay.  And it says, "This contractor at a minimum will," and

3    then subsection (g) there, do you see that?

4    A.  Yes, I do.

5    Q.  It says, "Have resources (including staff) available or on-call

6    for 24 hours a day, seven days a week (24/7), to include having a

7    toll free number available within 48 hours upon contract award to

8    report emergency (day and after-hours), and routine issues"; is

9    that correct?

10   A.  Yes, it is.

11   Q.  Is that the maintenance hot line?

12   A.  It is.

13   Q.  And that maintenance hot line, that was operated 24/7?

14   A.  Yes, it was.

15   Q.  At least while you guys were responsible for the contract?

16   A.  That's correct.  Thank you.

17   Q.  And when did Shaw hand off responsibility for maintaining the

18   maintenance hot line?

19   A.  The maintenance hot line?

20   Q.  Yes.

21   A.  You know, I believe that would have -- I have to be certain

22   about that and refresh.  I believe that's when we handed over

23   the -- when the maintenance deactivation contracts became active

24   and we handed over the trailer, we also handed over the hot line.

25   Q.  Best estimate, what time frame was that?

1  A.  Roughly, June of 2006.

2  Q.  Now, as part of the maintenance call-in, were you as the

3  contractor required to report to FEMA any unusual systemic problems

4  that arose or occurred with the temporary emergency housing units?

5  A.  Yes, we were.

6  Q.  And during the course of Shaw's operation of the maintenance

7  hot line, did it report any such type incidents or systematic

8  problems to FEMA?

9  A.  We reported incidences and rates of incidences and kept pretty

10  detailed records and statistics on these.

11  Q.  Okay.  And what were some of the type of systematic problems

12  that were identified by Shaw and reported, if you can recall?

13  A.  Well, when you say "systematic," things that were -- there were

14  really -- as I recall there were no things that really spiked up as

15  being habitual or perpetual or sustained problems.  There were

16  problems with air conditioning, problems with heaters, you know,

17  basically general maintenance type activities.

18  Q.  Was there any spiking or problems during the time that Shaw

19  operated its maintenance hot line relating to odor complaints in

20  units?

21  A.  No, nothing out of the ordinary, nothing to suggest that there

22  was a pervasive problem with odor.

23  Q.  How about formaldehyde complaints?

24  A.  There were -- I do not believe there were any specifically

25  formaldehyde complaints.

1    Q.  Now, in the event that someone called up with a maintenance

2    problem relating to an odor in the unit, what would have been the

3    response actions that would have been taken?

4    A.  We would have asked what the odor is related to, what type of

5    odor is it.  We would have gone to the unit and determined

6    whether -- asked them whether it was, you know, a persistent odor

7    or whether it was just simply transient and whether it could be

8    dealt with by increasing the ventilation in the trailer or whether,

9    again, it was persistent.

10   Q.  And in terms of odors in the unit, what was the general

11   response or what was the general advice that would be provided if

12   someone had problems with odors in the unit?

13   A.  The first line was ventilate the unit.

14   Q.  And why is that, sir?

15   A.  Just to get fresh air into the unit and move fresh air through

16   the unit.

17   Q.  And that's pretty much the common sensical response, isn't it?

18   A.  Yes.  You could look at it that way, yeah.

19   Q.  Now, and you understood that it was a responsibility to provide

20   safe travel trailers, is that right?

21   A.  Yes.

22   Q.  And given your responsibilities and Shaw's quality

23   responsibilities, at any point in time if Shaw believed that there

24   was a problem with odors or formaldehyde in the units, it had an

25   obligation to report that to FEMA?

```
 1    A.  Yes.

 2    Q.  At any point in time, did Shaw believe that there was a problem

 3    with odors or formaldehyde in the units that justified and required

 4    them to report to FEMA that there was a problem?

 5    A.  I'm sure we discussed that there were odors in the units and

 6    that the best way to deal with it was airing out the units.

 7    Q.  And so to the extent -- well, let me break it down.

 8    A.  Yes.

 9    Q.  Do you recall Shaw ever reporting to FEMA that there was a

10    problem with formaldehyde in the units?

11    A.  I do not recall that.

12    Q.  To the best of your knowledge, as Shaw's representative here,

13    testifying as Shaw's representative, did Shaw ever report any

14    problems with formaldehyde in the temporary emergency housing

15    units?

16    A.  We did not.

17    Q.  To the best of your knowledge, did Shaw ever have discussions

18    that some of the units might have had some problems with odors?

19    A.  Yes, I imagine that we did.

20    Q.  And did you make a recommendation to FEMA regarding the

21    appropriate way to address those?

22    A.  Yes.

23    Q.  And what was that recommendation?

24    A.  To ventilate the trailers.

25    Q.  And why did you think ventilation was the appropriate response?
```

1    A.  Well, just based on the simple fact that if you ventilated the

2    trailers, the odors were diminished or were mitigated.

3    Q.  You mentioned early that one of the things that Shaw would do

4    when a unit made it to the staging area before it was actually

5    transferred to the home site was that the door to the unit and

6    perhaps the windows would be opened to ventilate the unit, correct?

7    A.  Yes.

8    Q.  Was that done for every unit?

9    A.  To the best of my knowledge, it was done.  After a certain

10   period of time it became a standard practice.

11   Q.  And was it also a standard practice to test the various systems

12   of the unit as part of Shaw's QA/QV procedure?

13   A.  That's my understanding, yes.

14   Q.  Was it part of the preventive maintenance inspection procedure

15   for the inspectors to examine the seals around exterior windows?

16   A.  You know, reasonably --

17          Sorry.  They passed around the exterior and did a close

18   visual inspection, so if there were seals and other issues, they

19   likely would have been identified.

20   Q.  Can you look at Exhibit 25, the "Standard Operating Procedure."

21          If you turn to Shaw 13544 --

22   A.  Yes.

23   Q.  -- the Yard QC Checklist, I think it's 39, "leave door open on

24   trailer to vent.  Lock door open using door cradle handle."  Would

25   Shaw do that even if it was raining?

1    A.  I think they would use judgment, and if it was raining

2    sufficiently they would close the door and when it was sunny,

3    reopen the door.

4    Q.  Would there be situations where units would sit for days with

5    the doors open?

6    A.  There could have been.

7    Q.  Just so I'm clear, the Yard QC Checklist, 39, "leave door open

8    on trailer to vent," would it just remain open at the yard, and

9    then it would be closed when it was transported?

10   A.  Oh, yes.

11   Q.  Mr. Compeau, I'm showing you what's been marked as Exhibit 1,

12   which is an amended notice of videotaped Federal Rule 30(b)(6)

13   deposition of Shaw Environmental, Inc.  My question to you is, have

14   you seen that document before coming here today?

15   A.  Yes.

16   Q.  And you understand that you are being produced today as the

17   designated representative of Shaw Environmental, Inc. in the case

18   styled *Earline Castanel, et al v. Recreation By Design*?

19   A.  Yes.

20   Q.  And there is an Exhibit A to this deposition notice that sets

21   forth four different topic areas; is that right?

22   A.  Yes.

23   Q.  And you are the designated representative for Shaw

24   Environmental, Inc. on each one of those topic areas; is that

25   right?

1    A.  That is correct.

2    Q.  I'm going to hand you what has been marked as Exhibit 2.  Do

3    these appear to be Shaw-Cast documents 0001 through 37?

4    A.  As far as they're numbered, yeah.  1 through 37 are numbered

5    here.

6    Q.  And are all of those documents related to the travel trailer

7    that was ultimately assigned to Earline Castanel when she lived in

8    New Orleans?

9    A.  On quick review, yes, that I know of.

10   Q.  And that is consistent with the representation Mr. Kurtz, the

11   attorney for Shaw, made that those are the documents relevant to

12   the Castanel trailer?

13   A.  Yes.

14   Q.  And, sir, how are you currently employed?

15   A.  I'm a vice-president of operations for Shaw Environmental

16   Infrastructure.

17   Q.  Okay.  And we'll discuss that in more detail.  But you are the

18   designated representative on behalf of Shaw Environmental, Inc. on

19   item number 1?

20   A.  Yes.

21   Q.  Can we have the agreement today that when I talk about Shaw we

22   mean Shaw Environmental, Inc.?

23   A.  Yeah, sure.

24   Q.  The item that is referenced after that is number 2, any and all

25   maintenance that was done to the trailer, and by that I mean

1   maintenance that was done by Shaw when they were subcontractors.

2   Are you the designated representative on that item?

3   A.  Yes.

4   Q.  Item number 3 is the pickup, hauling, transportation, delivery,

5   set-up, location, installation, inspection of the trailer, and the

6   trailer has been previously defined in this deposition notice as

7   the trailer that Earline Castanel lived in.  My question to you,

8   are you the designated representative on that third item which I

9   have just recited to you?

10  A.  For Shaw, yes.

11  Q.  And, again, when you say for Shaw, are you making some type of

12  distinction?

13  A.  On the last item, the pickup, hauling, transportation,

14  delivery, set-up, location, installation and inspection some of the

15  inspections were done by Shaw, some of the inspections were done by

16  others after our contract period was over.

17  Q.  The fourth item on this deposition notice, Exhibit 1, in the

18  attachment there to Exhibit A is the subcontractor who was -- who

19  installed and/or maintained the trailer.  Are you the designated

20  representative of Shaw on that particular topic as well?

21  A.  Yes.

22  Q.  And you are ready and prepared to discuss all of these items

23  that are identified here to Exhibit A to the deposition notice?

24  A.  Yes.

25  Q.  But how is it that you became aware of the particulars with

1    regard to the Castanel unit?

2    A.  Oh, the specifics of the Castanel unit?

3    Q.  Yes.

4    A.  Basically by examining the exhibits that were in the file for

5    Earline Castanel.

6    Q.  And is that the documents we have before us here as Exhibit 2?

7    A.  Yes.

8    Q.  And who was the custodian of those documents?

9    A.  Well, Shaw is.

10   Q.  Now, would it be fair to say that you did not make any of the

11   entries on those documents that we have before us here as

12   Exhibit 2?

13   A.  Yes.

14   Q.  And what type of people on the line or answering the phone

15   would be making entries on these documents on behalf of Shaw?

16   A.  Well, we would have had site inspectors and database entry

17   people.

18   Q.  Anybody else?

19   A.  Yes.  I was just looking at that as I go through here.  People

20   responsible for making sure that the unit was ready for occupancy:

21   You say actually making the entries?

22   Q.  Yes.

23   A.  So that subcontractors in preparation of their other invoices

24   for what was performed, maintenance subcontractors, Shaw's

25   maintenance people.  Did I say our QC people?

1   Q.   No, but we'll add that to the list.

2   A.   The installation contractor.

3   Q.   And who was the installation contractor for this unit?

4   A.   Woodrow Wilson.

5   Q.   And then Woodrow Wilson did they have a right to hire other

6   subcontractors underneath them?

7   A.   Yes, they may have had other contractors working underneath

8   them.

9   Q.   What does that process entail, site/ap inspection, what does

10  that entail?

11  A.   Yes.  You want to know about the site inspection of the

12  Castanel unit?

13  Q.   Yes.  What would it have entailed?  And I want to be specific.

14  It says site/ap inspection.  I'm trying to understand what that

15  means with regard to the Castanel unit.

16  A.   Okay.  Let's see, documents aren't in -- reasonably in order as

17  they were reproduced, so basically Ms. Castanel would apply to FEMA

18  for assistance, FEMA would determine that the applicant met the

19  requirements.  And then on page 4, Shaw-Cast 0004, we get a record

20  from FEMA's database that identifies the applicant and identifies

21  the address.  And, you know, from that basically we would know that

22  we had to contact the applicant and they would sign an

23  ingress/egress agreement, which is 05, to allow us to go onto their

24  private property.

25           And then we would essentially do a simple sketch to

 1    determine if the site had any obstructions, you know, just to clear

 2    out any debris that might have been present, to see if it had

 3    sufficient space to accommodate the trailer.  And then to look at

 4    the logistics around hooking up water, sewer and electrical so that

 5    the trailer could be properly in place.

 6              And that's basically not the most beautiful drawing, but

 7    it's Shaw-Cast 007 is an example of a typical quick site drawing

 8    that the site inspector would do to go out and establish that, yes,

 9    you can fit a trailer and giving the distances of sewer, electric,

10    and water from the trailer to the hookups.

11    Q.  And who is the inspector there?

12    A.  Let's see.  Ronald LaHoste.

13    Q.  On Shaw-Cast 007?

14    A.  Yes.  LaHoste, Jr.

15    Q.  And is he an employee of Shaw or some subcontractor?

16    A.  I believe he's a subcontractor.  That might have been clear on

17    one of the other documents.

18    Q.  Okay.  So --

19    A.  Here he is, yeah, under -- when he came back on Shaw-Cast 004,

20    he identifies the site as feasible, he signs as Ronald LaHoste, Jr.

21    of CDM, Camp Dresser McKee.

22    Q.  Now, when it says here on the first page, contractor Wilson,

23    does that mean the site inspection subcontractor was a

24    subcontractor under Wilson or --

25    A.  No.  The site inspections were subcontracted directly to Shaw.

1   Q.  So what's the significance here of this contractor entry on

2   page 1 where it says Wilson?

3   A.  The contractor chosen for the installation of this trailer is

4   Wilson.

5   Q.  All right.  Well, what do we have on the second page here, sir?

6   A.  Page 2?

7   Q.  Yes.

8   A.  On this document?  Our contract -- Kendrick Paul did, he was

9   our -- a subcontractor.

10  Q.  And that would be a subcontractor responsible for completing

11  the ready for occupancy tasks; is that right?

12  A.  For checking through prior to lease-in.

13  Q.  Is that the same as ready for occupancy?

14  A.  Ready for occupancy is its own discrete task.

15  Q.  Okay.  So this is a task for checking in prior to lease-in?

16  A.  That's right.

17  Q.  All right.  What do we have here on the third page?

18  A.  The third page is the agreement to the rules of occupancy for

19  emergency shelter, so this basically is a document between the

20  applicant and FEMA.

21  Q.  And Kendrick Paul signed it on behalf of Shaw in one capacity

22  or another?

23  A.  Well, again, really as Shaw acting as FEMA's agent.  So, you

24  know, rule of the park, rules of occupancy are agreed to by people

25  who are going to be living in trailers leased to them by the

1    federal government.

2    Q.  Did anybody sign this on behalf of Shaw?

3    A.  On behalf of -- yeah, well, again, as our subcontractor,

4    Kendrick Paul signed that.

5    Q.  And is Edward Ganier identified as part of the family of

6    Earline Castanel?

7    A.  Yes, I see that.  I'm trying to recall the applicant.

8    Q.  But the person that this is assigned to, according to this

9    document, page 3, is Earline Castanel, is that right?

10   A.  Yeah.  Now, I've come to understand, you know, in looking at

11   the documents and the full understanding that Ganier was the -- had

12   assigned the -- on 05 had assigned as the landowner so he was the

13   landowner and Earline's trailer was placed on Edwin's property,

14   which was not uncommon.

15   Q.  All right.  Let's turn to page 4.  I think you referenced that

16   briefly.  What do we have here?

17   A.  This is an applicant pending inspection.  So this is basically

18   the document where FEMA would tell us that there was an applicant

19   who qualified for housing assistance in the form of a temporary

20   trailer at their or others property, but at property acceptable to

21   FEMA, and basically kicked us off to go out and do a site

22   inspection and make the site ready.

23   Q.  And here we have the site assessor Ronald?

24   A.  Ronald LaHoste, Jr.

25   Q.  And that's who we previously discussed?

1   A.  Yes.

2   Q.  And CDM was a subcontractor directly under Shaw?

3   A.  Yes.

4   Q.  So the assessment, is that going out and talking about what you

5   previously described, the water, the electricity and that sort of

6   thing?

7   A.  Sure, yes.  It's a site -- can you put temporary housing at the

8   site?

9   Q.  I'm sorry for the confusion, what's the deference between the

10  site assessment and the site inspection?  Is the inspection part of

11  the assessment?

12  A.  Well, it's an applicant pending inspection, so let's call it a

13  site inspection.  In performing the site inspection you would

14  assess water, sewer, electric, constraints such as overhead

15  utilities, the size of the plot, and other types of things that

16  would allow you or disallow you from putting a trailer out there.

17  Q.  Okay.  So now we look at page 5 of Exhibit 2 and that's the

18  ingress/egress agreement, correct?

19  A.  Yes.

20  Q.  And it looks like it says, owner agent signed by Edward Ganier,

21  applicant Earline Castanel?

22  A.  Yes.  That's the way it appears to me and the witness is Ronald

23  LaHoste.

24  Q.  Okay.  What do we have on page 6?

25  A.  Let's see.  It looks like -- it's a building, city of New

1    Orleans permit application checklist.

2    Q.  And how does that fit into the total scope of what's going on

3    here?

4    A.  You know, the -- certainly for water, sewer and electric, we

5    had permits.  There was a question about whether early on building

6    permits were necessary, and, you know, we had these available.  It

7    turned out that ultimately building inspections or building permits

8    were not required.  So at this particular point in time this went

9    along with the trailer.

10   Q.  And some time later these forms were not used?

11   A.  Right.

12   Q.  A description of proposed work, installation of temporary FEMA

13   trailer; is that right?

14   A.  That's right.

15   Q.  And then also signed at the bottom there applicant signature,

16   does that appear to be Edward Ganier?

17   A.  It does.

18   Q.  Okay.  What's the next page we have, page 7 of Exhibit 2?

19   A.  Page 7 is the simple sketch that Mr. LaHoste did when he was

20   out at the site and determining where he could put the trailer

21   between the two damaged dwellings.

22   Q.  So as, I understand it, page 7 is the proposal as it existed

23   when he goes out and does the assessment, and page 8 is as it was

24   indeed installed?

25   A.  That's the way I interpret these two drawings, yes.

1  Q.  And the inspector is Kendrick Paul; is that right?

2  A.  That's correct.

3  Q.  Okay.  What do we have now on page 9?

4  A.  Page 9 is -- again, this is a FEMA -- the Department of

5  Homeland Security/FEMA Temporary Housing Unit Inspection.  So we

6  are at the point here where we are looking at the description of

7  the trailer and basically going through it with the applicant.

8  Q.  And it's dated March 11, 2006?

9  A.  It is.

10  Q.  So that would be the date that she was there at the site and

11  signed off on this?

12  A.  Yes.  That's what it appears to be to me, yes.

13  Q.  And the inspector's signature there, just to the right of box

14  number 11, would that be a FEMA employee or would that be a

15  subcontractor or contractor for Shaw?

16  A.  That is -- those are likely the initials of Kendrick Paul.  Oh,

17  yeah.

18  Q.  Were there any instructions given to Kendrick Paul as to how to

19  fill out this form such as we have here on page 9 of Exhibit 2?

20  A.  There were -- yes, there were training sessions for subs on

21  various parts of the team as to how they would do their work.

22  Q.  What do we have on page 10?

23  A.  Page 10?

24  Q.  Yes.

25  A.  This is basically a report from Shaw's database that basically

1  summarizes information on the trailer as we get the applicant and

2  attach that to our customer service rep, establish whether the

3  thing is feasible or infeasible, whether it has power or not,

4  determines whether the construction/work order is complete.  I also

5  talked about the trailer and yard dispatch dates, what the VIN

6  number for the trailer is, the FEMA bar code for the trailer.  And

7  then discussion about -- well, not discussion, but data about the

8  contractor responsible for the successful installation.  So in this

9  case it's Wilson and the construction foreman Eddy Reynolds.

10  Q.  All right.  Looking at page 10, custom service representative,

11  James Chamness, it looks like it's about the 12th box down or so on

12  page 10.

13  A.  Page 10?

14  Q.  Who is James Chamness?

15  A.  James Chamness was basically our customer service

16  representative.

17  Q.  Was he an employee of Shaw?

18  A.  He may have been.  He may be.

19  Q.  And what was the responsibility of the customer service

20  representative such as we have here?

21  A.  The customer service rep, the CSR -- they're called the CSR --

22  basically there was, their responsibility was to provide a point of

23  contact for the applicant.  So if they called wondering where their

24  trailer was and when it might be ready, that was the number they

25  would call.  Okay.

1   Q.  Trailer dispatch date, 12-8-05, what does that reflect?

2   A.  I believe that's the date that it was actually taken to the

3   site, if I'm not mistaken.  So what we've got here is this is from

4   our database, it's collecting -- again, it's sort of a meta data.

5   It's collecting data that's in the other forms and then it's used

6   to populate this overall master record.  And I am trying to recall

7   the specific meanings or exact meanings of all of the fields and,

8   you know, database as they are, you're constricted as to how many

9   characters you can have, so they're not as full as you might like

10  them to be.

11  Q.  So page 11 quality control maintenance issues and page 12 is

12  quality control with regard to construction issues and they are

13  both blank?

14  A.  That's right.

15  Q.  So --

16  A.  With the exception of the X.

17  Q.  With the exception of the X they're both blank?

18  A.  And all of the other information on the form, they're really --

19  they're not filled in, but they're not blank.

20  Q.  Are you saying that the RFO was a quality control for

21  construction issues?

22  A.  Well, clearly it -- at the end of it, you know, if there were

23  no issues and the RFO checklist was completed, it clearly means

24  that the trailer was ready for occupancy.

25  Q.  And this RFO checklist, it reflects the various items on the

1   trailer that were examined before somebody moved in?

2   A.  When it was render, yeah, ready for occupancy.

3   Q.  And besides these items here, is there anything else that they

4   would check on?

5   A.  Well, again, there are two in this particular file.  They

6   probably relate to one another.  You know, we had construction

7   people and maintenance people, so this was a form that was prepared

8   together with Shaw and FEMA and so -- so the items looking forward

9   to 15, which is also an RFO checklist, that was basically rendered

10  into construction issues and maintenance issues, and that was --

11  this RFO checklist was -- for both construction issues and

12  maintenance issues was checked off and signed by Kendrick Paul on

13  March 11th.

14  Q.  Well, 15 isn't checked off, is it?

15  A.  Fifteen is just us a list of various things.

16  Q.  So the checklists that they went through and examined item by

17  item are set forth on page 13 and then also on page 14; is that

18  right?

19  A.  The page 14 is the actual trailer lease-in.

20  Q.  Okay.  So let me start over.  The items that were checked in

21  before somebody moved in are set forth on page 13; is that right?

22  A.  Those are -- well, there may have been other things that were

23  looked at, but these are the specific items that are checked.

24  Q.  Okay.  What other items were looked at with regard to the

25  Earline Castanel trailer besides what we have identified here on

1   page 13?

2   A.  That's a broad question.  You know, it could have been any

3   other debris or trash on the outside of the trailer.  It looked

4   good, the site looked neat.  Those kind of things were also done.

5   Q.  Well, besides what's checked here, you're not aware of anything

6   else that was examined with regard to the Earline Castanel trailer

7   before she moved in, are you?

8   A.  Specifically, no.

9   Q.  And again, Kendrick Paul would have done this on behalf of Shaw

10  on page 13?

11  A.  Yes.

12  Q.  And then on page 14, there's no date on that, what date would

13  that be?

14  A.  Well, again, this is part part of the overall RFO and check --

15  and lease-in process.  It would have been -- it would have been

16  concurrent with Shaw 16.

17  Q.  And the date on that is March the 16th or is that March 11th?

18  A.  March 11th.

19  Q.  And the trailer lease-in checklist that's a process that Shaw

20  would have taken somebody in before they received the keys to the

21  trailer?

22  A.  Yes.  And this is initialed by EC.

23  Q.  Earline Castanel?

24  A.  I suspect so.

25  Q.  Okay.  Page 16 is a warning and advisory notice regarding

1    propane; is that right?

2    A.  It is a warning and advisory notice regarding propane use.  It

3    is an 800 series maintenance number for 24/7 maintenance and it

4    also provides trailer return procedures when the occupant is ready

5    to release the trailer and then it also is a -- provides a place

6    for the person to sign as having read and understood the -- the

7    above.

8    Q.  In addition to the maintenance number for FEMA, were they given

9    any maintenance numbers from Shaw?

10   A.  This was one number.

11   Q.  When you say one number, is that a Shaw number that's posted

12   somewhere in the trailer or is that a number somewhere in the

13   documents?

14   A.  No.  This would have been post -- it would have either been

15   posted or provided, but it was a number basically that if there

16   were any maintenance issues with the trailer, the applicant would

17   call.

18         Now, it says call FEMA, but basically that was part of

19   our operations and maintenance contract and we had a subcontractor

20   who handled that part of our scope.

21   Q.  And who was the subcontractor that would have been responsible

22   for maintenance issues on Earline Castanel's unit?

23   A.  I believe it would have been Keta.

24   Q.  Excuse me?

25   A.  K-E-T-A.

1    Q.  What do we have here on page 18?

2    A.  Oh, this is the turnover to the maintenance and deactivation

3    contractor, so Shaw's performance period for operations and

4    maintenance private site ceased on June 1st and the new contractor

5    was C. Martin.

6    Q.  Shaw would have been responsible for maintenance all the way up

7    until June 1st, 2006?

8    A.  Yes, until June 1st, 2006.

9    Q.  And at that point C. Martin took it over?

10   A.  Yes.

11   Q.  Okay.  What do we have here on page 19?

12   A.  This is the Manhattan site transfer delivery list.

13   Q.  What does Manhattan mean?

14   A.  The Manhattan yard -- I said that Shaw had forward yards.  The

15   name of the forward yard was the Manhattan yard.

16   Q.  And was -- where was the Manhattan yard?

17   A.  It was down in New Orleans.  I can't remember whether if it was

18   New Orleans or Jefferson Parish, but it was down closer to the

19   field of operation.

20   Q.  And is that where Shaw first took control of the trailer, at

21   the Manhattan yard?

22   A.  No, we took control of the trailer at Baton Rouge yard.  So the

23   FEMA yard was in Baton Rouge and we would pull trailers forward to

24   our forward yards so you could build up a sufficient number of

25   trailers during the day and the evenings so that contractors would

1   have easier access to the their units and fulfill their

2   construction requirements.

3   Q.   Okay.  But when Shaw first took possession of this trailer it

4   was in the FEMA yard in Baton Rouge?

5   A.   Yes.

6   Q.   And which yard was that?

7   A.   Well, we call it the Baton Rouge yard.

8   Q.   Have you come across any documents yet that identify for us the

9   date when Shaw took possession of this vehicle?

10  A.   Well, we will see how these go.  I don't know if it's in here

11  or not.

12  Q.   Well, let's keep on going.  There's a date here that says -- it

13  looks like 12-8-2005.  What does that mean?

14  A.   That's either the -- well, let's see, Wilson Trucking Company.

15  This is the date, I believe, Wilson would have taken this trailer

16  from our yard and begun the process of putting -- implementing --

17  constructing it at the property.

18  Q.   And so it's your understanding that on December the 8th, 2005,

19  Wilson on behalf of Shaw would have taken this trailer out to

20  Urquhart Street?

21  A.   Yes.

22  Q.   The trucking company identified there is Wilson; is that right?

23  A.   Yes.

24  Q.   Yardman JW.  Do you know who that?

25  A.   No, I don't offhand.

```
 1   Q.  What do we have on page 20?

 2   A.  Page 20, FEMA home install PO Woodrow Wilson.  I believe this

 3   is a general invoice for Woodrow Wilson's services, so this would

 4   have been the invoice reflecting that SCO304942970117 was installed

 5   at 2261 Urquhart Street.

 6          So this would have been Woodrow Wilson Construction

 7   Company's invoice for the trailer construction

 8   Q.  And we should have an SC number somewhere that corresponds with

 9   the numbers we have seen previously, right?

10   A.  Probably right on that first page.

11   Q.  SC03 -- let's see here ...

12   A.  Site control number.

13   Q.  What's the -- if you could recite that site control number for

14   me, perhaps I could find it?

15   A.  Sure.  03049429.  That's it.

16   Q.  Yeah, and you see it's just to the right of that, it says

17   Urquhart Street; is that right?

18   A.  That's right.

19   Q.  And how much would have Shaw paid Woodrow Wilson for

20   installation of this unit?

21   A.  I don't know that.

22   Q.  Well, a contractor like Wilson to install the Castanel unit,

23   were they paid a flat right or did it depend upon various items

24   that were included in the installation?

25   A.  No, they were paid unit rates.  There's unit pricing and then
```

1    there were issues of extras, so this may, in fact, constitute

2    extras.  I'm not quite clear as to what we have got here.  I'm not

3    clear as to what we have on page 22.

4    Q.  Sir, I had asked you previously in a deposition and I believe

5    you examined some documents during the break, do you know when Shaw

6    first took possession of this trailer that eventually Earline

7    Castanel lived in?

8    A.  To the best of my understanding in reviewing the documents, if

9    I look at page 36, it would be sometime between the date that the

10   work was issued, December the 6th and December the 8th.

11   Q.  Let me ask you some different questions.  If we take again a

12   look at the deposition notices, is it your testimony that these are

13   your only records that relate to the Castanel unit in the files of

14   Shaw?

15   A.  To the best of my knowledge, yes.

16   Q.  And nowhere in here do we have any jacking instructions on how

17   to jack up this trailer, do we?

18   A.  No, I don't see those.

19   Q.  You are the designated representative on the subcontractor who

20   installed and/or maintained this trailer; is that right?

21   A.  Yes, I am.

22   Q.  And the subcontractor who installed this trailer was Woodrow

23   Wilson.  Who was the subcontractor who mentioned the trailer?

24   A.  Keta.  Keta and Keta also had some second tier subs.

25   Q.  With regard to maintenance done on this trailer, is that the

1  maintenance that's identified in this trial regarding air

2  conditioning?

3  A.  Why don't you direct me to a document?

4  Q.  Okay.  And then what we have on 24, 25, 26, and 27 is

5  maintenance; is that right?

6  A.  Yes.

7  Q.  And that's primarily related to air conditioning; is that

8  right?

9  A.  Oh, it covers a number of things.  I think it covers our -- you

10  know, we were required to do monthly maintenance after lease-in,

11  and one of the other files appears to be basically, I think, the

12  database records in 26 and 27 -- do they incorporate the other

13  information?

14  Q.  Well --

15  A.  Someone came out.

16  Q.  When we look at page 26 it appears to be a monthly inspection

17  on April 7th and they checked various items.

18  A.  Yes.

19  Q.  And on May 15th, they checked various items; is that right?

20  A.  Yes.

21  Q.  And then we also see on May 15th and May 17th some issues

22  relating to the air conditioner and a leak; is that right?

23  A.  Yes.  Let's see --

24  Q.  It's on page 27.

25  A.  This one --

```
 1   Q.  Does this one have a page -- oh, there it is.  Page 27?
 2   A.  Okay.  On the 7th -- someone came out yesterday.  So that would
 3   have been -- well, I don't know if that's the 16th or the 15th.
 4   How are these things dated?  The 16th, okay.  Someone came out
 5   yesterday.  According to the call center work order form, someone
 6   came out yesterday, 5-15, and this is filled out on the 16th and
 7   looked at her air conditioning and said you would have to order
 8   them another one.  She said to please come out because they are
 9   elderly and it's hot in there for them.  Okay.  That's the 15th,
10   16th.
11          And then the 17th went to the top of the trailer to check
12   leak for A/C and tighten the drain connection.  Need someone to
13   take air conditioner out and reseal air conditioner hole -- okay,
14   leaking when it rains.  Okay.
15   Q.  The maintenance on the 15th, 16th, 17th that appears to be
16   related to the air conditioner, doesn't it?
17   A.  Yes.  It would be -- the 15th would have been the routine
18   maintenance and it appears that something triggered in the routine
19   maintenance required a call for a more thorough check on the air
20   conditioner.
21   Q.  And they had to caulk the door on the 15th as well, didn't
22   they?
23   A.  Where is that one?  Yes, caulk the door.
24   Q.  Page 24, that maintenance is related to the air conditioner; is
25   that right?
```

1    A.  This -- again, they're a little out of sequence, this is dated

2    the 17th.  So this is kind of at end of that train.  Let's see,

3    tenant noted someone came out yesterday.  He writes someone came

4    out yesterday and -- gosh, something unit needs to be replaced.

5    Unit is freezing up -- freezing up bad.  Think there is a

6    restriction in line.  Only bottom two rows freezing.

7    Q.  That's what that record says?

8    A.  Right, signed by David Bennett.

9    Q.  And who is David Bennett?

10   A.  That would have been a maintenance -- well, a maintenance --

11   according to the -- under his signature he's a maintenance

12   technician.

13   Q.  And also Rusty Stout?

14   A.  Right.

15   Q.  Would they be employees of Shaw or somebody else?

16   A.  They were likely employees of the maintenance subcontractor.

17   Q.  And that was Keta?

18   A.  That was Keta.

19   Q.  The maintenance documents that we looked at in the ranges of

20   23, 24, 25, 26, 27, are you aware of any other maintenance that was

21   done on this trailer prior to May 31st, 2006?

22   A.  I'm not.

23   Q.  So maintenance you were aware of is two monthly inspections,

24   one on April 7th, another one on May 15th, 2006, and then somewhere

25   around May 15th there was a caulking of the door, and then also on

1    the 16th and 17th there was work done on the air conditioning?

2    A.  I would say that's a good summary.

3    Q.  You're not aware of any other maintenance that was done on

4    this?

5    A.  I'm not.

6    Q.  Let's go back to page 33.  It says test functioning of travel

7    trailer.  Is that where you like turn on the water, flush the

8    toilets, do that sort of thing?  Is that what that includes?

9    A.  Where are we at?

10   Q.  It's about the tenth box down on the left-hand side on page --

11   A.  Test functioning the travel trailer?

12   Q.  Yes.

13   A.  Yes, I believe so, that would cover those things.  You know, if

14   you looked up to the electric, the water and the sewer, you want to

15   be sure that those utilities were working properly without leaks

16   and so on.

17   Q.  Do you know when and if -- and if Shaw ever examined the

18   caulking or the joints around the windows and doors in this unit?

19   A.  Well, that was part of the standard monthly inspection.  I

20   believe it would have been part of our -- I believe it was part of

21   our yard check-in list as well, but I know it was certainly part of

22   the monthly inspection.

23   Q.  And the only monthly inspections with Shaw were for April 7th

24   and May 15th, 2006?

25   A.  Our statement of work was specified monthly after lease-in, and

1    we leased in in March and then one another after that April and

2    another month after that May and then June would have been done by

3    the MDC contractor.

4    Q.  So when was this unit first place on Urquhart Street, was that

5    March or sometime prior?

6    A.  Oh, sometime prior.  I think we established that.

7    Q.  January?

8    A.  Oh, I want to say -- I would have to go back and -- let me go

9    back and look through the documents, but I want to say it's

10   December.

11   Q.  And so far as you know there was no inspections on this trailer

12   during the month of January or February?

13   A.  Again, you know, it appears someone was at the trailer to

14   change the locks, but I am not sure why in January, or what else

15   they might have done.

16   Q.  And I want to be clear, January and February 2006?

17   A.  Yes.

18   Q.  And they were there to change the locks in January 2006, but

19   there's nothing to indicate they did any kind of inspection with

20   the seals or joints or anything like that on the trailer, is there?

21   A.  In January 2006?

22   Q.  Correct.

23   A.  No.

24   Q.  And the same question, you're not aware of any inspection with

25   regard to the seals or the joints on the trailer in February of

1    2006?

2    A.  I'm not aware.

3    Q.  And hat do we have a page 37?

4    A.  And, by the way, on -- also on 36 you note the date, December

5    6th, when the datae work issued.  So that's the issue of when it

6    was hauled from Baton Rouge between December 6th and December 8th.

7    Q.  Where do you see that?

8    A.  Date work order issued, December 6, 2005.

9    Q.  Just point that out to me, please.

10   A.  Right up here (INDICATING).

11   Q.  Okay.

12   A.  So that would reveal to you the first time that Shaw took

13   possession of this vehicle or one of their subcontractors took

14   possession was 2005.

15   Q.  Okay.  Let's be clear.  Are you aware of any other maintenance

16   that was done to this trailer that Earline Castanel lived in on or

17   prior to May 31st, 2006, other than what you've testified to today?

18   A.  I'm not.

19   Q.  You referenced Keta as being the maintenance contractor.  That

20   would have been up until June 1st, 2006, correct?

21   A.  That's correct.

22   Q.  Now, when we looked at the documents when the unit is

23   leased-in, you had the RFO instruction and maintenance checklist

24   that is signed by Kendrick Paul that's page 13, correct?

25   A.  Yes.

1   Q.  Okay.  And I note under the maintenance section of that item 29

2   it says check heat and A/C for proper operation.  Set A/C to 70

3   degrees Fahrenheit, auto high or heat at 65 in winter.  Did I read

4   that correctly?

5   A.  Yes, you did.

6   Q.  And that appears to be checked off by Mr. Kendrick Paul,

7   correct?

8   A.  Yes.

9   Q.  Sure.  Is there -- were there any other specifics that Kendrick

10  Paul would have done as part of complying with item 29 in checking

11  the air conditioning unit out on this unit?

12  A.  I don't believe so.

13  Q.  But he would have actually in order to comply with, have to

14  have powered up the unit to check it for proper operation; is that

15  correct?

16  A.  Oh, sure, yes.  And set it as noted for the high and the low.

17  Q.  If it had not complied with his inspection, assuming it would

18  not have complied with his inspection, would this item 29 have been

19  left open by Mr. Paul?

20  A.  Yes.

21  Q.  So the fact that it's checked off indicates that it passed his

22  inspection when he signed off on this form; is that correct?

23  A.  Yes.

24  Q.  Now I'm looking at items of page 14, the trailer lease-in

25  checklist.  Item number 9 says, show where the central heat air

1    thermostat is located and make sure they know how to operate it.

2    Is this something that Mr. Paul would have performed as part of his

3    lease-in to instruct Ms. Castanel regarding the heating and air

4    units?

5    A.  Yes, it is.

6    Q.  And that's something that the Shaw person on site when they

7    lease the unit in is asked to check with the incoming resident to

8    know how to operate their unit, correct?

9    A.  Right.

10   Q.  On page 16, the warning and advisory notice at the top of the

11   page and it has in the middle of the page maintenance, for

12   maintenance please call FEMA, and it gives a phone number?

13   A.  Yes.

14   Q.  Is that the maintenance number that would have been given to

15   Mr. Castanel if they had any complications with her unit?

16   A.  Yes.

17   Q.  Would Shaw have a separate number?  I think maybe you were

18   asked that earlier.  Would Shaw have had a separate number that was

19   given to Ms. Castanel?

20   A.  No.  That was a call number.

21   Q.  And when we see the sheet that's listed on the call center work

22   order form -- I am looking for the number there.  It's Castanel 25.

23   You may have a hard time seeing that.  It's actually the Bates

24   stamp it says special needs comments.

25             If someone called this number on page 16, that would have

1    generated a work order form; is that right?

2    A.  That's correct.

3    Q.  And it appears that on May 16, 2006 the call center received a

4    call from the occupants; is that correct?

5    A.  Yes.

6    Q.  And as page 24, is that a -- would that page be someone that

7    was generated after page 25?

8    A.  Yes, it would.

9    Q.  And I see that it was designed by David Bennett, maybe a Rusty

10   Stout yes May 17th, 2006 --

11   A.  At 9 A.M.

12   Q.  -- and these are forms that were generated in regard to the --

13   someone reporting an issue with the air conditioning unit, correct?

14   A.  Yes.  So that -- I believe the data in the work description is

15   verbatim to what's handwritten in the general comments on the form

16   that was filled out on May 16th.

17   Q.  Okay.  And the resolution/contractor notes on that page 24

18   mention someone came out yesterday and said the units needs to be

19   replaced, unit is freezing up.  I can't make out that next word,

20   but think there is a restriction in line, only bottom two rows

21   freezing; is that right?

22   A.  That's right.  Freezing up but think there is a restriction

23   line, only bottom two rows.

24   Q.  If there had been a subsequent call and someone going back to

25   the unit after May 17th and before June 1st to address anymore

1  issues with the air conditioner, would there be any other type of

2  forms that we are looking at here as far as maintenance or anything

3  showing the disposition of the unit?

4  A.  Yes, there would have been forms similar to 25 and forms still

5  to this.

6  Q.  Okay.

7  A.  So the actual log-in actual log-in of the call and the

8  resolution of the call.

9  Q.  Okay.  The fact that we have the two -- they have the call

10  center work order form, the call center maintenance request form,

11  and then no additional information under that transition report on

12  May 17th, could that indicate to you that the air conditioning

13  issues with the unit would have been fixed and corrected by Shaw's

14  contractor?

15  A.  It suggests that.

16  Q.  Would we see any other type of entry under the transition

17  report had there been any additional work on the Castonel Unit, for

18  any additional work on the Castanel unit -- air conditioning unit

19  after the May 17th?

20  A.  Between May 15th and May 31st or June 1st, yes.

21      Yes, if there was another issue, she would have -- if she

22  had picked up the phone and had an issue she would have called.

23  Q.  Would there be any other forms regarding the disposition of the

24  air conditioning unit if at the time, assuming the unit was

25  prepared around May 17th, would there be any additional forms that

1    would be generated by Shaw for the Castanel unit.

2    A.  Well, it really would have been under the resolution.  I think

3    the resolution description leaves a little bit to be desired, but

4    the fact that there were no additional calls suggests that it was

5    resolved.

6    Q.  As of June 1st, 2006, then any additional documentation or

7    maintenance regarding the Castanel unit would be outside of the

8    possession of Shaw and in this case with C. Martin; is that

9    correct?

10   A.  Yes.

11   Q.  If there was any warranty work performed on this unit such that

12   Shaw and/or I guess it's Keta would have sought warranty

13   reimbursement, would there have been any type of documentation in

14   this -- these materials that I would like to expect to see?

15   A.  It would have been part of the maintenance records.

16   Q.  Which of these new pages we saw, 24, 25, 26, 27; is that right?

17   A.  Let's go right to them and make sure we are clear.  Say that

18   one more time.  And my pages are out of order again.  And my pages

19   are out of order again.

20   Q.  Here we go.  We are talking 24, 25, 26 and 27.  Is that --

21   A.  Yes.

22   Q.  Does that consist of the maintenance record?

23   A.  Yes.

24   Q.  And there's nothing in there regarding warranty work that you

25   see in those pages?

1   A.  That's correct.

2   Q.  People don't call in with every complaint that they have, do

3   they?

4   A.  Again, the number is there, the 24/7 number is there.

5   Q.  But people don't call in with every complaints, do you call in

6   with every complaint we have calls.  Call FEMA, are you there?

7   A.  I don't believe so.

8       (CONCLUSION OF VIDEO DEPOSITION OF GEOFFREY COMPEAU.)

9       THE COURT:  Counsel, do we have time for the last one or

10   do we want to pick that up tomorrow?

11      MR. GARRISON:  We have four live witnesses tomorrow, and

12   we would like to get started with them as soon as we can.

13   Obviously it's up to you.

14      MR. WATTS:  It's 20 minutes.

15      MR. GARRISON:  It's a short one, 20 minutes.

16      THE COURT:  Let's go ahead and get this one in real quick

17   and we will break for the day.  That's less we have to do tomorrow,

18   maybe we can finish up a little bit early tomorrow.  All right.

19      MR. GARRISON:  This is Brian Boyle.

20      THE COURT:  Brian Boyle, B-O-Y-L-E.

21      (WHEREUPON, THE VIDEO DEPOSITION OF BRIAN BOYLE WAS PLAYED.)

22   Q.  Mr. Boyle, what is your current position?

23   A.  I am a program specialist for FEMA Individual Assistance.

24   Q.  And what does a program specialist for FEMA IA do?

25   A.  Everything.  I work in the housing operations.

1    Q.  Okay.  Is that -- is DHOPS a division of housing operations?

2    A.  Yes.

3    Q.  Mr. Boyle, I understand you worked in DHOPS following Hurricane

4    Katrina; is that right?

5    A.  Yes.

6    Q.  Okay.  What is DHOPS?

7    A.  Disaster housing operations.

8    Q.  I will ask the question again.  To your understanding, what

9    does DHOPS do following a disaster like Hurricane Katrina?

10   A.  Oh, okay.  All right.  What I understand it to be is that when

11   we are -- hit the ground after a disaster and we go through the PPI

12   process, we find out individuals or applicants or survivors that

13   are in need of temporary housing, and we do the planning and the

14   execution of temporary housing.

15   Q.  And what is the PPI process?

16   A.  Preplacement interview.

17   Q.  What does that entail?

18   A.  It entails the applicants talking with our applicant services

19   representatives, and that's when they find out what their plans are

20   to move forward.

21   Q.  Plans with regard to housing?

22   A.  Yes.

23   Q.  Mr. Boyle, following Hurricane Katrina, you worked with DHOPS

24   in New Orleans, right?

25   A.  Yes.

1   Q.  What did you do for DHOPS in New Orleans after Hurricane

2   Katrina?

3   A.  I worked special projects.

4   Q.  And what does that mean?

5   A.  That means, you know, I've done some field inspections.  I've

6   done whatever special projects -- an example of a special projects

7   would be, you know, the cruise ship depopulation, which we had

8   applicants saying on cruise ships down in New Orleans, and when the

9   cruise ship contracts were up, we needed to make sure they had

10  temporary housing to move back into.

11  Q.  When did you arrive in the New Orleans area following Hurricane

12  Katrina?

13  A.  In the New Orleans area, I came down to New Orleans at end of

14  September.  I hit Louisiana September 5th of 2005, in or about's

15  that date.

16  Q.  Where were you stationed at first, sir?

17  A.  Working out of Baton Rouge -- well, Baton Rouge I guess.

18  Q.  And then it's your recollection by the end of September you

19  were down in New Orleans?

20  A.  If I recall.

21  Q.  Okay.  How long did you stay in New Orleans working with DHOPS?

22  A.  I think I left around, I want to say June of 06, in or abouts.

23  Q.  Okay.  And Mr. Boyle, while you were with DHOPS, it's principal

24  mission following Hurricane Katrina was what?

25  A.  Temporary housing units.

1   Q.  Getting temporary housing units to disaster victims who needed

2   some place to live, right?

3   A.  Yes, sir.

4   Q.  Mr. Boyle, I've seen on some of your emails on your signature

5   block a title "QA contractor liaison".  Do you recall that, sir?

6   A.  Yes.

7   Q.  What does that mean QA contractor liaison?

8   A.  Quality assurance is QA and contractor liaison was, I was

9   pretty much an interface with the contractors.

10  Q.  Can you describe that, sir?

11  A.  That I was an interface -- I interfaced with the contractors on

12  some DHOPS operations.

13  Q.  Okay.  And by "contractors," you're referring to Shaw, CH2M

14  Hill and Fluor, correct?

15  A.  Yes, sir.

16  Q.  When you say "interface with the contractors," Mr. Boyle, what

17  are you referring to, what sorts of dialogue would you have,

18  generally speaking, with the contractors?

19  A.  Okay.  The interface would be that, you know, I would work with

20  the Fluor, or the Hill, or the Shaw people that were doing the

21  operations for the DHOPS mission.

22  Q.  If you could explain a little more detail, Mr. Boyle, and what

23  I'm trying to get at is would you ask them to do certain task s, or

24  would you respond to questions that they had about the tasks that

25  they were performing, or just can you elaborate a little bit on

1    what that interaction entailed?

2    A.  It would be more of a coordination role.  I would have dialogue

3    with them, I would not direct the contractors because that wasn't

4    our role.  I would get some feedback on where they are on some

5    progress with some units and, you know, sit in meetings with them.

6    Q.  During the time that you were in DHOPS, did you coordinate by

7    email and telephone with the contractors as well?

8    A.  Yes.

9    Q.  And did that generally occur daily?

10   A.  Yes.

11   Q.  Mr. Boyle, you mentioned that you conducted some field

12   inspections, right?

13   A.  Yes.

14   Q.  And what sorts of field inspections did you perform?

15   A.  I would perform whatever was tasked to me.  Mainly, there were

16   congressionals if they would come in, then they would make ask me

17   to go out there and make sure's a good side field -- a good site

18   estimate.

19   Q.  Would you inspect the completed state of an emergency housing

20   unit?  Was that part of the inspections that you performed.

21   A.  Clarify.

22   Q.  You understood that contractors took travel trailers, park

23   models and mobile homes and installed them to be used as emergency

24   housing for disaster victims, right?

25   A.  Yes.

1  Q.  And did you inspect those units in their completed states up on

2  blocks and hooked up to utilities?

3  A.  I have.

4  Q.  What did an inspection of a completed emergency housing unit

5  entail when you performed it?

6  A.  When I performed it, I would do exactly what you just said.  I

7  would make sure that it was level, make sure that it was a safe

8  environment for an applicant to be able to move in.  I did not

9  perform any RFO examinations.  I would just actually do some

10  physical expectations around the uptown.

11  Q.  Did you also have inspectors who reported to you, sir?

12  A.  Yes, I did.

13  Q.  And they conducted the same sorts of inspections, correct?

14  A.  More thorough.

15  Q.  Nor thorough than you did, okay.

16        Can you describe what you mean by that?

17  A.  What I would do, if I was going out to inspect a unit, I was

18  actually probably QCing or QAing, however, you know to use it, my

19  folks.  So I would, you know, just do a little follow-up on what

20  they came back with some of their information was.

21  Q.  Okay.  So you your inspectors who reported to you were the

22  primaries, as far as conducting the inspections of the completed

23  emergency housing units, and then you might do quality control

24  behind that; is that accurate?

25  A.  That's pretty much accurate, yes.

1  Q.  Now, you said earlier that you personally did not do RFO

2  inspections, right?

3  A.  Correct.

4  Q.  Did your inspectors perform any RFO inspections?

5  A.  Yes.

6  Q.  To perform an RFO -- do you know what an RFO inspection

7  entails?

8  A.  I have some ideas.

9  Q.  Okay.  It includes testing the functioning of the travel

10  trailer, right, like the appliances and so forth?

11  A.  Correct.

12  Q.  Do you have to have power to the travel trailer when an RFO

13  inspection is conducted?

14  A.  Yes.

15  Q.  Do you recall that there was an issue with not being able to

16  conduct RFO inspections and lease people in to trailers that had

17  already been set up because power was not available?

18  A.  Yes.

19  Q.  Can you describe that issue in anymore more detail than I just

20  did?

21  A.  There was some issues with the utility companies down in

22  Louisiana keeping up with the contractors.

23  Q.  Okay.  In your role at DHOPS, did you come to understand that

24  sometimes trailers would be set up and then have to wait for power

25  for weeks?

1    A.  Yes.

2    Q.  Mr. Boyle, you mentioned among your description of special

3    projects that you worked on the cruise ship depopulation.  Can you

4    describe what that was?

5    A.  As I stated earlier, we had applicants on cruise ships, and the

6    cruise ship contracts were coming to an end and we needed to make

7    sure that they had some temporary housing units to go into.  I

8    would coordinate with the contractors on the stages throughout when

9    the units were going to be set up, and then they were made, RFOed,

10   and then we know we could have an applicant ready to move in.

11   Q.  Do you recall ever using the phrase "one team, one fight" with

12   the contractors?

13   A.  Absolutely.

14   Q.  What does that phrase mean to you?

15   A.  That we were a team.

16   Q.  And what was that team working to achieve?

17   A.  The house to house the survivors.

18   Q.  When you say "we were a team," you mean DHOPS and the

19   contractors?

20   A.  FEMA and the contractors.

21   Q.  FEMA and the contractors.

22        All right.  Mr. Boyle, I've marked as Exhibit 9 a

23   document that's labeled Shaw 013510.  Do you see that?

24   A.  Yes.

25   Q.  That's an email that you sent to all three contractors on March

1    20, 2006, right?

2    A.  Yes.

3    Q.  What is the subject of this email?

4    A.  Formaldehyde.

5    Q.  You write, "gentlemen, our safety office needs to know from

6    each contractor the process of airing out all travel trailers, I'm

7    sorry, you wrote "TTs" which means travel trailers; right?

8    A.  Yes.

9    Q.  "And mobile homes to handle the existence of formaldehyde

10   inside the units and what you are doing to handle this problem."

11   Do you see that?

12   A.  Yes.

13   Q.  Do you recall having sent this email out?

14   A.  No, I don't recall, but now that it's in front of me I see that

15   I did.

16   Q.  Do you know what prompted you to send this email out?

17   A.  Send it on to Larry.  It's telling me that Larry Woodruff would

18   have sent me a directive to ask the contractors for this

19   information?

20   Q.  Okay.  While you were working at DHOPS, was Mr. Woodruff your

21   supervisor?

22   A.  He was one of them.

23   Q.  You sent this email to two individuals at each of the three

24   contractors, do you see that?

25   A.  Jay and Todd, Mike and Paul, Robert and -- yes, I do.

1  Q.  Why did you send it to those six individuals?

2  A.  Because they were the ones that I communicated the most with, I

3  guess.

4  Q.  Now, it was your expectation that the contractors would send

5  you their processes and that you would then forward the process

6  airing out the trailers on to Mr. Woodruff, right?

7  A.  Yes.

8  Q.  And actually, you wrote that at the end of the sentence -- at

9  the end of the email, Exhibit 9, if you could use the last sentence

10  of the email into the record, please.

11  A.  "Thank you for your attention to this, and I will wait to hear

12  from each of you and send it on to Larry."

13  Q.  Let me mark as Exhibit 10 a document bearing Bates labels Shaw

14  013563 through 013568.

15      Do you have Exhibit 10 in front of you, sir?

16  A.  Yes, I do.

17  Q.  And do you see that as an email from William Deane to you?

18  A.  Yes.

19  Q.  And who is Mr. Deane?

20  A.  Billy Deane worked for Shaw Company.

21  Q.  And he was one of the people with Shaw that you coordinated

22  with while you were at DHOPS, right?

23  A.  Yes.

24  Q.  This email, Exhibit 10, contains Shaw's SOP for trailer

25  processing and yard QC inspection.  Do you see that?

1    A.  Yes.

2    Q.  Mr. Boyle, do you see that the date of this email is March 21,

3    2006, Exhibit 10?

4    A.  Yes, I do.

5    Q.  Okay.  On the first page of the attachment, the date is

6    February 1, 2006.  Do you see that?

7    A.  Yes, I do.

8    Q.  Do you recognize this as being Mr. Deane's response to you with

9    regard to the email that you sent about formaldehyde, Exhibit 9?

10   A.  According to the email, yes.

11   Q.  Okay.  On the second to last page of Exhibit 10, it's marked

12   Shaw 13567.  Can you read item 39 into the record?

13   A.  39," leave door open on trailer to vent.  Lock door open

14   using" -- well, "lock door open using door cradle handle."

15   Q.  Okay.  So as of the time of this email, Shaw's standing

16   operating procedure was to leave the door open on the trailer to

17   vent, according to this email; right?

18   A.  According to this document, yes.

19   Q.  Okay.  Now, did Shaw's response to your question about their

20   process for airing out the travel trailers satisfy your request?

21   A.  Yes.

22   Q.  It's my understanding that you came to New Orleans to assist in

23   disaster response efforts in September of 2005.  How long were you

24   actually in the Gulf south area?

25   A.   I was down there from September of '05 and I just left this

1    past July of '09.  But I did leave for a short time in June of '06,

2    and I went home for a little bit.  Then I had to go up to Albany,

3    New York for a disaster up there.  If I'm correct, don't quote me

4    on the dates, but if I'm correct it was September of '06 that ended

5    up back in New Orleans.  And then from September of '06 to July of

6    '09, I was down in New Orleans the entire time.

7    Q.  From the time you first arrived in September of '05 until the

8    time that you actually terminated your involvement completely in

9    July of '09, did your job duties change in any way?

10   A.  Absolutely.

11   Q.  Okay.  Tell me how.

12   A.  Okay.  I start off, as you can see, as a field inspector.  I

13   went up to -- do you want me to go through the whole thing of what

14   my positions were?

15   Q.  If you don't mind.

16   A.  Okay.  Well, I can name them.  The positions were field

17   inspector, special projects coordinator, deputy DHOPS chief, DHOPS

18   chief, deputy section chief, section chief.

19   Q.  When you became the deputy director or the DHOPS chief, were

20   you responsible for overseeing the inspections that were being

21   performed?

22   A.  The folks that were doing the inspections were under me, yes.

23   Q.  In terms of overseeing the inspections that were being

24   performed when you transitioned into these -- those are more senior

25   position, DHOPS chief and the deputy direct?

1   A.  Deputy section chief and section chief to section chief is the

2   lead IA representative down on a disaster.

3   Q.  Okay.  When you transitioned into these more senior roles, were

4   you responsible simply for overseeing what was being done in terms

5   of the inspections?

6   A.  That would be pretty much accurate.

7   Q.  Was there a target that you wanted to inspect X percentage of

8   the emergency housing units that had been deployed?

9   A.  Our target goal was to inspect a 100 percent of them.

10   Q.  Was it the field inspector's responsibility to evaluate whether

11   there was any damage to the unit that was going to be occupied?

12   A.  Prior?

13   Q.  Yes, sir.

14   A.  Yes, sir.

15   Q.  And take me through, what particular damage would your DHOPS

16   and field inspectors be looking for with respect to a particular

17   unit?

18   A.  Again, I can't speak specifically for all of them, but I would

19   hope that they would report any type of damage?

20   Q.  And would they make entry in to the unit as part of the

21   inspection?

22   A.  Yes.

23   Q.  Would they be required to report water leaks if they were found

24   within the unit?

25   A.  In they found water leaks, yes.

1  Q.  Would your DHOPS personnel ever have direct contact with the

2  occupant of a unit?

3  A.  Yes.

4  Q.  And in what instances, to your knowledge, would a DHOPS field

5  inspector have direct conversation or contact with an occupant?

6  A.  At lease-in.

7  Q.  And take me through -- what involvement did the DHOPS

8  inspectors have at the lease-in emergency?

9  A.  What involvement?

10  Q.  Yes.

11  A.  They would have the survivor sign the lease-in paperwork,

12  review the inside of the unit with the survivor, make sure they

13  understand everything, operation of everything, and get the

14  paperwork signed and then report back.

15  Q.  Was it also DHOPS standard operating procedure for its field

16  inspectors performing lease-ins to provide a copy of the owner's

17  manual to the particular occupant?

18  A.  To provide?  Like I had said earlier, if it was in the unit,

19  that they would be one of the things that they would hand over to

20  the occupant, yes.

21  Q.  And in addition to providing the owner's manual, they would

22  also review the various components of the unit, the stove, the

23  refrigerator, the operation of the AC system, correct?

24  A.  Correct.

25  Q.  Would they also give instruction as to whether -- if the

1  occupant had a problem, what steps to take?

2  A.  They would tell them to call the maintenance.

3  Q.  So it was standard operating procedure at DHOPS if an occupant

4  had a problem, they were instructed by the DHOPS field inspector at

5  lease-in to call a maintenance number?

6  A.  Yes.

7  Q.  And that maintenance number was provided to the occupant was

8  provided at the time of the check in, correct?

9  A.  Yes.

10      (CONCLUSION OF VIDEO DEPOSITION OF BRIAN BOYLE.)

11      THE COURT:  Okay.  We'll go ahead and break for the day.

12  Please do not discuss anything about the case with anyone until you

13  get the case to deliberate, which we believe will be, we're on

14  course, to have that happen around or before midday on Monday.  So

15  tomorrow we will finish with all of the testimony and evidence,

16  hopefully we'll do that with a little spare time in which case

17  you'll get out a little bit early.  That's not a promise but we

18  feel like maybe that would be the thing to do.  But it will be too

19  late in the day for you to start your deliberations, because -- and

20  I'll explain tomorrow what that involves, but it looks very likely

21  that they will get the case to you by midday Monday at which time

22  you can begin your deliberation s.

23      So thank you again for all of your attention and your

24  patience, and we will see you at 8:30 tomorrow; and we'll try to

25  work through the day and get that finished up so you can get out a

1    little bit early tomorrow.

2            THE MARSHAL:  All rise.

3            THE COURT:  All right.  Counsel, very quickly.  Anything

4    we need to cover on the record at this point?

5            MR. WATTS:  Just one, your Honor.  The defense put in a

6    cut of Mr. Lapinski that at the end talks about the industry's

7    desire for a mandatory federal standard, and wouldn't it be helpful

8    if you had a federal standard; and then they end with a cut that

9    says you and FEMA never did get a federally mandated safe level or

10   unsafe level as a result of this.  There is no federal standard, we

11   know that's not true.  I know the court has made an order with

12   respect to the .015, but we would request the court reconsider that

13   in light of the testimony the defendant's put in and allow us to

14   admit that.

15           THE COURT:  Wait.  Let me make sure I understand what

16   you're saying.  First of all, why did this get in if it was not

17   part of a designated transcript and an objection that I could have

18   ruled on?  Because I spent a considerable amount of time last week

19   reading depositions that designated portions of depositions and

20   ruling on the objections which should have been briefed.  So how

21   did we get to the point where something is in that's objectionable?

22           MR. GARRISON:  Your Honor, the short answer is I don't

23   know but we -- you actually had Lapinski listed and you had the

24   video edited.  And when you decided not to use it, we picked it up.

25   But we did exchange objections and edits, but I think the editing

1    was done on the plaintiffs' side and we just picked up the tapes.

2           MR. WATTS:  I am not claiming that anybody put in

3    something that was objected to.  What I'm saying is this came into

4    evidence, we didn't object to it but we believe that now that it's

5    in that the standard should be in and we would just ask the court

6    to consider it.

7           THE COURT:  But it would have been incumbent upon counsel

8    if that was designated to so object.

9           MR. GARRISON:  Yes, sir.

10          THE COURT:  You know, to allow it to come in basically,

11   you know, it almost invites a Trojan horse type scenario where I am

12   not going to object to it, but once it gets in, I am going to use

13   it to open the door to bring in my staff.

14          MR. WATTS:  I understand the court's point.

15          THE COURT:  So quite honestly, when I heard that

16   testimony it wasn't something that I concentrated on in doing the

17   objections because I didn't have an objection before me.  When I

18   heard it I thought well, maybe something that was objectionable to

19   somebody but if there was no objection, I am not going to rule on

20   it one that's not made.

21          MR. WATTS:  I think you're right and I think it may have

22   been missed.  But I am asking anyway.  But I understand your

23   position.

24          THE COURT:  Okay.

25          Anything else on the record?  Exhibits?

```
 1          MR. WATTS:  Just the exhibits to those last couple of

 2    depositions, we'll get those to you in the morning, the maintenance

 3    record, that kind of thing we just need to get those in.

 4          MR. YOUNT:  We have a lot of work to do on exhibits and

 5    we are going to endeavor to it do that tonight.

 6          THE COURT:  Do that tonight because tomorrow you will

 7    have a lot of work to do with Pam at the end of the day, and you

 8    know what that includes.  Let me go through that on the record with

 9    you all the schedule, not in particular witnesses, but what I hope

10    to do tomorrow is to have our jury charge conference at ten minutes

11    to eight tomorrow morning, hopefully we can complete it by 8:15,

12    okay.  So go through that, a lot of the provisions in the jury

13    instructions are simply boilerplate typical jury instructions,

14    concentrate on the substantive portion of the instructions.  Also,

15    if you see any typos or anything like that that we can fix.

16    Because the jury instructions after I read them to the jury will go

17    into the jury room.  So we want to make sure we have as clean a

18    copy as possible.

19          MR. WATTS:  When were they sent, I haven't seen them yet?

20          THE LAW CLERK:  I gave them to Dennis.

21          MR. REICH:  Yes.

22          MR. WATTS:  I just hadn't seen them.

23          THE COURT:  And that likewise goes for the jury verdict

24    form, we will cover all of that tomorrow morning hopefully it won't

25    take too long -- wait.  Counsel, you need to be listening to what
```

```
 1    I'm saying, we can confer after.
 2              MR. GARRISON:  Yes, sir.
 3              THE COURT:  7:50 tomorrow morning in the conference room
 4    in the back.  We'll start at 8:30, my hope is we have four live
 5    witnesses and they're listed here and we know who they are and I
 6    assume we pretty much know what they're going to say, you all know
 7    what they're going to say, I know what some of them are going to
 8    say because I've seen them before.  Do we think these times here,
 9    these times here seem to conform with my idea of efficiency, but I
10    don't know how reality based they are.
11              MR. YOUNT:  Judge, we are working on cutting things back
12    right now, so I think that that's a realistic evaluation.
13              THE COURT:  If you can do the times that are on my sheet
14    here then we're doing great.  If we can get close to these times
15    we're doing great, but we all know sometimes things start careening
16    out of control depending on how a witness answers.
17              MR. WATTS:  They look a little optimistic to me, if
18    that's your times, but I have crosses too.
19              THE COURT:  I thought these were inclusive.
20              MR. WEINSTOCK:  I don't think Dr. Wegener's direct is not
21    going to take an hour, I assure you of that.
22              THE COURT:  Good.  But anyway, we have four live
23    witnesses, I think if we work from 8:30, unitl noon the same
24    schedule we've been working, it's likely that we will finish up
25    sometime early in the afternoon I would think.
```

1        MR. GARRISON:  I would think so, too.  We still have this

2  video of Garrett and we are going to decide tonight if we're going

3  to show it.  But we're going to take a hard look at it.

4        THE COURT:  Because he is not on the list here, and if we

5  show it hopefully he can be abbreviated in light of all of the

6  other videos we've seen.  And he has some repetitive stuff to say,

7  so we might can subtract some of the stuff out of the hour long

8  video is.

9        MR. GARRISON:  We'll take a look at it.

10        THE COURT:  My hope is that we can finish these

11  witnesses, this testimony between the one and three o'clock hours

12  tomorrow afternoon.  That's my hope.

13        MR. WATTS:  And we may have two rebuttal witnesses that

14  are no more than two or three minutes apiece.

15        THE COURT:  That was my next question.

16        MR. WATTS:  I don't know who they are yet.  One of them

17  is a short clip out DeRosa that just responds to something that

18  Little said; I'll get you that within the hour; and there may be,

19  at six o'clock just to handle one issue, I don't know what the

20  witness is issue wet.

21        THE COURT:  That was any next question.  So we would have

22  rebuttal up to two witnesses and very brief.

23        MR. WATTS:  Very short.

24        MR. REICH:  Your Honor, if I may ask a quick question.  I

25  know that some case law was submitted unobjected to concerning

1   Dr. Miller.  I am assuming those are the entire cases, not just

2   parts of them?

3             MR. YOUNT:  Correct.

4             MR. REICH:  Full opinions.

5             MR. YOUNT:  Correct.

6             THE COURT:  Double check that.  I will talk about

7   exhibits here in a minute.

8             After we release the jury tomorrow, we will take up the

9   motion practice, and that's assuming that we finish with the jury

10   instructions and we don't have to go back and reconvene with that.

11   I would like to at end of the evidence tomorrow take up the motions

12   that were reserved by the defendants at the conclusion of the

13   plaintiffs' case along with any other motions that you have.

14             All right.  With regard to exhibits, you need to confer,

15   the game plan was that we were going to withdraw from the court's

16   record any exhibits to which there have been no reference during

17   trial, even if they had been stipulated in at the outset.

18             So along the lines of what Dennis just said, you will

19   need to confer with each other and with Pam, my courtroom deputy,

20   who is the custodian of all of the exhibits.  The importance of

21   that is to make sure that what is included in the court record

22   should be in the court record and what Pam has is that and only

23   that and not any other extraneous materials or things that do not

24   belong in the court record, because (A) it's the court record, and

25   "B), it is going to be sent into the jury room as part of the

```
 1    deliberations as soon as we send them out to deliberate.

 2            In connection with that, somebody, a designated

 3    authorized attorney from each side will have to sign the form

 4    certifying that he has reviewed all exhibits and they are in

 5    conformity with what I just said.  In other words, inclusive of

 6    what should be in and exclusive of things that are, that don't

 7    belong in

 8            MR. WATTS:  We have somebody who is searching the trial

 9    transcript for the word exhibit, which is a fast way to find all of

10    this, and we will confer with you guys tonight to go through that

11    and just make sure we're good.

12            MR. GARRISON:  That sounds great.

13            THE COURT:  The jury is going to get -- my goal is to

14    start at 8:30 Monday, closing arguments, charge the jury, send them

15    back in there with a copy of the stipulations, make sure we have a

16    clean copy of that, I think we do, and the exhibits and the jury

17    verdict form and a copy of the jury instructions.  So those four

18    things will be sent back to the jury room and that will be what we

19    do Monday morning.

20            MR. WATTS:  Okay.

21            MR. GARRISON:  Yes, sir.

22            THE COURT:  Let's see what we can do to try to get

23    tomorrow in to more manageable, especially if you have Garrett on

24    videotape.  He is not on the list here, so I hadn't factored him in

25    but I really don't think we need a whole hour of him.
```

1        MR. GARRISON:  Probably not.  He was part of the

2   plaintiff's case, one that they dropped and we were on the fence

3   about it, but we'll take a look at it.

4        THE COURT:  He is a FEMA guy that I recall.

5        MR. GARRISON:  He is.

6        MR. WATTS:  Nine of ten FEMA witnesses.

7        THE COURT:  We've heard a lot about what FEMA did and

8   didn't do and tried to do and wanted to do.  So if it's duplicative

9   of anything that's been said, I would strongly suggest that we not

10  include that in whatever, whatever part of it you want to play.

11       MR. GARRISON:  Yes, sir.

12       THE COURT:  All right.  Anything we need to cover off of

13  the record at this point, we will see you at ten minutes to eight

14  in the conference room.

15       MR. GARRISON:  Yes, sir.

16       THE DEPUTY CLERK:  All rise.

17     (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

18                        *  *  *  *  *  *

19                     REPORTER'S CERTIFICATE

20

21       I, Karen A. Ibos, CCR, Official Court Reporter, United
    States District Court, Eastern District of Louisiana, do hereby
22  certify that the foregoing is a true and correct transcript, to the
    best of my ability and understanding, from the record of the
23  proceedings in the above-entitled and numbered matter.

24

25  Karen A. Ibos, CCR, RPR, CRR
    Official Court Reporter

DAILY COPY