1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
2

3    *****************************************************************

4    IN RE:  FEMA TRAILER
     FORMALDEHYDE PRODUCTS
5    LIABILITY LITIGATION
                         DOCKET MDL NO. 1873 "N"
6                        NEW ORLEANS, LOUISIANA
                         FRIDAY, MAY 21, 2010, 8:30 A.M.
7

     THIS DOCUMENT RELATES TO:
8

     *DOCKET NO. 09-3251,*
9    *EARLINE CASTANEL v*
     *RECREATION BY DESIGN, LLC*
10

     *****************************************************************
11

12                     **DAY 5, MORNING SESSION**
             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
13                 UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16

     FOR PLAINTIFF:        WATTS GUERRA CRAFT
17                         BY:  MIKAL C. WATTS, ESQUIRE
                           FOUR DOMINION DRIVE
18                         BUILDING THREE, SUITE 100
                           SAN ANTONIO TX 78257
19

20                         CHRIS PINEDO
                           ATTORNEY AT LAW
21                         802 N. CARANCAHUA, SUITE 2250
                           CORPUS CHRISTI TX  78470
22

23                         REICH & BINSTOCK
                           BY:  DENNIS C. REICH, ESQUIRE
24                         4265 SAN FELIPE, SUITE 1000
                           HOUSTON TX  77027
25

1  APPEARANCES CONTINUED:

2

3  FOR DEFENDANT:              GARRISON YOUNT FORTE & MULCAHY
                              BY:   LYON H. GARRISON, ESQUIRE
4                                  SCOTT P. YOUNT, ESQUIRE
                                  RANDALL C. MULCAHY, ESQUIRE
5                              909 POYDRAS STREET, SUITE 1800
                              NEW ORLEANS LA  70112
6

7                              DUPLASS ZWAIN BOURGEOIS MORTON
                              PFISTER & WEINSTOCK
8                              BY:   ANDREW D. WEINSTOCK, ESQUIRE
                                  JOSEPH G. GLASS, ESQUIRE
9                              THREE LAKEWAY CENTER
                              3838 N. CAUSEWAY BOULEVARD
10                             SUITE 2900
                              METAIRIE LA  70002
11

12

13  OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
                              500 POYDRAS STREET, ROOM B406
14                             NEW ORLEANS LA  70130
                              (504) 589-7779
15

16  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
   PRODUCED BY COMPUTER.

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3    EXAMINATIONS                                            PAGE

4

5    **DR. H. JAMES WEDNER**...................................1191

6    VOIR DIRE EXAMINATION BY MR. WEINSTOCK.................1191

7    DIRECT EXAMINATION BY MR. WEINSTOCK....................1193

8    CROSS-EXAMINATION BY MR. WATTS.........................1204

9    REDIRECT EXAMINATION BY MR. WEINSTOCK .................1223

10   VIDEOTAPED DEPOSITION OF **DAVID GARRATT**................1229

11   **ROBERT C. JAMES**........................................1264

12   DIRECT EXAMINATION BY MR. YOUNT........................1265

13   CROSS-EXAMINATION BY MR. WATTS.........................1285

14   REDIRECT EXAMINATION BY MR. YOUNT......................1297

15   VIDEOTAPED DEPOSITION OF **DR. CHRIS DEROSA**.............1304

16

17

18

19                           **E X H I B I T S**

20   DESCRIPTION                                             PAGE

21

22   EXHIBIT 1107 WAS ADMITTED..............................1262

23   EXHIBIT 569 WAS ADMITTED...............................1264

24

25

1          **P-R-O-C-E-E-D-I-N-G-S**

2                  MORNING SESSION

3          FRIDAY, MAY 21, 2010, 8:30 A.M.

4             (COURT CALLED TO ORDER)

5

6

7          THE COURT SECURITY OFFICER:  All rise.

8             (WHEREUPON, at this point in the proceedings, the jury

9   panel enters the courtroom.)

10         THE COURT:  Good morning.  You may be seated.

11             Once again, thank you all for being on time.  I've

12   spent some time with the attorneys this morning on some issues

13   that will pertain to what we do on Monday, so I apologize for the

14   few minutes delay here this morning.

15             We are ready to proceed.  I understand that we have

16   four live witnesses today that we'll try to get through as

17   quickly as possible, along with possibly one very brief rebuttal

18   witness, as we sit here now.  That, of course, could change.

19             So Mr. Weinstock, you were going to call the next

20   witness, I take it, from your appearance at the podium?

21         MR. WEINSTOCK:  Yes, Your Honor, Dr. Wedner.

22         THE COURT:  Dr. Wedner, if you would come forward.  When

23   you get up to this chair here by me, go ahead and remain standing

24   and take the oath, and then you may be seated.

25         THE DEPUTY CLERK:  Would you please raise your right

1    hand.  Do you solemnly swear that the testimony which you are

2    about to give will be the truth, the whole truth and nothing but

3    the truth, so help you God?

4         THE WITNESS:  I do.

5                      **DR. H. JAMES WEDNER**

6    was called as a witness and, after being first duly sworn by the

7    Clerk, was examined and testified on his oath as follows:

8         THE DEPUTY CLERK:  Please state and spell your full name

9    for the record.

10        THE WITNESS:  My name is H. James Wedner, W-e-d-n-e-r.

11                    VOIR DIRE EXAMINATION

12   BY MR. WEINSTOCK:

13   Q.   Good morning, Dr. Wedner.

14   A.   Good morning.

15   Q.   What are you a doctor in?

16   A.   I'm an internist and an allergist and immunologist.

17   Q.   Where do you practice medicine?

18   A.   At Washington University School of Medicine.  That's in

19   St. Louis.

20   Q.   For those of us who are not in the medical field, where does

21   Washington University rank in the hierarchy of medical schools?

22   A.   In the hierarchy, it ranks third.

23   Q.   What are your duties at Washington and Lee other than seeing

24   patients?

25   A.   I'm the chief of allergy and clinical immunology in the

1   department of medicine.  I'm the director of the Allergy and

2   Asthma Center of Washington University School of Medicine, and

3   I'm the director of the training program for Children's Hospital,

4   Barnes Hospital in the Washington University School of Medicine

5   in allergy and immunology.

6   Q.    Have you ever worked actually in the field trying to

7   determine what effects formaldehyde might have on inner city

8   children?

9   A.    Not formaldehyde, but we worked a lot with inner city

10  children.

11  Q.    What work did you do?

12  A.    There have been a series of studies on inner city children

13  dealing with asthma that started with what was called the

14  National Cooperative Inner City Asthma Study, and we -- my group

15  at Washington University School of Medicine was one of the first

16  groups that participated in that study.

17  Q.    How long did that study last?

18  A.    Five years.

19  Q.    And I misspoke before.  Is formaldehyde one of the things

20  you considered to look at?

21  A.    Yes.

22  Q.    What were you doing at this time yesterday?

23  A.    At this time?  I was taking care of sick people.

24  Q.    How often do you do that?

25  A.    Four out of five days a week.

1    Q.    Do you have staff privileges anywhere besides

2    Washington University?

3    A.    I have staff privileges at Barnes Hospital and --

4    Barnes-Jewish Hospital and Barnes-Jewish West County Hospital,

5    and I have guest privileges at Children's Hospital of St. Louis.

6              MR. WEINSTOCK:  Your Honor, at this time we would tender

7    Dr. Wedner in immunology, as an allergist and an internist.

8              MR. WATTS:  Agreed.

9              THE COURT:  The Court will therefore accept Dr. Wedner

10   in the field that he's offered in.

11                          DIRECT EXAMINATION

12   BY MR. WEINSTOCK:

13   Q.    Doctor, what exactly is formaldehyde?

14   A.    Formaldehyde is a very reactive one-carbon molecule.

15   Q.    Does it only come from outside the body?

16   A.    No.  It's both outside and inside.  It's a common metabolite

17   which our body uses in what we call "intermediary metabolism."

18   As you make things, you generate formaldehyde.

19   Q.    What is the odor threshold for formaldehyde?

20   A.    The odor threshold is about 500 parts per billion.

21   Q.    Are there people that can smell it below that level?

22   A.    There are probably people that can detect it at slightly

23   lower levels.

24   Q.    What's the irritant level for formaldehyde?

25   A.    About 1 part per million or about 1,000 parts per billion.

1   Q.   If somebody smells formaldehyde, what is their reaction, not

2   their personal reaction, what is their body doing?

3   A.   They are detecting an odor, so when you smell something,

4   what you're doing is detecting its odor.

5   Q.   And how does one react to this -- how does the human being

6   react to the smell of formaldehyde?

7   A.   Well, when you smell things that have a noxious odor or an

8   odor that's not particularly pleasant, that engenders what we

9   call the "fight, fright, or flight reaction."  It's your way of

10  saying, "I need to do something about that."  And normally, the

11  body can do one of three things:  You can fight it, you can be

12  frightened by it, or you can get out of there.  So fight, fright,

13  or flight.

14  Q.   And what is the process of adaption?

15  A.   The process of adaption is that when you are -- we're all

16  exposed to odors all the time, every day.  And if you didn't do

17  something about all these odors, we would all go crazy.  So

18  adaption is simply ignoring odors that you've already smelled,

19  you know they are there, you know that you don't really need to

20  do anything about them, so you avoid the fight, fright, or flight

21  by basically forgetting about them.

22  Q.   Is adaption a good thing?

23  A.   Oh, yes, a very good thing.

24  Q.   Why is that?

25  A.   Well, let's say that you smell something, and you think

1    about what it does, you don't actually think about it, your brain

2    thinks about "What should I do about this?"  And you realize that

3    that odor is of no consequence to you.  So you put it aside.  If

4    you didn't do that, every time you smelled that same odor, you

5    would have to go through the same brain process, and you would

6    spend your entire life doing that and you wouldn't be able to

7    think.

8              So this is a way our brain simply puts these little

9    pieces of information in the back -- this is where our olfactory

10   bulb is, way back here, puts them away.  You will remember them,

11   and because you remember them and you remember that they weren't

12   bad for you, you ignore them, basically.

13   Q.   Does it give you the ability to smell something new that

14   might be a problem, for example, a fire?

15   A.   Correct.

16   Q.   Can formaldehyde act as an irritant?

17   A.   Oh, yes, absolutely.

18   Q.   When it does act as an irritant, what part of the body does

19   it irritate?

20   A.   Well, it irritates the upper airway first, and the part of

21   our body that's affected most are the eyes.  So your eyes are

22   open more than any other part of the body, and the mucous

23   membranes of the eyes are the part of your body which detects

24   irritants best.  And formaldehyde is just another irritant.

25             So that's what happens first.  You start to have a

1    little bit of itchy, scratchy eyes, and then it goes upwards from

2    there.

3    Q.   And what happens to that irritant effect when you leave the

4    environment that contains the formaldehyde?

5    A.   It goes away.  Formaldehyde is what we call a "primary

6    irritant."  Everybody will be irritated by formaldehyde if you

7    give them enough of it.  So it's a primary irritant.  That's its

8    chemical property, but when you leave, you have tears, the tears

9    will wash it away, and a very short period of time after you

10   leave, the irritation is gone and that's it.

11   Q.   What are the long-term consequences of this irritant effect

12   of formaldehyde?  I mean, does it still linger with you days

13   later, months later, years later?

14   A.   No, it has no long-term effects.  Like all primary

15   irritants, the minute it's gone, it's gone.

16   Q.   What about if you're in the environment every day, day in

17   and day out for 17 months at low levels of formaldehyde, does

18   that have a long-term effect as an irritant?

19   A.   No.

20   Q.   Did you examine Earline Castanel?

21   A.   I did.

22   Q.   Did you take a history from her?

23   A.   I did.

24   Q.   Would you share with the jury the history you took from her.

25   A.   I saw Ms. Castanel in the first part of this year.  She told

1    me that she had had -- let me get to it so I don't misspeak now.

2            When I first saw her, she said she had a cold, and it

3    was pretty obvious that she did.  She had kind of a nose that

4    looked bad.  And that was her main complaint, that she had a

5    cold.  And she had seen Dr. Gautreaux and he had given her some

6    cough medicine and told her to take her Zyrtec.

7            She was hoarse.  She told me she was on her second

8    bottle of cough medicine.  And she had had some Dex-Tuss and he

9    gave her some Keflex or Cephalexin.

10           So she had a common, ordinary cold.  That was her main

11   complaint.

12   Q.   That was her main present complaint?

13   A.   Correct.

14   Q.   What history did she give you regarding this case?

15   A.   Her main history was that she had had sinus problems, and

16   she related that she had had sinus problems for many, many years.

17   She said that initially she probably had them in the '80s;

18   although, it was really not particularly bad.  Beginning in the

19   '90s -- actually, in the '80s she saw a physician.  She couldn't

20   remember exactly who she saw in the '80s.  Beginning in the '90s,

21   she began to see an ENT physician, and he began treating her a

22   couple of times a year.  He would give her an injection.  At the

23   time, she didn't remember what was in the injection, which was

24   quite reasonable.

25           And this happened long before she moved into the

1   Katrina trailer.  After she moved into the trailer, she noted

2   again that her nose was stuffy.  Her main complaint throughout

3   all of her sinus problems was stuffy nose, which is not unusual.

4   So she had a stuffy nose.

5   Q.   Doctor, if I can stop you right there.  A stuffy nose.  Is a

6   stuffy nose what you would expect to see caused by the irritating

7   effect of something like formaldehyde?

8   A.   Most times when you're irritated, your nose runs.  So people

9   will tell you, "When I walked into someplace that was irritating,

10  my nose ran like a faucet."  Stuffy nose is much more consistent

11  with chronic sinus disease than it is with an irritative -- what

12  we would call an irritative rhinitis or someone who was

13  irritated.

14  Q.   Did she relate when that stuffiness began after moving in

15  the trailer?

16  A.   She told me three or four weeks after she moved into the

17  trailer, she noted that at night her nose would become stopped up

18  and dry, so this was -- three or four weeks is what she told me.

19  Q.   Doctor, is it consistent with an irritant that there would

20  be a delayed reaction of three and four weeks before it would

21  start bothering you?

22  A.   No.

23  Q.   Is that something we would see immediately?

24  A.   Irritants, when you walk into a room where there is an

25  irritant, that's what happens.  You walk in -- it's like any

1    other irritant.  You walk in, you say, "Oops," and you either do

2    something about it or you endure it.  But it happens right away.

3    Q.   Did she complain of any odors or irritation while she was

4    living in the FEMA trailer?

5    A.   No.

6    Q.   Is that something you asked?

7    A.   Always.

8    Q.   Did she give you a history as to her sinus condition after

9    moving out of the FEMA trailer?

10   A.   After she moved out of the trailer, she continued to have

11   the sinus problems, and she has had sinus problems up until the

12   current time.

13   Q.   Have you reviewed her medical records as well?

14   A.   Yes, I have.

15   Q.   She had a recent surgery?

16   A.   She did.

17   Q.   Did they do a biopsy during that surgery?

18   A.   They did.

19   Q.   What did that biopsy show?

20   A.   It just showed acute and chronic inflammation.

21   Q.   Did it show any cellular damage?

22   A.   No.

23   Q.   Doctor, you were asked in deposition and Dr. Williams shared

24   with us earlier this week the Holstrom paper?

25   A.   Yes.

1  Q.    You are familiar with the Holstrom paper, correct?

2  A.    I am.

3  Q.    In the Holstrom paper, they did a histological scoring of

4  the nasal biopsies, correct?

5  A.    Yes.

6  Q.    And for those that were normal, they got the big goose egg,

7  a zero, correct?

8  A.    Right.

9  Q.    What score would this biopsy have gotten?

10  A.    It's hard to say.  The little bit that you could see would

11  probably be scored zero.  There was no evidence of abnormal

12  cells.  This was just acute and chronic inflammation, what you

13  would expect to see from what an ENT surgeon would do when he

14  would do endoscopic sinus surgery.

15  Q.    In your report you talk about the absence of studies that

16  link exacerbation or causation of sinus problems with

17  formaldehyde as an irritant.

18  A.    That's correct.  There are none.

19  Q.    Do you follow the studies in this field?

20  A.    Yes.

21  Q.    How often do you keep yourself updated on these studies?

22  A.    At least once a month, easily once a week.

23  Q.    Why is that?

24  A.    First of all, I want to know.  I've been following the

25  formaldehyde literature for, oh, 20 years, 25 years.  I'm writing

1    several articles on formaldehyde, and so we want to keep up to

2    date.

3    Q.   By the way, are you writing any articles at the request of

4    the Formaldehyde Council?

5    A.   Right now we're writing two articles:  One was at the

6    request of the Formaldehyde Council and one was at the request of

7    another collaborator, who, I think, was -- started off with the

8    Formaldehyde Council, but that was not my intent.

9    Q.   Did they find you or did you find them?

10   A.   They found me.

11   Q.   If we can go back to the statement you made.  You could find

12   no studies that showed exacerbation or causation of sinus

13   problems from the irritant effects of formaldehyde?

14   A.   That's correct.

15   Q.   Dr. McGwin was here earlier this week, and although he only

16   found one that dealt with the sinus and the nose, why didn't you

17   cite the Ritchie paper?

18   A.   The Ritchie paper is a paper that I'm very well aware of.

19   The Ritchie paper is a paper in which they just looked at

20   self-reporting.  They took a whole bunch of people.  There were

21   probably a couple of thousand people, and they asked a garden

22   variety of lists.  "What happened to you when you were in your

23   mobile home?"  And they gave them a list.  And they got to pick

24   and choose from a list.  "Did you have skin rashes?  Did you have

25   upper airway irritation?"  They didn't ask a goal-directed

1   question like we would do when you did -- they didn't say, "You

2   tell me what happened to you."  They got to pick from a list.

3        And so the paper has a number of things, one of which

4   is recall bias.  In other words, if something happened to you in

5   your mobile home, you were much more likely to remember it than

6   if nothing happened to you.

7        And the second thing is, there was no attempt in these

8   papers to make a correlation between any level of formaldehyde

9   and what happened to the individuals.  This was just, you were in

10  a mobile home.  What are all of the things that happened to you

11  in the mobile home?

12       So there was no, for example, attempt to say, "Were all

13  the people who reported that they had irritation of their nose

14  allergic to something?  Or were everybody that had irritation of

15  their eyes, did they have glaucoma?"

16       So it's just a garden variety list of everything that

17  happened to anybody who lived in a mobile home during that period

18  of time.  This is the kind of study that is basically called an

19  "observational study," and the only thing it might be useful for

20  in terms of science would be to say, "Okay, now we have to go

21  back and do another study."  But in terms of proving that an

22  individual who was in a mobile home, not respective of their

23  level of formaldehyde, does or does not have irritation, it's

24  useless.

25  Q.   Does the Ritchie paper in any way provide objective evidence

1    or data that formaldehyde is an irritant that causes permanent or
2    exacerbated sinus conditions?
3    A.    No, the Ritchie paper doesn't even address the sinuses.   The
4    Ritchie paper talks about the nose.   There has never been a paper
5    that addresses sinusitis and formaldehyde.   It simply doesn't
6    exist in the world's literature.
7    Q.    An issue has arisen in this case regarding fear of cancer.
8    A.    Yes, sir.
9    Q.    Did Ms. Castanel relate to you a fear of cancer?
10   A.    No.
11   Q.    Did she mention it at all?
12   A.    No.
13   Q.    Doctor, if Ms. Castanel had come to see you, if she drove up
14   or flew up to St. Louis in the summer of 2007 and gave you the
15   history she gave you, and just assume the levels of formaldehyde
16   in her trailer were 50 or 100 parts per million, would you have
17   told her on the basis of that exposure that she should move out
18   of that trailer?
19   A.    No.
20   Q.    The surgery records you reviewed, was that surgery in any
21   way related to formaldehyde exposure in that trailer?
22   A.    Oh, no.
23   Q.    Based on your years of experience, the medical records you
24   reviewed, the studies you've looked at, the physical examination
25   you performed, and the history you took from Ms. Castanel, to a

1    reasonable degree of medical certainty, does Earline Castanel

2    have rhinosinusitis that was exacerbated by formaldehyde while

3    she lived in the trailer for 17 months?

4    A.    No.

5    Q.    And I just want to make that last part clear.  You didn't

6    just talk to her, you did a physical examination of Ms. Castanel?

7    A.    Oh, yes.

8              MR. WEINSTOCK:  That's all the questions I have,

9    Your Honor.

10                          CROSS-EXAMINATION

11   BY MR. WATTS:

12   Q.    Dr. Wedner, Mikal Watts.  Good to see you again.

13              I want to start with the last thing Mr. Weinstock said.

14   She didn't fly up to St. Louis to see you, right?

15   A.    She did not.

16   Q.    She is not your patient?

17   A.    Oh, no.  She's not.

18   Q.    You are an expert witness being paid to perform services for

19   the lawyers that hired you.

20   A.    I am.

21   Q.    How much are you being paid, sir?

22   A.    $500 an hour.

23   Q.    And you charge them $500 an hour.  You understand the way it

24   works, when somebody makes a case, the defendant can have their

25   expert look at them, and that's who you are, right?

1   A.   That's correct.

2   Q.   So you flew down here while being paid $500 an hour and got

3   to see Ms. Castanel in your capacity as an expert for the

4   defense?

5   A.   I did.

6   Q.   Fair enough.

7        Now, as we look at your résumé as it presently exists,

8   of all the studies and articles that are in your résumé, not one

9   of them deals with formaldehyde.

10  A.   That's correct.

11  Q.   You have never performed any epidemiological studies with

12  respect to formaldehyde?

13  A.   That is also correct.

14  Q.   Now, back in the 1980s, you did testify as an expert in

15  formaldehyde litigation in the pre -- what do I say, the pre-HUD

16  standard days, fair?

17  A.   Correct.

18  Q.   And your position in those pre-HUD standard days is the

19  complaints that had been made to the CPSC about formaldehyde,

20  nobody got injured then either?

21  A.   That is also correct.

22  Q.   And so you thought and testified at the time that these

23  changes of the rules about trying to reduce formaldehyde were

24  unnecessary from the standpoint of public the health?

25  A.   No, I never testified to that.

1   Q.   Well, were they necessary or were they not?

2   A.   I don't think they were -- they were necessary because of

3   the smells, but they were not necessary because they caused

4   people to have injury.

5   Q.   Well, listen to my previous question.  I thought I was clear

6   about that.

7            You testified that the changes in the formaldehyde

8   standards with respect to manufactured housing, not travel

9   trailers, those changes didn't apply to travel trailers, right?

10  A.   Correct.

11  Q.   But the changes in the formaldehyde standards with respect

12  to manufactured housing that occurred in the 1980's, you

13  testified that they were unnecessary from a standpoint of public

14  health?

15  A.   Well, I don't remember exactly what I said, but my

16  recollection is that I never testified that they didn't need to

17  change anything.  I testified that people were not injured

18  because of the amount of formaldehyde that was in their trailers.

19  Q.   And the CPSC is the Consumer Product Safety Commission,

20  right?

21  A.   Correct.

22  Q.   And the safety commission is the one that initiated those

23  changes, right?

24  A.   Correct.

25            MR. WEINSTOCK:  Objection, Your Honor.  Can we approach?

1        THE COURT:  Yes.

2        MR. WATTS:  I'm done.

3        MR. WEINSTOCK:  Oh, you're done?

4        MR. WATTS:  Yes.

5                        EXAMINATION

6   BY MR. WATTS:

7   Q.   Now, you had not worked on the issue of formaldehyde from

8   the time that you testified in that litigation up until the

9   middle of the year 2005 or '6, when these gentlemen hired you?

10  A.   I think it was late 2006, but I'm not sure.

11  Q.   In addition to these gentlemen hiring you, you were hired by

12  the Formaldehyde Council to testify on its behalf?

13  A.   I was hired to testify at the EPA hearings, yes.

14  Q.   Now, you mentioned that you're writing some articles right

15  now.  One of them you were asked to write by the

16  Formaldehyde Council, correct?

17  A.   Correct.

18  Q.   And the Formaldehyde Council is this industry group of

19  people that manufacture and use formaldehyde, right?

20  A.   Correct.

21  Q.   They are asking you to write an article, and then you said

22  the other one is with a collaborator that has a history with the

23  Formaldehyde Council; is that right?

24  A.   That's also correct.

25  Q.   Is that Dr. Golden?

1  A.    Yes.

2  Q.    Dr. Golden is the guy who does consulting work for the

3  Formaldehyde Council who initially called you to get you to go

4  testify for the Formaldehyde Council?

5  A.    I don't think that's true.  I think the Formaldehyde Council

6  actually called me, but you may be right.  I don't know.

7  Q.    Have you told me before the first person that you talked to

8  was Dr. Golden, the toxicologist from Arlington, Virginia?

9  A.    Could be.  I mean, he and I have worked together.  He works

10 for the Formaldehyde Council.  I did work for the

11 Formaldehyde Council.

12 Q.    How much do you charge the Formaldehyde Council for the

13 testimony that you gave them?

14 A.    I charge them the same amount, $500 an hour.

15 Q.    All right.  Now, the fact of the matter is before the

16 Formaldehyde Council called you to get you involved, you had no

17 paper, no epidemiological study ever dealing with formaldehyde,

18 right?

19 A.    That's correct.

20 Q.    Now, with respect to what you have learned about

21 formaldehyde since you got involved in this litigation, number

22 one, you agree that as humidity levels increase in a FEMA

23 trailer, the levels of formaldehyde will correspondingly

24 increase, right?

25 A.    Yes.

1  Q.   In other words, there's a directional relationship, more

2  humidity, higher formaldehyde off-gassing, right?

3  A.   Correct.

4  Q.   There's a directional relationship, more temperature, higher

5  formaldehyde off-gassing?

6  A.   Correct.

7  Q.   You and I have discussed documentation that there is a rule

8  of thumb, for every 12 degrees of increase in temperature, you

9  double the amount of formaldehyde.  Do you remember that?

10  A.   Correct.

11  Q.   Now, with respect to when Ms. Castanel went in the trailer,

12  she moved in in March, right?

13  A.   March 2006.  Correct.

14  Q.   And the way the seasons work, it gets hotter the closer you

15  get to summer, fair?

16  A.   Correct.

17  Q.   And the summers are significantly higher temperature than we

18  are in the spring, right?

19  A.   Correct.

20  Q.   You mentioned the odor threshold is 500 parts per billion,

21  right?

22  A.   Yes.

23  Q.   And what that means is, is the average individual begins to

24  smell formaldehyde at 500 parts per billion, right?

25  A.   Correct.

1   Q.   But you mentioned that some can smell below that.

2   A.   Correct.

3   Q.   But people with a history of chronic rhinosinusitis may not

4   be able to smell it at 500 parts per billion, they may need it

5   higher than that, right?

6   A.   Correct.

7   Q.   Now, you mentioned that the irritant threshold is 1,000

8   parts per billion, right?

9   A.   Yes.

10  Q.   Now, when we talk about the irritant threshold, you've seen

11  the studies where people start -- their eyes start blinking, and

12  there's blink tests, right?

13  A.   Yes.

14  Q.   That's what you're talking about, right?

15  A.   Some of the studies are blink studies.  Some of the studies

16  are watery eye studies.  It depends upon the endpoint of the

17  study, yes.

18  Q.   But with respect to the literature that's out there, we've

19  already talked to some other people about this, but I just want

20  to make sure you agree.  When people start getting burning eyes

21  as opposed to just eye blink, that requires a higher formaldehyde

22  level than the irritant threshold, right?

23  A.   That's correct.

24  Q.   When people have burning eyes, the amount of formaldehyde

25  that was required to cause burning eyes is somewhere between 2

1  and 3 parts per billion, right?

2  A.   That's correct.

3           MR. WATTS:  May I approach, Your Honor?

4           THE COURT:  You may want to pull that microphone up a

5  little bit.

6           MR. WATTS:  May I approach?

7           THE COURT:  Yes.  Sure.

8                              EXAMINATION

9  BY MR. WATTS:

10 Q.   Now, with respect to burning eyes, we know this is true

11 because of the literature of these studies that you've been

12 reading?

13 A.   Correct.

14          MR. WEINSTOCK:  Your Honor, we would object to this

15 chart only that it's completely irrelevant.  We've had no

16 testimony about this from any of the fact witnesses.

17          MR. WATTS:  We actually have, Judge, and the jury can --

18          THE COURT:  I'm going to overrule.

19                             EXAMINATION

20 BY MR. WATTS:

21 Q.   All right.  Mr. Weinstock asked you about surgery records

22 that you have reviewed.  When we took your deposition, you hadn't

23 read those records yet, right?

24 A.   That's correct.

25 Q.   Okay.  Now, with respect to formaldehyde and what you've

1  learned, first, you agree that formaldehyde can cause rhinitis?

2  A.   It can cause a type of rhinitis.

3           MR. WATTS:  May I approach, Your Honor?

4           THE COURT:  Yes.

5                         EXAMINATION

6  BY MR. WATTS:

7  Q.   What is rhinitis, for the record?

8  A.   Rhinitis is inflammation of the nose.

9  Q.   Dr. Wedner, if you could, could you come down here and kind

10  of draw me a human head and the parts so we can show where the

11  rhinitis is and the sinusitis is?

12           MR. WATTS:  Would that be acceptable, Judge?

13           THE COURT:  Yes, that's fine.

14           THE WITNESS:  You sure you want me to draw?

15                         EXAMINATION

16  BY MR. WATTS:

17  Q.   Do your best.

18  A.   (Witness complies.)  Let's draw two.

19           So if you look straight on, your nose sits here.  As I

20  said, you didn't want me to draw.  But this is the nose.  Inside

21  the nose, there are three bony prominences which stick out like

22  this.  They are called "turbinates."  Their job is to make the

23  air swirl so it stays in your nose longer.

24           Off from the nose are three or four sets of sinuses.

25  The maxillary sinuses, the big ones are here.  Here are a set of

1    air cells called the "ethmoid air cells."

2         Behind the ethmoid air cells -- you can't see them on

3    this projection -- is the sphenoidal sinuses.  Okay?  So if you

4    went right back -- and that's the one that sits way back here

5    underneath your pituitary gland.

6         And then up here, which leads into, are the frontal

7    sinuses.  Okay?  And they can be variable.

8         If we look here, here is the nasal opening, and here is

9    the maxillary sinus sitting right in here, and here are those

10   ethmoid air cells.  And up here -- let's make this look a little

11   better, so here is the frontal sinus, and then way back here is

12   what we call the "anterior ethmoid," these are the posterior

13   ethmoids, and they run into the sphenoid sinus, which is up here.

14        And then connecting these to the nose are a series of

15   very, very tiny little openings.  So the opening that goes from,

16   let's say, the maxillary sinus, which is right here, into the

17   nose, is about that big.  It's one of the few design flaws in the

18   human body.  So you have this little opening here, and then it

19   connects up here.

20        And all of this is -- if you draw it here, we have the

21   turbinates, and here is the big one which is the inferior

22   turbinate and then the middle turbinate, and underneath the

23   middle turbinate is where all of these things come together.  And

24   then there is the superior turbinate way up here.

25   Q.   Now, if you could, using the side profile, can you just kind

1   of draw from the mouth, when we ingest food, where it goes.

2   A.   Well, now you're pushing me.  So here is the mouth.  And

3   here is the oral pharynx or the -- and so food is going to go

4   here.

5   Q.   And you mentioned the pharynx.  Where is that?

6   A.   Well, the whole thing here.  Your nose is here.  All right?

7   So here is your air passage, if you will.  And it all comes

8   together here.  And then you have your glottis, and so -- and

9   that divides in two.  So part of this is going to go into your

10  stomach and part of it is going to go into your -- and your

11  glottis protects that airway.

12  Q.   Where is the pharynx?

13  A.   It's right here.  This up here is the nasopharynx, right in

14  here, and this here is the oral pharynx.

15  Q.   So right here is the nasopharynx, right?

16  A.   Yes.

17  Q.   And then one other thing:  Where is the larynx?

18  A.   That's way down here.

19  Q.   Right here?

20  A.   Yeah, it's your Adam's apple.  So the Adam's apple is right

21  here.

22  Q.   So when somebody talks about the nasopharyngeal area --

23  A.   They are talking about this area up in here.

24  Q.   Now, formaldehyde passes through the nasopharyngeal area

25  when it's breathed in, right?

1   A.   It passes through?

2   Q.   Sure.  When it's breathed in, it can get through the

3   nasopharyngeal area?

4   A.   It never gets beyond there.

5   Q.   When you say, "It never gets beyond there," explain for the

6   jury why it gets to the nasopharyngeal area but doesn't get down

7   into the larynx.

8   A.   Formaldehyde is so reactive that it never, ever gets beyond

9   the upper airway.  It binds firmly and never lets go.  So you can

10  breathe high levels -- and they've done this in rats.  For

11  example -- you would never do this to a human being -- they put

12  them in an atmosphere which was 14 parts per million,

13  14,000 parts per billion of radioactive formaldehyde, and then --

14  this may sound bizarre, but that's what they did.  They let them

15  breathe that for a number of days, and then they froze the mouse

16  and cut it in half and put half of it against a piece of

17  photographic paper so you could see where the radioactivity was,

18  and all of the radioactivity was in the upper airway.  None of it

19  was in the mouth because rats are obligate nose breathers.  They

20  can't breathe through their mouth.

21  Q.   Let me stop you there and just ask you, the rat study that

22  you pointed out, why is it -- I mean, you just said that the

23  study showed that it doesn't get down, stays up here.  Why is it

24  that it stays up there?

25  A.   It's so reactive that it binds and it never lets go.

1   Q.   So it binds and never lets go where?

2   A.   To the mucosa of the airway.

3   Q.   To the mucosa in the nasopharyngeal area?

4   A.   Not just the nasopharyngeal.  Most of it is in the anterior

5   nose.  If you will, if you'd point to that hooky thing that I

6   drew up there, that's where most of it is going to be.  And at

7   very low levels, the kind of levels we're talking about, the vast

8   majority is not going to get past the tip of the nose.

9   Q.   But some of it will get into the nasopharyngeal area?

10  A.   Virtually none.  Remember, in order to get it into a rat's

11  nose so you could actually see it, they had to radiolabel it and

12  put it in at 14 parts per billion.

13  Q.   But you've seen studies where formaldehyde would bind in the

14  nose primarily --

15  A.   In the nose.

16  Q.   -- but also get to the nasopharyngeal area?

17  A.   They assume that it gets to the nasopharyngeal area, but I'm

18  not sure there are studies in humans where it's been shown to

19  actually be in the nasopharyngeal area.

20  Q.   Well, you just assumed it because you told it to me before,

21  right?  The literature demonstrates that formaldehyde gets into

22  the nose and into the nasopharyngeal area, but won't go down to

23  the larynx?

24  A.   No, the literature -- if you read the literature, they

25  presume that it gets into the upper airway and that it most

1   assuredly doesn't get to the larynx, but the literature, really,

2   if you read it carefully, doesn't actually say, "It gets into the

3   nasopharynx."  It presumes it from animal studies, but animal

4   studies are done at very, very high concentrations relative to

5   what we're talking about.

6   Q.   In animal studies, we see that it gets to the nasopharyngeal

7   area?

8   A.   Correct.

9   Q.   And when you said the literature demonstrates that it gets

10  in the upper airway, the nasopharyngeal area is in the so-called

11  upper airway, correct?

12  A.   Correct.

13  Q.   Good enough.

14       Now, the whole reason we went down there is, is I was

15  going to get you to explain to me where rhinitis occurs.  Where

16  does rhinitis occur on your map there?

17  A.   Rhinitis is the hooky part.  That's the nose.

18  Q.   And --

19  A.   It's the worst nose I've ever seen, I want you to know.

20  Q.   I've seen better.

21       You agree that formaldehyde can cause rhinitis?

22  A.   At what concentration?

23  Q.   Well, exposure to formaldehyde has been demonstrated to

24  cause rhinitis in the literature, correct?

25  A.   Yes.  At relatively high concentrations, yes.

1    Q.    You agree that sinitis (sic) is painful?

2    A.    Sinusitis.

3    Q.    Sinusitis is painful?

4    A.    Can be.

5    Q.    Histological changes can result from exposure to

6    formaldehyde in the mucosa, right?

7    A.    That's a very broad statement.

8    Q.    Well, have you made that statement before?

9    A.    I probably have, but I think I've always qualified it by

10   saying at what concentration and in what animal.

11   Q.    Have you said histological changes can result from exposure

12   to formaldehyde to the mucosa?

13   A.    I probably have, yes.

14   Q.    With you having said that, when we say "histological," what

15   does that word mean?

16   A.    Histological means when you look at it through a microscope,

17   in other words, you look at the individual cells.

18   Q.    At an exposure of several hundred parts per billion,

19   formaldehyde exposure can cause severe irritation of the mucosa

20   of the throat.

21   A.    Say that again.

22   Q.    Formaldehyde exposure causes severe irritation of the mucosa

23   of the throat.

24   A.    No.

25   Q.    Let me ask you about that.  Have you testified otherwise

1  about formaldehyde causing mucosal irritation of the throat?

2  A.   Of the throat?

3  Q.   Yes.

4  A.   Not that I recall.

5       MR. WEINSTOCK:  This is the testimony that Dr. Wedner

6  gave on January 25th, 2010, Pages 88 and 89.

7            May I approach, Your Honor?

8       THE COURT:  Yes.

9                          EXAMINATION

10 BY MR. WATTS:

11 Q.   Have you testified that formaldehyde causes mucosal

12 irritation of the throat at 1 to 2 parts per million?

13 A.   At 1 to 2 parts per million, it can, yes.

14      MR. WEINSTOCK:  Objection, Your Honor.  This is improper

15 impeachment.  He's changed the question.  He said several hundred

16 parts per billion.  Now, it's several thousand parts per billion.

17      MR. WATTS:  I agree, and I'm asking the question

18 differently.

19      THE COURT:  Go ahead and ask him -- before we get him to

20 refer to the deposition, let's find out what his answer is.  If

21 it's consistent, then we don't need the deposition and we can

22 move on.

23      MR. WATTS:  May I stay down here?

24      THE COURT:  Yes, that's fine.

25                          EXAMINATION

BY MR. WATTS:

Q.   I think my question was:  Have you testified that exposure
to formaldehyde can cause histological changes to the mucosa of
the throat?

A.   Histological changes to the throat?

Q.   Yes, sir.

A.   No.

Q.   What were you referring to when you talked about the mucosa
of the throat being changed by formaldehyde?

A.   I said there was irritation at high levels.  In that case,
it was about 2 parts per million, 2,000 parts per billion.

Q.   And actually, you said 1 to 2 parts per million, right?

A.   Right.

Q.   Great.  So irritation of the throat, as you described it,
requires 1,000 to 2,000 parts per billion?

A.   Correct.

Q.   Formaldehyde can cause headaches?

A.   No.

Q.   Have you testified otherwise in the past?

A.   I don't think I've ever said it can cause headaches.  I
mean, there is cause and effect.  I may have said it may be
associated with headaches, but I've never said it can cause
headaches.

            MR. WEINSTOCK:  May I approach, Your Honor?

            THE COURT:  Yes.

EXAMINATION

BY MR. WATTS:

Q.    Page 196, lines 7 through 11.

A.    What I said is -- I said it has been reported to.  I never said it can cause headaches.

Q.    You agree it has been reported in the literature that formaldehyde causes headaches?

A.    Yes.  The reports are the same kind of reports that we talked about before in which you had a garden variety of lists. "What happened to you when you were in your travel trailer or in your trailer?"  And one of the choices was headaches.  And so people check off headaches.  Everybody gets headaches.  So there is no evidence that formaldehyde caused headaches.  All the evidence was is that when people lived in trailers, they got headaches.

Q.    But your testimony was, it has been reported in the literature that formaldehyde causes headaches, right?

A.    That's what I said.

        MR. WATTS:  May I approach, Your Honor?

        THE COURT:  Yes.

        THE WITNESS:  You don't want me to draw again, do you?

        MR. WATTS:  No, I think we're done.  I'm firing you as a drawer.  But thank you, I appreciate it.

        THE WITNESS:  Want me to sign that for you?

        MR. WATTS:  A doctor that draws like that doesn't have

1    to sign.

2                            EXAMINATION

3    BY MR. WATTS:

4    Q.    Irritation of the throat, 1 to 2 parts per billion, right?

5    A.    1 to 2 parts per million.

6    Q.    I'm sorry.  Irritation of the throat is 1,000 to 2,000 parts

7    per billion, right?

8    A.    It's been reported.

9    Q.    Burning eyes, 2,000 to 3,000 parts per billion, right?

10   A.    Burning eyes, yes.

11   Q.    Irritated eyes, a thousand parts per billion?

12   A.    About a thousand.

13   Q.    Irritation of the nose, what do we need in terms of

14   threshold?

15   A.    The same thing.  That's about a thousand to two thousand.

16   Q.    And being able to smell, on average, 500 parts per billion,

17   right?

18   A.    Correct.

19   Q.    Do you know what the exposure levels were for the people who

20   claimed headaches in the studies that you and I were just talking

21   about?

22   A.    No one knows.

23   Q.    You don't know.

24          Now, have I got that all about right there?

25   A.    Yes.

1      MR. WATTS:  Dr. Wedner, thank you.  Those are all of my

2 questions.

3      THE COURT:  Any redirect?

4                    REDIRECT EXAMINATION

5 BY MR. WEINSTOCK:

6 Q.   We've got a little ground to cover, but we'll try to be as

7 brief as possible.

8      Mr. Watts was bouncing back and forth between

9 histological changes and irritation, complaints of irritation.  I

10 thought I heard you say histological changes are those we see

11 under a microscope.

12 A.   That's correct.

13 Q.   Is that what we see when we do a biopsy?

14 A.   Correct.

15 Q.   And in the biopsy of Ms. Castanel, were there any

16 histological changes related to formaldehyde?

17 A.   No.

18 Q.   So we can put that aside, there were no histological

19 changes.  We have the proof?

20 A.   We have the proof.

21 Q.   Now, if we can talk about the irritating properties.  Did

22 Ms. Castanel complain to you about irritated eyes?

23 A.   No.

24 Q.   Burning eyes?

25 A.   No.

1    Q.    Nose and throat irritation?

2    A.    No.

3    Q.    I'm not sure with nose, 1,000 to 2,000 parts per billion, is

4    that the rhinitis he was talking about?

5    A.    Yes.

6    Q.    If rhinitis was associated with formaldehyde, we would see

7    it on biopsy?

8    A.    Correct.

9    Q.    One level he didn't ask you about but I would like to ask

10   you about, did any of these things happen at 50 parts per

11   billion, like the measurement in the Castanel trailer?

12   A.    No.

13   Q.    They put an expert on earlier in the week.  You weren't here

14   with us.  I think Dr. Hewett said maybe 81 parts per billion.  Do

15   any of these things happen at 81 parts per billion?

16   A.    No.

17   Q.    You didn't just talk to Ms. Castanel, you interviewed her?

18   A.    I did.

19   Q.    Did she complain to you of burning and watery eyes while she

20   was in the trailer?

21   A.    No.

22   Q.    Mr. Watts asked you about some testimony you gave in front

23   of the EPA.  What were you asked to testify about in front of the

24   EPA?

25   A.    The EPA has set up a series of potentially new guidelines

1   and potentially new ways of making plywood and particleboard.

2   The way you make plywood and particleboard is, you put it

3   together with a glue.  The current glue contains formaldehyde.

4   And it's the formaldehyde in the glue which off-gasses.  And so

5   one of the questions that they are asking is:  "Here are some new

6   ways that we might make particleboard or plywood."  And so the

7   two questions:  One are the levels that are, let's say, being

8   suggested, these very low levels, for example, in California and

9   places like that, are they reasonable; and two, what about these

10  new potential bonding agents, which is what they are.  They are

11  glues.

12  Q.   Dr. Wedner, was one of those bonding agents isocyanates?

13  A.   Yes.

14  Q.   Did you give your opinion on the idea of replacing

15  formaldehyde with isocyanates?

16  A.   I did.

17  Q.   And what was that opinion?

18  A.   Well, we know from well-done clinical studies that

19  isocyanates are sensitizers.  There is a type of asthma which is

20  called painters asthma, and it comes from a chemical called

21  toluene diisocyanate or TDI.

22        And what I pointed out to the EPA was, as I put it,

23  "You better not jump out of the frying pan into the fryer when

24  you switch one bonding agent for another, and before you make the

25  levels that you are allowed to off-gas from particleboard or

1   plywood so low that you can't use the formaldehyde-based bonding

2   agents and you're forced to use other bonding agents, you better

3   make sure that those other bonding agents aren't worse than what

4   you've got."

5           So that was one of the areas.  And I also pointed out

6   that the levels, I thought, were just so ridiculously low that

7   you could never achieve them.

8   Q.   I want to go back to the isocyanate.

9           MR. WATTS:  Your Honor, may we approach?

10          THE COURT:  Yes.

11          (WHEREUPON, at this point in the proceedings, a

12   conference was held at the bench.)

13          MR. WATTS:  If that doesn't drive a truck through the

14   501, I don't know what does.  I think in fairness, Andy ought to

15   have to ask him or I ought to be able to ask additional questions

16   about what that standard is.  He's now said these are so low,

17   they are ridiculous.  A, the jury doesn't know what they are, and

18   B, they don't know that they were, in fact, adopted.

19          MR. WEINSTOCK:  He has not mentioned what the standards

20   are.  He has not talked about -- I mean, without saying .06 is so

21   ridiculously low, it's just a generic topic of levels, and that's

22   what he gave testimony about.  And he asked about the testimony.

23   Judge, he opens the door and then he doesn't like what comes out.

24          MR. WATTS:  No, I like what comes out fine.  They are

25   the ones that went into the content.  I just say he got hired by

1    the Formaldehyde Council.  If I had asked the question, you know,

2    you testified about these new levels, you would have jumped me.

3    And I didn't.

4              THE COURT:  So what are you proposing?

5              MR. WATTS:  I think the jury should know that the new

6    standard with respect to the levels of formaldehyde in these

7    trailers is .06.

8              THE COURT:  The new standard?

9              MR. WATTS:  Yeah.

10             MR. WEINSTOCK:  He's trying to say the post-Katrina

11   standard.

12             MR. WATTS:  That's what he was talking about.

13             MR. WEINSTOCK:  No, it was not what he was talking

14   about.  He was talking to the EPA about an EPA level, not about a

15   FEMA level that was being set.  And you asked him did he testify

16   before the EPA.  He answered you.

17             MR. WATTS:  I never used the term "EPA," and we can

18   check the transcript.

19             THE COURT:  Can you not make that clear?  Can you ask

20   him a question that makes it clear that he's talking about the

21   level --

22             MR. WEINSTOCK:  That has nothing to do with travel

23   trailers.  I can make that very clear.  That's no problem.

24             (WHEREUPON, at this point in the proceedings, the bench

25   conference was concluded.)

1                        EXAMINATION

2    BY MR. WEINSTOCK:

3    Q.   Doctor, first of all, I want to make this very clear.  Your

4    testimony before the EPA had nothing to do with travel trailers,

5    correct?

6    A.   No, not at all.

7    Q.   Now, I want to go back to the isocyanates, because that's

8    really what the nature of my question was.

9         We had some testimony earlier in the week that let's

10   replace formaldehyde-based particleboard with isocyanate-based

11   particleboard.  Is that something you would endorse?

12   A.   Not without a whole bunch of experimental evidence, because

13   I've seen a lot of patients with toluene-diisocyanate-based

14   asthma and it's not a good disease.

15   Q.   Have you seen a lot of patients with formaldehyde-induced

16   asthma?

17   A.   It doesn't exist.

18   Q.   If I could go back to one of these.

19        Burning eyes requires 2,000 to 3,000 parts per billion.

20   Is this something which we had in Ms. Castanel?

21   A.   No.

22   Q.   Is this a theoretical issue for this case?

23   A.   Oh, yeah, sure.

24        MR. WEINSTOCK:  That's all the questions I have for this

25   witness, Your Honor.  Thank you.

1          THE COURT:  Thank you.  You may step down, Doctor.

2               Who is next?

3          MR. WEINSTOCK:  Your Honor, we have a video, David

4    Garratt with FEMA.

5          THE COURT:  How long is this?

6          MR. WEINSTOCK:  55 minutes.  May I approach?

7               (WHEREUPON, at this point in the proceedings, a

8    conference was held at the bench outside the presence of the

9    court reporter.)

10         THE COURT:  We're going to go ahead and play the tape

11   here of David Garratt's testimony, G-a-r-r-a-t-t.  The video, as

12   counsel indicated, is about 55 minutes long, and then we'll take

13   a break.  It does appear that we will be able to finish sometime

14   in the early afternoon at the latest today.

15              So let's go ahead and get Mr. Garratt's testimony.

16              (WHEREUPON, at this point in the proceedings, the

17   videotaped deposition of David Garratt was played.)

18   Q.   Mr. Garratt, would you tell us what position you hold

19   currently?

20   A.   Acting deputy administrator of the Federal Emergency

21   Management Agency.

22   Q.   Could you give us a brief description of what your duties

23   are as acting deputy?

24   A.   Basically to manage the Federal Emergency Management Agency

25   and support the administrator in the management of the agency.

1    Q.    And how long have you held your position as acting deputy

2    director?

3    A.    Since January 21st.

4    Q.    Of?

5    A.    2009.

6    Q.    And prior to January 21st, 2009, what was your job title?

7    A.    Deputy assistant administrator of disaster assistance.

8    Q.    And how long did you hold that position?

9    A.    On and off, since May of 2005.

10   Q.    And what were your duties involved in that position?

11   A.    Managing the programs and responsibilities of that director,

12   supporting the -- either recovery director or assistant

13   administrator in that capacity.

14   Q.    What is your understanding of the purpose of this

15   declaration?

16   A.    As I recall, I was advised that I was going to be involved

17   in litigation.  I don't recall if I was specifically told this

18   was for a deposition or not, but I was advised that I needed to

19   make and file a declaration, and so I did.

20   Q.    You go on to state after that, "Disaster victims have been

21   not charged for their use of the EHUs, nor have they been

22   required to pay any cost associated with the installation,

23   maintenance, or removal of the units."

24         What is the significance of that statement in this

25   declaration?

1    A.    Other than, again, painting the picture of how we provide

2    these units and conditions under which they are provided to

3    disaster victims.

4    Q.    So in your mind, it's important to note that the victims

5    have received something at cost -- at no cost to them, and

6    they've not been required to pay any costs associated with the

7    installation, maintenance, or removal of the units.  Does that

8    mean that they should have no right to complain about what

9    they've received?

10   A.    No.  What it means is, these units are our responsibility.

11   Q.    So this statement basically means, what you're trying to

12   convey is that this is FEMA's responsibility.  It has no other --

13   no other meaning besides that?

14   A.    That's correct.

15   Q.    I'm trying to get to -- this -- this particular statement,

16   and you've just testified, is this to say that FEMA has the

17   authority, due to the Stafford Act, to provide and to -- to

18   respond to disasters, in this particular instance, to provide

19   temporary emergency housing assistance to victims?

20   A.    I'm still not sure I understand exactly what you're asking.

21   Let me try this:  As part of this declaration, it seems like it's

22   important to try to essentially lay the -- the background for the

23   operation that took place in the Gulf Coast.  And so this

24   paragraph just briefly summarizes what the disaster housing

25   mission is in terms of -- or how it's provided -- that assistance

1    is provided under the authority of the Stafford Act, and it

2    essentially says that these -- these units are provided at

3    absolutely no cost to the disaster victims and that we, the

4    federal government, are responsible for those units.  That's our

5    responsibility.

6    Q.   What was your understanding in June of 2006 of how the

7    Gulf Coast Recovery Office was responding to air quality

8    complaints?

9    A.   I'm not sure what you mean when you say my understanding of

10   how they were responding to complaints.  You mean, the -- the

11   mechanism by which they respond to complaints, how they're set up

12   to respond to complaints?

13   Q.   How they are set up to respond to complaints and how did

14   they actually respond to complaints, if you know?

15   A.   In terms of the former, the transitional recovery offices,

16   which are really extended versions of our joint field offices

17   that we set up in every disaster operation, but these are there

18   long-term and we typically staff them with longer-term employees,

19   have maintenance and deactivation contracts, and those

20   maintenance and deactivation contractors -- and they have

21   numerous maintenance and deactivation contractors supporting each

22   of the transitional recovery offices, depending on which state

23   that you're in -- are assigned a certain sector area, and

24   occupants of emergency housing units in those areas would call

25   this particular maintenance and deactivation contract, or if they

1233

1   have an issue or a problem with a unit, it was that contractor's

2   responsibility to respond and address and deal with the issue.

3   Q.   Do you know of any directives that were given to these

4   contractors on how to respond to these issues?

5   A.   I do not.  At least not at this time.

6   Q.   Not at this time?

7   A.   Right.

8   Q.   What is your understanding today of how they were

9   responding?

10  A.   My understanding today of how they were responding in June

11  of 2006?

12  Q.   Yes.

13  A.   My understanding is that the maintenance and deactivation

14  contractors were, in general, doing a pretty good job of

15  responding to the slew of complaints or concerns that occupants

16  were calling in, this being one among many.  And I have, at least

17  to this date, no reason to believe that they were not executing

18  the provisions of the contract in meeting their performance

19  requirements.

20  Q.   You go on to state in Section 5 that:  "Mr. Kevin Souza,"

21  who you've already mentioned, "took the lead for working this

22  issue, and sometime in late June, he briefed me regarding his

23  recommendation for dealing with the assertions regarding elevated

24  levels of formaldehyde in EHUs."

25         You further state that:  "He also recommended that the

1    testing should be conducted by an independent federal agency with

2    experience in such matters, and further recommended the

3    Environmental Protection Agency."

4            Specifically, what testing was Mr. Souza talking about?

5    What was your understanding of what testing needed to take place?

6    A.    Essentially validation testing.  Sierra Club had just

7    released a report that asserted that the levels of

8    formaldehyde -- emitted formaldehyde in some number of units that

9    they had tested were very high.  What we wanted was corroborative

10   evidence to that effect.  Didn't know what, for example, at the

11   time -- and none of us were or are formaldehyde industrial

12   hygiene experts, know what scientific basis Sierra Club used

13   to -- to come up with -- with their assertions.

14           And what we wanted was validation.  So we wanted an

15   independent credible third party to go in and essentially tell us

16   that the Sierra Club was on the mark or that they weren't.

17   Q.    And so you further state that you agree with Mr. Souza's

18   recommendation and advised him to issue a safety notice to

19   occupants and engage with the EPA to commence testing.

20           What was the safety notice that was issued to

21   occupants?

22   A.    We issued a number of safety notices or have issued a number

23   of safety notices.  I -- I'm not sure I remember exactly what

24   that first safety notice was, but I believe it was a notice that

25   advised them of the concerns and recommended that they take

1   certain precautions to reduce the potential for formaldehyde

2   buildup, such as increased ventilation.

3   Q.   And when was this notice issued?  Do you recall?

4   A.   I think it was around the July time frame.

5   Q.   And it appears to be an e-mail chain from Jeff Runge.

6   A.   Runge.

7   Q.   Runge, dated Friday, May 18, 2007, at 3:47 p.m., to Adam

8   Isles.

9   A.   Isles.

10  Q.   Isles, Paul Schneider, Tina Burnette, Paul Schneider again,

11  CC'ing Gil Jamieson, David Garratt, Bennett Waters, Elaine Duke,

12  and Price Roe.  And the subject matter is, Re:  FEMA Formaldehyde

13  in Trailers.  And it's forwarded, Reporter That Accosted the

14  Chief After the Hearing Tuesday.

15        Who is Jeff Runge?

16  A.   He was the assistant secretary for health affairs for the

17  Department of Homeland Security.

18  Q.   Was Jeff Runge -- how did he became involved in -- if you

19  know, in the FEMA formaldehyde in trailers issue?

20  A.   He was specifically asked to get involved in this issue, or

21  more specifically, the Office of Health Affairs that he headed

22  for the secretary.  I'm aware that he was specifically asked to

23  get involved following a report by a Bayou La Batre physician

24  that some number of children in units in Mississippi were

25  suffering what he characterized as an illness symptomatic of --

1  of exposure to formaldehyde.  And so both, I think, the deputy

2  secretary and ourselves reached out to the Office of Health

3  Affairs and requested their direct engagement.

4  Q.   I just to want to talk about this particular e-mail, Dr.

5  Runge's response to being looped in to this particular issue.

6  And I want to particularly direct you to Dr. Runge's Bullet .6.

7  And it says:  "No residential indoor air quality."

8         Do you see that?

9  A.   I do.

10 Q.   "No residential indoor air quality standards have been

11 established in the U.S.  There are HUD standards for building

12 materials, but it's always been considered too difficult to

13 measure and regulate actual residential indoor air quality."

14        Did I read that statement correctly?

15 A.   You did.

16 Q.   And is it fair to say that's because of the concerns about

17 formaldehyde in travel trailers?

18 A.   No.  It's because a travel trailer is, in our estimation,

19 not an adequate -- because of the size of the unit -- not

20 adequate to be a long-term temporary housing solution.  They're

21 very small, and we would not, for example, put travel trailers in

22 a group site environment that houses who were principally

23 pre-disaster renters who are going to have to wait for

24 post-disaster rental resources to be made available and might

25 need those sorts of accommodations for many, many months, if not

1    many years.

2             What they need is a unit that is, in fact, built for,

3    designed for long-term habitation, like a mobile home.

4    Obviously, millions of people live in those in this country as a

5    permanent home.

6             So that's an adequate longer-term living environment.

7    A travel trailer is designed for recreational use on weekends.

8    It's not designed for that sort of long-term.  So we will only

9    provide those in the very short-term for someone who we think can

10   get back on their feet in a relatively short period of time.

11   Q.    Would you be in a position to deny the fact that the first

12   complaints reached FEMA as early as October of 2005?

13   A.    I've got no basis to deny that.

14   Q.    And so assuming that to be true, between October 2005 and

15   June 2006, for roughly an eight-month period of time, FEMA was

16   handling complaints about these units -- complaints by occupants

17   on a case-by-case rather than programmatic basis?  True?

18   A.    Certainly true as far as air quality issues.

19   Q.    So there was no programmatic coordination of FEMA's

20   responses to the complaints that it was receiving about

21   formaldehyde concerns for the eight-month period of time we're

22   talking about?

23   A.    What do you mean when you say "programmatic"?

24   Q.    Well, I mean a coordinated, strategized, programmatic

25   response plan.

1   A.    Correct.

2   Q.    As opposed to an ad hoc case-by-case approach.

3   A.    I wouldn't describe it as ad hoc; however, it was case by

4   case.

5   Q.    And what do the records reflect was being said to people who

6   complained about air quality or formaldehyde?  What -- what kind

7   of response was being given to those types of complaints?

8   A.    I would -- as I recall, different types of responses were

9   being provided to individuals, but those responses were generally

10  related to what it was that was being reported.

11         For example, air quality issues:  My unit has an odor

12  to it, or my eyes are watering.  And I'm not saying that these

13  are specific things that they reported at the time.

14         I don't recall for most of the complaints that I saw

15  prior to -- and my memory is vague here -- that formaldehyde was

16  mentioned.  It was typically air -- general air quality issues

17  that were mentioned.  It was characterized that way.  It wasn't

18  really formaldehyde being reported as the problem until after

19  this became a public issue.

20  Q.    Yes, sir.  My question was, if you can tell me what types of

21  responses were being given to those who called about things like

22  air quality, smell, watery eyes, et cetera, according to the

23  records that you reviewed?

24  A.    I recall imperfectly different responses.  In some cases,

25  individuals were told to try and ventilate their units or air out

1   and then call back.  In some cases, people went out to the units

2   to check on them themselves.  In some cases, a determination was

3   made they needed to swap out a unit.  It depends, but different

4   responses.

5   Q.   You had the authority then, in June of '06, to authorize

6   both the issuance of safety notices and the commencement of

7   testing.

8   A.   Well, I certainly assumed that I had the authority.

9   Q.   But in any event, you were asked to authorize it and did so?

10  A.   Correct.

11  Q.   And on your authorization, it happened?

12  A.   Correct.

13  Q.   Who would know the total number of safety notices that were

14  directed to occupants, specifically regarding the formaldehyde

15  concerns in these units?

16  A.   You'd have to talk to whoever was heading up the individual

17  transitional recovery offices at the time.

18  Q.   What did the safety notices tell occupants regarding the

19  effects of long-term exposure to formaldehyde?

20  A.   I don't recall.

21  Q.   Do you believe that subject was addressed in the safety

22  notice?

23  A.   I don't know.

24  Q.   Do you believe it should have been addressed in the safety

25  notice?

1  A.    At the time we didn't know what the long-term effects of

2  formaldehyde exposure -- exposure were.

3  Q.    Wait a minute.  "At the time," we're talking about late

4  June of '06 --

5  A.    Right.

6  Q.    -- that you authorized the safety notice.  You're saying

7  that you didn't know at that time what the long-term exposure

8  effects of formaldehyde were?

9  A.    I did not.

10  Q.    Well, did any of the individuals having input into the

11  language of the safety notice, as far as you know, have

12  information to share about the long-term effects of formaldehyde?

13  A.    There was certainly discussion, a lot of discussion about

14  formaldehyde throughout that period of time.  And we were

15  reaching out to and consulting any number of people to try to get

16  a handle on exactly what we were dealing with at this particular

17  time.

18        Central to those discussions were, obviously, the

19  department's office of health affairs and CDC, at least in 2007

20  we actively engaged them.

21        In 2006, when this issue first arose, I think at the

22  time that we were starting this process we did not yet know what

23  the extent of this potential problems was.  What we recognized

24  was that the Sierra Club was asserting that, in fact, there was a

25  systemic issue, which, prior to that, we did not recognize.

1    So they had asserted there was a systemic issue, and

2  what we wanted was validation.  And that's really the point that

3  we were at at that point in time.  And what we were interested in

4  doing was reducing the formaldehyde levels in these units, and so

5  the safety notices were designed to help those occupants who

6  really didn't have any other place to go take actions to reduce

7  formaldehyde in their units.

8  Q.   Meaning ventilate the units?

9  A.   Ventilate the unit was the principal mechanism for reducing

10 formaldehyde.

11 Q.   Now, you could, though, I hope, tell us exactly how the

12 notices, the safety notices that you know about, were meant to be

13 delivered to or received by occupants?

14 A.   Hand delivered, at least some number of notices were hand

15 delivered.  It's entirely possible that some notices were also

16 mailed to occupants.  And I honestly don't recall, but that is

17 possible.

18    But at least this initial notice was to be hand

19 delivered, and we had asked the TROs to report back to us when

20 they had completed those hand deliveries.

21 Q.   And the TROs, just so the jury understands --

22 A.   Transnational Recovery.

23 Q.   -- Transitional Recovery Office.

24    All right.  So this initial notice of late June '06,

25 which is the one mentioned in your declaration, that was not

1  mailed but hand delivered to some occupants, correct?

2  A.   I believe it was hand delivered to all occupants.

3  Q.   All right.  So --

4  A.   Or at least to all units.

5  Q.   To all units.  All right.

6          Now, how many units were out in place in the field as

7  of late June of '06?

8  A.   I do not recall.

9  Q.   And the intent -- the mission, if you will, of this safety

10  notice effort was to get a written safety notice hand delivered

11  to each and every unit, correct?

12  A.   Correct.

13  Q.   Given the importance of the safety notice and what was at

14  stake, I assume that the intent was to have 100 percent delivery

15  of the notice, that is, every occupant in every -- every unit was

16  to physically receive the notice.  That was the intent?

17  A.   Correct.

18  Q.   Did you achieve that?

19  A.   To the best of my recollection, yes.

20  Q.   Well, was it your understanding at that time that if people

21  ventilated their units, they could get the level of formaldehyde

22  below that which would be a health risk for them?

23  A.   I don't know that it would be accurate to say that they

24  could get them below a level that would be a health risk to them.

25  I'm not in -- was never in a position to -- to state that.

1        What I was in a position to do was take the results of

2    the qualified agency that we had asked to make recommendations to

3    us, who said, if you ventilate them to these levels, then they

4    are safe for these folks to live in, and they can get them to

5    acceptable levels.

6        Now, the health risk --

7    Q.   Well, but -- so, your -- your conclusion going forward was,

8    if you ventilate the units, they're safe to occupy, true?

9    A.   Or can be made safe to occupy if they are ventilated, yes.

10   Q.   And that's, in fact, what you communicated going forward

11   from that point in time to people, that if they ventilated the

12   units, they would be safe to occupy?

13   A.   Safe in comparison to the averaging living environment that

14   the average -- that we live in, correct, as opposed to absolutely

15   safe.

16   Q.   Now, let me ask you about Dr. Runge.  This is his e-mail,

17   which was copied to you and others, May 18th of 2007.

18        Dr. Runge was the chief medical officer of the

19   Department of Homeland Security, correct?

20   A.   Correct.

21   Q.   You would certainly defer to him on issues dealing with the

22   medical and health effects of exposure to formaldehyde, wouldn't

23   you?

24   A.   We would.

25   Q.   And he was specifically asked to get involved in response to

1    reports of children becoming ill in these units from

2    formaldehyde, correct?

3    A.    Correct.

4    Q.    And his advice to FEMA in this e-mail of May 18, '07, was to

5    put a hold on citing to formaldehyde standards or levels at that

6    time, right?

7    A.    His advice to FEMA was much more than this e-mail.  His

8    advice to FEMA, when we initially reached out to Dr. Runge, was

9    that we can get CDC and HHS engaged right way and volunteered to

10   lead that effort and to devote his own resources to helping

11   coordinate and manage that effort.  So his advice was much more

12   comprehensive than just this e-mail.

13   Q.    And I'm not suggesting otherwise.  My -- my focus is this:

14   There's been talk here about all of these different standards and

15   .0 this and .0 that, and I think a witness yesterday called it "a

16   tyranny of numbers."  We've got all of these various levels and

17   standards of formaldehyde issues.

18           Did you understand this chief medical officer,

19   Dr. Runge, to be saying in May of '07, among other things, hold

20   off on citing to specific standards and levels, because, among

21   other things, as he puts in the e-mail, none of these are germane

22   to 24-hour, 7-day-a-week exposure in mobile home or trailers that

23   a child or stay-at-home parent may experience?

24   A.    First off, as I indicated before, I do not recall seeing

25   this e-mail or series of e-mails.

1    Q.    You're copied, though.

2    A.    I was copied.

3    Q.    Yeah.

4    A.    I don't recall seeing this, however.

5    Q.    And again, you know, because Runge was called in at a time

6    when there was concern about kids in these units, you would

7    agree, one of the most compelling points he makes here is that,

8    you know, none of these standards are really going to address

9    directly 24-hour-a-day, 7-day-a-week exposure for a child or

10   stay-at-home parent.  That's a pretty compelling point, isn't it?

11   A.    Agreed.

12   Q.    Now, in the prior months, FEMA had turned to ATSDR and EPA,

13   and they had established a level of concern, which is .3 ppm, by

14   the way, and then a health report goes out saying to people:  You

15   know, if you ventilate the unit, it will be safe, will get you

16   below the level of concern.  Correct?

17   A.    I don't know the exact terminologies, but the bottom line on

18   the report that came out of ATSDR was that ventilation would

19   reduce the levels to levels that occupants should feel safe

20   living in them.

21   Q.    Prior to that change, did -- was it the prevailing view, at

22   least your view, that the -- that the manufacturers were, in

23   fact, providing units that complied with the required safety

24   standards for formaldehyde?

25   A.    It was our understanding that the manufacturers were -- if

1   they were producing mobile homes or manufactured housing,

2   producing units that complied with HUD standards.

3   Q.   Uh-huh (affirmative response).

4   A.   For those who were not producing manufactured housing, they

5   were producing park models or travel trailers, which are

6   recreational vehicles, that they met or exceeded industry

7   standards since there were no federal standards that applied --

8   there were no HUD standards that applied to their construction at

9   the time that those units were purchased for Hurricane Katrina.

10  Q.   I'm showing you an exchange of e-mails between you and

11  Dr. Lang on May 25, 2007.  And in his e-mail to you of that date,

12  Dr. Lang, the bottom of that first page, he says this in

13  reference to CDC:  "We're going to -- we're having to push very

14  hard to get them to give us preliminary recommendations on what

15  we should do right now to reduce risk.  Their initial response

16  was to just move everyone out of trailers.  We told them that was

17  probably not a valid approach, and we really needed some

18  immediate guidance on a reasonable, short-term engineering target

19  that can be accomplished in days, not weeks.  They seem to

20  understand.  And they really do need to have something along

21  those lines."

22          Correct?  That's what Dr. Lang wrote to you?

23  A.   Correct.

24  Q.   And then your response on that same date, on the second

25  paragraph of your e-mail, you said:  "I agree that an en masse

1    evacuation of trailers is not a preferred solution by any means;

2    however, we want to confirm that does not represent a formal

3    medical recommendation from CDC but merely their opinion of an

4    expedient solution."

5            That was how you characterized CDC's recommendation, as

6    "an expedient solution"?

7    A.   No, I didn't characterize it as that.  I was asking him to

8    characterize it.

9    Q.   Oh, you wanted Dr. Lang to confirm?

10   A.   That's correct.

11   Q.   Did he?

12   A.   Yes.

13   Q.   In an e-mail?

14   A.   I don't recall.

15   Q.   What do you recall him saying to you?

16   A.   That they were not going to make a formal recommendation.

17   In other words, they could not formally say that -- it was their

18   opinion, is the bottom line here.  We did not get a -- or did

19   not, to my knowledge, ever receive a formal recommendation from

20   CDC that said, our formal recommendation is that you, for safety

21   reasons, for health reasons, get everyone out of these trailers

22   right now, because, again, if that had been their recommendation,

23   we would have done that.

24   Q.   Where would you have put the people?

25   A.   Don't know.

1   Q.   In the final paragraph of this e-mail to you of June 4, '07,

2   Jamieson says he remains concerned that we seem to be putting

3   ourselves at the tip of the spear on this issue.  "We are, quote,

4   consumer of these products, close quote.  The messaging, in my

5   view, should emphasize our understanding, compassion and

6   extensive efforts to find ways to mitigate but shift the issue to

7   standards-making groups in the industry."

8            I'm not sure that's a complete sentence.

9            But did you agree with Jamieson's apparent suggestion

10  that FEMA indeed ought to be viewed as the consumer of these

11  products?

12  A.   Well, I think he's technically correct.  We are a consumer

13  of those products in that we purchase those from the commercial

14  sector to deliver to end users, but that doesn't mean that we

15  don't have a responsibility, certainly an inherent responsibility

16  for units that we provide to disaster victims.

17           So I agree that we're a consumer of those products.

18  And I also agree with him that we were putting ourselves at the

19  tip of the spear of this issue.  But I thought that was our --

20  disagree with him.  I think that was our responsibility to do

21  that.

22  Q.   But do you agree with the suggestion that the industry

23  sources for these products should also be looked to as sharing in

24  the responsibility for the formaldehyde issues?

25  A.   Well, I would say anyone involved in -- in this should share

1    responsibility.  But let's keep in mind, if what they were

2    producing were units that were built to meet or exceed industry

3    standards, and if that's what our contracts required, and they

4    did, then they were meeting their contract obligations.

5           So in terms of responsibility, yes, we all share some

6    responsibility.  With regard to these particular units,

7    manufacturers share the responsibility for the construction of

8    the units and whatever guidance they provide regarding its use,

9    but it's our responsibility as the purchasers and subsequent

10   providers of those units to the disaster population to be -- to

11   own up to and be responsible for those units from that point on,

12   at least in terms of dealing with the needs and concerns of the

13   occupants of units that we own and have provided to them.

14          So I'd say it's a shared responsibility.

15   Q.   And you certainly wanted to -- you would -- you would rely

16   on the manufacturer of a travel trailer, for example, to furnish

17   a product that would be safe for long-term residents knowing that

18   these travel trailers, which, as you say, are recreational

19   vehicles, were going to be used for long-term residents?

20   A.   I would suggest that the responsibility of the manufacturers

21   would be to meet the terms of whatever performance specifications

22   that we ask them to meet with contracts that we awarded to them.

23   Q.   Did you specify anything in those contracts that was

24   directed to long-term residents or occupancy of a unit containing

25   formaldehyde-emitting products?

1    A.    Don't know.

2    Q.    Would it be in the contract if it was there?

3    A.    Well, yes.

4    Q.    I mean, it wouldn't have been done verbally.  If you

5    specified it, it would be written in the contract?

6    A.    I can't imagine a verbal --

7    Q.    Right.

8    A.    -- of that nature that would -- would not have to be in a

9    contract.

10   Q.    Right.

11   A.    In written form as an amendment or otherwise.

12   Q.    Are you suggesting there that the entities which have the

13   expertise and capability to render authoritative determinations

14   of the safety of those units would be the manufacturers?

15   A.    No.

16   Q.    Who would it be if not them and if not FEMA?

17   A.    Well, I would -- we believed or I believed that this --

18   establishing federal standards is a federal responsibility, and

19   it belongs within the bailiwick of whatever agency was most

20   appropriate.

21         I would have voted for EPA and/or CDC to be

22   establishing what are appropriate standards for -- for what is

23   safe in terms of formaldehyde exposure levels.  I do not think

24   that it's the industry's responsibility to develop federal

25   standards.  I think that's a federal responsibility.

1   Q.   Mr. Garratt, can you confirm that FEMA supplied thousands of

2   travel trailers for natural disasters prior to Hurricane Katrina?

3   A.   Yes.

4   Q.   Okay.  And certainly some of those natural disasters were

5   hurricanes, correct?

6   A.   Correct.

7   Q.   And some of those hurricanes hit, maybe a lot of them hit on

8   the Gulf Coast, in the hot and humid area where a lot of us live,

9   fair?

10  A.   Fair.

11  Q.   As we sit here today, based on whatever investigation that

12  you're aware of that FEMA has done, you're not aware of any

13  single formaldehyde claim presented to FEMA based on travel

14  trailers put out into the public prior to Hurricane Katrina?

15  A.   I have no direct knowledge of that.  Again, there is

16  anecdotal reports of that.  Nothing that has been confirmed that

17  I'm aware of.

18  Q.   As of September the 1st, 2005, when you walked into the

19  Katrina situation, did you have any reason to believe that travel

20  trailers were going to be a problem?

21  A.   From a formaldehyde --

22  Q.   From a formaldehyde standpoint?

23  A.   None whatsoever.

24  Q.   Can you talk a little bit about why FEMA used travel

25  trailers by the thousands both prior to Hurricane Katrina and

1  during the Hurricane Katrina response?

2  A.   They were the preferred direct temporary housing product

3  because of their -- because of their size, because we could move

4  them in and set them up quickly.  I think 80 percent of the units

5  that we provided in response to Hurricanes Katrina and Rita were

6  on individual's private property.

7       And typically we put travel trailers on private

8  property, or often because we can't fit anything else on their

9  private property.  They simply can't accommodate a mobile home on

10  their driveway.

11       So they were used because, number one, they filled a

12  need that could not be met any other way; two, they were

13  inexpensive compared to a mobile home; three, they allowed people

14  to stay at their property and rebuild their home as opposed to

15  relocating them to a community site that might be miles away and

16  might be far more expensive to build.

17       So a number of reasons, I think, contributed to the use

18  of travel trailers and their popularity, at least within a

19  certain segment of the disaster population, on those small

20  properties and wanted to stay on their property and rebuild their

21  home.

22  Q.   Am I also correct that during the prior natural disaster

23  events that we talked about prior to Hurricane Katrina, can we

24  assume that there were young children and elderly people and

25  stay-at-home moms living in those travel trailers as well?

1    A.    I think that's safe to assume.

2    Q.    And again, you're not aware of any formaldehyde claims by

3    any of those people in those prior disasters?

4    A.    I'm not personally aware of any.

5    Q.    You were asked about the volume or frequency of formaldehyde

6    complaints.  Do you recall that when Mr. Meunier was questioning

7    you?

8    A.    I'm sorry, the volume or frequency of formaldehyde

9    complaints?

10   Q.    Formaldehyde complaints, do you recall that?

11   A.    Yes, I recall that.

12   Q.    We talked about the slew, and then -- I had a document I

13   wanted to show you to see if this might refresh your memory.

14   This is a document Bates stamped FEMA 17-000023 and also marked

15   FEMA-Waxman 23.  It looks to be a memorandum from

16   Secretary Chertoff to -- to Secretary Chertoff from

17   David Paulison.  Let me -- let me show you that document and ask

18   you first if you've seen it before.

19   A.    I think I have seen this before, and I think I probably

20   participated in the review and editing of this document, I think.

21   Q.    What does that document say about the number of complaints

22   FEMA had recorded in Louisiana on formaldehyde as of July 2006,

23   compared to the total number of trailers on the ground in

24   Louisiana?

25   A.    You want to give me a clue as to where in --

1   Q.   Yes.   On the first page in about the middle.

2   A.   Okay.   "While the number of complaints recorded by FEMA thus

3   far has been minimal, 20 plus complaints out of 79,000 trailers

4   deployed in Louisiana."

5            Is that the reference?

6   Q.   Yes, sir.

7   A.   Okay.

8   Q.   So 20 plus complaints out 79,000 trailers that were in use?

9   A.   In Louisiana.

10   Q.   And that's about, what, 10 months after Hurricane Katrina,

11   11 months?

12   A.   Let's see.   "While the number of complaints recorded by FEMA

13   thus far has been minimal," and this is as of July, so a little

14   less than a year since Katrina.

15   Q.   Is one complaint in every 4,000 trailers an indication of a

16   systemic problem to you?

17   A.   I don't know.

18   Q.   It's a fairly small number, isn't it?

19   A.   I agree it's a small number.   I think -- it, obviously,

20   depends on your definition of systemic, but I don't know that I

21   have an arbitrary figure on what above or below that line would

22   qualify something as systemic.

23   Q.   Mr. Garratt, were you aware in the middle of 2006 of FEMA's

24   policy of swapping out trailers to people who express health

25   concerns due to their travel trailer?

1  A.   At what point again?

2  Q.   In the middle of '06.

3  A.   I can't tell you when I became aware of that as a policy.

4  It certainly was after the Sierra Club event -- or the

5  Sierra Club report, but I don't know when exactly I became aware

6  of that as a policy.  I would assume it would have been within a

7  relatively short period after that, be it a month or two.

8  Q.   So anybody who complained, any occupant who complained about

9  formaldehyde, and you couldn't resolve the concern, that person

10 would be given the opportunity to move into a different housing

11 unit?

12 A.   I can't say that everybody was given that opportunity.  I

13 can say that that was an opportunity that was presented to some

14 number of -- of occupants.

15 Q.   Are you aware of anyone who was denied that opportunity?

16 A.   No, I'm not aware that anyone was denied that opportunity,

17 at least until we made the determination that we were going to

18 stop swapping units and instead move people out of them and into

19 hotels and motels instead.  It doesn't mean that it did not

20 happen, but I'm not aware of it.

21 Q.   Did FEMA at some point establish a call center where an

22 occupant who had any concern at all about formaldehyde could make

23 a phone call to FEMA and talk about it?

24 A.   Yes.  We actually did several call centers.  The main one

25 was at one of our national processing service centers, and they

1    were linked into CDC, which also maintained a hot line, and so

2    they were collaborating on that in terms of referring phone calls

3    back and forth.

4         But also, our TROs established their own separate call

5    centers in Mississippi and Louisiana to handle calls regarding

6    the same thing.  They were also linked into this principal call

7    center.

8         The short answer is yes.

9    Q.   Am I correct that FEMA's authority to provide and install

10   housing, in this case the travel trailers, and under these

11   circumstances, ultimately derived from the Stafford Act?

12   A.   Correct.

13   Q.   And the post-Katrina housing effort, would it be fair to say

14   that this was probably the largest housing effort in the history

15   of FEMA?

16   A.   Is the largest housing effort in the history of FEMA.

17   Q.   Even to this day?

18        And would it be fair to say that FEMA, that federal

19   agency, didn't have the manpower or even the capacity in any

20   sense to actually deliver and install the travel trailers that we

21   have been discussing today?

22   A.   The agency certainly did not.  Prior to the use of the

23   IA-TAC, we relied on the Corps of Engineers for this particular

24   mission.  The Corps would not have had the capacity to do -- to

25   handle the scale of this mission.

1    So yes, we lacked the organic capacity to do this

2    mission.

3    Q.   So in order to fulfill FEMA's federal mandate to provide

4    this housing in the wake of this natural disaster, is it fair to

5    say that FEMA contracted with Fluor, Shaw, CH2M Hill and Bechtel

6    National to help it haul and install the travel trailers that we

7    have been discussing?

8    A.   Yes.

9    Q.   And the contractors, and I'll call them contractors rather

10   than saying all four names every time, the contractors had to

11   deliver the trailers that FEMA had designated and purchased;

12   isn't that true?  They couldn't pick up any trailer willy-nilly

13   and go buy their own trailers.  They were -- they were delivering

14   the trailers you guys told them to deliver.  Is that fair?

15   A.   Correct.

16   Q.   To do otherwise or to choose some other form of housing

17   would have been a breach of their contract; is that fair?

18   A.   That's correct.

19   Q.   And tell me if I'm getting too specific here, but did you

20   know that FEMA also directed the contractors to put these travel

21   trailers on blocks?

22   A.   Yes.

23   Q.   And you understand that that was a FEMA directive?

24   A.   Yes.

25   Q.   And would it be fair to say that if the contractors did not

1   do that, they would have been violating their contract?

2   A.   Yes.

3   Q.   And I would assume that you're also aware that FEMA required

4   that these travel trailers have electricity, plumbing, hot and

5   cold running water, sewerage?

6   A.   Correct.

7   Q.   And again, if the contractors didn't set them on blocks,

8   hook up the electricity, hook up the hot and cold running water,

9   hook up the sewerage, they would have been violating their

10   contract with the federal government through FEMA, correct?

11   A.   Correct.

12   Q.   If an air quality complaint, in this case a complaint about

13   formaldehyde, was brought to FEMA's attention or a maintenance

14   contractor's attention, and they were to deal with it on a

15   case-by-case basis, was it the policy to recommend airing out of

16   the trailer before swapping out the trailer?

17   A.   I don't know if it was a FEMA policy or not.  And by

18   "policy," we need to be careful here.  A written policy is

19   different than, again, a practice or an unwritten policy.

20        In this case, I'm not aware that -- of any policies

21   dictating or governing exactly what contractors or anybody who is

22   receiving complaints from occupants says and how they respond

23   to -- to those particular complaints.  I'm not saying they didn't

24   exist.  They may exist within the contract acquisitions

25   framework, but I'm not familiar with the existence of any such

1  policy.

2  Q.   Was it a FEMA practice to make that recommendation?

3  A.   Yes.

4  Q.   And you explained that at some point FEMA came to the

5  realization that it might have a possible systemic formaldehyde

6  problem.  I think that's the way you described it.  Is that a

7  fair way to describe it?

8  A.   Yes.

9  Q.   And I'm not trying to dictate a date on that, whenever it

10  turns out to be, but at some point in time around the time of the

11  Sierra Club results, I understand that the problem seemed to be

12  one that needed greater attention than perhaps it was getting.

13  Is that true?

14  A.   Yes.

15  Q.   And as I understand your testimony, FEMA assumed the

16  responsibility for coordinating the response to this issue at

17  that time, whenever it was; isn't that fair?

18  A.   That is fair.

19  Q.   And FEMA debated what an appropriate response might be,

20  whether it be testing, warnings, or taking people out of the

21  trailers; is that true?

22  A.   True.

23  Q.   And you would agree with me that the responsibility for

24  determining an appropriate programmatic response to this issue

25  lay within the FEMA organization?

1  A.   Let me caveat my response to that, and that -- or let me

2  characterize this carefully.

3         FEMA has delegated responsibility for the disaster

4  environment in coordinating the engagement and application of all

5  federal resources and assets to support that state.  So at the

6  top of that multi-organizational activity is FEMA, who is

7  solely -- or responsible for what goes on by all of those

8  agencies.

9         So yes, we are ultimately responsible, but in terms of

10  expertise and agency responsible -- agency responsibility, this

11  was something we believed that we shared.

12  Q.   With other agencies?

13  A.   Yes.

14  Q.   In any earlier disasters that you're aware of, was there the

15  same extent of the use of travel trailers, and specifically in

16  the state of Louisiana?

17  A.   No disaster compared to Katrina in terms of the total number

18  of forms of manufactured housing that were deployed in response

19  to that disaster.

20  Q.   And in any of the prior disasters that you're aware of where

21  FEMA provided emergency housing, what do you think was the

22  maximum length of time that any displaced citizen was required to

23  live in a temporary housing unit?

24  A.   First off, no one is required to live in a temporary housing

25  unit.  Individuals choose to live in a temporary housing unit.

1    Q.    Normally because they don't have any other place to go?

2    A.    Or because they don't want to go to any other place.

3    Q.    But we --

4    A.    There's always someplace else to go.  It just may not be as

5    close as they would like, and so they prefer living in a small

6    travel trailer here than in an apartment over there.

7    Q.    So what's the longest period of time, prior to the Katrina

8    disaster, that you knew displaced citizens to be actually

9    occupying a FEMA-provided emergency housing unit?

10   A.    Probably in the neighborhood of 36 months.

11   Q.    And in which disaster was that?

12   A.    Several different disasters.  For example, West Virginia,

13   we've had individuals who were living in manufactured housing.

14   These are very small disasters, but very small, little

15   communities in which purportedly there was no rental housing

16   available, and so they were extended in those -- those units for

17   an extensive period of time.

18         In Florida, following the 2004 hurricanes, we had

19   individuals living in units down there for at least 24 months,

20   perhaps longer.

21   Q.    Travel trailers?

22   A.    Some travel trailers, yes.

23   Q.    Would you agree that after Katrina there were more people

24   living for longer periods of time in travel trailers than in any

25   prior disaster ever in the history of this country?

1    A.    To my knowledge.

2    Q.    The answer is yes?

3    A.    Yes.  (Witness nods head affirmatively.)

4          WHEREUPON, at this point in the proceedings, the

5    videotaped deposition of David Garratt concluded.)

6          THE COURT:  All right.  Let's go ahead and turn the

7    lights up.

8              We'll take a short break here.  Let's plan on 10:45

9    to start up again.

10          THE COURT SECURITY OFFICER:  All rise.

11          (WHEREUPON, at this point in the proceedings, the jury

12   panel leaves the courtroom.)

13          MR. YOUNT:  By stipulation, Judge, we offer

14   Exhibit 1107, which is the *Lofgren* case in connection with

15   Dr. Miller.

16          MR. WATTS:  No objection.

17          THE COURT:  So ordered.

18          (WHEREUPON, at this point in the proceedings,

19   Exhibit 1107 was admitted into evidence and brief recess was

20   taken.)

21          THE COURT SECURITY OFFICER:  All rise.

22          THE COURT:  You may be seated.

23              Our game plan at this point for today is to try to

24   finish up in this session with you all today.  Now, we may go a

25   little bit into the noon hour, but I'm assuming, unless there is

```
 1   any -- anybody has any problem with it, you would rather do that
 2   and be done for the day.  When I say go into the noon hour, maybe
 3   until 12:15 or 12:30, if necessary.  We may finish before that.
 4            If it's only that much more, you would rather go
 5   ahead and sit through and be done for the day and be able to
 6   leave than come back, take a break at noon and come back at 1:00
 7   to hear an extra 30 or 45 minutes.
 8            So unless anybody has a big problem with that, I
 9   would propose to do that.  If it looks like we're getting
10   protracted and can't do it, then we'll break for lunch.  But
11   right now I feel like perhaps we can get this done in that amount
12   of time.  So let's try to do that.
13            If it does get to around noon and you start feeling
14   kind of hungry and you wondering why we're not stopping and why I
15   haven't mentioned the word "lunch," that's why, because it looks
16   like we might be rounding the last turn here.
17            All right.  Mr. Yount.
18       MR. YOUNT:  Thank you, Judge.  Recreation By Design
19   calls Dr. Robert James.
20       THE COURT:  Dr. James.
21       MR. YOUNT:  Judge, we're going to be offering Dr. James
22   as an expert in the field of toxicology.
23       MR. WATTS:  It's agreed, Judge.
24       THE COURT:  There is a stipulation -- Dr. James, if you
25   would come on up, sir.  Please remain standing until you take the
```

1  oath.

2              And the Court will, in light of the stipulation,

3  accept Dr. James as an expert in the field of toxicology.

4          THE DEPUTY CLERK:  Would you please raise your right

5  hand.  Do you solemnly swear that the testimony which you are

6  about to give will be the truth, the whole truth and nothing but

7  the truth, so help you God?

8          THE WITNESS:  I do.

9          THE DEPUTY CLERK:  Thank you.  You may be seated.

10 Please state and spell your full name.

11         THE WITNESS:  Dr. Robert James, R-O-B-E-R-T, J-A-M-E-S.

12                        **ROBERT C. JAMES**

13 was called as a witness and, after being first duly sworn by the

14 Clerk, was examined and testified on his oath as follows:

15         MR. YOUNT:  With initial C in middle, because it is in

16 the slide.

17             Your Honor, in connection with Dr. James'

18 testimony, we would offer, file and into evidence Exhibit 569,

19 which is his curriculum vitae.

20         MR. WATTS:  No objection.

21         THE COURT:  Any objection?  Any objection, Counsel?

22         MR. WATTS:  No, sir, I'm sorry.

23         THE COURT:  All right.  So ordered.

24         (WHEREUPON, at this point in the proceedings,

25 Exhibit 569 was admitted into evidence.)

DIRECT EXAMINATION

BY MR. YOUNT:

Q.    Good morning, Dr. James.  You've been offered as an expert
and accepted as an expert in the field of toxicology.  Will you
please tell us what a toxicologist is and take us through your
education and training.

A.    A toxicologist is a person who specializes in the adverse
effects of chemicals.

My training, I got a Ph.D. in pharmacology in '76.  At
that time, toxicology was one of the subdisciplines of
pharmacology.  We looked primarily at the adverse effects of
drugs, but over the years environmental issues and industrial
issues became more important.  And most pharmacology departments
now give a joint degree specializing more in toxicology, it would
be pharmacology and toxicology.

My research has always been in toxicology.  My thesis
for creating my Ph.D., my postdoctoral research was in
toxicology.

I spent about four years at the Vanderbilt University
in the clinical department doing some human studies on
metabolism, how chemicals are broken down into the body.  Some of
these breakdown products are toxic, they are toxic to the liver.
That was my area of research.

I then spent a year and a half with the Ecology and
Environment.  Ecology and Environment was the first national firm

1    to get the contract to help the EPA to go out and find hazardous

2    waste sites so they could be cleaned up and respond to chemical

3    spills, if there was a train wreck or truck derailment.  And the

4    FIT teams were the teams that went to the sites and found the

5    sites.  And the TAT, technical assistant teams were the ones that

6    responded to the spill.

7              So there I worked on the medical surveillance program.

8    We monitored the health of the employees, made sure they could

9    wear the heavy equipment they had to wear if they had to go into

10   the chemical spill or at a site where we didn't know what the

11   chemical exposures were.

12   Q.   You're going a little fast.  The court reporter is trying to

13   pick up.  Let me ask a question.

14   A.   I'm sorry.  Between noon -- trying to get out by noon,

15   sorry.

16   Q.   Okay.  You went to a four-year undergraduate and then you

17   went and got an advanced degree in toxicology, correct?

18   A.   Well, more training.  Postdoctoral training, yes.

19   Q.   When did you get your Ph.D.?

20   A.   I'm sorry, in 1976.

21   Q.   So you've been a Ph.D. in toxicology since 1976, correct?

22   A.   Yes.

23   Q.   Do you currently teach any toxicology classes?

24   A.   I haven't for about five years, but I taught toxicology and

25   pharmacology to medical students and graduate students for

1   six years at the University of Arkansas, and then for, I don't

2   know, part time another six to ten at the University of Florida.

3   Q.    And have you consulted with state or government agencies?

4   A.    Yes.  Several government agencies.  I helped California

5   develop a program.  It's called a TEF program for analyzing

6   certain products within oil products so they could tell how toxic

7   the mixture was.  A similar analysis or procedure is now used,

8   not only in oil products for polyaromatic hydrocarbons, but it's

9   also used for dioxins.

10          I helped the State of Florida pass a drinking water

11  standards.  We did toxicant profiles and proposed drinking water

12  levels.  And the toxicant profiles are those documents like you

13  might have heard the ATSDR summaries.  They are just like those

14  kinds of profiles.

15  Q.    Will you push a microphone a little bit back away from you.

16  A.    I have a dry throat.  I'm trying to keep the volume up.

17  Q.    You're currently -- what is TERRA, Inc.?

18  A.    TERRA, Inc., is a consulting firm I started about 1989.  I

19  had gone back into research, but because of my experience with

20  Ecology and Environment, I kept getting called by people to

21  analyze their environmental problems.

22          And so I kind of had competing loves, if you will, in

23  science.  I like to do research, basic research, find out how

24  chemicals were toxic.  And then I liked to apply toxicology, how

25  do you take that to the environment and what do you do.  How

1    clean is clean?  Make those kind of decisions.

2          At the time, for about six years with the two jobs

3    being essentially full time, I was working too hard, 80 to

4    90 hours a week.  And so I started a company.  I had postdoc

5    supplemental research, and I got young graduates to help with the

6    environmental.

7    Q.    Now, you're here today as a consultant, that my law firm has

8    hired you to consult on this case; is that correct?

9    A.    Yes.

10   Q.    And how much are you charging my firm?

11   A.    325 an hour.

12   Q.    Now, have you ever authored any peer-reviewed publications?

13   A.    Yes.  I have 75 publications that are either published

14   papers or published book chapters, and I'm an editor of two

15   volumes of a book in toxicology.

16   Q.    Will you please describe for the jury your experience in

17   formaldehyde before this case?

18   A.    I've never published any papers on formaldehyde, but in the

19   mid '80s we were doing a lot of investigations, site

20   investigations, and -- mid to late '80s, and the

21   urea-formaldehyde issue came up in homes.  They were using it in

22   insulation to try to make homes tighter.  They weren't curing the

23   foam correctly and a lot of formaldehyde was being given off.

24          Then animal experiments showed that it caused nasal

25   tumors in animals, and there was a lot of scientific interest and

1    meetings.  So I would have consulting jobs on it, and so I paid a

2    lot of attention to formaldehyde depending on what consulting job

3    I was doing.

4    Q.   Okay.  Now, in connection with this case, will you please

5    tell the jury what your role is.

6    A.   I was asked to evaluate the literature and determine what

7    the irritation threshold for formaldehyde was.

8    Q.   And then so what did you do?  What did you do to go about

9    evaluating this literature?  I know that there are different

10   types of literature.  We've heard a lot about that.  If you could

11   briefly describe what you look at and why you chose to look at

12   various studies as opposed to others.

13   A.   Yes.  I had a slide on it, but in the interest of time,

14   we're not using it.

15        But we rank epidemiology studies, studies in humans, by

16   their strengths and weaknesses.  And at the top are the

17   experimental studies, random clinical trials and direct

18   experimentation, like the studies that I used, they are

19   considered the gold standard in epidemiology.  They give the

20   best, most reliable evidence.

21        So there were a number of chamber studies, and I used

22   those chamber studies to evaluate the odor thresholds.

23   Q.   Now, do you ignore any studies or put away those studies

24   that don't support your ultimate conclusion?

25   A.   I didn't have any conclusion before I did it.  I found the

1    studies that were the chamber studies.  I analyzed them all.

2    Q.    Is it good science to ignore studies?

3    A.    No.

4    Q.    Now, tell us about some of those studies and the conclusions

5    that you reached, simply with respect to the Lang study?

6    A.    Did we want to -- I think you had some slides there.

7              If you back up one, maybe that's easier.

8              The studies that I looked at were two types.  We had

9    nonasthmatic volunteers that were put in chambers and given

10   various concentrations of formaldehyde for various time

11   intervals.  And then they also studied volunteers that had asthma

12   to see if the exposure to formaldehyde made their asthma worse or

13   gave them an asthmatic attack.

14   Q.    And what did those studies end up concluding?

15   A.    I think I have a slide.  We'll go past this one and maybe

16   come back to it.

17             You want the conclusion slide.  Okay.

18   Q.    Okay.

19   A.    Okay.  I'm sorry, we're going fast, we bouncing around here.

20             Ultimately the chamber studies -- I had a slide that

21   talked about the various features of a study and what you would

22   look for for the best studies.  So we wanted double-blind

23   studies.  We wanted studies where the volunteers didn't know what

24   the exposures were and the scientists didn't know what the

25   exposures were so that they wouldn't introduce investigator bias

1       or reporting bias and somehow kind of blur the results, if you

2       will.

3              Looking at all of the studies, although they gave

4       similar indications of what the threshold for irritation was --

5       and I picked eye irritation, because of your eyes, nose and

6       throat, it's the organ that's affected first.  It's the most

7       sensitive to irritation.

8              So I picked the Lang study.  They controlled for

9       negative affect.  If you're worried about exposures, if you're

10      depressed, if you were down, you would tend to respond

11      subjectively and give more complaints than a normal person would.

12             So this study basically controlled and had all of the

13      features that you would look for in a really good chamber study.

14      So I ended up using the results from this study, because not only

15      was it the best study, but it was the most conservative.  Because

16      it took out some of these other confounding influences, it gave

17      me the lower levels of a true no-effect level as measured by a

18      physiologic response.

19             And by that I mean, if you ask someone if they were

20      worried about the exposure, they might over report a symptom.

21      They'll say there is irritation there when the chemical is not

22      causing irritation.  And I have studies and slides that can show

23      that.

24             So this study used a physiologic response.  It measured

25      the blink rate and the redness of the eye.  And so that would

1    tell the investigators if they are blinking a lot, they are
2    trying to wash the eye off with tears and they are trying to wash
3    away the chemical or the dust.
4    Q.   Doctor, let me ask you about that.  I think you explained
5    that these are people that don't know what they are being exposed
6    to?
7    A.   Well, they were probably told that they were going to be
8    exposed to formaldehyde.  When they are put in chambers, they
9    sometimes get fresh air, then they introduce different
10   concentrations so they don't know what they are being exposed to
11   from minute to minute unless they pick up on the order of the
12   chemical.
13   Q.   What did this study end up determining with respect to when
14   people have health effects as a result of exposure to
15   formaldehyde?
16   A.   From objective measurements, .6 parts per million was the
17   highest no-effect level.  That's 600 parts per billion.  At that
18   level there was no measurable effect on the eyes.
19           Unfortunately, they didn't go up in constant stages up
20   to that, but they used peak exposures.  And they found it then
21   went to a peak exposure, using a half a part per million as the
22   baseline, and then giving them a peak exposure of one part per
23   million for a period of time and then coming back down, they
24   could get these measurable responses in the eye.
25           And so that was right at the edge of the threshold,

1    just above the threshold for eye irritation.

2    Q.    Okay.  So what did this study conclude was the threshold for

3    eye irritation?

4    A.    600 parts per billion.

5    Q.    600 parts per billion.  And that's same thing as .6 parts

6    per million?

7    A.    Yes.

8    Q.    All right.  Let's go back to the chart that you prepared.

9    And if you would, tell the jury what this chart represents.

10   A.    Yes.  This chart shows one of the reasons why you would want

11   an objective measurement like in the Lang study.  If you look at

12   the top, this is a chamber study done by Kulle using

13   formaldehyde, and I've highlighted in yellow the people exposed

14   to zero parts per million.  In other words, they were just

15   exposed to fresh air, no formaldehyde in the air.

16        And if you look up at the top row, we're looking at

17   subjects reporting eye irritation.  Well, at clean air, 5 percent

18   are reporting that they have mild irritation.  Now, unless there

19   is something wrong with that chamber air, it's just a subjective

20   response.  It may be due to the dryness of the air, it might be

21   something.  But they are not being exposed to an irritating

22   concentration.

23        If you notice, if you drop down one and actually add

24   formaldehyde, at the .5 level, the people reporting mild

25   irritation, it goes away.  They're actually now being exposed to

1  formaldehyde, and no one is reporting any irritation.

2          And then you get up to 1, which is the break point, and

3  where everyone says at 1 or above you get eye irritation.  Now

4  you get an increase above the baseline, which would be the

5  zero part per million.

6  Q.   And again, this parts per million, this is the equivalent of

7  500 parts per billion, correct?

8  A.   500 parts per billion.

9  Q.   And this is?

10 A.   1,000 parts per billion.

11          And you see the same with the nose and the throat.

12 Again, they got symptoms, more symptoms at -- with clean air than

13 they did with 500 parts per billion formaldehyde.

14 Q.   How do you know explain that?  How do you reconcile that?

15 A.   Well, the problem with symptoms is there is -- a lot of it,

16 it depends on the mood of the individual.

17          And studies have shown, I remember -- I put some

18 studies in my report, and I generated some slides, which I was

19 hoping to show, but because of time and we all want to go to

20 lunch, I think we cut them out.

21          But what it shows, we have used odorants like phenyl

22 ethyl alcohol.  It smells like roses.  This is a chemical that

23 stimulates the olfactory nerves in your nose that tell you

24 smells.  The stimulation of those nerves is various smells.

25          It does not affect the trigeminal nerve, which is the

1    nerve that tells you you're being irritated in the nose, that the

2    chemical is irritating.

3           Even though they expose subjects to a chemical that is

4    not irritating, if you look -- I could draw this, if you want.

5    Q.    Please do.

6    A.    I think that might help.

7           So if you expose them with phenyl ethyl alcohol, a

8    certain percent, as soon as they got exposed would report an

9    irritant, labeled as an irritating response.  And then over time

10   they get used to it.  You get tolerance.  I think they probably

11   told you about tolerance already.

12          And they come down to 5 or 10 percent, some percentage

13   of people saying they are irritated throughout the exposure.

14          Now, the interesting thing is, if before you expose

15   them to something that smells like roses, you tell them that it's

16   a bad chemical, a toxic chemical, then you get this (indicating).

17   So what happens is they get about the same initial irritation

18   response, but the reporting of an irritation stays higher.

19          Then before you put them in the chamber you tell them

20   it's a wonderful thing and it makes you feel better and it's good

21   for you, and this is what happens.  I don't know if yellow will

22   show up.  I'll use dots (indicating).  So now they have a lower

23   response for irritation.

24          So even though this is a chemical that causes no

25   irritation, some people, if told nothing, responded about 5 to

1   10 percent.  If you tell them it's a chemical, give it bad

2   labels, they respond to a higher amount.  And if you tell them

3   it's a really good chemical, they respond to a lower amount.  So

4   you're subjective interpretation of the odor or the smell has an

5   effect on what you interpret your environment is like.

6        So even though you might be in a nonirritating

7   environment, there may still be some people reporting irritation

8   and at different amounts, depending on their beliefs about that

9   environment or that smell.  Just like with Kulle, he got

10  responses with clean air.

11  Q.   Doctor, just to save some time, if you would, take us

12  through the conclusions that you came up with after reviewing all

13  of the chamber studies and all of the other research you've done

14  on formaldehyde.

15  A.   Yes.  What it showed is that even with exposures up to

16  three parts per million, whether you were a healthy individual or

17  a person that had asthma, it had no effect on the lower

18  respiratory system, that is, it didn't change lung function.  It

19  didn't induce asthma attacks.  It didn't cause any

20  bronchoconstriction.  It didn't do anything that changed the way

21  the lungs performed.

22       And then in the second point, there is a whole bunch of

23  measurements that they looked for, but all of it says that no

24  measurement that they looked on lung function changed.

25  Q.   And these are objective tests where people are hooked up to

1  a machine?

2  A.   Yes.   These are measured values.

3  Q.   Okay.

4  A.   And the only consistent finding among these studies was that

5  odor intensity was first, and greater than the -- intensity of

6  subjective complaints, eyes were first and then nose and throat.

7        So there rank order:  Odor, eyes, nose and throat.

8  Q.   And then you talk about some of these conclusions in

9  connection with why people might smell something?

10 A.   Yes.   And again, as we've talked about with Kulle and the

11 other studies, it depends on what kind of environment you're in

12 and how you might be interpreting that environment.

13 Q.   Now, I know you haven't been here for the trial, but a lot

14 of the witnesses have talked about the dose makes the poison.

15 A.   Yes.

16 Q.   Explain what this means.

17 A.   Well, basically, if you start at low doses, there will be no

18 effect.  Then you get to what we call a threshold, that's the

19 break point.  Above the threshold you begin to start -- you start

20 inducing the effect with whatever chemical or drug you have and

21 then you reach a maximal effect.

22 Q.   Is this a theory that is specific to formaldehyde?

23 A.   No.   It's a cornerstone of toxicology.  All chemicals have a

24 dose response curve.  So it's the dose that determines whether

25 the environment or the exposure, whatever you are receiving is

1  going to be a problem or not.

2  Q.   Okay.  I promised you we'd get to use some of your charts,

3  so explain what this chart means to the jury and how this relates

4  to the dose makes the poison.

5  A.   Yes.  Basically, what you see is the threshold.

6  Q.   You have a pointer up there.

7  A.   Okay, that's the threshold.  Concentrations are doses below

8  that, no effect.  Then as you increase those, then you go up the

9  dose response curve until finally you get a maximal response.

10       So if you were a doctor, you would want to be working

11  here up at the maximal response.  If you're a toxicologist, you

12  want to find this threshold dose and you want the concentration

13  below.  And that's basically what I did with the chamber studies.

14       What I did was we took objective measurements and found

15  the concentrations that caused no effect.  We then saw the

16  threshold.

17  Q.   And then here this is the -- this slide shows the difference

18  where physicians work, where toxicologists work.  Is that because

19  at these higher levels over here where it says "therapeutic,"

20  that's where people are injured or have some sort of adverse

21  health effect?

22  A.   No.  If you want the drug to do something, then you want to

23  be at the dose where everybody responds to the drug.  Doctors

24  work at the maximal response because the drug is doing something

25  the doctor wants your body to do.  So they are looking for the

1   100 percent.

2          If they were worried about the toxicity of the drug,

3   they would be down at the bottom of the threshold, let's see if I

4   can do it again, down there (indicating) like a toxicologist

5   would.

6          So toxicologists are usually trying to prevent adverse

7   effects, and so they are working where the yellow dot is down in

8   that orange region.  They're putting safety factors and other

9   things to drive the concentration away from the point where we

10  know some effect might begin to occur.

11  Q.   Okay.  And then you explained -- you prepared some slides to

12  give us an example of how dose response works.

13  A.   This is an actual -- some data pulled out from Casarette and

14  Doull.  I'm sorry.

15         Anyway, it's a basic toxicology text.  And this is a

16  study with benzo(a)pyrene.  And I can't remember if this was

17  mortality or cancer.

18         But what it shows is -- what toxicologists do is

19  they'll take animals, and we start dosing them.  And you can see

20  that nothing happens in the first three doses.  Well, I guess the

21  first two doses.  The screen up there is a little shaded.  I can

22  see it better on my screen.

23         Can you see the black -- one black mouse.  We're using

24  a dark mouse to show that that's an adversely affected mouse.

25  Then as you increase the dose, you see a larger percentage of the

1    population.

2           So we take that data and then we plot the curve.  And I

3    think if you'll scroll through, it shows more.  I can't remember.

4           So we know at 3.9 there is absolutely no effect.  So

5    that dose and below is the effect, and then at 5.8 and above is

6    an adverse effect.  And that's sort of what we were doing in the

7    chamber studies.  We were looking at how many people were

8    affected under what concentrations.

9    Q.   Doctor, there has been a lot of discussion, some positive,

10   some negative about my chart, which has been marked as 887, which

11   has some -- on the left-hand side it has some sources of

12   formaldehyde exposure that I think even Dr. Williams agreed were

13   formaldehyde that could -- that if people are exposed to, which

14   is relevant, and then she disputed the fact about the food

15   sources over here, she disputed that it was relevant to this, as

16   to whether formaldehyde caused Ms. Castanel any injury.

17          Will you please explain to the jury -- first of all, do

18   those food products on the right-hand side of that board contain

19   formaldehyde?

20   A.   Yes.  Many food groups contain formaldehyde.  Coffee has

21   caffeine.  As we break down caffeine, we generate formaldehyde in

22   the body, just like we do with cough syrup, dextromethorphan.  So

23   there is some free formaldehyde.  There will be some bound

24   formaldehyde that is digested, or as you sample it, you can pull

25   it off what it's bound to.

1        But what it's measuring is the total amount of fat

2   formaldehyde in that product.

3   Q.   Now, some other -- go back to the slide show.  Other sources

4   of formaldehyde.  We heard some testimony earlier today about

5   Ms. Castanel taking a cough medicine.  Does that contain

6   formaldehyde?

7   A.   Yes.  Robitussin is the one I use.  But I don't think it

8   matters which cough syrup you use, they all use dextromethorphan.

9   It's a synthetic narcotic.  It's very effective at cough, but it

10  has none of the narcotic activity.  So that is the drug of choice

11  for cough syrups.

12       A dose, a regular dose of Robitussin or any equivalent

13  amount of dextromethorphan, any cough drop, each time you take a

14  dose, you generate 6.6 milligrams of formaldehyde when you break

15  down the dextromethorphan in your body.

16       So even though they don't have free formaldehyde, these

17  are things that the body converts to a certain dose of

18  formaldehyde.

19  Q.   And then -- obviously, these are some other sources of

20  formaldehyde that you've identified.  And these are airborne

21  sources of formaldehyde; is that correct?

22  A.   Yes, there's lots of airborne sources.  Essentially every

23  airborne environment we have contains some level of formaldehyde

24  in it.

25  Q.   Okay.  Now, based upon your testimony, it sounds like

1    everybody's exposed to formaldehyde to some extent; is that

2    correct?

3    A.    Yes.

4    Q.    Are you able to calculate some sort of a lifetime exposure

5    level of formaldehyde?

6    A.    You can calculate yearly doses, lifetime doses, et cetera,

7    depending on what you want to consider.

8    Q.    Okay.  Now, the testimony in this case has been that

9    Ms. Castanel, by stipulation, it's been stipulated that she was

10   in the trailer for approximately 17 months, and that the tested

11   levels for formaldehyde --

12   A.    17 or 13?  I thought it was 13.

13   Q.    13.  I'm sorry.  I think you're right.  And that the

14   stipulated actually tested values was 9 parts per billion up to

15   81 parts per billion.  Compare those dosage levels of

16   formaldehyde to her lifetime exposures of formaldehyde.

17   A.    Well, they are not unusual.  Basically, if we look at indoor

18   air in residence, depending on the study, what year it was

19   done -- we are trying to get lower formaldehyde products,

20   emitting products into buildings now -- but 50 parts per billion

21   is a pretty good average for a residence.  I cited in my paper

22   probably four -- about four studies that measured homes and found

23   a mean, an average value, of 50 parts per billion, the highest

24   value rising up to about 100 parts per billion.  Some were lower.

25   Some homes are as low as 20 parts per billion or 10.

1       But what this means is if you look at the population,
2   everybody in this room has a formaldehyde exposure, composite
3   exposure, and there will be a range.  It will look like a little
4   bit of a mountain if it's normal distributed.  It's actually
5   logged normal, so it looks like a mountain.  It's steep on one
6   side and then the general slope on the other side.
7       But what it means is that we all have different doses
8   in there, and our doses -- Ms. Castanel, for a person of her age,
9   her dose is probably no different than anybody in the
10  United States.  The value in the trailer was the average for
11  several studies.
12      There is a study by Lemus of Louisiana homes where the
13  average was 375 parts per billion.  They had one home of 5.4, and
14  60 percent of the homes were above 100.  So it's just not unusual
15  to be exposed to 50 parts per billion.  I'm sure I have.  I've
16  worked in labs.  There has been some histology.  All of our homes
17  have formaldehyde.  And some studies have -- several studies that
18  I reported gave a mean value of about 50, which is about the
19  level that she's got.
20  Q.   Okay.  Now, Dr. James, assume for me, if you will, that
21  Ms. Castanel's trailer had formaldehyde levels of up to 81 parts
22  per billion as testified by Dr. Hewett.  In your opinion, is that
23  level of formaldehyde exposure sufficient to exacerbate her
24  long-standing run of rhinosinusitis?
25      MR. WATTS:  Objection.

```
 1  A.   No.  No.
 2            MR. WATTS:  This is not in his report.
 3            THE COURT:  Well, I think it's outside of his area of
 4  expertise.
 5            MR. WATTS:  I do, too.
 6            THE COURT:  Show me where it is in the report.  Why
 7  don't you come on up and show me where it is in the report,
 8  Counsel.
 9            (WHEREUPON, at this point in the proceedings, there was
10  a conference held at the bench.)
11            THE COURT:  This is a specific causation, as I
12  understood the question.  Let's pull it up.
13            MR. YOUNT:  I asked him is the level of exposure in the
14  trailer sufficient to exacerbate her long-standing run of
15  rhinosinusitis?
16            THE COURT:  It's a different question.  The question
17  that you're asking has to do with rhinosinusitis in particular.
18  This has to do with irritation.  And, granted, there is overlap
19  symptomatically, but when I hear rhinosinusitis, I'm thinking
20  medical doctor testimony.  Why don't you go ahead and rephrase
21  the question.
22            MR. YOUNT:  Yes.  Thank you, Judge.
23            (WHEREUPON, at this point in the proceedings, the
24  conference held at the bench concluded.)
25            THE COURT:  We'll rephrase the question.
```

1                        EXAMINATION

2   BY MR. YOUNT:

3   Q.   Dr. James, assume for me, if you will, that the level of

4   formaldehyde in Ms. Castanel's trailer was 81 parts per billion.

5   In your opinion, are those levels sufficient to cause her

6   irritation of the eyes, nose or throat as a result of

7   formaldehyde exposure?

8   A.   No, they are not.  They are well below the threshold.

9            MR. YOUNT:  Thank you, Dr. James.

10           THE COURT:  Thank you.  Cross.

11                    CROSS-EXAMINATION

12  BY MR. WATTS:

13  Q.   Dr. James, that last question asked you to assume something.

14  Can we also assume that she was not in the trailer in January of

15  2010, when this testing was done?

16  A.   I don't think she was, no.

17  Q.   Can we assume that that testing was done more than four

18  years after the manufacture of this travel trailer?

19  A.   Yes.

20  Q.   Can we assume that that testing was done almost two and a

21  half years after she moved out of it?

22  A.   Yes.

23  Q.   Now, as we talk about formaldehyde and off-gassing and these

24  kinds of things, you have agreed that the highest level of

25  formaldehyde is when the travel trailer is new, right?

1    A.    I would expect it to be, yes.

2    Q.    You have agreed --

3    A.    On average.

4    Q.    Yes.

5          And there is a finite amount of formaldehyde in the

6    wood, right?

7    A.    Yes.

8    Q.    And as it off-gasses it leaves the wood and goes into the

9    air, right?

10   A.    Yes.

11   Q.    And what happens when we see this from the curves is, is

12   that eventually at a point in time the amount of formaldehyde

13   that's off-gassing goes down, and the curve flattens out, right?

14   A.    It should be exponential over time.

15   Q.    Sure.  Putting it simply, once you get rid of all of the

16   formaldehyde, there is no formaldehyde left, right?

17   A.    If you do, yes.

18   Q.    Or if you get rid of 95 percent of the formaldehyde in the

19   first year or so, you have 5 percent of the formaldehyde left,

20   right?

21   A.    I don't know any numbers like that --

22   Q.    Just for example.  I mean, I'm not saying that's the actual

23   numbers.  But if you do a test 4 years and 2 months after a

24   travel trailer is manufactured, and all the off-gassing is done,

25   you're going to get a level that is much lower than during the

1    start of the off-gassing?

2    A.    I can't speak to how much off-gassing has been performed.

3    Q.    Not your area?  Okay.

4    A.    Well, it's -- Ginovin (spelled phonetically) and others have

5    responded to that, and it seems to be a disagreement as to how

6    much time affects it, and temperatures and whether you're

7    ventilating.  If you've locked up the trailer for the two years

8    since she had it and then you go out and sample it, then it's

9    accumulating levels in the air, and the levels start out high.

10           So off-gassing tells you how much is coming off the

11   wood.  It doesn't tell you how much is in the trailer.

12   Q.    Now, the other thing we have to look at --

13           MR. WATTS:  May I approach, Your Honor?

14           THE COURT:  Yes.

15                          EXAMINATION

16   BY MR. WATTS:

17   Q.    Before we even get into the issue of off-gassing over time,

18   the real key is dose, right?  How much of the chemical is

19   available, right?

20   A.    How much is the concentration in the air.  From that, you

21   can then calculate a dose, yes.

22   Q.    And your dose curve with respect to medicines, you want a

23   dose that's high enough to get a 100 percent response, right?

24   A.    Yes.

25   Q.    With respect to pollutants, you want to eliminate pollutants

1  when people get a response, right?

2  A.   Yes, you're trying to keep it below the threshold.  I

3  explained that to the jury.

4  Q.   And in terms of dose, if you have -- you said you had some

5  cases back in the 1980s with respect to -- that gave you an

6  interest in formaldehyde?

7  A.   Yeah.  I worked on a number of residential areas and

8  different things, yes.

9  Q.   Sure.  If you have regular formaldehyde-containing

10  particleboard, you'll have a higher dose than if you have low

11  formaldehyde-containing woods, right?

12  A.   Yes.

13  Q.   And, of course, if you have regular woods instead of LFE

14  woods, your dose of formaldehyde that you start with is higher,

15  right?

16  A.   Yes, that's why I think Ms. Castanel is no different than

17  the rest of us.

18  Q.   Well, let me just ask you, Exhibit 489, 416, what does that

19  say right there?

20  A.   I'll have to get my glasses.  You can read it to me if you'd

21  like.

22  Q.   How about Lauan regular?

23  A.   Lauan regular?  It doesn't mean anything to me.  I don't

24  know what that means.

25  Q.   Was this a purchase order from Rec By Design?

1       MR. YOUNT:  Objection, Judge, there is no foundation.

2   He said he didn't know what it is.

3       THE COURT:  No, he said he didn't understand the term

4   that appears on the document.  I think the question is does he

5   know what the document is; and, if he's not seen it, then he's

6   not seen it, but we don't know that until he answers.

7       THE WITNESS:  Yes.  I've never seen this document.  It's

8   a purchase order.  I guess it's for wood, but I don't know

9   anything about the wood, so I don't know what I can add to the

10  discussion here.

11                          EXAMINATION

12  BY MR. WATTS:

13  Q.   It's billed to Rec By Design from Adorn Wood Products?

14  A.   Okay.

15  Q.   And it says Lauan regular, right?

16  A.   Yes.

17  Q.   Now, once we have the dose issue determined, then we've got

18  to, in effect, figure out the off-gassing rate, right, to figure

19  out how much would be left after four years?  Are you an expert

20  on off-gassing rates?

21  A.   I said I wasn't.  In fact, I didn't model those.  You'd have

22  to also know the amount in the wood, so it's a little bit more

23  complicated than even you're portraying as off-gassing.  It's the

24  rate that comes out of the wood and how much is in the wood,

25  et cetera.

1  Q.   And you're not an expert in this field?

2  A.   No, I'm didn't make any claim to.

3  Q.   I'm not saying you did.

4  A.   Yeah.

5  Q.   Where you are an expert is in the field of toxicology, and,

6  that is, you try to figure out at what dose does irritation

7  occur, right?

8  A.   Yes.

9  Q.   You were in here when I was cross-examining Dr. Wedner?

10  A.   I saw part of it, yes.

11  Q.   We went through all of those different levels.  By and

12  large, he got it right?

13  A.   Yes.

14  Q.   Your first task was to determine at what air level of

15  formaldehyde a person would likely experience eye, nose and

16  throat irritation.  I could take you through that again, but all

17  we have to do is look at what we did with Dr. Wedner, and you'd

18  largely agree with those, right?

19  A.   I would largely agree with what; Dr. Wedner?

20  Q.   With the levels that he described?

21  A.   Yes, I think he said one and above was eye irritation, and

22  probably closer to two would be nose and throat.  And that seems

23  to be what I saw in the literature, but I focused on the eyes.

24  Q.   Fair enough.  You just saved us a bunch of time.

25          All right.  Now, in terms of this issue of dose, you

1  brought up the food and outdoor ambient air --

2  A.   Yes.

3  Q.   -- and I want to visit with you about that.

4        The dose that people are breathing inside of a travel

5  trailer is a function of the formaldehyde emission from the wood

6  largely, right?

7  A.   It's coming from someplace in the trailer, yes.

8  Q.   But your point about bringing up outdoor air is that's kind

9  of a baseline of what people breathe when they are not in a

10 travel trailer, right?

11 A.   Yes, that's why when you open windows it drops.  I think one

12 of the studies reported by Ginoven (spelled phonetically) drops a

13 new trailer about 90 percent of its indoor concentration if you

14 open the windows.

15 Q.   What your analysis allows us to do is to figure out if

16 people are being irritated as a result of formaldehyde, we know

17 what the minimum levels would have had to be for them to be

18 irritated as that result, right?

19 A.   No.   It's an objective measure.   If you have formaldehyde at

20 that concentration, you know you can get an objective

21 measurement.

22 Q.   I'll take that.

23        Now, in terms of this baseline issue, you and I have

24 discussed that -- and I think is in defense Exhibit 838, the EPA

25 has taken outdoor air measurements in a place called Kenner,

1  Louisiana, which averaged 3.63 parts per billion, do you remember

2  that?

3  A.   Yes, outdoor air studies range from low part per billion to

4  as high as 20 depending on your rural or a city environment.

5  Q.   3.63 parts per billion in Kenner, Louisiana, do you know how

6  far Kenner, Louisiana, is from New Orleans, Louisiana?

7  A.   I don't remember, but you told me it was close.  I don't

8  know where it is.  I'm sorry.

9  Q.   Now, if it's close, and let's just assume that's the outdoor

10  air for purposes of these next questions, 3.63 parts per billion,

11  what we would do is you could just multiply 3.63 parts per

12  billion, and you can divide it into 50 parts per billion to see

13  what the difference is, right?

14  A.   Yeah, you could tell how much higher the outdoor air than

15  the indoor air was, yes.

16  Q.   Sure.  So the travel trailer four years after it was built

17  had a formaldehyde dose that is -- 50 divided by 3.63 -- 12 to

18  15?

19  A.   About 15, yeah.  I'd say about, approximately 15 times.

20  Q.   Okay.  The travel trailer, if you buy this .081 a year and a

21  half to 2 and a half years after the travel trailer, that would

22  have a dose that's --

23  A.   20 to 25, somewhere in there.

24  Q.   -- 20 to 25 times more than what you have with the outdoor

25  air, right?

1   A.   Yes.  Most homes do, yes.

2   Q.   If you have somebody that is being irritated as a result of

3   formaldehyde such that the dose is 1 part per million or a

4   thousand parts per billion, that would be a formaldehyde dose

5   which is 250 to 300 times what the ambient air level of

6   formaldehyde, right?

7   A.   No, I can't quite agree with that.  The problem with

8   irritation and subjective complaints, if they are not in a

9   controlled environment, you don't know what is causing the

10  irritation.

11          For example, in indoor air studies one mistake they

12  make is they'll look at formaldehyde or another aldehyde,

13  forgetting all the other organics in air, and they'll try to

14  correlate with that one compound.  In indoor air there may be

15  100 volatile chemicals.

16          So if a person reports irritation, it could be due to a

17  lot of things.  It could be dust.

18  Q.   Really?

19  A.   It could be a lot of things, and you couldn't really

20  attribute it to formaldehyde.  You'd have to go in and measure it

21  to know.

22  Q.   Let me refine my question --

23  A.   Okay.

24  Q.   -- just for purposes of our analysis.  If the level of

25  formaldehyde inside of a travel trailer is a thousand parts per

1    billion, that is three hundred times the formaldehyde level in

2    the ambient air?

3    A.    For Kenner, I guess, yeah, it's about that.  It's going to

4    vary from location to location, yes.

5    Q.    If the level of formaldehyde in a trailer is 2000 parts per

6    billion, that would be a formaldehyde level which is 600 times

7    the formaldehyde level in the outdoor air in Kenner, Louisiana,

8    right?

9    A.    Yes.

10   Q.    Let me check my notes real quick.  I've got a couple of

11   other things, but I want to skip over as much as we can since

12   we've taken care of this.

13          You have agreed that it would be silly to compare the

14   amount of formaldehyde in food with the amount of formaldehyde

15   that's in the ambient air?

16   A.    Concentration wise, not dose.

17   Q.    It would be confusing to attempt to do the same?

18   A.    Yes.

19   Q.    It would be misleading to attempt to do the same?

20   A.    They have different units, you have different rates, you

21   breathe a certain amount.  You have to know how much you breathe,

22   you then have to know how much you eat, to take the concentration

23   and figure out what the total amount is.

24          So, in any situation you shouldn't compare a

25   concentration in air or water to food or soil or normal

1  application or something else.

2  Q.   Or soft drinks, tomatoes?

3  A.   Well, that just shows that formaldehyde is there, and

4  they're different concentrations just like there are different

5  concentrations in outdoor air and indoor air.  It just shows that

6  everything has a little formaldehyde it.

7  Q.   You think in science when we're doing causation we look for

8  a consensus opinion; is that right?

9  A.   I think if it's a causation it should be an opinion that is

10  a consensus opinion, yes.

11  Q.   And you agree that when IARC reaches a conclusion, it's the

12  consensus opinion?

13  A.   Not the consensus.  I would say generally that most

14  scientists would agree with IARC when they reach an opinion, but

15  not always.

16  Q.   It's the opinion that is most like to reflect the consensus

17  of the world scientific community, right?

18  A.   I would say in general I would agree with that.  I would not

19  agree with that with every chemical.  Some chemicals now IARC has

20  gone to mechanisms, and there is problems with using mechanisms

21  when you don't have good epidemiology data.  So I don't think

22  every scientist would agree.  I certainly wouldn't agree.

23  Q.   But, in general, do you agree?

24  A.   I think most people will take what IARC does and make that a

25  consideration, yes.

1    Q.    One last issue, and not being critical.   The chamber studies

2    that you selected, Kulle in 1993, those people were in there for

3    three hours?

4    A.    Yes, I think five hours was the longest, Mojave (spelled

5    phonetically).

6    Q.    Sure.   None of the chamber studies you looked at people were

7    in there for more than five hours, right?

8    A.    It doesn't matter for irritation.   Irritation is a

9    concentration.   In other words, it doesn't matter how long you

10   are, the concentration is what drives irritation.   You actually

11   get tolerant the longer you're exposed, and you actually -- the

12   longer you're exposed to a concentration you tend to have less of

13   a response to it.   So it is the time -- it's independent of

14   amount of time as far as irritation goes.

15   Q.    What about exposure to carcinogens, does time matter?   Dose

16   and time, right?

17   A.    Again, that depends.

18   Q.    Let me just take that and just --

19   A.    Okay.

20   Q.    With respect to time, Earline Castanel testified that she

21   averaged how many hours a day in her trailer?

22   A.    Oh, I don't remember that testimony.   I assumed that she was

23   retired, she lived there, she was in it most of the time.

24   Q.    When you say most of the time and retired --

25   A.    Yeah, I think she went out and talked to her neighbors, she

1   said, once in a while.  She went to the doctor once in a while.

2   I don't think she was working.  I think she spent a lot of time

3   at home, yes.

4   Q.   16, 17 hours a day?

5   A.   I would say yeah, probably.

6   Q.   And if you multiply 16 hours times 17 months, we can figure

7   out how many hours she was in that trailer, right?

8   A.   Yes.

9        MR. WATTS:  Those are all of my questions.  Thank you,

10  sir.

11       THE COURT:  Redirect?

12       MR. YOUNT:  Just very quickly, Judge.

13                    REDIRECT EXAMINATION

14  BY MR. YOUNT:

15  Q.   Dr. James, Mr. Watts asked you to make some mathematical

16  calculations suggesting that the amount of formaldehyde in her

17  trailer was X percent greater than the baseline in Kenner,

18  Louisiana.  Now, there is a significant difference in baseline

19  ambient levels of formaldehyde depending on whether the level is

20  taken in the country versus the city; is that correct?

21  A.   Yes.  It's also -- you know, he was critical about the food.

22  It's also an apples and oranges.  Outdoor air is lower.  You

23  don't compare it to indoor air.  Indoor air typically has higher

24  levels.

25  Q.   Do you know what at any time the outdoor air baseline is or

1  was for Lottie, Louisiana?

2  A.    No.

3  Q.    So you don't know what the real world background level was

4  where this trailer was tested?

5  A.    No.  As I said, urban environments are low.  The ATSDR

6  reports them like a part per billion up to as high as 20 if it's

7  a city with lots of traffic.  Cars generate formaldehyde when you

8  drive cars, so.

9  Q.    So if you're in a city level on Urquhart Street, you would

10 expect that to be significantly higher than 3.63 parts per

11 billion, correct?

12 A.    You guys are both asking me to speculate and guess.  I don't

13 know anything about Kenner, I don't know anything about that

14 location.  I don't think I could really give an answer that would

15 reasonable.  If it is more urban and there's more traffic than

16 the other place, yes, I would expect it to be higher.

17 Q.    Now, Mr. Watts asked you about Dr. Wedner's conclusions,

18 these?

19 A.    Yes.

20 Q.    If somebody were to suggest the proposition that because

21 there was a report of a smell, that then therefore you can

22 conclude that the formaldehyde was at 500 parts per billion; do

23 you understand my question?

24 A.    You can't do that.

25 Q.    Explain why not.

1   A.   Well, first of all, I couldn't say that what they were

2   smelling was strictly formaldehyde.  It might be components of

3   chemicals in the indoor air.

4   Q.   Let me ask you about that.

5   A.   There's -- okay.

6   Q.   Let me ask you about that smell thing.  Is there -- what are

7   the other sources of potential smells or things that might

8   potentially make your eyes water in a trailer or anywhere else?

9   A.   If you look at indoor air studies, if you have a very

10  sensitive instrument, you can pick up literally hundreds of

11  chemicals in the indoor air.  If you cook, you generate more

12  chemicals in the indoor air, especially if you're frying grease,

13  et cetera.

14       Lots of these are like formaldehyde.  They are larger

15  aldehydes, so they're irritants.  Ketones, which are very similar

16  to irritants, there's a number of ketones.  There might be

17  phenolic compounds.  There might be some organic acid compounds.

18  You have a whole range of compounds.  They all have different

19  thresholds.  They all have different potencies.  So you have to

20  consider the mixture, and you'd have to know the mixture.  That's

21  answer Number 1.

22       Number 2 is that there is a range of odor thresholds.

23  Some people have an odor threshold as low as 50.  The recent data

24  that I've seen is the highest threshold is 200 parts per billion

25  to 400, meaning most people -- almost all people will respond

1  somewhere between 50 and 400 parts per billion.  So if this is a

2  person that's responding at 50 or 100, it would be 100.  You

3  wouldn't know.

4  Q.   Would it be responsible science to come to the conclusion

5  that a particular level of formaldehyde in a trailer was, by way

6  of example, 1,000 parts per billion, which is by the eye

7  irritation, would it be responsible science to say, hey, there

8  must have been a thousand parts per billion in that trailer

9  because somebody reported irritated eyes?

10 A.   No.  You can't back extrapolate.  The body only has a

11 certain number of ways it responds to chemicals in a symptom.

12 You can get irritation, you might get dizzy, you might get

13 nauseous, et cetera.

14        So when you take a symptom, you have no idea what

15 chemical, what mixture of chemicals.  You don't even know -- you

16 have some of those same problems if you're sick.  You get the

17 flu, you get a runny nose, you get irritated eyes, you get

18 headaches.

19        The problem with symptoms is they are nonspecific.

20 They don't tell you what it is that's causing the symptom.

21 Q.   And so here we're now -- well, hypothetically speaking,

22 we're talking about symptoms that are being reported some four

23 years after the alleged exposure.  How does that play in with

24 this reporting bias that you talked about earlier when talking

25 about the studies?

1   A.   Well, there always a concern for reporting bias anytime

2   you're trying to recollect after you've been told you've been

3   exposed to a chemical, that the -- whoever is telling you tells

4   you that it's bad or it's something you shouldn't have been

5   exposed to, people tend to over remember it.  It's a big problem

6   with studies reporting bias as a well known problem that we try

7   to design out of epidemiology.

8           That's why we went double blind.  We don't want them to

9   know.  We don't want the investigator to know.  And we don't ask

10  them later what they thought.  We ask them then.

11          MR. YOUNT:  Thank you, Doctor.

12          THE COURT:  Thank you, Doctor.  You can step down.

13          THE WITNESS:  (Addressing the court reporter) Sorry if I

14  went too fast.  I hope everybody has a nice lunch.

15          THE COURT:  Counsel, anything further on the defendant's

16  side?

17          MR. GARRISON:  Your Honor, subject to the exhibits that

18  we had talked about previously, we don't have any more live

19  witnesses.

20          THE COURT:  So other than putting exhibits that have

21  been exposed to the jury into evidence, the defendant rests?

22          MR. GARRISON:  Yes, sir.

23          THE COURT:  Now, plaintiff, any rebuttal evidence?

24          MR. WATTS:  Yes, sir.  We have a 60-second video clip

25  from Chris DeRosa.

1        MR. WEINSTOCK:  We'd like to approach and discuss that

2   before we play that.

3        THE COURT:  Come on up.

4        (WHEREUPON, at this point in the proceedings, there was

5   a conference held at the bench.)

6        MR. WEINSTOCK:  As I understand it, the purpose of the

7   rebuttal is to put in that Dr. Little and Wright chose the wrong

8   standard based on the medical -- whatever it is.  They looked at

9   the wrong paper according to Dr. DeRosa.

10        THE COURT:  I'm not sure I'm understanding.  This is --

11        MR. WEINSTOCK:  That's Michael's e-mail from last night.

12        THE COURT:  Starting here?

13        MR. WEINSTOCK:  Yes.  That it's based on the medical

14   management guideline web site.

15        Now, in Joe Little's deposition, it certainly was

16   referenced.  That portion was not played, so it does not need to

17   be rebutted.

18        Second, this is what was the

19   plaintiff's [inaudible] during Dr. DeRosa's deposition.  During

20   Dr. DeRosa's deposition he already said that.  He already

21   referenced this in his live testimony, but this is not the right

22   place to look.  So it's already been placed in evidence.  So,

23   essentially, what they're asking to do is replay something that

24   we played in response to something that was not even played.

25        THE COURT:  Well, wait.  First of all, my understanding

1    is that this passage has not been played for the jury at all.

2         MR. WATTS:  It hasn't.

3         THE COURT:  Secondly, I don't view this passage as

4    necessarily being in response to something that Commander Little

5    said.  I know that issue has come up in a prior bellwether where

6    Little's testimony was attempted to be confronted on rebuttal by

7    DeRosa's testimony, but that doesn't -- first of all, it doesn't

8    mean that's the purpose of it here.  And second of all, it

9    doesn't mean that this has to be in rebuttal to Commander Little

10   at all.

11        MR. WEINSTOCK:  Fair enough; but, regardless of

12   Commander Little versus Chris DeRosa, clearly, the no action

13   level at .3 is something that not only were they aware of, but

14   Mr. Watts referenced both it and Commander Little on his opening.

15   So to suggest that they were surprised by it and now need to

16   rebut it is not the case.  They just want the last word on it.

17   They just want to repeat something that Dr. DeRosa has already

18   said.

19             And I'm not saying necessarily the exact same page

20   and line.  He clearly already said that he did not agree with

21   the .3.  It's something they absolutely anticipated, they

22   mentioned it on opening, and it does not need to be rebutted.

23   They were not surprised.

24             It's just the classic, we would like to get our

25   best point in last, once again, Your Honor.  It's repetitious.

1          MR. WATTS:  It hasn't been played.  It's 60 seconds

2     long.  And it's in rebuttal to issues that have come up during

3     the trial.

4          THE COURT:  I'm going to let him play it.  I don't see a

5     problem with it.

6          MR. YOUNT:  Chris DeRosa for 60 seconds.

7          (WHEREUPON, at this point in the proceedings, the

8     conference held at the bench concluded.)

9          THE COURT:  This is Mr. DeRosa, who testified earlier,

10    and this is being offered in rebuttal.

11         (WHEREUPON, at his point in the proceedings, the

12    Videotaped Deposition of Dr. Chris DeRosa was played.)

13    Q.   Is the .3 ppm formaldehyde level published by the ATSDR on

14    their medical management guideline web site?

15    A.   Yes, it is.

16    Q.   Okay.  And you're saying that would be a level that would be

17    applicable to an acute exposure?

18    A.   Right, as someone who has a spill of formaldehyde and

19    perhaps workers are exposed or in the event that there's an

20    accident involving the release of formaldehyde, that would be

21    used to give physicians a context in which to determine the

22    degree to which they are dealing with an acutely toxic hazard.

23    Q.   So it would be an inappropriate application to use a medical

24    management guideline for a population that is at risk for

25    continuous exposure, that is, exposure that goes beyond 14 or

1   15 days --

2   A.   Right.

3   Q.   -- perhaps as long as a year?

4   A.   This was a level intended for upon entry and up to 3 hours

5   of exposure.

6           (WHEREUPON, at this point in the proceedings, the

7   Videotaped Deposition of Chris DeRosa concluded.)

8           MR. WATTS:  Judge, that's it.

9           THE COURT:  All right.  So the plaintiff rests on

10  rebuttal at this time?

11          MR. WATTS:  We to, subject to the same agreement with

12  respect to exhibits that have been referenced.

13          THE COURT:  Well, while the jury is here, do we want to

14  go ahead and make certain that we have all exhibits in so that

15  they know what is in and what is not?  Do we -- is there anything

16  else that needs to be put into evidence at this time?

17          MR. WATTS:  In terms of the things that have been

18  referenced during the trial and the agreement that we had, we

19  don't think we need to do that in front of the jury, and we have

20  been working on that together.

21          MR. GARRISON:  I agree with that.

22          THE COURT:  So it's mostly housekeeping-type stuff, and

23  we can take care of that later after we let the folks on the jury

24  go.

25          MR. WATTS:  Yes, sir.

1          THE COURT:  Let me explain to the jury where we are and

2    what we intend to do.  And I made reference to this yesterday.

3    What we would like to do is to -- well, what we have left to do

4    in the case now that the evidence has concluded is we still have

5    closing arguments of counsel, and each side will be allotted a

6    given amount of time to address you.  Plaintiff can reserve some

7    of that time for rebuttal.

8               Then, after that, I will charge the jury, in other

9    words, give you your instructions as to deliberations and the

10   substantive law that you are to apply when you deliberate.  And

11   the attorneys and I have been working together on putting

12   together the jury instructions for you.

13               That process will take -- I mean, it varies, but it

14   will generally take maybe a half hour or 45 minutes after closing

15   arguments.  So you still have, let's say -- what was the time

16   allotted on closing arguments, counsel?  What did we discuss?

17          MR. GARRISON:  45 minutes.

18          THE COURT:  45 minutes per side.  So that's 90 minutes,

19   plus me charging you.  If you were to start that process after

20   lunch, you would get the case and start deliberating in the case

21   late in the day, and I don't think it's fair to the parties to

22   have you start deliberating late on a Friday, when, obviously,

23   it's been a long week, and you get to the point where you would

24   like to go home at the end of the day.

25               Also, I think that we can have a better

1    presentation on the closing arguments if the attorneys work on

2    those over the weekend and we start fresh on Monday morning.

3                So, for today, we will go ahead and let you go.

4    Monday at 8:30, if you can be here at 8:30, we are going to do

5    the closing arguments.  You will hear from counsel as to what all

6    of this evidence shows in their opinion.  And, of course, closing

7    arguments, like opening statements, are not evidence.  They are

8    merely argument of counsel.

9                Then I will charge you with the instructions, and

10   then you can begin your deliberations.  That will happen late in

11   the morning on Monday.  Monday for lunch, assuming you're still

12   deliberating, lunch will be on us on Monday, and you can

13   deliberate through the lunch hour and for the balance of the day

14   until whatever time you need to reach a verdict in this case.

15               In the meantime, between now and the time you reach

16   your -- well, until the time you go back to deliberate, please do

17   not discuss the case with anyone, either amongst yourself or any

18   friends, relatives, anybody who knows you're serving on a jury.

19   Please do not discuss the case with anyone.  You really need the

20   benefit of closing arguments, and you really need the benefit of

21   the jury charge, the applicable law that you're going to be using

22   in your deliberations.

23               So please don't get ahead of us in that regard.

24   Please do not try to do any type of independent research about

25   anything you've heard during the course of the week.  I know it's

1    been a long week, and we've thrown a lot at you in terms of

2    witnesses and this being a parts per million and all of this

3    other stuff that you've heard, but please don't try to do any

4    independent research.

5             The attorneys will have the opportunity to address

6    you on that and explain to you all of what they believe they have

7    shown you.  So let's give them that chance.  Let's wait until we

8    know what the law is and we understand clearly, after I give you

9    the law, before we come to any conclusions in the case.

10            So I hope you have a nice, relaxing weekend.  We

11   will get back to work at 8:30 on Monday.

12            Thank you all, again.

13        (WHEREUPON, at this point in the proceedings, the jury

14   panel leaves the courtroom.)

15        THE COURT:  You may be seated.  First things first.  Do

16   we need to do anything on these exhibits now on the record, or is

17   this something you can take up with Pam at a later time?

18        MR. WATTS:  I think we can take it up with her at a

19   later time.  I mean, literally, I think the process is we're just

20   scrolling through the word exhibit and where it's found we're

21   coming up with a list, and then I think we're agreed on that.

22        MR. YOUNT:  And then I think we just go on the record

23   for 30 seconds and say, pursuant to the agreement of the parties,

24   boom, boom, boom are in evidence.

25        THE COURT:  Well, remember my instructions from

1  yesterday or earlier in the week about verifying what needs to be

2  in there for intended exhibits and what needs to be taken out.

3  So maybe as part of that process, if you all can do that before

4  you all leave today, we will try to make certain that we have a

5  court reporter available for whenever you do that, and Pam will

6  be available, too.  Maybe if you want to try to do that after

7  lunch, after we finish with this motion practice.  I'd like to

8  finish with everything else before you all deal with the exhibits

9  and complete your exercise with regard to the record.

10            MR. WATTS:  Okay.

11            THE COURT:  Let's put that aside then.

12            Motion practice, we had talked about and we

13  reserved our right, I believe, for defendants to move at the

14  conclusion of the plaintiff's case in chief.  We can take those

15  issues up now.  We can take up any other motions you would like

16  to make at this time.  So why don't we go ahead and get that

17  done.

18            MR. GARRISON:  Yes, sir.  RBD has some Rule 50 motions.

19            THE COURT:  Why don't you go ahead and take the podium.

20            MR. GARRISON:  Thanks, Your Honor.  Lyon Garrison on

21  behalf of Recreation By Design.  We have -- or

22  Recreation By Design has several Rule 50 motions.  I understand

23  it's already been a long morning.  I'll run through these

24  briefly.

25            The first motion is a Rule 50 motion regarding no

1    evidence of construction defects.  I think we have an agreement

2    on that from this morning.

3            MR. WATTS:  Would do.  We withdraw the allegation and

4    have agreed to take it out of the charge.

5            THE COURT:  That was my understanding, as well, and that

6    is one of the several provisions of the LPLA, so that component

7    of the plaintiff's claim is therefore dismissed with prejudice

8    pursuant to the Rule 50 motion.

9                Go ahead.

10           MR. GARRISON:  Yes, sir.  The second motion, Rule 50

11   motion regarding no future medical evidence -- or expenses.  We

12   also have a stipulation.

13           MR. WATTS:  We agree on that one as well, Your Honor.

14           THE COURT:  We'll grant that one as unopposed.  That's

15   to dismiss a claim for future medical expenses.

16           MR. GARRISON:  The third Recreation By Design Rule 50

17   motion is regarding future pain and suffering.  There was really

18   no evidence, testimony or otherwise, regarding Ms. Castanel's

19   future pain and suffering, and we move that the Court grant the

20   Rule 50 motion in this regard based on the complete lack of

21   evidence.

22           MR. WATTS:  And, Your Honor, in response, you have

23   plenty of evidence by way of her testimony, that of her daughter,

24   Dr. Gautreaux, that she had mental anguish and pain and suffering

25   that was worse after the trailer than before.

1          I think counsel's point this morning was is that

2    there was one line that said after the surgery that she's doing

3    better.  I don't think there was ever any testimony that says

4    she's doing better than she was before the surgery.  I think it

5    was better than she was right -- I mean, better than -- let me

6    strike that last sentence and start over.

7          I don't think there was any testimony that her line

8    that she was doing better was meant to suggest that she was doing

9    better than she was before she left the trailer.  It was better

10   than she was before she had the surgery.  And so I still think

11   that you have evidence of harm.

12         Now, I think that goes to the weight in terms of

13   how much in future, and we'll have to argue that carefully, but I

14   think there is evidence in the record to defeat the Rule 50

15   motion.

16         MR. GARRISON:  Your Honor, if I may respond briefly, I

17   know you don't want long-winded arguments.  Just the nature of

18   Mr. Watts' argument about better versus better than ever, clearly

19   there's no specific evidence that Ms. Castanel will have future

20   pain and suffering.  And it's -- the evidence by Dr. Gautreaux

21   was vague and nonspecific relative to any future pain and

22   suffering.

23         THE COURT:  Well, it's a tempting motion, but I think

24   the more prudent thing to do is to allow that question to be

25   posed to the jury, so I'm going to go ahead and deny that one.

1          MR. GARRISON:  Yes, sir.  The fourth Recreation
2   By Design Rule 50 motion, it's been briefed in motions in limine
3   very thoroughly.  I could stand up here and talk about specific
4   causation and general causation.  And rather than bore the Court
5   with that, I'll get to the point.
6          The Rule 50 motion that RBD is presenting is lack
7   of medical causation.  That comes down to the two experts that
8   the plaintiffs presented, Dr. Miller on general causation and
9   Dr. Gautreaux on specific causation.
10          I'll remind the Court of the impeachment evidence
11   on Dr. Miller, the case law.  I believe there were two or three
12   Fifth Circuit cases that found -- or excluded his testimony.
13   There was the Arizona case that excluded his testimony.  There
14   was a Baton Rouge district court case that excluded his
15   testimony.  Also, all the other impeachment evidence.
16          It's clear that Dr. Miller has a history of
17   offering opinions with inadequate basis or foundation, and we
18   believe he did that in this case.  When he testified at trial, he
19   didn't even know there was a test result for the trailer.  And
20   his testimony was unpersuasive given his credibility issues, so
21   the plaintiffs lack general causation to prove up medical
22   causation in this case.
23          With respect to specific causation, Dr. Gautreaux's
24   testimony speaks for itself.  Dr. Gautreaux offered no specific
25   testimony on the increase in complaints by Ms. Castanel in 2010

1   with respect to her sinuses.  Dr. Gautreaux testified that

2   Ms. Castanel had the same diagnosis.  This was his deposition in

3   January of 2010.  He testified that the severity of

4   Ms. Castanel's complaints had not changed.

5                Dr. Gautreaux did not specifically state that

6   Ms. Castanel's increase in visits to his office in 2009 and 2010

7   were related to living in a FEMA trailer.  In fact, Dr. Gautreaux

8   testified that he didn't have sufficient knowledge about

9   formaldehyde to testify about any causal connection between

10  Ms. Castanel's complaints and her time in the FEMA trailer.

11               Also, the fact that Ms. Castanel left the trailer

12  in 2007, and she had the surgery on March 31, 2010, I believe

13  that's significant.  Dr. Gautreaux could offer no testimony

14  regarding the causal connection between the nasal procedure and

15  the time that Ms. Castanel was in the trailer.

16               Considering Dr. Gautreaux's testimony and

17  Dr. Miller's testimony along with Dr. Miller's history of

18  providing opinions with an insufficient basis, RBD moves for a

19  Rule 50 motion on medical causation.

20               THE COURT:  Okay.

21               MR. WATTS:  May I respond, Your Honor?

22               THE COURT:  Sure.  Primarily, three points.  Number one,

23  I think counsel in his argument got general causation and

24  specific causation mixed up, but we think we have ample evidence

25  of general causation from the standpoint of not only Dr. Miller

1   but Dr. Williams, Dr. McGwin's study, the admissions I got out of

2   Wedner, these kinds of things.

3            With respect to specific causation, as we said in

4   pretrial, Miller testified that formaldehyde exacerbated her

5   preexisting sinusitis, and Gautreaux said that when the problems

6   got worse it necessitated the surgery, and that's the link that

7   we have with respect to that.  You also have admissions from

8   Dr. Wedner with respect to formaldehyde will exacerbate rhinitis

9   and that you can have pain from that, so that would be an

10  addition.

11           MR. GARRISON:  Well, perhaps I --

12           MR. WATTS:  I'm sorry, one other thing.

13           Judge, there is no case that I am aware of, and as

14  the Court may have figured out, I try a lot of cases, and these

15  experts are put up time after time after time.  And in the last

16  15 years, *Daubert* motions have become de rigueur.  It's like

17  almost filing an answer now.  And the fact that somebody for

18  various different reasons has been stricken in whole or in part

19  four times over 25 years is not a disqualification in any way,

20  shape, form or fashion.  Most experts that I've hired or

21  cross-examined have had such a case where maybe a lawyer that we

22  didn't know didn't get them a piece of information in support or

23  didn't fund a test or this kind of thing.  That's not any

24  specific indication of the unreliability of this man's

25  methodology in this case.

 1          MR. GARRISON:  Perhaps, in talking about Dr. Gautreaux

 2   and Dr. Miller, I talked about general causation and specific

 3   causation.  Certainly, I understand that general causation deals

 4   with whether the substance can cause certain illnesses, and

 5   specific causation can -- is a -- the cause, in fact, of a

 6   specific illness of a plaintiff.

 7              But, in this case, when you look at Miller and you

 8   look at Gautreaux, and you look at their testimony, I believe

 9   it's clear that the plaintiff fails to meet the burden of proof

10   on medical causation.

11              And with respect to Dr. Miller, I think his

12   methodology is certainly an issue, especially in this case, with

13   his history and the facts that he failed to rely on to render an

14   opinion in this case.

15          THE COURT:  All right.  Let me start with the comments

16   you make about Dr. Miller, because we did have a pretrial motion

17   with regard to his testimony to exclude him as an expert in this

18   case.  And I did review the material prior to trial, the material

19   that counsel had indicated would be covered by way of

20   impeachment.

21              There is no question that he is an expert in the

22   field that he was offered, and I think I said that at the time I

23   accepted him as an expert.

24              In terms of his persuasiveness, and I think

25   Mr. Garrison just referred to his testimony as unpersuasive and

1  that he lacked credibility, those two terms, I think, by

2  definition are terms that the finder of fact should -- they

3  operate in this case because they are utilized by the finder of

4  fact.  In other words, an evaluation of persuasiveness, how

5  persuasive something is or isn't, is something for the finder of

6  fact.  Likewise, credibility is something that is the province of

7  the jury.

8          Regardless of whether I think he's persuasive or

9  not or whether I think he's credible or not isn't the issue on

10  this motion.  So I don't want to substitute my belief as to him

11  or any other witness, expert or lay witness, in terms of

12  credibility.  That's why we have the jury box built here in the

13  courtroom.

14          So I'm not convinced that I should discard his

15  opinion as a matter of law at this juncture in determining

16  whether or not plaintiff has satisfied the burden in this case.

17          I did allow counsel to spend time on Dr. Miller's

18  previous history as a testifying expert because it goes directly

19  to the issue of whether he's persuasive in this case.  We know

20  that experts are excluded, their opinions are excluded for a

21  variety of reasons relating to methodology, relating to

22  relevance.

23          Those opinions are excluded for a variety of

24  reasons, and I don't think we can extrapolate that an expert's

25  opinion has been excluded once, twice or a dozen times over a

1    given period of time in order to satisfy the desire to exclude

2    the expert opinion in this case, because we start out with the

3    fact that he is an expert and I accepted him as an expert, a

4    Board-certified expert in the fields that he was offered in.

5            So, basically what we're left with is whether his

6    opinion in this case was supported by adequate methodology, as

7    opposed to another case where -- or other cases, which counsel

8    brought out, where his methodology was considered inadequate or,

9    as Mr. Garrison just pointed out, his analysis failed to take

10   into account some critical component of the case.

11           In this particular case, I understand the arguments

12   that the defendant has made.  I think they were certainly good

13   enough arguments to go toward cross-examination, and so that's

14   where I placed them, within the realm of cross-examination.

15           Having said that, and I'm not really -- since the

16   attack on Dr. Gautreaux on cross-examination was more along the

17   lines of what he didn't know or what was outside of his

18   expertise, I mean, he testified basically as a treating

19   physician.  She had these symptoms.  He, in his professional

20   opinion, found that a course of action was advisable, conferred

21   with the patient and agreed to follow a course of action,

22   including medication all the way up to the point of a surgical

23   procedure.

24           So I'm going to deny the motion.  I think that

25   while the arguments that you make are strong, they are better

1    made for closing argument.  Everything that you have said here

2    sounds like grist for the mill of closing argument so I'm going

3    to deny the motion relative to causation.

4         MR. GARRISON:  Yes, sir.  Another Rule 50 motion from

5    Recreation By Design that's similar.  This is a Rule 50 motion

6    regarding the surgery claims.  And that relates back to the

7    analysis with Dr. Miller and Dr. Gautreaux.  But, specifically,

8    there is no medical evidence from this trial that indicates that

9    Ms. Castanel's surgery on March 31, 2010, is related to

10   formaldehyde or living in a FEMA trailer.

11        And I know the plaintiff's attorneys rely on the

12   combination of Dr. Miller and Dr. Gautreaux to somehow relate the

13   causal connection between the FEMA trailer and an exacerbation of

14   sinusitis; but, with respect to surgery, there is no specific

15   evidence, testimony or otherwise, that the surgery was related to

16   exposure to formaldehyde.

17        MR. WATTS:  Your Honor, as we argued in pretrial, again,

18   we reiterate the comments that were just made.  Bottom line is,

19   is you have an opinion that was admitted into evidence from

20   Dr. Miller that formaldehyde exposure from the travel trailer

21   exacerbated her preexisting rhinosinusitis, Dr. Gautreaux says

22   that the worsening condition of her rhinosinusitis is the reason

23   that he did the surgery, and that links it up.

24        THE COURT:  I think we did talk about this at the

25   pretrial conference, and there was motion practice on this prior

1    to trial.  So I'm going to deny that motion, as well.

2         MR. GARRISON:  Yes, sir.  Recreation By Design's next

3    Rule 50 motion, it's a Rule 50 motion on claims for increased

4    risk of cancer.  This is not the fear of cancer.  It's a Rule 50

5    motion on claims for increased risk of cancer.  And briefly,

6    there is absolutely no evidence, medical or otherwise, to suggest

7    that the plaintiff will likely get cancer.

8         MR. WATTS:  Judge, I didn't know that was in the

9    petition.  We're claiming fear of cancer.

10        THE COURT:  Yes, I understood the claim to be fear of

11   cancer as a component of the mental anguish claims, so to the

12   extent that there is such a claim, I would go ahead and grant it.

13        MR. WEINSTOCK:  Your Honor, I do want to make sure this

14   gets addressed, because, if you'll recall, during Dr. Williams'

15   testimony I had an objection.  Mr. Reich said, we're arguing

16   increased risk of cancer, and I just want to make sure that's not

17   part of the case going forward.

18        MR. REICH:  It's just an evidentiary foundation.

19        MR. WATTS:  I mean, it's a piece of evidence that

20   relates to her fear of cancer.

21        THE COURT:  Right.  Right, I agree.  I'll grant that

22   motion to the extent we need it, but I think we're on the same

23   page.

24        MR. GARRISON:  And I actually looked at the complaint,

25   Judge, but the reason I brought that up is for the reasons Andy

1    mentioned.  We just wanted to be sure.

2            THE COURT:  Sure.  Right.  What else?

3            MR. GARRISON:  The next Rule 50 motion is on fear of

4    cancer, the general claim.  And that's been briefed throughout

5    the litigation, motions in limine, what have you.  The Court

6    knows all the issues.

7            You know, the issue is whether the fear of cancer

8    is the result of some present injury.  And I'll submit to the

9    Court there was very, very little evidence on Ms. Castanel's fear

10   of cancer.  In fact, I handled Ms. Castanel on cross, and I

11   didn't ask her any questions about fear of cancer because she

12   didn't offer any testimony or any significant testimony on fear

13   of cancer; so, there was no real testimony there.

14           Dr. Miller's testimony was vague and nonspecific,

15   and, also, there was no testimony by a psychologist or a

16   psychiatrist to conclude -- there is really no significant or no

17   real evidence of a fear of cancer that Ms. Castanel had or has.

18           THE COURT:  Well, I mean, is it necessary for her to

19   call a psychologist, or is that something that, assuming there is

20   an evidentiary basis for that fear -- I mean, she is a layperson

21   and we have a jury of lay people.  Could they not reasonably

22   appreciate, as lay people who are being asked to consider the

23   circumstances that Ms. Castanel was in, could they not appreciate

24   a reasonable fear of cancer?

25           MR. GARRISON:  You know, I was pointing out that the

1    plaintiffs didn't call a psychologist or psychiatrist.  I think

2    that would probably help their burden of proof.  But,

3    notwithstanding the lack of a psychologist or a psychiatrist,

4    there is just a real lack of evidence about a fear of cancer in

5    this case, and I think that warrants the granting of this Rule 50

6    motion.

7           THE COURT:  All right.  Counsel.

8           MR. WATTS:  Four pieces of evidence that I can think of

9    off the top of my head.  When he says Ms. Castanel didn't offer

10   significant testimony, the fact that I choose to put my plaintiff

11   on for 15 minutes, once I ask a question and she gives an answer

12   on a subject, that is testimony that enables it to go to the

13   jury.  It was unobjected to testimony about her fear of cancer.

14          You also have her daughter, who was the first

15   witness in the case, that testified that she has a fear of cancer

16   and has expressed it to her.

17          You have testimony with respect to that from

18   Dr. Miller.  You even have a line of testimony from Dr. Bower,

19   who they played, with respect to fear of cancer.

20          So there is evidence in the case with respect to

21   her having a fear of cancer, and, of course, there is ample

22   evidence with respect to there being a good foundation for it, if

23   you will.

24          MR. GARRISON:  I did comment on Dr. Miller's testimony

25   as vague and nonspecific.  The testimony by Dr. Bowers is

1   specifically related to when Ms. Castanel had a mammogram, and

2   that's in no way connected to this case of living in a FEMA

3   trailer.  In fact, I believe Mr. Yount asked Dr. Miller if that

4   would be related, and he said no.  But there is no evidence to

5   link up the mammogram with the fear of cancer or any connection

6   to the FEMA trailer.

7              With respect to the daughter, a passing comment

8   about a conversation with her mother and a few comments by

9   Ms. Castanel, I just don't believe that it meets the level of

10  proof necessary to sustain a fear of cancer claim.

11             THE COURT:  I'm going to allow that one to go to the

12  jury, as well, and deny the motions.

13             MR. GARRISON:  Finally, this is a Rule 50 motion on

14  failure to warn.  Based on the plaintiff's testimony, the

15  plaintiff testified that she did not read warnings on household

16  products, cleansers, warnings associated with appliances and

17  other manuals that she got or received; so, on that basis, RBD

18  files this Rule 50 motion.

19             THE COURT:  But isn't that -- doesn't that go to the --

20  it seems to me a component of that is an adequacy of the warning

21  because the allegation and the evidence elicited -- the testimony

22  elicited was to the effect that not only did she not receive a

23  written warning of the type -- and they put up a -- the type that

24  the mobile homes had, not only -- as well as the type that was on

25  the documentation sent with product, but there was also some line

1    of questioning about whether she received a verbal or an oral

2    warning at the time she was assigned to that particular trailer.

3         MR. GARRISON:  Yes, sir, there was some issue of whether

4    she received a verbal warning --

5         THE COURT:  I mean, I guess my point -- and not to

6    interrupt you, but I think my point is, is that I do recall her

7    testimony that she did not typically read the warnings on the

8    cleanser cans and things like that, but I think we're talking

9    about something else in terms of the claim for failure to warn in

10   this case.

11        MR. GARRISON:  Well, I believe there is some case law in

12   *McCarthy versus Danek Medical*, 65 F.Supp.2d 410.  And it states,

13   "In a failure to warn action, under Louisiana products liability

14   law a plaintiff must establish a connection between a

15   manufacturer's omission and the damage suffered."

16             And the point being here that with Ms. Castanel not

17   reading warnings or admitting that she doesn't read warnings, I

18   think Ms. Castanel would have a difficulty establishing the

19   connection between her alleged injuries and RBD's omission to

20   provide a warning.

21        MR. WATTS:  Judge, in my direct examination, there were

22   a series of three questions, and we wrote it up on the board, if

23   you had received this warning, what would you have done?  I would

24   have moved out.  If you had been told in the first year, what

25   would you have done?  I'd have gotten out of there.  These kinds

1  of things.  Those are the causal connections that establish it.

2  We're not confined to an owner's manual that she says she didn't

3  get.

4          THE COURT:  Yes, I think there's enough testimony here

5  for the jury to either agree or disagree that she would have

6  taken some action in response to a warning.  And if you -- you're

7  certainly free to argue to the jury that this person, this

8  plaintiff in this case who's complaining about an inadequate or a

9  nonexistent warning doesn't heed warnings generally.  That's the

10 nature of the argument, but I think that in this case she's

11 testified that with regard to this particular product, she would

12 have heeded the warning.

13         So I think that there is a colorable claim here

14 that the jury needs to consider and determine and can do so in

15 light of the evidence that's been offered that Mr. Watts just

16 highlighted, as well as the closing argument, where I know you

17 all will highlight the testimony that's favorable to your

18 position.  So I'm going to deny that motion, as well.

19         MR. GARRISON:  Yes, sir.

20         THE COURT:  All right.

21         MR. YOUNT:  Judge, just because of the timing here, we

22 would offer all these Rule 50 motions at the close of plaintiff's

23 case and then reurge them all at the close of all evidence.

24         MR. WATTS:  I restate my stipulation that it's as if

25 they did it at the right time, and we'll incorporate our

1    responses as if they were made at that time and reiterate them

2    now as if they're made now.

3         THE COURT:  Right.  That's my understanding, so I think

4    the record is clear.

5         MR. WATTS:  Your Honor, we have two.

6         The first Rule 50 motion is the sophisticated

7    purchaser defense.  And I'll just throw myself at the Court and

8    tell you these are the same arguments I made at the close of

9    Wright, and I just want to preserve the issue.  And that is, is

10   that we do not believe that the law is sufficient that if a

11   failure to warn with respect to FEMA or Morgan entitles somebody

12   to the sophisticated purchaser defense.

13        In *Walker versus Preformed Line Products*, "the duty

14   of care extends not only to a purchaser in the distribute chain

15   but also to the ultimate user of the product."  And in the

16   Fifth Circuit, and I've given the Court this case before, the

17   *Mozeke versus International Paper* case, the ultimate user must be

18   warned.  And, therefore, we do not think that the sophisticated

19   purchaser defense applies in the case and would move for a Rule

20   50 dismissal of that affirmative defense.

21        THE COURT:  All right.  Counsel.

22        MR. YOUNT:  Thank you, Your Honor.  This, I understand,

23   has been briefed significantly in all of the other cases, but the

24   cases upon which we rely *Mozeke*, M-O-Z-E-K-E, *versus*

25   *International Paper*, *Davis versus Avondale Industries*, and

1    *Lambert versus BP Products*.  And those citations are contained

2    within the version of jury charges that the Court has previously

3    distributed.

4              Basically, the testimony in evidence is undisputed

5    that this transaction was RBD to Morgan and Morgan to FEMA.

6    There is ample evidence of both, the FEMA representative who

7    testified earlier today that it was FEMA's responsibility as the

8    user of this product to then act as a liaison between the product

9    and the end user itself.

10             And I think, based upon the case law, that

11   testimony and the testimony of Mr. Rush in connection with the

12   relationship between he and Morgan and Morgan and FEMA, that the

13   sophisticated purchaser charge is appropriate, and we would

14   respectfully submit that that motion be denied.

15        THE COURT:  This has come up in the prior matters.

16   Mr. Watts, do you want to say something?

17        MR. WATTS:  No, no.

18        THE COURT:  It's come up in the prior matters.  And in

19   this particular case, this case is unique from the prior matters

20   in that we have Morgan Building and Spas, which I think the

21   evidence showed was a retailer or someone who was sophisticated

22   in the business of retailing RV's and a number of other products

23   of a similar nature, so I think that we have not only FEMA, which

24   has been the traditional argument, but we also have Morgan

25   Building and Spas, who is interposed in this transaction.  So I'm

1 going to deny the motion relative to the sophisticated purchaser

2 doctrine.

3          MR. WATTS:  And, Your Honor, I apologize, I said I had

4 two.  I actually have three.  The second one is, as I mentioned

5 in the charge conference, we move under Rule 50 for an order

6 dismissing the contractor for destruction or deterioration of the

7 work under Section 9:2771 of the Louisiana Code.  The Code says,

8 "A contractor is not liable for the destruction or deterioration

9 of or any defects in the any work construction," and it goes on,

10 "if he constructed," and it goes on, "the work according to plans

11 or specifications furnished to him which he did not make or cause

12 to be made and if the destruction, deterioration or defect was

13 due to any fault or insufficiency of the plans or

14 specifications."

15          The problem is, is that under the evidence that we

16 have in this case, Rec By Design had almost virtual complete

17 control over the product.  The testimony is, is that he was given

18 no written specifications.  There was general oral conversation,

19 and he wrote down various things.  These specifications have

20 nothing to do with the issues in the case.  They are so general

21 as to be no specifications.

22          Thirdly, you have independent evidence that only

23 Rec By Design designed the trailer.  You have independent

24 evidence that it was a, quote, unique design, a design for

25 Morgan.  And, therefore, because RBD came up with the design

1    specifications and unique design and chose it, RBD is not

2    eligible for immunity under Louisiana Revised Statute.

3            And we would also provide the Court with *Pittman*

4    *Construction Company versus Housing Authority of New Orleans*.   In

5    that case, it's stated that immunity only extends where the

6    implicit purpose for the rationale is met, and that's where the

7    contract did not design the product built.

8            And under that case, and I realize it's a state

9    court case, but I guess we're here in every proceeding, we think

10   that's the controlling law.  They designed the product, and

11   therefore they are not entitled to some immunity based on some

12   vague conversation that said, hey, we want a bunch of trailers

13   that are about this big.

14           And we would hand that case to Amanda and the Court

15   for your consideration.

16           THE COURT:  Mr. Yount.

17           MR. YOUNT:  Thank you, Judge.  In the Louisiana Third

18   Circuit case, 1998 decision, *Griffin versus International*

19   *Insurance Company*, the Court plainly held that plans and

20   specifications which would implicate 9:2771 can be orally and do

21   not have to be in writing.

22           That court was citing the Louisiana Second Circuit

23   case, 1990 case, entitled *Winford Company, Inc., versus Webster*

24   *Gravel*, which is at 571 So.2d 802.

25           The testimony of Mr. Rush is the relevant testimony

1    in connection with what happened here, what happened with respect

2    to the designing of this trailer.  And Your Honor also has

3    received into evidence the handwritten notes.  I don't know the

4    exhibit number offhand, but I know that you asked for it earlier.

5              I submit that based upon Mr. Rush's testimony,

6    wherein he testified not only as to dimensions and the fact that

7    it needed to be a -- and this is not the correct term, but a

8    pseudo handicapped trailer, and, more importantly, the

9    specification by Morgan which was received by Morgan from FEMA,

10   that the trailer be, quote, industry standard.

11             Now, in addition to Mr. Rush's testimony on that,

12   we heard from the FEMA representative this morning, Mr. Garratt,

13   and he testified that, yes, that's all we wanted.  We wanted

14   industry standard.  That's what we required.  That was relayed to

15   Morgan.  Morgan, in turn, relayed that information to RBD.

16             So it's not just, hey, guys, we need some trailers

17   this dimension; it's, hey guys, we need trailers, we need them to

18   be this dimension, we need them to be almost handicapped

19   accessible, not completely handicapped accessible, and we need

20   them to be, quote, industry standard.

21             The reason, as Your Honor knows, that that's so

22   important here is because the alleged design defect is

23   inextricably intertwined with this industry standard requirement.

24   So it's not like it's a specification that is unrelated to the

25   allegedly design defect.  On the contrary, the very alleged

1    design defect is the one, the one specification at issue here.

2              At a minimum, it's a jury question as to whether

3    that, quote, industry specification was a part, a material part

4    of the contract or of the plans and specifications here.

5              Lastly, Mr. Rush testified, I believe it was the

6    second time he testified, but he did testify, nevertheless, that

7    he brought the trailer down here, they built a prototype, they

8    brought it down here, and Morgan, in turn, approved it.  And that

9    goes to the contract offer and acceptance.  You have an oral

10   design or plan or specification, and then the owner approves it.

11   And I think that under 9:2771 that does fit within the realm of

12   that statute.  At a minimum, we believe it's a jury question as

13   to whether there were adequate plans and specifications under the

14   statute.

15        MR. WATTS:  Judge, I think counsel misunderstood my

16   point about this oral communication.  I'm not saying that because

17   it's oral versus in writing it doesn't meet it.  What I'm saying

18   is, is that it was a vague collaboration that he participated in,

19   and he caused these plans to be made in the course of that

20   conversation.

21             And then, secondly, of course, he made the design

22   of the product which, under the case that we provided the Court,

23   *Pittman Construction versus the Housing Authority*, if you

24   designed the product that's built, then the implicit rationale of

25   the statute does not apply and it should not apply.

1    THE COURT:  All right.  I spent a lot of time on this

2  since we met this morning looking at the statute itself and asked

3  you all to identify and pull for me the particular exhibit.  And

4  the number of it escapes me, but I have the exhibit here that I

5  think we're all talking about, which is a written version of what

6  Mr. Rush understood his instructions to be from Morgan,

7  all right.

8          As I understood the testimony, there was an oral

9  conversation.  At no point was there a written specification that

10  was either handed down from FEMA to Morgan or from Morgan to RBD.

11  The communications, rather, were oral in terms of an order for X

12  number of trailers, a few thousand trailers, some of which were

13  to be outfitted so as to accommodate a -- well, it says here,

14  "handicap travel trailer specs," is what Mr. Rush put on this

15  document, this exhibit.  So some of those units were to be

16  sufficient to handle a handicapped person.

17          And I think his testimony related to the width of

18  the doorways and certain issues of maneuverability insofar as the

19  layout of the trailer was concerned and the ability to access

20  those areas of the trailer by someone who was not as ambulatory

21  than the typical purchaser or user.

22          I agree with you and the case law clearly says that

23  the specifications do not need to be in writing.  They can be

24  oral.  That's well settled, or seemingly well settled in

25  Louisiana law.  The only jurisprudence on it establishes that

1  proposition.

2              So we get into what is a certification and what

3  would constitute sufficient specifications.  And I have the

4  statute here, as well.  Just one second here.

5              And I'll highlight for you the provision that

6  concerns me about the statutes's application in this case.  It

7  says -- and I'm going to skip through here and highlight only the

8  parts that are relevant -- no contractor shall be liable for

9  destruction or deterioration of or defects in any work

10 constructed by him if he constructed the work according to plans

11 or specifications furnished to him which he did not make or cause

12 to be made.  That's one provision.

13             And the second part that concerns me is, and if the

14 destruction, deterioration or defect was due to any fault or

15 insufficiency of the plans or specifications.

16             And then there is another sentence that involves

17 time of delivery or acceptance.

18             The first issue is whether or not RBD was involved

19 in -- or I should say made or caused to be made a specification.

20 And the second issue which, to me, is the more important one or

21 the more -- the one of more concern to me, is whether or not the

22 defect was due to any fault or insufficiency of the plans or

23 specifications.

24             And like most statutes, this one probably could

25 have been written better or more clear, but the way I read that

1    provision is that the defect has to relate to a specification and

2    the product as built to meet that specification.

3            This statute -- and I'm not -- I don't have in

4    front of me all of the legislative history, but it's my

5    understanding that the statute was originally written relative to

6    construction of homes and commercial construction of immovable

7    property such that if a contractor is given plans and

8    specifications, presumably drawn up by an architect or specified

9    by a homeowner that they want X, Y and Z as part of the

10   construction, they cannot later come back later and claim that

11   the home is defective if the contractor put X, Y, Z in the home,

12   or if the architect called for the use of X, Y, Z in the

13   construction of a building.

14           I think the statute can be applied in circumstances

15   like this, but the facts of this case and the specifications that

16   we have here are generalized in nature.  The purpose of the

17   statute here, I'm shown here in the Louisiana Revised Statute, is

18   to relieve the contractor of liability for defects in materials

19   not manufactured by him when he is unaware of such defects.  And

20   that's the *New Orleans Unity Society versus Standard Roofing

21   Company*.  In other words, I guess, the incorporation of specified

22   products into a construction.  I mean, that's the way I read

23   that.

24           My question when I was considering this earlier

25   this morning is how specific do specifications need to be?  I

1    mean, by definition, we call them specifications.  They need to

2    be specific.

3              And in this instance, we have one, two, three --

4    let's see, that's five -- 14, we have 14 bullet points that

5    Mr. Rush put down on paper following his oral communication.

6    Most of those relate to the handicap feature of the unit, such as

7    wheelchair accessible entry door, wheelchair accessible interior

8    doors, handicap accessible commode, handicap accessible

9    tub/shower, and so on.

10             If Morgan had said, we simply want an

11   eight-by-33-foot travel trailer with a slide-out, would that be

12   sufficient to invoke the protection of the statute?  I think the

13   answer to that is no.  If that was the only specification they

14   gave, the answer would be no.

15             If they provided three of these, would it be

16   sufficient to invoke the protection of the statute?  Well, if one

17   of them was, we want you to use nonLFE wood or a particular type

18   of wood, then it would be; but, generally, no.  If any of these

19   three of these 14 were listed, I don't think so.

20             There is no specification in here that relates to

21   the type of material incorporated into the product.  We just have

22   a vague general notion of industry standard, which I think is

23   understood.  I think -- I think, rather, a specification would

24   have been, you don't have to satisfy industry standard.  This is

25   an emergency.  We're looking for housing.  Just give us what you

1   can give us.

2           Industry standard, I don't think, would qualify

3   under this statute as a specification for which a defect would be

4   forgiven and which the contractor would be provided immunity.

5           So I'm going to grant the motion.  If you want to

6   revisit this on pretrial motion, fine, but I'm going to grant the

7   motion to the extent that the instruction to the jury, which was

8   all of -- and I'll read it to you since I am not going to give

9   it, so that we all know what the stakes are here --

10          Did we include this in here, Amanda?

11          THE CLERK:  Yes, it's on page 24.

12          THE COURT:  All right.  The purpose of the motion, for

13  purposes of the jury instructions, is that the instruction was,

14  "A contractor who performs work in conformity with plans and

15  specifications provided by another party cannot be held liable to

16  any person injured as a result of that work unless the contractor

17  had a justifiable reason to believe that following the plans and

18  specifications would create a hazardous condition.  Therefore, if

19  you find that RBD is a contractor that performed its work in

20  accordance with the plans and/or specifications furnished to it,

21  then you must return a verdict in favor of RBD."

22          That is the instruction that arises out of the

23  statute, but I don't think that it necessarily applies in this

24  case.  In fact, I don't think that we have a sufficient factual

25  basis to include it at this point.

1             So I'm going to grant the motion, and I'm going to

2    exclude the jury instruction that I just read based upon our

3    conversation this morning and the additional research that you

4    all and I have had a chance to do and a careful reading of the

5    statute along the lines that I just outlined here on the record.

6             MR. WATTS:  Your Honor, for the record, we move under

7    Rule 50 on the government contractor defense, but I believe

8    that's agreed to.

9             MR. YOUNT:  No objection.

10            THE COURT:  So ordered.

11            MR. WATTS:  And then the final one is the issue as to

12   Shaw.  And here -- and I've read the transcript, again, with

13   respect to what happened, and I guess you could loop this into

14   two arguments.  I think the uncontroverted evidence, and this all

15   comes from Mr. Compeau, Shaw was only responsible for the

16   maintenance of this unit until June the 1st.

17            You have evidence with respect to the date of the

18   setup.  The date of the move-in is March the 11th.  A monthly

19   inspection, according to contract, occurred on the 7th of April.

20   A monthly inspection, according to contract, occurred on the 16th

21   of May.  An AC leak was noted.  It was fixed the next day on the

22   17.  And between May 17 and June 1, there were no calls with

23   respect to any air conditioning problem; and, therefore, when the

24   Shaw contract ends on June 1, I don't think there is any evidence

25   of negligence or proximate cause with respect to the air

1    conditioning maintenance issue.

2              The second part of it is this, and the Court

3    expressed some indication with respect to was there testimony

4    that he didn't take her through and educate her about all of the

5    issues.

6              I think the problem with that is this.  It's one of

7    time.  And, that is, is on March the 11th -- in other words, it's

8    a proximate cause issue.  On March the 11th of 2006, when she

9    moved into the trailer, if the allegation was is that Shaw is

10   negligent because they failed to take her through everything in

11   the trailer, there is no proximate cause with respect to the

12   failure, if any, to give that tour of the trailer.

13         THE COURT:  Well, it wasn't so much the tour as it was

14   the specific warning.

15         MR. WATTS:  Okay.  Well, here's the problem --

16         THE COURT:  Her testimony was that someone was there

17   with the keys, and they basically gave her the keys, and few

18   words were spoken before the person drove off.

19         MR. WATTS:  Exactly.  And here is the problem with it.

20   The only evidence that we have in this case is from Mr. Compeau

21   that as of this time they had received no complaints with respect

22   to the formaldehyde issue.  The only issue -- the only evidence

23   that you have in the case with respect to time is a subsequent

24   deposition where 10 days after she moves in, somebody from FEMA

25   sends an e-mail out to a variety of different contractors saying,

1    hey, we've heard something about this, what are you going to do

2    to lower the formaldehyde level.  And I think nine days after

3    that, Shaw writes back and says, we're going to initiate an

4    airout program, which they did.

5             Any airout program that was initiated after she

6    moved in bears no proximate cause to the failure to warn her

7    about something that there is no evidence in this case they knew

8    anything about at that point.

9         THE COURT:  Well, but we have had as a prominent feature

10   of not only this case but the others the term "a continuing duty

11   to warn," which has been argued, I think, with regard to all of

12   the defendants in the other cases.  And, of course, this case we

13   only have one defendant, but certainly that would -- wouldn't

14   that applicable to Shaw that they had a continuing duty to warn?

15            Even after their contract expired, if they come to

16   know that there is a hazardous circumstance, would they not,

17   according to -- if a defendant -- in this case, it's the

18   defendant making the argument, unlike in the other cases, but

19   wouldn't there be a continuing duty of Shaw to warn that they

20   have set up a trailer, it contains a hazardous substance, they

21   have provided the keys and, thus, access to an inhabitant?

22        MR. WATTS:  I thought that where we ended up in the

23   Wright case is, is that you had concluded that there was no such

24   continuing duty, and that the duty stopped with respect to Shaw

25   as of the date of the end of their contract.

1        And so I don't think there is a continuing duty

2   when the contract specifically said their duties ended on

3   June the 1st, but I get the frame of argument that the Court is

4   bringing up.  And if the legal issue is their continuing duty to

5   warn after your contract ends for a maintenance project, in this

6   case I think that the gravamen of our motion is, is no, for two

7   reasons.  And one of them is that I think that that determination

8   had been made before; and, two, with respect to the specific

9   facts of this case, you have no information that Shaw had any

10  more information about this.

11        THE COURT:  Counsel.

12        MR. YOUNT:  Judge, briefly.  In addition to the matters

13  that Your Honor pointed out, there was also the testimony of

14  Dr. Laughery who testified that he is in favor of and, in fact,

15  in his opinion it is negligent for there not to be this

16  tripartite warning system where not only there needs to be a

17  warning from the manufacturer itself, but that there needs to be

18  this one-on-one interaction, particularly in a situation where we

19  don't know if somebody can read, we don't know their educational

20  level, that there needs to be a one-on-one interaction

21  face-to-face warning system.

22        The testimony of both the FEMA representatives and

23  the Shaw representatives are clear.  And that's Mr. Compeau and

24  Mr. Lapinski and David Garratt all clearly testified that that

25  was Shaw's responsibility.

1    On cross-examination Ms. Castanel admitted that she

2   sued Shaw, and the allegations of the complaint allege that she

3   felt that they were, therefore, negligent.  So, you add the

4   combination of Dr. Laughery, the undisputed testimony that

5   there -- well, I don't know if it's disputed or not, but

6   certainly Ms. Castanel said that nobody did anything with respect

7   to her.  Certainly, there is sufficient evidence to have a

8   failure of the duty to warn, whether it's ongoing or not,

9   certainly when the keys were turned over.

10    MR. WATTS:  Again, I think the problem is, is that where

11  does the duty arise from?  And that is, is that, you know, Judge

12  Kurt Engelhardt did not have a duty to warn about formaldehyde

13  because you had no role in this.  The manufacturer clearly under

14  the law has a duty arising from the dangers of its product.

15    Shaw, on the other hand, its only duty arises by

16  virtue of what it took on in the contract, and so that frames the

17  time of the duty, in answer to your question about a continuing

18  duty, and, more importantly, the duty is defined by the contract.

19  And he says that everybody testified that Shaw was the one

20  responsible for the one-on-one interactions.  Here is the

21  problem.  The testimony was specific to maintenance, number one;

22  number two, a duty with respect to what they know.  And the only

23  evidence that you have in this case is that there were no

24  instances reported to Shaw as of May the 11th, and that they knew

25  nothing as of that point in time.  Anything after that with

1  respect to that ends on June the 1st, and the only case -- or the

2  only evidence that you have in this case with respect to any

3  knowledge is an anecdotal e-mail, we've heard something about

4  formaldehyde, and the question is what are you all going to do by

5  way of setup or something to prevent this.  And then they

6  establish a policy, but that policy post-dates the setup of this

7  date and, therefore, can't be a proximate cause.

8          THE COURT:  Well, but isn't it a component of your

9  negligence claim against Shaw, to the extent that there was one,

10  that Shaw knew or should have known of a hazardous condition, but

11  nonetheless allowed the plaintiff to enter on her premises.  In

12  fact, facilitated the entry on the premises.  And, even if they

13  didn't know, they should have known shortly thereafter or -- it

14  seems to me that we kind of meet ourselves coming and going on

15  this.

16          MR. WATTS:  Let me respond to that.

17          THE COURT:  Well, the other comment that I would make is

18  that we did spend considerable time establishing that

19  formaldehyde, the principles of formaldehyde as an irritant or

20  even as a carcinogen were not discovered after she was -- she was

21  afforded an opportunity to live in a trailer.  I mean, we've

22  spent a lot of time talking about all of the different studies

23  and benchmarks and probable carcinogen or known carcinogen, but

24  it was not discovered as -- it wasn't something that was

25  discovered after she lived in the trailer.

1   MR. WATTS:  I think that, to answer both of your

2   questions, with respect to the allegations that were made, I

3   agree that allegations were made, and if the law of the case is

4   anybody we sued we could get to the jury with, I could save a lot

5   of money not bringing experts, not bringing proof.  I think it's

6   pleading and proof --

7   THE COURT:  Well, no.  I mean, clearly that's not the

8   case.

9   MR. WATTS:  Yeah.

10   THE COURT:  The case is whether there is an evidentiary

11   basis for this jury to look at that blank and put anything other

12   than a zero on it.

13   MR. WATTS:  Right.  And I guess what I'm saying is, is

14   that with respect to this case, which is the way you've asked us

15   to do this -- and I understand that positions are floating around

16   all different ways across cases -- but with respect to this case,

17   a decision was made to not bring trial against Shaw because of

18   all of the air conditioning information and the time frames that

19   we've talked about.

20   And so the question that you've got to decide, is

21   there any evidence that they knew or should have known, and I

22   would argue from the standpoint of the evidence that we have in

23   this case, the only evidence that got before this jury was they

24   had no complaints whatsoever.  There is no evidence that they had

25   any involvement with respect to what was going into the trailers

1    or anything like that.  There is no setup witnesses that we've

2    had before from the standpoint of the staging areas smells and

3    everything like that.  If they'd have brought Schilligo, we would

4    have talked about that.

5              But, I mean, my point is when you wrap your arms

6    around the four corners of the evidence in this case, we think a

7    Rule 50 dismissal is appropriate.

8              THE COURT:  Refresh my memory, did we not have

9    Mr. Jarrell come in and talk about how he went in a whole bunch

10   of them, and he smelled them.  I mean, I thought that was the

11   whole point of his testimony was to highlight the fact that these

12   trailers had a very noticeable -- although defendant objected

13   because he couldn't say it was formaldehyde, but his testimony

14   was that this was pervasive.

15             MR. WATTS:  But then I think you have a problem in that

16   there is no evidence in the case that Mr. Jarrell reported that

17   are to Shaw.  And it's a know or should have known, and he didn't

18   work for Shaw.

19             THE COURT:  Well, no, but Shaw would have been -- Shaw's

20   people would have been smelling what he was smelling.  They were

21   installing the trailers.

22             What I'm saying is I think there's a reasonable

23   basis -- and I'm going to deny the motion.  I think there is a

24   reasonable basis to argue there is a colorable collection of

25   evidence, it may be meager, that's for argument, but I think

1    there is a colorable piece or pieces of evidence that would at

2    least allow an argument to be made.

3             MR. WATTS:  Judge, those are all of our motions.

4             THE COURT:  Anything else that we need to cover on the

5    record at this time?

6                  Counsel, anything else on the record?

7             MR. YOUNT:  No, Your Honor.

8             MR. WATTS:  Oh, I'm sorry, no.  I apologize.

9             THE COURT:  Well, then, we can go ahead and close the

10   record here with the exception of any exhibit cleanup you need to

11   put on the record.  We'll go ahead and close up the record right

12   now.

13            (WHEREUPON, at 12:46 p.m. the proceedings were

14   concluded.)

15                          *    *    *

16

17

18

19

20

21

22

23

24

25

```
 1                       REPORTER'S CERTIFICATE

 2

 3       I, Cathy Pepper, Certified Realtime Reporter, Registered

 4   Merit Reporter, Registered Professional Reporter, Certified Court

 5   Reporter of the State of Louisiana, Official Court Reporter for

 6   the United States District Court, Eastern District of Louisiana,

 7   do hereby certify that the foregoing is a true and correct

 8   transcript, to the best of my ability and understanding, from the

 9   record of the proceedings in the above-entitled and numbered

10   matter.

11

12

13                           s/Cathy Pepper

14                           Cathy Pepper, CRR, RMR, CCR

15                           Official Court Reporter

16                           United States District Court

17

18

19

20

21

22

23

24

25
```

## $

**$500** [4] - 1204:22, 1204:23, 1205:2, 1208:14

## '

**'06** [5] - 1239:5, 1240:4, 1241:24, 1242:7, 1255:2
**'07** [3] - 1244:4, 1244:19, 1248:1
**'76** [1] - 1265:9
**'80s** [5] - 1197:17, 1197:19, 1197:20, 1268:19, 1268:20
**'90s** [2] - 1197:19, 1197:20

## 0

**0** [2] - 1244:15
**06** [2] - 1226:20, 1227:7
**081** [1] - 1292:20
**09-3251** [1] - 1187:8

## 1

**1** [12] - 1193:25, 1219:12, 1219:13, 1220:12, 1222:4, 1222:5, 1274:2, 1274:3, 1293:3, 1299:21, 1336:22, 1336:24
**1,000** [7] - 1193:25, 1210:7, 1220:15, 1222:6, 1224:3, 1274:10, 1300:6
**10** [5] - 1254:10, 1275:12, 1276:1, 1282:25, 1337:24
**100** [10] - 1187:18, 1203:16, 1242:14, 1279:1, 1282:24, 1283:14, 1287:23, 1293:15, 1300:2
**1000** [1] - 1187:24
**10:45** [1] - 1262:8
**11** [2] - 1221:3, 1254:11
**1107** [3] - 1189:22, 1262:14, 1262:19
**1191** [2] - 1189:5, 1189:6
**1193** [1] - 1189:7
**11th** [4] - 1336:18, 1337:7, 1337:8, 1340:24
**12** [2] - 1209:8, 1292:17
**1204** [1] - 1189:8
**1223** [1] - 1189:9
**1229** [1] - 1189:10
**1262** [1] - 1189:22
**1264** [2] - 1189:11, 1189:23
**1265** [1] - 1189:12
**1285** [1] - 1189:13
**1297** [1] - 1189:14
**12:15** [1] - 1263:3
**12:30** [1] - 1263:3
**12:46** [1] - 1344:13
**13** [3] - 1282:12, 1282:13
**1304** [1] - 1189:15
**14** [6] - 1215:12, 1216:12, 1304:25, 1334:4, 1334:19
**14,000** [1] - 1215:13
**15** [6] - 1292:18, 1292:19, 1305:1, 1314:16, 1321:11
**16** [2] - 1297:4, 1297:6
**16th** [1] - 1336:20
**17** [8] - 1196:17, 1204:3, 1282:10, 1282:12, 1297:4, 1297:6, 1336:22
**17-000023** [1] - 1253:14
**18** [2] - 1235:7, 1244:4
**1800** [1] - 1188:5
**1873** [1] - 1187:5
**18th** [1] - 1243:17
**196** [1] - 1221:3
**1976** [2] - 1266:20, 1266:21
**1980's** [1] - 1206:12
**1980s** [2] - 1205:14, 1288:5
**1989** [1] - 1267:18
**1990** [1] - 1328:23
**1993** [1] - 1296:2
**1998** [1] - 1328:18
**1:00** [1] - 1263:6
**1st** [4] - 1251:18, 1336:16, 1339:3, 1341:1

## 2

**2** [10] - 1210:25, 1219:12, 1219:13,
1220:11, 1220:12, 1222:4, 1222:5, 1286:23, 1292:21, 1299:22
**2,000** [6] - 1220:11, 1220:15, 1222:6, 1222:9, 1224:3, 1228:19
**20** [8] - 1200:25, 1254:3, 1254:8, 1282:25, 1292:4, 1292:23, 1292:24, 1298:6
**200** [1] - 1299:24
**2000** [1] - 1294:5
**2004** [1] - 1261:18
**2005** [5] - 1207:9, 1230:9, 1237:12, 1237:14, 1251:18
**2006** [9] - 1207:10, 1209:13, 1232:6, 1233:11, 1237:15, 1240:21, 1253:22, 1254:23, 1337:8
**2007** [6] - 1203:14, 1235:7, 1240:19, 1243:17, 1246:11, 1313:12
**2009** [3] - 1230:5, 1230:6, 1313:6
**2010** [9] - 1187:6, 1190:3, 1219:6, 1285:15, 1312:25, 1313:3, 1313:6, 1313:12, 1318:9
**21** [2] - 1187:6, 1190:3
**21st** [2] - 1230:3, 1230:6
**2250** [1] - 1187:21
**23** [1] - 1253:15
**24** [2] - 1261:19, 1335:11
**24-hour** [1] - 1244:22
**24-hour-a-day** [1] - 1245:9
**25** [5] - 1200:25, 1246:11, 1292:23, 1292:24, 1314:19
**250** [1] - 1293:5
**25th** [1] - 1219:6
**2900** [1] - 1188:10

## 3

**3** [6] - 1211:1, 1245:13, 1303:13, 1303:21, 1304:13, 1305:4
**3,000** [2] - 1222:9,
1228:19
**3.63** [6] - 1292:1, 1292:5, 1292:10, 1292:11, 1292:17, 1298:10
**3.9** [1] - 1280:4
**30** [2] - 1263:7, 1308:23
**300** [1] - 1293:5
**31** [2] - 1313:12, 1318:9
**325** [1] - 1268:11
**36** [1] - 1261:10
**375** [1] - 1283:13
**3838** [1] - 1188:9
**3:47** [1] - 1235:7

## 4

**4** [2] - 1248:1, 1286:23
**4,000** [1] - 1254:15
**400** [2] - 1299:25, 1300:1
**410** [1] - 1323:12
**416** [1] - 1288:18
**4265** [1] - 1187:24
**45** [4] - 1263:7, 1306:14, 1306:17, 1306:18
**489** [1] - 1288:18

## 5

**5** [7] - 1187:11, 1233:20, 1273:17, 1273:24, 1275:12, 1275:25, 1286:19
**5.4** [1] - 1283:13
**5.8** [1] - 1280:5
**50** [37] - 1203:16, 1224:10, 1282:20, 1282:23, 1283:15, 1283:18, 1292:12, 1292:17, 1299:23, 1300:1, 1300:2, 1309:18, 1309:22, 1309:25, 1310:8, 1310:10, 1310:16, 1310:20, 1311:14, 1312:2, 1312:6, 1313:19, 1318:4, 1318:5, 1319:3, 1319:4, 1320:3, 1321:5, 1322:13, 1322:18, 1324:22, 1325:6, 1325:20, 1327:5, 1336:7, 1343:7
**500** [10] - 1188:13,
1228:19
**3.63** [6] - 1292:1,

**1193:20**, 1209:20, 1209:24, 1210:4, 1222:16, 1274:7, 1274:8, 1274:13, 1298:22
**501** [1] - 1226:14
**504** [1] - 1188:14
**55** [2] - 1229:6, 1229:12
**569** [3] - 1189:23, 1264:18, 1264:25
**571** [1] - 1328:24
**589-7779** [1] - 1188:14

## 6

**6** [4] - 1207:9, 1236:6, 1272:16, 1273:5
**6.6** [1] - 1301:24
**60** [3] - 1283:14, 1304:1, 1304:6
**60-second** [1] - 1301:24
**600** [4] - 1272:17, 1273:4, 1273:5, 1294:6
**65** [1] - 1323:12

## 7

**7** [1] - 1221:3
**7-day-a-week** [2] - 1244:22, 1245:9
**70002** [1] - 1188:10
**70112** [1] - 1188:5
**70130** [1] - 1188:14
**75** [1] - 1268:13
**77027** [1] - 1187:24
**78257** [1] - 1187:18
**78470** [1] - 1187:21
**79,000** [2] - 1254:3, 1254:8
**7th** [1] - 1336:19

## 8

**80** [2] - 1252:4, 1268:3
**802** [2] - 1187:21, 1328:24
**81** [5] - 1224:14, 1224:15, 1282:15, 1283:21, 1285:4
**838** [1] - 1291:24
**88** [1] - 1219:6
**887** [1] - 1280:10
**89** [1] - 1219:6
**8:30** [5] - 1187:6, 1190:3, 1307:4,

2

1308:11

**9**

**9** [1] - 1282:14
**90** [3] - 1268:4, 1291:13, 1306:18
**909** [1] - 1188:5
**95** [1] - 1286:18
**9:2771** [3] - 1327:7, 1328:20, 1330:11

**A**

**A.M** [2] - 1187:6, 1190:3
**ability** [3] - 1195:13, 1331:19, 1345:1
**able** [7] - 1195:6, 1210:4, 1222:16, 1226:15, 1229:13, 1263:5, 1282:4
**abnormal** [1] - 1200:11
**above-entitled** [1] - 1345:2
**absence** [1] - 1200:15
**absolutely** [6] - 1195:17, 1232:3, 1243:14, 1280:4, 1303:21, 1319:6
**AC** [1] - 1336:21
**accept** [2] - 1193:9, 1264:3
**acceptable** [2] - 1212:12, 1243:5
**acceptance** [2] - 1330:9, 1332:17
**accepted** [3] - 1265:4, 1315:23, 1317:3
**access** [2] - 1331:19, 1338:21
**accessible** [6] - 1329:19, 1334:7, 1334:8
**accident** [1] - 1304:20
**accommodate** [2] - 1252:9, 1331:13
**accommodations** [1] - 1236:25
**accomplished** [1] - 1246:19
**accordance** [1] - 1335:20
**according** [7] - 1238:22, 1302:9, 1327:10, 1332:10, 1336:19, 1336:20, 1338:17

**Accosted** [1] - 1235:13
**account** [1] - 1317:10
**accumulating** [1] - 1287:9
**accurate** [1] - 1242:23
**achieve** [2] - 1226:7, 1242:18
**acid** [1] - 1299:17
**acquisitions** [1] - 1258:24
**Act** [3] - 1231:17, 1232:1, 1256:11
**act** [3] - 1195:16, 1195:18, 1326:8
**acting** [3] - 1229:20, 1229:23, 1230:1
**action** [5] - 1303:12, 1317:20, 1317:21, 1323:13, 1324:6
**actions** [1] - 1241:6
**actively** [1] - 1240:20
**activity** [2] - 1260:6, 1281:10
**actual** [3] - 1236:13, 1279:13, 1286:22
**acute** [3] - 1199:20, 1200:12, 1304:17
**acutely** [1] - 1304:22
**ad** [2] - 1238:2, 1238:3
**Adam** [1] - 1235:7
**Adam's** [2] - 1214:20
**adaption** [4] - 1194:14, 1194:15, 1194:18, 1194:22
**add** [3] - 1273:23, 1289:9, 1340:3
**addition** [4] - 1207:11, 1314:10, 1329:11, 1339:12
**additional** [2] - 1226:15, 1336:3
**address** [5] - 1203:3, 1233:2, 1245:8, 1306:6, 1308:5
**addressed** [3] - 1239:21, 1239:24, 1319:14
**addresses** [1] - 1203:5
**Addressing** [1] - 1301:13
**adequacy** [1] - 1322:20
**adequate** [5] - 1236:19, 1236:20, 1237:6, 1317:6, 1330:13
**administrator** [4] - 1229:20, 1229:25,

1230:7, 1230:13
**admissions** [2] - 1314:1, 1314:7
**admitted** [4] - 1262:19, 1264:25, 1318:19, 1340:1
**ADMITTED..............** [1] - 1189:22
**ADMITTED..............** [1] - 1189:23
**admitting** [1] - 1323:17
**adopted** [1] - 1226:18
**Adorn** [1] - 1289:13
**advanced** [1] - 1266:17
**adverse** [5] - 1265:7, 1265:11, 1278:20, 1279:6, 1280:6
**adversely** [1] - 1279:24
**advice** [4] - 1244:4, 1244:7, 1244:8, 1244:11
**advisable** [1] - 1317:20
**advised** [4] - 1230:16, 1230:18, 1234:18, 1234:25
**affairs** [2] - 1235:16, 1240:19
**Affairs** [2] - 1235:21, 1236:3
**affect** [2] - 1271:9, 1274:25
**affected** [4] - 1195:21, 1271:6, 1279:24, 1280:8
**affects** [1] - 1287:6
**affirmatively** [1] - 1262:3
**afforded** [1] - 1341:21
**afternoon** [1] - 1229:14
**age** [1] - 1283:8
**agencies** [4] - 1260:8, 1260:12, 1267:3, 1267:4
**Agency** [3] - 1229:21, 1229:24, 1234:3
**agency** [8] - 1229:25, 1234:1, 1243:2, 1250:19, 1256:19, 1256:22, 1260:10
**agent** [1] - 1225:24
**agents** [5] - 1225:10, 1225:12, 1226:2, 1226:3
**agree** [34] - 1208:22,

1210:20, 1212:1, 1217:21, 1218:1, 1219:17, 1221:6, 1234:17, 1245:7, 1246:25, 1248:9, 1248:17, 1248:18, 1248:22, 1254:19, 1259:23, 1261:23, 1290:18, 1290:19, 1293:7, 1295:11, 1295:14, 1295:18, 1295:19, 1295:22, 1295:23, 1303:20, 1305:21, 1310:13, 1319:21, 1324:5, 1331:22, 1342:3
**agreed** [11] - 1193:8, 1245:11, 1263:23, 1280:12, 1285:24, 1286:2, 1294:13, 1308:21, 1310:4, 1317:21, 1336:8
**agreement** [4] - 1305:11, 1305:18, 1308:23, 1310:1
**ahead** [17] - 1190:23, 1219:19, 1229:10, 1229:15, 1262:6, 1263:5, 1284:20, 1305:14, 1307:3, 1307:23, 1309:16, 1309:19, 1310:9, 1311:25, 1319:12, 1344:9, 1344:11
**air** [60] - 1212:23, 1213:1, 1213:2, 1213:10, 1214:7, 1232:7, 1236:7, 1236:10, 1236:13, 1237:18, 1238:6, 1238:11, 1238:16, 1238:22, 1238:25, 1258:12, 1272:9, 1273:15, 1273:17, 1273:19, 1273:20, 1274:12, 1276:10, 1282:18, 1286:9, 1287:9, 1287:20, 1290:14, 1291:1, 1291:8, 1291:25, 1292:3, 1292:10, 1292:14, 1292:15, 1292:25, 1293:5, 1293:11, 1293:13, 1293:14, 1294:2, 1294:7, 1294:15, 1294:25, 1295:5, 1297:22, 1297:23, 1297:25, 1299:3, 1299:9, 1299:11, 1299:12, 1336:23,

1336:25, 1342:18
**airborne** [3] - 1281:20, 1281:22, 1281:23
**airing** [1] - 1258:15
**airout** [2] - 1338:4, 1338:5
**airway** [9] - 1195:20, 1201:25, 1214:11, 1215:9, 1215:18, 1216:2, 1216:25, 1217:10, 1217:11
**alcohol** [2] - 1274:22, 1275:7
**aldehyde** [1] - 1293:12
**aldehydes** [1] - 1299:15
**allegation** [3] - 1310:3, 1322:21, 1337:9
**allegations** [3] - 1340:2, 1342:2, 1342:3
**allege** [1] - 1340:2
**alleged** [4] - 1300:23, 1323:19, 1329:22, 1329:25
**allegedly** [1] - 1329:25
**allergic** [1] - 1202:14
**allergist** [2] - 1191:16, 1193:7
**allergy** [2] - 1191:25, 1192:5
**Allergy** [1] - 1192:1
**allotted** [2] - 1306:5, 1306:16
**allow** [4] - 1311:24, 1316:17, 1322:11, 1344:2
**allowed** [3] - 1225:25, 1252:13, 1341:11
**allows** [1] - 1291:15
**almost** [5] - 1285:20, 1299:25, 1314:17, 1327:16, 1329:18
**Amanda** [2] - 1328:14, 1335:10
**ambient** [5] - 1291:1, 1293:5, 1294:2, 1294:15, 1297:19
**ambulatory** [1] - 1331:20
**amendment** [1] - 1250:11
**amount** [19] - 1206:18, 1208:14, 1209:9, 1210:24, 1263:11, 1276:2, 1276:3, 1281:1, 1281:13, 1286:5, 1286:12, 1289:22, 1294:14,

3

1294:21, 1294:23, 1296:14, 1297:16, 1306:6
**amounts** [1] - 1276:8
**ample** [3] - 1313:24, 1321:21, 1326:6
**analysis** [5] - 1267:7, 1291:15, 1293:24, 1317:9, 1318:7
**analyze** [1] - 1267:21
**analyzed** [1] - 1270:1
**analyzing** [1] - 1267:5
**ANDREW** [1] - 1188:8
**Andy** [2] - 1226:14, 1319:25
**anecdotal** [2] - 1251:16, 1341:3
**anguish** [2] - 1310:24, 1319:11
**animal** [5] - 1217:3, 1217:6, 1218:10, 1268:24
**animals** [2] - 1268:25, 1279:19
**answer** [11] - 1219:20, 1256:8, 1262:2, 1298:14, 1299:21, 1314:17, 1321:11, 1334:13, 1334:14, 1340:17, 1342:1
**answered** [1] - 1227:16
**answers** [1] - 1289:6
**anterior** [2] - 1213:12, 1216:4
**anticipated** [1] - 1303:21
**ANTONIO** [1] - 1187:18
**anytime** [1] - 1301:1
**anyway** [1] - 1279:15
**apartment** [1] - 1261:6
**apologize** [3] - 1190:13, 1327:3, 1344:8
**apparent** [1] - 1248:9
**appear** [1] - 1229:13
**appearance** [1] - 1190:20
**APPEARANCES** [2] - 1187:15, 1188:1
**apple** [2] - 1214:20
**apples** [1] - 1297:22
**appliances** [1] - 1322:16
**applicable** [3] - 1304:17, 1307:21, 1338:14
**application** [4] - 1260:4, 1295:1,

1304:23, 1332:6
**applied** [3] - 1246:7, 1246:8, 1333:14
**applies** [2] - 1325:19, 1335:23
**apply** [5] - 1206:9, 1267:24, 1306:10, 1330:25
**appreciate** [3] - 1221:23, 1320:22, 1320:23
**approach** [13] - 1206:25, 1211:3, 1211:6, 1212:3, 1219:7, 1220:24, 1221:19, 1226:9, 1229:6, 1238:2, 1246:17, 1287:13, 1302:1
**appropriate** [6] - 1250:20, 1250:22, 1259:19, 1259:24, 1267:13, 1343:7
**approved** [1] - 1330:8
**approves** [1] - 1330:10
**April** [1] - 1336:19
**arbitrary** [1] - 1254:21
**architect** [2] - 1333:8, 1333:12
**area** [18] - 1214:22, 1214:23, 1214:24, 1215:3, 1215:6, 1216:3, 1216:9, 1216:16, 1216:17, 1216:19, 1216:22, 1217:7, 1217:10, 1232:23, 1251:8, 1265:23, 1284:3, 1287:3
**areas** [5] - 1226:5, 1232:24, 1288:7, 1331:20, 1343:2
**argue** [4] - 1311:13, 1324:7, 1342:22, 1343:24
**argued** [2] - 1318:17, 1338:11
**arguing** [1] - 1319:15
**argument** [12] - 1307:8, 1311:18, 1313:23, 1318:1, 1318:2, 1324:10, 1324:16, 1326:24, 1338:18, 1339:3, 1343:25, 1344:2
**arguments** [13] - 1306:5, 1306:15, 1306:16, 1307:1, 1307:5, 1307:7,

1307:20, 1311:17, 1317:11, 1317:13, 1317:25, 1325:8, 1336:14
**arise** [1] - 1340:11
**arisen** [1] - 1203:7
**arises** [2] - 1335:22, 1340:15
**arising** [1] - 1340:14
**Arizona** [1] - 1312:13
**Arkansas** [1] - 1267:1
**Arlington** [1] - 1208:8
**arms** [1] - 1343:5
**arose** [1] - 1240:21
**article** [1] - 1207:21
**articles** [5] - 1201:1, 1201:3, 1201:5, 1205:8, 1207:14
**aside** [3] - 1195:3, 1223:18, 1309:11
**asserted** [2] - 1234:7, 1241:1
**asserting** [1] - 1240:24
**assertions** [2] - 1233:23, 1234:13
**assets** [1] - 1260:5
**assigned** [2] - 1232:23, 1323:2
**assistance** [3] - 1230:7, 1231:19, 1231:25
**assistant** [4] - 1230:7, 1230:12, 1235:16, 1266:5
**associated** [5] - 1220:22, 1224:6, 1230:22, 1231:6, 1322:16
**assume** [14] - 1203:15, 1216:17, 1242:14, 1252:24, 1253:1, 1256:6, 1258:3, 1283:20, 1285:3, 1285:13, 1285:14, 1285:17, 1285:20, 1292:9
**assumed** [4] - 1216:20, 1239:8, 1259:15, 1296:22
**assuming** [5] - 1237:14, 1262:25, 1307:11, 1320:19
**assuredly** [1] - 1217:1
**Asthma** [2] - 1192:2, 1192:14
**asthma** [9] - 1192:13, 1225:19, 1225:20, 1228:14, 1228:16, 1270:11, 1270:12,

1276:17, 1276:19
**asthmatic** [1] - 1270:13
**AT** [1] - 1187:20
**atmosphere** [1] - 1303:6
**ATSDR** [5] - 1245:12, 1245:18, 1267:13, 1298:5, 1304:13
**attack** [2] - 1270:13, 1317:16
**attacks** [1] - 1276:19
**attempt** [4] - 1202:7, 1202:12, 1294:17, 1294:19
**attempted** [1] - 1303:6
**attention** [4] - 1258:13, 1258:14, 1259:12, 1269:2
**ATTORNEY** [1] - 1187:20
**attorneys** [5] - 1190:12, 1306:11, 1307:1, 1308:5, 1318:11
**attribute** [1] - 1293:20
**authored** [1] - 1268:12
**authoritative** [1] - 1250:13
**authority** [5] - 1231:17, 1232:1, 1239:5, 1239:8, 1256:9
**Authority** [2] - 1328:4, 1330:23
**authorization** [1] - 1239:11
**authorize** [2] - 1239:5, 1239:9
**authorized** [1] - 1240:6
**available** [5] - 1236:24, 1261:16, 1287:19, 1309:5, 1309:6
**average** [8] - 1209:23, 1222:16, 1243:14, 1282:21, 1282:23, 1283:10, 1283:13, 1286:3
**averaged** [2] - 1292:1, 1296:21
**averaging** [1] - 1243:13
**avoid** [1] - 1194:20
**Avondale** [1] - 1325:25
**awarded** [1] - 1249:22
**aware** [19] - 1201:18, 1235:22, 1251:12,

1251:17, 1253:2, 1253:4, 1254:23, 1255:3, 1255:5, 1255:15, 1255:16, 1255:20, 1258:3, 1258:20, 1260:14, 1260:20, 1303:13, 1314:13

## B

**B406** [1] - 1188:13
**background** [2] - 1231:22, 1298:3
**bad** [6] - 1195:12, 1197:4, 1197:18, 1275:16, 1276:1, 1301:4
**bailiwick** [1] - 1250:19
**balance** [1] - 1307:13
**Barnes** [4] - 1192:4, 1193:3, 1193:4
**Barnes-Jewish** [1] - 1193:4
**based** [16] - 1203:23, 1226:1, 1228:10, 1228:13, 1251:11, 1251:13, 1281:25, 1302:8, 1302:13, 1310:20, 1322:14, 1326:10, 1328:11, 1329:5, 1336:2
**baseline** [7] - 1272:22, 1274:4, 1291:9, 1291:23, 1297:17, 1297:18, 1297:25
**basic** [2] - 1267:23, 1279:15
**basis** [13] - 1203:17, 1234:12, 1237:13, 1237:17, 1258:15, 1312:17, 1313:18, 1320:20, 1322:17, 1335:25, 1342:11, 1343:23, 1343:24
**Bates** [1] - 1253:14
**Baton** [1] - 1312:14
**Batre** [1] - 1235:23
**Bayou** [1] - 1235:23
**bears** [1] - 1338:6
**became** [4] - 1235:18, 1238:19, 1255:3, 1255:5, 1265:13
**Bechtel** [1] - 1257:5
**become** [1] - 1198:17, 1314:16
**becoming** [1] - 1244:1
**BEFORE** [1] - 1187:12
**began** [3] - 1197:21,

1198:14
**begin** [3] - 1277:19, 1279:10, 1307:10
**beginning** [2] - 1197:18, 1197:20
**begins** [1] - 1209:23
**behalf** [2] - 1207:12, 1309:21
**behind** [1] - 1213:2
**belief** [1] - 1316:10
**beliefs** [1] - 1276:8
**bellwether** [1] - 1303:5
**belongs** [1] - 1250:19
**below** [11] - 1193:21, 1210:1, 1242:22, 1242:24, 1245:16, 1254:21, 1278:7, 1278:13, 1280:5, 1285:8, 1288:2
**bench** [7] - 1226:12, 1227:24, 1229:8, 1284:10, 1284:24, 1302:5, 1304:8
**benchmarks** [1] - 1341:23
**benefit** [2] - 1307:20
**Bennett** [1] - 1235:11
**benzo(a)pyrene** [1] - 1279:16
**best** [8] - 1195:24, 1212:17, 1242:19, 1269:20, 1270:22, 1271:15, 1303:25, 1345:1
**better** [18] - 1213:11, 1217:20, 1225:23, 1226:2, 1275:20, 1279:22, 1306:25, 1311:3, 1311:4, 1311:5, 1311:8, 1311:9, 1311:18, 1317:25, 1332:25
**between** [16] - 1202:8, 1210:25, 1223:8, 1237:14, 1246:10, 1266:14, 1300:1, 1307:15, 1313:9, 1313:14, 1318:13, 1323:14, 1323:19, 1326:8, 1326:12, 1336:22
**beyond** [4] - 1215:4, 1215:5, 1215:8, 1304:25
**bias** [6] - 1202:4, 1270:25, 1271:1, 1300:24, 1301:1, 1301:6
**big** [7] - 1200:6,

1212:25, 1213:17, 1213:21, 1263:8, 1301:5, 1328:13
**billed** [1] - 1289:13
**billion** [57] - 1193:20, 1193:25, 1209:20, 1209:24, 1210:4, 1210:8, 1211:1, 1215:13, 1216:12, 1218:18, 1219:16, 1220:11, 1220:15, 1222:4, 1222:7, 1222:9, 1222:11, 1222:16, 1224:3, 1224:11, 1224:14, 1224:15, 1228:19, 1272:17, 1273:4, 1273:5, 1274:7, 1274:8, 1274:10, 1274:13, 1282:14, 1282:15, 1282:20, 1282:23, 1282:24, 1282:25, 1283:13, 1283:15, 1283:22, 1285:4, 1292:1, 1292:3, 1292:5, 1292:10, 1292:12, 1293:4, 1294:1, 1294:6, 1298:6, 1298:11, 1298:22, 1299:24, 1300:1, 1300:6, 1300:8
**bind** [1] - 1216:13
**binds** [3] - 1215:9, 1215:25, 1216:1
**BINSTOCK** [1] - 1187:23
**biopsies** [1] - 1200:4
**biopsy** [6] - 1199:17, 1199:19, 1200:9, 1223:13, 1223:15, 1224:7
**bit** [8] - 1196:1, 1200:10, 1211:5, 1251:24, 1262:25, 1267:15, 1283:4, 1289:22
**bizarre** [1] - 1215:14
**black** [2] - 1279:23
**blank** [1] - 1342:11
**blind** [2] - 1270:22, 1301:8
**blink** [1] - 1210:12, 1210:15, 1210:21, 1271:25
**blinking** [2] - 1210:11, 1272:1
**blocks** [2] - 1257:21, 1258:7
**blur** [1] - 1271:1

**board** [2] - 1280:18, 1323:22
**Board** [1] - 1317:4
**Board-certified** [1] - 1317:4
**body** [15] - 1193:15, 1193:17, 1194:2, 1194:11, 1195:18, 1195:21, 1195:22, 1195:23, 1213:18, 1265:21, 1278:25, 1280:22, 1281:15, 1281:17, 1300:10
**bonding** [6] - 1225:10, 1225:12, 1225:24, 1226:1, 1226:2, 1226:3
**bony** [1] - 1212:21
**book** [2] - 1268:14, 1268:15
**boom** [3] - 1308:24
**bore** [1] - 1312:4
**bothering** [1] - 1198:21
**bottle** [1] - 1197:8
**bottom** [5] - 1245:17, 1246:12, 1247:18, 1279:3, 1318:18
**BOULEVARD** [1] - 1188:9
**bouncing** [2] - 1223:8, 1270:19
**bound** [2] - 1280:23, 1280:25
**BOURGEOIS** [1] - 1188:7
**Bower** [1] - 1321:18
**Bowers** [1] - 1321:25
**box** [1] - 1316:12
**BP** [1] - 1326:1
**brain** [3] - 1195:1, 1195:5, 1195:8
**breach** [1] - 1257:17
**break** [8] - 1229:13, 1262:8, 1263:6, 1263:10, 1274:2, 1277:19, 1280:21, 1281:14
**breakdown** [1] - 1265:22
**breathe** [6] - 1215:10, 1215:15, 1215:20, 1291:9, 1294:21
**breathed** [2] - 1214:25, 1215:2
**breathers** [1] - 1215:19
**breathing** [1] - 1291:4
**brief** [4] - 1190:17, 1223:7, 1229:22,

1262:19
**briefed** [4] - 1233:22, 1312:2, 1320:4, 1325:23
**briefly** [6] - 1231:24, 1269:11, 1309:24, 1311:16, 1319:5, 1339:12
**bring** [1] - 1342:17
**bringing** [4] - 1291:8, 1339:4, 1342:5
**broad** [1] - 1218:7
**broken** [1] - 1265:21
**bronchoconstriction** [1] - 1276:20
**brought** [7] - 1258:13, 1291:1, 1317:8, 1319:25, 1330:7, 1330:8, 1343:3
**build** [1] - 1252:16
**building** [2] - 1236:11, 1333:13
**BUILDING** [1] - 1187:18
**Building** [2] - 1326:20, 1326:25
**buildings** [1] - 1282:20
**buildup** [1] - 1235:2
**built** [8] - 1237:2, 1249:2, 1292:16, 1316:12, 1328:7, 1330:7, 1330:24, 1333:2
**bulb** [1] - 1195:10
**bullet** [1] - 1334:4
**Bullet** [1] - 1236:6
**bunch** [6] - 1200:10, 1228:12, 1276:22, 1290:24, 1328:12, 1343:9
**burden** [3] - 1315:9, 1316:16, 1321:2
**Burnette** [1] - 1235:10
**burning** [9] - 1210:20, 1210:24, 1210:25, 1211:10, 1222:9, 1222:10, 1223:24, 1224:19, 1228:19
**business** [1] - 1326:22
**buy** [2] - 1257:13, 1292:20
**BY** [34] - 1187:9, 1187:17, 1187:23, 1188:3, 1188:8, 1188:15, 1188:16, 1189:6, 1189:7, 1189:8, 1189:9, 1189:12, 1189:13,

1189:14, 1191:12, 1193:12, 1204:11, 1207:6, 1211:9, 1211:20, 1212:6, 1212:16, 1219:10, 1220:1, 1221:2, 1222:3, 1223:5, 1228:2, 1265:2, 1285:2, 1285:12, 1287:16, 1289:12, 1297:14

### C

**caffeine** [2] - 1280:21
**calculate** [3] - 1282:4, 1282:6, 1287:21
**calculations** [1] - 1297:16
**California** [2] - 1225:8, 1267:4
**CALLED** [1] - 1190:4
**cancer** [25] - 1203:7, 1203:9, 1279:17, 1319:4, 1319:5, 1319:7, 1319:9, 1319:16, 1319:20, 1320:4, 1320:7, 1320:10, 1320:11, 1320:13, 1320:17, 1320:24, 1321:4, 1321:13, 1321:15, 1321:19, 1321:21, 1322:5, 1322:10
**cannot** [2] - 1333:10, 1335:15
**cans** [1] - 1323:8
**capability** [1] - 1250:13
**capacity** [5] - 1205:3, 1230:13, 1256:19, 1256:24, 1257:1
**CARANCAHUA** [1] - 1187:21
**carbon** [1] - 1193:14
**carcinogen** [3] - 1341:20, 1341:23
**carcinogens** [1] - 1296:15
**care** [4] - 1192:23, 1294:12, 1305:23, 1325:14
**careful** [2] - 1258:18, 1336:4
**carefully** [3] - 1217:2, 1260:2, 1311:13
**cars** [2] - 1298:7, 1298:8

**Casarette** [1] - 1279:13

**case** [100] - 1197:14, 1203:7, 1204:24, 1220:10, 1228:22, 1237:17, 1238:2, 1238:3, 1238:4, 1256:10, 1258:12, 1258:15, 1258:20, 1262:14, 1268:8, 1268:17, 1269:4, 1282:8, 1303:16, 1306:4, 1306:20, 1307:14, 1307:17, 1307:19, 1308:9, 1309:14, 1312:11, 1312:13, 1312:14, 1312:18, 1312:22, 1314:13, 1314:21, 1314:25, 1315:7, 1315:12, 1315:14, 1315:18, 1316:3, 1316:16, 1316:19, 1317:2, 1317:6, 1317:7, 1317:10, 1317:11, 1319:17, 1321:5, 1321:15, 1321:20, 1322:2, 1323:10, 1323:11, 1324:8, 1324:10, 1324:23, 1325:16, 1325:17, 1325:19, 1326:10, 1326:19, 1327:16, 1327:20, 1328:5, 1328:8, 1328:9, 1328:14, 1328:18, 1328:23, 1330:22, 1331:22, 1332:6, 1333:15, 1335:24, 1337:20, 1337:23, 1338:7, 1338:10, 1338:12, 1338:17, 1338:23, 1339:6, 1339:9, 1340:23, 1341:1, 1341:2, 1342:3, 1342:8, 1342:10, 1342:14, 1342:16, 1342:23, 1343:6, 1343:16

**case-by-case** [3] - 1237:17, 1238:2, 1258:15

**cases** [12] - 1238:24, 1239:1, 1239:2, 1288:5, 1312:12, 1314:14, 1317:7, 1325:23, 1325:24, 1338:12, 1338:18, 1342:16

**Castanel** [35] - 1196:20, 1196:25, 1203:9, 1203:13, 1203:25, 1204:1, 1204:6, 1205:3, 1209:11, 1223:15, 1223:22, 1224:11, 1224:17, 1228:20, 1280:16, 1281:5, 1282:9, 1283:8, 1288:16, 1296:20, 1311:19, 1312:25, 1313:2, 1313:11, 1313:15, 1320:10, 1320:17, 1320:23, 1321:9, 1322:1, 1322:9, 1323:16, 1323:18, 1340:1, 1340:6

**CASTANEL** [1] - 1187:9

**Castanel's** [8] - 1283:21, 1285:4, 1310:18, 1313:4, 1313:6, 1313:10, 1318:9, 1320:9

**Cathy** [2] - 1344:21, 1345:7

**CATHY** [1] - 1188:13

**causal** [4] - 1313:9, 1313:14, 1318:13, 1324:1

**causation** [24] - 1200:16, 1201:12, 1284:11, 1295:7, 1295:9, 1312:4, 1312:7, 1312:8, 1312:9, 1312:21, 1312:22, 1312:23, 1313:19, 1313:23, 1313:24, 1313:25, 1314:3, 1315:2, 1315:3, 1315:5, 1315:10, 1318:3

**caused** [8] - 1198:6, 1206:3, 1221:13, 1268:24, 1278:15, 1280:16, 1330:19, 1332:19

**causes** [6] - 1203:1, 1218:22, 1219:11, 1221:7, 1221:17, 1275:24

**CAUSEWAY** [1] - 1188:9

**causing** [4] - 1219:1, 1271:22, 1293:9, 1300:20

**caveat** [1] - 1260:1

**CC'ing** [1] - 1235:11

**CCR** [2] - 1188:13, 1345:7

**CDC** [7] - 1240:19, 1244:9, 1246:13, 1247:3, 1247:20, 1250:21, 1256:1

**CDC's** [1] - 1247:5

**cells** [6] - 1200:12, 1213:1, 1213:2, 1213:10, 1218:17

**cellular** [1] - 1199:21

**CENTER** [1] - 1188:9

**center** [2] - 1255:21, 1256:7

**Center** [1] - 1192:2

**centers** [3] - 1255:24, 1255:25, 1256:5

**central** [1] - 1240:18

**Cephalexin** [1] - 1197:9

**certain** [12] - 1232:23, 1235:1, 1252:19, 1267:6, 1275:8, 1281:17, 1294:21, 1300:11, 1305:14, 1309:4, 1315:4, 1331:18

**certainly** [19] - 1237:18, 1239:8, 1240:13, 1243:21, 1248:15, 1249:15, 1251:4, 1255:4, 1256:22, 1295:22, 1302:15, 1315:3, 1315:12, 1317:12, 1324:7, 1338:13, 1340:6, 1340:7, 1340:9

**certainty** [1] - 1204:1

**CERTIFICATE** [1] - 1344:19

**certification** [1] - 1332:2

**certified** [1] - 1317:4

**Certified** [2] - 1344:21, 1344:22

**certify** [1] - 1344:25

**cetera** [5] - 1238:22, 1282:6, 1289:25, 1299:13, 1300:13

**CH2M** [1] - 1257:5

**chain** [2] - 1235:5, 1235:14

**chair** [1] - 1190:23

**chamber** [13] - 1269:21, 1269:22, 1270:1, 1270:20, 1271:13, 1273:12, 1273:19, 1275:19, 1276:13, 1278:13,

1280:7, 1296:1, 1296:6

**chambers** [2] - 1270:9, 1272:8

**chance** [2] - 1308:7, 1336:4

**change** [4] - 1190:18, 1206:17, 1245:21, 1276:18

**changed** [5] - 1219:15, 1220:9, 1276:20, 1276:24, 1313:4

**changes** [13] - 1205:23, 1206:7, 1206:9, 1206:11, 1206:23, 1218:5, 1218:11, 1220:3, 1220:5, 1223:9, 1223:10, 1223:16, 1223:19

**chapters** [1] - 1268:14

**characterize** [3] - 1247:7, 1247:8, 1260:2

**characterized** [3] - 1235:25, 1238:17, 1247:5

**charge** [9] - 1204:23, 1208:12, 1208:14, 1306:8, 1307:9, 1307:21, 1310:4, 1326:13, 1327:5

**charged** [1] - 1230:21

**charges** [1] - 1326:2

**charging** [2] - 1268:10, 1306:19

**chart** [6] - 1211:15, 1273:8, 1273:9, 1273:10, 1278:3, 1280:10

**charts** [1] - 1278:2

**check** [4] - 1221:12, 1227:18, 1239:2, 1294:10

**chemical** [21] - 1196:8, 1225:20, 1266:2, 1266:10, 1266:11, 1271:21, 1272:3, 1272:12, 1274:22, 1275:2, 1275:3, 1275:16, 1275:24, 1276:1, 1276:3, 1277:20, 1287:18, 1295:19, 1300:15, 1301:3

**chemicals** [11] - 1265:8, 1265:21, 1267:24, 1277:23, 1293:15, 1295:19,

1299:3, 1299:11, 1299:12, 1300:11, 1300:15

**Chertoff** [2] - 1253:16

**Chief** [1] - 1235:14

**chief** [4] - 1191:25, 1243:18, 1244:18, 1309:14

**child** [1] - 1244:23, 1245:9

**children** [6] - 1192:8, 1192:10, 1192:12, 1235:24, 1244:1, 1252:24

**Children's** [2] - 1192:3, 1193:5

**choice** [1] - 1281:10

**choices** [1] - 1221:11

**choose** [4] - 1201:24, 1257:16, 1260:25, 1321:10

**chose** [3] - 1269:11, 1302:7, 1328:1

**CHRIS** [2] - 1187:20, 1189:15

**Chris** [5] - 1301:25, 1303:12, 1304:6, 1304:12, 1305:7

**CHRISTI** [1] - 1187:21

**chronic** [4] - 1198:11, 1199:20, 1200:12, 1210:3

**Circuit** [4] - 1312:12, 1325:16, 1328:18, 1328:22

**circumstance** [1] - 1338:16

**circumstances** [3] - 1256:11, 1320:23, 1333:14

**citations** [1] - 1326:1

**cite** [1] - 1201:17

**cited** [1] - 1282:21

**citing** [3] - 1244:5, 1244:20, 1328:22

**citizen** [1] - 1260:22

**citizens** [1] - 1261:8

**city** [7] - 1192:7, 1192:9, 1192:12, 1292:4, 1297:20, 1298:7, 1298:9

**City** [1] - 1192:14

**claim** [12] - 1251:13, 1290:2, 1310:7, 1310:15, 1319:10, 1319:12, 1320:4, 1322:10, 1323:9, 1324:13, 1333:10, 1341:9

**claimed** [1] - 1222:20

**claiming** [1] - 1319:9
**claims** [5] - 1253:2, 1318:6, 1319:3, 1319:5, 1319:11
**classes** [1] - 1266:23
**classic** [1] - 1303:24
**clean** [5] - 1268:1, 1273:17, 1274:12, 1276:10
**cleaned** [1] - 1266:2
**cleanser** [1] - 1323:8
**cleansers** [1] - 1322:16
**cleanup** [1] - 1344:10
**clear** [11] - 1204:5, 1206:5, 1227:19, 1227:20, 1227:23, 1228:3, 1312:16, 1315:9, 1325:4, 1332:25, 1339:23
**clearly** [8] - 1303:12, 1303:20, 1308:8, 1311:18, 1331:22, 1339:24, 1340:13, 1342:7
**CLERK** [5] - 1190:25, 1191:8, 1264:4, 1264:9, 1335:11
**Clerk** [2] - 1191:7, 1264:14
**clinical** [4] - 1191:25, 1225:18, 1265:20, 1269:17
**clip** [1] - 1301:24
**close** [9] - 1248:4, 1261:5, 1292:7, 1292:9, 1324:22, 1324:23, 1325:8, 1344:9, 1344:11
**closer** [2] - 1209:14, 1290:22
**closing** [10] - 1306:5, 1306:14, 1306:16, 1307:1, 1307:5, 1307:6, 1307:20, 1318:1, 1318:2, 1324:16
**Club** [7] - 1234:6, 1234:12, 1234:16, 1240:24, 1255:4, 1255:5, 1259:11
**clue** [1] - 1253:25
**Coast** [3] - 1231:23, 1232:7, 1251:8
**Code** [2] - 1327:7
**coffee** [1] - 1280:20
**cold** [5] - 1197:2, 1197:5, 1197:10, 1258:5, 1258:8
**collaborating** [1] -

1256:2
**collaboration** [1] - 1330:18
**collaborator** [2] - 1201:7, 1207:22
**collection** [1] - 1343:24
**colorable** [3] - 1324:13, 1343:24, 1344:1
**combination** [2] - 1318:12, 1340:4
**coming** [5] - 1272:23, 1287:10, 1291:7, 1308:21, 1341:14
**Commander** [4] - 1303:4, 1303:9, 1303:12, 1303:14
**commence** [1] - 1234:19
**commencement** [1] - 1239:6
**comment** [3] - 1321:24, 1322:7, 1341:17
**comments** [3] - 1315:15, 1318:18, 1322:8
**commercial** [2] - 1248:13, 1333:6
**Commission** [1] - 1206:19
**commission** [1] - 1206:22
**commode** [1] - 1334:8
**common** [2] - 1193:16, 1197:10
**communicated** [1] - 1243:10
**communication** [2] - 1330:16, 1334:5
**communications** [1] - 1331:11
**communities** [1] - 1261:15
**community** [2] - 1252:15, 1295:17
**Company** [4] - 1328:4, 1328:19, 1328:23, 1333:21
**company** [1] - 1268:4
**compare** [4] - 1282:15, 1294:13, 1294:24, 1297:23
**compared** [3] - 1252:13, 1253:23, 1260:17
**comparison** [1] - 1243:13
**compassion** [1] -

1248:5
**Compeau** [3] - 1336:15, 1337:20, 1339:23
**compelling** [2] - 1245:7, 1245:10
**competing** [1] - 1267:22
**complain** [4] - 1199:3, 1223:22, 1224:19, 1231:8
**complained** [3] - 1238:6, 1255:8
**complaining** [1] - 1324:8
**complaint** [9] - 1197:4, 1197:11, 1197:12, 1198:2, 1254:15, 1258:12, 1319:24, 1340:2
**complaints** [33] - 1205:19, 1223:9, 1232:8, 1232:10, 1232:11, 1232:12, 1232:13, 1232:14, 1233:15, 1237:12, 1237:16, 1237:20, 1238:7, 1238:14, 1253:6, 1253:9, 1253:10, 1253:21, 1254:2, 1254:3, 1254:8, 1254:12, 1258:22, 1258:23, 1271:11, 1277:6, 1293:8, 1312:25, 1313:4, 1313:10, 1337:21, 1342:24
**complete** [4] - 1248:8, 1309:9, 1310:20, 1327:16
**completed** [1] - 1241:20
**completely** [2] - 1211:15, 1329:19
**complicated** [1] - 1289:23
**complied** [2] - 1245:23, 1246:2
**complies** [1] - 1212:18
**component** [5] - 1310:6, 1317:10, 1319:11, 1322:20, 1341:8
**components** [1] - 1299:2
**composite** [1] - 1283:2
**compound** [1] - 1293:14

**compounds** [3] - 1299:17, 1299:18
**comprehensive** [1] - 1244:12
**COMPUTER** [1] - 1188:16
**concentration** [14] - 1217:22, 1218:10, 1273:22, 1278:12, 1279:9, 1287:20, 1291:13, 1291:20, 1294:16, 1294:22, 1294:25, 1296:9, 1296:10, 1296:12
**concentrations** [9] - 1217:4, 1217:25, 1270:10, 1272:10, 1278:7, 1278:15, 1280:8, 1295:4, 1295:5
**concern** [7] - 1245:6, 1245:13, 1245:16, 1255:9, 1255:22, 1301:1, 1332:21
**concerned** [2] - 1248:2, 1331:19
**concerns** [9] - 1233:15, 1234:25, 1236:16, 1237:21, 1239:15, 1249:12, 1254:25, 1332:6, 1332:13
**conclude** [3] - 1273:2, 1298:22, 1320:16
**concluded** [8] - 1227:25, 1262:5, 1284:24, 1304:8, 1305:7, 1306:4, 1338:23, 1344:14
**concluding** [1] - 1270:14
**conclusion** [7] - 1243:7, 1269:24, 1269:25, 1270:17, 1295:11, 1300:4, 1309:14
**conclusions** [5] - 1270:4, 1276:12, 1277:8, 1298:17, 1308:9
**condition** [4] - 1199:8, 1318:22, 1335:18, 1341:10
**conditioning** [3] - 1336:23, 1337:1, 1342:18
**conditions** [2] - 1203:2, 1231:2
**conducted** [1] - 1234:1

**conference** [9] - 1226:12, 1227:25, 1229:8, 1284:10, 1284:24, 1302:5, 1304:8, 1318:25, 1327:5
**conferred** [1] - 1317:20
**confined** [1] - 1324:2
**confirm** [3] - 1247:2, 1247:9, 1251:1
**confirmed** [1] - 1251:16
**conformity** [1] - 1335:14
**confounding** [1] - 1271:16
**confronted** [1] - 1303:6
**confusing** [1] - 1294:17
**connected** [1] - 1322:2
**connecting** [1] - 1213:14
**connection** [12] - 1262:14, 1264:17, 1269:4, 1277:9, 1313:9, 1313:14, 1318:13, 1322:5, 1323:14, 1323:19, 1326:11, 1329:1
**connections** [1] - 1324:1
**connects** [1] - 1213:19
**consensus** [5] - 1295:8, 1295:10, 1295:12, 1295:13, 1295:16
**consequence** [1] - 1195:3
**consequences** [1] - 1196:11
**conservative** [1] - 1271:15
**consider** [4] - 1282:7, 1299:20, 1320:22, 1324:14
**considerable** [1] - 1341:18
**consideration** [2] - 1295:25, 1328:15
**considered** [4] - 1192:20, 1236:12, 1269:19, 1317:8
**considering** [2] - 1313:16, 1333:24
**consistent** [4] - 1198:10, 1198:19,

1219:21, 1277:4
**constant** [1] - 1272:19
**constitute** [1] - 1332:3
**constructed** [3] - 1327:10, 1332:10
**construction** [9] - 1246:8, 1249:7, 1310:1, 1327:9, 1333:6, 1333:10, 1333:13, 1333:22
**Construction** [2] - 1328:4, 1330:23
**consult** [1] - 1268:8
**consultant** [1] - 1268:7
**consulted** [1] - 1267:3
**consulting** [5] - 1208:2, 1240:15, 1267:18, 1269:1, 1269:2
**consumer** [4] - 1248:4, 1248:10, 1248:12, 1248:17
**Consumer** [1] - 1206:19
**contain** [3] - 1280:18, 1280:20, 1281:5
**contained** [1] - 1326:1
**containing** [3] - 1249:24, 1288:9, 1288:11
**contains** [4] - 1196:4, 1225:3, 1281:23, 1338:20
**content** [1] - 1226:25
**context** [1] - 1304:21
**CONTINUED** [1] - 1188:1
**continued** [1] - 1199:10
**continuing** [7] - 1338:10, 1338:14, 1338:19, 1338:24, 1339:1, 1339:4, 1340:17
**continuous** [1] - 1304:25
**contract** [23] - 1232:25, 1233:18, 1249:4, 1250:2, 1250:5, 1250:9, 1257:17, 1258:1, 1258:10, 1258:24, 1266:1, 1328:7, 1330:4, 1330:9, 1336:19, 1336:20, 1336:24, 1338:15, 1338:25, 1339:2, 1339:5, 1340:16, 1340:18

**contracted** [1] - 1257:5
**contractor** [11] - 1327:6, 1327:8, 1332:8, 1333:7, 1333:11, 1333:18, 1335:4, 1335:14, 1335:16, 1335:19, 1336:7
**contractor's** [2] - 1233:1, 1258:14
**contractors** [12] - 1232:20, 1232:21, 1233:4, 1233:14, 1257:9, 1257:10, 1257:20, 1257:25, 1258:7, 1258:21, 1337:25
**contracts** [4] - 1232:19, 1249:3, 1249:22, 1249:23
**contrary** [1] - 1329:25
**contributed** [1] - 1252:17
**control** [1] - 1327:17
**controlled** [3] - 1271:8, 1271:12, 1293:9
**controlling** [1] - 1328:10
**conversation** [6] - 1322:8, 1327:18, 1328:12, 1330:20, 1331:9, 1336:3
**converts** [1] - 1281:17
**convey** [1] - 1231:12
**convinced** [1] - 1316:14
**cook** [1] - 1299:11
**Cooperative** [1] - 1192:14
**coordinate** [1] - 1244:11
**coordinated** [1] - 1237:24
**coordinating** [2] - 1259:16, 1260:4
**coordination** [1] - 1237:19
**copied** [3] - 1243:17, 1245:1, 1245:2
**corners** [1] - 1343:6
**cornerstone** [1] - 1277:23
**Corps** [2] - 1256:23, 1256:24
**CORPUS** [1] - 1187:21
**Correct** [2] - 1206:10, 1242:17
**correct** [79] - 1195:15,

1197:13, 1200:1, 1200:4, 1200:7, 1200:18, 1201:14, 1205:1, 1205:10, 1205:13, 1205:17, 1205:21, 1206:21, 1206:24, 1207:16, 1207:17, 1207:20, 1207:24, 1208:19, 1209:3, 1209:6, 1209:10, 1209:13, 1209:16, 1209:19, 1209:25, 1210:2, 1210:6, 1210:23, 1211:2, 1211:13, 1211:24, 1217:8, 1217:11, 1217:12, 1217:24, 1220:16, 1222:18, 1223:12, 1223:14, 1224:8, 1228:5, 1231:14, 1238:1, 1239:10, 1239:12, 1242:1, 1242:11, 1242:12, 1243:14, 1243:19, 1243:20, 1244:2, 1244:3, 1245:16, 1246:22, 1246:23, 1247:10, 1248:12, 1251:5, 1251:6, 1252:22, 1256:9, 1256:12, 1257:15, 1257:18, 1258:6, 1258:10, 1258:11, 1266:17, 1266:21, 1268:8, 1274:7, 1281:21, 1282:2, 1297:20, 1298:11, 1329:7, 1344:25
**correctly** [2] - 1236:14, 1268:23
**correlate** [1] - 1293:14
**correlation** [1] - 1202:8
**correspondingly** [1] - 1208:23
**corroborative** [1] - 1234:9
**cost** [4] - 1230:22, 1231:5, 1232:3
**costs** [1] - 1231:6
**cough** [8] - 1197:6, 1197:8, 1280:22, 1281:5, 1281:8, 1281:9, 1281:11, 1281:13
**Council** [15] - 1201:4, 1201:6, 1201:8, 1207:12, 1207:16, 1207:18, 1207:23,

1208:3, 1208:4, 1208:5, 1208:10, 1208:11, 1208:12, 1208:16, 1227:1
**Counsel** [2] - 1264:21, 1284:8
**counsel** [15] - 1229:12, 1301:15, 1306:5, 1306:16, 1307:5, 1307:8, 1313:23, 1315:19, 1316:17, 1317:7, 1321:7, 1325:21, 1330:15, 1339:11, 1344:6
**counsel's** [1] - 1311:1
**country** [3] - 1237:4, 1261:25, 1297:20
**County** [1] - 1193:4
**couple** [3] - 1197:22, 1201:21, 1294:10
**course** [10] - 1190:18, 1288:13, 1307:6, 1307:25, 1317:20, 1317:21, 1321:21, 1330:19, 1330:21, 1338:12
**COURT** [101] - 1187:1, 1188:13, 1190:4, 1190:7, 1190:10, 1190:22, 1193:9, 1207:1, 1211:4, 1211:7, 1211:18, 1212:4, 1212:13, 1219:8, 1219:19, 1219:24, 1220:25, 1221:20, 1223:3, 1226:10, 1227:4, 1227:8, 1227:19, 1229:1, 1229:5, 1229:10, 1262:6, 1262:10, 1262:17, 1262:21, 1262:22, 1263:20, 1263:24, 1264:21, 1264:23, 1284:3, 1284:6, 1284:11, 1284:16, 1284:25, 1285:10, 1287:14, 1289:3, 1297:11, 1301:12, 1301:15, 1301:20, 1301:23, 1302:3, 1302:10, 1302:12, 1302:25, 1303:3, 1304:4, 1304:9, 1305:9, 1305:13, 1305:22, 1306:1, 1306:18, 1308:15, 1308:25, 1309:11, 1309:19, 1310:5,

1310:14, 1311:23, 1313:20, 1313:22, 1315:15, 1318:24, 1319:10, 1319:21, 1320:2, 1320:18, 1321:7, 1322:11, 1322:19, 1323:5, 1324:4, 1324:20, 1325:3, 1325:21, 1326:15, 1326:18, 1328:16, 1331:1, 1335:12, 1336:10, 1337:13, 1337:16, 1338:9, 1339:11, 1341:8, 1341:17, 1342:7, 1342:10, 1343:8, 1343:19, 1344:4, 1344:9
**Court** [22] - 1193:9, 1264:2, 1310:19, 1312:4, 1312:10, 1314:14, 1320:5, 1320:9, 1325:7, 1325:16, 1326:2, 1328:3, 1328:14, 1328:19, 1330:22, 1337:2, 1339:3, 1344:22, 1344:23, 1344:24, 1345:8, 1345:9
**court** [7] - 1229:9, 1266:12, 1301:13, 1309:5, 1312:14, 1328:9, 1328:22
**courtroom** [4] - 1190:9, 1262:12, 1308:14, 1316:13
**cover** [2] - 1223:6, 1344:4
**covered** [1] - 1315:19
**CPSC** [2] - 1205:19, 1206:19
**CRAFT** [1] - 1187:16
**crazy** [1] - 1194:17
**create** [1] - 1335:18
**creating** [1] - 1265:17
**credibility** [4] - 1312:20, 1316:1, 1316:6, 1316:12
**credible** [2] - 1234:15, 1316:9
**critical** [3] - 1296:1, 1297:21, 1317:10
**cross** [8] - 1285:10, 1290:9, 1314:21, 1317:13, 1317:14, 1317:16, 1320:10, 1340:1
**CROSS** [4] - 1189:8, 1189:13, 1204:10,

1285:11
cross-examination [4] - 1317:13, 1317:14, 1317:16, 1340:1
CROSS-EXAMINATION [4] - 1189:8, 1189:13, 1204:10, 1285:11
cross-examined [1] - 1314:21
cross-examining [1] - 1290:9
CRR [2] - 1188:13, 1345:7
curing [1] - 1268:22
current [2] - 1199:12, 1225:3
curriculum [1] - 1264:19
curve [5] - 1277:24, 1278:9, 1280:2, 1286:13, 1287:22
curves [1] - 1286:17
cut [2] - 1215:16, 1274:20

**D**

damage [2] - 1199:21, 1323:15
Danek [1] - 1323:12
dangers [1] - 1340:14
dark [1] - 1279:24
data [5] - 1203:1, 1279:13, 1280:2, 1295:21, 1299:23
date [9] - 1201:2, 1233:17, 1246:11, 1246:24, 1259:9, 1336:17, 1336:18, 1338:25, 1341:7
dated [1] - 1235:7
dates [1] - 1341:6
Daubert [1] - 1314:16
daughter [3] - 1310:23, 1321:14, 1322:7
DAVID [1] - 1189:10
David [7] - 1229:3, 1229:11, 1229:17, 1235:11, 1253:17, 1262:5, 1339:24
Davis [1] - 1325:25
DAY [1] - 1187:11
days [9] - 1192:25, 1196:12, 1205:16, 1205:18, 1215:15, 1246:19, 1305:1, 1337:24, 1338:2

de [1] - 1314:16
deactivation [5] - 1232:19, 1232:20, 1232:21, 1232:25, 1233:13
deal [3] - 1233:2, 1258:14, 1309:8
dealing [7] - 1192:13, 1208:17, 1233:23, 1240:16, 1243:21, 1249:12, 1304:22
deals [2] - 1205:9, 1315:3
dealt [1] - 1201:16
debated [1] - 1259:19
decide [1] - 1342:20
decision [2] - 1328:18, 1342:17
decisions [1] - 1268:1
declaration [5] - 1230:15, 1230:19, 1230:25, 1231:21, 1241:25
defeat [1] - 1311:14
defect [8] - 1327:12, 1329:22, 1329:25, 1330:1, 1332:14, 1332:22, 1333:1, 1335:3
defective [1] - 1333:11
defects [5] - 1310:1, 1327:9, 1332:9, 1333:18, 1333:19
DEFENDANT [1] - 1188:3
defendant [7] - 1204:24, 1301:21, 1317:12, 1338:13, 1338:17, 1338:18, 1343:12
defendant's [1] - 1301:15
defendants [2] - 1309:13, 1338:12
defense [7] - 1205:4, 1291:24, 1325:7, 1325:12, 1325:19, 1325:20, 1336:7
defer [1] - 1243:21
defined [1] - 1340:18
definition [3] - 1254:20, 1316:2, 1334:1
degree [4] - 1204:1, 1265:14, 1266:17, 1304:22
degrees [1] - 1209:8
delay [1] - 1190:14
delayed [1] - 1198:20
delegated [1] - 1260:3

deliberate [3] - 1306:10, 1307:13, 1307:16
deliberating [3] - 1306:20, 1306:22, 1307:12
deliberations [3] - 1306:9, 1307:10, 1307:22
deliver [4] - 1248:14, 1256:20, 1257:11, 1257:14
delivered [7] - 1241:13, 1241:14, 1241:15, 1241:19, 1242:1, 1242:2, 1242:10
deliveries [1] - 1241:20
delivering [1] - 1257:13
delivery [2] - 1242:14, 1332:17
demonstrated [1] - 1217:23
demonstrates [2] - 1216:21, 1217:9
denied [3] - 1255:15, 1255:16, 1326:14
DENNIS [1] - 1187:23
deny [10] - 1237:11, 1237:13, 1311:25, 1317:24, 1318:3, 1319:1, 1322:12, 1324:18, 1327:1, 1343:23
department [2] - 1192:1, 1265:20
Department [2] - 1235:17, 1243:19
department's [1] - 1240:19
departments [1] - 1265:13
deployed [2] - 1254:4, 1260:18
DEPOSITION [2] - 1189:10, 1189:15
deposition [12] - 1199:23, 1211:22, 1219:20, 1219:21, 1229:17, 1230:18, 1262:5, 1302:15, 1302:19, 1302:20, 1313:2, 1337:24
Deposition [2] - 1304:12, 1305:7
depressed [1] - 1271:10
deputy [5] - 1229:20,

1229:23, 1230:1, 1230:7, 1236:1
DEPUTY [4] - 1190:25, 1191:8, 1264:4, 1264:9
derailment [1] - 1266:3
derived [1] - 1256:11
DeRosa [8] - 1301:25, 1302:9, 1303:12, 1303:17, 1304:6, 1304:9, 1304:12, 1305:7
DeRosa's [3] - 1302:19, 1302:20, 1303:7
DEROSA............. [1] - 1189:15
describe [4] - 1238:3, 1259:7, 1268:16, 1269:11
described [3] - 1220:14, 1259:6, 1290:20
description [1] - 1229:22
DESCRIPTION [1] - 1189:20
design [12] - 1213:17, 1301:7, 1327:24, 1327:25, 1328:1, 1328:7, 1329:22, 1329:25, 1330:1, 1330:10, 1330:21
Design [10] - 1263:18, 1288:25, 1289:13, 1309:21, 1309:22, 1310:16, 1312:2, 1318:5, 1327:16, 1327:23
DESIGN [1] - 1187:9
Design's [1] - 1319:2
designated [1] - 1257:11
designed [7] - 1237:3, 1237:7, 1237:8, 1241:5, 1327:23, 1328:10, 1330:24
designing [1] - 1329:2
desire [1] - 1317:1
destruction [5] - 1327:6, 1327:8, 1327:12, 1332:9, 1332:14
detect [1] - 1193:22
detecting [2] - 1194:3, 1194:4
detects [1] - 1195:23
deterioration [5] - 1327:6, 1327:8,

1327:12, 1332:9, 1332:14
determination [3] - 1239:2, 1255:17, 1339:7
determinations [1] - 1250:13
determine [5] - 1192:7, 1269:6, 1290:14, 1304:21, 1324:14
determined [1] - 1289:17
determines [1] - 1277:24
determining [3] - 1259:24, 1272:13, 1316:15
develop [2] - 1250:24, 1267:5
devote [1] - 1244:10
Dex [1] - 1197:8
Dex-Tuss [1] - 1197:8
dextromethorphan [4] - 1280:22, 1281:8, 1281:13, 1281:15
diagnosis [1] - 1313:2
dictate [1] - 1259:9
dictating [1] - 1258:21
difference [3] - 1278:17, 1292:13, 1297:18
different [26] - 1238:8, 1238:24, 1239:3, 1244:14, 1255:10, 1258:19, 1261:12, 1269:9, 1272:9, 1276:8, 1283:7, 1283:9, 1284:16, 1288:8, 1288:16, 1290:11, 1294:20, 1295:4, 1299:18, 1299:19, 1314:18, 1337:25, 1341:22, 1342:16
differently [1] - 1219:18
difficult [1] - 1236:12
difficulty [1] - 1323:18
digested [1] - 1280:24
diisocyanate [1] - 1225:21, 1228:13
dimension [2] - 1329:17, 1329:18
dimensions [1] - 1329:6
dioxins [1] - 1267:9
DIRE [2] - 1189:6, 1191:11
direct [6] - 1236:3,

1236:6, 1251:15, 1252:2, 1269:17, 1323:21
**DIRECT** [4] - 1189:7, 1189:12, 1193:11, 1265:1
**directed** [4] - 1201:25, 1239:14, 1249:24, 1257:20
**directional** [2] - 1209:1, 1209:4
**directive** [1] - 1257:23
**directives** [1] - 1233:3
**directly** [2] - 1245:9, 1316:18
**director** [5] - 1192:1, 1192:3, 1230:2, 1230:11, 1230:12
**disagree** [2] - 1248:20, 1324:5
**disagreement** [1] - 1287:5
**disaster** [18] - 1230:7, 1231:3, 1231:24, 1232:3, 1232:17, 1236:23, 1236:24, 1248:16, 1249:10, 1252:19, 1252:22, 1257:4, 1260:3, 1260:17, 1260:19, 1261:8, 1261:11, 1261:25
**Disaster** [1] - 1230:20
**disasters** [8] - 1231:18, 1251:2, 1251:4, 1253:3, 1260:14, 1260:20, 1261:12, 1261:14
**discard** [1] - 1316:14
**discovered** [3] - 1341:20, 1341:24, 1341:25
**discuss** [4] - 1302:1, 1306:16, 1307:17, 1307:19
**discussed** [2] - 1209:7, 1291:24
**discussing** [2] - 1256:21, 1257:7
**discussion** [4] - 1240:13, 1280:9, 1289:10
**discussions** [1] - 1240:18
**disease** [2] - 1198:11, 1228:14
**dismiss** [1] - 1310:15
**dismissal** [2] - 1325:20, 1343:7
**dismissed** [1] -

1310:7
**dismissing** [1] - 1327:6
**displaced** [2] - 1260:22, 1261:8
**disputed** [3] - 1280:14, 1280:15, 1340:5
**disqualification** [1] - 1314:19
**distribute** [1] - 1325:14
**distributed** [2] - 1283:4, 1326:3
**DISTRICT** [3] - 1187:1, 1187:1, 1187:13
**District** [3] - 1344:24, 1345:9
**district** [1] - 1312:14
**divide** [1] - 1292:12
**divided** [1] - 1292:12
**divides** [1] - 1214:9
**dizzy** [1] - 1300:12
**DOCKET** [2] - 1187:5, 1187:8
**doctor** [6] - 1191:15, 1221:25, 1278:10, 1278:25, 1284:20, 1297:1
**Doctor** [12] - 1193:13, 1198:5, 1198:19, 1199:23, 1203:13, 1228:3, 1229:1, 1272:4, 1276:11, 1280:9, 1301:11, 1301:12
**doctors** [1] - 1278:23
**doctrine** [1] - 1327:2
**DOCUMENT** [1] - 1187:7
**document** [9] - 1253:12, 1253:14, 1253:17, 1253:20, 1253:21, 1289:4, 1289:5, 1289:7, 1331:15
**documentation** [2] - 1209:7, 1322:25
**documents** [1] - 1267:12
**DOMINION** [1] - 1187:17
**done** [22] - 1207:2, 1207:3, 1215:10, 1217:4, 1221:22, 1225:18, 1247:23, 1250:4, 1251:12, 1263:2, 1263:5, 1263:11, 1273:12, 1276:13, 1282:19,

1285:15, 1285:17, 1285:20, 1286:24, 1309:17, 1323:23, 1323:25
**door** [2] - 1226:23, 1334:7
**doors** [1] - 1334:8
**doorways** [1] - 1331:18
**dosage** [1] - 1282:15
**dose** [32] - 1277:14, 1277:24, 1278:4, 1278:9, 1278:12, 1278:23, 1279:12, 1279:25, 1280:5, 1281:12, 1281:14, 1281:17, 1283:9, 1287:18, 1287:21, 1287:22, 1287:23, 1288:4, 1288:10, 1288:14, 1289:17, 1290:6, 1290:25, 1291:4, 1292:17, 1292:22, 1293:3, 1293:4, 1294:16, 1296:15
**doses** [8] - 1277:17, 1278:7, 1279:20, 1279:21, 1282:6, 1283:7, 1283:8
**dosing** [1] - 1279:19
**dot** [1] - 1279:7
**dots** [1] - 1275:22
**double** [3] - 1209:9, 1270:22, 1301:8
**double-blind** [1] - 1270:22
**Doull** [1] - 1279:14
**down** [28] - 1205:2, 1212:9, 1214:18, 1215:6, 1215:23, 1216:22, 1217:14, 1219:23, 1229:1, 1261:19, 1265:21, 1271:10, 1272:23, 1273:23, 1275:12, 1279:3, 1279:4, 1279:7, 1280:21, 1281:15, 1286:13, 1301:12, 1312:7, 1327:19, 1330:7, 1330:8, 1331:10, 1334:5
**dozen** [1] - 1316:25
**DR** [3] - 1189:5, 1189:15, 1191:5
**dr** [1] - 1297:15
**Dr** [92] - 1190:21, 1190:22, 1191:13, 1193:7, 1193:9,

1197:5, 1199:23, 1201:15, 1204:12, 1207:25, 1208:2, 1208:8, 1212:9, 1219:5, 1223:1, 1224:14, 1225:12, 1236:4, 1236:6, 1243:16, 1243:18, 1244:8, 1244:19, 1246:11, 1246:12, 1246:22, 1247:9, 1262:15, 1263:19, 1263:20, 1263:21, 1263:24, 1264:3, 1264:11, 1264:17, 1265:3, 1280:12, 1283:20, 1283:22, 1285:3, 1285:9, 1285:13, 1290:9, 1290:17, 1290:19, 1298:17, 1302:7, 1302:9, 1302:19, 1302:20, 1303:17, 1304:12, 1310:24, 1311:20, 1312:8, 1312:9, 1312:11, 1312:16, 1312:23, 1312:24, 1313:1, 1313:5, 1313:7, 1313:13, 1313:16, 1313:17, 1313:25, 1314:1, 1314:8, 1315:1, 1315:2, 1315:11, 1315:16, 1316:17, 1317:16, 1318:7, 1318:12, 1318:20, 1318:21, 1319:14, 1320:14, 1321:18, 1321:24, 1321:25, 1322:3, 1339:14, 1340:4
**draw** [8] - 1212:10, 1212:14, 1212:18, 1212:20, 1213:20, 1214:1, 1221:21, 1275:4
**drawer** [1] - 1221:23
**drawn** [1] - 1333:8
**draws** [1] - 1221:25
**drew** [1] - 1216:6
**drinking** [2] - 1267:10, 1267:11
**drinks** [1] - 1295:2
**DRIVE** [1] - 1187:17
**drive** [3] - 1226:13, 1279:9, 1298:8
**drives** [1] - 1296:10
**driveway** [1] - 1252:10
**drop** [2] - 1273:23, 1281:13

**drops** [2] - 1291:11, 1291:12
**drove** [2] - 1203:13, 1337:18
**drug** [6] - 1277:20, 1278:22, 1278:23, 1278:24, 1279:2, 1281:10
**drugs** [1] - 1265:12
**dry** [2] - 1198:18, 1267:16
**dryness** [1] - 1273:20
**due** [7] - 1231:17, 1254:25, 1273:20, 1293:16, 1327:13, 1332:14, 1332:22
**Duke** [1] - 1235:11
**duly** [2] - 1191:6, 1264:13
**DUPLASS** [1] - 1188:7
**during** [11] - 1199:17, 1202:17, 1252:1, 1252:22, 1286:25, 1302:19, 1304:2, 1305:18, 1307:25, 1319:14
**dust** [2] - 1272:3, 1293:17
**duties** [4] - 1191:23, 1229:22, 1230:10, 1339:2
**duty** [17] - 1325:13, 1338:10, 1338:14, 1338:19, 1338:24, 1339:1, 1339:4, 1340:8, 1340:11, 1340:12, 1340:14, 1340:15, 1340:17, 1340:18, 1340:22

## E

**e-mail** [15] - 1235:5, 1236:4, 1243:16, 1244:4, 1244:7, 1244:12, 1244:21, 1244:25, 1246:11, 1246:25, 1247:13, 1248:1, 1302:11, 1337:25, 1341:3
**e-mails** [2] - 1244:25, 1246:10
**Earline** [3] - 1196:20, 1204:1, 1296:20
**EARLINE** [1] - 1187:9
**early** [2] - 1229:14, 1237:12
**easier** [1] - 1270:7
**easily** [1] - 1200:22

**EASTERN** [1] - 1187:1
**Eastern** [1] - 1344:24
**eat** [1] - 1294:22
**Ecology** [2] - 1265:24, 1267:20
**ecology** [1] - 1265:25
**edge** [1] - 1272:25
**editing** [1] - 1253:20
**editor** [1] - 1268:14
**educate** [1] - 1337:4
**education** [1] - 1265:6
**educational** [1] - 1339:19
**effect** [23] - 1196:3, 1196:11, 1196:18, 1198:7, 1220:21, 1234:10, 1271:17, 1272:17, 1272:18, 1276:5, 1276:17, 1277:18, 1277:20, 1277:21, 1278:8, 1278:15, 1278:21, 1279:10, 1280:4, 1280:5, 1280:6, 1289:18, 1322:22
**effective** [1] - 1281:9
**effects** [12] - 1192:7, 1196:14, 1201:13, 1239:19, 1240:1, 1240:8, 1240:12, 1243:22, 1265:8, 1265:11, 1272:14, 1279:7
**effort** [6] - 1242:10, 1244:10, 1244:11, 1256:13, 1256:14, 1256:16
**efforts** [1] - 1248:6
**egg** [1] - 1200:6
**EHUs** [2] - 1230:21, 1233:24
**eight** [2] - 1237:15, 1237:21
**eight-by-33-foot** [1] - 1334:11
**eight-month** [2] - 1237:15, 1237:21
**either** [7] - 1199:1, 1205:20, 1230:12, 1268:13, 1307:17, 1324:5, 1331:10
**Elaine** [1] - 1235:11
**elderly** [1] - 1252:24
**electricity** [2] - 1258:4, 1258:8
**elevated** [1] - 1233:23
**elicited** [2] - 1322:21, 1322:22
**eligible** [1] - 1328:2
**eliminate** [1] -

1287:25
**Emergency** [2] - 1229:20, 1229:24
**emergency** [5] - 1231:19, 1232:24, 1260:21, 1261:9, 1334:25
**emission** [1] - 1291:5
**emitted** [1] - 1234:8
**emitting** [2] - 1249:25, 1282:20
**emphasize** [1] - 1248:5
**employees** [2] - 1232:18, 1266:8
**en** [1] - 1246:25
**enables** [1] - 1321:12
**end** [6] - 1248:14, 1270:14, 1272:13, 1306:24, 1326:9, 1338:25
**ended** [3] - 1271:14, 1338:22, 1339:2
**endorse** [1] - 1228:11
**endoscopic** [1] - 1200:14
**endpoint** [1] - 1210:16
**ends** [3] - 1336:24, 1339:5, 1341:1
**endure** [1] - 1199:2
**engage** [1] - 1234:19
**engaged** [2] - 1240:20, 1244:9
**engagement** [2] - 1236:3, 1260:4
**Engelhardt** [1] - 1340:12
**ENGELHARDT** [1] - 1187:12
**engenders** [1] - 1194:8
**engineering** [1] - 1246:18
**Engineers** [1] - 1256:23
**ENT** [2] - 1197:21, 1200:13
**enter** [1] - 1341:11
**enters** [1] - 1190:9
**entire** [1] - 1195:6
**entirely** [1] - 1241:15
**entities** [1] - 1250:12
**entitled** [3] - 1328:11, 1328:23, 1345:2
**entitles** [1] - 1325:11
**entry** [3] - 1305:4, 1334:7, 1341:12
**Environment** [3] - 1265:25, 1267:20
**environment** [16] -

1196:4, 1196:16, 1236:22, 1237:6, 1243:13, 1260:4, 1267:25, 1276:5, 1276:7, 1276:9, 1277:11, 1277:12, 1277:25, 1281:23, 1292:4, 1293:9
**Environmental** [1] - 1234:3
**environmental** [3] - 1265:12, 1267:21, 1268:6
**environments** [1] - 1298:5
**EPA** [15] - 1207:13, 1224:23, 1224:24, 1224:25, 1225:22, 1227:14, 1227:16, 1227:17, 1228:4, 1234:19, 1245:12, 1250:21, 1266:1, 1291:24
**epidemiological** [2] - 1205:11, 1208:17
**epidemiology** [4] - 1269:15, 1269:19, 1295:21, 1301:7
**equipment** [1] - 1266:9
**equivalent** [2] - 1274:6, 1281:12
**escapes** [1] - 1331:4
**especially** [2] - 1299:12, 1315:12
**ESQUIRE** [7] - 1187:17, 1187:23, 1188:3, 1188:4, 1188:4, 1188:8, 1188:8
**essentially** [7] - 1231:22, 1232:2, 1234:6, 1234:15, 1268:3, 1281:22, 1302:23
**establish** [4] - 1255:21, 1323:14, 1324:1, 1341:6
**established** [3] - 1236:11, 1245:13, 1256:4
**establishes** [1] - 1331:25
**establishing** [4] - 1250:18, 1250:22, 1323:18, 1341:18
**estimation** [1] - 1236:18
**et** [5] - 1238:22, 1282:6, 1289:25,

1299:13, 1300:13
**ethmoid** [4] - 1213:1, 1213:2, 1213:10, 1213:12
**ethmoids** [1] - 1213:13
**ethyl** [2] - 1274:22, 1275:7
**evacuation** [1] - 1247:1
**evaluate** [2] - 1269:6, 1269:22
**evaluating** [1] - 1269:9
**evaluation** [1] - 1316:4
**event** [3] - 1239:9, 1255:4, 1304:19
**events** [1] - 1252:23
**eventually** [1] - 1286:12
**evidence** [69] - 1200:11, 1202:25, 1221:13, 1221:14, 1228:12, 1234:10, 1262:19, 1264:18, 1264:25, 1269:20, 1301:21, 1301:23, 1302:22, 1305:16, 1306:4, 1307:6, 1307:7, 1308:24, 1310:1, 1310:11, 1310:18, 1310:21, 1310:23, 1311:11, 1311:14, 1311:19, 1311:20, 1312:10, 1312:15, 1313:24, 1318:8, 1318:15, 1318:19, 1319:6, 1319:19, 1320:9, 1320:17, 1321:4, 1321:8, 1321:20, 1321:22, 1322:4, 1322:21, 1324:15, 1324:23, 1326:4, 1326:6, 1326:21, 1327:15, 1327:22, 1327:24, 1329:3, 1336:14, 1336:17, 1336:24, 1337:20, 1337:22, 1338:7, 1340:7, 1340:23, 1341:2, 1342:21, 1342:22, 1342:23, 1342:24, 1343:6, 1343:16, 1343:25, 1344:1
**evidentiary** [3] - 1319:18, 1320:20, 1342:10

**exacerbate** [3] - 1283:23, 1284:14, 1314:8
**exacerbated** [4] - 1203:2, 1204:2, 1314:4, 1318:21
**exacerbation** [3] - 1200:16, 1201:12, 1318:13
**exact** [2] - 1245:17, 1303:19
**exactly** [10] - 1193:13, 1197:20, 1206:15, 1231:20, 1234:23, 1240:16, 1241:11, 1255:5, 1258:21, 1337:19
**EXAMINATION** [26] - 1189:6, 1189:7, 1189:8, 1189:9, 1189:12, 1189:13, 1189:14, 1191:11, 1193:11, 1204:10, 1207:5, 1211:8, 1211:19, 1212:5, 1219:9, 1219:25, 1221:1, 1222:2, 1223:4, 1228:1, 1265:1, 1285:1, 1285:11, 1287:15, 1289:11, 1297:13
**examination** [8] - 1203:24, 1204:6, 1212:15, 1317:13, 1317:14, 1317:16, 1323:21, 1340:1
**EXAMINATIONS** [1] - 1189:3
**examine** [1] - 1196:20
**examined** [3] - 1191:7, 1264:14, 1314:21
**examining** [1] - 1290:9
**example** [13] - 1195:14, 1202:12, 1215:11, 1225:8, 1234:10, 1236:21, 1238:11, 1249:16, 1261:12, 1279:12, 1286:22, 1293:11, 1300:6
**exceed** [1] - 1249:2
**exceeded** [1] - 1246:6
**exception** [1] - 1344:10
**exchange** [1] - 1246:10
**exclude** [3] - 1315:17, 1317:1, 1336:2

excluded [7] - 1312:12, 1312:13, 1312:14, 1316:20, 1316:23, 1316:25

executing [1] - 1233:17

exercise [1] - 1309:9

Exhibit [6] - 1262:14, 1262:19, 1264:18, 1264:25, 1288:18, 1291:24

EXHIBIT [2] - 1189:22, 1189:23

exhibit [6] - 1308:20, 1329:4, 1331:3, 1331:4, 1331:15, 1344:10

exhibits [7] - 1301:17, 1301:20, 1305:12, 1305:14, 1308:16, 1309:2, 1309:8

exist [4] - 1203:6, 1228:17, 1258:24

existence [1] - 1258:25

exists [1] - 1205:7

expect [5] - 1198:6, 1200:13, 1286:1, 1298:10, 1298:16

expedient [2] - 1247:4, 1247:6

expenses [2] - 1310:11, 1310:15

expensive [1] - 1252:16

experience [6] - 1203:23, 1234:2, 1244:23, 1267:19, 1268:16, 1290:15

experimental [2] - 1228:12, 1269:17

experimentation [1] - 1269:18

experiments [1] - 1268:24

expert [21] - 1204:18, 1204:25, 1205:3, 1205:14, 1224:13, 1263:22, 1264:3, 1265:3, 1265:4, 1289:19, 1290:1, 1290:5, 1315:17, 1315:21, 1315:23, 1316:11, 1316:18, 1317:2, 1317:3, 1317:4

expert's [1] - 1316:24

expertise [4] - 1250:13, 1260:10, 1284:4, 1317:18

experts [6] - 1234:12, 1312:7, 1314:15, 1314:20, 1316:20, 1342:5

expired [1] - 1338:15

explain [9] - 1215:5, 1217:15, 1274:14, 1277:16, 1278:3, 1280:17, 1298:25, 1306:1, 1308:6

explained [4] - 1259:4, 1272:4, 1279:11, 1288:3

exponential [1] - 1286:14

expose [3] - 1275:3, 1275:7, 1275:14

exposed [18] - 1194:16, 1272:5, 1272:8, 1272:10, 1273:13, 1273:15, 1273:21, 1273:25, 1275:8, 1280:13, 1282:1, 1283:15, 1296:11, 1296:12, 1301:3, 1301:5, 1301:21, 1304:19

exposure [41] - 1203:17, 1203:21, 1217:23, 1218:5, 1218:11, 1218:18, 1218:19, 1218:22, 1220:2, 1222:19, 1236:1, 1239:19, 1240:2, 1240:7, 1243:22, 1244:22, 1245:9, 1250:23, 1270:12, 1271:20, 1272:14, 1272:21, 1272:22, 1275:13, 1277:25, 1280:12, 1282:4, 1283:2, 1283:3, 1283:23, 1284:13, 1285:7, 1296:15, 1300:23, 1304:17, 1304:25, 1305:5, 1318:16, 1318:20

exposures [7] - 1266:11, 1270:24, 1270:25, 1271:9, 1272:20, 1276:15, 1282:16

express [1] - 1254:24

expressed [2] - 1321:16, 1337:3

extended [2] - 1232:16, 1261:16

extends [2] - 1325:14, 1328:5

extensive [2] - 1248:6, 1261:17

extent [7] - 1240:23, 1260:15, 1282:1, 1319:12, 1319:22, 1335:7, 1341:9

extra [1] - 1263:7

extrapolate [2] - 1300:10, 1316:24

eye [13] - 1210:16, 1210:21, 1271:5, 1271:25, 1272:2, 1272:24, 1273:1, 1273:3, 1273:17, 1274:3, 1290:15, 1290:21, 1300:6

eyes [28] - 1195:21, 1195:23, 1196:1, 1202:15, 1210:11, 1210:20, 1210:24, 1210:25, 1211:10, 1222:9, 1222:10, 1222:11, 1223:22, 1223:24, 1224:19, 1228:19, 1238:12, 1238:22, 1271:5, 1272:18, 1277:6, 1277:7, 1285:6, 1290:23, 1299:8, 1300:9, 1300:17

# F

F.Supp.2d [1] - 1323:12

face [2] - 1339:21

face-to-face [1] - 1339:21

facilitated [1] - 1341:12

fact [26] - 1208:15, 1211:16, 1226:18, 1237:2, 1237:11, 1240:24, 1243:10, 1245:23, 1280:14, 1289:21, 1313:7, 1313:11, 1314:17, 1315:5, 1316:2, 1316:4, 1316:6, 1317:3, 1320:10, 1321:10, 1322:3, 1329:6, 1335:24, 1339:14, 1341:12, 1343:11

factors [1] - 1279:8

facts [3] - 1315:13, 1333:15, 1339:9

factual [1] - 1335:24

failed [3] - 1315:13, 1317:9, 1337:10

fails [1] - 1315:9

failure [7] - 1322:14, 1323:9, 1323:13, 1325:11, 1337:12, 1338:6, 1340:8

fair [18] - 1205:6, 1205:16, 1209:15, 1236:16, 1251:9, 1251:10, 1256:13, 1256:18, 1257:4, 1257:14, 1257:17, 1257:25, 1259:7, 1259:17, 1259:18, 1290:24, 1303:11, 1306:21

fairly [1] - 1254:18

fairness [1] - 1226:14

familiar [2] - 1200:1, 1258:25

far [7] - 1237:18, 1240:11, 1252:16, 1254:3, 1254:13, 1292:6, 1296:14

fashion [1] - 1314:20

fast [3] - 1266:12, 1270:19, 1301:14

fat [1] - 1281:1

faucet [1] - 1198:10

fault [3] - 1327:13, 1332:14, 1332:22

favor [2] - 1335:21, 1339:14

favorable [1] - 1324:17

fear [21] - 1203:7, 1203:9, 1319:4, 1319:9, 1319:10, 1319:20, 1320:3, 1320:7, 1320:9, 1320:11, 1320:12, 1320:17, 1320:20, 1320:24, 1321:4, 1321:13, 1321:15, 1321:19, 1321:21, 1322:5, 1322:10

feature [2] - 1334:6, 1338:9

features [2] - 1270:21, 1271:13

Federal [2] - 1229:20, 1229:24

federal [11] - 1232:4, 1234:1, 1246:7, 1250:18, 1250:24, 1250:25, 1256:18, 1257:3, 1258:10, 1260:5

feet [1] - 1237:10

FELIPE [1] - 1187:24

felt [1] - 1340:3

FEMA [63] - 1187:4, 1199:4, 1199:9, 1208:22, 1227:15, 1229:4, 1231:16, 1235:12, 1235:19, 1237:12, 1237:15, 1244:4, 1244:7, 1244:8, 1245:12, 1248:10, 1250:16, 1251:1, 1251:12, 1251:13, 1251:24, 1253:14, 1253:15, 1253:22, 1254:2, 1254:12, 1255:21, 1255:23, 1256:15, 1256:16, 1256:18, 1257:5, 1257:11, 1257:20, 1257:23, 1258:3, 1258:10, 1258:17, 1259:2, 1259:4, 1259:15, 1259:19, 1259:25, 1260:6, 1260:21, 1261:9, 1313:7, 1313:10, 1318:10, 1318:13, 1322:2, 1322:6, 1325:11, 1326:5, 1326:6, 1326:12, 1326:23, 1329:9, 1329:12, 1331:10, 1337:24, 1339:22

FEMA's [7] - 1231:12, 1237:19, 1254:23, 1256:9, 1257:3, 1258:13, 1326:7

FEMA-provided [1] - 1261:9

FEMA-Waxman [1] - 1253:15

few [5] - 1190:14, 1213:17, 1322:8, 1331:12, 1337:17

field [12] - 1191:20, 1192:6, 1193:10, 1200:19, 1232:16, 1242:6, 1263:22, 1264:3, 1265:4, 1290:1, 1290:5, 1315:22

fields [1] - 1317:4

Fifth [2] - 1312:12, 1325:16

fight [4] - 1194:9, 1194:11, 1194:12, 1194:20

figure [1] - 1254:21, 1289:18, 1290:6, 1291:15, 1294:23, 1297:6

**figured** [1] - 1314:14
**file** [2] - 1230:19, 1264:18
**files** [1] - 1322:18
**filing** [1] - 1314:17
**filled** [1] - 1252:11
**final** [2] - 1248:1, 1336:11
**finally** [2] - 1278:9, 1322:13
**finder** [3] - 1316:2, 1316:3, 1316:5
**fine** [4] - 1212:13, 1219:24, 1226:24, 1335:6
**finish** [5] - 1229:13, 1262:24, 1263:3, 1309:7, 1309:8
**finite** [1] - 1286:5
**fire** [1] - 1195:14
**firing** [1] - 1221:22
**firm** [4] - 1265:25, 1267:18, 1268:7, 1268:10
**firmly** [1] - 1215:9
**first** [38] - 1191:6, 1192:15, 1195:20, 1195:25, 1196:25, 1197:2, 1200:24, 1208:7, 1212:1, 1228:3, 1234:24, 1237:11, 1240:21, 1244:24, 1246:12, 1253:18, 1254:1, 1260:24, 1264:13, 1265:25, 1271:6, 1277:5, 1277:6, 1279:20, 1279:21, 1280:17, 1286:19, 1290:14, 1299:1, 1302:25, 1303:7, 1308:15, 1309:25, 1321:14, 1323:24, 1325:6, 1332:18
**fit** [2] - 1252:8, 1330:11
**FIT** [1] - 1266:4
**five** [6] - 1192:18, 1192:25, 1266:24, 1296:4, 1296:7, 1334:4
**fixed** [1] - 1336:21
**flattens** [1] - 1286:13
**flaws** [1] - 1213:14
**flew** [2] - 1203:14, 1205:2
**flight** [3] - 1194:9, 1194:13, 1194:20
**floating** [1] - 1342:15
**Florida** [3] - 1261:18,

1267:2, 1267:10
**flu** [1] - 1300:17
**Fluor** [1] - 1257:5
**fly** [1] - 1204:14
**foam** [1] - 1268:23
**focus** [1] - 1244:13
**focused** [1] - 1290:23
**folks** [2] - 1243:4, 1305:23
**follow** [2] - 1200:19, 1317:21
**following** [5] - 1200:24, 1235:23, 1261:18, 1334:5, 1335:17
**follows** [2] - 1191:7, 1264:14
**food** [9] - 1214:1, 1214:3, 1280:14, 1280:18, 1280:20, 1291:1, 1294:14, 1294:25, 1297:21
**FOR** [2] - 1187:16, 1188:3
**forced** [1] - 1226:2
**foregoing** [1] - 1344:25
**forgetting** [2] - 1194:21, 1293:13
**forgiven** [1] - 1335:4
**form** [3] - 1250:11, 1257:16, 1314:20
**formal** [4] - 1247:2, 1247:16, 1247:19, 1247:20
**formaldehyde** [220] - 1192:7, 1192:9, 1192:19, 1193:13, 1193:14, 1193:18, 1193:19, 1193:24, 1194:1, 1194:6, 1195:16, 1195:24, 1196:4, 1196:5, 1196:6, 1196:12, 1196:17, 1198:7, 1200:17, 1200:25, 1201:1, 1201:13, 1202:8, 1202:23, 1203:1, 1203:5, 1203:15, 1203:21, 1204:2, 1205:9, 1205:12, 1205:15, 1205:19, 1205:23, 1206:7, 1206:11, 1206:18, 1207:7, 1207:19, 1208:17, 1208:21, 1208:23, 1209:2, 1209:5, 1209:9, 1209:24, 1210:21, 1210:24,

1211:25, 1212:1, 1214:24, 1215:8, 1215:13, 1216:13, 1216:21, 1217:21, 1217:23, 1218:6, 1218:12, 1218:19, 1218:22, 1219:1, 1219:11, 1220:3, 1220:9, 1220:17, 1221:7, 1221:13, 1221:17, 1223:16, 1224:6, 1225:3, 1225:4, 1225:15, 1226:1, 1227:6, 1228:10, 1228:15, 1233:24, 1234:8, 1234:11, 1235:1, 1235:19, 1236:1, 1236:17, 1237:21, 1238:6, 1238:15, 1238:18, 1239:14, 1239:19, 1240:2, 1240:8, 1240:12, 1240:14, 1241:4, 1241:7, 1241:10, 1242:21, 1243:22, 1244:2, 1244:5, 1244:17, 1245:24, 1248:24, 1249:25, 1250:23, 1251:13, 1251:21, 1251:22, 1253:2, 1253:5, 1253:8, 1253:10, 1253:22, 1255:9, 1255:22, 1258:13, 1259:5, 1268:17, 1268:18, 1268:21, 1268:23, 1269:2, 1269:7, 1270:10, 1270:12, 1272:8, 1272:15, 1273:13, 1273:15, 1273:24, 1274:1, 1274:13, 1276:14, 1277:22, 1280:12, 1280:13, 1280:16, 1280:19, 1280:20, 1280:21, 1280:23, 1280:24, 1281:2, 1281:4, 1281:6, 1281:14, 1281:16, 1281:18, 1281:20, 1281:21, 1281:23, 1282:1, 1282:5, 1282:11, 1282:16, 1282:19, 1283:2, 1283:17, 1283:21, 1283:23, 1285:4, 1285:7, 1285:23, 1285:25, 1286:5, 1286:12, 1286:16, 1286:18,

1286:19, 1288:6, 1288:9, 1288:11, 1288:14, 1290:15, 1291:5, 1291:16, 1291:19, 1292:17, 1293:3, 1293:4, 1293:6, 1293:12, 1293:20, 1293:25, 1294:1, 1294:5, 1294:6, 1294:7, 1294:14, 1295:3, 1295:6, 1297:16, 1297:19, 1298:7, 1298:22, 1299:2, 1299:14, 1300:5, 1304:13, 1304:18, 1304:20, 1313:9, 1314:4, 1314:8, 1318:10, 1318:16, 1318:20, 1337:22, 1338:2, 1340:12, 1341:4, 1341:19, 1343:13
**FORMALDEHYDE** [1] - 1187:4
**Formaldehyde** [16] - 1201:4, 1201:6, 1201:8, 1207:12, 1207:16, 1207:18, 1207:23, 1208:3, 1208:4, 1208:5, 1208:10, 1208:11, 1208:12, 1208:16, 1227:1, 1235:12
**formaldehyde-based** [2] - 1226:1, 1228:10
**formaldehyde-containing** [2] - 1288:9, 1288:11
**formaldehyde-emitting** [1] - 1249:25
**formaldehyde-induced** [1] - 1228:15
**formally** [1] - 1247:17
**former** [1] - 1232:15
**forms** [1] - 1260:18
**FORTE** [1] - 1188:3
**forth** [2] - 1223:8, 1256:3
**forward** [4] - 1190:22, 1243:7, 1243:10, 1319:17
**forwarded** [1] - 1235:13
**foundation** [4] - 1289:1, 1312:17, 1319:18, 1321:22
**FOUR** [1] - 1187:17

**four** [18] - 1190:16, 1192:25, 1198:16, 1198:18, 1198:20, 1212:24, 1257:10, 1265:19, 1266:16, 1282:22, 1285:17, 1289:19, 1292:16, 1300:22, 1314:19, 1321:8, 1343:6
**four-year** [1] - 1266:16
**fourth** [1] - 1312:1
**frame** [2] - 1235:4, 1339:3
**frames** [1] - 1340:16, 1342:18
**framework** [1] - 1258:25
**free** [3] - 1280:23, 1281:16, 1324:7
**frequency** [2] - 1253:5, 1253:8
**fresh** [3] - 1272:9, 1273:15, 1307:2
**FRIDAY** [2] - 1187:6, 1190:3
**Friday** [2] - 1235:7, 1306:22
**friends** [1] - 1307:18
**fright** [3] - 1194:9, 1194:12, 1194:20
**frightened** [1] - 1194:12
**front** [4] - 1224:22, 1224:23, 1305:19, 1333:4
**frontal** [2] - 1213:6, 1213:11
**froze** [1] - 1215:15
**fryer** [1] - 1225:23
**frying** [2] - 1225:23, 1299:12
**fulfill** [1] - 1257:3
**full** [3] - 1191:8, 1264:10, 1268:3
**function** [3] - 1276:18, 1276:24, 1291:5
**fund** [1] - 1314:23
**furnish** [1] - 1249:16
**furnished** [3] - 1327:11, 1332:11, 1335:20
**future** [7] - 1310:11, 1310:15, 1310:17, 1310:19, 1311:13, 1311:19, 1311:21

**G**

**G-a-r-r-a-t-t** [1] -

1229:11
**game** [1] - 1262:23
**garden** [3] - 1201:21, 1202:16, 1221:9
**Garratt** [9] - 1229:4, 1229:17, 1229:18, 1235:11, 1251:1, 1254:23, 1262:5, 1329:12, 1339:24
**Garratt's** [2] - 1229:11, 1229:15
**GARRATT.............** [1] - 1189:10
**GARRISON** [24] - 1188:3, 1188:3, 1301:17, 1301:22, 1305:21, 1306:17, 1309:18, 1309:20, 1310:10, 1310:16, 1311:16, 1312:1, 1314:11, 1315:1, 1318:4, 1319:2, 1319:24, 1320:3, 1320:25, 1321:24, 1322:13, 1323:3, 1323:11, 1324:19
**Garrison** [3] - 1309:20, 1315:25, 1317:9
**gas** [1] - 1225:25
**gasses** [2] - 1225:4, 1286:8
**gassing** [12] - 1209:2, 1209:5, 1285:23, 1286:13, 1286:24, 1287:1, 1287:2, 1287:10, 1287:17, 1289:18, 1289:20, 1289:23
**Gautreaux** [16] - 1197:5, 1310:24, 1311:20, 1312:9, 1312:24, 1313:1, 1313:5, 1313:7, 1313:13, 1314:5, 1315:1, 1315:8, 1317:16, 1318:7, 1318:12, 1318:21
**Gautreaux's** [2] - 1312:23, 1313:16
**general** [16] - 1233:14, 1238:16, 1283:6, 1295:18, 1295:23, 1312:4, 1312:8, 1312:21, 1313:23, 1313:25, 1315:2, 1315:3, 1320:4, 1327:18, 1327:20, 1334:22
**generalized** [1] -

1333:16
**generally** [5] - 1238:9, 1295:13, 1306:14, 1324:9, 1334:18
**generate** [5] - 1193:18, 1280:21, 1281:14, 1298:7, 1299:11
**generated** [1] - 1274:18
**generic** [1] - 1226:21
**gentlemen** [2] - 1207:9, 1207:11
**germane** [1] - 1244:21
**Gil** [1] - 1235:11
**Ginoven** [1] - 1291:12
**Ginovin** [1] - 1287:4
**given** [15] - 1197:5, 1233:3, 1238:7, 1238:21, 1242:13, 1255:10, 1255:12, 1268:23, 1270:9, 1306:6, 1312:20, 1317:1, 1325:16, 1327:17, 1333:7
**gland** [1] - 1213:5
**GLASS** [1] - 1188:8
**glasses** [1] - 1288:20
**glaucoma** [1] - 1202:15
**glottis** [2] - 1214:8, 1214:11
**glue** [1] - 1225:3, 1225:4
**glues** [1] - 1225:11
**goal** [1] - 1201:25
**goal-directed** [1] - 1201:25
**God** [2] - 1191:3, 1264:7
**gold** [1] - 1269:19
**Golden** [3] - 1207:25, 1208:2, 1208:8
**goose** [1] - 1200:6
**governing** [1] - 1258:21
**government** [5] - 1232:4, 1258:10, 1267:3, 1267:4, 1336:7
**graduate** [1] - 1266:25
**graduates** [1] - 1268:5
**grant** [7] - 1310:14, 1310:19, 1319:12, 1319:21, 1335:5, 1335:6, 1336:1
**granted** [1] - 1284:18
**granting** [1] - 1321:5
**gravamen** [1] - 1339:6
**Gravel** [1] - 1328:24

**grease** [1] - 1299:12
**great** [1] - 1220:14
**greater** [3] - 1259:12, 1277:5, 1297:17
**Griffin** [1] - 1328:18
**grist** [1] - 1318:2
**ground** [2] - 1223:6, 1253:23
**group** [3] - 1192:14, 1207:18, 1236:22
**groups** [3] - 1192:16, 1248:7, 1280:20
**GUERRA** [1] - 1187:16
**guess** [9] - 1279:20, 1289:8, 1294:3, 1298:12, 1323:5, 1328:9, 1333:21, 1336:13, 1342:13
**guest** [1] - 1193:5
**guidance** [2] - 1246:18, 1249:8
**guideline** [3] - 1302:14, 1304:14, 1304:24
**guidelines** [1] - 1224:25
**Gulf** [3] - 1231:23, 1232:7, 1251:8
**guy** [1] - 1208:2
**guys** [4] - 1257:14, 1298:12, 1329:16, 1329:17

## H

**habitation** [1] - 1237:3
**half** [8] - 1215:16, 1265:24, 1272:21, 1285:21, 1292:21, 1306:14
**hand** [13] - 1191:1, 1241:14, 1241:18, 1241:20, 1242:1, 1242:2, 1242:10, 1264:5, 1280:11, 1280:18, 1328:14, 1340:15
**handed** [1] - 1331:10
**handicap** [4] - 1331:14, 1334:6, 1334:8
**handicapped** [4] - 1329:8, 1329:18, 1329:19, 1331:16
**handle** [4] - 1240:16, 1256:5, 1256:25, 1331:16
**handled** [1] - 1320:10
**handling** [1] - 1237:16

**handwritten** [1] - 1329:3
**hard** [3] - 1200:10, 1246:14, 1268:3
**harm** [1] - 1311:11
**haul** [1] - 1267:5
**hazard** [1] - 1304:22
**hazardous** [5] - 1266:1, 1335:18, 1338:16, 1338:20, 1341:10
**head** [3] - 1212:10, 1262:3, 1321:9
**headaches** [14] - 1220:17, 1220:20, 1220:22, 1220:23, 1221:5, 1221:7, 1221:11, 1221:12, 1221:13, 1221:15, 1221:17, 1222:20, 1300:18
**headed** [1] - 1235:21
**heading** [1] - 1239:16
**health** [14] - 1205:24, 1206:14, 1235:16, 1240:19, 1242:22, 1242:24, 1243:6, 1243:22, 1245:14, 1247:21, 1254:24, 1266:8, 1272:14, 1278:21
**Health** [1] - 1235:21, 1236:2
**healthy** [1] - 1276:16
**hear** [3] - 1263:7, 1284:19, 1307:5
**HEARD** [1] - 1187:12
**heard** [9] - 1223:10, 1267:13, 1269:10, 1281:4, 1307:25, 1308:3, 1329:12, 1338:1, 1341:3
**Hearing** [1] - 1235:14
**hearings** [1] - 1207:13
**heavy** [1] - 1266:9
**heed** [1] - 1324:9
**heeded** [1] - 1324:12
**held** [9] - 1226:12, 1229:8, 1230:1, 1284:10, 1284:24, 1302:5, 1304:8, 1328:19, 1335:15
**help** [8] - 1191:3, 1241:5, 1257:6, 1264:7, 1266:1, 1268:5, 1275:6, 1321:2
**helped** [2] - 1267:4, 1267:10
**helping** [1] - 1244:10

**hereby** [1] - 1344:25
**Hewett** [2] - 1224:14, 1283:22
**HHS** [1] - 1244:9
**hierarchy** [2] - 1191:21, 1191:22
**high** [9] - 1215:10, 1217:4, 1217:25, 1220:10, 1234:9, 1287:9, 1287:23, 1292:4, 1298:6
**higher** [14] - 1209:2, 1209:4, 1209:17, 1210:5, 1210:21, 1275:18, 1276:2, 1278:19, 1288:10, 1288:14, 1292:14, 1297:23, 1298:10, 1298:16
**highest** [4] - 1272:17, 1282:23, 1285:24, 1299:24
**highlight** [4] - 1324:17, 1332:5, 1332:7, 1343:11
**highlighted** [2] - 1273:13, 1324:16
**Hill** [1] - 1257:5
**hired** [7] - 1204:19, 1207:9, 1207:11, 1207:13, 1226:25, 1268:8, 1314:20
**hiring** [1] - 1207:11
**histological** [11] - 1200:3, 1218:5, 1218:11, 1218:14, 1218:16, 1220:3, 1220:5, 1223:9, 1223:10, 1223:16, 1223:18
**histology** [1] - 1283:16
**history** [17] - 1196:22, 1196:24, 1197:14, 1197:15, 1199:8, 1203:15, 1203:25, 1207:22, 1210:3, 1256:14, 1256:16, 1261:25, 1312:16, 1313:17, 1315:13, 1316:18, 1333:4
**hit** [2] - 1251:7
**hoarse** [1] - 1197:7
**hoc** [2] - 1238:2, 1238:3
**hold** [4] - 1229:18, 1230:8, 1244:5, 1244:19
**Holstrom** [3] - 1199:24, 1200:1,

1200:3
home [21] - 1201:23, 1202:5, 1202:10, 1202:11, 1202:17, 1202:22, 1237:3, 1237:5, 1244:22, 1244:23, 1245:10, 1252:9, 1252:13, 1252:14, 1252:21, 1252:25, 1283:13, 1297:3, 1306:24, 1333:11
Homeland [2] - 1235:17, 1243:19
homeowner [1] - 1333:9
homes [11] - 1246:1, 1268:21, 1268:22, 1282:22, 1282:25, 1283:12, 1283:14, 1283:16, 1293:1, 1322:24, 1333:6
honestly [1] - 1241:16
Honor [33] - 1190:21, 1193:6, 1204:9, 1206:25, 1211:3, 1211:14, 1212:3, 1219:7, 1219:14, 1220:24, 1221:19, 1226:9, 1228:25, 1229:3, 1264:17, 1287:13, 1301:17, 1303:25, 1309:20, 1310:13, 1310:22, 1311:16, 1313:21, 1318:17, 1319:13, 1325:5, 1325:22, 1327:3, 1329:2, 1329:21, 1336:6, 1339:13, 1344:7
HONORABLE [1] - 1187:12
hook [3] - 1258:8, 1258:9
hooked [1] - 1276:25
hooky [2] - 1216:5, 1217:17
hope [3] - 1241:11, 1301:14, 1308:10
hoping [1] - 1274:19
Hospital [6] - 1192:3, 1192:4, 1193:3, 1193:4, 1193:5
hot [4] - 1251:8, 1256:1, 1258:4, 1258:8
hotels [1] - 1255:19
hotter [1] - 1187:4
hour [9] - 1204:22, 1204:23, 1205:2,

1208:14, 1262:25, 1263:2, 1268:11, 1306:14, 1307:13
hours [9] - 1268:4, 1296:3, 1296:4, 1296:7, 1296:21, 1297:4, 1297:6, 1297:7, 1305:4
household [1] - 1322:15
housekeeping [1] - 1305:22
housekeeping-type [1] - 1305:22
houses [1] - 1236:22
Housing [2] - 1328:4, 1330:23
housing [25] - 1206:8, 1206:12, 1231:19, 1231:24, 1232:24, 1236:20, 1246:1, 1246:4, 1252:2, 1255:10, 1256:10, 1256:13, 1256:14, 1256:16, 1257:4, 1257:16, 1260:18, 1260:21, 1260:23, 1260:24, 1260:25, 1261:9, 1261:13, 1261:15, 1334:25
HOUSTON [1] - 1187:24
HUD [5] - 1205:15, 1205:18, 1236:11, 1246:2, 1246:8
human [5] - 1194:5, 1212:10, 1213:18, 1215:11, 1265:20
humans [2] - 1216:18, 1269:15
humid [1] - 1251:8
humidity [2] - 1208:22, 1209:2
hundred [3] - 1218:18, 1219:15, 1294:1
hundreds [1] - 1299:10
hungry [1] - 1263:14
Hurricane [7] - 1246:9, 1251:2, 1251:14, 1251:25, 1252:1, 1252:23, 1254:10
hurricanes [3] - 1251:5, 1251:7, 1261:18
Hurricanes [1] - 1252:5
hydrocarbons [1] - 1267:8

hygiene [1] - 1234:12
hypothetically [1] - 1300:21

I

IA [1] - 1256:23
IA-TAC [1] - 1256:23
IARC [4] - 1295:11, 1295:14, 1295:19, 1295:24
idea [2] - 1225:14, 1300:14
identified [1] - 1281:20
identify [1] - 1331:3
ignore [3] - 1195:12, 1269:23, 1270:2
ignoring [1] - 1194:18
ill [1] - 1244:1
illness [2] - 1235:25, 1315:6
illnesses [1] - 1315:4
imagine [1] - 1250:6
immediate [1] - 1246:18
immediately [1] - 1198:23
immovable [1] - 1333:6
immunity [4] - 1328:2, 1328:5, 1328:11, 1335:4
immunologist [1] - 1191:16
immunology [3] - 1191:25, 1192:5, 1193:7
impeachment [4] - 1219:15, 1312:10, 1312:15, 1315:20
imperfectly [1] - 1238:24
implicate [1] - 1328:20
implicit [2] - 1328:6, 1330:24
importance [1] - 1242:13
important [5] - 1231:4, 1231:22, 1265:13, 1329:22, 1332:20
importantly [2] - 1329:8, 1340:18
improper [1] - 1219:14
IN [1] - 1187:12
inadequate [3] - 1312:17, 1317:8,

1324:8
inappropriate [1] - 1304:23
inaudible [1] - 1302:19
Inc [3] - 1267:17, 1267:18, 1328:23
include [2] - 1335:10, 1335:25
including [1] - 1317:22
incorporate [1] - 1324:25
incorporated [1] - 1334:21
incorporation [1] - 1333:21
increase [8] - 1208:22, 1208:24, 1209:8, 1274:4, 1278:8, 1279:25, 1312:25, 1313:6
increased [4] - 1235:2, 1319:3, 1319:5, 1319:16
indeed [1] - 1248:10
independent [7] - 1234:1, 1234:15, 1296:13, 1307:24, 1308:4, 1327:22, 1327:23
indicated [3] - 1229:12, 1244:24, 1315:19
indicates [1] - 1318:8
indicating [1] - 1279:4
indicating) [2] - 1275:16, 1275:22
indication [3] - 1254:15, 1314:24, 1337:3
indications [1] - 1271:4
individual [6] - 1202:22, 1209:23, 1218:17, 1239:16, 1274:16, 1276:16
individual's [1] - 1252:6
individuals [7] - 1202:9, 1238:9, 1238:25, 1240:10, 1260:25, 1261:13, 1261:19
indoor [15] - 1236:7, 1236:10, 1236:13, 1282:17, 1291:13, 1292:15, 1293:11, 1293:14, 1295:5, 1297:23, 1299:3,

1299:9, 1299:11, 1299:12
induce [1] - 1276:19
induced [1] - 1228:15
inducing [1] - 1277:20
industrial [2] - 1234:11, 1265:12
Industries [1] - 1325:25
industry [13] - 1207:18, 1246:6, 1248:7, 1248:22, 1249:2, 1329:10, 1329:14, 1329:20, 1329:23, 1330:3, 1334:22, 1334:24, 1335:2
industry's [1] - 1250:24
inexpensive [1] - 1252:13
inextricably [1] - 1329:23
inferior [1] - 1213:21
inflammation [3] - 1199:20, 1200:12, 1212:8
influences [1] - 1271:16
information [7] - 1195:9, 1240:12, 1314:22, 1329:15, 1339:9, 1339:10, 1342:18
ingest [1] - 1214:1
inhabitant [1] - 1338:21
inherent [1] - 1248:15
initial [5] - 1241:18, 1241:24, 1246:15, 1264:15, 1275:17
initiate [1] - 1338:3
initiated [2] - 1206:22, 1338:5
injection [2] - 1197:22, 1197:23
injured [4] - 1205:20, 1206:17, 1278:20, 1335:16
injuries [1] - 1323:19
injury [3] - 1206:4, 1280:16, 1320:8
inner [3] - 1192:7, 1192:9, 1192:12
Inner [1] - 1192:14
input [1] - 1240:10
inside [4] - 1193:16, 1212:20, 1291:4, 1293:25
insofar [1] - 1331:18

inspection [2] - 1336:19, 1336:20
install [3] - 1256:9, 1256:20, 1257:6
installation [2] - 1230:22, 1231:7
installing [1] - 1343:21
instance [2] - 1231:18, 1334:3
instances [1] - 1340:24
instead [3] - 1255:18, 1255:19, 1288:13
instruction [4] - 1335:7, 1335:13, 1335:22, 1336:2
instructions [6] - 1306:9, 1306:12, 1307:9, 1308:25, 1331:6, 1335:13
instrument [1] - 1299:10
insufficiency [3] - 1327:13, 1332:15, 1332:22
insufficient [1] - 1313:18
insulation [1] - 1268:22
Insurance [1] - 1328:19
intend [1] - 1306:2
intended [2] - 1305:4, 1309:2
intensity [2] - 1277:5
intent [4] - 1201:8, 1242:9, 1242:14, 1242:16
interaction [2] - 1339:18, 1339:20
interactions [1] - 1340:20
interest [3] - 1268:25, 1269:13, 1288:6
interested [1] - 1241:3
interesting [1] - 1275:14
interior [1] - 1334:7
intermediary [1] - 1193:17
International [3] - 1325:17, 1325:25, 1328:18
internist [2] - 1191:16, 1193:7
interposed [1] - 1326:25
interpret [1] - 1276:5
interpretation [1] -

1276:4
interpreting [1] - 1277:12
interrupt [1] - 1323:6
intertwined [1] - 1329:23
intervals [1] - 1270:11
interviewed [1] - 1224:17
introduce [2] - 1270:25, 1272:9
investigation [1] - 1251:11
investigations [2] - 1268:19, 1268:20
investigator [2] - 1270:25, 1301:9
investigators [1] - 1272:1
invoke [2] - 1334:12, 1334:16
involved [10] - 1208:16, 1208:21, 1230:10, 1230:16, 1235:18, 1235:20, 1235:23, 1243:25, 1248:25, 1332:18
involvement [1] - 1342:25
involves [1] - 1332:16
involving [1] - 1304:20
irrelevant [1] - 1211:15
irritant [20] - 1193:24, 1195:16, 1195:18, 1195:24, 1196:3, 1196:6, 1196:7, 1196:11, 1196:18, 1198:19, 1198:25, 1199:1, 1200:17, 1201:13, 1203:1, 1210:7, 1210:10, 1210:22, 1275:9, 1341:19
irritants [5] - 1195:24, 1196:15, 1198:24, 1299:15, 1299:16
irritate [1] - 1195:19
irritated [12] - 1196:6, 1198:8, 1198:13, 1222:11, 1223:22, 1275:1, 1275:13, 1291:16, 1291:18, 1293:2, 1300:9, 1300:17
irritates [1] - 1195:20
irritating [7] - 1198:6, 1198:9, 1223:21, 1273:21, 1275:2,

1275:4, 1275:9
irritation [50] - 1196:10, 1199:3, 1201:25, 1202:13, 1202:14, 1202:23, 1218:19, 1218:22, 1219:1, 1219:12, 1220:10, 1220:14, 1222:4, 1222:6, 1222:13, 1223:9, 1224:1, 1269:7, 1271:4, 1271:5, 1271:7, 1271:21, 1271:22, 1273:1, 1273:3, 1273:17, 1273:18, 1273:25, 1274:1, 1274:3, 1275:17, 1275:18, 1275:23, 1275:25, 1276:7, 1284:18, 1285:6, 1290:6, 1290:16, 1290:21, 1293:8, 1293:10, 1293:16, 1296:8, 1296:10, 1296:14, 1300:7, 1300:12
irritative [2] - 1198:11, 1198:12
Isles [2] - 1235:8, 1235:10
isles [1] - 1235:9
isocyanate [2] - 1226:8, 1228:10
isocyanate-based [1] - 1228:10
isocyanates [4] - 1225:12, 1225:15, 1225:19, 1228:7
issuance [1] - 1239:6
issue [41] - 1203:7, 1207:7, 1228:22, 1233:1, 1233:2, 1233:22, 1234:18, 1235:19, 1235:20, 1236:5, 1238:19, 1240:21, 1240:25, 1241:1, 1248:3, 1248:6, 1248:19, 1259:16, 1259:24, 1268:21, 1287:17, 1289:17, 1290:25, 1291:23, 1296:1, 1303:5, 1315:12, 1316:9, 1316:19, 1320:7, 1323:3, 1325:9, 1330:1, 1332:18, 1332:20, 1336:11, 1337:1, 1337:8, 1337:22, 1339:4

issued [4] - 1234:20, 1234:22, 1235:3
issues [17] - 1190:12, 1233:4, 1237:18, 1238:11, 1238:16, 1243:21, 1244:17, 1248:24, 1265:12, 1265:13, 1304:2, 1309:15, 1312:20, 1320:6, 1327:20, 1331:18, 1337:5
itchy [1] - 1196:1
itself [4] - 1312:24, 1326:9, 1331:2, 1339:17

J

J-A-M-E-S [1] - 1264:11
JAMES [3] - 1189:5, 1191:5, 1264:12
James [13] - 1191:10, 1263:19, 1263:20, 1263:21, 1263:24, 1264:3, 1264:11, 1265:3, 1283:20, 1285:3, 1285:9, 1285:13, 1297:15
James' [1] - 1264:17
JAMES......................
.................. [1] - 1189:11
Jamieson [2] - 1235:11, 1248:2
Jamieson's [1] - 1248:9
January [5] - 1219:6, 1230:3, 1230:6, 1285:14, 1313:3
Jarrell [2] - 1343:9, 1343:16
Jeff [3] - 1235:5, 1235:15, 1235:18
Jewish [2] - 1193:4
job [4] - 1212:22, 1230:6, 1233:14, 1269:2
jobs [2] - 1268:2, 1269:1
Joe [1] - 1302:15
joint [2] - 1232:16, 1265:14
JOSEPH [1] - 1188:8
JUDGE [1] - 1187:13
Judge [12] - 1211:17, 1212:12, 1226:23, 1262:13, 1263:18, 1263:23, 1284:22,

1289:1, 1297:12, 1319:25, 1328:17, 1340:11
judge [9] - 1263:21, 1305:8, 1314:13, 1319:8, 1323:21, 1324:21, 1330:15, 1339:12, 1344:3
July [3] - 1235:4, 1253:22, 1254:13
jump [1] - 1225:23
jumped [1] - 1227:2
juncture [1] - 1316:15
June [14] - 1232:6, 1233:10, 1233:22, 1237:15, 1239:5, 1240:4, 1241:24, 1242:7, 1248:1, 1336:16, 1336:22, 1336:24, 1339:3, 1341:1
jurisprudence [1] - 1331:25
JURY [1] - 1187:12
jury [43] - 1190:8, 1196:24, 1211:17, 1215:6, 1226:17, 1227:5, 1241:21, 1262:11, 1268:16, 1269:5, 1273:9, 1278:3, 1280:17, 1288:3, 1301:21, 1303:1, 1305:13, 1305:19, 1305:23, 1306:1, 1306:8, 1306:12, 1307:18, 1307:21, 1308:13, 1311:25, 1316:7, 1316:12, 1320:21, 1321:13, 1322:12, 1324:5, 1324:7, 1324:14, 1326:2, 1330:2, 1330:12, 1335:7, 1335:13, 1336:2, 1342:4, 1342:11, 1342:23
justifiable [1] - 1335:17

K

Katrina [16] - 1198:1, 1227:10, 1246:9, 1251:2, 1251:14, 1251:19, 1251:25, 1252:1, 1252:5, 1252:23, 1254:10, 1254:14, 1256:13, 1260:17, 1261:7, 1261:23

**keep** [5] - 1200:21, 1201:1, 1249:1, 1267:16, 1288:2
**Keflex** [1] - 1197:9
**Kenner** [7] - 1291:25, 1292:5, 1292:6, 1294:3, 1294:7, 1297:17, 1298:13
**kept** [1] - 1267:20
**ketones** [2] - 1299:15, 1299:16
**Kevin** [1] - 1233:20
**key** [1] - 1287:18
**keys** [4] - 1337:17, 1338:21, 1340:9
**kids** [1] - 1245:6
**kind** [15] - 1197:3, 1202:18, 1212:9, 1213:25, 1216:7, 1221:8, 1238:6, 1263:14, 1267:22, 1268:1, 1271:1, 1277:11, 1291:8, 1314:23, 1341:14
**kinds** [4] - 1267:14, 1285:24, 1314:2, 1323:25
**knowing** [1] - 1249:17
**knowledge** [5] - 1247:19, 1251:15, 1262:1, 1313:8, 1341:3
**known** [6] - 1301:6, 1341:10, 1341:13, 1341:23, 1342:21, 1343:17
**knows** [4] - 1222:22, 1307:18, 1320:6, 1329:21
**Kulle** [4] - 1273:12, 1276:9, 1277:10, 1296:2
**Kurt** [1] - 1340:12
**KURT** [1] - 1187:12

## L

**LA** [3] - 1188:5, 1188:10, 1188:14
**labeled** [1] - 1275:9
**labels** [1] - 1276:2
**labs** [1] - 1283:16
**lack** [5] - 1310:20, 1312:6, 1312:21, 1321:3, 1321:4
**lacked** [1] - 1257:1, 1316:1
**LAKEWAY** [1] - 1188:9

**Lambert** [1] - 1326:1
**Lang** [7] - 1246:11, 1246:12, 1246:22, 1247:9, 1270:5, 1271:8, 1273:11
**language** [1] - 1240:11
**Lapinski** [1] - 1339:24
**large** [1] - 1290:12
**largely** [3] - 1290:18, 1290:19, 1291:6
**larger** [2] - 1279:25, 1299:14
**largest** [2] - 1256:14, 1256:16
**larynx** [4] - 1214:17, 1215:7, 1216:23, 1217:1
**last** [11] - 1192:17, 1204:5, 1204:13, 1263:16, 1285:13, 1296:1, 1302:11, 1303:16, 1303:25, 1311:6, 1314:15
**lastly** [1] - 1330:5
**late** [9] - 1207:10, 1233:22, 1240:3, 1241:24, 1242:7, 1268:20, 1306:21, 1306:22, 1307:10
**latest** [1] - 1229:14
**Lauan** [3] - 1288:22, 1288:23, 1289:15
**Laughery** [2] - 1339:14, 1340:4
**law** [16] - 1268:7, 1306:10, 1307:21, 1308:8, 1308:9, 1312:11, 1316:15, 1323:11, 1323:14, 1325:10, 1326:10, 1328:10, 1331:22, 1331:25, 1340:14, 1342:3
**LAW** [1] - 1187:20
**lawyer** [1] - 1314:21
**lawyers** [1] - 1204:19
**lay** [5] - 1231:22, 1259:25, 1316:11, 1320:21, 1320:22
**layout** [1] - 1331:19
**layperson** [1] - 1320:20
**lead** [2] - 1233:21, 1244:10
**leads** [1] - 1213:6
**leak** [1] - 1336:21
**learned** [2] - 1208:20, 1212:1
**least** [13] - 1200:22,

1233:5, 1233:16, 1240:19, 1241:14, 1241:18, 1242:4, 1245:22, 1249:12, 1252:18, 1255:17, 1261:19, 1344:2
**leave** [5] - 1196:3, 1196:8, 1196:10, 1263:6, 1309:4
**leaves** [3] - 1262:12, 1268:8, 1308:14
**Lee** [1] - 1191:23
**left** [8] - 1280:11, 1286:16, 1286:19, 1289:19, 1306:3, 1311:9, 1313:11, 1317:5
**left-hand** [1] - 1280:11
**legal** [1] - 1339:4
**legislative** [1] - 1333:4
**Lemus** [1] - 1283:12
**length** [1] - 1260:22
**less** [2] - 1254:14, 1296:12
**level** [43] - 1193:21, 1193:24, 1202:8, 1202:23, 1210:22, 1224:9, 1227:14, 1227:15, 1227:21, 1242:21, 1242:24, 1245:13, 1245:16, 1271:17, 1272:17, 1272:18, 1273:24, 1281:23, 1282:5, 1283:19, 1283:23, 1284:13, 1285:3, 1285:24, 1286:25, 1290:14, 1293:5, 1293:24, 1294:1, 1294:5, 1294:6, 1294:7, 1297:19, 1298:3, 1298:9, 1300:5, 1303:13, 1304:13, 1304:16, 1305:4, 1322:9, 1338:2, 1339:20
**levels** [42] - 1193:23, 1196:17, 1203:15, 1208:22, 1208:23, 1215:10, 1216:7, 1220:10, 1222:19, 1225:7, 1225:8, 1225:25, 1226:6, 1226:21, 1227:2, 1227:6, 1233:24, 1234:7, 1241:4, 1243:3, 1243:5, 1244:5, 1244:16, 1244:20, 1245:19, 1250:23, 1267:12,

1271:17, 1278:19, 1282:11, 1282:15, 1283:21, 1285:5, 1287:9, 1290:11, 1290:20, 1291:17, 1297:19, 1297:24
**LFE** [1] - 1288:13
**liability** [2] - 1323:13, 1333:18
**LIABILITY** [1] - 1187:5
**liable** [3] - 1327:8, 1332:8, 1335:15
**liaison** [1] - 1326:8
**life** [1] - 1195:6
**lifetime** [3] - 1282:4, 1282:6, 1282:16
**light** [2] - 1264:2, 1324:15
**lights** [1] - 1262:7
**likely** [3] - 1202:5, 1290:15, 1319:7
**likewise** [1] - 1316:6
**limine** [2] - 1312:2, 1320:5
**Line** [1] - 1325:13
**line** [10] - 1245:17, 1247:18, 1254:21, 1256:1, 1303:20, 1311:2, 1311:7, 1318:18, 1321:18, 1322:25
**lines** [4] - 1221:3, 1246:21, 1317:17, 1336:5
**linger** [1] - 1196:12
**link** [3] - 1200:16, 1314:6, 1322:5
**linked** [2] - 1256:1, 1256:6
**links** [1] - 1318:23
**list** [5] - 1201:23, 1201:24, 1202:2, 1202:16, 1308:21
**listed** [1] - 1334:19
**listen** [1] - 1206:5
**lists** [2] - 1201:22, 1221:9
**literally** [2] - 1299:10, 1308:19
**literature** [16] - 1200:25, 1203:6, 1210:18, 1211:11, 1216:21, 1216:24, 1217:1, 1217:9, 1217:24, 1221:6, 1221:17, 1269:6, 1269:9, 1269:10, 1290:23
**LITIGATION** [1] - 1187:5

**litigation** [5] - 1205:15, 1207:8, 1208:21, 1230:17, 1320:5
**Little's** [2] - 1302:15, 1303:6
**live** [11] - 1190:16, 1237:4, 1243:4, 1243:14, 1251:8, 1260:23, 1260:24, 1260:25, 1301:18, 1302:21, 1341:21
**lived** [5] - 1202:17, 1204:3, 1221:14, 1296:23, 1341:25
**liver** [1] - 1265:22
**living** [12] - 1199:4, 1237:6, 1243:13, 1245:20, 1252:25, 1261:5, 1261:13, 1261:19, 1261:24, 1313:7, 1318:10, 1322:2
**LLC** [1] - 1187:9
**location** [3] - 1294:4, 1298:14
**locked** [1] - 1287:7
**Lofgren** [1] - 1262:14
**logged** [1] - 1283:5
**long-standing** [2] - 1283:24, 1284:14
**long-term** [14] - 1196:11, 1196:14, 1196:18, 1232:18, 1236:20, 1237:3, 1237:8, 1239:19, 1240:1, 1240:7, 1240:12, 1249:17, 1249:19, 1249:24
**long-winded** [1] - 1311:17
**longer-term** [2] - 1232:18, 1237:6
**longest** [2] - 1261:7, 1296:4
**look** [28] - 1192:24, 1204:25, 1205:7, 1212:19, 1213:8, 1213:10, 1218:16, 1218:17, 1269:11, 1270:22, 1271:13, 1273:11, 1273:16, 1275:4, 1282:17, 1283:1, 1283:3, 1287:12, 1290:17, 1293:12, 1295:7, 1299:9, 1302:22, 1315:7, 1315:8, 1342:11
**looked** [11] - 1197:4,

Case 2:07-md-01873-KDE-MBN   Document 17803   Filed 11/05/10   Page 176 of 190

17

1201:19, 1203:24, 1248:23, 1265:11, 1270:8, 1276:23, 1276:24, 1296:6, 1302:8, 1319:24
**looking** [6] - 1271:3, 1273:16, 1278:25, 1280:7, 1331:2, 1334:25
**looks** [4] - 1253:15, 1263:9, 1263:15, 1283:5
**loop** [1] - 1336:13
**looped** [1] - 1236:5
**Lottie** [1] - 1298:1
**Louis** [4] - 1191:19, 1193:5, 1203:14, 1204:14
**LOUISIANA** [2] - 1187:1, 1187:6
**Louisiana** [23] - 1253:22, 1253:24, 1254:4, 1254:9, 1256:5, 1260:16, 1283:12, 1292:1, 1292:5, 1292:6, 1294:7, 1297:18, 1298:1, 1323:13, 1327:7, 1328:2, 1328:17, 1328:22, 1331:25, 1333:17, 1344:23, 1344:24
**loves** [1] - 1267:22
**low** [13] - 1196:17, 1216:7, 1225:8, 1226:1, 1226:6, 1226:16, 1226:21, 1277:17, 1282:25, 1288:10, 1292:3, 1298:5, 1299:23
**lower** [10] - 1193:23, 1271:17, 1275:22, 1276:3, 1276:17, 1282:19, 1282:24, 1286:25, 1297:22, 1338:2
**LPLA** [1] - 1310:6
**lunch** [9] - 1263:10, 1263:15, 1274:20, 1301:14, 1306:20, 1307:11, 1307:12, 1307:13, 1309:7
**lung** [2] - 1276:18, 1276:24
**lungs** [1] - 1276:21
**Lyon** [1] - 1309:20
**LYON** [1] - 1188:3

## M

**machine** [1] - 1277:1
**mail** [15] - 1235:5, 1236:4, 1243:16, 1244:4, 1244:7, 1244:12, 1244:21, 1244:25, 1246:11, 1246:25, 1247:13, 1248:1, 1302:11, 1337:25, 1341:3
**mailed** [2] - 1241:16, 1242:1
**mails** [2] - 1244:25, 1246:10
**main** [6] - 1197:4, 1197:10, 1197:12, 1197:15, 1198:2, 1255:24
**maintained** [1] - 1256:1
**maintenance** [12] - 1230:23, 1231:7, 1232:19, 1232:20, 1232:21, 1232:25, 1233:13, 1258:13, 1336:16, 1337:1, 1339:5, 1340:21
**majority** [1] - 1216:8
**mammogram** [2] - 1322:1, 1322:5
**man's** [1] - 1314:24
**manage** [2] - 1229:24, 1244:11
**Management** [2] - 1229:21, 1229:24
**management** [4] - 1229:25, 1302:14, 1304:14, 1304:24
**managing** [1] - 1230:11
**mandate** [1] - 1257:3
**maneuverability** [1] - 1331:18
**manpower** [1] - 1256:19
**manual** [1] - 1324:2
**manuals** [1] - 1322:17
**manufacture** [2] - 1207:19, 1285:18
**manufactured** [8] - 1206:8, 1206:12, 1246:1, 1246:4, 1260:18, 1261:13, 1286:24, 1333:19
**manufacturer** [3] - 1249:16, 1339:17, 1340:13
**manufacturer's** [1] -

1323:15
**manufacturers** [5] - 1245:22, 1245:25, 1249:7, 1249:20, 1250:14
**map** [1] - 1217:16
**March** [7] - 1209:12, 1209:13, 1313:12, 1318:9, 1336:18, 1337:7, 1337:8
**mark** [1] - 1234:16
**marked** [2] - 1253:14, 1280:10
**masse** [1] - 1246:25
**material** [4] - 1315:18, 1330:3, 1334:21
**materials** [2] - 1236:12, 1333:18
**mathematical** [1] - 1297:15
**matter** [7] - 1208:15, 1235:12, 1296:8, 1296:9, 1296:15, 1316:15, 1345:3
**matters** [6] - 1234:2, 1281:8, 1326:15, 1326:18, 1326:19, 1339:12
**maxillary** [3] - 1212:25, 1213:9, 1213:16
**maximal** [4] - 1277:21, 1278:9, 1278:11, 1278:24
**maximum** [1] - 1260:22
**MAY** [2] - 1187:6, 1190:3
**McCarthy** [1] - 1323:12
**McGwin** [1] - 1201:15
**McGwin's** [1] - 1314:1
**MDL** [1] - 1187:5
**meager** [1] - 1343:25
**mean** [35] - 1196:12, 1208:9, 1215:22, 1218:15, 1220:21, 1226:20, 1231:8, 1232:9, 1232:10, 1237:23, 1237:24, 1248:14, 1250:4, 1255:19, 1271:19, 1282:23, 1283:18, 1286:22, 1288:23, 1303:8, 1303:9, 1306:13, 1308:19, 1311:5, 1317:18, 1319:19, 1320:18, 1320:20, 1323:5, 1333:22, 1334:1,

1341:21, 1342:7, 1343:5, 1343:10
**meaning** [3] - 1231:13, 1241:8, 1299:25
**means** [10] - 1209:23, 1218:16, 1231:10, 1231:11, 1247:1, 1277:16, 1278:3, 1283:1, 1283:7, 1288:24
**meant** [2] - 1241:12, 1311:8
**meantime** [1] - 1307:15
**measurable** [2] - 1272:18, 1272:24
**measure** [3] - 1236:13, 1291:19, 1293:20
**measured** [4] - 1271:17, 1271:24, 1277:2, 1282:22
**measurement** [4] - 1224:11, 1273:11, 1276:24, 1291:21
**measurements** [4] - 1272:16, 1276:23, 1278:14, 1291:25
**measuring** [1] - 1281:1
**MECHANICAL** [1] - 1188:15
**mechanism** [2] - 1232:11, 1241:9
**mechanisms** [2] - 1295:20
**medical** [24] - 1191:20, 1191:21, 1199:13, 1203:23, 1204:1, 1243:18, 1243:22, 1244:18, 1247:3, 1266:7, 1266:25, 1284:20, 1302:8, 1302:13, 1304:14, 1304:23, 1310:11, 1310:15, 1312:7, 1312:21, 1313:19, 1315:10, 1318:8, 1319:6
**Medical** [1] - 1323:12
**medication** [1] - 1317:22
**medicine** [5] - 1191:17, 1192:1, 1197:6, 1197:8, 1281:5
**Medicine** [4] - 1191:18, 1192:2, 1192:4, 1192:15

**medicines** [1] - 1287:22
**meet** [7] - 1249:2, 1249:21, 1249:22, 1315:9, 1330:17, 1333:2, 1341:14
**meeting** [2] - 1233:18, 1249:4
**meetings** [1] - 1269:1
**meets** [1] - 1322:9
**membranes** [1] - 1195:23
**memorandum** [1] - 1253:15
**memory** [3] - 1238:15, 1253:13, 1343:8
**mental** [2] - 1310:24, 1319:11
**mention** [1] - 1203:11
**mentioned** [14] - 1207:14, 1209:20, 1210:1, 1210:7, 1214:5, 1226:19, 1233:21, 1238:16, 1238:17, 1241:25, 1263:15, 1303:22, 1320:1, 1327:4
**merely** [2] - 1247:3, 1307:8
**Merit** [1] - 1344:22
**messaging** [1] - 1248:4
**met** [4] - 1246:6, 1252:12, 1328:6, 1331:2
**metabolism** [2] - 1193:17, 1265:21
**metabolite** [1] - 1193:16
**METAIRIE** [1] - 1188:10
**methodology** [5] - 1314:25, 1315:12, 1316:21, 1317:6, 1317:8
**Meunier** [1] - 1253:6
**Michael's** [1] - 1302:11
**microphone** [2] - 1211:4, 1267:15
**microscope** [2] - 1218:16, 1223:11
**mid** [2] - 1268:19, 1268:20
**middle** [7] - 1207:9, 1213:22, 1213:23, 1254:1, 1254:23, 1255:2, 1264:15
**might** [25] - 1192:7, 1195:14, 1202:19,

1225:6, 1236:24, 1252:15, 1252:16, 1253:13, 1259:5, 1259:19, 1263:16, 1267:13, 1271:20, 1273:20, 1275:6, 1276:6, 1277:9, 1277:12, 1279:10, 1299:2, 1299:7, 1299:16, 1299:17, 1300:12
**MIKAL** [1] - 1187:17
**Mikal** [1] - 1204:12
**mild** [2] - 1273:18, 1273:24
**miles** [1] - 1252:15
**mill** [1] - 1318:2
**Miller** [15] - 1262:15, 1312:8, 1312:11, 1312:16, 1313:25, 1314:4, 1315:2, 1315:7, 1315:11, 1315:16, 1318:7, 1318:12, 1318:20, 1321:18, 1322:3
**Miller's** [5] - 1313:17, 1316:17, 1320:14, 1321:24
**milligrams** [1] - 1281:14
**million** [18] - 1193:25, 1203:16, 1215:12, 1219:12, 1219:13, 1220:11, 1220:12, 1222:5, 1272:16, 1272:21, 1272:23, 1273:6, 1273:14, 1274:5, 1274:6, 1276:16, 1293:3, 1308:2
**millions** [1] - 1237:4
**mind** [2] - 1231:4, 1249:1
**minimal** [2] - 1254:3, 1254:13
**minimum** [3] - 1291:17, 1330:2, 1330:12
**minute** [4] - 1196:15, 1240:3, 1272:11
**minutes** [9] - 1190:14, 1229:6, 1229:12, 1263:7, 1306:14, 1306:17, 1306:18, 1321:11
**misleading** [1] - 1294:19
**mission** [5] - 1231:25, 1242:9, 1256:24, 1256:25, 1257:2

**Mississippi** [2] - 1235:24, 1256:5
**misspeak** [1] - 1197:1
**misspoke** [1] - 1192:19
**mistake** [1] - 1293:11
**misunderstood** [1] - 1330:15
**mitigate** [1] - 1248:6
**mixed** [1] - 1313:24
**mixture** [4] - 1267:7, 1299:20, 1300:15
**mobile** [12] - 1201:23, 1202:5, 1202:10, 1202:11, 1202:17, 1202:22, 1237:3, 1244:22, 1246:1, 1252:9, 1252:13, 1322:24
**model** [1] - 1289:21
**models** [1] - 1246:5
**Mojave** [1] - 1296:4
**molecule** [1] - 1193:14
**moms** [1] - 1252:25
**Monday** [7] - 1190:13, 1307:2, 1307:4, 1307:11, 1307:12, 1308:11
**money** [1] - 1342:5
**monitored** [1] - 1266:8
**month** [4] - 1200:22, 1237:15, 1237:21, 1255:7
**monthly** [2] - 1336:18, 1336:20
**months** [12] - 1196:13, 1196:17, 1204:3, 1236:25, 1245:12, 1254:10, 1254:11, 1261:10, 1261:19, 1262:10, 1286:23, 1297:6
**mood** [1] - 1274:16
**Morgan** [17] - 1325:11, 1326:5, 1326:12, 1326:20, 1326:24, 1327:25, 1329:9, 1329:15, 1330:8, 1331:6, 1331:10, 1334:10
**MORNING** [2] - 1187:11, 1190:2
**morning** [15] - 1190:10, 1190:12, 1190:14, 1191:13, 1191:14, 1265:3, 1307:2, 1307:11, 1309:23, 1310:2,

1311:1, 1329:12, 1331:2, 1333:25, 1336:3
**mortality** [1] - 1279:17
**MORTON** [1] - 1188:7
**most** [22] - 1195:21, 1198:8, 1216:4, 1216:6, 1216:25, 1238:14, 1245:7, 1250:19, 1265:13, 1269:20, 1271:6, 1271:15, 1293:1, 1295:13, 1295:16, 1295:24, 1296:23, 1296:24, 1299:25, 1314:20, 1332:24, 1334:6
**mostly** [1] - 1305:22
**motels** [1] - 1255:19
**mother** [1] - 1322:8
**motion** [41] - 1309:7, 1309:12, 1309:25, 1310:8, 1310:10, 1310:11, 1310:17, 1310:20, 1311:15, 1311:23, 1312:2, 1312:6, 1313:19, 1315:16, 1316:10, 1317:24, 1318:3, 1318:4, 1318:5, 1318:25, 1319:1, 1319:3, 1319:5, 1319:22, 1320:3, 1321:6, 1322:13, 1322:18, 1324:18, 1325:6, 1326:14, 1327:1, 1335:5, 1335:6, 1335:7, 1335:12, 1336:1, 1339:6, 1343:23
**motions** [9] - 1309:15, 1309:18, 1309:22, 1312:2, 1314:16, 1320:5, 1322:12, 1324:22, 1344:3
**mountain** [2] - 1283:4, 1283:5
**mouse** [4] - 1215:15, 1279:23, 1279:24
**mouth** [4] - 1214:1, 1214:2, 1215:19, 1215:20
**move** [2] - 1203:17, 1219:22, 1246:16, 1252:3, 1255:10, 1255:18, 1309:13, 1310:19, 1325:19, 1327:5, 1336:6, 1336:18
**move-in** [1] - 1336:18

**moved** [9] - 1197:25, 1198:1, 1198:16, 1199:10, 1209:12, 1285:21, 1323:24, 1337:9, 1338:6
**moves** [2] - 1313:18, 1337:24
**moving** [2] - 1198:14, 1199:9
**Mozeke** [2] - 1325:17, 1325:24
**MOZEKE** [1] - 1325:24
**MR** [157] - 1189:6, 1189:7, 1189:8, 1189:9, 1189:12, 1189:13, 1189:14, 1190:21, 1191:12, 1193:6, 1193:8, 1193:12, 1204:8, 1204:11, 1206:25, 1207:2, 1207:3, 1207:4, 1207:6, 1211:3, 1211:6, 1211:9, 1211:14, 1211:17, 1211:20, 1212:3, 1212:6, 1212:12, 1212:16, 1219:5, 1219:10, 1219:14, 1219:17, 1219:23, 1220:1, 1220:24, 1221:2, 1221:19, 1221:22, 1221:25, 1222:3, 1223:1, 1223:5, 1226:9, 1226:13, 1226:19, 1226:24, 1227:5, 1227:9, 1227:10, 1227:12, 1227:13, 1227:17, 1227:22, 1228:2, 1228:24, 1229:3, 1229:6, 1262:13, 1262:16, 1263:18, 1263:21, 1263:23, 1264:15, 1264:20, 1264:22, 1265:2, 1283:25, 1284:2, 1284:5, 1284:13, 1284:22, 1285:2, 1285:9, 1285:12, 1287:13, 1287:16, 1289:1, 1289:12, 1297:9, 1297:12, 1297:14, 1301:11, 1301:17, 1301:22, 1301:24, 1302:1, 1302:6, 1302:11, 1302:13, 1303:2, 1303:11, 1304:1, 1304:6, 1305:8,

1305:11, 1305:17, 1305:21, 1305:25, 1306:17, 1308:18, 1308:22, 1309:10, 1309:18, 1309:20, 1310:3, 1310:10, 1310:13, 1310:16, 1310:22, 1311:16, 1312:1, 1313:21, 1314:11, 1314:12, 1315:1, 1318:4, 1318:17, 1319:2, 1319:8, 1319:13, 1319:18, 1319:19, 1319:24, 1320:3, 1320:25, 1321:8, 1321:24, 1322:13, 1323:3, 1323:11, 1323:21, 1324:19, 1324:21, 1324:24, 1325:5, 1325:22, 1326:17, 1327:3, 1328:17, 1330:15, 1336:6, 1336:9, 1336:11, 1337:15, 1337:19, 1338:22, 1339:12, 1340:10, 1341:16, 1342:1, 1342:9, 1342:13, 1343:15, 1344:3, 1344:7, 1344:8
**mucosa** [8] - 1216:2, 1216:3, 1218:6, 1218:12, 1218:19, 1218:22, 1220:3, 1220:8
**mucosal** [2] - 1219:1, 1219:11
**mucous** [1] - 1195:22
**MULCAHY** [2] - 1188:3, 1188:4
**multi** [1] - 1260:6
**multi-organizational** [1] - 1260:6
**multiply** [2] - 1292:11, 1297:6
**must** [4] - 1300:8, 1323:14, 1325:17, 1335:21

# N

**name** [3] - 1191:8, 1191:10, 1264:10
**names** [1] - 1257:10
**narcotic** [2] - 1281:9, 1281:10
**nasal** [4] - 1200:4, 1213:8, 1268:24, 1313:14

**nasopharyngeal** [13] - 1214:22, 1214:24, 1215:3, 1215:6, 1216:3, 1216:4, 1216:9, 1216:16, 1216:17, 1216:19, 1216:22, 1217:6, 1217:10

**nasopharynx** [3] - 1214:13, 1214:15, 1217:3

**national** [2] - 1255:25, 1265:25

**National** [2] - 1192:14, 1257:6

**natural** [4] - 1251:2, 1251:4, 1252:22, 1257:4

**nature** [6] - 1228:8, 1250:8, 1311:17, 1324:10, 1326:23, 1333:16

**nauseous** [1] - 1300:13

**necessarily** [3] - 1303:4, 1303:19, 1335:23

**necessary** [6] - 1206:1, 1206:2, 1206:3, 1263:3, 1320:18, 1322:10

**necessitated** [1] - 1314:6

**need** [30] - 1194:10, 1194:19, 1206:16, 1210:4, 1219:21, 1222:13, 1236:25, 1237:2, 1246:20, 1252:12, 1258:18, 1302:16, 1303:15, 1303:22, 1305:19, 1307:14, 1307:19, 1307:20, 1308:16, 1319:22, 1329:16, 1329:17, 1329:18, 1329:19, 1331:23, 1333:25, 1334:1, 1344:4, 1344:10

**needed** [6] - 1230:18, 1234:5, 1239:3, 1246:17, 1259:12, 1329:7

**needs** [8] - 1249:12, 1305:16, 1309:1, 1309:2, 1324:14, 1339:16, 1339:17, 1339:20

**negative** [2] - 1271:9, 1280:10

**negligence** [2] -

1336:25, 1341:9

**negligent** [3] - 1337:10, 1339:15, 1340:3

**neighborhood** [1] - 1261:10

**neighbors** [1] - 1296:25

**nerve** [2] - 1274:25, 1275:1

**nerves** [2] - 1274:23, 1274:24

**never** [18] - 1203:4, 1205:11, 1205:25, 1206:16, 1215:4, 1215:5, 1215:8, 1215:9, 1215:11, 1215:25, 1216:1, 1220:22, 1221:4, 1226:7, 1227:17, 1242:25, 1268:18, 1289:7

**nevertheless** [1] - 1330:6

**new** [10] - 1195:13, 1224:25, 1225:1, 1225:5, 1225:10, 1227:2, 1227:5, 1227:8, 1285:25, 1291:13

**New** [1] - 1292:6, 1328:4, 1333:20

**NEW** [3] - 1187:6, 1188:5, 1188:14

**next** [5] - 1190:19, 1229:2, 1292:10, 1319:2, 1320:3, 1336:21

**nice** [2] - 1301:14, 1308:10

**night** [2] - 1198:17, 1302:11

**nilly** [1] - 1257:12

**nine** [1] - 1338:2

**NO** [2] - 1187:5, 1187:8

**no-effect** [2] - 1277:17, 1272:17

**nobody** [2] - 1205:20, 1340:6

**nonasthmatic** [1] - 1270:9

**none** [9] - 1200:18, 1215:18, 1216:10, 1234:11, 1244:21, 1245:8, 1251:23, 1281:10, 1296:6

**nonetheless** [1] - 1341:11

**nonexistent** [1] -

1324:9

**nonirritating** [1] - 1176:6

**nonLFE** [1] - 1334:17

**nonspecific** [4] - 1300:19, 1311:21, 1320:14, 1321:25

**noon** [6] - 1262:25, 1263:2, 1263:6, 1263:13, 1266:14

**normal** [5] - 1200:6, 1271:11, 1283:4, 1283:5, 1294:25

**normally** [2] - 1194:10, 1261:1

**nose** [44] - 1197:3, 1198:2, 1198:3, 1198:4, 1198:5, 1198:6, 1198:8, 1198:10, 1198:17, 1201:16, 1202:13, 1203:4, 1212:8, 1212:19, 1212:20, 1212:21, 1212:23, 1212:24, 1213:14, 1213:17, 1214:6, 1215:19, 1216:5, 1216:8, 1216:11, 1216:14, 1216:15, 1216:22, 1217:17, 1217:19, 1222:13, 1224:1, 1224:3, 1271:5, 1274:11, 1274:23, 1275:1, 1277:6, 1277:7, 1285:6, 1290:15, 1290:22, 1300:17

**note** [1] - 1231:4

**noted** [3] - 1198:1, 1198:17, 1336:21

**notes** [2] - 1294:10, 1329:3

**nothing** [10] - 1191:2, 1202:6, 1227:22, 1228:4, 1251:16, 1264:6, 1275:25, 1279:20, 1327:20, 1340:25

**notice** [17] - 1234:18, 1234:20, 1234:24, 1235:3, 1239:22, 1239:25, 1240:6, 1240:11, 1241:18, 1241:24, 1242:10, 1242:13, 1242:15, 1242:16, 1273:23

**noticeable** [1] - 1343:12

**notices** [10] - 1234:22, 1234:23, 1239:6,

1239:13, 1239:18, 1241:5, 1241:12, 1241:14, 1241:15

**notion** [1] - 1334:22

**notwithstanding** [1] - 1321:3

**noxious** [1] - 1194:7

**Number** [5] - 1299:21, 1299:22, 1313:22

**number** [30] - 1202:3, 1208:21, 1215:15, 1234:8, 1234:22, 1235:24, 1239:13, 1240:15, 1241:14, 1252:11, 1252:17, 1253:21, 1253:23, 1254:2, 1254:12, 1254:18, 1254:19, 1255:14, 1260:17, 1269:21, 1288:7, 1299:16, 1300:11, 1326:22, 1329:4, 1331:4, 1331:12, 1340:21, 1340:22

**numbered** [1] - 1345:2

**numbers** [3] - 1244:16, 1286:21, 1286:23

**numerous** [1] - 1232:21

# O

**oath** [4] - 1190:24, 1191:7, 1264:1, 1264:14

**object** [1] - 1211:14

**objected** [1] - 1343:12

**objection** [10] - 1206:25, 1219:14, 1262:16, 1264:20, 1264:21, 1283:25, 1289:1, 1319:15, 1336:9

**objective** [7] - 1202:25, 1272:16, 1273:11, 1276:25, 1278:14, 1291:19, 1291:20

**obligate** [1] - 1215:19

**obligations** [1] - 1249:4

**observational** [1] - 1202:19

**obvious** [1] - 1197:3

**obviously** [5] - 1237:4, 1240:18, 1254:19, 1281:19, 1306:22

**occupancy** [1] - 1249:24

**occupant** [3] - 1242:15, 1255:8, 1255:22

**occupants** [16] - 1232:24, 1233:15, 1234:19, 1234:21, 1237:16, 1239:14, 1239:18, 1241:5, 1241:13, 1241:16, 1242:1, 1242:2, 1245:19, 1249:13, 1255:14, 1258:22

**occupy** [3] - 1243:8, 1243:9, 1243:12

**occupying** [1] - 1261:9

**occur** [3] - 1217:16, 1279:10, 1290:7

**occurred** [3] - 1206:12, 1336:19, 1336:20

**occurs** [1] - 1217:15

**October** [2] - 1237:12, 1237:14

**odor** [16] - 1193:19, 1193:20, 1194:3, 1194:4, 1194:7, 1194:8, 1195:3, 1195:4, 1209:20, 1238:11, 1269:22, 1276:4, 1277:5, 1277:7, 1299:22, 1299:23

**odorants** [1] - 1274:21

**odors** [4] - 1194:16, 1194:17, 1194:18, 1199:3

**OF** [4] - 1187:1, 1187:12, 1189:10, 1189:15

**off-gas** [1] - 1225:25

**off-gasses** [2] - 1225:4, 1286:8

**off-gassing** [12] - 1209:2, 1209:5, 1285:23, 1286:13, 1286:24, 1287:1, 1287:2, 1287:10, 1287:17, 1289:18, 1289:20, 1289:23

**offer** [7] - 1262:13, 1264:18, 1313:13, 1320:12, 1321:9, 1324:22, 1330:9

**offered** [7] - 1193:10, 1265:3, 1304:10, 1312:24, 1315:22, 1317:4, 1324:15

**offering** [2] - 1263:21, 1312:17

**offhand** [1] - 1329:4

**office** [2] - 1240:19, 1313:6

**Office** [4] - 1232:7, 1235:21, 1236:2, 1241:23

**officer** [2] - 1243:18, 1244:18

**OFFICER** [3] - 1190:7, 1262:10, 1262:21

**offices** [3] - 1232:15, 1232:16, 1232:22, 1239:17

**Official** [2] - 1344:23, 1345:8

**OFFICIAL** [1] - 1188:13

**often** [3] - 1192:24, 1200:21, 1252:8

**oil** [2] - 1267:6, 1267:8

**olfactory** [2] - 1195:9, 1274:23

**omission** [2] - 1323:15, 1323:19

**once** [10] - 1190:11, 1200:22, 1286:15, 1289:17, 1297:1, 1303:25, 1316:25, 1321:11

**one** [84] - 1190:17, 1192:15, 1192:19, 1193:14, 1194:5, 1194:11, 1201:5, 1201:6, 1201:16, 1202:3, 1205:8, 1206:22, 1207:15, 1207:22, 1208:22, 1213:4, 1213:17, 1213:21, 1214:17, 1221:11, 1222:22, 1224:9, 1225:5, 1225:7, 1225:12, 1225:24, 1226:5, 1228:18, 1233:16, 1241:25, 1245:7, 1252:11, 1254:15, 1255:24, 1255:25, 1259:12, 1260:24, 1265:10, 1270:7, 1270:15, 1272:22, 1273:10, 1273:23, 1274:1, 1279:23, 1281:7, 1283:5, 1283:13, 1290:21, 1291:11, 1293:11, 1293:14, 1296:1, 1310:6, 1310:13, 1310:14, 1311:2,
1311:25, 1313:22, 1314:12, 1322:11, 1327:4, 1330:1, 1332:4, 1332:12, 1332:20, 1332:21, 1332:24, 1334:3, 1334:16, 1336:11, 1337:6, 1338:13, 1339:7, 1339:18, 1339:20, 1340:19, 1340:20, 1340:21, 1341:9

**one-carbon** [1] - 1193:14

**one-on-one** [3] - 1339:18, 1339:20, 1340:20

**ones** [3] - 1212:25, 1226:25, 1266:5

**ongoing** [1] - 1340:8

**Oops** [1] - 1199:1

**open** [3] - 1195:22, 1291:11, 1291:14

**opening** [6] - 1213:8, 1213:15, 1213:18, 1314:3, 1303:22, 1307:7

**openings** [1] - 1213:15

**opens** [1] - 1226:23

**operate** [1] - 1316:3

**operation** [2] - 1231:23, 1232:17

**opinion** [21] - 1225:14, 1225:17, 1247:3, 1247:18, 1283:22, 1285:5, 1295:8, 1295:9, 1295:10, 1295:12, 1295:14, 1295:16, 1307:6, 1315:14, 1316:15, 1316:25, 1317:2, 1317:6, 1317:20, 1318:19, 1339:15

**opinions** [4] - 1312:17, 1313:18, 1316:20, 1316:23

**opportunity** [7] - 1255:10, 1255:12, 1255:13, 1255:15, 1255:16, 1308:5, 1341:21

**opposed** [6] - 1210:21, 1238:2, 1243:14, 1252:14, 1269:12, 1317:7

**oral** [11] - 1214:3, 1214:14, 1323:1, 1327:18, 1330:9,
1330:16, 1330:17, 1331:8, 1331:11, 1331:24, 1334:5

**orally** [1] - 1328:20

**orange** [1] - 1279:8

**oranges** [1] - 1297:22

**ORDER** [1] - 1190:4

**order** [9] - 1216:10, 1257:3, 1272:11, 1277:7, 1288:25, 1289:8, 1317:1, 1327:5, 1331:11

**ordered** [3] - 1262:17, 1264:23, 1336:10

**ordinary** [1] - 1197:10

**organ** [1] - 1271:6

**organic** [2] - 1257:1, 1299:17

**organics** [1] - 1293:13

**organization** [1] - 1259:25

**organizational** [1] - 1260:6

**originally** [1] - 1333:5

**ORLEANS** [3] - 1187:6, 1188:5, 1188:14

**Orleans** [3] - 1292:6, 1328:4, 1333:20

**otherwise** [8] - 1218:25, 1220:19, 1244:13, 1250:11, 1257:16, 1310:18, 1318:15, 1319:6

**ought** [3] - 1226:14, 1226:15, 1248:10

**ourselves** [4] - 1236:2, 1248:3, 1248:18, 1341:14

**outdoor** [11] - 1291:1, 1291:8, 1291:25, 1292:3, 1292:9, 1292:14, 1292:24, 1294:7, 1295:5, 1297:22, 1297:25

**outfitted** [1] - 1331:13

**outlined** [1] - 1336:5

**outside** [5] - 1193:15, 1193:16, 1229:8, 1284:3, 1317:17

**overlap** [1] - 1284:18

**overrule** [1] - 1211:18

**own** [5] - 1244:10, 1249:11, 1249:13, 1256:4, 1257:13

**owner** [1] - 1330:10

**owner's** [1] - 1324:2

**P**

**p.m** [2] - 1235:7, 1344:13

**page** [6] - 1221:3, 1246:12, 1254:1, 1303:19, 1319:23, 1335:11

**PAGE** [2] - 1189:3, 1189:20

**Pages** [1] - 1219:6

**paid** [4] - 1204:18, 1204:21, 1205:2, 1269:1

**pain** [6] - 1310:17, 1310:19, 1310:24, 1311:20, 1311:21, 1314:9

**painful** [2] - 1218:1, 1218:3

**painters** [1] - 1225:20

**painting** [1] - 1231:1

**Pam** [2] - 1308:17, 1309:5

**pan** [1] - 1225:23

**panel** [3] - 1190:9, 1262:12, 1308:14

**paper** [18] - 1199:24, 1200:1, 1200:3, 1201:17, 1201:18, 1201:19, 1202:3, 1202:25, 1203:3, 1203:4, 1208:17, 1215:17, 1282:21, 1302:9, 1334:5

**Paper** [2] - 1325:17, 1325:25

**papers** [3] - 1202:8, 1268:14, 1268:18

**paragraph** [3] - 1231:24, 1246:25, 1248:1

**parent** [2] - 1244:23, 1245:10

**park** [1] - 1246:5

**part** [27] - 1193:25, 1195:18, 1195:20, 1195:22, 1195:23, 1196:25, 1204:5, 1214:9, 1214:10, 1217:17, 1231:21, 1267:2, 1272:21, 1272:22, 1274:5, 1290:10, 1292:3, 1293:3, 1298:6, 1309:3, 1314:18, 1319:17, 1330:3, 1332:13, 1333:9, 1337:2

**party** [2] - 1234:15, 1335:15

**pass** [1] - 1267:10

**participated** [3] - 1192:16, 1253:20, 1330:18

**particleboard** [7] - 1225:1, 1225:2, 1225:6, 1225:25, 1228:10, 1228:11, 1288:10

**particular** [17] - 1231:15, 1231:18, 1232:25, 1236:4, 1236:5, 1240:16, 1249:6, 1256:23, 1258:23, 1284:17, 1300:5, 1317:11, 1323:2, 1324:11, 1326:19, 1331:3, 1334:17

**particularly** [4] - 1194:8, 1197:18, 1236:6, 1339:18

**parties** [2] - 1306:21, 1308:23

**parts** [70] - 1193:20, 1193:25, 1203:16, 1209:20, 1209:24, 1210:4, 1210:8, 1211:1, 1212:10, 1215:12, 1215:13, 1216:12, 1218:18, 1219:12, 1219:13, 1219:16, 1220:11, 1220:12, 1220:15, 1222:4, 1222:5, 1222:6, 1222:9, 1222:11, 1222:16, 1224:3, 1224:10, 1224:14, 1224:15, 1228:19, 1272:16, 1272:17, 1273:4, 1273:5, 1273:14, 1274:6, 1274:7, 1274:8, 1274:10, 1274:13, 1276:16, 1282:14, 1282:15, 1282:20, 1282:23, 1282:24, 1282:25, 1283:13, 1283:15, 1283:21, 1285:4, 1292:1, 1292:5, 1292:10, 1292:11, 1292:12, 1293:4, 1293:25, 1294:5, 1298:10, 1298:22, 1299:24, 1300:1, 1300:6, 1300:8, 1308:2, 1332:8

**passage** [3] - 1214:7, 1303:1, 1303:3
**passes** [2] - 1214:24, 1215:1
**passing** [1] - 1322:7
**past** [3] - 1216:8, 1220:19, 1270:15
**patient** - 1204:16, 1317:21
**patients** [3] - 1191:24, 1228:13, 1228:15
**Paul** [2] - 1235:10
**Paulison** [1] - 1253:17
**pay** [2] - 1230:22, 1231:6
**peak** [3] - 1272:20, 1272:21, 1272:22
**peer** [1] - 1268:12
**peer-reviewed** [1] - 1268:12
**people** [60] - 1192:23, 1193:21, 1193:22, 1198:8, 1201:20, 1201:21, 1202:13, 1206:4, 1206:17, 1207:19, 1210:3, 1210:11, 1210:19, 1210:20, 1210:24, 1221:12, 1221:14, 1222:19, 1237:4, 1238:5, 1239:1, 1240:15, 1242:20, 1243:11, 1245:14, 1247:24, 1252:13, 1252:24, 1253:3, 1254:24, 1255:18, 1259:20, 1261:23, 1267:20, 1272:5, 1272:14, 1273:13, 1273:24, 1275:13, 1275:25, 1276:7, 1276:25, 1277:9, 1278:20, 1280:7, 1280:13, 1288:1, 1291:4, 1291:9, 1291:16, 1295:24, 1296:2, 1296:6, 1299:23, 1299:25, 1301:5, 1320:21, 1320:22, 1343:20
**Pepper** [3] - 1344:21, 1345:6, 1345:7
**PEPPER** [1] - 1188:13
**per** [76] - 1193:20, 1193:25, 1203:16, 1209:20, 1209:24, 1210:4, 1210:8, 1211:1, 1215:12, 1215:13, 1216:12, 1218:18, 1219:12,

1219:13, 1219:16, 1220:11, 1220:12, 1220:15, 1222:4, 1222:5, 1222:7, 1222:9, 1222:11, 1222:16, 1224:3, 1224:10, 1224:14, 1224:15, 1228:19, 1272:16, 1272:17, 1272:21, 1272:22, 1273:4, 1273:5, 1273:6, 1273:14, 1274:5, 1274:6, 1274:7, 1274:8, 1274:10, 1274:13, 1276:16, 1282:14, 1282:15, 1282:20, 1282:23, 1282:24, 1282:25, 1283:13, 1283:15, 1283:22, 1285:4, 1292:1, 1292:3, 1292:5, 1292:10, 1292:11, 1292:12, 1293:3, 1293:4, 1293:25, 1294:5, 1298:6, 1298:10, 1298:22, 1299:24, 1300:1, 1300:6, 1300:8, 1306:18, 1308:2
**percent** [13] - 1242:14, 1252:4, 1273:17, 1275:8, 1275:12, 1276:1, 1279:1, 1283:14, 1286:18, 1286:19, 1287:23, 1291:13, 1297:17
**percentage** [2] - 1275:12, 1279:25
**perform** [1] - 1204:18
**performance** [2] - 1233:18, 1249:21
**performed** [5] - 1203:25, 1205:11, 1276:21, 1287:2, 1335:19
**performs** [1] - 1335:14
**perhaps** [7] - 1259:12, 1261:20, 1263:11, 1304:19, 1305:3, 1314:11, 1315:1
**period** [11] - 1196:9, 1202:17, 1237:10, 1237:15, 1237:21, 1240:14, 1255:7, 1261:7, 1261:17, 1272:23, 1317:1
**periods** [1] - 1261:24
**permanent** [2] - 1203:1, 1237:5

**person** [13] - 1208:7, 1255:9, 1265:7, 1271:11, 1276:17, 1283:8, 1290:15, 1293:16, 1300:2, 1324:7, 1331:16, 1335:16, 1337:18
**personal** [1] - 1194:2
**personally** [1] - 1253:4
**persuasive** [3] - 1316:5, 1316:8, 1316:19
**persuasiveness** [2] - 1315:24, 1316:4
**pertain** [1] - 1190:13
**pervasive** [1] - 1343:14
**petition** [1] - 1319:9
**PFISTER** [1] - 1188:7
**Ph.D** [4] - 1265:9, 1265:17, 1266:19, 1266:21
**pharmacology** [5] - 1265:9, 1265:11, 1265:13, 1265:15, 1266:25
**pharynx** [4] - 1214:3, 1214:5, 1214:12, 1214:14
**phenolic** [1] - 1299:17
**phenyl** [2] - 1274:21, 1275:7
**phone** [2] - 1255:23, 1256:2
**phonetically** [2] - 1287:4, 1291:12
**phonetically)** [1] - 1296:5
**photographic** [1] - 1215:17
**physical** [2] - 1203:24, 1204:6
**physically** [1] - 1242:16
**physician** [4] - 1197:19, 1197:21, 1235:23, 1317:19
**physicians** [2] - 1278:18, 1304:21
**physiologic** [2] - 1271:18, 1271:24
**pick** [6] - 1201:23, 1202:2, 1257:12, 1266:13, 1272:11, 1299:10
**picked** [2] - 1271:5, 1271:8
**picture** [1] - 1231:1
**piece** [4] - 1215:16,

1314:22, 1319:19, 1344:1
**pieces** [3] - 1195:9, 1321:8, 1344:1
**PINEDO** [1] - 1187:20
**Pittman** [2] - 1328:3, 1330:23
**pituitary** [1] - 1213:5
**place** [9] - 1231:23, 1234:5, 1241:6, 1242:6, 1261:1, 1261:2, 1291:25, 1298:16, 1302:22
**placed** [2] - 1302:22, 1317:14
**places** [1] - 1225:9
**plainly** [1] - 1328:19
**PLAINTIFF** [1] - 1187:16
**plaintiff** [12] - 1301:23, 1305:9, 1306:6, 1315:6, 1315:9, 1316:16, 1319:7, 1321:10, 1322:15, 1323:14, 1324:8, 1341:11
**plaintiff's** [6] - 1302:19, 1309:14, 1310:7, 1318:11, 1322:14, 1324:22
**plaintiffs** [3] - 1312:8, 1312:21, 1321:1
**plan** [4] - 1237:25, 1262:8, 1262:23, 1330:10
**plans** [13] - 1327:10, 1327:13, 1328:19, 1330:4, 1330:13, 1330:19, 1332:10, 1332:15, 1332:22, 1333:7, 1335:14, 1335:17, 1335:20
**play** [4] - 1229:10, 1300:23, 1302:2, 1304:4
**played** [8] - 1229:17, 1302:16, 1302:24, 1303:1, 1304:1, 1304:12, 1321:19
**pleading** [1] - 1342:6
**pleasant** [1] - 1194:8
**plenty** [1] - 1310:23
**plot** [1] - 1280:2
**plumbing** [1] - 1258:4
**plus** [3] - 1254:3, 1254:8, 1306:19
**plywood** [4] - 1225:1, 1225:2, 1225:6, 1226:1
**podium** [2] - 1190:20,

1309:19
**point** [48] - 1190:8, 1216:5, 1226:11, 1227:24, 1229:7, 1229:16, 1241:2, 1241:3, 1243:11, 1245:10, 1249:11, 1255:1, 1255:21, 1259:4, 1259:10, 1262:4, 1262:11, 1262:18, 1262:23, 1264:24, 1274:2, 1276:22, 1277:19, 1279:9, 1284:9, 1284:23, 1286:12, 1291:8, 1302:4, 1303:25, 1304:7, 1304:11, 1305:6, 1306:23, 1308:13, 1311:1, 1312:5, 1317:22, 1323:5, 1323:6, 1323:16, 1330:16, 1331:9, 1335:25, 1338:8, 1340:25, 1343:5, 1343:11
**pointed** [5] - 1215:22, 1225:22, 1226:5, 1317:9, 1339:13
**pointer** [1] - 1278:6
**pointing** [1] - 1320:25
**points** [3] - 1245:7, 1313:22, 1334:4
**poison** [2] - 1277:14, 1278:4
**policies** [1] - 1258:20
**policy** [11] - 1254:24, 1255:3, 1255:6, 1258:15, 1258:17, 1258:18, 1258:19, 1259:1, 1341:6
**pollutants** [2] - 1287:25
**polyaromatic** [1] - 1267:8
**popularity** [1] - 1252:18
**population** [5] - 1249:10, 1252:19, 1280:1, 1283:1, 1304:24
**portion** [1] - 1302:16
**portraying** [1] - 1289:23
**posed** [1] - 1311:25
**position** [9] - 1205:18, 1229:18, 1230:1, 1230:8, 1230:10, 1237:11, 1242:25, 1243:1, 1324:18

**positions** [1] - 1342:15
**positive** [1] - 1280:9
**possible** [5] - 1190:17, 1223:7, 1241:15, 1241:17, 1259:5
**possibly** [1] - 1190:17
**post** [4] - 1227:10, 1236:24, 1256:13, 1341:6
**post-dates** [1] - 1341:6
**post-disaster** [1] - 1236:24
**post-Katrina** [2] - 1227:10, 1256:13
**postdoc** [1] - 1268:4
**postdoctoral** [2] - 1265:17, 1266:18
**posterior** [1] - 1213:12
**potencies** [1] - 1299:19
**potential** [4] - 1225:10, 1235:1, 1240:23, 1299:7
**potentially** [3] - 1224:25, 1225:1, 1299:8
**POYDRAS** [2] - 1188:5, 1188:13
**ppm** [2] - 1245:13, 1304:13
**practice** [6] - 1191:17, 1258:19, 1259:2, 1309:7, 1309:12, 1318:25
**pre** [4] - 1205:15, 1205:18, 1236:23
**pre-disaster** [1] - 1236:23
**pre-HUD** [2] - 1205:15, 1205:18
**precautions** [1] - 1235:1
**preexisting** [2] - 1314:5, 1318:21
**prefer** [1] - 1261:5
**preferred** [2] - 1247:1, 1252:2
**Preformed** [1] - 1325:13
**prejudice** [1] - 1310:7
**preliminary** [1] - 1246:14
**premises** [2] - 1341:11, 1341:12
**prepared** [2] - 1273:8, 1279:11
**presence** [1] - 1229:8

**present** [2] - 1197:12, 1320:8
**presentation** [1] - 1307:1
**presented** [3] - 1251:13, 1255:13, 1312:8
**presenting** [1] - 1312:6
**presently** [1] - 1205:7
**preserve** [1] - 1325:9
**presumably** [1] - 1333:8
**presume** [1] - 1216:25
**presumes** [1] - 1217:3
**pretrial** [5] - 1314:4, 1315:16, 1318:17, 1318:25, 1335:6
**pretty** [4] - 1197:3, 1233:14, 1245:10, 1282:21
**prevailing** [1] - 1245:21
**prevent** [2] - 1279:6, 1341:5
**previous** [2] - 1206:5, 1316:18
**previously** [2] - 1301:18, 1326:2
**Price** [1] - 1235:12
**primarily** [3] - 1216:14, 1265:11, 1313:22
**primary** [3] - 1196:5, 1196:7, 1196:14
**principal** [2] - 1241:9, 1256:6
**principally** [1] - 1236:22
**principles** [2] - 1341:19
**private** [3] - 1252:6, 1252:7, 1252:9
**privileges** [3] - 1193:1, 1193:3, 1193:5
**probable** [1] - 1341:23
**problem** [25] - 1195:14, 1227:23, 1233:1, 1238:18, 1251:20, 1254:16, 1259:6, 1259:11, 1263:1, 1263:8, 1274:15, 1278:1, 1293:7, 1300:19, 1301:5, 1301:6, 1304:5, 1327:15, 1336:23, 1337:6, 1337:15, 1337:19, 1340:10, 1340:21,

1343:15
**problems** [12] - 1197:15, 1197:16, 1198:3, 1199:11, 1200:16, 1201:13, 1240:23, 1267:21, 1295:20, 1300:16, 1314:5
**procedure** [3] - 1267:7, 1313:14, 1317:23
**proceed** [1] - 1190:15
**proceeding** [1] - 1328:9
**PROCEEDINGS** [3] - 1187:12, 1188:15, 1190:1
**proceedings** [18] - 1190:8, 1226:11, 1227:24, 1229:7, 1229:16, 1262:4, 1262:11, 1262:18, 1264:24, 1284:9, 1284:23, 1302:4, 1304:7, 1304:11, 1305:6, 1308:13, 1344:13, 1345:2
**process** [8] - 1194:14, 1194:15, 1195:5, 1240:22, 1306:13, 1306:19, 1308:19, 1309:3
**processing** [1] - 1255:25
**PRODUCED** [1] - 1188:16
**producing** [5] - 1246:1, 1246:2, 1246:4, 1246:5, 1249:2
**Product** [1] - 1206:19
**product** [16] - 1249:17, 1252:2, 1281:2, 1322:25, 1324:11, 1325:15, 1326:8, 1327:17, 1328:7, 1328:10, 1330:22, 1330:24, 1333:2, 1334:21, 1340:14
**Products** [3] - 1289:13, 1325:13, 1326:1
**PRODUCTS** [1] - 1187:4
**products** [17] - 1248:4, 1248:11, 1248:13, 1248:17, 1248:23, 1249:25, 1265:22, 1267:6,

1267:8, 1280:18, 1282:19, 1282:20, 1322:16, 1323:13, 1326:22, 1333:22
**professional** [1] - 1317:19
**Professional** [1] - 1344:22
**profile** [1] - 1213:25
**profiles** [3] - 1267:11, 1267:12, 1267:14
**program** [6] - 1192:3, 1266:7, 1267:5, 1338:4, 1338:5
**programmatic** [5] - 1237:17, 1237:19, 1237:23, 1237:24, 1259:24
**programs** [1] - 1230:11
**project** [1] - 1339:5
**projection** [1] - 1213:3
**prominences** [1] - 1212:21
**prominent** [1] - 1338:9
**promised** [1] - 1278:2
**proof** [7] - 1223:19, 1223:20, 1315:9, 1321:2, 1322:10, 1342:5, 1342:6
**properties** [2] - 1223:21, 1252:20
**property** [7] - 1196:8, 1252:6, 1252:8, 1252:9, 1252:14, 1252:20, 1333:7
**propose** [1] - 1263:9
**proposed** [1] - 1267:11
**proposing** [1] - 1227:4
**proposition** [2] - 1298:20, 1332:1
**protection** [2] - 1334:12, 1334:16
**Protection** [1] - 1234:3
**protects** [1] - 1214:11
**prototype** [1] - 1330:7
**protracted** [1] - 1263:10
**prove** [1] - 1312:21
**provide** [11] - 1202:25, 1231:1, 1231:17, 1231:18, 1237:9, 1248:16, 1249:8, 1256:9, 1257:3, 1323:20, 1328:3
**provided** [14] -

1231:2, 1231:25, 1232:1, 1232:2, 1238:9, 1249:13, 1252:5, 1260:21, 1261:9, 1330:22, 1334:15, 1335:4, 1335:15, 1338:21
**providers** [1] - 1249:10
**providing** [2] - 1245:23, 1313:18
**province** [1] - 1316:6
**proving** [1] - 1202:21
**provision** [3] - 1332:5, 1332:12, 1333:1
**provisions** [2] - 1233:18, 1310:6
**proximate** [6] - 1336:25, 1337:8, 1337:11, 1338:6, 1341:7
**prudent** [1] - 1311:24
**pseudo** [1] - 1329:8
**psychiatrist** [3] - 1320:16, 1321:1, 1321:3
**psychologist** [4] - 1320:15, 1320:19, 1321:1, 1321:3
**public** [4] - 1205:24, 1206:13, 1238:19, 1251:14
**publications** [2] - 1268:12, 1268:13
**published** [4] - 1268:13, 1268:14, 1268:18, 1304:13
**pull** [4] - 1211:4, 1280:24, 1284:12, 1331:3
**pulled** [1] - 1279:13
**purchase** [3] - 1248:13, 1288:25, 1289:8
**purchased** [2] - 1246:9, 1257:11
**purchaser** [7] - 1325:7, 1325:12, 1325:14, 1325:19, 1326:13, 1327:1, 1331:21
**purchasers** [1] - 1249:9
**purportedly** [1] - 1261:15
**purpose** [6] - 1230:14, 1302:6, 1303:8, 1328:6, 1333:16, 1335:12
**purposes** [3] -

1292:10, 1293:24, 1335:13

**pursuant** [2] - 1308:23, 1310:8

**push** [2] - 1246:13, 1267:15

**pushing** [1] - 1214:2

**put** [30] - 1195:3, 1215:11, 1215:16, 1216:12, 1223:18, 1224:13, 1225:2, 1225:22, 1236:21, 1244:5, 1247:24, 1251:14, 1252:7, 1257:20, 1269:23, 1270:9, 1272:8, 1274:17, 1275:19, 1302:7, 1305:16, 1309:11, 1314:15, 1321:10, 1322:23, 1331:14, 1333:11, 1334:5, 1342:11, 1344:11

**puts** [3] - 1195:8, 1195:10, 1244:21

**putting** [6] - 1248:2, 1248:18, 1279:8, 1286:15, 1301:20, 1306:11

# Q

**qualified** [2] - 1218:9, 1243:2

**qualify** [1] - 1254:22, 1335:2

**quality** [10] - 1232:7, 1236:7, 1236:10, 1236:13, 1237:18, 1238:6, 1238:11, 1238:16, 1238:22, 1258:12

**questioning** [2] - 1253:6, 1323:1

**questions** [11] - 1204:8, 1223:2, 1225:5, 1225:7, 1226:15, 1228:24, 1292:10, 1297:9, 1320:11, 1323:22, 1342:2

**quick** [1] - 1294:10

**quickly** [3] - 1190:17, 1252:4, 1297:12

**quite** [2] - 1197:24, 1293:7

**quote** [6] - 1248:3, 1248:4, 1327:24, 1329:10, 1329:20, 1330:3

# R

**radioactive** [1] - 1215:13

**radioactivity** [2] - 1215:17, 1215:18

**radiolabel** [1] - 1216:11

**raise** [2] - 1190:25, 1264:4

**ran** [1] - 1198:10

**RANDALL** [1] - 1188:4

**random** [1] - 1269:17

**range** [4] - 1283:3, 1292:3, 1299:18, 1299:22

**rank** [3] - 1191:21, 1269:15, 1277:7

**ranks** [1] - 1191:22

**rashes** [1] - 1201:24

**rat** [1] - 1215:21

**rat's** [1] - 1216:10

**rate** [3] - 1271:25, 1289:18, 1289:24

**rates** [2] - 1289:20, 1294:20

**rather** [7] - 1237:17, 1257:9, 1263:1, 1263:4, 1312:4, 1331:11, 1334:23

**rationale** [2] - 1328:6, 1330:24

**rats** [2] - 1215:10, 1215:19

**RBD** [12] - 1309:18, 1312:6, 1313:18, 1322:17, 1326:5, 1327:25, 1328:1, 1329:15, 1331:10, 1332:18, 1335:19, 1335:21

**RBD's** [1] - 1323:19

**RE** [1] - 1187:4

**Re** [1] - 1235:12

**reach** [4] - 1277:21, 1295:14, 1307:14, 1307:15

**reached** [4] - 1236:2, 1237:12, 1244:8, 1270:5

**reaches** [1] - 1295:11

**reaching** [1] - 1240:15

**react** [2] - 1194:5, 1194:6

**reaction** [4] - 1194:1, 1194:2, 1194:9, 1198:20

**reactive** [3] - 1193:14, 1215:8, 1215:25

**read** [14] - 1211:23, 1216:24, 1217:2, 1236:14, 1288:20, 1322:15, 1323:7, 1323:17, 1332:25, 1333:22, 1335:8, 1336:2, 1336:12, 1339:19

**reading** [3] - 1211:12, 1323:17, 1336:4

**ready** [1] - 1190:15

**real** [6] - 1287:18, 1294:10, 1298:3, 1320:13, 1320:17, 1321:4

**realization** [1] - 1259:5

**realize** [2] - 1195:2, 1328:8

**really** [21] - 1194:19, 1197:18, 1217:1, 1228:8, 1232:16, 1238:18, 1241:2, 1241:6, 1245:8, 1246:17, 1246:20, 1271:13, 1276:3, 1293:18, 1293:19, 1298:14, 1307:19, 1307:20, 1310:17, 1317:15, 1320:16

**realm** [2] - 1317:14, 1330:11

**Realtime** [1] - 1344:21

**reason** [7] - 1217:14, 1233:17, 1251:19, 1318:22, 1319:25, 1329:21, 1335:17

**reasonable** [8] - 1197:24, 1204:1, 1225:9, 1246:18, 1298:15, 1320:24, 1343:22, 1343:24

**reasonably** [1] - 1320:21

**reasons** [9] - 1247:21, 1252:17, 1273:10, 1314:18, 1316:21, 1316:24, 1319:25, 1339:7

**rebuild** [2] - 1252:14, 1252:20

**rebut** [1] - 1303:16

**rebuttal** [9] - 1190:17, 1301:23, 1302:7, 1303:6, 1303:9, 1304:2, 1304:10, 1305:10, 1306:7

**rebutted** [2] - 1302:17, 1303:22

**Rec** [4] - 1288:25,

1289:13, 1327:16, 1327:23

**receive** [3] - 1242:16, 1247:19, 1322:22

**received** [10] - 1231:5, 1231:9, 1241:13, 1322:17, 1323:1, 1323:4, 1323:23, 1329:3, 1329:9, 1337:21

**receiving** [3] - 1237:20, 1258:22, 1277:25

**recent** [2] - 1199:15, 1299:23

**recess** [1] - 1262:19

**recognize** [1] - 1240:25

**recognized** [1] - 1240:23

**recollect** [1] - 1301:2

**recollection** [2] - 1206:16, 1242:19

**recommend** [1] - 1258:15

**recommendation** [9] - 1233:23, 1234:18, 1247:3, 1247:5, 1247:16, 1247:19, 1247:20, 1247:22, 1259:2

**recommendations** [2] - 1243:2, 1246:14

**recommended** [3] - 1233:25, 1234:2, 1234:25

**reconcile** [1] - 1274:14

**record** [15] - 1191:9, 1212:7, 1308:16, 1308:22, 1309:9, 1311:14, 1325:4, 1336:5, 1336:6, 1344:5, 1344:6, 1344:10, 1344:11, 1345:2

**recorded** [3] - 1253:22, 1254:2, 1254:12

**RECORDED** [1] - 1188:15

**records** [7] - 1199:13, 1203:20, 1203:23, 1211:21, 1211:23, 1238:5, 1238:23

**Recovery** [3] - 1232:7, 1241:22, 1241:23

**recovery** [4] - 1230:12, 1232:15, 1232:22, 1239:17

**Recreation** [7] - 1263:18, 1309:21, 1309:22, 1310:16, 1312:1, 1318:5, 1319:2

**RECREATION** [1] - 1187:9

**recreational** [3] - 1237:7, 1246:6, 1249:18

**REDIRECT** [4] - 1189:9, 1189:14, 1223:4, 1297:13

**redirect** [2] - 1223:3, 1297:11

**redness** [1] - 1271:25

**reduce** [5] - 1205:23, 1235:1, 1241:6, 1245:19, 1246:15

**reducing** [2] - 1241:4, 1241:9

**refer** [1] - 1219:20

**reference** [3] - 1246:13, 1254:5, 1306:2

**referenced** [5] - 1302:16, 1302:21, 1303:14, 1305:12, 1305:18

**referred** [1] - 1315:25

**referring** [2] - 1220:8, 1256:2

**refine** [1] - 1293:22

**reflect** [2] - 1238:5, 1295:16

**refresh** [2] - 1253:13, 1343:8

**regard** [7] - 1249:6, 1307:23, 1309:9, 1310:20, 1315:17, 1324:11, 1338:11

**regarding** [14] - 1197:14, 1203:7, 1233:22, 1233:23, 1239:14, 1239:18, 1249:8, 1256:5, 1309:25, 1310:11, 1310:17, 1310:18, 1313:14, 1318:6

**regardless** [2] - 1303:11, 1316:8

**region** [1] - 1279:8

**Registered** [2] - 1344:21, 1344:22

**regular** [6] - 1281:12, 1288:9, 1288:13, 1288:22, 1288:23, 1289:15

**regulate** [1] - 1236:13

**REICH** [3] - 1187:23,

1187:23, 1319:18
**Reich** [1] - 1319:15
**reiterate** [2] - 1318:18, 1325:1
**relate** [5] - 1198:14, 1203:9, 1318:12, 1333:1, 1334:6
**related** [10] - 1197:16, 1203:21, 1223:16, 1238:10, 1313:7, 1318:9, 1318:15, 1322:1, 1322:4, 1331:17
**relates** [4] - 1278:3, 1318:6, 1319:20, 1334:20
**RELATES** [1] - 1187:7
**relating** [2] - 1316:21
**relationship** [3] - 1209:1, 1209:4, 1326:12
**relative** [5] - 1217:4, 1311:21, 1318:3, 1327:1, 1333:5
**relatively** [3] - 1217:25, 1237:10, 1255:7
**relatives** [1] - 1307:18
**relaxing** [1] - 1308:10
**relayed** [2] - 1329:14, 1329:15
**release** [1] - 1304:20
**released** [1] - 1234:7
**relevance** [1] - 1316:22
**relevant** [4] - 1280:14, 1280:15, 1328:25, 1332:8
**reliable** [1] - 1269:20
**relied** [1] - 1256:23
**relieve** [1] - 1333:18
**relocating** [1] - 1252:15
**rely** [4] - 1249:15, 1315:13, 1318:11, 1325:24
**remain** [2] - 1190:23, 1263:25
**remains** [1] - 1248:2
**remember** [18] - 1195:10, 1195:11, 1197:20, 1197:23, 1202:5, 1206:15, 1209:9, 1216:10, 1234:23, 1274:17, 1279:16, 1280:3, 1292:1, 1292:7, 1296:22, 1301:5, 1308:25
**remind** [1] - 1312:10

**removal** [2] - 1230:23, 1231:7
**render** [2] - 1250:13, 1315:13
**rental** [2] - 1236:24, 1261:15
**renters** [1] - 1236:23
**repeat** [1] - 1303:17
**repetitious** [1] - 1303:25
**rephrase** [2] - 1284:20, 1284:25
**replace** [1] - 1228:10
**replacing** [1] - 1225:14
**replay** [1] - 1302:23
**report** [14] - 1200:15, 1234:7, 1235:23, 1241:19, 1245:14, 1245:18, 1255:5, 1271:20, 1274:18, 1275:8, 1284:2, 1284:6, 1284:7, 1298:21
**reported** [14] - 1202:13, 1221:4, 1221:6, 1221:16, 1222:8, 1238:10, 1238:13, 1238:18, 1283:18, 1291:12, 1300:9, 1300:22, 1340:24, 1343:16
**reporter** [4] - 1229:9, 1266:12, 1301:13, 1309:5
**Reporter** [7] - 1235:13, 1344:21, 1344:22, 1344:23, 1345:8
**REPORTER** [1] - 1188:13
**REPORTER'S** [1] - 1344:19
**reporting** [11] - 1201:20, 1271:1, 1273:17, 1273:18, 1273:24, 1274:1, 1275:18, 1276:7, 1300:24, 1301:1, 1301:6
**reports** [6] - 1221:8, 1244:1, 1251:16, 1293:16, 1298:6
**represent** [1] - 1247:2
**representative** [2] - 1326:6, 1329:12
**representatives** [2] - 1339:22, 1339:23
**represents** [1] - 1273:9

**request** [3] - 1201:3, 1201:6
**requested** [1] - 1236:3
**required** [9] - 1210:25, 1230:22, 1231:6, 1245:23, 1249:3, 1258:3, 1260:22, 1260:24, 1329:14
**requirement** [1] - 1329:23
**requirements** [1] - 1233:19
**requires** [3] - 1210:21, 1220:15, 1228:19
**research** [11] - 1265:16, 1265:17, 1265:23, 1267:19, 1267:23, 1268:5, 1276:13, 1307:24, 1308:4, 1336:3
**reserve** [1] - 1306:6
**reserved** [1] - 1309:13
**residence** [2] - 1282:18, 1282:21
**residential** [4] - 1236:7, 1236:10, 1236:13, 1288:7
**residents** [3] - 1249:17, 1249:19, 1249:24
**resolve** [1] - 1255:9
**resources** [3] - 1236:24, 1244:10, 1260:5
**respect** [48] - 1205:12, 1206:8, 1206:11, 1208:20, 1209:11, 1210:18, 1211:10, 1211:25, 1227:6, 1270:5, 1272:13, 1287:22, 1287:25, 1288:5, 1296:20, 1305:12, 1312:23, 1313:1, 1314:3, 1314:7, 1314:8, 1315:11, 1318:14, 1321:17, 1321:19, 1321:20, 1321:22, 1322:7, 1325:11, 1329:1, 1336:13, 1336:17, 1336:23, 1336:25, 1337:3, 1337:11, 1337:21, 1337:23, 1338:24, 1339:8, 1340:6, 1340:22, 1341:1, 1341:2, 1342:2, 1342:14, 1342:16, 1342:25
**respectfully** [1] -

1326:14
**respective** [1] - 1202:22
**respiratory** [1] - 1276:18
**respond** [16] - 1231:18, 1232:11, 1232:12, 1232:13, 1232:14, 1233:2, 1233:4, 1258:22, 1266:2, 1271:10, 1276:2, 1276:3, 1299:25, 1311:16, 1313:21, 1341:16
**responded** [3] - 1266:6, 1275:25, 1287:5
**responding** [6] - 1232:7, 1232:10, 1233:9, 1233:10, 1233:15, 1300:2
**responds** [2] - 1278:23, 1300:11
**response** [32] - 1236:5, 1237:25, 1238:7, 1243:25, 1246:15, 1246:24, 1252:1, 1252:5, 1259:16, 1259:19, 1259:24, 1260:1, 1260:18, 1271:18, 1271:24, 1273:20, 1275:9, 1275:18, 1275:23, 1277:24, 1278:9, 1278:11, 1278:24, 1279:12, 1287:23, 1288:1, 1296:13, 1302:24, 1303:4, 1310:22, 1324:6
**response)** [1] - 1246:3
**responses** [9] - 1237:20, 1238:8, 1238:9, 1238:21, 1238:24, 1239:4, 1272:24, 1276:10, 1325:1
**responsibilities** [1] - 1230:11
**responsibility** [24] - 1231:10, 1231:12, 1232:5, 1233:2, 1248:15, 1248:20, 1248:24, 1249:1, 1249:5, 1249:6, 1249:7, 1249:9, 1249:14, 1249:20, 1250:18, 1250:24, 1250:25, 1259:16, 1259:23, 1260:3,

1260:10, 1326:7, 1339:25
**responsible** [9] - 1232:4, 1249:11, 1260:7, 1260:9, 1260:10, 1300:4, 1300:7, 1336:15, 1340:20
**rest** [1] - 1288:17
**restate** [1] - 1324:24
**rests** [2] - 1301:21, 1305:9
**result** [10] - 1218:5, 1218:11, 1272:14, 1285:6, 1291:16, 1291:18, 1293:2, 1312:19, 1320:8, 1335:16
**results** [4] - 1243:1, 1259:11, 1271:1, 1271:14
**retailer** [1] - 1326:21
**retailing** [1] - 1326:22
**retired** [2] - 1296:23, 1296:24
**return** [1] - 1335:21
**reurge** [1] - 1324:23
**review** [2] - 1253:20, 1315:18
**reviewed** [6] - 1199:13, 1203:20, 1203:24, 1211:22, 1238:23, 1268:12
**reviewing** [1] - 1276:12
**Revised** [2] - 1328:2, 1333:17
**revisit** [1] - 1335:6
**rhinitis** [14] - 1198:12, 1212:1, 1212:2, 1212:7, 1212:8, 1212:11, 1217:15, 1217:16, 1217:17, 1217:21, 1217:24, 1224:4, 1224:6, 1314:8
**rhinosinusitis** [8] - 1204:2, 1210:3, 1283:24, 1284:15, 1284:17, 1284:19, 1318:21, 1318:22
**rid** [2] - 1286:15, 1286:18
**ridiculous** [1] - 1226:17
**ridiculously** [2] - 1226:6, 1226:21
**right-hand** [1] - 1280:18
**rigueur** [1] - 1314:16

**rise** [3] - 1190:7, 1262:10, 1262:21
**rising** [1] - 1282:24
**risk** [8] - 1242:22, 1242:24, 1243:6, 1246:15, 1304:24, 1319:4, 1319:5, 1319:16
**Rita** [1] - 1252:5
**Ritchie** [6] - 1201:17, 1201:18, 1201:19, 1202:25, 1203:3, 1203:4
**RMR** [2] - 1188:13, 1345:7
**Robert** [2] - 1263:19, 1264:11
**ROBERT** [3] - 1189:11, 1264:11, 1264:12
**Robitussin** [2] - 1281:7, 1281:12
**Roe** [1] - 1235:12
**role** [2] - 1269:5, 1340:13
**Roofing** [1] - 1333:20
**room** [2] - 1198:24, 1283:2
**ROOM** [1] - 1188:14
**roses** [2] - 1274:22, 1275:15
**Rouge** [1] - 1312:14
**roughly** [1] - 1237:15
**rounding** [1] - 1263:16
**row** [1] - 1273:16
**rule** [1] - 1209:7
**Rule** [26] - 1309:18, 1309:22, 1309:25, 1310:8, 1310:10, 1310:16, 1310:20, 1311:14, 1312:2, 1312:6, 1313:19, 1318:4, 1318:5, 1320:3, 1321:5, 1322:13, 1322:18, 1324:22, 1325:6, 1325:19, 1327:5, 1336:7, 1343:7
**rules** [1] - 1205:23
**run** [4] - 1213:13, 1283:24, 1284:14, 1309:23
**Runge** [8] - 1235:5, 1235:7, 1235:15, 1235:18, 1243:16, 1243:18, 1244:8, 1244:19, 1245:5
**runge** [1] - 1235:6

**Runge's** [2] - 1236:5, 1236:6
**running** [2] - 1258:5, 1258:8
**runny** [1] - 1300:17
**runs** [1] - 1198:8
**rural** [1] - 1292:4
**Rush** [6] - 1326:11, 1328:25, 1330:5, 1331:6, 1331:14, 1334:5
**Rush's** [2] - 1329:5, 1329:11
**RV's** [1] - 1326:22
**résumé** [2] - 1205:7, 1205:8

# S

**s/Cathy** [1] - 1345:6
**safe** [11] - 1243:4, 1243:8, 1243:9, 1243:12, 1243:13, 1243:15, 1245:15, 1245:19, 1249:17, 1250:23, 1253:1
**Safety** [1] - 1206:19
**safety** [22] - 1206:22, 1234:18, 1234:20, 1234:22, 1234:23, 1234:24, 1239:6, 1239:13, 1239:18, 1239:21, 1239:24, 1240:6, 1240:11, 1241:5, 1241:12, 1242:9, 1242:10, 1242:13, 1245:23, 1247:20, 1250:14, 1279:8
**sample** [2] - 1280:24, 1287:8
**SAN** [2] - 1187:18, 1187:24
**satisfied** [1] - 1316:16
**satisfy** [2] - 1317:1, 1334:24
**save** [2] - 1276:11, 1342:4
**saved** [1] - 1290:24
**saw** [8] - 1196:25, 1197:2, 1197:19, 1197:20, 1238:14, 1278:15, 1290:10, 1290:23
**scale** [1] - 1256:25
**Schilligo** [1] - 1343:3
**Schneider** [2] - 1235:10
**School** [4] - 1191:18,

1192:2, 1192:4, 1192:15
**schools** [1] - 1191:21
**science** [6] - 1202:20, 1267:23, 1270:2, 1295:7, 1300:4, 1300:7
**scientific** [3] - 1234:12, 1268:25, 1295:17
**scientist** [1] - 1295:22
**scientists** [2] - 1270:24, 1295:14
**score** [1] - 1200:9
**scored** [1] - 1200:11
**scoring** [1] - 1200:3
**SCOTT** [1] - 1188:4
**scratchy** [1] - 1196:1
**screen** [2] - 1279:21, 1279:22
**scroll** [1] - 1280:3
**scrolling** [1] - 1308:20
**seasons** [1] - 1209:14
**seated** [5] - 1190:10, 1190:24, 1262:22, 1264:9, 1308:15
**second** [13] - 1197:7, 1202:7, 1246:24, 1276:22, 1302:18, 1303:8, 1310:10, 1327:4, 1330:6, 1332:4, 1332:13, 1332:20, 1337:2
**Second** [1] - 1328:22
**secondly** [2] - 1303:3, 1330:21
**seconds** [3] - 1304:1, 1304:6, 1308:23
**secretary** [3] - 1235:16, 1235:22, 1236:2
**Secretary** [2] - 1253:16
**Section** [2] - 1233:20, 1327:7
**sector** [2] - 1232:23, 1248:14
**SECURITY** [3] - 1190:7, 1262:10, 1262:21
**Security** [2] - 1235:17, 1243:19
**see** [31] - 1197:21, 1198:6, 1198:23, 1200:10, 1200:13, 1203:13, 1204:12, 1204:14, 1205:3, 1213:2, 1215:17, 1216:11, 1217:6, 1223:10, 1223:13,

1224:6, 1236:8, 1253:13, 1254:12, 1270:12, 1274:11, 1278:5, 1279:3, 1279:19, 1279:22, 1279:23, 1279:25, 1286:11, 1292:12, 1304:4, 1334:4
**seeing** [3] - 1191:23, 1244:24, 1245:4
**seem** [2] - 1246:19, 1248:2
**seemingly** [1] - 1331:24
**segment** [1] - 1252:19
**selected** [1] - 1296:2
**self** [1] - 1201:20
**self-reporting** [1] - 1201:20
**sends** [1] - 1337:25
**sense** [1] - 1256:20
**sensitive** [2] - 1271:7, 1299:10
**sensitizers** [1] - 1225:19
**sent** [1] - 1322:25
**sentence** [3] - 1248:8, 1311:6, 1332:16
**separate** [1] - 1256:4
**September** [1] - 1251:18
**series** [5] - 1192:12, 1213:14, 1224:25, 1244:25, 1323:22
**service** [1] - 1255:25
**services** [1] - 1204:18
**serving** [1] - 1307:18
**session** [1] - 1262:24
**SESSION** [2] - 1187:11, 1190:2
**set** [9] - 1212:25, 1224:25, 1227:15, 1232:11, 1232:13, 1232:17, 1252:4, 1258:7, 1338:20
**sets** [1] - 1212:24
**settled** [2] - 1331:24
**setup** [4] - 1336:18, 1341:5, 1341:6, 1343:1
**several** [11] - 1201:1, 1218:18, 1219:15, 1219:16, 1255:24, 1261:12, 1267:4, 1283:11, 1283:17, 1309:22, 1310:6
**severe** [1] - 1218:19, 1218:22
**severity** [1] - 1313:3
**sewerage** [2] - 1258:5,

1258:9
**shaded** [1] - 1279:21
**shall** [1] - 1332:8
**shape** [1] - 1314:20
**share** [5] - 1196:24, 1240:12, 1248:25, 1249:5, 1249:7
**shared** [2] - 1199:23, 1249:14, 1260:11
**sharing** [1] - 1248:23
**Shaw** [21] - 1257:5, 1336:12, 1336:15, 1336:24, 1337:9, 1338:3, 1338:14, 1338:19, 1338:24, 1339:9, 1339:23, 1340:2, 1340:15, 1340:19, 1340:24, 1341:9, 1341:10, 1342:17, 1343:17, 1343:18, 1343:19
**Shaw's** [2] - 1339:25, 1343:19
**shift** [1] - 1248:6
**short** [7] - 1196:9, 1237:9, 1237:10, 1246:18, 1255:7, 1256:8, 1262:8
**short-term** [2] - 1237:9, 1246:18
**shortly** [1] - 1341:13
**show** [12] - 1199:19, 1199:21, 1212:10, 1253:13, 1253:17, 1271:22, 1274:19, 1275:22, 1279:24, 1281:3, 1284:6, 1284:7
**showed** [6] - 1199:20, 1201:12, 1215:23, 1268:24, 1276:15, 1326:21
**showing** [1] - 1246:10
**shown** [4] - 1216:18, 1274:17, 1308:7, 1333:17
**shows** [6] - 1273:10, 1274:21, 1278:17, 1279:18, 1280:3, 1295:3, 1295:5, 1307:6
**sic** [1] - 1218:1
**sick** [2] - 1192:23, 1300:16
**side** [8] - 1213:25, 1280:11, 1280:18, 1283:6, 1301:16, 1306:5, 1306:18
**Sierra** [7] - 1234:6, 1234:12, 1234:16,

1240:24, 1255:4, 1255:5, 1259:11
**sign** [2] - 1221:24, 1222:1
**significance** [1] - 1230:24
**significant** [5] - 1297:18, 1313:13, 1320:12, 1320:16, 1321:10
**significantly** [3] - 1209:17, 1298:10, 1325:23
**silly** [1] - 1294:13
**similar** [5] - 1267:7, 1271:4, 1299:15, 1318:5, 1326:23
**simply** [7] - 1194:18, 1195:8, 1203:5, 1252:9, 1270:5, 1286:15, 1334:10
**single** [1] - 1251:13
**sinitis** [1] - 1218:1
**sinus** [16] - 1197:15, 1197:16, 1198:3, 1198:11, 1199:8, 1199:11, 1200:14, 1200:16, 1201:12, 1201:16, 1203:2, 1213:9, 1213:11, 1213:13, 1213:16
**sinuses** [6] - 1203:3, 1212:24, 1212:25, 1213:3, 1213:7, 1313:1
**sinusitis** [6] - 1203:5, 1212:11, 1218:2, 1218:3, 1314:5, 1318:14
**sit** [3] - 1190:18, 1251:11, 1263:5
**site** [6] - 1236:22, 1252:15, 1266:10, 1268:19, 1302:14, 1304:14
**sites** [3] - 1266:2, 1266:4, 1266:5
**sits** [2] - 1212:19, 1213:4
**sitting** [1] - 1213:9
**situation** [3] - 1251:19, 1294:24, 1339:18
**six** [3] - 1267:1, 1267:2, 1268:2
**size** [2] - 1236:19, 1252:3
**skin** [1] - 1201:24
**skip** [2] - 1294:11, 1332:7

**slew** [2] - 1233:15, 1253:12
**slide** [8] - 1264:16, 1269:13, 1270:15, 1270:17, 1270:20, 1278:17, 1281:3, 1334:11
**slide-out** [1] - 1334:11
**slides** [4] - 1270:6, 1271:22, 1274:18, 1279:11
**slightly** [1] - 1193:22
**slope** [1] - 1283:6
**small** [7] - 1236:21, 1252:19, 1254:18, 1254:19, 1261:5, 1261:14
**smell** [16] - 1193:21, 1194:3, 1194:6, 1194:7, 1194:25, 1195:13, 1209:24, 1210:1, 1210:4, 1222:16, 1238:22, 1276:4, 1276:9, 1277:9, 1298:21, 1299:6
**smelled** [3] - 1194:18, 1195:4, 1343:10
**smelling** [3] - 1299:2, 1343:20
**smells** [8] - 1194:1, 1206:3, 1274:22, 1274:24, 1275:15, 1299:7, 1343:2
**so-called** [1] - 1217:10
**So.2d** [1] - 1328:24
**Society** [1] - 1333:20
**soft** [1] - 1295:2
**soil** [1] - 1294:25
**solely** [1] - 1260:7
**solemnly** [2] - 1191:1, 1264:5
**solution** [4] - 1236:20, 1247:1, 1247:4, 1247:6
**someone** [7] - 1198:12, 1237:9, 1271:19, 1304:18, 1326:21, 1331:20, 1337:16
**someplace** [3] - 1198:9, 1261:4, 1291:7
**sometime** [2] - 1229:13, 1233:22
**sometimes** [1] - 1272:9
**somewhere** [3] - 1210:25, 1292:23,

1300:1
**soon** [1] - 1275:8
**sophisticated** [6] - 1325:6, 1325:12, 1325:18, 1326:13, 1326:21, 1327:1
**sorry** [12] - 1222:6, 1253:8, 1264:22, 1266:14, 1266:15, 1266:20, 1270:19, 1279:14, 1282:13, 1292:8, 1314:12, 1344:8
**Sorry** [1] - 1301:13
**sort** [4] - 1237:8, 1278:20, 1280:6, 1282:4
**sorts** [1] - 1236:25
**sound** [1] - 1215:14
**sounds** [2] - 1281:25, 1318:2
**sources** [8] - 1248:23, 1280:11, 1280:15, 1281:3, 1281:19, 1281:21, 1281:22, 1299:7
**Souza** [2] - 1233:20, 1234:4
**Souza's** [1] - 1234:17
**Spas** [2] - 1326:20, 1326:25
**speaking** [1] - 1300:21
**speaks** [1] - 1312:24
**spear** [2] - 1248:3, 1248:19
**specializes** [1] - 1265:7
**specializing** [1] - 1265:14
**specific** [22] - 1238:13, 1244:20, 1257:19, 1277:22, 1284:11, 1311:19, 1312:3, 1312:9, 1312:23, 1312:24, 1313:24, 1314:3, 1314:24, 1315:2, 1315:5, 1315:6, 1318:14, 1333:25, 1334:2, 1337:14, 1339:8, 1340:21
**specifically** [12] - 1230:17, 1234:4, 1235:20, 1235:21, 1235:22, 1239:14, 1243:25, 1260:15, 1313:5, 1318:7, 1322:1, 1339:2
**specification** [13] -

1329:9, 1329:24, 1330:1, 1330:3, 1330:10, 1331:9, 1332:19, 1333:1, 1333:2, 1334:13, 1334:20, 1334:23, 1335:3
**specifications** [22] - 1249:21, 1327:11, 1327:14, 1327:18, 1327:19, 1327:21, 1328:1, 1328:20, 1330:4, 1330:13, 1331:23, 1332:3, 1332:11, 1332:15, 1332:23, 1333:8, 1333:15, 1333:25, 1334:1, 1335:15, 1335:18, 1335:20
**specified** [3] - 1250:5, 1333:8, 1333:21
**specify** [1] - 1249:23
**specs** [1] - 1331:14
**speculate** [1] - 1298:12
**spell** [2] - 1191:8, 1264:10
**spelled** [3] - 1287:4, 1291:12, 1296:4
**spend** [3] - 1195:6, 1316:17, 1341:18
**spent** [6] - 1190:12, 1265:19, 1265:24, 1297:2, 1331:1, 1341:22
**sphenoid** [1] - 1213:13
**sphenoidal** [1] - 1213:3
**spill** [3] - 1266:6, 1266:10, 1304:18
**spills** [1] - 1266:3
**spoken** [1] - 1337:18
**spring** [1] - 1209:18
**St** [4] - 1191:19, 1193:5, 1203:14, 1204:14
**staff** [3] - 1193:1, 1193:3, 1232:18
**Stafford** [3] - 1231:17, 1232:1, 1256:11
**stages** [1] - 1272:19
**staging** [1] - 1343:2
**stake** [1] - 1242:14
**stakes** [1] - 1335:9
**stamped** [1] - 1253:14
**stand** [1] - 1312:3
**standard** [15] - 1205:16, 1205:18, 1226:16, 1227:6,

1227:8, 1227:11, 1269:19, 1302:8, 1329:10, 1329:14, 1329:20, 1329:23, 1334:22, 1334:24, 1335:2
**Standard** [1] - 1333:20
**standards** [21] - 1206:8, 1206:11, 1226:19, 1236:10, 1236:11, 1244:5, 1244:14, 1244:17, 1244:20, 1245:8, 1245:24, 1246:2, 1246:7, 1246:8, 1248:7, 1249:3, 1250:18, 1250:22, 1250:25, 1267:11
**standards-making** [1] - 1248:7
**standing** [4] - 1190:23, 1263:25, 1283:24, 1284:14
**standpoint** [6] - 1205:24, 1206:13, 1251:22, 1313:25, 1342:22, 1343:2
**start** [22] - 1195:25, 1198:21, 1204:13, 1210:11, 1210:20, 1262:9, 1263:13, 1277:17, 1277:19, 1279:19, 1287:1, 1287:9, 1288:14, 1306:19, 1306:20, 1306:22, 1307:2, 1311:6, 1315:15, 1317:2
**started** [4] - 1192:13, 1201:7, 1267:18, 1268:4
**starting** [2] - 1240:22, 1302:12
**State** [2] - 1267:10, 1344:23
**state** [13] - 1191:8, 1230:20, 1232:22, 1233:20, 1233:25, 1234:17, 1242:25, 1260:5, 1260:16, 1264:10, 1267:3, 1313:5, 1328:8
**statement** [7] - 1201:11, 1218:7, 1218:8, 1230:24, 1231:11, 1231:15, 1236:14
**statements** [1] - 1307:7
**STATES** [2] - 1187:1,

1187:13

**states** [1] - 1323:12

**States** [3] - 1283:10, 1344:24, 1345:9

**Statute** [2] - 1328:2, 1333:17

**statute** [14] - 1330:12, 1330:14, 1330:25, 1331:2, 1332:4, 1333:3, 1333:5, 1333:14, 1333:17, 1334:12, 1334:16, 1335:3, 1335:23, 1336:5

**statutes** [1] - 1332:24

**statutes's** [1] - 1332:6

**stay** [6] - 1219:23, 1244:23, 1245:10, 1252:14, 1252:20, 1252:25

**stay-at-home** [3] - 1244:23, 1245:10, 1252:25

**stays** [4] - 1212:23, 1215:23, 1215:24, 1275:18

**steep** [1] - 1283:5

**STENOGRAPHY** [1] - 1188:15

**step** [2] - 1229:1, 1301:12

**stick** [1] - 1212:21

**still** [7] - 1196:12, 1231:20, 1276:7, 1306:4, 1306:15, 1307:11, 1311:10

**stimulates** [1] - 1274:23

**stimulation** [1] - 1274:24

**stipulated** [2] - 1282:9, 1282:14

**stipulation** [6] - 1262:13, 1263:24, 1264:2, 1282:9, 1310:12, 1324:24

**stomach** [1] - 1214:10

**stop** [3] - 1198:5, 1215:21, 1255:18

**stopped** [2] - 1198:17, 1338:24

**stopping** [1] - 1263:14

**straight** [1] - 1212:19

**strategized** [1] - 1237:24

**STREET** [2] - 1188:5, 1188:13

**Street** [1] - 1298:9

**strengths** [1] - 1269:16

**stricken** [1] - 1314:18

**strictly** [1] - 1299:2

**strike** [1] - 1311:6

**strong** [1] - 1317:25

**students** [2] - 1266:25

**studied** [1] - 1270:11

**studies** [63] - 1192:12, 1200:15, 1200:19, 1200:21, 1201:12, 1203:24, 1205:8, 1205:11, 1210:11, 1210:15, 1210:16, 1211:11, 1216:13, 1216:18, 1217:3, 1217:4, 1217:6, 1222:20, 1225:18, 1265:20, 1269:12, 1269:15, 1269:17, 1269:18, 1269:21, 1269:22, 1269:23, 1270:1, 1270:2, 1270:4, 1270:8, 1270:14, 1270:20, 1270:22, 1270:23, 1271:3, 1271:22, 1274:17, 1274:18, 1276:13, 1277:4, 1277:11, 1278:13, 1280:7, 1282:22, 1283:11, 1283:17, 1291:12, 1292:3, 1293:11, 1296:1, 1296:6, 1299:9, 1300:25, 1301:6, 1341:22

**Study** [1] - 1192:14

**study** [25] - 1192:16, 1192:17, 1202:18, 1202:19, 1202:21, 1208:17, 1210:17, 1215:21, 1215:23, 1270:5, 1270:21, 1271:8, 1271:12, 1271:13, 1271:14, 1271:15, 1271:24, 1272:13, 1273:2, 1273:11, 1273:12, 1279:16, 1282:18, 1283:12, 1314:1

**stuff** [2] - 1305:22, 1308:3

**stuffiness** [1] - 1267:13

**summarizes** [1] - 1231:24

**summer** [2] - 1203:14, 1209:15

**summers** [1] - 1209:17

**superior** [1] - 1213:24

**supplemental** [1] - 1268:5

**supplied** [1] - 1251:1

**support** [4] - 1229:25, 1260:5, 1269:24,

1314:22

**supported** [1] - 1317:6

**supporting** [2] - 1230:12, 1232:21

**surgeon** [1] - 1200:13

**surgery** [16] - 1199:15, 1199:17, 1200:14, 1203:20, 1211:21, 1311:2, 1311:4, 1311:10, 1313:12, 1314:6, 1318:6, 1318:9, 1318:14, 1318:15, 1318:23

**surgical** [1] - 1317:22

**surprised** [2] - 1303:15, 1303:23

**surveillance** [1] - 1266:7

**sustain** [1] - 1322:10

**swap** [1] - 1239:3

**swapping** [2] - 1254:24, 1255:18, 1258:16

**swear** [2] - 1191:1, 1264:5

**swirl** [1] - 1212:23

**switch** [1] - 1225:24

**sworn** [2] - 1191:6, 1264:13

**symptom** [4] - 1271:20, 1300:11, 1300:14, 1300:20

**symptomatic** [1] - 1235:25

**symptomatically** [1] - 1284:19

**symptoms** [6] - 1274:12, 1274:15, 1300:19, 1300:22, 1317:19

**synthetic** [1] - 1281:9

**syrup** [2] - 1280:22, 1281:8

**syrups** [1] - 1281:11

**system** [3] - 1276:18, 1339:16, 1339:21

**systemic** [6] - 1240:25, 1241:1, 1254:16, 1254:20, 1254:22, 1259:5

**T**

**TAC** [1] - 1256:23

**talks** [2] - 1203:4, 1214:22

**tape** [1] - 1229:10

**target** [1] - 1246:18

**task** [1] - 1290:14

**TAT** [1] - 1266:5

**taught** [1] - 1266:24

**TDI** [1] - 1225:21

**teach** [1] - 1266:23

**teams** [3] - 1266:4, 1266:5

**tears** [3] - 1196:8, 1272:2

**technical** [1] - 1266:5

**technically** [1] - 1248:12

**TEF** [1] - 1267:5

**temperature** [3] - 1209:4, 1209:8, 1209:17

**temperatures** [1] - 1287:6

**temporary** [6] - 1231:19, 1236:20, 1252:2, 1260:23, 1260:24, 1260:25

**tempting** [1] - 1311:23

**ten** [1] - 1267:2

**tend** [3] - 1271:10, 1296:12, 1301:5

**tender** [1] - 1193:6

**term** [21] - 1196:11, 1196:14, 1196:18, 1227:17, 1232:18, 1236:20, 1237:3, 1237:6, 1237:8, 1237:9, 1239:19, 1240:1, 1240:7, 1240:12, 1246:18, 1249:17, 1249:19, 1249:24, 1289:3, 1329:7, 1338:10

**terminologies** [1] - 1245:17

**terms** [24] - 1202:20, 1202:21, 1222:13, 1231:25, 1232:15, 1249:5, 1249:12, 1249:21, 1250:23, 1256:2, 1260:9, 1260:17, 1288:4, 1290:25, 1291:23, 1305:17, 1308:1, 1311:12, 1315:24, 1316:1, 1316:2, 1316:11, 1323:9, 1331:11

**TERRA** [2] - 1267:17, 1267:18

**test** [3] - 1286:23, 1312:19, 1314:23

**tested** [4] - 1234:9, 1282:10, 1282:14, 1298:4

**1239:21, 1301:17, 1305:11, 1321:12**

**subjective** [4] - 1273:19, 1276:4, 1277:6, 1293:8

**subjectively** [1] - 1271:11

**subjects** [2] - 1273:17, 1275:3

**submit** [3] - 1320:8, 1326:14, 1329:5

**subsequent** [2] - 1249:9, 1337:23

**substance** [2] - 1315:4, 1338:20

**substantive** [1] - 1306:10

**substitute** [1] - 1316:10

**sued** [2] - 1340:2, 1342:4

**suffered** [1] - 1323:15

**suffering** [6] - 1235:25, 1310:17, 1310:19, 1310:24, 1311:20, 1311:22

**sufficient** [11] - 1283:23, 1284:14, 1285:5, 1313:8, 1325:10, 1331:16, 1332:3, 1334:12, 1334:16, 1335:24, 1340:7

**suggest** [5] - 1249:20, 1298:20, 1303:15, 1311:8, 1319:6

**suggested** [1] - 1225:8

**suggesting** [3] - 1244:13, 1250:12, 1297:16

**suggestion** [2] - 1248:9, 1248:22

**SUITE** [5] - 1187:18, 1187:21, 1187:24, 1188:5, 1188:10

**summaries** [1] - 1267:13

**stuffy** [6] - 1198:2, 1198:3, 1198:4, 1198:5, 1198:6, 1198:10

**subdisciplines** [1] - 1265:10

**subject** [5] - 1235:12,

**testified** [35] - 1191:7, 1205:22, 1205:25, 1206:7, 1206:13, 1206:16, 1206:17, 1207:8, 1218:25, 1219:11, 1220:2, 1220:19, 1227:2, 1231:16, 1264:14, 1283:22, 1296:20, 1304:9, 1312:18, 1313:1, 1313:3, 1313:8, 1314:4, 1317:18, 1321:15, 1322:15, 1324:11, 1326:7, 1329:6, 1329:13, 1330:5, 1330:6, 1339:14, 1339:24, 1340:19

**testify** [8] - 1205:14, 1207:12, 1207:13, 1208:4, 1224:23, 1227:15, 1313:9, 1330:6

**testifying** [1] - 1316:18

**testimony** [76] - 1191:1, 1208:13, 1211:16, 1219:5, 1221:16, 1224:22, 1226:22, 1228:4, 1228:9, 1229:11, 1229:15, 1259:15, 1264:5, 1264:18, 1281:4, 1281:25, 1282:8, 1284:20, 1296:22, 1302:21, 1303:6, 1303:7, 1310:18, 1310:23, 1311:3, 1311:7, 1312:12, 1312:13, 1312:15, 1312:20, 1312:24, 1312:25, 1313:13, 1313:16, 1313:17, 1315:8, 1315:17, 1315:25, 1318:15, 1319:15, 1320:12, 1320:13, 1320:14, 1320:15, 1321:10, 1321:12, 1321:13, 1321:17, 1321:18, 1321:24, 1321:25, 1322:14, 1322:21, 1323:7, 1324:4, 1324:17, 1326:4, 1326:11, 1327:17, 1328:25, 1329:5, 1329:11, 1331:8, 1331:17, 1337:3, 1337:16, 1339:13, 1339:22, 1340:4, 1340:21,

1343:11, 1343:13

**testing** [10] - 1234:1, 1234:4, 1234:5, 1234:6, 1234:19, 1239:7, 1259:20, 1285:15, 1285:17, 1285:20

**tests** [2] - 1210:12, 1276:25

**text** [1] - 1279:15

**THE** [112] - 1187:12, 1190:7, 1190:10, 1190:22, 1190:25, 1191:4, 1191:8, 1191:10, 1193:9, 1207:1, 1211:4, 1211:7, 1211:18, 1212:4, 1212:13, 1219:8, 1219:19, 1219:24, 1220:25, 1221:20, 1221:21, 1221:24, 1223:3, 1226:10, 1227:4, 1227:8, 1227:19, 1229:1, 1229:5, 1229:10, 1262:6, 1262:10, 1262:17, 1262:21, 1262:22, 1263:20, 1263:24, 1264:4, 1264:8, 1264:9, 1264:11, 1264:21, 1264:23, 1284:3, 1284:6, 1284:11, 1284:16, 1284:25, 1285:10, 1287:14, 1289:3, 1289:7, 1297:11, 1301:12, 1301:13, 1301:15, 1301:20, 1301:23, 1302:3, 1302:10, 1302:12, 1302:25, 1303:3, 1304:4, 1304:9, 1305:9, 1305:13, 1305:22, 1306:1, 1306:18, 1308:15, 1308:25, 1309:11, 1309:19, 1310:5, 1310:14, 1311:23, 1313:20, 1313:22, 1315:15, 1318:24, 1319:10, 1319:21, 1320:2, 1320:18, 1321:7, 1322:11, 1322:19, 1323:5, 1324:4, 1324:20, 1325:3, 1325:21, 1326:15, 1326:18, 1328:16, 1331:1, 1335:11, 1335:12, 1336:10, 1337:13,

1337:16, 1338:9, 1339:11, 1341:8, 1341:17, 1342:7, 1342:10, 1343:8, 1343:19, 1344:4, 1344:9

**themselves** [1] - 1239:2

**theoretical** [1] - 1228:22

**theory** [1] - 1277:22

**therapeutic** [1] - 1278:19

**thereafter** [1] - 1341:13

**therefore** [10] - 1193:9, 1298:21, 1310:7, 1325:18, 1327:25, 1328:11, 1335:18, 1336:23, 1340:3, 1341:7

**thesis** [1] - 1265:16

**they've** [3] - 1215:10, 1231:6, 1231:9

**thinking** [1] - 1284:19

**thinks** [1] - 1195:2

**Third** [1] - 1328:17

**third** [3] - 1191:22, 1234:15, 1310:16

**thirdly** [1] - 1327:22

**THIS** [1] - 1187:7

**thoroughly** [1] - 1312:3

**thousand** [10] - 1201:21, 1219:16, 1222:11, 1222:12, 1222:15, 1293:4, 1293:25, 1300:8, 1331:12

**thousands** [2] - 1251:1, 1251:25

**three** [18] - 1194:11, 1198:16, 1198:18, 1198:20, 1212:21, 1212:24, 1252:13, 1276:16, 1279:20, 1294:1, 1296:3, 1312:11, 1313:22, 1323:22, 1327:4, 1334:3, 1334:15, 1334:19

**THREE** [2] - 1187:18, 1188:9

**threshold** [23] - 1193:19, 1193:20, 1209:20, 1210:7, 1210:10, 1210:22, 1222:14, 1269:7, 1271:4, 1272:25, 1273:1, 1273:2,

1277:18, 1277:19, 1278:5, 1278:7, 1278:12, 1278:16, 1279:3, 1285:8, 1288:2, 1299:23, 1299:24

**thresholds** [3] - 1269:22, 1299:19, 1299:22

**throat** [20] - 1218:20, 1218:23, 1219:1, 1219:2, 1219:12, 1220:4, 1220:5, 1220:9, 1220:14, 1222:4, 1222:6, 1224:1, 1267:16, 1271:6, 1274:11, 1277:6, 1277:7, 1285:6, 1290:16, 1290:22

**throughout** [4] - 1198:2, 1240:14, 1275:13, 1320:4

**throw** [1] - 1325:7

**thrown** [1] - 1308:1

**thumb** [1] - 1209:8

**tighter** [1] - 1268:22

**timing** [1] - 1324:21

**Tina** [1] - 1235:10

**tiny** [1] - 1213:15

**tip** [3] - 1216:8, 1248:3, 1248:19

**title** [1] - 1230:6

**TO** [2] - 1187:7, 1190:4

**today** [13] - 1190:16, 1229:14, 1233:8, 1233:10, 1251:11, 1256:21, 1262:23, 1262:24, 1268:7, 1281:4, 1307:3, 1309:4, 1326:7

**together** [7] - 1208:9, 1213:23, 1214:8, 1225:3, 1305:20, 1306:11, 1306:12

**tolerance** [2] - 1275:10, 1275:11

**tolerant** [1] - 1296:11

**toluene** [2] - 1225:21, 1228:13

**toluene-diisocyanate-based** [1] - 1228:13

**tomatoes** [1] - 1295:2

**took** [9] - 1196:24, 1201:20, 1203:25, 1211:22, 1231:23, 1233:21, 1271:16, 1278:14, 1340:16

**top** [5] - 1260:6, 1269:16, 1273:12, 1273:16, 1321:9

**topic** [1] - 1226:21

**total** [5] - 1239:13, 1253:23, 1260:17, 1281:1, 1294:23

**tour** [2] - 1337:12, 1337:13

**toward** [1] - 1317:13

**toxic** [6] - 1265:22, 1267:6, 1267:24, 1275:16, 1304:22

**toxicant** [2] - 1267:11, 1267:12

**toxicity** [1] - 1279:2

**toxicologist** [5] - 1208:8, 1265:5, 1265:7, 1278:11, 1279:4

**toxicologists** [3] - 1278:18, 1279:6, 1279:18

**toxicology** [17] - 1263:22, 1264:3, 1265:4, 1265:10, 1265:14, 1265:15, 1265:16, 1265:18, 1266:17, 1266:21, 1266:23, 1266:24, 1267:24, 1268:15, 1277:23, 1279:15, 1290:5

**traditional** [1] - 1326:24

**traffic** [2] - 1298:7, 1298:15

**TRAILER** [1] - 1187:4

**trailer** [80] - 1198:1, 1198:15, 1198:17, 1199:4, 1199:9, 1199:10, 1203:16, 1203:18, 1203:21, 1204:3, 1208:23, 1209:11, 1221:10, 1221:11, 1224:11, 1224:20, 1236:18, 1237:7, 1249:16, 1254:25, 1257:12, 1258:16, 1261:6, 1282:10, 1283:10, 1283:21, 1284:14, 1285:4, 1285:14, 1285:18, 1285:25, 1286:24, 1287:7, 1287:11, 1291:5, 1291:7, 1291:10, 1291:13, 1292:16, 1292:20, 1292:21, 1293:25, 1294:5,

1296:21, 1297:7, 1297:17, 1298:4, 1299:8, 1300:5, 1300:8, 1310:25, 1311:9, 1312:19, 1313:7, 1313:10, 1313:11, 1313:15, 1318:10, 1318:13, 1318:20, 1322:3, 1322:6, 1323:2, 1327:23, 1329:2, 1329:8, 1329:10, 1330:7, 1331:14, 1331:19, 1331:20, 1334:11, 1337:9, 1337:11, 1337:12, 1338:20, 1341:21, 1341:25

**trailers** [49] - 1206:9, 1206:18, 1221:14, 1227:7, 1227:23, 1228:4, 1235:19, 1236:17, 1236:21, 1244:22, 1246:5, 1246:16, 1247:1, 1247:21, 1249:18, 1251:2, 1251:14, 1251:20, 1251:25, 1252:7, 1252:18, 1252:25, 1253:23, 1254:3, 1254:8, 1254:15, 1254:24, 1256:10, 1256:20, 1257:6, 1257:11, 1257:13, 1257:14, 1257:21, 1258:4, 1259:21, 1260:15, 1261:21, 1261:22, 1261:24, 1328:12, 1329:16, 1329:17, 1331:12, 1342:25, 1343:12, 1343:21

**Trailers** [1] - 1235:13
**train** [1] - 1266:3
**training** [5] - 1192:3, 1265:6, 1265:9, 1266:18
**transaction** [2] - 1326:5, 1326:25
**transcript** [3] - 1227:18, 1336:12, 1345:1
**TRANSCRIPT** [2] - 1187:12, 1188:15
**transitional** [3] - 1232:15, 1232:22, 1239:17
**Transitional** [1] - 1241:23
**transnational** [1] -

1241:22
**travel** [42] - 1206:8, 1206:9, 1221:10, 1227:22, 1228:4, 1236:17, 1236:18, 1236:21, 1237:7, 1246:5, 1249:16, 1249:18, 1251:2, 1251:13, 1251:19, 1251:24, 1252:7, 1252:18, 1252:25, 1254:25, 1256:10, 1256:20, 1257:6, 1257:20, 1258:4, 1260:15, 1261:6, 1261:21, 1261:22, 1261:24, 1285:18, 1285:25, 1286:24, 1291:4, 1291:10, 1292:16, 1292:20, 1292:21, 1293:25, 1318:20, 1331:14, 1334:11
**treating** [2] - 1197:21, 1317:18
**trial** [8] - 1277:13, 1304:3, 1305:18, 1312:18, 1315:18, 1318:8, 1319:1, 1342:17
**TRIAL** [1] - 1187:12
**trials** [1] - 1269:17
**trigeminal** [1] - 1274:25
**tripartite** [1] - 1339:16
**TROs** [3] - 1241:19, 1241:21, 1256:4
**truck** [2] - 1226:13, 1266:3
**true** [12] - 1208:5, 1211:10, 1237:14, 1237:17, 1237:18, 1243:8, 1257:12, 1259:13, 1259:21, 1259:22, 1271:17, 1344:25
**truth** [6] - 1191:2, 1191:3, 1264:6, 1264:7
**try** [17] - 1190:16, 1223:6, 1231:21, 1231:22, 1238:25, 1240:15, 1262:23, 1263:12, 1268:22, 1290:6, 1293:13, 1301:6, 1307:24, 1308:3, 1309:4, 1309:6, 1314:14
**trying** [15] - 1192:6, 1205:23, 1227:10,

1231:11, 1231:15, 1259:9, 1266:12, 1266:14, 1267:16, 1272:2, 1279:6, 1282:19, 1288:2, 1301:2
**tub/shower** [1] - 1334:9
**Tuesday** [1] - 1235:14
**tumors** [1] - 1268:25
**turbinate** [4] - 1213:22, 1213:23, 1213:24
**turbinates** [2] - 1212:22, 1213:21
**turn** [4] - 1262:6, 1263:16, 1329:15, 1330:8
**turned** [2] - 1245:12, 1340:9
**turns** [1] - 1259:10
**Tuss** [1] - 1197:8
**twice** [1] - 1316:25
**two** [25] - 1201:5, 1212:18, 1214:9, 1222:15, 1225:7, 1225:9, 1252:12, 1255:7, 1268:2, 1268:14, 1270:8, 1279:21, 1285:20, 1287:7, 1290:22, 1312:7, 1312:11, 1316:1, 1325:5, 1327:4, 1334:3, 1336:14, 1339:6, 1339:8, 1340:22
**TX** [3] - 1187:18, 1187:21, 1187:24
**type** [9] - 1212:2, 1225:19, 1305:22, 1307:24, 1322:23, 1322:24, 1334:17, 1334:21
**types** [5] - 1238:7, 1238:8, 1238:20, 1269:10, 1270:8
**typical** [1] - 1331:21
**typically** [5] - 1232:18, 1238:16, 1252:7, 1297:23, 1323:7
**tyranny** [1] - 1244:16

## U

**U.S** [1] - 1236:11
**ultimate** [3] - 1269:24, 1325:15, 1325:17
**ultimately** [3] - 1256:11, 1260:9,

1270:20
**unaware** [1] - 1333:19
**uncontroverted** [1] - 1336:14
**under** [17] - 1223:11, 1231:2, 1232:1, 1256:10, 1280:8, 1323:13, 1327:5, 1327:7, 1327:15, 1328:2, 1328:8, 1330:11, 1330:13, 1330:22, 1335:3, 1336:6, 1340:13
**undergraduate** [1] - 1266:16
**underneath** [2] - 1213:5, 1213:22
**understood** [5] - 1284:12, 1319:10, 1331:6, 1331:8, 1334:23
**undisputed** [2] - 1326:4, 1340:4
**unfortunately** [1] - 1272:19
**unique** [3] - 1326:19, 1327:24, 1328:1
**unit** [17] - 1233:1, 1236:19, 1237:2, 1238:11, 1239:3, 1241:9, 1242:11, 1242:15, 1245:15, 1249:24, 1255:11, 1260:23, 1260:25, 1261:9, 1334:6, 1336:16
**UNITED** [2] - 1187:1, 1187:13
**United** [3] - 1283:10, 1344:24, 1345:9
**units** [41] - 1230:23, 1231:2, 1231:7, 1231:10, 1232:2, 1232:4, 1232:24, 1234:8, 1235:24, 1237:16, 1238:25, 1239:1, 1239:15, 1241:4, 1241:7, 1241:8, 1242:4, 1242:5, 1242:6, 1242:21, 1243:8, 1243:12, 1244:1, 1245:6, 1245:23, 1246:2, 1246:9, 1248:16, 1249:2, 1249:6, 1249:8, 1249:10, 1249:11, 1249:13, 1250:14, 1252:4, 1255:18, 1261:16, 1261:19,

1294:20, 1331:15
**Unity** [1] - 1333:20
**University** [9] - 1191:18, 1191:21, 1192:2, 1192:4, 1192:15, 1193:2, 1265:19, 1267:1, 1267:2
**unless** [5] - 1262:25, 1263:8, 1272:11, 1273:18, 1335:16
**unlike** [1] - 1338:18
**unnecessary** [2] - 1205:24, 1206:13
**unobjected** [1] - 1321:13
**unopposed** [1] - 1310:14
**unpersuasive** [2] - 1312:20, 1315:25
**unrelated** [1] - 1329:24
**unreliability** [1] - 1314:24
**unusual** [3] - 1198:3, 1282:17, 1283:14
**unwritten** [1] - 1258:19
**up** [93] - 1190:23, 1198:17, 1199:11, 1201:1, 1203:13, 1203:14, 1204:14, 1207:8, 1211:4, 1213:6, 1213:10, 1213:13, 1213:19, 1213:24, 1214:13, 1214:23, 1215:23, 1215:24, 1216:6, 1224:25, 1232:11, 1232:13, 1232:17, 1234:13, 1239:16, 1249:11, 1252:4, 1257:12, 1258:8, 1258:9, 1262:7, 1262:9, 1262:24, 1263:25, 1266:2, 1266:13, 1267:16, 1268:21, 1270:7, 1270:14, 1271:14, 1272:11, 1272:13, 1272:19, 1273:16, 1274:2, 1275:22, 1276:12, 1276:15, 1276:25, 1276:6, 1278:8, 1278:11, 1279:21, 1282:14, 1282:24, 1283:21, 1284:7, 1284:12, 1287:7, 1291:1, 1291:8, 1298:6,

1299:10, 1302:3,
1303:5, 1304:2,
1305:4, 1308:17,
1308:18, 1308:21,
1309:15, 1312:3,
1312:21, 1313:24,
1314:15, 1317:22,
1318:23, 1319:25,
1322:5, 1322:23,
1323:22, 1326:15,
1326:18, 1327:25,
1333:8, 1338:20,
1338:22, 1339:4,
1344:11
**updated** [1] - 1200:21
**upper** [7] - 1195:20,
1201:25, 1215:9,
1215:18, 1216:25,
1217:10, 1217:11
**upwards** [1] - 1196:1
**urban** [2] - 1298:5,
1298:15
**urea** [1] - 1268:21
**urea-formaldehyde**
[1] - 1268:21
**Urquhart** [1] - 1298:9
**useful** [1] - 1202:19
**useless** [1] - 1202:24
**user** [5] - 1325:15,
1325:17, 1326:8,
1326:9, 1331:21
**users** [1] - 1248:14
**uses** [1] - 1193:17
**utilized** [1] - 1316:3

**V**

**vague** [7] - 1238:15,
1311:21, 1320:14,
1321:25, 1328:12,
1330:18, 1334:22
**valid** [1] - 1246:17
**validation** [3] -
1234:6, 1234:14,
1241:2
**value** [4] - 1282:23,
1282:24, 1283:10,
1283:18
**values** [2] - 1277:2,
1282:14
**Vanderbilt** [1] -
1265:19
**variable** [1] - 1213:7
**varies** [1] - 1306:13
**variety** [6] - 1201:22,
1202:16, 1221:9,
1316:21, 1316:23,
1337:25
**various** [8] - 1244:16,

1269:12, 1270:10,
1270:21, 1274:24,
1314:18, 1327:19
**vary** [1] - 1294:4
**vast** [1] - 1216:7
**vehicles** [2] - 1246:6,
1249:19
**ventilate** [6] - 1238:25,
1241:8, 1241:9,
1243:3, 1243:8,
1245:15
**ventilated** [3] -
1242:21, 1243:9,
1243:11
**ventilating** [1] -
1287:7
**ventilation** [2] -
1235:2, 1245:18
**verbal** [3] - 1250:6,
1323:1, 1323:4
**verbally** [1] - 1250:4
**verdict** [2] - 1307:14,
1315:21
**verifying** [1] - 1309:1
**version** [2] - 1326:2,
1331:5
**versions** [1] - 1232:16
**versus** [15] - 1297:20,
1303:12, 1311:18,
1323:12, 1325:13,
1325:17, 1325:24,
1325:25, 1326:1,
1328:4, 1328:18,
1328:23, 1330:17,
1330:23, 1333:20
**victims** [6] - 1230:20,
1231:3, 1231:4,
1231:19, 1232:3,
1248:16
**video** [3] - 1229:3,
1229:11, 1301:24
**VIDEOTAPED** [2] -
1189:10, 1189:15
**videotaped** [2] -
1229:17, 1262:5
**Videotaped** [2] -
1304:12, 1305:7
**view** [4] - 1245:21,
1245:22, 1248:5,
1303:3
**viewed** [1] - 1248:10
**violating** [2] - 1258:1,
1258:9
**Virginia** [2] - 1208:8,
1208:12
**virtual** [1] - 1327:16
**virtually** [1] - 1216:10
**virtue** [1] - 1340:16
**visit** [1] - 1291:3
**visits** [1] - 1313:6

**vitae** [1] - 1264:19
**VOIR** [2] - 1189:6,
1191:11
**volatile** [1] - 1293:15
**volume** [3] - 1253:5,
1253:8, 1267:16
**volumes** [1] - 1268:15
**volunteered** [1] -
1244:9
**volunteers** [3] -
1270:9, 1270:11,
1270:23
**voted** [1] - 1250:21

**W**

**W-e-d-n-e-r** [1] -
1191:10
**wait** [4] - 1236:23,
1240:3, 1302:25,
1308:7
**wake** [1] - 1257:4
**walk** [3] - 1198:24,
1198:25, 1199:1
**walked** [2] - 1198:9,
1251:18
**Walker** [1] - 1325:13
**wants** [1] - 1278:25
**warn** [11] - 1322:14,
1323:9, 1323:13,
1325:11, 1338:6,
1338:11, 1338:14,
1338:19, 1339:5,
1340:8, 1340:12
**warned** [1] - 1325:18
**warning** [13] -
1322:20, 1322:23,
1323:2, 1323:4,
1323:20, 1323:23,
1324:6, 1324:9,
1324:12, 1337:14,
1339:16, 1339:17,
1339:21
**warnings** [7] -
1259:20, 1322:15,
1322:16, 1323:7,
1323:17, 1324:9
**warrants** [1] - 1321:5
**WAS** [2] - 1189:22,
1189:23
**wash** [3] - 1196:9,
1272:2
**Washington** [7] -
1191:18, 1191:21,
1191:23, 1192:2,
1192:4, 1192:15,
1193:2
**waste** [1] - 1266:2
**water** [6] - 1258:5,

1258:8, 1267:10,
1267:11, 1294:25,
1299:8
**watering** [1] - 1238:12
**Waters** [1] - 1235:11
**watery** [3] - 1210:16,
1224:19, 1238:22
**WATTS** [82] - 1187:16,
1187:17, 1193:8,
1204:11, 1207:2,
1207:4, 1207:6,
1211:3, 1211:6,
1211:9, 1211:17,
1211:20, 1212:3,
1212:6, 1212:12,
1212:16, 1219:10,
1219:17, 1219:23,
1220:1, 1221:2,
1221:19, 1221:22,
1221:25, 1222:3,
1223:1, 1226:9,
1226:13, 1226:24,
1227:5, 1227:9,
1227:12, 1227:17,
1262:16, 1263:23,
1264:20, 1264:22,
1283:25, 1284:2,
1284:5, 1285:12,
1287:13, 1287:16,
1289:12, 1297:9,
1301:24, 1303:2,
1304:1, 1305:8,
1305:11, 1305:17,
1305:25, 1308:18,
1309:10, 1310:3,
1310:13, 1310:22,
1313:21, 1314:12,
1318:17, 1319:8,
1319:19, 1321:8,
1323:21, 1324:24,
1325:5, 1326:17,
1327:3, 1330:15,
1336:6, 1336:11,
1337:15, 1337:19,
1338:22, 1340:10,
1341:16, 1342:1,
1342:9, 1342:13,
1343:15, 1344:3,
1344:8
**Watts** [8] - 1204:12,
1223:8, 1224:22,
1297:15, 1298:17,
1303:14, 1324:15,
1326:16
**Watts'** [1] - 1311:18
**WATTS..................**
..**.** [2] - 1189:8,
1189:13
**Waxman** [1] - 1253:15
**ways** [5] - 1225:1,

1225:6, 1248:6,
1300:11, 1342:16
**weaknesses** [1] -
1269:16
**wear** [2] - 1266:9
**web** [2] - 1302:14,
1304:14
**Webster** [1] - 1328:23
**Wedner** [16] -
1190:21, 1190:22,
1191:10, 1191:13,
1193:7, 1193:9,
1204:12, 1212:9,
1219:5, 1223:1,
1225:12, 1290:9,
1290:17, 1290:19,
1314:2, 1314:8
**WEDNER** [1] - 1191:5
**Wedner's** [1] -
1298:17
**WEDNER...................**
**................** [1] -
1189:5
**week** [11] - 1192:25,
1199:24, 1200:22,
1201:15, 1224:13,
1228:9, 1268:4,
1306:23, 1307:25,
1308:1, 1309:1
**weekend** [2] - 1307:2,
1308:10
**weekends** [1] - 1237:7
**weeks** [4] - 1198:16,
1198:18, 1198:20,
1246:19
**weight** [1] - 1311:12
**WEINSTOCK** [29] -
1188:7, 1188:8,
1189:9, 1190:21,
1191:12, 1193:6,
1193:12, 1204:8,
1206:25, 1207:3,
1211:14, 1219:5,
1219:14, 1220:24,
1223:5, 1226:19,
1227:10, 1227:13,
1227:22, 1228:2,
1228:24, 1229:3,
1229:6, 1302:1,
1302:6, 1302:11,
1302:13, 1303:11,
1319:13
**Weinstock** [3] -
1190:19, 1204:13,
1211:21
**WEINSTOCK............**
**...** [1] - 1189:6
**WEINSTOCK............**
**......** [1] - 1189:7
**well-done** [1] -

1225:18
**West** [2] - 1193:4,
1261:12
**whatsoever** [2] -
1251:23, 1342:24
**wheelchair** [2] -
1334:7
**wherein** [1] - 1329:6
**WHEREUPON** [17] -
1190:8, 1226:11,
1227:24, 1229:7,
1229:16, 1262:4,
1262:11, 1262:18,
1264:24, 1284:9,
1284:23, 1302:4,
1304:7, 1304:11,
1305:6, 1308:13,
1344:13
**whole** [11] - 1191:2,
1201:20, 1214:6,
1217:14, 1228:12,
1264:6, 1276:22,
1299:18, 1314:18,
1343:9, 1343:11
**width** [1] - 1331:17
**Williams** [3] -
1199:23, 1280:12,
1314:1
**Williams'** [1] - 1319:14
**willy** [1] - 1257:12
**willy-nilly** [1] -
1257:12
**winded** [1] - 1311:17
**windows** [2] -
1291:11, 1291:14
**Winford** [1] - 1328:23
**wise** [1] - 1294:16
**withdraw** [1] - 1310:3
**witness** [10] -
1190:18, 1190:20,
1191:6, 1204:18,
1228:25, 1244:15,
1264:13, 1316:11,
1321:15
**Witness** [2] - 1212:18,
1262:3
**WITNESS** [9] - 1191:4,
1191:10, 1212:14,
1221:21, 1221:24,
1264:8, 1264:11,
1289:7, 1301:13
**witnesses** [6] -
1190:16, 1211:16,
1277:14, 1301:19,
1308:2, 1343:1
**wonderful** [1] -
1275:20
**wondering** [1] -
1263:14
**Wood** [1] - 1289:13

**wood** [11] - 1286:6,
1286:8, 1287:11,
1289:8, 1289:9,
1289:22, 1289:24,
1291:5, 1334:17,
1334:18
**woods** [3] - 1288:11,
1288:13, 1288:14
**word** [4] - 1218:15,
1263:15, 1303:16,
1308:20
**words** [11] - 1202:4,
1209:1, 1218:17,
1247:17, 1273:14,
1296:9, 1306:9,
1316:4, 1333:21,
1337:7, 1337:18
**workers** [1] - 1304:19
**works** [3] - 1204:24,
1208:9, 1279:12
**world** [2] - 1295:17,
1298:3
**world's** [1] - 1203:6
**worried** [3] - 1271:9,
1271:20, 1279:2
**worse** [4] - 1226:3,
1270:12, 1310:25,
1314:6
**worsening** [1] -
1318:22
**worst** [1] - 1217:19
**wrap** [1] - 1343:5
**wreck** [1] - 1266:3
**Wright** [3] - 1302:7,
1325:9, 1338:23
**write** [2] - 1207:15,
1207:21
**writes** [1] - 1338:3
**writing** [7] - 1200:25,
1201:3, 1201:5,
1207:14, 1328:21,
1330:17, 1331:23
**written** [10] - 1242:10,
1250:5, 1250:11,
1258:18, 1322:23,
1327:18, 1331:5,
1331:9, 1332:25,
1333:5
**wrote** [3] - 1246:22,
1323:22, 1327:19

## Y

**year** [11] - 1196:25,
1197:22, 1207:9,
1254:14, 1265:24,
1266:16, 1282:18,
1286:19, 1292:20,
1305:3, 1323:24

**yearly** [1] - 1282:6
**years** [22] - 1192:18,
1196:13, 1197:16,
1200:25, 1203:23,
1237:1, 1265:12,
1265:19, 1266:24,
1267:1, 1268:2,
1285:18, 1285:21,
1286:23, 1287:7,
1289:19, 1292:16,
1292:21, 1300:23,
1314:16, 1314:19
**yellow** [3] - 1273:13,
1275:21, 1279:7
**yesterday** [4] -
1192:22, 1244:15,
1306:2, 1309:1
**young** [2] - 1252:24,
1268:5
**YOUNT** [23] - 1188:3,
1188:4, 1262:13,
1263:18, 1263:21,
1264:15, 1265:2,
1284:13, 1284:22,
1285:2, 1285:9,
1289:1, 1297:12,
1297:14, 1301:11,
1304:6, 1308:22,
1324:21, 1325:22,
1328:17, 1336:9,
1339:12, 1344:7
**Yount** [3] - 1263:17,
1322:3, 1328:16
**YOUNT......................**
[1] - 1189:14
**YOUNT......................**
. [1] - 1189:12
**yourself** [2] - 1200:21,
1307:17

## Z

**zero** [5] - 1200:7,
1200:11, 1273:14,
1274:5, 1342:12
**ZWAIN** [1] - 1188:7
**Zyrtec** [1] - 1197:6