UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION: N(5) |
| | * | |
| This Document Relates to: *Ausbrooks v. Forest* | * | |
| *River, Inc, et al; Early v.Gulf Stream, et al; Price v.* | * | JUDGE: ENGELHARDT |
| *Jayco, Inc, et al.; Clementin v. Keystone RV, et al.;* | * | |
| *Williams v. KZRV, LP, et al.* | * | MAG: CHASEZ |

*************************************************************************

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY OF PAUL HEWETT, Ph.D.**

**MAY IT PLEASE THE COURT:**

The Defendants respectfully submit the following Memorandum in Support of their Motion *in Limine* to Exclude Expert Testimony of Paul Hewett, Ph.D.

**A.     Dr. Hewett's Methodology and *Daubert***

In determining whether expert testimony should be admitted, the requirements of *Daubert* and its progeny direct district courts to concentrate on the second tenet listed in Rule 702: - The principles and methods utilized by the expert. "The focus, of course, must solely be on principles and methodology, not on conclusions they generate." *Bonner v. ISP Technologies, Inc.,* 259 F.3d 924, 929 (8th Cir.2001). (quoting, *Daubert*, 509 U.S. at 594-95, 113 S. Ct. 2786). "A trial judge must make a preliminary assessment of whether the proffered expert's methodology is both scientifically valid and acceptable to the case." *Bland v. Verizon Wireless, L.L.C.,* 538 F.3d 893, 896 (8th Cir.2008) (quoting, *Ahlberg v. Chrysler Corp.,* 481 F.3d 630, 635 (8th Cir.2007)). "An expert opinion must be supported by appropriate validation, i.e., good

grounds based on what is known." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 988-89 (8th Cir.2001) (quoting *Daubert*, 509 U.S. at 590, 113 S. Ct. 2786) (internal quotation marks omitted). "[T]he plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirement." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir.2003) (citing, *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir.1999)).

**B.     Scope of Dr. Hewett's opinions**

Paul Hewett's report describes a "retrospective exposure assessment with the primary goal of evaluating the available data and estimating the ***probable exposures to individuals***" who resided in THUs following Hurricane Katrina.  *See,* Exhibit "A," Rpt. Paul Hewett at p. 1 (Oct. 18, 2010).  Dr. Hewett's methodology involves a "statistical analysis of formaldehyde datasets for five manufacturers."  *Id.*  He uses the statistical data analysis as a basis for his opinions about probabilistic retrospective exposure of individual occupants who resided in THUs.  *Id.* at 27.

Dr. Hewett's analysis has the following four (4) objectives:

(1) Compare, using graphical and statistical methods, the formaldehyde levels to the Agency for Toxic Substances and Disease Registry (ATSDR) chronic exposure "Minimum Risk Level" (MRL) of 0.008 ppm limit for formaldehyde, which was intended to be used for **minimizing risk** to the general population whenever exposures exceed 365 days, as well as the intermediate and acute exposure MRL's;

(2) Compare, using graphical and statistical methods, the formaldehyde levels to other exposure limits;

(3) Evaluate the dataset for evidence that the formaldehyde levels tend to decline with the age of the THU;

(4) Estimate the probable formaldehyde levels for residents, such as the plaintiffs, in unmeasured, unevaluated, and untested THU's in general and in a specific model in particular.

*See,* Exhibit "A," at p. 2.

2

**C.     Retrospective Exposure Assessments**

The scientific validity of an exposure assessment must be determined on a case-by-case basis.  But, the federal government's guidelines for exposure assessment proves to be an extremely valuable resource in highlighting the lack of scientific and technical validity of the data used by Dr. Hewett in his retrospective exposure assessment.  *See,* U.S. Envtl. Protec. Agency, *Guidelines for Exposure Assessment,* Fed. Reg. 57(104) 22888 –22938 (May 29, 1992).  These guidelines describe the general concepts of exposure assessment including definitions and associated units, and provide guidance on the planning and conducting of an exposure assessment.  *Id.* at *22888.  "Guidance is also provided on presenting the results of the exposure assessment and characterizing uncertainty."  *Id.*   Additionally, the recognition in the 1992 guidelines of the use of "Monte Carlo" analyses provides the scientific basis for challenging any exposure assessment process that does not utilize some version of this methodology.  *Id.* at *22899.  The federal government, in March 1997, approved for publication, "*Guiding Principles for Monte Carlo Analysis*."  *See,* Exhibit "B," U.S. Envtl. Protec. Agency, *Guiding Principles for Monte Carlo Analysis* (March 1997).

The Monte Carlo analysis is an accepted mathematical technique, which recognizes that exposure assessment should be made as simple as possible while still including all important sources of risk.  *Id.* at p. 9.  Dr. Hewett, however, does not address risk factors that may make some plaintiffs more vulnerable than others.  Dr. Hewett concedes that his analysis was solely focused on an analysis of "measurement data."  *See,* Exhibit "C," Depo. of Paul Hewett at p. 177 (Nov. 15, 2010).  He *did not* consider any variables that attempt to capture anything about the occupant and how the occupant used the trailer.  *Id.*  Dr. Hewett, in fact, admits that he knows

nothing about plaintiffs' characteristics, other than their names and some information regarding move-in and move-out dates. *Id.* at p. 9.

The Monte Carlo analysis further incorporates all available exposure information and **calculates** a projected **actual exposure**.  Dr. Hewett's model, on the other hand, uses a single value: "concentration," which Dr. Hewett represents as an exposure level.  He makes no attempt to calculate actual exposure – an equation that considers many factors other than concentration.

The United States Fifth Circuit Court of Appeal recently recognized the reliability of the Monte Carlo analysis as providing "greater certainty" than basic alternatives.  *Lyondell Chemical Co. v. Occidental Chemical Corp.,* 08-40060 (C.A. 5th 6/8/2010), 608 F.3d 284, 294. The Monte Carlo analysis emphasizes the importance of adequately characterizing variability and uncertainty in fate, transport, exposure, and dose-response assessments for human health. It is the EPA's policy and preliminary guidance on using probabilistic analysis.

The basic goal of a Monte Carlo analysis is to characterize, quantitatively, the uncertainty and variability in estimates of exposure or risk**.** *See,* Exhibit "B," at p. 9.  The secondary goal is to identify key sources of variability and uncertainty and to quantify the relative contribution of these sources to the overall variance and range of model results.  *Id.* Whether or not a Monte Carlo analysis should be conducted is a "matter of judgment," based on consideration of the intended use, *the importance of the exposure assessment,* and the value and insights it provides.  *Id.* at p. 5.

**D.  Retrospective exposure assessments, unlike prospective exposure assessments, do not rely on prescriptive regulatory guidance to document potential characteristics of the exposed population.  The assessor, when conducting a retrospective exposure assessment, knows individual characteristics of the exposed individual or population.  Dr. Hewett, however, failed to incorporate individual-specific data in his assessment, which would have reduced uncertainty in his analysis.**

Dr. Hewett, in this case, was asked to perform a "retrospective exposure assessment." One significant difference between prospective and retrospective exposure assessments is the assessors' ability to characterize exposure settings.  *See*, Exhibit "D," Miller, Jason B. and Machado, Ranjit J. (2010) *Prospective and Retrospective Exposure Assessment,* Environmental Claims Journal, 22:3, 221 at *224.

> Such retrospective assessments are often, particularly in the litigation arena, based on individual exposures, or the potential exposures to small groups of individuals.  Regardless of whether retrospective assessments are for individuals or larger populations, they share a common feature—in most instances the individuals who may have experienced the exposure, and many of their individual characteristics, can be known to the assessor. Unlike the prospective exposure assessment, the assessor ***need not necessarily rely on prescriptive regulatory guidance*** to document potential characteristics of the exposed individual or population, activity patterns, or the locations where the exposures occurred. Reliance on available population or individual-specific data obviously reduces uncertainty. Further, the available data on potentially exposed individuals, their locations, and their activities often allow the assessor to better determine exposure pathways of interest.

*See,* Exhibit "D," at 226.

Prospective and retrospective exposure assessments are dominated by different sources of uncertainty – "incomplete population data for prospective assessments and constraints in available historical data for retrospective assessments." *Id.* at 227.  The *Guiding Principles for Monte Carlo Analysis* explain that Dr. Hewett should have "described quantitatively and qualitatively the scientific uncertainty in the models applied, the data utilized, and the specific risk estimates used." *See,* Exhibit "B," at p. 3.  Dr. Hewett's analysis falls into a category that

the *Guiding Principles for Monte Carlo Analysis* describes as turning the assessment into a "dynamic rather than static process."   *See*, Exhibit "B," at p. 3.   This is the realization that ultimately the most important aspect of quantitative variability and uncertainty analysis may well be the process of interaction between the assessor and other interested parties.  *See,* Exhibit "B," at p. 3.

Dr. Hewett's reliance on *government regulatory guidelines* is not the accepted scientific methodology when conducting retrospective exposure assessments.  But, he nonetheless used those guidelines because he was instructed by PSC to measure concentration levels against the ATSDR chronic MRL and the NIOSH MRL. *See,* Exhibit "C," at p. 14.  MRLs are used in *prospective* exposure assessments and are "intended to serve as a screening tool to help public health professionals decide where to look more closely." http://www.atsdr.cdc.gov/mrls/index.asp; *see also*, Exhibit "D," at 227.  "MRLs contain some *degree of uncertainty* because of the *lack of precise toxicological information on the people who might be most sensitive* (e.g., infants, elderly, and nutritionally or immunologically compromised) to effects of hazardous substances. *Id.*   ATSDR uses a conservative (i.e., protective) approach *to address these uncertainties* consistent with the public health principle of prevention."  *Id.*  (emphasis added).  This is the reason that "government agency regulatory standards" (such as ATSDR and NIOSH) are irrelevant to burden of proof in a toxic tort cause of action.   A government agency's approach differs from the court's in a critical aspect: a government agency requires a lesser showing of harm to the public than the preponderence-of-the-evidence or more-likely-than-not standards used to assess tort liability."  *Junk v. Terminix Int'l Co., LP,* 4:04-cv-06008-JAJ (S.D. Iowa 10/31/2008); 594 F.Supp.2d 1062,1071.

But, in a retrospective exposure assessment, the above-described uncertainties are addressed by incorporating available data into the assessment. "Applying default regulatory assumptions about populations to a known individual, rather than using available specific data, could result in an over or underestimate of exposure (e.g., by relying on regulatory defaults for exposure duration or frequency of particular activities, rather than relying on data specific to the known individual)." *See* Exhibit "D*,*" at 227.

The ATSDR MRL, anyhow, applies to a 24-hour-a-day, seven-day-a-week exposure. Dr. Hewett, however, made no attempt to factor in the amount of occupancy for any of the five individuals he was asked to assess. *See,* Exhibit "C," at p. 13-14. He testified that the way plaintiffs used their trailer was "not relevant to the statistical analysis" that he did. *Id.* Dr. Hewett likewise testified that ventilation practices and air-conditioning use were not relevant to his analysis. *Id.*

Similarly, the NIOSH PELs are designed as being applicable to 8-hour days, for a forty-hour work week, for a forty-year work life. *See,* Exhibit "C," at p. 74. Dr. Hewett's dataset does not reflect anything about the amount of hours per day any particular person spent in a trailer. *Id.* at 176. Additionally, the NIOSH exposure limit is an occupational exposure limit. *Id.* at p. 73. This is an ***inappropriate benchmark*** for the general public. Dr. Hewett testified as such:

> Q.   I want your opinion, and your opinion is it is inappropriate to use an occupational exposure limit for the general public. Correct?
>
> A.   In general, it is inappropriate to apply an occupational limit, particularly the OSHA limits, as most of them are very well dated.

*See,* Exhibit "C," at p. 10.

*       *       *

Q.    Do you consider it inappropriate to use an occupational limit for the general population?

A.    As a matter of managing risks, it is generally inappropriate.

*Id.* at 11.

**E.    Exposure Assessment is the process of estimating or measuring the magnitude, frequency, and duration of exposure to an agent, along with the number and characteristics of the population exposed.  Dr. Hewett did not calculate magnitude, frequency, or duration of exposure.  Nor did he assess the characteristics of the population exposed.**

Any opinion purporting to embody "probable exposure" needs to be represented by a formula used to calculate probable exposure.  Concentration levels alone are not mathematically equal to "probable exposure" levels.  Dr. Hewett's retrospective exposure opinions are based on the incorrect assumption that the terms "exposure" and "concentration" are synonymous:

Q.   What is the difference between exposure and concentration to you?

A.    Well, I think we have been through this many, many, many times before. To me, most of the time they are synonymous.  When you talk about concentration, we are talking about exposure.  When I talk about concentration, I am talking about potential exposure.

*See,* Exhibit "C," at p. 29.

Dr. Hewett's interpretation of "exposure" and "concentration" conflicts with the meaning of those terms as defined by the ATSDR and the EPA. This is because contaminant "concentration" and  human "exposure" are entirely different scientific concepts.  The ATSDR defines **"**concentration" as "the amount of a substance present in a certain amount of soil, water, air,   food,   blood,   hair,   urine,   breath,   or   any   other   media." *See,* http://www.atsdr.cdc.gov/glossary.html.  "Exposure," on the other hand, is defined by ATSDR as the "contact with a substance by swallowing, breathing, or touching the skin or eyes." *Id.*  The terms are similarly defined by the EPA in its *Guidelines for Exposure Assessment*:

8

> "[E]xposure" to a chemical is the ***contact*** of that chemical with the outer boundary. An "exposure assessment" is the quantitative or qualitative evaluation of that contact; it describes the intensity, frequency, and duration of contact, and often evaluates the rates at which the chemical crosses the boundary (chemical intake or uptake rates), the route by which it crosses the boundary (exposure route; e.g., dermal, oral, or respiratory), and the resulting amount of the chemical that actually crosses the boundary (a dose) and the amount absorbed (internal dose).

*See,* Fed. Reg. 57 (104) 22888 at *22891. (emphasis added).

"Exposure" describes contact. As a general rule, it is not expressed numerically. "Dose" is the "amount" of a substance to which a person is exposed over some time period. *See,* http://www.atsdr.cdc.gov/glossary.html. Dose, unlike exposure, is expressed numerically (parts per million) per kilogram (a measure of body weight) per day (a measure of time). *Id.* This numerical charecterization of dose is consistent with the fundamental tenet of toxicological law: "dose makes the poison. Substances considered toxic may be harmless in small doses, but an ordinarily harmless substance can be toxic if over-consumed."

Dr. Hewett, for purposes of his exposure assessment, assumed that the measurement data in the PSC dataset was "synonymous" with exposure data. This is not accurate. The EPA recognizes only one case in which measurement data may be used directly as exposure data: point-of-contact measurements. *See,* U.S. Fed. Reg. 57(104) 22888 at *22918. Point-of-contact measurement reflect exposures over a period of time and can be used directly as an indication of individual exposure during the sampling period, provided they are of adequate quality, measure the appropriate chemical, ***and actually measure exposure while it occurs***. *Id.* Still, when using point-of-contact measurements (even with statistically-based data), several inferences must be made to ***calculate exposure*** or dose:

(1) Inferences must be made to apply short-term measurements of exposure to long-term estimates of exposure; these are subject to the cautions outlined in section 5.3.1;[1]

(2) Inferences must be made about the representativeness of the individual or persons sampled for the individual or population segment for which the assessment is done;

(3) Inferences must be made about the factors converting measured exposure to potential or internal dose for use in a risk assessment;

(4) If the assessment requires it, inferences must be made about the relationship between the measured chemical exposures and the presence and relative contribution of various sources of the chemical.

*See,* U.S . Fed. Reg. 57(104) 22888 at *22918.

The majority, if not all, of the data in this case were collected using methods other than point-of-contact measurement.   But even if that method was employed, Dr. Hewett failed to recognize the several inferences that must be made to calculate exposure.  Exposure is generally calculated by using a generic "exposure-dose" equation.   *See,* http://www.atsdr.cdc.gov/HAC/PHAmanual/appg.html.  The ATSDR defines "exposure dose" as how much of a substance is encountered in the environment.   This is distinct from the ATSDR definition of "absorbed dose," which is the amount of a substance that actually got into the body

---

[1] Short-term data are data representing a short period of time measured (or modeled) relative to the time period covered in the exposure assessment. Short-term data can provide a snapshot of concentrations or exposures during that time, and an inference must be made about what that means for the longer term if the exposure assessment covers a long period. The assessor must determine how well the short-term data represent the longer period.

Even when short-term population data are statistically representative (i.e., they describe the shape of the distribution, the mean, and other statistics), use of these short-term data to infer long-term exposures and risks must be done with caution. ***Using short-term data to estimate long-term exposures has a tendency to underestimate the number of people exposed, but to overestimate the exposure levels to the upper end of the distribution, even though the mean will remain the same.*** Both concentration variation at a single point and population mobility will drive the estimates of the levels of exposure for the upper tail of the distribution toward the mean. If short-term data are used for long-term exposure or dose estimates, the implications of this on the estimated exposures must be discussed in the assessment. Likewise, use of long-term monitoring data for specific short-term assessments can miss significant variations due to short-term conditions or activities. Long-term data should be used cautiously when estimating short-term exposures or doses, and the implications should be discussed in the assessment. (Emphasis added).

through the eyes, skin, stomach, intestines, or lungs.  *Id.*  The ATSDR "exposure-dose" calculation to quantify the "amount of contact" a resident had with a contaminated medium is:

$$D = C \text{ x } IR \text{ x } AF \text{ x } EF \text{ / } BW.^{2}$$

It should be noted that "concentration" is only one factor in that equation – it is *not synonymous* with exposure.  Dr. Hewett simply failed to recognize this distinction, and as a result, he failed to calculate exposure.  He provided the following testimony about calculating exposure and dose:

Q.   What about the difference between exposure and dose?

A.   Well, you can have an exposure dose, but you can also have dose.  Dose   implies, if I am reading you correctly, more information than I have for this report, and, in fact, it would be outside of this report.   But calculating dose can be quite involved.   There can be cumulative exposure dose and there can be actual internal-absorbed dose.  Calculating the two can be quite different.  An internal-absorbed dose can be very, very difficult.

Q.   You say that is outside your expertise?

A.   For internal dose?

Q.   Yes.

A.   Well, probably in most scenarios, and it certainly wasn't part of my charge - with this.

Q.   You were not attempting to figure out what dose any individual of these five received, correct?

A.   That was not my charge, and I don't think you are going to find any evidence of it in the paper.

*See,* Exhibit "C," at pp. 29-30.

---

[2] D = exposure dose
C = contaminant concentration
IR = intake rate of the contaminated medium
AF = bioavailability factor
EF = exposure factor
BW = body weight

Dr. Hewett is correct that calculating "absorbed dose" involves many factors and can be very difficult. Such an equation takes into account the relatively complex physiological and chemical processes that occur once a substance enters the body. http://www.atsdr.cdc.gov/HAC/PHAmanual/appg.html. Dr. Hewett was not charged with this task. But, he was charged with "*estimating probable exposure to individuals who resided in THUs following Hurricane Katrina.*" This requires a calcuation to determine how much formaldehyde was encountered by individuals in their THUs. This is the ATSDR definition of "exposure dose," and it is precisely what Dr. Hewett purports to do. Dr. Hewett, in reality, did not perform *any* calculation to quantify exposure - he simply tabulated "measured concentrations."

Rather than perform the proper exposure calculations, Dr. Hewett disregarded data related to other variables in the exposure-dose equation. He did not know the body weight of any of the five individuals being assessed. *See,* Exhibit "C," at p. 33. His report includes no discussion about exposure factors or bioavailability factors. He did not review medical records or questionnaires. *Id.* at p. 9. And even though the information was available to him, Dr. Hewett knew nothing about the five plaintiffs he was asked to review. *Id.* Human activity patterns are a large part of any exposure assessment; the EPA describes uncertainties in these patterns as parameter uncertainty. *See,* Fed. Reg. 57(104) 22888 at *22827. Dr. Hewett, in addition to not calculating actual exposure, made no attempt to illustrate the inherent variability in human activity patterns.

**F.**     **An analysis of variability and uncertainty should provide the jury with clear and concise information on the variability in individual exposures.  Any exposure assessment should explicitly incorporate and quantify scientific uncertainty.**

The EPA *Guidelines for Exposure Assessment* outline the reasons for addressing uncertainties in an exposure assessment:

> (1) Uncertain information from different sources of different quality must be combined.

> (2) A decision must be made about whether and how to expend resources to acquire additional information (e.g., production, use, and emissions data; environmental fate information; monitoring data; population data) to reduce the uncertainty.

> (3) There is considerable empirical evidence that biases may result in so-called best estimates that are not actually very accurate. Even if all that is needed is a best-estimate answer, the quality of that answer may be improved by an analysis that incorporates a frank discussion of uncertainty.

> (4) Exposure assessment is an iterative process. The search for an adequate and robust methodology to handle the problem at hand may proceed more effectively, and to a more certain conclusion, if the associated uncertainty is explicitly included and can be used as a guide in the process of refinement.

> (5) A decision is rarely made on the basis of a single piece of analysis. Further, it is rare for there to be one discrete decision; a process of multiple decisions spread over time is the more common occurrence. Chemicals of concern may go through several levels of risk assessment before a final decision is made. Within this process, decisions may be made based on exposure considerations. An exposure analysis that attempts to characterize the associated uncertainty allows the user or decision-maker to better evaluate it in the context of the other factors being considered.

> (6) Exposure assessors have a responsibility to present not just numbers but also a clear and explicit explanation of the implications and limitations of their analyses. Uncertainty characterization helps carry out this responsibility.

*See,* Fed. Reg. 57(104) 22888 at *22926.

13

"Essentially, the construction of scientifically sound exposure assessments and the analysis of uncertainty go hand in hand." *Id.* Dr. Hewett uses no characteristics of the THU or occupants to model the systemic change in predicted exposures across the manufacturer, the data source, or design or usage of the THUs. He fails to address uncertainty in his analysis. One example of uncertainty is sampling errors, i.e., the extent to which the data used in the exposure assessment fails to fairly characterize (are representative of) the exposure scenario being analyzed. *Id.* at *22827. This information – had it been incorporated into Dr. Hewett's analysis – could have shown the jury the difference between actual measured values and potential exposure values; a difference which, in most cases, was caused by *non-random* variations in the testing parameters.

Dr. Hewett's failure to account for *non-random* variations reported in the PSC dataset results in an overestimation of average formaldehyde concentration levels. (*See e.g., In re Wireless Tel. Servs. Antitrust Litig.,* 385 F.Supp.2d 403, 427 (S.D.N.Y.2005) (regression analysis excluded as irrelevant because it failed to "incorporate major independent variables"). Certain *non-random* factors that affect formaldehyde emissions - and consequently measurement values - include increased temperature, increased humidity, outside sources of formaldehyde, ventilation habits, smoking, etc. Dr. Hewett offers no explanation of the impact that these variables have on the concentration probability distribution if they do not remain constant when samples are collected, i.e., sampling errors. The model could have been designed to account for these variations. Failure to account for these *non-random* variables results in a conclusion that is biased because the mean value of many separate formaldehyde concentrations levels differs significantly from the actual value of any given point estimate.

For example, the PSC dataset reports a measurement conducted with an inside temperature of 90.0º Fahrenheit and 91% relative humidity – the reported formaldehyde concentration level is 0.98 ppm.[3]  In comparison, the PSC dataset also reports a measurement conducted with an inside temperature of 67.2º Fahrenheit, the air conditioning unit operating, and 40.7% relative humidity – the reported formaldehyde concentration level is 0.076 ppm.[4]  The ***mean value*** of the two measured concentration levels is 0.528 ppm.  This amount, however, is significantly higher than the concentration level measured in the second example, which, in reality, is representative of exposure conditions likely experienced by a THU resident.  The average value (0.528 ppm) is not representative of the exposure levels in either THU.  In the first example, residents would not reside in a THU where temperatures were 90.0º Fahrenheit and there was no operating air conditioning unit. And, in the second example, failure to account for the *non-random* variations results in a noticable overestimation of "probable exposure."

Dr. Hewett attempts to discount the significance of this systemic error by stating:

> As the sample size increases the MVUE (and arithmetic mean), in principle, better estimates the true, but unknowable, mean concentration.  The MVUE (and arithmetic mean) can be considered a "point estimate" of the true mean….In principle, as the sample size increases the point estimate approaches the true mean and at the same time the confidence interval narrows, resulting in less uncertainty regarding the range in which the true mean lies.

*See,* Exhibit "A," at p. 14

The principle Mr. Hewett cites is correct when considering random variation.  In other words, the effects of random variation of a single point estimate is minimized by increasing the sample size.  But, the extreme range of formaldehyde measurements reported in PSC's dataset is

---

[3] PSC dataset record for THU VIN#4YDT28B246E320032.
[4] PSC dataset record for THU VIN#1NL1GTR2761074809.

not caused by randomness; those variations occured by changing the value of crucial variables (temperature, humidity, and ventilation) employed during the collection process.  These factors are defined independently of the physical measurements.  If they do not remain constant for all data measurements, then an average calculation is meaningless.  Repeating measurements or averaging large numbers of results cannot remove these non-random variations that are the result of different testing parameters.

The Monte Carlo analysis explicitly details the importance of conducting preliminary sensitivity analyses or numerical experiments to identify, among other things, model input assumptions and parameters that make important contributions to the assessment endpoint and its overall variability and/or uncertainty.  *See,* Exhibit "B," at p. 11.  Any valid statistical analysis highlights these variables and uncertainties.  Dr. Hewett's "statistical anlaysis" ignores these inherent issues of variability and uncertainty.  His analysis, instead, jumps straight to the "certain" opinion that "for all manufacturers, the overall mean or average levels of formaldehyde from both the occupied and unoccupied "travel trailers" exceeded the NIOSH ceiling limit of 0.1 ppm.  Dr. Hewett's opinion is not sound science and it misguides the jury by suggesting the absence of uncertainty.

The unreliability of Dr. Hewett's opinions is best displayed graphically in the Spearman Correlation Coefficients table.  If the data sources were at all similar, the correlations should be close to +1.  But, in this case, 11 of the 28 correlation coefficients are either 0.0 or negative.  This indicates that the measures of formaldehyde levels across THUs by data source are highly unreliable.  This unreliability would have been clear if Dr. Hewett had made any attempt to validate the data.

G.  **Dr. Hewett's statistical analysis should involve developing a model based on a variety of factors, and then applying that model to plaintiffs. Instead, he tabulates non-validated data obtained from a variety of bias-prone sources, in a non-standardized manner, fits the lognormal distribution to the data, computes confidence intervals from the lognormal distribution, compares the confidence limits to regulatory levels selected by the PSC and concludes that plaintiffs were harmed by exposure to formaldehyde from the THU.**

In theory, statistical testing should guide a jury in judging whether an experimental result reflects some real effect or is merely a random fluke. Numbers and statistics are powerful tools that can effectively strengthen any argument. But, as simple and straightforward as these numbers promise to be, statistics, when not based on purely objective data and reasoning, create confusion and misdirection.

Dr. Hewett purports to employ the following statistical methodology:

> Summary statistics were produced using both Systat and the IHDataAnalyst (Version 1.01).\k All figures, descriptive statistics, and analysis-of-variance statistics were generated or calculated using Systat®. The procedures for calculating the non-parametric exceedance fraction (and confidence limits) and the MVUE (and its confidence limits) are well known (see the references cited in Section 3.4). These statistics can be calculated using programmable calculators or computer spreadsheets, but were calculated here using the IHDataAnalyst simply for convenience. There were four non-detects in the Gulf Stream database, and one each in the Forest River, Jayco, and Keystone databases. Exposure Assessment Solutions, Inc. IHDataAnalyst was used (a) to evaluate the goodness-of-fit for the lognormal distribution model, looking for egregious departures, (b) to estimate the non-parametric exceedance fraction (i.e., the fraction or percent of formaldehyde levels expected to be above the ATSDR and other limits), plus the lower and upper confidence limits for this estimate, and (c) to calculate the Minimum Variance Unbiased Estimator (MVUE) (an estimate of the mean; discussed in Section 3.4) and its lower and upper confidence limits.\l

*See,* Exhibit "A," at pp. 11-12.

A possible explanation of why a report would purport to be a "statistical analysis" when it contains virtually no statistical analysis may follow from the quote of two senior Professors of

17

Statistics at Stanford University that are leaders in the modern methods of data analysis and statistical modeling: "Statistics is a subject of amazingly many uses and surprisingly few effective practitioners." (Efron & Tibshirani, 1993).

### 1.   Dr. Hewett failed to correctly assess the distribution of the exposures.

Assuming for the moment that all the THUs are identical except for random noise across the units (a **highly unlikely** assumption), Hewett claims that the distribution of the exposures and the data sources is lognormal. He does so without examining the data and with no evidence that the lognormal distribution he adopted fits the data. It does not. The report never compares the distribution chosen to the data, although Hewett describes such methods in chapters he has authored. Mr. Hewett did nothing but tabulate the data. He did not analyze the data in any meaningful, sophisticated sense. He did not let the data dictate or even help shape the model. He assumed that only a single parameter, the mean of the exposure for the THUs analyzed, needed to be estimated and then assumed that the error about that distribution follows a lognormal distribution. According to a recent excellent review of modeling exposure data, exposure or "administered dose" is defined as:

> **[T]he mathematical estimation of the amount of a substance encountered in the environment per unit of body weight and time. This dose is equivalent to the exposure to an agent of interest, and is typically what is estimated in an exposure reconstruction. (Sahmel et al., 2010, p. 799).**

Hewett did not develop a model of the exposure data and thus cannot estimate the exposure level for an individual THU or an individual plaintiff. This deficiency is surprising given that the stated primary goal of report was "*evaluating the available data and estimating the probable exposures to the individuals relocated after Hurricane Katrina. . . .*" (p. 1).

2.      **Hewett assumed that the lognormal fit without supporting evidence**

Even for the null model, Hewett fit the lognormal distribution by old-fashioned, sub-optimal methods and failed to reject the lognormal when the statistical test for the lognormal was statistically different.  Any professional statistician would have known that there are many right skewed distributions in addition to the lognormal. Dr. Hewett, however, did not consider any models except the lognormal and the normal. *See,* Exhibit "C," at p. 169.

In one of his publications, Mr. Hewett addressed the issue of testing the fit of a lognormal distribution:

**2.3 Is the lognormal distribution assumption valid?**
Goodness-of-fit testing involves both graphical and analytical evaluations. The data should be plotted so that (a) inconsistent data points can be identified and (b) the goodness-of-fit can be subjectively evaluated. This should be followed by an objective analytical test of the hypothesis of lognormality. The lognormal distribution model is often used when zero is the physical lower limit for possible values, large values occasionally occur, and the processes that generate or control exposures tend to interact in a multiplicative manner. Experience has shown that multiple exposure measurements collected either from a single individual or from multiple individuals within an exposure group tend toward a lognormal distribution. Therefore, it is reasonable to assume that the underlying distribution for workplace exposure data is the lognormal distribution unless there is a compelling reason to conclude otherwise. There are, however, instances where the normal distribution may be more appropriate, e.g., when multiple measurements are simultaneously collected at the same location... (Hewett, 2007b, p. 3-4, footnote numbers omitted, emphasis added).

It appears from the above quote that Mr. Hewett knows of only two distributions that can be used to fit exposure data, the normal and the lognormal. In fact, there are an infinite number of symmetric distributions that compete with the normal and an infinite number of right-skewed distributions that compete with the lognormal. The goal in this type of analysis is to let the data dictate the shape of the distribution.

An EPA publication, *The Lognormal Distribution in Environmental Applications,* illustrates the incorrect conclusions that occur when it is falsely suggested that a lognormal distribution provides a reasonable fit to the data:

> Often, the central portion of a data set will behave as if it came from a normal distribution.  However, in practice, a normally distributed data set with a few extreme (high) observations can be incorrectly modeled by the lognormal distribution with the lognormal assumption hiding the outliers. Also, the mixture of two or more normally distributed data sets with significantly different mean concentrations such as one coming from the clean background part and the other taken from a contaminated part of the site can also be modeled (incorrectly) by a lognormal distribution.

*See* Exhibit "E," Singh, Singh, Engelhardt, U.S. Envtl. Protec. Agency, *Technology Support Center Issue: The Lognormal Distribution in Environmental Applications at *5 (Dec.1997).

The lognormal is a probability distribution that has no upper boundary.  *See,* Exhibit "C," at p. 94.  According to the model, there is some probability of extraordinarily high exposures.  *Id.* When, in reality, those extraordinarily high exposures cannot occur.  *Id.*   For instance, Dr. Hewett's model predicts that some trailers had levels as high as 10 parts per million.  *Id.* at 95-96.  But, in reality, Dr. Hewett is not aware of any test results from occupied units as high as 10 parts per million.  *Id.* at 97.  To compute the upper confidence level of the mean, there has to be the "inherent assumption" that the data set under consideration comes from a single statistical population."  *See,* Exhibit "E," at *5.  "Violation of this assumption can lead to invalid applications of a statistical technique."  *Id.*  The consequences of this assumption being violated are discussed as follows:

> A data set can be put into a statistical procedure (e.g., the Shapiro-Wilks test of normality) or a computer program whether or not the required assumptions are met. It is the user's responsibility to ensure the underlying assumptions required to conduct the statistical procedure are met. The decisions and conclusions derived from incorrectly used statistics can be expensive… It should be reiterated that it is the analyst's (user's) responsibility to verify that none of the required assumptions are violated

> before using a statistical test and deriving inferences based upon the resulting analysis. ***In many cases, this may warrant expert advice from a statistician.***

*See* Exhibit "E," at *5.

Dr. Hewett admits that he has "never held [himself] out to be an expert in the field of statistics." *See,* Exhibit "C," at p. 169.

### 3.    Hewett calculated confidence intervals that are not optimal

Mr. Hewett used old-fashioned estimators to develop the confidence intervals for the lognormal distribution. An extensive literature, however, shows that the Land method used by Hewett and based on the *H*-statistic, can dramatically overestimate the upper confidence interval boundaries for the lognormal (*See,* for example, Exhibit "E," Singh, Singh, & Engelhardt, 1997). Hewett is obviously familiar with powerful new computer intensive methods of constructing such intervals, including methods based on the jackknife and the bootstrap, but he chose not to use them.

### 4.    Hewett did statistical tests and then ignored the results

Rather than allowing his conclusions to be driven by objective findings, Hewett disregarded findings that did not meet his preconceived notions. For example, on page 12 of his report he wrote: ***Each dataset was evaluated for the goodness-of-fit for the lognormal distribution, looking for egregious departures. In many cases the data passed the subjective goodness-of-fit evaluation, but failed an objective goodness-of-fit test. (This typically happens for large datasets such as those encountered here, in which case the subjective test is more informative.)*** The "large datasets such as those encountered here" include many with data as few as two-to-six THUs (e.g., Sierra Club, DeVaney, Texas Parks), to which Hewett fit the lognormal distribution (see the various Table 1's in Hewett's Appendix). Hewett asserts that the

data are poolable but does not pool them. On pages 18 and 19, his report concludes that there was "no compelling reason" to separate any of the data sets by model or manufacturer and thus the data can be pooled across manufacturers. However, the report tabulates the data and fits the lognormal distribution by manufacturer and data source; it makes no use of his assumption of poolability.

An objective goodness-of-fit evaluation applies any number of different formal goodness-of-fit statistical tests.  Dr. Hewett, in this case, reports that ***the data failed the goodness-of-fit objective evaluation***.  *See,* Exhibit "C," at p. 90-91.  He claims the data failed the objective test because exposure data and concentration data is "almost always well described by a lognormal model, but are not truly lognormally distributed." *Id.* at 94.  In other words, there is a "disconnect" between the mathematical model and the true exposure profile or a true concentration profile.  *Id.* at 95.

At this point, the EPA recommends using a nonparametric method to compute the upper confidence level of the mean.  *See*, Exhibit "E," at *19.  Dr. Hewett, however, opted to employ his ***subjective*** goodness-of-fit test to "see if the data looked reasonably lognormal or matched the distribution model." *Id.* at 93.  He decided that the data reasonably followed along a best-fit line, which is basically a line that is calculated through the data on a log probability plot.  *Id.*

This point highlights the major bias in Dr. Hewett's opinions:  Had the statistical test failed to reject the null hypothesis that the data is from the lognormal distribution, then Dr. Hewett would have trumped the fact that the data conforms to the lognormal distribution.  But, since the statistical test rejected the null hypothesis, Dr. Hewett decided to ignore the test and use subjective methods.

Science is based on the foundation of replication. No one could replicate this type of analysis since it depends on what the data analysts wants to find.  His rule: Test your model, if it is not significant, then accept your model; if it is significant, then reject the test.

**5.  No model capable of predicting exposure for individual THUs is developed.**

The report imposes a distribution on the data by using data for nothing more than estimating the parameters of the lognormal distribution and then using the data for nothing more than summarizing selective data from THUs. This does not constitute a statistical analysis. It pre-specifies the lognormal model and then imposes that model on the data, in a misguided attempt to estimate the parameters of the model. The fit of the data to the proposed distribution is not even reported, even though a goodness-of-fit test is provided in the software that Mr. Hewett's firm distributes (IHDataAnalyst at http://www.oesh.com/x%20Software/IHDA.php).

This failure to use statistical modeling was not due to a lack of awareness on Mr. Hewett's part; he demonstrated that he was aware of the existence of such procedures as they pertain to exposure assessment, writing on page 3 of his report:

> Even if measurements were not available, exposure-modeling methods would be permissible for estimating exposure. For example, exposure modeling in the absence of measurements is mentioned in the Federal Judicial Center's Reference Manual on Scientific Evidence (FJC, 2000; p.424):
>
> "Evidence of exposure is essential in determining the effects of harmful substances. Basically, potential human exposure is measured in one of three ways. First, when direct measurements cannot be made, exposure can be measured by mathematical modeling, in which one uses a variety of physical factors to estimate the transport of the pollutant from the source to the receptor.2 For example, mathematical models take into account factors as wind variations to allow calculation of the transport of radioactive iodine from a federal atomic research facility to nearby residential areas. Second, exposure can be directly measured in the medium question (sic) - air, water, food, or soil. When the medium of exposure is water, soil, or air, hydrologists or meteorologists may be called up to contribute their expertise to measuring exposure. The third approach directly measures human receptors through some form of biological monitoring..."

Hewett did none of these; he did not use "mathematical modeling," he did not take any direct measurements, and he did not utilize any "form of biological monitoring."

Dr. Hewett simply transferred the formaldehyde concentration data provided to him into an Excel spreadsheet and then imported that data into Systat (Version 12), a statistical analysis program. Systat (Version 12) is powerful statistical software that has every statistical procedure required to carry out efficient statistical analysis of the data, ***including Monte Carlo modules.***

Dr. Hewett calculated the percentage of measured data that fell above a pre–specified limit for each data source and for all the data sources pooled together. *See,* Exhibit "C," at p. 103. He produced "summary statistics" about formaldehyde concentrations. Dr. Hewett's "statistical analysis" makes no account for variability or uncertainty in his analysis; although, he admits that there are a multitude of variables that ***could be*** considered when modeling formaldehyde concentration in FEMA trailers:

Q.      So is it fair to say there are lots of other variables that could be considered when modeling formaldehyde concentration in FEMA trailers?

A.      Absolutely.

*See,* Exhibit "C," at p. 191.

Yet, the "analysis-of-variance" section of Dr. Hewett's report is four sentences long, and it explains that if variance occurred in the dataset for ***any specific model*** of occupied units or ***data collection source***, only then did he perform analysis-of-variance calculations using Systat.

Dr. Hewett simply regurgitated, in the form of graphs and data plots, the exact information given to him by PSC. This is not science. "Scatter plots may be excellent demonstrative aids to explain otherwise complex testing or results, but plotting data is not a scientific test. *In re Cessna*, 05-md-1721 (D. Kan., Nov. 4, 2009); 2009 WL 6561225 at *2.

**G.     Conclusion**

Dr. Hewett's report and deposition testimony demonstrate that the methodologies used to formulate his "exposure assessment" and "statistical analysis" opinions are flawed under *Daubert*.  Dr. Hewett even admits that he is not an expert in statistics.  And, according to the ATSDR and the EPA, Dr. Hewett did not actually conduct an exposure assessment.  His opinions are not calculated to produce reliable results.  He failed to look at all lines of reasoning and he neglected any considerations of variability and uncertainty.   Dr. Hewett's opinions and testimony should be excluded under *Daubert*.

Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS, PFISTER, & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK #18495**
**JOSEPH G. GLASS #25397**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
Fax: (504) 837-3119
andreww@duplass.com
jglass@duplass.com
*DEFENSE LIASON COUNSEL*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of November, 2010, a copy of the foregoing Defendants' Motion *in Limine* to Exclude Expert Testimony of Paul Hewett, Ph.D. was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file will be sent to all known counsel of record by operation of the court's electronic filing system.

s/Andrew D. Weinstock
_____
ANDREW D. WEINSTOCK #18495
andreww@duplass.com