UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION:  N(4) |
| | * | |
| This Document Relates to: | * | JUDGE: ENGELHARDT |
| *Kevin Ammentorp, et al. v. Gulf Stream* | * | |
| *Coach, Inc., et al., Case No. 10-4120* | * | MAG: CHASEZ |

**************************************************************************

## MEMORANDUN IN SUPPORT OF GULF STREAM COACH, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

**NOW INTO COURT,** through undersigned counsel, comes defendant, Gulf Stream Coach, Inc., ("Gulf Stream") and, with a full reservation of rights, files this Opposition to Plaintiffs' Motion to Remand and, based on the laws and facts stated herein, avers that this matter has been properly removed to this Court on the following grounds:

(1)     There is no procedural defect present in Gulf Stream's Notice of Removal.

    (a)     All consents to Gulf Stream's Removal were timely filed.

    (b)     The Removal clearly cites federal jurisdiction under 28 U.S.C. §1442(a). This statute provides an exception to the general rule under 28 U.S.C. §1441 that all defendants must consent to removal. This right of removal is absolute and the timing of any consent filed by another defendant is irrelevant.

(2)     Federal jurisdiction is proper in this matter under 28 U.S.C. §1332 as all plaintiffs named are diverse in citizenship from all named defendants and the amount in controversy more likely than not exceeds $75,000.00 per plaintiff.

    (a)     Plaintiffs' general allegation that no one plaintiff seeks more than $75,000.00 in damages is not dispositive.

    (b)     The category of damages sought in the Complaint and jurisprudence involving similar cases clearly demonstrates that, if proven, the plaintiffs' claims could be worth greater than $75,000.00

        (i)     It is facially apparent from the Plaintiffs' Original Petition for

1

Damages that potential damages in this matter exceed $75,000.00 for any individual plaintiff.

(ii)    Alternatively, based a sample of awards granted by various juries for cases similar to the current matter, the allegations of the Plaintiffs, if proven at trial, are reasonably valued at over $75,000.00, thus invoking federal jurisdiction.

(3)    In addition and/or alternatively, Federal jurisdiction over this case is proper under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1). Gulf Stream meets all three requirements established in the *Mesa* decision for jurisdiction.

(a)    Gulf Stream qualifies as a "person" under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1).

(b)    The federal government exercised the requisite federal control needed for jurisdiction under 28 U.S.C. § 1442(a)(1).

(c)    Gulf Stream established the plausibility of a "colorful defense" necessary for federal jurisdiction.

(i)    The United States approved reasonably precise specifications.

(ii)    Gulf Stream's travel trailers conformed to FEMA's specifications.

(iii)    FEMA knew of formaldehyde in the trailers, but to the extent Gulf Stream was obligated to "warn" FEMA about the dangers from formaldehyde, it did so.

## I.    Background

On or about June 01, 2010, the plaintiffs filed a Complaint for Damages entitled *"Kevin Ammentorp, et al." v. Gulf Stream Coach, Inc., et al."* in the Circuit Court for the County of Hancock, State of Mississippi.[1] On August 25, 2010, Gulf Stream properly removed this matter to the Federal Court for the Southern District of Mississippi ("the Removal").[2] Plaintiffs filed a motion to remand in this matter on September 24, 2010, alleging that the Removal was procedurally deficient and the Southern District lacked jurisdiction under 28 U.S.C. §1332 and 28 U.S.C. §1442(a)(1).

---

[1]    *See* Rec. Doc. 17825-1.
[2]    *See* Gulf Stream's Notice of Removal, attached as Exhibit "A."

On October 19, 2010, the United States Judicial Panel on Multidistrict Litigation conditionally transferred the case to the Eastern District of Louisiana for inclusion in the ongoing multidistrict litigation entitled *In re: FEMA Trailer Formaldehyde Products Liability Litigation*, MDL docket number 07-1873. On November 5, 2010, the plaintiffs re-filed their Motion to Remand. Rec. Doc. 17825. Gulf Stream respectfully submits that the Motion should be denied, and this Honorable Court should retain jurisdiction over the instant lawsuit.

## II.     There is no procedural defect present in Gulf Stream's Notice of Removal.

In their Memorandum in Support, Plaintiffs state that the defendants in this matter failed to satisfy the procedural requirements necessary to affect removal. In support of this conclusion, Plaintiffs cite that "[r]emoval requires that all defendants then served join or consent to removal within thirty days of receipt of the complaint or other paper." As shown below, all defendants in this matter satisfied the thirty-day delay requirement. Furthermore, the requirement that all defendants must consent to removal within thirty days of initial services is not applicable to this matter as Gulf Stream has a good faith claim for removal under 28 U.S.C. §1442.

### A.     All consents to Gulf Stream's Removal were timely filed.

Plaintiffs cite *Getty Oil Corp,* which holds that each defendant in a case must communicate its consent to a removal with the court no later than 30 days from the date on which the first defendant was served. *Getty Oil Corp. v. Insurance Co. of North America,* 841 F.2d 1254, 1262 n. 11 (5th Cir. 1988).[3] *Getty Oil Corp.* goes further to state that it is not necessary that all defendants sign the actual Removal, so long as each defendant makes some timely filed written indication that it consents to the removal. *Id.*

Gulf Stream was the first defendant served on August 06, 2010.[4] Thus, the thirty-day delay

---

[3]     *See* Plaintiffs' Memorandum of Authorities in Support of Motion to Remand, Rec. Doc. 17825-5, p. 3.
[4]     *See* date-stamped copy of the front page of Plaintiffs' Complaint sent to Gulf Stream, and accompanying

lapsed on September 05, 2010. However, when the period would end on a legal holiday, it continues to run until the next date that is not a weekend or legal holiday. As stated in Rule 6 of the Federal Rules of Civil Procedure:

> **(A)    Computing Time:** The following rules apply in computing any time period specified in these rules, in any local or court order, or <u>in any statute that does no specify a method of computing time</u>.
>
> > **(1)    *Period States in Days or a Longer Unit.*** When the period is stated in days or a longer unit of time:
> >
> > > **(c)**    include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the next day that is not a Saturday, Sunday, or legal holiday.

Here, September 05, 2010, fell on a Sunday. The following Monday, September 06, 2010, was Labor Day – a recognized legal holiday.[5] Thus, the "last day" for filing a consent to Gulf Stream's removal was the next day, September 07, 2010. Bechtel, Inc., the only other defendant named in this matter, filed its consent with the Court on September 07, 2010.[6]

**B.    The Removal clearly cites federal jurisdiction under 28 U.S.C. §1442(a). This statute provides an exception the general rule under 28 U.S.C. §1441 that all defendants must consent to removal. This right of removal is absolute and the timing of any consent filed by another defendant is irrelevant.**

Gulf Stream's removal dedicates four pages to its absolute right of removal under the federal contractor statute, 28 U.S.C. §1442(a).[7]

Under this section, the right of removal is absolute whenever suit in state court is for any act under color of federal office, regardless of whether suit could originally have been brought in federal court; and federal jurisdiction rests on federal interest in enforcement of federal law

---

[5]    certified mailing receipt, attached as Exhibit "B."
Federal Rules of Civil Procedure for District Courts, Rule 6(a)(6)(A) specifically recognizes Labor Day as a "Legal Holiday."
[6]    *See* Bechtel's Consent to Removal, attached as Exhibit "C."
[7]    *See* Exhibit A, pages 5-9.

through federal officials. *Willingham v. Morgan*, 89 S.Ct. 1813, 395 U.S. 402, 23 L.Ed.2d 396 (U.S. 1969), *on remand* 424 F.2d 200. Federal officer removal constitutes an exception to the general removal rule which would require all defendants to join in removal petition; this statutory exception allows a federal officer independently to remove a case to federal court even though that officer is only one of several named defendants, as Congressional policy permitting federal officer removal could easily be frustrated by simply joining non-federal defendants unwilling to remove if consent of codefendant(s) were required. *Akin v. Ashland Chemical Co*., 156 F.3d 1030 (10th Cir. 1998), *certiorari denied* 119 S.Ct. 1756, 526 U.S. 1112, 143 L.Ed.2d 788. Federal officer removal constitutes an exception to the general rule that removals must be unanimously agreed to by the defendants. *Hilbert v. McDonnell Douglas Corp*., 529 F.Supp.2d 187 (D. Mass. 2008). Filing of petition for removal by single federal officer removes entire case to federal court. *Fowler v. Southern Bell Tel. & Tel. Co.*, 343 F.2d 150 (5th Cir. 1965).

The federal jurisprudence cited above clearly indicates that the right of removal under 28 U.S.C. §1442(a) is absolute and the joining in or consenting to by other named defendants has no bearing on the originating defendant's right of removal. Therefore, the requirement that all defendants must consent to removal within thirty days of initial services is not applicable to this matter, in its entirety, as Gulf Stream has a good faith claim for removal under 28 U.S.C. §1442.

**III.    Federal jurisdiction is proper in this matter under 28 U.S.C. §1332 as all plaintiffs named are diverse in citizenship from all named defendants and the amount in controversy more likely than not exceeds $75,000.00 per plaintiff.**

Plaintiffs, in their Memorandum in Support of their Motion to Remand, do not dispute that diversity of citizenship exists between the parties.[8]  The Plaintiffs, however, allege that the damages sought by each plaintiff, exclusive of costs and interest, is less than $75,000.00.

Under 28 U.S.C. § 1332(a), a federal court has diversity jurisdiction if the matter in

---

[8]    *See* Plaintiffs' Memorandum of Authorities in Support of Motion to Remand, Rec. Doc. 17825-5, p. 4.

controversy (1) exceeds $75,000.00, exclusive of interest and costs, and (2) is between citizens of different states. In 2005, the United States Supreme Court held that where the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies 28 U.S.C. §1332(a)'s amount-in-controversy requirement, 28 U.S.C. §1367 authorizes supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the requisite amount." *Exxon Mobile Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 125 S.Ct. 2611, 2616-2628 (2005)(Emphasis Added).

**A.      Plaintiffs' general allegation that no one plaintiff seeks more than $75,000.00 in damages is not dispositive.**

In their Complaint, Plaintiffs attempt to specifically limit their damages by asserting that no individual plaintiff seeks more than $75,000.00, exclusion of interest or costs.[9]

The "amount in controversy should be determined at the time of filing." *White v. FCI USA, Inc.,* 319 F.3d 672, 674 (5th Cir. 2003). In cases where an exact amount is pled, the sum claimed by the plaintiff controls if the claim is made in good faith. *See Thrash v. New England Mut. Life Ins. Co.,* 534 F.Supp.2d 691, 693 (S.D. Miss. 2008.) However, a simple allegation by Plaintiffs that they are not seeking damages in excess of the jurisdictional amount is not dispositive. *Zunamon v. Brown*, 418 F.2d 883 (8th Cir. 1969). Federal diversity jurisdiction cannot be determined by looking solely to what a plaintiff asks for in way of damages. *Alker v. Insurance Co. of North America*, 279 F. Supp. 902 (E.D. La. 1968). Furthermore, where no specific amount is alleged in the Complaint, the party invoking federal jurisdiction must prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount. *Thrash* at 693(emphasis added)(quoting *De Aguilar v. Boeing Co.,* 11 F.3d 55, 58 (5th Cir.1993). The district court must first examine the complaint to determine whether it is "facially

---

[9]      Rec. Doc. 17825-1, page 3, paragraph 8.

apparent" that the claims exceed the jurisdictional amount. If it is not thus apparent, the court may rely on "summary judgment-type" evidence to ascertain the amount in controversy. *White* at 675 (quoting *St. Paul Reinsurance Co., Ltd. V. Greenberg,* 134 F.3d 1250, 1253 (5th Cir. 1998). If a defendant can prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount, removal is proper unless the plaintiff shows that at the time of removal he was legally certain not to be able to recover that amount." *Thrash* at 693 (quoting *Allen v. R&H Oil and Gas Co.,* 63 F.3d 1326, 1335 (5th Cir. 1995) *see also St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938). The plaintiffs' burden of proving this legal certainty of not recovering more than the amount plead for in the complaint can be met by: (1) showing state procedural rules binding a plaintiff to his pleadings; or (2) filing with the complaint a binding stipulation or affidavit to that effect. *De Aguilar v. Boeing Co.,* 47 F.3d 1404, 1412 (5th Cir.1995). Statements found in Complaints, such as found here, that allege that plaintiffs "do not seek a judgment in excess of $75,000.00" do not constitute a "specific amount" under *Thrash* or *De Aguilar. See generally Jackson v. Balboa Insurance Co., et al.,* 590 F.Supp.2d 825 (S.D. Miss. 2008); *Manguno v. Prudential Property and Cas. Ins. Co.,* 276 F.3d 720, 722-23 (5th Cir. 2002.)

Because the allegation seeking to limit damages under the jurisdictional requisite is neither dispositive nor a "specific amount," the allegations of injury and damages sought must be properly evaluated before any determination as to jurisdictional amount may be made. The allegation in Plaintiffs' Complaint that no plaintiff seeks more than $75,000.00, *per se,* is not enough to prevent federal jurisdiction under 28 U.S.C. §1332. It should be noted that the Plaintiffs have failed to show any state procedural rule binding them to their complaint and have failed to enter into a binding stipulation which would limit their damages to less than the

jurisdictional amount in compliance with *De Aguilar*.

> **B.** **The category of damages sought in the Complaint, paired with other evidence, clearly demonstrates that, if proven, plaintiffs' claims could be worth greater than $75,000.00**

A defendant makes a showing that the jurisdictional amount is "facially apparent" from a reading of the complaint when the plaintiff's claims are likely to exceed $75.000.00. *Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326, 1335 (5th Cir.1995). If it is not "facially apparent" from a plaintiff's petition that the amount in controversy exceeds $75,000.00, the Court may rely on "summary judgment-type" evidence relevant to the amount in controversy at the time of removal to make the determination. *White v. FCI USA, Inc.,* 319 F.3d 672, 675 (5th Cir. 2003); *Luckett v. Delta Airlines, Inc.,* 171 F.3d 295, 298 (5th Cir.1999). Under any manner of proof, jurisdictional facts must be judged at the time of removal, and post-petition affidavits are allowable only if relevant to that period of time. *Allen,* 63 F.3d at 1335 (Emphasis Added).

> **1.** **It is facially apparent from the Plaintiffs' Original Complaint for Damages that potential damages in this matter exceed $75,000.00 for any individual plaintiff.**

In their Original Complaint for Damages, the plaintiffs state:

> "In addition to and by way of summarizing the compensatory damages prayed for herein Plaintiffs aver that the defendants, Gulf Stream and Bechtel, individually and/or jointly are responsible for all damages which Plaintiffs herein have suffered and continue to suffer as a consequence of Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairment and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during a period of displacement from a natural disaster, as well as all general, special, incidental, and consequential damages which shall be proven at the time of trial."[10]

> **a.** **The U.S. Fifth Circuit Court of Appeals' decision in *In re 1994***

---

[10]   Rec. Doc. 17825-1, page 20, paragraph 88.

> ***Exxon Chemical Fire* discusses, in detail, the categories of damages alleged in chemical exposure cases which justify removal to federal courts. These categories of damages align with the categories of damages asserted by the Plaintiffs in this matter.**

The Fifth Circuit has held that removal is justified where alleged damages in a chemical exposure case include:

> "individual and familial suffering; injuries to physical and mental health, including, but not limited to, emotional distress and mental anguish from the knowledge of exposure to a hazardous substance; expenses incurred by reason of illness caused by the nuisance; fear and apprehension of further exposure to, and impact from, hazardous chemicals; economic and financial harm; loss of enjoyment of life and peaceful use of property; and, other consequential, incidental, general, and special damages."

*In re 1994 Exxon Chemical Fire,* 558 F.3d 378 (5th Cir. 2009).

The listed damages cited by the Federal Fifth Circuit in *In re 1994 Exxon Chemical Fire* closely mirrors the listed damages alleged by Plaintiffs here, justifying this removal under the "facially apparent" standard set forth in *Allen, supra.*

Plaintiffs argue that *In re 1994 Exxon Chemical Fire* should not be considered by this court because the requisite amount in controversy applicable in that case was $50,000.00 and not the $75,000.00 as present in this matter. However, in addition to the damages cited in *In re 1994 Exxon Chemical Fire,* Plaintiffs cite damages for "past and future physical impairments and disability," which, under federal jurisprudence, supports a substantially larger monetary basis for federal jurisdiction. Furthermore, in 2009, the Louisiana Eastern District, in *Aisola,* relying on *In re 1994 Exxon Chemical Fire,* held that the current requisite jurisdictional amount of $75,000.00 was facially apparent from the Petition (Complaint) when asserting the same type of alleged damages in chemical exposure cases.

Finally, Plaintiffs seek punitive damages in this action. [11] Punitive as well as compensatory damages are to be considered in determination of whether requisite jurisdictional amount is actually in controversy. *Wood v. Stark Tri-County Bldg. Trades Council*, 473 F.2d 272 (6th Cir. 1973). Claims for compensatory and punitive damages could be combined in determining jurisdictional amount. *Jeffries v. Silvercup Bakers, Inc*., 434 F.2d 310 (7th Cir. 1970). The Plaintiffs' allegation that they are entitled to Punitive damages only increases the potential value of each claim and solidifies the fact that the jurisdictional requisite is "facially apparent" from a clear reading of the Complaint.

> **b.     Recent U.S. Fifth Circuit decisions hold that petitions that seek damages for disability and impairment support a substantially larger monetary basis for federal jurisdiction.**

The Federal Fifth Circuit has noted that emotional distress, functional impairment, and disability are the kinds of damages that if alleged, "support a substantially larger monetary basis for federal jurisdiction." *Simon v. Wal-Mart Stores, Inc.* 193 F.3d 848, 851 (5th Cir. 1999).

In *Robinson v. Delchamps,* the plaintiff sought remand, citing a failure to establish the requisite jurisdictional amount of $75,000.00. The defendant argued that the jurisdictional amount was facially apparent from the plaintiff's petition which cited nine separate types of damages, including physical and mental pain and suffering (past and future), loss of income (past and future), medical expenses (past and future), loss of enjoyment of life (past and future), and disability (past and future). The Louisiana Eastern District held, "[t]he number of claims, the nature of those claims, and the allegations that plaintiff will continue to suffer damages into the future, all weigh against plaintiff's argument. It is facially apparent that if all damages alleged in this case are recovered, the amount of the judgment would likely be well in excess of

---

[11]     Rec. Doc. 17825-1, page 21, paragraph 89.

the jurisdictional amount." *Robinson v. Delchamps, Inc.,* No. 98-0503 1998 WL 352131 (E.D. La. 06/30/98)(emphasis added). In a similar holding, the Western District of Louisiana has found that the jurisdictional amount of $75,000.00 was facially apparent where the plaintiff sought damages for physical pain and suffering (past and future); mental anguish, emotional distress, worry, anxiety, and inconvenience (past and future); medical and related expenses (past and future); loss of enjoyment of life; and disability and impairment. *Lowery v. J.C. Penny Corp., Inc.* No. 06-1710 2006 WL 3827527 (W.D. La. 12/28/06)(Citing *Robinson.*)(emphasis added.) Furthermore, the Federal Fifth Circuit has found that the Louisiana Eastern District did not err in finding that it was facially apparent from the plaintiff's petition that the amount in controversy exceeded $75,000 when the petition sought damages for past and future medical expenses, past and future pain and suffering, past and future lost wages and past and future disability. *Davis v. Grider,* 214 F.3d 1350 (Table), 2000 WL 634655 (5ᵗʰ Cir. 2000) (emphasis added).

These cases stand for the proposition that a certain, specific category of injury – disability – when alleged in a Complaint, as it is here, causes the requisite amount under 28 U.S.C. §1332 to become facially apparent under the standard set in *Allen, supra.*

> **c.** **The Louisiana Eastern District's decision in *Aisola* is directly on point.**

Recently and most directly on point, the Eastern District of Louisiana found that a jurisdictional amount requirement of $75,000.00 was facially apparent from the Petition (Complaint) in a chemical exposure case asserting damages directly aligned with those asserted in the current matter.

In *Aisola,* thirteen minor school children were allegedly injured when the defendant negligently released chemicals into the air. *Aisola v. Exxonmobil Corp.,* No. 08-1105 2009 WL

1455788 at *1 (E.D. La. 05/22/09). Each plaintiff cited damages "inclusive of past, present, and future medical expenses; past, present, and future lost wages; past, present, and future mental anguish; past, present, and future pain and suffering; disability and disfigurement; and other damages." *Id.* at *2. Furthermore, the plaintiffs claimed the exposure "necessitated and will further necessitate medical treatment." *Id.* The Court, based primarily on the *In re 1994 Exxon Chemical Fire* holding and a thorough discussion of damages sought for disability, found that it was facially apparent from the plaintiffs' petition that the amount in controversy exceeded $75,000. *Id.* Again, the determination that the Federal Court had jurisdiction under §1332 was made solely by an analysis of the category of injuries asserted.

The damages asserted in *Aisola* are almost identical to the damages asserted in the current matter. Both cases seek damages for 1) past and future mental anguish/pain and suffering, 2) past and future physical pain and suffering, 3) past and future medical expense, and 4) disability and impairment/disfigurement. The Plaintiffs here also seek damages not cited in *Aisola* such as past and future physical injury, loss of enjoyment of life, and punitive damages. Using *In re 1994 Exxon Chemical Fire, Aisola,* and *Robinson* as guides, it is facially apparent from the Plaintiffs' Complaint for Damages that if all category of damages alleged by the Plaintiffs in paragraph 88 of the Complaint were recovered, then this amount would more likely than not be in excess of $75,000.00. In addition to these above-cited categories of injuries seeking compensatory damages, the Plaintiffs seek punitive damages under Mississippi law.[12] This only increases the defendants' the potential exposure at trial. The Plaintiffs' own allegations of damages show that Gulf Stream has met its burden of proving that the requisite amount in controversy under 28 U.S.C. §1332 is facially apparent from the Plaintiffs' Original

---

[12]   Rec. Doc. 17825-1, page 21, paragraph 89.

12

Petition for Damages, and this Court need not look further.

> **2.  Alternatively, based a sample of awards granted by various juries for cases similar to the current matter, the allegations of the Plaintiffs, if proven at trial, are reasonably valued at over $75,000.00, thus invoking federal jurisdiction.**

Although Section II(B) clearly indicates that the jurisdictional amount required under 28 U.S.C. §1332 is facially apparent from Plaintiffs' Complaint for Damages, in an abundance of caution and in accordance with *Luckett* and *White, supra*, Gulf Stream submits the following jurisprudence which clearly shows that Plaintiffs' claims for damages could be reasonably calculated to exceed $75,000.00. To reiterate the law stated earlier, so long as one named plaintiff in this action meets the jurisdictional requisite amount under 28 U.S.C. §1332, then jurisdiction is obtained over all other plaintiffs. *See Exxon Mobile Services, supra.*

It is important to note that the plaintiffs have failed to submit any allegations or evidence of the actual symptoms and/or ill-health effects allegedly suffered as a result of the their alleged exposure.[13] Thus, the only "summary judgment" type evidence that should be considered by this Court, in accordance with *White* and *Luckett,* is a jurisprudential sampling of the amount of damages awarded by various juries in similar cases involving formaldehyde exposure in mobile homes/trailers.

Four cases involving alleged formaldehyde exposure in mobile homes/trailers were presented to various juries on the state and federal level in which awards, both compensatory and punitive, were given to plaintiffs. In *Boelens,* a jury from the United States District Court for the Northern District of Texas awarded a mother and her two minor children $178,903.80 in compensatory damages for alleged injuries caused by formaldehyde fumes emitting from a

---

[13]     *See generally* Rec. Doc. 17825-1.

mobile home. *Boelens v. Redman Homes, Inc.,* 748 F.2d 1058, 1061 (N.D. Tex. 1983).[14] The jury also awarded the plaintiffs an additional $206,250.00 in punitive and discretionary damages. *Id.*

In *Tiderman,* the Washington State Supreme Court reversed the decision by an Appellate Court and reinstated a jury verdict of $566,500.00 for compensatory damages awarded to a single plaintiff for alleged formaldehyde exposure emitting from a mobile home after the plaintiff allegedly suffered eye, throat, and respiratory irritation as a result of the exposure. *Tiderman v. Fleetwood Homes of Washington,* 102 Wash.2d 334, 335 (Wash. 1984).

In *Troensegaard,* a California jury awarded a plaintiff $90,000.00 in compensatory damages, $55,000.00 in punitive damages, and levied a $90,000.00 "civil fine" against a mobile home manufacturer for alleged formaldehyde exposure suffered by the plaintiff in her mobile home. *Troensegaard v. Silvercrest Industries, Inc.,* 175 Cal.App.3d 218, 221 (Cal.App. 1 Dist. 1985). The Appellate Court affirmed the compensatory award but reversed the award of $55,000.00 in punitive damages on Appeal. *Id.* at 230.

In *Alley,* two plaintiffs were awarded $20,000.00 and $30,000.00 respectfully in compensatory damages for injuries suffered as the result of alleged formaldehyde exposure from a mobile home. *Alley v. Gubser Development, Co.,* 785 F.2d 849, 853 (10th Cir. 1986). Additionally, they were awarded a total of $510,000.00 in punitive damages against various defendants in the case. *Id* at 853-54.[15]

Thus, over the four cases examined involving formaldehyde exposure from mobile homes/trailers, the average compensatory award granted by juries was $126,486.25 per plaintiff.

---

[14]   The Federal Fifth Circuit overturned the jury's decision due to the fact that personal injury damages were not recoverable under Magnuson-Moss Warranty Act. *Boelens* at 1071.

[15]   These punitive awards were reduced on Appeal to an unspecified amount. *Alley* at 857.

Furthermore, these juries also awarded a total of $902,250.00 in punitive or discretionary damages. These figures far exceed the jurisdictional requisite of $75,000.00 required by 28 U.S.C. §1332. It should also be noted that these awards were granted between 1983-1986, some twenty-seven to twenty-four years ago. With the constant price increase of medical care and the natural decrease in the valuation of money over time, it is unreasonable to believe that the value of these types of cases has not increased in since the time in which they were decided.

The requisite amount under 28 U.S.C. §1332 is facially apparent from a clear reading of the categories of injuries asserted by the Plaintiffs the their Complaint for Damages under the standard set and jurisprudence found in *Allen, In re 1994 Exxon Chemical Fire, Robinson,* and *Aisola.* Furthermore, awards granted for compensatory damages alone by juries in the 1980s in strikingly similar cases were, on average, about $50,000.00 more per plaintiff than the current jurisdictional requirement. For the many reasons stated above, Gulf Stream has met its burden for jurisdiction under 28 U.S.C. §1332.

IV.    **Federal jurisdiction over this case is proper under the Federal Officer Removal statute, 28 U.S.C. §1442(a)(1). Gulf Stream meets all three requirements established in the *Mesa* decision for jurisdiction.**

In addition to diversity jurisdiction, this Court also has jurisdiction under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1). Under the statute, the Court has jurisdiction over any civil action involving any officer of the United States or officer of any federal agency, when that officer is sued for any act done under the color of his office. *Id*. The statute provides a federal forum for any case in which a federal official can raise a defense arising out of his official duties. *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981); *see Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55, 58 (5th Cir. 1975). Federal jurisdiction will apply to cases that involve a federal interest, and the most basic of those interests is the enforcement of

federal law by federal officials. *Willingham v. Morgan*, 395 U.S. 402, 406 (U.S. 1969).

As this Honorable Court has recognized, courts give a liberal and broad interpretation to the statute. *Allen v. City of Laurel*, 2009 WL 2486183, *2 (S.D. Miss. Aug. 11, 2009); *City of Petal v. Ashbritt, Inc.*, 2008 WL 4372758, *1 (S.D. Miss. Sept. 22, 2008). The statute is not "narrow or limited," and covers all cases in which a federal officer can raise a colorable defense arising out of its duty to implement federal law. *Malsch v. Vertex Aerospace, L.L.C.*, 361 F.Supp.2d 583, 587 (S.D. Miss. 2005).

Three requirements must be met to invoke the Federal Officer Removal statute: (1) the defendant must be a "person" within the meaning of § 1442(a)(1); (2) the defendant must have acted under color of federal authority when committing the acts that allegedly caused plaintiffs' injuries; and (3) the defendant must have a colorable federal defense. *Williams v. Todd Shipyards Co.*, 154 F.3d 416, 1998 WL 526612, *2 (5th Cir. 1998) (citing *Mesa v. California*, 489 U.S. 121, 129, 131 (1989)). Once these factors are established, the right of removal under the statute is absolute. *Willingham v. Morgan*, 395 U.S. 402, 406 (1969).

### A. Gulf Stream qualifies as a "person" under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1).

In this case, the plaintiffs have admitted that Gulf Stream would qualify as a "person" if a government contract existed.[16] However, the plaintiffs argue that there is no evidence of a contract between Gulf Stream and U.S. government for the period covering Hurricane Katrina.[17]

First of all, the plaintiffs' position is curious considering that they have already acknowledged that Gulf Stream's involvement in this case arose out of a federal contract to provide temporary housing. The plaintiffs allege that FEMA "contracted" with Gulf Stream to "purchase thousands of the housing units, primarily travel trailers, for provision to

---

[16]   *See* Plaintiffs' Motion for Remand, Record Document 17825, paragraph 9.
[17]   *See* Memorandum of Authorities in Support of Motion for Remand, Record Document 17825-5, p. 8.

individuals, including plaintiffs, as temporary housing."[18]

Regardless, Gulf Stream of course had a contract with the Federal Emergency Management Agency to produce Emergency Housing Units to Gulf Coast residents displaced by Hurricanes Katrina and Rita. That "contract," which is actually two separate agreements (each to manufacture 25,000 emergency housing units), is attached to this Opposition.[19] Accordingly, Gulf Stream's status as a person is not in dispute.

### B.   The federal government exercised the requisite federal control needed for jurisdiction under 28 U.S.C. § 1442(a)(1).

The second factor hinges on whether Gulf Stream acted under the color of federal authority when committing the acts that allegedly caused the plaintiffs to suffer damages. The color of federal authority requirement is "neither limited nor narrow, but should be afforded a broad reading so as not to frustrate the statute's underlying rationale." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998). In determining this prong, courts examine the level of official control, which is only sufficient when the control is direct and detailed. *City of Petal v. Ashbritt, Inc.*, 2008 WL 4372758, *2 (S.D. Miss. Sept. 22, 2008).

In this case, the plaintiffs have argued that Gulf Stream has failed to establish that FEMA had any oversight over the construction of travel trailers. That is simply not true. Gulf Stream asserts that FEMA – in various ways and over a significant period of time – exerted direct, detailed and substantial control over the construction and design of Gulf Stream's Temporary Housing Units ("THUs").

First, as Gulf Stream argued in the original Notice of Removal, Gulf Stream did not unilaterally decide how to construct the subject travel trailers, but rather built them in strict

---

[18]   *See* Plaintiffs' Complaint for Damages, Record Document 17825-1, p. 3, paragraph 12.
[19]   *See* contract, attached as Exhibit "D."

accordance with trailer specifications **that the government itself drafted**.[20] FEMA, not Gulf Stream or another trailer manufacturer, actually drafted a specific and detailed set of travel trailer procurement specifications, which showed the precise trailer design that the government wanted. *See id.* Those specifications called for a travel trailer "built to industry standards except where identified. . ." *Id*. The specifications then listed four pages worth of exceptions, modifications, and design parameters. *See id.* These modifications included the precise size of the travel trailer, the type of HVAC system, etc. – all of which showed the government's significant control over the design of these units. *See id.* For example, the specifications expressly limited the length and width of the trailer, and they included instructions for the inclusion of a full-sized bed, sleeper sofa, double-bunks, dinette table and seating. *Id*. In addition, the specifications also specifically dictated that there were to be no "optional accessories," presumably because the government did not want to pay for them. *Id*. The specifications clearly establish that the government set forth stringent constraints for the trailer design.

As for the date of the specifications, the plaintiff argument regarding the inapplicability of the 2004 specification is misplaced because FEMA asked Gulf Stream to build the Katrina units (i.e., the 2005 and 2006 units) in accordance with the 2004 specifications.[21] Therefore, the government control exerted in the 2004 specifications applied to Gulf Stream's manufacture of the 2005 and 2006 units, also.

Second, FEMA played a critical role in monitoring and inspecting Gulf Stream's construction of the units. In 2005 and 2006, FEMA traveled to Gulf Stream's facility in Indiana, to inspect the trailers that were produced for Katrina disaster relief.[22] Government inspectors

---

[20]     *See* Document HFSE04-04-Q-8000, attached as Exhibit "E."
[21]     *See* Deposition of Gulf Stream Coach, Inc., through Philip Sarvari, dated July 24, 2008, 24:5–10, attached as Exhibit "F."
[22]     *See* Deposition of Gulf Stream Coach, Inc., through James Shea, dated May 28, 2009, 237:21—24,

worked <u>inside</u> Gulf Stream's manufacturing facilities during the period of the contracts to inspect the Gulf Stream THUs and to attest to their sufficiency <u>before</u> they were shipped into the disaster zone. *Id*. at 299:3—23. These inspections were quite detailed, to the point that the inspectors were examining "down to the last nuts-and-bolts." *Id*. at 299:24—300:4. The inspectors used a comprehensive checklist, which encompassed all manner of trailer aspects, including every appliance, furnishing and instance of damage in order to ensure that Gulf Stream supplied a proper trailer. *See Id*. This detailed government inspection was also done on **<u>every</u>** trailer.[23]

Furthermore, FEMA's control over the process was long-standing. Gulf Stream first sold travel trailers to FEMA for disaster relief after Hurricane Andrew in 1992.[24] Because of FEMA's extensive experience, FEMA knew what it was buying when it purchased these THUs for disaster relief after Katrina.[25,26] <u>FEMA was even aware that the units contained formaldehyde</u>.[27] Martin McNeese, FEMA's Emergency Program Specialist, said that it was not surprising to him that the travel trailers contained formaldehyde. *Id*. at 108. Nevertheless, FEMA deliberately chose to use travel trailers because of their practicality and functionality.[28]

Finally, as stated above, the plaintiffs themselves have acknowledged that Gulf Stream's involvement in this case arose out of its federal contract to provide temporary housing. By manufacturing and selling the THUs to FEMA – as the plaintiffs have alleged Gulf Stream did – Gulf Stream's only "work" in this case was performed pursuant to FEMA's direction under the contract. Clearly, Gulf Stream was acting under color of federal authority when complying with its obligations under that agreement.

---

attached as Exhibit "G."
[23] *See* Deposition of Joseph Cleland, dated July 16, 2009, 41:13, attached as Exhibit "H."
[24] *See* Exhibit "G," at p. 280:1—2.
[25] *See* Deposition of David Garratt, taken on July 7, 2009, p. 157—58, attached as Exhibit "I."
[26] *See* Deposition of David Porter, taken on July 8, 2009, p. 115—16, 161—62, attached as Exhibit "J."
[27] *See* Deposition of Martin McNeese, taken on July 14, 2009, p. 35, attached as Exhibit "K."
[28] *See* Exhibit "I," at 207—08.

Taking this evidence into account, Gulf Stream respectfully submits that FEMA exercised direct, detailed and substantial control over Gulf Stream's construction of the THUs. FEMA specifically told Gulf Stream what to build and how to build it, FEMA inspected and monitored Gulf Stream's construction, and the plaintiffs have essentially admitted that Gulf Stream's very involvement in this case arose because of its contract with FEMA. Thus, Gulf Stream acted under the color of federal authority, and in doing so satisfied the second prong of Federal Officer Removal.

### C. Gulf Stream established the plausibility of a "colorful defense" necessary for federal jurisdiction.

The third factor centers on whether Gulf Stream has a colorable federal defense – namely, the government contractor defense. First, the U.S. District Court for the Eastern District of Louisiana, which is the Multi-District Litigation Court presiding over consolidated pre-trial proceedings in the FEMA trailer cases, has already ruled that in the Federal Officer Removal context that the THU manufacturers have a colorable claim to the government contractor defense. *See Joseph v. Fluor Corp.*, 513 F.Supp.2d 664, 671 (E.D. La. 2007).

If this Court feels, however, that the Eastern District's decision is inapplicable to this action, Gulf Stream nevertheless asserts that it has a colorable defense on the basis that it was a government contractor and is therefore immune from liability under state tort law. At the outset, it is critical to note that Gulf Stream has no obligation to actually prove the defense at this stage. *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998). All that is required is a showing that the defense is plausible. *U.S. v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001). Furthermore, the liberal construction given to the Federal Officer Removal statute is even more warranted in a case involving an immunity defense. The Fifth Circuit has recognized that one of the most important functions of Federal Officer Removal is to allow a federal court to explore

20

the validity of an asserted official immunity defense. *Winters*, 149 F.3d at 397.

As for the defense itself, the main focus is whether the federal preemption of state law is justified under the circumstances. In *Boyle v. United Tech Corp.*, the U.S. Supreme Court held that some areas of activity – those involving "uniquely federal interests" – are so committed to federal control that any applicable state law becomes pre-empted. *See* 487 U.S. 500, 504 (1988). However, preemption, or "displacement," of state law will occur only when a significant conflict exists between an identifiable federal interest and the operation of applicable state law, or when the operation of state law would hinder the specific objectives that federal legislation was designed to achieve. *Id*. In determining whether such "displacement" is warranted, the Court held that state-law liability for design defects in military equipment cannot be imposed when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id*. at 512.

At the outset, the plaintiffs incorrectly argue that Gulf Stream must show that its obligations under the contract with the government were in conflict with its performance of whatever state law might have been imposed on it.[29] Very recently, the U.S. Court of Appeals for the Fifth Circuit rejected the argument that the "significant conflict" issue was some sort of prerequisite to analyzing the three-prong test set forth in *Boyle*. *See In re Katrina Canal Breaches Litigation*, 2010 WL 3554304, *4 (5th Cir. Sept. 14, 2010). As the Fifth Circuit stated, "Whether the GCI defense will apply to a particular claim depends *only* upon whether *Boyle*'s three conditions are met . . . ." *Id*. (emphasis in original). Therefore, only the three *Boyle* factors are relevant to this inquiry.

---

[29]     *See* Memorandum of Authorities in Support of Motion for Remand, Record Document 17825-5, p. 8.

### 1.    The United States approved reasonably precise specifications.

The first prong of the defense calls for the government to "approve" specifications that are "reasonably precise." The government's approval turns on whether it exercised discretion over the product design, or whether it simply delegated discretion to the contractor. *See Trevino v. Gen. Dynamics*, 865 F.2d 1474, 1480 (5th Cir. 1989). Mere acceptance of the contractor's design choice without significant evaluation is "rubber stamping," not substantive review. *See Stout v. Berg-Warner Corp.*, 933 F.2d 331, 336 (5th Cir. 1991). The government exercises its discretion when it actually chooses a design feature. *Trevino,* 865 F.2d at 1480. As the Fifth Circuit has stated:

> The government delegates the design discretion when it buys a product designed by a private manufacturer; when it contracts for the design of a product or a feature of a product, leaving the critical design decisions to the private contractor; or when it contracts out the design of a concept generated by the government, requiring only that the final design satisfy minimal or general standards established by the government. *Id.*

The government exercises adequate discretion when it performs a "substantive review" of the specifications. *See Trevino,* 865 F.2d at 1480. Whether the government has undertaken such a review is based on several factors, including an examination of drawings, periodic evaluation, criticism, and extensive government testing. *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000). To complete a substantive review, there must be a "continuous back and forth between the contractor and government." *Id.* However, it is not necessary that the specifications depict the alleged defect, as long as the government evaluated the design aspect in question. *Id.*

### a.    Plaintiffs misconstrue the allegedly defective design aspect at issue; the actual design aspect at issue was detailed by the specifications in a reasonably precise fashion.

As it relates to the first prong of the defense, the plaintiffs have misunderstood what design aspect must be "reasonably precise" in the specifications. They have argued that because

"there is absolutely no mention of formaldehyde" in the specifications, the government's approval was not reasonably precise.[30] However, this argument has already been rejected by another appellate court. In *In Re: Agent Orange Product Liability Litigation*, the plaintiffs asserted that the government contractor defense was unavailable to chemical contractors because the specifications were silent with respect to dioxin, the allegedly harmful chemical involved in that case. 517 F.3d 76 (2nd Cir. 2008). Just as the plaintiffs in this case have done, the plaintiffs in *Agent Orange* "misconceive[d] the nature of what the contracts in question were about and define[d] the alleged defective design too narrowly." 517 F.3d at 89. In that case, the government contracts called for the contractors to produce Agent Orange, which contained dioxin. *Id*. The Court found that the dioxin was not, in and of itself, defective; rather, it was the herbicide combination that produced the dioxin as a byproduct of the Agent Orange that was the allegedly defective product. *Id*.

Applied to this case, the specifications did not have to reference formaldehyde because the formaldehyde is not the allegedly defective product at issue. The chemical was but a component of a larger product – namely, the wood products, floor coverings, carpeting and underlying pads that were used to construct the finished trailer – just like the dioxin was part of the larger herbicide combination used to make Agent Orange. Critically, the products that contained the formaldehyde – the actual allegedly defective products – **were specified** when the government called for industry standard products. The government's inclusion of "industry standard" in the specifications was a carefully chosen term based on FEMA's years of experience with the product, and was made subject to a number of very specific modifications by

---

[30]     *See* Memorandum of Authorities in Support of Motion for Remand, Record Document 17825-5, p. 9.

FEMA.[31] The industry standard was not some sort of vague catchall, but rather the foundation from which the government worked to obtain the exact product it wanted.

Thus, *Agent Orange* establishes that the specifications in this case did not need to reference formaldehyde in order to be reasonably precise, just like the dioxin did not need to be specified in that case. Plaintiffs' argument misses the mark as to the defective design, and as to what needed to be specified. In this case, the government made specific choices about the design, knew what it wanted, and set out to obtain units that conformed to its specific design choices. In other words, it approved reasonably precise specifications.

b.     **Additional evidence shows that the government's approval of the specifications was reasonably precise.**

Additionally, the *Agent Orange* court noted that where the government specifically assessed the alleged defect and made the decision to continue to order and use the product, the "reasonably precise specification" element of the *Boyle* test was met, concluding that "reordering the same product with knowledge of its relevant defects plays the identical role in the defense as listing specific ingredients, processes, or the like."[32] The *Agent Orange* court concluded:

> The government made an express determination, based on the knowledge available to it at the time, that Agent Orange as then being manufactured posed no unacceptable hazard for the wartime uses for which it was intended, and that the product should continue to be manufactured and supplied to it. In light of this exercise of discretion, we read *Boyle* to require displacement of any alleged state law rules to the contrary.[33]

Here, the evidence established that the government had done its own testing of formaldehyde concentrations in travel trailers long before it put the plaintiffs into them, and

---

[31]    *See, e.g., In Re Air Disaster at Ramstein Air Base, Germany, on 8/29/90.*, 81 F.3d 570 (5th Cir. 1996) (holding that the history of selection and use of particular product without problems or complaints establishes right to assert government contractor defense); *Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir. 1989) (holding similarly and that where, as here, products are returned into service the element of conformance is specifically satisfied under *Boyle*); *See* Exhibit "I," at p. 234; Deposition of Stephen Miller, dated July 9, 2009, 179-185, attached as Exhibit "L."

[32]    *Agent Orange*, 517 F.3d at 95—96.

[33]    *Id.* at 96—97.

concluded that they were viable temporary emergency housing options, particularly when combined with ventilation.[34] The government was also well aware that these units contained formaldehyde.[35] And, the government recognized that the design specification of EHUs was a <u>government</u> responsibility, and the assessment and response to the formaldehyde issue was likewise the purview of the <u>government</u>.[36]

In addition to *Agent Orange*, several decisions from the Fifth Circuit are on point with respect to the government's approval of reasonably precise specifications. In *Stout v. Berg-Warner Corp.*, the manufacturer alleged that the government approved reasonably precise specifications on an air conditioning unit used to cool a U.S. Army missile repair unit. *Id*. at 335. There, the Army controlled the design process by modifying the design of the air conditioner; reviewed, evaluated, tested and approved detailed design drawings at different stages during the process, including the prototype phase; and approved over fifty pages of design drawings. *Id*. The court agreed with the manufacturer and further acknowledged that the government had reviewed detailed drawings that the contractor submitted at various progressive stages of the design, performed critical design reviews, and evaluated and tested for months the prototype models produced by the manufacturer.

In *Smith v. Xerox Corp.*, an Army soldier was injured when a weapon simulator he was using exploded prematurely and burned his arm and torso. 866 F.2d 135, 136 (5th Cir. 1989). The soldier sued Xerox, the manufacturer, for his personal injuries. *Id*. Xerox won summary judgment under the government contractor defense. *Id*. On appeal, the Fifth Circuit noted that although Xerox failed to produce complete specifications for the original simulator, Xerox did produce a listing of those specifications, a copy of the original government performance criteria

---

[34]     *See* Exhibit "I," at 207—08.
[35]     *See* Exhibit "K," at 35.
[36]     *See* Exhibit "I," at 216, 218, 230-231, 233, p. 234.

dictating the environmental specifications the government wanted the simulator to meet, and a production contract furnished by Xerox for a series of simulators containing specific reference to government-approved specifications. *Id*. at 138. Further, a Xerox employee who was involved with the development of the simulator testified that the Army reviewed and approved the drawings and specifications prepared by Xerox. *Id*. Because the government in this case supplied the relevant environmental specifications, and the employee's unrebutted testimony was that the government reviewed and approved Xerox's final drawings and specifications, the court held that the government had approved reasonably precise specifications. *Id*.

In *In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*, the plaintiffs brought product liability claims against the manufacturers of a military plane that crashed, tragically killing 13 of the 17 servicemen aboard. 81 F.3d 570, 571—72 (5th Cir. 1996). In considering the government contractor defense, the court acknowledged that the U.S. Air Force's substantive review, evaluation and testing of the aircraft "clearly implicate[d] the Government's discretionary function and approval of reasonably precise specifications." *Id*. at 575. Affidavits established that the manufacturers and the Air Force had worked closely together on the development of the plane from planning through production. *Id*. In addition, the Air Force inspected and supervised all aspects of the aircraft's production. *Id*. As the court said, "Clearly, the approvals in this case go far beyond mere rubber stamping." *Id*.

In the Fourth Circuit, *Dowd v. Textron, Inc*., 792 F.2d 409 (4th Cir. 1986), the court held that the government contractor defense applied to shield a helicopter manufacturer from liability for an alleged design defect in the helicopter's rotor system. Plaintiffs argued that since the manufacturer originally designed the rotor system in the early 1960s without any participation by the Army, the government neither set nor approved reasonably detailed specifications. *Id.* at 412.

26

The Court dismissed that argument, noting:

> That argument overlooks a wealth of subsequent history. The Army had been using helicopters equipped with the 540 rotor system for some twenty years before Ellis and Dowd's accident; almost 9,000 UH-1 and AH-1 helicopters flew in Vietnam . . . The <u>length and breadth</u> of the Army's experience with the 540 rotor system-and its decision to continue using it-amply establish government approval of the alleged design defects. *Id.* at 412 (emphasis added).

Applying this case to the instant litigation, Gulf Stream asserts that the government approved reasonably precise specifications for the EHUs. In fact, FEMA did more than any of the other governmental entities discussed in the aforementioned cases – it actually prepared the original set of procurement specifications for FEMA Model Travel Trailers, as detailed above.[37] FEMA's specifications described minimum square footage of living space, floor plan configuration, finishes, furnishings, and environmental living conditions necessary to provide emergency housing during periods of disaster relief. *Id*. The specifications referenced the quality of workmanship, and the specifications adhered completely to federal regulatory requirements. *Id*. By making these pronouncements, FEMA supplied the relevant specifications that formed the basis of the production of travel trailers, much like the U.S. Army did in the *Smith* decision. FEMA specifically chose the design features for the trailer, and in doing so exercised great discretion over the complete design. *See Trevino,* 865 F.2d at 1480. Never did FEMA delegate design choices to Gulf Stream carte blanche; instead, FEMA created the preferred design itself.

Additionally, FEMA exercised its discretion over the product design by specifically choosing to use travel trailers as part of its disaster relief efforts.[38] FEMA had used this product since at least the early 1990s in south Louisiana. *See id*. at 22. Its use of these trailers as part of its disaster relief operations, especially in the same type of hot and humid climate that exists in

---

[37]   *See* Exhibit "E."

[38]   *See* Exhibit "I," p. 203 (stating that FEMA supplied thousands of travel trailers for natural disasters prior to Katrina).

this area, was extensive and well documented. *See id.* Travel trailers were not a revolutionary product – FEMA knew exactly what was in them and used them without incident prior to Hurricane Katrina.[39] Just like the Army in *Dowd*, FEMA had a long and broad track record of using Gulf Stream THUs and continued to use those units over the course of some 15 years. This establishes the government approval over the alleged design defects. Therefore, FEMA's approval of these reasonably precise specifications satisfies the first prong of the *Boyle* test. At the very least, the evidence establishes that Gulf Stream has a plausible defense that FEMA reasonably approved these specifications.

### c.      Plaintiffs' minimum standards argument is inapposite.

In response to this evidence, the plaintiffs argue that the government's approval was not reasonable precise because the specifications only set forth minimum standards for the construction of travel trailers and allowed the manufacturers to supply units of equal or better quality. They point to language in the specifications that the specifications establish the minimal standards for travel trailer construction and outfitting, and that suppliers are not prohibited from providing equal or better units.[40] According to the plaintiffs, the permission to construct better units allowed Gulf Stream too much discretion in its manufacture of the trailers, and the minimum design standards "do not direct Defendant Gulf Stream as to how to construct the units."[41]

With all due respect, the plaintiffs' argument is nonsensical. The simple fact that the government did not foreclose the option of providing a "better" trailer (provided the competitive pricing and delivery requirements were met) does not mean that the government failed to

---

[39]      *See* Exhibit "K," pages 100-01, 106-08.
[40]      *See* Memorandum of Authorities in Support of Motion for Remand, Rec. Doc. 17825-5, p. 9.
[41]      *See id.*; Rec. Doc. 17825, paragraph 12.

exercise control over the design of the actual unit it specified. That is akin to arguing that the government, in asking a car manufacturer to build a Volkswagen and giving the manufacturer precise instructions on how to build that Volkswagen, did not adequately control the Volkswagen design simply because it told the car builder it would take a Mercedes, too. That the government would accept a "better" model says nothing about the specificity of its design of the standard model – the two concepts are wholly unrelated. The plaintiff misunderstands this entirely, going so far as to argue that the minimum standards not only constitute a lack of specificity, but also that the minimum standards did "not direct Defendant Gulf Stream as to how to construct the units." How four pages of documents dealing with all aspects of a unit – including minimum square footage of living space, floor plan configuration, finishes, furnishings, and environmental living conditions – could be said to provide <u>no</u> direction whatsoever defies logic. That evidence, along with the other evidence discussed above, establishes that FEMA approved reasonably precise specifications for the procurement of travel trailers.

> ### 2.    Gulf Stream's travel trailers conformed to FEMA's specifications.

The second prong requires the contractor to prove that the equipment it produced conformed to the specifications that were approved by the government. *Boyle*, 487 U.S. at 512. The Fifth Circuit has held:

> Nonconformance with a specification means more than that the ultimate design feature does not achieve its intended goal. The alleged defect must exist independently of the design itself, and must result from a deviation from the required military specifications. Extensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications.

*Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435—36 (5th Cir. 2000).

Decisions from the Fifth Circuit have reinforced the general rule. In *In re Air Disaster*, discussed previously, the court held that the manufacturer's equipment conformed to specifications because the government inspectors were present and actively involved throughout the design, review, development and testing of the plane that crashed. 81 F.3d at 575. Furthermore, the evidence showed that the Air Force accepted and had used the plane for over 20 years without any significant problems before the crash. *Id*. Likewise, in the *Xerox* decision, the court held that the evidence showed the manufacturer of the weapon that discharged prematurely had complied with the specifications for the product. *See* 866 F.2d at 138. When technicians analyzed the weapon after the accident, they could not duplicate the problem. *Id*. at 139. After the product was reassembled, the government put the product back into use. *Id*. Thus, the court held that the product complied with the applicable specifications. *See id*.

In this case, the plaintiffs do not present **any** argument that the Gulf Stream units did not conform to the FEMA specifications. However, out of an abundance of caution, Gulf Stream submits that its production of the units conformed to the specifications set forth by FEMA. Gulf Stream reviewed nearly 20 years worth of records related to the production of THUs for FEMA and found zero complaints relating to formaldehyde in THUs.[42] Additionally, FEMA's own personnel testified that prior to Katrina, there was not a shred of written evidence or documentation that showed problems with formaldehyde.[43,44,45] Additionally, just as with the *In re Air Disaster* and *Xerox* cases, the government used Gulf Stream's products extensively as part of its disaster relief efforts following Hurricane Katrina. Such evidence shows that Gulf Stream complied with FEMA's specifications, and thus satisfied the second prong of the *Boyle* test.

---

[42]     *See* Exhibit "G," p. 130.
[43]     *See* Exhibit "I," p. 179.
[44]     *See* Exhibit "K," p. 100-01.
[45]     *See* Exhibit "L," p. 184—85.

     **3.**     **FEMA knew of formaldehyde in the trailers, but to the extent Gulf Stream was obligated to "warn" FEMA about the dangers from formaldehyde, it did so.**

The final prong requires the contractor to warn the government about dangers in the use of the equipment that are known to the contractor but not known to the government. *Kerstetter*, 210 F.3d at 436. The contractor has no obligation to inform the government of those dangers already known to the government. *Boyle*, 487 U.S. at 512. Additionally, "the purpose of this element is <u>not</u> to create an incentive to discover latent defects in a product designed for the government." *Kerstetter*, *v. Pac. Scientific Co.*, 210 F.3d 436 (5th Cir. 2000) (emphasis in original). Thus, the contractor only has a duty to inform of dangers it actually knows about, not those it should have known about. *Id*.

In this case, the plaintiffs have argued that Gulf Stream failed to establish that it made any effort to warn FEMA about the dangers of formaldehyde. This is incorrect. Because FEMA knew about the presence of formaldehyde in the trailers long before Hurricane Katrina, Gulf Stream was not obligated to warn FEMA about something with which it was previously familiar. However, to the extent Gulf Stream was obligated to warn FEMA about the dangers from formaldehyde, Gulf Stream did so.

First, Gulf Stream avers that to the extent the existence of formaldehyde would qualify as a "danger" that Gulf Stream needed to tell FEMA about, FEMA was well aware of the presence of this danger.[46] As Martin McNeese, FEMA's Emergency Program Specialist at the time of Hurricane Katrina, stated, it was no surprise that the travel trailers contained formaldehyde. *Id*. at 108. Clearly, FEMA knew that the subject unit contained the compound. In fact, it was known to FEMA that not only an industry standard travel trailer, but also a conventional home, would

---

[46]     *See* Exhibit "K," p. 35.

contain formaldehyde.[47] Because FEMA already knew of the existence of formaldehyde in the trailers, Gulf Stream had no obligation to warn them about any condition in the trailer.

Second, if Gulf Stream in fact had an obligation to tell FEMA about the danger, it did so as soon as Gulf Stream learned of occupant complaints. Gulf Stream first learned of complaints in March 2006. FEMA's own personnel testified that prior to that point, there was no evidence or documentation that showed problems with formaldehyde prior to Katrina.[48] In April, Gulf Stream had a meeting with FEMA officials, at which time Gulf Stream believed it would be working collectively to address the occupants' concerns. Shortly thereafter, on May 11, 2006, Gulf Stream's Executive Vice President Philip Sarvari sent correspondence to FEMA's Director of Operations in which Gulf Stream provided instructions on how to ventilate the units in order to address the occupant complaints. Gulf Stream also attached a set of specific ventilation instructions to the letter.[49] This evidence establishes that as soon as Gulf Stream learned of complaints, it met with FEMA and attempted to work with FEMA on appropriate methods for resolving the problems of which the THU occupants were complaining. By advising the government, Gulf Stream complied with the third prong of the *Boyle* test. At the least, Gulf Stream has established that it has a plausible defense that it complied with the responsibility to warn under the circumstances.

In conclusion, Gulf Stream avers that by establishing it has a plausible argument that it can satisfy each of the three elements to obtain government contractor immunity, it has proven its possession of a colorable federal defense. In doing so, it has satisfied the third and final prong of Federal Officer Removal. Accordingly, this Court has jurisdiction over the plaintiffs' claims against Gulf Stream.

---

[47]       *See* Exhibit "K," p. 107-08.
[48]       *See* Exhibit "I," p. 179; Exhibit "K," p. 100—01; Exhibit "L," at 184—85.
[49]       *See* GULF 0002336, 0002338—0002340, attached as Exhibit "M."

For the reasons set forth above, Gulf Stream respectfully submits that the Motion should be denied, and this Honorable Court should retain jurisdiction over the instant lawsuit.

Respectfully submitted:

**DUPLASS, ZWAIN, BOURGEOIS,
PFISTER & WEINSTOCK**

s/Andrew D. Weinstock
_____
**ANDREW D. WEINSTOCK (#18495)
JOSEPH G. GLASS (#25397)**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
andreww@duplass.com
jglass@duplass.com

and

**SCANDURRO & LAYRISSON**
Timothy D. Scandurro #18424
Dewey M. Scandurro #23291
607 St. Charles Avenue
New Orleans, LA 70130
Telephone: (504) 522-7100
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc**

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of December, 2010, a copy of the foregoing Memorandum in Support of Gulf Stream's Opposition to Plaintiffs' Motion to Remand was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file will be sent to all known counsel of record by operation of the court's electronic filing system.

/s/ Andrew Weinstock
_____
**ANDREW D. WEINSTOCK (#18495)**
andreww@duplass.com