Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF LOUISIANA
 3                  NEW ORLEANS DIVISION
 4   In Re:  FEMA Trailer      )
 5   Formaldehyde Products     ) MDL No. 1873
 6   Liability Litigation      )
 7
 8                              Washington, D.C.
 9                              Tuesday, July 7, 2009
10   Videotape Deposition of DAVID EDWARD GARRATT, called
11   for examination by counsel for Plaintiffs in the
12   above-entitled matter, the witness being duly sworn
13   by CHERYL A. LORD, a Notary Public in and for the
14   District of Columbia, taken at the offices of NELSON
15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution
16   Avenue N.W., Suite 900, Washington, D.C., at 9:07
17   a.m., and the proceedings being taken down by
18   Stenotype by CHERYL A. LORD, RPR, CRR.
19
20
21
22
```

1   necessarily made any awards on that contract at this
2   stage of the game, just that we had a protocol for
3   going forward to execute the new contracts using
4   these specs and this testing protocol.
5       Q.   Did the new contract protocol extend to
6   each and every manufacturer that was a source of
7   emergency housing units?
8       A.   Yes.
9       Q.   Prior to that change, did -- was it the
10  prevailing view, at least your view, that the con- --
11  that the manufacturers were in fact providing units
12  that complied with the required safety standards for
13  formaldehyde?
14      A.   It was our understanding that the
15  manufacturers were -- if they were producing mobile
16  homes or manufactured housing, producing units that
17  complied with HUD standards.
18      Q.   M-hm.
19      A.   For those who were not producing
20  manufactured housing, they were producing park models
21  or travel trailers, which were recreational vehicles
22  that met or exceeded industry standards since there

Page 158

1    were no federal standards that applied -- there were

2    no HUD standards that applied to their construction

3    at the time that those units were purchased for

4    Hurricane Katrina.

5         Q.    Well, how did the new specifications for

6    travel trailer manufacturing change what you refer to

7    as the industry standards?

8         A.    Well, our new specifications for park

9    models and mobile homes require that the units test

10   at point- -- what they ended up requiring is that

11   below .016 PPM.

12              Now, how the manufacturers and what the

13   manufacturers did to achieve that level in terms of

14   reducing components, materials, glues, et cetera,

15   that emit formaldehyde was up to them.  We were

16   interested in the outcome, which was a unit that

17   emitted no more than this amount of formaldehyde.

18              For travel trailers, we faced a different

19   or additional concern, and that was, they don't have

20   the ventilation systems that a park model or a mobile

21   home has.

22              So even if they use reduced formaldehyde,

Page 179

1  problem was on March 16, 2006. This issue has been
2  around a long time, and as I recall, surfaced in
3  previous disasters. Has anyone researched this.
4           Now, did you know what Gil Jamieson was
5  referring to there?
6       A.   No.
7       Q.   Did you research it or have anyone else
8  research it?
9       A.   Yes.
10      Q.   And what was the result of the research?
11      A.   Inconclusive, anecdotal, no one was able
12  to provide any written documentation that there were
13  prior formaldehyde issues.
14      Q.   From prior disaster responses --
15      A.   Correct.
16      Q.   -- in particular.
17      A.   Gil was one individual who raised this
18  issue in this email. I'm also aware and I don't
19  remember who the individual was, but somebody from
20  our logistics organization, had also suggested that
21  they had recalled dealing with formaldehyde problems
22  or a formaldehyde issue in a previous disaster, and I

Page 203

1        MR. MEUNIER:  Let me mark that as Garratt
2   16.
3            I will tender the witness and reserve the
4   remaining 8 minutes for redirect.
5                    (Garratt Exhibit No. 16
6                    was marked for
7                    identification.)
8        MR. MEUNIER:  Let me -- Garratt 16, by the
9   way, has Bates number at the bottom right-hand corner
10  DHS and T, 4060 through 62.
11
12  EXAMINATION BY COUNSEL FOR GULF STREAM COACH INC.
13          BY MR. SCANDURRO:
14      Q.   Mr. Garratt, my name is Tim Scandurro, and
15  I represent Gulf Stream Coach, one of the commercial
16  manufacturers of these travel trailers.
17              (Discussion off the record.)
18          BY MR. SCANDURRO:
19      Q.   Mr. Garratt, can you confirm that FEMA
20  supplied thousands of travel trailers for natural
21  disasters prior to Hurricane Katrina?
22      A.   Yes.

1    Q.    From a formaldehyde standpoint.

2    A.    None whatsoever.

3    Q.    Can you talk a little bit about why FEMA used travel trailers by the thousands both prior to Hurricane Katrina and during the Hurricane Katrina response?

7    A.    They were the preferred direct temporary housing product because of their -- because of their size, because we could move them in and set them up quickly. I think 80 percent of the units that we provided in response to hurricanes Katrina and Rita were on individuals' private property. And typically we put travel trailers on private property or often because we can't fit anything else on their private property. They simply can't accommodate a mobile home on their driveway.

17         So they were used because, number 1, they filled a need that could not be met any other way. 2, they were inexpensive compared to a mobile home. 3, they allowed people to stay at their property and rebuild their home as opposed to relocating them to a community site that might be miles away and might be

1  far more expensive to build.
2           So a number of reasons I think contributed
3  to the use of travel trailers and their popularity at
4  least within a certain segment of the disaster
5  population on those small properties and wanted to
6  stay on their property and rebuild their home.
7       Q.   Am I also correct that during the prior
8  natural disaster events that we talked about prior to
9  Hurricane Katrina, can we assume that there were
10 young children and elderly people and stay-at-home
11 moms living in those travel trailers as well?
12      A.   I think that's safe to assume.
13      Q.   And again you're not aware of any
14 formaldehyde claims by any of those people in those
15 prior disasters?
16      A.   I'm not personally aware of any.
17      Q.   When you were working with the CDC after
18 Hurricane Katrina, did you become aware of the
19 results of a study that they did in Hancock County,
20 Mississippi, of children's pre-Katrina and
21 post-Katrina doctor visits?
22      A.   Not by -- not by that reference.

1   did not happen, but I'm not aware of it.

2           BY MR. SCANDURRO:

3       Q.   Okay.  And did FEMA at some point

4   establish a call center where an occupant who had any

5   concern at all about formaldehyde could make a phone

6   call to FEMA and talk about it?

7       A.   Yes.

8           We actually did several call centers.  The

9   main one was at one of our national processing

10  service centers, and they were linked in to CDC,

11  which also maintained a hotline, and so they were

12  collaborating on that in terms of referring phone

13  calls back and forth.

14          But also our TROs established their own

15  separate call centers in Mississippi and Louisiana to

16  handle calls regarding the same thing.  They were

17  also linked into this principal call center.

18          The short answer is yes.

19      Q.   So am I correct that early on, occupants

20  who expressed a formaldehyde concern could be moved

21  into a different housing unit, and then later on in

22  the process occupants who expressed a concern about

1    Q.    But the point is, from the beginning of
2    the Hurricane Katrina response to the end, FEMA was
3    willing to give people the opportunity to move out of
4    a unit if they expressed any formaldehyde concern
5    that you couldn't resolve?
6          MR. MILLER:  Objection, vague, time.
7    A.    I believe that was the general practice in
8    play, and it was my understanding that that was how
9    these issues were being resolved in the field by the
10   transitional recovery offices through their MDCs,
11   yes.
12         MR. SCANDURRO:  I tender the witness.
13
14   EXAMINATION BY COUNSEL FOR BECHTEL NATIONAL INC.
15         BY MR. HAINKEL:
16   Q.    Good afternoon, Mr. Garratt.
17         My name is John Hainkel, and I represent
18   Bechtel National Inc. in the formaldehyde litigation.
19         I read your declaration a couple of times,
20   and I've tried to listen closely today, so hopefully
21   I won't plow any new ground.
22         Am I correct that FEMA's authority to

David Edward Garratt                                    July 7, 2009
Washington, DC

Page 230

1    Q.   As of May 17th, 2007, your email here
2  indicates that the new specifications will follow HUD
3  emission levels.
4         Do you see that?
5    A.   I do.
6    Q.   Was that the specifications that were
7  eventually adopted by FEMA?
8    A.   No.
9    Q.   What were the specifications that were
10 finally adopted by FEMA for the new purchase -- new
11 units that were being purchased?
12   A.   Below .016 parts per million.
13   Q.   And as you sit here today, what is your
14 best recollection of when that determination was made
15 to use the 0- -- 0.016 part per million standard?
16   A.   To the best of my recollection, it
17 occurred after we published the -- the interim
18 direction, and that interim direction is what
19 suspended the use of travel trailers and provided
20 conditions for the use of manufactured housing.
21        That interim direction required that
22 states must establish an acceptable level of

Page 231

1   formaldehyde for any units that we brought into their
2   states to be used by their -- by disaster survivors
3   in their states.
4            And what we found were that states were
5   very reluctant to establish these levels or that they
6   were defaulting to a very low level that was actually
7   below the HUD level. As a result, because that
8   forced to us then test every unit that we have before
9   we delivered it to find out what -- at what level it
10  was at and to see if it would meet their standards,
11  we needed a level that was so low that no state would
12  have a problem with us unilaterally bringing those
13  units into their states to serve their disaster
14  victims.
15       Q.   Were there any internal concerns or policy
16  concerns relating to use of those 0.016 PPM standard?
17       A.   There were some concerns.
18            I know that initially HUD did not think
19  that achieving such a standard in manufactured
20  housing was achievable. So there was a technical
21  concern from their perspective.
22            There were some concerns that what we were

1   agencies' actions during a disaster relief?
2       A.   I think supervision of their day-to-day
3   activities is probably overstating what our
4   responsibility is.
5            What our responsibility is to organize
6   the -- and coordinate and integrate the response of
7   all of the federal agencies who are brought to the
8   table to help in a disaster environment as well as
9   voluntary agencies as well as the private sector
10  designated by the president to perform that role in
11  that function.
12           Now, does that mean that we're responsible
13  for supervising all of the actions of everybody who's
14  involved in that response, no.
15           But what it does mean is that we are
16  responsible for the overall disaster and for, again,
17  organizing and coordinating the engagement of federal
18  agencies and the engagement of the resources, assets,
19  and authorities that they have.
20           For example, we can task a federal agency
21  to exercise their authorities in a disaster.  Well,
22  it's still their authority.  It's not ours.

Page 234

1        We can be responsible for requiring
2   them to do that, but it's their responsibility
3   to exercise their authorities and to do so
4   responsibly.
5        Q.   And in providing the disaster response, do
6   you rely upon other federal agencies?
7        A.   Absolutely.
8             MR. MILLER:  I have no further
9   questions.
10            Pass the witness.
11            MR. MEUNIER:  Any other cross-examination
12  by defense counsel?
13
14  FURTHER EXAMINATION BY PLAINTIFFS' CO-LIAISON COUNSEL
15            BY MR. MEUNIER:
16       Q.   I just have a couple of followup to what
17  was covered on cross, Mr. Garratt.
18            Counsel for the manu- -- for one of the
19  manufacturers asked if in earlier disasters there had
20  been complaints received by FEMA about formaldehyde
21  problems.
22            In any earlier disasters that you're aware