Page 1

1                  UNITED STATES DISTRICT COURT

2                     DISTRICT OF LOUISIANA

3                      NEW ORLEANS DIVISION

4    In Re:  FEMA Trailer      )

5    Formaldehyde Products     ) MDL No. 1873

6    Liability Litigation      )

7

8                              Washington, D.C.

9                              Tuesday, July 14, 2009

10   Videotape Deposition of MARTIN EDWARD McNEESE, called

11   for examination by counsel for Plaintiffs in the

12   above-entitled matter, the witness being duly sworn

13   by CHERYL A. LORD, a Notary Public in and for the

14   District of Columbia, taken at the offices of NELSON

15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16   Avenue N.W., Suite 900, Washington, D.C., at

17   9:03 a.m., and the proceedings being taken down by

18   Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22

Page 35

1           Objection.

2           There's no question pending.

3           MS. GILBREATH:  Okay.

4           MR. MILLER:  You can have the court

5   reporter read the que- -- answer back if you want.

6           MS. GILBREATH:  Can you read back his

7   previous answer.

8           (The reporter read the last

9           answer.)

10          BY MS. GILBREATH:

11      Q.  So did you believe the task of EPA and

12  ATSDR in terms of determining whether venting was an

13  effective response was to determine whether or not it

14  lowered the levels of formaldehyde?

15      A.  No, I didn't believe that.

16          If the test -- the test that was given to

17  EPA was to, number 1, establish a baseline or

18  establish a level of volatile inorganic compounds and

19  specifically formaldehyde, and number 2, to --

20  because we weren't denying that there was

21  formaldehyde in the units -- we knew there was -- to

22  see if -- what the impact of venting was on the

```
1       A.      Yes, I do.
2       Q.      And you recall that your conclusion was
3   that based on those tests, you felt like travel
4   trailers in combination with ventilation were a
5   viable option for emergency housing.
6               Correct?
7       A.      That's correct.
8       Q.      Okay.  And you were asked a followup
9   question as to whether you were basing that solely on
10  the ATSDR test or whether you had any personal
11  training or experience or knowledge.
12              Do you recall those questions?
13      A.      I do.
14      Q.      Am I correct that you did in fact have
15  some personal experience while you were with FEMA
16  with the use of travel trailers in other disasters
17  prior to Hurricane Katrina?
18      A.      That's correct.
19              I have actually been working in housing
20  programs over the past -- over the years before
21  Katrina.
22      Q.      And am I also correct that part of your
```

1   experience would have been working with travel
2   trailers in hurricane disaster areas, including the
3   Gulf Coast in Florida?
4       A.   That's correct.
5       Q.   Is -- am I also correct that to the best
6   of your knowledge and experience working with travel
7   trailers prior to Hurricane Katrina, you weren't
8   aware of any health concerns associated with
9   formaldehyde in the travel trailers; is that right?
10      A.   That's correct.  I was not.
11      Q.   And you dealt directly with occupants,
12  didn't you, in those other hurricane disaster areas
13  from time to time?
14      A.   I did.
15      Q.   And again, prior to Hurricane Katrina, you
16  weren't aware of any complaints by occupants relating
17  to formaldehyde or health effects of living in these
18  trailers?
19           MR. MILLER:  Objection, compound.
20      A.   Yeah,.
21           Actually I was not aware of any.
22           BY MR. SCANDURRO:

Martin Edward McNeese                                     July 14, 2009
                        Washington, DC

```
                                                        Page 106
 1   conclusion wasn't that everybody who might be exposed
 2   to a level above that .3 level of concern would have
 3   a problem.  It was only conceivably people with a
 4   prior sensitization.
 5             Was that your understanding?
 6       A.    That was my interpretation.
 7       Q.    Let me ask you also about McNeese number
 8   7.
 9             There's a reference in the second
10   paragraph here to the -- what's been described to us
11   in other depositions as the swapout program or the
12   swapping out of newer units for older units.
13             Do you see that discussion there on
14   McNeese 7 under number 2?
15       A.    Yes.
16       Q.    Was it your conclusion that the program at
17   this time of swapping out a newer trailer for an
18   older trailer with people who had complained an
19   adequate response that was in fact effective in
20   addressing the complaints of those individuals?
21       A.    It was my feeling that that was in fact a
22   valid program and valid process, realizing that if
```

Page 107

1   people did not want to do that, we would put them in
2   a hotel or somewhere else.
3            I mean, that was always the other option
4   that went with it, but the ones we swapped out with
5   older units, we never to my knowledge got a complaint
6   back from them again, so --
7        Q.   And the older units would be for example
8   units from the 2004 hurricanes in Florida?
9        A.   Or from any other disasters, but prior to
10  Katrina-type units, yes.
11       Q.   So some of the swapout units were in fact
12  from the 2004 hurricanes in Florida; is that right?
13       A.   That's probably true, yes.
14       Q.   And you're not aware of any followup
15  problems in those 2004 units once they were swapped
16  out from a formaldehyde standpoint?
17       A.   I'm not aware of any, that's correct.
18       Q.   Also in McNeese 7, you refer under number
19  3 to the fact that it is a given that the materials
20  used in the construction of mobile homes and travel
21  trailers in addition to other residential structures
22  contain formaldehyde.

1          Do you see that?
2     A.   I do.
3     Q.   It was no surprise to you that there was
4  some formaldehyde in these travel trailers, was it?
5     A.   No, it was not.
6     Q.   And in fact, you're generally aware that
7  there is also formaldehyde not only in travel
8  trailers but in mobile homes and in stick-built
9  residential structures; is that right?
10    A.   That's correct.
11    Q.   In some of the documents that we looked at
12 this morning, I noted that you made references to the
13 fact that there were no standards, residential indoor
14 air standards that FEMA could look to for guidance.
15         Do you recall having that concern at the
16 time?
17    A.   I do --
18    Q.   Could you --
19    A.   -- recall that.
20    Q.   -- elaborate on what -- what your reaction
21 was to learning that there were in fact no standards
22 that FEMA could look to regarding residential indoor