## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

IN RE: FEMA TRAILER
FORMALDEHYDE
PRODUCTS LIABILITY LITIGATION

MDL NO. 1873

SECTION N(5)

JUDGE ENGELHARDT

MAG. JUDGE CHASEZ

THIS DOCUMENT RELATES TO:

*Sheila M. Spiers, et al. v. Motex Enterprises, Inc., et al.*
*Civil Action No. 1:10-CV-449-LG-RHW, (U.S.D.C., So. Dist. Miss.)*

---

### RESPONSE TO MOTION TO REMAND

---

Defendant, Madison Services, Inc. (hereinafter "Madison Services"), by and through its

counsel of record, files this response to the Plaintiffs' Motion to Remand, and in support would

show the following:

### STATEMENT OF THE CASE

On or about June 1, 2010, the Plaintiffs filed suit against the Defendants Madison

Services, Motex Enterprises, Inc.; Keystone Industries, Inc.; SunnyBrook RV, Inc. (hereinafter

"SunnyBrook"); Bechtel National, Inc. (hereinafter "Bechtel"), and various John Doe

Defendants in the Circuit Court of Pearl River County, Mississippi, seeking damages for alleged

1

injuries they suffered from exposure to formaldehyde in a travel trailer provided to them by the Federal Emergency Management Agency (hereinafter "FEMA") after Hurricane Katrina hit the Mississippi Gulf Coast. Bechtel timely and properly removed this action to the United States District Court for the Southern District of Mississippi, Southern Division. On September 17, 2010, Madison Services joined and consented to Bechtel's Notice of Removal and adopted its arguments therein. *See* Joinder in Notice of Removal, attached hereto as Exhibit "A." Thereafter, this case was transferred to the United States Judicial Panel on Multidistrict Litigation FEMA Trailer Formaldehyde Products Liability Litigation MDL No. 1873 by Conditional Transfer Order No. 33 (Rec. Doc. 17392), which was finalized on October 27, 2010.

The Plaintiffs have moved to have this action remanded back to the Circuit Court of Pearl River County, Mississippi. Not only did Bechtel have the right to remove this action on the grounds asserted in its Notice of Removal, but Madison Services also had an independent right to remove this action. Accordingly, Madison Services files this response to the Plaintiffs' Motion to Remand to enumerate its independent grounds for removal. Specifically, the Plaintiffs' motion should be denied because (1) removal was proper under the Federal Officer removal statute; and (2) removal was proper under the Class Action Fairness Act. For these reasons, Madison Services respectfully requests that this Court deny the Plaintiffs' Motion to Remand and retain jurisdiction over this action.

## ARGUMENT

**I.     Removal was proper under 28 U.S.C. § 1442 because Madison Services was acting as a Federal Officer.**

The Plaintiffs' Complaint is removable to this Court because Madison Services is entitled to assert a federal officer defense in response to the allegations the Plaintiffs make against it in

their complaint.  Specifically, Madison Services was a government contractor who provided maintenance and deactivation of assigned trailers pursuant to FEMA's reasonably precise specifications and guidelines under a contract with FEMA, as part of the disaster relief provided by FEMA following Hurricane Katrina.  In this case, the Plaintiffs have sued Madison Services claiming that it "negligently failed or refused to provide adequate maintenance work and failed to take responsible, reasonable action that a reasonable maintenance company would do under the circumstances, including failing to perform routine work, address concerns of Plaintiffs or warn of dangerous conditions."  *See* Complaint for Damages, attached hereto as Exhibit "B" (¶50).  The only other specific allegation the Plaintiffs  make against Madison Services is that it negligently breached its "duty to provide maintenance services for the Plaintiffs' trailer."  *See* Exhibit "B" (¶¶97-98).  As is evident in the facts set forth below, Madison Services while performing this maintenance work for FEMA, was acting as a federal officer on behalf of FEMA.  Accordingly, removal of this action was proper under 28 U.S.C. § 1442, which allows removal of any civil action against a federal officer.

The purpose of the federal officer removal statute is to provide those acting as federal officers with the means to remove a case where they may have a defense arising out of their "official duties," so that the validity of any asserted official immunity defense can be decided by a federal court.  *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398, 400 (5th Cir. 1998) (*quoting Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)).  This removal statute is not to be interpreted narrowly.  *Winters*, 149 F.3d at 398.  A defendant removing a complaint on this basis need only demonstrate that it has a "colorable" claim to the government contractor defense, *Mesa v. California*, 489 U.S. 121, 133 (1989), and that the defense is "plausible."  *Magnin v. Teldyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996).

3

To qualify as a federal officer for removal purposes, Madison Services need only show that "(1) it is a 'person', (2) asserting a colorable claim to a federal defense, and (3) there is a causal nexus between the claims asserted by the plaintiff and the acts performed under color of federal office." *Williams v. Todd Shipyards Corp.*, 1998 WL 526612, *2 (5th Cir. 1998). Furthermore, while deciding the merits of the Plaintiffs' Motion to Remand in the instant case, Madison Services is only required to show that its federal defense "is not without foundation and made in good faith." *Marley v. Elliot Turbomachinery Co.*, 545 F. Supp. 2d 1266, 1271 (S.D. Fla. 2008). Madison Services does not have to prove that it would ultimately be successful on this defense. *Winters*, 149 F.3d at 400. Finally, this Court, while deciding whether it has jurisdiction over the Plaintiffs' claims against Madison Services, must accept Madison Services' version of the case. *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 432 (1999).

The first requirement to qualify as a federal officer is easily met as Madison Services, a corporation, is considered a "person" under Section 1442. *See Winters*, 149 F.3d at 398. The other two requirements – that Madison Services assert a colorable claim for a federal defense and that there must be a causal nexus between that defense and the Plaintiffs' claims against it – are also easily satisfied. Madison Services performed maintenance work specified by FEMA, as directed by FEMA, on emergency housing units assigned to it by FEMA under a contract with FEMA for its disaster relief efforts. A copy of this contract is attached hereto as Exhibit "C." The Plaintiffs' claims for damages resulting from their alleged excessive exposure to formaldehyde in their emergency housing unit necessarily arose out of Madison Services' contract with FEMA to provide maintenance on emergency housing units.

One consideration in determining whether a federal officer has a colorable defense to a plaintiff's claim is whether the government had a "substantial interest" and exercised detailed

control over the actions of the federal officer. *Winters*, 149 F.3d at 398. This control, however, does not have to be all inclusive. Instead, "[t]he government contractor defense requires only that the government approve *reasonably* precise specifications." *Smith v. Xerox Corp.*, 866 F.2d 135, 138 (5th Cir. 1989) (emphasis in original). Such is the case with the contract at hand. As set forth below, FEMA substantially controlled the day-to-day work of Madison Services under the contract to the extent that Madison Services is entitled to assert the government contractor defense. *In re FEMA Trailer Formaldehyde Products Liability Litigation*, 2010 WL 1410674, *1 (E.D. La. March 26, 2010) (holding that defendants had presented sufficient evidence for the government contractor defense to reach the jury); *see also In Re: World Trade Center Disaster Site Litigation*, 521 F.3d 169, 197 (2nd Cir. 2008) (stating that "if the government merely accepted, without substantive review or enforcement authority, decisions made by an entity, that entity would not be entitled to derivative discretionary function immunity").

   FEMA's reasonably precise specifications for work to be performed by Madison Services, under FEMA's control, evaluation, and approval of Madison Services' performance of that work, are clearly shown in the following provisions in the contract between FEMA and Madison Services. In the contract, FEMA listed the jobs that Madison Services could perform and fixed prices for that work. *See* Exhibit "C" (¶¶B.3, B.4; G.6.A). For any work that cost more than $250.00 to perform under the contract, Madison Services had to obtain permission from FEMA to perform that work and receive a task order for that work. *See* Exhibit "C" (¶F.3; Attachment A, p.1; Attachment A, Ex. 1, ¶¶1.2, 1.3.9). In order to perform work that did not have a set price or that was not listed, Madison Services was required to submit a proposal for that work to FEMA. FEMA would then determine whether a task order should be issued and

whether Madison Services would be the contractor chosen to fulfill that particular task order. *See* Exhibit "C" (¶G.6.A).

FEMA also supervised, monitored, and inspected the work performed by Madison Services and reserved the right to "maintain representatives on the premises of the Contractor." *See* Exhibit "C" (¶E.4). Under the contract, FEMA had the right to have its Contracting Officer, Project Monitor, and/or Contracting Officer's Technical Representative perform quality assurance checks and surveillance of the work performed by Madison Services. *See* Exhibit "C" (¶E.6.). The Contracting Officer's Technical Representative was "responsible for monitoring [Madison Services'] performance on a task order basis," and the Contracting Officer's Technical Representative, along with the Project Monitor, was to "provide overall technical management, and monitor contractor performance." *See* Exhibit "C" (Attachment B, p.3). The contract provided that the work performed by Madison Services would "be subject to the surveillance and written technical direction of the Contracting Officer's Technical Representative." *See* Exhibit "C" (¶G.5(a)). "Technical direction is defined [in the contract] as a directive to the Contractor which approves approaches, solutions, designs, or refinements; fills in details or otherwise completes the general description of work of documentation items; shifts emphasis among work areas or tasks; or otherwise furnishes guidance to the Contractor." *See* Exhibit "C" (¶G.5(a)). Madison Services was required to perform the technical directions provided by the Contracting Officer's Technical Representative promptly. *See* Exhibit "C" (¶E.6(d)).

The contract also provided that a FEMA Project Monitor would be designated for each task order, and that this monitor would be "responsible for individual project management and task assignment administration in the field." *See* Exhibit "C" (¶G.4). If FEMA desired, the Project Monitor's responsibility could "involve daily oversight to ensure work [was] performed

in accordance with the Task Order terms and conditions and the Performance Work Statement." *See* Exhibit "C" (¶G.4).  The Project Monitor was to provide Madison Services with any "technical guidance" it needed.  *See* Exhibit "C" (¶E.6).  The contract also provided that if Madison Services was "unclear <u>as to the direction provided</u>" by the Project Monitor, it could seek guidance from the Contracting Officer or the Contracting Officer's Technical Representative.  *See* Exhibit "C" (¶E.6) (emphasis added).  In the contract, FEMA's Project Monitor was given the duty of documenting Madison Services' "progress and performance," and he was to notify the Contracting Officer's Technical Representative of any problems or issues. *See* Exhibit "C" (Attachment B, p.3).  Under the contract, Madison Services, the Project Monitor, and the Contracting Officer's Technical Representative were to discuss the performance quality of each task order, and the Project Monitor was to document the results. *See* Exhibit "C" (Attachment B, p.3).  If Madison Services did not agree with the Project Monitor's assessment, it could have the matter evaluated by the Contracting Officer's Technical Representative, and if a dispute still existed, by the Contracting Officer.  *See* Exhibit "C" (Attachment B, p.3).  The Contracting Officer made the final decision on the evaluation in dispute, and Madison Services could not appeal his decision.  *See* Exhibit "C" (Attachment B, p.3).

As shown by these specific provisions of the contract, FEMA did not "'merely accept[], without any substantive review or evaluation, decisions' made by" Madison Services. *Winters*, 149 F.3d at 401.  Instead, FEMA subjected Madison Services to periodic "supervisory reviews to determine [its] compliance with the contractual provisions," which clearly demonstrates the degree of control FEMA exercised over the work performed by Madison Services.  *Id.* at 400-401.

In addition to the previously discussed provisions, the contract contained specific provisions requiring Madison Services to report to FEMA, and setting forth FEMA's right to exercise control over the employees and work of Madison Services.  Under the contract, Madison Services was required to submit regular reports summarizing the work it performed in the form specified by FEMA.  *See* Exhibit "C" (¶F.6).   Further, FEMA required employees of Madison Services to go through screening and/or background checks performed by the Department of Homeland Security ("DHS").  *See* Exhibit "C" (¶H.8.a; Attachment G, pages 4-7).  At his discretion, FEMA's Contracting Officer could "direct the contractor to exclude" any employee he deemed unsuitable.  *See* Exhibit "C" (¶H.8.f).  Additionally, under the contract, Madison Services was required to pay its employees wages and benefits set by the U.S. Department of Labor.  *See* Exhibit "C" (¶H.10).  While working, Madison Services' employees were required under the contract to wear a visible identification badge provided by FEMA, which stated the name of their employer and other information specified by FEMA.  *See* Exhibit "C" (Attachment A, Ex. 1, ¶5.4).  Finally, FEMA controlled and set the time line for payment of Madison Services for its work.  *See* Exhibit "C" (¶I.12(a)).  Additionally, FEMA determined the method of payment, which was by electronic funds transfer unless FEMA issued a waiver.  *See* Exhibit "C" (¶I.12(a)(3)(ix).  FEMA also determined whether it owed Madison Services interest for any late payment made by FEMA, how interest would be calculated, when interest was due, and when interest would be paid.  *See* Exhibit "C" (¶I.12(a)(4)-(7)).

Based on the clear language and/or provisions of Madison Services' contract with FEMA, FEMA controlled the day-to-day operations of Madison Services, including the making of any decisions as to what work was to be performed under the contract and what price would be paid to Madison Services for that work.  FEMA also supervised, monitored, inspected, and

8

evaluated the work Madison Services performed.  Moreover, FEMA provided technical assistance and guidance on the performance of each task order.  Madison Services was required to have any maintenance work or parts costing more than $250.00 approved in advance by FEMA, and Madison Services was never guaranteed to be the contractor assigned to perform that work.  Additionally, FEMA investigated and retained final approval of Madison Services' employees and dictated what wages Madison Services could pay them.  Under the contract between Madison Services and FEMA, it is clear that FEMA had a substantial interest in what work was performed by Madison Services while aiding FEMA's disaster relief efforts; that FEMA provided reasonably precise specifications for that work; and that FEMA exercised control over this work, evaluated this work, and had to approve this work.

An application of federal law to the terms and conditions of the contract as discussed above clearly reveals that Madison Services functioned as an employee or agent of FEMA while performing its duties under the contract rather than an independent contractor.  In *Linkous v. United States*, 142 F.3d 271, 275-276 (5th Cir. 1998), the Court held that although the government's control of a government contractor is a critical factor in identifying a government employee, control is not the only factor a court should examine while making this determination. Instead, the Court, citing *Rodriguez v. Sarabyn,* 129 F.3d 760, 765 (5th Cir. 1997), held that the following factors listed in § 220 of the RESTATEMENT (SECOND) OF AGENCY (1958) should also be applied while determining whether a person is a governmental employee or independent contractor:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;

(c)     the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d)     the skill required in the particular occupation;

(e)     whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f)     the length of time for which the person is employed;

(g)     the method of payment, whether by the time or by the job;

(h)     whether or not the work is a part of the regular business of the employer;

(i)     whether or not the parties believe they are creating the relation of master and servant; and

(j)     whether the principal is or is not in business.

*Linkous*, 142 F.3d at 276 (citing RESTATEMENT (SECOND) OF AGENCY § 220). The fact that a majority of these tests are satisfied while examining the contractual relationship between FEMA and Madison Services, shows that Madison Services was more akin to an employee or agent of FEMA rather than an independent contractor. As such, Madison Services has a colorable claim to a federal officer defense in this action.

A causal nexus exists between the level of control FEMA had over any decision by Madison Services to perform the kind of maintenance that would have abated the alleged "dangerous condition" the Plaintiffs claim existed in their travel trailers and the Plaintiffs' alleged injuries.[1] Specifically, the Plaintiffs allege that Madison Services did not perform adequate maintenance services, thereby exposing them to "dangerous conditions." Any maintenance work performed by Madison Services that would have abated this alleged dangerous condition, *i.e.*, the high levels of formaldehyde in their travel trailer, would have, at a minimum, required a complete refurbishing of their trailer to remove the particle board,

---

[1] Madison Services has denied in its Answer and Affirmative Defenses that any such dangerous condition existed.

fiberboard, plywood, glues and adhesives used to construct their trailer and that the Plaintiffs alleged were the source of the formaldehyde.

Under Madison Services' contract with FEMA, Madison Services had absolutely no authority to decide whether a travel trailer should be refurbished. Instead, this decision was delegated solely to FEMA. Specifically, only FEMA could decide when this kind of maintenance work should be performed and where each stage of the refurbishing took place. *See* Exhibit "C" (Attachment A, Section II, Cleaning, Sanitation & Reconditioning). This level of control by FEMA over Madison Services' performing this kind of maintenance work is also evidenced by language in the "Maintenance Areas of Responsibility" list found in Exhibit 1 to Attachment A to the contract, which states that Madison Services' maintenance duties are limited to performing plumbing work, electrical work, heating and cooling work; replacing component parts such as light bulbs, stoppers, drain baskets, and door keys; and maintaining the entrance and exit doors of the trailer as well as its windows and screens. *See* Exhibit "C," (Ex. 1, Attachment A). Finally, under the contract between FEMA and Madison Services, Madison Services could not replace any item involved in the refurbishing of a travel trailer unless the COTR, "in coordination with the program office," inspected the trailer and gave his express approval of the replacement. See Exhibit "C," (Ex. 1, Attachment A, 3.1.13 - 3.1.13.3).

FEMA's control over Madison Services in this regard is clearly sufficient to satisfy the "causal nexus" test set forth in *Winters*, 149 F.3d at 398, 400. Accordingly, Madison Services has sufficiently demonstrated that it has a colorable government contractor immunity defense to the Plaintiffs' allegations against it in their Complaint for Damages and that a causal nexus exists between that defense and the injuries claimed by the Plaintiffs. Removal of this action, therefore, was proper under 28 U.S.C. § 1442.

II.     **This Court has jurisdiction under the Class Action Fairness Act.**

Finally, this Court has diversity jurisdiction over this action because it constitutes a mass action, which is removable under the Class Action Fairness Act of 28 U.S.C. § 1332(d).  *See* 28 U.S.C. § 1332(d)(11)(A).  This statute defines a "mass action" as an action which 100 or more persons seek monetary relief on claims which "involve common questions of law or fact."  *See* 28 U.S.C. § 1332(d)(11)(B)(I); *Louisiana v. Allstate Ins. Co.*, 536 F.3d 418, 424 (5th Cir. 2008). The "CAFA contains a basic jurisdictional test for removal, which requires the removing defendant to prove minimal diversity and an aggregated amount in controversy of $5,000,000 or more."  *Preston v. Tenet Healthsystem Mem. Med. Ctr., Inc.*, 485 F.3d 804, 810 (5th Cir. 2007).

In the present complaint, the Plaintiffs assert that they were exposed to excessive amounts of formaldehyde while residing in a travel trailer provided by FEMA following Hurricane Katrina.  *See* Complaint for Damages, Exhibit "B," (¶¶20-27).  The Plaintiffs' claims arise from the same facts which are currently before this Court in MDL No. 1873.  This litigation contains over 5,000 actions which were either filed in the MDL or transferred there from district courts in Louisiana, Alabama, and Mississippi.  *See* Joint Report No. 20 of Liaison and Government Counsel (Rec. Doc. 18458), *see also generally In Re: FEMA Trailer Formaldehyde Product Liability Litigation*, 2:07-md-0873-KDE-ALC, dated May 12, 2010; *Statistical Analysis of Multidistrict Litigation 2009*, U. S. Judicial Panel on Multidistrict Litigation, October 2009, page 23.  These 5,000 claims from at least three states against numerous manufacturers and contractors from states all over the country easily meet the minimal diversity requirements for removal under the CAFA.  To date, more than 21,000 Plaintiff Fact Sheets have been produced by Plaintiffs.  *See* Joint Report No. 20 of Liaison and Government Counsel (Rec. Doc. 18458).

12

The large number of claims and plaintiffs involved no doubt exceed $5,000,000 in aggregate.[2] As this litigation continues to grow exponentially, there will ultimately be thousands more plaintiffs with pending actions in this litigation.  Thus, removal was proper under 28 U.S.C. § 1332(d) as the Plaintiffs' claims meet the jurisdictional test for removal under the CAFA of "minimal diversity and an aggregated amount in controversy of $5,000,000 or more." *Preston*, 485 F.3d at 810.

Moreover, "Congress enacted CAFA to expand federal jurisdiction over interstate class action lawsuits of national interest." *Preston,* 485 F.3d at 810.  This case clearly asserts claims that "involve matters of national or interstate interest." *See* 28 U.S.C. § 1332(d)(3)(A).  No doubt FEMA's provision of thousands of RVs, trailers, and travel trailers to the victims of Hurricane Katrina on the coastal areas of Louisiana, Mississippi, and Alabama, which these thousands of plaintiffs allege contained dangerous levels of formaldehyde, involves a matter of both national and interstate interest.  Accordingly, removal of this action was proper under the Class Action Fairness Act, and this Court should retain jurisdiction over this matter.

WHEREFORE, PREMISES CONSIDERED, the Defendant, Madison Services, respectfully requests this Court enter an order denying the Plaintiffs' Motion to Remand as removal was proper under the Federal Officer removal statute, 28 U.S.C. § 1442, and the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Madison Services prays for such further relief as this Court may deem appropriate in the premises.

---

[2] If each one of the 21,000 plus plaintiffs with actions currently pending in the FEMA Trailer Formaldehyde Product Liability Litigation MDL sought only $2,000 in damages, their claims would in aggregate exceed $42 million.

Respectfully, submitted, this the **7**th day of December, 2010.

Respectfully submitted,

**MADISON SERVICES, INC.**

BY:    _/s/ Rebecca B. Cowan_
          EDWARD J. CURRIE, JR. (MSB #5546)
          REBECCA C. COWAN (MSB #7735)
          KRISTI D. KENNEDY (MSB #10658)

OF COUNSEL:

CURRIE JOHNSON GRIFFIN GAINES & MYERS, P.A.
1044 River Oaks Drive
Jackson, MS  39232
Post Office Box 750
Jackson, MS 39205-0750
Telephone:  601/969-1010
Facsimile:  601/969-5120
ecurrie@curriejohnson.com
bcowan@curriejohnson.com
kkennedy@curriejohnson.com

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have this day electronically filed with the Clerk of the Court using the ECF system a true and correct copy of the foregoing document, who sent notification to such filing to the following:

Gerald Edward Meunier, Esq.
Gainsburgh, Benjamin, David, Meunier & Warshauer
gmeunier@gainsben.com

Andrew D. Weinstock, Esq.
Duplass, Zwain, Bourgeois, Morton, Pfister & Weinstock
andreww@duplass.com

SO CERTIFIED this the **7**th  day of December, 2010.

          _/s/ Rebecca B. Cowan_
          EDWARD J. CURRIE, JR. (MSB #5546)
          REBECCA C. COWAN (MSB#7735)
          KRISTI D. KENNEDY (MSB 10658)

14