# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRIAN CARPENTER and** | * | |
| **HOLLIE CARPENTER, Individually and** | * | |
| **on Behalf of Their Minor Children,** | * | |
| **JCH, JTC, and JDC** | * | |
| | * | |
| **Plaintiffs,** | * | |
| **vs.** | * | |
| | * | |
| **DOUG BOYD ENTERPRISES, LLC,** | * | |
| **GULF STREAM COACH, INC.** | * | **CIVIL DOCKET NO. 1:10cv424HS0-JMR** |
| **DUTCHMEN MANUFACTURING, INC.** | * | |
| **SUPERIOR HOMES, LLC, BECHTEL** | * | |
| **NATIONAL, INC., CH2M HILL** | * | |
| **CONSTRUCTORS, INC., AND JOHN** | * | |
| **DOE 1-50** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CH2M HILL CONSTRUCTORS, INC'S JOINDER IN
## AND NOTICE OF ADDITIONAL GROUNDS FOR REMOVAL

**NOW INTO COURT**, through undersigned counsel, comes defendant, CH2M HILL

Constructors, Inc. ("CH2M HILL"), and, with a full reservation of rights, files this Joinder in and

Notice of Additional Grounds for Removal and avers that, based on grounds asserted in the

Notice of Removal filed herein by Gulf Stream Coach, Inc. ("Gulf Stream") (Rec. Doc. 1) and

the additional grounds provided herein, this matter has properly been removed to this Honorable

Court.

- 1 -

Exhibit B

## JOINDER IN REMOVAL

Defendant CH2M HILL hereby joins and concurs in the removal of this action. Defendant CH2M HILL further suggests that this action is a potential tag-along action in *In re: FEMA Trailer Formaldehyde Products Liability Litigation*, No. 07-MD-1873, currently pending in the United States District Court for the Eastern District of Louisiana.

## NOTICE OF ADDITIONAL GROUNDS FOR REMOVAL

1.

On June 1, 2010, plaintiffs, through attorney Edward Gibson of the firm of Hawkins, Stracener & Gibson, PLLC, filed the original Complaint for Damages in this action, entitled *Brian Carpenter, et al. v. Doug Boyd Enterprises, LLC, et al.*, and bearing docket number 10-0337 ("the Complaint"), in the Circuit Court of Hancock County, State of Mississippi. On June 29, 2010, Plaintiffs filed their First Amended Complaint for Damages (the "Amended Complaint"). Copies of the Complaint and the Amended Complaint are attached hereto *in globo* as "Exhibit 1".

2.

For purposes of allotment, the Complaint and Amended Complaint arise solely from operative facts that are the subject of multidistrict litigation ongoing in the U.S. District Court for the Eastern District of Louisiana, entitled *In re: FEMA Trailer Formaldehyde Products Liability Litigation* and bearing MDL docket number 07-1873, which matter is pending before Judge Kurt

- 2 -

Engelhardt, Section N(5) [*In re: FEMA Trailer Formaldehyde Products Liability Litigation*, MDL No. 07-md-01873-KDE-ALC (E.D. La.)].

3.

CH2M HILL was served with the Complaint and the Amended Complaint on August 19, 2010. On August 25, 2010, defendant Gulf Stream timely and properly removed this matter to this Honorable Court in accordance with 28 U.S.C. §§ 1441 and 1446 based on diversity jurisdiction (28 U.S.C. § 1332) and the federal officer removal statute (28 U.S.C. § 1442(a)(1)). CH2M HILL avers that the Complaint and the Amended Complaint are properly removed based on these additional grounds.

**FEDERAL OFFICER REMOVAL STATUTE: CONTRACTOR DEFENDANT**

4.

This case is properly removed pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides an exception to the general rule requiring that all defendants join in the removal. *Akin v. Ashland Chemical*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Fowler v. Southern Bell Tel. & Tel. Co.*, 343 F.2d 150, 152 (5th Cir. 1965) ("it is settled that the filing of a petition for removal by a single federal officer removes the entire case to the federal court."); *Ely Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981) ("Since the federal officer is the only one entitled to remove under § 1442, he alone can remove without other defendants joining in the petition, and the entire case is removed to the federal court.").

- 3 -

5.

"[T]he right of removal under 28 U.S.C. § 1442 (a)(1) is made absolute whenever a suit in state court is for any act 'under color' of federal office, regardless of whether the suit could originally have been brought in federal court.  Federal jurisdiction rests on a 'federal interest in the matter' . . . ."  *Willingham v. Morgan*, 395 U.S. 402, 406, 89 S.Ct. 1813, 1816, 23 L.Ed.2d 396 (1969).

6.

Three requirements must be met to invoke the federal officer removal statute: (1) the defendant must be a "person" within the meaning of §1442(a)(1); (2) the defendant must have acted under color of federal authority when committing the acts that allegedly caused plaintiffs' injuries; and (3) the defendant must have a colorable federal defense.  *Williams v. Todd Shipyards Co.*, 154 F.3d 416 (5th Cir. 1998) (citing *Mesa v. California*, 489 U.S. 121, 129, 131, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)).  All three requirements exist in this instance.  *See, e.g.*, *Isaacson v. DOW Chemical Co.*, 517 F.3d 129 (2nd Cir. 2008) (finding removal proper under Section 1442(a)(1) where the defendant was a government contractor and its colorable federal defense was based upon the government contractor defense); *Miller v. Diamond Shamrock Chemical Co.*, 275 F.3d 414 (5th Cir. 2001) (same); *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 397-401 (5th Cir. 1998) (same); *Williams v. Todd Shipyards Corp.*, 154 F.3d 416 (5th Cir. 1998) (same).

7.

CH2M HILL qualifies as a "person" under Section 1442(a)(1).  *See Winters v. Diamond Shamrock Chemical Company*, 149 So. 2d 387, 398 (5th Cir. 1998) (examining the federal

- 4 -

officer removal statute and explaining that "corporate entities qualify as 'persons' under § 1442(a)(1)") (citation omitted).

8.

CH2M HILL was acting under color of federal authority when it is alleged to have performed the work that resulted in plaintiffs' alleged injuries. Indeed, plaintiffs' allegations against CH2M HILL arise out of CH2M HILL's contractual engagement by FEMA to perform "the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units." *See* Exh. "1," Amended Complaint ¶¶ 31-32. If CH2M HILL performed the transportation, installation, inspection, maintenance or repair of the FEMA trailer(s) involved in this litigation (the "Work"), then the Work, as alleged by plaintiffs, was performed pursuant to a federal contract between FEMA and CH2M HILL (the "Contract"), and CH2M HILL was acting under color of federal authority when performing under the Contract.

9.

Specifically, FEMA approved and provided reasonably precise specifications regarding installation of travel trailers, and mandated the installation method complained of at ¶¶ 37-40 of the Amended Complaint (*i.e.*, "blocking the unit"). Further, CH2M HILL performed this government work under FEMA's supervision and FEMA inspectors monitored and inspected the Work performed under the Contract. Moreover, FEMA maintained enforcement authority and substantively reviewed the Work performed by CH2M HILL. The Contract between CH2M HILL and FEMA is attached hereto as Exhibit "2."

- 5 -

10.

More specifically, the Contract provides detailed specifications, checklists, procedures and policies regarding delivery, installation, maintenance, and inspection of the FEMA trailers.[1] Exhibit 7 to Attachment A of the Contract, entitled "TRAVEL TRAILER INSTALLATION" provides precise direction as to the method of installing the units allegedly occupied by the plaintiffs, and these directions specifically mandate the "Blocking and Leveling" about which plaintiffs complain.[2]

11.

As a government contractor involved in the Hurricane Katrina disaster assistance provided by FEMA, CH2M HILL has available to it the government contractor defense.[3] *See In re World Trade Center Disaster Site Litigation*, 521 F.3d 169, 197 (2nd Cir. 2008) (applying the government contractor defense to "the disaster relief context due to the unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects, as evidenced by the Stafford Act.").

---

[1]     *See, e.g.,* Contract (Exh. "2") at Sections G.7 – Project Monitor; Section G.8 – Technical Direction and Surveillance; Section J, Attachment A – Performance Work Statement; and Section J, Attachment A – Performance Work Statement, Exhibits 1–15. Throughout performance of the Contract, FEMA modified and amended its policies and procedures with respect to the Work by contract modifications and verbal and written communication to CH2M HILL.

[2]     *See* Contract (Exh. "2"), Attachment A, Exhibit 7, Section 2.1.2 "Blocking and Leveling."

[3]     For purposes of removal, CH2M HILL is not required to prove success on its defense. *Mesa*, 489 U.S. at 133; *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) ("defense need only be plausible; its ultimate validity is not to be determined at the time of removal."); *Jamison v. Wiley*, 14 F.3d 222, 238 (4th Cir. 1994) ("defendant need not prove that he will actually prevail on his federal immunity defense in order to obtain removal"). Rather, CH2M HILL is only required to show a causal connection between the plaintiffs' claims and CH2M HILL's performance as a federal contractor; CH2M HILL has done so. *See Williams v. Todd Shipyards Co.*, 154 F.3d 416 (5th Cir. 1998).

- 6 -

**WHEREFORE,** defendant, CH2M HILL Constructors, Inc. consents to and joins in the Notice of Removal filed herein by Gulf Stream Coach, Inc., and provides this notice of additional grounds by which this matter has properly been removed to the United States District Court for the Southern District of Mississippi for further proceedings and disposition.

Respectfully submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

_____/s/_____
Sheryl Bey, Esq. (MSB No. #9484)
4268 I-55 North
Meadowbrook Office Park
P. O. Box 14167
Jackson, Mississippi 39236
Telephone: (601) 351-2400
Facsimile: (601) 351-2424

**ATTORNEYS FOR
CH2M HILL CONSTRUCTORS, INC.**

WMB 48344 v1
2900305-000004 08/27/2010

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

the ECF System which sent notification of such filing to the following:

John Hawkins, Esq.
Hawkins, Stracener & Gibson, PLLC
john@hsglawfirm.net
Counsel for Plaintiffs

William Trey Jones, III
Brunini, Grantham, Grower & Hewes, PLLC
tjones@brunini.com
Counsel for Gulf Stream, Inc.

Taylor B. McNeel
Brunini, Grantham, Grower & Hewes, PLLC
tmcneel@brunini.com
Counsel for Gulf Stream, Inc.

David P. Curtis
Frilot L.L.C.
dcurtis@frilot.com
Counsel for Bechtel National, Inc.

I further certify that I have mailed by United States Postal Service the document to the

following non-ECF participants:

Edward Gibson, Esq.
Rose M. Hurder, Esq.
Hawkins, Stracener & Gibson, PLLC
153 Main Street
Bay St. Louis, M 39520
Counsel for Plaintiffs

WMB 48344 v1
2900305-000004 08/27/2010

Ryan E. Johnson, Esq.
Jones Walker
Four United Plaza
8555 United Plaza Blvd.
Baton Rouge, LA 70809
Counsel for Dutchmen Manufacturing, Inc.

This 7th day of September, 2010.

_____/s/_____
Sheryl Bey

WMB 48344 v1
2900305-000004 08/27/2010

## IN THE CIRCUIT COURT OF HANCOCK COUNTY, MISSISSIPPI

**BRIAN CARPENTER, et al**                        **PLAINTIFFS**

**V.**                                  **DOCKET NO: 10-0337**

**DOUG BOYD ENTERPRISES, LLC, GULF STREAM COACH, INC., DUTCHMEN MANUFACTURING, INC., SUPERIOR HOMES, LLC, BECHTEL NATIONAL, INC., CH2M HILL CONSTRUCTORS, INC., and JOHN DOE 1-50**        **DEFENDANTS**

## SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF HANCOCK

TO:     CH2M Hill Constructors, Inc.
        Through its agent for Service of Process
        C T Corporation System
        645 Lakeland East Dr., Ste. 101
        Flowood, MS 39232

        Or Wherever It May Be Found

THE COMPLAINT AND AMENDED COMPLAINT WHICH ARE ATTACHED TO THIS SUMMONS ARE IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

You are required to mail or hand-deliver a copy of a written response to the Complaint to Edward Gibson, the attorney for the Plaintiff whose address is 153 Main Street, Bay Saint Louis, Mississippi 39520. Your response must be mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and seal of said Court, this the 29 day of July, 2010.

       (SEAL)              **HANCOCK COUNTY CIRCUIT CLERK**

BY: _____

**EXHIBIT 1**

# IN THE CIRCUIT COURT OF HANCOCK COUNTY, MISSISSIPPI

**BRIAN CARPENTER and HOLLIE CARPENTER,**
Individually and on Behalf of Their Minor Children
JCH, JTC and JDC

**PLAINTIFFS**

**V.**

DOCKET NO: 10-0337

FILED

**DOUG BOYD ENTERPRISES, LLC,**
**GULF STREAM COACH, INC., DUTCHMEN**
**MANUFACTURING, INC., SUPERIOR HOMES, LLC,**
**BECHTEL NATIONAL, INC., CH2M HILL**
**CONSTRUCTORS, INC., and JOHN DOE 1-50**

JUN 01 2010

KAREN LADNER RUHR
CIRCUIT CLERK HANCOCK CO **DEFENDANTS**
BY _____ D.C.

## COMPLAINT FOR DAMAGES
(jury trial requested)

This Complaint of certain persons of the full age of majority, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Plaintiffs"), who are all named in the annexed listing of the Plaintiffs, respectfully represents through undersigned counsel that:

## I. PARTIES

1.      Plaintiffs, HOLLIE CARPENTER and BRIAN CARPENTER, along with their minor children, are resident citizens of Bay St. Louis, Hancock County, Mississippi.

2.      Defendant DOUG BOYD ENTERPRISES, LLC, (hereinafter DBE) is a North Carolina licensed to do business in Mississippi. Defendant DOUG BOYD ENTERPRISES, LLC was the maintenance company required to perform maintenance for the trailer in question.

3.      GULF STREAM COACH, INC. (hereinafter Gulf Stream) is upon information and belief, an entity incorporated in the state of Indiana, which conducts business in the State of Mississippi, and which manufactured and supplied FEMA trailers or housing units as defined below

pursuant to contracts with FEMA for use in the State of Mississippi.

4.     DUTCHMEN MANUFACTURING, INC. (hereinafter Dutchmen) is upon information and belief, an entity incorporated in the state of Indiana, which conducts business in the State of Mississippi, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Mississippi.

5.     SUPERIOR HOMES, LLC (hereinafter Superior) is upon information and belief, an entity incorporated in the state of Alabama, which conducts business in the State of Mississippi, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Mississippi.

6.     BECHTEL NATIONAL INC, (hereinafter "Bechtel"), a Nevada corporation with its principal place of business in California, licensed to do business in the State of Mississippi and in good standing, received a No-Bid contract from FEMA and was tasked with, among other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of Hurricane Katrina, including Hollie Carpenter and Brian Carpenter, Individually and on behalf of their minor children JCH, JDC and JTC.

7.     CH2M HILL CONSTRUCTORS, INC. (hereinafter "CH2M"), a Delaware corporation with its principal place of business in Colorado, licensed to do business in the State of Mississippi and in good standing, received a No-Bid contract from FEMA and was tasked with, among other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided

**COMPLAINT FOR DAMAGES**
Page 2 of 26

by FEMA to the victims of Hurricane Katrina, including Hollie Carpenter and Brian Carpenter, Individually and on behalf of their minor children JCH, JTC, and JDC.

8.    Defendants John Does 1-10 are those persons, agents, employees, and/or representatives of Defendants whose conduct as described herein caused or contributed to the damages of the Plaintiffs, all of whose names and legal identities are unknown to the Plaintiffs at this time, but will be substituted by amendment when ascertained, individually and jointly.

### III. JURISDICTION AND VENUE

9.    GULF STREAM COACH, INC., is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

10.   SUPERIOR HOMES, LLC, is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

11.   DUTCHMEN MANUFACTURING, INC, is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

12. BECHTEL NATIONAL, INC. is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi, has committed torts in whole or in part within the State of Mississippi and the Defendant has such contacts with the State that the exercise of personal jurisdiction comports with due process and traditional notions of fair play. BECHTEL NATIONAL, INC., at all relevant times hereto engaged in commerce and committed torts in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

13. CH2M HILL CONSTRUCTORS, INC. is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi, has committed torts in whole or in part within the State of Mississippi and the Defendant has such contacts with the State that the exercise of personal jurisdiction comports with due process and traditional notions of fair play. CH2M HILL CONSTRUCTORS, INC. at all relevant times hereto engaged in commerce and committed torts in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

14. Venue is proper in Hancock County because the acts and omission complained of occurred there and the Plaintiffs reside there.

### IV. FACTS AND GENERAL ALLEGATIONS

15. The plaintiffs resided in a FEMA travel trailer after the landfall of Hurricane Katrina in August of 2005.

16. Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by

state transportation authorities rather than housing authorities. *Id. See* CENTER FOR DISEASE CONTROL AND PREVENTION, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

17.     The Plaintiffs' residence was rendered unhabitable following Hurricanes Katrina, leaving them in need of housing assistance.

18.     FEMA contracted with Defendants Gulf Stream, Dutchmen and Superior Homes to purchase thousands of the housing units, primarily travel trailers, for provision to individuals, including plaintiffs, as temporary housing.

19.     On information and belief, Defendants Gulf Stream, Dutchmen and Superior Homes expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by Plaintiffs containing higher than normal levels of formaldehyde.

20.     On information and belief, the travel trailer in question was manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

21.     Plaintiffs submit that the travel trailer at issue, whether manufactured prior to the hurricanes or later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Defendants Gulf Stream, Dutchmen and Superior Homes' use of certain materials in their construction, and/or posed the threat of producing dangerous levels of

formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that Defendants Gulf Stream, Dutchmen and Superior Homes failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

22.  Plaintiffs submit that Defendants Gulf Stream, Dutchmen and Superior Homes ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to Defendants Gulf Stream's, Dutchmen's and Superior Homes' use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell Defendants Gulf Stream's, Dutchmen's and Superior Homes' products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

23.  Plaintiffs spent significant time in the FEMA-provided trailers manufactured by Defendants Gulf Stream, Dutchmen and Superior Homes. As a result, the Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

24.  Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

IMPORTANT HEALTH NOTICE

**COMPLAINT FOR DAMAGES**
Page 6 of 26

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

25.     According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

26.     Most published exposure standards for formaldehyde address protective levels for the

adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

27.     HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

28.     Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. §206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |

| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| --- | --- |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

29. Defendants Gulf Stream, Dutchmen and Superior Homes knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

30. In order to implement and manage its disaster response obligation and temporary housing obligations, FEMA engaged Defendants Bechtel and CH2M with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of Defendants Bechtel and CH2M to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

31. Defendants Bechtel and CH2M were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

32. Under the terms of their contracts, Defendants Bechtel and CH2M were obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and

indicated by the manufacturers of same. Further, under their No-Bid contracts with FEMA, Defendants Bechtel and CH2M were obligated to advise and instruct FEMA regarding the implementation of those contracts. Defendants Bechtel and CH2M failed to properly fulfill either of these tasks.

33.     Defendants Bechtel and CH2M contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Defendants Bechtel and CH2M were tasked with operating. These new areas included staging areas to be managed and maintained as assigned to Defendants Bechtel and CH2M or individual locations and addresses where Defendants Bechtel and CH2M assigned that temporary housing unit would have obligations to manage and maintain it.

34.     To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Defendants Bechtel and CH2M entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under its individual contracts with FEMA.

35.     Defendants Bechtel and CH2M were tasked under its contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, among other things, ensuring there would be adequate water, sewage, electricity, etc. Defendants Bechtel and CH2M knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

36.     Once the temporary housing unit(s) occupied by the Plaintiff(s) were transported and delivered to a particular location, Defendants Bechtel and CH2M had the responsibility for installing that temporary housing unit. Defendants Bechtel and CH2M installed the temporary housing units

by "blocking" the unit. This meant raising the Plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

37. By blocking the temporary housing unit(s) of Plaintiffs, Defendants Bechtel and CH2M created stress and flexing on the frames of the unit as it was not designed to be lifted off of the wheel base. In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

38. The stress and flexing of temporary housing units' frames caused by Defendants Bechtel and CH2M "blocking" them with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

39. The temporary housing unit(s) occupied by the Plaintiff(s) which were provided by FEMA were for the most part travel trailers. The travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation. By installing the travel trailers on concrete blocks for extended occupancy, Defendants Bechtel and CH2M knowingly and intentionally modified the design and the actual use of these units occupied by the Plaintiff(s) by converting them into a temporary housing unit to be used as a residence for long term occupancy in some instances exceeding 18 months.

40. Defendants Bechtel and CH2M failed to consult with the manufacturers of the temporary housing units, including Defendants Gulf Stream, Dutchmen and Superior Homes , with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long

term residence and occupation. Defendants Bechtel and CH2M took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

41.     Once Defendants Bechtel and CH2M had completed the transportation, delivery and installation of the temporary housing unit(s) occupied by the Plaintiff(s), Defendants Bechtel and CH2M were tasked with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiff(s). Upon information and belief, Defendants Bechtel and CH2M failed to adequately inspect the temporary housing unit occupied by the Plaintiff(s) to ensure that the units were safe and suitable for their intended use – the long-term occupancy by individuals and families displaced by Hurricane Katrina. This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

42.     In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the Plaintiff(s) provided in response to Hurricane Katrina were also managed, maintained and repaired by Defendants Bechtel and CH2M, or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, Defendants Bechtel and CH2M failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the Plaintiff(s).

43.     Parallel to its duty to manage, maintain and repair each temporary housing unit, Defendants Bechtel and CH2M failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the Plaintiff-occupant(s) of the temporary housing units

to various adverse health effects caused by exposure to elevated levels of formaldehyde.

44.     Following the Plaintiffs' occupancy of each temporary housing unit, Defendants Bechtel and CH2M were tasked with its de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Defendants Bechtel and CH2M failed to identify the unsuitability of the temporary housing units for long-term occupancy.

45.     In addition to de-installation of the temporary housing units, Defendants Bechtel and CH2M were tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to Hurricane Katrina or for use in the future. By restoring and refurbishing these temporary housing units, Defendants Bechtel and CH2M warranted that the units were fit for their intended use, long term occupancy in response to disaster related displacement. By restoring and refurbishing these temporary housing units, Defendants Bechtel and CH2M created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units. Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by Hurricane Katrina, and who were then directly exposed to hazardous levels of formaldehyde.

46.     Defendants Bechtel and CH2M , at every stage of their involvement, failed to warn the Plaintiff-occupant(s) of each temporary housing unit of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of

**COMPLAINT FOR DAMAGES**
Page 13 of 26

childhood asthma and the onset of adult asthma in some of the Plaintiffs.

47.     Through its actions and omissions, Defendants Bechtel and CH2M created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Defendants Bechtel and CH2M negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

48.     Defendants Bechtel and CH2M failed to warn the occupants of temporary housing unit(s) of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

49.     By restoring and refurbishing the trailer for future habitation, Defendants Bechtel and CH2M improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

50.     Finally, despite these failures, Defendants Bechtel and CH2M received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiff-occupant(s) of the temporary housing units who simply had nowhere else to go and who were relying on defendants to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

51.     Defendant DBE was required to perform maintenance work on Plaintiff's unit.

Defendant DBE negligently failed or refused to provide adequate maintenance work and failed to take responsible, reasonable action that a reasonable maintenance company would do under the circumstances, including failing to perform routine work, address concerns of Plaintiffs or warn of dangerous conditions.

52.    CDC testing revealed the following important findings regarding FEMA trailers: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments.

53.    The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit;

**COMPLAINT FOR DAMAGES**
Page 15 of 26

and, (4) establish available construction practices which could assure safe and healthy conditions.

54.     The conduct of defendants in violation of Mississippi law caused the minor Plaintiffs damages, medical bills incurred on behalf of JCH, JDC and JTC as well as physical and emotional pain and suffering due chronic sinusitis, bronchitis, upper respiratory tract infections, croup, pharyngitis, shortness of breath, wheezing, abdominal pain, vomiting, nausea, rashes and headaches.

## COUNT I

### CAUSES OF ACTION AGAINST MANUFACTURING DEFENDANTS GULF STREAM, DUTCHMEN AND SUPERIOR HOMES MISS. CODE ANN. §11-1-63

55.     Defendants Gulf Stream, Dutchmen and Superior Homes, at the time that each subject housing unit left their control, knew or should have known that each product was defective because it deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

56.     Defendants Gulf Stream, Dutchmen and Superior Homes knew or should have known that the defective condition rendered each subject housing unit unreasonably dangerous to the user or consumer or others; and

57.      The defective and unreasonably dangerous condition of each product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by Plaintiffs.

58.     At the time the subject housing units left the control of Defendants Gulf Stream, Dutchmen and/or Superior Homes, each subject housing unit did not contain properly selected prepared and installed components.

**COMPLAINT FOR DAMAGES**
Page 16 of 26

59.     At all relative times, the Plaintiffs lacked actual or constructive knowledge of the defective condition of their respective housing units and that each defective product was inconsistent with their safety.

60.     At all relevant times, the Plaintiffs did not appreciate the danger of their housing unit's defective condition.

61.     At all relevant times, the Plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

62.     Each subject housing unit in question failed to function as expected as a result of their design characteristics.

63.     An alternative design existed at the time that each housing unit left the control of Defendants Gulf Stream, Dutchmen and/or Superior Homes which would have not impaired the product's usefulness or desirability.

64.     The alternative design would have to a reasonable probability prevented the toxic exposure of Plaintiffs.

65.     The housing unit was defective because it failed to contain adequate warnings or instructions.

66.     The housing unit breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use this product.

## COUNT II

### STRICT LIABILITY AND NEGLIGENCE OF
### DEFENDANTS GULF STREAM, DUTCHMEN AND SUPERIOR HOMES

**COMPLAINT FOR DAMAGES**
Page 17 of 26

67.     Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

68.     Defendants Gulf Stream, Dutchmen and Superior Homes knew or should have known that the subject housing units were defective and unreasonably dangerous to the user or consumer or others because of the excessive formaldehyde present in the housing units, which condition was foreseeable. Notwithstanding, Defendants Gulf Stream, Dutchmen and Superior Homes allowed the defective and dangerous housing units to be placed into the stream of commerce and to reach Plaintiffs without substantial change.

69.     Defendants Gulf Stream, Dutchmen and Superior Homes failed to warn Plaintiffs of the excessive levels/emissions of formaldehyde and the hazards associated therewith. Defendants Gulf Stream, Dutchmen and Superior Homes owed Plaintiffs a non-delegable duty to warn of any dangerous and defective conditions under theories of negligence and strict liability.

70.     Defendants Gulf Stream, Dutchmen and Superior Homes were negligent in one or more of the following respects which proximately contributed to Plaintiffs' injuries:

a.      In manufacturing and distributing the subject housing units to Plaintiffs for use as temporary housing. which housing was defective and unreasonably dangerous for use due to the present of excessive formaldehyde levels/emissions;

b.      In failing to properly test/inspect the subject housing units to properly evaluate the presence and/or levels of formaldehyde under foreseeable conditions for extended periods of time;

c.      In manufacturing, advertising, marketing, distributing, and selling the subject housing units to third party users when they knew or should have known that the housing

units were defective and not suitable for use under foreseeable conditions;

d.    In failing to provide proper and adequate warnings, after the sales of the subject housing units, of the hazards associated with excessive levels/emissions of formaldehyde; and,

e.    In failing to properly hire, train, and supervise individuals to inspect materials used in the manufacture of the subject housing units to ensure that such materials/component parts did not emit excessive levels of formaldehyde.

## COUNT III

### NEGLIGENCE OF DEFENDANTS BECHTEL AND CH2M UNDER MISSISSIPPI LAW

71.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

72.    At all relevant times, Defendants Bechtel and CH2M were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Plaintiffs' injuries.

73.    Defendants Bechtel and CH2M owed a duty to Plaintiffs to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

74.    Defendants Bechtel and CH2M knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by each

Plaintiff, and that the temporary housing units would be used in the manner that each Plaintiff herein used the temporary housing units.

75.    Defendants Bechtel and CH2M breached their duty to Plaintiffs in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

    a.    Failing to sufficiently warn the Plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy; and

    b.    Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units;

76.    Defendants Bechtel's and CH2M's actions were the proximate cause of the increased exposure of formaldehyde to Plaintiffs.

77.    Defendants Bechtel and CH2M contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COUNT IV

### STRICT PRODUCTS LIABILITY OF DEFENDANT NO-BID CONTRACTOR DEFENDANTS BECHTEL AND CH2M UNDER MS CODE ANNOTATED §11-1-63

78.    Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

79.    Defendants Bechtel and CH2M , at the time that each subject housing unit left their control, knew or should have known that each product was defective because it deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications and/or manufacturers' warnings.

80.     Defendants Bechtel and CH2M, by installing the housing units on concrete blocks for extended occupancy, knowingly and intentionally modified the design and the actual use of the housing units.

81.     Defendants Bechtel and CH2M knew or should have known that the defective condition rendered each subject housing unit unreasonably dangerous to the user or consumer or others.

82.     The defective and unreasonably dangerous condition of each product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by Plaintiffs.

83.     At all relative times, the Plaintiffs lacked actual or constructive knowledge of the defective condition of their respective housing units and that each defective product was inconsistent with their safety.

84.     At all relevant times, the Plaintiffs did not appreciate the danger of their housing unit's defective condition.

85.     At all relevant times, the Plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

86.     Each subject housing unit in question failed to function as expected as a result of its design characteristics.

87.     An alternative design existed at the time that each housing unit left the control of the Manufacturer which would have not impaired the product's usefulness or desirability.

**COMPLAINT FOR DAMAGES**
Page 21 of 26

88.     The alternative design would have to a reasonable probability prevented the toxic exposure of each Plaintiff.

89.     Each product (housing unit) was defective because it failed to contain adequate warnings or instructions.

90.     Defendants Bechtel and CH2M failed to warn the Plaintiffs of the inherently dangerous properties for the foreseeable conditions of the subject housing units when used for long term occupancy.

91.     Defendants Bechtel and CH2M failed to warn the Plaintiffs of the presence of excessive levels of formaldehyde present in the housing units they installed, maintained and supervised.

92.     Furthermore, Defendants Bechtel and CH2M breached the implied warranty of habitability due to the Plaintiffs. The subject housing units were installed and maintained with an expectation of habitability and a clear implied warranty that such housing would be safe and free of any toxic dangers.

## COUNT V

### BREACH OF CONTRACT BY NO-BID CONTRACTOR DEFENDANTS BECHTEL AND CH2M

93.     All paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

94.     Defendants Bechtel and CH2M entered into contracts with FEMA, contracting to provide the following service, among others: "The contractor will do maintenance necessary to maintain the temporary housing units in a safe, working, and livable, condition."

95.     The Plaintiffs constitute third party beneficiaries to the subject contracts.  The contracts were entered into for the Plaintiffs' benefit as residents of the temporary housing units, or alternatively, the benefit to the Plaintiffs as residents of the temporary housing units was the direct result of the performance within the contemplation of the parties to the contract as demonstrated by the terms of the contracts.

96.     The Defendants breached said contract by failing to maintain the Plaintiffs' temporary housing units in a safe, working, and livable condition.  Defendant's acts and omissions, which constitute its failure to honor its contractual obligation, has caused damage to the Plaintiffs for which Plaintiffs are entitled to recover money damages.

## COUNT VI

### NEGLIGENCE CLAIMS AGAINST DEFENDANT DBE

97.     All paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

98.     Defendant DBE had a duty to provide maintenance services for the Plaintiffs' trailer.

99.     Defendant DBE negligently breached its duties to Plaintiffs thereby causing damages as alleged herein.

### COMPENSATORY DAMAGES

100.    In addition to and by way of summarizing the compensatory damages prayed for herein, Plaintiffs avers that the defendants, Gulf Stream, Dutchmen, Superior Homes, Bechtel,

**COMPLAINT FOR DAMAGES**
Page 23 of 26

CH2M and DBE, individually and/or jointly are responsible for all damages which Plaintiffs herein

has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled

herein, which damages include, but are not limited to, past and future physical injuries, past and

future mental and physical pain and suffering, past and future physical impairments and disability,

past and future reasonable and necessary medical expenses, past and future loss of earning capacity,

past and future loss of enjoyment and quality of life and other damages and injuries, loss of

consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of

displacement from a natural disaster, as well as, all general, special, incidental and consequential

damages as shall be proven at the time of trial.

## PUNITIVE / EXEMPLARY DAMAGES

101.    Pursuant to Miss. Code Ann. §11-1-65, inasmuch as the conduct of Gulf Stream,

Dutchmen, Superior Homes, Bechtel, CH2M, DBE and their servant/employees constitutes willful,

wanton, egregious and reckless disregard for the rights and safety of the Plaintiffs, an award of

punitive damages is appropriate and necessary under these facts.

## REQUEST FOR JURY TRIAL

Plaintiffs are entitled to and demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that Gulf Stream, Dutchmen, Superior Homes, Bechtel,

CH2M and DBE be served with a copy of this Complaint, and that, after due proceedings:

a.      There be a judgment herein in favor of Plaintiffs and against Defendants for all

        compensatory damages and punitive damages together will legal interest thereon

from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the Defendants are liable for all applicable damages and thereafter;

b.   There be specially included in the judgment in Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   A.   Past and future physical injuries,

   B.   Past and future mental and physical pain and suffering,

   C.   Past and future physical impairments and disability,

   D.   Past and future reasonable and necessary medical expenses,

   E.   Past and future loss of earning capacity,

   F.   Past and future loss of enjoyment and quality of life,

   G.   Compensable out-of-pocket expenses related to Defendants' wrongdoing,

   H.   Costs of court,

   I.   Medical monitoring, and

   J.   Punitive damages,

c.   All other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted, this the 1st day of May, 2010.

> **PLAINTIFFS HOLLIE CARPENTER and BRIAN CARPENTER, Individually and on Behalf of their minor children, JCH, JDC and JTC**
>
> By: _____
> JOHN F. HAWKINS
> EDWARD GIBSON MSB 100640

**COMPLAINT FOR DAMAGES**
Page 25 of 26

EDWARD GIBSON
ROSE M. HURDER

**OF COUNSEL:**

John Hawkins, Esquire, (MS Bar No. 9556)
HAWKINS, STRACENER & GIBSON, PLLC
628 N. State Street
P.O. Box 24627
Jackson, Mississippi 39202
Ph. (601) 969-9692; Fx. (601) 914-3580

Edward Gibson, Esquire, (MS Bar No. 100640)
Rose M. Hurder, Esquire, (MS Bar No. 103040)
HAWKINS, STRACENER & GIBSON, PLLC
153 Main Street
Bay St. Louis, MS 39520
Ph.(228) 469-0785; Fx. (228) 467-4212

**COMPLAINT FOR DAMAGES**
Page 26 of 26

# IN THE CIRCUIT COURT OF HANCOCK COUNTY, MISSISSIPPI

FILED

JUN 2 9 2010

KAREN LADNER RUHR
CIRCUIT CLERK, HANCOCK CO.

**BRIAN CARPENTER, et al**                                              **PLAINTIFFS**

**V.**                                                        DOCKET NO: 10-0337

**DOUG BOYD ENTERPRISES, LLC,**
**GULF STREAM COACH, INC., DUTCHMEN**
**MANUFACTURING, INC., SUPERIOR HOMES, LLC,**
**BECHTEL NATIONAL, INC., CH2M HILL**
**CONSTRUCTORS, INC., and JOHN DOE 1-50**                          **DEFENDANTS**

---

### FIRST AMENDED COMPLAINT FOR DAMAGES
(jury trial requested)

---

COME NOW Plaintiffs in the above captioned matter, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Plaintiffs"), who are all named in the annexed listing of the Plaintiffs, and amend their complaint as a matter of course pursuant to Miss. Rule Civ. Proc. 15(a), as no responsive pleading has been served to date.

### I. PARTIES

1.      Plaintiffs, HOLLIE CARPENTER and BRIAN CARPENTER, along with their minor children, are resident citizens of Bay St. Louis, Hancock County, Mississippi.

2.      Defendant DOUG BOYD ENTERPRISES, LLC, (hereinafter DBE) is a North Carolina company licensed to do business in Mississippi. Defendant DOUG BOYD ENTERPRISES, LLC was the maintenance company required to perform maintenance for the trailer in question.

3.      GULF STREAM COACH, INC. (hereinafter Gulf Stream) is upon information and belief, an entity incorporated in the state of Indiana, which conducts business in the State of

Mississippi, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Mississippi.

4.      DUTCHMEN MANUFACTURING, INC. (hereinafter Dutchmen) is upon information and belief, an entity incorporated in the state of Indiana, which conducts business in the State of Mississippi, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Mississippi.

5.      SUPERIOR HOMES, LLC (hereinafter Superior) is upon information and belief, an entity incorporated in the state of Alabama, which conducts business in the State of Mississippi, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Mississippi.

6.      BECHTEL NATIONAL INC, (hereinafter "Bechtel"), a Nevada corporation with its principal place of business in California, licensed to do business in the State of Mississippi and in good standing, received a No-Bid contract from FEMA and was tasked with, among other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of Hurricane Katrina, including Hollie Carpenter and Brian Carpenter, Individually and on behalf of their minor children JCH, JDC and JTC.

7.      CH2M HILL CONSTRUCTORS, INC. (hereinafter "CH2M"), a Delaware corporation with its principal place of business in Colorado, licensed to do business in the State of Mississippi and in good standing, received a No-Bid contract from FEMA and was tasked with, among other things, performing significant functions in the transportation, delivery, installation,

**COMPLAINT FOR DAMAGES**
Page 2 of 27

maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of Hurricane Katrina, including Hollie Carpenter and Brian Carpenter, Individually and on behalf of their minor children JCH, JTC, and JDC.

8.      Defendants John Does 1-10 are those persons, agents, employees, and/or representatives of Defendants whose conduct as described herein caused or contributed to the damages of the Plaintiffs, all of whose names and legal identities are unknown to the Plaintiffs at this time, but will be substituted by amendment when ascertained, individually and jointly.

## II. JURISDICTION AND VENUE

9.      GULF STREAM COACH, INC., is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

10.     SUPERIOR HOMES, LLC, is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

11.     DUTCHMEN MANUFACTURING, INC, is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal

district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

12.     BECHTEL NATIONAL, INC. is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi, has committed torts in whole or in part within the State of Mississippi and the Defendant has such contacts with the State that the exercise of personal jurisdiction comports with due process and traditional notions of fair play. BECHTEL NATIONAL, INC., at all relevant times hereto engaged in commerce and committed torts in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

13.     CH2M HILL CONSTRUCTORS, INC. is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi, has committed torts in whole or in part within the State of Mississippi and the Defendant has such contacts with the State that the exercise of personal jurisdiction comports with due process and traditional notions of fair play. CH2M HILL CONSTRUCTORS, INC. at all relevant times hereto engaged in commerce and committed torts in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

14.     Venue is proper in Hancock County because the acts and omission complained of occurred there and the Plaintiffs reside there.

15.     The Plaintiffs specifically limit the damages sought. The Plaintiffs individually do not seek more than $75,000.00 exclusive of interests and costs. Furthermore, the Plaintiffs' claims are brought under state law and the Plaintiffs herein specifically do not bring any claims under the federal laws of the United States of America.

**COMPLAINT FOR DAMAGES**
Page 4 of 27

## IV. FACTS AND GENERAL ALLEGATIONS

16.    The plaintiffs resided in a FEMA travel trailer after the landfall of Hurricane Katrina in August of 2005.

17.    Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id. See* CENTER FOR DISEASE CONTROL AND PREVENTION, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

18.    The Plaintiffs' residence was rendered unhabitable following Hurricanes Katrina, leaving them in need of housing assistance.

19.    FEMA contracted with Defendants Gulf Stream, Dutchmen and Superior Homes to purchase thousands of the housing units, primarily travel trailers, for provision to individuals, including plaintiffs, as temporary housing.

20.    On information and belief, Defendants Gulf Stream, Dutchmen and Superior Homes expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by Plaintiffs containing higher than normal levels of formaldehyde.

21.     On information and belief, the travel trailer in question was manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

22.     Plaintiffs submit that the travel trailer at issue, whether manufactured prior to the hurricanes or later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Defendants Gulf Stream, Dutchmen and Superior Homes' use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that Defendants Gulf Stream, Dutchmen and Superior Homes failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

23.     Plaintiffs submit that Defendants Gulf Stream, Dutchmen and Superior Homes ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to Defendants Gulf Stream's, Dutchmen's and Superior Homes' use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell Defendants Gulf Stream's, Dutchmen's and Superior Homes' products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

24.     Plaintiffs spent significant time in the FEMA-provided trailers manufactured by Defendants Gulf Stream, Dutchmen and Superior Homes. As a result, the Plaintiffs unwittingly were

exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

25. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

## IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

**COMPLAINT FOR DAMAGES**
Page 7 of 27

26.     According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

27.     Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

28.     HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per

**COMPLAINT FOR DAMAGES**
Page 8 of 27

million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

29.     Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. §206.110(e).

| Agency | Standard |
|--------|----------|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

30.     Defendants Gulf Stream, Dutchmen and Superior Homes knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

31.     In order to implement and manage its disaster response obligation and temporary housing obligations, FEMA engaged Defendants Bechtel and CH2M with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and

knowledge of Defendants Bechtel and CH2M to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

32.     Defendants Bechtel and CH2M were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

33.     Under the terms of their contracts, Defendants Bechtel and CH2M were obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same.  Further, under their No-Bid contracts with FEMA, Defendants Bechtel and CH2M were obligated to advise and instruct FEMA regarding the implementation of those contracts.  Defendants Bechtel and CH2M failed to properly fulfill either of these tasks.

34.     Defendants Bechtel and CH2M contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Defendants Bechtel and CH2M were tasked with operating. These new areas included staging areas to be managed and maintained as assigned to Defendants Bechtel and CH2M or individual locations and addresses where Defendants Bechtel and CH2M assigned that temporary housing unit would have obligations to manage and maintain it.

**COMPLAINT FOR DAMAGES**
Page 10 of 27

35.     To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Defendants Bechtel and CH2M entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under its individual contracts with FEMA.

36.     Defendants Bechtel and CH2M were tasked under its contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, among other things, ensuring there would be adequate water, sewage, electricity, etc. Defendants Bechtel and CH2M knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

37.     Once the temporary housing unit(s) occupied by the Plaintiff(s) were transported and delivered to a particular location, Defendants Bechtel and CH2M had the responsibility for installing that temporary housing unit. Defendants Bechtel and CH2M installed the temporary housing units by "blocking" the unit. This meant raising the Plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

38.     By blocking the temporary housing unit(s) of Plaintiffs, Defendants Bechtel and CH2M created stress and flexing on the frames of the unit as it was not designed to be lifted off of the wheel base. In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

39.     The stress and flexing of temporary housing units' frames caused by Defendants Bechtel and CH2M "blocking" them with weight off of the wheels created distortion in the travel

trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

40.     The temporary housing unit(s) occupied by the Plaintiff(s) which were provided by FEMA were for the most part travel trailers. The travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation. By installing the travel trailers on concrete blocks for extended occupancy, Defendants Bechtel and CH2M knowingly and intentionally modified the design and the actual use of these units occupied by the Plaintiff(s) by converting them into a temporary housing unit to be used as a residence for long term occupancy in some instances exceeding 18 months.

41.     Defendants Bechtel and CH2M failed to consult with the manufacturers of the temporary housing units, including Defendants Gulf Stream, Dutchmen and Superior Homes , with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation. Defendants Bechtel and CH2M took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

42.     Once Defendants Bechtel and CH2M had completed the transportation, delivery and installation of the temporary housing unit(s) occupied by the Plaintiff(s), Defendants Bechtel and CH2M were tasked with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiff(s). Upon information and belief, Defendants Bechtel and CH2M failed to adequately inspect the temporary housing unit occupied by the Plaintiff(s) to ensure that the units were safe and suitable for their intended use – the long-term occupancy by individuals and families

displaced by Hurricane Katrina. This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

43.    In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the Plaintiff(s) provided in response to Hurricane Katrina were also managed, maintained and repaired by Defendants Bechtel and CH2M, or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, Defendants Bechtel and CH2M failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the Plaintiff(s).

44.    Parallel to its duty to manage, maintain and repair each temporary housing unit, Defendants Bechtel and CH2M failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the Plaintiff-occupant(s) of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldchyde.

45.    Following the Plaintiffs' occupancy of each temporary housing unit, Defendants Bechtel and CH2M were tasked with its de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Defendants Bechtel and CH2M failed to identify the unsuitability of the temporary housing units for long-term occupancy.

46.    In addition to de-installation of the temporary housing units, Defendants Bechtel and CH2M were tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to Hurricane Katrina or for use in the future. By restoring and refurbishing these

**COMPLAINT FOR DAMAGES**
Page 13 of 27

temporary housing units, Defendants Bechtel and CH2M warranted that the units were fit for their intended use, long term occupancy in response to disaster related displacement. By restoring and refurbishing these temporary housing units, Defendants Bechtel and CH2M created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units. Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by Hurricane Katrina, and who were then directly exposed to hazardous levels of formaldehyde.

47.     Defendants Bechtel and CH2M , at every stage of their involvement, failed to warn the Plaintiff-occupant(s) of each temporary housing unit of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the Plaintiffs.

48.     Through its actions and omissions, Defendants Bechtel and CH2M created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Defendants Bechtel and CH2M negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

**COMPLAINT FOR DAMAGES**
Page 14 of 27

49. Defendants Bechtel and CH2M failed to warn the occupants of temporary housing unit(s) of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

50. By restoring and refurbishing the trailer for future habitation, Defendants Bechtel and CH2M improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

51. Finally, despite these failures, Defendants Bechtel and CH2M received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiff-occupant(s) of the temporary housing units who simply had nowhere else to go and who were relying on defendants to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

52. Defendant DBE was required to perform maintenance work on Plaintiff's unit. Defendant DBE negligently failed or refused to provide adequate maintenance work and failed to take responsible, reasonable action that a reasonable maintenance company would do under the circumstances, including failing to perform routine work, address concerns of Plaintiffs or warn of dangerous conditions.

53. CDC testing revealed the following important findings regarding FEMA trailers: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants'

**COMPLAINT FOR DAMAGES**
Page 15 of 27

health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments.

54.     The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions.

55.     The conduct of defendants in violation of Mississippi law caused the minor Plaintiffs damages, medical bills incurred on behalf of JCH, JDC and JTC as well as physical and emotional pain and suffering due chronic sinusitis, bronchitis, upper respiratory tract infections, croup, pharyngitis, shortness of breath, wheezing, abdominal pain, vomiting, nausea, rashes and headaches.

**COUNT I**

## CAUSES OF ACTION AGAINST MANUFACTURING
## DEFENDANTS GULF STREAM, DUTCHMEN AND SUPERIOR HOMES
## MISS. CODE ANN. §11-1-63

56.     Defendants Gulf Stream, Dutchmen and Superior Homes, at the time that each subject housing unit left their control, knew or should have known that each product was defective because it deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

57.     Defendants Gulf Stream, Dutchmen and Superior Homes knew or should have known that the defective condition rendered each subject housing unit unreasonably dangerous to the user or consumer or others; and

58.     The defective and unreasonably dangerous condition of each product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by Plaintiffs.

59.     At the time the subject housing units left the control of Defendants Gulf Stream, Dutchmen and/or Superior Homes, each subject housing unit did not contain properly selected prepared and installed components.

60.     At all relative times, the Plaintiffs lacked actual or constructive knowledge of the defective condition of their respective housing units and that each defective product was inconsistent with their safety.

61.     At all relevant times, the Plaintiffs did not appreciate the danger of their housing unit's defective condition.

**COMPLAINT FOR DAMAGES**
Page 17 of 27

62.     At all relevant times, the Plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

63.     Each subject housing unit in question failed to function as expected as a result of their design characteristics.

64.     An alternative design existed at the time that each housing unit left the control of Defendants Gulf Stream, Dutchmen and/or Superior Homes which would have not impaired the product's usefulness or desirability.

65.     The alternative design would have to a reasonable probability prevented the toxic exposure of Plaintiffs.

66.     The housing unit was defective because it failed to contain adequate warnings or instructions.

67.     The housing unit breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use this product.

## COUNT II

## STRICT LIABILITY AND NEGLIGENCE OF
## DEFENDANTS GULF STREAM, DUTCHMEN AND SUPERIOR HOMES

68.     Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

69.     Defendants Gulf Stream, Dutchmen and Superior Homes knew or should have known that the subject housing units were defective and unreasonably dangerous to the user or consumer or others because of the excessive formaldehyde present in the housing units, which condition was foreseeable. Notwithstanding, Defendants Gulf Stream, Dutchmen and Superior Homes allowed the

defective and dangerous housing units to be placed into the stream of commerce and to reach Plaintiffs without substantial change.

70. Defendants Gulf Stream, Dutchmen and Superior Homes failed to warn Plaintiffs of the excessive levels/emissions of formaldehyde and the hazards associated therewith. Defendants Gulf Stream, Dutchmen and Superior Homes owed Plaintiffs a non-delegable duty to warn of any dangerous and defective conditions under theories of negligence and strict liability.

71. Defendants Gulf Stream, Dutchmen and Superior Homes were negligent in one or more of the following respects which proximately contributed to Plaintiffs' injuries:

    a.    In manufacturing and distributing the subject housing units to Plaintiffs for use as temporary housing, which housing was defective and unreasonably dangerous for use due to the present of excessive formaldehyde levels/emissions;

    b.    In failing to properly test/inspect the subject housing units to properly evaluate the presence and/or levels of formaldehyde under foreseeable conditions for extended periods of time;

    c.    In manufacturing, advertising, marketing, distributing, and selling the subject housing units to third party users when they knew or should have known that the housing units were defective and not suitable for use under foreseeable conditions;

    d.    In failing to provide proper and adequate warnings, after the sales of the subject housing units, of the hazards associated with excessive levels/emissions of formaldehyde; and,

**COMPLAINT FOR DAMAGES**
Page 19 of 27

e.   In failing to properly hire, train, and supervise individuals to inspect materials used in the manufacture of the subject housing units to ensure that such materials/component parts did not emit excessive levels of formaldehyde.

## COUNT III

## NEGLIGENCE OF DEFENDANTS BECHTEL AND CH2M UNDER MISSISSIPPI LAW

72.   Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

73.   At all relevant times, Defendants Bechtel and CH2M were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Plaintiffs' injuries.

74.   Defendants Bechtel and CH2M owed a duty to Plaintiffs to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

75.   Defendants Bechtel and CH2M knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by each Plaintiff, and that the temporary housing units would be used in the manner that each Plaintiff herein used the temporary housing units.

**COMPLAINT FOR DAMAGES**
Page 20 of 27

76. Defendants Bechtel and CH2M breached their duty to Plaintiffs in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

a. Failing to sufficiently warn the Plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy; and

b. Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units;

78. Defendants Bechtel's and CH2M's actions were the proximate cause of the increased exposure of formaldehyde to Plaintiffs.

79. Defendants Bechtel and CH2M contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

**COUNT IV**

**STRICT PRODUCTS LIABILITY OF DEFENDANT NO-BID CONTRACTOR DEFENDANTS BECHTEL AND CH2M UNDER MS CODE ANNOTATED §11-1-63**

80. Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

81. Defendants Bechtel and CH2M , at the time that each subject housing unit left their control, knew or should have known that each product was defective because it deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications and/or manufacturers' warnings.

**COMPLAINT FOR DAMAGES**
Page 21 of 27

82.     Defendants Bechtel and CH2M, by installing the housing units on concrete blocks for extended occupancy, knowingly and intentionally modified the design and the actual use of the housing units.

83.     Defendants Bechtel and CH2M knew or should have known that the defective condition rendered each subject housing unit unreasonably dangerous to the user or consumer or others.

84.     The defective and unreasonably dangerous condition of each product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by Plaintiffs.

85.     At all relative times, the Plaintiffs lacked actual or constructive knowledge of the defective condition of their respective housing units and that each defective product was inconsistent with their safety.

86.     At all relevant times, the Plaintiffs did not appreciate the danger of their housing unit's defective condition.

87.     At all relevant times, the Plaintiffs did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

88.     Each subject housing unit in question failed to function as expected as a result of its design characteristics.

89.     An alternative design existed at the time that each housing unit left the control of the Manufacturer which would have not impaired the product's usefulness or desirability.

90.     The alternative design would have to a reasonable probability prevented the toxic exposure of each Plaintiff.

91.     Each product (housing unit) was defective because it failed to contain adequate warnings or instructions.

92.     Defendants Bechtel and CH2M failed to warn the Plaintiffs of the inherently dangerous properties for the foreseeable conditions of the subject housing units when used for long term occupancy.

93.     Defendants Bechtel and CH2M failed to warn the Plaintiffs of the presence of excessive levels of formaldehyde present in the housing units they installed, maintained and supervised.

94.     Furthermore, Defendants Bechtel and CH2M breached the implied warranty of habitability due to the Plaintiffs. The subject housing units were installed and maintained with an expectation of habitability and a clear implied warranty that such housing would be safe and free of any toxic dangers.

### COUNT V

### BREACH OF CONTRACT BY NO-BID CONTRACTOR DEFENDANTS BECHTEL AND CH2M

95.     All paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

96.     Defendants Bechtel and CH2M entered into contracts with FEMA, contracting to provide the following service, among others: "The contractor will do maintenance necessary to maintain the temporary housing units in a safe, working, and livable, condition."

**COMPLAINT FOR DAMAGES**
Page 23 of 27

97. The Plaintiffs constitute third party beneficiaries to the subject contracts. The contracts were entered into for the Plaintiffs' benefit as residents of the temporary housing units, or alternatively, the benefit to the Plaintiffs as residents of the temporary housing units was the direct result of the performance within the contemplation of the parties to the contract as demonstrated by the terms of the contracts.

98. The Defendants breached said contract by failing to maintain the Plaintiffs' temporary housing units in a safe, working, and livable condition. Defendant's acts and omissions, which constitute its failure to honor its contractual obligation, has caused damage to the Plaintiffs for which Plaintiffs are entitled to recover money damages.

## COUNT VI

### NEGLIGENCE CLAIMS AGAINST DEFENDANT DBE

99. All paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

100. Defendant DBE had a duty to provide maintenance services for the Plaintiffs' trailer.

101. Defendant DBE negligently breached its duties to Plaintiffs thereby causing damages as alleged herein.

### COMPENSATORY DAMAGES

102. In addition to and by way of summarizing the compensatory damages prayed for herein, Plaintiffs avers that the defendants, Gulf Stream, Dutchmen, Superior Homes, Bechtel, CH2M and DBE, individually and/or jointly are responsible for all damages which Plaintiffs herein has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled

**COMPLAINT FOR DAMAGES**
Page 24 of 27

herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

## PUNITIVE / EXEMPLARY DAMAGES

103. Pursuant to Miss. Code Ann. §11-1-65, inasmuch as the conduct of Gulf Stream, Dutchmen, Superior Homes, Bechtel, CH2M, DBE and their servant/employees constitutes willful, wanton, egregious and reckless disregard for the rights and safety of the Plaintiffs, an award of punitive damages is appropriate and necessary under these facts.

## REQUEST FOR JURY TRIAL

Plaintiffs are entitled to and demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that Gulf Stream, Dutchmen, Superior Homes, Bechtel, CH2M and DBE be served with a copy of this Complaint, and that, after due proceedings:

a. There be a judgment herein in favor of Plaintiffs and against Defendants for all compensatory damages and punitive damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these

proceedings, and attorneys' fees, declaring that the Defendants are liable for all applicable damages and thereafter;

b.    There be specially included in the judgment in Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

    A.    Past and future physical injuries,

    B.    Past and future mental and physical pain and suffering,

    C.    Past and future physical impairments and disability,

    D.    Past and future reasonable and necessary medical expenses,

    E.    Past and future loss of earning capacity,

    F.    Past and future loss of enjoyment and quality of life,

    G.    Compensable out-of-pocket expenses related to Defendants' wrongdoing,

    H.    Costs of court,

    I.    Medical monitoring, and

    J.    Punitive damages,

c.    All other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted, this the 29th day of June, 2010.

    **PLAINTIFFS HOLLIE CARPENTER and BRIAN CARPENTER, Individually and on Behalf of their minor children, JCH, JDC and JTC**

    By:           

    JOHN F. HAWKINS
    EDWARD GIBSON
    ROSE M. HURDER

**COMPLAINT FOR DAMAGES**
Page 26 of 27

**OF COUNSEL:**

John Hawkins, Esquire, (MS Bar No. 9556)
HAWKINS, STRACENER & GIBSON, PLLC
628 N. State Street
P.O. Box 24627
Jackson, Mississippi 39202
Ph. (601) 969-9692; Fx. (601) 914-3580

Edward Gibson, Esquire, (MS Bar No. 100640)
Rose M. Hurder, Esquire, (MS Bar No. 103040)
HAWKINS, STRACENER & GIBSON, PLLC
153 Main Street
Bay St. Louis, MS 39520
Ph.(228) 469-0785; Fx. (228) 467-4212

**CONTRACT NUMBER:**

HSFEHQ-05-D-0592

**ISSUED BY:**
Department of Homeland Security
Federal Emergency Management Agency
Financial & Acquisition Management Division
Flood, Fire and Mitigation Branch
500 C Street, S.W., Room 350
Washington DC  20472

**NAME AND ADDRESS OF CONTRACTOR:**
CH2M Hill Constructors, Inc.
9191 South Jamaica Street
Englewood, CO 80112-5946

**LETTER CONTRACT FOR:**

Pursuant to Federal Acquisition Regulation (FAR) 16.603, the following agreement is hereby entered into on behalf of the Government.

**TERM OF CONTRACT**

The contract term shall be for a period commencing upon effective date of this contract and ending January 15, 2006.

The following and attached clauses (Sections B-J) to this letter contract apply:

**52.216-23, EXECUTION AND COMMENCEMENT OF WORK  (APR 1984)**

The Contractor shall indicate acceptance of this letter contract by signing three copies of the contract and returning them to the Contracting Officer not later than September 30, 2005.  Upon acceptance by both parties, the Contractor shall proceed with performance of the work, including purchase of necessary materials.



EXHIBIT

CH2M-FEMA(Sub2)-000083

**52.216-24, LIMITATION OF GOVERNMENT LIABILITY (APR 1984)**

(a) In performing this contract, the Contractor is not authorized to make expenditures or incur obligations exceeding the amount obligated under individual task orders.

(b) The maximum amount for which the Government shall be liable if this contract is terminated is equal to the cumulative amount obligated under individual task orders.

**52.216-25, CONTRACT DEFINITIZATION (OCT 1997)**

(a) An Indefinite Delivery/Indefinite Quantity (IDIQ) type definitive contract with firm fixed price/cost/time and materials task orders is contemplated. The Contractor agrees to begin promptly negotiating with the Contracting Officer the terms of a definitive contract that will include (1) all clauses required by the Federal Acquisition Regulation (FAR) on the date of execution of the letter contract, (2) all clauses required by law on the date of execution of the definitive contract, and (3) any other mutually agreeable clauses, terms, and conditions. The Contractor agrees to submit a proposal and cost or pricing data supporting its proposal.

(b) The schedule for definitizing this contract is:

(1)     Proposal due September 30, 2005;
(2)     Negotiations on or before October 21, 2005;
(3)     Definitization within 5 days of agreement;

(c) If agreement on a definitive IDIQ contract to supersede this letter contract is not reached by the target date in paragraph (b) above, or within any extension of it granted by the Contracting Officer, the Contracting Officer may, with the approval of the head of the contracting activity, determine a reasonable price or fee in accordance with Subpart 15.8 and Part 31 of the FAR, subject to Contractor appeal as provided in the Disputes clause. In any event, the Contractor shall proceed with completion of the contract, subject only to the Limitation of Government Liability clause.

(1) After the Contracting Officer's determination of price or fee, the contract shall be governed by–

(i) All clauses required by the FAR on the date of execution of this letter contract for either fixed-price or cost-reimbursement contracts, as determined by the Contracting Officer under this paragraph (c);

(ii) All clauses required by law as of the date of the Contracting Officer's determination; and

(iii) Any other clauses, terms, and conditions mutually agreed upon.

(2) To the extent consistent with subparagraph (c)(1) above, all clauses, terms, and conditions included in this letter contract shall continue in effect, except those that by their nature apply only to a letter contract.

**52.216-26  PAYMENTS OF ALLOWABLE COSTS BEFORE DEFINITIZATION  (DEC 2002)**

This clause applies to Cost Reimbursement Task Orders only.

(a) Reimbursement rate.  Pending the placing of the definitive contract referred to in this letter contract, the Government will promptly reimburse the Contractor for all allowable costs under this contract at the following rates:

(1) One hundred percent of approved costs representing financing payments to subcontractors under fixed-price subcontracts, provided that the Government's payments to the Contractor will not exceed 80 percent of the allowable costs of those subcontractors.

(2) One hundred percent of approved costs representing cost-reimbursement subcontracts; provided, that the Government's payments to the Contractor shall not exceed 85 percent of the allowable costs of those subcontractors.

(3) Eighty-five percent of all other approved costs.

(b) Limitation of reimbursement.  To determine the amounts payable to the Contractor under this letter contract, the Contracting Officer shall determine allowable costs in accordance with the applicable cost principles in Part 31 of the Federal Acquisition Regulation (FAR).  The total reimbursement made under this paragraph shall not exceed 85 percent of the maximum amount of the Government's liability, as stated in this contract.

(c) Invoicing.  Payments shall be made promptly to the Contractor when requested as work progresses, but (except for small business concerns) not more often than every 2 weeks, in amounts approved by the Contracting Officer.  The Contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as the representative may require, an invoice or voucher supported by a statement of the claimed allowable cost incurred by the Contractor in the performance of this contract.

(d) Allowable costs.  For the purpose of determining allowable costs, the term "costs" includes--

(1) Those recorded costs that result, at the time of the request for reimbursement, from payment by cash, check, or other form of actual payment for items or services purchased directly for the contract;

(2) When the Contractor is not delinquent in payment of costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for-

(i) Supplies and services purchased directly for the contract and associated financing payments to subcontractors, provided payments determined due will be made-

(A) In accordance with the terms and conditions of a subcontract or invoice; and

(B) Ordinarily within 30 days of the submission of the Contractor's payment request to the Government;

CH2M-FEMA(Sub2)-000085

(ii) Materials issued from the Contractor's stores inventory and placed in the production process for use on the contract;

(iii) Direct labor;

(iv) Direct travel;

(v) Other direct in-house costs; and

(vi) Properly allocable and allowable indirect costs as shown on the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts; and

(3) The amount of financing payments that the Contractor has paid by cash, check, or other forms of payment to subcontractors.

(e) Small business concerns. A small business concern may receive more frequent payments than every 2 weeks.

(f) Audit. At any time before final payment, the Contracting Officer may have the Contractor's invoices or vouchers and statements of costs audited. Any payment may be (1) reduced by any amounts found by the Contracting Officer not to constitute allowable costs or (2) adjusted for overpayments or underpayments made on preceding invoices or vouchers.

## 1. SCOPE OF WORK:

See attached, Section C.

## 2. WAGE DECISION NO.:

See attached, Section H.10, Wage Determination (Various).

## 3. Suspension of Davis-Bacon Act.

On September 8, 2005, the President signed a proclamation suspending the Davis-Bacon Act, 40 U.S.C. 3141, in those areas of the country seriously affected by Hurricane Katrina. The suspension applies to various counties/parishes in the states of Louisiana, Mississippi, Alabama and Florida to contracts awarded on or after September 8, 2005. The determination as to whether the Davis-Bacon Act applies to a particular Task Order under this contract will be determined upon the receipt of the contractor's Task Order proposal(s) and subsequent negotiations. The appropriate clauses will, then, be included in the negotiated Task Order(s).

CH2M-FEMA(Sub2)-000086

**SIGNATURES:**

_signature_

_____                    __9/30/05__
Contractor                                          Date

_signature_                                         9/30/05
Nancy A. Costello                                   Date
Contracting Officer

CH2M-FEMA(Sub2)-000087

## Table of Contents

PART I - THE SCHEDULE ............................................................................................. A-1

SECTION A - SOLICITATION/CONTRACT FORM ............................................... A-1

    SF 26   AWARD/CONTRACT ......................................................................... A-1

PART I - THE SCHEDULE ............................................................................................. B-1

SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS .............................. B-1

    B.1 ITEMS TO BE ACQUIRED .................................................................................... B-1
    B.2 MAXIMUM AND MINIMUM FUNDING LIMITATION ..................................... B-1
    B.3 CONSIDERATION AND PAYMENT-FIXED PRICE/COST REIMBURSABLE/TIME-AND-MATERIAL
        OR LABOR-HOUR ............................................................................................... B-1
    B.4 TASK ORDER FUNDING ....................................................................................... B-1
    B.5 MANAGEMENT AND ADMINISTRATION COSTS ............................................ B-2
    B.6 NEGOTIATED INDIRECT COST RATES ........................................................... B-2
    B.7 LIMITATION OF INDIRECT COSTS .................................................................. B-2
    B.8 DATE OF INCURRENCE OF COSTS ................................................................... B-3

SECTION C - DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK ..................... C-1

    C.1 STATEMENT OF WORK ....................................................................................... C-1

SECTION D - PACKAGING AND MARKING ....................................................... D-1

    D.1 PRESERVATION, PACKING AND PACKAGING -- COMMERCIAL ................. D-1

SECTION E - INSPECTION AND ACCEPTANCE ................................................ E-1

    E.1 NOTICE LISTING CONTRACT CLAUSES INCORPORATED BY REFERENCE .... E-1
    E.2 INSPECTION AND ACCEPTANCE ..................................................................... E-1

SECTION F - DELIVERIES OR PERFORMANCE ............................................... F-1

    F.1 NOTICE LISTING CONTRACT CLAUSES INCORPORATED BY REFERENCE ..... F-1
    F.2 TERM OF CONTRACT ........................................................................................... F-1
    F.3 PRINCIPAL PLACE OF PERFORMANCE ........................................................... F-1
    F.4 NOTICE OF DELAY ............................................................................................... F-1
    F.5 DELIVERY SCHEDULE ......................................................................................... F-1
    F.6 REPORTS OF WORK ............................................................................................. F-2

SECTION G - CONTRACT ADMINISTRATION DATA ...................................... G-1

    G.1 TRAVEL COSTS ..................................................................................................... G-1
    G.2 FIXED RATES FOR SERVICES ............................................................................. G-1
    G.3 INVOICES ............................................................................................................... G-1
    G.4 SUBMISSION OF INVOICES OR VOUCHERS FOR PAYMENT ....................... G-3
    G.5 DESIGNATION OF CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE .......... G-3
    G.6 HSAR 3052.242-72  CONTRACTING OFFICER'S TECHNICAL
        REPRESENTATIVE (DEC 2003) ......................................................................... G-3
    G.7 PROJECT MONITOR ............................................................................................. G-4
    G.8 TECHNICAL DIRECTION AND SURVEILLANCE ........................................... G-4
    G.9 TASK ORDER PROCEDURES .............................................................................. G-5

SECTION H - SPECIAL CONTRACT REQUIREMENTS .................................... H-1

    H.1 ACCESSIBILITY OF MEETINGS, CONFERENCES, AND SEMINARS TO PERSONS WITH
        DISABILITIES ....................................................................................................... H-1

CH2M-FEMA(Sub2)-000088

H.2   REPRODUCTION OF REPORTS..................................................................H-3
H.3   COORDINATION OF FEDERAL REPORTING SERVICES ............................H-3
H.4   PUBLICATION (APR 1984) ..........................................................................H-3
H.5   CONFIDENTIALITY OF INFORMATION ......................................................H-5
H.6   ELECTRONIC AND INFORMATION TECHNOLOGY (EIT)............................H-5
H.7   SERVICES OF CONSULTANTS ...................................................................H-6
H.8   NONPERSONAL SERVICES .........................................................................H-6
H.9   AWARD PRIOR TO AUDIT ............................................................................H-6
H.10  WAGE DETERMINATION .............................................................................H-7
H.11  HSAR 3052.245-70  GOVERNMENT PROPERTY REPORTS (DEC 2003)...........H-9
H.12  GOVERNMENT-FURNISHED PROPERTY .....................................................H-9
H.13  ACQUISITION OF GOVERNMENT PROPERTY ............................................H-9

**PART II - CONTRACT CLAUSES**...........................................................................I-1

**SECTION I  -  CONTRACT CLAUSES** .....................................................................I-1
I.1   NOTICE OF HYBRID CONTRACT ................................................................I-1
I.2   NOTICE LISTING CONTRACT CLAUSES INCORPORATED BY REFERENCE ......I-1
I.3   52.215-19  NOTIFICATION OF OWNERSHIP CHANGES (OCT 1997)...........I-4
I.4   52.216-18  ORDERING  (OCT 1995) ............................................................I-4
I.5   52.216-19  ORDER LIMITATIONS  (OCT 1995)............................................I-5
I.6   52.216-22  INDEFINITE QUANTITY  (OCT 1995)........................................I-5
I.7   52.217-8  OPTION TO EXTEND SERVICES  (NOV 1999) .............................I-6
I.8   52.222-21  PROHIBITION OF SEGREGATED FACILITIES (FEB 1999)............I-6
I.9   52.222-41  SERVICE CONTRACT ACT OF 1965, AS AMENDED
      (JUL 2005).....................................................................................................I-6
I.10  52.222-42  STATEMENT OF EQUIVALENT RATES FOR FEDERAL
      HIRES  (MAY 1989)......................................................................................I-11
I.11  52.222-49  SERVICE CONTRACT ACT - PLACE OF PERFORMANCE
      UNKNOWN  (MAY 1989) ..............................................................................I-12
I.12  52.225-9  BUY AMERICAN ACT--CONSTRUCTION MATERIALS
      (JAN 2005) .................................................................................................I-12
I.13  52.225-10  NOTICE OF BUY AMERICAN ACT REQUIREMENT
      --CONSTRUCTION MATERIALS (MAY 2002) ..............................................I-15
I.14  52.232-25  PROMPT PAYMENT (FEB 2002)
      ALTERNATE I (FEB 2002) ...........................................................................I-15
I.15  52.232-35 DESIGNATION OF OFFICE FOR GOVERNMENT RECEIPT OF
      ELECTRONIC FUNDS TRANSFER INFORMATION  (MAY 1999) ..................I-19
I.16  52.244-2 SUBCONTRACTS (AUG 1998)......................................................I-20
I.17  52.252-2  CLAUSES INCORPORATED BY REFERENCE  (FEB 1998)............I-22
I.18  HSAR 3052.204-70  SECURITY REQUIREMENTS FOR UNCLASSIFIED
      INFORMATION -- TECHNOLOGY RESOURCES (DEC 2003)...........................I-22
I.19  HSAR 3052.209-70  PROHIBITION ON CONTRACTS WITH CORPORATE EXPATRIATES
      (DEC 2003)...................................................................................................I-23
I.20  HSAR 3052.215-70  KEY PERSONNEL OR FACILITIES (DEC 2003) ...........I-25
I.21  HSAR 3052.237-71  INFORMATION TECHNOLOGY SYSTEMS ACCESS FOR
      CONTRACTORS (DEC 2003) .........................................................................I-25
I.22  HSAR 3052.237-72  CONTRACTOR PERSONNEL SCREENING FOR UNCLASSIFIED
      INFORMATION TECHNOLOGY ACCESS (DEC 2003) ...................................I-26

**PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS** .................J-1

**SECTION J - LIST OF ATTACHMENTS** .................................................................J-1

CH2M-FEMA(Sub2)-000089

HSFEHQ-05-D-0573                    SECTION B


## PART I - THE SCHEDULE

## SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS


### B.1  ITEMS TO BE ACQUIRED

The Contractor shall furnish all personnel, facilities, equipment, material, supplies, and services (except as may be expressly set forth in this contract as furnished by the Government) and otherwise do all things necessary to, or incident to, performing and providing the following items of work:

STATEMENT OF WORK IS ATTACHED AND LISTED IN
PART III, SECTION J, ATTACHMENT A

### B.2  MAXIMUM AND MINIMUM FUNDING LIMITATION

The maximum funding limitation for this contract (inclusive of the aggregate price of all task orders issued) shall not exceed                The guaranteed minimum under this contract is


### B.3  CONSIDERATION AND PAYMENT-FIXED PRICE/COST REIMBURSABLE/TIME-AND-MATERIAL OR LABOR-HOUR

(a)  FIXED PRICE.  Fixed price will be negotiated on a task order basis.  Total payments shall be made in installments based on the percentage of completion of work.

(b)  COST REIMBURSABLE.  Estimated cost and fixed fee will be negotiated on a task order basis.  The contractor shall be reimbursed for actual, incurred costs and fixed fee under each cost type task order.

(c)  TIME-AND-MATERIAL OR LABOR-HOUR.  Time-and-Material or Labor Hour price shall be based on rates specified in this contract. The government shall reimburse the contractor based on the actual number of hours incurred by labor category.  The following Time-and-Material or Labor Hours rates shall apply to this contract:

SEE SECTION J, ATTACHMENT B, PRICING SHEETS (TO BE NEGOTIATED).

Additional labor categories and rates may be added by modification of the contract.  These Time-and-Material Rates are established for full-time, bonafide company employees as well as employees of corporate affiliates and/or subsidiaries, temporary help, subcontractors and consultants, and include all applicable indirect rates, including G&A and overhead, as well as profit.  Only the skills listed are to be used in the performance of this contract.

(d)  Services may be ordered at any time during the effective period of performance.  Task orders shall be issued in accordance with the Section G clause entitled "Task Order Procedures."  The aggregate dollar amount of all task order funding obligations shall not exceed the ceiling price of this contract as specified in the Section B clause entitled "Maximum and Minimum Funding Limitation".


### B.4  TASK ORDER FUNDING

Fixed price/Cost Reimbursable/Time and Material or Labor Hour type Task Orders may be issued under this contract within the established contract ceiling limitation.

CH2M-FEMA(Sub2)-000090

HSFEHQ-05-D-0573                    SECTION B

## B.5  MANAGEMENT AND ADMINISTRATION COSTS

The Contractor shall provide Management and Administration (M&A) of the overall contract.  Responsibilities include but are not limited to:  Readiness, Project Management, Training, Reports, and Project Briefings.

Management and Administration that is directly related to specific projects should be charged to individual task orders.

Management and Administration (M&A)will be awarded by Time and Material or Labor Hour Task Order. Any applicable M&A tasks (e.g., reporting, briefing, and quality control) that the Government requires past the contract expiration date will be directly charged to specific task orders that remain open after formal contract expiration.

## B.6  NEGOTIATED INDIRECT COST RATES

Notwithstanding the provisions of Clause 52.216-7 of this contract entitled, "Allowable Cost and Payment," the allowable indirect costs under this contract shall be obtained by applying negotiated indirect rates to bases agreed upon by the parties.  The period(s) for which such rates will be established shall correspond to the contractor's fiscal year(s).

Negotiation of final indirect rates shall be in accordance with FAR 52.216-7 and Subpart 42.700 of the Federal Acquisition Regulation.

The results of each negotiation shall be set forth in a modification to this contract which shall specify (1) the agreed final rates, (2) the bases to which the rates apply, and (3) the periods for which the rates apply.

Pending establishment of final overhead rates for any period, the Contractor shall be reimbursed for allowable indirect costs, not claimed elsewhere, at the following billing rate(s).  Such billing rate(s) may, at the request of either party, be revised by mutual consent to apply either retroactively or prospectively to prevent substantial over and under payment.

| Indirect Cost | Base of Application | Billing Rate | Contractor's Fiscal Year |
|---|---|---|---|
| (TO BE NEGOTIATED.) | | | |

## B.7  LIMITATION OF INDIRECT COSTS

(a)  Notwithstanding any other clause(s) of this contract, the Government shall not reimburse the Contractor for any indirect costs in excess of the indirect expense dollars derived for each of the Contractor's fiscal years by the application of the following individual indirect cost ceiling rates to the appropriate base outlines below.  All indirect costs in excess of said amount(s) shall be borne by the Contractor.  In the event that the final indirect cost rates are less than the negotiated ceiling rates, the negotiated rates will be reduced to conform with the lower rates.

(b)  The indirect cost limitations set forth below include provisions for all known increases that will take place during the term of this contract resulting from statute, court decisions and/or written ruling or regulation by the Internal Revenue Service (IRS) or any other taxing authority.  However, in the event that during the term of this contract, any other statute, court decision and/or written ruling or regulation affects the Contractor's indirect costs, the indirect cost limitations will be

B-2

CH2M-FEMA(Sub2)-000091

HSFEHQ-05-D-0573                                    SECTION B

adjusted to the extent the Contracting Officer determines said statute, court decision and/or ruling or regulation impacts the Contractor's indirect costs.


| Indirect | Overhead | Indirect Cost Ceiling Rate(s) |
|----------|----------|-------------------------------|
| Application | Base | Contractor's Fiscal Year |

                       (TO BE NEGOTIATED)


## B.8  DATE OF INCURRENCE OF COSTS

The Contractor shall be entitled to reimbursement for costs incurred in an amount not to exceed ██████████ on or after August 31, 2005 which, if incurred after this contract had been entered into, would have been reimbursable under the provisions of this contract.

B-3

CH2M-FEMA(Sub2)-000092

HSFEHQ-05-D-0573                    SECTION C

**SECTION C - DESCRIPTION/SPECIFICATIONS/STATEMENT OF WORK**

**C.1  STATEMENT OF WORK**

      See Part III, Section J, Attachment A, Scope of Work.

CH2M-FEMA(Sub2)-000093

## SECTION D - PACKAGING AND MARKING

### D.1 PRESERVATION, PACKING AND PACKAGING -- COMMERCIAL

Preservation, packing, and packaging for shipment of all items ordered hereunder shall be in accordance with commercial practice and adequate to insure both acceptance by common carrier and safe transportation at the most economical rate(s).

**D-1**

CH2M-FEMA(Sub2)-000094

HSFEHQ-05-D-0573                    SECTION E

## SECTION E - INSPECTION AND ACCEPTANCE

### E.1  NOTICE LISTING CONTRACT CLAUSES INCORPORATED BY REFERENCE

The following contract clauses pertinent to this section are hereby incorporated by reference (by Citation Number, Title, and Date) in accordance with the clause at FAR "52.252-2  CLAUSES INCORPORATED BY REFERENCE" in Section I of this contract.  See FAR 52.252-2 for an internet address (if specified) for electronic access to the full text of a clause.

| | NUMBER | TITLE | DATE |
|---|---|---|---|
| | 52.246-4 | INSPECTION OF SERVICES--FIXED-PRICE | AUG 1996 |
| @ | 52.246-5 | INSPECTION OF SERVICES--COST-REIMBURSEMENT | APR 1984 |
| | 52.246-6 | INSPECTION--TIME-AND-MATERIALS AND LABOR-HOUR | MAY 2001 |

### E.2  INSPECTION AND ACCEPTANCE

Final inspection and acceptance shall be by the Contracting Officer or his/her duly authorized representative at the FEMA JFO to be specified in individual task orders.

For the purpose of this clause, the COTR named in the Designation of Contracting Officer's Technical Representative clause in this contract is the representative of the Contracting Officer.  The Contracting Officer reserves the right to unilaterally designate other Government agents as authorized representatives. Should such occur, the Contractor will be notified by a written notice.

**E-1**

CH2M-FEMA(Sub2)-000095

HSFEHQ-05-D-0573                    SECTION F

## SECTION F - DELIVERIES OR PERFORMANCE

### F.1  NOTICE LISTING CONTRACT CLAUSES INCORPORATED BY REFERENCE

The following contract clauses pertinent to this section are hereby incorporated by reference (by Citation Number, Title, and Date) in accordance with the clause at FAR "52.252-2  CLAUSES INCORPORATED BY REFERENCE" in Section I of this contract.  See FAR 52.252-2 for an internet address (if specified) for electronic access to the full text of a clause.

| | NUMBER | TITLE | DATE |
|---|---|---|---|
| | 52.242-15 | STOP-WORK ORDER | AUG 1989 |
| | 52.242-17 | GOVERNMENT DELAY OF WORK | APR 1984 |
| @ | 52.242-15 | STOP-WORK ORDER ALTERNATE I (APR 1984) | AUG 1989 |
| | 52.247-34 | F.O.B. DESTINATION | NOV 1991 |

### F.2  TERM OF CONTRACT

The contract shall be effective through January 15, 2006 except that delivery orders placed prior to the expiration date shall remain in full force and effect until deliveries have been completed and payments, therefore, have been made.

### F.3  PRINCIPAL PLACE OF PERFORMANCE

The effort required under this contract shall be performed at:

> Various disaster sites to be determined
> under individual task orders.

### F.4  NOTICE OF DELAY

If the Contractor becomes unable to complete the contract work at the time specified because of technical difficulties, notwithstanding the exercise of good faith and diligent efforts in the performance of the work called for hereunder, the Contractor shall give the Contracting Officer written notice of the anticipated delay and the reasons therefore.  Such notice and reasons shall be delivered promptly after the condition creating the anticipated delay becomes known to the Contractor but in no event less than forty-five (45) days before the completion date specified in this contract, unless otherwise directed by the Contracting Officer.  When notice is so required, the Contracting Officer may extend the time specified in the Schedule for such period as deemed advisable.

### F.5  DELIVERY SCHEDULE

F-1

CH2M-FEMA(Sub2)-000096

HSFEHQ-05-D-0573                                    SECTION F

Delivery of items specified below shall be shipped F.O.B. destination in accordance with the following schedule:

    To be determine on an individual task order basis.


## F.6 REPORTS OF WORK

The Contractor shall have the capability to develop and provide various databases, spreadsheets and reports. The Contractor shall have the capability and flexibility to tailor the reports to fit the needs of the declared disaster and FEMA requirements.

Reports not otherwise stated shall be provided in both soft and hard copies.

MONTHLY CONTRACT STATUS REPORT

The Contractor shall submit a Monthly Contract Status Report to the COTR and Contracting Officer by the 15th day after each month. This report shall reflect a summary of the overall contract status, including the current and cumulative hours worked by skill type. For each open Task Order Assignment, the report shall list the Task Order Assignment number, work location, a brief description of work and the number of personnel onsite. The report shall also provide the total number of personnel working on all Task Order Assignments; the start date(s) for the periods when personnel are deployed; the contract totals for dollars obligated and status; and estimated hours expended for the current month and overall contract to date by skill/skill levels usage. The Contractor will provide a summary of deliverables submitted, planned activities for the next month and problems and proposed corrective actions. The Contractor shall attach two graphs that depict: Personnel in Field vs. Time and Contract Totals vs. Time. The Contractor will include a summary of pending actions and actions expected in the next 30/60/90 days. Additionally, the Contractor will post a digital version of the report on the real-time Web reporting site.

FINAL REPORT

The Contractor shall submit a final report that documents and summarizes the results of the entire contractual effort, including recommendations and conclusions. The final report shall include tables, graphs, and other visual aids, as necessary to comprehensively explain the results achieved under the contract. The final report shall be submitted to the Government five (5) days prior to expiration of this contract. The Contractor shall submit copies of the report as follows: One copy to the COTR and one copy to the Contracting Officer.

SUBMISSION

One final copy of the report specified above shall be submitted to the COTR. In addition, one copy shall be submitted to the Contracting Officer at:

    Federal Emergency Management Agency Financial and Acquisitions Management Div Flood, Fire and Mitigation Branch 500 C Street, S.W., Room 350 Washington DC 20472

CH2M-FEMA(Sub2)-000097

## SECTION G - CONTRACT ADMINISTRATION DATA

### G.1 TRAVEL COSTS

Costs for transportation, lodging, meals and incidental expenses incurred by contractor personnel on official company business are allowable subject to FAR 31.205-46, Travel Costs. These costs will be considered to be reasonable and allowable only to the extent that they do not exceed on a daily basis the maximum per diem rates in effect at the time of travel as set forth in the Federal Travel Regulations.

### G.2 FIXED RATES FOR SERVICES

The following fixed rates, inclusive of all indirect costs and profit, shall apply for all Time and Materials Task Orders for the duration of the contract:

See Attachment B in Section J of Part III of this Contract (TO BE NEGOTIATED)

### G.3 INVOICES

An invoice is a written request for payment under this contract for supplies delivered or for services rendered. Payment of invoices submitted under this contract shall be made in accordance with the terms and conditions of the Prompt Payment clause and in accordance with the provisions of other clauses in this contract. Failure or refusal to provide the following information on all invoices submitted under this contract may result in the invoice being considered improper for payment in accordance with the Prompt Payment clause. In order to be proper, an invoice must include, as applicable, the following:

a. GENERAL INFORMATION

1. Name of Contractor

2. Invoice date

3. Contract number (including order number, if any), contract line item number, contract description of supplies or services, quantity, contract unit of measure and unit price, and extended total.

4. Shipment number and date of shipment (bill-of-lading number and weight of shipment will be shown for shipments on Government bills of lading).

5. Name, title, phone number and complete mailing address of responsible Official who can be contacted in the event of an improper invoice, if there are questions, or additional information is needed by this agency to process payment.

6. Any other information or documentation required by other provisions of the Contract (such as evidence of shipment).

7. Invoices shall be prepared and submitted as follows:

CH2M-FEMA(Sub2)-000098

HSFEHQ-05-D-0573                                  SECTION G

Number                                           Distribution

Original and 2 copies                            Payment Office

One copy                                          Contract Specialist

One copy                                         Project Officer


b. ELECTRONIC FUNDS TRANSFER (EFT) INFORMATION

1.  As mandated by the Debt Collection Improvement Act (DCIA) of 1996 and in accordance with FAR Clause 52.232-33-Payment By Electronic Funds Transfer--Central Contractor Registration of this contract, the contractor must submit the following written EFT information to the office designated in clause 52.232-35 of this award document by the date specified in clause 52.232-33:

(a) The contract number (or other procurement identification number).

(b) The contractor's name and remittance address, as stated in the contract(s).

(c) The signature (manual or electronic, as appropriate), title, and telephone number of the contractor official authorized to provide this information.

(d) The name, address, and 9-digit Routing Transit Number (RTN) of the contractor's financial agent.

(e) The contractor's account number and the type of account (checking, savings or lockbox).

(f) If applicable, the Fedwire Transfer System (FTS) telegraphic abbreviation of the contractor's financial agent.

(g) If applicable, the contractor shall also provide the name, address, telegraphic abbreviation, and 9-digit Routing Transit Number (RTN) of the correspondent financial institution receiving the wire transfer payment if the contractor's financial agent is not directly on-line to the FTS; and, therefore, not the receiver of the wire transfer payment.

2.  The contractor should include the EFT information set forth below on all invoices submitted for payment under this contract. Failure to provide the information or failure to notify this agency of changes to this information may result in delays in payments and/or rejection of the invoice in accordance with the Prompt Payment clause of this contract. The following EFT information should be submitted on each invoice:

(a) Routing Transit Number (RTN) â€" The contractor shall provide the current 9-digit RTN of the payee's bank

(b) Payee's account number

(c) Contractor's Tax Identification Number (TIN)

(The EFT information submitted must be that of the contractor unless there is an official Assignment of Claims on file with the payment office.)

If at any time during the term of this contract, the contractor changes any EFT information, (i.e. financial agent, RTN, account number, etc.) the new EFT information must replace the old EFT information on subsequent invoices submitted under this contract.

To avoid delays in processing invoices, the contractor must also submit written notification of EFT information changes to the office designated in this award document as soon as the new information is known to the contractor. This notification must be in writing and signed by the individual authorized by the contractor to make such changes.

CH2M-FEMA(Sub2)-000099

HSFEHQ-05-D-0573                    SECTION G

## G.4  SUBMISSION OF INVOICES OR VOUCHERS FOR PAYMENT

(a)  Payments of invoices or vouchers submitted under this contract shall be made in accordance with FAR clause 52.232-10 "Payments Under Fixed Price" (AUG 1987) for Firm Fixed Price Task Orders, or 52.232-7 "Payments Under Time-and-Materials and Labor-Hour Contracts" (DEC 2002) for Time and Materials Task Orders, and in accordance with provisions of other clauses in this contract. The Contractor shall submit vouchers once each month (or more frequent intervals, if approved by the Contracting Officer), to the offices designated below.  The contractor shall substantiate vouchers by evidence of actual payment and by individual daily job timecards, or other substantiation approved by the Contracting Officer.

(b)  Invoices or vouchers, and any required supporting documentation, must be properly identifiable with the Name of contractor, date of the invoice/voucher, contract number, task order number, name and address or EFT information that payment is to be sent to, and the name, title and phone number of the point of contact at the contractor's facility in case of a defective invoice/voucher. Invoices/vouchers shall be submitted as follows:

| | |
|---|---|
| Original and 2 Copies: | Federal Emergency Management Agency<br>Disaster Finance Center<br>Mt Weather EAC/Accounts Payable/Bldg 708<br>PO Box 800<br>Berryville, VA  22611 |
| One Copy: | Contract Specialist<br>Federal Emergency Management Agency<br>Financial & Acquisition Management Division<br>Flood, Fire & Mitigation Branch<br>500 C Street SW, Room 350<br>Washington, D.C. 20472 |
| One Copy: | Contracting Officer's Technical Representative<br>Federal Emergency Management Agency<br>Recovery Division<br>500 C Street SW, Room 600<br>Washington, D.C. 20472 |

(c) Payments of invoices or vouchers shall be subject to the withholding provisions of FAR clause 52.232-10 "Payments Under Fixed Price" (AUG 1987) or 52.232-7 "Payments Under Time-and-Materials and Labor-Hour Contracts" (DEC 2002). In the event that the amounts are withheld from payment in accordance with provisions of this contract, a separate invoice for the amount withheld will be required before payment for that amount may be made.

## G.5  DESIGNATION OF CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE

For the purpose of this contract the Contracting Officer's technical representative shall be:  David Porter

## G.6 HSAR 3052.242-72  CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (DEC 2003)

G-3

CH2M-FEMA(Sub2)-000100