UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PAUL FOUNTAIN, CHARLES RAY | * | DOCKET NUMBER _____ |
| FOUNTAIN, JOAN FOUNTAIN | * | |
| CAPTAIN AND JESSICA LANDRY | * | |
| FOUNTAIN | * | |
| | * | JUDGE _____ |
| versus | * | |
| | * | |
| UNITED STATES OF AMERICA THROUGH | * | |
| THE FEDERAL EMERGENCY MANAGEMENT | * | |
| AGENCY, ET Al | * | MAGISTRATE _____ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT FOR DAMAGES

This Complaint arises out the exposure of Mary Etta Fountain, the deceased mother of plaintiffs, to harmful and toxic fumes to which ultimately led to her death after a prolonged exposure with accompanying pain and suffering. As the surviving children and pursuant to their right to bring these actions under the Federal Tort Claims Act and La.C.C. Arts. 2315.1 and 2315.2, they bring this action and allege as follows:

1.

These claims arise out of the same causes and claims asserted in various suits in the consolidated matters in MDL NO. 1873 pending in the United States District Court for the Eastern District of Louisiana and involving class claims for the named plaintiffs for wrongful death and survival actions resulting from damages caused by the unlawful and harmful exposures in temporary housing units (hereinafter sometimes referred to as temporary housing units) provided by the United States of America through the Federal Emergency Management Agency (hereinafter sometimes referred to as FEMA). The class action status was recently denied in those suits.

### I. PARTIES

1. The plaintiffs, who are all, for purposes of 28 U.S.C. §1332, citizens of the State of

Louisiana, are:

a)   Paul Fountain, a resident and domiciliary within the Middle District of Louisiana;

b)   Charles Ray Fountain, a resident and domiciliary within the Western District of
     Louisiana;

c)   Joan Fountain Captain, a resident and domiciliary within the Western District of
     Louisiana; and

d)   Jessica Landry Fountain, a resident and domiciliary within the Western District of
     Louisiana.

2. The defendants are:

a)   The United States of America through the Federal Emergency Management Agency
     (hereinafter sometimes referred to as FEMA).

b)   American Camper Manufacturing, LLC d/b/a AMERI-CAMP which is alleged upon
     information and belief to be an entity incorporated in the state of Indiana limited
     liability company which conducts business in the state of Louisiana, and which
     manufactured and supplied FEMA trailers or housing units for use in the State of
     Louisiana.

c)   American Homestar Corporation which is alleged upon information and belief to be
     a Texas corporate entity which conducts business in the state of Louisiana,  and
     which manufactured and supplied FEMA trailers or housing units pursuant to
     contracts with FEMA for use in the State of Louisiana.

d)   Cavalier Home Builders, LLC which is alleged upon information and belief to be a
     Delaware corporate entity which conducts business in the state of Louisiana, and
     which manufactured and supplied FEMA trailers or housing units pursuant to
     contracts with FEMA for use in the State of Louisiana.

e)   Cavalier Homes Inc. which is alleged upon information and belief to be a Delaware
     corporate entity which conducts business in the state of Louisiana, and which
     manufactured and supplied FEMA trailers or housing units pursuant to contracts with
     FEMA for use in the State of Louisiana.

f)   Circle B Enterprises, Inc. which is alleged upon information and belief to be a
     Georgia corporate entity which conducts business in the state of Louisiana, and
     which manufactured and supplied FEMA trailers or housing units pursuant to
     contracts with FEMA for use in the State of Louisiana.

g)   Clayton Homes Of Lafayette, Inc (f/k/a Clayton Homes, Inc.) which is alleged upon information and belief to an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

h)   Coachmen Industries, Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

I)   Coachmen Recreational Vehicle Company, LLC and/or Coachmen Recreational Vehicle Company of Georgia, LLC which is alleged upon information and belief to be an Indiana limited liability company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

j)   Design Homes, Inc. which is alleged upon information and belief to be a Wisconsin corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

k)   Destiny Industries, LLC which is alleged upon information and belief to be a Georgia limited liability company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

l)   DS Corp. which is alleged upon information and belief to be an entity incorporated in the state of Indiana limited liability company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

m)   Dutch Housing, Inc. d/b/a Champion Homes which is alleged upon information and belief to be a Michigan corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

n)   Dutchmen Manufacturing, Inc. which is alleged upon information and belief to be a Delaware corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

o)   Fairmont Homes, Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

p)      Fleetwood Enterprises, Inc., which is alleged upon information and belief to be an entity incorporated in the state of Florida, which conducts business in the State of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana;

q)      Fleetwood Canada, Ltd. which is alleged upon information and belief to be a foreign corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

r)      Fleetwood Homes of North Carolina, Inc. which is alleged upon information and belief to be a North Carolina corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

s)      Forest River, Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

t)      Frontier RV, Inc., which is alleged upon information and belief to be a Texas corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

u)      Giles Family Holdings, Inc. and/or Giles Industries, Inc. and/or Giles Industries of Tazewell, Incorporated, which is alleged upon information and belief to be an Alabama corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

v)      Alliance Homes, Inc. ("Alliance") d/b/a Adrian Homes, which is alleged upon information and belief to be a Georgia and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

w)      Golden West Homes which is alleged upon information and belief to be a California corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

x)      Gulf Stream Coach, Inc., which is alleged upon information and belief to be an entity incorporated in the state of Indiana, which conducts business in the State of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana;

y)      Horton Homes, Inc. which is alleged upon information and belief to be a Georgia corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

z)      Indiana Building Systems, LLC d/b/a Holly Park which is alleged upon information and belief to be an entity incorporated in the state of Indiana limited liability company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

aa)     Heartland Recreational Vehicles, LLC which is alleged upon information and belief to be an Indiana company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

bb)     Jayco Enterprises, Inc. and/or Jayco, Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

cc)     Keystone Industries, Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

dd)     Keystone RV Company which is alleged upon information and belief to be a Delaware corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

ee)     KZRV, LP which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

ff)     Lakeside Park Homes, Inc. which is alleged upon information and belief to be a Georgia corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

gg)     Layton Homes Corp. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

hh)   Liberty Homes Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

ii)   Liberty RV & Marine, Inc. which is alleged upon information and belief to be a Florida corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

jj)   Monaco Coach Corporation which is alleged upon information and belief to be a Delaware corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

kk)   Morgan Buildings & Spas, Inc. which is alleged upon information and belief to be a Nevada corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

mm)   Morgan Building Systems, Inc. which is alleged upon information and belief to be a Texas corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

nn)   Oak Creek Homes, L.P. which is alleged upon information and belief to be a Texas limited partnership which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

oo)   Oak Creek Homes, Inc. which is alleged upon information and belief to be a foreign corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

pp)   Oakwood Homes, LLC which is alleged upon information and belief to be a Georgia limited liability company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with  FEMA for use in those states.

qq)   Palm Harbor Homes, Inc. which is alleged upon information and belief to be a Florida corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

rr)     Lexington Homes which is alleged upon information and belief to be a Mississippi corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

ss)     Philips Products, Inc. which is alleged upon information and belief to be a Delaware corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

tt)     Pilgrim International, Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

uu)     R-Vison, Inc., which is alleged upon information and belief to be an entity incorporated in the state of Florida, which conducts business in the State of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana;

vv)     Recreation By Design, LLC which is alleged upon information and belief to be an entity incorporated in the state of Indiana limited liability company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

ww)     Redman Homes Inc. (f/k/a Dutch Homes)which is alleged upon information and belief to be a Delaware corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

xx)     River Birch Homes, Inc. and/or River Birch Homes, L.L.C. is/are upon information and belief to be an Alabama corporate entity/limited liability company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

yy)     Scotbilt Homes, Inc. which is alleged upon information and belief to be a Georgia corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

zz)     Silver Creek Homes, Inc. which is alleged upon information and belief to be a Texas corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with

FEMA for use in the State of Louisiana.

aaa)   Skyline Corporation which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

bbb)   Starcraft RV, Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

ccc)   Southern Energy Homes, Inc. which is alleged upon information and belief to be a Delaware corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

ddd)   Stewart Park Homes, Inc. which is alleged upon information and belief to be a Georgia corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

eee)   Sunray RV, LLC and/or SunRay Investments, LLC, which is alleged upon information and belief to be a Tennessee limited liability company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

fff)   Superior Homes, LLC which is alleged upon information and belief to be a South Dakota limited liability company which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

ggg)   Hy-Line Enterprises, Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

hhh)   Thor California, Inc., doing business in California as Thor Manufacturing which is alleged upon information and belief to be a Delaware corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

iii)   Thor Industries, Inc. which is alleged upon information and belief to be a Delaware

corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

jjj) TL Industries, Inc. which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

kkk) Vanguard Industries of Michigan, Inc. (a/k/a Palomino RV) which is alleged upon information and belief to be a Michigan corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

lll) Waverlee Homes, Inc. which is alleged upon information and belief to be an Alabama corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

mmm) CMH Manufacturing, Inc., which is alleged upon information and belief to be a Tennessee corporate entity, which conducts business in the state of Louisiana and which manufactured and supplied FEMA trailers or housing units to FEMA for use in the State of Louisiana which units were labeled as "Golden West" units and "Oakwood" units.

nnn) Palm Harbor Mfg., Inc. which is alleged upon information and belief to be a foreign corporate entity, which conducts business in the state of Louisiana and which manufactured and supplied FEMA trailers or housing units FEMA for use in the State of Louisiana.

ooo) Palm Harbor Albermarle, LLC is upon information and belief a foreign corporate entity or limited liability company, which conducts business in the state of Louisiana and which manufactured and supplied FEMA trailers or housing units for use in the State of Louisiana.

ppp) Viking Recreational Vehicles, LLC is alleged upon information and belief to be a Michigan company, which conducts business in the state of Louisiana and which manufactured and supplied FEMA trailers or housing units for use in the State of Louisiana.

qqq) Timberland RV Company d/b/a Adventure Manufacturing which is alleged upon information and belief to be an Indiana corporate entity which conducts business in the state of Louisiana, and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

rrr) Champion Home Builders Co. which is alleged upon information and belief to be a Michigan corporation which conducts business in the state of Louisiana and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

sss) Townhomes, LLC which is alleged upon information and belief to be a Florida company and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

ttt) Homes of Merit, Inc. which is alleged upon information and belief to be a Florida company and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

uuu) Play'Mor Trailers, Inc. which is alleged upon information and belief to be a Missouri corporate entity which conducts business in the state of Louisiana and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

vvv) Dreams R.V. Sales, Inc. which is alleged upon information and belief to be a Florida corporation, which conducts business in the State of Louisiana and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

xxx) Sunnybrook R V, Inc. which is alleged upon information and belief to be an Indiana corporation which conducts business in Louisiana and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

yyy) Patriot Homes of Texas, L.P which is alleged upon information and belief to be a Texas limited partnership which conducts business in the State of Louisiana and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

zzz) Patriot Manufacturing, Inc. which is alleged upon information and belief to be a New Jersey corporation, which conducts business in the State of Louisiana and which manufactured and supplied FEMA trailers or housing units pursuant to contracts with FEMA for use in the State of Louisiana.

4. The United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the dispute as:

a)      Pursuant to 28 U.S.C. §§1346 and 2671, et seq., this Court has jurisdiction over the
        United States of America and FEMA ;

b)      Each plaintiff alleges to have suffered damages in an amount in excess of
        $75,000.00, exclusive of interest and costs and none of the non-governmental
        defendants (some times referred to as housing unit manufacturers) are domiciled in
        Louisiana, creating complete diversity as defined under the provisions of 28 U.S.C.
        §1332.

c)      The housing unit manufacturers are subject to the in personam jurisdiction of this
        Court because they do sufficient business in the State of Louisiana and within this
        federal district to confer same, and at all relevant times hereto engaged in commerce
        both in this federal district and in the State of Louisiana with respect to the activities
        and claims which are the subject of this litigation.

6. Venue is proper in the Middle District of Louisiana pursuant to 28 U.S.C. §1391, as the

emergency housing unit made the subject of this litigation was provided to Mary Etta Fountain in

this district and injuries were sustained in this district.

### III. FACTS AND GENERAL ALLEGATIONS

7. The mother of the plaintiffs, Mary Etta Fountain, resided in one of the temporary housing

units provided by FEMA in the State of Louisiana were provided this housing unit by FEMA after

the landfalls of Hurricane in September of 2005.

8. The residence of Mary Etta Fountain was rendered unhabitable following Hurricane Rita,

leaving her need of housing assistance.

9. FEMA contracted with the housing unit manufacturers, including the one which

manufactured the housing unit in which Mary Etta Fountain lived,  to purchase thousands of

temporary housing units.

10. On information and belief, housing unit manufacturers expedited production of these

housing units, and, on information and belief, resorted to using substandard materials and/or

employing irregular practices during the manufacturing process, all of which resulted in the temporary housing units occupied by Mary Etta Fountain containing higher than normal levels of formaldehyde.

11. On information and belief, the housing unit occupied by Mary Etta Fountain deviated from Government specifications pertaining to the safety of the unit as a residence and did not conform to any Government-imposed specifications which addressed the design and/or construction of the temporary housing units pertinent to formaldehyde levels.

12. The plaintiffs submit that the housing unit at issue herein contained dangerous levels of formaldehyde due to the manufacturer's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to FEMA's intended use of the temporary housing units as temporary residences for at least 18 months, but that housing unit manufacturers failed to take reasonable steps to warn FEMA or the intended inhabitants about these dangers, which dangers were not initially known to FEMA.

13. The plaintiffs submit that housing unit manufacturers ignored, or concealed and/or condoned the concealment of, the fact that the temporary housing units, including the one at issue in this litigation, contained dangerous levels of formaldehyde due to their use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to FEMA's intended use of the temporary housing units as temporary residences for at least 18 months, all in order to sell their products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

14. Mary Etta Fountain spent several months in the FEMA-provided temporary housing unit. As a result, she was unwittingly exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

15. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the temporary housing units, including the one made the subject of this litigation. Pursuant to federal law, the defendants are and were required to display a "Health Notice" about exposure to formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system. If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

See 24 C.F.R. §3280.309.

16. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3ppm to 1 ppm.

In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

17. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as used in the temporary housing units). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". See 24 C.F.R. §3280.308.

18. Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. See 44 C.F.R. § 206.110(e). Agency Standard EPA recognized level at which acute health effects can manifest are 0.1 parts per million (ppm) Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) 0.04 ppm for exposure durations up to 14 days; 0.03 ppm for exposure durations between two weeks and a year and 0.008 ppm for exposure durations s exceeding 365 days. See Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, FEMA Exposes Gulf Coast Residents to Formaldehyde, Updated on Dec 19, 2007.

19. Housing unit manufacturers knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards and published medical studies.

20. FEMA has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer

purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. See Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007.

21. As alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these temporary housing units being provided to Mary Etta Fountain and others, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde. In addition, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

22. In fact, FEMA was conducting initial formaldehyde air sampling of temporary housing units at the FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006. The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels. See Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted to it on November 16, 2007.

23. Despite this knowledge and even though the Government was actively testing for and aware dangerous levels of formaldehyde present in temporary housing units scheduled for delivery to the hurricane victims, the Inspector General of the Department of Homeland Security, testifying

before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, 75,000 travel trailers had been delivered to hurricane victims. See Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006.

24. FEMA also continued to supply the defective and dangerous housing units after March of 2006 .

25. FEMA continued to supply the defective and dangerous housing units even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. See Union of Concerned Scientists, *supra*.

26. FEMA continued to supply the defective and dangerous housing units to the Plaintiffs even though FEMA in March of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.

27. FEMA continued to supply the defective and dangerous temporary housing units to hurricane victims and continued to allow their continued occupancy of those units, including to and by Mary Etta Fountain, even though FEMA had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units.

28. While complaints of formaldehyde exposure continued to be reported to FEMA and evidence supporting the existence of dangerous levels of formaldehyde present in the temporary

housing units was uncovered, FEMA intentionally avoided undertaking any comprehensive testing

of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA

Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK.

While I agree that we should conduct testing, we should not do so until we are fully prepared to

respond to the results. Once you get results and should they indicate some problem, the clock is

ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has

advised that we do not do testing, which would imply FEMA's ownership of the issue."

29. plaintiffs aver that, even as Mary Etta Fountain was being placed at risk in unsafe

temporary housing, FEMA had reviewed the results of all earlier testing and complaints of

formaldehyde associated with the temporary housing units and were actively conferring with

temporary housing unit manufacturers concerning formaldehyde exposure in the temporary housing

units and how best to deal with the publicity fallout as the media reports of same increased.

30. Evidence of communications between the defendants exists by way of emails emanating

from the FEMA Office of General Counsel (OCG). For example, in June 16, 2006 the same email

which states "OGC has advised that we do not do testing," states that "Gulfstream is working closely

with FEMA to resolve the formaldehyde problem in smaller travel trailer (Cavalier) units." A later

email reflects relief of the FEMA OCG at the "good news" that "one of the major manufacturers of

national housing units (Gulfstream I think)...wanted to get with External Affairs so they could get

on the same page...we may get the benefit of the manufacturer's 'science' and 'public relations'

approaches." See U.S. House of Representatives, Committee on Oversight and Government Reform,

FEMA'S TRAVEL TRAILERS: LITIGATION CONSIDERATIONS V. HEALTH AND SAFETY

CONSIDERATIONS, AND THE WINNER IS?, July 19, 2007.

31. FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease

Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light.

32. FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana.

33. This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or time scales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.

34. FEMA purposefully interfered with the design and implementation of the earlier testing of the temporary housing units supplied in the wake of the hurricanes in order to avoid legal liability for damages resulting from exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after its receipt of complaints from trailer residents concerning formaldehyde fumes in 2006. See correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security,

January 28, 2008.

35. FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review. FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the temporary housing units. See correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

36. FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. See THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007 at page 7.

37. In testimony before Congress, independent industrial hygienist Mary DeVany described

the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw… I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at pages 107-108.

38. On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

39. Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation"did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." See An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006.

40. FEMA deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in prolonging Mary Etta Fountain's exposure to dangerous levels of formaldehyde in her temporary housing unit, contributing to her injuries and death.

41. It was not until December of 2007 that FEMA initiated testing of occupied housing units. Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.

See Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental
Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and
Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH
CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES
IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

42. The CDC testing revealed the following important findings: (1) the formaldehyde levels
were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2)
levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring
77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments;
(3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary
measured levels are likely to under represent long-term exposures because formaldehyde levels tend
to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were
associated with higher formaldehyde levels, independent of unit make or model; and, (6)
formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer),
but all types tested had elevated levels compared to the data on single-family homes and apartments.
Id. at 4.

43. The CDC's recommendations as a result of this testing included the following: (1) move
quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to
consider establishment of a registry to conduct long-term health monitoring of children and others
who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in
FEMA-provided housing units should spend as much time outdoors as possible and maintain the
temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4)
establish available construction practices which could assure safe and healthy conditions. *Id.*, at 5-6,

11.

44. As a result of this round of testing, FEMA implemented a program which essentially entailed removing the remaining residents from the temporary housing units and placing them into other, safe, forms of housing. FEMA's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, ongoing litigation, and media coverage.

45. FEMA's actions in response to the early reports of formaldehyde emissions, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy. Rather, FEMA's actions and decisions were made with a view toward avoiding negative publicity and legal liability.

46. Additionally and/or in the alternative FEMA ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the temporary housing units it provided.

COUNT 1:

CAUSE OF ACTION AGAINST FEMA

47. At all times herein, FEMA was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the temporary housing units, which duty extended to Mary Etta Fountain and the plaintiffs as her surviving children.

48. FEMA was obligated to promptly warn Mary Etta Fountain of any defects in the temporary housing units which could cause harm and of which FEMA was aware.

49. FEMA, after becoming aware of the potential for such harm, violated this duty to Mary

Etta Fountain, rendering FEMA negligent, grossly negligent, reckless, willful and/or wanton.

50. As a direct and proximate result of the acts and/or omissions of FEMA, as well as its

violations of state and federal laws, Mary Etta Fountain has suffered injury and death and her

surviving children are entitled to recover damages from FEMA.

51. Further, since each the plaintiffs are within the class and category of individuals meant

to be protected by the state and federal statutory and regulatory laws which FEMA violated, they

plead the application of the doctrine of negligence per se.

52. The negligence of FEMA included but was not limited to the following non-exclusive

particulars:

> a. In failing to warn the each of Mary Etta Fountain the plaintiffs of the unreasonably
> dangerous nature of the housing unit which that Plaintiff occupied
>
> b. In failing to promptly remedy the dangerous nature of each such housing unit, on
> becoming aware of the formaldehyde dangers associated with the unit.
>
> c. In failing to timely implement adequate safety measures and procedures to address the
> defects in the housing unit of Mary Etta Fountain, on becoming aware of the formaldehyde
> danger associated with the unit.
>
> d. Such other actions of negligence and fault as will be shown at the trial of this matter.

COUNT 2:

CAUSE OF ACTION AGAINST THE MANUFACTURERS
UNDER LOUISIANA PRODUCTS LIABILITY ACT

53. The housing unit occupied by Mary Etta Fountain was a product under the Louisiana

Products Liability Act [LPLA].

54. The exposure to Mary Etta Fountain to formaldehyde fumes from the temporary housing

unit manufacturer's product and equipment resulted from the normal, foreseeable, and intended use

of the products and equipment, without substantial alteration in the condition in which housing unit

manufacturers sold these housing units.

55. The design of temporary housing units by the manufacturer of her units and other in the industry, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to Mary Etta Fountain, and all contributed to her unreasonable exposure.

56. Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to Mary Etta Fountain.

57. The temporary housing unit manufacturer's products, equipment and supplies were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left housing unit manufacturer's control. Mary Etta Fountain was an intended and foreseeable user of the alleged defective products and damages and losses to Mary Etta Fountain and her surviving children reasonably could have been anticipated by housing unit manufacturers

58. The defects in housing unit manufacturer's temporary housing units are the result of and/or include, but are not limited to, the following:

I. In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

ii. In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;

iii. In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonably anticipated use;

iv. In providing housing units which did not conform to the express warranties made by the housing unit manufacturers regarding their fitness for use as reasonably anticipated;

v. In manufacturing, testing, marketing, distributing, licensing and selling of unreasonably dangerous housing units;

vi. In failing to properly test the temporary housing units to property evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

vii. In failing to warn Mary Etta Fountain of the unreasonably dangerous nature of the housing unit she occupied, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit.

viii. In failing to ensure that the temporary housing units it manufactured and provided to Mary Etta Fountain were suitable for their intended use;

ix. In failing to adhere to any and all express warranties of fitness and safety for the temporary housing units they manufactured and provided;

x. In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

xi. Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

## COMPENSATORY DAMAGES

59. The defendants are individually and/or jointly are responsible for all damages which Mary Etta Fountain and the plaintiffs, her surviving children, suffered and continue to suffer as a consequence of defendants' acts and/or omissions as pled herein.

60. The damages included the loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster.

62. The damages sought herein by plaintiffs were caused by Mary Etta Fountain's exposure to formaldehyde as set forth herein, which damages include, but are not limited to, those available to plaintiffs in wrongful death and survival actions, including loss of society, loss of support, survivor's grief, and incidental damages such as funeral and burial expenses.

## REQUEST FOR JURY TRIAL

Each plaintiffs is entitled to and demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs pray that the defendants be served with a copy of this

Complaint, and that, after due proceedings:

1. there be a judgment herein in favor of the plaintiffs and against defendants for all compensatory damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2. there be specially included in the judgment in each plaintiffs's favor, provisions for all damages and for such relief as found applicable and supported by the evidence, including costs of court and expert witness fees; and

3. all other general, equitable, and further relief as the Court may deem just and proper.

Respectfully Submitted:


**SIMIEN & SIMIEN, L.L.C.**
Attorneys and Counselors at Law
7908 Wrenwood Boulevard
Baton Rouge, Louisiana 70809
Telephone: (225) 932-9221
Facsimile: (225) 932-9286

*s/ Eulis Simien, Jr.*

_____
**Eulis Simien, Jr.** (Bar #12077)