## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JOHNNY SPEER** | * | **DOCKET NO. 07-7018** |
| | * | **CONSOLIDATED WITH MDL NO. 1873** |
| | * | |
| | * | |
| **versus** | * | |
| | * | **JUDGE: ENGELHARDT** |
| | * | |
| **GULF STREAM COACH, INC.,** | * | **SECTION: "N"** |
| **ET AL** | * | |
| | * | **MAGISTRATE: CHASEZ** |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### AMENDED COMPLAINT FOR JOHNNY SPEER
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

The plaintiff **JOHNNY SPEER** pursuant to pursuant to Federal Rules of Civil Procedure Rule 21 and this Honorable Court's instructions in Pretrial Orders 40 (Doc. 1781) and 68 (Doc.14779), respectfully files this Amended Complaint to sever Johnny Speer's claims from  that of Robert and Luca Devlin, and herein Amend as follows:

I.     PARTIES

   A.  Defendants

   That the defendants to this cause of action are:

   **1.**     **GULF STREAM COACH, INC.** a foreign corporation organized in the State of Indiana and authorized to do and doing business in the State of Louisiana.

   **2.**     The Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

**3.**        **Fluor Enterprises, Inc**., a foreign corporation organized in the State of California, whose principal place of business is 6700 Las Colinas Blvd. Irving, TX 75039 and agent for service is Corporation Service Company, 320 Somerulos St. Baton Rouge, La 70802-6129

**B.  Plaintiffs**

**4.**        Plaintiff, **JOHNNIE SPEER,** is of the full age of majority and a resident of Orleans Parish, Louisiana who respectfully represent:

**II.        JURISDICTION**

**5.**

This Court also has jurisdiction under 28 U.S.C. § 1332. The plaintiffs are citizens of Louisiana, and the defendants are incorporated under the laws of Indiana and Delaware. Each plaintiff's claim, exclusive of interest and costs, exceeds $75,000.00.

**6.**

This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq.*.

**II.        VENUE**

**7.**

Venue is proper in this district under 28 U.S.C.§ 1391 (b)-( c) and 1400(b) because the defendants are doing business in this district and the plaintiffs causes of actions arose in this district.

**III.        FACTS**

**8.**

Plaintiff was displaced from his permanent home as a result of Hurricane Katrina. Since

2

his home was rendered uninhabitable as a result of Hurricane Katrina, Plaintiff was deemed eligible to receive emergency housing assistance from the defendant FEMA, pursuant to  the Stafford Act and applicable federal regulations.

**9.**

The emergency housing assistance provided to plaintiff, **Johnny Speer** received was in the form of a **travel trailer manufactured by the defendant Gulf Stream Coach, Inc.,** with Vehicle Identification Number (VIN) 1NL1GTR2761029687.

**10.**

The travel trailer was delivered to plaintiff Johnny Speer for occupancy at 6494 Ponchartrain, New Orleans, Louisiana.

**11.**

The travel trailer delivered to Johnny Speer was **installed** at the above location and hooked to utilities, etc. for residential purposes by the defendant **Fluor Enterprises, Inc**., pursuant to a contract between Fluor Enterprises and the defendant FEMA.

**12.**

Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet.  They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at:*

http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.    They    are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities.  *Id.*

**13.**

Plaintiff resides or has resided in a manufactured mobile homes or travel trailers (hereinafter, collectively referred to as "Housing Units") in the State of Louisiana. This Housing Units were provided by the Federal Emergency Management Agency("FEMA") after the landfalls of Hurricane Katrina and Hurricane Rita in August and September 2005. Persons residing or living in these Housing Units have been and continue to be subjected to harmful levels of formaldehyde while residing in the Housing Units.

**14.**

Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area).  They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction.  *Id.*

**15.**

Plaintiff has spent significant time in a FEMA-provided Housing Unit, manufactured by the Defendant. In this Manner, Plaintiff has been exposed to dangerously high concentrations of formaldehyde fumes.

**16.**

Formaldehyde is used in the manufacture of certain construction materials such as particle board and plywood, particularly in the manufactured home industry. There is no question that Defendants knew that formaldehyde is dangerous. Indeed, pursuant to federal law, Defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

4

**IMPORTANT HEALTH NOTICE**

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and Young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult Your doctor or local health department.

See 24 C.F.R. Section 3280.309.

## IV.    CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT

### 17.

At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to  the Plaintiff.

### 18.

The Federal Government was obligated to promptly warn the Plaintiff of any defects in the housing unit which could cause harm and of which the Federal Government was aware.

### 19.

The Federal Government, after becoming aware of the potential for such harm, violated this duty to the Plaintiff, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

**20.**

As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violation(s) of state and federal laws, Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

**21.**

Further, since Plaintiff is within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiff specifically pleads the application of the doctrine of negligence *per se.*

**22.**

The Federal Government was negligent and at fault in the following non-exclusive particulars:

    i.  In failing to warn the each of the Plaintiff of the unreasonably dangerous nature of the housing unit which that Plaintiff occupied

    ii.  In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit.

    iii.  In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of the Plaintiff, on becoming aware of the formaldehyde danger associated with the unit.

    iv.  Such other actions of negligence and fault as will be shown at the trial of this matter.

## V.    <u>HEALTH EFFECTS OF FORMALDEHYDE</u>

**23.**

Formaldehyde is classified as a human carcinogen and has been linked to nasal, lung cancer, brain cancer, leukemia and other blood malignancies. Formaldehyde is mutagenic to human cells

and causes permanent replicable damage to recombinant DNA.

## 24.

Short term exposure to formaldehyde can be fatal. During short-term exposure irritation of the eyes and mucous membranes will occur.

## 25.

Long-term exposure to formaldehyde may cause respiratory difficulty, eczema and sensitization. Further, asthma, irregular bleeding, shortness of breath, nausea, and other disorders are caused by formaldehyde.

## 26.

According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA").

## 27.

Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

## 28.

ATSDR, OSHA and NIOSH have set limits on formaldehyde exposure for adults in the workplace, based on 40 hour workweeks. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an eight hour day, from 3 parts per million(ppm) to 1 ppm. In May 1992, the formaldehyde exposure limit was further reduced to 0.75 ppm.

**29.**

Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects.  In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3ppm to 1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

**30.**

The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied  housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.   Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf)  and D (*available at* http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

**31.**

HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when

installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

**32.**

Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between two weeks and a year |
| | 0.008 ppm – exposures exceeding 365 days |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

**33.**

OSHA also requires medical monitoring for all employees exposed to a time-weighted average concentration of formaldehyde of .01 ppm or more.

**34.**

**GULF STREAM COACH, INC.** knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards and published medical studies.

**35.**

The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

**36.**

Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

**37.**

In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every

trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels. *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

**38.**

Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Plaintiffs. *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at:*

http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

**39.**

The Federal Government also continued to supply the defective and dangerous housing units to the Plaintiffs after March of 2006 .

**40.**

The Federal Government continued to  supply the defective and dangerous housing units to the Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

**41.**

The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra*, and Exhibits E (*available at:* http://oversight.house.gov/documents/20070719113322.pdf), I (*available at:* http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at:* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

**42.**

While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue."  Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails *available at:* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

**43.**

The Plaintiffs avers that, even as he was being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the Manufacturing Defendants concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

**44.**

FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher.  The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light.   Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at:*

 http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

**45.**

FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers.  This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents.  This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge,  Louisiana.  Union of Concerned Scientists, and Exhibit R attached thereto, *supra*.  *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units,

Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at*http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report_0507.pdf.

**46.**

This testing methodology did not simulate the living conditions, temperatures, humidity, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.  Union of Concerned Scientists, *supra*.

**47.**

FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein as a result of their exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

**48.**

FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.  FEMA did

so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

**49.**

FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as  its "level of concern," a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this  "level of concern," the average sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

**50.**

Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating  "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw… I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee

on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

**51.**

On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

**52.**

Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation" did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at:*

http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

**53.**

The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiff's exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

**54.**

It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random

sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

**55.**

The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments.  *Id.* at 4.

**56.**

The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still

living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions.  *Id.* at 5-6, 11.

**57.**

As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing.  The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

**58.**

The Federal Government's actions in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy.  Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

**59.**

Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

**60.**

Defendants provided Housing Units to the Plaintiff which emit formaldehyde at a dangerously unhealthy rate, in excess of these levels, and which have resulted and will continue to result in injury to the Plaintiffs.

VI.     **EXPOSURE PATHWAYS**

**61.**

Formaldehyde can enter the human body in any one of three ways: absorption through the skin, by inhalation or by ingestion. Formaldehyde is given off as a gas from treated wood inside the trailers and mobile homes, Formaldehyde dust or resin is also inhaled in its solid form and is deposited in the nasopharyngeal, laryngeal, and bronchial tissues of the human body.

VII.     **FEAR OF CANCER AND OTHER SERIOUS DISEASES**

**62.**

As a result of his exposure to formaldehyde the plaintiff will develop, among other things, diseases, birth defects, cancers, including but not limited to: nasal, lung cancer, brain cancer, leukemia and other blood malignancies and other serious diseases such as respiratory disorders, reproductive disorders, cardiovascular disorders, and non-malignant tumors.

**63.**

Plaintiff sustained significant exposures to a known human carcinogen known as formaldehyde. As a proximate cause of such exposure plaintiff has a significant risk of contracting a serious latent disease. The plaintiff's risk is increased by being exposed to formaldehyde.

## VIII.   NEGLIGENCE, NEGLIGENCE PER SE, GROSS NEGLIGENCE

### 64.

At all times, Defendants were under a duty to use due care and caution for the safety of foreseeable users and occupants of Housing Units, including the Plaintiff, in:

    i.   Manufacturing, marketing, distributing, licensing and selling the Housing Units.

    ii.  Providing safe and non-dangerous Housing Units for the use of the Plaintiff.

    iii. Observing and complying with the requirements of all applicable statutes, regulations and ordinances.

    iv. Ensuring that the products at issue, the Housing Units, met or exceeded industry and government standards.

    v.  Alerting consumers and occupants of the defects in the Housing Units, through a meaningful product recall or other notice of defects, to the marketplace.

### 65.

Defendants breached their duties and were negligent, negligent per se, grossly negligent, and reckless and willful in providing Housing Units which were unreasonably dangerous, unhealthy and unsafe, due to their high level of formaldehyde emissions, in the following respects:

    i.   Manufacturing, testing marketing, distributing, providing, licensing, and selling of  Housing Units, which were defective and unreasonably dangerous for their foreseeable use, and not suited for their intended use, because of excessive emissions of formaldehyde.

    ii.  Failing to properly test the Housing Units to properly evaluate their level of emissions of formaldehyde under foreseeable conditions for extended periods of time.

    iii. Failing to properly, hire, train, and supervise individuals who in turn would inspect materials manufactured by vendors of wood products used in Housing Units to ensure that such wood material did not emit excessive levels of formaldehyde.

    iv. Failing to provide adequate updates, information, and warnings to occupants and end users of Housing Units, about the presence of excessive levels of formaldehyde emissions and the hazards associated with the excessive levels of formaldehyde emissions.

v.   Failing to provide proper and adequate updated, information, and warnings to occupants and end users after the sale of Housing Units, about the hazards associate with excessive levels of formaldehyde emissions.

vi.   Failing to remedy to dangerous nature of the Housing Units they manufactured and provided.

vii.   Failing to act in a prudent and careful way under the situation and circumstances.

viii.   Failing to adhere to an express or implied warranty of fitness and safety for the housing units they manufactured and provided.

ix.   Such other actions of negligence and fault as will be shown at the trial of this matter.

## IX.   STRICT LIABILITY

### 66.

Defendants' actions in selling the Housing Units in a defective condition, which was unreasonably dangerous, and which reached the Plaintiff without substantial change in condition, constituted a behavior for which the Defendants are strictly liable to the Plaintiff in tort.

## X.   LOUISIANA PRODUCTS LIABILITY

### 67.

The Housing Units constitute products under the Louisiana Products Liability Act.

### 68.

The exposure to formaldehyde fumes from the Defendant's Housing Units resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration, in the condition in which the Defendant sold these products and equipment.

### 69.

The design of the Housing Units, using plywood, press board or other composite wood products that contain formaldehyde is defective and poses an unreasonable risk of harm to the Plaintiff. Alternatively, the use of plywood, press board or other composite wood products that contain formaldehyde constitutes a defect in composition or manufacture, which poses an unreasonable risk of harm to the Plaintiff.

21

**70.**

The U.S. federal government contracted directly or indirectly with the Defendant Gulf Stream Coach, Inc. to purchase more than 100,000 Housing Units after Hurricane Katrina and Rita. At the time, only 14,000 had been manufactured.

**71.**

In order to meet the government's order, the Defendant manufacturer set up ad hoc assembly lines, hired temporary workers, operated the assembly lines for twelve hour shifts, six days per week, and required workers to produce trailers at a rate of as little as ten minutes per trailer. This was done without the benefits of Defendant's usual quality control.

**72.**

Defendant manufacturer was unable to find enough construction materials from their usual suppliers of low-formaldehyde emitting material, and instead used high-formaldehyde emitting particle board, composite woods, adhesive and other materials in the manufacture of the Housing Units.

**73.**

The exposure to the Plaintiff to formaldehyde fumes from **GULF STREAM COACH, INC.***'s* products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which **GULF STREAM COACH, INC.** sold these housing units.

**74.**

The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to the Plaintiff.

**75.**

On information and belief, the housing unit of the Plaintiff, whether manufactured prior to the hurricanes or later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

**76**.

Plaintiff submits that the housing unit which is at issue herein, whether manufactured prior to the hurricanes or manufactured later and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

**77.**

Plaintiff submit that the housing unit at issue contained dangerous levels of formaldehyde due to **GULF STREAM COACH, INC.**'s use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that **GULF STREAM COACH, INC.** failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

**78.**

Plaintiff submits that **GULF STREAM COACH, INC.** ignored, or concealed and/or condoned the concealment of, the fact that the housing unit at issue contained dangerous levels of formaldehyde due to **GULF STREAM COACH, INC.**'s use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell **GULF STREAM COACH, INC.**'s products, and/or avoid the costs

23

of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

79.

Defendant's products were in a defective condition, and were unreasonably dangerous under normal use at the time the products and equipment left the respective Defendant's control. The Plaintiff was an intended and foreseeable user of the Housing Unit, and damages and losses to the Plaintiff could reasonably be anticipated by the Defendant. The defects in Defendant's Housing Unit include, without limitation:

i. Lack of instructions or lack of sufficient instructions for eliminating or minimizing the health risks in the use of the product;

ii. Lack of sufficient inspections by the Defendant of its products to ensure that such products contained sufficient warnings of the dangerous properties of the product;

iii. Lack of reasonable inspections by the Defendants of its products to ensure that such products contained sufficient instructions for eliminating or minimizing the health risks inherent in the use of the products;

iv. Lack of testing or lack of sufficient tests to determine the effects and/or the risks of formaldehyde fumes on intended users of the products or their guests;

v. Defective designs calling for the inclusion of materials which included formaldehyde, when equally suitable materials which did not contain formaldehyde were available.

vi. In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

vii. In providing a housing unit which, by virtue of its design and/or manufacture and/or composition, was unreasonably dangerous under reasonably anticipated use;

viii. In providing a housing unit which, by virtue of a lack of an adequate warning(s), was unreasonably dangerous under reasonably anticipated use;

ix. In providing a housing unit which did not conform to the express warranties made by **GULF STREAM COACH, INC.** regarding its fitness for use as reasonably anticipated;

x. In manufacturing, testing, marketing, distributing, licensing and selling of unreasonably dangerous housing units;

xi. In failing to properly test the housing unit to properly evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

xii. In failing to warn the Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit.

xiii. In failing to ensure that the housing units it manufactured and provided to the Plaintiff was suitable for its intended use;

xiv. In failing to adhere to any and all express warranties of fitness and safety for the housing units it  manufactured and provided;

xv. In manufacturing and providing a housing unit which was unduly dangerous due to its emissions of formaldehyde; and,

xvi. Such other indicia of fault under the LPLA  as will be shown at the trial of this matter

**80.**

Plaintiff alleges that the defendant manufacturer's duty to warn him about the dangers and risks of formaldehyde in this travel trailer was continuing in nature, and legally was owed to plaintiff by the defendant manufacturer during the entire period that plaintiff occupied this travel trailer.

**81.**

The Plaintiff spent significant time in the FEMA-provided housing unit manufactured by **GULF STREAM COACH, INC.** and provided to Plaintiffs by the Federal Government.  As a result, the Plaintiff unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

**XI.**   **BREACH OF WARRANTIES**

**82.**

At all times relevant, Defendants were in the business of manufacturing, marketing, distributing, and selling mobile homes and travel trailers in the United States.

**83.**

Defendant manufacturer sold the mobile homes and trailers to the U.S. federal government

and/or its agents or representatives for use as Housing Units.

**84.**

Defendant manufacture expressly or impliedly warranted that the Housing Units would be of merchantable quality and fit for their intended purpose as a safe and compliant house to be used, among other things, to house families including families with small children and infants.

**85.**

Defendant manufacturer materially breached these warranties in that the Housing Unit was defective and unfit for those particular purposes and was not of a reasonably merchantable quality.

**XII.    CONCEALMENT AND MISREPRESENTATIONS**

**86.**

The defendants concealed the health effects associated with formaldehyde and failed to warn the plaintiff of the risk of exposure to formaldehyde in the trailers.

**87.**

The defendants knew that the information being provided to the public, in particular to the plaintiffs was false. Furthermore, the defendants concealed the testing that indicated harmful levels of formaldehyde were emitting from the trailers.

**88.**

As a result of the defendants misrepresentations, the Plaintiff has suffered additional damages by being exposed to these toxic and unsafe fumes when they relied upon the fraudulent misrepresentations by occupying the trailers. The plaintiff did not learn of the toxic exposures until recently.

**89.**

As a result of the defendants' misrepresentations and concealment of material facts, the Plaintiff has suffered damages in the form of mental and physical pain and suffering, personal injury, past and future medical expenses, fear of cancer and mental distress.

XIII.  **INJURY**

**90.**

Plaintiff **JOHNNIE SPEER** has experienced the following symptoms or disorders, while living

in Gulf Stream Coach, Inc. Trailer bearing VIN # 1NL1GTR2761029687 including but not limited to:

    i.  bleeding;

    ii.  blood disorders.

XIV.  **DAMAGES**

**91.**

As a result of the defendants' acts and omissions as described, petitioner has sustained

tremendous damages. The plaintiff is entitled to recover full money damages, past and future, for

all elements of damage allowed by Louisiana law. The damages suffered by the plaintiff exceed

the minimum jurisdictional limit of this court. The damages are, without limitation:

    i.    Past, present, and future loss of income;

    ii.    Past, present, and future medical expenses and costs;

    iii.    Past, present, and future pain and suffering, emotional distress, mental anguish, temporary and permanent disability;

    iv.    Expenses relating to psychological and mental therapy;

    v.    Loss of life;

    vi.    Loss of Quality of Life

    vii.    Loss of Consortium;

    viii.    Loss of chosen profession;

    ix.    Funeral and Burial Expenses; and

    x.    All damages which have flowed and which will flow from the maintaining by the defendants of the negligent condition.

XV.  **JURY TRIAL**

**92.**

Plaintiff requests a trial by jury.

## XVI.   JOINT_AND SOLIDARY LIABILITY

**93.**

 The defendants are liable to the plaintiffs jointly and in solido, for the amounts of money necessary to repair the damages suffered by the plaintiff.

**96.**

Plaintiff respectfully reiterates and incorporates all of the allegations with respect to the cause of action for negligence against the defendant Fluor under the Louisiana law, specifically in the alternative and in the event these defendants are not be found to be a "manufacturer" liable under the Louisiana Product Liability Act.

Wherefore, the plaintiffs requests that the defendants, **GULF STREAM COACH, INC, FEMA, and Fluor Enterprises, Inc**., be served with process and that there be judgment in favor of plaintiffs for all their damages and against defendants, jointly and in solido for all their damages, and pre-judgment and post judgment interest, for attorney fees and costs, and for general relief at law or in equity.

RESPECTFULLY SUBMITTED:

**WILLIAMS LAW OFFICE, LLC**
/s/ L. Eric Williams, Jr.
L. Eric Williams, Jr. #26773
 3000 W. Esplanade Ave., Suite 200
Metairie, Louisiana 70001
Telephone:(504) 832-9898
Facsimile: (504) 832-9838
eric@toxictortlaw.net
**Lead Counsel for Plaintiffs**

**CERTIFICATE OF SERVICE**
I hereby certify that, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.
s/L. Eric Williams, Jr.
L. Eric Williams, Jr.