UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * * * * | MDL NO. 1873 SECTION "N" (5) JUDGE ENGELHARDT MAGISTRATE CHASEZ |
| THIS DOCUMENT IS RELATED TO | | * * | |
| *Ausbrooks v. Forest River, Inc., et al.; Early v. Gulf Stream, et al.; Price v. Jayco, Inc., et al.; Clementin v. Keystone RV, et al.; Wiliams v. KZRV, LP, et al.* | | * * * * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY OF PAUL HEWETT, PH. D., CIH**

Plaintiffs respectfully submit the following response to "Defendants' Motion *in Limine* to Exclude Expert Testimony of Paul Hewett, Ph. D.," and show as follows:

**I. INTRODUCTION**

Plaintiffs have designated Paul H. Hewett, Ph.D., CIH for his expertise in exposure assessment and statistical analysis. Dr. Hewett holds a doctorate degree in industrial hygiene, and previously worked for NIOSH for twenty-five years. Exhibit A, Curriculum Vitae of Paul Hewett, Ph.D., CIH, p. 1. He is currently CEO of Exposure Assessment Solutions, Inc., a firm engaging in consulting, training, software design and sales, and publications related to industrial hygiene. Exhibit A, p. 1. He has published extensively in peer-reviewed journals. Exhibit A, p. 2-4.

In this matter, Dr. Hewett has performed statistical analysis on a dataset of formaldehyde measurements from various models of emergency housing units ("EHUs") manufactured by Forest River, Inc., Gulf Stream Coach, Inc., Jayco, Inc.,

1

Keystone RV Company, and KZRV, LP. Exhibit B, Report of Paul Hewett, Ph. D., CIH, Oct. 4, 2010, p. 1. The dataset, consisting of over 3,943 separate exposure measurements, is the result of formaldehyde testing conducted on FEMA trailers by various entities. These testing entities, for which the data is publicly available, include the Sierra Club, the Centers for Disease Control ("CDC"), and the Texas Parks & Wildlife Department. The remainder of data originates from testing performed by four different firms hired by the Plaintiffs' Steering Committee ("PSC"),[1] and has been produced in full to Defendants.

In five previous FEMA bellwethers trials, Plaintiffs have utilized Dr. Hewett's expertise to provide the probable levels of formaldehyde in each bellwether's EHU. Here, Defendants again take issue with Dr. Hewett's methodology, and for the reasons asserted below, this Court should again deny Defendants' motion to exclude Dr. Hewett's testimony.

## II.  STANDARD OF ADMISSIBILITY.

An expert must "by knowledge, skill, experience, training, or education" provide "scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 508 U.S. 579, 589-91 (1993). Prior to accepting the testimony of an expert witness, trial courts are charged with a "gatekeeper" function requiring a determination of whether an expert is sufficiently qualified and whether their opinion is based upon sound, reliable theory. *Daubert,* 509 U.S. at 589-91 (1993). As such, "[p]roposed testimony must be supported by appropriate validation—*i.e.*, good grounds." *Id.* at 590 (internal quotations omitted).

---

[1] Gulf Stream, Inc. collected data measurements, which it submitted to the U.S. House of Representatives. The test results, however, did not specify the manufacturer, and thus were not included in Dr. Hewett's dataset.

2

The court's role as gatekeeper, however, should not replace the adversarial system. *Pipitone v. Biomatrix*, Inc., 288 F.3d 239, 250 (5th Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, H509 U.S. at 595.

### III. DEFENDANTS CONFUSE THE OBJECTIVES OF DR. HEWETT'S TESTIMONY

Dr. Hewett has clearly enunciated his objectives in pooling and analyzing the various datasets:

(1) Compare, using graphical and statistical methods, the formaldehyde levels to the Agency for Toxic Substances and Disease Registry (ATSDR) chronic exposure "Minimum Risk Level" (MRL) of 0.008 ppm limit for formaldehyde, which was intended to be used for minimizing risk to the general population whenever exposures exceed 365 days, as well as the intermediate and acute exposure MRL's;

(2) Compare, using graphical and statistical methods, the formaldehyde levels to other exposure limits;

(3) Evaluate the dataset for evidence that the formaldehyde levels tend to decline with the age of the THU;

(4) Estimate the probable formaldehyde levels for residents, such as the plaintiffs, in unmeasured, unevaluated, and untested THU's in general and in a specific model in particular.

Exhibit B, p. 2.

Nonetheless, Defendants dedicate the majority of their motion to misconstruing Dr. Hewett's stated objectives. Defendants argue that Dr. Hewett's methodology is faulty because is does not follow the Monte Carlo analysis and assess the "magnitude, frequency, and duration" of plaintiffs formaldehyde exposure. Rec. Doc. 18283-1, p. 8. Defendants further cite multiple technical definitions from multiple sources in attempt to reconfigure Dr. Hewett's stated objectives. Dr. Hewett was not tasked with assessing

plaintiffs' toxicological risk of formaldehyde, but was limited to "estimat[ing] the probably formaldehyde levels." Exhibit B, p. 2.

### A. The Scope of Dr. Hewett's Analysis Does Not Involve an Assessment of Plaintiffs' Biological Response to Formaldehyde Exposure

Defendants begin their motion with a lengthy description of the Monte Carlo analysis. Rec. Doc. 18283-1, p. 3. This analysis is predominantly used in verifying risk assessments, and despite Defendants' implications, it is but one method to verify reliability. Moreover, Dr. Hewett, as explained in great detail below, has not been charged with assessing the level of risk of exposure to formaldehyde. He has only been charged with estimating the level of formaldehyde in EHUs.

Further, Defendants rely on the Environmental Protection Agency's ("EPA") Exposure Assessment Guidelines as somehow unequivocally "requiring" the performance of individual plaintiff evaluations. Rec. Doc. 18283-1, p. 8. Defendants, however, fail to realize that the EPA utilizes exposure assessments to achieve varying goals, for example: to calculate risk or to establish causation. Both of these goals clearly require analysis of the subject population. *See,* U.S. Envtl. Protec. Agency, *Guidelines for Exposure Assessment*, 57 Fed. Reg. 22888, 22889 (1992). However, where the assessor does not seek to draw conclusion regarding risk or causation, i.e. population-specific conclusions, the "magnitude, frequency, and duration" are not relevant. *See, e.g.,* Exhibit C, Deposition of Paul Hewett, Ph. D., CIH, Nov. 15, 2010, p. 26:22 – 27:4. Accordingly, Defendants unbridled reliance on the Monte Carlo analysis, and their focus on plaintiff-specific factors is odd and irrelevant given Hewett's stated objectives.

Essentially, Defendants fail to take their own words to heart: "scientific validity of an exposure assessment must be determined on a case by case basis." Rec. Doc. 18283-1, p. 3. In this litigation, Dr. Hewett does not seek to assess risk or establish

4

causation—such is accomplished by other experts—instead, Hewett is limited to evaluating formaldehyde levels and using his expertise to assess whether untested models would fall above or below regulatory limits. Dr. Hewett simply has not been tasked to evaluate the effects of formaldehyde on plaintiffs.

### B. Defendants' Definitions Do Not Alter Dr. Hewett's Stated Objectives

Defendants further attempt to confuse Dr. Hewett's objectives by reciting definitions from various sources to imply that individual analysis is required regardless of the assessment's purpose. For example, Defendants include the ATSDR definition and calculation of "exposure dose" to establish the need for all plaintiffs "intake rate," "body weight," and other factors. Again, Defendants ignore Dr. Hewett's objectives in his analysis, and disregard the EPA tenant that all assessments must be tailored to their purposes, which Dr. Hewett has done. U.S. Envtl. Protec. Agency, *Guidelines for Exposure Assessment*, 57 Fed. Reg. 22888, 22889 (1992). Essentially, Defendants engage in a game of semantics to manipulate the purpose of Dr. Hewett's testimony. Dr Hewett does not purport to establish the "dose," or amount of plaintiffs' exposure, but only the probable level of formaldehyde in the EHU during the time of residence. *See* Exhibit B, p. 2.

### IV. DR. HEWETT'S METHODOLOGY IS RELIABLE, AND ANY QUESTIONS REGARDING SUCH ARE MORE APPROPRIATELY HANDLED THROUGH CROSS EXAMINATION OR REBUTTAL WITNESSES

In section three of his report, Dr. Hewett clearly establishes the exact methodology utilized:

> The data were transferred to a "working" Excel spreadsheet and then imported into Systat® (Version 12), a statistical analysis program. Appropriate fields were inspected for odd or inconsistent entries, such as text entries in a numeric field, or unexpected entries, e.g., a temperature of 932°F that should have been entered as 93.2°F.
>
> Summary statistics were produced using both Systat and the

5

> IHDataAnalyst (Version 1.01). All figures, descriptive statistics, and analysis-of-variance statistics were generated or calculated using Systat. The IHDataAnalyst was used (a) to evaluate the goodness-of-fit for the lognormal distribution model, looking for egregious departures, (b) to estimate the non-parametric exceedance fraction (i.e., the fraction or percent of formaldehyde levels expected to be above the ATSDR and other limits), plus the lower and upper confidence limits for this estimate, and (c) to calculate the Minimum Variance Unbiased Estimator (MVUE) (an estimate of the mean; discussed in Section 3.4) and its lower and upper confidence limits.
>
> A few of the "travel trailer" measurements were identified as non-detects (i.e., the true concentration was less than the minimum detectable concentration). Given the low percentage of non-detects, the common method of substituting half of the minimum detectable concentration (i.e., the non-detect concentration) for use in the statistical analyses was employed (Hewett and Ganser, 2007; Hewett, Appendix VIII, in Bullock and Ignacio, 2006).

Exhibit B, p. 11-12 (footnotes omitted). Defendants take issue with Dr. Hewett's methodology, specifically his: (1) validation of the data; (2) use of lognormal distribution; (3) calculation of confidence intervals; and (4) comparison to ATSDR and other regulatory limits. As shown below, Defendants arguments lack merit. Moreover, given that Defendants' motion to exclude is in large part a direct quotation of their expert's report (notably without quotation marks) and is unsupported by models or calculations, whether Dr. Hewett's methodology is unreliable is more appropriately handled during trial through cross examination or rebuttal testimony.

  A.  **Validation of the Data**

Defendants cite Dr. Hewett's failure to "validate" the testing data as a basis for flawed methodology. Rec. Doc. 18283-1, p. 17; *see also* Exhibit D, Deposition of Lawrence Mayer, M.D., Ph. D., Jan. 7, 2011, p. 89:6-8; 282:6-8. As noted above, Dr. Hewett was not tasked with "validating" the dataset; he was tasked with analyzing the testing set under his prescribed objectives. Defendants have been provided with all test

6

results, and could have contested the data itself in a motion *in limine*, but have chosen not to. As this Court noted in a previous bellwether matter:

> [Defendant] fails to point out a single instance wherein such data, or portions of the data, are, in fact, unreliable or inaccurate. While it is clear Dr. Hewett may not be in the position to vouch for the accuracy or reliability of the data provided to him, such will not be his task at trial. Of course, [Defendant] is entitled to cross examine Dr. Hewett's opinions, such that it is established that the opinion may be only be as good as the underlying data, which is a common method of scrutinizing the opinion of a testifying expert.

Rec. Doc. 3091-1, p. 1-2. The same situation is present again before the Court: Defendants have provided no examples of erroneous or unreliable data. Therefore, Plaintiffs respectfully request that this Court adopt the above quoted finding in this matter.

    **B.    Use of Lognormal Distribution**

Defendants next contest Dr. Hewett's methodological decision to use a lognormal distribution. Copying, word for word, the report of their expert, Dr. Mayer,[2] Defendants allege that Dr. Hewett's decision to use the lognormal distribution model is flawed because (1) Dr. Hewett does not examine the data; (2) Dr. Hewett does analyze the data; and (3) Dr. Hewett does not let the data dictate the model. Rec. Doc. 18283-1, p. 18; Exhibit E, p. 5. These assertions, however, are all false. In his deposition, Dr. Hewett clearly enunciated the manner in which he examined and analyzed the data:

> Q.    First, I want to know what you are looking for subjectively to see that goodness of fit is met?
>
> A.    You look to see if the data follow along a best-fit line reasonably well. A perfect concordance would be every data point falls exactly along the best fit line. You also see departures at the high end and the low end. There are other variations. If you see a waviness or a systematic departure from the best fit line, you might suspect you have a mixture of distributions. In the majority of the cases, the

---

[2] Plaintiffs have highlighted the portions of Dr. Mayer's report that Defendants have improperly quoted without citation. See Exhibit E, Report of Lawrence Mayer, M.D., Ph. D., Nov. 14, 2010.

> data fit very well. In some cases, extraordinarily well, even though they failed a formal goodness of fit test.

Exhibit C, p. 93:3-19; see also Exhibit C, p. 91:8-9 ("Q. Did you graph the data? A. Yes, I did."). Dr. Hewett additionally explained the necessity of subjective and objective analysis prior to conducting the lognormal distribution on large datasets.

> A. When you have a large dataset, you often fail the goodness of fit objective evaluation. Which is why you do a subjective test as well, to see if the data looked reasonably lognormal or matched whatever distribution model you're applying.

Exhibit D, p. 90:24-91:4.

Defendants additionally argue that Dr. Hewett "assumed" that the lognormal fit without support. Rec. Doc. 18283-1, p. 19. Again, as noted in the quotes above, Dr. Hewett performed analysis on the data, and in his deposition, Dr. Hewett detailed his assessment of lognormal distribution, including an explanation of the occurrences of "extraordinarily high exposures." Exhibit C, p. 94:6-96:23.

More importantly, though, during his extensive career as an industrial hygienist with NIOSH, Dr. Hewett accrued the experienced to properly assess the fit for data. His use of software programs has included not only those available in the public domain, but Dr. Hewett has also developed his own software available for sale to the public. In so many words, Dr. Hewett uses the same methodology in the same manner as an expert industrial hygienist. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

    C.    **Calculation of Confidence Intervals**

Defendants next assert that Dr. Hewett's calculation of confidence intervals "are not optimal," but fail to provide any evidence that such confidence intervals are, in fact, not optimal. Instead, Defendants provide a quotation that merely suggests the possibility of overestimation. Despite the existence of alternative means to calculate

8

confidence intervals, without evidence that Dr. Hewett's calculations are in fact flawed, a mere possibility of error is insufficient to render his testimony unreliable. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994). ("T]he grounds for the expert's opinion merely have to be good, they do not have to perfect.").

### D. Comparison to ATSDR

Defendants next take issue with Dr. Hewett's use of ATSDR and other regulatory limits. Dr. Hewett is not incorporating these limits into his calculation, but is simply comparing his analysis to these limits. A similar argument was presented in a previous bellwether matter, to which the Court responded:

> [Defendant] objects to Dr. Hewett's testimony on grounds that he was asked by Plaintiffs' counsel to use regulatory risk assessment variables such as the National Institute for Occupation Safety and Health ("NIOSH") level and the Agency for Toxic Substances and Disease Registry ("ATSDR") level. [Defendant] claims that those levels are not established as the appropriate levels to determine its liability. It is expected that Plaintiffs' counsel, in his direct examination of Dr. Hewett, will make it clear where those levels came form, and that those levels do not necessarily establish [Defendant]'s liability. This Court will also give an appropriate instruction to the jury when Dr. Hewett testifies as to how his analyses of the levels match up against those two particular measurements. To be clear, ambient formaldehyde levels established for a variety of regulatory purposes will not be conveyed to the jury as the benchmark or threshold for the establishment of legal liability.

Rec. Doc. 3091-1, p. 2. Plaintiffs respectfully request this Court adopt this finding with respect to this matter.

### E. Whether Dr. Hewett's Methodology is Reliable Should be Handled Through Cross Examination or Rebuttal Witnesses During Trial

In his report, Dr. Hewett has provided his exact methodology, which he has defended through multiple depositions in this litigation. The portion of Defendants' motion pertaining to Dr. Hewett's methodology is a word-for-word, unquoted copy of their expert's report, and further fails to provide any factual basis in which to discount Dr. Hewett's methodology. Defendants do not support their contentions with any

9

models or calculations, and instead rely only on the statement of their expert, Dr. Mayer. Although provided with the means to "correct" or "recalculate" Dr. Hewett's analysis, Dr. Mayer refrained from proving his assertions. Exhibit E, Report of Lawrence Mayer, M.D., Ph.D. Essentially, Defendants ask the Court to exclude Dr. Hewett's testimony based on a game of "he said, she said." Such is not proper given Dr. Hewett's experience as an industrial hygienist, and the lack of data supporting Dr. Mayer's conclusions. Accordingly, the reliability of Dr. Hewett's methodology should be properly left to trial.

## V.  CONCLUSION

Despite Dr. Hewett's statement of his objectives, Defendants have lost site of Dr. Hewett's testimonial purpose. Dr. Hewett does not seek to opine on how formaldehyde affects plaintiffs. His opinion is confined to determining, with reasonable probability, the level of formaldehyde in a trailer. Such has nothing to do with a person's body mass, rate of intake, or duration in an EHU. Further, the methodology employed by Dr. Hewett is one employed by an expert experienced in these types of assessments, and Defendants provide no evidence to the contrary. Accordingly, Plaintiffs respectfully request that this Court deny Defendants Motion to Exclude the Testimony of Dr. Hewett.

        Respectfully submitted:

        FEMA TRAILER FORMALDEHYDE
        PRODUCT LIABILITY LITIGATION

        BY:   s/Gerald E. Meunier
                GERALD E. MEUNIER, #9471
                PLAINTIFFS' CO-LIAISON COUNSEL
                Gainsburgh, Benjamin, David, Meunier &
                Warshauer, L.L.C.
                2800 Energy Centre, 1100 Poydras Street
                New Orleans, Louisiana 70163
                Telephone:   504/522-2304

Facsimile: 504/528-9973
gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
PLAINTIFFS' CO-LIAISON COUNSEL
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: 504/522-2304
Facsimile: 504/528-9973
jwoods@gainsben.com

COURT-APPOINTED PLAINTIFFS' STEERING COMMITTEE
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
Dennis Reich, Texas #16739600

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing on January 14, 2011.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471