# Comments on "Analysis of the Formaldehyde Dataset For Forest River, Inc.; Gulf Stream Coach, Inc.; Jayco, Inc., Keystone RV Company; and KZRV, LP" dated October 4, 2010 by  Paul Hewett, PhD, CIH

## Lawrence S. Mayer, MD, MS, PhD

## November 14th, 2010

In an Order dated July 23, 2010 the Honorable Kurt D. Engelhardt of the United States District Court Eastern District of Louisiana directed:

> **On or before Friday, September 3, 2010**, Plaintiffs shall identify particular cases wherein statistical analysis can be used. **On or before Monday, October 4, 2010, Plaintiffs shall issue a statistical analysis report** (along with the reliance materials) addressing the earlier identified cases.  [**bold emphasis** in original; **bold underlined emphasis** added herein]

A "statistical analysis report" of a potential toxic exposure in temporary housing units (THUs) should cover five topics:

1. Gathering, or at least validating, the available exposure data.
2. Building and validating a statistical model of the level of exposure in a THU as a function of the characteristics of the unit and the occupants.
3. Selecting and testing a distribution for the random error associated with the model.
4. Using the statistical model to predict the level of exposure for individual THUs and assessing the overall accuracy of these predictions.
5. Predicting the exposure level for the plaintiffs' THUs and estimating the uncertainty of these predictions.

Mr. Hewett's report (hereinafter referred to as "Hewett") does none of these five. Details are given below but my findings can be summarized as follows:

1. Mr. Hewett does not make measurements on any THU nor does he validate any measurements by repeat sampling or any other standard statistical method.

2. The report does not develop a predictive model that is a function of the characteristics of the THU or of the occupants.
3. The report assumes all THUs and occupants are <u>identical</u> except for random error and consequently a single distribution can be used to describe all exposures. But then it displays several mistakes in selecting that distribution.
4. It does not use a statistical model to predict the exposure model for an individual THU.
5. Since the report develops no predictive model it cannot predict the exposure for the plaintiffs' THUs. In fact it uses no information about the plaintiffs or their THUs.

The first page of Hewett states its intention:

> ***This report describes a retrospective exposure assessment with the primary goal of evaluating the available data and estimating the probable exposures to the individuals relocated after Hurricane Katrina by Federal Emergency Management Agency (FEMA) into Temporary Housing Units (THU's)...***

The report does not even attempt to the task of "estimating the probable exposures". In fact, this report is almost identical to his report in similar litigation, which was prepared without this mandate.[1]  Hewett uses no information whatsoever about the plaintiffs' THUs.

Before turning to the specific reasons that Hewett fails to satisfy the Court's mandate a speculation on the failure of the report is in order.

A possible explanation of why a report would purport to be a "statistical analysis" when it contains virtually no statistical analysis may follow from the quote of two senior Professors of Statistics at Stanford University that are leaders in the modern methods of data analysis and statistical modeling:

> ***Statistics is a subject of amazingly many uses and surprisingly few effective practitioners.  (Efron & Tibshirani, 1993)***

---

[1] Given the similarity of his current report to his previous reports, and the lack of any substantive response from Hewett concerning the flaws in his previous reports, all of the comments presented in my June 4, 2010 report continue to be valid (see the Appendix ).

Perhaps Mr. Hewett, an industrial hygienist with some background in statistics, lacks the ability to do a formal statistical analysis. He is not a professional statistician – nor does he appear to claim to be. But this report is being judged as if it were done by a well-trained, practicing statistician familiar with the use of statistical methods in the analysis of environmental data. Alternatively, Mr. Hewett may have the ability to do a statistical analysis of environmental data but chose not to display those skills in this report.

I now revisit my five conclusions:

1. **Failure to gather or validate the data.**

The constraint on the value of any statistical analysis is the quality of the data, not the sophistication of the models.

In the words of the Federal Judicial Center's *Reference Manual on Scientific Evidence* (2000), a treatise regarding the use of scientific expert testimony in federal litigation, "An analysis is only as good as the data on which it rests" (p. 90).

Elsewhere Mr. Hewett has stressed the importance of making careful measurements on a random sample of units under analysis and then validating the data (Hewett, 2007a), a principle that is uniformly accepted in almost every book on the statistical analysis of environmental data (e.g., Ginevan, & Splitstone, 2003).

Mr. Hewett neither made careful measurements (in fact he made no measurements) nor did he make any attempt to assess the accuracy of the measurements made by others. Mr. Hewett is an industrial hygienist and the focus of that profession, and much of his writing, is on making careful measurements and validating the data generated by those measurements. (See Appendix for more comment on this issue.)

Instead, the report relies upon measurements collected from 10 different sources, with no standardization or validation of the data generated. Many of the formaldehyde measurements were provided by firms working for parties to the litigation and some were directly collected by people that have a stake in the outcome of litigation. (See

Appendix for additional comments.)

To get a glimpse at the reliability of the data being used, the manufacturers for each data source were rank ordered and then correlated by the standard Spearman's nonparametric correlation to produce the table below.  If the data sources were at all similar the correlations should be close to +1.   In fact, 11 of the 28 correlation coefficients are either 0.0 or negative. This indicates that the measures of formaldehyde levels across THUs by data source are highly unreliable.  This unreliability would have been clear if Hewitt had made any attempt to validate the data.

Spearman Correlation Coefficients

|  | DeVany Industrial | FEMA CDC | Occupant | Sierra Club | TES | Texas Parks Wildlife | WD Scott Group |
|---|---|---|---|---|---|---|---|
| Bureau Veritas | .80 | .40 | .60 | .80 | .80 | -.80 | -.40 |
| DeVany Industrial |  | .00 | .80 | .60 | .60 | -.40 | .20 |
| FEMA CDC |  |  | .40 | .80 | .80 | -.20 | -.40 |
| Occupant |  |  |  | .80 | .80 | .00 | .40 |
| Sierra Club |  |  |  |  | 1.00 | -.40 | -.20 |
| TES |  |  |  |  |  | -.40 | -.20 |
| Texas Parks Wildlife |  |  |  |  |  |  | .80 |

On page 5 of his report Mr. Hewett wrote:

> **FEMA requested that CDC measure formaldehyde levels in occupied THU's (this dataset will be referred to as the "FEMA CDC" dataset).  A stratified random sample for <u>519 THU's</u> was obtained... [emphasis added]**

This is the best data set since it is the only one generated by random sampling, a cornerstone of statistical analysis.  But the report appears to have analyzed only 201 of

4

the 519 units and does not explain why the other 61% of the dataset was ignored. This is a serious omission and perhaps a serious error.

## 2. Failure to develop a predictive model that is a function of the characteristics of the THU or the occupants.

Hewitt uses no characteristics of the THU or occupants to model the systematic change in the predicted exposures across the makes, the data source, or design or usage of the THU. This critique is further developed in Section 5, below.

## 3. Failure to correctly assess the distribution of the exposures.

Assuming for the moment that all the THUs are identical except for random noise across the units (a **highly unlikely** assumption), Hewitt claims that the distribution of the exposures and the data sources is lognormal. He does so without examining the data and with no evidence that the lognormal distribution he adopted fits the data. It does not. The report never compares the distribution chosen to the data, although Hewitt describes such methods in chapters he has authored.

Mr. Hewitt did nothing but tabulate the data. He did not analyze the data in any meaningful, sophisticated sense. He did not let the data dictate or even help shape the model. He assumed that only a single parameter, the mean of the exposure for the THUs analyzed, needed to be estimated and then assumed that the error about that distribution follows a lognormal distribution.

According to a recent excellent review of modeling exposure data, exposure or "administered dose" is defined as:

> *[T]he mathematical estimation of the amount of a substance encountered in the environment per unit of body weight and time. This dose is equivalent to the exposure to an agent of interest, and is typically what is estimated in an exposure reconstruction. (Sahmel et al., 2010, p. 799)*

Hewitt did not develop a model of the exposure data and thus cannot estimate the exposure level for an individual THU. This deficiency is surprising given that the stated

5

primary goal of report was *"evaluating the available data and estimating the probable exposures to the individuals relocated after Hurricane Katrina. . . ."* (p. 1)

**Hewett Assumed That the Lognormal Fit Without Supporting Evidence**

Even for this null model, Hewett fit the lognormal distribution by old-fashioned, sub-optimal methods and failed to reject the lognormal when the statistical test for the lognormal was statistically different.  Any professional statistician would have known that there are many right skewed distributions in addition to the lognormal.

In one of his publications Mr. Hewett addressed the issue of testing the fit of a lognormal distribution:

> **2.3 Is the lognormal distribution assumption valid?**
>
> **Goodness-of-fit testing involves both graphical and analytical evaluations.  The data should be plotted so that (a) inconsistent data points can be identified and b) the goodness-of-fit can be subjectively evaluated. This should be followed by an objective analytical test of the hypothesis of lognormality. The lognormal distribution model is often used when zero is the physical lower limit for possible values, large values occasionally occur, and the processes that generate or control exposures tend to interact in a multiplicative manner. Experience has shown that multiple exposure measurements collected either from a single individual or from multiple individuals within an exposure group tend toward a lognormal distribution. <u>Therefore, it is reasonable to assume that the underlying distribution for workplace exposure data is the lognormal distribution unless there is a compelling reason to conclude otherwise. There are, however, instances where the normal distribution may be more appropriate</u>, e.g., when multiple measurements are simultaneously collected at the same location... (Hewett, 2007b, p. 3-4, footnote numbers omitted, emphasis added)**

It appears from the above quote that Mr. Hewett knows of only two distributions that can be used to fit exposure data, the normal and the lognormal.  In fact, there are an infinite number of symmetric distributions that compete with the normal and an infinite number of right-skewed distributions that compete with the lognormal. The goal in this type of analysis is to let the data dictate the shape of the distribution.

### Hewett Calculated Confidence Intervals That Are Not Optimal

Mr. Hewett used old-fashioned estimators to develop the confidence intervals for the lognormal distribution. An extensive literature shows that the Land method used by Hewett and based on the *H* statistic, can dramatically overestimate the upper confidence intervals for the lognormal (see, for example, Singh, Singh, & Engelhart, 1997). Hewett is obviously familiar with powerful new computer intensive methods of constructing such intervals, including methods based on the jackknife and the bootstrap. But, he chose not to use them.

### Hewett Did Statistical Tests and Then Ignored The Results

Rather than allowing his conclusions to be driven by objective findings, he disregarded findings that did not meet his preconceived notions. For example, on page 12 of his report he wrote:

> *Each dataset was evaluated for the goodness-of-fit for the lognormal distribution, looking for egregious departures. In many cases the data passed the subjective goodness-of-fit evaluation, but failed an objective goodness-of-fit test. (This typically happens for large datasets such as those encountered here, in which case the subjective test is more informative.)*

The "large datasets such as those encountered here" include many with data on two to six THUs (e.g., Sierra Club, DeVaney, Texas Parks), to which Hewett fit the lognormal distribution (see the various Table 1's in Hewett's Appendix).

### Hewett Asserts That The Data are Poolable But Does Not Pool Them

On pages 18 and 19, the report concludes that there was "no compelling reason" to separate any of the data sets by model or manufacturer and thus the data can be pooled across manufacturers. However, the report tabulates the data and fits the lognormal distribution by manufacturer and data source; it makes no use of the demonstration of the poolability demonstrated.

7

Perhaps it is a good thing that he did not pool the data since the analysis of poolability is seriously flawed. The report incorrectly interprets the non-significant superiority tests (analysis of variance [ANOVA] followed by Tukey's Honestly-Significant-Difference Test) as proof of no difference in values collected by the different contractors and across trailer types. Equivalence tests showing that two contractors or two trailer types did not differ, on average, by a pre-specified amount would have more appropriately addressed the question he posed because a first principle of statistical analysis is that the absence of evidence (of a difference between makes and data sources) is not evidence of absence (of a difference between makes and data sources. (e.g., Altman & Bland, 1995).

The report seems to prefer imposing structure on data rather than exposing the structure of data. This type of modeling was common practice in the days before the rise of sufficient computing power to take an in-depth look at the patterns of the data. In Hewett, both the fitting of the lognormal distribution and the estimation of the decay model are by fiat, not by assessing the data.

### 4. No model capable of predicting the exposure for individual THUs is developed.

The report imposes a distribution on the data by using data for nothing more than estimating the parameters of the lognormal distribution and then using the data for nothing more than summarizing selective data from THUs. This does not constitute a statistical analysis. It prespecifies the lognormal model and then imposes that model on the data, in a misguided attempt to estimate the parameters of the model. The fit of the data to the proposed distribution is not even reported, even though a goodness-of-fit test is provided in the software that Mr. Hewett's firm distributes (IHDataAnalyst at http://www.oesh.com/x%20Software/IHDA.php).

This failure to use statistical modeling was not due to a lack of awareness on Mr. Hewett's part; he demonstrated that he was aware of the existence of such procedures as they pertain to exposure assessment, writing on page 3 of his report:

> *Even if measurements were not available, exposure modeling methods would be permissible for estimating exposure. For example, exposure modeling in the absence of measurements is mentioned in the Federal Judicial Center's Reference Manual on Scientific Evidence (FJC, 2000; p.424):*

> *"Evidence of exposure is essential in determining the effects of harmful substances. Basically, potential human exposure is measured in one of three ways. First, <u>when direct measurements cannot be made</u> [emphasis added by Hewett], exposure can be measured by mathematical modeling, in which one uses a variety of physical factors to estimate the transport of the pollutant from the source to the receptor.[2] For example, mathematical models take into account factors as wind variations to allow calculation of the transport of radioactive iodine from a federal atomic research facility to nearby residential areas. Second, exposure can be directly measured in the medium question (sic) - air, water, food, or soil. When the medium of exposure is water, soil, or air, hydrologists or meteorologists may be called up to contribute their expertise to measuring exposure. The third approach directly measures human receptors through some form of biological monitoring..."*

Hewett did none of these; he did not use "mathematical modeling," he did not take any direct measurements, and he did not utilize any "form of biological monitoring."

5. **Since he has no statistical model he can not apply that model to predict the exposure for the plaintiff's THUs.**

Rather than developing a predictive model, the report does nothing more than fit the lognormal distribution to the exposures displayed in the data.  It did not directly model the exposure to the plaintiffs, as could be done by including factors for a variety of input data and considering alternative models of the distribution of the deviations from the model.

Rather than estimate probable exposures for plaintiffs Ausbrooks, Early, Price and Clementin, the report provides a great deal of summary values on formaldehyde levels measured in a non-random, highly selective sample, based on unqualified statistical models, for occupied and unoccupied, housing units, "at times overlapping the occupancy period for the plaintiffs." (Hewett, p. 2)

Although the databases assembled by plaintiffs' attorneys, and on which this report relied, consisted "in part, of measurements of formaldehyde exposures and formaldehyde levels," (Hewett, p. 2) the report never addresses the issue of individual

---

[2] See Panzhauser and Mahdavi (1993) for an example of this approach.

9

exposure. While it purports to address exposure, in fact, it is almost entirely devoid of this discussion.

No connection is made between the level of exposure and the risk adverse health outcomes in the plaintiffs, either as individuals or as groups.  For example, do symptoms increase with exposure?  This relationship, which is called the dose-response gradation in the analysis of environmental exposures, is central to the analysis of environmental exposures.  Hewett does not address risk factors (such as age, chronic health problems or smoking) that may make some plaintiffs more vulnerable than others.

The report specifies four THUs of interest, those belonging to the plaintiffs.  But it makes absolutely no use of any parameters of these THUs.  He did not report formaldehyde levels from these THUs, nor did he describe any attempt to analyze data that specifically addressed these cases.  In fact, he did not perform any "statistical analysis" that directly addressed the "probable exposure" to formaldehyde of the plaintiffs.

**A few final comments:**

Hewett's entire report could be replaced by a single page. A parsimonious yet valid method of accomplishing his apparent goal would have been to estimate the percentage of THUs that have exposures exceeding a certain level (such as 0.008 ppm) by calculating the percentage of the sample that exceeds this level.  A confidence interval on this value could be obtained by applying the bootstrap method to this estimate. This confidence interval would be far preferable to the ones given in his report since it requires no assumptions on the distribution of the exposures.  Instead of doing this simple analysis, the report fits the lognormal distribution to the data but simple inspection of the lognormal as fit to the data would show that the distribution does not fit the data.

Using the statistics reported in the table and assuming the distribution is lognormal, about 1 percent of the THUs should have exposures in excess of 25 ppm. But the highest measured exposure is less than 2.5.

Furthermore addressing the effect of very large acute exposures the National Cancer Institute suggests that at exposures

> *above 10 ppm severe lacrimation occurs, burning in the nose and throat is experienced, and breathing becomes difficult. Acute exposure to concentrations above 25 ppm can cause serious injury, including fatal pulmonary edema. (from the National Cancer Institute Center for Cancer Research, LABORATORY OF PATHOLOGY POLICY MANUAL, Formaldehyde Fact Sheet, Adopted from OSHA standard 29 CFR 1910.1048)*

No one could stay a day in a THU with exposures over 25 ppm.

The 30 page appendix on modeling the decay analysis is not used significantly in the report except to support the assertion that the level of formaldehyde decreases in time, an assertion that is obvious on first principles.

At the direction of plaintiffs' counsel, Mr. Hewett made extensive use of guidelines from the Agency for Toxic Substances and Disease Registry (ATSDR), an agency primarily tasked with providing information regarding toxic substances that may be found at "Superfund" sites.

As Hewett specifically notes, his application of the ATSDR MRL of 0.008 ppm (again at the request of plaintiffs' attorneys) is a misleading use of this standard; he quotes the ATSDR:

> *The ATSDR Minimum Risk Levels limits for formaldehyde are...*
>
>> *"... intended only to serve as a screening tool to help public health professionals decide where to look more closely. They may also be viewed as a mechanism to identify those hazardous waste sites that are not expected to cause adverse health effects." (Hewett, p.8, ellipsis in original)*

The chronic inhalation MRL (0.008 ppm) was derived from a human study. After 7.3 years of exposure, <u>the lowest observable adverse effect level (LOAEL) was 0.24 ppm</u>, which caused lesions in nasal mucosa. Dividing by a safety factor of 30 yielded the MRL of 0.008 (ATSDR, 1999, 2007).

The mere observation that an exposure may have exceeded a regulatory standard does not establish general or specific causation. There are vast substantive differences between standards set for regulatory processes and those appropriate for litigation

(James, 2006).  The former were mandated by legislative bodies based on political and public policy concerns, whereas the latter are grounded in scientific research.

The *Reference Manual on Scientific Evidence*, which Hewett cites in another context (p. 2), comments on the use of regulatory standards in personal injury litigation:

> ***Particularly problematic are generalizations made in personal injury litigation from regulatory positions. For example, if regulatory standards are discussed in toxic tort cases to provide a reference point for assessing exposure levels, it must be recognized that there is a great deal of variability in the extent of evidence required to support different regulations.***

In conclusion, Mr. Hewett's report in this matter appears to support the syllogism:

> ***1.  Some THUs have formaldehyde levels in excess of the levels dictated by plaintiffs' counsel.***
>
> ***2.  The plaintiffs lived for a period of time in THUs.***
>
> ***3.  Therefore, the plaintiffs have been made ill by being exposed to formaldehyde from the THUs.***

This syllogism cannot be supported by any statistical analysis.

As described above, a proper statistical analysis would involve developing a model based on a variety of factors, and then applying that model to the plaintiffs.  Instead the reports tabulates non-validated data obtained from a variety of bias-prone sources, in a nonstandardized manner, fits the lognormal distribution to the data, computes confidence intervals from the lognormal distribution, compares the confidence limits to the regulatory levels selected and concludes that the plaintiffs were harmed by their exposure to formaldehyde from the THU. But the report fails to explain the relationship between the summary data provided in the many tables and the plaintiffs' risk of exposure, admitting that with respect to at least one critical parameter the analysis has nothing to offer; Hewett wrote:

***The data analyzed here do not speak to the actual amount of time that each plaintiff spent in the assigned unit. (p. 27)***

**References**

Agency for Toxic Substances and Disease Registry. (1999). *Toxicology profile for formaldehyde*. http://www.atsdr.cdc.gov/toxprofiles/tp111.pdf

Agency for Toxic Substances and Disease Registry. (2007). *An update and revision of ATSDR's February 2007 health consultation: Formaldehyde sampling of FEMA temporary-housing trailers. Baton Rouge, Louisiana, September-October, 2006*. Atlanta, GA.

Altman, D. G., & Bland, J. M. (1995). Absence of evidence is not evidence of absence. *BMJ, 311*(7003), 485.

Arts, J. H., Muijser, H., Kuper, C. F., & Woutersen, R. A. (2008). Setting an indoor air exposure limit for formaldehyde: factors of concern. *Regul Toxicol Pharmacol, 52*(2), 189-194.

Arts, J. H., Rennen, M. A., & de Heer, C. (2006). Inhaled formaldehyde: evaluation of sensory irritation in relation to carcinogenicity. *Regul Toxicol Pharmacol, 44*(2), 144 160.

Efron, B., & Tibshirani, R. J. (1993). *An introduction to the bootstrap*. London: Chapman & Hall.

Federal Judicial Center. (2000). *Reference manual on scientific evidence*. http://air.fjc.gov/public/f jcweb.nsf/pages/16

Ginevan, M. E., & Splitstone, D. E. (2002). Bootstrap upper bounds for the arithmetic mean of right-skewed data, and the use of censored data. *Environmetrics, 13*, 453-464.

Ginevan, M. E., & Splitstone, D. E. (2003). *Statistical tools for environmental quality measurement*. Norwell, MA: Chapman & Hall/CRC.

Godish, T. (1989). Formaldehyde exposures from tobacco smoke: a review. *Am J Public Health, 79*(8), 1044-1045.

Hewett, P. (2007a). *Chapter 15: Industrial hygiene exposure assessment -- Data collection and management.* Technical Report 07-02, www.oesh.com.

Hewett, P. (2007b). *Chapter 16: Industrial hygiene exposure assessment -- Data analysis and interpretation.* Technical Report 07-03, www.oesh.com.

Hewett, P. (2010). *Analysis of the formaldehyde dataset for Forest River, Inc.; Gulf Stream Coach, Inc.; Jayco, Inc., Keystone RV Company; and KZRV, LP*: Exposure Assessment Solutions, Inc.

James, C. F. (2006). A tale of two standards: Regulatory standards and causation in toxic torts litigation. In C. H. Cwik & H. E. Witt (Eds.), *Scientific evidence review: Current issues at the crossroads of science, technology and the law*. Chicago: American Bar Association.

Millard S. P., & Neerchal N. K. (2001). *Environmental statistics with S-Plus.* Boca Raton, FL: CRC Press.

Pagano, M., & Gauvreau, K. (2000). *Principles of biostatistics* (2nd ed.). Pacific Grove, CA: Duxbury.

Panzhauser, E., & Mahdavi, A. (1993). A computational model for the prediction and evaluation of formaldehyde concentration in residential buildings. *Modeling of Indoor Air Quality and Exposure, ASTM STP 1205*.

Sahmel J., Devlin K., Paustenbach D., Hollins D. & Gaffney S. (2010) . The role of exposure reconstruction in occupational human health risk assessment: Current methods and a recommended framework. *Critical Reviews in Toxicology, 40(9):799–843.*

Singh, A. K., Singh, A., & Engelhardt, M. (1997). *The lognormal distribution in environmental applications*. United States Environmental Protection Agency: EPA/600/R-97/006.

White, E., Saracci, R., & Armstrong, B. K. (2008). *Principles of exposure measurement in epidemiology: Collecting, evaluating, and improving measures of disease risk factors* (2nd ed.). New York: Oxford University Press.

World Health Organization. (2008). *Uncertainty and Data Quality in Exposure Assessment, International Programme on Chemical Safety (IPCS)*

*Harmonization Project No. 6. Geneva, Switzerland: World Health Organization (WHO) Press.*

Zhou, X. H., & Gao, S. (1997). Confidence intervals for the log-normal mean. *Stat Med, 16*(7).