Stephen J. Smulski
June 10, 2009

Page 1

        UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF LOUISIANA
           NEW ORLEANS DIVISION

IN RE: FEMA TRAILER        * MDL NO. 1873
       FORMALDEHYDE        *
       PRODUCTS LIABILITY  *
       LITIGATION          * SECTION: N(5)
                           *
This Document Relates to:  * JUDGE: ENGELHARDT
Charles Age, et al, v.     *
Gulf Stream Coach, Inc.,   *
et al, Docket No. 09-2892  * MAG: CHASEZ
* * * * * * * * * * * * * * * * * * * * * *

     Video-Taped Deposition of STEPHEN
SMULSKI, Ph.D., 435 Wendall Road, Shutesbury,
Massachusetts, 01072, taken in the law offices
of Lambert & Nelson, 701 Magazine Street, New
Orleans, Louisiana, 70130, on Wednesday, the
10th day of June, 2009.


APPEARANCES:


     T. CHRISTOPHER PINEDO
     ATTORNEY AT LAW
     4550 Jericho Road
     Corpus Christi, Texas  78413

          - and -

     FRANK J. D'AMICO
     ATTORNEY AT LAW
     622 Baronne Street
     New Orleans, Louisiana  70113

          - and -

     REICH & BINSTOCK, LLP
     (By:  Dennis C. Reich, P.C.)
     4265 San Felipe
     Suite 1000
     Houston, Texas  77027
          (Attorneys for the Plaintiffs)



EXHIBIT
AA

Stephen J. Smulski
June 10, 2009

```
 1    APPEARANCES:   (Continued)

 2

             DUPLASS, ZWAIN, BOURGEOIS, MORTON,
 3           PFISTER & WEINSTOCK
             (By:  Joseph G. Glass, Esquire)
 4           3838 North Causeway Boulevard
             Three Lakeway Center - Suite 2900
 5           Metairie, Louisiana 70002
                     (Attorneys for the Defendant,
 6                    Gulf Stream Coach, Inc.)

 7

             BAKER, DONELSON, BEARMAN, CALDWELL &
 8           BERKOWITZ, PC
             (By:  M. David Kurtz, Esquire)
 9           201 St. Charles Avenue - Suite 3600
             New Orleans, Louisiana  70170
10                   (Attorneys for the Defendants,
                      Shaw Environmental and CH2M Hill
11                    Constructors)

12

             ALLEN & GOOCH
13           (By:  Brent M. Maggio, Esquire)
             One Lakeway
14           3900 North Causeway Boulevard
             Suite 1450
15           Metairie, Louisiana  70002
                     (Attorneys for the Defendant,
16                    Recreational Vehicles, LLC)

17

             FRILOT PARTRIDGE
18           (By:  John J. Hainkel, III)
             1100 Poydras Street - Suite 3600
19           New Orleans, Louisiana  70163
                     (Attorneys for the Defendant,
20                    Bechtel National, Inc.)

21

             U.S. DEPARTMENT OF JUSTICE
22           CIVIL DIVISION
             (By:  Adam M. Dinnell, Esquire)
23           Ben Franklin Station
             P.O. Box 340
24           Washington, DC  20044
                     (Attorneys for the Defendant, The
25                    United States)
```

Stephen J. Smulski
June 10, 2009

```
 1     APPEARANCES:  (Continued)

 2          GARRISON, YOUNT, FORTE & MULCAHY, L.L.C.
            (By:  Kelly M. Morton, Esquire)
 3          909 Poydras Street - Suite 1800
            New Orleans, Louisiana  70112
 4               (Attorneys for the Defendants,
                  Recreation By Design, LLC, TL
 5                Industries, Inc., Frontier RV,
                  Inc., Play'Mor Trailers)

 6

 7          GIEGER, LABORDE & LAPEROUSE, L.L.C.
            (By:  Jason D. Bone, Esquire)
 8          Forty-Eighth Floor
            One Shell Square
 9          701 Poydras Street
            New Orleans, Louisiana  70139-4800
10               (Attorneys for the Defendant,
                  Forest River, Inc.)

11

12          MIDDLEBERG, RIDDLE & GIANNA
            (By:  Richard A. Sherburne, Jr., Esq.)
13          450 Laurel Street - Suite 1101
            Baton Rouge, Louisiana  70801
14               (Attorneys for the Defendant,
                  Fluor Enterprises)

15

16          (Via telephone)
            WILLINGHAM, FULTZ & COUGILL, LLP
17          (By:  Thomas L. Cougill, Esquire)
            Niels Esperson Building
18          808 Travis - Suite 1608
            Houston, Texas  77002
19               (Attorneys for the Defendants,
                  Jayco, Inc. and Starcraft RV,
20                Inc.)

21          (Via telephone)
22          DEUTSCH, KERRIGAN & STILES
            (By:  Joshua G. Keller, Esquire)
23          755 Magazine Street
            New Orleans, Louisiana  70130
24               (Attorneys for Defendants,
                  Destiny Industries, LLC,
25                Lexington Homes, LLC and
```

Stephen J. Smulski
June 10, 2009

Page 4

1    APPEARANCES:   (Continued)

2

3           (Via telephone)
            JONES, WALKER, WAECHTER, POITEVENT,
            CARRERE & DENEGRE, L.L.P.
4           (By: James Percy, Esquire)
            8555 United Plaza Boulevard
5           Baton Rouge, Louisiana 70809-7000
                        (Attorneys for the Defendants,
6                        Keystone RV Company, DS
                         Corporation (d/b/a CrossRoads),
7                        Thor California, Dutchmen, KZ
                         RV)

8

9    ALSO PRESENT:

10          (Via telephone)
            KRAFT, GATZ, LANE, BENJAMIN, LLC
            Shyra L. Latiolais
11          Legal Assistant
            On behalf of Walter K. Jamison, III

12

13          DAMIEN W. DERAUSKAS, P.E.
            Professional Engineering Services

14

15

16   VIDEOGRAPHER:

17          MARY ELIZABETH GAASCH
            STATOS LEGAL

18

19   REPORTED BY:

20          NANCY LAPORTE, CCR
            STRATOS LEGAL
21          Certified Court Reporter
            State of Louisiana

22

23               *      *      *      *      *

24

25

Stephen J. Smulski
June 10, 2009

Page 5

1              EXHIBIT INDEX

2

                                    Page No.

3

4

   Exhibit Smulski 1                15
5  (Notice of Video-Taped Deposition)

6  Exhibit Smulski 2                16
   (E-mail from Joseph G. Glass to
7  Chris Pinedo, dated 06/07/09,
   Subject: FEMA Trailer Litigation -
8  Deposition of Smulski)

9
   Exhibit Smulski 3                16
10 (Bates Nos. ALX-EXP-73-000001 -
   000011, Affidavit of Stephen Smulski,
11 Ph.D.)

12
   Exhibit Smulski 4                16
13 (Bates Nos. ALX-EXP-70-000001 -
   000010, Curriculum Vitae)
14

15 Exhibit Smulski 5                16
   (Bates No. ALX-EXP-71-000001, letter
16 from Stephen Smulski, Ph.D. to Attorney
   Pinedo, dated May 15, 2009, Re: Gulf
17 Stream Coach, Inc. Litigation)

18
   Exhibit Smulski 6                16
19 (Ernest Orlando Lawrence Berkeley
   National Laboratory, "Aldehyde and
20 Other Volatile Organic Chemical
   Emissions in Four FEMA Temporary
21 Housing Units - Final Report")

22
   Exhibit Smulski 7                151
23 (Handwritten notes)

24

25

Stephen J. Smulski
June 10, 2009

Page 6

1    EXHIBIT INDEX: (Continued)

2

3    Exhibit Smulski 8              218
     (Two compact discs entitled "Wood
     Science in the Courtroom" and "Inside
4    Wood")

5

6    Exhibit Smulski 9              289
     (Bates Nos. ALX-EXP-73-000175 -
     000177, "Formaldehyde Indoors" dated
7    April 1987)

8

9    Exhibit Smulski 10             304
     (Photocopy of photograph)

10

11   Exhibit Smulski 11             321
     (Miscellaneous documents from the
     file of Stephen Smulski, Ph.D.)

12

13   Exhibit Smulski 12             322
     (Bates Nos. CPSC-000001 - 000012,
14   "An Update on Formaldehyde" 1997
     Revision, U.S. Consumer Product
15   Safety Commission)

16

17   Exhibit Smulski 13             388
     (Bates Nos. ALX-EXP-73-000010 -
     000011, Exhibit B, an inventory of
18   the list of products in the
     Alexander/Cooper trailer that contained
19   formaldehyde)

20

21   Exhibit Smulski 14             388
     (Bates No. ALX-EXP-73-000343,
     Photocopy of photograph)

22

23   Exhibit Smulski 15             389
     (Bates No. ALX-EXP-73-000313,
24   Photocopy of photograph)

25

Stephen J. Smulski
June 10, 2009

Page 7

1    EXHIBIT INDEX:   (Continued)

2

3    Exhibit Smulski 16              392
     (Bates No. ALX-EXP-73-000314,
     Photocopy of photograph)

4

5    Exhibit Smulski 17              393
     (Bates No. ALX-EXP-73-000311,
6    Photocopy of photograph)

7

8    Exhibit Smulski 18              395
     (Bates No. ALX-EXP-73-000318,
9    Photocopy of photograph)

10   Exhibit Smulski 19              396
     (Bates No. ALX-EXP-73-000321,
11   Photocopy of photograph)

12

13   Exhibit Smulski 20              398
     (Bates No. ALX-EXP-73-000323,
14   Photocopy of photograph)

15   Exhibit Smulski 21              400
     (Bates No. ALX-EXP-73-000317,
16   Photocopy of photograph)

17   Exhibit Smulski 22              402
     (Bates No. ALX-EXP-73-000340,
18   Photocopy of photograph)

19

20   Exhibit Smulski 23              404
     (Bates No. ALX-EXP-73-000337,
     Photocopy of photograph)

21

22   Exhibit Smulski 24              407
     (Bates No. ALX-EXP-73-000332,
23   Photocopy of photograph)

24

25   Exhibit Smulski 25              408
     (Bates No. ALX-EXP-73-000334,

Stephen J. Smulski
June 10, 2009

Page 8

1    EXHIBIT INDEX:  (Continued)

2

      Exhibit Smulski 26                414
3    (Bates No. ALX-EXP-73-000348,
      Photocopy of photograph)
4

5    Exhibit Smulski 27                415
      (Bates No. ALX-EXP-73-000344,
6    Photocopy of photograph)

7

      Exhibit Smulski 28                415
8    (Bates No. ALX-EXP-73-000356,
      Photocopy of photograph)
9

10   Exhibit Smulski 29                416
      (Bates No. ALX-EXP-73-000359,
11   Photocopy of photograph)

12

      Exhibit Smulski 30                417
13   (Bates No. ALX-EXP-73-000346,
      Photocopy of photograph)
14

15   Exhibit Smulski 31                418
      (Bates No. ALX-EXP-73-000329,
16   Photocopy of photograph)

17

      Exhibit Smulski 32                419
18   (Bates No. ALX-EXP-73-000357,
      Photocopy of photograph)
19

20   Exhibit Smulski 33                421
      (Bates No. ALX-EXP-73-000353,
21   Photocopy of photograph)

22

      Exhibit Smulski 34                422
23   (Bates No. ALX-EXP-73-000355,
      Photocopy of photograph)
24

25

Stephen J. Smulski
June 10, 2009

Page 9

1    EXHIBIT INDEX:  (Continued)

2

     Exhibit Smulski 35                424
3    (Bates No. ALX-EXP-73-000351,
     Photocopy of photograph)
4

5    Exhibit Smulski 36                455
     Bates Nos. GULF0002330 - 2333,
6    Material Safety Data Sheets on
     Medium Density Fiberboard)
7

8

9
     *      *      *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stephen J. Smulski
June 10, 2009

Page 10

1              S T I P U L A T I O N

2

3        It is stipulated and agreed by and among

4    counsel for the parties hereto that the

5    deposition of the aforementioned witness is

6    hereby being taken for all purposes allowed

7    under the Federal Rules of Civil Procedure, in

8    accordance with law, pursuant to notice;

9        That the formalities of filing, sealing,

10    and certification are specifically waived;

11        That the formalities of reading and

12    signing are specifically not waived;

13          That all objections, save those as to

14    the form of the question and the

15    responsiveness of the answer, are hereby

16    reserved until such time as this deposition,

17    or any part thereof, may be used or sought to

18    be used in evidence.

19

20        *      *      *      *      *

21

22        NANCY LAPORTE, CCR, Certified Court

23    Reporter in and for the State of Louisiana,

24    officiated in administering the oath to the

25    witness.

Stephen J. Smulski
June 10, 2009

Page 11

1          P R O C E E D I N G S

2

3

4          THE VIDEOGRAPHER:

5    We are on the record.  It is June

6    10th, 2009.  The time on the video monitor is

7    9:10 a.m.  This is the beginning of tape 1 of

8    the video deposition of Dr. Stephen J.

9    Smulski.  The video operator today is Mary

10   Elizabeth Gaasch, representing Stratos Court

11   Reporting.  The court reporter today is Nancy

12   Laporte, also representing Stratos Legal Court

13   Reporting.  Today's deposition was taken at

14   Lambert and Nelson, located at 701 Magazine

15   Street in New Orleans, 70130.

16   Would counsel please introduce

17   yourselves and state whom you represent?

18        MR. GLASS:

19   Joseph Glass, representing Gulf

20   Stream Coach, Inc.

21        MR. KURTZ:

22   David Kurtz, representing Shaw

23   Environmental, Inc.

24        MR. BONE:

25   Jason Bone for Forest River,

Stephen J. Smulski
June 10, 2009

Page 295

1    Q.       Ventilation is an effective way
2    to reduce formaldehyde levels at the use stage
3    of a product?
4    A.       Yes, it is.
5    Q.       For a home?
6    A.       (Witness nods head.)
7    Q.       Are you familiar with what the
8    Consumer Product Safety Commission has said
9    regarding chemical treatment with strong
10   ammonia?
11   A.       I am not.
12   Q.       You said you have not kept up to
13   date with the usage of ammonia as a mitigation
14   technique with regard to formaldehyde; is that
15   correct?
16        MR. PINEDO:
17   Objection to form.
18        THE WITNESS:
19   Yes, it is.
20   EXAMINATION BY MR. DINNELL:
21   Q.       That may have changed since 1987,
22   you just wouldn't know about it?
23   A.       Correct.
24   Q.       You edited a -- what I believe is
25   a book entitled "Engineered Wood Products:  A

Stephen J. Smulski
June 10, 2009

Page 297

1   photocopies of excerpts from articles, other

2   books that I had written and used as a handout

3   for the class.

4   Q.       And those texts that you

5   mentioned by name just now, you would use

6   those in the classroom setting in discussing

7   composite wood products and the adhesives used

8   in composite wood products?

9   A.       Yes.  I used them when I taught a

10  class entitled "Wood Adhesives Technology."

11  Q.       I want to turn back to your

12  report now.

13  In opinion 5 you say -- basically

14  you just mention the 1987 article

15  "Formaldehyde Indoors" that we just discussed.

16  Then go on to -- let's move forward to page 3.

17  At the end of opinion 7 you said, "Many of

18  these same methods for reducing the release of

19  formaldehyde gas from particle board and

20  medium density fiberboard are directly

21  applicable to other wood composite panels

22  including hardwood plywood."

23  What kind of methods for reducing

24  the release of formaldehyde gas are you

25  talking about there?

Stephen J. Smulski
June 10, 2009

Page 298

1    A.        Primarily the use of overlays or

2    finishes.

3    Q.        And overlays and finishes would

4    be applied by the product manufacturer?

5    A.        It depends.   There are some

6    hardwood plywood manufacturers who will apply

7    overlays, and sometimes it's done by a

8    secondary manufacturer who purchases the

9    plywood, applies the overlay, and then sells

10   it as an overlaid product.

11   Q.        Applying those overlays and

12   finishes would not be something that would be

13   done by an end user or owner, correct?

14   A.        Typically not.

15   Q.        And there would be places --

16   there would be products that the end user or

17   owner would not be able to reach, just because

18   the wood has already been used in the

19   construction of a home or some other product,

20   correct?

21   A.        If I understand correctly, by the

22   "end user," you mean, for example, a homeowner

23   who has some of these products in their home?

24   Q.        Correct.

25   A.        Right.

Stephen J. Smulski
June 10, 2009

Page 299

1    Q.        For instance, when you visited

2    the Alexander unit, there were portions of

3    wood product in areas of the trailer you

4    couldn't access without tearing it apart or

5    opening it up.   They were in place and nothing

6    could be done to reach them, correct?

7    A.        Yes, that's true.

8    Q.        Do you know if these overlays and

9    finishes contain other types of VOC's?

10   A.        Typically they do.

11   Q.        Opinion 9 you talked about some

12   of the history of this specific unit about how

13   you believed it was in Florida at a FEMA

14   facility.

15   Would you say that the history

16   and the usage of this particular unit is

17   important in discussing the levels of

18   formaldehyde that this unit would have had?

19   A.        I think it is in the sense that

20   it would be useful to know was this unit a

21   never-used unit, was it a once-occupied unit,

22   a several-times occupied unit?   Had things

23   been replaced or changed over time?   Those

24   sort of things.

25   Q.        Because age and usage, other

Stephen J. Smulski
June 10, 2009

Page 313

1    ventilation would be to put a mechanical air

2    exchange system on the unit."

3    EXAMINATION BY MR. DINNELL:

4    Q.        Have you ever opined elsewhere

5    that a mechanical air system should also be

6    installed in stick-built homes?

7    A.        I have.

8    Q.        Now in opinion 23 you say, "The

9    current formaldehyde gas problem in the

10   FEMA-supplied travel trailers could have been

11   prevented had Gulf Stream Coach, Inc. (and

12   FEMA) employed the mitigation techniques

13   detailed in the extensive body of literature

14   documenting an identical formaldehyde gas

15   problem," right?

16   A.        Yes.

17   Q.        And you are saying Gulf Stream

18   Coach and FEMA could have used these

19   mitigation techniques in your opinion, right?

20   A.        I am to the extent that the --

21   some of the techniques, for example,

22   retrofitting the unit with, say, mechanical

23   air exchange can be done after the fact.  Some

24   of the techniques would be employable only by

25   the Gulf Stream as the manufacturer.

Stephen J. Smulski
June 10, 2009

Page 314

1   Q.      Aside from retrofitting, is there

2   any mitigation technique that could be done by

3   FEMA or by the end user of this product?

4   A.      I would think retrofitting with a

5   mechanical air exchange unit is about the only

6   one.

7   Q.      The other things that you

8   mention, modifying materials, that would be a

9   decision for the manufacturer or the designer

10  of the unit, correct?

11  A.      Yes.

12  Q.      Construction of the unit, that

13  would be left to the person that is actually

14  constructing the unit, correct?

15  A.      Yes.

16  Q.      Design practices, that would

17  depend on the designer of the unit, not

18  someone else down the line, correct?

19  A.      Yes.

20  Q.      Have you seen anything in your

21  work on this case that indicates FEMA had the

22  MSDS sheets for the products that were used in

23  these trailers?

24  A.      I have not.

25  Q.      You mentioned earlier the MSDS

Stephen J. Smulski
June 10, 2009

Page 315

1   sheets are important in identifying what

2   potential hazards are being placed into

3   something that is being constructed; is that

4   correct?

5   A.        By law, MSDS sheets must be made

6   available by product manufacturers to the

7   users of those products, so that they can then

8   be informed of potential hazards associated

9   with the use of those products.

10   Q.        Now, you mentioned further on

11   that it's your opinion that this unit was not

12   suitable for use as long-term housing,

13   correct?

14   A.        Yes.

15   Q.        But just to clarify, you haven't

16   done anything in the way of examining what

17   other options FEMA had available in providing

18   disaster housing for people?

19   A.        That is correct.

20   Q.        You haven't looked at the history

21   of what other options FEMA considered in

22   providing disaster housing?

23   A.        That is correct.

24   Q.        You haven't engaged in any kind

25   of comparative risk analysis of using travel

Stephen J. Smulski
June 10, 2009

Page 316

1    trailers versus some other form of disaster

2    housing like tents, have you?

3    A.        Correct.

4         MR. D'AMICO:

5    Is that what you-all are going to

6    use next?

7    EXAMINATION BY MR. DINNELL:

8    Q.        And also, you haven't done any

9    research into whether or not FEMA had ever

10   received previous complaints about the use of

11   travel trailers in earlier disasters?

12   A.        That is correct.

13   Q.        You don't know how long FEMA had

14   been employing travel trailers in response to

15   disasters; is that right?

16   A.        Yes, it is.

17   Q.        And again, you don't know where

18   the concept of using travel trailers as

19   disaster housing came from; is that right?

20   A.        Correct.  I don't know.

21   Q.        Now, in assessing whether FEMA

22   made a reasonable decision to use travel

23   trailers, would it not be important to know

24   the history using travel trailers, what other

25   options were available, and what kind of

Stephen J. Smulski
June 10, 2009

Page 317

1   representations were being made from Gulf

2   Stream to FEMA about the units?

3   A.        I think those are part of the

4   general considerations, yes.

5   Q.        They would certainly be important

6   to know in deciding whether or not FEMA made a

7   reasonable decision?

8   A.        Yes.

9   Q.        Now, I have seen in other cases,

10  there were a couple of cases you worked on

11  involving 84 Lumber, for instance.

12  You reached opinions about

13  whether or not the wood product involved in

14  the case was of a superior quality or inferior

15  quality; is that fair?

16  A.        You are going to have to refresh

17  my memory.  I do recall working for 84 Lumber.

18  I don't remember, off of the top of my head,

19  exactly what the case involved.

20  Q.        Have you reached any opinions in

21  this case about the quality of the wood

22  products that were used inside of the

23  Alexander trailer?

24  A.        I would say, yes.  In my opinion

25  they are what I would call economy wood

Stephen J. Smulski
June 10, 2009

Page 322

1   materials that are part of his file, but they

2   don't constitute reliance materials for his

3   report, as it was completed on May 18th, 2009.

4   Is that correct, Dr. Smulski?

5       THE WITNESS:

6   That is.

7       MR. DINNELL:

8   Those materials are marked as

9   Exhibit 11; is that right?

10      MR. PINEDO:

11  In globo, yes.  Some of these,

12  I'll add, include the articles you asked this

13  witness.  Mr. Glass, you tendered a request to

14  me certain -- that the witness bring certain

15  articles, and that is part of what is included

16  here in Exhibit 11.

17  Let us proceed.

18  EXAMINATION BY MR. DINNELL:

19  Q.      Dr. Smulski, I just want to go

20  back to one item we discussed earlier.  I am

21  going to mark this as Smulski 12.  This is

22  entitled "An Update on Formaldehyde," 1997

23  revision from the U.S. Consumer Product Safety

24  Commission in Washington, DC.  The first Bates

25  labeled page is numbered CPSC 1.

Stephen J. Smulski
June 10, 2009

Page 323

1    Have you ever seen this document

2    before?

3    A.        Not that I recall.

4    Q.        I want you to turn to page 11.

5    A.        Wait, in retrospect, this does

6    look familiar.  I may have seen this

7    previously.  Page 11?

8    Q.        Yes, please.  There is a title on

9    page 11 that says "How Do You Reduce Existing

10   Formaldehyde Levels?"  You see that?

11   A.        Yes.

12   Q.        Number one, bring large amounts

13   of fresh air into the home, increase

14   ventilation by opening doors and windows, and

15   installing an exhaust fan."

16   You would agree with that

17   suggestion, correct?

18   A.        Yes, I would.

19   Q.        Because for the end user,

20   ventilation is probably the best way to reduce

21   levels of formaldehyde in a home or space,

22   correct?

23   A.        Yes.

24   Q.        Down at the bottom the Consumer

25   Product Safety Commission says, "One method

Stephen J. Smulski
June 10, 2009

Page 324

1    not recommended by CPSC is a chemical

2    treatment with strong ammonia, 28 to 29

3    percent ammonia and water, which results in a

4    temporary decrease in formaldehyde levels.  We

5    strongly discourage such treatment since

6    ammonia in this strength is extremely

7    dangerous to handle."

8    As you sit here today, do you

9    have a reason to dispute CPSC's conclusion

10   that ammonia is not a good idea in terms of

11   reducing formaldehyde levels?

12   A.        No, I do not.

13   Q.        Do you remember reading through

14   the entire CFR, the Code of Federal

15   Regulations section about the HUD standard?

16   A.        I can't tell you that I read

17   every single line, but more skimmed than

18   glanced I would call it.

19   Q.        Can wood flooring be a source of

20   formaldehyde?

21   A.        What is called engineered wood

22   flooring can be.

23   Q.        What is engineered wood flooring?

24   A.        Traditional wood flooring is

25   solid, sound pieces of wood.  Engineered wood

Stephen J. Smulski
June 10, 2009

Page 331

1    could change the emission rate of formaldehyde

2    by manipulating temperature and moisture of

3    that product when you are testing it, right?

4    A.       You could.  You would be

5    violating the test protocol, which is a

6    standardized procedure.

7    Q.       I understand, but you could

8    change various variables, and those would

9    affect the rate of formaldehyde off-gassing

10   from the material?

11   A.       Yes, and that's why test

12   procedures are standardized, so we can make

13   apples-and-apples comparison between a test I

14   conduct and a test somebody else conducts.

15   Q.       During your work on this case,

16   have you seen any studies of the formaldehyde

17   concentrations off-gassed in stick-built homes

18   in Louisiana?

19   A.       I have not.

20   Q.       And just to clarify something you

21   mentioned earlier, these scavengers that can

22   be used to reduce formaldehyde emissions, that

23   is something that is done at the creation of

24   the wood product stage?

25   A.       Right.  That would be something

Stephen J. Smulski
June 10, 2009

Page 332

1    done by the medium density fiberboard

2    manufacturer or particle board manufacturer as

3    part of the manufacturing process.

4    Q.       Just to touch on the ATSDR

5    minimum risk levels again, which you obviously

6    have talked a lot about today, you are not an

7    expert in toxicology, are you?

8    A.       No, I'm not.

9    Q.       And you're not an expert in

10   health effects, correct?

11   A.       No, I am not.

12   Q.       You have no understanding --

13   well, I'll ask you.

14   Do you have any understanding of

15   how the ATSDR arrived at those minimum risk

16   levels?

17   A.       I do not.

18   Q.       Do you have any idea what safety

19   factors they used in forming those levels?

20   A.       I do not.

21   Q.       And you don't have the expertise

22   to assess what the ATSDR did in making those

23   numbers?

24   A.       Correct.

25   Q.       You have just used those --