```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
                    NEW ORLEANS DIVISION

IN RE:  FEMA TRAILER           )   MDL NO. 1783
FORMALDEHYDE PRODUCTS          )
LIABILITY LITIGATION           )
                               )   SECTION N(5)
This Document Relates to:      )
Charlie Age, et al. v. Gulf    )
Stream Coach, Inc., et al.,    )   JUDGE:   ENGELHARDT
Docket No. 09-2892             )   MAG:     CHASEZ



         *****************************************

             ORAL AND VIDEOTAPED DEPOSITION OF

                    PAUL HEWETT, PH.D.

                      JULY 10, 2009

         *****************************************
```

ORAL AND VIDEOTAPED DEPOSITION of PAUL HEWETT, PH.D.,
produced as a witness at the instance of the Defendant,
and duly sworn, was taken in the above-styled and
numbered cause on the 10th of July, 2009, from 9:39 a.m.
to 5:44 p.m., before Wendi Broberg, CSR in and for the
State of Texas, reported by machine shorthand, at the
Law Offices of Reich & Binstock, L.L.P., 4265
San Felipe, Suite 1000, Houston, Texas 77027, pursuant
to the Federal Rules of Civil Procedure.



EXHIBIT BB

Paul Hewett
July 10, 2009

Page 2

1             INDEX

2    Index ....................................2

3    Index of Exhibits ........................3

4    Appearances ..............................4

5    PAUL HEWETT, PH.D.

6        Examination by Mr. Percy .............8

7        Examination by Mr. Sherburne .......229

8        Examination by Mr. Dinnell .........234

9        Further Examination by Mr. Percy ...255

10       Examination by Mr. Reich ...........257

11       Further Examination by Mr. Dinnell .282

12   Signature of Witness ...................285

13   Reporter's Certification ...............286

Paul Hewett
July 10, 2009

Page 3

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | MARKED/IDENTIFIED |
|---|---|---|
| 1 | USDC Civil Subpoena, Paul Hewett, Ph.d., with attached Exhibit A | 16 |
| 2 | Notice to Video-Taped Deposition, Paul Hewett, Ph.D. | 17 |
| 3 | CD - FEMA Expert Designation CV, Compensation Rates, Lists of Testimonies & Reports | 28 |
| 4 | CD- 31 photos Alexander Home | 28 |
| 5 | CD - Alexander/Cooper USA and Gulf Stream Expert Designations | 28 |
| 6 | CD - Expert Reliance File Paul Hewett, Bates ALX-EXP-20-0000221 thru ALX-EXP-20-000271 | 29 |
| 7 | CV, Paul Hewett | 38 |
| 8 | SD card, dataset information | 134 |
| 9 | Dr. Paul Hewett's report | 229 |

Paul Hewett
July 10, 2009

Page 4

1                A P P E A R A N C E S

2

   FOR THE PLAINTIFFS:
3

4     MR. DENNIS C. REICH
      REICH & BINSTOCK, L.L.P.
5     4265 San Felipe
      Suite 1000
6     Houston, Texas 77027
      Ph. (713) 622-7271
7     Fax (713) 623-8724
      E-mail:  dreich@reichandbinstock.com
8
      and
9
      MR. T. CHRISTOPHER PINEDO
10    LAW OFFICES OF T. CHRISTOPHER PINEDO
      4550 Jericho Road
11    Corpus Christi, Texas   78413
      Ph. (361) 946-1474
12    E-mail:  cpinedo@pinedolaw.com

13    and

14    MR. NEWTON B. SCHWARTZ, SR.
      LAW OFFICES OF NEWTON B. SCHWARTZ, SR.
15    1911 Southwest Freeway
      Houston, Texas   77098
16    Ph. (713) 630-0708
      Fax (713) 630-0789
17    E-mail:  nbs@nbslawyers.com

18

19  FOR THE DEFENDANT FLUOR ENTERPRISES:

20
      MR. RICHARD SHERBURNE
21    MIDDLEBERG RIDDLE & GIANNA
      450 Laurel Street
22    Suite 1101
      Baton Rouge, Louisiana   70801-1819
23    Ph. (225) 381-7700
      Fax (225) 381-7730
24    E-mail:  rsherburne@midrid.com

25

Paul Hewett
July 10, 2009

Page 5

1          A P P E A R A N C E S (Continued)

2   FOR THE DEFENDANT UNITED STATES OF AMERICA:

3       MR. ADAM M. DINNELL
        U.S. DEPARTMENT OF JUSTICE - CIVIL DIVISION
4       Ben Franklin Station
        P.O. Box 340
5       Washington, D.C.  20044
        Ph. (202) 616-4211
6       Fax (202) 616-4477
        E-mail:  adam.dinnell@usdoj.gov
7

8   FOR THE DEFENDANT GULF STREAM COACH, INC.:

9       MR. RYAN M. MALONE
        DUPLASS ZWAIN BOURGEOIS PFISTER & WEINSTOCK, P.L.C.
10      Three Lakeway Center
        3838 N. Causeway Boulevard
11      29th Floor
        Metairie, Louisiana  70002
12      Ph. (504) 832-3700
        Fax (504) 837-3119
13      E-mail:  rmalone@duplass.com

14
    FOR THE DEFENDANT KEYSTONE:
15
        MR. JAMES C. PERCY
16      JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
        DENEGRE, L.L.P.
17      8555 United Plaza Boulevard
        Baton Rouge, Louisiana  70809-7000
18      Ph. (225) 248-2130
        Fax (225) 248-3130
19      E-mail:  jpercy@joneswalker.com

20
    FOR THE DEFENDANTS JAYCO, INC. AND STARCRAFT RV, INC.:
21
        MR. THOMAS L. COUGILL (Telephonic Appearance)
22      WILLINGHAM, FULTZ & COUGILL, L.L.P>
        Niels Esperson Building
23      808 Travis, Suite 1608
        Houston, Texas  77002
24      Ph. (713) 333-7600
        Fax (713) 333-7601
25      E-mail:  tomc@willingham-law.com

```
 1            A P P E A R A N C E S (Continued)

 2

     FOR THE DEFENDANT HEARTLAND RECREATIONAL VEHICLES,
 3   L.L.C.:

 4
        MS. LORI DAIGLE (Telephonic Appearance)
 5      ALLEN & GOOCH
        3900 N. Causeway Boulevard
 6      Suite 1450
        Metairie, Louisiana  70002
 7      Ph. (504) 836-5200
        Fax (504) 836-5205
 8      E-mail:  loridaigle@allengooch.com

 9


10   FOR THE DEFENDANT BECHTEL NATIONAL, INC.:

11
        MR. A.J. KROUSE (Telephonic Appearance)
12      FRILOT, L.L.C.
        1100 Poydras Street
13      Suite 3700
        New Orleans, Louisiana  70163
14      Ph. (504) 599-8000
        Fax (504) 599-8100
15      E-mail:  akrouse@frilot.com

16

17   FOR THE DEFENDANTS RECREATION BY DESIGN, L.L.C., TL
     INDUSTRIES, INC., FRONTIER RV, INC., AND PLAY'MOR
18   TRAILERS, INC.:

19
        MR. RANDALL C. MULCAHY (Telephonic Appearance)
20      GARRISON, YOUNT, FORTE & MULCAHY, L.L.C.
        909 Poydras Street
21      Suite 1800
        New Orleans, Louisiana  70112
22      Ph. (504) 527-0680
        Fax (504) 527-0686
23      E-mail:  rmulcahy@garrisonyount.com

24

25
```

Paul Hewett
July 10, 2009

Page 7

1     A P P E A R A N C E S (Continued)

2

    FOR THE DEFENDANT FLEETWOOD ENTERPRISES, INC.:
3

4       MS. AMANDA N. SHELTON (Telephonic Appearance)
        NELSON MULLINS RILEY & SCARBOROUGH, L.L.P.
5       Atlantic Station
        201 17th Street N.W.
6       Suite 1700
        Atlanta, Georgia  30363
7       Ph. (404) 322-6233
        Fax (404) 322-6050
8       E-mail:  amanda.shelton@nelsonmullins.com

9

10   ALSO PRESENT:

11      Mr. Doug Overstreet - Videographer

12

13   REPORTED BY:

14      WENDI BROBERG, TEXAS CSR 7091
        Contracted by:
15      Stratos Legal Services, L.P.
        1001 West Loop South
16      Suite 809
        Houston, Texas  77027
17      Ph. (713) 481-2180

18

19

20

21

22

23

24

25

Page 8

1            THE VIDEOGRAPHER:  We're on the record
2    July 10, 2009.  It's 9:39 a.m., beginning of Tape 1.
3            Would the court reporter, please, swear in
4    the witness.
5                (Witness sworn)
6                PAUL HEWETT, PH.D.,
7    having being first duly sworn, testified as follows:
8                     EXAMINATION
9    BY MR. PERCY:
10       Q    Good morning, Mr. Hewett.
11       A    Good morning.
12            MR. PERCY:  I think we ought to probably
13    do our appearances for the record.
14            MR. PINEDO:  We had been doing that
15    routinely.  Chris Pinedo on behalf of the Plaintiffs.
16            MR. REICH:  Dennis Reich on behalf of the
17    Plaintiffs.
18            MR. PERCY:  Jim Percy on behalf of
19    Keystone.
20            MR. DINNELL:  Adam Dinnell for Defendant
21    United States.
22            MR. SHERBURNE:  Richard Sherburne for
23    Defendant Fluor Enterprises.
24            MR. MALONE:  Ryan Malone on behalf of Gulf
25    Stream Coach, Incorporated.

Page 245

1   me on May 13th.
2        Q    I want to just briefly touch on your reference
3   to the ATSDR chronic MRL.  And on Page 2 of your report
4   you mention that that MRL is for a period greater than
5   365 days, correct?
6        A    Yes.
7        Q    Is it correct that that MRL as stated by the
8   ATSDR is to be used for periods of time greater than 365
9   days and that that could range potentially over the
10  course of a person's life from 365 days until the
11  conclusion of being exposed to formaldehyde?
12       A    I think that's what their intention was.
13       Q    Okay.
14       A    I'm not sure if they've had any notion as to
15  what the maximum -- maximum amount of time might be, but
16  since it was applied I'm assuming to -- is -- is to be
17  applied I'm assuming to the general population that
18  they're thinking about a person's -- the average
19  person's lifetime.
20       Q    Okay.  And you'd -- you'd expect from your
21  training and experience in industrial hygiene that
22  people are exposed to some level of formaldehyde on a
23  daily basis, correct?
24       A    Well, I don't know about that.  I've never
25  measured formaldehyde either in a workplace or in the

1   general environment or in anybody's home.
2       Q    Okay.  I want you to accept that people are
3   exposed -- and this is just for the purpose of this
4   hypothetical.  I want you to accept that people are
5   exposed to some level of formaldehyde in the -- in both
6   indoor and outdoor environments on a daily basis.  All
7   right?  If people are exposed to some level of
8   formaldehyde on a daily basis from day one of their life
9   to the last day of their life and the ATSDR MRL, the
10  chronic MRL, applies to exposures for greater than 365
11  days, all right, and you mentioned that the intent is
12  that the mean or average exposure should be calculated
13  for comparison up against this ATSDR chronic MRL,
14  wouldn't you want to know the mean or average exposure
15  over the course of the person's life to formaldehyde?
16              MR. REICH:  Objection.  Incomplete
17  hypothetical.
18      A    I think I would have to say, no, I would not
19  under any circumstances want to know what the mean
20  exposure is across a person's lifetime, the reason being
21  if the number is not a good number it is way too late to
22  do anything about managing exposures.  Why in -- would I
23  want to collect data in such a fashion?
24      Q    (By Mr. Dinnell)  Do you know whether the ATSDR
25  describes its MRL's as conservative in nature?

Paul Hewett
July 10, 2009

Page 247

1  A   Do I know where they did?
2  Q   Do you know whether they describe their MRL's
3  as conservative in nature?
4  A   I do not know if they did. I do have -- and I
5  think it's one of the items that was requested
6  earlier -- a worksheet or a small document, supposedly
7  an A -- an ATSDR document, where they discuss or present
8  the derivation or calculation of the minimum risk level,
9  but where in there they discuss whether or not it's
10 conservative, I do not know.
11 Q   And you defer to the AT -- ATSDR's own
12 published language on how these numbers should be or
13 should not be used, correct?
14 A   Well, I think in that -- in the second
15 paragraph on Page 2 under 2.2, I point out that I -- I'm
16 not aware of any guidance from ATSDR as to how these
17 measure -- these limits should be applied or how
18 compliance relative these -- to these limits be
19 determined or ascertained.
20 Q   If the ATSDR says that their MRLs are intended
21 only to serve as a screening tool, would you have any
22 reason to dispute their own language?
23 A   Well, how could I dispute their own language?
24 That's what they said.
25 Q   Okay. So that --

Paul Hewett
July 10, 2009

Page 248

1   A    I don't think I would disagree with the value
2   as a good value for those purposes.
3       Q    Do you know if the NIOSH REL level that you
4   referenced -- and that's -- REL stands for recommended
5   exposure limit; is that correct?
6       A    Correct.
7       Q    Do you know if that level is derived based upon
8   health effects or simply based on analytical
9   sensitivity?
10      A    I do not believe it's based upon strictly a --
11  a dose response analysis.  It may be based upon
12  analytical sensitivity.  It may be based upon lowest --
13  well, that would be analytical sensitivity --
14  measurement capability.
15      Q    You rely on whatever the NIOSH says about their
16  number?
17      A    Oh, you bet.
18      Q    And the same is true with the ATSDR --
19      A    Ab --
20      Q    -- in characterizing their numbers, you'd rely
21  on however they've characterized them?
22      A    Right.  I'm not going to second guess or
23  critique.
24      Q    All right.
25      A    These numbers were developed -- I'll -- I'll

1   characterize both ATSDR process and NIOSH broad stroke.
2   I'm assuming that both of them were generated by
3   committees. Both of them were generated by groups of
4   people that have various levels of expertise,
5   epidemiology, statistics, medical, occupational
6   medicine, environmental or whatever, and that a
7   consensus was developed regarding these levels. So I'm
8   not going to second guess the opinions of the ATSDR
9   committee that generated the MRL or the NIOSH committee
10  that generated the NIOSH limit no more than I would
11  second guess the ACGIH committee or OSHA whenever they
12  come up with their limits. These are their limits.
13  They're responsible for them. They're responsible for
14  justifying it. But they -- I view them as risk
15  management tools. Here's the risk management tool
16  whether you agree with it or disagree with it. The
17  speed limit on that road out there is 70 miles an hour.
18  You may believe that you can drive safely 100 miles an
19  hour on that road, but they've set the limit. You
20  cannot change their limit. You can disagree with its
21  premises, but you can't change it. So whether I agree
22  or disagree, I cannot change the ATSDR limit nor can I
23  change the NIOSH limit. They are risk management tools.
24              What I'm doing with the report here is
25  looking at all of the available data, at least the data

Page 250

1   that's been made avail -- made available to me and
2   trying to determine does it appear like risk has been
3   properly managed relative to those two limits.  And then
4   one of them is not even appropriate.  The NIOSH limit is
5   an occupational exposure limit.  It's in there for
6   reference -- reference peer -- purposes.  There's no
7   intention here in my report and the intention is not to
8   say that the NIOSH limit is an appropriate limit for
9   evaluating exposure levels to formaldehyde in these
10  trailers.  If it's higher than an occupational limit,
11  I'm going to be very concerned about it.
12      Q   When you were working for NIOSH, did you do any
13  work or review on setting NIOSH RELs?
14      A   Yes, I did.
15      Q   Specific to formaldehyde?
16      A   No.  Let me qualify that.  I participated in
17  the process.  I was part of a multidisciplinary group
18  that covered, I think, 22 or 23 people.  And, in fact,
19  the group I was involved with -- and I've -- I was only
20  involved on one exposure limit, and that was for
21  respirable coal mine dust.  The NIOSH criteria document
22  on respirable coal mine dust was published in 1995.  The
23  group won, just to -- to let you know, the Alice
24  Hamilton award for our efforts.  So I'm part of the
25  team.  I did not come up with the NIOSH limit, but I was

Paul Hewett
July 10, 2009

Page 251

1  part of the process providing technical materials to the
2  team, and those technical materials made their way into
3  the final document.
4      Q    Do those NIOSH RELs take into account a
5  person's entire occupational work history over the
6  course of some years?
7      A    Well, they're meant to be applied to an
8  individual -- meant to be applied to a situation where
9  an individual is expected to work and be exposed to a
10 material throughout a working lifetime.
11     Q    Do they use a 40-year working lifetime?
12     A    I think they use a 40 year, although in the
13 specific instance in which I was involved we looked at
14 exposures from periods ranging from, I think, 25 to 30
15 to 35 to 40 years.  We generated, "we" being the group,
16 generated various dose response curves depending upon
17 various hypothesized tenures in underground coal mining.
18     Q    We've referenced a few times today that you
19 were deposed in the class certification phase of this
20 case back last September of '08, I think, the fall of
21 2008 --
22     A    Right.
23     Q    -- at some point.
24     A    Uh-huh.
25     Q    Did you read that deposition transcript in

Page 252

| | |
|---|---|
| 1 | preparation for today's deposition? |
| 2 | A   Meant to, but I did not. |
| 3 | Q   Okay.  And also when we've discussed your |
| 4 | expert report -- and we know that there's been a July |
| 5 | second revision, but I'll just deal with the expert |
| 6 | report that was completed on -- completed and dated on |
| 7 | May 18th, 2009.  Prior to finalizing this report, did |
| 8 | you send a draft of it to anyone for review? |
| 9 | A   I sent a draft to Mikal Watts and Linda Nelson. |
| 10 | Q   On what day? |
| 11 | A   Maybe Friday of that week, I believe. |
| 12 | Q   And what was your purpose of sending that draft |
| 13 | to them? |
| 14 | A   For them to review it. |
| 15 | Q   What comments did they have for you? |
| 16 | A   Well, the comments were looks good. |
| 17 | Q   Did you make any changes in response to their |
| 18 | comments? |
| 19 | A   There may have been some wording changes just |
| 20 | to make sure that I am referring to the case correctly, |
| 21 | not being all that conversant in legalese and jargon |
| 22 | that you guys use.  What else.  I'm reaching into the |
| 23 | depths of my memory.  Just give me a second here.  Oh, |
| 24 | right.  The Footnote A in the report -- we should have |
| 25 | some kind of objection that Footnote A should not be |