1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  FEMA TRAILER           )

        FORMALDEHYDE PRODUCTS  ) MDL NO. 1873

        LIABILITY LITIGATION   ) SECTION "N" 5


        The videotaped deposition of KENNETH

RONALD LAUGHERY, called for examination pursuant

to the Rules of Civil Procedure for the United

States District Courts pertaining to the taking

of depositions, taken before BRENDA S.

TANNEHILL, a notary public within and for the

County of Kane and State of Illinois, at 7101

Chestnut Street, Rosemont, Illinois, on

May 5, 2010 at the hour of 10:54 o'clock a.m.



REPORTED BY:  Brenda S. Tannehill, CSR, RPR, CRR

LICENSE NO.  084-003336

2

1    APPEARANCES:
         THE LAW OFFICES OF JOSEPH M. BRUNO
2        BY MR. L. SCOTT JOANEN
         855 Baronne Street
3        New Orleans, Louisiana 70113
         (504) 525-1335
4        scott@jbrunolaw.com
             Representing the Plaintiffs;
5
         U.S. DEPARTMENT OF JUSTICE
6        CIVIL DIVISION
         BY MR. ADAM M. DINNELL
7        Ben Franklin Station
         P.O. Box 340
8        Washington, D.C. 20044
         (202) 616-4211
9        adam.dinnell@usdoj.gov
             Representing the United States;
10
         JONES, WALKER, WAECHTER, POITEVENT,
11       CARRÈRE & DENÈGRE, LLP
         BY MR. RYAN E. JOHNSON
12       8555 United Plaza Boulevard
         Baton Rouge, Louisiana 70809-7000
13       rjohnson@joneswalker.com
             Representing Keystone RV Company;
14
         BAKER, DONELSON, BEARMAN,
15       CALDWELL & BERKOWITZ, PC
         BY MR. DAVID KURTZ (via telephone)
16       201 St. Charles Avenue, Suite 3600
         New Orleans, Louisiana 70170
17       (504) 566-5259
         dkurtz@bakerdonelson.com
18           Representing CH2M Hill Constructors,
             Inc.;
19
         WILLINGHAM, FULTZ & COUGILL, LLP
20       BY MR. THOMAS COUGILL (via telephone)
         808 Travis Street, Suite 1608
21       Houston, Texas 76002
         (713) 333-7600
22       tomc@willingham-law.com
             Representing Jayco, Inc. and
23           Starcraft RV, Inc.;
24

3

1    APPEARANCES:  (Continued)
         MIDDLEBERG, RIDDLE & GIANNA
2        BY MR. RICHARD A. SHERBURNE, JR.
         (via telephone)
3        450 Laurel Street, Suite 1101
         Baton Rouge, Louisiana 70801
4        (225) 381-7700
         RSherburne@midrid.com
5           Representing Fluor Enterprises,
            Inc.;
6
         LUGENBAHL, WHEATON, PECK,
7        RANKIN & HUBBARD
         BY MR. KRISTOPHER M. REDMANN
8        (via telephone)
         601 Poydras Street, Suite 2775
9        New Orleans, Louisiana 70130
         (504) 568-1990
10       kredmann@lawla.com
            Representing Liberty Mutual
11          Insurance Corporation.
12    Also Present:  Mr. Ben Dixon, CLVS
13
14
15
16
17
18
19
20
21
22
23
24

4

1                     I N D E X

2     WITNESS                    EXAMINATION

3     KENNETH RONALD LAUGHERY

4       By Mr. Johnson                7

5       By Mr. Dinnell               132

6       By Mr. Kurtz                 218

7

8

9

10                  E X H I B I T S

11    NUMBER                   MARKED FOR ID

12    Laughery Deposition Exhibit

13      Nos. 1&2                   14

14      No. 3                     26

15      No. 4                     43

16      No. 5                    125

17      No. 6                    132

18      No. 7                    142

19      No. 8                    203

20      No. 9                    205

21      No. 10                   213

22      No. 11                   221

23

24

5

1          THE VIDEOGRAPHER:  Good morning.  My

2    name is Ben Dixon, Certified Legal Video

3    Specialist with McCorkle Court Reporters located

4    at 200 North LaSalle Street, Suite 300, Chicago,

5    Illinois 60601.

6          I am the camera operator or May 5th,

7    2010, for the videotaping of the deposition of

8    Kenneth Laughery being taken at 7101 Chestnut

9    Street, Rosemont, Illinois at the time of 10:54

10   a.m. in the matter In Re:  FEMA Trailer

11   Formaldehyde Products Liability Litigation filed

12   in the United States District Court, Eastern

13   District of Louisiana, MDL number 1873, Section

14   N5.

15          Will Counsel please identify themselves

16   for the record beginning with plaintiffs'

17   counsel?

18          MR. JOANEN:  Scott Joanen for the

19   plaintiffs.

20          MR. JOHNSON:  Ryan Johnson for

21   defendant Keystone RV Company.

22          MR. DINNELL:  Adam Dinnell for

23   defendant United States.

24          MR. JOHNSON:  We have some folks on the

6

1    phone, but I think they've already provided

2    their information to the court reporter and will

3    e-mail their contact information to her.

4         THE VIDEOGRAPHER:  I'm sorry.  Off the

5    record for a second.  We are off the record at

6    10:55 a.m.

7              (Whereupon, a discussion was

8               had off the record.)

9         THE VIDEOGRAPHER:  We are back on the

10   record at 10:58 a.m.

11        Will the reporter please identify

12   herself and swear in the witness?

13        THE COURT REPORTER:  Brenda Tannehill

14   from McCorkle Court Reporters.

15              (Whereupon, the witness was

16               duly sworn.)

17        MR. JOHNSON:  Good morning,

18   Dr. Laughery.  My name is Ryan Johnson.  We met

19   a few minutes ago.

20        Am I pronouncing your last name right?

21   I want to make sure I don't --

22        THE WITNESS:  Yes.

23        MR. JOHNSON:  Laughery, okay.

24        For the record, would you just state

7

1    your full name, please?

2          THE WITNESS:  Kenneth Ronald Laughery.

3            KENNETH RONALD LAUGHERY,

4    called as a witness herein, having been first

5    duly sworn, was examined and testified as

6    follows:

7                    EXAMINATION

8    BY MR. JOHNSON:

9        Q.   And what's your present address, work

10   and home, please?

11       A.   It's the same:  3050 Claire Court,

12   Janesville, Wisconsin 53548.

13       Q.   How about your telephone number?

14       A.   (608) 754-0849.

15       Q.   I will not go over stuff that you've

16   been asked about in your prior deposition, I'll

17   commit to you right now, but what I'd like to

18   ask you is you gave a deposition in March of

19   this year; is that correct?

20       A.   Are you talking about in the Castanel

21   case?

22       Q.   Yes, sir.

23       A.   Yes.

24       Q.   Since that time -- and I'm going to

8

1    identify a couple different areas.  I'd like to

2    know if anything's changed about your situation.

3         Have you received any additional

4    education since you gave that deposition in

5    March of 2010?

6    A.  No.

7    Q.  Any additional papers or publications

8    that you've put out since that time?

9    A.  I have a couple of things in press but

10   nothing that's come out in print yet.

11   Q.  Okay.  What are those things that are

12   in press since that time?

13   A.  Oh, I have a paper that's going to be

14   published that I co-authored in a book that will

15   come from a conference to take place in Miami in

16   July an ergonomics, human factors meeting, and

17   it concerns, oh, human factors issues in

18   propane, propane safety kinds of contexts.

19        And then I have a paper that's going to

20   come out at some point -- I don't know yet

21   when -- in The Journal of Applied Ergonomics and

22   Design that has to do with the safety hierarchy,

23   the design, guard and warn and some human

24   factors perspectives on that.

57

1    give you a minute to look -- where in the

2    deposition McGraw referred to meeting with a

3    CH2M representative?

4        A.   I didn't say he knew it was a CH2M.

5    I don't know that he characterized it as CH2M.

6        He did testify that he met with a

7    representative, they did a walkthrough, they

8    turned the materials over to him, it included

9    the owners manual and so forth.

10       Q.   Okay.  Your statement in your report

11   says McGraw met with a CH2M representative?

12       A.   That's right.

13       Q.   How do we know he met with a CH2M

14   representative?

15       A.   I'm assuming that was a CH2M -- CH2M

16   representative from the complaint and that they

17   were the ones responsible for setting it up,

18   turning it over and so forth.

19       I don't know that McGraw actually said

20   "CH2M."  I can look if I've got the index to his

21   deposition and see if it's referred to that way.

22       On Page 206 of his deposition, there's

23   a question.  You'll notice at the bottom of

24   there, first page, 184, they're talking about

58

1    the document.

2           "It says, Copyright 2006 by CH2M Hill,

3    Incorporated, company confidential.  Do you see

4    that?"  So there's reference there.

5           There's a number of references to CH2M

6    in his deposition.  If you want, I'll go

7    through.

8       Q.   No.  I'd like you to show me the spot

9    in his deposition where he said that he met with

10   a CH2M Hill or CH2M representative.

11      A.   I didn't say that he said that.

12      Q.   Okay.  So the statement you've made in

13   your report that he actually met with a CH2M

14   representative is an assumption on your part?

15      A.   Yeah.  It's in the section on

16   assumptions and understandings.  I don't know

17   how I could be more clear.

18      Q.   I want to understand how it is that you

19   came to that assumption if Mr. McGraw in his

20   deposition didn't say it.  Does that make sense?

21      A.   Well, I've answered that in part by

22   saying that the complaint is clear that CH2M was

23   responsible for that, and from the deposition

24   testimony, it seems to be consistent with that.

59

1        If you want me to assume that somebody

2   other than CH2M was there, fine, I'll assume it,

3   that my assumption is not correct.

4      Q.   I don't want to you assume one way or

5   the other.  I'd just like to know you made a

6   statement --

7      A.   I have to assume one way or the other.

8   I'm assuming that it was CH2M.

9      Q.   Okay.  Let's go to Item Number 5,

10   Doctor.  Could you read that one from your

11   report?

12      A.   The Keystone trailer provided to

13   Mr. McGraw by FEMA contained component parts

14   that off gassed formaldehyde.

15      Q.   Would you agree with me, Doctor, this

16   is a pretty important assumption for purposes of

17   your report?

18      A.   Sure.

19      Q.   And we'll get to this in a little bit,

20   but doesn't this assumption really relate to the

21   issue of whether there's a hazard involved that

22   needs to be warned of?

23      A.   Whether there's a formaldehyde hazard,

24   yes.

60

1        Q.   What did you base this statement or

2    assumption on?

3        A.   Actually, things I've been reading from

4    the entire body of stuff in these formaldehyde

5    trailer cases including Smulski and so forth.

6             Now, I'm making that assumption.

7    Obviously, if that's not a valid assumption,

8    then there's nothing to be warned about in the

9    formaldehyde context or hazard.

10            So it's based in part on stuff I've

11   read of Smulski's, of other experts, but mostly,

12   I just relied on him that the products that are

13   used in these trailers off gas formaldehyde.

14       Q.   Okay.  So if you couldn't determine

15   that there was formaldehyde in McGraw's

16   trailer, --

17       A.   I wouldn't determine that, to start

18   with.

19       Q.   Fair enough.

20            If there were no formaldehyde, there

21   was no formaldehyde in McGraw's trailer, there

22   wouldn't be a hazard that would need to be

23   warned of, correct?

24       A.   About formaldehyde?

81

1    Q.  Okay.

2    A.  Okay.

3    Q.  Can we move on?

4    A.  Yeah.

5    Q.  I mean, if there's something else you

6    want to point out in the deposition, I want to

7    give you an opportunity to do that.

8    A.  No.

9    Q.  Doctor, I want to now ask you -- we're

10   done with the assumptions and understandings

11   section of your report.  I want to go on your

12   opinions which are set out at Pages 7 and 8 of

13   your report which is McGraw 1456 and 1457.

14       It appears to me that you have three

15   opinions that you've reached in this case and

16   that are represented in your report; is that

17   correct?

18   A.  Yes.

19   Q.  What are the three opinions that you

20   reached?

21   A.  Well, one of them is that the

22   formaldehyde hazard and the consequences

23   associated with it is not an open and obvious

24   hazard.  In other words, just being in the

82

1    trailer and knowing -- or using the trailer

2    doesn't tell you that there's off gassing of

3    formaldehyde, that formaldehyde is hazardous to

4    your health and that there's a safety problem or

5    issue associated with it.

6         And I contrast that with -- I pointed

7    out in my report that the hazards are -- that

8    hazard is technical in nature, it concerns

9    issues of chemical vapors, toxicology,

10   biological and medical reactions so it's not an

11   open and obvious hazard.  It's what in the

12   warnings literature we'd call a hidden hazard.

13      Q.  Hidden, okay.

14         What's the next opinion that you

15   reached?

16      A.  That the warning system -- I'm going to

17   read from it.  The warning system associated

18   with the trailer regarding formaldehyde hazards

19   was inadequate and data was not nonexistent.

20         There was no warnings about it.

21   Indeed, in the owners manual, the information

22   regarding formaldehyde, the owners manual that

23   he received, it said Keystone RV does not use

24   products containing formaldehyde.  And to the

83

1    extent there was formaldehyde off gassing in the

2    trailer, that's a misrepresentation.

3        Q.   Okay.  What's your third opinion that

4    you reached?

5        A.   Well, I'm sorry.  I wasn't done with

6    the second one.

7        Q.   Oh, I'm sorry to interrupt.

8        A.   I point out in my second opinion not

9    only was there a no warning system existing

10   addressing the formaldehyde hazards and that

11   there was a statement in the owners manual

12   misrepresenting what I assume to be a

13   formaldehyde hazard but that there are three

14   components of what might be in effect a warning

15   system, none of which were followed with this

16   trailer.

17        And those three are labels displayed in

18   or on the trailer addressing the formaldehyde

19   problem.  Another would be the owners manual.

20   That's a source of potential information about

21   it.  And a third would be a verbal or a handout

22   exchanged at the time of delivery.

23        Those are three components that lend

24   themselves to use in a warning system for this

84

1    trailer regarding the formaldehyde.  And that's

2    all addressed in my second opinion.

3        Q.   Okay.  What's the third opinion that

4    you reached?

5        A.   Since travel trailers, like

6    manufactured housing, contain

7    formaldehyde-emitting composite wood products, a

8    notice similar to that described in Item 21

9    above should be prominently displayed in travel

10   trailers.

11        I'm not saying that you have to display

12   that notice but a notice.  The concept of a

13   displayed notice about formaldehyde is one that

14   has existed for manufactured housing so it's not

15   a new idea.  In the previous opinion, I said

16   that some label, some display of information on

17   the trailer.

18        And my point in the third one is that

19   precedent in manufactured housing at least

20   exists for doing something like that.

21        Q.   So are you saying in that Item

22   Number 3, Conclusion Number 3 or Opinion Number

23   3, rather, that you recommend using the HUD

24   label in a travel trailer?

85

1     A.  No, that's not what I said.

2     Q.  What is your opinion about the HUD

3  label?

4     A.  Well, the HUD label is one that's used

5  and required in manufactured housing, as

6  I understand it.  And I think I made that

7  assumption in the assumptions section of the

8  report.

9         And what I'm saying is that that's a

10  precedent in a related -- different but in my

11  opinion related context because it's housing

12  that addresses the formaldehyde hazard, and

13  something like that that addresses the

14  formaldehyde hazard should be prominently

15  displayed.

16     Q.  Okay.  Let's go back to Opinion

17  Number 1, Doctor.

18         You'll know these buzz words when I ask

19  you, but what's the methodology that you go

20  through or you went through to reach opinion

21  Number 1?

22     A.  That it's not an open and obvious

23  hazard?

24     Q.  Yeah.  I mean, you've got a couple

86

1    different things in there.  It seems to me that

2    you have formaldehyde is a health hazard, it's

3    not open and obvious, it's technical, and it's

4    imperative that a warning system be provided.

5    There's sort of multiple components in that.

6         What's the methodology that you went

7    through to come up with that Opinion Number 1?

8      A.   First of all, it's not an opinion of

9    mine, it's an assumption of mine that there's a

10   hazard of formaldehyde in the trailers.  We've

11   been around on that, and I just want to be clear

12   about that.

13        But given that assumption, then the

14   question becomes how is it that people can

15   become aware of and know about this health

16   hazard, what its consequences are and what to do

17   or not to do with respect to addressing it.

18   That's what a warning system should accomplish.

19        And the question becomes then is it

20   necessary to have a warning that addresses the

21   health hazard of formaldehyde.

22        One issue in whether or not a warning

23   is necessary is whether or not the hazard is

24   open and obvious.  An example I use is I would

1   not argue that you need to have a warning

2   telling somebody that if they get their fingers

3   in the rotating blades of a chain saw , they've

4   got a problem.  That's in my opinion an example

5   of an open and obvious hazard.  Moving parts,

6   pinch points sometimes are in the category of

7   open and obvious hazards.

8          I don't think you have to tell the

9   ironworker walking on a beam 10 stories up on a

10   construction of a new building that if he falls,

11   he's got a problem.  I mean, falls from heights,

12   especially if the heights are great enough, are

13   examples of an open and obvious hazard.

14          But in some categories of hazards of

15   products, they generally are not open and

16   obvious:  Chemical products, medical products,

17   medicines and so forth.

18          You can't look at a pill and know if

19   you take it what the side effects might be or

20   what the contraindications might be for using

21   it.  And similarly, if you've got a solvent, you

22   can't tell what will happen if you get it on

23   your skin just by looking at it.

24          And so there's a substantial body of

88

1    scientific literature in psychology and related

2    fields called naive science, and it really deals

3    with what do people know and understand, and

4    when it comes to technical issues that would be

5    the domain of a toxicologist, say, you can't

6    expect people to know about those kinds of

7    hazards.

8        Q.   Well, tell me just so I get a better

9    understanding, you mentioned the chain saw.

10   What are some other examples of things that are

11   open and obvious hazards that wouldn't have to

12   be warned about?

13       A.   Well, generally, the category where you

14   do find some of them is mechanical hazards,

15   moving things, height kinds of hazards, I mean,

16   whether you think of that as mechanical or not.

17          Electrical hazards, no.  Hazards

18   associated with fire where a fire is burning,

19   not a source that might be ignited.  That might

20   be more complex than that.

21          But even the fire example is

22   potentially questionable because not only does

23   it -- we grow up and we learn about fires being

24   hazardous or something hot being hazardous, and

93

1      A.   No.  I mean, that's a toxicology issue.

2      I mean, I wouldn't be expert to say at what

3      levels and what kinds of exposure it becomes a

4      hazard.  I understand that the toxicologists

5      would have to address that, but that's not my

6      issue.  If it's a hazardous level, then it needs

7      to be warned about is my point.

8      Q.   And what is a hazardous level?

9      A.   That you've got ask the toxicologists.

10      Q.   So in preparing your report, in

11      concluding that a hazardous condition existed in

12      the trailer, you don't know what the level at

13      which the hazard exists, do you?

14      A.   I don't know what the level of the

15      hazard is, and I don't know what the minimum

16      level is that's safe or the maximum level is

17      that's safe.  Those kinds of questions are

18      really not my expertise; that's toxicology.  I'm

19      assuming there's a hazardous level of

20      formaldehyde in the trailers.

21      Q.   If there's a very, very low level of

22      formaldehyde in the trailer, just for sake of

23      this question, just assume that that's correct,

24      very low level, is that something that needs to

94

1    be warned of?

2         MR. JOANEN:  Object to the form of the

3    question.

4         THE WITNESS:  That's a question you've

5    got to ask people like Patricia Williams.  I'm

6    being serious.  I mean, that --

7    BY MR. JOHNSON:

8         Q.  But she's not a human factors expert,

9    you are, right?

10        A.  But she's a toxicologist.  She's the

11   one or the Williamses of the world, somebody

12   with that expertise, whether it's toxicology in

13   medicine, has to say yes, this is hazardous,

14   people could have these kinds of health effects

15   from this kind of exposure to that level of

16   formaldehyde.  That's clearly not my expertise.

17   And if that doesn't exist, then I'm not in favor

18   of warning about it.

19        Q.  And that was going to be my next

20   question.

21            You would agree that if the hazard

22   doesn't exist, we don't need to warn?

23        A.  Absolutely.

24        Q.  Is there a theory or concept in your

95

1    discipline that talks about not warning when

2    there's no hazard?

3         That's a poorly-worded question, but

4    did you understand that?

5      A.  I think so.

6      Q.  What is that?

7      A.  I think the closest -- I mean, people

8    don't write papers about if there's no hazard,

9    don't warn or let's warn about things that don't

10   exist.

11        What may get addressed, though, in some

12   of the technical literature is a point that

13   I was referring to earlier, whenever the hazard

14   exists with some probability, in other words, if

15   you use this product in this way -- let me give

16   you an example.

17        Back-up lawn mowers and children who

18   get run over.  That's a rare event.  Do you need

19   a warning on a lawn mower like an auditory

20   signal when it's backing up?  I'm not

21   necessarily talking about a sign on the front of

22   it, but that's a warning system.  We do that on

23   garbage trucks.  When they back up, they make

24   noise.

96

1          What are the odds of that occurring?

2     Well, every time it backs up, is there a hazard

3     of somebody getting run over?  Well, there may

4     not even be anybody around, but that doesn't

5     mean a warning system doesn't have a useful

6     function there.  Now, if it's only ever used in

7     situations where nobody's around, then

8     I wouldn't argue you've got to put a warning on

9     it.

10          Hopefully I'm making my point.  The

11     point is that sometimes hazards exist with some

12     probability and then there's some different

13     kinds of issues that come into it that people in

14     my field -- where it comes in in the psychology

15     and human factors of it is if the odds are one

16     in 50,000, that means it's not going to happen

17     to me and I don't have to worry.  People may

18     take that view.

19     Q.   But isn't there a problem with over

20     warning, --

21     A.   There might be.

22     Q.   -- too many warnings on things that are

23     of little chance of happening?

24     A.   Yeah, that could be.

105

1    they just don't like, and they can open the

2    window to get some fresh air.  That's not what

3    we're talking about.  That's not what I'm

4    talking about.

5          I'm talking about an odor that reflects

6    the presence of a toxic gas and can cause some

7    health problems.  That's what they need to know.

8      Q.  So "toxic" meaning a chemical substance

9    of some kind that could hurt somebody?  I mean,

10   is that your assumption when you say "toxic"?

11     A.  Yes.

12     Q.  And so it ought to say the substance

13   exists, the consequence is that it might cause

14   you some physical problem and you ought to

15   ventilate?  Is that what the warning would

16   include?

17     A.  Yeah, not with those words, but it's

18   got to give them information that's meaningful

19   and explicit, but yes, that's the three

20   categories.

21     Q.  What the hazard is, what the

22   consequences are and what to do or not to do?

23     A.  Yeah.

24          And incidentally, I'll add this at this

106

1     point.  One of the things that there's an

2     enormous amount of scientific literature on --

3     and I wrote a chapter on it for The Handbook of

4     Warnings that I've brought with me today -- is

5     explicit information particularly with respect

6     to consequences.

7           If consequences of some hazard are

8     severe, then explicit information meaning

9     explicit in terms of detail and specificity that

10    people will understand and appreciate is one of

11    the most important factors that drives

12    compliance.

13          And my example that I sometimes use for

14    that is we can go to the cabinet at our house

15    and open it and probably find something that

16    says "Keep out of the reach of children."  If it

17    says "Keep out of the reach of children, one

18    swallow will kill the child," it's probably

19    going to be on a higher shelf because that

20    drives compliance, understanding the

21    consequences, and especially if it's severe.

22          That's just characteristics of warning

23    systems that influence their effectiveness.

24    Q.   Okay.  Of the four steps that we talked

107

1    about before, the fourth one was the capability

2    to carry out the warning, the user's ability to

3    carry out what the warning recommends; is that

4    right?

5        A.   Yes.

6        Q.   Applying that to the McGraw trailer and

7    the formaldehyde warning, what is it that --

8    what conclusion did you reach on that?  How did

9    you analyze that step as a part of your

10   opinions?

11       A.   Well, there was no warning system with

12   respect to the formaldehyde hazard so I'm not

13   quite sure how to answer your question in terms

14   of analysis.

15           It wasn't as though in the owners

16   manual or in a posted label or in some exchange

17   between the CH2M person and McGraw they said

18   something about formaldehyde and it could cause

19   you health hazards and then they told them what

20   to do or not to do.  That didn't happen, that

21   didn't exist so -- but that's something that

22   needs to be a part of it.

23           Maybe I'm not understanding your

24   question.

108

1      Q.   Well, let me ask you then, on Page 5 of

2   your report, you set out the chemical

3   sensitivity section of the Keystone 2004 manual.

4   Do you remember that?

5      A.  Yes.

6      Q.   And I mean, you've testified here

7   that -- and McGraw testified at his

8   deposition -- that this is an excerpt of the

9   manual that was actually given to him, correct?

10     A.  Yes.

11     Q.   This section appears to me to recommend

12   for a trailer user if they have issues with

13   chemical sensitivity -- that's what the section

14   is called -- to ventilate their trailer.  That

15   recommends something to deal with a problem.

16          Is this the kind of warning that would

17   suggest what the user ought to do with a

18   particular hazard?

19     A.  It's a start in that direction.

20          Let me note an alternative example.

21          In one of the documents that I

22   understand FEMA tried to distribute in the

23   2006-2007 era was a document called Important

24   Information For Travel Trailers Occupants that

1  apparently never got -- never reached

2  Mr. McGraw.  And they broke it down into three

3  sections.  One of them says what the hazard is,

4  another one says what effect it will have on

5  you, and the third says what I can do about it.

6      In short, they laid out -- now, I'm not

7  addressing whether or not they did it

8  competently, but they approached it in that

9  fashion.

10      And in the section, coming to your

11  question, "What can I do to reduce my exposure

12  to formaldehyde in my travel trailer" which is

13  the instructional aspect of it, they talk about

14  increasing ventilation, keep indoor temperatures

15  moderate, lower the humidity and don't smoke,

16  don't smoke in the trailer.

17      Well, to the extent those are

18  adequately explicit and describe something that

19  somebody can do, then that's a potential

20  component of an effective warning.

21      Q.   Well, go back to Page 5 of your report

22  where you quoted from the 2004 Keystone manual.

23  The title of the section is Chemical

24  Sensitivities Issues, and you have these two

110

1    paragraphs.  Is this a warning?

2       A.   Chemical sensitivity?

3       Q.   The whole section, is this considered a

4    product warning or a hazard warning?

5       A.   No, I wouldn't give that credit for

6    being much of a warning.

7            For example, Chemical Sensitivity, it's

8    an okay label, but if I were going to make a

9    warning out of this or try to present it as a

10   warning about some safety issue, some hazard

11   issue, first of all, I would indicate that this

12   has something to do with safety by using a

13   signal word like "warning" or "caution" or

14   "danger," and I would make it into a warning.

15           That's one of my criticisms about what

16   FEMA did here, even though the content of some

17   of it isn't bad.

18           And then in this one, it says, "Many

19   individuals are sensitive to out gassing from

20   common construction materials used in the

21   construction of RVs.  This occurs most

22   frequently in hot weather and after a unit has

23   been closed up for extended periods."

24           And then they highlight, actually,

111

1    "Chemical sensitivity is an individual reaction.

2    Common symptoms include but are not limited to

3    burning eyes, respiratory irritations and other

4    allergic reactions."

5         And then the next sentence in my

6    opinion kills them:  "These conditions are not

7    manufacturing defects."  And then it follows

8    that:  "A common myth is that formaldehyde is

9    used in the manufacturing of paneling and the

10   materials."

11        It's basically taking the position that

12   there is no problem here, if you've got a

13   problem of chemical sensitivity, it's because of

14   you, not the product, not the trailer, it has

15   nothing to do with the trailer.  And it's in

16   that sense that the whole thing is in my opinion

17   misleading, but certainly the last part about

18   formaldehyde which I've talked about before

19   today is misleading.

20       Q.   Well, Doctor, maybe I didn't

21   understand, but I mean, before, you said there

22   were three things that -- three kinds of

23   information that go into a warning, first, what

24   is the hazard, and the chemical sensitivity

112

1    issue section from the manual seems to describe

2    what the problems I'd call the hazard are,

3    chemical sensitivity, reactions, symptoms.

4         Doesn't that meet the first step of

5    your analysis in terms of whether it's a

6    warning?

7    A.   No.

8    Q.   Why not?

9    A.   No, no, because it's not even talking

10   about the trailer.  It's talking about the

11   chemical where sensitivity is a problem of

12   people, not a problem of products.

13        Where in there does it say this trailer

14   can produce toxic gases, toxic fumes, fumes that

15   might cause you to have some kind of a health

16   problem?  It doesn't use language like that.

17        Basically, what it's saying is chemical

18   sensitivity is an individual reaction, these

19   conditions are not manufacturing defects, a

20   common myth.  I mean, if anything, it's the

21   opposite of a warning about the product.

22   Q.   And then you said the second step was

23   it should tell you what the consequences of the

24   hazard are, and here, it says, "Symptoms include

121

1    Wogalter edited, there's some stuff on that.

2         I'm trying to think of what the most

3    salient information is that one could find on

4    that, I mean, but it's in a variety of

5    literature.  One place where you find it is in

6    the computer literature that --

7         Q.   What do you mean, the computer

8    literature?

9         A.   Owners manuals come with computers

10   and -- or they used to.  Now they're part of the

11   software on the computer, you find your owners

12   manual in the software.  And there are some good

13   reasons for that that has to do with ability in

14   getting lost and all kinds of things like that.

15        I'm trying to think of something that

16   I've published that addresses that.  I'll try to

17   give you some references on it.

18        Q.   Okay.  We'll come back to that.  If you

19   think of something, let me know.

20        What is it that you think a warning

21   label, on-product warning label, in the Keystone

22   trailer should have had in it?

23        A.   Well, with respect to the hazard, it

24   needs to tell people -- I'm talking about its

122

1    content now, --

2        Q.   That's what I'm asking about.

3        A.   -- I mean, how to get people's

4    attention, and that's the use of color and

5    signal words and where it's displayed and so

6    forth.

7            But with regard to its content and the

8    three categories of information in the content,

9    it ought to be clear as to what the hazard is

10   that we're dealing with or that the owner is

11   going to deal with, namely that the components

12   of this trailer, the materials in this trailer,

13   give off formaldehyde gas, and formaldehyde gas

14   can be hazardous to your health, but it needs to

15   say that there's formaldehyde and where it comes

16   from and that it can be at a level that creates

17   health problems.

18           Then it needs to be explicit as to what

19   those health problems are, whatever they are,

20   and that's the toxicologist and medical people

21   to say.  But whatever they are, it needs to be

22   explicit, and "Hazardous to Your Health" is a

23   common, non-explicit, useless component of a

24   warning system.

123

1        And then it needs to tell you what to

2    do.  And, you know, if I can quote from here, --

3        Q.   What are you looking at, just so the

4    record is clear?

5        A.   Well, I'm looking at that FEMA

6    Important Information For Travel Trailer

7    Occupants.

8        We were talking about the chemical

9    sensitivity issues that I quoted from the manual

10    in my report a few minutes ago, and here,

11    there's a section on how might formaldehyde

12    affect me.  For example, it just starts:

13    "Formaldehyde is just one of several gases

14    present indoors that may cause discomfort.  It

15    may cause symptoms similar to that of the common

16    cold or flu," and it goes on and then it

17    comments about children and the elderly may be

18    more of a problem.  And that's in the

19    consequences section of it.

20        And then in the instructional section

21    of it, it needs to tell people things they can

22    do that they can do.  That was that fourth

23    criterion for when you need to warn.  And they

24    talk about how you can increase ventilation,

1    keep indoor temperatures moderate, lower the

2    humidity and don't smoke inside.

3         So this is giving some instructions,

4    and in my opinion, these are the kinds of things

5    that need to be addressed in an on-trailer

6    label.

7        Q.   So you're saying that the FEMA document

8    is a good warning?

9        A.   What I'm saying is it's getting much

10   closer to being an adequate warning.

11        I think, frankly, in my opinion, it's a

12   more effective, better label than the one that

13   the health notice in the manufactured housing

14   has.  I think that's also a start in the right

15   direction because it talks about some of the

16   building materials in this home emit

17   formaldehyde.  That's what I'm talking about in

18   the hazard, some of the building, some of the

19   construction materials in this trailer give off

20   formaldehyde.  Eye, nose and throat irritation,

21   headache, nausea and a variety of asthma-like

22   symptoms.  They get into the consequences

23   quickly.

24        MR. DINNELL:  I'm sorry, Ryan.

125

1          Doctor, you mentioned a FEMA document.

2     Can you read the Bates number into the record if

3     you have it in front of you?

4          MR. JOHNSON:  Turn it sideways to get

5     that FEMA number at the bottom of the document.

6          THE WITNESS:  Yeah, that's what I'm

7     doing.  It's FEMA 08-000013 through 14.

8          MR. DINNELL:  Thank you.  Sorry about

9     that.

10          THE WITNESS:  And I have more than one

11     copy of it.

12          MR. JOHNSON:  That's fine.

13          Why don't we make that a deposition

14     exhibit?  Can I have a copy that you have there?

15     We'll make that Laughery No. 5.

16          MR. DINNELL:  Here, I have an extra.

17     You don't have to take his copy.

18          MR. JOHNSON:  This one he's got

19     highlighted.

20          MR. DINNELL:  Yeah, use his.

21          MR. JOHNSON:  We'll use this one.

22              (Whereupon, Laughery Deposition

23              Exhibit No. 5 was marked for

24              identification.)

126

1    BY MR. JOHNSON:

2        Q.   Doctor, have you ever designed a

3    warning for travel trailers?

4        A.   No.

5        Q.   Have you ever designed a warning label

6    for mobile homes?

7        A.   No.

8        Q.   Have you ever designed a warning label

9    that was used in a commercial setting?

10       A.   Probably not what would be considered

11   commercial.  Back in the 1980s, I did some

12   warning design for a couple of companies in

13   Houston.  One of them was a company called

14   Kulkoni.  They marketed -- imported and marketed

15   a number of products like, I mean, oh, blocks

16   and tackles and stuff used in construction and

17   so on.  And some of the products were things

18   that a handy person around the home might use,

19   but whether you call that commercial or not, I'm

20   not sure.

21       Q.   What I'm asking is have you written a

22   warning that's been put on a product that's been

23   sold in the marketplace?

24       A.   Well, those were sold in the

1    marketplace.

2        Q.  Oh, they were actually?

3        A.  Yeah.  Oh, yeah.

4        Q.  Have you ever designed a formaldehyde

5    warning label?

6        A.  I don't think so.

7            The reason I'm hesitating is

8    I haven't -- after doing some of that work for

9    Kulkoni and Welker Engineering and a couple of

10   companies in Houston in the 80s, I made a

11   decision that that was not one more kind of

12   activity I was going to get into.

13           I get requests sometimes for that, but

14   I recommend some other people to do that.  And

15   it's not that I didn't feel I could do it.

16   I just -- I was basically a university

17   professor, and the variety of things that

18   I could do, I had to make some decisions, and

19   that wasn't one.

20           I'm sorry.  Having made that speech,

21   I lost your question.

22       Q.  I think I got the answer that I needed

23   from that.

24           Are you familiar with Nathan Doris?  Do

128

1    you know who that is?

2        A.   Yes.

3        Q.   Have you read Mr. Doris' report in this

4    case, in the McGraw case?

5        A.   No.

6        Q.   Have you read Mr. Doris' report from

7    other cases?

8        A.   Yes.

9        Q.   In the formaldehyde MDL?

10       A.   Yes.

11       Q.   Which ones?

12       A.   I think I've seen his reports in both

13   the Wright case and the Castanel case.  I think

14   that's true.  I've seen a couple of them.

15       Q.   Was there anything in either of those

16   reports that you disagreed with that you

17   remember?

18       A.   Most of it.

19       Q.   Anything specific that you disagreed

20   with?

21       A.   Well, he seems to take the position --

22   I haven't looked at it very recently, at least

23   not since my deposition in Castanel, but he

24   seems to take the position that -- and that's

149

1          The scientific method can be applied

2     across those kinds of data collection and used,

3     but yeah, I mean, it has to do with rigor and

4     methodology.

5          Q.   And in various scenarios in human

6     factors engineering, you've tested the

7     effectiveness of various warnings to see whether

8     there's an impact; is that right?

9          A.   Sure.

10         Q.   You've taken surveys as part of your

11    work in human factors engineering to see whether

12    or not a warning appears to be effective or

13    ineffective; is that right?

14         A.   Yes.

15         Q.   Did you look to see whether there was

16    any literature -- I guess I'll limit it to did

17    you look to see whether there was any

18    peer-reviewed literature addressing the need for

19    formaldehyde warnings in products?

20         A.   No, I didn't do that kind of a search.

21         Q.   Are you aware --

22         A.   I'm taking that as very specific,

23    I mean, for formaldehyde.

24         Q.   I understand, and I'll ask an equally

150

1    specific question.

2        Are you aware of any testing that's

3    been done of the effectiveness of formaldehyde

4    warnings?

5        A.  No.

6        Q.  Now, would you consider your

7    discipline, human factors, a part of the design

8    stage of making something?

9        A.  Yeah, I mean, it certainly can

10    contribute to that and does.

11        Q.  Would you consider the goal of human

12    factors to help grapple with hazards before a

13    product ever gets to a product purchaser or

14    owner?

15        A.  Yes.

16        Q.  Would you agree with me that warning

17    systems should be a part of the overall design

18    of a product before it leaves the hands of the

19    manufacturer?

20        A.  Yes.

21        Q.  As a warnings expert, do you believe

22    that it's appropriate for a manufacturer to rely

23    upon some third party to do a hazard analysis?

24        A.  I guess that depends on who the third

1      party is.

2            I'm not trying to be flippant.  I mean,

3      I could endorse or say yeah, it's appropriate if

4      there is competence and ability in the third

5      party to do a competent job.

6            Sometimes, you know, there may be

7      consulting firms who specialize in that, and

8      that would be a more effective way of doing it

9      well than an in-house effort.

10         Q.   But as part of that -- in that

11     scenario, if a third party was to do a competent

12     job, to be able to do a competent job, they'd

13     have to have access to all of the information of

14     the manufacturer; is that correct?

15         A.   Yes.  All of the relevant information

16     at least, yes.

17         Q.   And assuming that a manufacturer didn't

18     bring in that kind of consultant or that kind of

19     third party to work in conjunction with them in

20     developing a system, would you agree with me

21     that -- well, I'll just ask you, is it

22     appropriate for a manufacturer to then rely upon

23     some other third party to pass along information

24     that's necessary for the safety of its products?

152

1      A.  I'm not understanding --

2      Q.  That was a bad question.

3      A.  -- how to interpret the question.

4      Q.  That's fine.  Let me ask you a

5    different question.  I'll ask it this way.

6         Would it be your opinion that it's an

7    obligation -- and I don't mean legal obligation,

8    but is it your opinion it's the obligation of a

9    manufacturer separate and distinct from a

10   contractor or a distributor to relay information

11   to the end user through appropriate warning

12   systems?

13      A.  Yeah, I'm not sure that -- there may be

14   times when it can't be distinct from the

15   distributor and so forth that they may have a

16   role in it, but in my opinion, as a general

17   role, it starts -- the responsibility starts

18   with the manufacturer certainly.

19      Q.  And as a general rule, the party that's

20   going to have the most knowledge about the

21   potential hazards of a product is going to be

22   the person that makes the product; is that

23   correct?

24      A.  Is going to have and should have the

1   most knowledge.

2       Q.   Now, if a product is designed so there

3   is no hazard, you don't need -- you never need a

4   warning for that product, right?

5       A.   Right.

6       Q.   And that's what you talk about, -- I've

7   seen it in various places -- this concept of,

8   number one, your number-one priority is to

9   design or design around a hazard; two, if you

10  can't design around the hazard, then try to

11  guard against the hazard; and then three, your

12  final, you know, last measure if you can't do a

13  design or guard, would be to warn about the

14  hazard; isn't that right?

15      A.   Yes.

16          MR. JOANEN:  Object to the form.

17  BY MR. DINNELL:

18      Q.   That's correct?

19      A.   Yes.

20      Q.   And thus, when a product is being made

21  or designed, the ideal approach if you can

22  design around the hazard would be to design

23  around the hazard?

24      A.   Oh, yeah.  That priority scheme needs

154

1    to be taken into account in the design stage,

2    right.

3        Q.   And those are things that would be

4    considered as a part of a hazard analysis on a

5    product, right?

6        A.   Well, the hazard analysis feeds into

7    that in the sense that the hazard analysis is

8    information that goes into decisions about how

9    to apply that hierarchical priority scheme, do

10   we need to step back and see if we can come up

11   with an alternative design to solve this, or do

12   we need to slap a warning on it.

13       Q.   And you mentioned earlier that the

14   designer or maker of a product should do as much

15   as they can to identify hazards that may result

16   from their product; is that correct?

17       A.   Yes, yes.

18       Q.   And to do that -- correct me if I'm

19   wrong, but to do that and to assess whether or

20   not there are hazards would take time; is that

21   right?

22       A.   Yes.

23       Q.   That's not something that you could

24   just do overnight; is that correct?

1        A.   Well, I mean, that probably would be

2    optimistic, right, but I mean, that's going to

3    depend on what kind of product you're talking

4    about, what the issues are.  There may be some

5    things that can be done fairly quickly and

6    efficiently; others may be a major effort to do

7    a hazard analysis.

8        Q.   But before you start trying to design

9    around a hazard or trying to warn about a

10   hazard, you really need to know the ins and outs

11   of that hazard; is that correct?

12       A.   Yes.

13       Q.   Would you agree that an important part

14   of any hazard analysis is to re-evaluate your

15   initial analysis as new information comes in?

16       A.   I mean, that sounds like an appropriate

17   principle, yes.

18       Q.   I asked you about Dr. Loukes earlier,

19   and you know that she was involved in an earlier

20   form of this big case, but when I talked with

21   her about a year ago, she mentioned a concept

22   called psychological ownership of a product.

23   Does that mean anything to you?  Is that a term

24   of art?

156

1     A.  Psychologists use those kinds of terms.

2    It's not a term that I've used, but as

3    I understand it, -- I'm not sure of the context

4    in which she was using it -- it has to do or is

5    at least related to a sense or feeling of

6    responsibility and that kind of thing.

7     Q.  And if she had told me that a

8    manufacturer of a product, the person that

9    designs a product, has to have psychological

10    ownership over that product and any warnings

11    that are issued about that product, would you

12    agree with that statement?

13     A.  Yes.

14     Q.  In going through the design-guard-warn

15    process, would you agree that every aspect of

16    design and potential -- and the potential

17    warning system must be thought through in a

18    thorough and systematic fashion?

19    MR. JOANEN:  Object to the form.

20     THE WITNESS:  That's certainly an

21    appropriate goal to the extent it's doable.

22    BY MR. DINNELL:

23     Q.  Okay.  And again, you've mentioned this

24    briefly earlier, but just to be clear, your

1    initial goal is to figure out whether there is

2    or is not a hazard, correct?

3        A.   Yes, I mean, and what its

4    characteristics are, sure.

5        Q.   One way to see whether or not there is

6    a hazard would be to test the performance of the

7    product; is that right?

8        A.   Yes.

9        Q.   Another way to see whether or not there

10   is actually a hazard is to test potential

11   mitigation techniques or mitigation devices on a

12   product, right?

13       A.   Well, that would be a way of not just

14   discovering a hazard but of exploring solutions

15   to it.

16       Q.   And again, in an optimal scenario, this

17   process of assessing whether there are or are

18   not hazards would take time, effort, et cetera,

19   trying to test and figure out what's going on

20   with the product?

21       MR. JOANEN:  Object to the form.

22       THE WITNESS:  Yeah.  Again, how much

23   time, effort, cost.  Cost may be many forms,

24   time, effort, money.  What the cost of doing it

158

1    is will vary depending upon a variety of

2    factors, no doubt.

3    BY MR. DINNELL:

4        Q.   Depending upon the circumstances,

5    right?

6        A.   Yeah, and circumstances including the

7    nature of the product.

8        Q.   Would you agree that before you can

9    decide whether to warn about a product, you

10   really have to understand the hazard that you're

11   warning about?

12       A.   Yes, you must understand it at a

13   sufficient level certainly to know what it is

14   you're warning about.

15       Q.   You also have to understand your

16   potential target audience of a potential

17   warning; is that right?

18       A.   Well, that's a part of designing the

19   warning system, sure.

20           For example, when we're talking about

21   the four considerations which is one way of

22   analyzing when you need to warn, I think it was

23   the third one in the order that we had talked

24   about them that noted the knowledge and

159

1    information that the consumer brings with them

2    to the use of it.  Well, that's a target

3    audience property.

4    BY MR. DINNELL:

5        Q.   Okay.  And in making this decision

6    whether or not to warn, the probability of the

7    hazard is something that's very important to

8    consider?

9        A.   Probability, interestingly, obviously,

10   it's relevant.  It turns out that for most kinds

11   of hazards and most kinds of products in the

12   practical world, it's not as significant as some

13   other factors.

14        We don't put products in the

15   marketplace that have a 50/50 chance of hurting

16   you every time you use it.  You know, those

17   never get there.

18        And so this is part of that

19   psychological ownership kind of thing, or it

20   could be, that -- so there's a frequency or

21   probability if they tend to be very low, which

22   they do.  I mean, we don't expect to get up in

23   the morning and get hurt that day using some

24   product.  That's the point I'm making.

160

1          And in response to your question, the

2     probability of a negative event turns out not to

3     be as important in how you design a warning

4     system as is the severity of what can happen to

5     you.  That drives compliance.

6          Q.   Even aside from assessing probability,

7     would you agree that -- I understand what you're

8     saying, you know, you're not going to put a

9     product out there that's 50 percent and

10    everything, but let me ask it this way.

11          Before you go forward with a decision

12    to warn about a product, you may want to know

13    the probability of harm, but you certainly need

14    to know whether the possibility of harm is a

15    real possibility of harm or not?

16          A.   Yeah, I'm not quite sure how that's

17    different from is there really a hazard or not,

18    yeah.

19          Q.   Did you do any research in connection

20    with your work on the McGraw case into how long

21    FEMA has been using emergency housing units in

22    responding to disasters?

23          A.   No, I didn't do any research on it.

24          My understanding from something that

161

1   I just learned in passing is that there had been

2   a FEMA project prior to Katrina where some kind

3   of emergency housing or trailers were used maybe

4   in Florida or someplace.  But that just happened

5   to have been something I encountered.  I didn't

6   do any research on it.

7        Q.  If I had told you that there had been

8   decades going back of using travel trailers as

9   emergency housing, you wouldn't quibble with me

10  one way or another, right?

11       A.  Yeah, I wouldn't know that one way or

12  the other, right.

13       Q.   And you haven't tried to look back and

14  see whether in the published literature or

15  anecdotally there were any reports that FEMA was

16  ever confronted with a formaldehyde concern or

17  complaint about travel trailers as emergency

18  housing?

19       A.  I'm not aware of that one way or the

20  other, right.

21       Q.   Did you look at any MSDS sheets in

22  connection with your work on the McGraw case?

23       A.  I've looked at a lot of MSDS sheets in

24  the context of this litigation.  I don't recall

1    if any of them were specific to the McGraw case.

2        Q.   What are MSDS sheets, generally?

3        A.   Material Safety Data Sheets.  OSHA

4    requires them for some kinds of products, and

5    basically, they're intended to provide

6    information about the hazards, the safety

7    issues, associated with a product.

8        Q.   So if I purchase a product, do they

9    hand me the MSDS sheets for that product?

10       A.   It depends on what the product is and

11   what the context.  There are some rules, some

12   requirements, in the sense that they're

13   government requirements that govern when they

14   must be provided and with what kinds of

15   products.

16       Q.   Generally speaking, when we're talking

17   about a consumer product, a consumer does not

18   get handed the MSDS sheets for that product upon

19   purchase?

20       A.   That's correct.  That would be very

21   unusual.

22       Q.   But from your familiarity of MSDS

23   sheets, are those something that the

24   manufacturer usually keeps in the place of

163

1    manufacture?

2        A.  I'm not sure I understand your

3    question.

4            The manufacturer is responsible for

5    producing the MSDS sheets, documents, and for

6    distributing them with the product to the

7    consumer of those products so they start with

8    the manufacturer and supposedly end up in the

9    hands of the user or consumer.

10       Q.  We've talked about how before you go

11   and warn about a hazard, you have to know about

12   the risk of the hazard, right?

13       A.  Not to get caught up in semantics, but

14   how are you using the word "risk" here?  Because

15   "risk" happens to be a word that has a lot of

16   different meanings.

17       Q.  Well, we won't use "risk."

18           Before you warn about the hazard, you

19   have to know about the hazard, right?

20       A.  Yes.

21       Q.  And before you issue that warning, you

22   have to know enough about the hazard that you

23   can give correct or appropriate information,

24   right?

1      A.   Yes.

2          Q.   Because a flawed warning or a warning

3      based upon incomplete information could be worse

4      than no warning at all; is that right?

5          A.   It could be, yeah.

6          Q.   Because you could give somebody a false

7      sense of security based upon an incomplete

8      warning?

9          A.   Yes.

10         Q.   Would you agree with me that under an

11     optimal warning system, as more information

12     comes in that may change or may alter the

13     initial warning that was given that a new

14     warning should be given with the updated

15     information?

16         MR. JOANEN:  Object to the form.

17         THE WITNESS:  Yes.

18     BY MR. DINNELL:

19         Q.   If you were brought in as a third party

20     to prepare a hazard communication, would you

21     agree that turning to the manufacturers that

22     actually make those products and learning --

23     asking them about the ins and outs of their

24     products would be the ideal approach?

165

1          MR. JOANEN:  Object to the form.

2          THE WITNESS:  Well, that would

3     certainly be an important step in the approach

4     to doing it.

5     BY MR. DINNELL:

6          Q.   Because you can't warn about a product

7     that you don't know from top to bottom?

8          A.   Yeah, and you expect the manufacturer

9     to be the source, normally a primary source, of

10    such information.

11         Q.   And that warning is ideally the last

12    defense after you've already considered

13    potentially changing the design or instituting

14    some sort of guard with the product; is that

15    right?

16         A.   Yeah.

17         MR. JOANEN:  Object to form.

18         THE WITNESS:  Yes.

19    BY MR. DINNELL:

20         Q.   And in relation to the unit that

21    Mr. McGraw lived in, based upon your

22    investigation, would you agree that there's no

23    evidence that FEMA played any role in designing

24    the McGraw trailer?

166

1       A.  I'm not aware of any.

2       Q.   You've seen nothing that would indicate

3    FEMA played any role in designing the McGraw

4    trailer?

5       A.  That's correct.

6       Q.   Or actually manufacturing the McGraw

7    trailer?

8          MR. JOANEN:  Object to the form.

9          THE WITNESS:  Yeah, I'm not aware of

10    any of that.

11    BY MR. DINNELL:

12       Q.   If you were setting up a hazard

13    communication system, could referring somebody

14    to a phone number or a hotline be a useful part

15    of an adequate hazard communication system?

16       A.   Yeah, it can be, and we do that.

17    I mean, you can look on labels of products and

18    find 800 numbers.  That's not uncommon where

19    we're concerned with some safety thing.  And for

20    example, it may not be a phone number, but you

21    know, "If the child swallows this, call the

22    Poison Control Center."

23       Q.   So there are some circumstances where

24    referring somebody to call someone and actually

1    talk with a person about potential problems may

2    be a great component of a warning system or a

3    hazard communication system?

4        A.   Yeah, it's going to be very situational

5    and product and circumstance specific, but, you

6    know, there obviously could be situations where

7    that would be true.

8        Q.   You've mentioned that at its core, the

9    key points of any warning or hazard

10   communication system are that that hazard

11   communication system or warning should say:

12   One, what the hazard is; two, the potential

13   consequences of the hazard; and three,

14   instructional information about how to

15   potentially avoid the hazard; is that right?

16       MR. JOANEN:  Object to form and it's

17   repetitive, it's been asked and answered.

18       THE WITNESS:  Yes, I mean, that's the

19   content aspects of warnings.

20   BY MR. DINNELL:

21       Q.   And in terms of other things that you'd

22   like to see in a warning or hazard

23   communication, it would be important to use

24   attention-grabbing words; is that right?

1    A.   Yeah.  The word that's in the warning

2    science is "conspicuity," warnings ought to be

3    conspicuous.  And things that influence that are

4    where they are, how big they are, what color

5    they are, the things that influence attention

6    getting.

7    Q.   Using the word "important information"

8    could be considered an attention-grabbing term,

9    could it not?

10    A.   In some situations.  The problem with

11    using that in warnings is that it doesn't

12    necessarily refer to safety information like the

13    word "caution," "warning" or "danger" would.

14    That's sort of saying to somebody, "Hey, pay

15    attention, I'm going to tell you something about

16    safety."

17    Q.   Using pictures or bolded headings on a

18    hazard communication can stress the relevance or

19    importance of that communication to the reader;

20    is that right?

21    A.   Pictures or what?

22    Q.   Pictures or bolded headings.

23    A.   Yeah, pictures are a very powerful

24    factor, potentially powerful factor, in warnings

169

1    for a variety of reasons but including attention

2    getting.  The answer is yes.

3        Q.  Pictures can help a reader know what

4    this communication is actually about; is that

5    right?

6        A.  Yeah.  Well, I mean, pictures get

7    attention, but they also can be used to

8    communicate hazards, to communicate

9    consequences, to communicate instructions, and

10    they can do that where you might have language

11    or literacy problems.

12        Q.  And in any hazard communication,

13    specificity is important, right?

14        A.  Yes.  "Explicitness" is the phrase

15    that's used.

16        Q.  You want the communication to be

17    explicit about what can potentially result from

18    the hazard?

19        A.  Yes.

20        Q.  And you want the communication to be

21    explicit about what you can potentially do about

22    the hazard?

23        A.  Yes.

24        Q.  So if a communication were to talk

170

1    about -- I guess we'll use ventilation as an

2    example since we're in this case.

3            If the communication were to say, "Use

4    good ventilation," that would not be as explicit

5    as would not be as effective in a communication

6    as listing how you should ventilate?

7            MR. JOANEN:  Object to form.

8            THE WITNESS:  Yeah, adequate

9    ventilation is a classic example that's used.

10   I use it, but it's in the literature of a

11   non-explicit instruction that's not much good.

12   BY MR. DINNELL:

13       Q.  But a statement saying ventilate by

14   opening doors and windows would have more

15   explicitness?

16       A.  Well, that would be more explicit, yes.

17       Q.  And would be a more effective type of

18   hazard communication?

19       A.  Yeah.

20       Q.  Would you agree that a good hazard

21   communication avoids dense paragraphs?

22       A.  Oh, yeah.  There's research to show

23   that.  That comes out of the educational

24   literature as well.

171

1      Q.   Ideally, an effective hazard

2   communication would use short paragraphs, right?

3      A.   Short paragraphs, lists, bullet points,

4   things like that, make a difference not only in

5   holding people's attention but in remembering

6   it.

7      Q.   As does good use of white space on the

8   paper, right?

9      A.   That's an educational term that's used,

10   yes.

11      Q.   And if you can condense the information

12   into one sheet or one page, that's likely going

13   to be a more effective hazard communication than

14   having a five-page handout?

15      A.   Yeah.

16      Q.   You talked about how ideally a hazard

17   communication or warning would be on a product;

18   is that right?

19      A.   Yes.

20      Q.   Slapped on the product?

21      A.   Yes.

22      Q.   And that's --

23      A.   I'm not sure I like the word "slapped."

24      Q.   I'll use a different word.

172

1        A.  Well, I mean, if we've got a product

2    with a half-life of ten years used outdoors, you

3    want something that's got some non-slapping kind

4    of stamina.

5        Q.  In terms of after a product leaves the

6    hands of the manufacturer, would it be a more

7    effective hazard communication to mail a

8    document or to personally deliver a document

9    about that hazard?

10       A.  Oh, well, I mean, I have to agree that

11   it would be more effective to personally deliver

12   it.  That might be a high-cost kind of thing,

13   but certainly in terms of potential

14   effectiveness, that's going to be more

15   effective.

16       Q.  So based upon your knowledge in the

17   field of human factors engineering and warnings,

18   personally delivering a hazard communication

19   would be far preferred and would be more

20   effective than mailing that communication?

21       A.  Yeah, I mean, that's related to the

22   point I made earlier today about when you have

23   people's attention and things that influence

24   that.  The delivery would influence it that way.

1    So yeah, there's a lot of factors that make that

2    true.

3        Q.   Would posting or taping a communication

4    on someone's door be a more effective way of

5    communicating a hazard than mailing?

6        A.   It could be.  It's going to depend on

7    the design of it and so forth, but yeah, it

8    could be.

9        And the mailing issue gets more

10   complicated, too, as we live increasingly in

11   what people call the junk mail age and how we

12   filter out and what we look at and so on.

13       Q.   Would you agree that if a warning

14   cannot allow a user to use a product safely that

15   you need something other than a warning to solve

16   that hazard?

17       A.   Yeah.  I mean, that's the sense in

18   which -- the fourth criterion for when to warn

19   has to do with that you'll be able to do

20   something.  You know, you can give somebody

21   instructions that they're capable of carrying

22   out, and if they can't, the warning is not going

23   to solve it.

24       Q.   And in your report, you mention that a

1    warning on this Keystone Springdale unit would

2    have been appropriate in your mind; is that

3    right?

4        A.   Yes.

5        Q.   And by offering that opinion, is it

6    also correct that you believe a warning could

7    have mitigated or dealt with the potential

8    hazards that we're talking about here?

9        A.   Yeah.

10        MR. JOANEN:  Object to form.

11        THE WITNESS:  I'm assuming that, for

12    example, in some of the instructions that I've

13    seen about ventilation, if you have the air

14    conditioner on or the heat on, the air exchange

15    is a mitigating factor.

16        I'm not the engineering expert on air

17    exchange to give an opinion about that, but

18    assuming that there are procedures such as that

19    that can help with a problem, then a warning has

20    the potential to be useful.

21    BY MR. DINNELL:

22    Q.   Understood.

23        Does preparing a warning require

24    balancing risk factors?

175

1      A.  I'm not sure.

2      Q.   You don't like the word "risk" so I

3   won't use it.

4      A.  Well, no, that's true.  "Risk" has a

5   lot of different meanings.  Quite seriously, it

6   does.

7      Q.   Let me ask you a different question.

8         In making a decision about when or how

9   to warn about something or when and how to make

10   a hazard communication, do you have to balance

11   all sorts of different factors in arriving at

12   your conclusion?

13      A.  Well, you may.  I mean, one can view it

14   as a cost-benefits kind of analysis.  There may

15   be times, incidentally, when it's rational for

16   somebody to read a warning, a good warning, and

17   decide not to comply with it.

18         If I've got a stopped-up drain and I go

19   and I come home from the store with drain

20   cleaner, sulfuric acid, and I read the warning

21   on it and it says if you get it on your skin,

22   you could get a chemical burn so wear rubber

23   gloves but I don't have any rubber gloves and

24   the hardware store is two miles away, there's a

176

1    cost of complying with that:  Time, effort, a

2    little bit of money and so forth.

3          I'm not suggesting don't go get the

4    rubber gloves, but there's a rationality at

5    least to decide I'm not going to do that, I'll

6    just handle it more carefully.

7        Q.   What about on the part of whoever is

8    issuing the hazard communication, do they have

9    to engage in a cost-benefit analysis to decide

10   whether to issue that communication and how to

11   issue that communication?

12       A.   Sure.

13       Q.   Does somebody issuing a hazard

14   communication have to consider and balance

15   social factors?

16       A.   That's a -- my social psychologist

17   colleagues would talk about all kinds of things

18   there.

19          Generally, I mean, I have to agree

20   that, you know, if there are relevant social

21   factors, then they're relevant and you have to

22   try to take them into account.

23          What do you do, for example, about

24   drinking and driving?  There may be social

177

1    factors that influence the warnings you give or

2    the rules you set up for that.

3        Q.  So in deciding when or how to issue a

4    hazard communication, social factors may play a

5    role.  Would economic factors play a role, too?

6        A.  Yeah.  Well, the usual -- the usual

7    phrase that's used in deciding whether to

8    redesign, guard or warn is technological and

9    economic feasibility so economic factors always

10    have a place somewhere in the mix.

11        Q.   And someone that's designed -- strike

12    that.

13           Someone that's deciding or in the

14    process of deciding whether to issue a hazard

15    communication and how to issue that hazard

16    communication has to balance those different

17    type of factors?

18        A.   Yeah, I mean, in two ways, the economic

19    part of it in two ways.  One is the cost of

20    doing the warning system.

21           You know, we don't deliver warnings --

22    we don't have somebody stand in the drug store

23    where the Nyquil is on display by the

24    manufacturer of Nyquil and tell people what the

178

1    side effects may be or the contraindications.

2    It might be pretty effective, but it's a silly

3    example to the extent it's just prohibitive.

4        On the other hand -- well, I'll stop

5    there.

6    Q.   Would you agree --

7        A.   There may be economic costs to the

8    receiver of the product of the information as

9    well.

10       If you ask people to do something

11   that's going to cost them a lot of money, you

12   know, the rubber gloves are too expensive for

13   me, then that's going to deter compliance.

14       Q.   This decision whether or not to issue a

15   hazard communication can be a complex decision

16   involving value judgments, right?

17       A.   Well, sure.

18       Q.   You agree that an ideal hazard

19   communication should be easy to understand; is

20   that right?

21       A.   Yes.

22       Q.   It would be a bad hazard communication

23   strategy to just hand somebody a hundred pages

24   of scientific and medical research; is that

1       right?

2               MR. JOANEN:  Object to the form.

3               THE WITNESS:  Most of the time, that's

4       not going to be effective.

5       BY MR. DINNELL:

6           Q.   Most of the time, when you're putting

7       together a hazard communication, you have to

8       find a balance between providing the right

9       amount of info and making it easy to understand?

10          A.   Sure.

11              MR. DINNELL:  How are we on tape?

12              THE VIDEOGRAPHER:  20 minutes.

13      BY MR. DINNELL:

14          Q.   Do you agree that everything can

15      potentially be hazardous?

16          A.   Well, I suppose a soft pillow if left

17      lying in the middle of the floor you could trip

18      over, but I don't want to give a silly answer to

19      that.  I mean, I suppose in some sense, like I

20      just said, everything can be hazardous, but

21      generally, that's not the issue.

22          Q.   Well, this is like, you know, in the

23      toxicological context, they say, well, even

24      water could be a poison, right?

180

1          My question is:  Because everything

2     could be potentially be hazardous, in talking

3     about a hazard communication system, the key is

4     to figure out the probability of the hazard and

5     whether the hazard is clear?

6          A.  Yes.

7          Q.  And it would be important to get a firm

8     grasp on the likelihood of harm before issuing a

9     hazard communication; is that correct?

10          A.  Well, that comes back to the issue

11     we've touched on earlier about the probability

12     versus the severity of the outcome, and

13     obviously, if the probability gets to be too

14     high, then all kinds of other considerations

15     come in.

16          What's high and what isn't, though,

17     even that takes into account what the severity

18     of the outcome is.  Something that can be a

19     hazard but the consequences are kind of minor,

20     you can see where those tradeoffs come in.

21          Q.  But before you take action, you need to

22     engage in that kind of analysis?

23          A.  Yes.

24          Q.  Do you agree you can have an adequate

1    warning or hazard communication and still not

2    actually change a person's behavior?

3         A.   Yes.

4         Q.   Would you agree that you could provide

5    someone with a hazard communication, and even if

6    that communication was good in your mind, that

7    person may have absolutely no recollection of

8    seeing the hazard communication?

9         A.   Well, I mean, I have to agree with

10   things like that, that that can happen.

11        Q.   You'd never expect 100 percent of the

12   people out there to remember seeing your hazard

13   communication even if the communication itself

14   was in your mind effective?

15        A.   Yeah, I mean, I typically make the

16   point that we don't expect warnings to be a

17   hundred percent effective.  That's why they're

18   in third place in some sense.

19        Q.   But even if a warning or a hazard

20   communication doesn't reach its intended

21   recipient or it doesn't reach that specific

22   person, there are still collateral benefits from

23   that warning; is that right?

24        A.   Well, yeah.  I mean, you can have

1    direct and indirect effects of warnings.  A

2    direct effect refers to a situation where

3    somebody sees or hears or smells a warning and

4    responds to it or doesn't respond to it, but

5    that's a direct effect.

6         An indirect effect is I may not see it

7    but my neighbor sees it and tells me about it.

8    Or more to the point, the pharmaceutical company

9    marketing the prescriptive medication may not

10    communicate it to the end user but the

11    intervening prescribing physician and who in

12    turn communicates it so that -- and that's the

13    point of the indirect effect of warnings, and

14    you get into learned intermediaries and all that

15    kind of stuff.

16         Q.   So if I issue a warning that says "Do

17    not put your fingers here" and somebody does,

18    that doesn't mean that the warning itself is

19    deficient?

20         A.   Yeah, I'd want to ask more questions

21    about it than that, right.

22         And that's the point I was making a

23    little while ago.  There may be circumstances

24    where it's rational to not comply with a

183

1   warning.

2       Q.   But that doesn't mean that the warning

3   itself is bad or ineffective?

4       A.   Yeah, and it also doesn't mean that if

5   those circumstances might occur but are rare,

6   it's an excuse for not warning.

7       Q.   Can a media campaign be a part of an

8   effective hazard communication?

9       A.   Sure.  Look at the air bags and

10  children in front of them in car seats.  That

11  changed that.

12      Q.   Can press statements make up an

13  effective component of a good hazard

14  communication system?

15      A.   I don't -- I guess that's always a

16  possibility.  Some people aren't buying Toyotas

17  these days.

18      Q.   Can the Internet or a posting on the

19  Internet make up a good component of an

20  effective hazard communication system?

21      A.   It could, but we have to recognize the

22  limits of its application in terms of

23  accessibility, but probably an increasing

24  potential component is the Internet.

184

1        Q.   In connection with your work in the

2    McGraw case, have you looked at any of the media

3    statements or Internet postings that FEMA did in

4    connection with formaldehyde in travel trailers?

5        A.   No.

6        Q.   Specifically, I assume you haven't

7    looked at a June 2006 posting about ventilation

8    in travel trailers that FEMA put on the

9    Internet?

10       A.   I had some documents.  I don't think it

11   included that.

12            Did you say that FEMA put on the

13   Internet?

14       Q.   That's correct.

15       A.   I know about the two FEMA documents

16   that were -- the deliver stuff, and I don't know

17   if they were put on the Web as well.

18       Q.   And your understanding of the two

19   documents you're talking about were flyers that

20   were -- one is a flyer that was issued in 2006,

21   the other is a flyer that was issued in 2007?

22       A.   Yes.

23       Q.   And to be specific, one was issued

24   Summer of 2006, the other was issued Summer of

185

1    2007?

2       A.   That's my understanding.

3       Q.   That's consistent with your

4    understanding?

5       A.   I think so, yeah.

6       Q.   But you're not aware of any Internet

7    postings that would have been out there aside

8    from those two things that you've seen?

9       A.   Yeah, I'm not aware of any Internet

10   postings and I'm not aware whether these were

11   posted.  They may have been; I just don't know

12   that.

13      Q.   Understood.

14          You'd agree that people can perceive

15   risk through physical irritation?

16      A.   Yes.

17      Q.   And I'll ask you a specific question

18   about travel trailers.

19          If there were risks associated with

20   sitting in a travel trailer when it was

21   extremely hot, say 95 degrees inside, that would

22   be a risk that that person could perceive, in

23   other words, the person can experience the heat,

24   you know, in that unit?

186

1      A.   Well, I certainly assume that people

2   can perceive within the limits of our senses the

3   temperature of the environment and the humidity

4   of the environment.  I don't have to work too

5   hard to know that August in Houston and August

6   in Janesville, Wisconsin are different in that

7   sense.

8           Whether or not they perceive or what

9   hazard or what hazards they perceive associated

10   with that, it's a little more complex, but the

11   detection of the heat or cold or whatever is

12   certainly defined by human sensitivities.

13      Q.   With like a car, you wouldn't have to

14   warn or post a warning in a car that it's not a

15   good idea to sit in the car in Houston without

16   any air conditioning without rolling down the

17   windows for a few hours, that would be an open

18   and obvious thing that that person would

19   experience?

20           MR. JOANEN:  Object to the form.

21           THE WITNESS:  I don't know whether I'd

22   call that open and obvious.  I'm not disagreeing

23   with that, but experiencing it would tell you

24   pretty quickly, I think.  As I understand, when

187

1    the temperature is 95 degrees hot and you sit in

2    the sun, it doesn't take long.  And we hear

3    horror stories about that with children or

4    animals.

5         Yeah, people would sense that and know

6    that.  And in that sense, I'd agree it's an open

7    and obvious hazard.

8    BY MR. DINNELL:

9         Q.  You mentioned earlier you've written

10   proposed -- well, strike that.

11        You've written various proposed

12   warnings for research purposes and for

13   litigation purposes, right?

14        A.  Yes.

15        Q.  And you also mentioned that you had

16   written some actual product warnings that were

17   used on products?

18        A.  Yeah, very limited back in the 80s.

19        Q.  Would you ever write a warning for a

20   product without -- strike that.  Let me ask a

21   different question.

22        Would you ever want to write a warning

23   for a product without knowing the ins and outs

24   of how that product has been designed and

188

1    manufactured?

2         MR. JOANEN:  Object to the form.

3         THE WITNESS:  Well, I think you have to

4    know some information about how it's been

5    designed and manufactured, the information that

6    would be relevant to understanding and

7    addressing the hazard.  There may be

8    manufacturing processes that are irrelevant to

9    that, but certainly the relevant information you

10   would want.

11   BY MR. DINNELL:

12       Q.   In your report, you reference what I

13   call the HUD warning.  Do you know what I'm

14   talking about when I say "HUD warning"?

15   Specifically, I'm talking --

16       A.   Oh, oh, I'm sorry.  Yes.  Okay, I know

17   what you're talking about.

18       Q.   Just so it's clear, I'm talking about

19   what is in your report on Page 6, McGraw 1455 --

20       A.   Right.

21       Q.   -- which is under Number 20.  And it

22   says 3280.309, Health Notice on Formaldehyde

23   Emissions, and then it goes on and gives the

24   text of that.

189

1      A.  Yes.

2        Q.   And it's your opinion that a notice

3    similar to this 3280.309 -- oh, sorry.  Strike

4    that.

5            It's your opinion that a notice similar

6    to this HUD warning, this 3280.309 Health Notice

7    on Formaldehyde Emissions, should have been

8    prominently displayed in the McGraw Springdale

9    travel trailer?

10     A.  Yes.

11       Q.   Now, this Important Health Notice, the

12   HUD notice, mentions formaldehyde as the hazard,

13   right?

14     A.  Yes.

15       Q.   And that helps make it an effective

16   hazard communication -- or let me ask it a

17   different way.

18           The Important Health Notice mentions

19   formaldehyde as the hazard, which is an

20   important component of a hazard communication;

21   is that right?

22           MR. JOANEN:  Objection.  Asked and

23   answered.

24           THE WITNESS:  Yes.

190

1    BY MR. DINNELL:

2        Q.   The Important Health Notice, the HUD

3    notice, mentions ventilation as a potential

4    solution.  That's an important element, right?

5        A.   Yes.

6        Q.   And it mentions some of the specific

7    problems, shortness of breath and headache,

8    irritation, as some of the consequences of the

9    hazard.  That's an important element of the

10   hazard communication, right?

11       A.   Yes, yes.

12       Q.   And because of that, you say that this

13   HUD Important Health Notice would have been

14   something that should have been placed in this

15   McGraw Keystone Springdale unit?

16       A.   Well, what I say is something similar

17   to it.

18       Q.   Okay.

19          Have you encountered any testing or

20   research about the effectiveness of the HUD

21   Important Health Notice?

22       A.   No.

23       Q.   Have you done any work to test that

24   notice?

1      A.  No.

2      Q.  Have you encountered any research or

3    evidence that discusses the effectiveness of the

4    HUD Important Health Notice in changing

5    behavior?

6      A.  No.

7      Q.  And you haven't tested whether it's

8    effective in changing behavior?

9      A.  That's correct.

10         MR. DINNELL:  Let's take five minutes.

11   I'm almost done.

12         THE VIDEOGRAPHER:  This marks the end

13   of Tape 2.  The time is 3:10 p.m.  We are off

14   the record.

15              (Whereupon, a short recess

16              was taken.)

17         THE VIDEOGRAPHER:  This marks the

18   beginning of Tape 3.  The time is 3:16 p.m.  We

19   are on the record.

20   BY MR. DINNELL:

21     Q.  Doctor, I just have a little bit left

22   for you.

23        At the Castanel deposition, you had

24   mentioned that you had read the depositions of

192

1    Mr. Larson and Mr. Benomo, two FEMA employees;

2    is that right?

3        A.   Yes.

4        Q.   Have you read the deposition of any

5    other FEMA employees?

6        A.   Not that I'm aware of.

7        Q.   Have you looked at any spreadsheet

8    documents that reflect the delivery of certain

9    flyers and notices?

10       A.   I don't remember whether there were

11   those documents attached to those depositions or

12   not.

13       Q.   Okay.

14            You mentioned in your report that it's

15   your understanding Mr. McGraw did not receive

16   any of the FEMA flyers about formaldehyde in

17   travel trailers?

18       A.   That was his testimony.

19       Q.   And do you base your statement in your

20   report entirely off of his testimony?

21       A.   Yes.  I don't have any -- at this point

22   any independent verification on that.

23       Q.   And you also haven't seen any other

24   verication -- I'm sorry.

193

1        You also haven't seen any other

2    verification out there from FEMA about whether

3    the flyer was actually delivered?

4        A.  I have not.

5        Q.  Would that be helpful to see in stating

6    that -- making that statement in your report?

7        A.  Well, it could change my assumption as

8    to whether he saw it or didn't or whether it

9    was -- there are two or three steps there:  One,

10   was it delivered; one, did he see it; one, did

11   he read it and understand.  You know, those are

12   all parts of what I would want to know.

13       Q.  But as of right now, you assume that he

14   didn't get any of those FEMA formaldehyde flyers

15   solely because that's what he said at his

16   deposition?

17       A.  Yeah, I'm assuming that he didn't see

18   those.

19       Q.  You've worked on other FEMA

20   formaldehyde trailer -- I'm sorry -- other FEMA

21   trailer formaldehyde cases, right?

22       A.  I think this is the fourth one.

23       Q.  Alexander, --

24       A.  No, I didn't work on Alexander.

194

1      Q.   That's right.  You're right.

2           Dubuclet, Wright, Castanel, McGraw?

3      A.   That's correct.

4      Q.   In connection with your work on those

5    cases, did you see that different manufacturers

6    would warn or not warn about formaldehyde in

7    different ways?

8      A.   Yes.

9      Q.   You could even say some of the

10   statements of those various manufacturers

11   contradicted one another; is that true?

12     A.   I'm not sure what kind of

13   contradictions you're referring to.  I mean,

14   they did different things.

15     Q.   And those -- from your experience

16   working on those cases, those were different

17   products, right?

18     A.   I'm not sure -- I mean, they were

19   different products.  They were all trailers.

20   Maybe I'm not understanding what you mean by

21   "different."

22     Q.   Let me ask you a different question.

23           If a third party were to issue a hazard

24   communication about a product, would you ever

1   want to directly contradict a statement that the

2   manufacturer has made?

3       A.   I mean, generally, you don't want to do

4   that.  Now, if the manufacturer has made a wrong

5   statement, then you've got a quandary set up.

6   You know, you don't want to repeat a wrong

7   statement, and so then you get into

8   contradiction issues.

9       Q.   But you'd want to tread lightly and

10  know what you're talking about the hazard

11  before you as a third party go out and issue a

12  hazard communication that contradicts something

13  that the manufacturer has said?

14      A.   Yeah.

15          MR. JOANEN:  Object to the form.

16          THE WITNESS:  Yes.

17  BY MR. DINNELL:

18      Q.   Similarly, do you think that there

19  would be any complications if you were a third

20  party warning about a variety of products where

21  those products were all accompanied by very

22  different manufacturer warnings?

23      A.   If you're a third party warning --

24      Q.   Yes.

1      A.  -- about a variety of products?

2      Q.  Yes.

3      A.  Well, I'm not sure I understand.

4          I mean, obviously, what we were just

5   talking about a minute ago is you want to be

6   careful about contradictions, for example, and

7   to the extent that you've got --

8          MR. JOANEN:  Doctor, if you don't

9   understand the question, just tell him you don't

10   understand the question.  Make him rephrase it.

11         THE WITNESS:  Yeah, I'm confused by

12   your question.

13   BY MR. DINNELL:

14     Q.  Let me ask you a different question.

15         In reviewing the depositions of Benomo

16   and Larson, did you see any indication that FEMA

17   employees didn't take their formaldehyde flyer

18   campaign seriously?

19         MR. JOANEN:  Let me stop for a second.

20         Are we dealing with this litigation or

21   the litigation in general and his previous

22   opinions?

23         MR. DINNELL:  The McGraw case and the

24   depositions of FEMA employees that are

1        applicable in the McGraw case and throughout the

2        MDL.

3              THE WITNESS:  I haven't seen any

4        depositions of FEMA people in the McGraw case.

5        BY MR. DINNELL:

6          Q.   You've seen the depositions of Benomo

7        and Larson in the FEMA formaldehyde litigation.

8          A.   Okay.  Is that --

9          Q.   That's what I'm talking about.

10         A.   Okay.

11         Q.   And you've read those depositions?

12         A.   Yes.

13         Q.   In your review of those depositions,

14       did you see any indication that FEMA employees

15       were not taking the formaldehyde flyer campaign

16       seriously?

17         A.   No.

18         Q.   Did you see any indication that they

19       were showing concern about the formaldehyde

20       flyer campaign?

21         A.   Yes.

22         Q.   Did you see any indication that they

23       were trying to move as quickly as possible with

24       the formaldehyde flyer campaign?

198

1       A.   Yes.

2       Q.   Have you done any research into when

3    FEMA got its first complaint from an occupant

4    about the possibility of formaldehyde in travel

5    trailers?

6       A.   No.  I don't remember if that was

7    addressed in those depositions or not, but

8    I don't know that.

9       Q.   But you do know from what you've read

10    that flyers about formaldehyde were issued by

11    FEMA in the Summer of '06, right?

12       A.   A flyer, yes.

13       Q.   If a travel trailer unit had a

14    potential formaldehyde hazard, would swapping

15    that unit out with a different trailer that was

16    thought to not have that hazard be an effective

17    way to guard the occupant from a formaldehyde

18    hazard?

19          MR. JOANEN:  I'm going to object to the

20    form of the question.  I also think it's

21    probably outside the scope of his expertise.

22          THE WITNESS:  Well, as I understand the

23    question, yeah, I mean, that's just an exchange.

24    That's a design solution in disguise, I guess.

199

1     I mean, we'll take away the hazard one and give

2     you one without the hazard.

3     BY MR. DINNELL:

4        Q.   And design solutions are preferred over

5     warning solutions generally?

6        A.   Sure.

7        Q.   That's right?

8        A.   Yes.

9        Q.   In connection with your human factors

10    work, have you ever looked at the statements of

11    different government agencies, maybe NIOSH,

12    OSHA, Consumer Product Safety Commission, that

13    kind of thing?

14       A.   Yeah, I've looked at FDA stuff and

15    CPSC stuff.

16       Q.   And from that experience, would you

17    agree that different government agencies can

18    have very different outlooks on things?

19       A.   Well, I don't think it would surprise

20    anybody to think that different agencies of the

21    government have different outlooks on things.

22    I suppose so, but it's not something that I've

23    zeroed in on.

24       Q.   Okay.  You referenced in one of your --

200

1    actually, it's in your report on Page 2 that you

2    looked at the Consumer Product Safety

3    Commission's document on formaldehyde?

4        A.  On what page?

5        Q.  I'm sorry.  It's Page 2 of -- maybe

6    this is not your report and maybe it is the

7    other set of documents.

8        A.  The set that my wife prepared?

9        Q.  Yeah.

10        Here, I'll just -- I'm on

11    McGraw/Laughery 2106.

12        MR. JOANEN:  Is this included in the --

13        MR. DINNELL:  It's included in what we

14    have marked as, I believe, six.

15        MR. JOHNSON:  The reliance material

16    printout.

17        MR. DINNELL:  It should be on the

18    second page of that.

19        MR. JOANEN:  Is that six?

20        MR. DINNELL:  Yeah.

21        MR. JOANEN:  Six, okay.

22    BY MR. DINNELL:

23        Q.  I've showed you Page 2 of Exhibit 6.

24    Do you see that?

209

1    I can determine, about the manner in which --

2    the interaction with the installer and he

3    reviewed this.  There was no follow-up questions

4    to that to determine that.

5        Q.   From your review of his deposition, he

6    said that he read the document, right?

7        A.   He said:  "And did you read through

8    this document?"  He said, "Yes.  He went through

9    it with me."

10       Q.   Well, regardless, on Page 5 where it

11   says, "Controlling moisture condensation,

12   partially open the roof vents and windows so

13   that outside air can circulate into the

14   interior," do you know whether Mr. McGraw

15   followed that statement during the time --

16       A.   His -- I'm sorry.

17       Q.   -- he lived in the unit?

18       A.   His testimony was that he did not

19   typically ventilate in that way.

20       Q.   Okay.  Now let's turn to Page 8 of the

21   FEMA Trailer Users Guide Version 5 under Mold

22   and Mildew Bates numbered McGraw 190.

23          Are you on that page?

24       A.   Yes.

210

1      Q.   I'm under Mold and Mildew on Bullet

2   Point 5, and this FEMA Trailer Users Guide

3   Version 5 on Page 8 says:  "Leave one or more

4   windows and roof vents slightly open to help

5   prevent condensation in the trailer."

6        Do you see that statement?

7      A.  Yes.

8      Q.   And again, do you know whether he

9   complied with that statement during his time in

10   the trailer?

11      A.  According to his testimony, he did not.

12      Q.   And on this document, FEMA Trailer

13   Users Guide Version 5, down at the bottom, it

14   says, "Copyright 2006 by CH2M, Inc."

15        Do you see that?

16      A.  Where are you?

17      Q.   On any of the pages down at the bottom.

18      A.  Yes.

19      Q.   There's a little tag line, right?

20      A.  Yes, I see it.

21      Q.   And then above that, it says,

22   "Maintenance Hotline, 1-800-774-3249," is that

23   right?

24      A.  Yes.

211

1        Q.   And that statement is made on every

2    single page at the bottom of every single page

3    in this document, right?

4        A.   It appears to be, yes.

5        Q.   Earlier, you looked at what was marked

6    as Exhibit 5, the Important Information For

7    Travel Trailer documents?

8        A.   Yes.

9        Q.   Right?

10        A.   Yes.

11        Q.   And you understand this to be a

12    document that was distributed by FEMA in the

13    Summer of 2006?

14        A.   Yes.

15        Q.   This document mentions what

16    formaldehyde is, right?

17        A.   Yes.

18        Q.   And that could be -- that would be a

19    statement about what the potential hazard is,

20    right?

21        A.   You mean the one that they use?

22    I mean, what statement are you referring to?

23        Q.   Let me start over.

24        In this Important Information For

1   Travel Trailer Occupants, there are three

2   sections.  The first is "What is Formaldehyde,"

3   right?  That is the first section in this

4   document?

5        A.   That is correct.

6        Q.   The second section is "How Might

7   Formaldehyde Affect Me," right?

8        A.   Yes.

9        Q.   The third section is "What Can I Do to

10   Reduce My Exposure to Formaldehyde in My Travel

11   Trailer," correct?

12        A.   Yes.

13        Q.   And you mentioned earlier today that

14   hazard communications are generally set up --

15   effective hazard communications require that the

16   hazard communication has three components.  The

17   first is you have to identify the hazard, right?

18        A.   Yes.

19        Q.   The second is you have to give

20   specifics about what that hazard can do to the

21   reader, right?

22        A.   Consequences, yes.

23        Q.   And the third section or the third item

24   is that hazard communication should provide

213

1    guidance about what can be done to mitigate or

2    avoid that hazard, correct?

3         A.   Yes.

4         Q.   Let's look at the next one I which I

5    you have in your materials.  I'll go ahead and

6    mark this as Laughery 10, Bates FEMA 0815.

7              (Whereupon, Laughery Deposition

8              Exhibit No. 10 was marked for

9              identification.)

10   BY MR. JOHNSON:

11        Q.   Do you have that one?  You have a

12   different one?

13        A.   I think so.  Yes.

14        Q.   You do have this one?

15        A.   Yes.

16        Q.   The document's titled "FEMA Important

17   Formaldehyde Information For FEMA Housing

18   Occupants," correct?

19        A.   Yes.

20        Q.   And again, this document says, "What is

21   formaldehyde," right?

22        A.   Yes.

23        Q.   Then it says, "How might formaldehyde

24   affect me and my family," correct?

214

1      A.   Yes.

2      Q.   And then down at the bottom, it has a

3   full additional information section that tells

4   the person where he can call to get more

5   information, correct?

6      A.   Yes.

7      Q.   And again, earlier, you said that an

8   effective hazard communication should say what

9   the hazard is, right?

10      A.   Yes.

11      Q.   In this case, that would be saying what

12   is formaldehyde, correct?

13      A.   Yes.

14      Q.   The effective hazard communication

15   should say what the effects, the specific

16   effects, of the hazard are, correct?

17      A.   Yes.

18      Q.   And here, that would be how would

19   formaldehyde potentially affect one's health,

20   correct?

21      A.   Yes.

22      Q.   And then the final part of an effective

23   hazard communication would be saying what should

24   I do now or what can I do about this hazard,

1    correct?

2        A.  Yes.

3        Q.  And this document that we've marked as

4    Exhibit 10 down at the bottom says you should

5    seek medical attention to see if formaldehyde

6    may be causing your symptoms or if -- then it

7    says if you have additional questions, call this

8    toll free number, right?

9        A.  Yes.

10       Q.  The last item I was going to ask you

11   about, and I'm not going to go through this for

12   very long, is it true that you've testified

13   about in upwards of a hundred different

14   products?

15       A.  Probably.  I put a list together like

16   that once, and it was, I think, at that time 84.

17       Q.  And I know somebody's done this with

18   you before, but if we were to sit down and make

19   a list, we could probably list a product for

20   every letter of the alphabet about which you've

21   criticized warning labels?

22       A.  Yeah, somebody thought that was a cute

23   game and played it, and I guess it was.

24       Q.  Among the products that you've dealt

216

1    with and criticized warning labels would be

2    Nyquil; is that right?

3        A.   All of those weren't criticisms.   There

4    were some of those in that list --

5        Q.   Well, I understand.

6        A.   -- that were defense cases.

7        Q.   I'm going to ask you specifically.

8    I'll just ask you:  Have you criticized in

9    litigation the warning label on Nyquil?

10       A.   Yes.

11       Q.   On Bic lighters?

12       A.   I don't know if I was ever deposed in

13   one of those, but I have been critical of them.

14       Q.   On K-Mart clothing, a blouse?

15       A.   I may have.  I don't remember that.

16       Q.   A trampoline?

17       A.   Yes.

18       Q.   A swimming pool?

19       A.   Well, diving issues in swimming pools.

20       Q.   Diet drugs?

21       A.   Yes.

22       Q.   A church bus?

23       A.   The church bus was involved in a case

24   once.  I don't remember what the issues were.

221

1          (Whereupon, Laughery Deposition

2          Exhibit No. 11 was marked for

3          identification.)

4    BY MR. JOHNSON:

5       Q.   Let me ask, this is three pages worth

6    of testimony in different cases listed, three

7    full pages, and it looks like it dates from --

8       A.   It should be four years.

9       Q.   Yeah, 2006 through 4/20/10 so it's up

10   to date.

11          How much would you estimate that you

12   have earned in fees on these cases that are

13   represented in Laughery No. 11, just a rough

14   guess?

15      A.   It's varied over the last four years.

16          My last year as an officer in the

17   international association which involved a lot

18   of foreign travel and other commitments,

19   I didn't do as much in '06, and that got

20   reflected in my income.

21          The largest amount he -- do you want to

22   know the income amount?  Was that your question?

23      Q.   I'm sorry?

24      A.   Do you want to know the income amount?

222

1      Q.  I'd like to know what you've earned

2   from the -- let me put my microphone on -- what

3   you've earned in fees from the cases that are

4   represented on this Deposition Exhibit No. 11

5   total.  And an proximate number is fine because

6   I know you'd have to --

7      A.  Yeah.  Well, we just passed income tax

8   time, and so in 2009, my personal income not

9   including my wife's but mine was right around

10  300,000.  And that was the highest it's been.

11       In one year, it might have been 2006 or

12  2007, it was under 200.  And I think in 2008, it

13  was under 200, but it was close to that.  So

14  it's varied from probably 180 or 90.  I don't

15  know if it ever reached 250 until '09.  So

16  whatever those numbers add up to.

17     Q.  Sure.

18       So in 2009, you said 250, then you said

19  300 a second ago, but whether it be 200 or --

20  250 or 300 in 2009, that's all generated from

21  expert witness testimony?

22     A.  Yes.

23       MR. JOHNSON:  I have no further

24  questions.  Thank you for your time.

223

1          MR. JOANEN:  Before we go off, I just

2     want to say that we have Laughery Exhibits

3     1 through 11, and I'm going to maintain Exhibit

4     No. 4 in my possession to make copies.

5          THE VIDEOGRAPHER:  This concludes the

6     deposition.  The time is 3:56 p.m.  We are off

7     the record.

8               (FURTHER DEPONENT SAITH NOT.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

224

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3    IN RE:  FEMA TRAILER          )

4            FORMALDEHYDE PRODUCTS  ) MDL NO. 1873

5            LIABILITY LITIGATION   ) SECTION "N" 5

6

7      This is to certify that I have read the

8    transcript of my deposition taken in the

9    above-entitled cause by BRENDA S. TANNEHILL,

10   Certified Shorthand Reporter, on May 5, 2010,

11   and that the foregoing transcript accurately

12   states the questions asked and the answers given

13   by me as they now appear.

14

15   _____

16            KENNETH RONALD LAUGHERY

17

     SUBSCRIBED  AND  SWORN  TO

18   before me this _____, day

     of _ _____ 2010.

19    _____

     Notary Public

20

21

22

23

24

225

1    STATE OF ILLINOIS    )

2                         ) SS:

3    COUNTY OF K A N E    )

4        I, BRENDA S. TANNEHILL, a notary public

5    within and for the County of Kane County and

6    State of Illinois, do hereby certify that

7    heretofore, to-wit, on May 5, 2010, personally

8    appeared before me, at 7101 Chestnut Street,

9    Rosemont, Illinois, KENNETH RONALD LAUGHERY, in

10   a cause now pending and undetermined in the

11   United States District Court, Eastern District

12   of Louisiana, In Re: FEMA Trailer Formaldehyde

13   Products Liability Litigation.

14       I further certify that the said witness

15   was first duly sworn to testify the truth, the

16   whole truth and nothing but the truth in the

17   cause aforesaid; that the testimony then given

18   by said witness was reported stenographically by

19   me in the presence of the said witness, and

20   afterwards reduced to typewriting by

21   Computer-Aided Transcription, and the foregoing

22   is a true and correct transcript of the

23   testimony so given by said witness as aforesaid.

24       I further certify that the signature to

226

1    the foregoing deposition was not waived by

2    counsel for the respective parties.

3        I further certify that the taking of this

4    deposition was pursuant to notice, and that

5    there were present at the deposition the

6    attorneys hereinbefore mentioned.

7        I further certify that I am not counsel

8    for nor in any way related to the parties to

9    this suit, nor am I in any way interested in the

10   outcome thereof.

11       IN TESTIMONY WHEREOF:  I have hereunto

12   set my hand and affixed my notarial seal this

13   12th  day of May, 2010.

14

15

16                     Brenda S. Tannehill

17           Brenda S. Tannehill

18        NOTARY PUBLIC, KANE COUNTY, ILLINOIS

19

20

21

22

23

24

227

1          McCorkle Court Reporters, Inc.
            200 N. LaSalle Street Suite 300
2              Chicago, Illinois 60601-1014
3    DATE: May 12, 2010
4    THE LAW OFFICES OF JOSEPH M. BRUNO
     MR. L. SCOTT JOANEN
5    855 Baronne Street
     New Orleans, Louisiana 70113
6
     IN RE: FEMA TRAILER FORMALDEHYDE LITIGATION
7    COURT NUMBER: MDL NO. 1873
     DATE TAKEN: 05/05/2010
8    DEPONENT: KENNETH RONALD LAUGHERY
9    Dear Mr. Joanen:
10   Enclosed is the deposition transcript for the
     aforementioned deponent in the above-entitled
11   cause. Also enclosed are additional signature
     pages, if applicable, and errata sheets.
12
     Per your agreement to secure signature, please
13   submit the transcript to the deponent for review
     and signature.  All changes or corrections must
14   be made on the errata sheets, not on the
     transcript itself.  All errata sheets should be
15   signed and all signature pages need to be signed
     and notarized.
16
     After the deponent has completed the above,
17   please return all signature pages and errata
     sheets to me at the above address, and I will
18   handle distribution to the respective parties.
19   If you have any questions, please call me at the
     phone number below.
20
21   Sincerely,
22
     Margaret Setina        Court Reporter:
23   Signature Department       Brenda S. Tannehill
24   cc: All Counsel of Record

LAUGHERY EX02-000049



Important
Information for
Travel Trailer
Occupants

FEMA

FEMA

FEMA08-000013

EXHIBIT
6-91

EXHIBIT
Laughery
5
5/5/10 BT

## If you notice an odor in your trailer—it could be formaldehyde.

### What is formaldehyde?

Formaldehyde is a common indoor air pollutant that can be found in nearly all homes and buildings. It is a colorless gas that is released into the home from a variety of indoor sources. Formaldehyde can be found in a variety of every day products in your home, such as:

Household Products: cleaning solutions, dishwashing liquids, fabric softeners, shoe-care agents, carpet cleaning solutions, adhesives

Personal Care Products: nail polish, cosmetics, shampoos, antiperspirants

Fabrics: clothing, linens, draperies, couch cushions, automobile interiors

Appliances: wood stoves, gas appliances, kerosene stoves

Tobacco products: cigarettes, cigars

Building materials: particleboard, plywood, cabinets, and wall and floor materials, wallpaper, some other paper goods, paint coatings

As a result, travel trailers, mobile homes, manufactured homes, new homes, and recently remodeled homes are more likely to contain higher levels of formaldehyde. Over time, formaldehyde goes away and the odors and the effects decrease or disappear.

### How might formaldehyde affect me?

Formaldehyde is just one of several gases present indoors that may cause discomfort. It may cause symptoms similar to that of the common cold or flu. Formaldehyde can affect people differently; some people are very sensitive to formaldehyde while others may not have any noticeable reaction to the same level. People with eye, skin, respiratory, or allergic conditions, and those with asthma are potentially more susceptible to the effects of formaldehyde. Children and the elderly may be more sensitive as well. People who suspect they are sensitive to formaldehyde should work closely with a doctor to see if formaldehyde is causing their symptoms.

### What can I do to reduce my exposure to formaldehyde in my travel trailer?

• **Increase ventilation.** You can reduce your exposure to formaldehyde by bringing more outdoor air into your home. Open windows and doors whenever possible.

• **Keep indoor temperatures moderate.** As the temperature rises, the effects of formaldehyde may be more noticeable. You can use the air conditioner to keep temperatures relatively low, which will help lower the formaldehyde effects and odors.

• **Lower the humidity.** You can decrease the rate at which formaldehyde is released from pressed wood and other products by lowering the humidity in your travel trailer. Humidity should be maintained at about 40% to 50% relative humidity in the home.

• **Do not smoke inside.** Tobacco smoking produces formaldehyde and other toxic chemicals.

FEMA08-000014

Case 2:07-md-01873-KDE-ALC     Document 196-37     Filed 05/18/2008     Page 2 of 2

 **FEMA**   | **Important Formaldehyde Information for FEMA Housing Occupants** |

### Why are you receiving this information?

FEMA is providing this information to help you and your family better understand what formaldehyde is and how it could affect living and health conditions in your FEMA-provided housing unit. We are also providing you with a phone number where you can receive additional information about formaldehyde and discuss your disaster housing situation with a FEMA specialist.

### What is formaldehyde?

Formaldehyde is a common indoor air pollutant that can be found in nearly all homes and buildings. It is a colorless gas that is released into the home from a variety of indoor sources. Formaldehyde can also be found in a variety of materials used in home construction and products for everyday living.

### How might formaldehyde affect me and my family?

There are several formaldehyde-related symptoms, such as watery eyes, runny nose, burning sensation in the eyes, nose, and throat, headaches and fatigue. These symptoms are similar to those associated with the common cold, the flu or other pollutants.

Formaldehyde can affect people differently. Some people may not have any noticeable reaction to formaldehyde; others are very sensitive to it. People with eye, skin, respiratory, or allergic conditions, and those with asthma are more likely to feel the effects of formaldehyde. Children and the elderly may be more sensitive as well.

The most common route of exposure is by breathing it, which may cause nose and eye irritation even in low levels. More serious health problems may be caused by extended exposure, including a small but increased risk of some forms of cancer.

If these symptoms lessen when you are away from your home but reappear when you return, your symptoms could be from indoor pollutants that may include formaldehyde or other indoor pollutants, such as dust, mold or smoke.

If you are experiencing these symptoms, or suspect you are sensitive to formaldehyde, you should seek medical attention to see if formaldehyde may be causing your symptoms.

### Additional Information

**If you have additional questions or concerns regarding formaldehyde in your FEMA provided housing unit, please call:**

# 1-866-562-2381
# (TTY 1-800-462-7585)

FEMA operators will immediately direct your call to specialists who will assist you with questions about:

- Formaldehyde and health related issues
- Other available FEMA housing assistance options; and
- Recently purchased FEMA housing units

FEMA08-000015


EXHIBIT
Laughery
10
5/5/10 BT

LAUGHERY_EX02-000092