UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE  PRODUCTS | * | |
| LIABILITY LITIGATION | * | |
| | * | SECTION:  N (5) |
| | * | |
| This Document Relates to: | * | |
| **Ausbrooks v. Forest river, Inc., et al;** | * | JUDGE: ENGELHARDT |
| **Early v. Gulf Stream Coach, Inc., et al.** | * | |
| **Price v. Jayco, Inc., et al;** | * | MAG: CHASEZ |
| **Clementin v. Keystone RV, et al;** | * | |
| **Williams v. KZRV, LP, et al** | * | |

****************************************************************************

### REPLY MEMORANDUM TO PLAINTIFF'S RESPONSE TO MANUFACTURING DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF PAUL HEWETT, Ph.D.

Plaintiffs attempt to qualify Dr. Hewett as an expert in statistical analysis; thereby, giving weight to his testimony at trial as a foundation for the admissibility of "probable exposure levels" and statistical evidence.

This Court, in its Order dated July 23, 2010, directed Plaintiffs to identify particular cases wherein statistical analysis can be used.  The Court required plaintiffs to issue a **statistical analysis report** (along with the reliance materials) addressing the earlier identified cases no later than October 4, 2010.  Rec. Doc 14860.

The plaintiffs, presumably to carry out this order, relied on the work of Paul Hewett.  In plaintiffs' own words,

> "Plaintiffs have designated Paul H. Hewett, Ph.D., CIH for his expertise in exposure assessment and **statistical analysis**" [**emphasis added**] (page 1, Plaintiff's Response to Defendants Motion in Limine…)

\*   \*   \*

> "In this matter, **Dr. Hewett has performed statistical analysis** on a dataset of formaldehyde measurements from various models of emergency

housing units…" [**emphasis added**] (page 1, Plaintiff's Response to Defendants Motion in Limine…).

Plaintiffs' reliance on Dr. Hewett to provide a "statistical analysis report" is misguided for three reasons: (1) Dr. Hewett is not an expert statistician, he is an industrial hygienist. As such, Dr. Hewett is not qualified to render an expert opinion that relies on statistical reasoning, the core of any statistical analysis; (2) Dr. Hewett, an industrial hygienist familiar with statistics, carried out *statistical computations* as directed by the plaintiffs' attorneys. Dr. Hewett, however, did not design and execute his own *statistical analysis*, nor does he demonstrate that he utilized any statistical reasoning to arrive at his conclusions; and (3) Dr. Hewett's report provides multiple pages of graph and charts showing his statistical computations. But, his ultimate conclusions do not depend on, or even utilize, the bulk of those calculations.

**I.      Dr. Hewett is not an expert in statistics. He therefore should not qualify as an expert witness on statistical analysis.**

Dr. Hewett testified at his deposition on November 15, 2010 that he was not a statistician. See, Ex. "A," Depo. of Paul Hewett at p. 169 (Nov. 15, 2010).

Q. Do you hold yourself out to be an expert in the field of statistics?

A. I have never held myself out to be an expert in the field of statistics.

Dr. Hewett, in fact, does not have any credentials in the field of statistics, as evidenced by his CV. It is noteworthy that Dr. Hewett's own resume provides no evidence of his expertise in statistics. The resume does not list any degrees or certifications in statistics. Nor does Dr. Hewett list any professional memberships related to statistics, including membership in the American Statistical Association (ASA), the flagship professional organization for professional statisticians. Dr. Hewett's resume

only represents him as an interpreter of statistical methods for the community of industrial hygienists, an admirable task, but not one that makes him an expert in statistics.

Dr. Hewett's own website does not even mention statistical analysis as a service provided for litigation. Dr. Hewett is the principal of Exposure Assessment Solutions, Inc (EAS) and was engaged by the Plaintiffs via that firm. According to the company's website, EAS offers the following "legal" consultation services:

- independent review and critique of exposure assessment documents, reports, and studies;
- exposure reconstruction: e.g., respirable silica, respirable coal mine dust, welding fumes;
- analysis and critique of corporate exposure assessment data and documents;
- comparison of corporate programs and actions with the legal requirements and the exposure assessment state-of-the-art at the time of data collection.

No reference is made to statistical analysis as a service rendered by Dr. Hewett's firm. See, www.oesh.com (Jan. 28, 2011). Dr. Hewett is unqualified to offer opinions about "statistical analysis." This is the charge for an expert statistician. Any opinions offered by Dr. Hewett about statistical analysis should be rejected because those opinions go beyond the scope of Dr. Hewett's expertise.

Dr. Hewett is an industrial hygienist, and a long-time member of the American Industrial Hygiene Association (AIHA), the primary professional organization for industrial hygienists. Even the American Industrial Hygiene Association does not include statistical analyses as being in the domain of the industrial hygienist. The AIHA outlines the role of the industrial hygienist on a page of its website entitled "What is an Industrial Hygienist?" See, Ex. "B," http://www.aiha.org/aboutaiha/Pages/WhatIsanIH.aspx. It states that the typical roles of the industrial hygienist include:

• Investigating and examining the workplace for hazards and potential dangers

- •Making recommendations on improving the safety of workers and the surrounding community
- • Conducting scientific research to provide data on possible harmful conditions in the workplace
- • Developing techniques to anticipate and control potentially dangerous situations in the workplace and the community
- • Training and educating the community about job-related risks
- •Advising government officials and participating in the development of regulations to ensure the health and safety of workers and their families
- • Ensuring that workers are properly following health and safety procedures

Even if Dr. Hewett were a statistical expert, or even a professional statistician, then his analysis should comply with the "Ethical Guidelines for Statistical Practice." http://www.amstat.org/about/ethicalguidelines.cfm. The guidelines encourage statisticians to:

- Guard against the possibility that a predisposition by investigators or data providers might predetermine the analytic result.

Dr. Hewett's methodology conflicts with this ethical guideline by allowing plaintiffs' attorneys to dictate the statistical design and parameters.

In addition, the ethical guidelines suggest that:

- Where appropriate, [the statistician] present a client or employer with choices among valid alternative statistical approaches that may vary in scope, cost, or precision.

There is no evidence that Dr. Hewett presented plaintiffs' counsel with alternative approaches. He was told what calculations to do and he did them. The common theme in these guidelines is that statisticians should take an active role in and responsibility for all phases of data collection, analyses, and interpretation, rather than merely blindly tabulating number they are given. Dr. Hewett would be in violation of these guidelines if he were in fact a professional statistician. Dr. Hewett, as an industrial hygienist, was

tasked to make a set of statistical calculations and he did so. These calculations, however, do not constitute a statistical analysis because they are void of any statistical reasoning.

**II.     Dr. Hewett, being an industrial hygienist familiar with statistics but not a statistical expert, carries out statistical computations as directed by the plaintiffs' attorneys rather than designing and executing his own analysis. He engages in no statistical reasoning.**

Statistical thinking is a complex process at the heart of expert statistical analysis. See, Ex. "C," C.J. Wild & M. Pfannkuch, *Statistical Thinking in Empirical Enquiry Source*: International Statistical Review / Revue Internationale de Statistique, Vol. 67, No. 3 (Dec., 1999), pp. 223-248.  Dr. Hewett, carrying out the wishes of the plaintiffs' attorneys skipped almost all steps of the statistical reasoning process. *Id.* at 226.  What he was assigned to do by the plaintiffs' attorneys - as opposed to the Court's order - is mostly a series of statistical calculations.  Statistical calculations are but a single part of 17 steps in the investigative cycle of the statistical process. *Id.*  The objectives of Mr. Hewett's report are stated on page 2 of his report:

> • Compare, using graphical and statistical methods, the formaldehyde levels to the Agency for Toxic Substances and Disease Registry (ATSDR) chronic exposure "Minimum Risk Level" (MRL) of 0.008 ppm limit for formaldehyde, which was intended to be used for minimizing risk to the general population whenever exposures exceed 365 days, as well as the intermediate and acute exposure MRL's.
> • Compare, using graphical and statistical methods, the formaldehyde levels to other exposure limits.
> • Evaluate the dataset for evidence that the formaldehyde levels tend to decline with the age of the THU.
> • Estimate the probable formaldehyde levels for residents, such as the plaintiffs, in unmeasured, unevaluated, and untested THU's in general and in a specific model in particular.

In his deposition he admits that these objectives were assigned by the plaintiffs' attorneys.  See, Exhibit "A," at p. 14-15.  Thus he made no attempt to design and

implement a study that would estimate the level of formaldehyde in the population of THU's.

The conclusions derived from Dr. Hewett's statistical calculations should be limited to the paragraph on page 17 of his report:

> The percentage of measurements that exceeded the various limits varied by manufacturer and data source. Each of the percentages discussed above represent estimates of the true percent (or fraction; divide the percent by 100) of the formaldehyde levels that exceeded the ATSDR MRL's and other limits. The 99% lower confidence limits (99% LCL) and the 99% upper confidence limits (99% UCL) were also calculated for the percent exceeding the ATSDR chronic exposure MRL of 0.008 ppm and are provided in these tables. In most cases, the 99% LCL was greater than 50%. (The instances where the 99% LCL was less than 50% involved small sample sizes.) In summary, the points estimates of the percent or fraction of formaldehyde levels that exceed the ATSDR chronic exposure MRL suggest that the overwhelming majority of the formaldehyde levels in THU's were greater than this limit. The 99% LCL suggest that one could be 99% confident that considerably more than 50% of the formaldehyde levels exceeded the two MRLs.

The problem arises when Dr. Hewett goes beyond his calculations and offers additional opinions about "probable exposure levels." By doing so, Dr. Hewett's statistical analysis goes beyond the raw data and into an area of greater uncertainty. One of the bases of defendants' motion *in limine* is that Dr. Hewett never addresses those uncertainties. His opinions about "exposure levels" and "probable human exposure" are entirely dependent upon the assumption that formaldehyde concentration measurements are always equal to human exposure levels, regardless of the conditions under which the formaldehyde concentration measurements were collected, the individual characteristics of certain THUs, or the human factors involved in the population being assessed.

Experts are not prohibited from making extrapolations from underlying data. But, uncertainty and variability must be addressed. Otherwise, the expert's opinions are only connected to the underlying data by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The defendants proffered one example of a viable statistical tool for analyzing such variability and uncertainty: Monte Carlo Analysis. And, contrary to plaintiffs' assertion, defendants did not exhibit "unbridled reliance" on this particular analysis. In fact, there is no single Monte Carlo method; instead, the term describes a large and widely used class of approaches. The different methods are individually tailored to do what Dr. Hewett neglected to do - address uncertainty.

Plaintiffs also argue that Dr. Hewett "was not tasked with 'validating' the dataset; he was tasked with analyzing the testing set under his prescribed objectives." Plaintiffs, however, incorrectly interpret the defendants' argument about Dr. Hewett's failure to validate the data. The defendants did not address whether Dr. Hewett was in a position to vouch for the accuracy or reliability of the data provided to him. Defendants take issue with Dr. Hewett's methodology because he failed to validate whether the underlying formaldehyde concentration data scientifically supports his conclusions about "exposure levels" and "probable human exposure." Dr. Hewett, in other words, made no attempt to improve the quality of data he was given by designing a statistical model that accounts for variability and uncertainty of the testing procedures used to collect the concentration measurements. At the very least, Dr. Hewett should be expected to rely only on those datasets that he considers to be high-quality: BVNA and CDC. See, Ex. "A," at pp. 33-

36; 52.  Dr. Hewett acknowledges that these data were collected using the same protocol and the samples were submitted to an AIHA-accredited laboratory. *Id.*

### III. Dr. Hewett's report provides multiple pages of graph and charts showing his statistical computations.  But, even so, his ultimate conclusions do not depend, or even utilize, the bulk of those calculations.

Dr. Hewett's computations have no bearing on his conclusions.  In his report, Dr. Hewett fitted the lognormal distribution to the data.  He did an analysis of variance to determine if the data were poolable (although he ignored this alleged poolability).  He then calculated a decay curve.  But, the conclusions stated on page 27 of Dr. Hewett's report make no use of the results of these calculations.

Dr. Hewett only opined that there was a greater than 50% chance ("more likely than not") that the formaldehyde levels in units "similar to that provided to the plaintiff" exceeded occupational standards.  He also opined that "there is an age-related decline in formaldehyde levels for travel trailers."  This last finding is almost a truism; a decay curve must be negative (thus the name "decay") based on a simple physical principle of diffusions.

### IV. Conclusion

Dr. Hewett, however well credentialed he may be, is not permitted to be the mouthpiece of an expert in a different specialty.  He is not an expert statistician; therefore, he should not be allowed to offer opinions about statistical reasoning and statistical analysis.

Again The Court Order dated July 23, 2010 mandated that the:

> *Plaintiffs shall issue a statistical analysis report addressing the early identified cases [parenthetical material omitted].*

Dr. Hewett neither performed a "statistical analysis," nor did he address early identified cases." The defendants, therefore, request that Dr. Hewett's opinions, at the very least, be limited to his conclusions *as stated* on page 27 of his report. He should not be allowed to testify beyond those opinions regarding "exposure assessment" and "probable human exposure levels" because he has not performed such an analysis. Dr. Hewett does not address (whether using Monte Carlo or any other method) any of the variables or uncertainties necessary to consider when conducting such an analysis. Dr. Hewett simply performed statistical computations based on a dataset provided by plaintiffs' attorneys and then he compared his calculated results to a baseline provided by plaintiffs' attorneys. This is not a statistical analysis.

      Respectfully Submitted,

      ***DUPLASS, ZWAIN, BOURGEOIS,***
      ***PFISTER & WEINSTOCK***

      s/ *Andrew D. Weinstock*
      _____
      **ANDREW D. WEINSTOCK #18495**
      **JOSEPH G. GLASS #25397**
      Three Lakeway Center, Suite 2900
      3838 N. Causeway Boulevard
      Metairie, Louisiana 70002
      Telephone: (504) 832-3700
      Facsimile: (504) 837-3119
      **MANUFACTURING DEFENDANTS**
      **LIAISON COUNSEL**

## CERTIFICATE OF SERVICE

**I DO HEREBY CERTIFY** that on this 31st day of January, 2011, a copy of the above and foregoing was filed electronically. Notice of this pleading was sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

                                              s/ *Andrew D. Weinstock*
                                            _____
                                            **ANDREW D. WEINSTOCK**