UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | Docket MDL 1873 "N" |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | New Orleans, Louisiana |
| | * | |
| THIS DOCUMENT IS RELATED TO: | * | September 18, 2009 |
| | * | |
| CHARLIE AGE, ET AL V | * | 12:40 P.M. |
| GULF STREAM COACH, INC., | * | |
| ET AL, DOCKET NO. 09-2892; | * | |
| ALANA ALEXANDER, INDIVIDUALLY | * | |
| AND ON BEHALF OF | * | |
| CHRISTOPHER COOPER | * | |

* * * * * * * * * * * * * * * *

DAY 5
AFTERNOON SESSION
JURY TRIAL PROCEEDINGS BEFORE THE
HONORABLE KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:          Gainsburgh, Benjamin, David,
                               Meunier & Warshauer
                             BY:  GERALD E. MEUNIER, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163


                             The Buzbee Law Firm
                             BY:  ANTHONY G. BUZBEE, ESQ.
                             JP Morgan Chase Tower
                             600 Travis, Suite 7300
                             Houston, Texas  77002


JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

Page 215

```
14:59   1    right?
14:59   2              MR WATTS:  Yes, sir.
14:59   3              THE COURT:  Okay.  Good.
14:59   4              THE DEPUTY CLERK:  All rise.
14:59   5              (WHEREUPON, the jury exited the courtroom.)
15:12   6              THE DEPUTY CLERK:  All rise.
15:13   7              THE COURT:  You may be seated.  And the next witness,
15:13   8    Mr. Watts, is going to be?
15:13   9              MR WATTS:  Dr. Paul Hewett.
15:13  10              THE COURT:  Dr. Paul Hewett.  I'll ask you to stand
15:13  11    up again, Dr. Hewett.
15:13  12              (WHEREUPON, Paul Hewett, having been duly sworn,
15:13  13    testified as follows.)
15:13  14              THE DEPUTY CLERK:  Please state your full name and
15:13  15    correct spelling for the record.
15:14  16              THE WITNESS:  My name is Paul Hewett, P-A-U-L,
15:14  17    H-E-W-E-T -- H-E-W-E-T-T -- excuse me.  I have no middle
15:14  18    initial, my parents could not afford one.
15:14  19                        DIRECT EXAMINATION
15:14  20    BY MR WATTS
15:14  21    Q.   All right.  Dr. Hewett, tell the members of the jury your
15:14  22    name and what you do.
15:14  23    A.   Well, again, Paul Hewett.  I am a professional industrial
15:14  24    hygienist or occupational hygienist.  We go by both terms.  My
15:14  25    training is in the recognition, evaluation in control of
```

15:14  1    occupational exposures, that is exposures to toxic chemicals

15:14  2    and particulars that one that might encounter in workplaces, be

15:14  3    they general industry, chemical industry, or my specialty

15:14  4    actually when I was working for the federal government was in

15:14  5    mining, below ground, above ground and surface mining.

15:15  6             MR WATTS:  Your Honor, I've conferred with counsel,

15:15  7    we offer as Exhibit 300, his curriculum vitae and the 20 pages

15:15  8    of charts and tables that were produced with his report.

15:15  9             MR. WEINSTOCK:  No objection, with the understanding

15:15 10    that they're going to use the charts that are applicable.

15:15 11             MR WATTS:  Fine.

15:15 12             MR. WEINSTOCK:  I'll tell you what, once it goes in,

15:15 13    it goes. in.

15:15 14             THE COURT:  Well, you-all know what you're talking

15:15 15    about here, because I'm not quite sure what -- if you-all have

15:15 16    come to an agreement on that.

15:15 17             MR WATTS:  I think we have.

15:15 18             MR. WEINSTOCK:  I think we've come to an agreement

15:15 19    for cross -- for this examination, but we might have to pull

15:15 20    some pieces out of that before it goes into --

15:15 21             THE COURT:  What number is this?

15:15 22             MR WATTS:  It's Exhibit 300.  I put both the CV and

15:15 23    the charts that were with his report.

15:15 24             THE COURT:  Okay.  So that's Exhibit 300.  And now

15:15 25    the area of expertise that he's going to testify?

Page 217

```
15:15   1              MR WATTS:  Which offer him on the field of

15:15   2    retrospective exposure assessment and statistics as they relate

15:15   3    to industrial hygiene.

15:15   4              THE COURT:  All right.  Counsel, do we have a

15:15   5    stipulation?

15:16   6              MR. SHERBURNE:  Yes, Your Honor.

15:16   7              MR. WEINSTOCK:  Yes, yes, we can stipulate, Your

15:16   8    Honor.

15:16   9              THE COURT:  All right.  The court will accept him

15:16  10    accordingly.

15:16  11              MR WATTS:  Excellent.

15:16  12    BY MR WATTS

15:16  13    Q.   With that understanding, I want to blow through your

15:16  14    curriculum vitae, no offense but it's Friday afternoon.  I've

15:16  15    got LSU shirts on, people are ready for football, and we've got

15:16  16    to get you out of here, okay?

15:16  17              Dr. Hewett, you've got a Ph.D., a master's and a

15:16  18    bachelor's of science, and your Ph.D. is in industrial hygiene;

15:16  19    right?

15:16  20    A.   Correct.

15:16  21    Q.   You're a certified industrial hygienist?

15:16  22    A.   Correct.

15:16  23    Q.   When you got out of high school, did you go into the

15:16  24    United States Army?

15:16  25    A.   Yes.
```

Page 218

15:16  1    Q.   After you got back from the Army did you get a bachelor's

15:16  2    and master's and work for NIOSH?

15:16  3    A.   Yes.  I went to school on the G.I. Bill.  Upon graduating

15:16  4    with a master's in industrial hygiene, I joined the National

15:16  5    Institute for Occupational Safety and Health.

15:16  6    Q.   How long did you work for NIOSH?

15:16  7    A.   For 25 years, from 1978 to 2003.

15:17  8    Q.   And while you were with NIOSH, did you participate in

15:17  9    retrospective exposure assessments?

15:17  10   A.   I participated as an industrial hygienist assisting in the

15:17  11   collection of occupational exposure data.

15:17  12   Q.   All right.  And while you were there, you got the NIOSH

15:17  13   Alice Hamilton award; is that correct?

15:17  14   A.   Yes, sir.

15:17  15   Q.   Tell the jury what that is just real briefly.

15:17  16   A.   Well, the Alice Hamilton award is given to researchers --

15:17  17   NIOSH researchers, that is, that a committee finds has produced

15:17  18   an exemplary piece of work in the past year.  There's four

15:17  19   types of awards.  And in 1996, I won an award for a chapter I

15:17  20   wrote on interpreting -- using and interpreting occupational

15:17  21   exposure limits.

15:17  22   Q.   One more thing on your CV then we can get to the crux of

15:17  23   it.  You won the Edward J. Baier Technical Achievement Award

15:17  24   from the American Industrial Hygiene Association; is that

15:17  25   right?

15:17  1   A.   Yes, sir.

15:17  2   Q.   What did you win that award for?

15:18  3   A.   Well, for the past ten or so years, I've been working on

15:18  4   applying on Bayesian statistics.  There's two types of

15:18  5   statistics.  There's classical or frequent statistics and

15:18  6   there's Bayesian statistics.

15:18  7          I've been working on applying Bayesian statistics to

15:18  8   the analysis and interpretation of occupational exposure data.

15:18  9   And without going into it, because I know we don't have much

15:18  10  time, but Bayesian statistics is that branch of statistics that

15:18  11  allows you quantify professional judgment and enter into the

15:18  12  analysis of the data and the interpretation of the data.

15:18  13          And in occupational hygiene, we have so little data

15:18  14  for most of our exposure scenarios that we find we are often

15:18  15  making decisions using professional judgment or factoring that

15:18  16  in.  Now we can do it mathematically and quantitively.  And I

15:18  17  was given an award for that body of work.

15:18  18  Q.   Okay.  And when we talk about what industrial hygiene is,

15:18  19  just explain that to the jury very briefly.

15:18  20  A.   Well, industrial hygiene is the practice of anticipating,

15:18  21  recognizing, evaluating and controlling exposures.  So

15:18  22  recognizing that you have an issue, that you may have an issue,

15:19  23  measuring the exposures in the workplace and then determining

15:19  24  if exposures are too high relative to exposure limits developed

15:19  25  by the government and other organizations, then recommending
             JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

15:19  1    suitable controls for lowering and mitigating or maybe even

15:19  2    eliminating exposures.

15:19  3              MR WATTS:   May I approach the witness, Your Honor?

15:19  4              THE COURT:   Yes.

15:19  5    BY MR WATTS

15:19  6    Q.    Tell the ladies and gentlemen of the jury what a

15:19  7    retrospective exposure assessment is?

15:19  8    A.    Well there's two types of exposure assessment.   There's

15:20  9    normal exposure assessment or prospective exposure assessment

15:20 10    where we're trying to determine are exposures currently in

15:20 11    control or not in control and, if not, do something, for

15:20 12    purposes of predicting future exposures.   That's what most

15:20 13    companies are involved in when they do exposure assessments on

15:20 14    a normal basis.

15:20 15              In a situation where you're trying to estimate

15:20 16    exposures for scenarios that occurred in the past, you have to

15:20 17    adopt various mechanisms for generating estimates of exposure.

15:20 18    One would be to gather data that has been collected by other

15:20 19    organizations, government organizations, or academic

15:20 20    organizations, look in the literature, look and see what's been

15:20 21    published.

15:20 22              You could collect data from similar types of jobs in

15:20 23    similar workplaces, or you could even develop physical chemical

15:20 24    models using chemical engineering principles to predict what an

15:20 25    exposure would have been given particular scenarios.

15:21  1          The gold standard in retrospective exposure

15:21  2   assessment is to find data in some way, shape or form from the

15:21  3   actual workers or similar workers doing the same work or

15:21  4   similar work in similar types of workplaces, and we do that and

15:21  5   have done that in NIOSH quite frequently.

15:21  6          For example, in the last part of my career at NIOSH,

15:21  7   we were doing a mortality study on diesel particulate, did the

15:21  8   mortality study having lung cancer as an end point.  And one of

15:21  9   the goals was to estimate exposures back for 10, 20, 30 years

15:21  10  to diesel particulate.  So to do that, we went out and we

15:21  11  measured exposures in similar workplaces or line-type

15:21  12  environments.

15:21  13         So I think that -- I hope that covered it.

15:21  14  Q.   I think it gets us there.  Let's get out of the general to

15:21  15  the specific.  Did our side contact you and ask you to perform

15:21  16  a retrospective exposure assessment of sorts based upon

15:22  17  formaldehyde measurements that had been taken in a large number

15:22  18  of these FEMA trailers?

15:22  19  A.   Well, the initial contact had a different focus, but

15:22  20  ultimately the goal was to do a retrospective exposure

15:22  21  assessment to estimate exposures at past points in time since

15:22  22  we, obviously, cannot go back in time and measure exposures for

15:22  23  any particular individual.

15:22  24  Q.   All right.

15:22  25         MR. WEINSTOCK:  Can we just approach, Judge, very