UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | Docket MDL 1873 "N" |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | New Orleans, Louisiana |
| | * | |
| THIS DOCUMENT IS RELATED TO: | * | September 18, 2009 |
| | * | |
| CHARLIE AGE, ET AL V | * | 12:40 P.M. |
| GULF STREAM COACH, INC., | * | |
| ET AL, DOCKET NO. 09-2892; | * | |
| ALANA ALEXANDER, INDIVIDUALLY | * | |
| AND ON BEHALF OF | * | |
| CHRISTOPHER COOPER | * | |

* * * * * * * * * * * * * * * *

DAY 5
AFTERNOON SESSION
JURY TRIAL PROCEEDINGS BEFORE THE
HONORABLE KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:          Gainsburgh, Benjamin, David,
                               Meunier & Warshauer
                             BY:  GERALD E. MEUNIER, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163


                             The Buzbee Law Firm
                             BY:  ANTHONY G. BUZBEE, ESQ.
                             JP Morgan Chase Tower
                             600 Travis, Suite 7300
                             Houston, Texas  77002


JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

Page 215

14:59  1  right?

14:59  2              MR WATTS:  Yes, sir.

14:59  3              THE COURT:  Okay.  Good.

14:59  4              THE DEPUTY CLERK:  All rise.

14:59  5              (WHEREUPON, the jury exited the courtroom.)

15:12  6              THE DEPUTY CLERK:  All rise.

15:13  7              THE COURT:  You may be seated.  And the next witness,

15:13  8  Mr. Watts, is going to be?

15:13  9              MR WATTS:  Dr. Paul Hewett.

15:13 10              THE COURT:  Dr. Paul Hewett.  I'll ask you to stand

15:13 11  up again, Dr. Hewett.

15:13 12              (WHEREUPON, Paul Hewett, having been duly sworn,

15:13 13  testified as follows.)

15:13 14              THE DEPUTY CLERK:  Please state your full name and

15:13 15  correct spelling for the record.

15:14 16              THE WITNESS:  My name is Paul Hewett, P-A-U-L,

15:14 17  H-E-W-E-T -- H-E-W-E-T-T -- excuse me.  I have no middle

15:14 18  initial, my parents could not afford one.

15:14 19                   DIRECT EXAMINATION

15:14 20  BY MR WATTS

15:14 21  Q.  All right.  Dr. Hewett, tell the members of the jury your

15:14 22  name and what you do.

15:14 23  A.  Well, again, Paul Hewett.  I am a professional industrial

15:14 24  hygienist or occupational hygienist.  We go by both terms.  My

15:14 25  training is in the recognition, evaluation in control of
                   JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| 15:14 | 1 | occupational exposures, that is exposures to toxic chemicals |
| 15:14 | 2 | and particulars that one that might encounter in workplaces, be |
| 15:14 | 3 | they general industry, chemical industry, or my specialty |
| 15:14 | 4 | actually when I was working for the federal government was in |
| 15:14 | 5 | mining, below ground, above ground and surface mining. |
| 15:15 | 6 | MR WATTS:  Your Honor, I've conferred with counsel, |
| 15:15 | 7 | we offer as Exhibit 300, his curriculum vitae and the 20 pages |
| 15:15 | 8 | of charts and tables that were produced with his report. |
| 15:15 | 9 | MR. WEINSTOCK:  No objection, with the understanding |
| 15:15 | 10 | that they're going to use the charts that are applicable. |
| 15:15 | 11 | MR WATTS:  Fine. |
| 15:15 | 12 | MR. WEINSTOCK:  I'll tell you what, once it goes in, |
| 15:15 | 13 | it goes. in. |
| 15:15 | 14 | THE COURT:  Well, you-all know what you're talking |
| 15:15 | 15 | about here, because I'm not quite sure what -- if you-all have |
| 15:15 | 16 | come to an agreement on that. |
| 15:15 | 17 | MR WATTS:  I think we have. |
| 15:15 | 18 | MR. WEINSTOCK:  I think we've come to an agreement |
| 15:15 | 19 | for cross -- for this examination, but we might have to pull |
| 15:15 | 20 | some pieces out of that before it goes into -- |
| 15:15 | 21 | THE COURT:  What number is this? |
| 15:15 | 22 | MR WATTS:  It's Exhibit 300.  I put both the CV and |
| 15:15 | 23 | the charts that were with his report. |
| 15:15 | 24 | THE COURT:  Okay.  So that's Exhibit 300.  And now |
| 15:15 | 25 | the area of expertise that he's going to testify? |

```
15:15   1              MR WATTS:  Which offer him on the field of
15:15   2    retrospective exposure assessment and statistics as they relate
15:15   3    to industrial hygiene.
15:15   4              THE COURT:  All right.  Counsel, do we have a
15:15   5    stipulation?
15:16   6              MR. SHERBURNE:  Yes, Your Honor.
15:16   7              MR. WEINSTOCK:  Yes, yes, we can stipulate, Your
15:16   8    Honor.
15:16   9              THE COURT:  All right.  The court will accept him
15:16  10    accordingly.
15:16  11              MR WATTS:  Excellent.
15:16  12    BY MR WATTS
15:16  13    Q.   With that understanding, I want to blow through your
15:16  14    curriculum vitae, no offense but it's Friday afternoon.  I've
15:16  15    got LSU shirts on, people are ready for football, and we've got
15:16  16    to get you out of here, okay?
15:16  17              Dr. Hewett, you've got a Ph.D., a master's and a
15:16  18    bachelor's of science, and your Ph.D. is in industrial hygiene;
15:16  19    right?
15:16  20    A.   Correct.
15:16  21    Q.   You're a certified industrial hygienist?
15:16  22    A.   Correct.
15:16  23    Q.   When you got out of high school, did you go into the
15:16  24    United States Army?
15:16  25    A.   Yes.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

15:16   1   Q.   After you got back from the Army did you get a bachelor's

15:16   2   and master's and work for NIOSH?

15:16   3   A.   Yes.   I went to school on the G.I. Bill.   Upon graduating

15:16   4   with a master's in industrial hygiene, I joined the National

15:16   5   Institute for Occupational Safety and Health.

15:16   6   Q.   How long did you work for NIOSH?

15:16   7   A.   For 25 years, from 1978 to 2003.

15:17   8   Q.   And while you were with NIOSH, did you participate in

15:17   9   retrospective exposure assessments?

15:17 10   A.   I participated as an industrial hygienist assisting in the

15:17 11   collection of occupational exposure data.

15:17 12   Q.   All right.   And while you were there, you got the NIOSH

15:17 13   Alice Hamilton award; is that correct?

15:17 14   A.   Yes, sir.

15:17 15   Q.   Tell the jury what that is just real briefly.

15:17 16   A.   Well, the Alice Hamilton award is given to researchers --

15:17 17   NIOSH researchers, that is, that a committee finds has produced

15:17 18   an exemplary piece of work in the past year.   There's four

15:17 19   types of awards.   And in 1996, I won an award for a chapter I

15:17 20   wrote on interpreting -- using and interpreting occupational

15:17 21   exposure limits.

15:17 22   Q.   One more thing on your CV then we can get to the crux of

15:17 23   it.   You won the Edward J. Baier Technical Achievement Award

15:17 24   from the American Industrial Hygiene Association; is that

15:17 25   right?

```
15:17   1    A.    Yes, sir.

15:17   2    Q.    What did you win that award for?

15:18   3    A.    Well, for the past ten or so years, I've been working on

15:18   4    applying on Bayesian statistics.  There's two types of

15:18   5    statistics.  There's classical or frequent statistics and

15:18   6    there's Bayesian statistics.

15:18   7               I've been working on applying Bayesian statistics to

15:18   8    the analysis and interpretation of occupational exposure data.

15:18   9    And without going into it, because I know we don't have much

15:18  10    time, but Bayesian statistics is that branch of statistics that

15:18  11    allows you quantify professional judgment and enter into the

15:18  12    analysis of the data and the interpretation of the data.

15:18  13               And in occupational hygiene, we have so little data

15:18  14    for most of our exposure scenarios that we find we are often

15:18  15    making decisions using professional judgment or factoring that

15:18  16    in.  Now we can do it mathematically and quantitively.  And I

15:18  17    was given an award for that body of work.

15:18  18    Q.    Okay.  And when we talk about what industrial hygiene is,

15:18  19    just explain that to the jury very briefly.

15:18  20    A.    Well, industrial hygiene is the practice of anticipating,

15:18  21    recognizing, evaluating and controlling exposures.  So

15:18  22    recognizing that you have an issue, that you may have an issue,

15:19  23    measuring the exposures in the workplace and then determining

15:19  24    if exposures are too high relative to exposure limits developed

15:19  25    by the government and other organizations, then recommending
```

15:19  1   suitable controls for lowering and mitigating or maybe even

15:19  2   eliminating exposures.

15:19  3          MR WATTS:   May I approach the witness, Your Honor?

15:19  4          THE COURT:   Yes.

15:19  5   BY MR WATTS

15:19  6   Q.   Tell the ladies and gentlemen of the jury what a

15:19  7   retrospective exposure assessment is?

15:19  8   A.   Well there's two types of exposure assessment.   There's

15:20  9   normal exposure assessment or prospective exposure assessment

15:20  10  where we're trying to determine are exposures currently in

15:20  11  control or not in control and, if not, do something, for

15:20  12  purposes of predicting future exposures.   That's what most

15:20  13  companies are involved in when they do exposure assessments on

15:20  14  a normal basis.

15:20  15          In a situation where you're trying to estimate

15:20  16  exposures for scenarios that occurred in the past, you have to

15:20  17  adopt various mechanisms for generating estimates of exposure.

15:20  18  One would be to gather data that has been collected by other

15:20  19  organizations, government organizations, or academic

15:20  20  organizations, look in the literature, look and see what's been

15:20  21  published.

15:20  22          You could collect data from similar types of jobs in

15:20  23  similar workplaces, or you could even develop physical chemical

15:20  24  models using chemical engineering principles to predict what an

15:20  25  exposure would have been given particular scenarios.

15:21  1           The gold standard in retrospective exposure

15:21  2   assessment is to find data in some way, shape or form from the

15:21  3   actual workers or similar workers doing the same work or

15:21  4   similar work in similar types of workplaces, and we do that and

15:21  5   have done that in NIOSH quite frequently.

15:21  6           For example, in the last part of my career at NIOSH,

15:21  7   we were doing a mortality study on diesel particulate, did the

15:21  8   mortality study having lung cancer as an end point.  And one of

15:21  9   the goals was to estimate exposures back for 10, 20, 30 years

15:21 10   to diesel particulate.  So to do that, we went out and we

15:21 11   measured exposures in similar workplaces or line-type

15:21 12   environments.

15:21 13           So I think that -- I hope that covered it.

15:21 14   Q.   I think it gets us there.  Let's get out of the general to

15:21 15   the specific.  Did our side contact you and ask you to perform

15:21 16   a retrospective exposure assessment of sorts based upon

15:22 17   formaldehyde measurements that had been taken in a large number

15:22 18   of these FEMA trailers?

15:22 19   A.   Well, the initial contact had a different focus, but

15:22 20   ultimately the goal was to do a retrospective exposure

15:22 21   assessment to estimate exposures at past points in time since

15:22 22   we, obviously, cannot go back in time and measure exposures for

15:22 23   any particular individual.

15:22 24   Q.   All right.

15:22 25           MR. WEINSTOCK:  Can we just approach, Judge, very