# EXHIBIT Q

Report on Formaldehyde in FEMA Temporary Housing Units
Provided after the 2005 Hurricanes

Michael K. Lindell
Bryan TX 77802

19 June 2009



percent per year, according to the Colorado State University hurricane forecasting group (see <landfalldisplay.geolabvirtualmaps.com>). In summary, it was far more cost effective for FEMA emergency managers to adapt their temporary housing program to the circumstances that arose after a major disaster than to maintain a reserve inventory that would have been large enough to meet the projected demand from a major hurricane striking New Orleans.

Ultimately, the substantially greater demand for temporary housing caused by Hurricane Katrina (approximately eight times as much as the next greatest disaster) created a secondary crisis for FEMA. This situation was a crisis because 1) there was initial uncertainty about how FEMA should meet the housing demand created by 600,000 displaced households and 2) the required number of THUs that were needed as soon as possible greatly exceeded FEMA's capacity to respond—at least with the speed that displaced households and their political representatives wanted.

Table 1: Residential Losses in Major Urban Disasters Preceding Hurricane Katrina (US$)

|  | Hurricane Hugo September 1989 | Loma Prieta October 1989 | Hurricane Andrew August 1992 | Northridge January 1994 |
|---|---|---|---|---|
| Estimated Property Damage | $6.4 Billion | $7.5 Billion | $22.6 Billion | $25 Billion |
| Estimated value of residential losses | $3 Billion | $2 Billion | $10.5 Billion | $13 Billion |
| Housing damage as share of total per cent | 46 | 26 | 46 | 52 |
| Damaged housing units | 112,000 | 43,000 | 135,000 | 500,000 |
| Destroyed and severely damaged housing units | 36,000 | 11,500 | 80,000 | 60,000 |
| Per cent | | | | |
| destroyed or severely damaged | 32 | 27 | 59 | 20 |
| single-family units | 71 | 40 | 63 | 11 |
| multi-family units | 11 | 60 | 29 | 88 |
| mobile homes | 18 | 0 | 8 | 1 |
| Number of insurance claims | 278,000 | 45,000 | 300,000 | 280,000 |
| Residential insurance payouts | $1.5 Billion | $.6 Billion | $1.2 Billion | $10 Billion |
| Residential vacancy rate (per cent) | 8 | 1 | 10 | 9 |

Source: Adapted from Comerio (1997)

4. **FEMA emergency managers had no forewarning about formaldehyde in THUs from its experience in providing temporary housing after previous disasters.**

FEMA emergency managers had a long history of providing THUs to displaced households but there is no indication they had ever received any complaints about air quality in general or formaldehyde in particular. It is not clear from the research literature what was the first time the federal government provided travel trailers or mobile homes to households that were displaced by disasters. However, there is an account of the federal government providing THUs after Tropical Storm Agnes flooded central Pennsylvania in 1972 (SEDA Council of Governments 1975). After the flood, Northumberland County placed 94 households into public and private rental units and 291 into federally supplied mobile homes. The report noted the advantages of placing mobile homes near residences. "Placing mobile homes or other temporary quarters near the residences of flood victims provides families with the opportunity to repair and protect their property. These sites use existing

6

utilities from the pre-flood residences and can be set up with little delay. Use of these sites allows families to continue to live in a relatively familiar lifestyle." (p. 23). However, the report also noted three types of problems with the THUs after the Tropical Storm Agnes flooding. First, some large families were assigned two mobile homes that lacked a connecting walkway, which would be an especially significant problem in the winter months. Second, the THUs had inadequate insulation for a northern climate. Third, THUs had insufficient storage space for items salvaged from the flood. However, there was no mention anywhere in the report of problems with air quality, let alone formaldehyde.

In addition, there are at least ten scholarly studies that have addressed FEMA's provision of temporary housing after disasters. Bolin (1982) discussed the provision of THUs after two Texas tornadoes, one in Vernon and the other in Wichita Falls. Because of local housing shortages, almost all the displaced households who used temporary housing moved into FEMA mobile homes. There were differences between the two communities in the average length of stay in the THUs; "[t]he longer length of occupancy in Wichita Falls reflects the housing shortage there and home rebuilding delays because of contractor and material scarcity." (p. 161). Moreover, higher income households tended to have shorter stays, presumably because they were more likely to be home owners and better able to afford to pay for the reconstruction of their homes. Ninety six percent of the respondents rated FEMA THUs as important to their families' recovery and provided positive comments about the advantages of siting the units at their pre-disaster homesites. However, THU occupants did have some negative reactions to their accommodations. Specifically, 35% thought the amount of space was a problem, 36% thought the lack of privacy (both inside and outside the THU) was a problem, 62% reported problems with utilities, maintenance, or the THU structure (e.g., inadequate wiring, inadequate heating); 21% complained of unexpected expenses (such as paying for repairs rather than waiting for FEMA contractors), and 48% complained about constant monitoring by FEMA personnel (many times caused by miscommunication and misunderstanding of federal regulations on temporary housing). However, there was no mention of any problems with air quality, let alone formaldehyde.

Bolin and Bolton (1986) interviewed 431 households that were affected by the 1982 Paris Texas tornado. A total of 391 households were eligible for temporary housing assistance and 387 received it. The majority (299—77%) moved into houses or apartments, 84 (22%) moved into mobile homes, and four (1%) moved into travel trailers.

> The majority of respondents in both racial groups living in FEMA mobile home courts (60% of whites and 85% of blacks) felt that the courts were less pleasant than their old neighborhoods. For both racial groups, most respondents felt that the trailer application form was not difficult to fill out, that the wait to actually get the trailer was reasonable, and that no extra or unanticipated expenses were incurred. When asked to assess the disruption to family life caused by being temporarily housed in FEMA trailers, 75% of both groups reported that it was very disruptive. (Bolin and Bolton 1986, p. 48).

Although the authors used a questionnaire that was quite similar to that used by Bolin (1982), they did not report any problems with air quality or, specifically, with formaldehyde.

Comerio's (1998b) study of temporary housing after Hurricane Hugo reported that half the total damage was concentrated in four coastal counties, where 25 percent of the existing housing stock was affected. Temporary housing was not a problem despite the concentrated damage because there were high vacancy rates and the most severely damaged, and therefore uninhabitable, housing consisted of coastal

7

vacation units. Her report on this disaster does not mention any problems with air quality or, specifically, formaldehyde.

Phillips (1993, 1998) examined post-disaster shelter and housing following the Loma Prieta earthquake by conducting 117 face-to-face interviews and contacting eight key informants for a total of 72 separate persons from 58 different organizations in Santa Cruz County California. The major issues her respondents reported were an insufficient number of Spanish-language brochures and bilingual workers, and frustration with FEMA administrative procedures. Although there were 122 trailers allocated to displaced households in this area, there is no mention of problems with air quality in general, or formaldehyde in particular.

Comerio's (1998a, 1998b) study of temporary housing after the Loma Prieta earthquake reported that, in proportion to the area's housing stock, the losses appeared to be minimal. Despite the large number of structures severely damaged or destroyed, this represented less than one percent of the total housing in San Francisco and Oakland and about ten percent in Watsonville and Santa Cruz. However, the damage was concentrated in specific types of structures. Most (60 %) of the severe damage was in old single-room-occupancy hotels and apartments that served elderly, transients, and low-income households. Thus, there was a general short-term shortage of temporary housing because vacancy rates were low and housing was severely limited at the lowest rental rates (p. 172). Comerio's (1998a) comparison of housing recovery in San Francisco (population 720,000) and Watsonville (population 30,000) noted that San Francisco had 1,482 red tagged (uninhabitable) housing units, whereas Watsonville lost 642 of its 8,100 housing units. An undetermined number of mobile homes was brought into Watsonville but there is no mention of mobile homes within San Francisco—presumably because of the larger number of vacant housing units available for displaced households in the larger city. Neither of Comerio's reports on the Loma Prieta earthquake mentions air quality issues or, more specifically, formaldehyde.

Peacock, Morrow and Gladwin (1997) reported the results of nine studies conducted in the aftermath of Hurricane Andrew. Although the hurricane destroyed or severely damaged 144,000 housing units and displaced approximately 137,000 households, FEMA only needed to move about 3,800 households into THUs (Morrow, 1997). A year after the hurricane, there were still 2,261 FEMA trailers occupied in the Miami area (Yelvington 1997), which was 60 per cent of the original allocation. Three chapters in the Peacock et al. (1997) book specifically address post-disaster housing in THUs and one of these includes an extensive interview with a THU resident. The book documents a large number of negative comments about THUs, the first of which concerns delays in moving households to THUs from damaged structures or tent cities and the second of which is the inadequate number of THUs. However, neither formaldehyde specifically, nor air quality more generally, are mentioned in any of the chapters.

Comerio's (1998b) study of temporary housing after Hurricane Andrew reported FEMA sited about 3,600 THUs and HUD provided 8,000 Section 8 rental vouchers for disaster victims. Approximately half of these rental vouchers were still in force four years after the storm. However, this study did not report any complaints about air quality or formaldehyde.

Comerio's (1997, p. 167) report on the Northridge earthquake indicated that displaced households were rapidly resettled through a combination of FEMA short-term rental assistance and HUD Section 8 rent vouchers to 130,000 middle- and low-income families. The majority of the households found alternate housing less than two months after the earthquake, mostly because of high vacancy rates (over 8 per cent) in the local housing market. Almost all households found alternative housing that was equivalent to what they had before the earthquake. Her further work on this earthquake concluded "the recession had created high vacancies in multifamily apartments, so temporary housing was not a significant issue."

8

(Comerio 1998b, p. 109). This was because the uninhabitable units were only three percent of the local housing but the recession had resulted in a nine percent vacancy rate—54,000 vacant units—in the San Fernando Valley. This study did not report any complaints about air quality or formaldehyde.

Enarson (1999) conducted interviews in Miami during the two years after the 1992 landfall of Hurricane Andrew. The sample comprised 25 service providers and five focus groups totaling 25 women. She also conducted interviews with 95 women, service providers, and disaster responders after the 1997 Grand Forks flood. Respondents reported respiratory problems from mildew and mold while living in apartments that were still being repaired, but complaints about trailers focused on "physical limitations of temporary accommodations, e.g., lack of privacy, few play spaces for children or activities for teens, insufficient laundry facilities, and social isolation." (p. 48). Even though mildew and mold are mentioned specifically, there is no report of complaints about formaldehyde.

Tobin, Bell, Whiteford and Montz (2006) conducted a study of THU residents who were displaced by Hurricane Charley. The researchers obtained the data from a FEMA survey of 159 households in a single trailer park and supplemented it with 61 face-to-face interviews (approximately 20 minutes apiece) and 18 in-depth interviews (approximately 45 minutes apiece). Open ended question on "the ways in which their lives were impacted by Hurricane Charley" elicited the loss of housing (100% of respondents), loss of transportation (46%), loss of job (39%), loss of everything (20%), and stress (18%). After two and a half months, the three most common current concerns were housing (74%), money and job (30%), and future prospects ("Now where, now what?", 21%). When asked for improvements to the relocation facility, most suggestions addressed children's issues (25%). "Trailer improvements tended to focus on size and special needs issues. Multiple interviewees commented on the small size of appliances, especially refrigerators, which necessitated more frequent shopping trips and limited meal diversity." (p. 95). This study reported no complaints about air quality in general, let alone formaldehyde in particular.

In summary, none of the scholarly studies that have collected data on the use of FEMA THUs after disasters has reported any complaints about air quality in general, let alone formaldehyde in particular. In some cases, the questionnaires were highly structured so there was less opportunity for respondents to provide information that was not specifically requested. However, even the reports of open-ended interviews and focus groups failed to generate comments about formaldehyde, even when other environmental contaminants were mentioned (i.e., mold and mildew). As a consequence, FEMA emergency managers appear to have received no forewarning about formaldehyde in trailers during their experience in providing temporary housing after previous disasters.

5. **FEMA emergency managers achieved timely detection and accurate classification of the potential formaldehyde threat after Hurricane Katrina.**

Detection and classification of the potential formaldehyde threat in THUs was much more difficult than the detection and classification of the hurricane threat that created the need for the extraordinary numbers of THUs. First, the weather patterns that generate hurricanes are routinely monitored by satellites, radar, aircraft, as well as ships at sea and land-based weather stations as part of a continuous world-wide meteorological monitoring system. By contrast, an excessive level of formaldehyde would have to be detected as part of an air quality monitoring program in the approximately 144,000 THUs FEMA provided after Hurricane Katrina. As noted earlier, there is no clear indication that FEMA had received complaints about THU air quality, particularly formaldehyde, in the years before Hurricane Katrina. Thus, there would have been no reason to establish the air quality monitoring system that would be needed to measure formaldehyde concentrations in these THUs.

9