1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3    ************************************************************

4    IN RE:  FEMA TRAILER
5    FORMALDEHYDE PRODUCTS
     LIABILITY LITIGATION
6                              DOCKET MDL NO. 1873 "N"

7                              NEW ORLEANS, LOUISIANA
                             WEDNESDAY, MARCH 2, 2011
8                              9:00 A.M.

9    ************************************************************
10

11        TRANSCRIPT OF DAUBERT HEARING PROCEEDINGS

12    HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT

13             UNITED STATES DISTRICT JUDGE

14

15

16

17   OFFICIAL COURT REPORTER:   SUSAN A. ZIELIE, RPR, FCRR
18                              UNITED STATES DIST COURT
                             EASTERN DIST OF LOUISIANA
19                              500 POYDRAS STREET
                             ROOM HB-406
20                              NEW ORLEANS, LA 70130
                             504.589.7781
21

22

23   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.
     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
24

25

1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:          WATTS GUERRA CRAFT
                                  BY:  MIKAL C. WATTS, ESQ.
4                                 FOUR DOMINION DRIVE
                                  BUILDING THREE, SUITE 100
5                                 SAN ANTONIO, TX 78257

6                                 CHRIS PINEDO, ESQ.
                                  802 N. CARANCAHUA
7                                 SUITE 2250
                                  CORPUS CHRISTI, TX 78470

8    FOR THE PLAINTIFFS'          GAINSBURGH BENJAMIN DAVID
     STEERING COMMITTEE:          MEUNIER AND WARSHAUER, LLC
9                                 BY: GERALD E. MEUNIER, ESQ.
                                  2800 ENERGY CENTRE
10                                1100 POYDRAS STREET
                                  SUITE 2800
11                                NEW ORLEANS LA  70163

12

13   FOR THE DEFENDANTS:          DUPLASS ZWAIN BOURGEOIS
                                  MORTON PFISTER WEINSTOCK
14                                BY:  ANDREW WEINSTOCK, ESQ.
                                  THREE LAKEWAY CENTER
15                                3838 N. CAUSEWAY BOULEVARD
                                  SUITE 2900
16                                METAIRIE LA  70002

17                                BAKER DONELSON BEARMAN
                                  CALDWELL & BERKOWITZ
18                                BY: MICHAEL D. KURTZ,  ESQ.
                                  201 ST. CHARLES AVENUE
19                                SUITE 3600
                                  NEW ORLEANS LA  70170
20

21   FOR THE UNITED STATES        UNITED STATES DEPARTMENT
     AMERICA:                          OF JUSTICE
22                                CIVIL DIVISION, TORTS
                                  BY:  HENRY T. MILLER, ESQ.
23                                P.O. BOX 340
                                  BEN FRANKLIN STATION
24                                WASHINGTON DC  20004

25

1        NEW ORLEANS, LOUISIANA; WEDNESDAY, MARCH 2, 2011

2                        9:00 A.M.

3            THE COURT:  We have one civil matter set

4    for hearing today, and that is in the MDL 1873

5    regarding the FEMA trailer formaldehyde issue.

6            The particular matter is record docket 18283,

7    which is a motion of defendants in limine to exclude

8    expert testimony of Paul Hewitt.  This motion is

9    brought by defendants.

10            Before we get to you, Mr. Weinstock, let's

11    go ahead and make your appearances for the record.

12            MR. WEINSTOCK:  Andy Weinstock for the

13    manufacturing defendants.

14            MR. WATTS:  Mikal Watts for the

15    plaintiffs, Your Honor.

16            THE COURT:  Good morning.

17            MR. KURTZ:  David Kurtz for the

18    contractors.

19            THE COURT:  Anyone else need to make an

20    appearance on the record at this point?

21            And, Mr. Weinstock, you're going to be

22    arguing this for the defendants?

23            MR. WEINSTOCK:  I believe so, Your Honor.

24            THE COURT:  I had previously notified you

25    all that I wanted to afford you 20 minutes apiece.

1    Of course you can reserve some of that for rebuttal.

2             I have reviewed all of the material that

3    you all have submitted, very well versed in the

4    arguments that you make.  And, if you would

5    incorporate that into your oral presentations, that

6    would be appreciated.  You can go ahead and begin,

7    Mr. Weinstock.

8             MR. WEINSTOCK:  Your Honor, first and

9    foremost, Paul Hewitt is not a statistician.  Not

10   because I don't say he's not a statistician, but

11   because he acknowledges he's not a statistician in

12   his own deposition.  He says he's never held himself

13   out as a statistician.

14             THE COURT:  Does that preclude him from

15   using statistics?  It seems to me that, and I'm

16   looking in the Reference Manual on Scientific

17   Evidence which the Judicial Center published.  I

18   don't know if it's cited in any of the material.  But

19   it does say:  Statistical expertise is not confined

20   to those with degrees in statistics because

21   statistical reasoning underlines all empirical

22   research; researchers in many fields are exposed to

23   statistical ideas.

24             MR. WEINSTOCK:  I agree completely, Your

25   Honor, as long as you use them right.  He has some

1    background, he's been doing data analysis, he's a

2    CIH.  If he does it right, it can be done.  We're

3    here to demonstrate today why he didn't do it right.

4                    THE COURT:  Okay.

5                    MR. WEINSTOCK:  First mistake he makes is

6    he considers exposure and concentration to be

7    identical, he said in his deposition.  It's simply

8    not correct.

9                    Last week, we were up in Atlanta deposing

10   two ATSDR people.  Coincidentally, one of them is

11   Michael Allred, Ph.D., who happened to have a

12   PowerPoint on toxicological evaluation on the

13   materials produced.  Dr. Allred agreed with us that

14   the formula for estimating exposure dose is not

15   simply measured in air concentration.

16                   We presented a similar calculation in our

17   brief, but I just thought it was amazingly

18   coincidental, we were there, and in his own

19   PowerPoint he has a very similar formula, the exact

20   same parameters.

21                   Why is that important?  It's important

22   because, when you look at exposure, you have to

23   consider frequency and duration.  And we're going to

24   get to it a minute, but the part of the problem with

25   the MRLs is, and the plaintiff's reliance on them, is

1    that an MRL is based on a 24/7 exposure, which is

2    just not factored in to when Dr. Hewitt does his

3    comparison.

4              What is an MRL?  An MRL, I think we all

5    know by now, is the health guideline.  It's

6    specifically in the ATSDR's guideline, minimal risk

7    levels.

8              What did Dr. Allred have in the exact same

9    PowerPoint using health guidelines?  When estimated

10   exposure dose exceeds the health guidance value or

11   the MRL, it does not mean that health effects will

12   occur; just that a more focused evaluation is needed.

13             And that's what the ATSDR did when they

14   did their February 2007 health consultation.

15   Dr. Allred told us in deposition:  When estimating

16   exposure dose exceeds the health guidance value, it

17   does not mean that health effects will occur; just

18   that a more focused evaluation is needed.

19             Is that a general toxicological principle?

20   That is the way it is used in the ASTDR.  I would say

21   that statement is true.

22             Now, why is this important?  It's

23   important because it is prejudicial to the defendants

24   to have a 25 year certified industrial hygienist,

25   whom you've already agreed at the beginning is very

1    well qualified for a lot of things, to stand up here

2    and say these defendants have violated these

3    guidelines which don't apply.  It's prejudicial to

4    say, and what he's trying to attempt to do is say,

5    instead of what they should be used for, which is

6    prospective screening, do we do additional testing,

7    do we need to do something like the ASTDR did on a

8    going-forward basis, or do we use it as a

9    retrospective assessment, which is what Dr. Hewitt

10   said he was attempting to do, a retrospective

11   exposure assessment.

12            That's not what the MRLs are for.  It's to

13   say:  If we're above it, you need to a take a hard

14   look.  Not to say:  If we're above it, there is huge

15   problems.  And that's what Dr. Hewitt has done.

16            THE COURT:  Hasn't that been the issue

17   with all of the bellwethers that we've had already,

18   where we've familiarized the jury with different risk

19   levels?  And they seem to appreciate the idea that

20   those in and of themselves, even if they're exceeded,

21   don't necessarily make a product defective under the

22   Louisiana Product Liability Act.

23            MR. WEINSTOCK:  We certainly have had that

24   argument in several of the trials.  And clearly, you

25   know, I guess it's gone our way on the issue, so you

1    could say no harm/no foul.  But that doesn't mean

2    there wasn't a foul.  We argued originally it

3    shouldn't be allowed, and to this day it shouldn't be

4    allowed.

5            And I'll take it a step further.  The next

6    opinion that Dr. Hewitt gives is that we exceed a

7    NIOSH level.  This is Daubert at it's finest, Your

8    Honor.  One of the things you know about Daubert is

9    you've got to say the same things in a courtroom that

10   you say out of court.  And Dr. Hewitt would tell us

11   that it's inappropriate to use occupational exposure

12   limits when he's out of court, but he compares it

13   when he's in court.  You've got to be consistent.

14   You can't bring something into the courtroom that you

15   wouldn't use out in the field.  And that's what he's

16   done.  Whether it's gone before is one thing.

17   Whether it's prejudicial, it clearly is.  Whether we

18   can overcome it, yeah, so far we have done well with

19   it.  But that doesn't make it right.

20           THE COURT:  I can think of at least one

21   occasion, if my memory is correct, and the record is

22   what it is, but I think on at least one occasion I've

23   pointed out to the jury and given them an instruction

24   that for their purposes they're to apply the law as I

25   give it to them that it was relevant information -- I

1    know you're arguing that it's not even relevant.  But

2    I disagreed with that.  That it was something that

3    the jury could hear.  But that they were advised that

4    that was not the basis for liability; the cases are

5    not simply if they exceed this MRL then therefore the

6    defendant's liable.

7              MR. WEINSTOCK:  It can certainly be

8    relevant, Your Honor.  I dispute whether it is.  But,

9    more importantly, it is prejudicial, which is why you

10   feel the need and you've given on at least one

11   occasion, you're correct, a correcting instruction.

12   My preference would be to take out the prejudicial

13   evidence and avoid the instruction.

14             Moving on to the third opinion Dr. Hewitt

15   gives.  Dr. Hewitt gives an opinion that formaldehyde

16   levels go down over time, an opinion we've all heard,

17   an opinion we can probably all agree with.

18             He says that age-related decline in

19   formaldehyde, the true coefficient is expected to be

20   negative.  And just like we all have said all along

21   and you knew that before you did any analysis; right?

22   Yes.

23             But then he did the analysis.  And that's

24   what we're here about today, Your Honor, Dr. Hewitt's

25   statistical analysis.  And what did that analysis

1    find?  Amazingly, he did the analysis for 15

2    different data sets, three models, for five different

3    manufacturers.  And what did he find?

4         Those that did not generate negative

5    coefficients generated positive coefficients.  In

6    other words, the levels went up over time.  Something

7    nobody agrees with, unless of course there are other

8    variables at play, and we'll get to that in a minute.

9         But, when you do the math, the ones missing

10   from table 4 are the ones that had positive

11   coefficients.  Three for Forest River, two for

12   Fleetwood, two for Recreation By Design, one for

13   Keystone.  Out of 15, eight of them were wrong.  In

14   the world of Dr. Hewitt, that doesn't mean there's a

15   problem with the model; there is a problem with the

16   data, because his model is perfect.  It can't be

17   wrong.  It's got to be the data that's flawed.

18        The truth is, Your Honor, there are other

19   factors at play, and those factors have to be

20   controlled.  The plaintiff chose not to control them.

21   You've got to reap what you sew.

22        When this litigation started, we've got

23   pretty much five factors that we're talking about

24   today.  BPNA is a government agency; CDC, a

25   government agency; Mary DeVaney, occupant testing; WD

1    Scott, plaintiff's expert.  What these people did was

2    control for temperature and humidity.  Very important

3    variables that would make levels go up over time.

4              What these three people did, I assume the

5    plaintiff's direction was, they went in, they put up

6    the passive monitor, they turned off the

7    air-conditioner, they turned off the heat, whatever

8    was in play.  And they left the levels subject to the

9    elements.  They then demonstrate in their brief how

10   high they can go and how low they can go.  And then,

11   to turn around and say:  But we want to use all this

12   as though it's the same data, is simply inaccurate.

13             They criticize us in our brief.  They say:

14   Hey, the government used this exact same formula,

15   they used the lognormal distribution.

16             I'm not even remotely smart enough to

17   explain to you what's wrong with the lognormal

18   distribution.  I assume there's nothing wrong with

19   the lognormal distribution if it fits the data.  I

20   assume it's a well recognized statistical model, but

21   you've got to control the variables.

22             And what did the government do?  They

23   adjusted for average temperature and relative

24   humidity.  They controlled those ever so important

25   variables that the plaintiffs' experts chose to leave

1    to the randomness of nature and failed to record more

2    often than not interior temperature and humidity so

3    it can't even be accounted for.

4           Your Honor, you have to reap what you sew.

5    If you choose not to control those variables, for

6    purposes I assume of getting the highest levels

7    possible, you then can't mix them in with some fairly

8    credible testing done by the government and say, oh,

9    it's all the same, which is what they've done.

10          And here's the interesting part.  You

11   test these models.  You do a Goodness of Fit

12   evaluation, does it fit the data.  I assume the

13   government did not publish this without testing their

14   data.  And I assume controlled the testing for

15   humidity, it did that test.  But Dr. Hewitt's model

16   failed.  It failed the objective test.

17          So what did he do?  He did a subjective

18   test.  This is ipsy dipsy at its finest, I know it

19   when I've see it.  I'm Paul Hewitt, I've got 45

20   years' experience, and I tell you it passed my

21   subjective test.  What is that subjective test?

22   Well, it's what I say it is, it looked good to me.

23          The plaintiff agrees with them in their

24   brief.  Page 8:  More important, though, during his

25   extensive career as an industrial hygienist with

1    NIOSH, Dr. Hewitt accrued the experience to properly

2    assess the fit for data.  I know it when I see it,

3    trust me on this; I can't tell you what it is, it's

4    not an objective test, my test.

5              That's why we have Daubert, because Paul

6    Hewitt makes a credible witness when he's sitting on

7    the stand, and he's not allowed to just say:  I know

8    it when I see it.  He's got to tell you.

9              That brings us to opinion 4.  Opinion 4

10   is his measurement of the probable exposure levels

11   for trailers that have not been tested.  Again, I

12   start with dose does not equal exposure, but I'm not

13   going to repeat myself.  But, for the same reasons I

14   said before, you can't just accept dose as exposure.

15             We suggested you should use the Monte

16   Carlo method which details and goes into the

17   statistical analysis for what an individual might

18   have been exposed to, what dose they might have

19   obtained.  The plaintiff rejected it, it's too much

20   work.

21             Dr. Hewitt says he knows how to do it, but

22   he did not do it here.  What he did was the lognormal

23   distribution.

24             Part of the problem with the lognormal

25   distribution it is does not mirror reality, by his

1    own admission.  If you use Dr. Hewitt's model, we get

2    test results, by his own admission, that exceed 10

3    parts per million.  The model should fit the data.

4    But, again, in Dr. Hewitt's world, we failed Goodness

5    of Fit, that doesn't matter.  We have test results

6    that are not in reality, that doesn't matter.

7    Because, in reality, the highest test level he has in

8    his formulas was 2.5 parts per million.  He's four

9    times higher than, over 10 parts per million, by his

10   statistical model.  So his model fails and he should

11   not be allowed to use it.

12            Your Honor, we tried to present -- well,

13   let me back up.  The data that even he acknowledges

14   is the quality data is the BPNA CDC data, the FEMA

15   test data set.  It was to some degree based on random

16   design.  And here's the important point, the test

17   came from a standardized protocol, a standardized

18   protocol that compensated for temperature and

19   humidity.  To take that and combine it with tests

20   that did not makes no sense, and that's what they're

21   doing.  Is all I can put it is they're taking apples

22   and oranges, it doesn't make apple juice and it

23   doesn't make orange juice.  I'm not sure what it

24   makes.  But, if you want apple juice, use apples; if

25   you want orange juice, use oranges.

1           We presented to the Court the Spearman

2    correlation model.  And, quite frankly, it's not a

3    simple thing, so I tried to simplify it and make it

4    the Weinstock Spearman model.  And, in that way, the

5    concept is this.

6           What Spearman attempts to do is say, if

7    we've got five data sets, shouldn't Company A have

8    the highest levels across the board and shouldn't

9    Company B have the lowest levels across the board?

10   Why would the test matter?  And, here, we see, for

11   example, with Keystone, that, for the plaintiff

12   experts, Keystone has the highest levels.  I've rated

13   them a 4.  But, for the government testing, Keystone

14   has the second lowest levels.  Jayco, when the

15   government tests, has the highest levels, but an

16   average of 2 when the plaintiff experts tests.

17   There's something different about what the plaintiffs

18   are doing and getting away from consistency among

19   testing.

20           Why does Jayco have the lowest maximums;

21   but, when we put up minimums, they're near the

22   bottom?  Why does Gulf Stream have clearly the lowest

23   minimums; but, when we get to the maximums, they're

24   pretty much the highest?  The data is not consistent

25   when you look at these five different test patterns,

1    and making them homogenous and putting them in the

2    same blender doesn't make it work.

3            One more point on the quality of the

4    plaintiff's data set.  The plaintiffs use -- when you

5    take a passive monitor and you put it in a trailer,

6    it absorbs formaldehyde.  And then you do a lab test

7    and you figure out how much formaldehyde was in it.

8    That's a passive monitor, that's what the plaintiff

9    used.

10           There's something called an active monitor

11   where you take air and it draws it past the medium

12   and you do the same test.  NIOSH 2016 is a test for

13   an active monitor.

14           In Dr. Hewitt's report, he says, well, the

15   test was modified.  How was it modified?  2016 is an

16   active sampling method.  The modification involves

17   replacement of the active sampler with a passive

18   sampler.  Did they use a pump at the passive sampler?

19   No, that would be the modification.

20           There are plenty of protocols for passive

21   samplers, but when lawyers -- and this from the

22   occupant testing -- when lawyers send passive badges

23   out to their clients instead of experts doing the

24   testing, you get modifications that give us not a

25   NIOSH approved method, the wrong NIOSH approved

1   method, and then we're going to treat the quality of

2   data as though it's equal and it's the same.

3              THE COURT:  You've got like two and a half

4   minutes.

5              MR. WEINSTOCK:  Okay.  I can hopefully

6   wrap this point in a minute and a half and save 30

7   seconds or so.

8              What the plaintiffs have done here, and

9   Dr. Hewitt, more importantly, is he's controlled the

10  population.  For example, if we have a thousand

11  trailers, thousand Gulf Stream trailers, 53 percent

12  exceed .1.  Now, what Dr. Hewitt would say -- so that

13  means 528 exceed, 472 are below .1.  But Dr. Hewitt

14  concedes:  But if I was testifying at trial, each

15  individual trailer, one-by-one, I'd say it's more

16  likely than not to exceed .1.  Because that's the

17  characteristic of this population.  He controls the

18  population.

19             Well, if you move a trailer from one

20  population to another, you change that

21  characteristic.  And I'll give you a perfect example.

22  We all know Elaine Alexander was in a 2000 foot

23  trailer with an .050 reading when measured.  With all

24  probability, because formaldehyde does go down over

25  time, 2004 trailers were below .1 on average.  But

1    Dr. Hewitt, by putting it in a group with units above

2    .1, 2005 and 2006 units, he now changes the trailer,

3    that had it not been measured, he would testify to

4    the contrary, that it exceeded .1 by changing the

5    population.  Essentially, statistics, and even Dr.

6    Hewitt would concede this, this is based in fact on

7    randomness.  But what he's done, when it comes to

8    population, is taken a deck of cards made up of aces

9    and face cards, and you can bet your life it's going

10   to come up with Black Jack a lot more often.   Thank

11   you, Your Honor.

12             THE COURT:  Mr. Watts.

13             MR. WATTS:  Good morning, Your Honor.

14   I'll just follow Andy's outline and respond to it,

15   for lack of a better word.

16             First, as the Court mentioned, we have

17   two things to answer to his first assessment that Dr.

18   Hewitt has admitted he's not a statistician.

19             In the Alexander trial, page 217, the

20   transcript on day five, we have a stipulation from

21   this lawyer says we're going to accept on the issue

22   of retrospective exposure assessment and statistics

23   as it relates to industrial hygiene.

24             Number two, as the Court mentioned,

25   inside of the reference that you mentioned, there are

1    a lot of different fields, and industrial hygiene is

2    certainly one of them, that is well accepted to be a

3    field that utilizes statistics.

4            Thirdly, I would mention that all of the

5    crosses of Dr. Hewitt have never touched Dr. Hewitt

6    making a mistake or Dr. Hewitt not being qualified,

7    not knowing how to do the math.  The math is the

8    math.  The indictments that you hear today have

9    nothing to do with whether he's a statistician or an

10   industrial hygienist or whether he's done that

11   process well.

12           Secondly, he makes the argument that Dr.

13   Hewitt confuses the concepts of exposure and

14   concentration.  We would respond to the defendants'

15   attempt to say that Dr. Hewitt is doing so -- not

16   only doing so, but in fact he has been very clear and

17   the Court has been very clear on at least three or

18   four different occasions that what Dr. Hewitt is

19   doing is establishing exposure levels at a given

20   point in time.  Now, how you compare that or contrast

21   that with these different agency standards or levels

22   or this kind of thing, and as Andy says this does not

23   mean that health effects will occur.

24           The Court has been very consistent in at

25   least three trials that I've participated in, and

1    that is look -- and I think maybe even an offer that

2    ended up in your order -- it's expected that

3    plaintiff's counsel in his direct examination of

4    Dr. Hewitt will make clear where those levels came

5    and that those levels do not necessarily establish

6    Gulf Stream's liability.

7              The one case that I didn't put Dr. Hewitt

8    on, I didn't know how that went, I didn't read that

9    transcript.

10             But I can assure you that it is our intent

11   to continue to follow the Court's law of the case, if

12   you will.  And that is to say this is ATSDR, this is

13   NIOSH, this is OSHA, there's all different ways to

14   look at this, but the data shows that this is where,

15   likely what the exposure level was at a given time.

16   And we intend to continue to do that.  And we would

17   recommend to the Court the Court's own order from the

18   standpoint of consistency in the case, and we believe

19   that that's the appropriate way to go.

20             Thirdly, in his argument about exposure

21   versus concentration at ATSDR and NIOSH, Mr.

22   Weinstock said, quote:  It can be certainly be

23   relevant, Your Honor, close quote.

24             Now, I don't want to lecture anybody, I

25   don't want to state the obvious, but we are here in a

1    Daubert proceeding, and Daubert is a function of

2    admissibility as opposed to weight.  You have

3    admission from this lawyer that:  Look, really what

4    this is is this is relevant and it's a question of

5    weight.  And the Court on three different occasions

6    has said:  Look, it's relevant, I'm going to let it

7    happen, but the defendant can utilize vigorous cross

8    examination to distinguish between XYZ ABC.  And we

9    believe that's the way to go.

10            The third argument is, formaldehyde

11   levels go down after time, and he says that's

12   something that Dr. Hewitt says, and then he says we

13   all agree.  So I don't know what the complaint is

14   there.  Dr. James certainly has been cross examined

15   by me on at least three occasions to establish that

16   very point.

17            I would recommend for the Court your order

18   on November the 18th of 2009 in the Fleetwood trial

19   where you say specifically that Fleetwood may

20   vigorously cross examine him on this subject such to

21   establish that his opinion may be only as good as the

22   underlying data.  And I think that's the way it

23   should go.

24            Andy is right, we did control for

25   temperature and humidity, and we've been very honest

1    with respect to the things that were not controlled

2    for because it was an impossibility.

3              Now, the fourth thing that he talks about

4    is Goodness of Fit.  I would have two comments on

5    that.  First of all, Goodness of Fit is a statistical

6    test that is important as a reflection of a sample

7    size.  In other words, if you take a very small

8    sample size where you can't possibly get statistical

9    significance in these kinds of things, and you're

10   trying to project that into a conclusion, then you

11   need to do a Goodness of Fit analysis and say does

12   this really makes sense with the data.

13             And, with respect to the issue of that

14   sample size and statistical size of what we would do,

15   we would refer you to page 7 and 8 of our original

16   response, page 93, lines 3 through 19, and page 91,

17   lines 8 through 9.  In fact, I think just I read that

18   wrong.  Yeah, 93, 3 through 19 and page 91, 8 through

19   9 with respect to when Goodness of Fit is important

20   and when it is not.

21             Then I think my friend Mr. Weinstock makes

22   a misstatement when he says you have to do a

23   lognormal distribution and Dr. Hewitt did not do

24   that.  That's just wrong.  On each of these slides

25   that I've put up on each of the three trials, we show

1    what the statistics are and he's taken them through

2    the lognormal statistical test and to show what they

3    are.   And the reason we've done that is I've tried to

4    be very honest that we have all these different

5    sources of data, and the jury in its role as decider

6    of fact and judges of credibility and these kinds of

7    things needs to be able to look at which sources are

8    different and we posit different reasons.

9              For example, one of the indictments of

10   Dr. DeVaney's data is a lot of it was done in the

11   late summer when it's the hottest, so of course it's

12   the going to the highest.   As opposed to just

13   ignoring that fact, on direct examination, I've asked

14   Dr. Hewitt on multiple occasions why is this higher.

15   Well, he shows graphs that show why it's higher.   And

16   you remember this is why we came up with the graphs

17   about the month of the sampling.   And this isn't the

18   best one, there is a better one somewhere.   The jury

19   can decide, hey, during the summer months you're

20   likely to get higher values than during the winter

21   months.

22             In fact, that's one of the things that we

23   say is the problem with the government testing that

24   was done in January or the testing that we did in

25   Alexander that was done in January.   Not that it's an

1   illegitimate number, but the jury can put on its

2   thinking cap and say:  Hey, if this test had been

3   done in August, given what Dr. James says, given what

4   our side says, formaldehyde off-gasses in greater

5   heat, in greater humidity, shazam, in Louisiana,

6   you've got greater heat and greater humidity in

7   August, then you're going to give higher levels.  So

8   what we're doing is giving the jury all this data to

9   make whatever conclusion they choose to make.

10          Now, Andy next says:  Well, they should

11  have just used the FEMA data, that's the best data

12  set.  Now, I can make argument for each of these data

13  sets, strong points, weak points, these kinds of

14  things.  But the reason we have merged them all

15  together and the reason we took so many samples is

16  that if you just utilize, you know, one particular

17  data set, like FEMA, I may have something that looks

18  like the best test known to mankind, but I don't have

19  statistical significance, I don't have a big enough

20  sample size.  Which is why we continued at great cost

21  to send people out in the field over and over again

22  and kept doing it until we got to a statistical

23  sample size.

24          THE COURT:  But doesn't that go to the

25  point that Mr. Weinstock was making, that if the

1    protocol was different for the government testing

2    versus the DeVaney testing versus anybody else,

3    wouldn't that make a difference?  That's his apples

4    and oranges argument.

5              MR. WATTS:  Right.  And, his apples to

6    oranges argument, my response to that is this.  If we

7    had just brought up Dr. Hewitt and said here's the

8    total average, the jury should rely upon that

9    average, then I would think that he might have a

10   point.  But we stratify the data for the jury.  And

11   that's what the importance is, is we come in and we

12   say:  Look, this was done a little different than

13   this, this was done in August, this was done in

14   January, these kinds of things.  You could lump them

15   all together if you want to and get the following

16   average.  Or you can stratify the data, which is what

17   we do.  If you stratify this data, this is what we

18   got.  If you stratify this data, this is what we got.

19             THE COURT:  But explaining it as being

20   different doesn't make it any more reliable, though;

21   does it?

22             MR. WATTS:  It doesn't make it

23   non-reliable.  What it does is explains the

24   difference in the methodology, but that doesn't

25   affect the statistical significance of the combined

1    sample size.  When you look at statistics, that's why

2    you do a statistical significance test, and you don't

3    need the same modality among them all.  And that's

4    the same response I would give you were some of them

5    were done with active testers and some of them were

6    done with passive testers.

7              Andy's argument assumes, hey, because you

8    have a different way of collecting them, they must

9    therefore be different.  And what we're saying is

10   they could be different, look at the data to see

11   whether they are by stratifying the data.  And, by

12   stratifying that data, you eliminate any risk the

13   truth is being mislead or misguided from the

14   standpoint of, hey, this is different.

15             Now, the fact of the matter is, is that

16   you on at least two occasions asked the defendant, as

17   part of this process:  Hey, I don't want just an

18   indictment of Dr. Hewitt; I want an opposing expert

19   affidavit saying, you know, addressing the

20   plaintiff's report, these kinds of things.  By my

21   count, you never got that opposing affidavit.

22             Why is that important?  I think it's

23   important from this standpoint.  It's easy to sit in

24   the cheap seats, not having done any statistical

25   analysis, trying to throw darts on it trying to pop a

1    hole in it.  But what you have not gotten, after

2    being asked twice to give it, is a specific way that

3    they would do this testing if they had chosen to do

4    it.

5           The ironic place that we are is the

6    defendant has chosen not to do this testing.  We have

7    spent I think well over a million dollars doing so

8    much testing so that we can get to a level that we

9    can look the jury in the eye and state from the

10   standpoint of statistical significance this is

11   significant.

12          Now, to answer your last question even

13   more specifically, with a defendant like Gulf Stream

14   where there are so many that are tested by each of

15   the seven or eight testing facilities, even the

16   concern that you have raised is not a problem because

17   we have statistical significance.

18          Where your question may come in to I want

19   to say more relevance, if you will, is one of these

20   defendants -- let's take, you know, has 19 or 20

21   small sample sizes that were tested -- and I will be

22   the first to admit to the Court that with respect to

23   some of the smaller players, late in this process, we

24   said:  Judge, we want to do some more testing before

25   Henry goes and destroys all the things.  Now, while

1    we can't say that across every defendant, what we did

2    is we ran the statistical test with respect to each

3    of the defendants to make sure that in each trial we

4    would be able to look you and the jury in the eye and

5    say we have a sufficient enough sample size to

6    achieve statistical significance in this projection

7    of what was likely to exist.

8              THE COURT:  As to that particular

9    manufacturer.

10             MR. WATTS:  Exactly.

11             And so I guess my point is this.  With

12   respect to where we are here today as an MDL court

13   making an MDL type decision, I think that the only

14   way the math will allow you to go is to say this is

15   reliable at this point in time.  However -- and

16   probably not going to be popular with my cohorts

17   here -- that this is without reservation or without

18   prejudice of a particular defendant, given the mass

19   size in the particular defendant sample set, coming

20   in and making the arguments that Andy's making here.

21   And I really think that, as a matter of statistical

22   legitimacy, that's the way we ought to go.

23             THE COURT:  That's my understanding of the

24   purpose of this motion, was that it was the general

25   proposition that a statistical model could be used,

1    in lieu of actual testing.  But that's why I said, as

2    to each particular manufacturer.  Because, on the

3    list of manufacturers that I saw that you all are

4    tweaking right now, in terms of number of claimants

5    versus manufacturer, I would assume that some of

6    these manufacturers have -- not assuming -- I know,

7    based on those numbers, given that they may be

8    slightly inaccurate, but some of them may be so small

9    in terms of production that a statistical model is

10   really meaningless.  Therefore, they are not part of

11   what Hewitt has done.

12            MR. WATTS:  Right.  And I'm going to be

13   really honest with the Court.  If we get down to a --

14   and again, you said you're going to talk about

15   remands at the end of this year -- but if we get down

16   to a remanded case where we have No. 87 out of 88,

17   and we just scrape by to get these statistical

18   significance, and we look at it and Andy comes in and

19   this modality is different than this, as a matter of

20   statistics you can't even lump them together and get

21   there, I would encourage the Court at that point to

22   reserve as to any individual case the statistical

23   test with respect to that defendant.

24            As an MDL court as we are now, there are

25   yards of cases, I've written a paper on the use of

1    statistics in federal court, where in all sorts of

2    industrial hygiene settings the federal courts have

3    allowed the admissibility of statistics to project a

4    given exposure level.  This isn't rocket science that

5    we're doing here.  It's an accepted science that's

6    used outside of the courtroom repeatedly by

7    government agencies and these types of things.

8              In sum, I think where the Court ought to

9    go, with due respect, is as you have done in the

10   past.  Number one, that you make very clear that, if

11   we're going to say, hey, you're at this level and

12   that's more than ATSDR, that you don't allow a

13   plaintiff's lawyer like me to come in and say, ah-ha,

14   that means liability, the Court says we've got you.

15   And you leave that line in your order that says:  I

16   expect the plaintiff's counsel to give the background

17   of the ATSDR line, give the background of NIOSH, give

18   the background of the CDC, give the background of

19   OSHA, and to make it clear that we're not saying that

20   that establishes liability all by itself.  You've

21   given it now on two or three different occasions, and

22   I think that that would be an appropriate part of

23   this order.

24              Number two, I think, where we are now, it

25   is clear that this Court is on safe ground reaching

1    the conclusion that the use of this statistical model

2    is admissible.  You've done it on three specific

3    occasions.  But across the MDL, I think from the

4    standpoint of a Daubert challenge, with reliability

5    and methodology, that we are clearly there.

6              But I do think, in all fairness to the

7    smaller members of Andy's team of 89 or however many

8    defendants there are, that the Court should reserve

9    with respect to the defendants for whom there was a

10   small amount of testing, that you say this is without

11   prejudice to that individual defendant to come in and

12   say:  For the math, from my particular trailer set,

13   you know, Watts doesn't have enough of this to be

14   able to stratify the data as he's done on the Gulf

15   Stream or this or that.

16             And I'll be honest with you, in a case

17   like that, before I even come up here and waste your

18   time, I'm going to come here and run those tests.

19   And you are probably going to see in those smaller

20   manufacturer cases that we're going to be going on

21   olfactory exposure, as you've seen on a couple of the

22   last trials, as opposed to statistics.  But I don't

23   think that that means that this Court ought to say:

24   Hey, you can't use those statistics.

25             So what I'm saying is we have got to get

1    an order that gives both sides the option.  In other

2    words, the Hewitt as an industrial hygienist clearly

3    qualifies as a background qualification matter.  His

4    statistic model clearly meets the hurdle of Daubert

5    and therefore is presumptively admissible.  However,

6    without prejudice to an individual defendant and

7    smaller data set, to be able to come in and say

8    because I'm one of those smaller data set guys, I

9    don't think you can mix and match them and get the

10   kind of statistical significance that Mr. Watts said

11   he should have with Gulf Stream and Fleetwood and

12   some of these others.

13            So, if the Court has any questions, I'd be

14   happy to answer, but I think that's our basic

15   position.

16            MR. MEUNIER:  Judge, may I have just a few

17   seconds to fellow up on something?

18            THE COURT:  He's still got about four

19   minutes left.

20            Jerry, you need to make your appearances.

21   That's why I asked if anyone else wanted to make an

22   appearance.

23            MR. MEUNIER:  Jerry Meunier.

24            I know.  But, since the question has been

25   raised about the scope of this, I feel I need to make

1    this clear for the record.

2              The PSC never saw today as being an

3    exercise by which the Court would make a Daubert

4    ruling on global admissibility.  However, we did

5    purposefully, with Dr. Hewitt, select named

6    manufacturers, I think a total of five.

7              MR. WEINSTOCK:  Yes.

8              MR. MEUNIER:  And we wanted to get a

9    purposeful spread in the size of the sampling among

10   those five.  And we wanted a ruling from the Court as

11   to whether, under Daubert, Hewitt's model could be

12   applied to those five.

13             Now, I haven't read the order that Mr.

14   Weinstock and his team want the Court to enter, but I

15   assume the order is limited to admissibility as to

16   these five defendants.  And, that was always

17   understood, that we were not going to seek your

18   ruling on how the model might be applied to

19   manufacturer 7 or 83, as Mikal said.

20             I just wanted to make it clear that we did

21   serve up the applicability of Daubert -- the

22   applicability of Hewitt, rather, to some specific

23   defendants, and we did try to seek a sample size

24   spread in that in order to see, you know, more about

25   how this thing could be applied going forward.  I

1    just wanted to --

2              THE COURT:  Say that again.  We were

3    talking about these five.

4              MR. MEUNIER:  We're talking about these

5    five.  I think the scope and limit of the Court's

6    ruling on Daubert and on Hewitt, in our view, is

7    these five.  In other words, under Daubert, can a

8    model be applied to these five manufacturers.  That's

9    all I wanted to make clear.

10             MR. WATTS:  If I could, Judge --

11             THE COURT:  Is it being offered -- I mean,

12   my understanding -- maybe I'm missing something

13   obvious that everybody else appreciates here -- my

14   understanding is that it would not be offered as to

15   any other manufacturing defendant.

16             MR. MEUNIER:  It may.  I mean, we may have

17   a trial against another manufacturer in which Hewitt

18   appears.

19             THE COURT:  I know.  But this model,

20   though, such that these statistics incorporate

21   testing of five and only five manufacturers, we're

22   talking about, to use our apples and oranges, we're

23   talking about a completely different product.  All

24   though it is called a FEMA trailer, it's a different

25   manufacturer, different plant, may be manufactured in

1    a different part of the country, using different

2    materials.

3              MR. MEUNIER:  I think the answer to your

4    question -- let me answer it two ways.  Number one,

5    following up on Jerry, the five that we got, I am

6    very comfortable that we hit statistic significance,

7    we hit all the reliability and all of that.

8              I don't want to misrepresent to the Court.

9    We didn't pick 88 out of 89.  We've got some problems

10   with those bottom three or five, and we'll deal with

11   that later.

12             To answer the question you just asked,

13   your specific ruling as to these five, I think the

14   intent of this purpose is with respect to, A, the

15   trial that's coming up; and, B, to give us some

16   guidepost about where it's going to smell right and

17   where it's going to smell wrong.  We're comfortable

18   that, with respect to those five, we're going to

19   bring these home.  But we're also comfortable that

20   the Court ought to say:  Hey, look, this is with

21   these five and this is without prejudice to the

22   ability of the plaintiffs to come forward and some

23   other manufacturer that may be in between two and

24   three to have that argument.  Or, more importantly,

25   for the defendants, somewhere between four and five,

1    and we're going to have it again with the precept or

2    the lessons learned from this process.  Does that

3    make sense?

4                   THE COURT:  Yeah.  So let's say there is a

5    manufacturer who has not had a trailer tested such

6    that the test is incorporated into Hewitt's

7    statistical analysis.

8                   MR. MEUNIER:  Then we can't use it.

9                   THE COURT:  That's what I assumed.

10                  MR. MEUNIER:  What we tried to do with

11   respect to the vast majority of the manufacturers,

12   that we tested enough of them that we could look you

13   in the eye and say we've done that.  But, if there

14   are manufacturers where we didn't get the numbers

15   high enough or they weren't tested at all, then I

16   don't think you can project Hewitt analysis and say:

17   Hey, this is some manufacturer that I never saw any

18   testing for but I foresee that it would have been

19   like the others.  I don't think that works.

20                  THE COURT:  We're not talking about

21   generic travel trailers; we're taking about trailers

22   manufactured by these five, and Hewitt took the time

23   to look at data with regards to its accuracy, as

24   defendant argues, that relates to these five and only

25   these five manufacturers.

1        MR. MEUNIER:  Well, he can do it with

2   respect to all of them.  But, for the purposes of the

3   agreement that was made for this purpose, we're

4   asking for a ruling on these five.  And then, with

5   the idea that it's without prejudice for somebody to

6   be able to come in and say I'm different than those

7   five or I'm different than Alexander or Fleetwood or

8   these kind of things.

9        THE COURT:  What of the argument that one

10  of these five could say, well, we know that you've

11  said that Hewitt can testify but we think the

12  specific data relative to my manufacturer is faulty

13  and faulty to the point of exceeding admissibility,

14  even though it may have been used for Gulf Stream and

15  it may have been used for two others?

16        MR. MEUNIER:  I don't think that showing

17  has been made to you by any of these five, and I

18  don't think the math backs up that argument.  But I

19  am not telling you that there will not be a situation

20  down the line where that argument could be made and

21  have a lot more merit than what we have here.  But I

22  think I'm going to be able to predict because it's

23  just a math problem.

24        THE COURT:  But that was your point before

25  when you said I may not be too popular with my

1    colleagues here.

2              MR. MEUNIER:  So called manufacturers, 88

3    out of 89, I think that what you're going to see is

4    that, when we try that guy's case, we're not going to

5    bring Hewitt.  We're going to say it's a result of an

6    olfactory response or they got scars and we know what

7    Dr. James has said the level must be in order to get

8    that response, and we just won't go with statistics

9    on that.

10             All I'm telling you is, as a lawyer,

11   non-statistician, if you will, I can do the math or

12   have someone do the math and tell me if we get there

13   in a way that achieves a Daubert pass or not.  If it

14   doesn't, I'm going to bring it before you.  Why would

15   I cause him to get dinged so that Andy in a

16   subsequent Gulf Stream trial can say:  You were found

17   to be unreliable in a previous case?  Why would I do

18   that?

19             THE COURT:  Mr. Weinstock, you want to

20   very briefly ...

21             MR. WEINSTOCK:  I'm going to move very

22   quickly through a few points, Your Honor.

23             First and foremost, vigorous cross

24   examination, I think that is the mating call for

25   anybody who has ever put on an expert that didn't

1    meet Daubert.  Just go ahead and cross examine,

2    that's the way we used to do it, that is why we have

3    Daubert.

4              As far as this model being accepted in

5    other cases, it was first produced in the Lewis case

6    and they did not present Dr. Hewitt at that case.

7    And, because it was a summary trial, we didn't

8    challenge it on a Daubert basis.  So this model has

9    not been approved by this Court.

10             As far as what we said previously, you

11   asked right off the bat did we accept these in all

12   the bellwethers.  And there is a difference.

13   Because, in all the bellwethers so far, we had a test

14   result.  So the jury was able to see through the

15   statistics of Dr. Hewitt and say, but come on, we had

16   a test result.  Once you get away from that, he's

17   going to carry a lot more weight.  And, when he said

18   it exceeds these MRLs and these NIOSH levels, it's

19   going to be a lot more prejudicial.  After that, the

20   question is not just could it potentially be

21   relevant, which I acknowledge it could potentially be

22   relevant, but it is certainly unduly prejudicial.

23             As far as Goodness of Fit, I think Mr.

24   Watts misstated or incompletely stated it, he said

25   it's just about sample size.  It's not.  It's also

1    very much about quality of data.  That is why the

2    government's test can pass their Goodness of Fit.

3    And the plaintiffs' and Dr. Hewitt's test fails the

4    Goodness of Fit because those important dependent

5    variables are not controlled.

6              Mr. Watts presented an order to you saying

7    I owed you a signed copy of the report to comply with

8    that order.  He certainly has it.  If you would like

9    a signed copy of Dr. Meyers' report, I'm happy to

10   give it to you.  He's had it since November 4th.

11             Last but not least, you know, he puts

12   things up and they said we explained it -- well, they

13   don't.  But it doesn't work quite that simply.  Mary

14   DeVaney did all the testing in the summer.  Those

15   were for unoccupied units.  When we get to Mary

16   DeVaney's test of occupied units, page 46 of the

17   report, Mary DeVaney tested eight Gulf Stream units

18   that were occupied.  So, I mean, it's not we've got

19   all these tests from the summer and we explained that

20   to the jury.  It's, we've got all these tests from

21   the summer and that's how we confuse the jury, Your

22   Honor.  Thank you.

23             THE COURT:  Thank you, Mr. Weinstock.

24             All right.  As I've come to expect in this

25   case, I appreciate the very high quality of briefing

1   that you all have done on both sides.  Very, very

2   complete and your arguments are very clear and

3   coherent.  And I think the defendants in this case

4   raise some good arguments regarding the expert

5   report, particularly regarding the methodology.  In

6   fact, some of the arguments are rather compelling,

7   beginning with and certainly not ending with the

8   notion that the theory that I call the garbage-in

9   garage-out argument, which is that the opinions are

10  only as good as the information that supports them;

11  and, therefore, if the underlying data is not good or

12  is not reliable, then the opinion itself is infirmed

13  and in fact may be one that the jury rejects in whole

14  or in part.

15          We did have discussions in this case

16  early on, I can remember several telephone

17  conferences with counsel, regarding the huge volume

18  of trailers in this case.  And we're talking tens of

19  thousands, I think at one point in time the number

20  was even somewhere in the neighborhood, at least

21  theoretically -- maybe not be the number of

22  plaintiffs because that was an ongoing process -- but

23  we talked perhaps about number of travel trailers

24  being in the neighborhood of 140,000, and they were

25  scattered about in locations from Arkansas to various

1    locations in Mississippi, and I think there was even

2    a park somewhere in Florida, if I remember correctly,

3    and several locations in Louisiana.  So there was a

4    logistical factor that came into play with regard to

5    these claims and how these trailers could possibly be

6    individually tested and at what cost, not only to the

7    plaintiffs themselves and their counsel but also at

8    what cost to the government.

9              And I think I indicated some concern early

10   on -- Mr. Miller's here today in the courtroom --

11   when Mr. Miller raised the issue of paying rent, that

12   the government was actually paying rent to store used

13   FEMA trailers.  And these are not things like

14   documents that can be put on a disk or things that

15   could somehow be condensed.  And they are what they

16   are, and they occupy the space that they occupy, and

17   there's virtually no way to store them, other than

18   putting them on a piece of property.  I mean, you

19   can't even house them anywhere indoors, there's so

20   many of them.

21             So that was always a problem that was

22   always recognized by counsel, all counsel, and the

23   Court, and that there was a cost factor involved as

24   well that played into the notion of using a

25   statistical analysis, for better or worse.  And,

1    regardless of its completion in terms of these lines

2    of attack that the defendants have developed on the

3    opinion, I think there was inherent in the MDL the

4    idea that a statistical analysis would be not only

5    appropriate but probably necessary in order to

6    preserve the claims of those who had already filed

7    and for those who we knew would file such that the

8    trailers could be destroyed.  Or, even if they were

9    not destroyed, they would not be subject to being

10   tested or maybe even could not be identified if they

11   had not been destroyed, identified and located and

12   then tested.  So there was a tremendous amount of

13   logistical issues that came up with regard to testing

14   and the need for a statistical analysis.

15            Having said that, I do think, and I put

16   that in the order, I think Mr. Watts highlighted, I

17   do think it would be intellectually dishonest of any

18   counsel to suggest that because a test exceeds some

19   MRL that is established by the government for any

20   variety of purposes -- during the course of the

21   bellwethers, we've had NIOSH, we've had ASTDR, we've

22   had even some discussion of OSHA standards.  And I

23   think we pretty much have uniformly agreed that those

24   standards apply for the purposes in which they have

25   been created, none of which would qualify a product

1    as being defective under the Louisiana Product

2    Liability Act or any of the other relevant state

3    statutes that govern products liability.

4                Put another way, simply because one of

5    these levels, these government ordained levels, is

6    exceeded, I should say the concentration, whether

7    it's the air concentration or whether it's exposure,

8    simply because that level is exceeded does not make

9    the product legally defective and does not in any way

10   create liability automatically for a defendant

11   manufacturer, or contract, for that matter.

12               I'm going to maintain the position that

13   I've maintained with regard to Hewitt's analysis,

14   which is to deny the motion, subject to the

15   instructions I've given, to deny the motion.  I do

16   think that his analysis passes muster under Daubert

17   and under 702 such that it could be utilized at trial

18   as to possibly the five manufacturers that are the

19   subject of his analysis.

20               And I would of course reserve the right of

21   each manufacturer to raise issues regarding the

22   analysis as to that particular manufacturer who

23   happens to be a defendant in either a bellwether

24   trial or a trial elsewhere outside of the MDL at a

25   later date.

1                    I think that the lines of questioning for

2       cross examination -- and I know Mr. Weinstock's

3       right, that under Daubert and 702, the law changed

4       some years ago, that the Court cannot simply raise

5       its hands up in frustration and say:  Well, cross

6       examine him.  And it certainly hasn't been the

7       practice here in the Eastern District, and it's not

8       my practice as well.  But I think that there is a

9       minimum threshold that Daubert requires in order to

10      get an opinion beyond the term of junk science, which

11      was I think the supreme court used that term in its

12      Daubert opinion and the trilogy of opinions that

13      discussed expert testimony.  And I think that

14      Hewitt's opinion exceeds the minimum threshold and is

15      not considered junk science such as the supreme court

16      envisioned it and the circuit opinions envisioned it

17      post-Daubert.  And so I'm going to go ahead and deny

18      the motion.

19                    MR. WEINSTOCK:  Thank you, Your Honor.

20                    THE COURT:  All right.

21                    MR. WATTS:  Your Honor, could you give us

22      five minutes?

23                    (9:54 a.m., Proceedings Concluded.)

24

25

CERTIFICATE


        I, Susan A. Zielie, Official Court
Reporter, do hereby certify that the foregoing
transcript is correct.


                /S/ SUSAN A. ZIELIE, RPR, FCRR
                _____
                Susan A. Zielie, RPR, FCRR