UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRIALER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | SECTION: N(4) |
| LITIGATION | * | |
| | * | |
| This Document Relates to: | * | JUDGE:  ENGELHARDT |
| *Eloise Gums, et al. v. Forest River, Inc.,* | * | |
| Docket No. 11-410 | * | MAG:  CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPPOSITION TO PLAINTFFS' MOTION TO REMAND

**NOW INTO COURT,** through undersigned counsel, comes defendant, Forest River, Inc., ("Forest River") and, with a full reservation of rights, files this Opposition to Plaintiffs' Motion to Remand [Rec. Doc. 20423] and, based on the laws and facts stated herein, avers that this matter has been properly removed to this Court on the following grounds:

(1)    Federal jurisdiction is proper in this matter under 28 U.S.C. §1332 as all plaintiffs named are diverse in citizenship from all named defendants and the amount in controversy more likely than not exceeds $75,000.00 per plaintiff.

    (a)    Plaintiffs' general allegation that no one plaintiff seeks more than $75,000.00 in damages is not dispositive.

    (b)    The category of damages sought in the Complaint and jurisprudence involving similar cases clearly demonstrates that, if proven, the plaintiffs' claims could be worth greater than $75,000.00.

        (i)    It is facially apparent from the Plaintiffs' Original Petition for Damages that potential damages in this matter exceed $75,000.00 for any individual plaintiff.

        (ii)    Alternatively, based a sample of awards granted by various juries for cases similar to the current matter, the allegations of the Plaintiffs, if proven at trial, are reasonably valued at over $75,000.00, thus invoking federal jurisdiction.

        (c)      Plaintiffs' "Declarations under Penalty of Perjury" are not binding stipulations and have no effect on this removal.

(2)      In addition and/or alternatively, federal jurisdiction over this case is proper under the Federal Officer Removal statute, 28 U.S.C.§ 1442(a)(1).  Forest River meets all three requirements established in the *Mesa* decision for jurisdiction.

        (a)      The federal government exercised the requisite federal control needed for jurisdiction under 28 U.S.C. § 1442(a)(1).

        (b)      Forest River established the plausibility of a "colorful defense" necessary for federal jurisdiction.

            (i)      The United States approved reasonably precise specifications.

            (ii)      Forest River's travel trailers conformed to FEMA's specifications.

            (iii)      FEMA knew of formaldehyde in the trailers, but to the extent Forest River was obligated to "warn" FEMA about the dangers from formaldehyde, it did so.

## BACKGROUND

On December 29, 2010, Plaintiffs, through attorney Anthony Buzbee of the Buzbee Law Firm, filed the Original Petition in this action, entitled *"Eloise Gums, William Vaughn, Sr. and Charlene Vaughn v. Forest River, Inc."* and bearing Docket Number A189-040 (the "Complaint" or "Petition"), in the 58th Judicial District Court in Jefferson County, Texas.[1]  On February 1, 2011, Plaintiffs filed their First Amended Complaint for Damages (the "Amended Complaint") in the same court.[2]

On February 1, 2011, Forest River properly removed this matter to the Federal Court for the Eastern District of Texas.  Because this Petition arises solely from operative facts that are the subject of multidistrict litigation ongoing in the U.S. District Court for the Eastern District of Louisiana, entitled *In re: FEMA Trailer Formaldehyde Products Liability Litigation* and bearing

---

[1] *See* Case No. 11-0410, Rec. Doc. 1-2.
[2] *See* Case No. 11-0410, Rec. Doc. 1-1.

MDL docket number 07-1873, the Panel on Multidistrict Litigation subsequently transferred the case into the Eastern District of Louisiana. Plaintiffs then filed a Motion to Remand in this matter on March 3, 2011, alleging that the Federal Court lacks jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 1442.

Forest River respectfully submits that the Motion should be denied, and this Honorable Court should retain jurisdiction over the instant lawsuit.

## II. Federal jurisdiction is proper in this matter under 28 U.S.C. §1332 as all plaintiffs named are diverse in citizenship from all named defendants and the amount in controversy more likely than not exceeds $75,000.00 per plaintiff.

Under 28 U.S.C. § 1332(a), a federal court has diversity jurisdiction if the matter in controversy (1) exceeds $75,000.00, exclusive of interest and costs, and (2) is between citizens of different states. In 2005, the United States Supreme Court held that where the other elements of jurisdiction are present <u>and at least one named plaintiff in the action satisfies 28 U.S.C. §1332(a)'s amount-in-controversy requirement</u>, 28 U.S.C. §1367 authorizes supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the requisite amount. *See Exxon Mobile Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 125 S.Ct. 2611, 2616-2628 (2005) (emphasis added). Therefore, once this Court obtains §1332 jurisdiction over a single plaintiff in this suit, the entire suit falls under this Court's §1367 jurisdiction.

In their Memorandum in Support of their Motion to Remand, Plaintiffs argue that this Court has no jurisdiction to hear this matter under 28 U.S.C. 1332 for three separate reasons: 1) Plaintiffs have "stipulated" that the amount in controversy is less than $75,000 per plaintiff, 2) the jurisdictional amount is not facially apparent from the Original Complaint, and 3) Forest River has set forth no facts or evidence showing the jurisdictional amount has been satisfied. Each of these arguments is without merit.

## A. Plaintiffs' general allegation that no one plaintiff seeks more than $75,000.00 in damages is not dispositive.

Plaintiffs, in their Memorandum in Support of their Motion to Remand, do not dispute that diversity of citizenship exists between the parties.[3]   The Plaintiffs, however, allege that the damages sought by each plaintiff, exclusive of costs and interest, is less than $75,000.00.[4]

In their Complaint, Plaintiffs attempt to specifically limit their damages by asserting that no individual plaintiff seeks more than $75,000.00, exclusion of interest or costs.   The "amount in controversy should be determined at the time of filing." *White v. FCI USA, Inc.,* 319 F.3d 672, 674 (5th Cir. 2003).  In cases where the plaintiff pleads a specific amount of damages that exceeds the required amount in controversy, that amount controls if made in good faith. *Allen v. R&H Oil & Gas Co.,* 63 F.3d 1326, 1335 (5th Cir. 1995) *citing St. Paul Mercury Indem. Co. v. Red Cab Co.* 303 U.S. 283, 289 (1939); *Thrash v. New England Mut. Life Ins. Co.,* 534 F.Supp.2d 691, 693 (S.D. Miss. 2008.)  The converse holds true, barring removal if plaintiff pleads damages less than the jurisdiction amount. *Allen,* 63 F.3d at 1335.  However, a simple allegation by Plaintiffs that they are not seeking damages in excess of the jurisdictional amount is not dispositive. *Zunamon v. Brown*, 418 F.2d 883 (8th Cir. 1969).

For pre-removal stipulations to be binding and, thus, preclude federal court removal, plaintiffs must affirmatively renounce the right to accept a judgment in excess of $75,000.00. *Levith v. State Farm Fire and Cas. Co.,* Civil Action No. 06-2785, 2006 WL 2947906, *2 (E.D. La. 2006)(Vance, J.); *Crosby v. Lassen Canyon Nursery, Inc.,* Civil Action No. 02-2721, 2003 WL 22533617, *3 (E.D. La. 2003) (Vance, J.)  Plaintiffs "stipulation" in their complaint simply states that no single plaintiff seeks more than $75,000 at trial.  It does not affirmatively renounce their right to accept an amount over the jurisdictional limit in accordance with *Levith* and *Crosby.*  Thus, this "stipulation" is ineffective as it concerns this removal.

Because the allegation seeking to limit damages under the jurisdictional requisite is neither dispositive nor a "specific amount," the allegations of injury and damages sought must be properly

---

[3] *See* Memorandum in Support of Motion to Remand, Record Document #20423-1, p. 2.
[4] *Id.*

evaluated before any determination as to jurisdictional amount may be made.  The allegation in Plaintiffs' Complaint that no plaintiff seeks more than $75,000.00, *per se,* is not enough to prevent federal jurisdiction under 28 U.S.C. §1332.  Furthermore, Plaintiffs have failed to show any state procedural rule binding them to their complaint and have failed to enter into a binding stipulation, which would limit their damages to less than the jurisdictional amount in compliance with *De Aguilar.*

> **B.      The category of damages sought in the Complaint and jurisprudence**
> **involving similar cases clearly demonstrates that, if proven, the plaintiffs'**
> **claims could be worth greater than $75,000.00**

Forest River bears the burden of showing that it is more likely than not that Plaintiffs' claims for damages exceeds the jurisdictional amount.  Where no <u>specific</u> amount is alleged in the Complaint, the party invoking federal jurisdiction may prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount.  *De Aguilar v. Boeing Co.,* 11 F.3d 55, 58 (5th Cir. 1993); *Thrash,* 534 F.Supp.2d at 693. The burden of preponderance of the evidence is met if (1) it is apparent from the face of the complaint that the claims are likely to exceed $75,000, or alternatively, (2) the defendant sets forth summary judgment type evidence of facts in controversy that support a finding of the requisite amount.  *Manguno v. Prudential Property and Casualty Ins. Co.* 276 F.3d 720 at 723 (5th Cir. 2002), *citing De Aguilar,* 47 F.3d at 1412.

It is facially apparent from Plaintiffs' specific category of damages cited in their complaint, that the amount in controversy in this matter exceeds $75,000.  Furthermore, a thorough evaluation of awards granted for similar claims of formaldehyde exposure in travel-trailers suggests that if Plaintiffs were able to prove their claims at trial, the amount in controversy in this matter would exceed $75,000.

> **1.      It is facially apparent from the Plaintiffs' Original Complaint**
> **for Damages that potential damages in this matter exceed**
> **$75,000.00 for any individual plaintiff.**

In their Original Complaint for Damages, Plaintiffs state:

"As a result of the foregoing, Plaintiffs were caused to sustain injuries including, but not limited to,  past and future physical injuries, past and future mental and physical pain and suffering, past and  future physical impairment and disability, past and future reasonable and

necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during a period of displacement from a natural disaster, as well as all general, special, incidental, and consequential damages which shall be proven, but in no event to exceed $75,000 each, exclusive of interest and costs."[5]

A defendant makes a showing that the jurisdictional amount is "facially apparent" from a reading of the complaint when the plaintiff's claims are likely to exceed $75,000.00. *Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326, 1335 (5th Cir.1995). Under any manner of proof, jurisdictional facts must be judged at the time of removal, and post-petition affidavits are allowable only if relevant to that period of time. *Allen,* 63 F.3d at 1335 (emphasis added).

> a.   **The U.S. Fifth Circuit Court of Appeals' decision in *In re 1994 Exxon Chemical Fire* discusses, in detail, the categories of damages alleged in chemical exposure cases which justify removal to federal courts under the facially apparent standard. These categories of damages align with the categories of damages asserted by the Plaintiffs in this matter.**

The Fifth Circuit has held that removal is justified where alleged damages in a chemical exposure case include:

> "individual and familial suffering; injuries to physical and mental health, including, but not limited to, emotional distress and mental anguish from the knowledge of exposure to a hazardous substance; expenses incurred by reason of illness caused by the nuisance; fear and apprehension of further exposure to, and impact from, hazardous chemicals; economic and financial harm; loss of enjoyment of life and peaceful use of property; and, other consequential, incidental, general, and special damages."
>
> *In re 1994 Exxon Chemical Fire,* 558 F.3d 378 (5th Cir. 2009).

The listed damages cited by the Federal Fifth Circuit in *In re 1994 Exxon Chemical Fire* closely mirror the listed damages alleged by Plaintiffs here, justifying this removal under the "facially apparent" standard set forth in *Allen, supra.*[6]

---

[5]  *See* Case No. 11-0410, Rec. Doc. 1-2, Plaintiff's Amended Complaint.
[6]  *See also Aisola v. Exxonmobil Corp.,* No. 08-1105 2009 WL 1455788 at *1 (E.D. La. 05/22/09) where the Eastern District held that the current requisite jurisdictional amount of $75,000.00 was facially apparent from the Petition (Complaint) when asserting the exact same type of alleged damages in *In re 1994 Exxon Chemical Fire* and other chemical exposure cases.

**b.** **Recent U.S. Fifth Circuit decisions hold that complaints that seek damages for disability and impairment support a substantially larger monetary basis for federal jurisdiction.**

In addition to the damages cited in *In re 1994 Exxon Chemical Fire,* Plaintiffs cite damages for "past and future physical impairments and disability,"[7] which, under federal jurisprudence, supports a substantially larger monetary basis for federal jurisdiction. The Federal Fifth Circuit has noted that emotional distress, functional impairment, and disability are the kinds of damages that if alleged, "support a substantially larger monetary basis for federal jurisdiction." *Simon v. Wal-Mart Stores, Inc.* 193 F.3d 848, 851 (5th Cir. 1999).

In *Robinson v. Delchamps,* the plaintiff sought remand, citing a failure to establish the requisite jurisdictional amount of $75,000.00. The defendant argued that the jurisdictional amount was facially apparent from the plaintiff's petition, which cited nine separate types of damages, including physical and mental pain and suffering (past and future), loss of income (past and future), medical expenses (past and future), loss of enjoyment of life (past and future), and disability (past and future). The Louisiana Eastern District held, "[t]he number of claims, the nature of those claims, and the allegations that plaintiff will continue to suffer damages into the future, all weigh against plaintiff's argument. It is facially apparent that if all damages alleged in this case are recovered, the amount of the judgment would likely be well in excess of the jurisdictional amount." *Robinson v. Delchamps, Inc.,* No. 98-0503 1998 WL 352131 (E.D. La. 06/30/98) (emphasis added). In a similar holding, the Western District of Louisiana has found that the jurisdictional amount of $75,000.00 was facially apparent where the plaintiff sought damages for physical pain and suffering (past and future); mental anguish, emotional distress, worry, anxiety, and inconvenience (past and future); medical and related expenses (past and future); loss of enjoyment of life; and disability and impairment. *Lowery v. J.C. Penny Corp., Inc.* No. 06-1710 2006 WL 3827527 (W.D. La. 12/28/06) (*citing Robinson*)(emphasis added).

---

[7] *See* Case No. 11-0410, Rec. Doc. 1-2, Plaintiff's Amended Complaint.

Furthermore, the Federal Fifth Circuit has found that the Louisiana Eastern District did not err in finding that it was facially apparent from the plaintiff's petition that the amount in controversy exceeded $75,000 when the petition sought damages for past and future medical expenses, past and future pain and suffering, past and future lost wages and past and future disability. *Davis v. Grider,* 214 F.3d 1350, 2000 WL 634655 (5th Cir. 2000) (emphasis added). These cases stand for the proposition that a certain, specific category of injury – disability – when alleged in a Complaint, as it is here, causes the requisite amount under 28 U.S.C. §1332 to become facially apparent under the standard set in *Allen, supra.*

> **c.    The Louisiana Eastern District's decision in *Aisola* is directly on point on this issue.**

Recently and most directly on point, the Eastern District of Louisiana found that a jurisdictional amount requirement of $75,000.00 was facially apparent from the Petition (Complaint) in a chemical exposure case asserting damages directly aligned with those asserted in the current matter.

In *Aisola,* thirteen minor school children were allegedly injured when the defendant negligently released chemicals into the air. *Aisola v. Exxonmobil Corp.,* No. 08-1105 2009 WL 1455788 at *1 (E.D. La. 05/22/09). Each plaintiff cited damages "inclusive of past, present, and future medical expenses; past, present, and future lost wages; past, present, and future mental anguish; past, present, and future pain and suffering; disability and disfigurement; and other damages." *Id.* at *2. Furthermore, the plaintiffs claimed the exposure "necessitated and will further necessitate medical treatment." *Id.* The Court, based primarily on the *In re 1994 Exxon Chemical Fire* holding and a thorough discussion of damages sought for disability, found that it was facially apparent from the plaintiffs' petition that the amount in controversy exceeded $75,000. *Id.* Again, the determination that the Federal Court had jurisdiction under §1332 was made solely by an analysis of the category of injuries asserted.

The damages asserted in *Aisola* are almost identical to the damages asserted in the current matter. Both cases seek damages for 1) past and future mental anguish/pain and suffering, 2) past and future physical pain and suffering, 3) past and future medical expense, and 4) disability and

8

impairment/disfigurement. The Plaintiffs here also seek damages not cited in *Aisola* such as past and future physical injury, loss of enjoyment of life, and exemplary damages.  Using *In re 1994 Exxon Chemical Fire, Aisola,* and *Robinson* as guides, it is facially apparent from the Plaintiffs' Complaint and Amended Complaint for Damages that if all category of damages alleged by the Plaintiffs were recovered, then this amount would more likely than not be in excess of $75,000.00.

> **d.     Plaintiffs seek exemplary damages which solidifies defendant's argument that the value of damages, if completely proven at trial, more likely than not exceeds $75,000.00.**

In addition to these above-cited categories of injuries seeking compensatory damages, the Plaintiffs seek exemplary damages under Texas law. This only increases the defendants' the potential exposure at trial.

It is well settled that, if Texas law permits exemplary/punitive damages attendant to the particular claims the plaintiff is seeking redress for, then those damages are included in computation of the amount in controversy.  *St. Paul Reinsurance Co., Ltd. v. Greenberg,* 134 F.3d 1250, 1253 (5th Cir. 1998); *Ruhgras AG v. Marathon Oil Co.,* 526 U.S. 574, 585-86 (1999) (by implication).  Claims for compensatory and punitive damages can be combined in determining jurisdictional amount. *Jeffries v. Silvercup Bakers, Inc.,* 434 F.2d 310 (7th Cir. 1970).  The Plaintiffs' allegation that they are entitled to exemplary damages only increases the potential value of each claim and solidifies the fact that the jurisdictional requisite is "facially apparent" from a clear reading of the Complaint.

Based on the Plaintiffs' own allegations of damages, Forest River has proved that the requisite amount in controversy under 28 U.S.C. §1332 is facially apparent from the Plaintiffs' Amended Complaint, and this Court need not look further.

> **2.     Alternatively, based a sample of awards granted by various juries for cases similar to the current matter, the allegations of the Plaintiffs, if proven at trial, are reasonably valued at over $75,000.00, thus invoking federal jurisdiction.**

Although Section II clearly indicates that the jurisdictional amount required under 28 U.S.C. §1332 is facially apparent from Plaintiffs' Complaint for Damages, in an abundance of caution and in

accordance with *Luckett* and *White, infra*, Forest River submits the following jurisprudence which clearly shows that Plaintiffs' claims for damages could be reasonably calculated to exceed $75,000.00. To reiterate the law stated earlier, so long as one named plaintiff in this action meets the jurisdictional requisite amount under 28 U.S.C. §1332, then jurisdiction is obtained over all other plaintiffs. *See Exxon Mobile Services, supra.*

If it is not "facially apparent" from a plaintiff's petition that the amount in controversy exceeds $75,000.00, the Court may rely on "summary judgment-type" evidence relevant to the amount in controversy at the time of removal to make the determination. *White v. FCI USA, Inc.,* 319 F.3d 672, 675 (5th Cir. 2003); *Luckett v. Delta Airlines, Inc.,* 171 F.3d 295, 298 (5th Cir.1999). It is important to note that, despite requests from defendants, the plaintiffs have failed to submit any allegations or evidence of the actual symptoms and/or ill-health effects allegedly suffered as a result of the their alleged exposure.[8] Thus, the only "summary judgment" type evidence that should be considered by this Court, in accordance with *White* and *Luckett,* is a jurisprudential sampling of the amount of damages awarded by various juries in similar cases involving formaldehyde exposure in mobile homes/trailers.

Four cases involving alleged formaldehyde exposure in mobile homes/trailers were presented to various juries on the state and federal level in which awards, both compensatory and punitive, were given to plaintiffs. In *Boelens,* a jury from the United States District Court for the Northern District of Texas awarded a mother and her two minor children $178,903.80 in compensatory damages for alleged injuries caused by formaldehyde fumes emitting from a mobile home. *Boelens v. Redman Homes, Inc.,* 748 F.2d 1058, 1061 (N.D. Tex. 1983).[9] The jury also awarded the plaintiffs an additional $206,250.00 in punitive and discretionary damages. *Id.*

---

[8]   All Plaintiffs in FEMA formaldehyde exposure cases in the U.S. District Court for the Eastern District of Louisiana, entitled *In re: FEMA Trailer Formaldehyde Products Liability Litigation* and bearing MDL docket number 07-1873 have been ordered to fill out a "Plaintiff Fact Sheet" which asks the party to identify the   actual symptoms and consequences suffered as a result of the alleged formaldehyde exposure. It also asks the Plaintiff to identify medical providers and supply a medical history. Finally, it asks Plaintiffs to note whether   they   have suffered from any property loss or devaluation as a result of the alleged exposure.
[9]   The Federal Fifth Circuit overturned the jury's decision due to the fact that personal injury damages were not recoverable under Magnuson-Moss Warranty Act. *Boelens* at 1071.

In *Tiderman,* the Washington State Supreme Court reversed the decision by an Appellate Court and reinstated a jury verdict of $566,500.00 for compensatory damages awarded to a single plaintiff for alleged formaldehyde exposure emitting from a mobile home after the plaintiff allegedly suffered eye, throat, and respiratory irritation as a result of the exposure. *Tiderman v. Fleetwood Homes of Washington,* 102 Wash.2d 334, 335 (Wash. 1984).

In *Troensegaard,* a California jury awarded a plaintiff $90,000.00 in compensatory damages, $55,000.00 in punitive damages, and levied a $90,000.00 "civil fine" against a mobile home manufacturer for alleged formaldehyde exposure suffered by the plaintiff in her mobile home. *Troensegaard v. Silvercrest Industries, Inc.,* 175 Cal.App.3d 218, 221 (Cal.App. 1 Dist. 1985).  The Appellate Court affirmed the compensatory award but reversed the award of $55,000.00 in punitive damages on Appeal. *Id.* at 230.

In *Alley,* two plaintiffs were awarded $20,000.00 and $30,000.00 respectfully in compensatory damages for injuries suffered as the result of alleged formaldehyde exposure from a mobile home. *Alley v. Gubser Development, Co.,* 785 F.2d 849, 853 (10th Cir. 1986). Additionally, they were awarded a total of $510,000.00 in punitive damages against various defendants in the case. *Id* at 853-54.[10]

Thus, over the four cases examined involving formaldehyde exposure from mobile homes/trailers, the average compensatory award granted by juries was $126,486.25 per plaintiff. Furthermore, these juries also awarded a total of $902,250.00 in punitive or discretionary damages. These figures far exceed the jurisdictional requisite of $75,000.00 required by 28 U.S.C. §1332.  It should also be noted that these awards were granted between 1983-1986, some twenty-seven to twenty-four years ago. With the constant price increase of medical care and the natural decrease in the valuation of money over time, it is unreasonable to believe that the value of these types of cases has not increased in since the time in which they were decided.

---

[10] These punitive awards were reduced on Appeal to an unspecified amount. *Alley* at 857.

The requisite amount under 28 U.S.C. §1332 is facially apparent from a clear reading of the categories of injuries asserted by the Plaintiffs the their Complaint for Damages under the standard set and jurisprudence found in *Allen, In re 1994 Exxon Chemical Fire, Robinson,* and *Aisola.*  Furthermore, awards granted for compensatory damages alone by juries in the 1980s in strikingly similar cases were, on average, about $50,000.00 more per plaintiff than the current jurisdictional requirement.  For the many reasons stated above, Forest River has met its burden for jurisdiction under 28 U.S.C. §1332.

  C. **Plaintiffs' "Declarations under Penalty of Perjury" are not binding stipulations. Thus, they have no legal effect in this matter.**

Plaintiffs filed their First Amended Petition on February 01, 2011, the same day Forest River filed its removal.  Attached as an exhibit to this Amended Complaint were three documents entitled "Declarations under Penalty of Perjury."[11]  In these documents, each Plaintiff declares that he or she is not <u>seeking</u> damages in excess of $75,000 exclusive of interests or costs. These documents are ineffective for the reasons cited below.

First, it should be noted that, if a defendant can prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount, removal is proper unless the plaintiff shows that at the time of removal he was legally certain not to be able to recover that amount."  *Thrash*, 534 F.Supp.2d at 693 (quoting *Allen v. R&H Oil and Gas Co.,* 63 F.3d 1326, 1335 (5th Cir. 1995); *see St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289 (1938).  The plaintiffs' burden of proving this legal certainty of not recovering more than the amount plead for in the complaint can be met by: (1) showing state procedural rules binding a plaintiff to his pleadings; or (2) filing with the complaint a binding stipulation or affidavit to that effect. *De Aguilar v. Boeing Co.,* 47 F.3d 1404, 1412 (5th Cir.1995).  Statements found in Complaints, such as found here, that allege that plaintiffs "do not seek a judgment in excess of $75,000.00" do not constitute a "specific amount" under *Thrash* or *De Aguilar.*

---

[11] *See* "Declarations under Penalty of Perjury," *in globo*, attached as Ex. A to Rec. Doc. #20423-1.

*See generally Jackson v. Balboa Insurance Co., et al.,* 590 F.Supp.2d 825 (S.D. Miss. 2008); *Manguno v. Prudential Property and Cas. Ins. Co.,* 276 F.3d 720, 722-23 (5th Cir. 2002).

The "Declarations under Penalty of Perjury" also do not meet the standards for a binding stipulation. In *Hamilton,* the federal court for the Southern District for West Virginia evaluated stipulations concerning the jurisdictional amount in controversy in a case seeking removal. The Court honored the stipulations because it was determined that these stipulations meet the requirements needed for a binding agreement. The Court noted that these stipulations:

1. Unequivocally stated that Plaintiffs would not accept an amount greater than $74,000, in any event (magical words.)

2. The stipulation was filed in the state court prior to removal being filed.

3. The stipulation was notarized.

*Hamilton, Burgess, Young, & Pollard, PLLC, v. Markel American Ins. Co.,* 2006 WL 218200, (S.D. W. Vir. 2006), *citing as support Hicks v. Herbert,* 122 F.Supp.2d. 699, 701 (S.D.W.Va.2000).

Plaintiffs' current "Declarations Under Penalty of Perjury" fail to meet any of these three requirements. First, the Declarations state, "the damages I am seeking do not exceed $75,000 exclusive of interest or costs." This statement does not unequivocally state that the Plaintiffs will not accept an amount in excess of the jurisdictional limit; it only states that plaintiffs are not seeking an amount over $75,000.[12] In order for allegations within a state court petition to constitute a binding stipulation limiting damages below the federal jurisdictional minimum, warranting remand to state court, the plaintiff must do more than simply allege that the amount in controversy or the amount of damages suffered does not exceed $74,999; the plaintiff must expressly deny that he or she will accept more than $75,000 if the state court awards in excess of that amount. *McGlynn v. Huston,* 693 F.Supp.2d 585, (M.D. La. 2010). Finally, none of these Declarations is notarized.[13] The Declarations fail to meet any of the requirements

---

[12] The *Hamilton* Court held that two statements would satisfy the unequivocal statement requirement. The Plaintiffs could state that "plaintiff will not accept an amount over $75,000, in any event" or " plaintiff will not seek or accept" an amount greater than the jurisdictional amount. *Hamilton* at 2.

[13] *See generally* "Declarations under Penalty of Perjury," *in globo*, attached as Ex. A to Rec. Doc. #20423-1.

of a binding stipulation as cited in *Hamilton,* and, as such, should not be considered in this jurisdictional determination.

In support of the unsworn declarations, the plaintiffs cite *ANPAC v. Dow Quimcia de Columubia S.A.*  In *ANPAC,* the Federal Fifth Circuit allowed a post-removal affidavit to be used in support of the plaintiffs' Motion to Remand. The Court reasoned that the affidavit was attempting to "clarify" and not change the previously asserted damages. *ANPAC v. Dow Quimcia de Columubia S.A.,* 988 F.2d 559 (5th Cir. 1993), *abrogated by Marathon Oil Co. v. A.G. Ruhrgas,* 145 F.3d 211 (5th Cir. 1998). The U.S. Court of Appeals for the Fifth Circuit, mere months after deciding *ANPAC,* described, in detail, its very limited application.  In *Marcel,* the Fifth Circuit stated, "*ANPAC,* though controlling authority, is very narrowly drawn and circumscribed and is plainly distinguishable." *Marcel v. Pool Co.*, 5 F.3d 81, 84 (5th Cir. 1993). The Fifth Circuit concluded, "[n]othing in *ANPAC* suggests that stipulations or affidavits-- from the plaintiffs, their attorneys, or otherwise--always or even usually should be given effect to defeat removal." *Marcel,* at p. 85.

In any case, nothing prevents the Plaintiffs from amending their petition to claim a greater amount of damages.  Under the Texas Rules of Civil Procedure, parties are free to amend their pleadings at any time prior to a deadline to amend pleadings established by a pre-trial order, or in the absence of such a pre-trial order, at any time up until seven days prior to trial.  Tex. R. Civ. P. 63; *Mackey v. U.P. Enterprises*, 935 S.W. 2d 446, 461 (Tex. App.-Tyler 1996, no writ); *G.R.A.V.I.T.Y. Enterprises v. Reece Sup.*, 177 S.W. 3d 537, 542 (Tex. App.-Dallas 2005, no pet.).  The Texas Rules would allow these Plaintiffs to amend their petition without leave of court at any time as long as it was more than seven days prior to trial or before a pleadings deadline established by a pre-trial order.  In fact, Texas law allows a claimant in some circumstances to amend the pleadings after a jury verdict so as to conform the amount of damages claimed in the petition to the amount of the verdict if a jury returns a verdict in an amount greater than the maximum amount claimed in the petition. *Greenhalgh v. Service Lloyds Ins. Co.*, 787

S.W. 2d 938, 939 (N.1 (Tex. 1990)); *Harvey v. Stanley*, 803 S.W. 2d 721, 727 (Tex. App.-Fort Worth 1990, den.).

Based on the foregoing, it is clear that Forest River has met its burden of proof in showing that removal is proper under the diversity jurisdiction granted this Court under 28 U.S.C. §1332. However, in the alternative, if this Court were to determine that Forest River has failed to meet this burden, then Forest River requests that this Court grant the parties time to conduct limited discovery as to the value of this claim prior to making a final ruling on removability.

### D.     Other Similar Claims

Finally, Forest River would note that the case at bar is but one of many lawsuits brought by plaintiffs complaining of injuries resulting from formaldehyde in travel trailers supplied to them by FEMA. Plaintiffs' attorney has also filed other petitions that are part of this MDL alleging similar causes of action and damages.[14] In those cases, Plaintiffs' counsel has alleged that plaintiff's damages exceed $75,000.00 each. The instant case is no different. The types of damages being claimed and the causes of action being alleged are similar to those in the other cases. Forest River contends that these other filings demonstrate that the Complaint in this case and belatedly submitted declarations are nothing more than an attempt to avoid federal court jurisdiction.

Based on the foregoing, it is clear that Forest River has met its burden of proof showing that removal is proper under the diversity jurisdiction granted this Court under 28 U.S.C. §1332. However, in the alternative, if this Court were to determine that Forest River has failed to meet this burden, then Forest River requests that this Court grant the parties time to conduct limited discovery as to the value of this claim prior to making a final ruling on removability as more fully set forth below.

---

[14] *See Andrea Baquet, et al v. Forest River, Inc., et al;* Docket No. 09-2961 EDLA.

**III.** **Federal jurisdiction over this case is proper under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1).  Forest River meets all three requirements established in the *Mesa* decision for jurisdiction.**

In addition to diversity jurisdiction, this Court also has jurisdiction over this case under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1).  Under that statute, the Court has jurisdiction over any civil action involving any officer of the United States or officer of any federal agency, when that officer is sued for any act done under the color of his office.  *Id.*  The statute provides a federal forum for any case in which a federal official can raise a defense arising out of his official duties. *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981); *see Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55, 58 (5th Cir. 1975).  Courts give a liberal interpretation to the statute and resolve any factual disputes in favor of federal jurisdiction.  *See Preston v. Tenet Healthsystem Memorial Med. Ctr.*, 463 F.Supp.2d 583, 588 (E.D. La. 2006).  As this Honorable Court has recognized, courts give a liberal and broad interpretation to the statute. *Allen v. City of Laurel*, 2009 WL 2486183, *2 (S.D. Miss. Aug. 11, 2009); *City of Petal v. Ashbritt, Inc.*, 2008 WL 4372758, *1 (S.D. Miss. Sept. 22, 2008). The statute is not "narrow or limited," and covers all cases in which a federal officer can raise a colorable defense arising out of its duty to implement federal law. *Malsch v. Vertex Aerospace, L.L.C.*, 361 F.Supp.2d 583, 587 (S.D. Miss. 2005).

Three requirements must be met to invoke the Federal Officer Removal statute: (1) the defendant must be a "person" within the meaning of § 1442(a)(1); (2) the defendant must have acted under color of federal authority when committing the acts that allegedly caused plaintiffs' injuries; and (3) the defendant must have a colorable federal defense. *Williams v. Todd Shipyards Co.,* 154 F.3d 416, 1998 WL 526612, *2 (5th Cir. 1998) (citing *Mesa v. California,* 489 U.S. 121, 129, 131 (1989)). Once these factors are established, the right of removal under the statute is absolute. *Willingham v. Morgan*, 395 U.S. 402, 406 (1969).  In this case, plaintiffs have stipulated that Forest River is a "person," so only factors two and three warrant discussion.  *See* Rec. Doc. 20423-1, p. 7.

16

A.      **Requisite Federal Control**

The second factor hinges on whether Forest River acted under the color of federal authority when committing the acts that allegedly caused the plaintiffs to suffer damages. The color of federal authority requirement is "neither limited nor narrow, but should be afforded a broad reading so as not to frustrate the statute's underlying rationale." *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998). In determining this prong, courts examine the level of official control, which is only sufficient when the control is direct and detailed. *Breaux v. Gulf Stream Coach, Inc.*, No. 08-893, 2009 WL 152109, *3 (E.D. La. Jan. 21, 2009). In this case, Forest River asserts that FEMA – in various ways and over a significant period of time – exerted direct, detailed and substantial control over the construction <u>and</u> design of Forest River's Temporary Housing Units.

First of all, Forest River has not, as the plaintiffs incorrectly allege, overstated FEMA's role in the monitoring and inspecting of Forest River's travel trailers. The evidence establishes that the design and construction of the Forest River travel trailers were dictated by specifications provided by the United States, through the Federal Emergency Management Agency. In June of 2004, Richard Spillane, a Contracting Specialist from FEMA, contacted Forest River with a Request for Proposal setting out FEMA specifications for travel trailers to be used in future disasters.[15] The FEMA-issued procurement specifications detailed how the EHUs were to be built.[16] These "FEMA specs" were comprehensive, setting forth information about the size and configuration of the trailers, electrical service, plumbing service, appliances, furnishings, heating and cooling mechanisms, safety equipment, coverings, transportation methods, and other issues.[17] The specifications were thorough, detailing all aspects of the trailers' construction from the overall square footage to the quantity of master key sets that were required for each unit.[18]

---

[15]  *See* Deposition of Doug Gaeddert depo, dated August 6, 2008, p. 39, attached as Exhibit "A."
[16]  *See, e.g.*, FEMA Travel Trailer Procurement Specifications, attached as Exhibit "B."
[17]  *Id.*
[18]  *Id.*

At the time Forest River initially received these FEMA specs in 2004, none of its commercially available travel trailers was equipped with the items mandated by FEMA.[19]  In particular, the existing Forest River models did not have any "FEMA upgrades" related to air conditioning, plumbing, bathroom, kitchen and heating components, nor did the commercially available floor plans address FEMA's requests.[20]  Consequently, Forest River had to create a unique floor plan design and integrate other specialized components in order to meet FEMA's specifications.[21]

Additionally, FEMA required the manufacturer to produce a "first article" or prototype to be inspected by FEMA prior to large scale production.  A FEMA representative was sent to inspect this prototype during a "First Article Inspection," which consisted of an in-person visit to the manufacturer's location to ensure conformance with FEMA's specifications.[22]  This visit was conducted in the summer of 2004 by Dave Porter, an emergency management specialist with FEMA.[23]  Porter had worked at FEMA since 1993 and helped to coordinate specifications for housing following disasters from 1997 to 2007.[24]  His responsibilities included inspection of emergency housing units, monitoring refurbishment of those units, and dispatching those units to various sites following disasters.[25]

During the First Article Inspection at Forest River's manufacturing facility in Indiana, Porter spent three hours at the plant, during which time he performed inspections of both the plant and FEMA spec prototype.  As Forest River's Doug Gaeddert explained, Porter had access to the entire

---

[19] *See* Deposition of Doug Gaeddert, dated August 6, 2008, p. 38, attached as Exhibit "A."
[20] *See* Deposition of Doug Gaeddert, dated November 2009, p. 174-75, attached as Exhibit "C"; Deposition of Jamie Albrecht, production manager at Forest River, taken 1/20/10, p. 30-32; 108-110, attached as Exhibit "D."
[21] *See* Deposition of Doug Gaeddert, dated August 6, 2008 p. 38, attached as Exhibit "A"; Deposition of Doug Gaeddert, dated November 6, 2009, p. 197-99, attached as Exhibit "C."
[22] *See* Deposition of Doug Gaeddert, dated November 6, 2009, p. 127-28, attached as Exhibit "C."
[23] *See* Deposition of Doug Gaeddert, dated November 6, 2009, p. 127-28, attached as Exhibit "C"; Deposition of David Porter, p. 15, attached as Exhibit "E."
[24] *See* Deposition of David Porter, p. 15-16, attached as Exhibit "E."
[25] *Id.* at 16.

18

plant, was allowed to review Forest River's books, and engaged in a question and answer session following his inspection.[26]

Following this inspection, Forest River employees made several recommendations to the existing FEMA specs to facilitate production on the scale required by FEMA. For instance, Forest River raised concerns over the ability to provide this roofing on a large scale following a disaster, and therefore recommended that a rubber roof, which was standard in the travel trailer industry, be used in place of an aluminum roof.[27] Forest River also suggested that a three-burner stovetop was more readily available than the four-burner stovetop requested by FEMA and suggested that the procurement specifications be broadened to allow for the inclusion of a three burner range.[28] FEMA responded to these suggestions later that summer by incorporating the rubber roof into the specs and allowing the option of either a three or four-burner stovetop.[29]

Following Hurricane Katrina, Forest River was contacted by North American Catastrophe Services ("NACS") with an invitation to submit a bid for production of the FEMA spec travel trailers.[30] In response, Forest River submitted a bid to NACS to produce 5,000 FEMA spec models.[31] These units were ultimately produced in conformance with the August 2004 FEMA specs and delivered to FEMA through NACS.[32]

As this time line demonstrates, FEMA's control over the process was long-standing. Indeed, Forest River sold approximately 800 travel trailers that were used in FEMA disaster relief in response to hurricanes in Florida in 2004.[33] FEMA has long used travel trailers as emergency housing units in

---

[26] *See* Deposition of Doug Gaeddert, dated November 6, 2009, p. 147-49, attached as Exhibit "C."

[27] *See* Deposition of Doug Gaeddert, dated November 6, 2009, p. 127-29, attached as Exhibit "C."

[28] *Id.; see also* Deposition of Jamie Albrecht, production manager at Forest River, taken January 20, 2010, p. 30-32; 108-110, attached as Exhibit "D."

[29] *Id.*

[30] *See* Deposition of Doug Gaeddert, taken August 6, 2008, p. 32-34, attached as Exhibit "A."

[31] *Id.*

[32] *See* Deposition of Doug Gaeddert, taken November 6, 2009, p. 20-21; 78-79, attached as Exhibit "C."

[33] *See* Deposition of Doug Gaeddert, taken November 6, 2009, p. 72, attached as Exhibit "C."

responding to disasters, including in Louisiana.[34]  FEMA believed that trailers were the preferred direct temporary housing product.[35]  Their size allowed them to be transported and installed quickly, they were less expensive than mobile homes, and they could be placed on an individual's property so that the individual could return home and rebuild his or her property more quickly.[36]

Also, because of FEMA's extensive experience, FEMA knew what it was buying when it purchased these THUs for disaster relief after Katrina.[37]  FEMA was aware that the units contained formaldehyde.[38]  Martin McNeese, FEMA's Emergency Program Specialist, said that it was not surprising to him that the travel trailers contained formaldehyde.[39]  Nevertheless, FEMA deliberately chose to use travel trailers because of their practicality and functionality.[40]  Second, FEMA's control started well before construction, at the time when it supplied specific and detailed specifications for travel trailer procurement.[41]  As a manufacturer of these trailers, Forest River was compelled to abide by these specifications during manufacture. The specifications were incredibly detailed, describing square footage requirements, floor plan configurations, finishes, furnishings, and environmental living conditions.[42]  The specifications also required the manufacturer to construct them with a superior quality of workmanship and in total compliance with federal regulatory requirements.[43]  The instructions were direct and detailed, and they controlled precisely how Forest River was to build the THUs.

Regarding the argument that the specifications did not rise to the level of "official control" needed for Federal Officer Removal, Forest River asserts that the case cited by the plaintiffs is

---

[34] *See* Deposition of David Garratt, taken on July 7, 2009, p. 32, attached as Exhibit "F" (stating that travel trailers were used in the disaster relief efforts undertaken since Hurricane Andrew in 1992).
[35] *Id.* at 207.
[36] *Id.* at 207-08.
[37] *See* Deposition of David Garratt, taken July 7, 2009, p. 157-58; Deposition of David Porter, p. 115-16, 161-62, attached as Exhibit "E."
[38] *See* Deposition of Martin McNeese, dated July 14, 2009, p. 35, attached as Exhibit "G."
[39] *Id.* at 108.
[40] *Id.* at 207-08.
[41] *See generally* FEMA specs, attached as Ex. "B."
[42] *See id.*
[43] *See id.*

distinguishable with respect to this issue.  In that case, *Joseph v. Fluor Corp.*, the defendants relied upon the FEMA trailer specifications as the only basis for Federal Officer Removal.  *See* 513 F.Supp.2d 664, 672 (E.D. La. 2007).  The Court specifically noted that the defendants never presented any other evidence that FEMA exercised control over the defendants' other activities (e.g., on-site inspections and installation of travel trailers).  *Id*. at 673 n. 11.  In this case, the opposite is true – Forest River has shown that FEMA exercised control over Forest River's actions not only through the production of specifications but also through FEMA's "first article" inspection.  Thus, regarding the question of whether it worked under color of federal authority, Forest River stands apart from the defendants in the *Joseph* case.

While Forest River did not have a direct contractual relationship with FEMA, the absence of a contract does not impair Forest River's right to invoke the government contractor defense.  *See In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*, 81 F.3d 570 (5th Cir. 1996) (extending the government contractor defense to subcontractors that did not have a direct government contract). **Moreover, the Eastern District of Louisiana has already allowed Forest River's government contractor defense to be presented to the jury and included in the Jury Instructions in a 2010 FEMA formaldehyde litigation bellwether trial, *Lyndon Wright v. Forest River, Inc., et al.,* No. 09-2977 (E.D. La., March 2010).**

Taking this evidence discussed above into account, Forest River respectfully submits that FEMA exercised direct, detailed and substantial control over Forest River's construction of the Temporary Housing Units. FEMA inspected and monitored Forest River's construction, it specifically told Forest River what to build and how to build it, and the plaintiffs have essentially admitted that Forest River's very involvement in this case arose because of its relationship with FEMA. Thus, Forest River acted under the color of federal authority, and in doing so satisfied the second prong of Federal Officer Removal.

**B.**     **Forest River has established the plausibility of a "colorable defense" necessary for federal jurisdiction.**

The third factor centers on whether Forest River has a colorable federal defense – namely, the government contractor defense. This is essentially a moot issue. In a Federal Officer Removal case involving Temporary Housing Units provided after Hurricane Katrina, this Court ruled that the trailer manufacturers have a colorable claim to the government contractor defense. *See Joseph v. Fluor Corp.*, 513 F.Supp.2d 664, 671 (E.D. La. 2007).  Additionally, during the *Wright* bellwether trial involving Forest River, this Court heard the plaintiffs' Rule 50 motion to dismiss Forest River's government contractor defense, yet still allowed the defense to be submitted to the jury.[44]  Thus, it is evident by these decisions that Forest River meets the minimum threshold of having a colorable federal defense.

If this Court feels, however, that these decisions are inapplicable to this action, Forest River nevertheless asserts that it has a colorable defense on the basis that it was a government contractor and is therefore immune from liability under state tort law. At the outset, it is critical to note that Forest River has **no obligation to actually prove the defense at this stage**.  *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998).  All that is required is a showing that the defense is plausible.  *U.S. v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001).  Furthermore, the liberal construction given to the Federal Officer Removal statute is even more warranted in a case involving an immunity defense.  The Fifth Circuit has recognized that one of the most important functions of Federal Officer Removal is to allow a federal court to explore the validity of an asserted official immunity defense.  *Winters*, 149 F.3d at 397.

Plaintiffs also point out that Forest River did not have direct contract with FEMA regarding the production of travel trailers.  Plaintiff argues that Forest River is not a government contractor because the government does not have a direct contract with Forest River, and, therefore, the government's

---

[44] Also, during the *Alexander* trial, this Court heard the plaintiffs' Rule 50 motion to dismiss Gulf Stream's government contractor defense, yet still allowed the defense to be submitted to the jury.

rights and interests are not involved.  This argument ignores the realities of the facts of this case, as the government clearly has an intimate interest in providing shelter to its citizens following a natural disaster as part of its police power.  Plaintiff cannot legitimately argue that the federal government's interests are not at issue with respect to Forest River merely because Forest River sold the trailers through an intermediary such as NACS.  FEMA and Forest River, not NACS, worked together to design these units, and the price of these units set by Forest River in its bid to NACS was essentially the same as the price NACS charged to FEMA.[45]  The costs and design of the trailers supplied to the government clearly implicate the government's rights and interests.  Forest River again points out that the policies of *Boyle* – discouraging the costs of liability from being built into the price of products supplied to the government – necessitate that the defense apply to subcontractors as well and has cited cases to that effect.

As for the defense itself, the main focus is whether the federal preemption of state law is justified under the circumstances. In *Boyle v. United Tech Corp.*, the U.S. Supreme Court held that some areas of activity – those involving "uniquely federal interests" – are so committed to federal control that any applicable state law becomes pre-empted. *See* 487 U.S. 500, 504 (1988).  However, preemption, or "displacement," of state law will occur only when a significant conflict exists between an identifiable federal interest and the operation of applicable state law, or when the operation of state law would hinder the specific objectives that federal legislation was designed to achieve.  *Id*.  In determining whether such "displacement" is warranted, the Court held that state-law liability for design defects in military equipment cannot be imposed when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."  *Id*. at 512.

---

[45]  *See* Deposition of Doug Gaeddert, taken August 6, 2008, p. 149, attached as Ex. "A."

At the outset, Plaintiffs incorrectly argue that Forest River must show that its obligations under the contract with the government were in conflict with its performance of whatever state law might have been imposed on it.  Very recently, the U.S. Court of Appeals for the Fifth Circuit rejected the argument that the "significant conflict" issue was some sort of prerequisite to analyzing the three-prong test set forth in *Boyle*. *See In re Katrina Canal Breaches Litigation*, 2010 WL 3554304, *4 (5th Cir. Sept. 14, 2010). As the Fifth Circuit stated, "Whether the GCI defense will apply to a particular claim depends *only* upon whether *Boyle*'s three conditions are met . . . ." *Id*.  (emphasis in original). Therefore, only the three *Boyle* factors are relevant to this inquiry.

### 1. Government's Approval of Reasonably Precise Specifications

The first prong of the defense calls for the government to "approve" specifications that are "reasonably precise."  The government's approval turns on whether it exercised discretion over the product design, or whether it simply delegated discretion to the contractor.  *See Trevino v. Gen. Dynamics*, 865 F.2d 1474, 1480 (5th Cir. 1989).  Mere acceptance of the contractor's design choice without significant evaluation is "rubber stamping," not substantive review. *See Stout v. Berg-Warner Corp.*, 933 F.2d 331, 336 (5th Cir. 1991). The government exercises its discretion when it actually chooses a design feature. *Trevino,* 865 F.2d at 1480. As the Fifth Circuit has stated:

> The government delegates the design discretion when it buys a product designed by a private manufacturer; when it contracts for the design of a product or a feature of a product, leaving the critical design decisions to the private contractor; or when it contracts out the design of a concept generated by the government, requiring only that the final design satisfy minimal or general standards established by the government.

> *Id.*

However, the government's approval does not mean the government has to prepare the specifications itself.  *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000).  All that is required is that the government performs a "substantive review" of the specifications. *Trevino,* 865 F.2d at 1480.  Whether the government has undertaken such a review is based on several factors, including an examination of drawings, periodic evaluation, criticism, and extensive government testing.

24

*Kerstetter*, 210 F.3d at 435.  To complete a substantive review, there must be a "continuous back and forth between the contractor and government." *Id.* Furthermore, it is not necessary that the specifications depict the alleged defect, as long as the government evaluated the design aspect in question. *Id.*

> a.    **Plaintiffs misconstrue the allegedly defective design aspect at issue; the actual design aspect at issue was detailed by the specifications in a reasonably precise fashion.**

As it relates to the first prong of the defense, Plaintiffs have misunderstood what design aspect must be "reasonably precise" in the specifications.  They have argued that because "there is absolutely no mention of formaldehyde" in the specifications, the government's approval was not reasonably precise.  However, this argument has already been rejected by another appellate court. In *In Re: Agent Orange Product Liability Litigation*, the plaintiffs asserted that the government contractor defense was unavailable to chemical contractors because the specifications were silent with respect to dioxin, the allegedly harmful chemical involved in that case.  517 F.3d 76 (2nd Cir. 2008).  Just as the plaintiffs in this case have done, the plaintiffs in *Agent Orange* "misconceive[d] the nature of what the contracts in question were about and define[d] the alleged defective design too narrowly."  517 F.3d at 89. In that case, the government contracts called for the contractors to produce Agent Orange, which contained dioxin. *Id.* The Court found that the dioxin was not, in and of itself, defective; rather, it was the herbicide combination that produced the dioxin as a byproduct of the Agent Orange that was the allegedly defective product. *Id.*

Applied to this case, the specifications did not have to reference formaldehyde because the formaldehyde is not the allegedly defective product at issue. The chemical was but a component of a larger product – namely, the wood products, floor coverings, carpeting and underlying pads that were used to construct the finished trailer – just like the dioxin was part of the larger herbicide combination used to make Agent Orange. Critically, the products that contained the formaldehyde – the actual allegedly defective products – **were specified** when the government called for industry standard

25

products. The government's inclusion of "industry standard" in the specifications was a carefully chosen term based on FEMA's years of experience with the product, and was made subject to a number of very specific modifications by FEMA.[46] The industry standard was not some sort of vague catchall, but rather the foundation from which the government worked to obtain the exact product it wanted.

Thus, *Agent Orange* establishes that the specifications in this case did not need to reference formaldehyde in order to be reasonably precise, just like the dioxin did not need to be specified in that case. Plaintiffs' argument misses the mark as to the defective design, and as to what needed to be specified.  In this case, the government made specific choices about the design, knew what it wanted, and set out to obtain units that conformed to its specific design choices. In other words, it approved reasonably precise specifications.

### b.   Additional evidence shows that the government's approval of the specifications was reasonably precise.

Additionally, the *Agent Orange* court noted that where the government specifically assessed the alleged defect and made the decision to continue to order and use the product, the "reasonably precise specification" element of the *Boyle* test was met, concluding that "reordering the same product with knowledge of its relevant defects plays the identical role in the defense as listing specific ingredients, processes, or the like."[47] The *Agent Orange* court concluded:

> The government made an express determination, based on the knowledge available to it at the time, that Agent Orange as then being manufactured posed no unacceptable hazard for the wartime uses for which it was intended, and that the product should continue to be manufactured and supplied to it.  In light of this exercise of discretion, we read *Boyle* to require displacement of any alleged state law rules to the contrary.[48]

---

[46]   *See, e.g., In Re Air Disaster at Ramstein Air Base, Germany, on 8/29/90.*, 81 F.3d 570 (5th Cir. 1996) (holding that the history of selection and use of particular product without problems or complaints establishes right to assert government contractor defense); *Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir. 1989) (holding similarly and that where, as here, products are returned into service the element of conformance is specifically satisfied under *Boyle*).

[47]   *Agent Orange*, 517 F.3d at 95—96.

[48]    *Id.* at 96—97.

Here, the evidence established that the government had done its own testing of formaldehyde concentrations in travel trailers long before it put the plaintiffs into them, and concluded that they were viable temporary emergency housing options, particularly when combined with ventilation.[49] The government was also well aware that these units contained formaldehyde.[50] And, the government recognized that the design specification of EHUs was a <u>government</u> responsibility, and the assessment and response to the formaldehyde issue was likewise the purview of the <u>government</u>.[51]

In addition to *Agent Orange*, several decisions from the Fifth Circuit are on point with respect to the government's approval of reasonably precise specifications. In *Stout v. Berg-Warner Corp.*, the manufacturer alleged that the government approved reasonably precise specifications on an air conditioning unit used to cool a U.S. Army missile repair unit. *Id.* at 335. There, the Army controlled the design process by modifying the design of the air conditioner; reviewed, evaluated, tested and approved detailed design drawings at different stages during the process, including the prototype phase; and approved over fifty pages of design drawings. *Id.* The court agreed with the manufacturer and further acknowledged that the government had reviewed detailed drawings that the contractor submitted at various progressive stages of the design, performed critical design reviews, and evaluated and tested for months the prototype models produced by the manufacturer.

In *Smith v. Xerox Corp.*, an Army soldier was injured when a weapon simulator he was using exploded prematurely and burned his arm and torso. 866 F.2d 135, 136 (5th Cir. 1989). The soldier sued Xerox, the manufacturer, for his personal injuries. *Id.* Xerox won summary judgment under the government contractor defense. *Id.* On appeal, the Fifth Circuit noted that although Xerox failed to produce complete specifications for the original simulator, Xerox did produce a listing of those specifications, a copy of the original government performance criteria dictating the environmental

---

[49]     *See* Deposition of David Garratt, taken July 7, 2009, p. 207—08, attached as Exhibit "F."
[50]     *See* Deposition of Martin McNeese, taken July 14, 2009, p. 35, attached as Exhibit "G."
[51]     *See* Deposition of David Garratt, taken July 7, 2009, p. 216, 218, 230-231, 233, 234, attached as Exhibit "F."

specifications the government wanted the simulator to meet, and a production contract furnished by Xerox for a series of simulators containing specific reference to government-approved specifications. *Id.* at 138. Further, a Xerox employee who was involved with the development of the simulator testified that the Army reviewed and approved the drawings and specifications prepared by Xerox. *Id.* Because the government in this case supplied the relevant environmental specifications, and the employee's unrebutted testimony was that the government reviewed and approved Xerox's final drawings and specifications, the court held that the government had approved reasonably precise specifications. *Id.*

In *In re Air Disaster* at *Ramstein Air Base, Germany, on 8/29/90*, the plaintiffs brought product liability claims against the manufacturers of a military plane that crashed, tragically killing 13 of the 17 servicemen aboard. 81 F.3d 570, 571—72 (5th Cir. 1996). In considering the government contractor defense, the court acknowledged that the U.S. Air Force's substantive review, evaluation and testing of the aircraft "clearly implicate[d] the Government's discretionary function and approval of reasonably precise specifications." *Id.* at 575. Affidavits established that the manufacturers and the Air Force had worked closely together on the development of the plane from planning through production. *Id.* In addition, the Air Force inspected and supervised all aspects of the aircraft's production. *Id.* As the court said, "Clearly, the approvals in this case go far beyond mere rubber stamping." *Id.*

Decisions from outside of the Fifth Circuit are also instructive. In *Dowd v. Textron, Inc.*, 792 F.2d 409 (4th Cir. 1986), the Fourth Circuit held that the government contractor defense applied to shield a helicopter manufacturer from liability for an alleged design defect in the helicopter's rotor system. Plaintiffs argued that since the manufacturer originally designed the rotor system in the early 1960s without any participation by the Army, the government neither set nor approved reasonably detailed specifications. *Id.* at 412. The Court dismissed that argument, noting:

28

That argument overlooks a wealth of subsequent history. The Army had been using helicopters equipped with the 540 rotor system for some twenty years before Ellis and Dowd's accident; almost 9,000 UH-1 and AH-1 helicopters flew in Vietnam . . . the length and breadth of the Army's experience with the 540 rotor system-and its decision to continue using it-amply establish government approval of the alleged design defects.

*Id.* at 412 (emphasis added).

Applying these cases to the instant litigation, Forest River asserts that the government approved reasonably precise specifications for the EHUs. Forest River points out that, regardless of page length, these specifications were comprehensive and thorough, as was the inspection of the prototype. Plaintiffs completely ignore the fact that the Forest River FEMA spec unit was a unique floor plan/design that was specifically tailored to incorporate FEMA's requirements. Again, Forest River was not retrofitting any previously manufactured trailers but constructing each of these units to FEMA's design requirements. In fact, FEMA did more than any of the other governmental entities discussed in the aforementioned cases – it actually prepared the original set of procurement specifications for FEMA Model Travel Trailers, as detailed above. FEMA's specifications described minimum square footage of living space, floor plan configuration, finishes, furnishings, and environmental living conditions necessary to provide emergency housing during periods of disaster relief. The specifications referenced the quality of workmanship, and the specifications adhered completely to federal regulatory requirements. By making these pronouncements, FEMA supplied the relevant specifications that formed the basis of the production of travel trailers, much like the U.S. Army did in the *Smith* decision. FEMA specifically chose the design features for the trailer, and in doing so exercised great discretion over the complete design. *See Trevino,* 865 F.2d at 1480. Never did FEMA delegate design choices to Forest River carte blanche; instead, FEMA created the preferred design itself.

Additionally, FEMA exercised its discretion over the product design by specifically choosing to use travel trailers as part of its disaster relief efforts. Its use of these trailers as part of its disaster relief operations, especially in the same type of hot and humid climate that exists in this area, was

extensive and well documented.  Travel trailers were not a revolutionary product – FEMA knew exactly what was in them and used them without incident prior to Hurricane Katrina.  Just like the Army in *Dowd*, FEMA had a long and broad track record of using Forest River THUs and continued to lose those units over the course of some 15 years.  This clearly establishes the government approval over the alleged design defects.    Therefore, FEMA's approval of these reasonably precise specifications satisfies the first prong of the *Boyle* test. At the very least, the evidence establishes that Forest River has a plausible defense that FEMA reasonably approved these specifications.

        **c.**        **Plaintiffs' minimum standards argument is inapposite.**

In response to this evidence, the plaintiffs argue that the government's approval was not reasonable precise because the specifications only set forth minimum standards for the construction of travel trailers and allowed the manufacturers to supply units of equal or better quality. They point to language in the specifications that the specifications establish the minimal standards for travel trailer construction and outfitting, and that suppliers are not prohibited from providing equal or better units. According to the plaintiffs, the permission to construct better units allowed Forest River too much discretion in its manufacture of the trailers, and the minimum design standards "do not direct Defendant Forest River as to how to construct the units."

With all due respect, the plaintiffs' argument is nonsensical. The simple fact that the government did not foreclose the option of providing a "better" trailer (provided the competitive pricing and delivery requirements were met) does not mean that the government failed to exercise control over the design of the actual unit it specified. That is akin to arguing that the government, in asking a car manufacturer to build a Volkswagen and giving the manufacturer precise instructions on how to build that Volkswagen, did not adequately control the Volkswagen design simply because it told the car builder it would take a Mercedes, too. That the government would accept a "better" model says nothing about the specificity of its design of the standard model – the two concepts are wholly unrelated. The plaintiff misunderstands this entirely, going so far as to argue that the minimum

standards not only constitute a lack of specificity, but also that the minimum standards did "not direct Defendant Forest River as to how to construct the units." How four pages of documents dealing with all aspects of a unit – including minimum square footage of living space, floor plan configuration, finishes, furnishings, and environmental living conditions – could be said to provide no direction whatsoever defies logic. That evidence, along with the other evidence discussed above, establishes that FEMA approved reasonably precise specifications for the procurement of travel trailers.

### 2. Conformance to Specifications

The second prong requires the contractor to prove that the equipment it produced conformed to the specifications that were approved by the government. *Boyle*, 487 U.S. at 512. The Fifth Circuit has held:

> Nonconformance with a specification means more than that the ultimate design feature does not achieve its intended goal. The alleged defect must exist independently of the design itself, and must result from a deviation from the required military specifications. Extensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications.

*Kerstetter*, 210 F.3d at 435—36.

Decisions from the Fifth Circuit have reinforced the general rule. *In re Air Disaster*, discussed previously, held that the manufacturer's equipment conformed to specifications because the government inspectors were present and actively involved throughout the design, review, development and testing of the plane that crashed. 81 F.3d at 575. Furthermore, the evidenced showed that the Air Force accepted and had used the plane for over 20 years without any significant problems before the crash. *Id*. Likewise, in the *Xerox* decision, the court held that the evidence showed the manufacturer of the weapon that discharged prematurely had complied with the specifications for the product. *See* 866 F.2d at 138. When technicians analyzed the weapon after the accident, they could not duplicate the problem. *Id*. at 139. After the product was reassembled, the government put the product back into use. *Id*. Thus, the court held that the product complied with the applicable specifications. *See id*.

In this case, Forest River submits that its production of the units conformed to the specifications set forth by FEMA, and Plaintiffs have offered no evidence or argument to the contrary. Forest River has no record of any health complaints relating to formaldehyde in THUs. Additionally, FEMA's own personnel testified that prior to Katrina, there was not a shred of written evidence or documentation that showed problems with formaldehyde.[52] Additionally, just as with the *In re Air Disaster* and *Xerox* cases, the government used Forest River's products extensively as part of its disaster relief efforts following Hurricane Katrina. Such evidence shows that Forest River complied with FEMA's specifications, and thus satisfied the second prong of the *Boyle* test.

### 3. FEMA knew of formaldehyde in the trailers, but to the extent Forest River was obligated to "warn" FEMA about the dangers of formaldehyde, it did so.

The final prong requires the contractor to warn the government about dangers in the use of the equipment that are known to the contractor but not known to the government. *Kerstetter*, 210 F.3d at 436. The contractor has no obligation to inform the government of those dangers already known to the government. *Boyle*, 487 U.S. at 512. Additionally, "the purpose of this element is not to create an incentive to discover latent defects in a product designed for the government." *Kerstetter*, 210 F.3d at 436 (emphasis in original). Thus, the contractor only has a duty to inform of dangers it actually knows about, not those it should have known about. *Id*.

Even if one assumes that the presence of such low-levels of formaldehyde constitutes a "danger," a point which Forest River denies, the contractor only has a duty to inform of the **dangers it actually knows about, not should have known about**. *Kerstetter*, 210 F. 3d at 436. As Martin McNeese, FEMA's Emergency Program Specialist at the time of Hurricane Katrina, stated, it was no surprise that the travel trailers contained formaldehyde.[53] Clearly, FEMA knew that the subject unit contained the compound. In fact, it was known to FEMA that not only an industry standard travel

---

[52] *See* Deposition of David Garratt, taken July 7, 2009, p. 179 attached as Exhibit "F"; Deposition of Martin McNeese, taken July 14, 2009, p. 100-01, attached as Exhibit "G."
[53] *See* Deposition of Martin McNeese, taken July 14, 2009, p. 108, attached as Exhibit "G."

trailer, but also a conventional home, would contain formaldehyde.  Because FEMA already knew the existence of formaldehyde in the Emergency Housing Units, Forest River had no obligation to warn them about any condition in the trailer.

In addition, Forest River had **no health complaints** related to formaldehyde prior to this litigation, despite manufacturing thousands of trailers.  Thus, Forest River had no actual knowledge of any potential health hazards.  The fact that Forest River's Owner's Manual contained a formaldehyde warning is not evidence that it knew of any health complaints directed at the company.  The warning was a precautionary measure, not an admission of knowledge regarding its knowledge of health complaints related to formaldehyde.  Nevertheless, the statement was provided to FEMA with each unit.

Forest River provided a copy of its owner's manual, which contained a formaldehyde warning, with every trailer to FEMA – giving FEMA knowledge at least equal to that of Forest River.  FEMA personnel were also aware that formaldehyde was present inside the trailers, and at least had constructive knowledge of the health hazards related to formaldehyde via the HUD regulations on same.  *See U.S. ex rel. Finney v. Nextwave Telecom, Inc.*, 337 B.R. 479, 487 (S.D.N.Y., 2006) (noting that the federal legislature which enacted the law, the federal agencies which enforce the law, and the federal courts which apply the law are all charged with knowledge of the statute).

Even presuming there was a fact issue as to Forest River's actual knowledge of any alleged health hazards, it is clear that FEMA knew as much or more than Forest River.  At a minimum, Forest River has established that it has a plausible defense that it complied with the responsibility to warn under the circumstances.

In conclusion, Forest River avers that by establishing it has a plausible argument that it can satisfy each of the three elements to obtain government contractor immunity, it has proven its possession of a colorable federal defense. In doing so, it has satisfied the third and final prong of

Federal Officer Removal. Accordingly, this Court has jurisdiction over the plaintiffs' claims against Forest River.

### Plaintiffs' Requests for Costs

Plaintiffs also seek costs related to the filing of their instant Motion to Remand.  The United States Supreme Court has held that "the standard for awarding fees should turn on the reasonableness of the removal" and "[a]bsent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal."  *Admiral Ins. Co. v. Abshire,* 574 F.3d 267, 280 (5th Cir. 2009).  Further, it is settled in the Fifth Circuit that "[t]here is no automatic entitlement to an award of attorney's fees."  *Valdes v. Wal-Mart Stores, Inc.* 199 F.3d 290, 292 (5th Cir. 2000).  "Indeed, the clear language of the statute makes such an award discretionary."  *Id.*  "Although from time to time factual situations may arise in which the district court is required to award attorney's fees, the mere determination that removal was improper is not one of them." *Valdes,* 199 F.3d at 292.

Forest River submits that this request must be denied, as it has submitted not one but two valid grounds for removal.  In addition to the valid grounds for diversity removal under 28 U.S.C § 1332, Forest River has also set forth legitimate grounds for removal as a federal officer.  With regard to that federal question jurisdiction, it is critical to note that Forest River has **no obligation to actually prove the defense at this stage**.  *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998).  All that is required is a showing that the defense is plausible.  *U.S. v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001).  The Fifth Circuit has recognized that one of the most important functions of Federal Officer Removal is to allow a federal court to explore the validity of an asserted official immunity defense.  *Winters*, 149 F.3d at 397.

Forest River has provided a sufficient legal and factual basis to support removal under either diversity or federal question jurisdiction.  Accordingly, Plaintiffs' assertion that the removal

was "frivolous" is without merit, and their claim for costs related to this Motion to Remand should be denied.

## CONCLUSION

WHEREFORE, defendant, Forest River, Inc., prays that the Court deny Plaintiffs' Motion to Remand. Forest River prays that this matter be removed to the United States District Court for the Eastern District of Louisiana for further proceedings and disposition.

Respectfully submitted,

/s/ Ernest P. Gieger, Jr.
ERNEST P. GIEGER, JR.
Louisiana State Bar No. 6154
Texas State Bar No. 24054169
ANDREW A. BRAUN
Louisiana State Bar No. 3415
Texas State Bar No. 24061558
LAUREN C. CANCIENNE
Texas State Bar No. 24055257
GIEGER, LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana  70139-4800
Telephone:  (504) 561-0400
Facsimile:  (504) 561-1011
ATTORNEYS FOR FOREST RIVER, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of March, 2011, a copy of the foregoing *Opposition to Plaintiffs' Motion to Remand* was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to all known counsel of record by operation of the court's electronic filing system.

/s/ Ernest P. Gieger, Jr.