1

1        UNITED STATES DISTRICT COURT

2           DISTRICT OF LOUISIANA

3            NEW ORLEANS DIVISION

4    In Re:  FEMA Trailer    )

5    Formaldehyde Products  ) MDL No. 1873

6    Liability Litigation   )

7

8                            Washington, D.C.

9                            Tuesday, July 7, 2009

10   Videotape Deposition of DAVID EDWARD GARRATT, called

11   for examination by counsel for Plaintiffs in the

12   above-entitled matter, the witness being duly sworn

13   by CHERYL A. LORD, a Notary Public in and for the

14   District of Columbia, taken at the offices of NELSON

15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16   Avenue N.W., Suite 900, Washington, D.C., at 9:07

17   a.m., and the proceedings being taken down by

18   Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22

**EXHIBIT F**

1          Q.     With that being said, I want to direct you

2     to page 2 of 6, and particularly section 3 of your

3     declaration.   And this is where you're talking about

4     temporary emergency housing assistance to disaster

5     victims.   And I want to direct you to the sentence

6     that begins -- the second sentence of 3.

7               It begins:   From September 2005 to May 1,

8     2009, FEMA has provided a significant number of

9     Hurricane Katrina and Rita disaster victims with at

10    no cost travel trailers, park model trailers, and

11    manufactured housing, also commonly referred to as

12    mobile homes, hereinafter collectively referred to as

13    emergency housing, or EHUs.

14               Did I read that statement correctly, that

15    sentence?

16          A.     Yes.

17          Q.     Mr. Garratt, I want to ask a question:

18    What is the purpose of this sentence in this

19    statement in your declaration?

20          A.     Other than to convey the information that

21    it conveys?

22               (Mr. Fried and Ms. Williams-Jones entered

157

1    necessarily made any awards on that contract at this

2    stage of the game, just that we had a protocol for

3    going forward to execute the new contracts using

4    these specs and this testing protocol.

5          Q.    Did the new contract protocol extend to

6    each and every manufacturer that was a source of

7    emergency housing units?

8          A.    Yes.

9          Q.    Prior to that change, did -- was it the

10   prevailing view, at least your view, that the con- --

11   that the manufacturers were in fact providing units

12   that complied with the required safety standards for

13   formaldehyde?

14         A.    It was our understanding that the

15   manufacturers were -- if they were producing mobile

16   homes or manufactured housing, producing units that

17   complied with HUD standards.

18         Q.    M-hm.

19         A.    For those who were not producing

20   manufactured housing, they were producing park models

21   or travel trailers, which were recreational vehicles

22   that met or exceeded industry standards since there

158

1    were no federal standards that applied -- there were

2    no HUD standards that applied to their construction

3    at the time that those units were purchased for

4    Hurricane Katrina.

5         Q.    Well, how did the new specifications for

6    travel trailer manufacturing change what you refer to

7    as the industry standards?

8         A.    Well, our new specifications for park

9    models and mobile homes require that the units test

10   at point- -- what they ended up requiring is that

11   below .016 PPM.

12           Now, how the manufacturers and what the

13   manufacturers did to achieve that level in terms of

14   reducing components, materials, glues, et cetera,

15   that emit formaldehyde was up to them.  We were

16   interested in the outcome, which was a unit that

17   emitted no more than this amount of formaldehyde.

18           For travel trailers, we faced a different

19   or additional concern, and that was, they don't have

20   the ventilation systems that a park model or a mobile

21   home has.

22           So even if they use reduced formaldehyde,

179

1    problem was on March 16, 2006.  This issue has been

2    around a long time, and as I recall, surfaced in

3    previous disasters.  Has anyone researched this.

4             Now, did you know what Gil Jamieson was

5    referring to there?

6        A.   No.

7        Q.   Did you research it or have anyone else

8    research it?

9        A.   Yes.

10       Q.   And what was the result of the research?

11       A.   Inconclusive, anecdotal, no one was able

12   to provide any written documentation that there were

13   prior formaldehyde issues.

14       Q.   From prior disaster responses --

15       A.   Correct.

16       Q.   -- in particular.

17       A.   Gil was one individual who raised this

18   issue in this email.  I'm also aware and I don't

19   remember who the individual was, but somebody from

20   our logistics organization, had also suggested that

21   they had recalled dealing with formaldehyde problems

22   or a formaldehyde issue in a previous disaster, and I

1        Q.      From a formaldehyde standpoint.

2        A.      None whatsoever.

3        Q.      Can you talk a little bit about why FEMA

4    used travel trailers by the thousands both prior to

5    Hurricane Katrina and during the Hurricane Katrina

6    response?

7        A.      They were the preferred direct temporary

8    housing product because of their -- because of their

9    size, because we could move them in and set them up

10   quickly.  I think 80 percent of the units that we

11   provided in response to hurricanes Katrina and Rita

12   were on individuals' private property.  And typically

13   we put travel trailers on private property or often

14   because we can't fit anything else on their private

15   property.  They simply can't accommodate a mobile

16   home on their driveway.

17            So they were used because, number 1, they

18   filled a need that could not be met any other way.

19   2, they were inexpensive compared to a mobile home.

20   3, they allowed people to stay at their property and

21   rebuild their home as opposed to relocating them to a

22   community site that might be miles away and might be

1    far more expensive to build.

2              So a number of reasons I think contributed

3    to the use of travel trailers and their popularity at

4    least within a certain segment of the disaster

5    population on those small properties and wanted to

6    stay on their property and rebuild their home.

7         Q.    Am I also correct that during the prior

8    natural disaster events that we talked about prior to

9    Hurricane Katrina, can we assume that there were

10   young children and elderly people and stay-at-home

11   moms living in those travel trailers as well?

12        A.    I think that's safe to assume.

13        Q.    And again you're not aware of any

14   formaldehyde claims by any of those people in those

15   prior disasters?

16        A.    I'm not personally aware of any.

17        Q.    When you were working with the CDC after

18   Hurricane Katrina, did you become aware of the

19   results of a study that they did in Hancock County,

20   Mississippi, of children's pre-Katrina and

21   post-Katrina doctor visits?

22        A.    Not by -- not by that reference.

216

1    did not happen, but I'm not aware of it.

2            BY MR. SCANDURRO:

3       Q.    Okay.  And did FEMA at some point

4    establish a call center where an occupant who had any

5    concern at all about formaldehyde could make a phone

6    call to FEMA and talk about it?

7       A.    Yes.

8            We actually did several call centers.  The

9    main one was at one of our national processing

10   service centers, and they were linked in to CDC,

11   which also maintained a hotline, and so they were

12   collaborating on that in terms of referring phone

13   calls back and forth.

14           But also our TROs established their own

15   separate call centers in Mississippi and Louisiana to

16   handle calls regarding the same thing.  They were

17   also linked into this principal call center.

18           The short answer is yes.

19      Q.    So am I correct that early on, occupants

20   who expressed a formaldehyde concern could be moved

21   into a different housing unit, and then later on in

22   the process occupants who expressed a concern about

1        Q.    But the point is, from the beginning of

2    the Hurricane Katrina response to the end, FEMA was

3    willing to give people the opportunity to move out of

4    a unit if they expressed any formaldehyde concern

5    that you couldn't resolve?

6            MR. MILLER:  Objection, vague, time.

7        A.    I believe that was the general practice in

8    play, and it was my understanding that that was how

9    these issues were being resolved in the field by the

10   transitional recovery offices through their MDCs,

11   yes.

12            MR. SCANDURRO:  I tender the witness.

13

14      EXAMINATION BY COUNSEL FOR BECHTEL NATIONAL INC.

15            BY MR. HAINKEL:

16       Q.    Good afternoon, Mr. Garratt.

17            My name is John Hainkel, and I represent

18   Bechtel National Inc. in the formaldehyde litigation.

19            I read your declaration a couple of times,

20   and I've tried to listen closely today, so hopefully

21   I won't plow any new ground.

22            Am I correct that FEMA's authority to

230

```
 1         Q.    As of May 17th, 2007, your email here

 2    indicates that the new specifications will follow HUD

 3    emission levels.

 4              Do you see that?

 5         A.    I do.

 6         Q.    Was that the specifications that were

 7    eventually adopted by FEMA?

 8         A.    No.

 9         Q.    What were the specifications that were

10    finally adopted by FEMA for the new purchase -- new

11    units that were being purchased?

12         A.    Below .016 parts per million.

13         Q.    And as you sit here today, what is your

14    best recollection of when that determination was made

15    to use the 0- -- 0.016 part per million standard?

16         A.    To the best of my recollection, it

17    occurred after we published the -- the interim

18    direction, and that interim direction is what

19    suspended the use of travel trailers and provided

20    conditions for the use of manufactured housing.

21              That interim direction required that

22    states must establish an acceptable level of
```

231

1    formaldehyde for any units that we brought into their

2    states to be used by their -- by disaster survivors

3    in their states.

4              And what we found were that states were

5    very reluctant to establish these levels or that they

6    were defaulting to a very low level that was actually

7    below the HUD level.  As a result, because that

8    forced to us then test every unit that we have before

9    we delivered it to find out what -- at what level it

10   was at and to see if it would meet their standards,

11   we needed a level that was so low that no state would

12   have a problem with us unilaterally bringing those

13   units into their states to serve their disaster

14   victims.

15        Q.    Were there any internal concerns or policy

16   concerns relating to use of those 0.016 PPM standard?

17        A.    There were some concerns.

18              I know that initially HUD did not think

19   that achieving such a standard in manufactured

20   housing was achievable.  So there was a technical

21   concern from their perspective.

22              There were some concerns that what we were

233

1        agencies' actions during a disaster relief?

2           A.     I think supervision of their day-to-day

3        activities is probably overstating what our

4        responsibility is.

5               What our responsibility is to organize

6        the -- and coordinate and integrate the response of

7        all of the federal agencies who are brought to the

8        table to help in a disaster environment as well as

9        voluntary agencies as well as the private sector

10       designated by the president to perform that role in

11       that function.

12              Now, does that mean that we're responsible

13       for supervising all of the actions of everybody who's

14       involved in that response, no.

15              But what it does mean is that we are

16       responsible for the overall disaster and for, again,

17       organizing and coordinating the engagement of federal

18       agencies and the engagement of the resources, assets,

19       and authorities that they have.

20              For example, we can task a federal agency

21       to exercise their authorities in a disaster.  Well,

22       it's still their authority.  It's not ours.

1              We can be responsible for requiring

2    them to do that, but it's their responsibility

3    to exercise their authorities and to do so

4    responsibly.

5        Q.    And in providing the disaster response, do

6    you rely upon other federal agencies?

7        A.    Absolutely.

8              MR. MILLER:  I have no further

9    questions.

10             Pass the witness.

11             MR. MEUNIER:  Any other cross-examination

12   by defense counsel?

13

14   FURTHER EXAMINATION BY PLAINTIFFS' CO-LIAISON COUNSEL

15             BY MR. MEUNIER:

16       Q.    I just have a couple of followup to what

17   was covered on cross, Mr. Garratt.

18             Counsel for the manu- -- for one of the

19   manufacturers asked if in earlier disasters there had

20   been complaints received by FEMA about formaldehyde

21   problems.

22             In any earlier disasters that you're aware