1

1  UNITED STATES DISTRICT COURT

2  DISTRICT OF LOUISIANA

3  NEW ORLEANS DIVISION

4  In Re:  FEMA Trailer       )

5  Formaldehyde Products      ) MDL No. 1873

6  Liability Litigation       )

7

8                                  Washington, D.C.

9                                  Thursday, July 9, 2009

10  Videotape Deposition of STEPHEN CARL MILLER, called

11  for examination by counsel for Plaintiffs in the

12  above-entitled matter, the witness being duly sworn

13  by CHERYL A. LORD, a Notary Public in and for the

14  District of Columbia, taken at the offices of NELSON

15  MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16  Avenue N.W., Suite 900, Washington, D.C., at

17  9:18 a.m., and the proceedings being taken down by

18  Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22

179

1  filed in this case by the United States as Miller

2  number 21.

3                    (Miller Exhibit No. 21

4                     was marked for

5                     identification.)

6           BY MR. SCANDURRO:

7      Q.   This is a declaration by Clyde Payne, who

8  was with OSHA at the time.  And I want to just ask

9  you a question about one of Mr. Payne's conclusions.

10          If you turn to page 3 of 4, sir.

11          In paragraph 10, 5 lines from the bottom

12 of paragraph 10, Mr. Payne makes the statement in his

13 declaration:  Further, I informed him -- and "him" is

14 Bronson Brown of the FEMA safety office -- further I

15 informed him that OSHA had conducted followup testing

16 to firm that ventilation and airing out the units was

17 a sufficient response action.  That testing confirmed

18 that airing out and venting units for a short time

19 reduced formaldehyde levels below OSHA PELs, and

20 those results were shared at regular JFO meetings and

21 also posted on the OSHA Website.

22          Do you see that?

1    A.    I do see that.

2    Q.    Okay. And in paragraph 11, Mr. Payne

3 says: In addition, I further inform Mr. Brown that

4 formaldehyde levels in units should be relatively low

5 once they were handed over to the public. This is

6 because by the time the unit is issued to a disaster

7 victim, the unit will have had an opportunity to air

8 out and vent as a result of contractor making the

9 unit ready for occupancy.

10        Do you see that?

11    A.    Yes, sir.

12    Q.    Do you agree with those conclusions based

13 on your experience in the field working for FEMA?

14        MR. WOODS: Objection, foundation.

15    A.    That was the -- you know, the levels of

16 formaldehyde would be reduced. I can't say that --

17 what -- how low they would be on individual units or

18 how they would have an effect on an applicant on any

19 individual in there, but the -- from my experience,

20 that the formaldehyde would eventually cure or bake

21 off, and would no longer off-gas, so that's -- does

22 somewhat, you know, validate what I know as far as

1   the levels being dropped.  I don't know how long, you

2   know, it would be in there relatively low, once they

3   were handed over.  I don't know that.

4            BY MR. SCANDURRO:

5       Q.   When the reference is made to a contractor

6   making the unit ready for occupancy, do you -- do you

7   have an understanding of who that contractor would

8   be?

9       A.   That would have been a -- one of the

10  contractors for one of the prime contractors that was

11  contracted with FEMA.

12      Q.   It wouldn't be a manufacturer like Gulf

13  Stream?

14      A.   No, sir.

15      Q.   I'm going to mark an email as Miller

16  number 22 and ask you to take a look at that.

17                  (Miller Exhibit No. 22

18                   was marked for

19                   identification.)

20           BY MR. SCANDURRO:

21      Q.   This is a May 11, 2006, email from Kurtis

22  Melnick to Marvin Dickerson.

182

1            And do you see you're cc'ed on that email?
2       A.   Yes, sir.
3       Q.   Who is Kurtis Melnick?
4       A.   Kurtis Melnick and I work together. He's
5  a log (phonetic) chief down in New Orleans now.
6       Q.   And what about Marvin Dickerson?
7       A.   I do not -- I don't -- do not recall
8  Mr. Dickerson.
9       Q.   Looking at the email in the third
10 paragraph, Mr. Medical is talking about the procedure
11 for removing formaldehyde odor from a temporary
12 housing unit that's been sitting in the sun.
13           Do you see that?
14      A.   Yes, sir.
15      Q.   He says the procedure for this is opening
16 the windows and possibly the door for a day or 2 or
17 until the odor is completely gone. In Louisiana,
18 this has been the job of the contractors or it has
19 occurred that someone from IA enters a trailer and
20 notices the odor, then they have also been opening
21 the windows. This should however be the
22 responsibility of the contractors.

183

1          Do you see that?
2     A.   Yes, sir.
3     Q.   Was that your understanding of what the
4  contractors and/or the IA personnel were doing in the
5  field when they set these trailers up?
6     A.   That is pretty much my understanding.
7     Q.   And if you look down in the last
8  paragraph, Mr. Melnick says:  Our current method of
9  having the contractors who make the units RFO -- is
10 that "ready for occupancy"?
11    A.   Yes, sir.
12    Q.   -- seems to be satisfying any concerns
13 from the applicants we are housing.
14         Do you see that?
15    A.   Yes, sir.
16    Q.   Do you agree with that statement based on
17 your experience at that time?
18    A.   I think at that time during early May of
19 2006 that the number of complaints and the resolution
20 by airing it out by the contractor making it was --
21 was satisfying the applicants.
22    Q.   And again, the contractors we're talking

184

1    about here are the contractors who are actually
2    installing the units on-site?
3         A.    That is correct.
4         Q.    It would not be a manufacturer like Gulf
5    Stream?
6         A.    No, sir.
7         Q.    When you worked the Florida hurricanes in
8    2004, did you actually go to Florida at any -- for
9    any of those 4 storms you described earlier?
10        A.    I was in Florida.
11        Q.    So you were in Florida at the end of 2004?
12        A.    Yes, sir.
13        Q.    Okay.  Were you made aware of any
14   formaldehyde claims by residents of the THUs in
15   Florida?
16        A.    I do not recall any formaldehyde claims
17   out of Florida --
18        Q.    Okay.
19        A.    -- that I'm aware of.
20        Q.    Are you aware of the fact that Gulf Stream
21   sold approximately 7,000 travel trailers to FEMA on
22   the Florida disaster?

1   A.   I'm not sure of the number, but I do know
2   that they did sell -- we had quite a number of the
3   spec models.
4   Q.   And as far as your experience in Florida
5   was concerned, there was no formaldehyde problem or
6   issue with any of those Gulf Stream travel trailers
7   in 2004?
8   A.   That is correct.
9   Q.   I'm going to show you a document I'm going
10  to mark Miller number 23.
11                    (Miller Exhibit No. 23
12                     was marked for
13                     identification.)
14        BY MR. SCANDURRO:
15  Q.   I've handed you what appears to be a
16  chronology.  It may be a draft chronology.  And I
17  just wanted to ask you -- on the first page at the
18  top, it says, travel trailers, formaldehyde
19  chronology, draft modified 5-23-07, 9 AM Eastern.
20       Do you see that?
21  A.   Yes, sir, I do see that.
22  Q.   Do you recognize this document?