1

1        UNITED STATES DISTRICT COURT

2          DISTRICT OF LOUISIANA

3           NEW ORLEANS DIVISION

4   In Re:  FEMA Trailer    )

5   Formaldehyde Products   ) MDL No. 1873

6   Liability Litigation    )

7

8                        Washington, D.C.

9                        Tuesday, July 7, 2009

10  Videotape Deposition of DAVID EDWARD GARRATT, called

11  for examination by counsel for Plaintiffs in the

12  above-entitled matter, the witness being duly sworn

13  by CHERYL A. LORD, a Notary Public in and for the

14  District of Columbia, taken at the offices of NELSON

15  MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16  Avenue N.W., Suite 900, Washington, D.C., at 9:07

17  a.m., and the proceedings being taken down by

18  Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22

**EXHIBIT F**

```
 1         Q.   With that being said, I want to direct you
 2    to page 2 of 6, and particularly section 3 of your
 3    declaration.  And this is where you're talking about
 4    temporary emergency housing assistance to disaster
 5    victims.  And I want to direct you to the sentence
 6    that begins -- the second sentence of 3.
 7              It begins:  From September 2005 to May 1,
 8    2009, FEMA has provided a significant number of
 9    Hurricane Katrina and Rita disaster victims with at
10    no cost travel trailers, park model trailers, and
11    manufactured housing, also commonly referred to as
12    mobile homes, hereinafter collectively referred to as
13    emergency housing, or EHUs.
14              Did I read that statement correctly, that
15    sentence?
16         A.   Yes.
17         Q.   Mr. Garratt, I want to ask a question:
18    What is the purpose of this sentence in this
19    statement in your declaration?
20         A.   Other than to convey the information that
21    it conveys?
22              (Mr. Fried and Ms. Williams-Jones entered
```

1    necessarily made any awards on that contract at this

2    stage of the game, just that we had a protocol for

3    going forward to execute the new contracts using

4    these specs and this testing protocol.

5         Q.   Did the new contract protocol extend to

6    each and every manufacturer that was a source of

7    emergency housing units?

8         A.   Yes.

9         Q.   Prior to that change, did -- was it the

10   prevailing view, at least your view, that the con- --

11   that the manufacturers were in fact providing units

12   that complied with the required safety standards for

13   formaldehyde?

14        A.   It was our understanding that the

15   manufacturers were -- if they were producing mobile

16   homes or manufactured housing, producing units that

17   complied with HUD standards.

18        Q.   M-hm.

19        A.   For those who were not producing

20   manufactured housing, they were producing park models

21   or travel trailers, which were recreational vehicles

22   that met or exceeded industry standards since there

1   were no federal standards that applied -- there were

2   no HUD standards that applied to their construction

3   at the time that those units were purchased for

4   Hurricane Katrina.

5       Q.   Well, how did the new specifications for

6   travel trailer manufacturing change what you refer to

7   as the industry standards?

8       A.   Well, our new specifications for park

9   models and mobile homes require that the units test

10  at point- -- what they ended up requiring is that

11  below .016 PPM.

12           Now, how the manufacturers and what the

13  manufacturers did to achieve that level in terms of

14  reducing components, materials, glues, et cetera,

15  that emit formaldehyde was up to them.  We were

16  interested in the outcome, which was a unit that

17  emitted no more than this amount of formaldehyde.

18           For travel trailers, we faced a different

19  or additional concern, and that was, they don't have

20  the ventilation systems that a park model or a mobile

21  home has.

22           So even if they use reduced formaldehyde,

1      Q.    From a formaldehyde standpoint.
2      A.    None whatsoever.
3      Q.    Can you talk a little bit about why FEMA
4  used travel trailers by the thousands both prior to
5  Hurricane Katrina and during the Hurricane Katrina
6  response?
7      A.    They were the preferred direct temporary
8  housing product because of their -- because of their
9  size, because we could move them in and set them up
10 quickly.  I think 80 percent of the units that we
11 provided in response to hurricanes Katrina and Rita
12 were on individuals' private property.  And typically
13 we put travel trailers on private property or often
14 because we can't fit anything else on their private
15 property.  They simply can't accommodate a mobile
16 home on their driveway.
17           So they were used because, number 1, they
18 filled a need that could not be met any other way.
19 2, they were inexpensive compared to a mobile home.
20 3, they allowed people to stay at their property and
21 rebuild their home as opposed to relocating them to a
22 community site that might be miles away and might be

```
 1   far more expensive to build.
 2            So a number of reasons I think contributed
 3   to the use of travel trailers and their popularity at
 4   least within a certain segment of the disaster
 5   population on those small properties and wanted to
 6   stay on their property and rebuild their home.
 7       Q.   Am I also correct that during the prior
 8   natural disaster events that we talked about prior to
 9   Hurricane Katrina, can we assume that there were
10   young children and elderly people and stay-at-home
11   moms living in those travel trailers as well?
12       A.   I think that's safe to assume.
13       Q.   And again you're not aware of any
14   formaldehyde claims by any of those people in those
15   prior disasters?
16       A.   I'm not personally aware of any.
17       Q.   When you were working with the CDC after
18   Hurricane Katrina, did you become aware of the
19   results of a study that they did in Hancock County,
20   Mississippi, of children's pre-Katrina and
21   post-Katrina doctor visits?
22       A.   Not by -- not by that reference.
```