UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCTS LIABILITY | * | SECTION: N (5) |
| LITIGATION | * | |
| | * | JUDGE: ENGELHARDT |
| THIS DOCUMENT RELATES TO: | * | |
| | * | MAG. JUDGE: CHASEZ |
| *Irma Miller, et al. v. Sun Valley, Inc., et al* | * | |
| *Docket No. 09-5658 (Charles Marshall)* | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF SUN VALLEY'S MOTION FOR SUMMARY JUDGMENT FOR FAILURE TO ESTABLISH "REASONABLY ANTICIPATED USE" UNDER THE LPLA REGARDING CLAIMS OF CHARLES MARSHALL**

**MAY IT PLEASE THE COURT:**

Defendant, Sun Valley, Inc. d/b/a Sun Lite ("Sun Valley"), respectfully submits this Memorandum in Support of its Motion for Summary Judgment regarding the claims made against Sun Valley under the Louisiana Products Liability Act ("LPLA") by Plaintiff Charles Marshall. Sun Valley asserts that Plaintiff cannot carry his burden of establishing "reasonably anticipated use" as contemplated by, and required for his recovery under, the LPLA.

**I.   FACTUAL SUMMARY**

This Multi-District Litigation is the consolidation of several state and federal toxic tort suits in which an estimated thirty thousand named plaintiffs claimed to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal Emergency Management Agency ("FEMA") as a result of the alleged un-inhabitability of their residences due to Hurricanes Katrina and Rita. (Doc. No. 109, at ¶ 96). During the course of this litigation,

the parties completed the class certification phase, conducted substantial discovery, and now have moved into the trial phase.

Charles Marshall commenced his cause of action in an unmatched lawsuit on June 15, 2009. (*Kenshawn King v. Alliance Homes, Inc et al.*, case #09-4074) (Rec. Doc. 1) He then "matched" his claims against Sun Valley on August 14, 2009. (*Irma Miller, et al. v. Sun Valley, Inc., et al.*, case #09-cv-04074) (Rec. Doc. 1) Plaintiff subsequently filed a Second Amended Complaint for Damages. (Rec. Doc. 17717) On January 6, 2011, this Court issued Orders severing the claims of the Plaintiff, so that he could be tried separately. (Rec. Doc. 19333)

The causes of action against Defendant, Sun Valley, arise under the LPLA, and are embodied throughout paragraphs 97 through 102 of the Plaintiff's Second Amended Complaint for Damages. (Rec. Doc. 17717) The LPLA establishes the exclusive theories of liability for manufacturers for damage caused by their products, and Plaintiff may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in the provisions of the LPLA. LA. R.S. 9:2800.52.

In summary, Sun Valley herein asserts that Plaintiff, Charles Marshall, cannot carry his burden of establishing essential elements of his claims, namely he cannot establish the threshold requirement of demonstrating that his use of Sun Valley's travel trailer for permanent housing in excess of two years was a "reasonably anticipated use" as contemplated by the LPLA. La. R.S. 9:2800.54 A; 9:2800.53(7)

## II. LAW & ARGUMENT

### A. Summary Judgment Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the nonmoving party, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must initially show "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party need only point out this absence; it "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994).

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir.1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Little*, 37 F.3d at 1075; *Wallace*, 80 F.3d at 1047. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Wallace*, 80 F.3d at 1048 (quoting *Little*, 37 F.3d at 1075); *see also, S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir.1996). If the nonmovant cannot meet this burden, then "the motion for summary judgment must be granted." *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir.1996); *Little*, 37 F.3d at 1076.

**B.     Plaintiff Fails to Establish "Reasonably Anticipated Use" as Contemplated by the Louisiana Product Liability Act**

   **1.  Definition and Legal Standard of Reasonably Anticipated Use**

The LPLA states that "[t]he manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La. R.S. 9:2800.54(A). Under the LPLA, if a plaintiff's damages did not arise from a reasonably anticipated use of the product, then the "unreasonably dangerous" question need not be reached. *Kampen v. American Isuzu Motors, Inc.*, 157 F.3d 306, 309 (5th Cir. 1998) (citing *Johnson v. Black & Decker U.S., Inc.*, 701 So.2d 1360, 1366 (La.App. 2d Cir.1997); *Delphen v. Department of Transportation and Development*, 657 So.2d 328, 334 (La.App. 4th Cir. 1995). Plaintiff bears the burden of proving at trial that his use of the product in question was a "reasonably anticipated use" as contemplated by the LPLA. *Lockart v. Kobe Steel Ltd. Const. Machinery Div.*, 989 F.2d 864 (5th Cir. 1993)

The LPLA defines "reasonably anticipated use" as a "use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. R.S. 9:2800.53(7) The standard for determining a reasonably anticipated use, under the LPLA, is objective and what constitutes a reasonably anticipated use is to be ascertained from the point of view of the manufacturer at the time of manufacture. *Thompson v. Nissan North America, Inc.*, 429 F.Supp.2d 759 (E.D. La. 2006), affirmed, 230 Fed.Appx. 443, 2007 WL 1655307; See also, *Broussard v. Procter & Gamble Co.*, 463 F.Supp.2d 596 (W.D. La. 2006), affirmed, 517 F.3d 767; *Payne v. Gardner*, 2010 WL 4225906 (La.App. 3 Cir. 10/27/10). This definition of "reasonably anticipated use" in the LPLA is narrower in scope than its pre-LPLA counterpart, "normal use," which included all reasonably foreseeable uses and

misuses of product. *Myers v. American Seating Co.*, 637 So.2d 771, 775 (La.App. 1 Cir. 5/20/94), writ denied 644 So.2d 631 (La. 10/7/94), writ denied 644 So.2d 632 (La. 10/7/94).

"The restriction was incorporated to make it clear that a manufacturer will not be responsible for accounting for every conceivable foreseeable use of a product." *Butz v. Lynch*, 762 So.2d 1214, 1218 (La.App. 1 Cir. 6/23/00), rehearing denied, writ denied, 774 So.2d 980 (La. 11/17/00) (citing *Delphen*, 657 So.2d at 233). Furthermore, the use of the words "reasonably anticipated" effectively discourages the fact-finder from using hindsight. *Payne v. Gardner*, 56 So.3d 229, 231 (La. 2011) (citing *Daigle v. Audi of America, Inc.*, 598 So.2d 1304, 1307 (La.App. 3 Cir.), *writ denied,* 604 So.2d 1306 (La. 1992))

If Plaintiff's claims are to survive summary judgment, this Court must determine, in light of the above, that Plaintiff has made a sufficient evidentiary showing that Sun Valley, at the time of manufacture, should have reasonably expected an ordinary customer to use its product in the manner in which it was used by Plaintiff, i.e. permanent housing for more than two years. See, *infra*, Section II(B)(3) (for discussion of scope-of-use analysis); *Hunter on Behalf of Hunter v. Knoll Rig & Equipment Mfg. Co., Ltd.*, 70 F.3d 803, 808 (5th Cir. 1995). This showing, and judicial determination, must be made whether or not Plaintiff's actual use of Sun Valley's product was reasonably foreseeable by Sun Valley. *Id.* at 810 (citing *Daigle*, 598 So.2d at 1307; *Lockart*, 989 F.2d at 867)

## 2. Application of the "Reasonably Anticipated Use" Analysis to the Instant Case

### a) The Manufacturer

Sun Valley manufactured truck campers and travel trailers. (Exhibit "A", Deposition of Mark Romanetz, 17:12-16).[1] The company began as Sun Lite, Inc., in 1980, and became Sun Valley, Inc., after financial reorganization in 2000. (Exhibit "A", 12:15-17; 14:22-25) In 2008, a downturn in the economy resulted in the inability of Sun Valley dealers to secure financing to purchase Sun Valley products, and a similar lack of consumer financing caused demand for their product to fall. (See Exhibit "A", 16:1-17:11) Faced with falling demand, dealer foreclosure, and economic losses from inventory re-purchase, Sun Valley executives determined that continuing operations was not worthwhile, and ceased business operations in December, 2008. (Exhibit "A", 16:1-17:11)

### b) The Product

The Sun Valley products at issue are marketed as "recreational vehicles." (Sun Valley Owner's Manual, attached hereto as "Exhibit "B") Specifically, the instant products are "travel trailers" with "either two or three sets of axles . . . pulled by a pickup truck, SUV [or] car." (Exhibit "A", 14:3-5) Because the type of travel trailer eventually acquired by FEMA was Sun Valley's "standard" travel trailer, any distributor or dealer across the country could purchase it. (Exhibit "A", 64:24-65:5).

The definition of "travel trailers" within Plaintiff's Complaints states that "[t]hey are designed to provide temporary living quarters and are generally considered vehicles." (paragraph 18, Rec. Doc. 17717) This is a conveniently edited excerpt of the more complete definition which provides, in pertinent part:

---

[1] Mark Romanetz was deposed as a corporate representative of Sun Valley pursuant to Fed. R. Civ. Proc. 30(b)(6).

> Travel trailers are wheel-mounted trailers designed to provide temporary living quarters **during periods of recreation, camping, or travel**. Travel trailers generally have size limits, such as 8 feet wide and 40 feet long, for an area of less than 320 square feet. Travel trailers generally are considered vehicles rather than structures and are regulated by state transportation authorities rather than by housing authorities. (emphasis added)

(See INTERIM CDC FINDINGS—FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 9, 2008, at 4, *available at* http://www.cdc.gov/nceh/ehhe/trailerstudy/assessment.htm ("CDC Interim Report")).

### c) Industry Distinctions and Regulation

The distinctions among the various products involved in this litigation are manifestly apparent in the definitions provided in the CDC reports cited above. "Mobile Homes" are, as also evidenced by their name, distinguishable from "travel trailers." Mobile Homes, or manufactured homes, are built on a permanent chassis; contain plumbing, heating, air-conditioning, and electrical systems; and are designed to be used as permanent homes. They are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). (24 C.F.R. § 3280.2) Title 24 of the Code of Federal Regulations creates standards with regard to design, construction, fire safety, plumbing, heating and electrical systems of "manufactured homes" which are designed to be used as dwelling units. (24 C.F.R. § 3280.1) These standards were developed specifically for "manufactured homes" due to Congressional findings that these homes "play a vital role in meeting the housing needs of the nation" and "provide a significant resource for affordable homeownership and rental housing." (42 U.S.C.A. § 5401(a))

Sun Valley "travel trailers" are not manufactured housing. (Exhibit "C", Deposition of Tommie Sanford, 16:23-25). Instead, Sun Valley travel trailers are "recreational vehicles." They are not designed or marketed for or made for full-time residential use or for commercial purposes. The owner's manual warranty excludes full-time or commercial use. (Exhibit "A",

25:11-15; Exhibit "B", page 7, exclusion #3) HUD requirements and regulations do not apply to Sun Valley travel trailers. (*In re FEMA Trailer Formaldehyde Products Liability Litigation*, 620 F.Supp.2d 755 (E.D. La. 2009); Exhibit "C", 16:20-22)

Instead of being regulated by HUD, Sun Valley was a member of the Recreational Vehicle Industry Association (the "RVIA") which establishes nationwide industry standards for recreational vehicles such as travel trailers. (Exhibit "A", 21:3-22:19) The RVIA conducted regular inspections of manufacturing facilities and finished products of its members, including Sun Valley, ensuring compliance with industry standards. (Exhibit "A", 21:25-22:19) The entire time that Sun Valley designed and built travel trailers, from 1984 through 2008, its travel trailers complied with all applicable codes, regulations, and industry standards. (Exhibit "A", 22:2-14)

### d) The Ordinary Customer

Sun Valley travel trailers were not designed, made, or marketed for full-time residential use. (Exhibit "A", 25:11-15) Instead, "[Sun Valley] travel trailers were meant for the 'weekend warrior' or somebody that's going to take it out for a couple weeks." (Exhibit "A", 25:17-19) "It's a recreational travel trailer." (Exhibit "A", 25:19-20) Even a cursory review of the Sun Valley Owner's Manual would reveal that the product is designed to be a portable, temporary shelter for outdoor recreational excursions, such as camping.

The first substantive portion of the Owner's Manual is entitled "Before Your First Trip." (Exhibit "B", page 9) It provides the customer with "tips to ensure that [their] first excursion is as effortless as possible" and discusses topics such as hitching, towing, loading and highway driving. (Exhibit "B", pages 9-14) The Manual also has a section on "Camping Procedures" which advises that "[w]hen finding a campsite, try to find a site as level as possible." (Exhibit "B", page 23) At the end of the manual, Sun Valley offers its customers advice on "Winterizing

Your Trailer", noting that "[y]ou can continue to camp in cold weather . . . [h]owever, if you decide to store your trailer during the winter, we recommend the following procedures." (Exhibit "B", page 34)

Moreover, the Sun Valley travel trailer is designed with spring suspension, to be towed down the road, at highway speeds, even on back roads or bumpy roads, and in campgrounds. (Exhibit "A". 68:2:-70:11) The product is one of several in a distinct industry: the recreational vehicle industry. The travel trailer is regulated by transportation authorities rather than housing authorities. (Rec. doc 17717, paragraphs 17-18) For ordinary customers looking for permanent, long-term, immobile housing, there is an entirely different product—manufactured housing—in a wholly separate industry: the manufactured housing industry.  See, *supra*, Section II(B)(2)(c) of this Memorandum.

The manufactured housing industry requires that their products meet specifications similar to other residential housing units. 24 C.F.R. § 3280.1.  Why?  Because the products manufactured by this industry "play a vital role in meeting the housing needs of the nation" and "provide a significant resource for affordable homeownership and rental housing." 42 U.S.C. §5401(a)) The same, of course, cannot be said of a recreational vehicle.  Clearly, an ordinary customer of the recreational vehicle industry would not be looking for a manufactured home, and likewise, an ordinary customer of the manufactured housing industry is not looking for a recreational vehicle.

### e) The Time of Manufacture

Plaintiff's travel trailer was manufactured in the 2006 model year. (Exhibit "A", 20:15-22; Exhibit "D", Deposition of Charles Marshall, Exhibit 6) Sun Valley manufactured their 2006 model year travel trailers from June of 2005 through May of 2006. (Exhibit "A", 109:17-18).

However, by late November 2005, Plaintiff Charles Marshall had received his travel trailer from FEMA. (Exhibit "D", 194:2-4).

### f) The Actual Use of the Product by the Plaintiff

Prior to and throughout plaintiff's use of the Sun Valley travel trailer, his trailer was raised up off of its wheels, onto six evenly-spaced cinder block pilings. (Exhibit "A", 80:9-19, referring to Deposition Exhibit 7; Exhibit "D", 192:23-193:2) Sun Valley never saw FEMA's requirements for trailer installation, thus it was unaware that its travel trailers were being set up on cinder blocks. (Exhibit "A", 79:12-80:8) Sun Valley's Owner's Manual does not address lifting a travel trailer to heights which bring the wheels off of the ground. (Exhibit "A", 86:14-22)

Plaintiff's use of the travel trailer was for permanent, full-time housing for a continuous period of roughly three years. (Exhibit "D", 63:15-23; 194:7-10) Plaintiff, Charles Marshall lived in his trailer from December 2005 through October 2008. (Exhibit "D", 156:21-157:2)

### g) The Intended, and Reasonably Anticipated, Use of the Product

The Sun Valley travel trailer at issue was not designed with FEMA in mind. Sun Valley did not contract to build trailers for, or to have trailers purchased by, FEMA. (Exhibit "A", 46:2-4; 51:17-19) Sun Valley did not expedite manufacturing or modify trailer design to meet FEMA requirements. (Exhibit "A", 48:3-5; 51:20-52:6) Sun Valley had an opportunity to bid on a FEMA contract to build trailers to FEMA specifications and chose not to do so. (Exhibit "E", Deposition of Daniel Morrison, 35:18-23).[2] It was a conscious corporate decision not to divert manufacturing capacity away from its standard designs and its dealers. (Exhibit "A", 14:20-25; 46:16-8) Sun Valley simply was unwilling and lacked the manufacturing capacity to build "a

---

[2] Daniel Morrison was deposed as a corporate representative of Sun Valley pursuant to Fed. R. Civ. Proc. 30(b)(6).

special travel trailer" for FEMA emergency housing." (Exhibit "A", 50:4-14)  Prior to Hurricanes Katrina and Rita, Sun Valley had no knowledge that its trailers were ever used in connection with any other disaster. (Exhibit "A", 95:9-15)

Similarly, Sun Valley travel trailers are not designed with a residential user in mind.  Its trailers do not have typical residential toilets, nor are they designed to connect to sewer lines. (Exhibit "A", 159:1-22) Sun Valley trailers only have a six (6) gallon hot water heater and six (6) cubic foot refrigerator. (Exhibit "A", 160:2-6; 160:18-22) The holding tanks are not big enough for full-time use, and are not insulated or heated to provide for extended use during winter months. (Exhibit "A", 163:17-164:4) For example, the Owner's Manual describes the tank's limitations, explaining that if you have a twenty gallon holding tank, you can get about 80 flushes before you have to empty the tank. (Exhibit "B", page 26)

Instead, the Sun Valley Owner's Manual "welcomes [the purchasers of its trailers] to the exciting world of recreational travel." (Exhibit "B", page 3) Clearly, the Owner's Manual prepares the purchaser for no other use of the trailer other than short-term excursions in which the trailer is towed to and from a recreational camping sight, or other comparable excursion. (Exhibit "B"; *supra*, Section II(B)(2)(b) and Section II(B)(2)(d) of this Memorandum). Sun Valley has clearly testified to the intended use of its trailers: "[O]ur products[s] that we build were specifically for fair weather climates." (Exhibit "A", 163:23-25) The trailers were designed for the "'weekend warrior' or somebody that's going to take it out for a few weeks." (Exhibit "A", 25:17-20) Finally, Sun Valley's product warranty does not apply in cases of commercial or full time residential use, and thus was expressly not intended for such use. (Exhibit "B", page 7)

### 3. Plaintiff's Use Was Not Objectively Reasonably Anticipated By Sun Valley at the Time of Manufacture

Under the LPLA, a manufacturer is liable only for those uses it should reasonably expect of an ordinary consumer. *Butz*, 762 So.2d at 1218 (citing Kennedy, *A Primer on the Louisiana Products Liability Act,* 49 La. Law Rev. 565 (1989) at 586). This reasonably expected use does not encompass foreseeable uses or misuses. *Frith v. John Deere Co.*, 955 F.Supp. 663; *Hunter*, 70 F.3d at 810. If damages are linked to a product misuse (i.e., one that is not reasonably anticipated), then those damages are not recoverable under the Act. *Kampen,* 157 F.3d at 316; *see also Payne,* 56 So.3d 229, 231–32.

In the instant case, the use that must have been reasonably anticipated is not merely plaintiff utilizing the travel trailer as temporary shelter or even short-term housing. Rather, the use that must have been reasonably anticipated is the systematic, continuous use of the travel trailer for permanent shelter, as a long-term residence for nearly three years. See *Matthews v. Remington Arms Co.*, 2000 WL 35894124 (5th Cir. 2011) at *8, 9 (plaintiff's "use" of a rifle, for purposes of determining that use which should have been reasonably anticipated, includes both firing it generally, but also specifically attempting to fire it after failure to re-install the bolt-assembly, and the latter, plaintiff's actual "use", was not a reasonably anticipated use); see also *Kampen*, 157 F.3d 310-312 (plaintiff's use of a car jack, for purposes of determining that use which should have been reasonably anticipated, included jacking the car, but also, the specific conduct of plaintiff in positioning himself under the car being held up by the jack, and the latter, plaintiff's actual "use", was not reasonably anticipated use).

Essentially, therefore, plaintiff in the instant case must argue, and establish, that Sun Valley should have reasonably expected an ordinary person to utilize its travel trailers as long-

term housing, spending the better part of three continuous years residing inside the trailer. A discussion of several factors demonstrates that Sun Valley should have never reasonably expected an ordinary person to do so.

### a) Intended Use

"[Sun Valley] travel trailers were meant for the 'weekend warrior' or somebody that's going to take it out for a couple weeks." (Exhibit "A", 25:17-19) "It's a recreational travel trailer." (Exhibit "A", 25:19-20) These recreational vehicles have "either two or three sets of axles" and are "pulled by a pickup truck, SUV [or] car." (Exhibit "A", 14:3-5) The Sun Valley travel trailer is designed with spring suspension, to be towed down the road, at highway speeds, even on back roads or bumpy roads, and in campgrounds. (Exhibit "A". 68:2:-70:11) Sun Valley travel trailers were not designed, made, or marketed for full-time residential use. (Exhibit "A", 25:11-15)

### b) Materials and Design

The travel trailers at issue are considered "price point" models, designed to compete with other similar recreational vehicles, for a price around eight thousand dollars. (Exhibit "A', 153:14-25). Its trailers do not have typical residential toilets, nor are they designed to connect to sewer lines. (Exhibit "A", 159:1-22) Sun Valley trailers only have a six (6) gallon hot water heater and six (6) cubic foot refrigerator. (Exhibit "A", 160:2-6; 160:18-22) The holding tanks are not big enough for full-time use, and are not insulated or heated to provide for extended use during winter months. (Exhibit "A", 163:17-164:4)

These are but a few examples. Sun Valley travel trailers are not luxury motor homes, double-wide manufactured housing, nor any other type of dwelling. The size, composition, capacity, and amenities of the Sun Valley travel trailers are prohibitive, and Sun Valley should

not have reasonably expected the ordinary person to attempt to live in its travel trailers continuously for three years, nor in any event beyond short-term recreational excursions.

### c) Market and Industry Expectations

The fact that an entire industry, the manufactured housing industry, exists to service the ordinary customer seeking affordable, long-term housing, should also be determinative in the reasonably anticipated use analysis. The manufactured housing industry provides its ordinary customers with mobile homes, built on permanent chassis; containing plumbing, heating, air-conditioning, and electrical systems; and which are designed to be used as permanent homes. They are defined and regulated by HUD, and must meet standards with regard to design, construction, fire safety, plumbing, heating and electrical systems of "manufactured homes" which are designed to be used as dwelling units. (24 C.F.R. § 3280.1) Sun Valley, who manufactured products for the recreational vehicle industry's marketplace and customers, was not regulated by HUD, as they did not manufacture a product designed to be used as a permanent home. In fact, Sun Valley products are, by definition, excluded from HUD regulation. (24 C.F.R. § 3280.2)

For all of the reasons articulated in Section II(B)(2)(d), *supra*, of this Memorandum, an ordinary customer of the recreational vehicle industry would not be looking for a manufactured home, and likewise, an ordinary customer of the manufactured housing industry is not looking for a recreational vehicle. These two industries do not make competing products. A manufactured home cannot displace, replace, or substitute for, a recreational vehicle in the marketplace. The converse is equally true.

Why, then, would it be reasonable to find that a recreational vehicle manufacturer should reasonably expect an ordinary customer to use its product for long-term housing? That is to say,

it cannot be reasonable to expect the manufacturer of a recreational vehicle to anticipate that its product will be used as manufactured housing when there is an entire industry devoted to making products for that specific use. Clearly such use is not one that should have been reasonably anticipated for purposes of liability under the LPLA.

### d) Prior Use

Sun Valley sold its product exclusively to RV dealers or distributors. (Exhibit "A", 18:6-13). Sun Valley at no time manufactured or sold travel trailers to FEMA for use in any hurricane response. (Exhibit "A", 45:23-46:7) Prior to Hurricanes Katrina and Rita, Sun Valley had no knowledge that its travel trailers were ever used in connection with any disaster. (Exhibit "A", 95:9-15) In summary, Sun Valley had no reason to anticipate, expect, or foresee such use for its trailers.

### e) Interaction With FEMA

Sun Valley did not contract with, sell to, or receive sale proceeds from FEMA. (Exhibit "A", 45:23-46:7). Sun Valley made a decision not to build trailers to FEMA specifications, in order to keep their production focused on their customer and dealer bases. (Exhibit "A", 46:12-48:4). Sun Valley had no idea its trailers were going to be used by FEMA until after the fact. (Exhibit "A", 63:7-9).

### f) Time of Manufacture

Plaintiff's trailer was manufactured sometime after June 2005 and sometime before November 2005. See, *supra*, Section II(B)(2)(e) of Memorandum. Sun Valley had no prior knowledge of similar uses for its trailers (*i.e.*, disaster response), and had specifically declined to build trailers to FEMA specifications for such use. See, *supra*, Sections II(B)(3)(d) and (e) of Memorandum. Plaintiff bears the burden of establishing not only that their use was reasonably

anticipated, but also that it was so at the time of manufacture; Defendant points out the absence of evidence required to meet this burden.

### g) Distinctions Between Sun Valley Trailers and FEMA Spec Trailers

FEMA specifications required larger refrigerators than the ones placed in typical Sun Valley trailers. (Exhibit "A", 48:17-23; 160:18-22). These specifications called for a normal residential toilet, as opposed to the marine commode in Sun Valley trailers. (Exhibit "A", 48:9-16; 159:7-9). FEMA specifications required a larger hot water heater and a different range and oven. (Exhibit "A", 160:2-12). The FEMA requirements for trailer heating and cooling units were different. (Exhibit "A", 161:2-14). FEMA specifications prohibited sewage holding tanks or similar waste water holding tanks. (Exhibit "A", 48:9-16)

Without holding tanks, which was a FEMA specification, Sun Valley could not sell the trailer to any RV customer in the market. (Exhibit "A", 48:15-16). Accordingly, Sun Valley refused to make trailers to FEMA specifications (Exhibit "A", 48:3-5), and Sun Valley's manufacturing process never changed during the post-Katrina time period. (Exhibit "A", 50:20-23). Sun Valley could not have reasonably expected an ordinary customer to utilize their travel trailers in the manner in which plaintiff did.

### h) Warranty Exclusions

Sun Valley's product warranty does not apply in cases of commercial or full time residential use, and thus was expressly not intended for such use. (Exhibit "B", page 7).

## 4. Additionally, or Alternatively, Subsequent Modifications Were Not a Reasonably Anticipated Use

Plaintiff also alleges that his injuries are, at least in part, a result of certain contractors "blocking" the trailers, or raising them several feet in the air, and off of their wheel base, setting the trailers on concrete blocks. (Rec. doc. 17717, paragraph 41) Plaintiff alleges that his trailer

was not designed to be lifted in this manner, and that subsequent stress and flexing of the trailers increased moisture intrusion and formaldehyde exposures. (Rec. Doc. 17717, paragraphs 42, 43) Sun Valley never saw FEMA's requirements for trailer installation, thus was unaware that its travel trailers were being set up on blocks. (Exhibit "A", 79:12-80:8) For this reason, and all others cited, *supra*, herein, the permanent "installation" of travel trailers through this "blocking" procedure was not a reasonably anticipated use of Sun Valley travel trailers.

### III.   CONCLUSION

In order for Charles Marshall's claims to survive summary judgment, this Court must determine that Plaintiff has made a sufficient evidentiary showing that Sun Valley (at the time of manufacture in 2005) should have reasonably expected an ordinary customer to use its product in the manner in which it was actually used by Plaintiff, i.e. more than two years of continuous, residential, permanent housing. If this showing has not been made, all claims against Sun Valley should be dismissed, with prejudice.

The plaintiff's actual use—as a full-time residence for a continuous period of approximately three years—of Sun Valley's travel trailer (designed, marketed, and outfitted for a typical RV customer, and for the intended use of recreational excursions such as camping) is not one that Sun Valley should have expected of an ordinary customer at the time of the trailer's manufacture. Additionally, the "installation" and "blocking" of the Sun Valley trailers by FEMA and/or its contractors, without Sun Valley's knowledge, constitute a separate, independent, modification which could not have been reasonably anticipated.

Plaintiff, Charles Marshall has failed to demonstrate that his use of Sun Valley's travel trailer was a reasonably anticipated use, such that he might recover under the LPLA. Where a

plaintiff's use is not one that a manufacturer should reasonably expect of an ordinary consumer, there is no liability under the LPLA.

Under the LPLA, if a plaintiff's damages did not arise from a "reasonably anticipated use" of the product, then the "unreasonably dangerous" question need not be reached.

Defendant, Sun Valley, respectfully requests, and this Court should, grant summary judgment in favor of Sun Valley, dismissing the claims of Plaintiff, Charles Marshall, with prejudice, as such claims do not arise out of a reasonably anticipated use of Sun Valley's product.

Respectfully submitted,
**ALLEN & GOOCH**

/s/ *Brent M. Maggio*
BRENT M. MAGGIO, T.A., # 19959
MARK W. VERRET, #23583
LORI D. BARKER, # 31687
SCOTT F. DAVIS, # 26013
JEFFREY E. MCDONALD, #33270
3900 N. Causeway Blvd, Suite 1450
Metairie, Louisiana 70002
Tel: 504.836.5260
Fax: 504.836.5265
***Attorneys for Sun Valley, Inc.***

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been electronically filed on the 25th day of July, 2011, with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, and, it will be emailed to all Liaison Counsel, Government Counsel, and counsel for the above-captioned plaintiff.

/s/ Brent M. Maggio
BRENT M. MAGGIO