# Exhibit "B"

# In The Matter Of:

## FEMA Trailer Formaldehyde Products Liability Litigation

### Daniel Morrison
### March 17, 2011

---

*Midwest Reporting, Inc.*
*1448 Lincolnway East*
*South Bend, Indiana 46613*
*574-288-4242*
*reporters@midwestreporting.net*

Original File Morrison Daniel.txt
Min-U-Script® with Word Index

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE: FEMA TRAILER              )
     FORMALDEHYDE PRODUCTS LIABILITY  )
 4   LITIGATION,                      )
                                      )  MDL NO. 1873
 5   _____     )  SECTION N (5)
     THIS DOCUMENT RELATES TO:        )  JUDGE: ENGELHARDT
 6   This document applies to all     )  MAGISTRATE JUDGE:
     cases.                           )       CHASEZ
 7                                    )
 8
 9   The Videotaped Deposition of the Corporate
10       Representative of Sun Valley, Inc., through
11       Daniel M. Morrison
12           Date:  Thursday, March 17, 2011
13           Time:  9:00 o'clock a.m.
14           Place: Baker & Daniels
                    202 South Michigan Street
15                  Suite 1400
                    South Bend, Indiana
16
17           Called as a witness by Sun Valley, Inc.,
18       in accordance with the Federal Rules
19       of Civil Procedure for the United States
20       District Court, Eastern District of
21       Louisiana, pursuant to Notice.
22
     Before Brenda L. Davis, CSR, RPR, RMR, and Notary
23   Public, Porter County, Indiana
24
25
```

Page 2

```
 1   APPEARANCES:
 2       MR. BRENT M. MAGGIO
         MS. LORI D. BARKER
 3           ALLEN & GOOCH
             3900 North Causeway Boulevard
 4           Suite 1450
             Metairie, Louisiana 70002
 5
         On behalf of Sun Valley, Inc.;
 6
 7       MR. HENRY T. MILLER
             U.S. DEPARTMENT OF JUSTICE
 8           1331 Pennsylvania Avenue NW
             Room 8220-N
 9           Washington, D.C. 20001
10       On behalf of The United States of America;
11
         MR. CHARLES R. PENOT, JR.
12           MIDDLEBERG, RIDDLE & GIANNA
             717 North Harwood
13           Suite 2400
             Dallas, Texas 75201
14
         On behalf of Fluor Enterprises;
15
16       MR. RICK D. MEILS
             MEILS, THOMPSON, DIETZ & BERISH
17           281 East Ohio Street
             Suite 830
18           Indianapolis, Indiana 46204
19       On behalf of Colony Insurance Co.;
20
         MR. G. BENJAMIN WARD
21           LARZELERE, PICOU, WELLS, SIMPSON,
             LONERO, LLC
22           Suite 1100 - Two Lakeway Center
             3850 North Causeway Boulevard
23           Metairie, Louisiana 70002
24       On behalf of ACE Westchester;
25
```

Page 3

```
 1   APPEARANCES CONTINUED:
 2
         MR. GERARDO R. BARRIOS
 3           BAKER, DONELSON, BEARMAN, CALDWELL
             & BERKOWITZ, PC
 4           3 Sanctuary Boulevard
             Suite 201
 5           Mandeville, Louisiana 70471
 6       On behalf of CH2M Hill Constructors, Inc.;
 7   APPEARANCES BY TELEPHONE:
 8
 9       MS. SHARI WRIGHT
         MR. DENNIS C. REICH
10           REICH & BINSTOCK, LLP
             4265 San Felipe
11           Suite 1000
             Houston, Texas 77027
12
         On behalf of Plaintiffs;
13
14       MR. HAL L. ROACH, JR.
         MR. THOMAS L. COUGILL
15           WILLINGHAM, FULTZ & COUGILL, LLP
             Neil Esperson Building
16           808 Travis Street
             Suite 1608
17           Houston, Texas 77002
18       On behalf of Jayco, Inc., and Starcraft RV,
             Inc.;
19
20       MR. PHILIP WATSON
             DUPLASS, ZWAIN, BOURGEOIS, PFISTER
21           & WEINSTOCK
             3838 North Causeway Boulevard
22           Suite 2900
             Metairie, Louisiana 70002
23
         On behalf of Gulf Stream Coach, Inc.;
24
25
```

Page 4

```
 1   APPEARANCES BY TELEPHONE CONTINUED:
 2
         MR. PETER R. TAFARO
 3           FRILOT L.L.C.
             1100 Poydras Street
 4           Suite 3700
             New Orleans, Louisiana 70163
 5
         On behalf of Bechtel National, Inc.;
 6
 7       MS. HEATHER CHEESBRO
             LOBMAN, CARNAHAN, BATT, ANGELLE
 8           & NADER
             400 Poydras Street
 9           Texaco Center - Suite 2300
             New Orleans, Louisiana 70130
10
         On behalf of Crum & Forster;
11
12       MR. RANDALL C. MULCAHY
             GARRISON, YOUNT, FORTE & MULCAHY, LLC
13           909 Poydras Street
             Suite 1800
14           New Orleans, Louisiana 70112
15       On behalf of Recreation by Design, LLC,
             TL Industries, Inc., Frontier RV, Inc.,
16           Play'Mor Trailers, Inc., and Cruiser RV,
             LLC;
17
18       MR. KRISTOPHER M. REDMANN
             LUGENBUHL, WHEATON, PECK, RANKIN
19           & HUBBARD
             601 Poydras Street
20           Suite 2775
             New Orleans, Louisiana 70130
21
         On behalf of Liberty Mutual Insurance
22           Corporation;
23
24       Also present:
25       Laura A. Switalski, CLVS
```

Page 5

1     I N D E X
2     THE DEPOSITION OF
      DANIEL M. MORRISON
3
4               PAGES
5  DIRECT EXAMINATION ...........................7
6     By Mr. Maggio
7  CROSS-EXAMINATION ............................25
8     By Mr. Ward
9  CROSS-EXAMINATION ............................26
10    By Mr. Penot
11 CROSS-EXAMINATION ............................29
12    By Mr. Miller
13
14        E X H I B I T S
15 SUN VALLEY                       MARKED
16 16 - Doty Complaint for Damages ...............18
17 17 - Certificate of Dissolution ...............19
18 18 - Defendant Profile Form ...................21
19 19 - Insurance policy .........................22
20 20 - Insurance policy .........................23
21 21 - Insurance policy .........................23
22 22 - Insurance policy .........................24
23
24
25

Page 6

1       VIDEOGRAPHER: Good morning.
2  We're now on the record at 9:05 a.m.
3  Today's date is March 17, 2011.
4       This is the case of FEMA
5  Trailer Formaldehyde Products
6  Liability Litigation, in the United
7  States District Court, Eastern
8  District of Louisiana, MDL number
9  1873. This is the 30(b)(6)
10 deposition of Sun Valley,
11 Incorporated.
12      Will the attorneys present
13 please introduce themselves, who
14 they represent, and will the court
15 reporter please swear in the
16 Deponent.
17      MR. MAGGIO: Brent Maggio for
18 Sun Valley, Inc.
19      MS. BARKER: Lori Barker for
20 Sun Valley, Inc.
21      MR. BARRIOS: Gerry Barrios
22 for CH2M Hill Constructors, Inc.
23      MR. WARD: Ben Ward for
24 Westchester.
25      MR. MEILS: Rick Meils for

Page 7

1  Colony.
2       MR. PENOT: Charles Penot for
3  Fluor Enterprises, Inc.
4       MS. WRIGHT: Shari Wright for
5  the Plaintiff.
6       MR. MILLER: Henry Miller for
7  the United States.
8       DANIEL M. MORRISON
9  Called as a witness by Sun Valley, Inc., having
10 been first duly sworn, was examined and testified
11 as follows:
12      DIRECT EXAMINATION
13 BY MR. MAGGIO:
14 Q.  Sir, if you would, go ahead and introduce
15     yourself to the Jury, please.
16 A.  My name is Dan Morrison.
17 Q.  Mr. Morrison, this is a continuation of the
18     corporate deposition of Sun Valley, Inc. You're
19     aware that you're being produced as a corporate
20     representative of the company?
21 A.  I do.
22 Q.  A few of the ground rules that we have... As you
23     know, you've been placed under oath by our court
24     reporter to tell us the truth. It's just as if
25     you were in a court with a judge and a jury. You

Page 8

1     must tell us the truth. Do you understand that?
2  A. Yes, I do.
3  Q. Try not to say "uh-huh" or "uh-uh," because the
4     court reporter cannot type that up. If you say
5     that, we will correct you and then ask you what
6     that is.
7  A. Okay.
8  Q. You're entitled to explain all of your answers.
9     If you don't know something, that's fine, just
10    tell us you don't know, you don't remember,
11    that's acceptable.
12       Try not to talk over us, and we'll try not
13    to do that with you. So if we ask a question,
14    let us finish the question before you talk.
15    Again, if we talk at the same time, the court
16    reporter cannot type it up.
17       And as you're aware, you're being videotaped
18    by the camera here behind me.
19 A. Yes.
20 Q. And then the last thing is, you have the right to
21    read and sign the deposition once it's
22    transcribed, which I ask that you do. Which
23    means in a few weeks the court reporter will
24    transcribe it into a little booklet, she'll send
25    it to you, and you have a certain time period in

Page 9

1  which to review it and, if there are any errors
2  in her transcription, you have to note it on an
3  errata sheet and get it back to her.
4  A. Okay.
5  Q. All right. With that, Mr. Morrison, if you
6     would, go ahead and give us your current home
7     address.
8  A. Current home address is 55105 Colonial Ridge
9     Drive, Bristol, Indiana, 46507.
10 Q. And you're aware today we're taking your
11    deposition in South Bend, Indiana, correct?
12 A. Yes.
13 Q. Tell me about Sun Valley. At one time were you
14    involved with Sun Valley, Inc.?
15 A. Yes. I was originally the president. And at the
16    time that the corporation was dissolved, I was
17    the secretary of the corporation.
18 Q. When was Sun Valley, Inc., formed?
19 A. We -- and when I say we, there were a group of
20    investors that we got together and we actually
21    purchased the assets of Sunlight, Inc., from
22    Bank One. And that was December 30, if I recall,
23    1999. And then we started operations in January
24    of 2000.
25 Q. And at that time, on December 30, 1999, what was

Page 10

1  your title with the company?
2  A. My title was president.
3  Q. And were you also an owner?
4  A. And I was also an owner.
5  Q. At some point did Mark Romanetz become president?
6  A. Yes.
7  Q. When was that?
8  A. I do not recall.
9  Q. Would it have been within a couple of months, you
10    think, of Sun Valley --
11 A. No.
12 Q. -- being created?
13 A. I was the president for the first ten to twelve
14    months. I was actually there every day. Mark
15    was an employee that we hired. He had been with
16    the previous Sunlight. We hired him in January
17    when we started operations. It would have been
18    in the twelfth to eighteenth month. So it would
19    have been sometime in 2001.
20 Q. That he became president?
21 A. That he became president.
22 Q. And at that time what did your title become?
23 A. Secretary.
24 Q. As secretary what were your responsibilities for
25    the company?

Page 11

1  A. I really represented the -- I oversaw the
2     fiduciary responsibility of our small group of
3     investors that put this together.
4  Q. And eventually I understand that Sun Valley,
5     Inc., was -- went out of business and dissolved?
6  A. That's correct.
7  Q. Approximately when was that? We'll get into
8     little bit more exact date later.
9  A. We filed the formal dissolution in 2009. We
10    ceased operations in the fall of 2008.
11 Q. Through 2001 through the fall of 2008, did your
12    title remain that of secretary?
13 A. Yes.
14 Q. And were you an owner throughout that period of
15    time?
16 A. Yes.
17 Q. When did Sun Valley experience financial hard
18    times?
19 A. I'm going to --
20        MR. MILLER: I'm going to
21    object.
22 A. I'm trying to recall --
23        MR. MILLER: Hold on.
24    Objection. Vague, assumes facts not
25    in evidence.

Page 12

1  BY MR. MAGGIO:
2  Q. Was there some point in time when Sun Valley
3     basically started going out of business?
4  A. Yes.
5  Q. Explain that to me.
6  A. The beginning of 2008, due to the economy, our
7     orders dropped significantly. And there were a
8     number of factors for that. Our dealers were
9     having a hard time getting floorplan lending to
10    buy trailers from us, to be able to floorplan, to
11    sell to the consumer.
12       Consumer lending, the availability of
13    consumer loans, was tough to get. And we started
14    losing money and we started losing a lot of
15    money, and that started the early part of 2008.
16    And by, again, as I said, the fall of 2008, we
17    had made the decision to run our -- do our last
18    production run and that was it, and that was
19    September or October of 2008.
20 Q. Was that about the same time that the United
21    States was experiencing a decline in its economy?
22 A. Yes. Absolutely.
23 Q. Being felt by the various banks and housing
24    industry?
25 A. Uh-huh. And, additionally, what exacerbated our

Page 13

1  issue was -- I don't know if you're familiar with
2  this, but we had repurchase agreements with the
3  lending institutions, and a lot of dealers -- not
4  just us, but a lot of dealers were going out of
5  business, and we had to buy back the inventory
6  that we had sold them previously, and then we had
7  to turn around and resell that at a pretty large
8  discount. So we were taking big losses on those
9  repurchases as well.
10 Q. I take it at some point you learned about
11   Hurricane Katrina and FEMA going out, entering
12   into or trying to enter into contracts to
13   purchase travel trailers?
14 A. Yes.
15 Q. Can you ex-- did Sun Valley participate in that
16   program?
17 A. We did not. We were actually asked to
18   participate. And Mark Romanetz, who was the
19   president of the company, and myself had
20   discussed that. And as small as we were -- we
21   were very small, we were $20 million company --
22   we just felt that we could not participate, it
23   would disrupt our normal flow to the dealer. So
24   we did not build any trailers to FEMA
25   specifications.

Page 14

1 Q. What would have been, I guess, the problem if you
2   all would have tried to accomplish that?
3 A. Well, FEMA, they were looking for five hundred --
4         MR. MILLER: Objection.
5     Foundation. Go ahead.
6         MR. MAGGIO: You can answer
7     the question.
8         THE WITNESS: FEMA was looking
9     for five hundred to a thousand units
10    at a time. The most we ever did in
11    a year was fifteen hundred. And if
12    we would have tried to have built
13    five hundred units, we would not
14    have been able to build anything for
15    our normal dealer base for six or
16    seven months.
17 BY MR. MAGGIO:
18 Q. And what's the problem with that?
19 A. Well, it would have been great to have those five
20   hundred units -- five hundred orders from FEMA.
21   But if we can't supply our dealers, our dealers
22   are going to go elsewhere. And after we would
23   have fulfilled that FEMA order, our dealers would
24   have been gone. We would have been out of
25   business.

Page 15

1 Q. Did Sun Valley at any time enter into any type
2   of contract with FEMA to supply it with any kind
3   of travel trailers?
4 A. No, sir.
5 Q. Did Sun Valley manufacture and sell any of its
6   trailers to FEMA for use following these
7   hurricanes?
8 A. No, sir.
9 Q. Now, you said at some point Sun Valley ceased
10   doing business, shut down the plant.
11 A. Yes.
12 Q. When was that, approximately?
13 A. That was September or October of 2008.
14 Q. After that what did Sun Valley do with its
15   assets?
16 A. After we did our final production run during that
17   time period I just mentioned, we liquidated. So
18   we had some raw material left over, we had all
19   the machinery and equipment that we had used to
20   build our trailers, and we liquidated that over
21   the following two to three months, and then
22   actually in January of 2009 had all the final
23   auction to liquidate whatever was remaining.
24 Q. And did Sun Valley sell all of its equipment,
25   assets that you're talking about?

Page 16

1 A. Yes. Office equipment. Everything that was left
2   we sold in January of 2009.
3 Q. I take it Sun Valley had computers?
4 A. Yes, sir.
5 Q. Tell me what, if anything, y'all did about the
6   computers.
7 A. We had a file server that housed our financial
8   records, and we brought an IT guy in to back that
9   up, so we preserved that. And then each of the
10   salespeople and other office folks had laptops
11   and desktop computers in their offices. And the
12   same IT person, before we auctioned off all those
13   computers, deleted everything on those computers.
14 Q. And what was the purpose of deleting the
15   computers of any information prior to auctioning
16   off the computers to third persons?
17 A. Well, we didn't want any individual's personal
18   information or any corporate information being
19   sold to some individual we did not know at the
20   auction.
21 Q. Right. And I assume there were privacy records
22   you'd have to worry about?
23 A. Yes. Absolutely.
24 Q. When did all of this computer backing up and
25   erasing occur?

### Page 17

1  A.  It would have been from September or October --
2      whenever we did the last production run, between
3      that date and the date of the auction, which was
4      in January. So it would have been over that two-
5      to three-month time period.
6  Q.  And you're talking about months, but years are
7      important as well. So the cleaning of the
8      computers --
9  A.  October of 2008 to January of 2009, it would have
10     been during that time period.
11 Q.  Now, by that time, let's say January of 2009,
12     when Sun Valley's auctioning its assets, did Sun
13     Valley have any notification that it was going
14     to be sued by anyone for the FEMA litigation or
15     the formaldehyde issues?
16         MR. MILLER: Objection.
17         Leading.
18         MR. MAGGIO: You can answer.
19         THE WITNESS: No, sir.
20 BY MR. MAGGIO:
21 Q.  At the time that Sun Valley auctioned its assets
22     in January of 2009, what information, if any,
23     did it have that it could potentially be sued or
24     was going to be sued by anyone involving FEMA
25     trailers or formaldehyde issues?

### Page 18

1  A.  Absolutely none. We had not received any
2      information. And to add to that, since we never
3      built any units to FEMA specs or for a FEMA
4      contract, we would have never thought there would
5      have been any liability at all.
6  Q.  I take it at some point Sun Valley, through you,
7      learned that it was being sued for this
8      formaldehyde.
9  A.  Yes, sir.
10         (Sun Valley Deposition Exhibit 16
11         marked for identification.)
12 BY MR. MAGGIO:
13 Q.  I'm going to show you a document that has been
14     marked as Exhibit Sun Valley 16. It's the
15     Bryce Doty lawsuit, bearing Bates label, which is
16     on the bottom right-hand corner, Sun Valley
17     01-00172 through Sun Valley 01-00210.
18         Do you see that document?
19 A.  I do.
20 Q.  You recognize that it says Bryce Doty versus
21     Sun Valley and some others, and it's styled a
22     Complaint for Damages?
23 A.  I do. This would have been the first lawsuit
24     that we received.
25 Q.  Okay. And if you look at the top of that page,

### Page 19

1      you'll see that there's a case number followed by
2      the word "Document 1" and a filing date, correct?
3  A.  Yes.
4  Q.  What is the filing date, according to this
5      record?
6  A.  Filing date is June the 3rd, 2009.
7  Q.  So before June 3, 2009, Sun Valley did not have
8      any notice that it was going to be sued for this
9      litigation?
10 A.  No, sir.
11 Q.  I'm going to go ahead and offer that document
12     into evidence as Sun Valley 16.
13         (Sun Valley Deposition Exhibit 17
14         marked for identification.)
15 BY MR. MAGGIO:
16 Q.  The next document that I want to direct your
17     attention to is marked Sun Valley Exhibit 17, it
18     bears Bates label Sun Valley 01-00427 through
19     01-00434.
20         In summary, can you tell me what these
21     documents are?
22 A.  Yes. This is the Certificate of Dissolution
23     that we filed with the Secretary of State in
24     Indiana to formally dissolve Sun Valley, Inc.
25 Q.  And according to this document, what was the date

### Page 20

1      that Sun Valley was dissolved by the Indiana
2      Secretary of State?
3  A.  June the 17th, 2009.
4  Q.  And that's reflected on page Sun Valley 01-00428?
5  A.  Yes.
6  Q.  As of that date was Sun Valley aware that it had
7      been sued in the FEMA formaldehyde litigation?
8  A.  No, sir.
9  Q.  When do you think Sun Valley first received
10     notification that it was being sued for the
11     formaldehyde issues?
12 A.  It would have been the very latter part of June
13     or the first part of July.
14 Q.  Of what year?
15 A.  Of 2009. And, additionally, just to add this for
16     clarification, the state accepted our dissolution
17     on June the 17th of 2009. We would have filed
18     that earlier in June -- the latter part of May or
19     the first part of June is when we actually filed
20     the dissolution documents. It takes time to
21     process.
22 Q.  I understand. All right. I'm going to go ahead
23     and offer that document, Exhibit Sun Valley 17,
24     into evidence.
25         Has Sun Valley -- whatever documents Sun

Page 21

1     Valley possessed after it auctioned off all of
2     its assets, has it maintained possession of those
3     documents?
4 A. Yes, it has.
5 Q. What documents still remain in Sun Valley's
6     possession?
7 A. All the documents that were removed from Sun
8     Valley in January of 2009, prior to the auction,
9     we maintain the file server that has all the
10    financial records of Sun Valley, and we moved
11    over -- we still have the personnel records and
12    some of the month-end closings, the financial
13    files, that are reflected on the file server.
14 Q. And that's it.
15 A. And that's it.
16       (Sun Valley Deposition Exhibit 18
17       marked for identification.)
18 BY MR. MAGGIO:
19 Q. Gotcha. The next document that I want to direct
20    you to is going to be marked Sun Valley 18, it's
21    entitled: Defendant Profile Form. Do you
22    recognize this document?
23 A. Yes, sir.
24 Q. And if you look -- for identification purposes,
25    it bears Bates label Sun Valley 01-00160 through

Page 22

1     01-00163, correct?
2 A. Yes.
3 Q. And on that last page, 163, does that bear your
4     signature?
5 A. Yes, sir.
6 Q. And you dated it what date?
7 A. May 26, 2010.
8 Q. And you approved the information that was on
9     here, correct?
10 A. I did.
11 Q. I'll mark that -- introduce that as my next
12    exhibit, Sun Valley 18.
13       (Sun Valley Deposition Exhibit 19
14       marked for identification.)
15 BY MR. MAGGIO:
16 Q. The next document that I'm going to direct your
17    attention to is Sun Valley 19, bearing Bates
18    label Sun Valley 01-00211 through 01-00263. What
19    is this document?
20 A. This is a copy of one of the insurance policies
21    that we had.
22 Q. And according to the title of it, which company
23    provided this to Sun Valley?
24 A. This is ACE Westchester.
25 Q. And if you look on the first page that's marked

Page 23

1     211, right about the middle section it gives you
2     the effective and expiration date. What is that?
3 A. Effective date was December 30, 2004. Expiration
4     date was December 30, 2005.
5 Q. And the named insured is?
6 A. Sun Valley.
7 Q. That will be introduced as 20, Sun Valley 20.
8     That is going to be introduced -- tendered as
9     Exhibit Sun Valley 19.
10       (Sun Valley Deposition Exhibit 20
11       marked for identification.)
12 BY MR. MAGGIO:
13 Q. The next document is Sun Valley 20, bearing Bates
14    label Sun Valley 01-00264 through 01-00320. What
15    is this document?
16 A. This is another insurance policy.
17 Q. Issued by whom?
18 A. Colony National Insurance Company.
19 Q. And to whom -- who is the named insured?
20 A. Sun Valley.
21 Q. And what is the policy period?
22 A. December 30, 2005 to December 30, 2006.
23 Q. I'll offer that into evidence as Exhibit Sun
24    Valley 20.
25       (Sun Valley Deposition Exhibit 21

Page 24

1       marked for identification.)
2 BY MR. MAGGIO:
3 Q. The next document marked is Sun Valley 21,
4     bearing Bates label Sun Valley 01-00321 through
5     01-00373. What is this?
6 A. It's also an insurance policy.
7 Q. Issued by whom?
8 A. Colony National Insurance Company.
9 Q. To who?
10 A. Sun Valley.
11 Q. And what is the policy period?
12 A. December 30, 2006 to December 30, 2007.
13 Q. I'll tender that as the next exhibit, which is,
14    again, Sun Valley 21.
15       (Sun Valley Deposition Exhibit 22
16       marked for identification.)
17 BY MR. MAGGIO:
18 Q. The next document I'm marking as Sun Valley 22,
19    bearing Bates label Sun Valley 01-00374 through
20    01-00426. What is this document?
21 A. It's also an insurance policy.
22 Q. Issued by whom?
23 A. Colony National Insurance Company.
24 Q. And to who?
25 A. Sun Valley.

Page 25

1 Q. And for what policy period?
2 A. December 30, 2007 to December 30, 2008.
3     MR. MAGGIO: And, again, I'm
4 tendering that as the next exhibit,
5 Sun Valley 22.
6     Mr. Morrison, that is all the
7 questions that I have for you.
8 Thank you very much.
9     THE WITNESS: Thank you.
10    MR. MAGGIO: Shari?
11    MS. WRIGHT: I pass the
12 witness.
13    MR. WARD: This is Ben Ward,
14 representing ACE Westchester.
15    CROSS-EXAMINATION
16 BY MR. WARD:
17 Q. Mr. Morrison, when the company dissolved --
18    VIDEOGRAPHER: Pardon me.
19    (Off the record.)
20    VIDEOGRAPHER: Please
21 continue.
22 BY MR. WARD:
23 Q. Mr. Morrison, when the company dissolved, was
24 there any discussion about purchasing products or
25 completed operations coverage for the dissolved

Page 26

1 company?
2 A. No, sir.
3 Q. And no additional insurance coverage was
4 purchased by Sun Valley after the December 30,
5 2008 policy from Colony?
6 A. No, sir.
7     MR. WARD: Thank you. That's
8 all the questions I have.
9     MR. PENOT: Mr. Morrison,
10 Charles Penot for Fluor Enterprises,
11 Inc.
12    CROSS-EXAMINATION
13 BY MR. PENOT:
14 Q. What is your background, education, just very
15 generally, for me?
16 A. I'm a graduate of Indiana University. And I was
17 a CPA with Price Waterhouse. I'm a financial
18 guy.
19 Q. Okay. I'm going to ask you what your
20 understanding is. I understand that you're not a
21 lawyer. But just what your understanding is of
22 some aspects of the dissolution.
23    Under Indiana state law, following
24 dissolution of a corporation in the manner that
25 Sun Valley pursued, is an individual appointed or

Page 27

1 does an individual have to stand for some period
2 of time as a liquidator or some such position?
3     MR. MAGGIO: Let me just
4 object to the form of the question.
5 But you can answer.
6     THE WITNESS: I don't know.
7 BY MR. PENOT:
8 Q. Do you know whether you hold some office or title
9 or position with respect to, for lack of a
10 better word, the estate of Sun Valley, Inc., at
11 this moment?
12 A. I don't know.
13    MR. PENOT: Thank you. That's
14 all I have.
15    MR. MEILS: Rick Meils for
16 Colony. I have no questions today.
17    MR. MILLER: Mr. Morrison, my
18 name is Henry Miller, and I
19 represent the United States. The
20 government is a defendant in
21 approximately 2,500 lawsuits that
22 have been filed involving over
23 30,000 plaintiffs. And these
24 questions relate to any of those
25 plaintiffs that may have occupied

Page 28

1 units constructed by Sun Valley.
2     First of all, Counsel, can
3 you please identify the subject
4 matters that this witness is being
5 presented for pursuant to the
6 notices of 30(b)(6)?
7     MR. MAGGIO: Yeah. I said it
8 yesterday, but let me just say it
9 again. He's being tendered as a
10 corporate representative for Sun
11 Valley for all the issues that he
12 just testified about and only those
13 issues, which are: when Sun Valley
14 came into existence, when it ceased
15 doing business, how it went about
16 closing down its company, when it
17 was dissolved, when it auctioned its
18 assets and the process that it went
19 through in preparation for that,
20 including the computer records, why
21 Sun Valley went into closure, the
22 insurance policies, and the
23 Defendant Profile Form, and when it
24 first received notification that it
25 was being sued in the FEMA

Page 29

1   formaldehyde litigation.
2           CROSS-EXAMINATION
3   BY MR. MILLER:
4   Q. Mr. Morrison, you were president and then
5       secretary of Sun Valley, Incorporated; is that
6       correct?
7   A. Correct.
8   Q. During the time that Sun Valley operated,
9       approximately how many employees did Sun Valley
10      have?
11  A. At the time of dissolution or at the time that it
12      was incorporated?
13  Q. When it was incorporated and operating.
14  A. Well, when we ac-- the day we incorporated it had
15      zero employees. And we had to hire a number of
16      the employees from Sunlight. I'm going to
17      estimate that that was around eighty to a
18      hundred.
19  Q. During the time that Sun Valley operated prior to
20      the shut down of the lines in September or
21      October 2008, what was the range of the total
22      number of employees? Was it that eighty to a
23      hundred? Or did it increase over time, decrease
24      over time?
25  A. Over time it increased. And if I recall, we

Page 30

1   peaked at around 200 employees. At the time that
2   we closed down, that last month we were down to
3   roughly 30 to 40 employees, if I recall.
4   Q. When did you hit the peak of 200 employees? What
5       is your best estimate of the date, time period?
6   A. I don't recall.
7   Q. Was it before 2005 or after 2005?
8   A. I would have to speculate. I don't recall.
9   Q. You have no idea as you sit here today.
10  A. Well, if I had my financial statements in front
11      of me to -- I don't recall.
12  Q. Sun Valley, Incorporated, were there
13      shareholders?
14  A. There were. It was an S corporation.
15  Q. How many total shares were outstanding?
16  A. A hundred.
17  Q. Do you know who the owners of those shares were?
18  A. I do.
19  Q. At the time of dissolution who were the owners of
20      those shares?
21  A. At the time of dissolution it was myself, Mark
22      Romanetz, Brian Smith, Greg Fulmer, F-u-l-m-e-r,
23      and Leroy VanKirk.
24  Q. Do you know how many shares each of those persons
25      had?

Page 31

1   A. I don't.
2   Q. How many shares did you have?
3   A. I don't recall the exact number.
4   Q. What's your best estimate?
5   A. Around 18 is my best estimate.
6   Q. Well, what's your best estimate of how many
7       shares Mr. Romanov had?
8   A. Around 10 to 12.
9   Q. Mr. Smith?
10  A. Around 18. And Mr. Fulmer would have been around
11      18. We were equal.
12  Q. And Mr.-- is it Leroy VanKirk?
13  A. Yes. And there was also another that I -- Lou
14      Hansell. I'm sorry, I just recalled that. L-o-u
15      Hansell, H-a-n-s-e-- I think it's double L.
16  Q. So how many shares did Mr. VanKirk have?
17  A. Around that 18 as well.
18  Q. And Mr. Hansel?
19  A. They were both in that 15 to 18 range, if I
20      recall.
21  Q. Were the people who were in this 15 to 18 range,
22      were these the initial investors in the company?
23  A. Yes.
24  Q. And then Mr. Romanov was brought in and given
25      stocks as part of being the president?

Page 32

1   A. Yes, sir.
2           MR. MAGGIO: You mean
3           Romanetz.
4   BY MR. MILLER:
5   Q. Romanetz. Thank you. I apologize.
6       Other than these six persons, which includes
7       yourself, any other shareholders?
8   A. We had -- there were two additional, if I recall,
9       and they were -- I'm involved in a number of
10      different companies, and they were shareholders
11      in some other companies I'm involved in. And if
12      I recall, it was Chris Pollack and Curtis Holmes,
13      H-o-l-m-e-s, and they had two or three shares.
14  Q. When the company was dissolved, did all eight of
15      these persons have shares?
16  A. Yes.
17  Q. Initially as president, then as secretary what
18      were your duties and responsibilities?
19  A. For the first year, as president, I was -- I was
20      primarily ordained by this investment group to
21      get things up and running, to get the correct
22      people in place and oversee what we were doing,
23      get the banking relationships in place and so
24      forth, and I did that the first 12 months.
25          After that -- and that, again, as I

Page 33

1 mentioned, I think that 12- to 18-month time
2 period, then Mark Romanetz, I had identified him
3 as the one that could run the operation, and he
4 was appointed president.
5      And as secretary, I handled all the banking
6 relationships. Our comptroller really worked
7 closely with me, with my financial background.
8 We held monthly board meetings. And Mark
9 Romanetz actually worked for me. But I was not
10 there every day.
11 Q. Did you have any -- after you became secretary,
12 did you have any involvement in the day-to-day
13 operations of the company?
14 A. No.
15 Q. Did you have any involvement in safety matters,
16 safety offices or --
17 A. No.
18 Q. Did you maintain an office at the facility?
19 A. No.
20 Q. Approximately on a per-month basis how many hours
21 did you spend a month at the manufacturing
22 facilities?
23 A. I was there probably two to three hours a week,
24 so that would have -- you know, eight to ten
25 hours a month.

Page 34

1 Q. When did you become -- first become aware that
2 there were allegations -- and I stress that it's
3 allegations -- of problems with formaldehyde in
4 travel trailers that were being used as temporary
5 emergency housing in the Gulf Coast region in
6 response to Hurricane Katrina and Rita?
7 A. I cannot tell you the exact date. But,
8 obviously, the press reporting -- you know, so
9 whenever I heard -- heard on TV and through the
10 press.
11 Q. So your first notification of these potential
12 problems came from reading newspaper articles or
13 TV reports?
14 A. Yes.
15 Q. And, in fact, this area of Indiana, South Bend,
16 Elkhart, it's pretty much -- it's one of the
17 largest centers for the construction of travel
18 trailers.
19 A. Yes, sir.
20 Q. And there are many companies that are located up
21 here besides your own.
22 A. Yes, sir.
23 Q. And I believe companies such as -- what are some
24 of the other companies that have facilities that
25 you're aware of in this area?

Page 35

1 A. Sure. A lot of Thor companies; Keystone,
2 Heartland. We have Gulf Stream, Jayco,
3 Starcraft. A number of them.
4 Q. Pretty much all the big manufacturers of RV
5 vehicles.
6 A. Yes.
7 Q. And when this came about, the allegations of
8 formaldehyde in these travel trailers, this was
9 big news up in this area.
10 A. Sure. Yes.
11 Q. I mean, it strikes home because that's one of the
12 basic economic lifebloods of this area.
13 A. Yes, sir.
14 Q. Now, in response to Mr. Maggio's question you
15 indicated that Sun Valley never sold any units to
16 FEMA; is that correct?
17 A. That is correct.
18 Q. You indicated that you had been contacted -- that
19 Sun Valley had been contacted about selling units
20 to FEMA or FEMA spec units; is that correct?
21 A. I was made aware through Mark Romanetz that we
22 had an opportunity to bid on a contract. At
23 which time we decided not to.
24 Q. And that's what I want to direct my questions to.
25 Do you know whether -- did you ever have any

Page 36

1 direct contact with anybody from the Federal
2 Emergency Management Agency, FEMA?
3 A. No, sir.
4 Q. Do you know whether Mark Romanetz ever had any
5 contact with any FEMA employees?
6 A. I don't believe so. But I don't know.
7 Q. When you say that you were invited to bid on
8 contracts, who asked Sun Valley to bid on
9 contracts for FEMA spec units?
10 A. I don't know the names.
11 Q. Was it FEMA?
12 A. That I don't know. I just recall the
13 conversation with Mark saying we had an
14 opportunity. And I don't know if that was
15 through a dealer, through FEMA, or whomever.
16 Q. So, in other words, the person who would be most
17 knowledgeable of that would either be Mark
18 Romanetz or the sales agent that was dealing with
19 that issue.
20 A. Yes, sir.
21 Q. And you have -- you yourself have no knowledge of
22 whether there was any direct contact with FEMA.
23 A. No, sir.
24 Q. Do you know whether Sun Valley had any contact
25 with any other government agencies besides FEMA

Page 37

1   about the construction of FEMA spec travel
2   trailers?
3 A. I'm not aware of any contact.
4 Q. So what I gather is that the -- you did become
5   aware that some of Sun Valley units were being
6   used by -- or used in response to the Gulf Coast
7   disaster, Hurricane Katrina and Rita; is that
8   right?
9       MR. MAGGIO: I'm going to
10      object to the form of the question.
11  BY MR. MILLER:
12 Q. Did you at some point become aware that Sun
13   Valley travel trailers were being used as
14   temporary emergency housing units in the Gulf
15   Coast area?
16 A. Yes. When I received notice of the lawsuit.
17 Q. And Mr. Maggio had gone over that. And that was
18   in June of 2006, I believe.
19      MR. MAGGIO: No. Objection.
20      That's --
21  BY MR. MILLER:
22 Q. Or, no. I'm sorry. I apologize. I misspoke.
23   You are correct. Thank you, counsel. June two
24   thousand and --
25      MR. PENOT: Nine.

Page 38

1 Q. -- nine. Thank you.
2 A. That's when it was filed. I don't recall exactly
3   when I received it. It would have been the
4   latter part of June 2009 or July of 2009.
5 Q. Prior to making the decision to wipe all the
6   personal computers and the, I guess, stand-alone
7   computers, did your firm consult with any
8   attorneys or counsel regarding obligations to
9   preserve data or information?
10 A. No, sir.
11 Q. In the 2006 time period -- 2005-2006 time period
12   were there requests from your dealers to produce
13   what would be called "price point models," units
14   that could be sold to FEMA?
15 A. Not that I am aware of.
16 Q. Who would be the most knowledgeable of that?
17 A. Mark Romanetz. If I can expound on that --
18 Q. Please.
19 A. -- as well. I mean, I was aware of product lines
20   that we built. And if we ever added a new
21   product line, Mark consulted with me. And I'm
22   not aware of any new products that we added for
23   anyone other than our entire dealer base, not
24   just one or two individuals.
25 Q. Do you know -- have you -- do you know what the

Page 39

1   prase -- in travel trailers they use a lot of
2   soft goods to manufacture them; such as,
3   curtains, bedding, and they are I think generally
4   referred to as "soft goods"?
5 A. I'm not familiar with that term, but...
6 Q. Are you familiar with the use of what are
7   referred to as "obsolete materials"?
8       MR. MAGGIO: Let me just, I
9       guess, make an objection as far as
10      corporate representative for those
11      line of questions, Romanetz was
12      appointed for that purpose.
13          You can answer the -- you can
14      still answer those questions. But I
15      just want to at least put our
16      position for the record on that.
17      He's answering those line of
18      questions as a fact witness, not as
19      a corporate representative.
20          THE WITNESS: I'm familiar
21      with the term.
22  BY MR. MILLER:
23 Q. Okay. What's your understanding of what that
24   term refers to?
25      MR. MAGGIO: I'll just

Page 40

1   continue with the same objection.
2       MR. MILLER: Oh, certainly,
3       Counsel. Certainly.
4       THE WITNESS: My understanding
5       about obsolescence is when you move
6       from this model year to the next
7       model year and you change your
8       patterns and so forth, those are
9       obvious -- and if we're using 2005 as
10      my example, and we're moving to a
11      new pattern, new color scheme and so
12      forth for 2006, whatever we had left
13      for 2005 would now be obsolete for
14      2006.
15  BY MR. MILLER:
16 Q. And what was the general practice of what to do
17   with those obsolete materials?
18 A. Use them up.
19 Q. And with those that you hadn't used up by the
20   end of the model year when you switched over,
21   what would you do with those materials?
22 A. My recollection is that generally we didn't have
23   a lot of obsolescence. Some of it we would
24   pitch. And, again, a lot of it we would try and
25   use, we would -- it was a purchasing function.

Page 41

1    MR. MILLER: Can you please
2    hand the witness what is marked
3    Exhibit Number 13?
4    MR. MAGGIO: Since this is a
5    new topic, again, same objection.
6    And I'll just have a continuing as
7    long as you're talking about this
8    exhibit.
9  BY MR. MILLER:
10 Q. You have in front of you a document which is
11    marked Exhibit 13, Bates stamped, which is the
12    number in the bottom right-hand corner,
13    SV1001-001946 through 47. And this is an e-mail
14    from Mark Romanetz to a Mr. Dunithan and
15    Mr. Sanford, dated June 5, 2007.
16    MR. MAGGIO: Do you have a
17    question?
18 BY MR. MILLER:
19 Q. Have you had a chance to look at the document?
20 A. I perused part of it.
21 Q. Okay.
22 A. Yes.
23 Q. Do you feel comfortable answering questions
24    relating to it at this point?
25 A. Yes.

Page 42

1 Q. Okay. Have you seen this document, Exhibit 13,
2    before, the e-mail from Mr. Romanetz?
3 A. This specific document, no.
4 Q. Did you have any discussions with Mr. Romanetz in
5    June 2007, or any time after that, relating to
6    potential issues of formaldehyde in travel
7    trailers?
8 A. I do not recall.
9 Q. Do you know whether Mr. Romanetz ever received a
10    response to this inquiry to Mr. Dunithan or
11    Mr. Sanford?
12 A. I don't know.
13 Q. Do you know whether any inquiry was ever actually
14    made as to the suppliers regarding formaldehyde
15    in products those suppliers provided?
16 A. I don't know.
17 Q. This appears to be an article that Mr. Romanetz
18    forwarded to Mr. Dunithan and Mr. Sanford; is
19    that correct?
20 A. It appears so.
21 Q. Do you recall ever seeing this article before?
22 A. No, I don't.
23 Q. As we sit here today it's my understanding that
24    your first knowledge of the lawsuits -- well,
25    when did you first become aware that lawsuits had

Page 43

1    been filed against other manufacturers?
2 A. It would have been whatever I heard in the media.
3    And I can't give you the exact date.
4 Q. And by "the media," are you referring to articles
5    such as this? Not specifically this article but
6    similar-type articles?
7 A. It could have been TV, RV Business website, trade
8    magazines.
9 Q. And did that information become available to you
10    prior to the receipt of that first lawsuit in
11    June 2009?
12 A. I can't tell you the exact date.
13 Q. And I'm not asking for the exact date. What's
14    your best estimate? Did that occur before or
15    after you received that lawsuit in June 2009?
16 A. Oh, I'm going to assume that I had some knowledge
17    of lawsuits in the industry in general prior to
18    us receiving our first notice.
19 Q. And as you sit here today what's your best
20    estimate when you first received that first --
21    that notice? Or, actually, what's your best
22    estimate when the corporation, Sun Valley,
23    received that notice?
24    MR. MAGGIO: Just to make it
25    clear, when you say, "that notice,"

Page 44

1    can you --
2    THE WITNESS: Are you talking
3    about the first lawsuit --
4    MR. MILLER: No, no, no.
5    THE WITNESS: -- that we
6    received?
7    MR. MILLER: Yeah. When you
8    received -- when the corporation
9    obtained notice that other
10    manufacturers were being sued as a
11    result of formaldehyde in their
12    travel trailers.
13    THE WITNESS: I don't recall
14    the dates that -- they were
15    publicized widely throughout the
16    media.
17 BY MR. MILLER:
18 Q. And let me ask you this: For purposes of
19    30(b)(6) deposition here today as corporate
20    representative, what did you do to prepare for
21    the deposition?
22 A. I reviewed a few documents provided to me by my
23    attorney.
24 Q. And what documents were those?
25 A. Copies of the insurance policies, copies of the

Page 45

1  lawsuit.
2  Q. The documents that were made an exhibit here
3     today?
4  A. Yes, sir.
5  Q. Besides the documents that were made an exhibit
6     by counsel, did you review any other materials?
7  A. No, sir.
8  Q. Did you talk with any other persons who were
9     formerly employed by Sun Valley?
10 A. No, sir.
11 Q. Approximately how much time did you spend
12    preparing for this deposition?
13 A. Fifteen minutes.
14 Q. As you sit here today do you feel comfortable
15    talking about, as a representative of the
16    corporation, the dates that Sun Valley, employees
17    of Sun Valley as a whole, would have received
18    notice that lawsuits had been filed relating to
19    formaldehyde in the trailers to the industry,
20    other entities such as Gulf Stream, these news
21    reports.
22 A. State that again?
23 Q. Well, you're here as a corporate representative.
24 A. Correct.
25        MR. MAGGIO: Wait. For

Page 46

1        certain issues.
2  BY MR. MILLER:
3  Q. I understand that. And one of the issues is when
4     Sun Valley received notice.
5  A. Are you talking about lawsuits filed against Sun
6     Valley or just in general in the industry?
7  Q. I'm talking generally -- there's -- without
8     getting into what the legal nuances, I want to
9     know when Sun Valley received notice that
10    lawsuits were being filed against the industry
11    relating to formaldehyde.
12 A. As I previously stated, I can't -- I don't know
13    those dates.
14       MR. MAGGIO: Just remember,
15    Mr. Morrison, to let him finish
16    asking his question.
17       THE WITNESS: Okay.
18 BY MR. MILLER:
19 Q. When did you first become aware -- or when did
20    Sun Valley first become aware that FEMA had
21    purchased Sun Valley trailers from your dealers?
22 A. I first became aware when we received notice of
23    the lawsuit.
24 Q. Okay. My question is: Do you know when Sun
25    Valley became aware?

Page 47

1  A. I do not.
2  Q. Do you know whether Sun Valley received warranty
3     cards completed by FEMA?
4  A. I do not.
5  Q. Warranty cards that had been completed, what
6     happened to those when you dissolved the company?
7  A. Those would have been destroyed.
8         MR. MAGGIO: Are you finished
9     with that exhibit? Can I put it
10    back in the box?
11 BY MR. MILLER:
12 Q. You can leave it out for right now. We'll get
13    it.
14    Did you ever have an opportunity to walk
15    around the manufacturing facility?
16 A. I did.
17 Q. Did you ever enter into a trailer that was in the
18    process of being constructed or had just been
19    constructed?
20 A. I did.
21 Q. Did you ever have any problems or experience any
22    problems with watering eyes, respiratory problems
23    when you were in a trailer?
24 A. No, sir.
25 Q. Ever notice any odors that -- any unusual smells?

Page 48

1  A. No, sir.
2  Q. When you were in high school did you do the
3     dissection of the fetal pig or the crawfish?
4  A. Yes, sir.
5  Q. Do you remember that formaldehyde --
6  A. The frog and --
7  Q. -- smell?
8  A. Yes, sir.
9  Q. Okay. With that experience you have some idea
10    what formaldehyde smells like?
11 A. Using that as an example, yes.
12 Q. Okay. Did you ever notice any such smell in any
13    of the trailers that you walked around at the
14    facility?
15 A. Not that I recall.
16 Q. Well, that's a pretty, pretty noxious smell.
17 A. Yeah.
18 Q. It's something you think you would recall?
19 A. I think I would recall.
20 Q. And as you sit here today do you recall ever
21    smelling such an odor?
22 A. No.
23 Q. Now, as a former president and the secretary of
24    Sun Valley when it was in operation, would
25    you agree that your firm had an obligation to

Page 49

1   manufacture a safe product?
2 A. Yes, sir.
3 Q. And by that it would mean a product where, if
4   someone bought it from you, they could be assured
5   that if they lived in there, spent time in
6   there, they wouldn't get sick from just living or
7   being in there.
8 A. Yes, sir. Can I add to that --
9 Q. Oh, please.
10 A. -- as well? The nice thing about our industry,
11   we built everything RVIA code, which was -- and
12   inspected by a third party. So we felt very
13   confident and very comfortable that we were
14   building a product just like all the other
15   manufacturers, which RVIA stood by, the industry.
16 Q. And to the extent that the government or FEMA
17   purchased any of these units for use in the
18   Gulf Coast area, they would have purchased those
19   from your dealers; is that correct?
20 A. Yes, sir.
21 Q. If they bought new units, they would have had to
22   buy it from your dealers.
23 A. They would have had to purchase them through our
24   dealers. Yes, sir.
25 Q. And in so buying those units they would have been

Page 50

1   no different than any other member of the general
2   public who went out and bought one of your units.
3 A. No, sir, they would have been exactly the same.
4 Q. And the units that they would have bought from
5   your dealers would have been identical to the
6   ones that you were selling to the general public.
7 A. Yes, sir. Which includes holding tanks and
8   everything. Yes, sir.
9 Q. And as such, the same promise that you're making
10   to the public who you're selling these units,
11   that these would be safe, they could be used,
12   people could live in them safely, you were making
13   that same promise to FEMA; is that right?
14 A. Well, we never made a promise to FEMA, so --
15 Q. No, no. But your dealers are selling them to
16   FEMA.
17 A. I guess it can be imputed that we made the same
18   promise. But every unit we sold to our dealer
19   was with the promise that that was a good, safe
20   product.
21 Q. And to the extent that FEMA was buying those
22   units from your dealer, the dealer was extending
23   that promise to FEMA.
24 A. Yes, sir.
25 Q. And you understood that your dealers were doing

Page 51

1   that to anyone they sold the units to.
2 A. Yes, sir.
3       MR. MILLER: Can you provide
4   the witness with Exhibit Number 3,
5   which is the Owner's Manual.
6       MR. MAGGIO: Again, since
7   we're going to a new issue, same
8   continuing objection; that Romanetz
9   was designated as the representative
10   for these kind of issues.
11 BY MR. MILLER:
12 Q. What I've provided you with is Exhibit Number 3,
13   which is marked Sun Valley 01-00120 through 159.
14   And I'd represent to you that Mr. Romanetz
15   indicated that this is a true and accurate copy
16   of the Owner's Manual.
17       Were you familiar with the Owner's Manual?
18 A. Vaguely. I never read one completely.
19 Q. Okay. Does this appear to be the Owner's Manual
20   that you were familiar with?
21 A. It appears to be.
22 Q. And what I'd ask to -- refer you to is the fifth
23   page, which is Bates stamped 01-00124 and it's
24   titled: "Introduction." Do you have that?
25 A. I do.

Page 52

1 Q. In this statement there, second paragraph, it
2   says, "All Sun Valley, Inc. recreational vehicles
3   are engineered, manufactured, inspected and
4   tested to meet or exceed all the safety standards
5   enforced by the Recreational Vehicle Industry
6   Association (RVIA) or by the Canadian Standards
7   Association (CSA)." Do you see that?
8 A. I do.
9 Q. That's what you were referring to earlier; is
10   that correct?
11 A. Yes, sir.
12 Q. And did the RVIA come in and do inspections of
13   the units?
14 A. RVIA and CSA, both.
15 Q. And if there were any deficiencies, would you
16   correct those deficiencies?
17 A. Yes.
18 Q. And do you agree that all of the units that you
19   manufactured and sold to dealers met or exceeded
20   all the safety standards issued by RVIA?
21 A. Yes, sir.
22 Q. The next paragraph goes on to say, "Sun Valley
23   builds the best towable recreational vehicles in
24   the marketplace." Do you see that?
25 A. I do.

Page 53

1 Q. Do you agree with that statement?
2 A. It's very subjective. And, yes, we felt that we
3    built a very good product.
4 Q. Why do you think your product was better than
5    some of the other manufacturers' product? I know
6    it's subjective. But I want to know what those
7    subjective reasons are.
8 A. Okay. I don't have a good answer.
9 Q. Quality? Workmanship?
10 A. Yeah. We had Amish workmanship. I mean, we
11    were -- a lot of our product was entry level. We
12    had some -- we felt some unique design features
13    and so forth. But craftsmanship. We just felt we
14    built a very solid, good product.
15 Q. And this being in the manual, what you were
16    representing to anyone -- and this was the manual
17    that you provided to your dealer with
18    instructions to provide to any purchaser,
19    correct?
20 A. Correct.
21 Q. And so in doing so, you were basically telling
22    any purchaser of the unit that this is the best
23    towable recreational vehicle in the marketplace.
24 A. Speculation, I guess. You can infer that.
25    That's what it states.

Page 54

1 Q. That's what it states.
2 A. That's what it states.
3 Q. And that's the manual that was provided to all
4    purchasers of the unit, correct?
5 A. Yes, sir.
6 Q. And this was the manual that you guys prepared.
7 A. That Sun Valley prepared, yes.
8 Q. And as such, any purchaser of the unit, such as
9    FEMA, could reasonably expect that it was
10    buying the best towable recreational vehicle in
11    the marketplace.
12 A. I assume.
13 Q. You assume? That's what you were telling them,
14    isn't it?
15 A. Yes, sir.
16 Q. Okay. I'm not trying -- it's not a trick
17    question or anything.
18 A. Yes, sir.
19    MR. MILLER: We're almost out
20    of time on the tape. Why don't we
21    take a short break. I'll look
22    through my notes. But I have very
23    little left to ask you. Okay?
24    THE WITNESS: Okay.
25    MR. MILLER: Thank you.

Page 55

1    VIDEOGRAPHER: Off the record
2    at 10:01 a.m.
3    (A brief recess was taken.)
4    VIDEOGRAPHER: We're now back
5    on the record at 10:07 a.m. Please
6    continue.
7 BY MR. MILLER:
8 Q. I think I've identified two additional subject
9    matters I wanted to talk to you about.
10    First of all, the documents that were
11    produced, are you familiar with what documents
12    have been produced by Sun Valley in response to
13    the discovery requests that have been issued?
14    Let me just say --
15 A. I don't know that I can answer that.
16 Q. -- we've received -- there was -- we received
17    approximately eight thousand documents on a disc
18    from Mr. Maggio. And, in addition, we re-- or
19    from Sun Valley's counsel. And we've also
20    received the documents which were used today,
21    which were approximately five hundred pages of
22    documents, that Sun Valley's counsel indicated
23    they'd use for the deposition.
24    Do you know where those documents came from?
25 A. The eight thousand that you're referring to, I --

Page 56

1    I don't -- I mean, you have to show me. I don't
2    know.
3 Q. Okay. And that's -- for purposes of this
4    deposition did you review the documents that were
5    produced by Sun Valley to the parties in this
6    litigation?
7 A. No.
8 Q. And the reason why I'm asking is that the United
9    States has gone through those documents, and
10    there were files in there, things -- I mean,
11    different file -- and I'll just represent, things
12    that -- represented such as Cialis, there were --
13    you know, the terms, the things that were coming
14    up were totally unrelated to this litigation, I
15    think that was a result of search terms, such as
16    Chinese, or something else, that was put in there
17    and this is the information that came up.
18    Do you have any idea what documents were
19    produced by Sun Valley's counsel and where those
20    documents came from?
21 A. No.
22 Q. Do you know who assisted Sun Valley or counsel,
23    Sun Valley's counsel, in production of the
24    documents?
25 A. I don't. Financial -- we provided the hard drive

Page 57

1    from the server to Mr. Maggio, and that's all I
2    can answer.
3 Q. And so your involvement in producing the
4    documents was simply to produce the computer hard
5    drives which had been preserved after the
6    company's dissolution.
7 A. Yes, sir.
8 Q. And what specific hard drives did you produce?
9 A. It was the hard drive that resided in the file
10   server, it was backed up by our IT guy and
11   provided in whole then to Mr. Maggio.
12 Q. And that hard drive that was backed up by the IT,
13   what were the documents that were supposed to be
14   on that hard drive? Or materials?
15 A. All of our financial records.
16 Q. Anything else besides financial records?
17 A. Not that I'm aware of.
18 Q. And, for example, that article which I had shown
19   you, that e-mail from Mr. Romanetz which was
20   Exhibit 13 -- that's an e-mail from Mr. Romanetz
21   dated June 5, 2007 -- do you know where that
22   document came from?
23 A. I do not.
24 Q. I mean, having looked at that document, that does
25   not appear to be a financial document.

Page 58

1 A. No, sir.
2 Q. That's not a document that would have been on
3    that hard drive that you had provided.
4 A. That I don't know. I'm aware that financial
5    records were on there. That's all I know.
6 Q. Would there have been anything else on there
7    besides financial records?
8 A. I don't know.
9 Q. Who would know that?
10 A. Probably a combination of Mark Romanetz and our
11   IT guy that preserved it. And that's my best
12   guess.
13 Q. Did anyone, to the best of your knowledge, go
14   through the documents on that hard drive to
15   identify what materials were present on that hard
16   drive?
17 A. Obviously, it was preserved as it was.
18 Q. And I gather -- was there supposed to be anything
19   else on that drive besides the financial records?
20 A. Not that I'm aware of.
21 Q. Who would have been the custodian or the person
22   responsible for maintaining that hard drive?
23 A. Primarily, Mark Romanetz.
24 Q. Who actually provided that hard drive to your
25   counsel, or to Sun Valley's counsel?

Page 59

1 A. Our IT guy.
2 Q. And who was your IT guy?
3 A. His name is Glen Kaufmann.
4 Q. And was Mr. Kaufmann an employee of Sun Valley?
5 A. He was not.
6        MR. MAGGIO: Wait. At what
7        point in time? I mean, I know it
8        sounds like a silly question.
9        THE WITNESS: He was never an
10       employee of -- he was an employee of
11       one of my other companies and we
12       loaned him, if you will, to do this.
13 BY MR. MILLER:
14 Q. And does Mr. Kaufmann, Kaufee, still work for
15   you?
16 A. He does.
17 Q. And what is your understanding of what Mr. Kaufee
18   did --
19 A. Mr. Kaufmann.
20 Q. Mr. Kaufmann. Thank you.
21 A. M-a-n-n.
22 Q. I apologize. What Mr.-- what was Mr. Kaufmann's
23   duties and responsibilities as to the IT portions
24   or IT activities at Sun Valley?
25 A. Very limited. The only thing he actually did was

Page 60

1    to prepare the desktop and laptop computers for
2    auction. He deleted all of the information and
3    preserved the hard drive in whole. Prior to that
4    he had no involvement.
5 Q. So he was the person who was involved in
6    basically wiping these computers for sale.
7 A. Yes, sir.
8 Q. And who issued the instructions for him to wipe
9    those computers?
10 A. I did.
11 Q. And who issued the instructions on what
12   information to be saved?
13 A. I did. I instructed him to save the entire hard
14   drive of the file server.
15 Q. And when you say, "the file server" -- I'm not
16   computer savvy and so I apologize. But the file
17   server would have connected to what?
18 A. The office was networked. So different people
19   entering accounts payable, accounts receivable
20   information and so forth all fed into our
21   financial records. If that server was used for
22   additional things, e-mail and so forth, which it
23   very well may have, I don't know, that could have
24   been on there as well. I was familiar with the
25   financial records being housed there.

Page 61

1  Q. And the network itself, would someone like
2     Mr. Romanetz have a computer terminal that would
3     hook up into this file server?
4  A. Yes, sir.
5  Q. Which employees would have had computers that
6     connected into this file server that was
7     preserved?
8  A. I can't give you a complete list. I mean, it
9     would have been some of our accounting people,
10    accounts payable clerk. I can't give you names.
11 Q. Okay, let's go through it. Mr. Romanetz, he
12    would have had one.
13 A. Yes, sir.
14 Q. How about Mr. Sanford?
15 A. Yes, sir.
16 Q. Mr. Dunithan?
17 A. I don't know.
18 Q. Anyone else who was in the production end,
19    working in the manufacturing facility?
20 A. I don't know.
21 Q. And if you had a computer that was connected to
22    this file server -- did you have one?
23 A. I did not. And, also, you had password
24    protection. So you had different levels of
25    access based on your password. And, again, I

Page 62

1     can't tell you who had which levels. I did not
2     maintain that. Mark Romanetz would have known
3     that.
4  Q. If Mr. Romanetz wanted to send an e-mail to
5     yourself or any of the other owners, would he
6     have sent that to your personal e-mail accounts
7     or a different e-mail account?
8  A. Our e-mails that we use at -- well, it could have
9     been -- I can't speak for the others. Myself, it
10    was my work account.
11 Q. And was that a work account that you maintained
12    for Sun Valley or was that a separate work
13    account?
14 A. It's a separate work account for Heritage
15    Financial Group, which is where I work.
16 Q. And did you communicate with Mark Romanetz or
17    other persons employed by Sun Valley via e-mail?
18 A. Mark would have been the only one. Mark
19    Romanetz.
20 Q. And how often would you communicate with Mark?
21 A. Via e-mail, my best guess, once every couple
22    weeks. Most of it -- our communication was
23    verbal, in person or over the phone.
24 Q. For purposes of this deposition did you review
25    any e-mails that Mr. Romanetz may have sent to

Page 63

1     you?
2  A. No, sir.
3  Q. Are those e-mails still available on your server?
4  A. No, sir.
5  Q. And you say -- that's a pretty emphatic no. Why
6     do you think they're not available?
7  A. Because I know I personally delete all my e-mails
8     after a couple weeks. I keep my files cleaned
9     up.
10 Q. Does your server have an automatic delete after a
11    certain amount of dates -- days pass by?
12 A. No.
13 Q. Do you archive anything? Do you maintain any
14    archives?
15 A. I would have to clarify that with Glen Kaufmann,
16    our current IT. We might.
17 Q. I have one last subject that I want to talk to
18    you about and that is motor homes and travel
19    trailers. Have you ever owned an RV vehicle?
20 A. Yes, sir.
21 Q. Do you have children?
22 A. I do.
23 Q. How many children do you have?
24 A. Four children.
25 Q. What's the age range?

Page 64

1  A. Ages 18, 14, 11 and 9.
2  Q. Do you use that RV vehicle for weekend trips,
3     extended trips?
4  A. We do.
5  Q. Do you allow your children to go into that RV
6     unit?
7  A. We do.
8  Q. Let them sleep in that RV unit?
9  A. We do.
10 Q. Have you ever experienced any complaints from any
11    of your children about runny noses, respiratory
12    problems, burning eyes, itching?
13 A. No, sir.
14 Q. Do you think the RV unit that you own is safe?
15 A. I do.
16 Q. Would you let your children go into that RV unit
17    if you thought the air in that unit was
18    dangerous?
19 A. Absolutely not.
20 Q. Do any other family members own a RV unit?
21 A. My parents.
22 Q. Do they still own that unit?
23 A. They don't. But they did for 15 or 20 years.
24 Q. And what would they use that unit for?
25 A. They would -- they camped frequently. And, also,

Page 65

1 they -- they were "snowbirds," and in the
2 wintertime they would set their RV up in an RV
3 park in Florida for four months and live in it.
4 Q. Did they live full-time up here in Indiana?
5 A. Yes.
6 Q. And they two drive it down to Florida and set it
7 up?
8 A. Yes, sir.
9 Q. They would be what we'd call "snowbirds" or
10 "full/long-timers"?
11 A. Yes, sir.
12 Q. Did you allow your children to go into that unit
13 with your parents?
14 A. Yes, sir.
15 Q. Did you ever receive any complaints from your
16 parents or your children when they were in that
17 unit about problems with breathing, itchy nose,
18 eye problems, anything like that?
19 A. No, sir.
20 Q. Did you think that travel trailer that your
21 parents owned was safe?
22 A. Yes, sir.
23 Q. Would you have let your children go into that
24 unit and stay with your parents if you thought it
25 was unsafe?

Page 66

1 A. Absolutely not.
2    MR. MILLER: Sir, I appreciate
3 your time and patience with me. I
4 have no further questions. And the
5 United States also requests that you
6 read and sign the deposition.
7    THE WITNESS: Thank you.
8    MR. MILLER: Thank you, sir.
9    MR. MAGGIO: All right.
10    MR. MILLER: Shari, do you
11 have any further questions?
12    MS. WRIGHT: No, I don't.
13    MR. MAGGIO: All right. Going
14 off the record.
15    VIDEOGRAPHER: Off the video
16 record at 10:21 a.m.
17    (Off the record.)
18    MR. MAGGIO: This concludes
19 the 30(b)(6) corporate deposition
20 of Sun Valley.
21    (Deposition concluded and witness
22 excused.)
23    * * *

Page 67

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: FEMA TRAILER
FORMALDEHYDE PRODUCTS LIABILITY
LITIGATION,
   MDL NO. 1873
   SECTION N (5)
THIS DOCUMENT RELATES TO:
   JUDGE: ENGELHARDT
This document applies to all
   MAGISTRATE JUDGE:
cases.
   CHASEZ

DANIEL M. MORRISON

   I hereby acknowledge that I have read the foregoing deposition transcript regarding the case of In Re: FEMA Trailer Formaldehyde Products Liability Litigation, taken Thursday, March 17, 2011, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the additions or changes, if any, as noted on the attached errata sheet.

   _____
   DANIEL M. MORRISON

   Subscribed and sworn to me this _____ day of _____, 2011, A.D.

   _____
   Notary Public or Witness
   State of _____
   County of _____
   My Commission expires: _____

Page 68

C E R T I F I C A T E

   I, Brenda L. Davis, CSR, RPR, RMR, and Notary Public within and for the County of Porter, State of Indiana, do hereby certify that there appeared before me the deponent, DANIEL M. MORRISON, at 202 South Michigan Street, South Bend, Indiana, on the 17th day of March 2011, who was thereupon first duly sworn by me to testify the truth and nothing but the truth in response to questions propounded to said deponent at the taking of the foregoing deposition relating to the above-captioned cause now pending and undetermined in said court.

   I further certify that I then and there reported in machine shorthand the testimony so given at said time and place, and that the original shorthand notes, and the foregoing printed transcript is a true and accurate record of said testimony given by said deponent at said time and place.

   I further certify that I am not related by blood or marriage to any of the parties to said suit, nor am I an employee of any of the parties or of their attorneys or agents, nor am I interested in any way, financially or otherwise, in the outcome of said litigation.

   Dated at Valparaiso, Indiana, this _____ day of _____, 2011.

   _____
   Brenda L. Davis

My Commission Expires:
May 24, 2014

County of Residence: Porter