UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: FEMA TRAILER                    MDL NO. 07-1873
       FORMALDEHYDE PRODUCTS
       LIABILITY LITIGATION

                                      SECTION "N"  (5)

THIS DOCUMENT RELATES TO
ALL CASES

**ORDER AND REASONS**

Before the Court are the following motions: 1) Fluor Enterprises, Inc.'s Motion for Partial Judgment on the Pleadings to Dismiss Negligent Failure to Warn Claims in the Third and Fourth Supplemental and Amended Administrative Master Complaints (Rec. Doc. 17751); and 2) CH2M Hill Constructors, Inc.'s and Shaw Environmental, Inc.'s Joint Rule 12(b)(6) Motion to Dismiss Failure to Warn Claims in the Third and Fourth Supplemental and Amended Administrative Master Complaints (Rec. Doc. 17753).

I. **Background:**

In this multi-district litigation ("MDL"), the plaintiffs are individuals who resided in emergency housing units ("EHUs") provided by the Federal Emergency Management Agency ("FEMA") after Hurricanes Katrina and Rita made landfall in August and September 2005. In general, they claim injuries resulting from alleged exposure to the release of formaldehyde in these units. Plaintiffs have sued over 100 entities, including the manufacturers of the EHUs, the United States Government, and the government contractors who FEMA retained to deliver, set up, and/or maintain the EHUs. Each of the movants is a contractor defendant.

The plaintiffs allege that each of the contractor defendants "received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the

1

transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita in the States of Louisiana, Mississippi, Alabama, and Texas." *See* Third Supplemental & Amended Administrative Master Complaint (Rec. Doc. 4486) ("AMC") at ¶¶ 106-108.  They assert claims against the contractor defendants under Louisiana law invoking three general theories: (1) that the contractor defendants are liable as "manufacturers" under the Louisiana Products Liability Act (LPLA); (2) that the contractor defendants are liable under Louisiana's general law of negligence for increasing formaldehyde levels in the EHUs by way of cracks and increased moisture caused by improper installation (*e.g.*, "blocking" or jacking the trailers with their weight off their wheel base) or improper maintenance; and (3) that the contractor defendants are liable under Louisiana's general law of negligence for "failing to sufficiently warn the plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy."  *See* AMC at ¶¶ 293-304.

The instant motion filed by Fluor Enterprises, Inc. ("FEI") (Rec. Doc. 17751) addresses only the third theory of recovery:   failure to warn under Louisiana's general law of negligence.[1]  The instant motion filed by CH2M Hill Constructors, Inc. ("CH2M") and Shaw Environmental, Inc. ("Shaw")  seeks to dismiss plaintiffs' negligent failure to warn claims under Alabama, Louisiana,

---

[1]  Both FEI and the plaintiffs refer in their memoranda to the plaintiffs' LPLA claim.  In an Order and Reasons dated September 11, 2009, the Court granted FEI's motion for partial summary judgment in the *Alexander* bellwether case, dismissing the bellwether plaintiffs' LPLA claims upon finding that FEI was not a "manufacturer" of the EHU in that case.  (Rec. Doc. 3217).  That ruling was made based upon the summary judgment evidence.  No such evidence is before the Court in connection with the instant motion.  Moreover, the parties have not briefed the issue.  Accordingly, this Order and Reasons is limited to the plaintiffs' claim for failure to warn under Louisiana's general law of negligence.  It does not address plaintiffs' LPLA claim.

Mississippi, and Texas law (Rec. Doc. 17753).

## II. **Plaintiff's Allegations:**

### A. **General Allegations:**

"The residence of each Named Plaintiff was rendered unhabitable following Hurricanes Katrina and/or Rita, leaving each plaintiff homeless" and with "nowhere else to go...in the aftermath of the greatest natural disaster in the history of the United States." AMC ¶¶ 128, 171.  FEMA responded to this emergency situation pursuant to "the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, *et seq.* (the 'Stafford Act')," which enables FEMA to provide temporary housing assistance by providing either "financial assistance" or "direct assistance" in "the form of temporary housing units...directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative 'financial assistance.'" AMC ¶142.  Toward this end, FEMA contracted with three corporations (the "Procurement Defendants"), tasking them "with the identification, selection and procurement of approximately 143,000 temporary housing units..., which FEMA purchased from the manufacturers and off dealer lots, and intended for Gulf Coast residents in the four states at issue [Alabama, Louisiana, Mississippi, and Texas]."  AMC ¶143.

"Plaintiffs submit that each of the housing units...purchased by FEMA, contained dangerous levels of formaldehyde due to the Manufacturing Defendants' use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that the Manufacturing Defendants failed to warn the Federal Government about these dangers...." AMC ¶133. "Formaldehyde is found in construction materials such as particle board,

fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units." AMC ¶136.  According to plaintiffs, federal law required display of a health notice, which reads in part:  "Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk.  Research is continuing on the possible long-term effects of exposure to formaldehyde."  *Id.* Plaintiffs allege that formaldehyde has been classified as a "probable human carcinogen by the U.S. Environmental Protection Agency ("EPA")" and that, according to the Agency for Toxic Substances and Disease Registry ("ATSDR"), "there is no recognized safe level of exposure, and ...any level of exposure to formaldehyde may pose a cancer risk, regardless of duration."  AMC ¶137.

According to plaintiffs, "the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006."  AMC ¶175.  Plaintiffs allege that these "sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels."  *Id.*

**B.  <u>Allegations Against the Contractor Defendants</u>:**

Plaintiffs allege that after procuring the EHUs, the United States government contracted with the "No-Bid Defendants" (referred to herein by the Court as the "contractor defendants"), tasking them "with the transportation, installation, site identification and preparation of locations and group

4

sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units." AMC ¶152.

**1. Pick-up, Transport, and Delivery of the EHUs:**

"The No-Bid Defendants contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which The No-Bid Defendants were tasked with operating." AMC ¶154. "These new areas included staging areas to be managed and maintained as assigned to one of The No-Bid Defendants or individual locations and addresses where the No-Bid Defendants assigned that temporary housing unit would have obligations to manage and maintain it." *Id.* "The No-Bid Defendants were tasked under their contracts with FEMA to identify and prepare the infrastructure for the various group site locations," which included "ensuring there would be adequate water, sewage, electricity, etc.." AMC ¶156.

**2. Installation of the EHUs:**

"Once the temporary housing unit(s)...were transported and delivered to a particular location, the No-Bid Defendants had the responsibility for installing that temporary housing unit." AMC ¶157. "The No-Bid Defendants installed the temporary housing units by 'blocking' the unit,' " which "meant raising the plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks." *Id.* Plaintiffs allege that by blocking the units, "the No-Bid Defendants created stress and flexing on the frames of the unit as it w[as] not designed to be lifted off...the wheel base." AMC ¶158. According to plaintiffs, "[t]he stress and flexing of temporary housing units' frames caused by the No-Bid Defendants' 'blocking' them with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed

5

to increased formaldehyde exposures." AMC ¶159.

Plaintiffs further allege that "temporary housing unit(s)...provided by FEMA were for the most part travel trailers...designed for and intended for periodic, recreational use and not for long-term habitation." AMC ¶160. They allege that "[b]y installing the travel trailers on concrete blocks for extended occupancy, the No-Bid Defendants knowingly and intentionally modified the design and the actual use of these units...by converting them into a temporary housing unit to be used as a residence for long term occupancy in some instances exceeding 18 months." *Id.* According to plaintiffs, "[t]he No-Bid Defendants failed to consult with the manufacturers of the temporary housing units, including the Manufacturing Defendants, with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation." AMC ¶161.

### 3.  Inspection of the EHUs:

According to the plaintiffs, "the No-Bid Defendants were tasked with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the plaintiff(s)." AMC ¶162. Plaintiffs infer from this, "[u]pon information and belief," that the contractor defendants were obligated "to ensure that the units were safe and suitable for their intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita" and that they failed to do so. *Id.*

### 4.  Maintenance and Repair of the EHUs:

The plaintiffs allege that "the temporary housing units...were also managed, maintained and repaired by one of the No-Bid Defendants, or their various subcontractors over whom they maintained direct oversight and responsibility." AMC ¶163. With regard to these alleged

6

maintenance obligations, plaintiffs allege that "the No-Bid Defendants failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the plaintiff-occupants of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde." AMC ¶164. Further, plaintiffs allege that in carrying out these maintenance obligations, the contractor defendants "enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the Plaintiffs." AMC ¶163.

### 5. De-Installation of the EHUs:

"Following the plaintiffs' occupancy of each temporary housing unit, the No-Bid Defendants were tasked with its de-installation." AMC ¶165. Plaintiffs conclude from this that the contractor defendants became obligated "[u]pon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal... to identify the unsuitability of the temporary housing units for long-term occupancy" and failed to do so. *Id.*

### 6. Refurbishment and Restoration of the EHUs:

"[T]he No-Bid Defendants were tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to hurricanes Katrina and Rita or for use in the future." AMC ¶166. Plaintiffs conclude that "[b]y restoring and refurbishing these temporary housing units, the No-Bid Defendants warranted that the units were fit for...long term occupancy in response to disaster related displacement" and "created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units," which "in thousands of cases...were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde." *Id.*

### III.  Plaintiff's Failure to Warn Claims Under Louisiana's General Law of Negligence:

FEI moves pursuant to Rule 12(c) to dismiss the negligent failure to warn claim on grounds that it had no duty under Louisiana negligence law to warn the plaintiffs of possible elevated levels of formaldehyde in the trailers or of the potential risks associated with formaldehyde.[2]

#### A.  Standard for Dismissal under Rule 12(c):

The Court should "evaluate a motion under Rule 12(c) for judgment on the pleadings using the same standard as a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Gentiello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010). "'[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief.' " *Id.* at 544 (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (internal quotations omitted)).   "To avoid dismissal, a plaintiff must plead sufficient facts to ' " 'state a claim to relief that is plausible on its face.' " ' *Id.* (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 129 S.Ct. At 1949).   "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief — including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th

---

[2]  To the extent that the motion filed by CH2M and Shaw (Rec. Doc. 17753) adopts FEI's motion and thereby seeks to dismiss plaintiffs' negligent failure-to-warn claims under Louisiana law, then it is included in the Court's disposition of FEI's motion.  Thus, the Court's reasoning, findings, and conclusions with regard to FEI extend likewise to CH2M and Shaw.  To the extent that Shaw's and CH2M's motion also seeks dismissal of failure-to-warn claims brought under the laws of states other than Louisiana, it is addressed separately below.

Cir.2007) (quoting *Twombly*, 550 U.S. at 555).  "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.' " *Cuvillier*, 503 F.3d at 401 (quoting *Twombly*, 550 U.S. at 557) (internal quotation omitted).

The Court "must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party."  *In re Southern Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008), *cert. denied*, 129 S.Ct. 1669 (2009).  However, the Court does "not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Gentilello*, 627 F.3d at 544  (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir.2005)).

**B.  Louisiana's General Law of Negligence:**

To determine whether the complaint states a claim for negligent failure to warn, the Court turns to the substantive law of Louisiana.[3]  The source of negligence liability in Louisiana is Louisiana Civil Code article 2315, which states:  "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."  La. Civ. Code Ann. art. 2315(A)

---

[3]  In *Wiltz v. Bayer Cropscience Ltd. P'ship*, 645 F.3d 690, 695 (5th Cir. 2011), the Fifth Circuit capsulized the rules that a federal court follows in determining Louisiana substantive law:

> When faced with unsettled questions of Louisiana law, we adhere to Louisiana's Civilian decision-making process by first examining primary sources of law, namely, Louisiana's Constitution, codes, and statutes.  *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264 (5th Cir. 2009).  This is because the primary basis of Louisiana's Civil Law is legislation and not the prior decisions of its courts.  *In Re: Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007).  In the absence of a definitive resolution in the State's primary sources, however, we look next to the final decisions of the Louisiana Supreme Court.  *Moore*, 556 F.3d at 269.  Only in the absence of such a final decision must we make an "*Erie* guess" as to how that court would resolve the issue if presented with the same case.  *Id.*  Although we do not disregard the decisions of Louisiana's intermediate courts unless we are convinced the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them.

(2010).  This article tells us that one who damages another by his or her "fault" is obliged to repair it.  However, as the Supreme Court of Louisiana has explained, the article "does not tell us...when the author of the damage is at fault."  *Pitre v. Opelousas Gen. Hosp.*, 530 So. 2d 1151, 1156 (La. 1988).  "The framers conceived of fault as a breach of a preexisting obligation..., and they left it to the court to determine in each case the existence of an anterior obligation which would make an act constitute fault."  *Id.*

In making this determination, the Supreme Court of Louisiana has employed a "duty-risk" analysis.  To establish liability for negligence, a plaintiff must prove each of the following:  "(1) given the relationship and circumstances of the parties, does the law impose upon the defendant a duty of reasonable conduct for the benefit of the plaintiff, the violation of which is considered to be fault? (2) If the defendant owed such a duty, did his conduct fall short of the standard and come within the scope set by law? (3) Did the defendant's negligence in fact cause damage to the plaintiff ('cause in fact')? (4) Should any of the damage to the plaintiff be ascribed in law to the defendant, and, if so, should the defendant be held liable for every kind of damage done to each of plaintiff's interests ('legal cause')?"[4]  *Pitre*, 530 So. 2d at 1155.

Thus, the "threshold issue in any negligence action is whether the defendant owed the plaintiff a duty."  *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 633 (La. 2006).  "Whether a duty is owed is a question of law."  *Lemann*, 923 So. 2d at 633.  "The inquiry is whether the

---

[4]  Another formulation of duty-risk is:  "(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element)."  *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 633 (La. 2006).

plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Id.* "When a plaintiff articulates a general rule or principle of law that protects his interests, it is necessary for the court to determine whether the rule is intended to protect him from the particular harm alleged, an inquiry which involves both the duty and causation elements of the negligence formulation." *Meany v. Meany*, 639 So. 2d 229, 233 (La. 1994). Stated another way, in certain cases part of the duty inquiry may be: "was the defendant under a duty to protect each of the plaintiff's interests affected against the type of damage that did in fact occur?" *Pitre*, 530 So. 2d at 1155.[5]

"In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented." *Lemann*, 923 So. 2d at 633. In doing so, "the court may consider various moral, social, and economic factors, including whether the imposition of a duty would result in an unmanageable flow of litigation; the ease of association between the plaintiff's harm and the defendant's conduct; the economic impact on society as well as the economic impact on similarly situated parties; the nature of the defendant's activity; moral considerations, particularly victim fault; and precedent as well as the direction in which society and its institutions are evolving." *Meany*, 639 So. 2d at 233.

### C. **Duty to Warn**:

Here, the plaintiffs do not allege that FEI or any other of the contractor defendants[6] made any

---

[5] *See also McLachlan v. New York Life Ins. Co.*, 488 F.3d 624, 627 (5th Cir. 2007) ("Under Louisiana law, the existence of a duty, and the corollary issue whether the duty extends to protect a particular plaintiff from a particular harm, are questions of law usually determined together, case-by-case.").

[6] Although the Court refers to FEI throughout this analysis, the plaintiffs' allegations against Shaw and CH2M are identical to those against FEI. Thus, the Court's reasoning,

statements to any of the plaintiffs regarding formaldehyde or the appropriateness of residing "long term" in the trailers given the presence of formaldehyde. Rather, they allege that the contractor defendants failed to give the plaintiffs any such warnings. *See* AMC ¶167, 169. Thus, the question for the Court is whether FEI had a preexisting affirmative obligation to speak to the plaintiffs about formaldehyde, such that its silence in the face of such a duty would constitute fault within the meaning of article 2315. *See, e.g., Audler v. CBC Innovis Inc.*, 519 F.3d 239, 254 (5th Cir. 2008) ("a cause of action for failure to warn does not exist unless there is an affirmative duty to provide a warning") (citing *Fryar v. Westside Habilitation Ctr.*, 479 So. 2d 883, 889 (La. 1985) (Failure to warn is a "failure to act...nonfeasance rather than malfeasance. This liability is dependent on an underlying, affirmative duty imposed by contract, custom, or social policy.")).

FEI argues that Louisiana law imposes an affirmative duty to warn in only three circumstances: 1) on manufacturers under the LPLA;[7] 2) on those having custody or *garde* over the thing whose ruin, vice, or defect causes damage under articles 2317 and 2317.1; and 3) where the defendant and the victim have one of the "special relationships" recognized by law as creating responsibility for failing to prevent harm caused by or to warn about dangerous conditions created by a third person. Plaintiffs respond by arguing that: 1) as the "intended beneficiaries" of FEI's work under the FEMA contract, the plaintiffs did have a "special relationship" with FEI; 2) as custodian for FEMA, FEI did have *garde* over the trailers; and 3) by "voluntarily assuming" the obligations it undertook to perform under its contract with FEMA, FEI necessarily assumed a duty

---

findings, and conclusions herein apply equally to Shaw and CH2M unless specifically stated otherwise.

[7] As discussed *supra*, plaintiffs' LPLA claim is not addressed here.

to perform those contractual obligations in a reasonable and prudent manner, which included a duty to warn about formaldehyde.  The Court addresses each of these arguments in turn.

### 1.  "Special Relationships" Giving Rise to an Affirmative Duty to Warn:

The Louisiana Supreme Court has stated that, [t]ypically, in cases such as this, where the alleged wrongful conduct of the defendant is a failure to act or 'nonfeasance,' courts have found it necessary for some definite relationship between the parties to exist, such that social policy justifies the imposition of a duty to act upon the defendant." *Fox v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 576 So. 2d 978, 981 (La. 1991).  Examples of such special relationships are: "carrier and passenger; innkeeper and guest; shopkeeper and business visitor; jailer and prisoner; and school and pupil." *Strickland v. Ambassador Ins. Co.*, 422 So. 2d 1207, 1209 (La. Ct. App. 1st Cir. 1982); *see also, e.g., Terrell v. Wallace*, 747 So. 2d 748, 750 (La. Ct. App. 1st Cir. 1999), *writ denied*, 758 So. 2d 158 (La. 2000).  Where  the relationship between a plaintiff and defendant has special attributes of trust or confidence, Louisiana courts have found an affirmative duty to act on behalf of the plaintiff's safety, to protect him or her from a harm presented or created by someone other than the defendant itself.  *See, e.g.*, *L.P. v. Oubre*, 547 So. 2d 1320, 1324 (La. Ct. App. 5th Cir.) (because Boy Scouts of America and its regional counsel undertook the responsibility of supervising the children in their program, they owed plaintiffs a duty to warn about the criminal sexual propensities of scoutmaster), *writ denied*, 550 So. 2d 634 (La. 1989); *Smith v. Orkin Exterminating Co., Inc.*, 540 So. 2d 363, 366 (La. Ct. App. 1st Cir. 1989) (because Orkin sends employees directly into clients' homes, special relationship existed between Orkin and client such that Orkin owed duty to protect client from rape by Orkin employee).  However, in the absence of such a relationship, courts generally have declined to impose an affirmative duty to take such action on behalf of another

person.  For example, courts have found no such "special relationship" to exist between friends, a lessee and lessor, or a university and an invitee, among others.[8]

In the context of duty to warn, the Louisiana Supreme Court has stated that a "duty to disclose exists where the parties stand in some confidential or fiduciary relation to one another, such as that of principal and agent or executor and beneficiary of an estate." *Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376, 1383-84 (La. 1990); *see also Kadlec Medical Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 420 (5th Cir.) ("In Louisiana, a duty to disclose does not exist absent special circumstances, such as a fiduciary or confidential relationship between the parties, which, under the circumstances, justifies the imposition of the duty."), *cert. denied*, 555 U.S. 1046 (2008); *McLachlan v. New York Life Ins. Co.*, 488 F.3d 624, 628 (5th Cir. 2007) ("a legal duty to disclose exists only where there was privity of contract or a fiduciary relationship between the parties").  However, this "confidential relationship is not restricted to any specific association of the parties." *Id.* at 1384 n.4. "While the most frequent illustrations are those of trustee and beneficiary, attorney and client, parent and child, or husband and wife, the term embraces partners and co-partners, principal and agent, master and servant, physician and patient, 'and generally all persons who are associated by any relation of trust and confidence.' " *Id.*

Plaintiffs have failed to articulate any relationship with FEI that would bring them within the

---

8 *See Strickland*, 422 So. 2d at 1209 (no traditional special relationship and thus, no duty to warn of dangerousness of situation, where friend of victim helped the victim attempt to move a mobile home from a ditch); *Terrell*, 747 So. 2d at 750 (no traditional special relationship and thus, lessor owed no duty to protect lessees from known criminal activity on the premises); *Fox*, 576 So. 2d at 981 (no special relationship between LSU and member of invited rugby team and thus, LSU owed no duty to act on behalf of player's safety); *Irwin v. Rubens*, __ So. 3d. __, 2011 WL 3964581 *4 (La. Ct. App. 4th Cir., Sept. 7, 2011) (no special relationship between homeowner and contractor's foreman and, thus, homeowner had no duty to warn foreman that contractor was dangerous or otherwise protect foreman from being shot by contractor).

cases in which courts have imposed a duty on this basis.  Nor have they cited a single case that would support this Court in doing so.   Rather, plaintiffs argue that a special relationship exists here because they are the "intended beneficiaries" of FEI's work under its contract with FEMA. Essentially, plaintiffs' argument is that a "special relationship" arose between FEI and the plaintiffs by virtue of FEI's contractual obligations to FEMA and that this special relationship gave rise to an affirmative duty to provide information and warnings to the plaintiffs.  Plaintiffs have cited no law to support this argument,[9] and the cases located by the Court are not favorable to the plaintiffs.  *See, e.g., Enterprise Transp. Co. v. Veals*, 532 So. 2d 917, 921 (La. Ct. App. 5th Cir. 1988) (no special relationship and no duty to protect third persons from vehicular accident where only relationship was a contractual one to provide sugar for a price); *Pradia v. Southern Personnel of La., Inc.*, 776 So. 2d 474, 479 (La. Ct. App. 3d Cir. 2000) (even though contract between temporary services agency and management company imposed safety obligations on agency, plaintiffs failed "to show that the contract itself created a special relationship between [worker] and [agency] for purposes of tort liability"), *writ denied*, 778 So. 2d 599 (La. 2001).

Even in cases where the defendant has contracted to provide a third person with the very information that the plaintiffs claim would have prevented their harm, courts are reluctant to find an affirmative duty to disclose to persons outside the contract.  For example, in *Smith v. State Farm Ins. Cos.*, 869 So. 2d 909, 913 (La. Ct. App. 4th Cir. 2004), the plaintiffs reported to their insurer that they had noticed mold growing after water entered their home.  The insurer hired an environmental consultant to perform testing and render a report.  The consultant reported the test results to the

---

[9]  The cases cited by the plaintiffs relate to the doctrine of "voluntary assumption" of a duty, which is discussed separately below.

insurer but not to the plaintiffs.  Several months later, the insurer informed the plaintiffs that their home had tested positive for toxic mold.  The court dismissed the plaintiffs' negligence claims against the consulting group on grounds that it "owed no duty to the plaintiffs."[10]  *Id.*  "The fact that Rimkus [the consultant] discovered the presence of mold in the plaintiffs' home, and did not report it directly to the plaintiffs, does not give rise to a claim for negligence."  *Id.*

Likewise, in *Lemaire v. Breaux*, 788 So. 2d 498, 503 (La. Ct. App. 5th Cir. 2001), a homeowner sued an appraiser on grounds that his inspection and report to the mortgage lender had failed to uncover the presence of roof damage.  The court dismissed the claim, holding that while the appraiser owed a contractual duty to the lender, it owed no duty whatever to the plaintiffs.  *Id.; see also Thomas v. Livingston Parish Sheriff's Off.*, 923 So. 2d 662, 668 (La. Ct. App. 1st Cir. 2005) (appraiser who prepared allegedly improper appraisal report was hired by sheriff on behalf of seizing creditor and therefore owed no duty to the judgment debtor), *writ denied*, 925 So. 2d 1254 (La. 2006).  The United States Court of Appeals for the Fifth Circuit reached a similar conclusion in *Audler v. CBC Innovis Inc.*, 519 F. 3d 239, 249-254 (5th Cir. 2008), where a homeowner with Katrina flood damage sued the company that had provided flood zone determinations to his lender, asserting claims for negligent misrepresentation and failure to warn.  The Fifth Circuit dismissed both claims, holding that the company did not owe the home buyer a duty to provide a correct flood zone determination.  *Id.* at 254.

One exception where Louisiana courts have extended a contractual duty to provide accurate information to third persons outside the contract is where the third person is known to the defendant

---

[10]  The court also dismissed the plaintiffs' claim of *stipulation pour autrui* claim, finding that the contract between the insurer and the consultant had not stipulated a benefit for the plaintiffs.  *Smith*, 869 So. 2d at 912-13.

to be the intended end-user of the report or information it was hired to produce.  In *Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1017 (La. 1993), the court was faced with the question of whether a state licensed termite inspector has a duty to use reasonable care and competence in rendering its statutorily required wood destroying insects report in connection with the sale of a home, so as to protect the purchaser for whose benefit and guidance the information was sought and supplied, but who had no contractual privity or direct contact with the inspector.  *Id.* at 1008.

Before reaching its decision, the *Barrie* court surveyed Louisiana jurisprudence to determine under what circumstances courts had found a duty to provide accurate information to third persons outside the contract.  The court noted that "[w]here there is privity of contract or a fiduciary relationship," the courts have "found a duty owed to the tort victim under factual scenarios of both non-disclosure and misinformation."  *Id.* at 1015.  However, "in cases where privity of contract is absent," finding a duty had been limited to cases of misinformation, where there was "communication of the misinformation by the tortfeasor directly to the user or the users' agent."  *Id.* (citing, *e.g.*, *Pastor v. Lafayette Bldg. Ass'n*, 567 So. 2d 793, 796 (La. Ct. App. 3d Cir. 1990) ("LBA had no duty to supply any information to Mr. Pastor, who was not a customer for this transaction and to whom it owed no fiduciary duty, in connection with this transaction.  However, once it volunteered information, it assumed a duty to insure that the information volunteered was correct."); *Cypress Oilfield Contractors, Inc. v. McGoldrick Oil Co. Inc.*, 525 So. 2d 1157, 1162 (La. App. 3d Cir.) ("FAB owed no duty to McGoldrick to furnish it any information regarding GDL's financial condition.  However, when FAB stated clearly that the financial stability of GDL was not in jeopardy it *assumed* a duty to insure that the information volunteered was correct.") (emphasis in

original), *writ denied*, 530 So. 2d 570 (La. 1988)).[11]

*Barrie* extended the duty scenario slightly.  Although *Barrie* was a case of misinformation (as opposed to non-disclosure), the defendant had not delivered the report directly to the plaintiff or the plaintiff's agent or otherwise had contact with the plaintiffs, as had been the case in previous scenarios where courts had extended a contractual duty beyond the contract (absent a fiduciary or confidential relationship).  The court concluded that the inspector nevertheless owed a duty to the plaintiffs "because they were known to [the inspector] as the intended users of the report."  625 So. 2d at 1016.  The purchaser's "use of the termite inspection report was not merely one possibility among many, but the end and aim of the...transaction." *Id.* at 1016-17 (internal quotations omitted). The seller had contracted for the report solely for the purpose of providing it to the buyers to give them assurance regarding the condition of the dwelling, and the inspector knew this.  In reaching its holding, the court emphasized that Louisiana's approach to negligent misrepresentation has been and continues to be a "case by case application of the duty/risk analysis." *Id.* at 1016.

Other negligent misrepresentation cases are instructive as well, including cases where the defendants did not contract to provide information but possessed for their own purposes information that would have prevented or mitigated the plaintiff's harm had it been disclosed to the plaintiff. For example, in *McLachlan v. New York Life Ins. Co.*, 488 F.3d 624 (5th Cir. 2007), in response to the plaintiff's application for increased life insurance benefits, New York Life required the plaintiff to submit blood and urine samples for testing.  After learning from the tests that the plaintiff had elevated levels of both alkaline phosphatase and creatinine, New York Life sent the plaintiff a letter

---

[11]  *See also McLachlan v. New York Life Ins. Co.*, 488 F.2d 624, 630 (5th Cir. 2007) (noting the distinction in Louisiana case law between cases involving affirmative misstatements or misinformation and those involving non-disclosure).

explaining that it was accepting his application, but at a higher premium due to his high alkaline phosphatase levels. New York Life never informed the plaintiff of his elevated creatinine levels (a measure of kidney function), which continued to rise unchecked until they were revealed in a subsequent test the following year, at which time the plaintiff learned that he had irreversible kidney damage, necessitating a transplant. The Fifth Circuit concluded that New York Life owed the plaintiff no affirmative duty to disclose. *Id.* at 628. New York Life had "purchased the medical tests for its own purposes, not the McLachlans'." *Id.*

A similar holding was reached in *Kadlec Medical Center v. Lakeview Anesthesia Associates*, 527 F.3d 412 (5th Cir. ), *cert. denied*, 555 U.S. 1046 (2008). In *Kadlec*, a patient had fallen into a vegetative state after being treated by an anesthesiologist who admitted afterwards to on-duty use of narcotics. The hospital where the incident occurred (Kadlec) sued the anesthesiologist's prior professional corporation (PC) and the hospital where he had worked previously (Lakeview Medical), alleging that they had misrepresented his qualifications. Despite having fired the anesthesiologist only sixty-eight days earlier for using narcotics while on-duty and putting patients at risk (and despite a previous investigation regarding his suspicious withdrawals of Demerol at the hospital), the physicians in his PC wrote letters recommending him highly as an anesthesiologist. In response to a request by Kadlec for credentialing information, including a questionnaire asking detailed questions about the anesthesiologist's judgment, health, behavior, and personality, the hospital (Lakeview Medical) wrote only a sentence stating that the anesthesiologist had been on active staff at the hospital during the noted dates, without disclosing any of the narcotics abuse. The Fifth Circuit found that the affirmative statements made by the physicians were misleading, and therefore supported liability against the physicians, for "even when there is no initial duty to disclose

19

information, 'once [a party] volunteer[s] information, it assume[s] a duty to insure that the information volunteered [is] correct.'"  *Id.* at 419-20 (citation omitted).[12]  However, the court reversed the judgment against the hospital, holding that it had made no affirmative misstatements and that there was no affirmative duty to disclose.  *Id.* at 420-23.  The court found that the requisite "special relationship" between the plaintiff and defendants "necessary to impose a duty to disclose" was lacking.  *Id.* at 421-22.[13]

Here, the plaintiffs have alleged no facts that would bring them within the cases finding an affirmative duty to disclose or warn.  As discussed in more detail in the Court's analysis section below, the plaintiffs do not allege that FEI was engaged by FEMA to provide information related to formaldehyde or to any hazardous substances in the trailers.  Moreover, even if they had made such allegations, such that the Court might draw a reasonable inference that FEI owed a contractual duty to provide such information to FEMA, the plaintiffs have failed to allege any special circumstances that would justify imposing an affirmative duty on FEI to provide such information to the plaintiffs.  The plaintiffs have alleged no affirmative misstatement by FEI or any other factors such as those that led to the imposition of a duty in *Barrie*.  Nor have the plaintiffs alleged facts that would support the finding of a fiduciary or confidential relationship of trust between FEI and the plaintiffs.

---

[12]  "In Louisiana, '[a]lthough a party may keep absolute silence and violate no rule of law or equity, ... if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to [disclose] the whole truth.'" *Kadlec*, 527 F.3d at 419 (quoting *Am. Guar. Co. v. Sunset Realty & Planting Co.*, 23 So. 2d 409, 455-56 (La. 1944)).

[13]  The court also found that the defendants lacked the requisite pecuniary interest in providing the information.  *Kadlec*, 527 F.3d at 421.

## 2.  **Custody or *Garde* under Civil Code Articles 2317**:

FEI is correct that one source of a duty to warn is Civil Code articles 2317 and 2317.1, which make us responsible for damages caused by "the things which we have in our custody." La. Civ. Code Ann. art. 2317 (2010).[14]  To recover under article 2317, "a plaintiff must prove he was injured by a thing, the thing was in the defendant's custody, there was a vice or defect creating an unreasonable risk of harm in the thing, and the injured person's damage arose from such a defect." *Spott v. Otis Elevator Co.*, 601 So. 2d 1355, 1363 (La. 1992).[15]  The question here is whether plaintiffs have alleged the second element, *i.e.*, that the thing was in the defendant's custody. Plaintiffs argue that FEI was custodian of the EHUs by virtue of its actions in hauling, installing, and maintaining the EHUs.  *See* Rec. Doc. 19842 at 5.  The Court disagrees.  The plaintiffs have alleged no facts that would support a reasonable inference of custody or *garde.*

Liability under article 2317 "arises from the guardian's legal relationship to the thing whose defect creates an unreasonable risk of injury to others."  *King v. Louiviere*, 543 So. 2d 1327, 1329 (La. 1989).  "The *guarde* is the obligation imposed by law on the proprietor of a thing, or on one who avails himself of it, to prevent it from causing harm to others."  *Id.*  "Under most circumstances

---

[14]  Liability under article 2317, which was once strict liability, was modified in 1996 by the addition of article 2317.1, which states in part: "The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care."  La. Civ. Code Ann. art. 2317.1 (2010); *see Price v. Martin*, __ So. 3d __, 2011 WL 6034519 *7 & n.10 (La. 12/6/2011) ("In *Loescher v. Parr...*, this court held that claims under La. C.C. art. 2317 are governed by principles of strict liability. That changed in 1996 with the enactment of La. C.C. art. 2317.1.").

[15]  Contrary to statements by FEI, application of article 2317 is not restricted to immovable things.  *See, e.g., King v. Louiviere*, 543 So. 2d 1327 (La. 1989) (deciding whether employee had custody of her employer's automobile for purposes of liability under article 2317).

ownership alone establishes the requisite benefit, control and authority to find *guarde*."  *Doughty v. Insured Lloyds Insurance Co.*, 576 So. 2d 461, 464 (La. 1991) ("the civil code defines ownership as 'the right that confers on a person direct, immediate, and exclusive authority over a thing'").  However, this presumption is rebuttable, and non-owners can be found have *guarde* under certain circumstances.  To determine whether a person has *guarde* with regard to a thing, the Louisiana Supreme Court has stated: "The things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them."  *King*, 543 So. 2d at 1329.  Thus, the inquiry is two-fold.  To determine whether a thing is in a person's custody or *guarde*, a court must look to "(1) whether the person bears such a relationship as to have the right of direction and control over the thing; and (2) what, if any, kind of benefit the person derives from the thing."  *Dupree v. City of New Orleans*, 765 So. 2d 1002, 1009 (La. 2000); *see also Giorgio v. Alliance Operating Corp.*, 921 So. 2d 58, 73 (La. 2006).

Pretermitting the question of benefit derived from the thing, plaintiffs' argument for *guarde* fails here because they have failed to allege any facts from which the Court might reasonably infer that FEI had a right of direction and control over the EHUs.  In determining whether a party has a legal relationship with a thing so as to have the right of direction and control over it, courts have looked to a variety of factors, including whether the party has the right to use, alienate, encumber, or lease the thing, or otherwise grant a right of use to others;[16] whether the party has the right to authorize alterations or repairs to the thing,[17] and whether the party has an unfettered right to access

---

[16]  *See Doughty*, 576 So. 2d at 464-65; *Smith v. State of Louisiana*, 620 So. 2d 1172, 1183-84 (La. Ct. App. 1st Cir. 1992).

[17]  *Butler v. Re/Max New Orleans Props., Inc.*, 828 So. 2d 43 (La. Ct. App. 4th Cir. 2002).

the thing at will, versus only a limited access to enter.[18]  The Louisiana Supreme Court has made

clear that "a service contract by itself does not create *garde*."  *Spott*, 601 So. 2d at 1363.  Indeed,

a service contract by itself does not create *garde* even if it gives the contractor the exclusive right

to service the thing and even if it requires the contractor to conduct regular inspections of the thing.

*Id.; see also Ledet v. Montgomery Elevator Co.*, 644 So. 2d 1075, 1078 (La Ct. App. 4th Cir. 1994),

*writ denied*, 649 So. 2d 384 (La. 1995); *Rabito v. Otis Elevator Co.*, 648 So. 2d 18, 19 (La. Ct. App.

4th Cir. 1994); *King v. Home Depot U.S.A., Inc.*, 729 So 2d 1149, 1152 (La. Ct. App. 1st Cir. 1999).

The one exception is where the service contractor has "exclusive care and custody" of the thing in

question, such as where it has been hired to be on the premises full time to care for the thing.  *See*

*Coleman v. Otis Elevator Co.*, 582 So. 2d 341, 343 (La. Ct. App. 4th Cir. 1991) (upholding article

2317 liability upon finding that Otis had exclusive custody and control of elevators where Otis had

placed an employee full time on premises of Charity Hospital to service its forty-eight elevators).

Here, plaintiffs allege that FEMA hired the contractor defendants (including FEI) to pick up

and haul the EHUs that FEMA had purchased, deliver them to a designated location (either the

plaintiff's private property or a temporary trailer park), and install them (*e.g.*, hook up electrical,

water, and sewer lines) for the plaintiffs to occupy as temporary shelter.  It is alleged that during the

plaintiffs' occupancy, FEMA tasked certain of the contractor defendants with maintenance

obligations, requiring them to perform repairs on the EHUs as needed.  Following a plaintiff's

occupancy, it is alleged that FEMA tasked contractor defendants with de-installing and removing

the EHU from the property and that,  in some cases, contractor defendants were then hired to repair

and refurbish the EHU for occupancy by another household displaced by the hurricanes.

---

[18]  *See Bethea v. Great Atlantic & Pacific Tea Co.*, 22 So. 3d 1114, 1116 (La. Ct. App. 4th Cir. 2009).

Nothing in the allegations supports a reasonable inference that FEI had a relationship to any of the EHUs so as to have the right of direction and control over them. There is nothing to suggest that FEI had a right to access and/or enter the EHUs at will, to use, alienate, encumber, or lease any of the EHUs, or to alter the EHUs at will. Nor is there any allegation that would support an inference that FEI had exclusive care and custody of the EHUs. Thus, custody or *garde* under article 2317 cannot serve as a basis for finding a duty to warn on the part of FEI.

### 3. <u>Voluntary Assumption of a Duty:</u>

While the plaintiffs half-heartedly disagree with FEI's arguments that it had no *garde* as to the EHUs and no special relationship with the plaintiffs that would give rise to an affirmative duty to warn, their primary argument in opposition to the instant motions is based on the doctrine of "voluntary assumption" and the general principle that one who undertakes to perform a duty is responsible for damages caused by his failure to exercise reasonable care in the performance of that duty.

Louisiana courts have long held that where a person voluntarily undertakes to perform a task, he thereby assumes the duty to exercise reasonable care in the performance of that task and may be held liable for damages caused by the breach of that duty, even though he may have had no prior obligation to perform the task. *See, e.g.*, *LeBlanc v. Stevenson*, 770 So. 2d 766, 770-71 (La. 2000) (when plaintiff accepted friend's offer to assist in pulling plaintiff's truck out of the mud, that friend assumed a duty to perform the task in a reasonable manner, which duty was breached when he moved his Suburban without telling plaintiff or waiting for all-clear signal from plaintiff, who was re-tying the straps attaching the two vehicles).[19] Although the doctrine of voluntary assumption has

---

[19] *See also Blair v. Tynes*, 621 So. 2d 591, 598 (La. 1993) (where lessor contractually assumed an express duty to hire and schedule special personnel for event parking and security, it was

its roots in common law,[20] it follows naturally from article 2315 and the distinction that Louisiana

courts have made between malfeasance and nonfeasance.  Though the law may impose no duty to

act, once a person undertakes to act, he must do so with reasonable care.  However, because such

cases involve the imposition of liability where the law imposes no duty, the critical threshold

question in any such case is whether the defendant affirmatively undertook to perform the task or

---

liable to injured event-goer and family of deceased event-goer, where event-goers were struck by moving vehicles as a result of lessor's failure to use reasonable care in performing this task); *Harris v. Pizza Hut of Louisiana, Inc.*, 455 So. 2d 1364, 1371-72 (La. 1984) (whether restaurant in high-crime area had a duty to provide a security guard found to be irrelevant; given that restaurant voluntarily undertook to protect patrons by providing a security guard, it assumed a duty to do so with due care and was liable to patrons who were shot and/or killed during armed robbery as result of guard's negligent acts, which provoked gunfire); *Moore v. Safeway, Inc.*, 700 So. 2d 831, 846-47 (La. Ct. App. 1st Cir. 1996) ("Although Shell may not have been obligated to perform its contractual right to inspect" work site for safety violations, it "did undertake such a performance" and "[h]aving assumed this responsibility, [it] would have had a duty to perform it in a reasonable and prudent manner."), *writ denied*, 709 So. 2d 735, 744 (La. 1998); *Carlin v. Rapides Parish Police Jury*, 584 So. 2d 337, 339 (La. Ct. App. 3d Cir. 1991) (although Police Jury had no legal duty to perform repair work on bridge, once it undertook the project, it had the duty to carry out the work in a reasonably prudent manner).

[20]   *See Bujol v. Entergy Servs., Inc.*, 922 So. 2d 1113, 1128-29 (La. 2004).  The doctrine, also known as the "Good Samaritan" doctrine, is ensconced in section 324A of the Restatement (Second) of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect [perform] his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Id.* at 1128 (brackets in original) (quoting REST. 2D § 324A).  The Louisiana Supreme Court has employed the Restatement's formulation of the doctrine in the context of determining the liability, if any, of a parent corporation for injuries sustained by a subsidiary's employee.  *Id.* 1128-38.

services at issue.  *See Bujol v. Entergy Services, Inc.*, 922 So. 2d 1113, 1130-38 (La. 2004).

Here, as set forth above, the plaintiffs allege that FEMA hired the contractor defendants (including FEI) to pick up and haul the EHUs that FEMA had purchased, to deliver them to a designated location (either the plaintiff's private property or a temporary trailer park), to inspect them for habitability, and to install them (*e.g.*, hook up electrical, water, and sewer lines) for the plaintiffs to occupy as a temporary shelter.  In addition, FEMA tasked certain of the contractor defendants with maintenance obligations, requiring them to perform repairs on the EHUs as needed, and with de-installing and removing the EHU once the plaintiff's occupancy had ended.  In certain cases, contractor defendants were hired to repair and refurbish a de-commissioned EHU for occupancy by another person or family displaced by the hurricanes.  Thus, for purposes of this Rule 12(c) motion, it reasonably may be inferred that FEI affirmatively undertook to perform these tasks (*i.e.*, to haul, install, repair, and maintain the EHUs) and therefore necessarily assumed a duty to perform these tasks with reasonable care.  Indeed, the Court already has held that the plaintiffs have stated a claim against FEI for negligence in the performance of these duties.[21]

It is also fathomable that, under certain factual scenarios, such duty to exercise reasonable care in the performance its tasks might entail a duty to warn.  For example, FEI possibly would have had a duty to warn plaintiffs to the extent that its actions in carrying out its tasks directly increased the risk of harm to the plaintiffs.[22]  However, it requires an enormous leap to move from this logical

_____

[21]  *See* Order and Reasons, dated April 27, 2011 (Rec. Doc. 20847).  Specifically, plaintiffs' negligence claim is that by "jacking" and "blocking" the EHUs, the contractor defendants caused stress and flexing of the EHUs' frames, which distorted the EHUs' shells, allowing for increased moisture intrusion and formaldehyde exposure.  *See* AMC ¶¶ 157-59.

[22]  *See, e.g., Brooks v. Henson Fashion Floors, Inc.*, 647 So. 2d 440, 442-43 (La. Ct. App. 2d Cir. 1994) (where contractor increased risk to pedestrians by applying slippery adhesive to floor and blocking adjacent passageway, requiring pedestrian to step onto the slippery floor,

scenario to the plaintiffs' conclusion that "when Fluor contracted for, took possession of, hauled, prepared, installed, and maintained travel trailers...for use by Plaintiffs, it assumed the responsibility to...warn[] trailer occupants of the dangers associated with long term occupancy." Rec. Doc. 19842 at 6. Indeed, as explained more fully below, there is nothing in the Master Complaint to support a reasonable inference that FEI affirmatively undertook any such responsibility. Thus, the Court can find no basis to support a conclusion that FEI voluntarily assumed a duty to warn the plaintiffs about any formaldehyde-related dangers associated with long term occupancy of a travel trailer.

### D.  Duty-Risk Analysis:

As set out above, the plaintiffs have made no factual allegations that would support finding *guarde* or a special relationship as a source of a duty to warn on the part of FEI. Nor have the plaintiffs pointed to any other law or rule that would impose a duty to warn under the circumstances, other than the doctrine of voluntary assumption. However, this doctrine imposes a duty of reasonable care only with regard to willful affirmative undertakings. Here, there are no allegations that FEI undertook to perform any task or render any services relating to investigating, testing, opining, or issuing warnings regarding (1) the air quality of the EHUs; (2) whether the EHUs contained formaldehyde or any other chemical that might pose a health risk to occupants; or (3) the wisdom of providing travel trailers as emergency shelters to those rendered homeless by hurricanes Katrina and Rita. While the plaintiffs allege that the United States government was conducting formaldehyde air sampling of the EHUs as early as October 11, 2005, that FEMA conducted formaldehyde testing in March 2006, and that FEMA intentionally delayed undertaking comprehensive testing, there are no allegations to suggest that FEI or any other contractor defendant

---

contractor "owed a duty to plaintiff to warn of the hazardous floor condition created by its employees").

was engaged or undertook any responsibilities in this regard.  The factual allegations simply do not support a finding that FEI voluntarily assumed a duty to take any action related to warning the plaintiffs about formaldehyde.

The policy considerations also weigh against finding a duty to warn on the part of FEI.[23] Based on the allegations of the Master Complaint, FEMA did not hire FEI to render toxicological services.  It hired FEI to haul the trailers and set them up for occupancy.   To require contractors who haul and hook up trailers to investigate and warn future occupants of toxicological dangers associated with the trailers they install would impose too great an economic burden on contractors who haul and install products that they do not make, build, or even sell.  The skill set required would be completely different.  Toxicological and environmental expertise would be required on every installation job.  The nature of the installers' activity simply does not warrant the imposition of such a duty in the absence of facts showing that such a duty was affirmatively, specifically, and voluntarily undertaken.

The particular circumstances surrounding this case weigh even further against the imposition of such a duty than the ordinary case of a contractor hired to haul and install a trailer or mobile home.  Here, the United States government made the decision to provide travel trailers for use as temporary shelters to those rendered homeless in the wake of hurricanes Katrina and Rita.  As FEI points out: "Imagine the disruption and delay that would have ensued had FEI, of its own accord,

---

[23]   In deciding whether to impose a duty in a particular case, the court must make a policy decision and in doing so, "may consider various moral, social, and economic factors, including whether the imposition of a duty would result in an unmanageable flow of litigation; the ease of association between the plaintiff's harm and the defendant's conduct; the economic impact on society as well as the economic impact on similarly situated parties; the nature of the defendant's activity; moral considerations, particularly victim fault; and precedent as well as the direction in which society and its institutions are evolving." *Meany*, 639 So. 2d at 233.

shut down the housing assistance effort to test every trailer for possible airborne contaminates or other possible dangers, when the government had expressly contracted for prompt provision of housing to displaced residents of the Gulf Coast."  Rec. Doc. 17751-1 at 8-9.

Thus, for all these reasons, the Court concludes that FEI owed the plaintiffs no duty to warn about the dangers of formaldehyde under the general negligence law of Louisiana.  Further, the Court finds that FEI owed no duty to "warn the plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy." AMC ¶ 302(a).  Consequently, the plaintiffs negligent failure to warn claim must be dismissed.

## IV.  Plaintiffs' Failure to Warn Claims Under Alabama, Mississippi, or Texas Law:

In addition to adopting FEI's motion to dismiss plaintiffs' failure-to-warn claims under Louisiana law, CH2M and Shaw also seek dismissal of plaintiffs' failure-to-warn claims under Alabama, Mississippi, and Texas law.  *See* Movant's Memorandum in Support at p.2 (Rec. Doc. 17753).  Their motion papers, however, fail to set forth the applicable law of any state.  Based on this showing, their motion is denied to the extent that it seeks dismissal of any claims other than those for failure to warn under Louisiana's general law of negligence.

Accordingly, for all of these reasons,

**IT IS ORDERED** that:

1)  **Fluor Enterprises, Inc.'s Motion for Partial Judgment on the Pleadings to Dismiss Negligent Failure to Warn Claims in the Third and Fourth Supplemental and Amended Administrative Master Complaints (Rec. Doc. 17751)**, is hereby **GRANTED**; and

2)  **CH2M Hill Constructors, Inc.'s and Shaw Environmental, Inc.'s Joint Rule(b)(6) Motion to Dismiss Failure to Warn Claims in the Third and Fourth Supplemental and**

**Amended Administrative Master Complaints (Rec. Doc. 17753)** is hereby **GRANTED IN PART**, in that it is granted with respect to plaintiffs' negligent failure to warn claim under Louisiana's general law of negligence, and **DENIED IN PART**, in that it is denied in all other respects.

New Orleans, Louisiana, this __18th__ day of January, 2012.

**KURT D. ENGELHARDT**
**United States District Court**

30