# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2010 OCT 14  PM 3: 10

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| EDDIE DAVIS, SR.<br>together with all individuals and entities<br>whose names appear on the attached<br>"Exhibit A"<br><br>versus<br><br>LAKESIDE PARK HOMES, INC., and<br>United States of America through the<br>Federal Emergency Management Agency<br>This Document Relates To:<br>*In re: FEMA Trailer Formaldehyde Products<br>Liability Litigation - MDL No. 1873* | DOCKET NO.<br><br>**10-3601**<br>**SECT.N MAG5** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## PLAINTIFFS' FIRST SUPPLEMENTAL AND AMENDED COMPLAINT FOR DAMAGES

NOW INTO COURT, comes certain persons of the full age of majority, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Named Plaintiffs"), who are all named in the annexed listing of all Named Plaintiffs (hereinafter, "Exhibit "A"), through undersigned counsel, supplement and amend their original Complaints for Damages as listed on Exhibit A pursuant to Pretrial Orders 40 and 68. Plaintiffs, based upon information now in the possession of counsel that was unknown at the time the underlying suit was filed, lived in a FEMA-supplied emergency housing unit manufactured by Lakeside Park Homes, Inc., (hereinafter "Lakeside") and hauled, installed and maintained by an unknown Contractor. Therefore, plaintiffs seek to supplement and amend their original complaint for damages to reassert claims against defendants Lakeside and the United States Governments through the Federal Emergency Management Agency

Fee _____
___ Process _____
x Dktd _____
___ CtRmDep _____
___ Doc. No. _____

No answer has been filed in the underlying original Complaints for Damages and plaintiffs are entitled to amend their original Complaints for Damages as a matter of course pursuant to Rule (15) of the Federal Rules of Civil Procedure.

Plaintiffs, through undersigned counsel, supplements and amends their original Complaints for Damages in the following respects and otherwise reiterate and reaver all of the allegations, claims and prayers for relief contained herein.

## I. PARTIES

1. Each Named Plaintiffs is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the state(s) in which Defendants are citizens.

2. Named Plaintiffs are those individuals and entities listed on the attached Exhibit A, which is incorporated herein as if set forth *in extenso*.

3. Defendant Lakeside Park Homes, Inc. ("Lakeside") is, upon information and belief, an entity incorporated in the state of Indiana, which conducts business in the State of Louisiana, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana.

4. The Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq.*.

6. Each plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

7. Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8. Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

9. Lakeside is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

10. Shaw is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

11. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

## III. FACTS AND GENERAL ALLEGATIONS

12. The Named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") in the State of Louisiana were provided these

housing units by FEMA after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

13. Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet.  They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

14. Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet.  They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

15. Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area).  They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. *Id.*

16. The residence of each Named Plaintiff was rendered unhabitable following Hurricanes Katrina and/or Rita, leaving each plaintiff homeless and in need of housing assistance.

17. FEMA contracted with Lakeside to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

18. On information and belief, Lakeside expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Named Plaintiff containing higher than normal levels of formaldehyde.

19. On information and belief, the housing unit of each Named Plaintiff, including those units which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

20. Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

21. Named Plaintiffs submit that each of the housing units at issue, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Lakeside's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that Lakeside failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

5

22. Named Plaintiffs submit that Lakeside ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to Lakeside's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell Lakeside's products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

23. Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by Lakeside and provided to Plaintiffs by the Federal Government. As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

24. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

25. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

26. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels

established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

27. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

28. Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |

| | 0.03 ppm – exposure durations between 15 and 364 days |
| --- | --- |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

29. Lakeside knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

30. FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

31. In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Shaw with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of Shaw to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

32. The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

33. Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

10

34. In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006. The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels. *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

35. Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Plaintiffs. *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

36. The Federal Government also continued to supply the defective and dangerous housing units to the Plaintiffs after March of 2006 .

37. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which

reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra.*

38. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value. Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf) and D (*available at* http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

39. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra*, and Exhibits E (*available at* http://oversight.house.gov/documents/20070719113322.pdf), I (*available at* http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

40. While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel

12

(OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue." Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails *available at* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

41. Named Plaintiffs aver that, even as each Named Plaintiff was being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

42. FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light. Union of Concerned Scientists, *supra*, and Exhibit R (various emails

*available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

43. FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra. See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at* http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report _0507.pdf.

44. This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years. Union of Concerned Scientists, *supra.*

45. FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the plaintiffs supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein as a result of their exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints

14

from trailer residents concerning formaldehyde fumes in 2006. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

46. FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review. FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

47. FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS,

Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

48. Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw... I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

49. On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

50. Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation "did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-

16

Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

51. The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

52. It was not until December of 2007 that the Federal Government initiated testing of occupied housing units. Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units. *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

53. The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer

housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

54. The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

55. As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

56. The Federal Government's actions with regard to these plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions

which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

57. Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

## COUNT 1:

## CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT

58. At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to each and all of the Named Plaintiffs herein.

59. The Federal Government was obligated to promptly warn each Named Plaintiff of any defects in the housing units which could cause harm and of which the Federal Government was aware.

60. The Federal Government, after becoming aware of the potential for such harm, violated this duty to each Named Plaintiff, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

61. As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violation(s) of state and federal laws, each Named Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

62. Further, since each Plaintiff is within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiffs specifically plead the application of the doctrine of negligence *per se.*

63. The Federal Government was negligent and at fault in the following non-exclusive particulars:

    a.    In failing to warn the each of the Named Plaintiffs of the unreasonably dangerous nature of the housing unit which that Plaintiff occupied

    b.    In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit.

    c.    In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of each Named Plaintiff, on becoming aware of the formaldehyde danger associated with the unit.

    d.    Such other actions of negligence and fault as will be shown at the trial of this matter.

**COUNT 2:**

**CAUSE OF ACTION AGAINST THE MANUFACTURER UNDER
LOUISIANA PRODUCTS LIABILITY ACT**

97. Lakeside is a manufacturer of each of the housing units occupied by the Named Plaintiffs, which units constitute products under the Louisiana Products Liability Act [LPLA].

98. The exposure to each Named Plaintiff to formaldehyde fumes from Lakeside's products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which Shaw sold these housing units.

99. The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to each Named Plaintiff.

100. Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to each Named Plaintiff.

101. Lakeside's product, equipment and supplies used by each Named Plaintiff were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left Shaw's control. Each Named Plaintiff was an intended and foreseeable user of the alleged defective products and damages and losses to each Named Plaintiff reasonably could have been anticipated by Lakeside.

102. The defects in Lakeside's housing units are the result of and/or include, but are not limited to, the following:

> i. In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

ii.    In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;

iii.    In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonably anticipated use;

iv.    In providing housing units which did not conform to the express warranties made by Lakeside regarding their fitness for use as reasonably anticipated;

v.    In manufacturing, testing, marketing, distributing, licensing and selling of unreasonably dangerous housing units;

vi.    In failing to properly test the housing units to property evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

vii.    In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit.

    viii.    In failing to ensure that the housing units it manufactured and provided to each Named Plaintiff were suitable for their intended use;

    ix.    In failing to adhere to any and all express warranties of fitness and safety for the housing units they manufactured and provided;

    x.    In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

    xi.    Such other indicia of fault under the LPLA as will be shown at the trial of this matter

## COMPENSATORY DAMAGES

117.  In addition to and by way of summarizing the compensatory damages prayed for herein, each Named Plaintiff avers that the defendants, the United States of America through FEMA and Lakeside, individually and/or jointly are responsible for all damages which each Named Plaintiff herein has suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of

displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

## REQUEST FOR JURY TRIAL

Each Named Plaintiff is entitled to and demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs pray that Lakeside, and the Federal Government be served with a copy of this Complaint, and that, after due proceedings:

1. there be a judgment herein in favor of each Named Plaintiff and against Defendants for all compensatory damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2. there be specially included in the judgment in each Named Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   a.  past and future physical injuries,

   b.  past and future mental and physical pain and suffering,

   c.  past and future physical impairments and disability,

   d.  past and future reasonable and necessary medical expenses,

e.     past and future loss of earning capacity,

f.     past and future loss of enjoyment and quality of life,

g.     loss of consortium and/or society,

h.     compensable out-of-pocket expenses related to defendants' wrongdoing, and

i.     costs of court,

3.  all other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted,

_____
FRANK J. D'AMICO, JR., T.A. (#17519)
AARON Z. AHLQUIST (#29063)
**FRANK J. D'AMICO, JR., APLC**
622 Baronne Street
New Orleans, LA 70113
Telephone:     (504) 525-7272
Fax:           (504) 525-9522
***Counsel for Plaintiff***

**PLEASE SERVE:**

1.  Lakeside Park Homes, Inc.
    Through its Agent for Service of Process
    Ben C. Jarvis
    70 Peachstate Drive
    Adel, GA 31620

2. The United States of America
   **through**
   U.S. Attorney's Office, Eastern District of Louisiana
   500 Poydras Street
   Room B210
   New Orleans, Louisiana 70130
   **and through**
   Attorney General of the United States
   U.S. Department of Justice
   950 Pennsylvania Avenue, NW
   Washington, DC 20530-0001
   **and through**
   Federal Emergency Management Agency
   Office of the Director, Office of the General Counsel

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **EDDIE DAVIS, SR.** | * | **DOCKET NO.** |
| **together with all individuals and entities** | * | |
| **whose names appear on the attached** | * | **10-3601** |
| **"Exhibit A"** | * | |
| | * | |
| **versus** | * | **SECT. N MAG 5** |
| | * | |
| **LAKESIDE PARK HOMES, INC., and** | * | |
| **United States of America through the** | * | |
| **Federal Emergency Management Agency** | * | |
| **This Document Relates To:** | * | |
| *In re:  FEMA Trailer Formaldehyde Products* | * | |
| *Liability Litigation - MDL No. 1873* | * | |

*************************************************************************

## EXHIBIT A

Claims Originated in *Sims, et al. v. Alliance Homes, Inc., et al.,* 09-5334

Eddie Davis, Sr.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **EDDIE DAVIS, SR.** | * | DOCKET NO. |
| **together with all individuals and entities** | * | |
| **whose names appear on the attached** | * | **10-3601** |
| **"Exhibit A"** | * | |
| | * | **SECT.N MAG5** |
| **versus** | * | |
| | * | |
| **LAKESIDE PARK HOMES, INC., and** | * | |
| **United States of America through the** | * | |
| **Federal Emergency Management Agency** | * | |
| **This Document Relates To:** | * | |
| *In re: FEMA Trailer Formaldehyde Products* | * | |
| *Liability Litigation - MDL No. 1873* | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORIGINATING COMPLAINTS

Pursuant to Pretrial Orders 40 and 68, the complaints listed below are the complaints in which the Named Plaintiffs on Exhibit A first asserted their allegations against the defendants:

*Sims, et al. v. Alliance Homes, Inc., et al.,* **09-5334**

Case 2:07-md-01873-KDE-ALC Document 24653-1 Filed 02/29/12 Page 29 of 40
Case 2:10-cv-03601-KDE-ALC Document 52-1 Filed 04/28/12 Page 1 of 3
Case 2:07-md-01873-KDE-ALC Document 1781 Filed 06/17/2009 Page 1 of 3

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**In Re: FEMA TRAILER**
**FORMALDEHYDE PRODUCTS**
**LIABILITY LITIGATION**

**THIS DOCUMENT RELATES TO**
**ALL CASES**

**MDL NO. 07-1873**

**SECTION "N" (5)**

## PRETRIAL ORDER NO. 40

On June 15, 2009, the Hurricane Legal Center filed 172 new complaints related to the above referenced matter. As such, these new complaints are subject to Pretrial Order No. 38 (document #1596) which was issued on May 27, 2009 and requires, in part, that newly filed cases shall contain only plaintiffs who have claims against the same manufacturer, where known. Unmatched plaintiffs were to be included in separate complaints, not to exceed 300 plaintiffs in each case.

While 144 of the complaints filed yesterday do list only one manufacturing defendant (or one or more related manufacturing defendants), there are 28 lawsuits containing up to 300 plaintiffs and 73 separate manufacturing defendants. Allowing such cases to proceed through the regular

docketing process would place an extreme burden on the court and all counsel in indexing and monitoring the numerous parties, and providing service and summons for each and would make it nearly impossible for the defendants to timely respond to those complaints.

Accordingly, IT IS ORDERED that all unmatched plaintiffs shall be matched with a specific manufacturing defendant within 45 days of the date of the filing of the complaint. This deadline is subject to extension for good cause shown.

Once they are matched to a specific manufacturing defendant, such plaintiffs shall be severed from their original complaint and counsel shall file amended complaints, each containing no more than 300 plaintiffs and naming only one manufacturing defendant as well as any other specific non-manufacturing defendants.

These new complaints will be filed with the Clerk of Court on paper, not electronically, and shall contain a copy of this order and a list of the original complaint(s) from which the plaintiffs in the amended complaint came. There will be no additional filing fee. The Clerk will assign a new civil action number for each amended complaint.

At the end of the 45 day period, counsel for plaintiffs will also notify the court of any plaintiffs which remain unmatched and the civil action number of the original complaint in which they were named. The original claims by any plaintiff who has not filed an amended complaint or who has not notified the court of their continued unmatched status will be subject to dismissal, without prejudice, and without further notice.

2

This order will remain in effect and shall apply to any pending or new complaints containing unmatched plaintiffs, whether filed directly in this court or transferred here by the MDL Panel.

NEW ORLEANS, LOUISIANA, this 17th day of June, 2009.

KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In Re: FEMA TRAILER                                          MDL NO. 07-1873
        FORMALDEHYDE PRODUCTS
        LIABILITY LITIGATION
                                                            SECTION "N" (5)

THIS DOCUMENT RELATES TO
*ALL CASES*

**PRETRIAL ORDER NO. 68**
**CONCERNING DEADLINES FOR MATCHING AND FILING**

The Court enters this Order to assist potential claimants for whom matching information has not yet been obtained from the USA by providing a "last chance" process for them to obtain whatever other information is efficiently obtainable from other sources; (2) to provide a date certain by which the matching effort will end, and dismissals of claims for unmatched claimants will occur.

**I.  BACKGROUND OF MATCHING PROCESS**

A large number of persons occupied in excess of 150,000 Emergency Housing Units ("EHUs"), provided by FEMA, in the aftermath of Hurricanes Katrina and Rita.  Lawsuits were filed against the United States of America (FEMA), various manufacturers of the EHUs and various government contractors who transported and installed such EHUs.  Most early complaints were filed on behalf of numerous plaintiffs who collectively sued most known EHU manufacturers and most known government contractors involved in the hauling and installing of such EHUs.  On May 27, 2009, this Court entered Pretrial Order No. 38 (Rec.Doc. 1596), ordering that each Plaintiff had the burden to file suit against only the particular manufacturer of his or her trailer, and on December 14, 2009, this Court entered Pretrial Order No. 53 (Rec.Doc. 10228), ordering that each Plaintiff had the burden to file suit only against the particular government contractor involved with his or her unit.  To assist in "matching" a particular plaintiff to a particular manufacturer and a particular government contractor, Defendant United States of America ("USA") agreed to provide matching data to claimants who provided certain basic information, including a FEMA ID Number. The "matching process" has been underway for more than two years.  Months ago, in an effort to have counsel for all parties provide the Court with a process to end the matching process fairly by providing matching data to all who properly and timely requested it, and to set deadlines for the filing of all cases against particular defendants in compliance with the Court's previous order, the Court appointed Henry Miller, attorney for Defendant United States of America, and Mikal Watts and Justin Woods of the Plaintiffs' Steering Committee ("PSC") to serve on a "matching committee."     For several months, the matching committee has conferred, and reported on its efforts to the Court on May 7.  The Court notes that the statistics provided by counsel from the Plaintiffs' Steering Committee and by counsel for Defendant United States of America ("USA") indicate that the matching process has worked very well, but there are a subset of potential

claimants for whom matching information has not yet been obtained from the USA's searches of its databases. Before the Court is this process of "matching" claimants to a particular Defendant manufacturer and to a particular Contractor/Installer, and how to end it to facilitate the final and appropriate filings of all claims to be made.

## II. THE MATCHING PROCESS GOING FORWARD

The Court enters this Order to (1) assist those potential claimants for whom matching information has not yet been obtained from the USA by providing a "last chance" process for them to obtain whatever other information is efficiently obtainable from other sources; (2) to provide a date certain by which the matching effort will end.

### A. OBTAINING FEMA ID NUMBERS

Over the past two years, potential claimants have been encouraged to obtain their FEMA ID Number, to allow Defendant USA to match persons with manufacturers and contractors. Potential claimants were informed that their FEMA ID Number should have appeared on all correspondence from FEMA. On January 26, 2010, the USA filed a Notice Regarding How an Applicant or Co-Applicant Who Applied for and Received a FEMA EHU May Call To Obtain His or Her FEMA Identification Number for Matching Purposes (Rec.Doc. 10795). Additionally, in Section V of the Joint Status Report No. 15, entered on March 15, 2010, and in Section V of the Joint Status Report No. 16, entered on May 12, 2010, counsel were advised "that any aid applicant or co-applicant who was issued a FEMA EHU and requires their FEMA ID number may take the following action to obtain their FEMA ID number:

1. Call (800) 621-FEMA and press # to speak with a FEMA agent representative.
2. Inform the FEMA agent that they applied for and received FEMA assistance in the form of an emergency housing unit (trailer) following Hurricane Katrina/Rita.
3. Inform the FEMA agent that they cannot find their FEMA ID number and no longer have any of their correspondence containing their FEMA ID number.
4. Inform the FEMA agent that they would like to obtain their FEMA ID number for their records.
5. Provide the following personal information to the FEMA again so that the caller's identity may be verified and the FEMA ID may be provided:
   a. Their first and last name.
   b. Their Social Security Number.
   c. Their damaged dwelling address.
   d. Their damaged dwelling telephone number.
   e. Their current mailing address (on file with FEMA).
   f. Their current telephone number (on file with FEMA).
   g. Date of Birth.

This process has also been placed on the website for this MDL proceeding – Notice by Defendant United States of America Regarding How an Applicant or Co-Applicant Who Applied For and Received A FEMA EHU May Call To Obtain His Or Her FEMA Identification Number for Matching Purposes (Rec. Doc. 10795).
(http://www.laed.uscourts.gov/FEMA07md1873/Orders/notice10795.pdf).

The Court has been advised by Counsel for the PSC that most attorneys' claimants have been contacted about the need to call FEMA to obtain their FEMA ID numbers. The court and the PSC have encouraged all attorneys to advise their clients of the need to procure their FEMA ID numbers immediately.

The Court therefore orders that the deadline for Plaintiffs' counsel and Plaintiffs to obtain the FEMA ID Numbers for any unmatched claimants, and to provide the same to FEMA for final matching requests in this case, is June 15, 2010.

### B. DEADLINE FOR SUBMITTING MATCHING REQUESTS TO FEMA FOR CLAIMANTS WITH RECENTLY-OBTAINED FEMA ID NUMBERS AND OTHER NEW INFORMATION, AND FOR FILING MATCHED CASES IN COMPLIANCE WITH PREVIOUS PRETRIAL ORDERS

The Court has been advised by the matching committee that FEMA successfully provides matching data for most of those Claimants who have provided FEMA ID Numbers and other required information, but that with respect to some plaintiffs, FEMA is unable to match either the manufacturer or the contractor from the information given. There are three reasons provided to the Court for this inability to match either the manufacturer or the contractor: (1) perhaps the FEMA ID Number is incorrect; (2) perhaps the FEMA data on a person was entered incorrectly into the government's databases, and that most likely, (3) with respect to minors and other persons living in a trailer issued to another, the potential claimant does not know the identity of the head of household to whom FEMA issued the trailer the claimant occupied. Counsel for FEMA has informally suggested that Plaintiffs seek to obtain this information through discovery from the contractors and IA/TAC entities.

The Court finds that the Plaintiff has the burden under Pretrial Order Nos. 38 and 53 to file his or her suit against the specific manufacturer and/or contractor who may be liable for the injuries claimed, and not to sue all potential defendants. This burden is not lifted by a Plaintiff providing FEMA a matching request with an incorrect FEMA ID Number. The burden still exists with respect to Plaintiffs for whom data on a person was entered incorrectly into the government's databases, and with respect to minors and other persons living in a trailer issued to another, such that the potential claimant does not know the identity of the head of household to whom FEMA issued the trailer the claimant occupied; however, these potential claimants are entitled to a "last chance process" by all the parties to locate this information for them. The Court is persuaded that one additional limited and efficient "last chance" process should be undertaken, but that the need for the defendants and the Court to know which claimants are suing which defendants still exists and must be achieved within short order.

The Court therefore orders.

1. The deadline for plaintiffs' counsel submitting matching requests to FEMA is June 15, 2010. FEMA shall be under no obligation to conduct matching searches for data submitted to them after June 15, 2010.
2. At a minimum, counsel should provide FEMA with the claimant's first and last name, the state where the EHU was occupied, the Claimants' FEMA ID Number,

and the Claimant's Date of Birth.  To the extent available, counsel should also provide Claimants' Social Security Number, street address where the EHU was installed, and the unit's FEMA Barcode.

3. Claimants' counsel should not re-submit duplicate requests that have previously been submitted, without providing new or updated information.   If the request is a re-submission, Claimant's counsel should highlight or clearly identify the new or updated information being submitted to facilitate the matching process.

4. FEMA shall have thirty (30) days, until July 15, 2010, to provide the matching request responses to Plaintiffs' counsel who submitted the same.

5. All potential claimants for whom matching information is provided by July 15, 2010, shall comply with previous pretrial orders concerning filing claims in groups of no more than 300 plaintiffs, and concerning suing individual manufacturers and individual claimants, and shall make such filings on or before August 2, 2010.  The Court clarifies its previous orders to state herein that if claimant's counsel has a good faith belief of the identity of a particular manufacturer or contractor, that pursuant to Fed. R.Civ.P. 11, such suits may be filed at any time prior to this deadline, and shall be construed to be "matched".

6. The Court's deadline set herein is not intended as safe-harbor from previously existing prescription deadlines, and shall not in any way be construed as extending or tolling prescription deadlines.

**C.**   **LAST CHANCE PROCESS FOR OBTAINING MATCHING INFORMATION ON PREVIOUSLY UNMATCHABLE CLAIMANTS**

With respect to any claimants for whom matching data has not successfully been obtained from FEMA by July 15, 2010, the Court enters the following orders to provide such claimants with a "last chance" process to obtain matching information necessary to comply with this Court's previous orders:

1. The only potential claimants who are eligible to participate in this Court-ordered "last chance" process ("eligible last chance claimants") are those whose counsel avers under oath to the following:

   a. The claimant executed a legal employment contract to engage such lawyer prior to the date of this Order;

   b. The claimant provided his FEMA ID Number to FEMA in a matching request made on or before June 15, 2010;

   c. The claimant does not remember the identity of the manufacturer of his or her EHU, or does  not remember the identity of the government contractor who hauled or installed his or her EHU;

   d. The claimant has looked for and cannot find documentation containing the identity of the manufacturer of his or her EHU, or does  not remember the identity of the government contractor who hauled or installed his or her EHU

   e. The claimant received data back from FEMA in response to a properly-made matching request, which did not include the manufacturer or the contractor

applicable to his or her EHU. To the extent that prior matching responses have included a VIN Number, the claimant has attempted to match his or her name with the applicable contractor by consulting the IA-TAC documents provided to the PSC on January 31, 2009 (Bates # FEMA 120-001085-010246) and the manufacturer by consulting previously-provided VIN Codes.

2.      Counsel for eligible last chance claimants shall file on August 2, 2010 a motion before this Court seeking to participate in this last chance process. The Motion shall be no more than two pages in length without the single attachment listing all such claimants, shall be verified by counsel, and shall state:

"_____, counsel for the potential claimants listed Exhibit "A" attached hereto, seek leave to participate in the Court's last chance process for obtaining matching information. I state under oath the following:

1.      Each claimant listed on Exhibit "A" executed a legal employment contract with my lawfirm prior to May 24, 2010;

2.      My lawfirm, on behalf of each claimant listed on Exhibit "A", provided his or her FEMA ID Number to FEMA in a matching request made on or before June 15, 2010;

3.      I certify that each claimant listed on Exhibit "A" has stated to me, or members of my staff, that the claimant does not remember the identity of the manufacturer of his or her EHU, or does not remember the identity of the government contractor who hauled or installed his or her EHU;

4.      I certify that each claimant listed on Exhibit "A" has stated to me, or members of my staff, that the claimant has looked for and cannot find documentation containing the identity of the manufacturer of his or her EHU, or does not remember the identity of the government contractor who hauled or installed his or her EHU;

5.      I certify that I, on behalf of each claimant listed on Exhibit "A", received data back from FEMA in response to a properly-made matching request, which did not include the manufacturer or the contractor applicable to his or her EHU. To the extent that prior matching responses have included a VIN Number, I have attempted to match my client's name with the applicable contractor by consulting the IA-TAC documents provided to the PSC on January 31, 2009 (Bates # FEMA 120-001085-010246) and the manufacturer by consulting previously-provided VIN Codes; and

6.      I certify that my address is _____, and that any information regarding matching information on the claimants listed in Exhibit "A" should be delivered to the address provided herein.

Manufactures and government contractors reserve the right to seek penalties for any improper certifications. The Exhibit "A" shall be in a Microsoft excel format, and contain the following information regarding each unmatched plaintiff:

1.    Last Name (Column A);
2.    First Name (Column B); and
3.    Claimant's FEMA ID Number (Column C); and
4.    If Known, the approximate month and year of Lease-In,
        (i.e. 0306 for March, 2006)(Column D)
5.    The docket number of the case in which the claimant has initiated his
        or her action (Column E)

and either

6.    the last name (Column F), First Name (Column G) and FEMA ID
Number (Column H) of the applicant (the FEMA applicant in whose trailer
the claimant resided), and the full address (number and street of address
(Column I), City (Column J), State (Column K) and Zipcode (Column L),
where the unit was installed), or
7.    the VIN # (Column M) and/or FEMA Bar Code number (Column N) of
the unit lived in.

The Court has been informed that matching requests without the information in
#5 or #6 above will not be successful, and therefore orders counsel for plaintiff
not to submit matching requests in this process without providing either the
information needed as outlined in #5 and #6 above.

Also, each Exhibit "A" excel spreadsheet shall contain the name of counsel
submitting the same on Column H, which name shall appear in Column N for
each claimant listed on the excel spreadsheet.

Each counsel submitting motions with an Exhibit "A" shall provide an electronic
copy of both the motion filed and the Exhibit "A" to the PSC. On or before August
13, 2010, the PSC shall merge all the Exhibit "A" excel spreadsheets provided,
eliminate duplicate claimants, and shall submit a single electronic excel
spreasheet for each state (where the EHU at issue is located) to each liaison
counsel for the various defendants.

These motions shall be filed pursuant to this Court's previous Orders, and shall
be copied to Henry Miller, counsel for USA, Andy Weinstock, liaison counsel for
the manufacturing defendants, David Kurtz, liaison counsel for the government
contractors, and Charlie Leche and Ralph Hubbard, liaison counsel for defendant
insurance companies. Liaison counsel are directed to immediately forward
these lists to all defendants in the case.

3.    Counsel who fail to file such motion with compliant spreadsheets on August 2,
        2010 have caused their unmatched claimants to be ineligible to participate in
        this last chance matching process.

4.    By September 13, 2010, each manufacturer and each government contractor shall perform an electronic search of their principal installation database, and with respect to each individual listed on the merged spreadsheets of August 13, 2010, they shall provide via federal express delivery to liaison counsel for the PSC an excel file for each state containing the following information with respect to each such claimant:

    a.    For the manufacturer defendants - the name of the manufacturer who manufactured the EHU associated with the applicant name (Columns F-L), VIN # (Column M), and/or Bar Code number (Column N), if identified by a complete matching of that information as supplied on the August 13, 2010 spreadsheets, for each such claimant, by listing such manufacturer's name in Column O of the excel spreadsheet;

    b.    The name of the contractor who installed the EHU associated with the applicant name (Columns F-L), VIN # (Column M), and/or Bar Code number (Column N), if identified by a complete matching of that information as supplied on the August 13, 2010 spreadsheets, for each such claimant, by listing such contractor's name in Column P of the excel spreadsheets.

    c.    If matching was not successful as to either the manufacturer or the contractor, the line shall state "unmatched" for each such particular claimant;

To be clear, the manufacturers and government contractors are not required to search paper records or any electronically stored information other than the Principal Installation Database, which David Kurtz, liaison counsel for the contractors, has represented to the Court is the database most likely to contain the sought-after information. Manufacturers and government contractors reserve the right to request that the Court enter an Order allowing them additional time to respond (and adjusting dates in this order that flow from the response date), and/or an order directing cost sharing with regard to this effort. The PSC reserve the right to oppose such request, if made, and to request that their data experts being given access to the Database to perform these searches themselves.

5.    By September 20, 2010, the PSC shall provide each claimant's counsel with the portion of the excel file relating to that lawyer's clients.

6.    By October 15, 2010, each claimants' counsel shall do the following:

    a.    With respect to each claimant for whom matching information has been received for both the manufacturer and the government contractor, shall file suit against such manufacturer and government contractor in the appropriate venue in groups of not more than 300 claimants per petition, and shall promptly effectuate service against the defendants sued;

    b.    With respect to each claimant for whom matching information has been received for only the manufacturer, shall file suit against such manufacturer in the appropriate venue in groups of not more

than 300 claimants per petition, and shall promptly effectuate service against the defendant sued.;

c.     With respect to each suit previously filed where a claimant or claimants sued multiple manufacturers and multiple government contractors, file a motion before this Court to cause such suits to be dismissed; and

d.     Provide to the Court, to Jerry Meunier of the PSC, and to Andrew Weinstock and David Kurtz, defense liaison counsel, and Henry Miller, government liaison counsel, and Charlie Leche and Ralph Hubbard, insurance liaison counsel, an excel spreadsheet, containing the following information

1.     Full Name of Each Claimant (Column A)
2.     First Name of Each Claimant (Column B)
3.     FEMA ID Number of Each Claimant (Column C)
4.     Manufacturer Sued By Each Claimant (Column D)
5.     Government Contractor Sued by Each Claimant (Column E)
6.     Whether FEMA has been sued by Each Claimant (Column F)
7.     The Style of the case in which Each Claimant has sued (Column G);
8.     The Cause Number of Such Claimant's suit (Column H); and
9.     The location (i.e., court – e.g., E.D.La) where each such suit is filed (Column I).

### D.    DISMISSAL OF CLAIMS UNMATCHED

Beginning on November 1, 2010, Defendants shall file Motions to Dismiss (1) any claims still in existence in which a claimant has sued multiple manufacturers and/or multiple government contractors; and (2) motions to dismiss any claims made by Claimants who failed to comply with this Order. These motions shall be filed beginning on November 1, 2010, and shall be titled "Motions to Dismiss Claims For Failure to Comply With Order and Reasons Concerning Deadlines for Matching and Filing. Counsel for the claimants served with such Motions shall file responses to said Motions to Dismiss within fifteen (15) days of being served with such motions. Compliance with this Order shall be the only grounds for denial of said Motions to Dismiss, as the Court states now its intention not to extend these deadlines. The Court intends, with the guidance of liaison counsel, to enter orders beginning on November 15, 2010, dismissing with prejudice the claims of all claimants who fail to comply with this Order.

### III. INVENTORY OF REMAINING CASES

On or before December 10, 2010, PSC liaison counsel are ordered to provide the Court, and to the Court's court-appointed master, data files listing the number of plaintiffs with cases filed against each defendant manufacturer, against each defendant government contractor and against the USA. The Court will then conduct a status conference as to how to proceed forward concerning resolving, litigating or dismissing such cases, as may be appropriate.

## IV. STATEMENT REGARDING SCOPE AND INTENT OF THIS ORDER

The Court has been advised that the prescription deadlines have passed already in most instances.  The intent of this Order is to facilitate the transition from previously-filed unmatched cases into matched cases.  It is not the intent of this order to establish any new deadlines affecting prescription.  Counsel are advised that no deadline set herein shall affect prescription in any way if the case has not yet been filed prior to the entry of this order and prior to the applicable prescription date.

NEW ORLEANS, LOUISIANA, this 26th day of May, 2010.

_____
KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE