# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOSEPH CLAIBORNE**<br>together with all individuals and entities<br>whose names appear on the attached<br>"Exhibit A"<br><br>versus<br><br>**LAKESIDE PARK HOMES, INC., and**<br>**United States of America through the**<br>**Federal Emergency Management Agency** | DOCKET NO.<br><br>**09-8586**<br><br>**SECT. N MAG. 5** |

`*******************************************************************************`

## COMPLAINT FOR DAMAGES

This Complaint of certain persons of the full age of majority, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Named Plaintiffs"), who are all named in the annexed listing of all Named Plaintiffs (hereinafter, "Exhibit A"), through undersigned counsel, respectfully represents that:

## I. PARTIES

1. Each Named Plaintiffs is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the state(s) in which Defendants are citizens.

2. Named Plaintiffs are those individuals and entities listed on the attached Exhibit A, which is incorporated herein as if set forth *in extenso.*

3. Defendant Lakeside Park Homes, Inc. ("Lakeside") is, upon information and belief, an entity incorporated in the state of Indiana, which conducts business in the State of

Louisiana, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana.

4. The Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq.*.

6. Each plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

7. Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8. Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

9. Lakeside is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

10. Shaw is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all

relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

11. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

## III. FACTS AND GENERAL ALLEGATIONS

12. The Named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") in the State of Louisiana were provided these housing units by FEMA after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

13. Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet. They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

14. Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

3

15. Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area). They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. *Id.*

16. The residence of each Named Plaintiff was rendered unhabitable following Hurricanes Katrina and/or Rita, leaving each plaintiff homeless and in need of housing assistance.

17. FEMA contracted with Lakeside to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

18. On information and belief, Lakeside expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Named Plaintiff containing higher than normal levels of formaldehyde.

19. On information and belief, the housing unit of each Named Plaintiff, including those units which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

20. Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications

which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

21. Named Plaintiffs submit that each of the housing units at issue, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Lakeside's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that Lakeside failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

22. Named Plaintiffs submit that Lakeside ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to Lakeside's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell Lakeside's products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

23. Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by Lakeside and provided to Plaintiffs by the Federal Government. As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

24. Formaldehyde is found in construction materials such as particle board, fiberboard and

plywood, as well as glues and adhesives used in the manufacture of the housing units.

Pursuant to federal law, the defendants are required to display a "Health Notice" about

exposure to formaldehyde which reads:


### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose
and throat irritation, headache, nausea, and a variety of asthma-like symptoms,
including shortness of breath, have been reported as a result of formaldehyde
exposure. Elderly persons and young children, as well as anyone with a history of
asthma, allergies, or lung problems, may be at greater risk.  Research is
continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow
formaldehyde and other contaminants to accumulate in the indoor air. Additional
ventilation to dilute the indoor air may be obtained from a passive or mechanical
ventilation system offered by the manufacturer.  Consult your dealer for
information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home
is to be located in areas subject to extreme summer temperatures, an air-
conditioning system can be used to control indoor temperature levels. Check the
comfort cooling certificate to determine if this home has been equipped or
designed for the installation of an air-conditioning system.


If you have any questions regarding the health effects of formaldehyde, consult
your doctor or local health department.

*See* 24 C.F.R. §3280.309.

25. According to the National Cancer Institute, formaldehyde has been classified as a human

carcinogen (cancer-causing substance) by the International Agency for Research on

Cancer and as a probable human carcinogen by the U.S. Environmental Protection

Agency ("EPA").  Additionally, the Agency for Toxic Substances and Disease Registry

("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

26. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to 1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

27. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

28. Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

29. Lakeside knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

30. FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The

Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

31. In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Shaw with No-Bid contracts, eventually amounting to billions of dollars.  The Federal Government also relied on the expertise and knowledge of Shaw to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

32. The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith.  *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

33. Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

34. In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

35. Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs, the Inspector General of the Department of Homeland Security,  testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Plaintiffs.  *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the

10

Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

36. The Federal Government also continued to supply the defective and dangerous housing units to the Plaintiffs after March of 2006 .

37. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra.*

38. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.    Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf)    and D (*available at* http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

39. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra*, and Exhibits E (*available at* http://oversight.house.gov/documents/20070719113322.pdf), I (*available at*

http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

40. While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue." Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails *available at* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

41. Named Plaintiffs aver that, even as each Named Plaintiff was being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

42. FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light. Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

43. FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra*. *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at* http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report _0507.pdf.

44. This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the

trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.   Union of Concerned Scientists, *supra*.

45. FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the plaintiffs supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein as a result of their exposure to formaldehyde.   FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

46. FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.   FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

14

47. FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

48. Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw... I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

49. On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to

disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

50. Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation"did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

51. The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

52. It was not until December of 2007 that the Federal Government initiated testing of occupied housing units. Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units. *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO

16

HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

53. The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

54. The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

55. As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing.  The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

56. The Federal Government's actions with regard to these plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy.  Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

57. Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

## COUNT 1:

### CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT

58. At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to each and all of the Named Plaintiffs herein.

59. The Federal Government was obligated to promptly warn each Named Plaintiff of any defects in the housing units which could cause harm and of which the Federal Government was aware.

60. The Federal Government, after becoming aware of the potential for such harm, violated this duty to each Named Plaintiff, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

61. As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violation(s) of state and federal laws, each Named Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

62. Further, since each Plaintiff is within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiffs specifically plead the application of the doctrine of negligence *per se.*

63. The Federal Government was negligent and at fault in the following non-exclusive particulars:

    a.    In failing to warn the each of the Named Plaintiffs of the unreasonably dangerous nature of the housing unit which that Plaintiff occupied

    b.    In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit.

c.      In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of each Named Plaintiff, on becoming aware of the formaldehyde danger associated with the unit.

d.      Such other actions of negligence and fault as will be shown at the trial of this matter.

## COUNT 2:

## CAUSE OF ACTION AGAINST THE MANUFACTURER UNDER LOUISIANA PRODUCTS LIABILITY ACT

97. Lakeside is a manufacturer of each of the housing units occupied by the Named Plaintiffs, which units constitute products under the Louisiana Products Liability Act [LPLA].

98. The exposure to each Named Plaintiff to formaldehyde fumes from Lakeside's products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which Shaw sold these housing units.

99. The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to each Named Plaintiff.

20

100. Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to each Named Plaintiff.

101. Lakeside's product, equipment and supplies used by each Named Plaintiff were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left Shaw's control. Each Named Plaintiff was an intended and foreseeable user of the alleged defective products and damages and losses to each Named Plaintiff reasonably could have been anticipated by Lakeside.

102. The defects in Lakeside's housing units are the result of and/or include, but are not limited to, the following:

    i.     In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

    ii.    In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;

    iii.   In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonably anticipated use;

iv. In providing housing units which did not conform to the express warranties made by Lakeside regarding their fitness for use as reasonably anticipated;

v. In manufacturing, testing, marketing, distributing, licensing and selling of unreasonably dangerous housing units;

vi. In failing to properly test the housing units to property evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

vii. In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit.

viii. In failing to ensure that the housing units it manufactured and provided to each Named Plaintiff were suitable for their intended use;

ix. In failing to adhere to any and all express warranties of fitness and safety for the housing units they manufactured and provided;

x. In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

xi.    Such other indicia of fault under the LPLA as will be shown at the trial of this matter

## COMPENSATORY DAMAGES

117. In addition to and by way of summarizing the compensatory damages prayed for herein, each Named Plaintiff avers that the defendants, the United States of America through FEMA and Lakeside, individually and/or jointly are responsible for all damages which each Named Plaintiff herein has suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

## REQUEST FOR JURY TRIAL

Each Named Plaintiff is entitled to and demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs pray that Lakeside, and the Federal Government be served with a copy of this Complaint, and that, after due proceedings:

1. there be a judgment herein in favor of each Named Plaintiff and against Defendants for all compensatory damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2. there be specially included in the judgment in each Named Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

    a.    past and future physical injuries,

    b.    past and future mental and physical pain and suffering,

    c.    past and future physical impairments and disability,

    d.    past and future reasonable and necessary medical expenses,

    e.    past and future loss of earning capacity,

    f.    past and future loss of enjoyment and quality of life,

    g.    loss of consortium and/or society,

24

h.     compensable out-of-pocket expenses related to defendants' wrongdoing, and

i.     costs of court,

3.  all other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted,

FRANK J. D'AMICO, JR., T.A. (#17519)
AARON Z. AHLQUIST (#29063)
**FRANK J. D'AMICO, JR., APLC**
622 Baronne Street
New Orleans, LA 70113
Telephone:    (504) 525-7272
Fax:          (504) 525-9522

***Counsel for Plaintiff***

**PLEASE SERVE:**

1. Lakeside Park Homes, Inc.
   Through its Agent for Service of Process
   Ben C. Jarvis
   70 Peachstate Drive
   Adel, GA 31620

2. The United States of America
   **through**
   U.S. Attorney's Office, Eastern District of Louisiana
   500 Poydras Street
   Room B210
   New Orleans, Louisiana 70130
   **and through**
   Attorney General of the United States
   U.S. Department of Justice
   950 Pennsylvania Avenue, NW
   Washington, DC 20530-0001
   **and through**
   Federal Emergency Management Agency
   Office of the Director, Office of the General Counsel

## EXHIBIT "A"

Each of the following Plaintiffs is a person of the full age of majority and resident of the State Louisiana.

1.  Plaintiff, Joseph Claiborne, is a resident of New Orleans, Louisiana, and was an occupant or resident of a FEMA Trailer manufactured and distributed by Defendant, Lakeside Park Homes, Inc.

2.  Plaintiff, Peggy Penton, is a resident of Slidell, Louisiana, and was an occupant or resident of a FEMA Trailer manufactured and distributed by Defendant, Lakeside Park Homes, Inc.

3.  Plaintiff, Jocelyn Joseph, Individually and on behalf of Isaiah Joseph, minor child, is a resident of New Orleans, Louisiana, and was an occupant or resident of a FEMA Trailer manufactured and distributed by Defendant, Lakeside Park Homes, Inc.

4.  Plaintiff, Rebecca Shallowhorne, is a resident of New Orleans, Louisiana, and was an occupant or resident of a FEMA Trailer manufactured and distributed by Defendant, Lakeside Park Homes, Inc.

5.  Plaintiff, Brenda Bourgeois, Individually and on behalf of minor child, Brittany Bourgeois, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

6.  Plaintiff, Clarence Bourgeois, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

7.  Plaintiff, Leslie Brazley, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

8.  Plaintiff, Timmie Burnett, is a resident of Slidell, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

9.  Plaintiff, Alphathada Cassimere, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

10. Plaintiff, Debra Cassimere, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

11. Plaintiff, Orlander Cassimere Jr., Individually and on behalf of minor child, Mathew Williams, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

12. Plaintiff, Orlander Cassimere Sr., is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

13. Plaintiff, Yvonne Cassimere, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

14. Plaintiff, Leroy Cutno, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

15. Plaintiff, Julie Duplessis, Individually and behalf of minor children, Mathew Harvey, Joey Duplessis, and Joseph Duplessis Jr., is a resident of Port Sulphur, Louisiana and was

an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

16. Plaintiff, Donnell Evans, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

17. Plaintiff, Maria Evans, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

18. Plaintiff, Bessie Falls, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

19. Plaintiff, Paul Falls, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

20. Plaintiff, Stephanie Falls, Individually and on behalf of the minor child, Stephan Falls, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

21. Plaintiff, Joseph Felix, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

22. Plaintiff, Crystal Ferguson, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

23. Plaintiff, David Gould, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

24. Plaintiff, Kywanda Hammothe, Individually and on behalf of minor child, Deshay Hammothe, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

25. Plaintiff, Loulla Hammothe, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

26. Plaintiff, Tinika Hammothe, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

27. Plaintiff, Zerrick Hammothe, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

28. Plaintiff, Gerald Humphrey, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

29. Plaintiff, Kean Humphrey, is a resident of Harvey, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

30. Plaintiff, Sean Humphrey, Individually and on behalf of the minor child, Ayalla Humphrey, and is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

31. Plaintiff, Venessa Humphrey, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

32. Plaintiff, Dwight Jacobs, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

33. Plaintiff, Kevin Johnson Jr., is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

34. Plaintiff, Delores Kelson, is a resident of Marrero, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

35. Plaintiff, Sequette Madison, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

36. Plaintiff, Jamie Massey, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

37. Plaintiff, Jessica Massey, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

38. Plaintiff, Toriano Massey Sr., is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

39. Plaintiff, Toriano Massey Jr., is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

40. Plaintiff, Venita Massey, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

41. Plaintiff, Lalannie Mathews, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

42. Plaintiff, Nira Mathews, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

43. Plaintiff, Alvin Paul, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

44. Plaintiff, Debera Renee, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

45. Plaintiff, Danielle Roberson, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

46. Plaintiff, Joane Roberson, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

47. Plaintiff, Rose Smith, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

48. Plaintiff, Noella Stanley, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

49. Plaintiff, James Stokes, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

50. Plaintiff, Melvin Stovall, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

51. Plaintiff, Balandra Taylor, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

52. Plaintiff, Lydia Taylor is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

53. Plaintiff, Frederick Victoran, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

54. Plaintiff, Mary Victoran, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

55. Plaintiff, Della Weatherspoon, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

56. Plaintiff, Calvin Williams, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

57. Plaintiff, Kate Williams, is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

58. Plaintiff, Leadine Williams, is a resident of Braithwaite, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

59. Plaintiff, Marguerite Bourgeois is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

60. Plaintiff, Pagalyn Bourgeois is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

61. Plaintiff, Elnathan Thornton is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

62. Plaintiff, Marion Thornton is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

63. Plaintiff, Tracey Thornton is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

64. Plaintiff, Herbert Brazley is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

65. Plaintiff, Sarah Carter is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

66. Plaintiff, Leroy Falls is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

67. Plaintiff, Lourdes Schexnayder, Individually and on behalf of the minor child, Shane Schexnayder, and is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

68. Plaintiff, Lanesha Schexnayder is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

69. Plaintiff, Patrick Schexnayder is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.

70. Plaintiff, Leon Williams is a resident of New Orleans, Louisiana and was an occupant or resident of a FEMA trailer manufactured and distributed by defendant, Lakeside Park Homes, Inc.