

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

DEC 2 9 2011

J.T. NOBLIN, CLERK
BY_____DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| LAKISHA SMITH, together with all individuals and entities whose names appear on the attached "Exhibit A" | * * * * * | DOCKET NO. 1:11cv554HSO-RHW |
| VERSUS | * * | |
| AMERICAN CAMPER MANUFACTURING, LLC, and BECHTEL NATIONAL, INC. (This case relates to MDL No. 07-1873) | * * * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT FOR DAMAGES

This Complaint of certain persons of the full age of majority, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Named Plaintiffs"), who are all named in the annexed listing of all Named Plaintiffs (hereinafter, "Exhibit A"), through undersigned counsel, respectfully represents that:

### I. PARTIES

1. Each Named Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the state(s) in which Defendants are citizens.

2. Named Plaintiffs are those individuals and entities listed on the attached Exhibit "A", which is incorporated herein as if set forth *in extenso*.

3. The Defendant, American Camper Manufacturing, LLC, d/b/a Ameri-Camp (hereinafter referred to as "Ameri-Camp"), is, an entity incorporated in the State of Indiana, which, upon information and belief, conducted business in the State of

Mississippi, and manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Mississippi.

4.  The Defendant, Bechtel National, Inc. (hereinafter referred to as "Bechtel"), a Nevada corporation with its principal place of business in California, licensed to do business in the State of Mississippi and in good standing, received No-Bid contracts from the Federal Emergency Management Agency ("FEMA") and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita:

## II.  JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq.*

6.  Each plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

7.  Pursuant to 28 U. S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.  Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's

2

supplemental jurisdiction over these claims.

9.     Ameri-Camp is subject to the in personam jurisdiction of this Court because its does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

10.    Bechtel is subject to the in personam jurisdiction of this Court because its does sufficient business in the State of Mississippi and within this federal  district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are subject of this litigation.

11.    Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

### III.  FACTS AND GENERAL ALLEGATIONS

12.    The Named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") in the State of Mississippi were provided these housing units by FEMA after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

13.    Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet.  They are designed to be used as permanent homes and are defined and regulated by the

U. S. Department of Housing and Urban Development ("HUD").  *See Center for Disease Control and Prevention*, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at*
http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

14.    Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average of less than 320 square feet.  They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities.  *Id*.

15.    Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area).  They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction.  *Id*.

16.    The residence of each Named Plaintiff was rendered unhabitable following Hurricanes Katrina and/or Rita, leaving each plaintiff homeless and in need of housing assistance.

17.    FEMA contracted with Ameri-Camp to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

4

18.     On information and belief, Ameri-Camp expedited production of these housing
units, and, on information and belief, resorted to using substandard materials
and/or employing irregular practices during the manufacturing process, all of
which resulted in the housing units occupied by each Named Plaintiff containing
higher then normal levels of formaldehyde.

19.     On information and belief, the housing unit of each Named Plaintiff, including
those units which were manufactured prior to the hurricanes and those later
manufactured and purchased by FEMA, deviated from Government specifications
pertaining to the safety of the unit as a residence.

20.     Named Plaintiffs submit that each and all of the housing units which are at issue
herein, both those which were manufactured prior to the hurricanes and those later
manufactured and purchased by FEMA, did not conform to any Government-
imposed specifications which addressed the design and/or construction of the
housing units pertinent to formaldehyde levels.

21.     Named Plaintiffs submit that each of the housing units at issue, both those which
were manufactured prior to the hurricanes and those later manufactured, and
purchased by FEMA, contained dangerous levels of formaldehyde due to Ameri-
Camp's use of certain materials in their construction, and/or posed the threat of
producing dangerous levels of formaldehyde due to the Federal Government's
intended use of the housing units as temporary residences for at least 18 months,
but that Ameri-Camp failed to warn the Federal Government about these dangers,
which initially were not known to the Federal Government.

5

22.   Named Plaintiffs submit that Ameri-Camp ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to Ameri-Camp's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell Ameri-Camp's products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

23.   Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by Ameri-Camp and provided to Plaintiffs by the Federal Government.  As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

24.   Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units.  Pursuant to federal law, the defendants are required to display a "Health Notice" about expose to formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of

6

exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air maybe obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.  If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

25.     According to the National Cancer Institute, formaldehyde has been classified as a

human carcinogen (cancer-causing substance) by the International Agency for

Research on Cancer and as a probable human carcinogen by the U.S.

Environmental Protection Agency ("EPA").  Additionally, the Agency for Toxic

Substances and Disease Registry ("ATSDR") has reported to FEMA and members

of Congress that not only is formaldehyde classified as "reasonably anticipated to

be a human carcinogen," but also that there is no recognized safe level of

exposure, and that any level of exposure to formaldehyde may pose a cancer risk,

regardless of duration.

26.     Most published exposure standards for formaldehyde address protective levels for

the adult working population in the workplace, based upon a 40-hour work week,

and specifically do not address chronic exposure levels or protective levels for the

7

more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8 hour day from 3ppm to 1ppm. In May, 1992 the formaldehyde exposure limit was further reduced to 0.75ppm.

27.     HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm) ... [and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...." *See* 24 C.F.R. §3280.308.

28.     Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute | 0.1 parts per million (ppm) |

| health problems can manifest | |
|---|---|
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm – short exposure up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposure of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for

Environmental Solutions, *FEMA Exposes Gulf Coast Residents to*

*Formaldehyde*, Updated on December 19, 2007, available at

http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

29.   Ameri-Camp knew or should have known of the health hazards inherent in the

products it constructed, by familiarity with industry standards, the material safety

data sheets in its possession, and published medical studies.

30.   FEMA's disaster response obligations are delineated in the Robert T. Stafford

Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the

"Stafford Act").  The Stafford Act outlines two types of temporary housing

assistance to be made available to eligible, displaced applicants: financial

assistance and direct services.  This aid is sometimes referred to as Section 408

assistance.  This provision was enacted as Public Law 93-288, Title IV, §408

(1988).  Under the Stafford Act, a 42 U.S.C.A. §5174, the Executive, through

FEMA, may provide "direct assistance" in the form of temporary housing units,

acquired by purchase or lease, directly to individuals or households who, because

9

of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

31.   In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Bechtel with No-Bid contracts, eventually amounting to billions of dollars.  The Federal Government also relied on the expertise and knowledge of Bechtel to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

32.   Bechtel was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

33.   Under the terms of their contract, Bechtel was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same.  Further, under their No-Bid contract with FEMA, Bechtel was obligated to advise and instruct FEMA regarding the implementation of those contracts.  Bechtel failed to properly fulfill either of these tasks.

34.   Bechtel contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Bechtel was tasked with operating.  These new areas included staging areas to be

10

managed and maintained as assigned to one of Bechtel's individual locations and addresses where Bechtel assigned that temporary housing unit would have obligations to manage and maintain it.

35. To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Bechtel entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

36. Bechtel was tasked under the contract with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc. Bechtel knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

37. Once the temporary housing units occupied by the plaintiffs were transported and delivered to a particular location, Bechtel had the responsibility for installing that temporary housing unit. Bechtel installed the temporary housing units by "blocking" the unit. This meant raising a plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

38. By blocking the temporary housing units of each plaintiff, Bechtel created stress and flexing on the frames of the unit as it was not designed to be lifted off of the wheel base. In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

11

39.    The stress and flexing of temporary housing units' frames caused Bechtel
       "blocking" them with weight off of the wheels created distortion in the travel
       trailer's shell allowing increased moisture intrusion which contributed to
       increased formaldehyde exposures.

40.    The temporary housing units occupied by the plaintiffs which were provided by
       FEMA were for the most part travel trailers.  The travel trailers are, by definition,
       mobile.  They are designed for and intended for periodic, recreational use and not
       for long-term habitation.  By installing the travel trailers on concrete blocks for
       extended occupancy, Bechtel knowingly and intentionally modified the design and
       the actual use of these units as a residence for long term occupancy in some
       instances exceeding 18 months.

41.    Bechtel failed to consult with the manufacturers of the temporary housing units,
       including Ameri-Camp, with regard to the installation, warnings, warranty issues
       or advisability of using travel trailers for long term residence and occupation.
       Bechtel took actions which voided the warranties of the manufacturers and
       directly created or contributed to unsafe and hazardous living conditions in the
       temporary housing units.

42.    Once Bechtel had completed the transportation, delivery and installation of the
       temporary housing units occupied by the plaintiffs, Bechtel was tasked with
       inspecting each unit to ensure that it was safe and habitable, prior to occupancy by
       the plaintiffs.  Upon information and belief, Bechtel failed to adequately inspect
       the temporary housing units occupied by the plaintiff(s) to ensure that the units

12

were safe and suitable for their intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita. This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

43.    In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the plaintiffs provided in response to hurricanes Katrina and Rita were also managed, maintained and repaired by one of Bechtel, or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, Bechtel failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the plaintiffs.

44.    Parallel to their duty to manage, maintain and repair each temporary housing unit Bechtel failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the plaintiffs of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

45.    Following the plaintiffs' occupancy of each temporary housing unit, Bechtel was tasked with its de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Bechtel failed to identify the unsuitability of the temporary housing units for long-term occupancy.

13

46.     In addition to de-installation of the temporary housing units, Bechtel was tasked

with refurbishment and restoration of the temporary housing units for use, either

in direct response to hurricanes Katrina and Rita or for use in the future.  By

restoring and refurbishing these temporary housing units, Bechtel warranted that

the units were fit for their intended use, long-term occupancy in response to

disaster related displacement.  By restoring and refurbishing these temporary

housing units, Bechtel created and perpetuated existing hazardous conditions

which would foreseeably lead to adverse health effects caused by the elevated

levels of formaldehyde in the temporary housing units.  Further, in thousands of

cases, following the restoration and refurbishment, these temporary housing units

were immediately occupied by new individuals or families displaced by

hurricanes Katrina and Rita, and who were then directly exposed to hazardous

levels of formaldehyde.

47.     Bechtel, at every stage of their involvement, failed to warn the plaintiffs of each

temporary housing unit of the potential risk of hazardous and unsafe living

conditions due to the presence of elevated levels of formaldehyde – a known

human carcinogen – which led directly to adverse health effects, including but not

limited to the advent of childhood asthma and the onset of adult asthma in some

of the plaintiffs.

48.     Through their actions and omissions, Bechtel created and perpetuated a situation

wherein occupants of the temporary housing units were exposed to elevated levels

of formaldehyde and, as a result, suffered adverse health effects.  Bechtel

14

negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

49.     Bechtel  failed to warn the occupants of temporary housing unit(s) of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

50.     By restoring and refurbishing the trailer for future habitation, Bechtel improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

51.     Finally, despite these failures, Bechtel received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the plaintiff-occupants of the temporary housing units who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

52.     The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See*

15

Statement of R. David Paulison, Administrator, Federal Emergency Management

Agency, Department of Homeland Security, before the Committee on Oversight

and Government Reform, U.S. House of Representatives, July 19, 2007, *available*

*at* http://oversight.house.gov/documents/20070719131219.pdf.

53.     Although, as alleged above, FEMA has long been aware of the presence of

formaldehyde in certain construction materials used in manufactured housing,

including these housing units, and specifically was aware of the published dangers

associated with the "out" or "off-gassing" or the gradual release into the

atmosphere of formaldehyde, upon information and belief, in March of 2006, a

family in Mississippi reported the results of independent testing and health

complaints which they related to high levels of formaldehyde.

54.     In fact, the Federal Government was conducting initial formaldehyde air sampling

of the subject housing units at FEMA staging facilities in Mississippi as early as

October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that

the levels detected in nearly every trailer exceeded the ATSDR minimum risk

levels associated with exposures up to and exceeding 14 days, that most levels

exceeded the EPA recognized level at which acute health effects can manifest, and

that several exceeded the OSHA workplace maximum levels.  *See* Response of

the U.S. Department of Labor, Occupational Safety and Health Administration to

Freedom of Information Act Request submitted by a plaintiff herein, November

16, 2007.

55.     Nonetheless, even though the Government was actively testing for and aware of

16

the dangerous levels of formaldehyde present in housing units scheduled for

delivery to the Plaintiffs, the Inspector General of the Department of Homeland

Security, testifying before the Committee on Homeland Security and

Governmental Affairs of the United States Senate, approximated that as of

February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers

had been delivered to Plaintiffs. *See* Statement of Richard L. Skinner, Inspector

General, U.S. Department of Homeland Security Before the Committee on

Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006,

*available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

56.     The Federal Government also continued to supply the defective and dangerous

        housing units to the Plaintiffs after March of 2006.

57.     The Federal Government continued to supply the defective and dangerous housing

        units to the Plaintiffs even though the Sierra Club publicly announced the

        initiation of its own testing of occupied housing units and, in April of 2006,

        reported the results which reflected formaldehyde levels above the threshold that

        the EPA warns can cause acute health effects in humans in 83% of the trailers

        tested. Union of Concerned Scientists, *supra*.

58.     The Federal Government continued to supply the defective and dangerous housing

        units to the Plaintiffs even though the Federal Government, through FEMA, in

        March of 2006, conducted formaldehyde testing of unoccupied housing units at

        the Purvis, Mississippi staging area, and tested and obtained the results of an

        occupied Mississippi trailer on April 6, 2006, which reflected the presence of

17

formaldehyde at twelve times the EPA's value.  Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf) and D (*available at* http://oversight.house.gov/documents/20070719113219.pdf) attached thereto

59. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra*, and Exhibits E (*available at* http://oversight.house.gov/documents/20070719113322.pdf), I (*available at* http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

60. While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has

18

advised that we do not do testing, which would imply FEMA's ownership of the issue." Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails *available at* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

61.   Named Plaintiffs aver that, even as each Named Plaintiff was being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

62.   FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher.  The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light.  Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

63.   FEMA and EPA senior leadership instead agreed to test ventilation methods on

19

unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra*. *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available* at

http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_r eport_0507.pdf.

64.     This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years. Union of Concerned Scientists, *supra*.

65.     FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the plaintiffs supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein as a result of their exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began

immediately after FEMA began to receive complaints from trailer residents

concerning formaldehyde fumes in 2006. *See* correspondence from U.S. House of

Representatives, Committee on Science and Technology, to Michael Chertoff,

Secretary, U.S. Department of Homeland Security, January 28, 2008.

66.    FEMA further manipulated the governmental testing by involving a little-known

office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought

to ensure that no long-term exposure considerations would be included in the

health consultation by removing the consultation from the normal ATSDR review

process so that scientists who had specifically recommended looking at long-term

exposure effects were excluded from the review. FEMA did so in order to avoid

negative publicity and legal liability in connection with the presence of

formaldehyde in the housing units. *See* correspondence from U.S. House of

Representatives, Committee on Science and Technology, to Michael Chertoff,

January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for

Environmental Health/Agency for Toxic Substances and Disease Registry,

January 28, 2008.

67.    FEMA's manipulation of the data was evidenced in the testing designed and

implemented by FEMA through the ATSDR in July of 2006. The testing results

of the study showed high levels of formaldehyde in nearly all of the trailers, yet

the ATSDR, at FEMA's urging, did not use as its "level of concern" its own

exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of

0.3 ppm as its "level of concern," a level nearly 400 times the ATSDR's

annualized exposure limit.  Yet even applying this "level of concern," the average

sampling results still were higher.  *See* THE SERIOUS PUBLIC HEALTH ISSUES

RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS

ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS,

Testimony of Mary C. DeVany before the Committee on Oversight and

Government Reform, U.S. House of Representatives, July 19, 2007, at 7,

*available at* http://oversight.house.gov/documents/20070719102502.pdf.

68.     Indeed, in testimony before Congress, independent industrial hygienist Mary

DeVany described the FEMA testing and analysis process by stating "All I can

say, in my professional opinion, is that they did this in order to minimize the

actual extent of the problems in these trailers. I have no other conclusion I can

draw... I think it was a complete violation of our professional code of ethics."

Oral testimony of Mary C. DeVany before the House Committee on Oversight and

Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript,

*available at* http://oversight.house.gov/documents/20071114164004.pdf.

69.     On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr.

Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the

February Health Consultation was "possibly misleading and a threat to public

health" for failure to disclose the carcinogenic status of formaldehyde and that

there are no safe exposure levels.

70.     Despite this information, FEMA and the ATSDR did not revise the original

Health Consultation until October of 2007 to include the warning that the original

22

Health Consultation"did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

71. The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

72. It was not until December of 2007 that the Federal Government initiated testing of occupied housing units. Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units. *See* Statement of Howard Frumkin, M.D., D.Ph., Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION,

23

March 4, 2008, at 1, 3-4.

73.    The CDC testing revealed the following important findings: (1) the formaldehyde

levels were higher than typical levels of U.S. indoor exposure in single-family

homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb,

with the average levels in all units measuring 77 ppb, the latter being higher than

U. S. background levels in single-family homes and apartments; (3) the levels

recorded in many of the units could affect the occupants' health; (4) the

contemporary measured levels are likely to under-represent long-term exposures

because formaldehyde levels tend to be higher in newer housing units and during

warmer weather; (5) higher indoor temperatures were associated with higher

formaldehyde levels, independent of unit make or model; and, (6) formaldehyde

levels varied by type of housing unit (mobile home, park model, and travel

trailer), but all types tested had elevated levels compared to the data on single-

family homes and apartments. *Id.* at 4.

74.    The CDC's recommendations as a result of this testing included the following: (1)

move quickly to relocate residents before the weather in the region warms up; (2)

FEMA and the CDC to consider establishment of a registry to conduct long-term

health monitoring of children and others who resided in FEMA- provided housing

units in the Gulf Coast Region; (3) families still living in FEMA-provided

housing units should spend as much time outdoors as possible and maintain the

temperature inside the units at the lowest comfortable level as well as ventilate the

unit; and, (4) establish available construction practices which could assure safe

24

and healthy conditions. *Id.* at 5-6, 11.

75.     As a result of this round of testing, the Federal Government implemented a

program which essentially entails removing the remaining residents from the

subject housing units and placing them into other, safe, forms of housing.  The

Federal Government's action in this regard was the result of pressure imposed on

it to act through various Congressional investigations into the Government's

implementation of the "direct assistance" program under the Stafford Act, this

litigation, and media coverage.

**COUNT 1:**
**<u>STRICT PRODUCTS LIABILITY</u>**
**<u>MS CODE ANNOTATED §11-4-63</u>**

76.     Ameri-Camp, at the time that each subject housing unit left its control, knew or

should have known that each product was defective because it deviated in a

material way from the manufacturers' specifications or from otherwise identical

units manufactured to the same manufacturing specifications.

77.     Ameri-Camp knew or should have known that the defective condition rendered

each subject housing unit unreasonably dangerous to the user or consumer or

others; <u>and,</u>

78.     The defective and unreasonably dangerous condition of each product (the failure

of the subject housing units to be safely habitable without exposure to

formaldehyde) proximately caused the damages and injuries sustained by each

Named Plaintiff.

79.     At the time the subject housing units left the control of the Ameri-Camp,  each

25

subject housing unit did not contain properly selected prepared and installed components.

80.    At all relative times, each Named Plaintiff lacked actual or constructive knowledge of the defective condition of their respective housing units and that each defective product was inconsistent with their safety.

81.    At all relevant times, each Named Plaintiff did not appreciate the danger of their housing unit's defective condition.

82.    At all relevant times, each Named Plaintiff did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

83.    Each subject housing unit in question failed to function as expected as a result of their design characteristics.

84.    An alternative design existed at the time that each housing unit left the control of Ameri-Camp which would have not impaired the product's usefulness or desirability.

85.    The alternative design would have to a reasonable probability prevented the toxic exposure of each Named Plaintiff.

### PRODUCTS LIABILITY: FAILURE TO WARN

86.    Each product (housing unit) was defective because it failed to contain adequate warnings or instructions.

### PRODUCTS LIABILITY: BREACH OF EXPRESS WARRANTY

87.    Each product (housing unit) breached an express warranty and/or failed to

26

conform to other express factual representations upon which the claimant

justifiably relied in electing to use this product.

## COUNT 2:

## NEGLIGENCE OF CONTRACTOR DEFENDANT UNDER MISSISSIPPI LAW

88.   Each Named Plaintiff incorporates the above allegations as if fully repeated

verbatim herein.

89.   At all relevant times Bechtel was tasked with the transportation, installation, site

identification, preparation, inspection, maintenance and repair, refurbishment and

restoration, and removal of the temporary housing units, which caused the

Plaintiffs' injuries.

90.   Bechtel owed a duty to each Named Plaintiff to provide, transport, install, inspect,

maintain, repair, refurbish, recondition and restore safe temporary housing units

that did not emit hazardous levels of formaldehyde.

91.   Bechtel knew or should have known when they provided, transported, installed,

inspected, maintained, repaired, refurbished, reconditioned and restored the

temporary housing units to the general public (thereby modifying and converting

the mobile units into residential installations) the actual and intended use of the

temporary housing units by each plaintiff, and that the temporary housing units

would be used in the manner that each plaintiff herein used the temporary housing

units.

92.   Bechtel breached their duty to each Named Plaintiff in failing to act reasonably in

the provision, installation, inspection, maintenance, repair, refurbishment,

reconditioning and restoration of the temporary housing units; specifically by:

a.   Failing to sufficiently warn the plaintiffs of the inherently dangerous

properties or the foreseeable conditions of the temporary housing units

when used for long term occupancy; and,

b.   Failing to adhere to the manufacturers' warnings against jacking the

temporary housing units off the wheel base by "blocking" the units.

93.   Bechtel's actions were the proximate cause of the increased exposure of

formaldehyde to the each Named Plaintiff.

94.   Bechtel contributed to and exacerbated the adverse health impacts upon the

residents of the temporary housing units.

## COUNT 3:
## STRICT PRODUCTS LIABILITY MS CODE ANNOTATED §11-1-63
## OF THE CONTRACTOR DEFENDANT

95.   Named Plaintiffs incorporate the above allegations as if fully repeated verbatim

herein.

96.   Bechtel, at the time that each subject housing unit left its control, knew or should

have known that each product was defective because it deviated in a material way

from the manufacturer's specifications or from otherwise identical units

manufactured to the same manufacturing specification and/or manufacturers'

warnings.

97.   Bechtel, by installing the housing units on concrete blocks for extended

occupancy, knowingly and intentionally modified the design and the actual use of

28

the housing units.

98.     Bechtel knew or should have known that the defective condition rendered each

        subject housing unit unreasonably dangerous to the user or consumer or others.

99.     The defective and unreasonably dangerous condition of each product (the failure

        of the subject housing units to be safely habitable without exposure to

        formaldehyde) proximately caused the damages and injuries sustained by each

        Named Plaintiff.

100.    At all relative times, each Named Plaintiff lacked actual or constructive

        knowledge of the defective condition of their respective housing units and that

        each defective product was inconsistent with their safety.

101.    At all relative times, each Named Plaintiff did not appreciate the danger of their

        housing unit's defective condition.

102.    At all relative times, each Named Plaintiff did not deliberately and voluntarily

        choose to expose themselves to this danger in such a manner to register assent to

        the continuance of the dangerous condition.

103.    Each subject housing unit in question failed to function as expected as a result of

        their design characteristics.

104.    An alternative design existed at the time that each housing unit left the control of

        Bechtel which would have not impaired the product's usefulness or desirability.

105.    The alternative design would have to a reasonable probability prevented the toxic

        exposure of each Named Plaintiff.

## COUNT 4:
## FAILURE TO WARN OF THE CONTRACTOR DEFENDANT

106.    Named Plaintiffs incorporate the above allegations as if fully repeated verbatim

herein.

107.    Each product (housing unit) was defective because it failed to contain adequate

warnings or instructions.

108.    Bechtel failed to warn the Named Plaintiffs of the inherently dangerous properties

of the foreseeable conditions of the subject housing units when used for long term

occupancy.

109.    Bechtel failed to warn the Named Plaintiffs of the presence of excessive levels of

formaldehyde present in the housing units they installed, maintained, and

supervised.

## COUNT 5:
## BREACH OF IMPLIED WARRANTY BY THE CONTRACTOR DEFENDANT

110.    Named Plaintiffs incorporate the above allegations as if fully repeated verbatim

herein.

111.    Bechtel breached the implied warranty of habitability due to the Named Plaintiffs.

The subject housing units were installed and maintained with an expectation of

habitability and a clear implied warranty that such housing would be safe and free

of any toxic dangers.

## COMPENSATORY DAMAGES

112.    In addition to and by way of summarizing the compensatory damages prayed for

herein, each Named Plaintiff avers that the defendants, Ameri-Camp, as well as

30

Bechtel, individually and/or jointly are responsible for all damages which each Named Plaintiff herein has suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

## PUNITIVE/EXEMPLARY DAMAGES

113.  Pursuant to Miss. Code Ann. §11-1-65, inasmuch as the conduct of Ameri-Camp and/or Bechtel and their servant/employees constitutes willful, wanton, egregious and reckless disregard for the rights and safety of the plaintiffs, an award of punitive damages is appropriate and necessary under these facts.

## REQUEST FOR JURY TRIAL

114.  Each Named Plaintiff is entitled to and demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs pray that Ameri-Camp and Bechtel be served with a copy of this Complaint, and that, after due proceedings:

1.    there be a judgment herein in favor of each Named Plaintiff and against

31

Defendants for all compensatory damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2.   there be specially included in the judgment in each Named Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

    A.   past and future physical injuries,

    B.   past and future mental and physical pain and suffering,

    C.   past and future physical impairments and disability,

    D.   past and future reasonable and necessary medical expenses,

    E.   past and future loss of earning capacity,

    F.   past and future loss of enjoyment and quality of life, loss of consortium and/or society,

    G.   compensable out-of-pocket expenses related to defendants' wrongdoing,

    H.   costs of court,

    I.   punitive damages, and

    J.   all other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/

MARYANNA PENTON (MSBA# 102979)
209 Hoppen Place
Bogalusa, LA 70427
Phone: (985) 732-5651
Fax: (985) 735-5579
**Counsel for Plaintiffs**

33

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

La Kisha Smith, et al

**(b)** County of Residence of First Listed Plaintiff  Harrison
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Mary Ana Penton, The Penton Law Firm, 209 Hoppen Place, Bogalusa, LA
70427  985-732-5651

## DEFENDANTS

American Camper Manufacturing, LLC

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

SOUTHERN DISTRICT OF MISSISSIPPI

DEC 29 2011

J.T. NOBLIN, CLERK                    DEPUTY

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☒ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☒ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28:1332
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE Engelhardt    DOCKET NUMBER 07-md-1873

DATE 12/28/12

SIGNATURE OF ATTORNEY OF RECORD  Mary Ana Penton

FOR OFFICE USE ONLY

RECEIPT # 4104300026917  AMOUNT $350.00  APPLYING IFP    JUDGE    MAG. JUDGE

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **LAKISHA SMITH, together** | * | **DOCKET NO.** |
| **with all individuals and entities whose** | * | |
| **names appear on the attached** | * | |
| **"Exhibit A"** | * | |
| | * | |
| **VERSUS** | * | |
| | * | |
| **AMERICAN CAMPER** | * | |
| **MANUFACTURING, LLC, and** | * | |
| **BECHTEL NATIONAL, INC.** | * | |
| **(This case relates to MDL No. 07-1873)** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EXHIBIT "A"

1.  Lakisha Smith

2.  Lakisha Smith on behalf of the minor child, A. C.

3.  Lakisha Smith on behalf of the minor child, S. S.

4.  Lakisha Smith on behalf of the minor child, K. S.

5.  Lakisha Smith on behalf of the minor child, C. S.

6.  Isiah Tatum

7.  Robert Carter

8.  Ericka Simmons on behalf of W.M., Jr.

9.  Charlene McBroom

10. Jerrye Barre

11. Ericka Simmons on behalf of S.S.



12.    Ericka Simmons

13.    Helen Brown

14.    Robert Brown

15.    Donna Lambert

16.    Stephen Lambert

17.    Helen Brown

18.    Robert Brown

19.    Donna Lambert

20.    Stephen Lambert