# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

DEC 29 2011

J.T. NOBLIN, CLERK
BY_____DEPUTY

| | | |
|---|---|---|
| **JANICE CRAWFORD, together** | * | **DOCKET NO.** |
| **with all individuals and entities whose** | * | |
| **names appear on the attached** | * | 1:11cv534 HSO-RHW |
| **"Exhibit A"** | * | |
| | * | |
| **VERSUS** | * | |
| | * | |
| **IVRBS, INC. (Formerly SunnyBrook** | * | |
| **RV, Inc.) and BECHTEL** | * | |
| **NATIONAL, INC.** | * | |
| **(This case relates to MDL No. 07-1873)** | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT FOR DAMAGES

This Complaint of certain persons of the full age of majority, on behalf of themselves

and, in some instances, on behalf of individuals who lack the capacity to sue individually

(hereinafter, "Named Plaintiffs"), who are all named in the annexed listing of all Named

Plaintiffs (hereinafter, "Exhibit A"), through undersigned counsel, respectfully represents that:

### I. PARTIES

1.      Each Named Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state

other than the state(s) in which Defendants are citizens.

2.      Named Plaintiffs are those individuals and entities listed on the attached Exhibit

"A", which is incorporated herein as if set forth *in extenso*.

3.      The Defendant, IVRBS, Inc. (Formerly SunnyBrook RV, Inc., and hereinafter

referred to as "IVRBS"), is, upon information and belief, an entity incorporated in

the State of Indiana, which conducted business in the State of Mississippi, and

manufactured and supplied FEMA trailers or housing units as defined below

pursuant to contracts with FEMA for use in the State of Mississippi.

4.   The Defendant, Bechtel National, Inc. (hereinafter referred to as "Bechtel"), a

Nevada corporation with its principal place of business in California, licensed to

do business in the State of Mississippi and in good standing, received No-Bid

contracts from the Federal Emergency Management Agency ("FEMA") and was

tasked with, amongst other things, performing significant functions in the

transportation, delivery, installation, maintenance and repair, de-installation and

refurbishment of the temporary housing units provided by FEMA to the victims of

hurricanes Katrina and Rita:

## II. JURISDICTION AND VENUE

5.   This Court has subject matter jurisdiction over the United States of America and

FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq*.

6.   Each plaintiff alleges to have suffered damages in an amount in excess of

$75,000.00, exclusive of interest and costs.

7.   Pursuant to 28 U. S.C. §1332, this Court has subject matter jurisdiction over the

claims asserted herein against the defendant(s) with citizenship other than that of

plaintiff(s), because of diversity of citizenship and because the amount in

controversy exceeds $75,000.00, exclusive of interest and costs.

8.   Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over

any claims, not otherwise subject to federal jurisdiction, based on the Court's

supplemental jurisdiction over these claims.

9.   IVRBS is subject to the in personam jurisdiction of this Court because its does

sufficient business in the State of Mississippi and within this federal district to

confer same, and at all relevant times hereto engaged in commerce both in this

federal district and in the State of Mississippi with respect to the activities and

claims which are the subject of this litigation.

10. Bechtel is subject to the in personam jurisdiction of this Court because its does

sufficient business in the State of Mississippi and within this federal district to

confer same, and at all relevant times hereto engaged in commerce both in this

federal district and in the State of Mississippi with respect to the activities and

claims which are subject of this litigation.

11. Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C.

§1391, as the emergency housing units were provided to the Plaintiffs in this

district, and Named Plaintiffs' injuries were sustained in this district.

### III.  FACTS AND GENERAL ALLEGATIONS

12. The Named Plaintiffs residing or living in travel trailers, park models, and mobile

homes (hereinafter referred to as "housing units") in the State of Mississippi were

provided these housing units by FEMA after the landfalls of Hurricane Katrina

and/or Rita in September of 2005.

13. Of the housing units at issue, "mobile homes" are generally wider than 8 feet

and/or longer than 40 feet, for an average area greater than 320 square feet.  They

are designed to be used as permanent homes and are defined and regulated by the

U. S. Department of Housing and Urban Development ("HUD").  *See* Center for

Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE

3

LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND

MOBILE HOMES, Feb. 29, 2008, at 4, *available at*

http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

14.     Of the housing units at issue, "travel trailers" are wheel-mounted and generally no

        larger than 8 feet wide and 40 feet long, for an average of less than 320 square

        feet. They are designed to provide temporary living quarters and are generally

        considered vehicles, regulated by state transportation authorities rather than

        housing authorities. *Id.*

15.     Of the housing units at issue, "park models" are larger versions of travel trailers

        (up to 400 square feet in area). They are designed for temporary living quarters

        and, although they are manufactured housing, they are exempted from HUD

        construction standards, typically regulated by transportation authorities and by

        manufacturer acceptance of a Voluntary American National Standards Institute

        ("ANSI") standard applying to their construction. *Id.*

16.     The residence of each Named Plaintiff was rendered unhabitable following

        Hurricanes Katrina and/or Rita, leaving each plaintiff homeless and in need of

        housing assistance.

17.     FEMA contracted with IVRBS to purchase thousands of the housing units,

        primarily travel trailers, for provision to the Named Plaintiffs as temporary

        housing.

18.     On information and belief, IVRBS expedited production of these housing units,

        and, on information and belief, resorted to using substandard materials and/or

4

employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Named Plaintiff containing higher then normal levels of formaldehyde.

19.     On information and belief, the housing unit of each Named Plaintiff, including those units which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

20.     Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

21.     Named Plaintiffs submit that each of the housing units at issue, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to IVRBS's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that IVRBS failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

22.     Named Plaintiffs submit that IVRBS ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained

dangerous levels of formaldehyde due to IVRBS's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell IVRBS's products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

23.     Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by IVRBS and provided to Plaintiffs by the Federal Government. As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

24.     Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about expose to formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in

6

the indoor air. Additional ventilation to dilute the indoor air maybe obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.  If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

25.     According to the National Cancer Institute, formaldehyde has been classified as a

human carcinogen (cancer-causing substance) by the International Agency for

Research on Cancer and as a probable human carcinogen by the U.S.

Environmental Protection Agency ("EPA").  Additionally, the Agency for Toxic

Substances and Disease Registry ("ATSDR") has reported to FEMA and members

of Congress that not only is formaldehyde classified as "reasonably anticipated to

be a human carcinogen," but also that there is no recognized safe level of

exposure, and that any level of exposure to formaldehyde may pose a cancer risk,

regardless of duration.

26.     Most published exposure standards for formaldehyde address protective levels for

the adult working population in the workplace, based upon a 40-hour work week,

and specifically do not address chronic exposure levels or protective levels for the

more susceptible population, for instance, the very young, the elderly and those

with respiratory, skin and other chronic diseases.  Nonetheless, reference to the

7

levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8 hour day from 3ppm to 1ppm. In May, 1992 the formaldehyde exposure limit was further reduced to 0.75ppm.

27.    HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm) ... [and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...." *See* 24 C.F.R. §3280.308.

28.    Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health problems can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm – short exposure up to 14 days |

8

|  | 0.03 ppm – exposure durations between 15 and 364 days |
|  | 0.008 ppm – exposure of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for

Environmental Solutions, *FEMA Exposes Gulf Coast Residents to*

*Formaldehyde*, Updated on December 19, 2007, available at

http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

29.     IVRBS knew or should have known of the health hazards inherent in the products

it constructed, by familiarity with industry standards, the material safety data

sheets in its possession, and published medical studies.

30.     FEMA's disaster response obligations are delineated in the Robert T. Stafford

Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the

"Stafford Act").  The Stafford Act outlines two types of temporary housing

assistance to be made available to eligible, displaced applicants: financial

assistance and direct services.  This aid is sometimes referred to as Section 408

assistance.  This provision was enacted as Public Law 93-288, Title IV, §408

(1988).  Under the Stafford Act, a 42 U.S.C.A. §5174, the Executive, through

FEMA, may provide "direct assistance" in the form of temporary housing units,

acquired by purchase or lease, directly to individuals or households who, because

of a lack of available housing resources, would be unable to make use of the

alternative "financial assistance" provided under subparagraph (c)(1)(A).

9

31.    In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Bechtel with No-Bid contracts, eventually amounting to billions of dollars.  The Federal Government also relied on the expertise and knowledge of Bechtel to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

32.    Bechtel was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

33.    Under the terms of their contract, Bechtel was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same.  Further, under their No-Bid contract with FEMA, Bechtel was obligated to advise and instruct FEMA regarding the implementation of those contracts.  Bechtel failed to properly fulfill either of these tasks.

34.    Bechtel contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Bechtel was tasked with operating.  These new areas included staging areas to be managed and maintained as assigned to one of Bechtel's individual locations and addresses where Bechtel assigned that temporary housing unit would have

10

obligations to manage and maintain it.

35.     To accomplish their contractual obligations with FEMA, in addition to the use of

subsidiary companies, Bechtel entered into numerous sub-contracts, but at all

times retained supervisory capacity and responsibility under their individual

contracts with FEMA.

36.     Bechtel was tasked under the contract with FEMA to identify and prepare the

infrastructure for the various group site locations.  This included, amongst other

things, ensuring there would be adequate water, sewage, electricity, etc.  Bechtel

knew or should have known that these preparations were for long-term occupancy

of the temporary housing units.

37.     Once the temporary housing units occupied by the plaintiffs were transported and

delivered to a particular location, Bechtel had the responsibility for installing that

temporary housing unit.  Bechtel installed the temporary housing units by

"blocking" the unit.  This meant raising a plaintiff's unit several feet into the air

and off of its wheel base, and setting it on concrete blocks.

38.     By blocking the temporary housing units of each plaintiff, Bechtel created stress

and flexing on the frames of the unit as it was not designed to be lifted off of the

wheel base. In fact, the manufacturers of the temporary housing units warned in

the various owners' manuals provided with the units, that units should not be

jacked so that the vehicle's weight is no longer supported by the wheels.

39.     The stress and flexing of temporary housing units' frames caused Bechtel

"blocking" them with weight off of the wheels created distortion in the travel

11

trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

40.  The temporary housing units occupied by the plaintiffs which were provided by FEMA were for the most part travel trailers.  The travel trailers are, by definition, mobile.  They are designed for and intended for periodic, recreational use and not for long-term habitation.  By installing the travel trailers on concrete blocks for extended occupancy, Bechtel knowingly and intentionally modified the design and the actual use of these units as a residence for long term occupancy in some instances exceeding 18 months.

41.  Bechtel failed to consult with the manufacturers of the temporary housing units, including IVRBS, with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation.  Bechtel took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

42.  Once Bechtel had completed the transportation, delivery and installation of the temporary housing units occupied by the plaintiffs, Bechtel was tasked with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the plaintiffs.  Upon information and belief, Bechtel failed to adequately inspect the temporary housing units occupied by the plaintiff(s) to ensure that the units were safe and suitable for their intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita.  This failure to

properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

43.     In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the plaintiffs provided in response to hurricanes Katrina and Rita were also managed, maintained and repaired by one of Bechtel, or their various subcontractors over whom they maintained direct oversight and responsibility.  Upon information and belief, Bechtel failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the plaintiffs.

44.     Parallel to their duty to manage, maintain and repair each temporary housing unit Bechtel failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the plaintiffs of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

45.     Following the plaintiffs' occupancy of each temporary housing unit, Bechtel was tasked with its de-installation.  Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Bechtel failed to identify the unsuitability of the temporary housing units for long-term occupancy.

46.     In addition to de-installation of the temporary housing units, Bechtel was tasked with refurbishment and restoration of the temporary housing units for use, either

13

in direct response to hurricanes Katrina and Rita or for use in the future. By restoring and refurbishing these temporary housing units, Bechtel warranted that the units were fit for their intended use, long-term occupancy in response to disaster related displacement. By restoring and refurbishing these temporary housing units, Bechtel created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units. Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

47.    Bechtel, at every stage of their involvement, failed to warn the plaintiffs of each temporary housing unit of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the plaintiffs.

48.    Through their actions and omissions, Bechtel created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Bechtel negligently failed to adhere to the manufacturer instructions and warnings related to: (1)  the manufacturers' intended (short-term) use of the temporary housing

14

units; (2) the installation and set-up of the temporary housing units; and (3) the

warning that the temporary housing units contained urea formaldehyde resin

which would release formaldehyde gas directly into the intended living space.

49.     Bechtel failed to warn the occupants of temporary housing unit(s) of the

hazardous conditions created by the elevated levels of formaldehyde in the

temporary housing units.

50.     By restoring and refurbishing the trailer for future habitation, Bechtel improperly

and negligently warranted that the units were fit for the intended use of long-term

occupancy.

51.     Finally, despite these failures, Bechtel received billions of dollars in contracts

from FEMA and the United States government, at the expense of the health of the

plaintiff-occupants of the temporary housing units who simply had nowhere else

to go and who were relying on FEMA and its contractors to keep them safe in the

aftermath of the greatest natural disaster in the history of the United States.

52.     The Federal Government has been aware for years that formaldehyde is used in

certain construction materials used in manufactured housing, has regulated

emissions standards for HUD-regulated mobile homes, has, since the hurricanes,

adopted the HUD emissions regulations for travel trailer purchase specifications,

and has known for over thirty years of the relationship between formaldehyde

emissions in indoor environments and health problems associated therewith. *See*

Statement of R. David Paulison, Administrator, Federal Emergency Management

Agency, Department of Homeland Security, before the Committee on Oversight

15

and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

53.   Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

54.   In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATSDR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels. *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

55.   Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs, the Inspector General of the Department of Homeland

16

Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Plaintiffs. *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

56. The Federal Government also continued to supply the defective and dangerous housing units to the Plaintiffs after March of 2006.

57. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

58. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value. Union of Concerned Scientists, *supra*, and Exhibits B (*available at*

17

http://oversight.house.gov/documents/20070719113015.pdf) and D (*available at*

http://oversight.house.gov/documents/20070719113219.pdf) attached thereto

59.     The Federal Government continued to supply the defective and dangerous housing

units to the Plaintiffs even though the Federal Government had been notified on a

number of occasions in May and June 2006 regarding residents' concerns over

formaldehyde emissions in their housing units. Union of Concerned Scientists,

*supra*, and Exhibits E (*available at*

http://oversight.house.gov/documents/20070719113322.pdf), I (*available at*

http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at*

http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

60.     While complaints of formaldehyde exposure continued to be reported to the

Federal Government and evidence supporting the existence of dangerous levels of

formaldehyde present in the housing units was uncovered, the Federal

Government intentionally avoided undertaking any comprehensive testing of their

own because it wanted to avoid liability for the problem, as stated in emails from

the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any

testing until we give the OK. While I agree that we should conduct testing, we

should not do so until we are fully prepared to respond to the results. Once you get

results and should they indicate some problem, the clock is ticking on our duty to

respond to them." Another email repeats these concerns, reading "OGC has

advised that we do not do testing, which would imply FEMA's ownership of the

issue." Union of Concerned Scientists, *supra*, and Supplemental A (various

18

emails *available at* http://oversight.house.gov/documents/20070809120917.pdf)

and Supplemental B (various emails *available at*

http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

61.     Named Plaintiffs aver that, even as each Named Plaintiff was being placed at risk

in unsafe temporary housing, the Federal Government had reviewed the results of

all earlier testing and complaints of formaldehyde associated with the housing

units and were actively conferring with one or more of the manufacturers

concerning formaldehyde exposure in the housing units and how best to deal with

the publicity fall-out as the media reports of same increased.

62.     FEMA participated in an inter-agency meeting with the EPA and the Centers for

Disease Control and Prevention (CDC) in July of 2006, during which senior EPA

officials advised FEMA that the "health base level" for formaldehyde might be

much lower than previously expected, with anticipated levels being more than 100

times higher.  The discussions during this conference were more "strategic" in

nature, with the EPA warning against the "the advisability of testing at all"

concerned that the data would have to be released to the public and that the media

would characterize the findings in the worst possible light.  Union of Concerned

Scientists, *supra*, and Exhibit R (various emails *available at*

http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

63.     FEMA and EPA senior leadership instead agreed to test ventilation methods on

unoccupied trailers.  This testing methodology completely failed to simulate the

living conditions of a trailer resident, so results, which would not be released for

another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra*. *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available* at

http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_r eport_0507.pdf.

64.    This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.   Union of Concerned Scientists, *supra*.

65.    FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the plaintiffs supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein as a result of their exposure to formaldehyde.  FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006. *See* correspondence from U.S. House of

Representatives, Committee on Science and Technology, to Michael Chertoff,

Secretary, U.S. Department of Homeland Security, January 28, 2008.

66.      FEMA further manipulated the governmental testing by involving a little-known

office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought

to ensure that no long-term exposure considerations would be included in the

health consultation by removing the consultation from the normal ATSDR review

process so that scientists who had specifically recommended looking at long-term

exposure effects were excluded from the review.  FEMA did so in order to avoid

negative publicity and legal liability in connection with the presence of

formaldehyde in the housing units.  *See* correspondence from U.S. House of

Representatives, Committee on Science and Technology, to Michael Chertoff,

January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for

Environmental Health/Agency for Toxic Substances and Disease Registry,

January 28, 2008.

67.      FEMA's manipulation of the data was evidenced in the testing designed and

implemented by FEMA through the ATSDR in July of 2006.  The testing results

of the study showed high levels of formaldehyde in nearly all of the trailers, yet

the ATSDR, at FEMA's urging, did not use as its "level of concern" its own

exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of

0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's

annualized exposure limit.  Yet even applying this "level of concern," the average

sampling results still were higher.  *See* THE SERIOUS PUBLIC HEALTH ISSUES

21

RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS

ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS,

Testimony of Mary C. DeVany before the Committee on Oversight and

Government Reform, U.S. House of Representatives, July 19, 2007, at 7,

*available at* http://oversight.house.gov/documents/20070719102502.pdf.

68.    Indeed, in testimony before Congress, independent industrial hygienist Mary

DeVany described the FEMA testing and analysis process by stating "All I can

say, in my professional opinion, is that they did this in order to minimize the

actual extent of the problems in these trailers. I have no other conclusion I can

draw… I think it was a complete violation of our professional code of ethics."

Oral testimony of Mary C. DeVany before the House Committee on Oversight and

Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript,

*available at* http://oversight.house.gov/documents/20071114164004.pdf.

69.    On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr.

Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the

February Health Consultation was "possibly misleading and a threat to public

health" for failure to disclose the carcinogenic status of formaldehyde and that

there are no safe exposure levels.

70.    Despite this information, FEMA and the ATSDR did not revise the original

Health Consultation until October of 2007 to include the warning that the original

Health Consultation"did not sufficiently discuss the health implications of

formaldehyde exposure and included language that may have been unclear,

22

leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

71.     The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

72.     It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units. *See* Statement of Howard Frumkin, M.D., D.Ph., Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC's RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

73.     The CDC testing revealed the following important findings: (1) the formaldehyde

23

levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

74.   The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

75.   As a result of this round of testing, the Federal Government implemented a

24

program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing.  The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

## COUNT 1:
## STRICT PRODUCTS LIABILITY
## MS CODE ANNOTATED §11-4-63

76.     IVRBS, at the time that each subject housing unit left its control, knew or should have known that each product was defective because it deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

77.     IVRBS knew or should have known that the defective condition rendered each subject housing unit unreasonably dangerous to the user or consumer or others; and,

78.     The defective and unreasonably dangerous condition of each product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by each Named Plaintiff.

79.     At the time the subject housing units left the control of the IVRBS,  each subject housing unit did not contain properly selected prepared and installed components.

80.     At all relative times, each Named Plaintiff lacked actual or constructive

25

knowledge of the defective condition of their respective housing units and that

each defective product was inconsistent with their safety.

81.    At all relevant times, each Named Plaintiff did not appreciate the danger of their

housing unit's defective condition.

82.    At all relevant times, each Named Plaintiff did not deliberately and voluntarily

choose to expose themselves to this danger in such a manner to register assent to

the continuance of the dangerous condition.

83.    Each subject housing unit in question failed to function as expected as a result of

their design characteristics.

84.    An alternative design existed at the time that each housing unit left the control of

IVRBS which would have not impaired the product's usefulness or desirability.

85.    The alternative design would have to a reasonable probability prevented the toxic

exposure of each Named Plaintiff.

### PRODUCTS LIABILITY: FAILURE TO WARN

86.    Each product (housing unit) was defective because it failed to contain adequate

warnings or instructions.


### PRODUCTS LIABILITY: BREACH OF EXPRESS WARRANTY

87.    Each product (housing unit) breached an express warranty and/or failed to

conform to other express factual representations upon which the claimant

justifiably relied in electing to use this product.

26

**COUNT 2:**
**NEGLIGENCE OF CONTRACTOR**
**DEFENDANT UNDER MISSISSIPPI LAW**

88.     Each Named Plaintiff incorporates the above allegations as if fully repeated

verbatim herein.

89.     At all relevant times Bechtel was tasked with the transportation, installation, site

identification, preparation, inspection, maintenance and repair, refurbishment and

restoration, and removal of the temporary housing units, which caused the

Plaintiffs' injuries.

90.     Bechtel owed a duty to each Named Plaintiff to provide, transport, install, inspect,

maintain, repair, refurbish, recondition and restore safe temporary housing units

that did not emit hazardous levels of formaldehyde.

91.     Bechtel knew or should have known when they provided, transported, installed,

inspected, maintained, repaired, refurbished, reconditioned and restored the

temporary housing units to the general public (thereby modifying and converting

the mobile units into residential installations) the actual and intended use of the

temporary housing units by each plaintiff, and that the temporary housing units

would be used in the manner that each plaintiff herein used the temporary housing

units.

92.     Bechtel breached their duty to each Named Plaintiff in failing to act reasonably in

the provision, installation, inspection, maintenance, repair, refurbishment,

reconditioning and restoration of the temporary housing units; specifically by:

27

    a.    Failing to sufficiently warn the plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy; and,

    b.    Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units.

93.    Bechtel's actions were the proximate cause of the increased exposure of formaldehyde to the each Named Plaintiff.

94.    Bechtel contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COUNT 3:

## STRICT PRODUCTS LIABILITY MS CODE ANNOTATED §11-1-63

## OF THE CONTRACTOR DEFENDANT

95.    Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

96.    Bechtel, at the time that each subject housing unit left its control, knew or should have known that each product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specification and/or manufacturers' warnings.

97.    Bechtel, by installing the housing units on concrete blocks for extended occupancy, knowingly and intentionally modified the design and the actual use of

the housing units.

98.   Bechtel knew or should have known that the defective condition rendered each

subject housing unit unreasonably dangerous to the user or consumer or others.

99.   The defective and unreasonably dangerous condition of each product (the failure

of the subject housing units to be safely habitable without exposure to

formaldehyde) proximately caused the damages and injuries sustained by each

Named Plaintiff.

100.   At all relative times, each Named Plaintiff lacked actual or constructive

knowledge of the defective condition of their respective housing units and that

each defective product was inconsistent with their safety.

101.   At all relative times, each Named Plaintiff did not appreciate the danger of their

housing unit's defective condition.

102.   At all relative times, each Named Plaintiff did not deliberately and voluntarily

choose to expose themselves to this danger in such a manner to register assent to

the continuance of the dangerous condition.

103.   Each subject housing unit in question failed to function as expected as a result of

their design characteristics.

104.   An alternative design existed at the time that each housing unit left the control of

Bechtel which would have not impaired the product's usefulness or desirability.

105.   The alternative design would have to a reasonable probability prevented the toxic

exposure of each Named Plaintiff.

**COUNT 4:**

29

## FAILURE TO WARN OF THE CONTRACTOR DEFENDANT

106.   Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

107.   Each product (housing unit) was defective because it failed to contain adequate warnings or instructions.

108.   Bechtel failed to warn the Named Plaintiffs of the inherently dangerous properties of the foreseeable conditions of the subject housing units when used for long term occupancy.

109.   Bechtel failed to warn the Named Plaintiffs of the presence of excessive levels of formaldehyde present in the housing units they installed, maintained, and supervised.

## COUNT 5:
## BREACH OF IMPLIED WARRANTY BY THE CONTRACTOR DEFENDANT

110.   Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

111.   Bechtel breached the implied warranty of habitability due to the Named Plaintiffs. The subject housing units were installed and maintained with an expectation of habitability and a clear implied warranty that such housing would be safe and free of any toxic dangers.

## COMPENSATORY DAMAGES

112.   In addition to and by way of summarizing the compensatory damages prayed for herein, each Named Plaintiff avers that the defendants, IVRBS, as well as Bechtel,

30

individually and/or jointly are responsible for all damages which each Named

Plaintiff herein has suffered and continues to suffer as a consequence of

defendants' acts and/or omissions as pled herein, which damages include, but are

not limited to, past and future physical injuries, past and future mental and

physical pain and suffering, past and future physical impairments and disability,

past and future reasonable and necessary medical expenses, past and future loss of

earning capacity, past and future loss of enjoyment and quality of life and other

damages and injuries, loss of consortium, and loss of use and/or opportunity to

use safe and adequate shelter during the period of displacement from a natural

disaster, as well as, all general, special, incidental and consequential damages as

shall be proven at the time of trial.

## PUNITIVE/EXEMPLARY DAMAGES

113.   Pursuant to Miss. Code Ann. §11-1-65, inasmuch as the conduct of IVRBS and/or

Bechtel and their servant/employees constitutes willful, wanton, egregious and

reckless disregard for the rights and safety of the plaintiffs, an award of punitive

damages is appropriate and necessary under these facts.

## REQUEST FOR JURY TRIAL

114.   Each Named Plaintiff is entitled to and demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs pray that IVRBS and Bechtel be served with a copy

of this Complaint, and that, after due proceedings:

1.   there be a judgment herein in favor of each Named Plaintiff and against

Defendants for all compensatory damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2.      there be specially included in the judgment in each Named Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

    A.      past and future physical injuries,

    B.      past and future mental and physical pain and suffering,

    C.      past and future physical impairments and disability,

    D.      past and future reasonable and necessary medical expenses,

    E.      past and future loss of earning capacity,

    F.      past and future loss of enjoyment and quality of life, loss of consortium and/or society,

    G.      compensable out-of-pocket expenses related to defendants' wrongdoing,

    H.      costs of court,

    I.      punitive damages, and

    J.      all other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ _____

MARYANNA PENTON (MSBA# 102979)

32

209 Hoppen Place
Bogalusa, LA 70427
Phone: (985) 732-5651
Fax: (985) 735-5579
***Counsel for Plaintiffs***

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **JANICE CRAWFORD, together** | * | **DOCKET NO.** |
| **with all individuals and entities whose** | * | |
| **names appear on the attached** | * | |
| **"Exhibit A"** | * | |
| | * | |
| **VERSUS** | * | |
| | * | |
| **IVRBS, INC. (Formerly SunnyBrook** | * | |
| **RV, Inc.) and BECHTEL** | * | |
| **NATIONAL, INC.** | * | |
| **(This case relates to MDL No. 07-1873)** | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## EXHIBIT "A"

1.    Janice Crawford

2.    Janice Crawford on behalf of C. C.

3.    Janice Crawford on behalf of C. C.

4.    Janice Crawford on behalf of D.P.

5.    Janice Crawford on behalf of L. P.

6.    Janice Crawford on behalf of W. P.

7.    Michael Lindsey

8.    James Parker

9.    James Parker on behalf of J. P.

10.   Issha Stallworth

11.   Sarah Stallworth

12.   Willie Stallworth

34

13.    Barbara Delaughter

14.    Barbara DeLaughter on behalf of the minor child, C.D.

15.    Catherine Heilig