```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA
     ************************************************************
 3

 4   IN RE:  FEMA TRAILER
     FORMALDEHYDE PRODUCTS                 Docket No. MDL-1873(N)
 5   LIABILITY LITIGATION                  New Orleans, Louisiana
                                           Wednesday, July 23, 2008
 6
     ************************************************************
 7

 8                 TRANSCRIPT OF MOTION PROCEEDINGS
            HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
 9                   UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:

12   FOR THE PLAINTIFF
     STEERING COMMITTEE:          GAINSBURGH BENJAMIN DAVID
13                                MEUNIER AND WARSHAUER
                                  BY:  GERALD E. MEUNIER, ESQ.
14                                2800 Energy Centre
                                  1100 Poydras Street, Suite 2800
15                                New Orleans, LA 70163

16
                                  MURRAY LAW FIRM
17                                BY:  STEPHEN B. MURRAY, ESQ.
                                  650 Poydras Street, Suite 1100
18                                New Orleans, LA 70130

19
     FOR THE DEFENDANTS'
20   LIAISON COUNSEL:             DUPLASS ZWAIN BOURGEOIS MORTON
                                  PFISTER & WEINSTOCK
21                                BY:  ANDREW D. WEINSTOCK, ESQ.
                                  Three Lakeway Center
22                                3838 N. Causeway Boulevard, Suite 2900
                                  Metairie, LA 70002

23

24

25
```

```
 1   FOR THE GOVERNMENT:          UNITED STATES DEPARTMENT OF JUSTICE
     (BY TELEPHONE)               BY:  HENRY T. MILLER, ESQ.
 2                                Civil Division - Torts Branch
                                  P.O. Box 340, Ben Franklin Station
 3                                Washington, D.C. 20004

 4
     FOR NEWLY ADDED DEFENDANTS:  FOWLER RODRIGUEZ & CHALOS
 5                                BY:  JAMES K. CARROLL, ESQ.
                                  400 Poydras Street, 30th Floor
 6                                New Orleans, LA 70130

 7                                MAYNARD, COOPER & GALE
                                  BY:  LEE E. BAINS, ESQ.
 8                                2400 AmSouth/Harbert Plaza
                                  1901 Sixth Avenue North
 9                                Birmingham, AL 35203-2616

10
     FOR MORGAN BUILDINGS & SPAS,
11   INC. AND MORGAN BUILDING
     SYSTEMS, INC.:               McGLINCHEY STAFFORD
12                                BY:  CHRISTINE LIPSEY, ESQ.
                                  One American Place, 14th Floor
13                                Baton Rouge, LA 70825

14
     FOR INDIANA BUILDING SYSTEMS: BREAZEALE, SACHSE & WILSON
15                                BY:  DAVID R. KELLY, ESQ.
                                  One American Place, 23rd Floor
16                                Baton Rouge, LA 70821

17
     FOR FOREST RIVER, INC.:      GIEGER, LABORDE & LAPEROUSE
18                                BY:  ERNEST P. GIEGER, JR., ESQ.
                                  701 Poydras Street, Suite 4800
19                                New Orleans, LA 70139-4800

20
     Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR
21                                500 Poydras Street, Room HB-406
                                  New Orleans, Louisiana 70130
22                                (504) 589-7776

23

24       Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25
```

<u>P R O C E E D I N G S</u>

(WEDNESDAY, JULY 23, 2008)

(MOTION PROCEEDINGS)


    THE COURT:  As you were.  All right.  The court today is entertaining oral argument on several motions, which I will go through and recite by docket number here shortly.  This is in the in re:  FEMA Trailer Formaldehyde Multidistrict Litigation, which is under the general docket No. 07-1873.

    Counsel, if you would at this time, those of you who are here and will be participating in oral argument, if you would go ahead and make your appearances, we will proceed from there.

    MR. MILLER:  Your Honor, Henry Miller for the defendant United States of America.

    THE COURT:  Good morning.

    MS. LIPSEY:  Christine Lipsey for defendant Morgan Buildings and Spas and Morgan Building Systems.

    THE COURT:  Good morning.

    MR. KELLY:  May it please the court, David Kelly, your Honor, on behalf of Indiana Building Systems.

    THE COURT:  Good morning.

    MR. MEUNIER:  Jerry Meunier for the PSC, your Honor.

    MR. MURRAY:  Stephen Murray for the PSC, your Honor.

    MR. CARROLL:  James Carroll, your Honor, on behalf of newly added defendants with motions to dismiss.  And Mr. Lee Bains

1   with Maynard, Cooper & Gale will be arguing with me.

2           THE COURT:  All right.  Good morning.  Why don't you all

3   come on up here and have a seat.

4           Anybody else that is going to be participating in oral

5   argument today?  That is my understanding those of you who have made

6   appearances will be those who are presenting oral argument.

7           Let me go through the docket at this time and recite what

8   we are going to cover today.  I have met with the lawyers, we have

9   discussed the order of procedure here today.  The court will

10  maintain a 20 minute time limit.  The movant will have the right to

11  reserve some time for rebuttal, but the court will impose a 20

12  minute time limit on those making oral argument, with one exception,

13  which will be much shorter.

14          First of all, docket No. 196 is the motion to dismiss by

15  the United States of America.  That will be the motion we will

16  handle first.  Mr. Miller is going to have 20 minutes, again with

17  rebuttal time, Mr. Meunier will have 20 minutes on behalf of the

18  plaintiffs.

19          Document No. 259 is a motion to dismiss the administrative

20  master complaint on behalf of the newly added defendants, CMH

21  Manufacturing, Inc., Southern Energy Homes, Inc., Giles Industries,

22  Inc., SunRay RV, LLC, Palm Harbor Albemarle LLC, if am pronouncing

23  that correctly, that will also be 20 minutes per side.  And I

24  understand that Mr. Bains and Mr. Carroll will be arguing that on

25  behalf of the movant.  Am I correct in that?

1          MR. CARROLL:  Correct, your Honor.

2          THE COURT:  And you will have a 20 minute total.

3          Docket No. 233 is the motion by Horton Homes, Inc., motion

4    to dismiss the administrative master complaint.  That is an adoption

5    of the motion set forth in Document 259.  That will not require any

6    additional argument.  So there will be none.

7          Docket No. 240 is a motion to dismiss or in the

8    alternative a 12(e) motion for more definite statement.  That has

9    been filed by Indiana Building System, LLC d/b/a Holly Park.  That

10   is also an adoption of 259.  That will require no additional

11   argument.  Although, and here is the exception, Mr. Kelly, will have

12   one to two minutes to make a very brief statement I understand.

13         MR. KELLY:  Yes, your Honor.

14         THE COURT:  Document No. 217 is Morgan's motion to dismiss

15   plaintiffs' fraud claims pursuant to Rule 12(b)(2) and 9(b).

16   Counsel, is my understanding correct that that motion is now moot?

17   Can we get a stipulation here on the record that that motion is

18   moot?

19         MS. LIPSEY:  Yes, your Honor.  As I understand the

20   plaintiffs' opposition I do believe it's moot.  The plaintiffs may

21   have a different view.

22         THE COURT:  Mr. Miller, is that correct, you have no

23   problem with that either?  I don't know if you have a dog in that

24   hunt.

25         MR. MILLER:  I'm sorry?  Which one is that?

```
 1              THE COURT:  217, the Morgan motion to dismiss the fraud

 2    claim.  Are you fine with that?

 3              MR. MILLER:  Yes.

 4              MR. MEUNIER:  The plaintiffs consider it moot, Judge.

 5              THE COURT:  All right.  Good.  So that motion will be

 6    denied as moot.

 7              All right.  Lastly, documents 211 and 214 are Morgan's

 8    motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(6) with

 9    respect to the Louisiana plaintiffs' claims and Morgan's motion to

10    dismiss under the 12(b)(1) and 12(b)(6) with respect to the

11    Mississippi and Alabama claims of plaintiffs.  And I understand

12    Ms. Lipsey, you're going to have 20 minutes to argue that motion as

13    well.

14              MS. LIPSEY:  Yes, your Honor.  They are two separate

15    motions, but I believe that I can argue both of them at the same

16    time.

17              THE COURT:  I think what the plan was to go ahead and have

18    20 minutes from Mr. Bains and Mr. Carroll, then let Mr. Kelly make

19    his brief remarks, then have your argument, and then the plaintiffs

20    will respond to all of that.  Since there is a great deal of

21    overlap, plaintiffs will have a total of 35 minutes to respond to

22    all of those arguments.

23              MS. LIPSEY:  Right.

24              THE COURT:  All right.  Let's go ahead and start.  I will

25    tell all counsel at this time, as I told counsel yesterday, I have
```

1    read the materials you've submitted, there are voluminous papers

2    that have been filed in connection with these motions, in particular

3    with regard the government's motion on both sides.  I am familiar

4    with the arguments set forth, I have reviewed the critical case law

5    that's been cited, so there is no need to plow any ground that you

6    have adequately covered in the course of your written submissions.

7         Having said that, I will allow you the opportunity to make

8    any additional points that you would like to make or respond to any

9    questions that the court has or respond to any comments that your

10   opponent makes at this time.

11        There is no penalty if you do not use the entirety of your

12   20 minutes.  I will not read any sign of weakness in an attorney who

13   decides that they have had their say and would like to have a seat.

14        So, Mr. Miller, with those cautionary words, we'll go

15   ahead and take up the government's motion.

16        MR. MILLER:  May it please the court, your Honor, Henry

17   Miller for the defendant United States of America.  Before the court

18   is the government's motion to dismiss, Docket No. 196, the

19   plaintiffs' response Document No. 348, and the government's reply

20   Docket No. 419.  I will basically deal with the procedural issues

21   first, the request for discovery and the 12( b)(1) versus the Rule

22   56(c), and then go on the substantive matters, your Honor.

23        On the discovery issue, this is a legal question before

24   the court, not a factual dispute.  Specifically, there are two

25   prongs to the discretionary function exception.  Let me deal with

1   the second prong first, and that is whether or not the government's

2   conduct is susceptible to policy analysis.  The Supreme Court in

3   Gaubert and the Fifth Circuit in Baldassaro explicitly adopted the

4   susceptible standard because they do not want that prong to be

5   subject to discovery.

6          The Third Circuit in the Fisher Brothers case explicitly

7   explains the susceptible standard is there so it can object to legal

8   issue that the court must inquire.  Is the challenge conduct by the

9   plaintiffs susceptible to policy analysis and, that's a legal issue

10  that the court has to decide.  In this context is the government's

11  failure or decision not to include formaldehyde specifications in

12  the contract susceptible to policy analysis, and is the government's

13  response to concerns regarding formaldehyde in the units susceptible

14  to policy analysis.  These are the issues that the court has to

15  decide and they are not subject to factual disputes.  Specifically

16  the court in the Eleventh Circuit in Mesa explicitly ruled that you

17  do not get discovery.

18         In addition, this court did not rule on the blank slate.

19  The Hillard case, the Freeman case, and Judge Duval's most recent

20  case O'Dwyer in the in re:  Canal Litigation explicitly denied

21  requests for discovery in the context of a 12(b)(1) motion to

22  dismiss claims pursuant to the discretionary function exception that

23  arose out of the Katrina response.

24         Let me go to the first prong of the discretionary function

25  exception here.  The only, only potential reason that you could

1   grant discovery is to find out if there is internal policy

2   regulations that aren't available publicly, such as statutes or

3   regulations.  The statute or regulations have been identified here

4   and they clearly impose no mandatory and specific requirement.

5        In this case there is no justification to grant

6   plaintiffs' request to defer, it had discovery; and the reason why

7   is the government has proffered to the court declarations and

8   affidavits indicating there is no such requirements.

9        Two:  The PSC has failed to meet its own burden.  They

10  have not offered a 56(f) declaration giving any plausible basis for

11  the belief that there would be any such internal mandatory and

12  specific regulations.

13       Three, it's implausible, implausible in this case to

14  believe that any would exist.  Specifically, plaintiffs in their own

15  complaint, paragraph 37, concede that there are no specific and

16  mandatory formaldehyde regulations relating to trailers.

17       Furthermore, in this case because of the problems that

18  occurred as a result of these trailers, FEMA, in fact, has adopted

19  regulations.  That is in the exhibits that have been provided to the

20  court.  Because of concerns, we are now taking steps for future

21  purchases of trailers to insure that they are formaldehyde safe.

22       THE COURT:  You would not agree that a more general

23  regulation such as the one I think plaintiffs' cite relative to OSHA

24  would be superimposed on FEMA in this circumstance; in other words,

25  the mobile home threshold would not be in play in this case with

1    regard to travel trailers or EHU's?

2           MR. MILLER:  Your Honor, the mobile home threshold is a

3    target level that HUD adopted for purposes of determining how

4    they're going to regulate, and what they adopted was that the

5    manufacturers had to use low emission materials in building mobile

6    homes.

7           THE COURT:  But the reason for that, as I understand it or

8    I would appreciate, is the fact that persons would be living in

9    those units permanently.  In other words, as opposed to an RV or

10   something that a person would use not as a primary residence but

11   rather on a very temporary basis.  In this case, however, we have

12   those very same vehicles, for lack of a better term, something

13   that's not a mobile home but something that would be an RV or

14   trailer, some type of trailer unit that would not typically be used

15   as a permanent residence, in fact, being submitted to displaced

16   persons as a permanent residence.  Are you suggesting that the --

17          MR. MILLER:  I think you have to go two stages here, is

18   that regulation, does it per se apply to the trailers, and the

19   answer to that is no and the plaintiffs concede that.

20           The next question is is the failure to incorporate those

21   requirements into our contract specs susceptible to policy analysis.

22   And the answer to that is I think, your Honor, it has to be yes.

23   Because at the stage where we are purchasing these trailers, we had

24   the largest housing disaster in the United States' history.  You had

25   the contract officer trying to basically arrange in an emergency

1   setting as many units as possible.  They are literally going out and

2   buying every unit that they can get off lots from vendors because we

3   had this disaster.  And everyone here lived through this disaster

4   and realized what it brought on.

5           And so under that emergency setting, your Honor, I do not

6   believe there is such a requirement.  And the fact of the matter is

7   the policy here was to get these houses as quickly as possible to

8   house the people.  This was not something that was brought into the

9   mind-set at the time.

10          THE COURT:  Was the purchase based upon existing housing

11  units that were purchased very quickly after the hurricane hit and

12  persons were displaced, or was this an order, or perhaps it was a

13  combination of the two, an order that was placed with the

14  manufacturers that suddenly we need X thousand units, so get

15  cracking at that and ship them as quickly as you can.

16          MR. MILLER:  Two ways, your Honor, I believe about 33,000

17  units were brought right off the lots from vendors and the remainder

18  of the units were bought through contracts that the government

19  issued directly to manufacturers.

20          THE COURT:  As a result of this particular event?

21          MR. MILLER:  Exactly, your Honor.  And so under that

22  circumstances, given that this is right after the emergency, I don't

23  believe it would be appropriate, I think the decision that we need

24  to get the housing trumps the decision that we're going to go in and

25  figure out what specs.  Because if you look at the HUD specs, it

1    took HUD five years to come up with those specs, your Honor.

2            If you look at Government Exhibit No. 9, which is the

3    rational decision that was then challenged in the New Mexico v. HUD

4    case, that's what the process you're going to go through.  And I

5    don't think given the emergency setting you had the time to do that

6    here.

7            THE COURT:  Well, what I think they're arguing, though, is

8    that HUD having taken all of those steps and having established all

9    of those standards that on the FEMA side they would not have to

10   reinvent the wheel by going through that same process, that there is

11   already a predicate investigation and establishment of a level, an

12   acceptable level of formaldehyde.  As I understand it, that's the

13   plaintiffs' argument, at the juncture at which the orders were

14   placed, there was information known and there were standards that

15   were set with regard to formaldehyde emission.

16           MR. MILLER:  And once again, your Honor, what you're

17   basically saying is that the contract officer before issuing these

18   bids has to go out and investigate all of these and find this out

19   and gather all of that information.  And I think when you're doing

20   that you're weighing the policy -- is it more important to get these

21   contracts and get the units right away, or do I wait and do whatever

22   investigation I have to do.  And I think that is the policy issue

23   there that the discretionary function is designed to protect.

24           THE COURT:  Okay.  Let me ask you, too, before you go on.

25   It seems to me, and I know Mr. Meunier is probably going to, can

1    address this, but it seems to me that we're dealing with almost two

2    allegations of tortious conduct here.  It is not just in the

3    procurement of the housing units, there is also the action or

4    inaction of FEMA after there is a test conducted, I believe, in

5    October of 2005, the first test, and then there is a course of

6    conduct by the government relative to how those test results are

7    treated and what is going to happen to those living in those units,

8    and the government's action or inaction with knowledge of these

9    October of 2005 tests.  Is that your appreciation as well with their

10   position?

11          MR. MILLER:  Your Honor, very clearly there were tests

12   that were done by the government's contractor Bechtel in October

13   2005.  Those were for Occupational Health And Safety purposes.  FEMA

14   did not really become aware of those until March 2006 when it had

15   received the first occupant's complaint about formaldehyde.  And

16   from March when they became really aware of that, steps were taken

17   that the plaintiffs obviously allege is insufficient, but steps have

18   been taken since that time.

19          THE COURT:  Who ordered or requested that that testing

20   occur in October of 2005?

21          MR. MILLER:  The government's -- the government had four

22   independent assistants, technical assistant contractors at that

23   time.  Becktel was one of them.  They were the entities that took

24   the unit from FEMA and then installed them and maintained them for

25   the disaster victims.

```
1          THE COURT:  Right.  But when you say the government, is

2    that something that FEMA said we would like to get these units

3    tested?  And we're talking about some four to six weeks after the

4    event of the hurricane.  Was that testing that was done at the

5    request or instance of someone at FEMA?

6          MR. MILLER:  No, your Honor.  That was done at the request

7    of Becktel.

8          THE COURT:  All right.

9          MR. MILLER:  And the next issue your Honor was asking

10   about the response and other actions that were taken.  And at that

11   point, your Honor, what you are looking at is what is the decisions

12   that FEMA made and the appropriate response to safety concerns.  And

13   it's documented what those actions were; but in this case, FEMA has

14   actually responded in each incident.  When they had the initial

15   complaint, they basically asked the person, we're going to remove

16   you from the unit or you can stay in this unit, increase

17   ventilation, or what not.

18          By June they had about seven to eight complaints from

19   occupants and they adopted a more widespread policy.  And that was

20   where they continued to deal with complaints on an individual basis,

21   but they realized there might be a larger problem and they issued

22   warnings to all occupants that if you are concerned, increase

23   ventilation and also see your doctor if you have problems with this.

24   They also decided to conduct a ventilation study to determine the

25   effectiveness of ventilation.
```

1          In this case, your Honor, there is no mandatory and

2     specific regulation out there saying how you respond to this.  All

3     you have is the ATSDR and EPA's recommendation that ventilation is

4     an effective and efficient way to resolve formaldehyde concerns.

5     And this is what FEMA did.

6          And, your Honor, that's in Exhibits Nos. I believe it's 25

7     and 15, I think, I am not sure.  But I do identify it earlier.  The

8     ATSDR in their toxilogical profile and the EPA in their formaldehyde

9     fact sheet, that's what they recommend, ventilation.

10          So with that said, I want to 12(b)(1) versus the 56(c).

11     That's pretty much the same as the discovery issue here, your Honor.

12     And so all I can say is that it's a legal question, not a factual

13     question.  There is no reason to convert; but even if you do

14     convert, the only factual issue is the existence of internal

15     regulations or policies.  And plaintiffs haven't met their burden to

16     justify further discovery.

17          THE COURT:  Before we move off of that, let me find the

18     part here that I -- plaintiffs have highlighted by way of exhibits

19     information that as early as October 11th of 2005 that air sampling,

20     and we've already referenced this, that air sampling occurred with

21     regard to some staging units at staging facilities in Mississippi.

22     Plaintiffs allege that that testing was done at the request of two

23     FEMA contractors, I think we've talked about that.  The sampling

24     results showed levels detective in nearly every trailer that

25     exceeded ATDSR minimum risk levels associated with exposure up to

1    and exceeding 14 days.  And most levels exceeded the EPA recognized

2    level which acute health effects can manifest.  That's Exhibit 6 to

3    the document 348.

4         There is a course of conduct that I would like you to

5    respond to.  In March of 2006, and this is according to plaintiffs,

6    in March of 2006, FEMA's Bronson Brown directed in an e-mail that

7    staff be instructed prior to entering trailers to allow a period of

8    off-gassing before workers safely enter the trailers.  That's

9    Exhibit 19.

10        Also that with regard to the government that there be, I

11   want to quote it and I don't want to mischaracterize it here, June

12   of 2006, this is an e-mail from FEMA office of general counsel, "Do

13   not initiate any testing until we give the okay."  While I agree

14   that we should conduct testing, we should not do so until we are

15   fully prepared to respond to the results.  Once you get results and

16   should they indicate some problem, the clock is ticking on our duty

17   to respond to them."

18        And later on there is also a reference to OGC has advised

19   that we do not do testing which would imply FEMA's ownership of the

20   issue.  That would be Exhibit 5 and Exhibit 6.  Don't you consider

21   that to be part of this second tort, second course of tortious

22   conduct by the government?

23        MR. MILLER:  And the issue here by the government is

24   FEMA's response actions and what they took.  And the question is,

25   and I go back to the Gaubert and Bellarosa analysis, which is the

1   court is not to analyze the factual actions that took place, but is

2   the decisions on how to respond susceptible to policy decisions, not

3   whether or not that was actually negligent or wrongful.  <u>Lively</u> in

4   the other courts explicitly holds that whether the government acted

5   negligently, wrongfully, violated its duty of care is totally

6   irrelevant to the discretionary function analysis.  Could we have

7   maybe acted better, differently, more appropriately in some way?

8   Possibly yes, your Honor, but that is not what the court is faced

9   here.  The question is, is the decisions on how respond susceptible

10  to policy analysis, and the answer is the courts universally hold,

11  yes, it is.

12        Safety response actions are supposed to be protected.

13  They are involved policy considerations.  And the fact that some of

14  those considerations where they make wrongful decisions si simply

15  what the discretionary function is designed to protect.  In fact,

16  all of this material comes out legislative hearings that are held by

17  Congress, and that's important to realize because it's the

18  legislative branch to be investigating these decisions, not the

19  judiciary to second guess these decisions.  It's a separation of

20  powers issue.

21        THE COURT:  The reason I raise it is because at what point

22  would you say in light of the jurisprudence, at what point would you

23  say the courts, it would be inappropriate and incorrect for the

24  court to second guess negligent conduct or decisions that are just

25  bad decisions, at what point do we get to an actionable level of

1    conduct?  Is it gross negligence?  We have an allegation of fraud or

2    intentional act, which is we talked earlier at the outset, but at

3    what point do you go from something that is truly discretionary,

4    albeit perhaps bad policy or wrong policy or erroneous, at what

5    point do we depart into an actionable area, and is there a standard

6    of conduct by the government that suddenly enters into the realm of

7    actionable conduct?

8             MR. MILLER:  Your Honor, from my reading of the case law,

9    it does not.  It is the objective standard, is this type of issue a

10   policy decision, the type of conduct they're challenging susceptible

11   to policy analysis, and that always remains no matter how the

12   underlying decision is made and whether or not you second guess.

13             I mean, I forgot which of the cases where the city of, one

14   of the cities in Texas blew up the entire city because of the

15   government's action, that couldn't be second guessed by the court.

16   That had to be resolved by legislative action.  And I believe in

17   this case that's the same matter, that's how this has to be resolved

18   as to the government, not by the court, your Honor.

19             THE COURT:  Okay.

20             MR. MILLER:  I don't believe that any of the actions can

21   rise to the level where the court would say all of a sudden it takes

22   it out of the realm of policy because it's an objective, not a

23   subjective review.

24             THE COURT:  Okay.

25             MR. MILLER:  I would like to just address briefly, your

Honor, the first prong in the safety issue, because plaintiffs'

major argument and the video clip they're going to show you suggests

that FEMA has adopted a mandatory and specific requirement to

provide safe habitable housing.  And the response to that is

actually quite simple, and that is the statute or regulation has to

specifically prescribe a course of action, that's what <u>Gaubert</u> says

and the Fifth Circuit in <u>Aix El Dorado</u> specifically said that

generalized, mandatory rules are insufficient.

In the context of safety requirements, the Fifth Circuit

in three cases, three cases have ruled that a general requirement of

safety is insufficient to impose a mandatory and specific

requirement.  Those three cases are <u>Guile</u>, <u>Garza</u> and <u>Hix</u>.  <u>Guile</u> is

in the context of hospitals, <u>Garza</u> in the context of a prison, and

<u>Hix</u> in the context of water safety.

In addition, again this court doesn't write on a blank

slate.  Judge Lemmon in <u>Hillard</u> also rejected this argument by the

plaintiffs, the same argument was made; and I provided the court

with a copy of the order and the argument and the plaintiffs'

complaint.

With that said, your Honor, unless the court has

questions, I would like to reserve the rest of my time.

THE COURT:  Sure.

MR. MILLER:  Thank you.

THE COURT:  Let's go ahead to Mr. Meunier.  You still have

a few minutes left, but let's go ahead to Mr. Meunier.

1        MR. MEUNIER:  May it the please the court, Jerry Meunier

2   for the plaintiffs.

3        As your Honor is aware, this motion to dismiss cannot and

4   should not be addressed in a factual vacuum.  We, therefore, propose

5   to focus on three areas of government conduct, or misconduct in this

6   case, which the plaintiffs view as fault actionable under the FTCA.

7   And as to each area, we hope to demonstrate, first, that one or both

8   of the two prerequisites for the discretionary function defense are

9   not satisfied; and second, that a sufficient factual record does not

10  exist to properly decide all issues relevant to the defense making

11  discovery as to these issues both necessary and appropriate.

12       The three pertinent areas of defendant conduct can be

13  discussed chronologically:  First, the government's selection of the

14  emergency housing units; second, the government's provision of these

15  units for the plaintiffs' use; third, the government's response to

16  reports of formaldehyde exposure in the emergency housing units.

17       Now, the gravamen of the plaintiffs' case regarding the

18  selection of housing units is this:  Every unit selected by FEMA,

19  whether it was a mobile home, a park model or a travel trailer was

20  intended by FEMA to serve as housing.  Housing.  And potentially

21  long-term housing for the plaintiffs and their families.  Beyond the

22  initial Stafford Act decision to provide emergency housing, FEMA had

23  a federal policy mandate to provide emergency housing that was safe

24  and habitable.  There are, and at all times pertinent there were,

25  specific governmental directives and standards addressed to

1    formaldehyde levels in construction materials and even standards

2    addressed to formaldehyde levels in ambient air inside mobile or

3    manufactured housing units.

4         FEMA in selecting park models and travel trailers for

5    housing purposes, units that were exempt from the standards because

6    they were never designed to be housing, failed in our view to

7    incorporate or apply appropriate government formaldehyde standards

8    for housing in this case, as to all of the units, resulting in

9    formaldehyde levels in these units which made them unfit for

10   long-term residents and neither safe, nor habitable for the

11   plaintiffs.

12        Now, the government contends that a generalized safety

13   mandate is not enough to defeat the choice versus mandate first

14   prerequisite for the discretionary function defense, but your Honor

15   should not accept so readily a characterization that we are dealing

16   here with a generalized safety mandate.  In fact, we're dealing with

17   a mandate for safe and habitable housing which was specific to the

18   selection of these emergency housing units.  And we are also dealing

19   with specific formaldehyde standards applicable to housing which the

20   government chose to apply for certain units but not for others.

21        THE COURT:  Well, are you referring specifically when you

22   say a specific standard, are you claiming as a mandatory and a

23   specific statute the mobile home provisions that HUD has

24   incorporated?

25        MR. MEUNIER:  Yes, your Honor.  We are talking about a

1   federal policy mandate, and the specific directive that we focus on

2   is the requirement of the government that in certain construction

3   materials for mobile and manufactured housing, this is dealing with

4   the formaldehyde risk specifically, there was a .3 PPM and a .2 PPM

5   specification for particle board and plywood.  Same material that's

6   used in travel trailers and park models.

7            THE COURT:  Are there any other sources for the mandatory

8   and specific statutory reference that you would cite at this time in

9   support of that?

10           MR. MEUNIER:  The other is target level of .4 PPM that HUD

11  said in the federal registry in discussing those plywood and

12  particle board specs, there is a .4 PPM ambient air for indoor

13  quality that suggested as a target level in the federal register for

14  mobile homes and housing units.

15           THE COURT:  And that would be independent of the

16  requirement that you've cited relative to the mobile home or is

17  it --

18           MR. MEUNIER:  It's associated with it, Judge.  I think in

19  fairness my understanding is there is a specification for those

20  construction materials inside the mobile homes and housing units to

21  prevent too much formaldehyde from getting out of the material s.

22  The target level that results from that is this .4 PPM, so I think

23  there is an associated relationship between the construction

24  material specs and the ambient air expectation.

25           THE COURT:  So you don't contest that what the government

1    has said, but regarding the exemption or the lack of applicability

2    of that threshold to travel trailers or mobile home units --

3              MR. MEUNIER:  Well, this is the --

4              THE COURT:  In other words, it applies to some but it

5    doesn't apply to those that are more mobile such as RVs and travel

6    trailers, and your link in order to get them under the same standard

7    is that, in fact, all of them were intended under these

8    circumstances to be housing as opposed to temporary travel-type

9    recreational use?

10             MR. MEUNIER:  Exactly, your Honor.  Here is the analogy I

11   would use.  Let's suppose the government undertook to furnish to a

12   union of welders uniforms that would be safe to weld in.  And let's

13   assume that the government said we're going to give you two batches

14   of uniforms.  We're going to give you welding outfits which meet all

15   of the government specs on flammability, every single one.  And

16   then, you know, what else we're going to do?  We're going to give

17   you baseball uniforms that we want you to use as welding outfits.

18   Now, there are no flammability specs pertinent to baseball uniforms

19   in the abstract, but we are going to give you all of this to weld

20   in.

21             Now, I find it hard to believe that the government can

22   say, can stand back and say in response to the burned people who

23   used the baseball uniforms, well, there are no standards.  Don't

24   blame us.  You know, they're using park models, travel trailers,

25   mobile homes, housing units all for the same purpose, emergency

1    housing.  They've got formaldehyde safety specs in front of them for

2    a certain category, not for another.  And they want to say, well,

3    you know, you can't blame us because the travel trailers aren't

4    designed for long-term housing, therefore, they have no formaldehyde

5    specs.  They've lumped them all together and they have the same

6    mandate for all of them, and we're going to see that.

7         Let me demonstrate the importance of this mandate.  We

8    have FEMA administrator Paulison's July '07 declaration of the

9    agency's commitment to provide emergency housing that was both safe

10   and healthy.  We have FEMA Deputy Administrator Harvey Johnson's

11   written statement to Congress in March of this year that FEMA

12   provides housing assistance under the Stafford Act in order to give

13   disaster victims housing that is safe, secure and sanitary.

14        Perhaps more notably, this same gentleman, Mr. Johnson's

15   testimony before a congressional committee on April 1st of 2008

16   confirmed that the mandate to provide safe and habitable housing

17   specifically extended to the travel trailers.

18        (WHEREUPON, A VIDEO CLIP WAS PLAYED.)

19        MR. MEUNIER:  And finally, your Honor, we have two

20   affidavits from FEMA officials Brian McCreary and Stephen Miller,

21   both attached to the government's motion, both acknowledging that

22   the agency did undertake through vendors and manufacturers to

23   provide emergency housing that was both safe and habitable.

24        Now, I should emphasize here that the standard for housing

25   habitability can hardly be seen as foreign to this case, because the

1    CFR, the Code of Federal Regulations itself specifies that to be

2    eligible for Stafford Act assistance, a disaster victim's home must

3    be uninhabitable.  And the regulations themselves go on to define

4    this to mean a dwelling that is not safe, sanitary, or fit to

5    occupy.  Which raises this question:  If it is the uninhabitability

6    of a plaintiffs' home which by clear federal regulation makes that

7    plaintiff eligible to receive emergency housing assistance from

8    FEMA, could it ever be fairly suggested that the habitability of the

9    emergency housing provided to that person is not a matter of

10   government choice or discretion but a federal policy mandate.  And a

11   mandate that surely extends to every kind of unit, which the

12   government selects to use as emergency housing.

13        The question then becomes what is there relevant to the

14   plaintiffs' claims of harm in this case which specifies a course of

15   action for FEMA officials?  And we've talked about.  For over 20

16   years, Judge, the government has been aware of the risk of

17   formaldehyde exposure in manufacturing of mobile homes.  And the CFR

18   itself specifies safe, maximum formaldehyde emissions from the

19   plywood and particle board used in both manufactured and mobile

20   homes.  Same material used in the travel trailers.

21        And, in fact, as I mentioned in association with that,

22   there was a target level of formaldehyde emissions of .4 PPM in the

23   federal register, which is discussed as needed to maintain safe

24   ambient air in these manufactured and mobile homes.

25        So the specific course of conduct in this case dealing

 1    with the specific risk of formaldehyde exposure to us is as clear as

 2    the policy mandate which overrides all, which is provide safe,

 3    habitable housing, even if you pick a travel trailer.

 4            Now, the government claims, this is the heart of the

 5    matter, at page 6 of its brief, you know, that the reason it can't

 6    be legally accountable to the plaintiffs' injured by formaldehyde in

 7    travel trailers is because the travel trailers are exempt from HUD's

 8    formaldehyde regulations for housing.  Why?  Because the travel

 9    trailers are not really meant to be housing.  They're vehicles with

10    VIN numbers.

11            THE COURT:  Let me ask you.  Would you concede that the

12    initial response of FEMA regardless of who demanded the housing,

13    whether it be state or local officials, that seems to me there was a

14    decision made by somebody or perhaps a demand made by state or local

15    officials at some point somewhere in the briefs, one of them talks

16    about that, that people be allowed to return and live at or near

17    their damaged home, their uninhabitable home, that they be allowed

18    to participate in community events and perhaps even to vote and do

19    all of things that they did prior to the hurricane regardless of why

20    they were here, the government or FEMA's attempt to obtain housing

21    of units that preexisted the hurricane; in other words, that were

22    not procured through a Katrina resulting contract, that those should

23    be treated differently than those that the government contracted for

24    in direct response to the disaster of Katrina.

25            Is there any distinction in your mind or on plaintiffs'

1    side that the government's conduct should be viewed through those

2    two different points of view as opposed to a single approach and

3    impose the same standard?

4         MR. MEUNIER:  I think, Judge, what applies to all of the

5    decision making here is the mandate, federal policy mandate for safe

6    housing.  Whether they choose to address certain local concerns,

7    obviously I don't think the courts are set up to second guess the

8    administrative and policy decision making on, you know, let's try to

9    coordinate with the local people, let's try to address the specific

10   concerns on the ground.  I don't think the courts are set up to do

11   that.

12        All we're saying is that once you get past those

13   decisions, whatever they are, the courts have to be available to

14   scrutinize the simple question, did you in this adhere to the

15   mandate of affording these people safe and affordable housing,

16   that's all.  And specifically with respect to formaldehyde, did you,

17   in doing all that you did, end up adhering to standards that you

18   already had in place for a whole category of units.

19        THE COURT:  I guess what I am suggesting is a thought

20   process by which FEMA is met with a mandate to provide housing,

21   there are not available 140 or 200,000 units, they have to be

22   manufactured.  Of course on August 20th or August 21st, there was no

23   reason to think that we would need an extra 140,000 units.  So

24   following the events of Katrina and in the days thereafter, there

25   were some, I forget the number, Mr. Miller, I wrote it down, 33,000

1    or something units that were readily available, albeit constructed

2    not for the purpose perhaps of housing long-term or short-term

3    housing but rather were constructed for use as recreational vehicles

4    or travel trailers.  The government's use of those units in an

5    emergency, should that perhaps not be considered a discretionary

6    decision, as opposed to those where the government comes in and

7    says, well now we've got whatever, 300,000 displaced persons.  We

8    need X numbers of units.  Manufacturers, here is the contract, start

9    making them and sending them down.

10            MR. MEUNIER:  Sure, Judge.  And I think that's a merits

11   based question.  But I think we get back to the baseball uniforms.

12   You know, we're out of welding uniforms, we have a crisis, we have

13   to get the welding done for national security, use the baseball

14   uniforms.

15            You ask the question, at what point do we have to say we

16   know you've got a crisis, but there is a minimal standard here that

17   people have to be protected against danger.  I mean, the logical

18   extent of the argument that in a crisis the government is free to do

19   as it wishes with regard to safety concerns for these residences,

20   you know, we'll furnish them with units that are filled with

21   asbestos.  They've been taken off the market, everybody knows

22   they're unsafe, but you know we have a crisis, let's put them in

23   there and hope for the best.

24            Obviously there has to be a time when the courts come in

25   and say, you know what?  We know you did what you could, we know you

1   had a crisis, but there have to be certain markers that you meet,

2   particularly when it comes to safe and habitable housing.  You can't

3   furnish gas chambers, you can't furnish places without roofs, you

4   know, there has to be something that draws the line where the courts

5   do come in and scrutinize.

6          And that's what we're saying.  When you've got this

7   mandate, you've got these formaldehyde specs, we have to have a

8   right to scrutinize the conduct.  You know, the Supreme Court in

9   Berkovitz held that the defense of discretionary function is not

10  available when there is a federal regulation law or policy that

11  mandates a course of action for government officials to follow.  And

12  we say that just as the government in Berkovitz had no discretion,

13  this is on the first prong, to issue polio vaccine licenses without

14  first obtaining test data results, FEMA here in selecting travel

15  trailers and park models as emergency housing had no discretion to

16  ignore and violate an admitted safe and habitable emergency housing

17  mandate by failing to assure that the same formaldehyde regulations

18  and standards which applied to manufacturing and mobile housing

19  units, likewise would be used to protect the long-term residents of

20  the park molds and travel trailers.

21         As to the second prong of the defense, we invite the

22  court's reference to the Ninth Circuit decision in Whisnant where

23  the court drew a distinction, and I think it is as important as it

24  is obvious.  This second guessing of policy weighing that we all

25  want to try to avoid under this defense, the whole purpose of the

1    defense, this second guessing is simply not at issue where the

2    challenged decision of the government is whether or not to adhere to

3    known existing safety precautions and standards.

4           It's not -- you know, if the court excuses itself from

5    that, then what is the court here for?  So we have to drill down on

6    what the decision making is.  You can, truthfully with this

7    susceptibility, it's susceptible to policy, you can capture a whole

8    lot.  You can capture those baseball uniforms, everything is

9    susceptible to policy.  We ran out of safe welding uniforms, we had

10   no use the others.  We ran out of mobile housing, we had to use

11   unsafe units.

12          But when the decision that the Plaintiffs challenge is,

13   look, you made a choice here or a decision here that was a refusal

14   or failure to follow a known mandate and known directives, then the

15   court says, you know, that's not weighing socioeconomic policy.

16   That's a decision whether or not to adhere to a known safe principle

17   and that's where the courts come in.  So under the second prong as

18   pointed out in Whisnant, we don't think the government satisfies the

19   defense.

20          And finally, Judge, we submit that at the very least a

21   complete factual record must be a predicate for any favorable

22   consideration of this defense.  The Fifth Circuit in Montez says

23   that when the 12(b)(1) jurisdictional challenge is based on facts

24   which are relevant to and intertwined with the facts underlying the

25   plaintiffs' claims on the merits, the proper course is for this

1   court to deny the 12(b)(1) motion to accept subject matter

2   jurisdiction at this time, to treat the defense as one raised under

3   either 12(b)(6) or Rule 56, and on those rules we believe the motion

4   fails on the present record, absent discovery into the question of

5   why and how it was that travel trailers and park models came into

6   use under an emergency housing safe and habitable mandate with no

7   precaution set up against formaldehyde exposure.

8           Now, as to the second and third categories of government

9   conduct, I will be more brief, your Honor.

10          THE COURT:  You're getting close to the end of your time

11   and I have a couple more questions.  Go ahead.

12          MR. MEUNIER:  I should be real short then.  Beyond

13   selecting the units, FEMA provided them to the plaintiffs.  What

14   does that mean?  They had arrangements in the field where they

15   contracted to bring these units out, set them up, and make them

16   available for residential use.  And we reference a couple of the

17   owner's manuals, this is the 2006 Fleetwood manual for the Pioneer

18   Travel Trailers.  Interestingly you'll notice it says your trailer

19   is not designed to be used as permanent housing.  Some of these

20   people are still in these trailers almost three years later.

21          So we have a manufacturer spec saying this.  In the same

22   manual do not attempt to use the stabilizer jacks to level the

23   trailer, lift the weight of the trailer, raise the tires off the

24   ground.  That same warning is found in another manual we have on the

25   Pilgrim model, do not attempt to level, raise or otherwise place the

1    weight on the stabilizers.

2         THE COURT:  Are those also not provided to the trailer

3    occupants, I mean this information here?

4         MR. MEUNIER:  Well, the trailer occupants are not the

5    owners, these are owner manuals.

6         THE COURT:  I understand.

7         MR. MEUNIER:  And the trailer occupants don't jack the

8    trailers up.  What I'm saying is FEMA makes those arrangements.  The

9    trailer occupants, who are out of their homes, show up and the unit

10   is set up for them to live in.  This is the importance of this, the

11   second area of how FEMA provided the units.  Because I think our

12   experts and the evidence is going to indicate that the way in which

13   many of these units, particularly travel trailers, were set up off

14   of their wheels is improper under the manufacturer's only specs.

15        And why is that important?  Some of the spaces are

16   misaligned in that process.  These are spaces that normally would be

17   sealed off where the formaldehyde, the urea-formaldehyde which is

18   emitted from the glued wood products, is trapped in spaces that are

19   not breathed by the people.  Once you jack these up, that's why we

20   have specs not to do it, those spaces open up.

21        There is also when you do this a huge factor of heat and

22   humidity introduced, humidity in particular, moisture which as we

23   know increases formaldehyde emissions.

24        THE COURT:  Why don't you go ahead and wrap up.

25        MR. MEUNIER:  There's a whole area there.  And the third

1    area, Judge, you've already alluded to, which is the response.

2         If I may just make three quick points.  I think that FEMA

3    vigorously defends its response, you have read those e-mails about

4    the clock ticking.  And you've also alluded to the testing results.

5    We have a chart here.  As early, as you mentioned, October 2005

6    results of up to 5.0 PPM.

7         Now, here is what we know.  According to a February '06

8    statement from, to Congress by Richard Skinner, who is the Inspector

9    General for Department of Homeland Security, of the 114,000 some odd

10   travel trailers that were purchased by FEMA, only about 75,000 had

11   been placed and used as of that time, February of '06.  Meaning --

12   it also says roughly 21,000 were available for delivery and more

13   were being prepped for delivery.  February of '06.  We have test

14   results from fall of '05.  FEMA is still putting the travel trailers

15   into use.

16        We also know that that initial February '07 health consult

17   was challenged by Dr. Chris DeRosa, federal agent for the ATSDR, he

18   said FEMA really upset him by not letting people be told in February

19   of '07 about the long-term residential exposure effect, the

20   carcinogenic effects of formaldehyde.  And then you have that series

21   of e-mails don't do testing, the clock is ticking if we do, we own

22   the problem if we do.

23        Now, we submit that the government's response to this

24   crisis did put families needlessly at risk and it amounted to

25   another deviation from the federal policy mandate for safe and

1    habitable housing.  And, you know, even if, even if the government's

2    response to the crisis were seen as a matter of choice, we did the

3    best we could, I think what you get in the flavor of those e-mails

4    is, do you know what was driving the decision making?  It wasn't

5    socio economic policy, it was litigation.  It was let's seek cover.

6    But what they can't run and hide from is the safe and habitable

7    mandate.

8         So in closing, let me just say as we stand here today,

9    with no merits discovery having occurred whatsoever, there are many

10   more questions than answers regarding the role and accountability of

11   FEMA in this case.  And while I can understand why the government

12   wants to simply throw a Stafford Act discretionary function blanket

13   over everything and anything that FEMA might have done or failed to

14   do in causing or contributing to the crisis, neither the two prong

15   discretionary function defense nor the existing record in our view

16   supports this effort.

17        The government's motion, Judge, should be denied.

18   Plaintiffs should be allowed to discover the evidence, which we

19   think will show that FEMA violated a federal policy mandate and

20   existing formaldehyde standard s, and we ask the court to rule

21   accordingly.  Thank you, Judge.

22        THE COURT:  I have a couple of questions.  You've gone a

23   little bit over, so, Mr. Miller, I'll give you the appropriate

24   amount of time.

25        With regard to the government's arguments on Louisiana

1    Civil Code Article 2696, are plaintiffs challenging the argument

2    that the court lacks jurisdiction for that particular claim?

3         MR. MEUNIER:  We are not, Judge.  Under the Federal Tort

4    Claims Act we agree that it's a tort theory that we're presenting

5    against the government, not a contract theory.

6         THE COURT:  All right.  And also are you suggesting, and I

7    don't know who all is in your group yet in terms of individual

8    plaintiffs and what units they were in, seems to me though that

9    there is a distinction between a mobile home unit that has been

10   manufactured consistently and in conformity with the standard that

11   we've talked about, are we now saying that those are not going to be

12   part of this case, those who lived in mobile homes that were

13   provided and those homes were in conformity?

14        MR. MEUNIER:  Well, Judge, I would agree that we have to

15   treat separately, and we'll talk about this, I think, in response to

16   other motions that are before you, we have to treat separately for

17   case management purposes and litigation purposes the category of

18   units, I do agree with you.  I think the travel trailers and park

19   models fall on one side of the line and the mobile housing units on

20   the other.

21        Now, you have manufacturer claims or claims against

22   manufacturers in all cases.  It may be that FEMA has a different

23   position and a different defense available to it with respect to the

24   mobile housing units where it did furnish and set forth and

25   presumably do everything it could to enforce safe formaldehyde

1   standards.

2        THE COURT:  Well, it just seems as though the argument

3   here today, and I know that we're not here on a summary judgment by

4   mobile home manufacturers per se, but the argument today would seem

5   to undercut any claim against FEMA relative to homes provided,

6   mobile homes that were provided that were subject to the HUD

7   guidelines and that were, in fact, manufactured in conformity with

8   those guidelines.

9        MR. MEUNIER:  Well, your Honor, I think the same mandate

10  applies.  I would concede the same mandate applies, those homes

11  should be safe, they should be habitable.  Now, we have high test

12  results on some of the mobile housing units.  I don't want to

13  mislead this record, I mean, we have concerns about the --

14       THE COURT:  But that may be a manufacturer question, but

15  we're talking about the government here.

16       MR. MEUNIER:  I understand.

17       THE COURT:  And the notion that somehow they should have

18  demanded that the mobile, that the RVs and units that were not

19  subject to the HUD regulation or an OSHA guideline that somehow they

20  should have imposed that if the government procured mobile home

21  units that were subject to it and were manufactured in conformity

22  with it, seems to me that the government has a pretty good argument

23  that we've done everything that we could have possibly done with

24  regard to those units.  If you have a problem then the manufacturer

25  perhaps.

1        MR. MEUNIER:  I would agree with you in theory, Judge.

2    Here is the issue.  You know, there was a rush in this case, as

3    counsel and the court knows, and we want to be sure that the

4    products, the wood products in particular, that went into all of

5    these units, not just the travel trailers, mobile housing units as

6    well, were appropriate products.  I mean, in the rush did we get

7    wood from the Philippines?  Did we get wood from abroad from China?

8    Did we not adhere to the specs on formaldehyde?  Did the government

9    know that and say that's okay, we need the units?  It's too much of

10   a crisis, we can't afford formaldehyde safety.

11        Those are unanswered questions.  But as we get into it, I

12   will agree that I think we will find a different theory as to

13   government role and responsibility applicable with respect to the

14   mobile housing units because there was, at least in the regulations,

15   some specified level of formaldehyde.

16        If the manufacturers failed to comply with those regs,

17   shame on the manufacturers.  If FEMA said go ahead and use the bad

18   wood and don't worry about the standards, shame on FEMA, that would

19   be deviating from a clear spec as well.  We just don't know the

20   answer to those questions.

21        THE COURT:  Okay.  Let me also ask you, go ahead, come on

22   up, Mr. Miller.  The government also makes a claim with regard to

23   the recision plaintiffs who have purchased units.  There is a claim

24   for rescinding the contracts of sale, and the government asserts

25   that those would fall within the scope of the CDA.  Do the

1    plaintiffs agree with that argument as well?

2         MR. MEUNIER:  We do, Judge.  The class and the claims that

3    we are presenting are by plaintiffs as residents.  So if a person is

4    a resident, as a resident of a trailer suffers injury and presents a

5    claim in tort, that is the gravamen of the case.

6         If some of the plaintiffs in this case were also owners

7    and want their money back on the sale, then that I would agree is a

8    recision claim that may not sound in tort under the FTCA.  So who is

9    the seller as Louisiana recision redhibition law apply to the

10   manufacturers in that case, those are questions that we have not yet

11   addressed.

12        THE COURT:  Mr. Miller, you had about three minutes left,

13   I'll give you ten minutes because I think we went over several

14   minutes with Mr. Meunier.

15        MR. MILLER:  Thank you, your Honor.  I will first start

16   addressing Mr. Meunier's points on Whisnant.  Whisnant is a Ninth

17   Circuit case and Mr. Meunier explains that that means you should be

18   able to second guess safety issues.  Whisnant was a case that

19   involved the government taking no, absolutely no safety response

20   actions for three years after it learned that there was mold growing

21   on food and other items in the commissary.  Absolutely none.

22        The court in Whisnant drops a footnote, and I am not sure

23   which footnote number it is, the decisions on what safety actions to

24   take is policy.  When you're making those fundamental decisions on

25   what does that require you to weigh and balance various things, is

1    susceptible and is not susceptible to second guessing by the

2    judiciary.

3           In that case it's the absolute absence of any action by

4    the government.  In that case the court says, wait.  You cannot take

5    no action because you have to do something, whether it is a

6    conscious decision that this is not a sufficient problem to take

7    action or action needs to be done.

8           I'd like to go back to the question I think as the court

9    indicated a lot of interest in, and that is the issue of including

10   the formaldehyde specs in the contracts.  And I think this is an

11   important issue to realize.  The HUD formaldehyde specifications

12   apply to manufacturers of mobile homes.  They do not apply to

13   purchasers.  They require the manufacturers to use this low emission

14   plywood.  Purchasers don't have these requirements.

15          And so what they're requiring FEMA to do in this case in

16   the emergency setting, in a setting where FEMA initially wanted to

17   use mobile homes which would have positioned people too far out of

18   the jurisdiction and then use travel trailers in its place because

19   it would have allowed people to stay closer to home, all involved

20   fundamental policy decisions.

21          There is no doubt that there is fundamental policy on

22   whether you're going to basically locate people in Arkansas, Texas

23   where you can use mobile homes, because the mobile homes could not

24   be placed in a flood plane area.  And so what you end up doing is in

25   order to comply with these political issues and social issues, you

1    turn to travel trailers.

2            Now, in that context, what the plaintiffs are saying,

3    well, once you did that, now you have to guarantee, government you

4    have to guarantee their safety.  But that's not what safety

5    requires.  Safety has to mean that you did something that you

6    thought was appropriate.  In this case we relied upon the

7    manufacturers.  We relied upon the manufacturers.  They are putting

8    these objects into the stream of commerce.

9            And in addition, this is an emergency setting, your Honor.

10   This is not Joe Shmoe out buying a trailer.  This is the government

11   with the largest housing disaster ever.  Providing this type of

12   temporary emergency housing is only one of the multitude of actions

13   that were taking place, removal of rubbish, identifying and dealing

14   with dead bodies that were coming up.  I mean, this is not -- I

15   mean, what they're basically saying is you need to take and put on

16   to the forefront, ignore everything else, this is the most important

17   and where you concentrate all of your resources.

18           And simply put, your Honor, that is the type of second

19   guessing that the Stafford Act, discretionary function exception, as

20   well as the FTCA discretionary function is designed to protect.

21           In fact, in the I believe it is the Fang case or the FEMA

22   case coming out of Florida where the housing that they provided or

23   they just refused to provide housing.  And in that case where people

24   didn't have housing that was deemed discretionary.

25           And so what they're basically saying is you need to second

1    guess those decisions.  And that, your Honor, is exactly, exactly

2    what the discretionary function is designed to protect in this case.

3              I would like to address the ownership manuals, your Honor,

4    and I refer the court to the Government's Exhibit No. 11, which is

5    the declaration by Mr. Miller.  He was in charge of the government's

6    inventory of these units.  Any documents or materials that were

7    provided to the government with the individual units, so if they

8    were included in the units, those were left in the units and handed

9    over to our contractors.  And so I am gathering that they probably

10   were left in the units as well.  But they were just transferred

11   over, the government had no involvement with those, and that would

12   have been the units.

13             Also, the installation to the extent that Mr. Meunier is

14   arguing that issue, and that's not in their complaint and hadn't

15   been really addressed here, but all of that issues were handled by

16   the installation contractors.  And the plaintiffs have specifically

17   said what's at issue here is the government's conduct, not the

18   contractors.  We address that briefly in our brief.

19             THE COURT:  Did the government have any standards with

20   regard to how these units were installed or was it simply an

21   arm's-length transaction basis where you had so many contractors

22   that were told to install units as directed by location?

23             MR. MILLER:  Your Honor, my understanding is there were

24   the four major contractors, and these were letter contracts issued

25   out.  The contracts, I think, are running in the $4 billion dollars

```
 1   or so.  They were basically on hand, these were independent
 2   contracts.
 3              THE COURT:  Okay.
 4              MR. MILLER:  And Mr. Oliver, Clifford Oliver's
 5   declaration, I am not sure what exhibit number it is, address that.
 6   He was in charge of the independent assistant, technical assistant
 7   contractors, your Honor.
 8              Finally, I want to focus this court very clearly on this
 9   issue of housing safety and a determination what is sufficiently
10   safe because that is ultimately what we are arguing about here, what
11   is sufficiently safe for these occupants in this type setting.  And
12   I would note to the court what the plaintiffs are saying is that the
13   government should have expended massive amounts of resources,
14   somehow relocated all of these persons once we had some little
15   notice that there was a formaldehyde concern.
16              We had one complaint from an occupant as of March 2006.
17   By July 2007 we had approximately 207 complaints total.  And what
18   the plaintiffs would say is that, no, you have one complaint, move
19   140,000 people out.  Physically it is not possible to do that.
20              Even to this day since February 2008 when we got the
21   reports back and CDC's most recent recommendation to move people out
22   by the summer, we have been unable to achieve that.  There are still
23   20,000 people in these units.  We've given them the option to move
24   out if they want, and since July 2007 anyone who has wanted to move
25   out of a unit has had that ability.  But people still remain because
```

 1   the alternatives that are out there are not satisfactory.  That is

 2   the issue here and with a disaster you have to weigh and balance

 3   these things.

 4        And what plaintiffs are essentially saying is that the

 5   government should have forcibly evicted, forcibly evicted 140,000

 6   families from units when, in fact, we only had 200 people

 7   complaining about this.  And what was the alternative?  To move them

 8   to Baton Rouge?  To move them to Arkansas?  To move them to Texas?

 9   Those are risks that have to weigh and balance.

10        And Judge Lemmon in the Hillard decision explicitly noted

11   that and explained to the counsel, what were they supposed to do?

12   What was the alternative?  And the alternative is not necessarily

13   that safe either, your Honor.  I mean, the background levels for

14   formaldehyde, the standards that the plaintiffs want to impose is

15   the ATSDR's MRL, which is .80 parts per million.  That's the

16   equivalent of eight parts per billion, your Honor.  That's the same

17   level that you could get underneath the I-10 bridge, it's an ambient

18   background level.  There would be no safe place to put people if you

19   adopt that level.  It's a goal, even ATSDR says those standards are

20   not to be applied as action levels.

21        And so you're dealing with these things, and it's the

22   balancing is fundamental to figuring out how to deal with it.  And

23   that's what this court is not supposed to second guess, it is what

24   the legislature branch is supposed to second guess, and they are

25   doing that, your Honor, and they are vigorously exercising that.

1    And the solution to this issue as to the government is legislative

2    in nature, not judicial.  The FTCA discretionary function exception

3    and the FEMA Stafford Act discretionary function exception, as well

4    as the explicit provision in the Stafford Act and the regulations

5    that imbue FEMA with discretion on what type of units to use

6    protects the government in this case from judicial second guessing.

7    Thank you, your Honor.

8              THE COURT:  All right.  Thank you, Mr. Miller.

9               All right.  Let's go ahead and move on then to the

10   Document 259 motion.  That would be handled, I understand, by

11   Mr. Bains and Mr. Carroll.

12             MR. BAINS:  May it please the court, your Honor, I'm Lee

13   Bains.  Jim Carroll had planned to present part of the oral argument

14   but he had something come up, so I am going to make the entire

15   argument.

16             THE COURT:  Sure.

17             MR. BAINS:  Your Honor, I would also like to reserve

18   probably about five minutes or so in rebuttal.

19             THE COURT:  All right.

20             MR. BAINS:  Your Honor, thank you for setting aside the

21   time for oral argument today on this motion to dismiss that we have

22   filed on behalf of the newly added defendants that have been brought

23   into this MDL proceeding through the administrative master

24   complaint.  I will focus primarily on Article III standing and then

25   touch on the AMC.

1        As your Honor knows, federal courts are courts of limited

2   jurisdiction.  Federal courts can only exercise the jurisdiction

3   that has been granted to them by the U.S. Constitution or by

4   Congress.  Article III of the U.S. Constitution limits this court's

5   jurisdiction to cases in controversy.  The United States Supreme

6   Court has adopted certain doctrines in connection with Article III,

7   including ripeness, mootness, and what's at issue in our motion to

8   dismiss, Article III standing.

9        Over the last 20 years or so there's been an increasing

10  emphasis by the United States Supreme Court and the Fifth Circuit on

11  Article III standing and the appropriate role of federal courts

12  within the constitutional frame work.  The United States Supreme

13  Court and the Fifth Circuit have addressed Article III often

14  standing sua sponte.  So, for example, last year in 2007 the en banc

15  Fifth Circuit dismissed a case because the plaintiff did not have

16  Article III standing.  And the Fifth Circuit raised that sua sponte,

17  even though the defendants did not challenge the plaintiffs' Article

18  III standing, even though the federal district court did not address

19  Article III standing, and even though the panel, the Fifth Circuit

20  panel found that there was Article III standing, and that was in the

21  Doe case from last year.

22        And less than 30 days ago, your Honor, the United States

23  Supreme Court issued a decision dealing with Article III standing,

24  and that was in the Davis v. Federal Election Commission case,

25  decided June 26th.  And this is what the U.S. Supreme Court

1   explained:  "Standing is not dispensed in gross.  Rather a plaintiff

2   must demonstrate standing for each claim he seeks to press and for

3   each form of relief that is sought."

4          So against that backdrop, your Honor, the plaintiffs and

5   the defendants agree on four points about Article III standing in

6   this case:  First, plaintiffs bear the burden of establishing

7   Article III standing; second, there are three required elements of

8   Article III standing:  Injury in fact, causal connection between the

9   injury and the challenged action of a particular defendant and

10  redressability; third, the administrative master complaint fails to

11  identify a single plaintiff who has lived in a housing unit made by

12  one of the newly added defendants; and fourth, the administrative

13  master complaint fails to identify a single plaintiff who was harmed

14  as an approximate result of any action taken by the specific new

15  defendant.

16         And, your Honor, the new defendants are all manufactured

17  home defendants in contrast to the travel trailer companies that

18  have been the subject of this litigation.  The motion that we have

19  filed is all on behalf of these manufactured home companies.  And

20  those four points, your Honor, upon which the parties agree is

21  dispositive on the Article III standing issue.

22         Now, within the last week, your Honor, we have received

23  the plaintiffs' fact sheet for the named plaintiffs in the

24  administrative master complaint.  Those fact sheets demonstrate that

25  not a single plaintiff in the administrative master complaint lived

1    in one of the manufactured homes built by any of the newly added

2    defendants.  So the net effect of that, your Honor, is that my

3    clients have been in this case having to defend it for four months

4    since the administrative master complaint was filed, and not a

5    single named plaintiff has Article III standing against any of my

6    clients.

7         THE COURT:  There is some reference in the opposition to a

8    possible amendment of either the AMC or one of the underlying cases

9    such that there is a pairing of a particular plaintiff and a

10   particular defendant, including each and all of the newly added

11   defendants.  Would that address the issue that you're raising in the

12   Article III issue?

13        MR. BAINS:  No, sir.  Because the named plaintiffs as they

14   currently exist in the AMC do not have Article III standing against

15   my client.  As a result, this court does not have subject matter

16   jurisdiction against my clients.  And as a result, the named

17   plaintiffs cannot amend in to bring in new plaintiffs where there is

18   no subject matter jurisdiction.

19         And, your Honor, I saw that yesterday, the proposed

20   amended complaint, and I quickly looked and I found three Fifth

21   Circuit cases that address that very point that if the named

22   plaintiff does not have Article III standing or if the court does

23   not have subject matter jurisdiction over the original complaint,

24   then the plaintiffs cannot amend the complaint to create subject

25   matter jurisdiction.  And, your Honor, I can give you those cites.

 1          THE COURT:  Yes, if you would.

 2          MR. BAINS:  Your Honor, the first case is Summit Office

 3   Park v. United States Steel Corporation, 639 F.3d 1278 at 1283,

 4   Fifth Circuit, 1981.  And this is what the Fifth Circuit said:

 5   "Since plaintiff had no standing to assert a claim, it was without

 6   power to amend the complaint so as to initiate a new lawsuit with

 7   new plaintiffs and a new cause of action."

 8          Then, your Honor, in Federal Recovery Services, Inc. v.

 9   United States, 72 F.3d 447 at 453, Fifth Circuit, 1995, the Fifth

10   Circuit said this:  "In Aetna Casualty & Surety v. Hillman," which

11   I'll get to in just a second, it's 796 F.2d 770 at 774, Fifth

12   Circuit, 1986, "we held that Rule 15 does not permit a plaintiff

13   from amending its complaint to substitute a new plaintiff in order

14   to cure the lack of subject matter jurisdiction.  See also Summit

15   Office Park, Inc. v. United States Steel Corporation," which was the

16   case I just mentioned, your Honor, first, holding that, "where a

17   plaintiff never had standing to assert a claim against the

18   defendant, it does not have standing to amend the complaint and

19   control the litigation by substituting new plaintiffs."

20          Rule 15 does not allow a party to amend to create

21   jurisdiction where none actually existed.

22          THE COURT:  What was the 796 cite?

23          MR. BAINS:  796, 770 at 774, that was that -- and that's

24   the third case, your Honor, that I wanted to mention is the Aetna

25   decision by the Fifth Circuit.  Aetna Casualty & Surety v. Hillman

```
1    796 F.2d 770 at 774, Fifth Circuit, 1986.  And the court there said,

2    if the plaintiff did not have the ability to bring the suit in

3    federal court, it could not amend.  And again it refers back to, "In

4    Summit Office Park, this court stated that where a plaintiff never

5    had standing to assert a claim against the defendant, it does not

6    have standing to amend the complaint and control the litigation by

7    substituting new plaintiffs, a new class or a new cause of action."

8         So those three Fifth Circuit cases, your Honor, address

9    and demonstrate that the plaintiffs cannot cure the absence of

10   subject matter jurisdiction, cannot cure the lack of Article III

11   standing through an amendment that seeks to add additional

12   plaintiffs.

13        Now, your Honor, the plaintiffs can file a new lawsuit and

14   we could deal with that straight up, but they cannot amend this

15   existing administrative master complaint.

16        THE COURT:  Well, if they were to file a new lawsuit,

17   wouldn't it just wind up back here as part of the MDL?

18        MR. BAINS:  Well, potentially.  Potentially, your Honor.

19   First, it's important because of the statute of limitation issues.

20   By being brought into the lawsuit potentially there is a tolling of

21   the statute of limitations, but in the absence of subject matter

22   jurisdiction and the absence of Article III standing, the plaintiff

23   would not be able to toll the running of the statute.  But if a new

24   lawsuit were brought, let's say a new lawsuit were brought by this

25   plaintiff in Mississippi, the procedure that would be in place
```

1   before the Judicial Panel of Multidistrict Litigation is that a

2   conditional transfer order would be issued.  The parties would have

3   an opportunity to object to whether the case should be treated as a

4   tagalong or not, and the manufactured home defendants could take the

5   position before the MDL panel that the case against us is

6   fundamentally different from the case against the travel trailer

7   companies that's currently in place and was the subject of the MDL

8   proceeding that was created before Judge Engelhardt.

9           When the MDL was created before your Honor, it was only

10  travel trailer defendants.  There were no manufactured home

11  defendants in the case.  So if a new lawsuit were filed, the

12  manufactured home defendants could take the position with the MDL

13  Panel do not transfer us to that travel trailer litigation, we are

14  fundamentally different.  We are regulated by HUD, we have all sorts

15  of regulations apply to us.  Don't put us into that litigation

16  that's been going on two years ago.

17          So it would be up to the MDL Panel about whether to

18  transfer the case here and it would be up to your Honor how the case

19  against the manufactured home companies should be treated relative

20  to the travel trailer companies.

21          But, your Honor, the fact sheets that we've obtained from

22  these plaintiffs demonstrate that none of these named plaintiffs

23  have any claims against us.

24          THE COURT:  When we mentioned newly added defendants, and

25  I know you're here in the capacity of representing a particular

1    client or clients, and maybe this isn't an appropriate question for

2    you, but are those standing arguments equally applicable to some of

3    the earlier defendant manufacturers?

4            MR. BAINS:  Potentially, your Honor.

5            THE COURT:  And I know I have some tagalong motions or

6    some motions that join in, so, okay.

7            MR. BAINS:  And, your Honor, particularly I think the

8    newly added defendants would certainly have that same Article III

9    objection.  A lot of them have joined in this argument and I think

10   are not going to try to make oral argument themselves, but I think

11   that would also be true, you're right, your Honor, for some of the

12   original defendants.

13           THE COURT:  Okay.

14           MR. BAINS:  Your Honor, there are two particular cases

15   that I wanted to mention that are closely analogous to this case and

16   demonstrate that there is a lack of Article III standing by the

17   named plaintiffs, the Audler case and the Manning case.  First is

18   the Audler case that your Honor handled at the district court level,

19   I know you know it well; but as your Honor recalls, it was a

20   purported class action filed by one named plaintiff.  The named

21   plaintiff had had dealings with one of the defendants but it had no

22   dealings with 19 of the defendants.  Your Honor dismissed the

23   complaint, dismissed the lawsuit, mooted some of the motions and it

24   was appealed.  And the Fifth Circuit -- before the Fifth Circuit two

25   of the 19 unrelated defendants filed a motion to dismiss the appeal

1    for lack of Article III standing.

2            In the Fifth Circuit said, first, before we get to the

3    merits we have to decide Article III standing.  And the Fifth

4    Circuit looked at it and they said the plaintiff, the named

5    plaintiff has no cognizable injury as a result of the actions of any

6    of these 19 unrelated defendants.  So they determined that the named

7    plaintiff lacked standing to bring claims against any of those 19

8    unrelated defendants and they dismissed the appeal for lack of

9    subject matter jurisdiction.

10           So, your Honor, that's exactly analogous here.  None of

11   the named plaintiffs in the administrative master complaint have

12   standing against my clients, the newly added defendants.  And so

13   that's the first issue off the bat that needs to be considered

14   according to the Fifth Circuit in Audler.  Just as the named

15   plaintiffs there did not have Article III standing, they don't have

16   Article III standing here.

17           The second decision, your Honor, is the Matte v. Sunshine

18   Mobile Homes case in the Western District of Louisiana from 2003.

19   And in Matte there were a group of plaintiffs who sued 282 mobile

20   home manufacturers.  The plaintiffs had had no contact with 281 of

21   those 282 defendants.  All of the plaintiffs had had dealings with

22   only one of the defendants.  And the court in the Matte case ruled

23   that the named plaintiffs lacked Article III standing against the

24   281 defendants with which they had not dealt.  And so the court

25   dismissed the plaintiffs' claims against those 281 defendants for

1    lack of Article III standing.  Essentially the same position that

2    the Fifth Circuit took in the Audler case.

3           So, your Honor, based on the Audler and Matte decisions

4    and those four points on which the parties agree that the plaintiffs

5    bear the burden of the three required elements for Article III

6    standing, the fact that the AMC fails to allege that any of the

7    named plaintiffs lived in any of our manufactured homes, and the

8    fact that the AMC does not allege that any of the named plaintiffs

9    have suffered any proximate cause injury from our defendants, this

10   court should dismiss the complaint.

11          THE COURT:  You indicated you want to save five minutes,

12   so you're at 15 right now.

13          MR. BAINS:  Thank you, your Honor.

14          THE COURT:  All right.  Thank you.  Mr. Kelly.

15          MR. KELLY:  May it please the court, David Kelly on behalf

16   of the Indiana Building Systems, LLC, more commonly known as Holly

17   Park Homes.

18          Your Honor, I asked for just a couple of minutes to

19   address the court, because what the court just heard was more of a

20   40,000 foot point of view on the standing issue, and I wanted to

21   bring it more down to the ground level with regard to my client.

22   Small manufacturer up in Indiana, had 400 homes subject to the

23   contract, only 141 of those homes didn't show up on the list of

24   never occupied homes, so 141 homes that my client manufactured could

25   possibly be at issue in this case.

1          What I've been doing since I got involved, I've been

2     trying to accumulate every list I can get my hands on to see if my

3     client's homes have been involved.  It doesn't show up on any of the

4     FRATS lists provided by the government, it doesn't show up on any

5     previously occupied home list provided by the plaintiffs --

6          THE COURT:  None of the 141 homes?

7          MR. KELLY:  None of the 141 homes.  It doesn't show up on

8     any of the homes that the plaintiffs are currently testing and

9     sending out notice to all of the defendants to come in and test

10    behind them if you want.  I am not -- my client is not on any of one

11    of those lists, and I know a number, if not all, of the newly added

12    defendants are in the same position as I am.

13         My client simply does not exist in this case.  But what's

14    been going on for the past four months is my client has been

15    required to respond to discovery, I just filed the class action

16    discovery in response to the plaintiffs' discovery request.  We've

17    had to keep pace with the testing issues that are going on, we've

18    had to file pleadings, we're here today as well as other pleadings

19    that we filed.  I know the issue of settlement has been discussed,

20    we've explored that; but that can't go anywhere, that's a dead end

21    for now and for a considerable period of time.

22         But thousands and thousands and thousands of dollars are

23    being expended by my client in a case where I don't have a

24    plaintiff.  Article III of the United States Constitution, as you

25    just heard the legal arguments, requires the key to the federal

1    courthouse fundamental requirement is standing.  No plaintiff has

2    come forward with a key to open the courthouse against my client.

3    Thank you, your Honor.

4         THE COURT:  All right.  Thank you, Mr. Kelly.  All right.

5    Ms. Lipsey.

6         MS. LIPSEY:  Your Honor, my argument does deal with issues

7    in addition to the standing issue, would you like me to go ahead and

8    do my whole deal right now?

9         THE COURT:  Well, if it relates to something that we've

10   already covered then I don't want to plow any ground that's already

11   been covered.  But let's go ahead and I'll give you your 20 minutes

12   now relative to your motion pending.

13        MS. LIPSEY:  All right.  Your Honor, Christine Lipsey on

14   behalf of Morgan Buildings and Spas and Morgan Building Systems.  We

15   have two motions before the court today, one is a motion to dismiss

16   with respect to the Louisiana plaintiffs claims and that motion is

17   actually a 12(b)(1) and 12(b)(2) and 12(b) --

18        THE COURT:  Excuse me for a second.  Is there a phone or

19   something in here?  Somebody -- maybe not.  All right.  Go ahead.

20   If you do have a cell phone in here, please, through some amazing

21   fete didn't see the signs on the door to the courtroom, please turn

22   them in to my secretary and you can pick it up after the hearing.

23   If anyone has one, please ditch it.  Okay.  Go ahead.

24        MS. LIPSEY:  Your Honor, we do have two motions before the

25   court today, one is to dismiss the Louisiana plaintiffs' named and

1    that motion is a 12(b)(1) and 12(b)(2) and 12(b)(6) motion to

2    dismiss.

3              THE COURT:  Okay.

4              MS. LIPSEY:  Our second motion to dismiss is to dismiss

5    the Mississippi and Alabama claims, and that motion is a 12(b)(1)

6    and a 12(b)(6) motion.

7              With respect to the Louisiana plaintiffs claims, there was

8    method in the madness of dividing the motions.  The first aspect of

9    our motion to dismiss the Louisiana plaintiffs' claims is relating

10   to in personam jurisdiction.  As the court likely knows, Morgan

11   Buildings and Spas was at one time in the McGuire litigation, which

12   is an underlying suit that was consolidated into this MDL.  Morgan,

13   however, along with several other defendants was dismissed from the

14   McGuire litigation, that occurred a little over a year ago.

15             To this day Morgan has not been named in an underlying

16   suit or a tagalong suit, has become an underlying suit, that

17   involves Louisiana plaintiffs.  It is not currently in a suit that

18   involves a Louisiana plaintiff, and I believe that initially I think

19   that was lost on the plaintiffs, I believe that they thought that

20   maybe Morgan was somewhere, there were so many defendants and so

21   many places that surely we had to be somewhere, but we were not, we

22   were dismissed.

23             And that dismissal is the basis of our 12(b)(2) motion

24   that Morgan is not presently before the court in any underlying suit

25   and there's got to be an underlying suit first.  Morgan must be a

1    party to that, an underlying suit in order to be properly before the

2    court so Morgan is not properly before the court with respect to the

3    Louisiana plaintiffs' claims.

4         And I won't go through the argument that's been detailed

5    in briefs because I know the court has read the briefs.  So that's

6    the situation that we have with respect to no in personam

7    jurisdiction.

8         Now, as the court knows, the plaintiffs did dismiss Morgan

9    from the administrative master complaint and they have amended the

10   administrative master complaint and have now served Morgan with the

11   amended master complaint seeking to bring Morgan back into the MDL.

12   However, to this day there has been no underlying suit, either

13   amended or a fresh suit filed by Louisiana plaintiffs.

14        So that's where we are today.  So Morgan is not before the

15   court with respect to the Louisiana plaintiffs.

16        With respect to the Alabama and Mississippi plaintiffs'

17   claims, there were underlying suits.  There was the Meshack suit out

18   of Mississippi and the White suit out of Alabama that are tag-along

19   suits that were added to this MDL.  Morgan was named in those suits.

20   However, Morgan was dismissed through the dismissal, has been

21   brought back in to the administrative master complaint, but the

22   underlying Meshack and White suits have not been amended to bring

23   Morgan back in.  So Morgan is not before the court, even though I

24   stand before the court today, is not before the court with respect

25   to the Alabama and Mississippi plaintiffs' claims either, as of this

1    moment.

2           So that's where we stand, so there would be no in personam

3    jurisdiction with respect to the Alabama or Mississippi plaintiffs'

4    claims either.

5           With respect to the standing argument, your Honor, I am

6    certainly not going to go back through what's already been argued.

7    The court did ask the question of counsel that argued earlier for

8    the newly added defendants as to whether the argument is being

9    advanced on behalf of the newly added defendants would apply equally

10   to other defendants, and they do.

11          They do argue -- they do apply and also the argument with

12   respect to amendment also applies.  The amendment that we received

13   last night, the amendment to the administrative master complaint

14   cannot cure the problems with respect to standing.  And as with the

15   newly added defendants, there has been no plaintiff linked to a

16   Morgan, I use the term manufactured very broadly because Morgan does

17   not manufacture trailers.  Of course there's been an issue as to

18   whether Morgan had its name on a sticker that was applied to some

19   trailers or mobile homes, that issue is out there.  But Morgan does

20   not actually manufacture.

21          It did buy trailers and mobile homes from manufacturers

22   and did sell them to the government.  That much is clear.  However,

23   there has been no plaintiff that has said I was in a Morgan

24   manufactured provided or whatever home and that travel trailer or

25   mobile home caused these specific injuries.  That is still out

1   there.

2         So there is still no Article III standing and that

3   applies, of course, with respect to the Louisiana plaintiffs, if

4   there are any, and to any Alabama and Mississippi plaintiffs as

5   well.

6         Your Honor, with respect to failure state a claim.  We've

7   also advanced a 12(b)(6) claim with respect to all of the Louisiana,

8   Alabama and Mississippi plaintiffs' claims.  Again, I won't

9   reiterate what's in the briefs; however, under the Louisiana

10  Products Liability Act a plaintiff has to allege facts to support

11  that a trailer manufactured by Morgan was defective and that alleged

12  defect was the legal cause of the plaintiffs' injuries.  That

13  allegation has not been made.

14        There have been general allegations made but the kind of

15  allegation that's necessary to survive a motion to dismiss on an

16  LPLA claim has not been made.

17        With respect to medical monitoring and the Louisiana

18  plaintiffs.  The Louisiana Civil Code Article 2315 says that medical

19  monitoring is not recoverable, unless it's directly related to a

20  physical or mental injury or disease.  The plaintiffs have simply

21  failed to advance any allegations that suggests that there has been

22  a manifest, physical or mental injury for which medical monitoring

23  would be required.

24        Also, your Honor, the in personam jurisdiction argument

25  also applies here.  There is no underlying complaint that advances a

1   medical monitoring claim because there is no Louisiana complaint out

2   there.  So that issue is also out there with respect to the medical

3   monitoring claim.

4        Of course there is a medical, a general medical monitoring

5   claim, rather cryptic, but there is one in the administrative master

6   complaint, there is one there.  But there is no Louisiana complaint

7   that had a medical monitoring claim.

8        Also, your Honor, with respect to the motion to dismiss

9   the Mississippi and Alabama plaintiffs' claims.  The plaintiffs,

10  none of the plaintiffs have satisfied the Supreme Court's standard

11  in the Bell Atlantic v. Twombly case.  They simply have not alleged

12  any act facts that would rise above a speculative level that would

13  assert a claim, so they have not asserted a claim as required by the

14  U.S. Supreme Court.

15       Now, Morgan moved to dismiss the plaintiffs' Mississippi

16  Products Liability Act claim.  There is no question if one reviews

17  the underlying Meshack Mississippi suit that the nature of that

18  claim is a products liability claim.  Now, there is sort of

19  subsidiary to that claim a type of breach of express warranty claim

20  but the count itself is a products liability count, as is the count

21  in the administrative master complaint.  Morgan has argued in its

22  motion to dismiss that the plaintiffs have not satisfied in the

23  underlying Meshack case when it was still alive, and it isn't

24  presently, that the plaintiffs failed to allege an injury resulting

25  from exposure in a trailer manufactured or provided by Morgan.

1  Similar to the Louisiana Products Liability Act, the Mississippi

2  Products Liability Act requires the same type of allegation and same

3  type of proof.

4       Morgan briefed this in its motion to dismiss and the

5  plaintiffs simply didn't respond to the argument.  What the

6  plaintiffs did, and I know that the plaintiffs were likely

7  overwhelmed with all of the briefs they had to contend with and the

8  various oppositions they needed to do, and I understand that, and as

9  a result of that I'm sure they incorporated their arguments made in

10 other oppositions, I understand that as well.

11      But in scrutinizing all of the oppositions, there was no

12 opposition to a motion to dismiss the Mississippi Products Liability

13 Act claim, so there is no opposition to Morgan's motion in that

14 regard.

15      With respect to the plaintiffs' breach of express warranty

16 claim, if they, in fact, have a freestanding breach of express

17 warranty claim, which I am not convinced that they do, but let's say

18 that they do have an Article II UCC type of argument.  Under

19 Mississippi's Article II of the UCC, there must be a buyer, there

20 must be a seller, and there must be a contract for sale.  And the

21 plaintiffs have failed to allege that they purchased a FEMA trailer

22 and I think, in fact, even plaintiffs' counsel in argument earlier

23 today said that with respect to the owner's manual question I think

24 that the court posed, I think that the owners were the -- the

25 government was the owner and not the end users.  So there is no UCC

1    claim to the extent one has been advanced, and I am not sure that

2    one has.

3              Similarly, your Honor, with respect to the Alabama

4    plaintiffs' claims.  It's very clear in the underlying White Alabama

5    suit that what the plaintiffs intended to advance as a claim was

6    under the Alabama Extended Manufacturers Liability Doctrine, which

7    is called the AEMLD.  And once again, that doctrine also requires

8    that there be an injury, an actual injury and that that injury

9    actually be linked to the defendant.  Again, that's not occurred

10   here.

11             Also, again, I guess as I mentioned earlier with respect

12   to the Mississippi motion to dismiss, the plaintiffs failed to

13   oppose this claim for dismissal.  They simply ignored Morgan's

14   argument that they had no claim under the Alabama Extended

15   Manufacturers Liability Doctrine.  There is nothing in all of their

16   oppositions that goes to it.  So that is out there and it's

17   unopposed.

18             With respect to the Alabama UCC express warranty claim.

19   Morgan moved to dismiss the breach of warranty claims because the

20   Alabama plaintiffs failed to allege they purchased a trailer from

21   Morgan or that Morgan made an affirmation relating to the qualities

22   that that trailer had or mobile home had or did not have.  Once

23   again, plaintiffs failed to oppose this claim for dismissal, there

24   was no opposition in any of the oppositions.

25             While privity is not required for injuries to natural

1  persons, and I think that the court is aware of that but because of

2  other briefing, plaintiffs have not alleged that they suffered any

3  injuries relatable to a Morgan provided trailer.

4         With respect to economic losses under Alabama law.  The

5  plaintiffs have failed to allege privity with Morgan, which is

6  required to recover for economic losses.  Privity may not be

7  required under Alabama express law with respect to personal injury

8  damages and losses but it is required for economic losses; and, in

9  fact, the plaintiffs acknowledge arguably that they cannot recover

10 for economic loss under Alabama law.

11        With respect to the medical monitoring claim, as it

12 affects the Mississippi plaintiffs and the Alabama plaintiffs.  Once

13 again, the underlying Mississippi suit, the Meshack suit does not

14 advance a claim for medical monitoring; neither does the underlying

15 Alabama White suit, it does not advance a claim for medical

16 monitoring.  The fact that there is a medical monitoring claim in

17 the administrative master complaint does not cure that problem.  All

18 parties and all claims must be before the court in the underlying

19 suits or the tag-along suits, they cannot just spring forward in the

20 administrative master complaint.

21        Even if the court were to consider the allegations in the

22 administrative mater complaint concerning medical monitoring,

23 Alabama law and Mississippi law, as does Louisiana law, require a

24 showing of physical injury in order to have the medical monitoring

25 claim, and plaintiffs have made no such claims of specific physical

1    injuries resulting from a trailer provided by Morgan.

2          Thank you, your Honor.  And in the event I have any

3    additional time, I would like to reserve it in case I need it.

4          THE COURT:  You have about five minutes left.

5          MS. LIPSEY:  Okay.  Thank you.

6          THE COURT:  Mr. Meunier, do you want to respond to these

7    folks we've heard from?

8          MR. MEUNIER:  Your Honor, I will respond and then Mr.

9    Murray will address the medical monitoring issues.

10          Because the various challenges made to standing in my view

11    can only be viewed in light of the PSC's proposed motion to amend

12    both the master complaint and the underlying Pujol's action that was

13    more recently filed, we are going to ask the court to take

14    cognizance of the proposed amendment.  I have circulated it to

15    counsel, I have a copy for the court, and there are just a few

16    points in it that I think are pertinent, I'll hand it up to the

17    bench.

18          Your Honor, this proposed second supplemental and amended

19    complaint, master complaint will allege as to each proposed class

20    representative and as to a number of named and identified plaintiff

21    class members that the individual suffered harmful exposure to

22    formaldehyde as a result of residing in a unit manufactured by a

23    named and identified manufacturer.  And if you will look at the

24    complaint beginning at the bottom of page three, the addition of

25    subparagraph 7(c) lists the previously identified class reps who

1   were set out in 7(a) and 7(b) of the master complaint.  The reason

2   we had (a) and (b) is because (a) were those with ripe FTCA claims

3   and (b) were those who did not yet have the six months pending.  But

4   (a) and (b) in the master complaint identified all of the proposed

5   class reps.  So what 7(c) would do is refer back to that same list

6   of people and in each case specifically allege injurious exposure to

7   formaldehyde due to a unit manufactured by and then the manufacturer

8   is named.

9         I do want to note on page five Morgan is identified in

10  subparagraph (r) in the case of one of the named class reps.

11        Now, at page seven, at the bottom of page seven you'll see

12  that we propose to add paragraph 7(d).  7(d) sets forth named class

13  members.  We're not proposing to add a whole new list or roster of

14  proposed class reps, but these are identified class members; and for

15  them, too, we set forth the allegation that they were exposed to

16  injurious levels of formaldehyde as a result of residing in a unit

17  manufactured by.

18        THE COURT:  Two things.  What of the argument that this

19  cannot be done as part of the amended master complaint but rather --

20  you mentioned that you would perhaps do this in the underlying

21  Pujol's matter as well.

22        MR. MEUNIER:  We will.

23        THE COURT:  Okay.  And secondly, I asked Mr. Bains about

24  the idea, he cited the three cases, and perhaps this is something

25  that just lately developed here so I am catching you cold, but he

```
 1   did cite three cases and you heard him state his position that

 2   relative to subject matter jurisdiction would not be something that

 3   could be amended so as to cure or create subject matter

 4   jurisdiction.

 5            MR. MEUNIER:  Well, I think it overlooks the fact that

 6   this is a class action.  And let me first say that I wish we could

 7   have provided this matching data sooner.  As you know, Judge, we

 8   have had a difficult time with FRATS and the FEMA materials.  We

 9   have plaintiffs who frankly can't remember and tell us today what

10   unit they were in.  So it's been an effort.

11            But once the standing, once the standing of a named class

12   representative is recognized, and we think the standing of all of

13   these named plaintiff class reps, and I think you've heard a

14   concession that many of them already have standing because they had

15   sued in underlying actions before we ever did the master complaint,

16   the first group of manufacturers who were identified.

17            Now, when the master complaint and Pujol's together, Pujol

18   always meaning to be that underlying action because we had that

19   issue of the AMC added FEMA, added new claims and we wanted there to

20   be an underlying action.

21            If we take up the underlying action of Pujol and the

22   master complaint together, we step forward now with some additional

23   plaintiff class reps who now are being matched to a specific

24   manufacturer, we submit, have standing.  So the issue is this --

25            THE COURT:  Wait, do you have something in here for
```

1    Mr. Kelly?

2             MR. MEUNIER:  Well, I was looking for his client.  I know

3    he indicates that --

4             THE COURT:  There is a listing of things here.

5             MR. MEUNIER:  He's been looking at all of the lists.

6             THE COURT:  He's waiting for word as to how he is involved

7    in this.

8             MR. MEUNIER:  And look, Judge, I will say this, you know,

9    the last thing --

10            THE COURT:  Is he on this list at all?  Is his client on

11   the list at all?

12            MR. MEUNIER:  I don't think he is.  And the last thing the

13   plaintiffs want to do is hold into this case people, defendants as

14   whom we have not yet identified.  The problem is we may have a

15   plaintiff in our group who resided in one of his units, rare though

16   that chance may be, I may not know until we get into further

17   discovery and more matching data.  If the court contemplates

18   entering some sort of order that sets him on the side, dismiss it

19   without prejudice, we don't have any interest in actively engaging

20   with defendants we can't make a match to.

21            THE COURT:  I think we've talked at our status conferences

22   in the past that there would be manufacturing defendants in

23   precisely that position that either manufactured so few and could be

24   somehow involved with a small group of plaintiffs, or in this case

25   where according to what Mr. Kelly has been able to find out on his

1    investigation, he's manufactured not one that's involved with a

2    plaintiff, one that could be ascertained as being the subject of

3    this litigation.

4         So I am a bit sensitive to the expenditure of fees and

5    resources when the case could be simplified in ever such a small way

6    by eliminating a party or participation of counsel, as well as the

7    expense that would be involved.

8         MR. MEUNIER:  And I would agree, Judge.  And let me just

9    add this that when we did this matching, and we are going to amend,

10   we're going to propose to amend Pujols and the master complaint, I

11   think there were three or four entities, and his client may be one

12   of them, for whom we do not presently have a match.  And what the

13   court wishes to do with respect to those defendants, we're open to

14   all of the suggestions about the need to not force them to

15   participate in a case where, who knows, we may never have a

16   plaintiff who lived in one of their units and it may not be fair to

17   make them come to court and actively incur legal costs.

18        On the other hand, if at some point through discovery or

19   otherwise it turns out that one of the plaintiff class members did

20   indeed reside in one of his units, there has to be a way obviously

21   for the plaintiffs to not have to reinvent the wheel, if you will,

22   and to not meet resistance with inclusion in this MDL so that we can

23   seek an expedited resolution of the entire litigation.

24        And that takes us, again, to the issue of the juridical

25   link doctrine, which has not been mentioned.  But the concept is

1    that once there is standing on the part of proposed class

2    representatives, that each and every one of them has standing to the

3    extent that they say I was injured in a unit manufactured by X.

4    Obviously they lived in one unit, they can never have standing and

5    say I lived in every single one, that's absurd.  I have standing, I

6    lived in this one, we have others who say I lived, etc., we cover as

7    many as we do with proposed class reps.  It is true, if you take the

8    population of proposed class reps and you don't have in that

9    population a unit manufactured by every single one of the named

10   defendants, which is why I went to the extent of naming class

11   members who have, who lived in units made by those others.  And a

12   few fell out and didn't get matched.

13           Now, the issue is they say, well, too bad, you know,

14   you've got named plaintiff reps who didn't live in one of my units

15   and I don't care whether one of the class members did or not because

16   the named plaintiff rep didn't, he has no standing as to me and

17   don't you dare try to now have them come in and amend and try to

18   capture me.  Well, the absurdity of that is, and this is the

19   importance of juridical link doctrine, is that if you have standing

20   on the part of class reps in this case, and we submit that these do,

21   and if there is a common transactional event or policy that

22   juridically links all of the defendants, and to us it's self-evident

23   here, it's FEMA, every single one of these entities get into this

24   case in one way, they made arrangements with FEMA to provide housing

25   units to the plaintiffs.

1        And we say that juridical link allows us to have reps with

2   standing as to a certain group of defendants who propose now to

3   represent a class in whom we know there are members who have

4   standing as well.  And to go forward and let this court do what the

5   Ortiz case said, which is that when you have a class action and

6   you've got that situation, you address typicality and adequacy of

7   representation as a logical precedent to Article III.

8        Because if you deny a class, if you decide that this is a

9   mass joinder, then guess what we have?  We have then the need, the

10  obvious need to name every single one of the plaintiffs that are now

11  identified in some cases as just class members --

12      THE COURT:  Isn't this case different from Ortiz though?

13  It seemed to me that in the Ortiz case -- well, in this case the

14  newly added defendants are not alleging that some absent unnamed

15  class members don't have standing.  In this case here the newly

16  added defendants are claiming that the named plaintiffs have failed

17  to satisfy their burden to establish that they have the Article III

18  standing.  There is a bit of distinction there between the two

19  cases.

20      MR. MEUNIER:  Well, I think what Ortiz says is simply

21  this, that if you've got a standing challenge and you've got a class

22  action, you've got to logically precede the standing question with

23  the typicality and Rule 23 analysis of do these proposed reps

24  adequately represent the class.  And I think that's where we are.

25  And we also cite the court to the Peyton and Vulcan Gulf cases at

1   pages eight and nine of our brief, which illustrate that when the

2   plaintiff class representative claims do stand in relationship to

3   claims against all defendants, then the Rule 23 lens of typicality

4   and adequacy of representation comes first.

5          THE COURT:  Can you cite me to any portion of any Fifth

6   Circuit opinion wherein this notion of, seems to me a very generous

7   notion of standing from the Ninth Circuit has been adopted or

8   commented on favorably by a panel of the Fifth Circuit?

9          MR. MEUNIER:  Well, I think the Fifth Circuit -- I'll do

10  my best.  The Fifth Circuit in Audler, we don't think Audler

11  rejected the juridical link concept.  The juridical link concept

12  again is that you look not at the standing only of the plaintiff

13  class reps individually, but you look at the claims being made by

14  the class, and you ask the question are the claims being made by the

15  class such that this court should exercise jurisdiction to go

16  forward and decide, okay.  Do those reps adequately represent the

17  class.

18         But Audler recognized the authority of Ortiz.  Now, the

19  court suggests there maybe a distinction between Ortiz and this

20  case, but what Audler in recognizing Ortiz said, it's fair to insist

21  that the named plaintiffs must have standing to proceed.  We think

22  the plaintiffs named as reps do.

23         Now, let me drop a footnote here.  One of the solutions to

24  the concern that's being addressed here might be, you know, what I

25  was reluctant to do in this proposed second supplemental amendment,

 1   and that is have 150 some odd class reps.  I mean, what we could do

 2   is I could take paragraph 7D wherein I seek to name class members

 3   who do have standing specifically as to these new defendants and I

 4   can just transport every single one of those names into a new

 5   expanded list of class reps.

 6          The reason I didn't do that, frankly, is because we're

 7   underway with class rep discovery and I didn't want to hear the

 8   howling that I'd hear from the defendants, wait a minute.  You know,

 9   now you want us to look at fact sheets and potentially take

10   depositions of all of these people when you started out with these.

11   That's the reason I didn't.  But if the concern is that -- I only

12   made a unit that you now can prove was made by a class member.  But

13   that class member is not a class rep and so the class rep doesn't

14   have standing as to me so I go home.  I mean, it's absurd.

15          If that's where we're headed, then what the plaintiffs

16   will simply do, I'll pick a class member that you admit lived in one

17   of your units, I'll make them a class rep.  So now he has standing

18   and now he can represent the class and go forward.

19          I think the point of the juridical link is let's look at

20   plaintiff class rep group, let's see if they're typical of the

21   entire group.  You may conclude they're not typical, because you

22   know what, they don't represent that guy who was in that

23   manufactured home.  But that's the first analysis and what falls out

24   from that is an appropriate set up for a mass joinder case.  But I

25   don't think we're there yet.

1          Although I am open, Judge, to the suggestion of naming

2   every single one of those class members, and we captured everybody

3   except three or four, I'll make them all class reps.  And if the

4   defendants want to then conduct discovery on that many class reps

5   and that'll get us past the standing concern where they're seeking

6   to go just home right now, then we can do that.

7          So I think the Summit case that counsel mentioned where he

8   says, you know, the plaintiff without standing doesn't have the

9   power to amend, I haven't read the case, but I submit that my

10  plaintiffs have standing in the case.  May not have standing as to

11  his client individually, as an individual claimant, they have

12  standing to represent the class which includes claims against his

13  clients, so these plaintiffs with standing come in.

14         He mentioned the case where Rule 15 doesn't allow the

15  substitution of new plaintiffs.  Not substituting new plaintiffs,

16  giving further information as to the named class reps, naming class

17  members who were always in the case as unnamed plaintiffs and giving

18  information as to them.  And he also mentioned the case about,

19  again, the plaintiff without an ability to bring the action in the

20  first place can't amend.  And we get back to the question of do

21  these class reps have the ability or not to be fair and adequate

22  reps.

23         And so, Judge, there are any number of ways we can skin

24  this cat.  But again, if at the end the day what we want, first is

25  to take the small, so-called small manufacturing home defendants as

1    to whom we don't have a match, put them in some separate category.

2    As to all of the other manufactured home defendants who have been

3    brought into the case now, we've given matching information for all

4    of them, except a small or handful, and figure out what kind of

5    pleading arrangement we want to have to satisfy this court and those

6    defendants that yes, indeed, there is a named plaintiff who is

7    making a claim against them because of formaldehyde.  If we want to

8    expand the group of class reps, we can do it that way.  I don't

9    think the juridical link doctrine makes that necessary.

10           Let me now address the issue with the administrative

11   master complaint.  The court will --

12           THE COURT:  You mentioned Mr. Murray would have some

13   comments as well.

14           MR. MEUNIER:  How much time do I have left?

15           THE COURT:  You have about ten minutes or so left.

16           MR. MEUNIER:  Well, maybe I don't really need to talk too

17   much about the AMC, I didn't hear much argument made today about

18   that, except with respect to Morgan.

19           I do want to concede this.  When we came up against the

20   defendant argument that we had added new claims and new defendants

21   in the AMC and we didn't have an underlying action, as you recall

22   what we did is we filed Pujol, which is I call it a master

23   underlying.  Now, when we filed Pujol, we didn't name Morgan because

24   unfortunately we didn't realize, we didn't perceive and understand

25   at that point Morgan had been dismissed.  Morgan has been in and

1    out, they labeled Fleetwood trailers, under the LPLA we say they're

2    a manufacturer, I let them out initially because of an affidavit

3    saying they weren't a manufacturer.  They came back in.

4         What we're doing in the Pujol's amendment, which will

5    accompany this AMC amendment, is we will put Morgan into the Pujol's

6    case so there will be an underlying action with Pujols.

7         I am not totally clear, before I hand it over to

8    Mr. Murray, what counsel for Morgan's saying with respect to the

9    Mississippi and Alabama product claims.  I think we have set forth

10   in the AMC and in Pujol's all of the available remedies for product

11   relief under those statutes, and we now have a named plaintiff who

12   says they were in a unit made by Morgan.  So I am not sure what

13   counsel seeks to have dismissed as a matter of law.

14        We'll make it clear again.  This is a case based upon

15   personal injury, including general and economic loss associated with

16   formaldehyde exposure in trailers, that's what the case is about.

17   If Morgan is saying is if you didn't have a contract to buy my unit,

18   you can't recover in this case, well, it's hard for me to believe

19   that a consumer of your product who is injured as a result of a

20   defect in your product doesn't have a tort claim to recover for PI

21   and economic loss, and that's what we're doing, whether we want to

22   add the argument that these plaintiffs are third-party beneficiaries

23   of the contract between FEMA, which is the owner, and the

24   manufacturer, which is the seller, is another matter.

25        But I think if we address the standing issue as to Morgan

1   and put them in the Pujol's case, we can go forward.

2           Thank you, Judge, and I'll let Mr. Murray have his say on

3   medical monitoring.

4           THE COURT:  Thank you.

5           MR. MURRAY:  Good morning, your Honor, Stephen Murray for

6   the PSC.

7           THE COURT:  Good morning.

8           MR. MURRAY:  Your Honor, I may have misapprehended the

9   defendant's contentions with regard to the medical monitoring issue.

10  It was my understanding that the gravamen of their motion to dismiss

11  with respect to medical monitoring was the failure of the master

12  complaint to allege manifest injury as required by the Louisiana

13  legislature and some, the law of some states.  And I was prepared to

14  address that because it was clear to me that we did allege physical

15  injury, we alleged emotional injury, and we specifically alleged the

16  symptoms that would be secondary to formaldehyde exposure, and we

17  alleged the increased risk of cancer.

18          But as I've heard the argument, I have a little different

19  slant on it, and it seems to me that what they're saying is that

20  some of the underlying complaints didn't adequately allege those

21  issues, and, therefore, it can't be incorporated into the amended

22  master complaint.  So what I would like to do, if the court would

23  allow me, is to discuss the issue of a master complaint.

24          THE COURT:  Okay.

25          MR. MURRAY:  Your Honor, I have been doing MDL litigation

1    for many, many years.  Master complaints are an invention of MDL

2    courts.  They're not covered by the Federal Rules of Civil

3    Procedure.  The purpose of master complaints was that MDL courts

4    were confronted with multiple, multiple filings, and the threshold

5    issue is to what extent are the claims made and all of these filings

6    common such that they can be addressed by this court in a class

7    action.  That's the threshold issue for me as an MDL judge.

8           So the concept arose, and it was kind of a collaboration

9    between the courts and the lawyers, that why don't we address the

10   class action issue first and we'll do it with a master complaint

11   that consolidates all of the class action issues into one complaint,

12   and the court in addressing that single complaint can deal with

13   class certification.  If class certification fails or it fails in

14   some particulars, then we fall back to the underlying complaints.

15   And those complaints can be addressed individually, common issues

16   dealt with in the MDL transferor court and then they can be remanded

17   back to the -- in the MDL transferee court and then they can be sent

18   back to the MDL transferor courts for adjudication.

19          Now, what is a master complaint?  It is a complaint.  To

20   the extent the court has jurisdiction, the court can entertain it.

21   In a class action, parties are represented by the class

22   representatives.  If this court ultimately certifies a class action,

23   then the standing issue is addressed by reference to the class

24   representatives and not by named individuals.  If the court finds

25   that it is appropriate to certify the class and if those individuals

1    proposed as class representatives are adequate and you address that

2    obviously, that's an analysis that's done a little further down the

3    road, but you would want to know that that class representative is

4    adequate to represent the party who is suing Morgan, for instance.

5           And if you find that he is not, then Morgan is not part of

6    the class action, they are out of the class issue, and we now revert

7    back to individual complaints that pend against Morgan and seek to

8    the extent to which those can go forward.

9           But for purposes of the initial analysis, class

10   certification on common issues, if you find adequacy in those class

11   representatives, then I think the Article III standing is resolved

12   by that finding.

13          THE COURT:  Even though some of these defendants have been

14   added only by virtue of the master complaint and are not otherwise

15   named in any of the underlying complaints?

16          MR. MURRAY:  Yes, your Honor, because the master complaint

17   is a complaint.  It's -- in some ways it's superseding.  It doesn't

18   require an underlying complaint.  It's a complaint that stands on

19   its own but only with respect to class certification issues.  If you

20   find that this putative class that we propose in the amended

21   complaint can't go forward as a class action, then the master

22   complaint becomes moot.  It's there for the purpose of analyzing the

23   management of this case as a class action.  If it fails as a class

24   action, it's moot.

25          Now, we fall back to those complaints that have been

1    filed, or which are later filed, by parties who say, well, no class

2    action, I've got to file my own individual complaint.

3            But the alternative to that, your Honor, is that you would

4    have to have 120,000 individual complaints filed in something that

5    you may determine can be managed as a class, and that's the reason

6    that the class issues come up first.  We've determined whether we

7    can manage this as a class action, failing which the only

8    alternative is to everybody to come in and file individual

9    complaints.

10           But to the extent that you find that these proposed class

11   representatives are adequate and if you ultimately certify a class,

12   then I think the Article III standing is addressed by that

13   representative capacity, just as any other representative, legal

14   representative can bring a claim on behalf of that party whom he is

15   qualified to represent.

16           So, your Honor, having said that, I don't think I need to

17   address the question because I think it was conceded, that in the

18   amended master complaint we have adequately alleged manifest injury,

19   if indeed that's a requirement for a medical monitoring program.

20           If the court has any questions, I'd be happy to address

21   it.  Thank you.

22           THE COURT:  No, thank you.

23           All right.  Mr. Bains, if you want to respond briefly.

24           MR. BAINS:  Yes, your Honor.  The plaintiff has raised

25   three arguments in response to the Article III standing, and I want

1    to address each of those three, your Honor.  First juridical link;

2    second, the timing of the Article III decision, vis-a-vis the class

3    certification decision; and third, the plaintiffs' position that

4    this proposed amended complaint solves everything.

5         First, your Honor, on the juridical link doctrine.  Your

6    Honor posed the question about whether any Fifth Circuit panel had

7    commented favorably on the juridical link doctrine or the Lamar case

8    in the Ninth Circuit.  The answer to your Honor's question is no.

9    No Fifth Circuit decision has adopted the Juridical Link Doctrine or

10   commented favorably on the Lamar case.

11        In the Audler case, the Fifth Circuit said, "the Fifth

12   Circuit has not yet addressed the Juridical Link Doctrine."

13        And, your Honor, in Audler, this year, 2008 the Fifth

14   Circuit had the opportunity to adopt the Juridical Link Doctrine if

15   it wanted to but it declined that opportunity.  And for the same

16   reason, your Honor, you shouldn't create new law adopting the

17   Juridical Link Doctrine when the Fifth Circuit has declined that

18   option.

19        Also, your Honor, the Juridical Link Doctrine is really

20   properly considered not as an Article III standing issue but as a

21   Rule 23 issue.  In the court in Matte said this, "the Juridical Link

22   Doctrine has no bearing on the issue of Article III standing."  And

23   the Matte court had it exactly right.  And we cited in our reply

24   brief, your Honor, six other federal district courts that drew that

25   same distinction that the Juridical Link Doctrine is properly

1  understood in the Rule 23 context but not in the Article III

2  context.  So the constitutional requirement of Article III standing

3  cannot be trumped by the Ninth Circuit Juridical Link Doctrine that

4  is dicta and is applicable only to Rule 23 class action issues.

5       This civil action is also, as to the newly add defendants,

6  is in the same posture as was Audler in that no named plaintiff in

7  the original AMC has alleged sufficient facts against any of the

8  newly add defendants to find that any of the named plaintiffs have

9  standing.  So just as the Fifth Circuit stated in Audler, even if

10  the court recognized the Juridical Link Doctrine, these plaintiffs

11  cannot invoke it as successful.

12       Now, your Honor, I can go into more detail about the Lamar

13  case from the Ninth Circuit, but it was 35 years ago, the U.S.

14  Supreme Court has never adopted the Juridical Link Doctrine, the

15  Fifth Circuit has never adopted the Juridical Link Doctrine.  It

16  obviously from 35 years ago predated this increasing emphasis over

17  the last two decades by the U.S. Supreme Court and the Fifth Circuit

18  on Article III standing and limiting the role of federal courts.

19       And also, your Honor, it's important to recognize that in

20  that Lamar decision from the Ninth Circuit, the Ninth Circuit

21  actually took the same position that the defendants did, albeit in a

22  Rule 23 context.  I want to read two sentences from that Lamar case,

23  your Honor.  This is what the Ninth Circuit said:  "The common issue

24  of these cases is whether a plaintiff having a cause of action

25  against a single defendant can institute a class action against a

single defendant and an unrelated group of defendants who have
engaged in conduct closely similar to that of the single defendant
on behalf of all of those injured by all of the defendants sought to
be included in the defendant class, we hold that he cannot, the
named plaintiff cannot represent those having causes of action
against other defendants against whom the plaintiff has no cause of
action and from whose hand he suffered no injury."

So the Ninth Circuit's holding in Lamar is consistent with
the position of the defendants here, although they reached that
decision in the context of Rule 23 rather than standing.

So their comments, your Honor, about the Juridical Link
Doctrine are all dicta.  Because in that Ninth Circuit case the
court said, we "assume standing."  That's what the Ninth Circuit
said, we assume standing.  In the en banc Fifth Circuit case that I
discussed at the beginning of this oral argument, the Doe case said
in 2007 we cannot assume that the named plaintiff suffered the type
of injury that would confer standing.

So 35 years ago the Ninth Circuit said we'll assume
standing and then it goes on to make its decisions.  The Fifth
Circuit last year takes a diametrically opposed position and says we
cannot assume standing.  So, your Honor, the Juridical Link Doctrine
simply does not apply and that Lamar Ninth Circuit case does not
support the plaintiffs on this position.  It's never been cited by
the U.S. Supreme Court or the Fifth Circuit.

Now, your Honor, the second issue that the plaintiff

1    raised was the timing of the Article III decision, vis-a-vis the

2    class certification decision.  Your Honor commented on the

3    distinction of the Ortiz case, and I think your Honor's got it

4    exactly right.  Ortiz and Amchem really addressed Article III

5    standing of the unnamed class members rather than the challenge that

6    we've asserted here, an Article III challenge to the named

7    plaintiffs.  The U.S. Supreme Court and the Fifth Circuit have

8    explained that Article III standing is a threshold issue.  There

9    have been a series of decisions by the U.S. Supreme Court and the

10   Fifth Circuit in class action context where they say that the named

11   plaintiff has to have Article III standing.  And that decision has

12   to be made before the class certification decision.

13        I can give your Honor the cites of those, here are three

14   U.S. Supreme Court cases, and I'll give you four Fifth Circuit cases

15   on that.  The U.S. Supreme Court cases are Lewis v. Casey, 518 US

16   343 at 357.  And I'll read one sentence from that.  "That a suit may

17   be a class action adds nothing to the question of standing.  For

18   even named plaintiffs who represent a class must allege and show

19   that they personally have been injured."

20        The second U.S. Supreme Court case, your Honor, is O'Shea

21   v. Littleton, 414 US 488 at 494.  There the Supreme Court said, "If

22   none of the named plaintiff purporting to represent a class

23   establishes the requisite of a case or controversy but the

24   defendants, none may seek relief on behalf of themself or any of the

25   other members of the class."

```
 1              The third U.S. Supreme Court case, your Honor, on this
 2   point is General Telephone v. Falcon, 457 US 147 at 159, note 15.
 3   And there the Supreme Court said, "The mere fact that an aggrieved
 4   private plaintiff is a member of an identifiable class of persons of
 5   the same race is insufficient to establish his standing to litigate
 6   on their behalf all possible claims of discrimination against the
 7   defendant."
 8              Your Honor, there are four Fifth Circuit cases that
 9   also --
10              THE COURT:  You have about a minute left, if you want to
11   go through and give me those.
12              MR. BAINS:  Yes, sir.  Brown v. Sibley, 650 F.2d 760 at
13   771; Bertulli v. Independent Association, 242 F.3d 290 at 294;
14   Rivera v. Wyeth, 283 F.3d 315 at 319; and then of course the Audler
15   case, your Honor, because in Audler, even though it's a purported
16   class, they said we have to consider Article III standing of the
17   named plaintiff first.  And, your Honor, particularly that Rivera
18   case reached the same conclusion that your Honor did about Ortiz and
19   the distinction that your Honor drew in Ortiz, so your Honor is
20   exactly consistent with the Fifth Circuit in that Rivera case, 283
21   F.3d 315 at 318, note six.
22              And, your Honor, to accept the plaintiffs' position that
23   the Article III standing issue can be deferred until after the class
24   certification decision would mean that the Fifth Circuit was wrong
25   in its decisions in Audler, Rivera v. Wyeth, Brown v. Sibley, and
```

1    <u>Bertulli</u> because each of those Fifth Circuit cases say you have to

2    consider the Article III standing of the named plaintiff before you

3    reach the class certification decision.

4         Your Honor, the plaintiffs also suggested that --

5         THE COURT:  Very quickly because you're over time at this

6    point.

7         MR. BAINS:  I wanted to make two points, your Honor.  The

8    plaintiffs' amended complaint does not solve everything.  As I

9    mentioned before those Fifth Circuit cases say you can't amend, the

10   plaintiff doesn't have standing, it has to be viewed in the context

11   of <u>Audler</u>, too, if the named plaintiff doesn't have Article III

12   standing the action of the court is to dismiss those defendants for

13   lack of subject matter jurisdiction, no chance to replead.  They can

14   file a new lawsuit, they can't amend the complaint.

15        The proposed amended complaint also fails to identify a

16   single plaintiff who had any dealings with one of my newly added

17   defendants, CMH Manufacturing is still not mentioned in the proposed

18   amended complaint.

19        Finally, your Honor, I wanted to mention briefly about the

20   AMC because there was a discussion about that.  The AMC may be fine

21   as to the original defendants, but it is an inappropriate procedural

22   vehicle for bringing into this lawsuit the newly added defendants

23   who have not been sued in any underlying lawsuit.  Our motion is

24   directed to the administrative master complaint, but it was not

25   consistent with the judicial, the rules of the judicial panel of

1   multidistrict manual litigation or Rule 3 or 4 of the Federal Rules

2   of Civil Procedure.  It should be treated as a nullity as to the

3   newly added defendants.  Of course your Honor wouldn't reach that

4   issue if you decide on the Article III standing issues as subject

5   matter jurisdiction.  Thank you, your Honor.

6        THE COURT:  All right.  Thank you.

7        MR. WEINSTOCK:  Your Honor, I do have one small

8   housekeeping matter, it may be one major housekeeping matter.

9        THE COURT:  Wait, Andy.  Ms. Lipsey also has a few minutes

10  left in rebuttal.

11       MR. WEINSTOCK:  You want me to go last, that's fine.

12       THE COURT:  Well, let's go in the order in which we took

13  the arguments, so let's let Ms. Lipsey, and then we'll get back to

14  you in a second.

15       MS. LIPSEY:  I'll be very brief.  In the event that I was

16  not clear earlier, I want to be very clear.  Plaintiffs' counsel

17  wondered if Morgan was saying that there must be a contract in order

18  to advance personal injury claim, that's not at all what Morgan is

19  saying.  Morgan is saying, plaintiffs, we thought what your claim

20  was was essentially a products liability claim under Louisiana law,

21  Mississippi law and Alabama law.  And we're saying to advance those

22  claims, to properly allege them you have to allege specific things

23  under those laws.

24       You've not alleged those things, you've not alleged that

25  an Alabama plaintiff, a Mississippi plaintiff, a Louisiana plaintiff

```
 1   was injured in a trailer provided by Morgan.  That's what we're

 2   saying.  We are not saying there needs to be a contract, we are not

 3   going off on a warranty tangent.

 4        THE COURT:  Well, I understood his comment to be relative

 5   to the elements you set forth, maybe I misunderstood, but the breach

 6   of the express warranty was the contract of sale, the buyer and the

 7   seller.  So maybe we do need to make sure that all of our ducks are

 8   in the proper row here.

 9        MS. LIPSEY:  There are --

10        THE COURT:  That's what I thought the reference was.

11        MS. LIPSEY:  This is the way I appreciate the plaintiffs'

12   complaints.  The Louisiana -- well, Morgan was only in on the

13   administrative master complaint.  That clearly was Louisiana

14   Products Liability.  There was no mystery there.  The mystery comes

15   in with Mississippi and Alabama.

16         If you read those Mississippi and Alabama complaints and

17   then you go and you look at the administrative master complaint,

18   they're essentially the same except for medical monitoring.  Medical

19   monitoring is in the administrative master complaint, it's not in

20   the Mississippi or Alabama suits.  So we'll put that to the side.

21         The complaints say our claim under Mississippi law is

22   under the Mississippi Products Liability Act and there are a lot of

23   allegations relating to Mississippi Products Liability Act, but what

24   they failed to allege is that they were in a trailer provided by

25   Morgan that caused them to be sick.  That is what they have failed
```

1    to allege under both Mississippi law, Alabama law, and then of

2    course under Louisiana law.

3            Then they have sort of a, it's not even a separate count,

4    there is another allegation about breach of express warranty under

5    Mississippi law.  And if there is, in fact, and I am not sure that

6    there is, but if there is a breach of express warranty claim, that's

7    got to come under Article II of the UCC, which Mississippi has

8    adopted.  And under Mississippi law for that breach of express

9    warranty UCC claim, there's got to be a buyer and a seller and a

10   contract for sale clearly under UCC 2.

11           But I think a fair reading of the plaintiffs' pleadings is

12   what they really intend is a products liability claim.  So we don't

13   even really need to be talking about UCC 2 because I don't really

14   think that's what their claim is.  We just advance that argument in

15   an abundance of caution.  Morgan well recognizes that this is

16   essentially a products liability case, but they have not alleged

17   what they need to under Alabama law or Mississippi law or Louisiana

18   law to allege a products liability claim, that's what we're saying.

19           Moreover, on the Mississippi and Alabama motion to

20   dismiss, they never opposed Morgan's arguments, that's what we're

21   saying.  They never filed an opposition to those arguments.  They

22   talked a lot in other oppositions to other defendants' claims about

23   all kind of breach of warranty stuff, but that wasn't the thrust of

24   our motion to dismiss, they simply didn't address it.

25           On medical monitoring, we acknowledge that should the

1    court not agree with our argument that the medical monitoring claims

2    need to be advanced in an underlying suit, which we do believe they

3    do, but putting that to the side, if we look at what they say in the

4    administrative master complaint, and there is a medical monitoring

5    claim there, they have not alleged that Jane Doe suffered a physical

6    injury as a result of being in a Morgan provided trailer and,

7    therefore, because of this physical injury she suffered, she is

8    entitled to medical monitoring, that is what they have not alleged.

9    And I just wanted to make sure that the court understood Morgan's

10   argument.

11            THE COURT:  I understand.

12            MS. LIPSEY:  Thank you, your Honor.

13            THE COURT:  Thank you, Ms. Lipsey.  Mr. Weinstock, you

14   wanted to do some housekeeping matters?

15            MR. WEINSTOCK:  The document, the amended complaint is

16   styled an unopposed motion.  Certainly I've had conversations with

17   Mr. Meunier that this was coming.  I don't know that I've ever had a

18   conversation, or if I did I miscommunicated it, as to whether we

19   would have an opposition, but that's something obviously I would

20   have to run by my entire group.

21            MR. MEUNIER:  And let me make it clear for the record.  I

22   styled it that way to circulate it that way to get back the

23   response.  The government and the manufacturers have to tell me can

24   I file it that way or do I file a notice for hearing.  So I am not

25   suggesting it's unopposed, I circulated it that way in the hopes

1   that it could become unopposed.

2          THE COURT:  It's yet to be filed and wishful thinking.

3          MR. MEUNIER:  Wishful thinking.  And, Judge, I believe

4   Ms. Boyle indicated for the government, and we talked about this,

5   that maybe our proposal would be to file it Monday, give the rest of

6   this week, allow the rest of the week to be an opportunity for the

7   defendants and the government to decide if they will oppose, and

8   then we will either file it Monday as unopposed or notice it for

9   hearing.

10          MR. BAINS:  Your Honor, I can tell you now the newly added

11   defendants do oppose that proposed amended complaint based on the

12   reasons we discussed.

13          MR. MEUNIER:  Then we will file it, I guess there is no

14   reason to delay then, we will file it and notice it for hearing.

15          THE COURT:  Yes.  And then those who don't oppose it can

16   indicate as much with a simple one-page filing.

17          MR. MEUNIER:  And just to be clear, it will be two

18   motions, one to amend the AMC and the other to amend Pujols.

19          THE COURT:  Okay.  Anything else today relative to these

20   motions?  Anybody at all?  Okay.

21          MR. WEINSTOCK:  Not related to these motions, your Honor.

22          THE COURT:  Is there anything else that we need to cover

23   on the record, like you say housekeeping matters?

24          MR. WEINSTOCK:  Not housekeeping.  I filed late last night

25   a protective order regarding tomorrow's deposition, and I was hoping

1    to take that up.  But if the court is not inclined to, I understand.

2         THE COURT:  Okay.  Well, is that something that you've

3    discussed with counsel already or is this --

4         MR. WEINSTOCK:  I haven't even really discussed it with

5    Jerry.  It's Jerry's dream, it's a fight amongst the defendants.

6         MR. MEUNIER:  Oh, I don't have standing on this one.

7         THE COURT:  Why don't you all -- if you've just filed it,

8    why don't you all discuss it amongst yourselves, as is always the

9    policy, to see if there is a resolution.  I understand you do what

10   you have to do to protect the record and your client's interest, but

11   why don't you go ahead and discuss it amongst yourselves --

12        MR. WEINSTOCK:  I did discuss it yesterday before I filed

13   it.  I filed it as a last resort.  It was a 615 request, I was told,

14   no, you have to have a protective order or we're not going to honor

15   the request, so I filed it.

16        THE COURT:  We'll get to that in a minute, let's go ahead

17   and close the record here.

18         I want to thank you all for all of your very detailed and

19   very well-prepared written materials, as well as your presentations

20   here today, which have been very helpful, and I've taken notes on

21   the various points that you've made.  So I think this has been very

22   helpful.

23         The court will take the motions, with the exception of the

24   one that is now moot, that would be No. 217, the court will take

25   these motions under advisement and render a written opinion in due

course.  To the extent that the court would require any further

information or further oral presentation, we will so advise counsel

through liaison counsel.

I would discourage any further post hearing briefing with

the caveat that if something truly significant and directly on point

from either the U.S. Supreme Court or the Fifth Circuit comes out

you think is rather dispositive of some of the things we've talked

about here today, I would rather not get into another round of

briefing.  We could have spent much more time, we could spend the

entire day having just oral argument on this because it's very

interesting and I know you all are very well prepared to get into

all of the details of it, but let me digest all of what you have in

writing and what you've said today and we'll go from here.

Mr. Weinstock, did you want to cover that on the record or

not?

MR. WEINSTOCK:  Since I am asking for a protective order,

I think I need to do it on the record, your Honor.

THE COURT:  I'll tell you right now, if you filed it last

night I haven't read it.  I've been reading this.

MR. WEINSTOCK:  I understand and I can sum it up in 60

seconds.

THE COURT:  Why don't you sum it up and let us talk about

it now and see what we can do on it.  Sum it up and see if we can't

possibly make some headway on it.  If I can't, then I am just going

to tell you that I'll read the material, ask for a very prompt reply

1    and either handle it myself or refer you to the magistrate on it.

2              Now, I understand at 11 o'clock, or sometime soon, the

3    magistrate is taking up some issues -- does it have any bearing on

4    what you're talking about?

5              MR. WEINSTOCK:  It does not.

6              THE COURT:  Okay.  Let's hear it.

7              MR. WEINSTOCK:  Your Honor, my client's deposition, Gulf

8    Stream Coach, is set for tomorrow.  We learned last week and then

9    again yesterday, we requested people not bring clients, there is a

10   lot of confidential sensitive information that's going to come up.

11   We were told yesterday that people were planing on bringing

12   corporate reps, people that these documents would mean something to.

13   We requested they not come.  I was met with, well, Rule 615 says a

14   request doesn't do it, you need a protective order to sequester

15   witnesses.

16             We do not have an agreement, we're working on an

17   agreement, we do not have one in place amongst defendants for

18   attorney eyes only on these kinds of things yet, so to let them in

19   the deposition where the documents are going to be unduly prejudices

20   my client.

21             If at a later time you decide, yes, they can see all of

22   that, well, they can see the transcript, but I can't put the genie

23   back in the bottle once they've seen the docs and once they've heard

24   the testimony.  And that's why --

25             THE COURT:  Who in particular is insisting that their

1    client attend the entirety of the deposition?

2             MR. WEINSTOCK:  Here is one.

3             THE COURT:  There's one here, okay.

4             MR. GEIGER:  Good morning, your Honor.

5             MR. WEINSTOCK:  My very good friend.

6             MR. GEIGER:  Your Honor, Ernie Geiger for Forest River.

7    Judge, I was at the first corporate deposition and this issue came

8    up about corporate reps being present.  Clearly, Judge, because we

9    were one of the authors of the protective order, there is a clear

10   issue of confidential documents and information that the defendants

11   have been struggling with for a long time.

12            THE COURT:  It seems like all of you all would have some

13   type of proprietary or trade secret type information that's going to

14   come into play.

15            MR. GEIGER:  Not secret, Judge, just proprietary.

16            THE COURT:  All right.

17            MR. GEIGER:  And at the first deposition the suggestion

18   was made by me, and again yesterday with Andy, because my corporate

19   rep I do want there because I do need him there for certain reasons,

20   is that when there are, as he puts it, sensitive pricing

21   information, design drawings and proprietary transportation

22   information that comes up during that deposition, which didn't

23   happen during the Fleetwood deposition, and Andy's right, it may or

24   may not come up during the Gulf Stream deposition.  And truly, your

25   Honor, my deposition of my client is next and I am just as

1    concerned.

2          My suggestion has been, and will continue to be, that if

3    those questions are asked, weren't during the Fleetwood, don't know

4    about the Gulf Stream and mine, is that simply I'll ask or Andy can

5    ask my corporate representative or other corporate representative to

6    step out of the room.

7          THE COURT:  Well, that's what I was going to suggest is

8    that certainly not all of the information is going to be something

9    that's private or proprietary, but I don't think it's unreasonable

10   given the nature of this case and the fact that in many respects

11   some, if not all, of the defendants are competitors at one level or

12   another, that we simply allow portions of the deposition to be for

13   counsel's eyes and ears only.  And with a designation that we are

14   now getting into an area, a line of questioning that is eliciting

15   this type of proprietary information, and have that corporate rep

16   step outside and that portion of the deposition sealed for counsel's

17   eyes only.  Is that a terribly burdensome procedure?

18         MR. WEINSTOCK:  I personally don't know.  I think there is

19   like six or seven that are coming, and if every time the plaintiffs

20   want to ask a specific question six or seven people have to troop up

21   and there will be people on the phone and they have to get off the

22   phone and then get back on, it can become a logistical nightmare.

23   But I understand the court's view of this.

24         THE COURT:  During the course of the deposition, can you

25   interpose an objection to all of the questions -- it would be

1   perfect if plaintiffs in their lines of questioning were able to

2   just defer those questions, of course they don't know what you're

3   going to assert as proprietary, so they may go from here to there,

4   here to there, here to there and touch all of the bases of

5   proprietary information amongst all of the other non-proprietary

6   questions or answers.

7        If you were to interpose the objection in response to

8   those questions, we could simply defer those to the end of the

9   depositions; in other words, complete all of the non-proprietary

10  questions.  And that's more burdensome but at least at that point

11  everything that comes thereafter is going to be something that's

12  only going to be for counsel, so everybody gets off the phone,

13  everybody leaves the room, and then you go ahead and reask those

14  questions, ask your follow-ups that you need to follow-up on, and

15  that portion of the deposition is sealed rather than passages here

16  and there.  It may be the most careful way to handle it.

17       MR. WEINSTOCK:  Since I have no questions, your Honor, I

18  would not have a problem with that approach.

19       MR. GEIGER:  Nor would I, Judge.  And truly what we did

20  during the Fleetwood deposition is, and I suspect the plaintiffs

21  will do the same thing again, is that all of the documents that were

22  produced by Fleetwood, and I assume the documents produced by Gulf

23  Stream and my client in two weeks, were entered into the record.

24  They are clearly confidential, there is no protective order yet

25  issued by the court, and we agreed, the people present, that we

 1  wouldn't look at them, we would look at no documents that were

 2  there.  Nothing that was produced ended up being proprietary, and I

 3  will assure that you counsel for the manufacturers who is their

 4  request, as I would hope they would do for me, that if I say this is

 5  going to be proprietary or this is a line of questions on

 6  proprietary, I would ask that they ask their client to leave.

 7       THE COURT:  Just go ahead and move on from those

 8  questions, finish up all of the non-proprietary questions that could

 9  possibly be asked and answered and then go back, either have your

10  court reporter mark those questions or make a notation of it; and

11  then once you excuse those who should be not privy to it, go back

12  into those areas and complete the deposition under a seal and under

13  a protective order.

14       MR. GEIGER:  Absolutely.

15       THE COURT:  That's what I would suggest you do.  Is that a

16  burden on the plaintiffs who are taking the deposition?

17       MR. MEUNIER:  I think we can work it out.  I am a little

18  concerned about our three hour limit.  I have a team in the field

19  ready to go on this, we need to communicate to them exactly what the

20  protocol is.  As I understand it, Andy will endeavor to identify

21  those areas that get into proprietary material and ask us to stack

22  those questions to the end and only proceed with the ones that he

23  says does not appear to raise proprietary information, and then I'll

24  just have to assume that the PSC questioner can arrange that

25  comfortably and stack the proprietary questions to the end.

1          THE COURT:  Right.  Have we got an idea of what it is

2     exactly that makes the deponent company uncomfortable?  Can we not

3     designate on the 30(b)(6) listing that these are topics that you

4     might take last?  That might save us sometime because we do have a

5     time limit.

6          MR. MEUNIER:  That's what I'm hoping, yes.

7          MR. GEIGER:  May I suggest, at least, your Honor, that at

8     least our experience through the Fleetwood deposition is that there

9     were no questions that got into pricing, design and manufacture.  I

10    would suspect that unless the questions are going to be so radically

11    different against either Gulf Stream or my client Forest River, it

12    won't be an issue.  But certainly the plaintiffs would know that

13    now.  If they are going to ask those questions --

14         MR. MEUNIER:  In other words, you're saying we shouldn't

15    ask anything that's a problem.  He is the one who has raised the

16    issue, so I think Andy should look at our notice and tell us, okay.

17    I have enough awareness to tell you these questions are going to

18    lead, they may not have done it in your case, but in this case

19    they're going to lead to proprietary information.  If he tells us

20    that, we'll just ask our people to ask them later.

21         MR. GEIGER:  That's fine.

22         THE COURT:  Let's try to do it that way.  Is that

23    satisfactory?

24         MR. WEINSTOCK:  Yes.

25         MR. GEIGER:  And that works for me because I am up next,

1   Judge.

2           THE COURT:  We will go ahead and do a minute entry

3   relative to the protective order along the lines that we've talked

4   about here, and, of course, it's reflected on the transcript.  If

5   there is a problem -- this is tomorrow?

6           MR. WEINSTOCK:  Tomorrow.

7           THE COURT:  If there's a problem, just call in and we'll

8   try to resolve it.  But that seems to be a workable way to do it.

9           MR. WEINSTOCK:  I agree, your Honor.

10          THE COURT:  Especially if you can tip them off on these

11  are the areas that I am sensitive about, let's cover everything

12  else, that ought to be sufficient.

13          MR. WEINSTOCK:  Okay.  Thank you, your Honor, and thank

14  you for taking it up on short notice.

15          THE COURT:  All right.  Thank all of you all.

16          THE DEPUTY CLERK:  All rise.

17      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

18

19                      *  *  *  *  *  *

20

21

22

23

24

25

1

2                       REPORTER'S CERTIFICATE

3

4        I, Karen A. Ibos, CCR, Official Court Reporter, United States

5   District Court, Eastern District of Louisiana, do hereby certify

6   that the foregoing is a true and correct transcript, to the best of

7   my ability and understanding, from the record of the proceedings in

8   the above-entitled and numbered matter.

9

10

11   _____

12                       Karen A. Ibos, CCR, RPR, CRR

13                       Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25