FILED '09 DEC 30 14:31 USDC-LAE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **SHARON SERPAS** | * | **DOCKET NO.** |
| **together with all individuals and entities** | * | |
| **whose names appear on the attached** | * | **09-8696** |
| **"Exhibit A"** | * | |
| | * | **SECT. N MAG. 5** |
| **versus** | * | |
| | * | |
| **KEYSTONE RV COMPANY, and** | * | |
| | * | |
| **CONTRACTOR DEFENDANT** | * | |
| **as identified on the attached** | * | |
| **"Exhibit A"** | * | |
| | * | |
| **and** | * | |
| | * | |
| **United States of America through the** | * | |
| **Federal Emergency Management Agency** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SUPPLEMENTAL AND AMENDING COMPLAINT
## PURSUANT TO PRETRIAL ORDER NO. 40 (Rec. Doc. 1781)

     **NOW INTO COURT,** through undersigned counsel, comes SHARON SERPAS

(hereinafter "Plaintiff"), on behalf of themselves and, in some instances, on behalf of individuals

who lack the capacity to sue individually, who are all named in the annexed listing of all

Plaintiffs (hereinafter, "Exhibit A"), who respectfully supplements and amends his or her

Complaint as follows:

1

**EXHIBIT**
B

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

1.

Made defendants herein are:

A.      KEYSTONE RV COMPANY, (hereinafter "Manufacturing Defendant"), upon information and belief, conducted business in the State of Louisiana, and manufactured and supplied Federal Emergency Management Agency ("FEMA") trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana.   Upon information and belief, this entity is incorporated in the state of Indiana;

B.      Contractor Defendant (as identified in the attached "Exhibit A") that, upon information and belief, received a No-Bid contract from the Federal Emergency Management Agency ("FEMA") and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

C.      The Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

2.

Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the states in which Defendants are citizens.

3.

Plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

4.

This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, et seq..

Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendants with citizenship other than that of plaintiffs, because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.

Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

6.

The Manufacturing Defendant is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

7.

The Contractor Defendant is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

3

8.

Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

9.

Plaintiff seeks compensatory, statutory and punitive damages from the defendants as a result of their wrongful conduct, for the following reasons, to wit:

**FACTUAL BACKGROUND**

10.

Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") in the State of Louisiana were provided these housing units by FEMA after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

11.

Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet. They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, available at http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

12.

Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger

4

than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

13.

Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area). They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. *Id.*

14.

The residence of the Plaintiff was rendered unhabitable following Hurricanes Katrina and/or Rita, leaving each plaintiff homeless and in need of housing assistance.

15.

FEMA contracted with the Manufacturing Defendant to purchase thousands of the housing units, primarily travel trailers, for provision to the Plaintiff as temporary housing.

16.

On information and belief, the Manufacturing Defendant expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Plaintiff containing higher than normal levels of formaldehyde.

17.

On information and belief, the housing unit of the Plaintiff, including those units which

5

were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

18.

Plaintiff submits that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

19.

Plaintiff submits that each of the housing units at issue, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Manufacturing Defendant's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that the Manufacturing Defendant failed to warn the Federal Government about these dangers.

20.

Plaintiff submits that the Manufacturing Defendant ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to the Manufacturing Defendant's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at

6

least 18 months, all in order to sell their products, and/or avoid the costs of safety

precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

21.

Plaintiff spent significant time in the FEMA-provided housing units manufactured by the

Manufacturing Defendant and provided to Plaintiffs by the Federal Government. As a result, the

Plaintiff was unwittingly exposed to dangerously high concentrations of the formaldehyde

emitted from products used in the manufacture of the subject housing units.

22.

Formaldehyde is found in construction materials such as particle board, fiberboard and

plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant

to federal law, the defendants are required to display a "Health Notice" about exposure to

formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit
formaldehyde. Eye, nose and throat irritation, headache, nausea,
and a variety of asthma-like symptoms, including shortness of
breath, have been reported as a result of formaldehyde exposure.
Elderly persons and young children, as well as anyone with a
history of asthma, allergies, or lung problems, may be at greater
risk. Research is continuing on the possible long-term effects of
exposure to formaldehyde.


Reduced ventilation resulting from energy efficiency standards
may allow formaldehyde and other contaminants to accumulate in
the indoor air. Additional ventilation to dilute the indoor air may
be obtained from a passive or mechanical ventilation system
offered by the manufacturer. Consult your dealer for information
about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

23.

According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

24.

Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health

Administration ("OSHA") evidences formaldehyde's harmful effects.  In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to 1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

### 25.

HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...".  *See* 24 C.F.R. §3280.308.

### 26.

Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |

| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions,

FEMA Exposes Gulf Coast Residents to Formaldehyde, updated on Dec 19, 2007, available at

http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

27.

The Manufacturing Defendant knew or should have known of the health hazards

inherent in the products it constructed, by familiarity with industry standards, the material safety

data sheets in its possession, and published medical studies.

28.

FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster

Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act").  The

Stafford Act outlines two types of temporary housing assistance to be made available to eligible,

displaced applicants: financial assistance and direct services. This aid is sometimes referred to

as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408

(1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may

provide "direct assistance" in the form of temporary housing units, acquired by purchase or

lease, directly to individuals or households who, because of a lack of available housing

resources, would be unable to make use of the alternative "financial assistance"  provided under

subparagraph (c)(1)(A).

29.

10

In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged the Contractor Defendant with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of the Contractor Defendant to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

30.

The Contractor Defendant were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

31.

Under the terms of their contracts, the Contractor Defendant was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same. Further, under their No-Bid contracts with FEMA, the Contractor Defendant was obligated to advise and instruct FEMA regarding the implementation of those contracts. The Contractor Defendant failed to properly fulfill either of these tasks.

32.

The Contractor Defendant contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which the Contractor Defendant was tasked with operating. These new areas included staging areas to be managed and maintained as assigned to a Contractor Defendant or individual locations and

11

addresses where the Contractor Defendant assigned that temporary housing unit would have obligations to manage and maintain it.

33.

To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, the Contractor Defendant entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

34.

The Contractor Defendant was tasked under their contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc.

The Contractor Defendant knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

35.

Once the temporary housing units occupied by the plaintiff was transported and delivered to a particular location, the Contractor Defendant had the responsibility for installing that temporary housing unit. The Contractor Defendant installed the temporary housing unit by "blocking" the unit. This meant raising the plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

36.

By blocking the temporary housing units of the plaintiff, the Contractor Defendant created stress and flexing on the frame of the unit as it was not designed to be lifted off of the

wheel base. In fact, manufacturers of the temporary housing units warned in the various

owners' manuals provided with the units, that units should not be jacked so that the vehicle's

weight is no longer supported by the wheels.

37.

The stress and flexing of temporary housing unit's frame caused the Contractor

Defendant's "blocking" it with weight off of the wheels created distortion in the travel trailer's

shell allowing increased moisture intrusion which contributed to increased formaldehyde

exposures.

38.

The temporary housing units provided by FEMA were for the most part travel trailers.

The travel trailers are, by definition, mobile. They are designed for and intended for periodic,

recreational use and not for long-term habitation. By installing the travel trailers on concrete

blocks for extended occupancy, the Contractor Defendant knowingly and intentionally modified

the design and the actual use of these units by converting them into a temporary housing unit to

be used as a residence for long term occupancy in some instances exceeding 18 months.

39.

The Contractor Defendant failed to consult with the Manufacturing Defendant ith regard

to the installation, warnings, warranty issues or advisability of using travel trailers for long term

residence and occupation. The Contractor Defendant took actions which voided the warranties

of the manufacturer and directly created or contributed to unsafe and hazardous living

conditions in the temporary housing units.

40.

13

Once the Contractor Defendant had completed the transportation, delivery and installation of the temporary housing unit occupied by the plaintiff, the Contractor Defendant was tasked with inspecting the unit to ensure that it was safe and habitable, prior to occupancy by the plaintiff. Upon information and belief, the Contractor Defendant failed to adequately inspect the temporary housing unit occupied by the plaintiff to ensure that the unit was safe and suitable for it intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita. This failure to properly inspect the unit for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

41.

In addition to transportation, site identification, installation and inspection, the temporary housing unit occupied by the plaintiff provided in response to hurricanes Katrina and/or Rita was also managed, maintained and repaired by the Contractor Defendant, or its various subcontractors over whom it maintained direct oversight and responsibility. Upon information and belief, the Contractor Defendant failed to adequately manage, maintain and repair the temporary housing unit which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects to the plaintiff.

42.

Parallel to its duty to manage, maintain and repair each temporary housing unit, the Contractor Defendant failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the plaintiff-occupants of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

43.

14

Following the Plaintiff's occupancy of each temporary housing unit, the Contractor Defendant was tasked with its de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, the Contractor Defendant failed to identify the unsuitability of the temporary housing units for long-term occupancy.

44.

In addition to de-installation of the temporary housing unit, the Contractor Defendant was tasked with refurbishment and restoration of the temporary housing unit for use, either in direct response to hurricanes Katrina and Rita or for use in the future. By restoring and refurbishing these temporary housing unit, the Contractor Defendant warranted that the unit was fit for its intended use, long term occupancy in response to disaster related displacement. By restoring and refurbishing the temporary housing unit, the Contractor Defendant created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing unit.

45.

The Contractor Defendant, at every stage of its involvement, failed to warn the plaintiff of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects.

46.

Through its actions and omissions, the Contractor Defendant created and perpetuated a situation wherein Plaintiff was exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. The Contractor Defendant negligently failed to adhere to the

15

manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

47.

The Contractor Defendant failed to warn the Plaintiff of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

48.

By restoring and refurbishing the trailer for future habitation, the Contractor Defendant improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

49.

Finally, despite these failures, the Contractor Defendant received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiff, who simply had nowhere else to go and who was relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

50.

The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the

16

relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, available at http://oversight.house.gov/documents/20070719131219.pdf.

51.

Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off-gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

52.

In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006. The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels. *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request, November 16, 2007.

53.

Nonetheless, even though the Government was actively testing for and aware of the

dangerous levels of formaldehyde present in housing units scheduled for delivery to the gulf

coast region, the Inspector General of the Department of Homeland Security, testifying before

the Committee on Homeland Security and Governmental Affairs of the United States Senate,

approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel

trailers had been delivered to the region.  *See* Statement of Richard L. Skinner, Inspector

General, U.S. Department of Homeland Security Before the Committee on Homeland Security

and Governmental Affairs, U.S. Senate, February 13, 2006, available at

http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

54.

The Federal Government also continued to supply the defective and dangerous housing

units to the Plaintiffs after March of 2006.

55.

The Federal Government supplied defective and dangerous housing units to the Plaintiff

even though the Sierra Club publicly announced the initiation of its own testing of occupied

housing units and, in April of 2006, reported the results which reflected formaldehyde levels

above the threshold that the EPA warns can cause acute health effects in humans in 83% of the

trailers tested.

56.

The Federal Government supplied the defective and dangerous housing units to the

Plaintiff even though the Federal Government, through FEMA, in March of 2006, conducted

formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and

tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which

reflected the presence of formaldehyde at twelve times the EPA's value.

57.

The Federal Government supplied the defective and dangerous housing unit to the

Plaintiff even though the Federal Government had been notified on a number of occasions in

May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing

units.

58.

While complaints of formaldehyde exposure continued to be reported to the Federal

Government and evidence supporting the existence of dangerous levels of formaldehyde present

in the housing units was uncovered, the Federal Government intentionally avoided undertaking

any comprehensive testing of their own because it wanted to avoid liability for the problem, as

stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not

initiate any testing until we give the OK. While I agree that we should conduct testing, we

should not do so until we are fully prepared to respond to the results. Once you get results and

should they indicate some problem, the clock is ticking on our duty to respond to them."

Another email repeats these concerns, reading "OGC has advised that we do not do testing,

which would imply FEMA's ownership of the issue."

59.

Plaintiff avers that the Federal Government had reviewed the results of all earlier testing

and complaints of formaldehyde associated with the housing units and were actively conferring

with one or more of the manufacturers concerning formaldehyde exposure in the housing units

and how best to deal with the publicity fall-out as the media reports of same increased.

60.

Evidence of communications between the defendants exists by way of emails emanating from the FEMA Office of General Counsel (OCG).  For example, in June 16, 2006 the same email which states "OGC has advised that we do not do testing," states that "Gulfstream is working closely with FEMA to resolve the formaldehyde problem in smaller travel trailer (Cavalier) units."  A later email reflects relief of the FEMA OCG  at the "good news" that "one of the major manufacturers of national housing units (Gulfstream I think)...wanted to get with External Affairs so they could get on the same page...we may get the benefit of the manufacturer's 'science' and 'public relations' approaches."  *See* U.S. House of Representatives, Committee on Oversight and Government Reform, FEMA'S TRAVEL TRAILERS: LITIGATION CONSIDERATIONS V. HEALTH AND SAFETY CONSIDERATIONS, AND THE WINNER IS?, July 19, 2007, available at http://republicans.oversight.house.gov/Media/PDFs/20070719FEMAEmails.pdf.

61.

FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher.  The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light.

20

62.

FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. *See* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, available at

http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report_0507.pd f.

63.

This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.

64.

FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the plaintiffs supplied in the wake of the hurricanes in order to avoid legal liability for injuries to the Plaintiff herein as a result of their exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other

21

agencies, began immediately after FEMA began to receive complaints from trailer residents

concerning formaldehyde fumes in 2006.  *See* correspondence from U.S. House of

Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S.

Department of Homeland Security, January 28, 2008.

65.

FEMA further manipulated the governmental testing by involving a little-known office

of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no

long-term exposure considerations would be included in the health consultation by removing the

consultation from the normal ATSDR review process so that scientists who had specifically

recommended looking at long-term exposure effects were excluded from the review.  FEMA did

so in order to avoid negative publicity and legal liability in connection with the presence of

formaldehyde in the housing units.  *See* correspondence from U.S. House of Representatives,

Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr.

Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic

Substances and Disease Registry, January 28, 2008.

66.

FEMA's manipulation of the data was evidenced in the testing designed and

implemented by FEMA through the ATSDR in July of 2006.  The testing results of the study

showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's

urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or

more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern, "a level nearly 400 times

the ATSDR's annualized exposure limit.  Yet even applying this "level of concern," the average

22

sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES

RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL

TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION

ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government

Reform, U.S. House of Representatives, July 19, 2007, at 7, available at

http://oversight.house.gov/documents/20070719102502.pdf.

67.

Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany

described the FEMA testing and analysis process by stating "All I can say, in my professional

opinion, is that they did this in order to minimize the actual extent of the problems in these

trailers. I have no other conclusion I can draw… I think it was a complete violation of our

professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee

on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript,

available at http://oversight.house.gov/documents/20071114164004.pdf.

68.

On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin,

sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health

Consultation was "possibly misleading and a threat to public health" for failure to disclose the

carcinogenic status of formaldehyde and that there are no safe exposure levels.

69.

Despite this information, FEMA and the ATSDR did not revise the original Health

Consultation until October of 2007 to include the warning that the original Health Consultation

"did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, available at http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

70.

The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiff's exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

71.

It was not until December of 2007 that the Federal Government initiated testing of occupied housing units. Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units. *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

72.

The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

73.

The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

74.

As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

75.

The Federal Government's actions with regard to these plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

76.

Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

## COUNT 1:

## CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT

77.

At all times herein, the Federal Government was under a duty to use due care and

26

caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to the Plaintiff herein.

78.

The Federal Government was obligated to promptly warn the Plaintiff of any defects in the housing unit which could cause harm and of which the Federal Government was aware.

79.

The Federal Government, after becoming aware of the potential for such harm, violated this duty to the Plaintiff, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

80.

As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violations of state and federal laws, the Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

81.

Further, since the Plaintiff is within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiff specifically pleads the application of the doctrine of negligence per se.

82.

The Federal Government was negligent and at fault in the following non-exclusive particulars:

a.      In failing to warn the Plaintiff of the unreasonably dangerous nature of the housing unit that Plaintiff occupied;

27

b.      In failing to promptly remedy the dangerous nature of the housing unit, on

becoming aware of the formaldehyde dangers associated with the unit;

c.      In failing to timely implement adequate safety measures and procedures

to address the defects in the housing unit of Plaintiff, on becoming aware of the

formaldehyde danger associated with the unit;

d.      Such other actions of negligence and fault as will be shown at the trial of

this matter.

## COUNT 2:

## CAUSE OF ACTION AGAINST THE MANUFACTURING DEFENDANT UNDER LOUISIANA PRODUCTS LIABILITY ACT

83.

The Manufacturing Defendant is a manufacturer of the housing unit occupied by the

Plaintiff, which unit constitutes a products under the Louisiana Products Liability Act [LPLA].

84.

The exposure of the Plaintiff to formaldehyde fumes from the Manufacturing

Defendant's product and equipment resulted from the normal, foreseeable, and intended use of

the products and equipment, without substantial alteration in the condition in which the

Manufacturing Defendant sold this housing unit.

85.

The design of the housing unit, using plywood, press board, other composite wood

products and other products that contain formaldehyde is defective and posed an unreasonable

risk of harm to the Plaintiff.

28

86.

Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to the Plaintiff.

87.

The Manufacturing Defendant's product, equipment and supplies used by the Plaintiff were in a defective condition and were unreasonably dangerous under normal use at the time the product and equipment left the Manufacturing Defendant's control.  The Plaintiff was an intended and foreseeable user of the alleged defective products and damages and losses to the Plaintiff reasonably could have been anticipated by the Manufacturing Defendant.

88.

The defects in the Manufacturing Defendant's housing unit were the result of and/or include, but are not limited to, the following:

      a.     In failing to design their products so as not to emit dangerous levels of formaldehyde;

      b.     In providing a housing unit which, by virtue of their design and/or manufacture and/or composition, was unreasonably dangerous under reasonably anticipated use;

      c.     In providing a housing unit which, by virtue of a lack of adequate warnings, was unreasonably dangerous under reasonably anticipated use;

      d.     In providing a housing unit that did not conform to the express warranties made by the Manufacturing Defendant regarding its fitness for use as reasonably

29

anticipated;

e.      In manufacturing, testing, marketing, distributing, licensing and selling of

an unreasonably dangerous housing unit;

f.      In failing to properly test the housing unit to property evaluate the level of

emissions of formaldehyde under foreseeable conditions for extended periods of

time;

g.      In failing to warn the Plaintiff of the unreasonably dangerous nature of

the housing unit, or warn adequately of the presence of excessive levels of

emissions of formaldehyde and the hazards associated with the excess levels of

emissions of formaldehyde in the unit.

h.      In failing to ensure that the housing unit it manufactured and provided to

the Plaintiff was suitable for its intended use;

i.      In failing to adhere to any and all express warranties of fitness and safety

for the housing unit it manufactured and provided;

j.      In manufacturing and providing a housing unit that was unduly dangerous

due to its emissions of formaldehyde; and,

k.      Such other indicia of fault under the LPLA  as will be shown at the trial

of this matter

## COUNT 3:

## CAUSE OF ACTION AGAINST THE CONTRACTOR DEFENDANTS UNDER

## LOUISIANA PRODUCTS LIABILITY ACT

89.

Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

90.

The Contractor Defendant qualifies as a manufacturer under the Louisiana Products Liability Act ("LPLA"), as it performed work pursuant to the contracts with FEMA which altered the character, design, construction, and/or quality of the product and the housing unit constitute products under the LPLA.

91.

The increased exposure to formaldehyde fumes from the alteration of the temporary housing units by the Contractor Defendant resulted from the normal, foreseeable, and intended use of the products and equipment.

92.

The installation and alteration of the temporary housing unit, the modifications to the manufacturer's designs, and the "blocking" of units off their wheel base, altered the product which increased the effects of the product's defect and posed an unreasonable risk of harm to the Plaintiff.

93.

The Plaintiff was an intended and foreseeable user of the alleged defective product, and damages and losses to the Plaintiff reasonably could have been anticipated by the Contractor Defendant.

94.

The Contractor Defendant, by installing the temporary housing unit on concrete blocks for extended occupancy and, further, by installing residential appliances and heating and air

31

conditioning units, knowingly and intentionally modified the design and the actual use of the unit.

95.

The defects in the Contractor Defendant's product were the result of and/or include, but are not limited to the following:

a.      In creating stress and flexing on the frame of the unit by lifting significant weight from the wheel base, which distorted the travel trailer's shell allowing for increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell;

b.      In providing the temporary housing unit to the Plaintiff which, by virtue of their composition, refurbishment, reconditioning, and/or construction were unreasonably dangerous under reasonably anticipated use;

c.      In providing the temporary housing unit to the Plaintiff which, lacking adequate warnings, were unreasonably dangerous under reasonably anticipated use;

d.      In failing to warn the Plaintiff of the unreasonably dangerous nature of the travel trailer converted to temporary housing unit for their intended use by FEMA or of the presence of excessive levels of emissions of formaldehyde;

e.      In failing to ensure that the temporary housing unit they installed, refurbished, and reconditioned was suitable for its intended use, as long term housing;

f.      In failing to adhere to any and all of the warnings against the jacking of

32

the unit with weight off the wheel base by the manufacturer;

g.      In failing to follow the manufacturer's instructions for the installation and intended use of the temporary housing unit;

h.      In providing a housing unit that was unduly dangerous due to their emissions of formaldehyde; and,

i.      Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

## COUNT 4:

## NEGLIGENCE OF THE CONTRACTOR DEFENDANTS UNDER LOUISIANA LAW

96.

Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

97.

At all relevant times the Contractor Defendant was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing unit that caused the Plaintiff's injuries.

98.

The Contractor Defendant owed a duty to the Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore a safe temporary housing unit that did not emit hazardous levels of formaldehyde.

99.

The Contractor Defendant knew or should have known when it provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary

33

housing unit to the general public (thereby modifying and converting the mobile unit into residential installations) the actual and intended use of the temporary housing unit by the plaintiff, and that the temporary housing unit would be used in the manner that the plaintiff herein used the temporary housing unit.

100.

The Contractor Defendant breached its duty to the Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

      a.      Failing to sufficiently warn the plaintiff of the inherently dangerous properties or the foreseeable conditions of the temporary housing unit when used for long term occupancy;

      b.      Failing to adhere to the manufacturer's warnings against jacking the temporary housing unit off the wheel base by "blocking" the units;

101.

The Contractor Defendant's actions were the proximate cause of the increased exposure of formaldehyde to the Plaintiff.

102.

The Contractor Defendant contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COMPENSATORY DAMAGES

103.

In addition to and by way of summarizing the compensatory damages prayed for herein,

34

the Plaintiff avers that the defendants, the United States of America through FEMA, and the

Manufacturing Defendant, as well as the Contractor Defendant, individually and/or jointly are

responsible for all damages which the Plaintiff herein has suffered and continues to suffer as a

consequence of defendants' acts and/or omissions as pled herein, which damages include, but

are not limited to, past and future physical injuries, past and future mental and physical pain and

suffering, past and future physical impairments and disability, past and future reasonable and

necessary medical expenses, past and future loss of earning capacity, past and future loss of

enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use

and/or opportunity to use safe and adequate shelter during the period of displacement from a

natural disaster, as well as, all general, special, incidental and consequential damages as shall be

proven at the time of trial.

### REQUEST FOR JURY TRIAL

Plaintiff is entitled to and demands a trial by jury.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays that the Manufacturing Defendant, the Contractor

Defendant, and the Federal Government be served with a copy of this Complaint, and that, after

due proceedings:

1.    there be a judgment herein in favor of the Plaintiff and against Defendants for all

compensatory damages together will legal interest thereon from the date of judicial demand

until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the

defendants are liable for all applicable damages and thereafter;

2.    there be specially included in the judgment in the Plaintiffs' favor, provisions for

the following damages and relief as found applicable and supported by the evidence:

    a.    past and future physical injuries,

    b.    past and future mental and physical pain and suffering,

    c.    past and future physical impairments and disability,

    d.    past and future reasonable and necessary medical expenses,

    e.    past and future loss of earning capacity,

    f.    past and future loss of enjoyment and quality of life,

    g.    loss of consortium and/or society,

    h.    compensable out-of-pocket expenses related to defendants' wrongdoing,

and

    i.    costs of court,

    j.    all other general, equitable, and further relief as the Court may deem just

and proper.

                Respectfully submitted:

                LAW OFFICE OF JOSEPH M. BRUNO

                BY:   /s/ Joseph M. Bruno
                JOSEPH M. BRUNO (# 3604)
                L. SCOTT JOANEN (# 21431)
                855 Baronne Street
                New Orleans, LA   70113
                Telephone: (504) 525-1335
                Facsimile:  (504) 581-1493

# Exhibit A

**Plaintiff(s) Matched with: Keystone RV Company**

Each Plaintiff identified on this
Complaint originated from
**Case Number 09- 5282**

| | PLAINTIFF NAME | INSTALLER(S) | CONTRACTOR(S) |
|---|---|---|---|
| 1 | VERNON J. ALLEN | CH2M Hill Constructors, Inc. | CH2M Hill Constructors, Inc. |
| 2 | GEORGE BROWN | Flour Enterprises, Inc. | |
| 3 | PAUL A. BRYANT | CH2M Hill Constructors, Inc. | |
| 4 | GLORIA P. BYRD | Flour Enterprises, Inc. | |
| 5 | HENRY J. BYRD | Flour Enterprises, Inc. | |
| 6 | MARIE L. CHAUVIN | CH2M Hill Constructors, Inc. | |
| 7 | ALBERT L. DAVIS | Flour Enterprises, Inc. | Flour Enterprises, Inc. |
| 8 | GAIL M. DAVIS | Shaw Enviornmental | |
| 9 | SANDRA V. DAVIS | CH2M Hill Constructors, Inc. | |
| 10 | CYNTHIA DELAGUERONNIERE | Shaw Enviornmental | |
| 11 | CYNTHIA DELAGUERONNIERE | Shaw Enviornmental | |

*Wednesday, December 30, 2009*

**EXHIBIT A**

*Page 1 of 9*

| | PLAINTIFF NAME | INSTALLER(S) | CONTRACTOR(S) |
|---|---|---|---|
| 12 | JAMES FAULKNER JR. | CH2M Hill Constructors, Inc. | |
| 13 | RITA L. FAULKNER | CH2M Hill Constructors, Inc. | |
| 14 | CYNTHIA P. FOOTS | Fluor Enterprises, Inc. | |
| 15 | CYNTHIA P. FOOTS | Fluor Enterprises, Inc. | |
| 16 | TYRONNE FOOTS SR | Fluor Enterprises, Inc. | |
| 17 | TYRONNE FOOTS SR | Fluor Enterprises, Inc. | |
| 18 | EARNESTINE FRANK | C. Martin Company, Inc. | |
| 19 | EARNESTINE FRANK | C. Martin Company, Inc. | |
| 20 | BETTY W. FRANKLIN | Shaw Enviornmental | |
| 21 | BEVERLY I. FREZEL | Fluor Enterprises, Inc. | |
| 22 | BEVERLY I. FREZEL | Fluor Enterprises, Inc. | |
| 23 | JOHNNY M. GALLO | CH2M Hill Constructors, Inc. | |
| 24 | JEMELL R. GEORGE | Flour Enterprises, Inc. | |
| 25 | LINDA L. GUMBS | Flour Enterprises, Inc. | Flour Enterprises, Inc. |

*Wednesday, December 30, 2009*

EXHIBIT A

| | PLAINTIFF NAME | INSTALLER(S) | CONTRACTOR(S) |
|---|---|---|---|
| 26 | LINDA L. GUMBS | Fluor Enterprises, Inc. | |
| 27 | LINDA L. GUMBS | Fluor Enterprises, Inc. | |
| 28 | MARC D. HALL , MINOR, BY LATARIA HINES | CH2M Hill Constructors, Inc. | CH2M Hill Constructors, Inc. |
| 29 | RONDELL HARRIS | Fluor Enterprises, Inc. | |
| 30 | JOYCELYN HAYES | SRS, Inc. | |
| 31 | JOYCELYN HAYES | SRS, Inc. | |
| 32 | KENDRICK D. HENDERSON | Fluor Enterprises, Inc. | |
| 33 | KENDRICK D. HENDERSON | Fluor Enterprises, Inc. | |
| 34 | KENDRICK D. HENDERSON | Fluor Enterprises, Inc. | |
| 35 | KENNETH HENDERSON JR | | |
| 36 | KENNETH HENDERSON JR | | |
| 37 | KENNETH HENDERSON SR | Fluor Enterprises, Inc. | |
| 38 | BARRY J. JOHNSON JR | Fluor Enterprises, Inc. | Flour Enterprises, Inc. |
| 39 | BARRY J. JOHNSON JR | Fluor Enterprises, Inc. | |

EXHBIT A

| | PLAINTIFF NAME | INSTALLER(S) | CONTRACTOR(S) |
|---|---|---|---|
| 40 | BARRY J. JOHNSON JR | Fluor Enterprises, Inc. | |
| 41 | EDWARD V. JOHNSON | | |
| 42 | EDWARD V. JOHNSON | | |
| 43 | JOSHUA M. JOHNSON | CH2M Hill Constructors, Inc. | |
| 44 | LANELL JOHNSON | Fluor Enterprises, Inc. | |
| 45 | LANELL JOHNSON | Fluor Enterprises, Inc. | |
| 46 | LANELL JOHNSON | Flour Enterprises, Inc. | Flour Enterprises, Inc. |
| 47 | RONALD G. JOHNSON JR | CH2M Hill Constructors, Inc. | |
| 48 | REGINALD LEWIS | Flour Enterprises, Inc. | |
| 49 | MERCEDES LOMBARDINO | CH2M Hill Constructors, Inc. | |
| 50 | MERCEDES LOMBARDINO | CH2M Hill Constructors, Inc. | |
| 51 | DEREK J. MEILLEUR SR. | Shaw Enviornmental | |
| 52 | DERIANNE M. MEILLEUR | Shaw Enviornmental | |
| 53 | MARSH G. MERCADEL | Shaw Enviornmental | |

**EXHIBIT A**

| | PLAINTIFF NAME | INSTALLER(S) | CONTRACTOR(S) |
|---|---|---|---|
| 54 | MARSH G. MERCADEL | Shaw Enviornmental | |
| 55 | JOSEPH O. OLUBADEWO | Shaw Enviornmental | |
| 56 | JOSEPH O. OLUBADEWO | Shaw Enviornmental | |
| 57 | VICTORIA OLUBADEWO | Shaw Enviornmental | |
| 58 | ERROL L. OWENS | Flour Enterprises, Inc. | |
| 59 | LYNETTE OWENS | Flour Enterprises, Inc. | |
| 60 | RONNIE OWENS | Shaw Enviornmental | |
| 61 | LINDSEY PAYNE III | Flour Enterprises, Inc. | |
| 62 | LINDSEY PAYNE III | Fluor Enterprises, Inc. | |
| 63 | LINDSEY PAYNE III | Fluor Enterprises, Inc. | |
| 64 | YOLANDA E. PHILLIPS | Flour Enterprises, Inc. | |
| 65 | ANTHONY L. POHLMANN JR | Bechtel National, Inc. | |
| 66 | JERVAL R. PROUT | CH2M Hill Constructors, Inc. | |
| 67 | JERVAL R. PROUT | CH2M Hill Constructors, Inc. | |

**EXHIBIT A**

| | PLAINTIFF NAME | INSTALLER(S) | CONTRACTOR(S) |
|---|---|---|---|
| 68 | JOSHUA L. PROUT | CH2M Hill Constructors, Inc. | CH2M Hill Constructors, Inc. |
| 69 | JULINEE R. PROUT | CH2M Hill Constructors, Inc. | CH2M Hill Constructors, Inc. |
| 70 | LISA H. PROUT | CH2M Hill Constructors, Inc. | CH2M Hill Constructors, Inc. |
| 71 | KEYON M. REDDICK | | |
| 72 | KEYON M. REDDICK | | |
| 73 | DARLENE M. REDDICK-HENDERSON | | |
| 74 | DARLENE M. REDDICK-HENDERSON | | |
| 75 | CLARENCE ROBINSON JR | Shaw Enviornmental | |
| 76 | CLARENCE ROBINSON JR | Shaw Enviornmental | |
| 77 | ERNESTINE SAUL | Shaw Enviornmental | |
| 78 | DORA M. SAVERIN | Fluor Enterprises, Inc. | |
| 79 | TRENISE S. SAVERIN | Fluor Enterprises, Inc. | |
| 80 | TRENISE S. SAVERIN | Fluor Enterprises, Inc. | |
| 81 | TRITTANY S. SAVERIN | Fluor Enterprises, Inc. | |

**EXHIBIT A**

| | PLAINTIFF NAME | INSTALLER(S) | CONTRACTOR(S) |
|---|---|---|---|
| 82 | MARY SCOTT | CH2M Hill Constructors, Inc. | |
| 83 | MARY SCOTT | Flour Enterprises, Inc. | |
| 84 | MARY SCOTT | Shaw Enviornmental | |
| 85 | SHARON G. SERPAS | 3D Disaster Services, Inc., Flour Enterprises, Inc. | |
| 86 | SHARON G. SERPAS | Flour Enterprises, Inc. | |
| 87 | KIARA D. SIMS , MINOR, BY RITA FAULKNER | CH2M Hill Constructors, Inc. | |
| 88 | RENEE M. SIMS , MINOR, BY RITA FAULKNER | CH2M Hill Constructors, Inc. | |
| 89 | RENEE M. SIMS , MINOR, BY RITA FAULKNER | Shaw Enviornmental | |
| 90 | TYRICK L. SIMS , MINOR, BY RITA FAULKNER | CH2M Hill Constructors, Inc. | |
| 91 | BARBARA S. SMITH | CH2M Hill Constructors, Inc. | |
| 92 | CHRISTOPHER SMITH JR, MINOR, BY HENRY SMITH, SR. | Flour Enterprises, Inc. | |

*Wednesday, December 30, 2009*

**EXHIBIT A**

*Page 7 of 9*

| | PLAINTIFF NAME | INSTALLER(S) | CONTRACTOR(S) |
|---|---|---|---|
| 93 | FAY O. SMITH | Flour Enterprises, Inc. | |
| 94 | HENRY L. SMITH SR | Flour Enterprises, Inc. | |
| 95 | JOHN F. SMITH | Shaw Enviornmental | |
| 96 | LOUISE SMITH | CH2M Hill Constructors, Inc. | |
| 97 | SAMUEL A. SMITH JR. | Flour Enterprises, Inc. | |
| 98 | WILBERT E. SMITH | Shaw Enviornmental | |
| 99 | CAMILLA A. SMOTHERS | C. Martin Company, Inc., Shaw Enviornmental | |
| 100 | CHARLES G. SMOTHERS | C. Martin Company, Inc., Shaw Enviornmental | |
| 101 | CHARLES A. STEVENS | Shaw Enviornmental | |
| 102 | WOODROW L. STEVENSON | Shaw Enviornmental | |
| 103 | RANDY STEWART | Shaw Enviornmental | |
| 104 | RANDY STEWART | Shaw Enviornmental | |
| 105 | SANDRA J. STEWART | Shaw Enviornmental | |

*Wednesday, December 30, 2009*

**EXHIBIT A**

*Page 8 of 9*

| PLAINTIFF NAME | INSTALLER(S) | CONTRACTOR(S) |
|---|---|---|
| 106 SANDRA J. STEWART | Shaw Enviornmental | |
| 107 ALVIN E. TIRCUIT | Shaw Enviornmental | |
| 108 EST. PAMELA F. WALKER | Fluor Enterprises, Inc. | |
| 109 EST. PAMELA F. WALKER | Fluor Enterprises, Inc. | |
| 110 GRETA L. WALKER | Flour Enterprises, Inc. | |
| 111 JAMES T. WHITE | Shaw Enviornmental | |
| 112 MARY E. WHITE | CH2M Hill Constructors, Inc. | |
| 113 GLENDA WILLIAMS | Flour Enterprises, Inc. | |
| 114 LORI N. WILLIAMS | Shaw Enviornmental | |

*Page 9 of 9*

**EXHBIT A**

*Wednesday, December 30, 2009*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: FEMA TRAILER                                 MDL NO. 07-1873
FORMALDEHYDE PRODUCTS
LIABILITY LITIGATION
                                                    SECTION "N" (5)

THIS DOCUMENT RELATES TO
ALL CASES

**PRETRIAL ORDER NO. 40**

On June 15, 2009, the Hurricane Legal Center filed 172 new complaints related to the above

referenced matter.  As such, these new complaints are subject to Pretrial Order No. 38 (document

#1596) which was issued on May 27, 2009 and requires, in part, that newly filed cases shall contain

only plaintiffs who have claims against the same manufacturer, where known. Unmatched plaintiffs

were to be included in separate complaints, not to exceed 300 plaintiffs in each case.

While 144 of the complaints filed yesterday do list only one manufacturing defendant (or one

or more related manufacturing defendants), there are 28 lawsuits containing up to 300 plaintiffs and

73 separate manufacturing defendants.  Allowing such cases to proceed through the regular

1

docketing process would place an extreme burden on the court and all counsel in indexing and monitoring the numerous parties, and providing service and summons for each and would make it nearly impossible for the defendants to timely respond to those complaints.

Accordingly, IT IS ORDERED that all unmatched plaintiffs shall be matched with a specific manufacturing defendant within 45 days of the date of the filing of the complaint. This deadline is subject to extension for good cause shown.

Once they are matched to a specific manufacturing defendant, such plaintiffs shall be severed from their original complaint and counsel shall file amended complaints, each containing no more than 300 plaintiffs and naming only one manufacturing defendant as well as any other specific non-manufacturing defendants.

These new complaints will be filed with the Clerk of Court on paper, not electronically, and shall contain a copy of this order and a list of the original complaint(s) from which the plaintiffs in the amended complaint came. There will be no additional filing fee. The Clerk will assign a new civil action number for each amended complaint.

At the end of the 45 day period, counsel for plaintiffs will also notify the court of any plaintiffs which remain unmatched and the civil action number of the original complaint in which they were named. The original claims by any plaintiff who has not filed an amended complaint or who has not notified the court of their continued unmatched status will be subject to dismissal, without prejudice, and without further notice.

2

This order will remain in effect and shall apply to any pending or new complaints containing unmatched plaintiffs, whether filed directly in this court or transferred here by the MDL Panel.

NEW ORLEANS, LOUISIANA, this 17th day of June, 2009.

KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE

3