UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
|     FORMALDEHYDE PRODUCTS | * | |
|     LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE: ENGELHARDT |
| THIS DOCUMENT IS RELATED TO: | * | |
| | * | |
| *Lillian Triplett, et al v. Forest River, Inc.,* | * | MAG: CHASEZ |
| *et al* | * | |
| **Docket No. 09-6914** | * | |

*******************************************************************************

**FOREST RIVER, INC.'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT REGARDING CAUSATION**

**MAY IT PLEASE THE COURT:**

**A.      Background**

This is a damage claim filed by Plaintiff, Wilbert W. Linscheid ("Linscheid" or "Plaintiff"), against Forest River, Inc. ("Forest River") arising from his alleged exposure to formaldehyde from a temporary housing unit manufactured by Forest River he claims he lived in post-Hurricane Katrina.  On July 30, 2009, Plaintiff filed a Petition for Damages in the United States District Court for the Southern District of Mississippi.[1]  (Rec. Doc. 1).  The case was subsequently transferred into the *In Re: FEMA Formaldehyde Products Liability Litigation* MDL on October 28, 2009. *Id.*

In his Plaintiff Fact Sheet ("PFS"), Linscheid asserts that between December 2005 and April 2007, he resided in a FEMA-provided temporary housing unit manufactured by Forest River. *See* Plaintiff Fact Sheet, attached to Motion for Summary Judgment Regarding Causation, as Exhibit "A", at pp. 8-9.  Linscheid alleges that he was exposed to dangerously high concentrations of formaldehyde emitted from products used in the manufacture of the housing

---
[1] Amended complaints were filed on September 10, 2009 and September 30, 2009.

unit. (Rec. Doc. 1-3), at ¶IV.22).  Plaintiff further alleges that he was diagnosed with head, neck and esophageal cancer (hereafter referred to as "esophageal cancer" or "cancer of the esophagus") in March 2007.[2]  Ex. A, at p. 4.  For the reasons set forth below, Plaintiff cannot sustain his burden in establishing general causation, and therefore summary judgment is proper as a matter of law.

**B.     Law**

        **1.     Summary Judgment Standard**

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor."  *Lavespere v. Niagara Mach. & Tool Works*, Inc., 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.  *Celotex*, 477 U.S. at 322.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial.

---

[2] Plaintiff subsequently clarified that he was diagnosed with squamos cell carcinoma of the upper respiratory tract. *See Plaintiff's Opt-Out letter,* dated August 3, 2012, attached hereto as Exhibit "B."  While it is disputed whether plaintiff actually suffers from esophageal cancer, this motion is based on that diagnosis.  *See* Ex. C, *infra.*

2

*See Celotex*, 477 U.S. at 325; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1996). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a general issue for trial.  *SEC v. Recile,* 10 F.3d 1093, 1097 (5th Cir. 1993).

### 2. The Law Regarding Medical Causation

Under Louisiana law, a plaintiff in a tort action must prove every essential element of his case, including medical causation, by a preponderance of the evidence.  *James v. Lincoln General Ins. Co.*, 09-0727 (W.D. La. 8/15/11), 2011 WL 3610800, at *4 (Citing *Lasha v. Olin Corp.,* 625 So.2d 1002, 1005 (La.1993)).  In a toxic tort suit such as this one, the plaintiff must present admissible expert testimony to establish general causation as well as specific causation. *Knight v. Kirby Inland Marine Inc.*, 06-60134 (5 Cir. 3/19/07), 482 F.3d 347, 351.  General causation is whether a substance is capable of causing a particular injury or condition in the general population. *Id.* (*quoting Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997). Specific causation is whether the substance at issue actually caused a particular individual's injury. *Id.*

In a toxic tort case, the Court must initially determine whether there is evidence of general causation.  *Seaman v. Seacor Marine LLC,* 564 F. Supp. 2d 598, 600 (E.D. La. 2008) *aff'd sub nom. Seaman v. Seacor Marine L.L.C.,* 326 F. App'x 721 (5th Cir. 2009).  If the plaintiff cannot prove general causation, evidence of specific causation is not admissible. *Johnson v. Arkema, Inc.,* 685 F. 3d 452, 469 (5th Cir. 2012).  Only if the court finds that there is admissible evidence of general causation can the court then turn to the issue of whether or not there is admissible specific causation evidence.  *Knight,* at 351; *Johnson*, at 469.  Hence, without

3

reliable scientific proof of general causation, specific causation cannot be established. *See Phillips v. Metabolife International, Inc.,* Civil No. 02-CV-0130, (S.D.Ca. 4/2/03).

### i. General Causation

To establish general causation, a plaintiff must prove that the substance to which he or she was exposed is capable of causing the injury for which the plaintiff is seeking compensation. *See In re Joint E. & S. Dists. Asbestos Litig.*, 52 F.3d at 1131 (2d Cir. 1995). Thus, Plaintiff must show that it is more likely than not that the type of formaldehyde exposure alleged here, during the time period in which such exposure took place, can cause esophageal cancer. *See Knight*, 482 F.3d at 352.

### ii. Specific Causation

Specific causation is established when the medical expert isolates an external factor as the cause of internal disease. *Knight*, 482 F.3d at 351-52. Expert evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence. *Knight*, 482 F.3d at 351; citing, *Raynor v. Merrell Pharm.,* 104 F.3d 1371, 1376 (D.C.Cir. 1997). To meet his burden of proof here, Plaintiff, after proving general causation, would have to establish that his esophageal cancer was <u>actually</u> caused by the alleged formaldehyde exposure while residing in a FEMA trailer. *Knight*, 482 F.3d at 352.

### C. Plaintiff Cannot Prove General Medical Causation

Plaintiff cannot meet his burden of establishing that formaldehyde is capable of causing the alleged injury for which he is seeking compensation in the instant matter. *In re Joint,* 52 F.3d at 1131. The most useful and conclusive type of evidence to prove general causation in a case such as this are epidemiological studies. *Allen*, 102 F.3d at 197 (citing *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 311 (5th Cir. 1989)). The United States Court of

Appeals for the Fifth Circuit has held that the failure to present statistically significant epidemiological proof of causation is a very important element in a toxic tort case and failure to present such proof may be <u>fatal to a claim</u>. *Brock II*, 884 F.2d at 167. (emphasis added).

Epidemiology is a scientific method that is used to define a relationship (an association) between a disease and exposure to an agent suspected of causing it - in this case, esophageal cancer and exposure to formaldehyde. *See Havner,* 953 S.W.2d at 715. To define that relationship, the epidemiologist examines the incidence of the disease among those people exposed to the agent at various exposure levels to determine the incidence of the disease in unexposed populations. *Brock*, 874 F.2d at 311. The epidemiologist then uses statistical methods and reasoning to allow her to draw a biological inference between the agent being studied and the disease's etiology.[3] *Id.* An association between exposure to an agent and a disease is said to exist when they occur together more frequently than one would expect by chance. Reference Manual For Scientific Litigation (2nd Ed.)(hereinafter "Ref. Man."), p. 348. The strength of an association between exposure and disease can be stated as the "relative risk." *Id.* The relative risk is calculated by dividing the number of cases where the disease occurred in the exposed

---

[3] Two key concepts of epidemiology are relative risk (discussed *supra*) and statistical significance. A study's finding must also be "statistically significant" to be relied upon. *Brock,* 874 F.2d at 312. Statistical significance is determined by reference to a study's "confidence interval." A confidence interval shows a "range of values within which the results of a study sample would be likely to fall if the study were repeated numerous times." *Havner,* 953 S.W.2d at 723. If the confidence interval includes the number 1.0, then the study will be said to show no statistically significant association between the factor and the disease. *See Brock*, 874 F.2d at 312. As the Fifth Circuit explained in *Brock*:

> Just because an epidemiological study concludes that a relative risk is greater than 1.0 does not establish that the factor caused the disease. If the confidence interval is so great that it includes the number 1.0, then the study will be said to show no statistically significant association between the factor and the disease. For example, if a study concluded that the relative risk for Bendectin was 1.30, which is consistent with a 30% elevated risk of harm, but the confidence interval was from 0.95 to 1.82, then no statistically significant conclusions could be drawn from this study because the relative risk, when adjusted by the confidence interval, includes 1.0. Again, it is important to remember that the confidence interval attempts to express mathematically the magnitude of possible error, due to the above mentioned sources as well as others, and therefore a study with a relative risk of greater than 1.0 must always be considered in light of its confidence interval before one can draw conclusions from it.

*Id.*

group by the number of times it appeared in the nonexposed group. *Pick v. American Medical Systems, Inc.*, 958 F.Supp. 1151, 1159 (E.D. La. 1997). As the *Pick* court explained:

> If the particular disease appears with the same frequency in both groups, the relative risk is expressed as 1.0. A relative risk less than 1.0 suggests no connection between the suspected cause and the disease; a risk greater than 1.0 suggests a causal connection. See *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1353, n. 1 (6th Cir.1992), *cert. denied,* 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992). A relative risk of 2.0 means that the disease occurs among the population exposed to the suspect cause *twice* as often or "double" that of the control population. "Phrased another way, a relative risk of 2.0 means that, on the average, there is a fifty percent likelihood that a particular case of the disease was caused by the event under investigation and a fifty percent likelihood that the disease was caused by chance alone. A relative risk *greater* than 2.0 means that the disease more likely than not was caused by the event." *Manko v. United States,* 636 F.Supp. 1419, 1434 (W.D.Mo.1986); *aff'd,* 830 F.2d 831 (8th Cir.1987).

*Id*. (emphasis in original).

Most courts considering the issue have adopted a relative risk of 2.0 or greater (200%) as the threshold for determining by a preponderance of the evidence that an association exists between an agent and a disease from a general causation standpoint.[4]  Even then, however, it should be noted that a determination that an association exists, alone, is not equivalent to a finding of causation. An association identified in an epidemiologic study may or may not be causal. Michael D. Green, et. al., *Reference Guide on Epidemiology*, Federal Judicial Center 2000, Reference Manual on Scientific Evidence, 2d Ed., at pp. 335-337. To assess whether or

---

[4] *See, e.g., DeLuca v. Merrell Dow Pharms., Inc.,* 911 F.2d 941, 958–59 (3d Cir.1990) (Bendectin allegedly caused limb reduction birth defects); *In re Joint, supra,*(relative risk less than 2.0 may still be sufficient to prove causation); *Daubert v. Merrell Dow Pharms.,* Inc., 43 F.3d 1311, 1320 (9th Cir.) (requiring that plaintiff demonstrate a relative risk of 2), *cert. denied,* 516 U.S. 869 (1995); *Pick*, *supra,* (recognizing that a relative risk of 2 implies a 50% probability of specific causation, but recognizing that a study with a lower relative risk is admissible, although ultimately it may be insufficient to support a verdict on causation); *Manko v. United States*, 636 F.Supp. 1419, 1434 (W.D.Mo.1986) (swine flu vaccine allegedly caused Guillain–Barré syndrome), *aff'd in part,* 830 F.2d 831 (8th Cir.1987); *In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. 740, 835–37 (E.D.N.Y.1984) (Agent Orange allegedly caused a wide variety of diseases in Vietnam veterans and their offspring), *aff'd,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004 (1988); *Havner*, supra, ("The use of scientifically reliable epidemiological studies and the requirement of more than a doubling of the risk strikes a balance between the needs of our legal system and the limits of science.").

not an association is causal in nature, epidemiologists generally employ what is known as the "Bradford Hill factors" or "Hill criteria."  *See LeBlanc v. Chevron USA Inc.,* 513 F. Supp. 2d 641, 647 (E.D.LA 2007).  *See also*, Thompson, *Causal Inference in Epidemiology: Implications for Toxic Tort Litigation*, 71 N.C.L. Rev. 247, 256-9 (1992).  These factors require consideration, among other things, of: (1) the temporal sequence of events, (2) whether a dose-response relationship exists, (3) the consistency of the observed association, (4) the strength of the association, and (5) the biological plausibility of the association.  *Id.*

Plaintiff's claim in the instant case is flawed as a matter of law due to Plaintiff's inability to present any evidence of general causation, and in particular, epidemiological proof thereof.  While the International Agency for Research of Cancer ("IARC") has classified formaldehyde as a human carcinogen, this classification alone is insufficient to establish statistical significance regarding general causation.  *See Pennington v. Vistron Corp.*, 876 F.2d 414, 426 (5th Cir. 1989)(the general claim that some carcinogens may work together to increase the risk of contracting cancer does not, by itself, raise a material fact issue regarding the cause of cancer).

On the other hand, extensive studies have been conducted in recent years analyzing whether or not an association exists between exposure to formaldehyde and cancer of the esophagus in human beings, the disease Plaintiff is alleged to have contracted.  As Dr. Philip Cole, Forest River's expert epidemiologist who has reviewed the relevant epidemiologic research points out, <u>none</u> of the available research concluded such an association exists or suggests that persons with formaldehyde exposure have an increased risk of cancer of the esophagus.  *See* Affidavit of Dr. Philip Cole, attached to Motion for Summary Judgment Regarding Causation as Exhibit "C", p. 6.

Six epidemiologic studies were recently conducted with the specific purpose to explore the link, if any, between formaldehyde exposure and cancer of the esophagus.  None of them found an association.  *Id.* at p. 4.  Indeed, four of those studies explored the esophageal cancer mortality experience of those who had moderate to heavy occupational exposure to formaldehyde—embalmers, funeral directors and anatomists.  *Id.*  Each concluded that the esophageal cancer mortality experience of the formaldehyde-exposed subjects was actually lower than the general population.  *Id.*

Likewise, two large, modern follow-up studies reported no finding of an association or link between formaldehyde and cancer of the esophagus.  The Coggan, et al study found that the risk of death from esophageal cancer among chemical workers who had heavy industrial exposure to formaldehyde, was increased by only .28 (28%).  *Id.* at p. 5.  As noted in Dr. Cole's affidavit, such a slight increase in risk is considered not to be statistically significant and may have been caused merely by chance.  *Id.*[5]  In any event, it is far less than the 2.0 (200%) threshold widely accepted in epidemiology and the law for concluding that an association exists.  Epidemiologically speaking, therefore, this study suggests no connection between formaldehyde exposure and esophageal cancer.  Even more significant perhaps, the Pinkerton, et al study reported that a long-term follow-up of garment workers with moderate exposure to occupational formaldehyde showed that they had a 32% deficit of deaths from cancer of the esophagus compared to the general population.  *Id.*

As summarized by Dr. Cole, collectively these six epidemiologic studies regarding the relationship between formaldehyde exposure and cancer of the esophagus demonstrate that rather than there being an increased risk of esophageal cancer associated with exposure to

---

[5] Studies that do not show statistically significant results are generally held not to be admissible in attempting to prove general causation. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145, 118 S.Ct. 512, 138 L.Ed.2d 508 (1997).

formaldehyde, there is no evidence of such an association. In his affidavit, Dr. Cole compared the number of deaths from cancer of the esophagus among persons with occupational exposure to formaldehyde that were "observed" in the six studies to the number of deaths from cancer to the esophagus that would be "expected" in the general population even without exposure to formaldehyde. He calculated that the number of esophageal cancer deaths among persons who were exposed to formaldehyde were only 96% of the number of deaths from esophageal cancer among those in the general public. *Id.,* at p. 5. In other words, the six studies collectively reflect a <u>slight reduction or deficit</u> in the risk of cancer of the esophagus as a result of exposure to formaldehyde as compared to the general population.[6] This shows without a doubt that epidemiologically speaking, there is no association between formaldehyde exposure and an increased risk of developing cancer of the esophagus. *Id*. p. 6.[7]

In sum, the published epidemiologic studies do not indicate an association between formaldehyde exposure and cancer of the esophagus. Consequently, Plaintiff is unable to produce admissible evidence supporting general causation, an essential element of his case; without this support, he may not proceed to establish specific causation as a matter of law. Further, as a result, Plaintiff's lawsuit should be dismissed.

---

[6] Dr. Cole created a chart in his affidavit setting out the results of the six formaldehyde-cancer of the esophagus studies published from 1983 to 2004. It details the number of observed deaths and expected deaths from cancer of the esophagus among each study's subjects. Ex. C., p. 5. Essentially, it attempts to demonstrate the same concept of relative risk.

[7] Even if Plaintiff were to present evidence establishing a significant epidemiologic association between formaldehyde and esophageal cancer, the inquiry as to whether the association is causal is not over. Although a causal relationship is one possible explanation for the association, an association does not necessarily mean there is a cause-effect relationship. *See*, Ref. Man., p. 348. It would then have to be determined whether the association is causal or merely coincidental. *See*, Thompson, *supra.* As Cole cautioned, for instance the slight increase in risk observed in the Coggan study may well be attribute to chance alone. Ex. C., p. 5.

E.	Conclusion

Forest River, Inc. respectfully submits that Wilbert W. Linscheid is unable to carry his burden of proof on causation (an essential element of this claim) in this matter, and prays that the Court grant its Motion for Summary Judgment and dismiss the claims against it, with prejudice.

Respectfully Submitted,

**GIEGER, LABORDE & LAPEROUSE, LLC**

BY: /s/ Ernest P. Gieger, Jr.
ERNEST P. GIEGER, JR., T.A. (#6154)
ANDREW A. BRAUN (#3415)
J. MICHAEL DIGIGLIA (#24378)
GIEGER, LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011
egieger@glllaw.com
abraun@glllaw.com
mdigiglia@glllaw.com

**ATTORNEYS FOR FOREST RIVER, INC.**

**CERTIFICATE OF SERVICE**

I do hereby certify that a true and correct copy of the forgoing document has been served upon all counsel of record in accordance with the Federal Rules of Civil Procedure on the 20th day of August, 2012 via electronic filing.

/s/ Ernest P. Gieger, Jr.