## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION "N" (5)<br><br>JUDGE ENGELHARDT<br>MAG. JUDGE CHASEZ |

THIS DOCUMENT RELATES TO: ALL CASES

**************************************************************************

<u>MEMORANDUM IN SUPPORT OF MOTION FOR COMMON BENEFIT FEE
AND COST ALLOCATION BY PLAINTIFFS' STEERING COMMITTEE
FORMER PSC MEMBER, RONNIE G. PENTON</u>

**MAY IT PLEASE THE COURT:**

Pursuant to Court Order establishing a common benefit lump sum fund, the

Plaintiff's Steering Committee (hereinafter "PSC"), authorized co-liaison counsel to

propose an allocation for each PSC and subscribing member firms and counsel from the

common benefit fee fund of $6,196,159.65 (Exhibit E of the Memorandum in Support of

Motion of Co-Liaison Counsel for Plaintiffs to Approve Proposed Common Benefit Fee

Allocation filed under seal on October 30, 2012). The allocation methodology employed

by co-liaison is summarized as follows:

(1)     Review of narrative submission (Exhibit A 1 - 20 of the Memorandum in

Support of Motion of Co-Liaison Counsel for Plaintiffs to Approve

Proposed Common Benefit Fee Allocation filed under seal on October 30,

2012);[1]

---

[1]     Referred herein as Exhibit 3 - Narrative Summary of The Penton Law Firm

(2)     Review of common benefit assessment payments (Exhibit B of the Memorandum in Support of Motion of Co-Liaison Counsel for Plaintiffs to Approve Proposed Common Benefit Fee Allocation filed under seal on October 30, 2012);

(3)     Review of "held costs" payments (Exhibit D of the Memorandum in Support of Motion of Co-Liaison Counsel for Plaintiffs to Approve Proposed Common Benefit Fee Allocation filed under seal on October 30, 2012).

In evaluating the common benefit time claimed by each applicant, co-liaison stated in their brief that, "they are in a position which allows them to put these time submissions in proper evaluative perspective; where total hours did not render an equivalent value, they were discounted, and where the hours were devoted to assignments having a significant impact on outcome, they were given more weight."  Co-liaison further observes in its comments upon their methodology that, "the ultimate determinant in review of submitted hours should be what counsel accomplished with their time which had a demonstrable benefit for all plaintiffs."

As a result of co-liaison's proposed fee allocation, certain members of the PSC voted to propose an alternate allocation (Exhibit F of the Memorandum in Support of Motion of Co-Liaison Counsel for Plaintiffs to Approve Proposed Common Benefit Fee Allocation filed under seal on October 30, 2012), which was opposed by co-liaison counsel.  The PSC jointly agreed that both proposed allocations would be filed into the record by Tuesday, October 30, 2012, with opposition due Tuesday, November 6, 2012, and a hearing on the fee allocation on November 14, 2012.

Undersigned counsel does not comment on the competing allocation motions, nor the relative common benefit contributions of other applications, but instead files this brief in support of its application for allocation of a common benefit fee and cost that is fair and reasonable based upon substantive, critical legal services rendered by the applicant, which conferred a substantial positive benefit to claimants in this litigation.

## I.      HISTORY OF THIS LITIGATION AND APPLICANT'S FOUNDATIONAL ROLE

In the wake of Hurricane Katrina, 800,000 Gulf Coast residents were rendered homeless.  The Federal Emergency Management Administration (hereinafter "FEMA") responded to this emergency by providing 150,000 temporary housing in the form of travel trailers and other modular, portable housing at a cost of almost $3 Billion.  Some evacuees living in these homes complained of strong odors and fumes being emitted from the interior of the trailers, allegedly causing physical and medical symptoms, especially young children, the elderly, and those with underlying pulmonary/respiratory infirmities.

As a result of increasing media coverage of a potential toxic exposure syndrome, federal and state agencies began looking into these complaints, as did special interest groups, including the Sierra Club.  This testing overwhelmingly evidenced that 88% of the trailers tested exceed 0.1 ppm in a short term exposure with expected health effects. Much lower levels were set for longterm exposure, for example, 0.03 ppm for fourteen (14) to three hundred sixty four (364) days exposure.

The undersigned counsel/applicant had been appointed to the PSC by Judge Eldon Fallon in the Murphy Oil Litigation, Docket Number 05-4206, on October 12, 2005.  As a result of participating in that litigation and through clients in that case, several former

St. Bernard Parish clients were living in FEMA-provided trailer housing and wanted legal representation arising out of this alleged exposure to toxic fumes from the trailers.

In the late winter of 2007, Mover began investigating and researching clients' complaints of exposure and the potential cause and origin of the fumes being reported throughout the Gulf Coast region from trailer housing provided by FEMA.

On May 18, 2007, Mover filed a complaint, *Oldenburg v. USA and Fleetwood*, Docket Number 07-2961 "B"(3), the first of eighty-seven (87) lawsuits filed on behalf of approximately 2,000 claimants in the States of Louisiana, Mississippi, and Florida. Mover presented the litigation to the Gainsburgh Firm through Gerald Meunier and invited their participation in the litigation at this time, given the potential scope of the case.

As of the time of filing the *Oldenburg* case, there were two (2) other cases pending: *Hillard, et al v. United States of America,* Civil Action Number 06-2576, filed on May 18, 2006; and *McGuire, et al v. United States of America*, Civil Action Number 06-5659, filed on August 31, 2006.

On November 6, 2007, an MDL was ordered under the official caption, "In Re: FEMA Trailer Formaldehyde Product Liability Litigation", MDL Number 1873.

On December 11, 2007, Judge Engelhardt appointed the undersigned as one of the fifteen (15) original PSC members.

In June 2009, due to time constraints being imposed upon undersigned personally arising out of a personal divorce going to trial the first week of August 2009, Mover was forced to withdraw from the PSC, which was granted by this Court.

This common benefit fee application concerns undersigned counsel's time and cost contributions prior to the date of withdrawal from the PSC.

## II.    PSC MEMBERSHIP SERVICE AND REQUIREMENTS

Applicants and appointees to a court-appointed steering committee must declare that they have the training, experience, time, and financial resources to serve as a member of a steering committee.  From the early spring of 2007 until June 2009, the undersigned counsel almost exclusively devoted his time to the research, investigation, and development of this litigation.

## III.    FINANCIAL SUPPORT TO THE LITIGATION

According to the records of Bourgeois Bennett, the following monies were timely paid, as requested by the PSC (assessments), or required by the litigation (held costs):

|  |  |
|---|---|
| Held Costs | $  31,254.89 |
| PSC Assessments | $165,000.00 |
| Total: | $196,254.89 |

## IV.    LITIGATION SUPPORT TO THE LITIGATION PRIOR TO AND DURING PSC APPOINTMENT

Undersigned counsel adopts the language of co-liaison at page 7 of its Memorandum in Support of Motion of Co-Liaison Counsel for Plaintiffs to Approve Proposed Common Benefit Fee Allocation, which was filed under seal on October 30, 2012, wherein it declares that they are "sensitive to the inevitable risk of self-interested analysis in any fee allocation advocacy."  The synopsis of the work performed by the

undersigned will follow the "*Johnson* Factors" in the case *Johnson v. GA Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), which enumerates twelve (12) factors by the Fifth Circuit for consideration in determining the reasonableness of a fee requiring judicial approval:

(1)   The time and labor required;

(2)   The novelty and difficulty of the questions;

(3)   The skill requisite to perform the legal service properly;

(4)   The preclusion of other employment by the attorney due to acceptance of the case;

(5)   The customary fee;

(6)   Whether the fee is fixed or contingent;

(7)   Time limitations imposed by the client or the circumstances;

(8)   The amount involved and the results obtained;

(9)   The experience, reputation, and ability of the attorneys;

(10)   The "undesirability" of the case;

(11)   The nature and length of the professional relationship with the client; and

(12)   Awards in similar cases.

The most relevant factors are as follows:

**A.   The Time and Labor Required**

In order that this fee application be as accurate as possible, Mover has attached a high-point summary of the common benefit work performed by Mover and his firm,

consisting of three (3) lawyers, four (4) paralegals, two (2) legal assistants, and two (2) legal secretaries.[2]

The time submissions recorded by Bourgeois Bennett evidences the following hours of the firm:[3]

| | |
|---|---:|
| Ronnie G. Penton | 1,302.63 |
| Associate Attorney | 441.24 |
| Paralegal | 463.00 |
| Other | 477.50 |
| | 2,684.37 |

In the ten (10) months prior to the December 2007 PSC appointment, the following critical litigation actions were taken by Mover and his firm:

(1)     Extensive formaldehyde toxicology research;

(2)     Travel trailer/industry research;

(3)     Investigative interviews and identification of contractors handling trailers;

(4)     Association with Gerald Meunier and Gainsburgh Firm;

(5)     Filed *Oldenburg v. USA, et al*, on May 18, 2007, which resulted in the MDL proceedings;

(6)     Fleetwood defense counsel coordination meetings;

(7)     Retained the leading toxicologist and co-author of Cassarate & Doull text, Dr. John Doull, and developed a medical/toxicology profile and trailer testing threshold standard;

---

[2]     Exhibit 1 - Timeline of Common Benefit Work by The Penton Law Firm
[3]     Exhibit 2 - Reports of Bourgeois Bennett Indicating Time Submissions of The Penton Law Firm and other Firms

(8)     Retained expert in industrial hygiene and developed a medical

        questionnaire for formaldehyde exposure;

(9)     Coordinated Plaintiffs' lawyers for support of MDL motion;

(10)    Expert retained in travel trailer/modular home design, construction, and

        materials and developed a comparative analysis of the materials of

        construction for each type of mobile or modular home;

(11)    Meetings with Congressional hearing witnesses and staffers in the

        Congress on the investigation;

(12)    Coordinated experts with Justin Woods and Lambert Nelson with regards

        to selection and testing of trailers and provided Dr. Doull's opinion on the

        odor threshold pre-requisite for trailer selection for testing;

(13)    Filing of Federal Court lawsuits in Mississippi and Alabama in March

        2008 and March through September 2009, consisting of 87 lawsuits and

        2,000 claimants;

(14)    "Lone Pine" meetings with Gerald Meunier and the defense.

(15)    Developed a manufacturer's list for travel trailers and mobile homes

        provided to FEMA for the program.

In 2008, the following non-exclusive listing of critical litigation actions was taken

by Mover and his firm:

(1)     PSC participation with Gerald Meunier to coordinate PSC activities into

        an organizational committee structure, including a work order system to

        allocate approved work tasks to the PSC membership.

(2)     PSC Committee participation - discovery, documents, experts, trial, public

relations, and science;

(3)     Co-chair of Expert and Trial Committees;

(4)     Primarily responsible for retention and working with the following

experts in the following fields of expertise for development of a medical/

toxicological profile:

| | | | |
|---|---|---|---|
| (a) | Dr. Harry Milman | Cancer Toxicology | Washington, D.C. |
| (b) | Dr. Gerald McGwin | Health Screening | Birmingham, AL |
| (c) | Dave Barnes | Meteorology | Slidell, LA |
| (d) | Connie Nichols | Document Management | New Orleans, LA |
| (e) | Dr. Rodd Hood | Reproductive Toxicology | Tuscaloosa, Alabama |
| (f) | Dr. Erroll Geiger | Genetic Toxicology | North Carolina |
| (g) | Dr. Steven Lamm | Epidemiology | Washington, D.C. |

(5)     Congressional hearings and meetings with Congressman Bennie

Thompson, District 2, and coordination with Mississippi trailer locations

storage sites;

(6)     Court and chamber conference attendance as co-chair of critical

committees;

(7)     Developed PSC Operating Agreement for PSC assignments with Gerald

Meunier;

(8)     Meetings with contractors managing Southeast Mississippi trailer storage yards to develop information on locations for testing and testing conducted at their site by CDC;

(9)     Developed deposition manual for PSC attorneys, including protocols and orders governing them after meetings with Winstock and defense delegation;

(10)    Coordinate Trial Committee for class certification hearings;

(11)    Coordinate with Stephen Murray, Gerald Meunier, and the defense for designation of class representatives and trial plaintiffs;

(12)    Ronnie Penton and Gerald Meunier discovery coordination meetings with defense;

(13)    Deposition participation:

      (a)     Shaw Group           1st Chair           Baton Rouge, LA

      (b)     Gulfstream           2nd Chair           Indiana

      (c)     CH2M Hill            1st Chair           Colorado

      (d)     Coachmen             2nd Chair           Indiana

      (e)     Keystone             1st Chair           Indiana

      (f)     North American       1st Chair           Florida

      (g)     Morgan               2nd Chair           New Orleans, LA

      (h)     Defended Plaintiff experts' depositions of Dr. Harry Milman, Dave Barnes, and Mary DeVaney.

(14)    Document review and summarization of trailer manufacturers' documents;

(15)    Class certification participation:

      (a)     Prepared preliminary and final witness and exhibit lists from 1 ½ years of investigation, research, and PSC discovery;

      (b)     Coordinated exhibit presentation;

      (c)     Coordinated certification trial order of evidence;

      (d)     Trial preparation of witnesses;

      (e)     Trial

In the five (5) months in 2009, prior to my withdrawal from the PSC, the following litigation support activities were completed:

      (1)     Chair the juror questionnaire development project;

      (2)     Chair Trial I Plaintiff expert report exchange project;

      (3)     Trial I Plaintiff interviews, research, and preparation.

**B.**      **The Novelty and Difficulty of the Questions and the Skill Required**

From the onset of this litigation, ten (10) months prior to the PSC appointment and for 1 ½ years after the PSC appointment, undersigned counsel was lead in the research and investigation of formaldehyde and its affect on humans under prevailing environmental conditions that prevailed within these travel trailers and mobile homes. The challenge was the absence of definitive, peer-reviewed, scientific and toxicological literature defining the potential harm to humans from exposure to formaldehyde gases similar to the conditions presented.

To develop a scientifically-sound toxicological and medical profile for the exposed claimant population, Mover personally sought a consult and then retained Dr. John Doull in July 2007, co-author of the well-known authoritative toxicology text,

Cassarate & Doull, considered by many to be the Bible in this field of science. The toxicology foundation upon which the trailer testing protocols were developed involved an odor threshold as pre-requisite for first-round selection of testing trailers, as well as those used by CDC and the Sierra Club.

Similarly, the scientific literature led Mover to the retention of other experts identified at Page 9 of this brief to investigate the disease potential of short and long term exposures at various levels of concentration.

Mover's previous 25 years' experience handling toxic and harmful substance cases, beginning with the infamous Legionnaire's Disease litigation in the mid-1980's, then a long list of cases involving chemical plant releases and explosions, railroad derailments, chemical tanker accidents, railroad chemical car explosions, contaminated buildings, chemical fires, oilfield well blowouts and explosions, and other point source releases of hazardous substances, equipped undersigned with the requisite medical and toxicological knowledge and experience to enable Mover to competently research and investigate this relatively obscure human toxin under these circumstances.

**C.    The Preclusion of Other Employment**

Mover's law firm is located on the Northshore of Lake Pontchartrain in Bogalusa. At the time of this litigation, the firm consisted of Mover, three (3) associate attorneys, with paralegal and legal assistant support -- a small country firm by anyone's definition. Taking on this litigation precluded most all other legal case opportunities, based upon the small staff and the lack of availability of contract staff in rural Louisiana and Southeast Mississippi. Specifically, Mover had been on and/or worked on litigation committees in various mass tort/class actions over the years, including Legionnaire's Disease; Angie,

Louisiana Ammonia Release; Ford Motor Company Ignition Litigation; Gaylord Chemical Release; Latex Glove Litigation; Telectronics Pacemaker Litigation; PPA; Festus, Missouri Chlorine Plant Explosion; Baycol Litigation; Serzone Litigation; Meridia Litigation; Thimerosal Litigation; Welding Rods; Glendale, Arizona Chemical Plant Explosion; Temple-Inland Chemical Release; City of Baltimore Train Derailment and Explosion; Neurontin; Shell Oil Fuel Contamination; Vioxx; Vinyl Chloride; New Iberia School; Graniteville, South Carolina Chlorine Release; Seneca, South Carolina Landfill; Murphy Oil Katrina Litigation; Viagra; Guidant Implantable Defibrillators; Bextra; Celebrex; and Apex Fire.  All of these cases involved medicine, toxicology, general and specific causation.

Mover was regularly offered positions and participation on trial teams in complex litigation cases, nationwide.  When Mover started the case, which resulted in this MDL, Mover was just coming off a fast track settlement and resolution for fourteen-months in the Murphy Oil case, where Mover was Co-Lead Trial Counsel.

**D.      Time Limitations Imposed By Circumstances**

Significant time restraints developed out of the identification of testing trailers, the matching of trailers to contractors, the development of a medical/toxicological profile, and the governmental programs to sell, dispose or destroy the subject trailers and evidence in the case.

The huge number of trailers, trailer manufacturers, claimants, and contractors, was a serious challenge to the time and financial resources required to identify a claimant to a trailer, to a contractor, and to a toxic exposure within the trailer.  Congress pressured

FEMA to warn trailer residents of the potential health effects in 2008 and the race was on to identify and test trailers that were being taken to storage sites around the Southeast United States for either destruction or sale.  These time-sensitive issues presented meaningful factors in assessing the work done in this case and, hence, the common benefit fee awarded.

**E.     Experience, Reputation, and Ability of Counsel**

Without inflating undersigned counsel's experience, reputation, and ability in these types of cases, it is the belief of Mover that PSC members, subscribing members, co-liaison, and the defense would not deny that these are positive characteristics of this applicant.

**V.     CO-LIAISON COUNSEL'S PROPOSED FEE ALLOCATION**

Co-Liaison counsel's proposed percentage of fee allocation of 0.20% equates to a dollar value of $12,392.32.  If that fee allocation is compared to the 1,302.63 hours that Mover reasonably devoted to this case, then compensation would be $9.51 an hour, which is hardly reasonable.  It is important to note that Mover is in the bottom tier with subscribing members but, reasonably, should be within striking distance, at least, of the Committee.  Co-Liaison counsel describes the bottom tier of their proposed allocation as, "the firms in this tier for the most part consist of 'passive investors' during the MDL proceedings (i.e., they are firms which provided helpful financial support but little in the way of litigation activity)."  Mover believes he was unconsciously put in the bottom tier, based upon not being fresh on all his original foundational contributions at the beginning

of this litigation, moving this proceeding into the MDL, and litigating for 1 ½ years at the level of experts, documents, discovery, and PSC contribution.  It is requested that both the hourly contribution of Mover and his firm, as well as the character of the work performed by Mover, be considered when setting the fee in this case.

## VI.    CONCLUSION

In conclusion, Mover avers that the combined effort of co-liaison, Gerald Meunier and Mikal Watts, got the case settled, despite all of the work along the way by everyone. It's been three (3) years since Mover was forced to devote practically all of his time to personal issues, however, what Mover respectfully requests is that both the court and co-liaison counsel focus on the foundational work his Firm and Mover performed in getting this litigation into an MDL and all of the work through the time of the class certification phase and run-up to Trial I.

Undersigned does not criticize the placement of his allocation in the bottom tier, but assumes that co-liaison counsel may not have reviewed his extensive contribution early on in this case.  Mover writes this brief in opposition to clarify his contributions, both to the Court and co-liaison counsel.

The work performed by Mover and his firm was critical to this litigation and it would be unlikely that anyone could dispute that categorization.

Mover is requesting an allocation that considers his pre-PSC and post-PSC work and that the substantive areas in which he worked, and in most cases the leadership role in which he functioned, be given the weight by hour commensurate with the potential benefit to the common good of the claimants and "a significant impact on outcome."

THE PENTON LAW FIRM
209 HOPPEN PLACE
BOGALUSA, LOUISIANA  70427
PHONE          :          (985) 732-5651
FAX               :          (985) 735-5579
E-MAIL          :          fedcourtmail@rgplaw.com


s/Ronnie G. Penton
Ronnie G. Penton
Trial Counsel for Plaintiff
Louisiana Bar Roll Number 10462