## COMMON BENEFIT FEE ALLOCATION PROPOSAL OF PSC MEMEBERS
## RAUL BENCOMO, FRANK D'AMICO, JR. AND DENNIS REICH

| FIRM/ATTORNEY NAME | PERCENT OF COMMON BENEFIT FEE ($6,196,159.95) | FEE AWARD |
|---|---|---|
| Gainsburgh and Watts/Hilliard (Pinedo) | 50% | $3,098,079.98 |
| Buzbee Law Firm | 10% | $619,616.00 |
| Raul Bencomo | 7.50% | $464,712.00 |
| Lambert & Nelson | 7.50% | $464,712.00 |
| Frank D'Amico, Jr. | 7.50% | $464,712.00 |
| Dennis Reich | 7.50% | $464,712.00 |
| Matt Moreland and Robert Becnel/Diane Zink | 5% | $309,808.00 |
| Sidney Torres/ Roberta Burns | 1.25% | $77,452.00 |
| Hurricane Legal Center | 1.25% | $77,452.00 |
| Jim Hall/Joe Rausch | 0.70% | $43,373.12 |
| Nomi Husain | 0.50% | $30,980.80 |
| Nexsen Pruet | 0.45% | $27,882.72 |
| Rodney & Etter | 0.35% | $21,686.56 |
| Ronnie Penton | 0.20% | $12,392.32 |
| Keith Doley/Catrice Johnson | 0.10% | $6,196.16 |
| Joseph Bruno | 0.10% | $6,196.16 |
| Douglas Schmidt | 0.10% | $6,196.16 |
| **TOTAL** | **100%** | **$6,196,159.95** |

### Raúl R. Bencomo Common Benefit Contribution Narrative

Undersigned has been one of the most active members of the PSC since his appointment by Judge Engelhardt in December 2007. Mr. Bencomo's participation is as follows:

#### Washington, D.C. / Media / Medical Monitoring

The undersigned made three trips to Washington, D.C. during the early stages of the litigation. The first involved meetings with members of the Senate Homeland/Housing Committee in an effort to further the Senate's involvement with the FEMA victims. The second involved attendance at the Science and Technology Committee's Hearing on FEMA Trailers. The third trip involved meeting with Hispanic Congressional Caucus Staff and with Congressman Waxman's Chief Investigator on the House Oversight Committee. During the course of these trips, Mr. Bencomo also met with Senator Landrieu, members of her staff, and others. He also participated in meetings with Ron Faucheux to discuss political solutions to medical monitoring issues.

In early 2008, Mr. Bencomo also participated in a press conference at the FEMA facility on the West Bank, which was carried by a number of media outlets. Additionally, he attended a number of community informational meetings in St. Bernard and Orleans Parish.

In addition to the above, Mr. Bencomo helped edit a number of press releases that were being circulated on our behalf. These press releases were done in conjunction with Tony Buzbee's office, since Mr. Bencomo and he were both heading up the Public Relations Committee. He also participated in meetings and phone conferences with Norma Jane Sabiston and her colleagues on these issues.

#### Claims Office

In spite of the fact that the undersigned had limited resources, he stepped up to the plate when a request came from Liaison Counsel for staffing the Claims Office. Ms. Elaine Bates worked on behalf of Bencomo & Associates and logged in a total of one thousand four hundred eighty-two hours (1,482). Likewise, Ms. Elise Borruano also worked at the Claims Office on behalf of Bencomo & Associates and logged in four hundred thirty-nine (439) hours. Both Ms. Bates and Ms. Borruano performed any and all tasks assigned to them by those in charge of the Claims Office. At no time did undersigned claim payments made to either individual as "held costs."

#### Assessments

Undersigned paid his assessments, since their inception, **on or before the Committee-imposed deadlines.** As Liaison Counsel is well aware, not everyone did so in a timely manner, which burdened the mother's milk of all significant litigation, the funding of the case as required. Although some may not consider this a significant factor when dealing with the issue of apportioning fees from a limited fund, it is important to recognize the fact that if those who paid by the Committee-imposed timelines had also failed to do so, the consequences would have been disastrous in a case(s) that faced almost insurmountable hurdles during its lifespan.

#### Insurance Policies and Reviews Thereof

Early on, the undersigned was assigned the responsibility of reviewing and researching defendants' insurance policies. A comprehensive review of the (approximately 39) policies provided by defendants (primary/excess/umbrella) was performed by undersigned as soon as he was provided the pertinent policies and sent to all members of the PSC. That review specifically identified the various applicable exclusions (i.e., pollution, formaldehyde-specific) and was made available to everyone on the PSC. During several of the early PSC phone conferences, Mr. Bencomo specifically made the members aware of the potential pitfalls (i.e., the high deductibles, formaldehyde exclusions) only to be met with "damn the torpedoes, full speed ahead." Regardless, the research was undertaken early and the results disseminated for all to see. The only other research that was conducted on insurance policies occurred towards the latter part of the litigation and was performed by the offices of Liaison Counsel.

#### Depositions

Mr. Bencomo personally monitored and/or participated in approximately forty-six (46) depositions. Of the ones that he took or defended, approximately one dozen or more required out-of-

state travel. The travel included several trips to Riverside, California (**Fleetwood**), South Bend, Indiana (**Recreation by Design** and **Jayco**), Houston (**Recreation by Design**), Austin, Texas (**Recreation by Design**), and Birmingham, Alabama (**Circle B Enterprises**). Locally, Mr. Bencomo participated in depositions throughout the metropolitan area involving witnesses, medical doctors, and other experts retained by various defendants. To list every deposition taken or defended by Mr. Bencomo would not allow him to keep the three-page limit for this narrative. However, he incorporates them herein for purposes of the fee allocation.

### PSC Meetings/Conference Calls

Mr. Bencomo participated in at least ninety-three (93) conference calls and numerous in-person PSC meetings. To the best of his knowledge, his participation in these was in the 98+ percentile.

### Motions/Pleadings

In preparation for the **Dubuclet/Castanel/Dolliole** trials, Mr. Bencomo personally prepared and argued numerous Motions, Memoranda, Oppositions to Motions in Limine, Motions in Limine, Motions to Strike and other pleadings leading up to the conclusion of these matters. To list every motion and pleading submitted to the Court by Mr. Bencomo in this litigation is impossible due to page limitations, but the fact that the effort was significant should be noted.

### Court Appearances

Mr. Bencomo appeared in Court for Court-ordered conferences or other conferences re: specific trials on at least twenty-four (24) occasions.

### Trailer Inspection

In connection with Mr. Bencomo's preparations for the **Fleetwood Trial**, he traveled to Lottie, Louisiana, where he met and consulted with our experts who were conducting the inspection of the **Dubuclet** trailer. No inspections of the Recreation by Design (**Castanel**) nor Jayco (**Dolliole**) trailers took place since they couldn't be located.

### Trials

Undersigned specifically prepared three cases for trial: **Elisha Dubuclet on behalf of Timia Dubuclet v. Fleetwood Enterprises, Earline Castanel v. Recreation by Design, and Quiniece Lambert-Dolliole v. Jayco**. The first case resulted in a recoupment of expenses. However, the case was ready to be tried; all discovery, depositions, etc. had been undertaken by Mr. Bencomo against **Fleetwood** when it became apparent that the case needed to be settled. Regardless, the case was "in the can" and ready to be tried by the undersigned.

The next trial assignment that undersigned took was that of **Earline Castanel v. Recreation by Design**. Mr. Bencomo, as lead trial counsel, took the majority of the depositions and was ready to try the case only to learn, after many hours spent by him in discovery and depositions in and out of state, etc. and virtually on the eve of trial for all practical purposes, that Mikal Watts would try the case. This surprising news came to Mr. Bencomo upon his return from Manresa, when he learned from a voice message that a change in plans had occurred. Regardless, discovery had been completed by Mr. Bencomo and several of the depositions that he took were played to the jury by the Plaintiffs' team in lieu of live testimony.

**Quiniece Lambert-Dolliole v. Jayco** was the last Summary Jury Trial and, for that matter, the last trial to take place in connection with this litigation. After suffering losses in all of the previous trials and summary jury trials, the jury in **Dolliole** returned hung, which is the closest that anyone had ever come to winning one of these cases. In addition, the cross examination of Dr. James Wedner by undersigned totally neutralized his testimony and was structured in such a way that defense counsel wasn't able to ask a single question on re-direct, leaving the jury with Plaintiffs' cross examination of Wedner as the last thing that they heard from this expert. There is no question in the undersigned's mind that the defendants became keenly aware of the damage that had been done to Dr. Wedner and this fact was even conveyed by defense counsel to Mr. Dan Balhoff, which helped with settlement negotiations and ultimately settlement with all outstanding Defendants.

### Settlement/Mediation

The first case to settle was that of Fleetwood, which was undersigned's direct responsibility. Even though Mr. Bencomo had traveled to Riverside, California, on a number of occasions to participate in discovery with that particular Defendant and even though he felt that he could win this trial, it soon became apparent to him that, in the end, we would be facing nothing but a Pyrrhic victory. As you know, Fleetwood was not only bankrupt, but their insurance policy was self-depleting. The better part of valor was to settle the case once this became apparent, thereby allowing us to receive reimbursement for our expenses.

Undersigned was also part of the "Settlement Team" led by Liaison Counsel that negotiated with Manufacturers, Setup Contractors, and Insurers, including Interstate Fire and Casualty Company, Lexington Insurance Company, Westchester Surplus Lines Insurance Company, and Arch Specialty Insurance Company. This area alone could take several paragraphs, but Liaison Counsel is aware of undersigned's involvement in settlement negotiations.

### THE JOHNSON FACTORS
### Risk

Both Leslie Schiff and Professor Dane Ciolino consider this to be one of the most significant, if not the most significant, of the **Johnson factors**. A firm that has unlimited financial resources or several law partners to apportion the risk is not as "at risk" as the individual who bears 100% of the risk ($502,500 in assessments and thousands of hours) and has limited financial resources. These figures do not include the "held costs" incurred by Mr. Bencomo in travel, lodging, document preparation, trial exhibits, etc. It is important to note that not everyone seeking fees incurred "held costs" and their participation may have only been limited to paying assessments and nothing more. It is for these reasons (money and time invested) that the jurisprudence, as well as the experts in the field, recognize the risk undertaken as bearing particular significance when awarding fees amongst counsel.

### Preclusion of Other Employment

Due to the severe timelines imposed by the Court, coupled with the fact that there was but a small core of lawyers actively involved in prosecuting this case from beginning to end, undersigned counsel was precluded from undertaking other significant employment during the course of this litigation. Since counsel is not with a firm whose duties and responsibilities can be shared, he participated in any and all responsibilities assigned to him in this case in spite of the fact that this litigation (FEMA) soon became a "can't win" proposition. When others abandoned ship, he kept the laboring oar assigned to him on course and never wavered from seeing this matter to its ultimate conclusion. Leslie Schiff, an expert in the area of lawyer ethics, including dealing with the issue of attorneys' fees, is on record as believing that the preclusion of other employment is a significant factor when taking into account a lawyer's contribution in class action/mass tort litigation and the awarding of attorneys' fees.[1]

### Other Johnson Factors

Mr. Bencomo's hourly fee in cases such as this is in the $400-$500 per hour range. Undersigned has been practicing law for 37 years, is AV rated, and has been named to Louisiana Super Lawyers with a specialty in class actions/mass torts for a number of years.

### Conclusion

While others had "other fish to fry" or partners to spread the risk and bring in other revenue during the five years it took to bring this case to a conclusion, the undersigned bore the great risk that this litigation posed. As such, he should be remunerated accordingly taking into account his efforts and the **Johnson factors** and other jurisprudence pertaining to the awarding/apportioning of Attorneys' Fees.

---

[1] Undersigned concurs with the current law that some of the Johnson Factors are subsumed within the hourly fee, but this is not the case with the Risk involved or the Preclusion of Other Employment.

Page 3 of 3

Frank J. D'Amico, Jr.
David J. Mitchell

THE LAW OFFICES OF
*Frank J. D'Amico, Jr.*
A Professional Law Corporation



Of Counsel
Michael A. McNulty, Jr.
Darryl J. Carimi
** Licensed in New York

October 17, 2012

Jerry Meunier
Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Re: *In Re: FEMA Trailer Formaldehyde Products Liability Litigation*
    *Case Number: 2:07-md-01873*

Dear Mr. Meunier:

I am writing this narrative in response to Judge Englehardt's recent approval of the "Common Benefit Cost Reimbursement" and the "Common Benefit Fee." This narrative serves as an official request from my firm to be refunded my contribution to said common benefit reimbursements and fees.

The Law Offices of Frank J. D'Amico, Jr., APLC has been heavily involved in all phases since the inception of this litigation. Initially, I was appointed as one of the original members of the Plaintiff Steering Committee (PSC). Soon thereafter, I jointly purchased a building to process claims which benefited others associated with the prosecution of claims involved in this matter. Ten (10) staff members were hired by my firm to perform various works on claims, such as intakes, gathering all necessary medical and trailer related documentation, assisting clients in filling out Plaintiff Fact Sheets, and mail-outs to clients. I along with Matt Mooreland, ran the claims office for two years.

Before and during litigation phases, I was responsible for bringing the majority of experts to the table including Patricia Williams (Toxicology Expert), Stephen Smulski (Wood Expert), and Stephen Mallet and Paul LaGrange (Construction Experts). Further, I deposed most toxicologists and was in charge of prosecuting claims against Forest River. Specifically, I tried *Wright v. Forest River, Inc. et al* (Case No. 9-2977), the only Bellwether case, which included a Contractor Defendant Shaw Environmental and lasted two (2) weeks. I spent nearly $500,000 on this trial and took six (6) months to prepare while assisting the PSC by conducting seminal depositions of Forest River and Shaw Enterprises and expended roughly $3.2 million in the prosecution of FEMA claims.

My firm has brought the litigation critical mass. My firm represents either individually or in common with other attorneys, 8,000 clients. I have expended hundreds of hours personally and

**NEW ORLEANS OFFICE**
622 Baronne St.
New Orleans, LA 70113
(504) 525-7272 • Fax (504) 525-9522

Toll Free 866-70-FRANK   www.damicolaw.net

**NORTHSHORE OFFICE**
4407 Highway 190 East Service Road, Suite 100
Covington, LA 70433
(985) 893-4443 • Fax (985) 893-3951

*Proudly serving the interests of injured people across Louisiana since 1986.*

have traveled to Atlanta, South Bend, and Seattle for depositions.

This case has taken up most of my attention for the past five (5) years that I have been involved. I hope this narrative gives you some feel for my involvement in this case and, quite candidly, this case has been a huge drain on my firm. I would certainly have been better served to have invested $100,000 in thirty individual drug and product cases and yielded a much better result. This is a sentiment I am sure that we all feel now.

Finally, to date, my firm is current on all assessments which total $516,938.23 including the $100,000 advanced to my firm for the prosecution of the *Wright v. Forest River* trial, my firm has a considerable amount of hours billed, I have attended every status conference and meetings, and I have been ready and willing to perform every task called upon.

With the kindest regards, I remain

Sincerely yours,

Frank J. D'Amico, Jr.

NEW ORLEANS OFFICE
622 Baronne St.
New Orleans, LA 70113
(504) 525-7272 • Fax (504) 525-9522

NORTHSHORE OFFICE
4407 Highway 190 East Service Road, Suite 100
Covington, LA 70433
(985) 893-4443 • Fax (985) 893-3951

Toll Free 866-70-FRANK    www.damicolaw.net

*Proudly serving the interests of injured people across Louisiana since 1986.*



# Reich & Binstock, LLP

A Limited Liability Partnership Including Professional Corporations

## Attorneys & Counselors at Law

4265 San Felipe, Suite #1000
Houston, TX 77027
Phone: 713-622-7271
Fax: 713-623-8724

Toll Free:
1-800-622-7271

www.reichandbinstock.com

Dennis C. Reich *+π
Robert J. Binstock *#

* Board Certified Personal Injury Trial Law
Texas Board of Legal Specialization
+ Admitted State Bar of California
π Admitted State Bar of New York
# Board Certified Civil Trial Advocacy
National Board of Trial Advocacy

Shari A. Wright
Charles C. Hunter
Eric O'Steen

Debra Brewer Hayes
(Of Counsel)

October 17, 2012

### 07-MD-1873 FEMA Trailer Formaldehyde Products Liability Litigation

### Memo: PSC Fee and Cost Reimbursement for Reich & Binstock, LLP

Reich & Binstock has made a significant contribution to the development and prosecution of the Plaintiffs' claims in In re *FEMA Product Liability Litigation MDL 1873*. As evidenced by the most recent record of Bourgeois Bennett, LLC, Reich & Binstock has spent **$505,261.00** for PSC assessments, **$446,559.92** in reimbursable held costs for a total out of pocket amount of **$951,820.92**. Reich & Binstock, has contributed the following Committee hours:

| | |
|---|---|
| Dennis C. Reich (as PSC member) | 2,603.78 |
| D. Reich subscribing attorney prior to PSC appointment | 330.00 |
| Shari Wright (attorney hours) | 616.00 |
| T. Beard, A. Snoddy, C. Wiese (Paralegal hours) | 1,047.45 |
| T. Hargrove, O. Herrington, A. Cronin, C. Hudson (Claims office personnel): | 7,227.13 |

Dennis Reich played a pivotal role in the development of the medical causation case for the FEMA litigation. He worked extensively with all of the medical, toxicological, and epidemiological experts retained by the PSC. At the class certification hearing, he cross-examined Dr. Wedner, the only expert called by the Defendants. He deposed the principal epidemiological, toxicological, and medical experts retained by the Defendants for the bellwether cases. He also deposed numerous treating physicians and independent medical examiners hired by the defendants.

As trial counsel in the *Wright* case, Mr. Reich was responsible for medical causation, presenting and cross-examining the medical and scientific expert witnesses, and delivering the scientific evidence portion of the final argument. As lead counsel in the *Castanel* case, he presented and/or cross-examined the medical experts.

For the *Alexander* trial, Mr. Reich, together with Jerry Meunier, travelled to Atlanta to depose Christopher De La Rosa, a prominent toxicologist at the CDC. Mr. Reich also accompanied Mr. Meunier to Washington DC to participate in the deposition of the corporate representative for the Formaldehyde Institute. Additionally, Mr. Reich argued the Appeal to the Fifth Circuit of the dismissal of the United States as a defendant in the *Alexander* case.

Mr. Reich served as lead counsel in the *Sun Valley* case. During the litigation, Brent Maggio, defense counsel for *Sun Valley*, never missed a billing opportunity. Ms. Wright and Mr. Reich drafted pleadings, served and responded to discovery requests, and took and defended numerous depositions. Ultimately, the combined efforts of Justin Woods, Jerry Meunier, and Mr. Reich led *Sun Valley* and the other manufacturers insured by the same carriers to settlement.

Shari Wright is a Reich & Binstock employee. Ms. Wright has been practicing law for over 20 years. She contributed at total of 616 hours to the FEMA litigation. She served as an active member of the briefing teams for the *Alexander, Dubuclet, Wright*, and *Castanel* cases, as well as coordinating the *Castanel* briefing. She also wrote the *Castanel* appellate briefs. In the *Sun Valley* case, she participated in every aspect of the litigation, including presenting and deposing fact and expert witnesses.

In addition to the above, Reich & Binstock hired and paid staff for the Claims office. Together they logged thousands of hours of common benefit work. Cynthia Wallace and David McClendon were full-time attorneys who were hired by Reich and Binstock that worked on several of the bellwether cases and also did work in the claims office. Amanda Cronin, Crystal Hudson, Kristen Despommier, Oana C. Herrington, Jennifer Reavis were the Claims office paralegal personnel, including the lawyers totaled **$178,834.83** .

In light of the foregoing, Reich & Binstock requests reimbursement of total out-of-pocket expenses (PSC assessments & held costs) in the amount of **$951,820.92.** In addition, Dennis Reich requests at least 15% of the common benefit fees, **$929,424.00**[1], an amount that is significantly less than his lodestar alone[2]. Therefore, Mr. Reich believes that a fair and reasonable fee and cost reimbursement equal **$1,881,244.90.**

REICH & BINSTOCK, LLP

//s// Dennis C. Reich

Dennis C. Reich

---

[1] .15 x $6,196,159.92= $929,424.00 (Common Benefit Fees)
[2] 2,603 hours x $550 per hour = $1,431,650.00