UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER                            MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION                   SECTION "N-5"

                                               JUDGE ENGELHARDT
                                               MAG. JUDGE CHASEZ

THIS DOCUMENT IS RELATED TO ALL CASES

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

MEMORANDUM IN SUPPORT OF
MOTION OF CO-LIAISON COUNSEL FOR PLAINTIFFS
TO APPROVE PROPOSED COMMON BENEFIT FEE ALLOCATION

MAY IT PLEASE THE COURT:

Based upon three prior Orders, the Court has approved and set aside from various

settlements a total common benefit fee of $6,196,159.95.[1]  This lump sum fee now must be

allocated among counsel who performed services for plaintiffs' common benefit.

To begin this process, and create the record needed by the Court to make its

determination, the PSC authorized the undersigned Co-Liaison Counsel to recommend a

common benefit fee allocation.  This is hardly unusual, and certainly logical; the position of co-

liaison or co-lead counsel in an MDL such as this can be expected to provide an overview and

appreciation of both the scope and value of all common benefit activities carried out by counsel

---

[1] In its Order of 9/27/12 (Doc. 25885), the Court approved a common benefit fee of
$5,339,271.82 in connection with the plaintiff class settlement with manufacturers; in its Order
of the same date, 9/27/12 (Doc. 25886), the Court approved a common benefit fee of
$730,918.16 in connection with the plaintiff class settlement with contractors; and in its Order
and Reasons of 10/3/12 (Doc. 25901), the Court granted (without opposition) a PSC Motion and
Order (Docs. 25842 and 25842-3) to approve a common benefit fee of $125,970 in connection
with the plaintiffs' non-class settlement with certain manufacturers.

and their staff.

Undersigned Co-Liaison Counsel undertook their charge by first soliciting page-limited narratives from each common benefit fee applicant describing the common benefit services rendered by that firm/attorney. Every PSC and non-PSC plaintiffs' counsel of record who had submitted costs for the common benefit and/or hours in common benefit service, per this Court's previous orders and protocol, was deemed eligible and invited to submit such a narrative.

As reflected in these narratives, therefore, the following firms and counsel are seeking an allocation from the common benefit fee:

1.  Gainsburgh Benjamin
2.  Watts/Hilliard
3.  Buzbee Law Firm
4.  Raul Bencomo
5.  The Lambert Firm
6.  Frank D'Amico
7.  Dennis Reich
8.  Matt Moreland
9.  Robert Becnel/Diane Zink
10. Sidney Torres/Roberta Burns
11. Hurricane Legal Center
12. Jim Hall/Joe Rausch
13. Nomi Husain
14. Nexsen Pruet
15. Rodney & Etter
16. Ronnie Penton
17. Joseph Bruno
18. Douglas Schmidt
19. Catrice Johnson-Reid/Keith Doley
20. Woodfill Firm

The narrative of each is attached hereto as Exhibit A(1)-(20) [the numbers corresponding to the foregoing list].

Although not sworn, the narratives were solicited with an express directive that counsel

-2-

be prepared to execute an affidavit or affidavits attesting to the content of the narrative; and each applicant now has been further advised by e-mail to do so by filing such affidavits in the record prior to the Court's hearing on this motion. The Court will note that some of the attached narratives already have been supplemented by affidavits for the record.

In addition to reviewing the narratives, undersigned Co-Liaison Counsel reviewed the common benefit assessment payments by each counsel, the "held costs" common benefit submissions made by counsel to Bourgeois Bennett pursuant to the Court's earlier protocol, and the Bourgeois Bennett report on the common benefit time submissions made by each firm pursuant to that same protocol. These documents are attached as Exhibit B (statement of common benefit assessment payments). Exhibit C (Bourgeois Bennett report on "held" cost submissions), and Exhibit D (Bourgeois Bennett report on common benefit time submissions).

Although there has been no audit of the common benefit time submissions by counsel (Exhibit D), the undersigned submits that such time submissions provide at least an understanding of the amount of time each firm claims to have expended in common benefit services. None would dispute that some firms are better (more aggressive) "record keepers" than others. More to the point, the undersigned as Co-Liaison Counsel believe they are in a position which allows them to put these time submissions in proper "evaluative" perspective: where total hours did not render an equivalent value, they were discounted, and where the hours were devoted to assignments having a significant impact on outcome, they were given more weight. The undersigned believes that the ultimate determinant in review of submitted hours should be what counsel accomplished with their time which had a demonstrable benefit for all plaintiffs. Self-evidently, an hour reading e-mails or supervising someone in the Claims Office is

qualitatively different than an hour spent at trial or in negotiating settlement.

The "held cost" submissions (Exhibit C) are being subjected to an audit by a PSC sub-committee (Justin Woods, Matt Moreland and Tony Buzbee), and this audit report will be forthcoming and made a matter of record prior to the Court's hearing on this motion. For present purposes, Exhibit C does at least provide information as to what cost outlays (in addition to the paid assessments reflected in Exhibit B) various firms and attorneys made in purported common benefit activities.

Based on review of this material, now made a matter of record (under seal), the undersigned Co-Liaison Counsel proposed an allocation of a common benefit fee which is Exhibit E. It includes all common benefit fee applicants who submitted narratives (both PLC members and subscribing common benefit counsel). The proposed allocation first was circulated among PSC members only, for discussion at a PSC telephone conference held on Tuesday, October 23, 2012. All PSC members initially were participating in this telephone conference, as well as Hugh (Skip) Lambert of Lambert and Nelson in a non-voting capacity, by PSC agreement.[2] During this meeting, PSC member Mikal Watts had to excuse himself because of another commitment. After further discussion, Matt Moreland made a motion, seconded by Robert Becnel, which proposed an allocation different from that proposed by Co-Liaison Counsel. This proposed allocation is Exhibit F (formatted by Mr. Moreland to allow a "side by side" comparison with Co-Liaison Counsel's proposal).

Undersigned Co-Liaison Counsel made it clear during discussion at the 10/23 PSC

---

[2]Linda Nelson of Lambert & Nelson left that firm and withdrew from the PSC during the course of this MDL, in November 2010. Mr. Lambert effectively represents her and his firm's interest.

meeting that they would not agree to the alternative allocation proposed by Mr. Moreland, and that they continued to consider their initial proposal fair and reasonable. The alternative allocation then proceeded to a vote by the PSC members participating on the call (i.e., all except Mr. Watts, who had left the meeting). The Moreland/Becnel alternative proposal was supported by the votes of PSC members Messrs. Bencomo, D'Amico, Reich, Moreland and Becnel. It was opposed by Messrs. Meunier, Woods and Hilliard.[3] Mr. Buzbee abstained from the vote.

It then was agreed that the two allocations would be circulated to all common benefit fee applicants (i.e., to include non-PSC firms and counsel) and made the subject of competing motions for approval by the Court. It was further agreed that these motions would be filed by Tuesday, October 30th, so as to allow for opposition memoranda by Tuesday, November 6, and a hearing by the Court on Wednesday, November 14.

The principal differences in these proposals relate to: (1) the "shares" of the Gainsburgh firm and the Watts/Hilliard (Pinedo) team, and (2) the parity among all remaining members of the PSC except for Tony Buzbee (whose 10% remains the same in either proposal).[4] The undersigned submit that these differences merely serve to expose the fact that the Moreland/Becnel proposal is neither a realistic nor complete analysis of the relative common benefit work done herein. Confected without even the benefit of examining narratives or time and expense submissions, it appears to be more the product of political coalition-building than

---

[3]Mr. Watts has now signified his support for the Co-Liaison Counsel proposal, and, along with Mr. Hilliard, has joined in this motion.

[4]Another difference is that the Moreland/Becnel proposal only addresses 95% of the total fee at issue because it does not specify recommend shares for non-PSC common benefit applicants. *See* Exhibit F.

informed evaluation.

There should be no dispute that the "top tier" of common benefit services in this case was rendered by the Gainsburgh Benjamin firm (as the narratives from Gerald Meunier, Justin Woods, Palmer Lambert and Denise Martin in the attached narrative specified) and the combined services of Mikal Watts, Bob Hilliard and Chris Pinedo. Indeed, both proposals acknowledge as much. The question is how much of the total common benefit services in this case should be allocated to this top tier. There also appears to be no dispute that Tony Buzbee above should occupy the next tier at 10%.

The Co-Liaison Counsel proposal then allocates fee to a third tier consisting of four PSC members in equal shares: Raul Bencomo, Lambert & Nelson (Ms. Linda Nelson was Discovery Chair and was very active in the case but she did withdraw prior to much of the trial, and all of the settlement activity), Frank D'Amico and Dennis Reich. Even though there are differences between and among the services of these counsel, the undersigned believe that, on balance, their respective contributions and should be evaluated at the same level. Apparently, the PSC counsel in this group (Bencomo, D'Amico and Reich) do not disagree, since they also support such parity in the Moreland/Becnel proposal.

A fourth tier in the Co-Liaison proposal consists of Matt Moreland and Robert Becnel, both at parity, on the basis of the lesser scope and value of their common benefit assignments and services. Neither of these counsel played any role in pleadings, discovery, trial work or settlement negotiations. They did provide service in other areas, but it is respectfully submitted that the areas in which they were active were far less contributory to the ultimate class benefit of a global settlement resolution. The alternative Moreland/Becnel proposal nonetheless puts at

-6-

parity the contributions of Bencomo, Nelson, D'Amico, Reich, Moreland <u>and</u> Becnel, ignoring

what the record shows to be an obvious distinction within this group.

Finally, the Co-Liaison Counsel proposal allocates 5% of the common benefit fee among

9 subscribing common benefit counsel (who were assigned work by the PSC) and one former

PSC member, Ronnie Penton (who withdrew from the PSC in May 2009).  It goes without saying

that the resulting dollar amount allocations in this group are relatively modest.  However, Co-

Liaison Counsel has concluded, and the submitted narratives confirm, that the firms in this tier

for the most part consist of "passive investors" during the MDL proceedings (i.e., they are firms

which provided helpful financial support but little in the way of litigation activity).  In some

cases where additional, non-financial support was given, it was service which, frankly, pales in

comparison to the work done by counsel in the higher tiers   The distinctions between and among

allocations in this "5%" grouping are, we submit, made clear by reference to the submitted

narratives.

The undersigned are sensitive to the inevitable risk of self-interested analysis in any fee

allocation advocacy, and recognize that, in the final analysis, Your Honor is well-situated to

assess the common benefit contributions of <u>all</u> fee applicants, based upon (1) their submitted

narratives, (2) the relevant time and expense submissions, and (3), of equal importance, the

observations and experience of the Court in closely presiding over these proceedings for

approximately five years.[5]  But it bears emphasis that the necessary allocation of a lump-sum fee

represents a "zero sum game," since the enhancement of one contributor's position requires the

---

[5]Since Your Honor conducted meetings with all Court-appointed counsel, including all
PSC members, in advance of every MDL status conference, the roles and activities of these
attorneys and their firms were hardly hidden from judicial view.

diminution of another. Any assessment of an individual counsel's common benefit contribution must be made in relative, not stand-alone, terms. The question, then, is not only whether and to what extent the services of a given attorney or firm contributed to the ultimate common benefit of all plaintiffs, but also how that attorney's contribution should be weighed in comparison to the contributions of others.

The balance of this memorandum will address the reasons why the common benefit contribution of the Gainsburgh Benjamin firm was at least 35%, and the contribution of the Watts/Hilliard (Pinedo) group at least 25%, of all attorney/firm contributions which contributed to the common benefit settlement outcome on plaintiffs' behalf (i.e., the outcome which created the fund making a common benefit fee payment possible). In doing so, the legal framework for analysis will be both the Fifth Circuit jurisprudence and the relevant provisions of the Louisiana State Bar Rules of Professional Conduct which identify factors for a district court to consider in determining the reasonableness of a requested legal fee.

In the seminal case of *Johnson v. GA Highway Express, Inc.*, 488 F.2 714 (5th Cir. 1974), twelve factors were enumerated by the Fifth Circuit for consideration in determining the reasonableness of a fee requiring judicial approval:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 717-19. These factors have continued to be utilized by federal district courts for the

purposes of determining the reasonableness of class counsel/common benefit fee awards. *See, e.g., Turner v. Murphy Oil USA, Inc.*, 472 F.Supp. 2 830, 859 (EDLA 2007).

Rule 1.5 of the LSBA Rules of Professional Conduct enumerates eight factors to be considered by a Court in determining "the reasonableness of a fee," *to-wit*:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similarly legal services; (4) the amount involved and the services obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation and ability of a lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

The undersigned respectfully submit that, since not all of these overlapping factors are relevant or particularly helpful for present purposes (e.g., whether the fee is fixed or contingent, or the "undesirability" of the case, are considerations which apply equally to <u>all</u> common benefit counsel), there are six considerations enumerated in both *Johnson* and Rule 1.5 which appropriately may guide the Court in deciding this matter:

(1)     the time and labor required;

(2)     the novelty and difficulty of the questions;

(3)     the skill required to perform the legal service at issue;

(4)     the preclusion of other employment;

(5)     time limitations imposed by the circumstances of the litigation; and

(6)     the experience, reputation and ability of counsel.

### (1) The Time and Labor Required

The total common benefit hours submitted to Bourgeois Bennett on behalf of the

Gainsburgh Benjamin firm is 19,040.65.  As Co-Liaison Counsel, Gerald Meunier and Justin

Woods endeavored to keep accurate time records of their activity in the case, although there is

little question that, given the pace of activity at times, their recording and reporting of this time

did not capture all that was done by them.  But the contributions of others in the firm cannot be

discounted:  A significant amount of time also was invested by Palmer Lambert doing critical

work in the case, particularly in the mediation and settlement finalization phases where inventory

data and coverage issues were important.  Mr. Meunier's legal assistant Denise Martin rendered

important administrative services on literally each and every day this case was pending; and,

without her assistance to not only Gainsburgh Benjamin but all common benefit counsel, there is

little doubt a less favorable outcome for plaintiffs would have resulted. The firm's law clerks,

bookkeepers, contract attorneys and even its switchboard receptionist, all devoted value time and

effort as well to the plaintiffs' common benefit of managing and prosecuting this MDL.

It is respectfully submitted that every hour "logged" by the Gainsburgh Benjamin firm,

therefore, had weight and value beyond a merely numeric total.  The firm was "the tip of the

spear" which first and foremost touched the case in every aspect as it moved forward.  Your

Honor is asked to evaluate this "time and labor" factor, therefore, in a way which accords both

quantitative and qualitative meaning.

In the case of the Watts Hilliard group, these attorneys were involved in every

critical stage of this litigation and were instrumental in bringing this case to global resolution.

The total common benefit hours submitted to Bourgeois Bennett on behalf of the Watts Hilliard

firm is 15,388. Mikal Watts willingly volunteered his firm, attorneys and staff to handle

important projects, such as organizing the database, preparing responses to *Daubert* motions,

-10-

handling appellate briefing and other tasks. Watts Hilliard had over thirty attorneys, staff and paralegals involved in one stage or another of this effort from trial to settlement. Besides trial work, Mikal Watts undertook important tasks such as successfully negotiating for extensions to the Plaintiff Fact Sheet deadline, extensions to the matching process, and a stay in the Fact Sheet deficiency process. Mikal Watts also took the lead in negotiating for a reduced set of data from the Fact Sheets to use in a database and then in compiling the database. The database was in turn used by all the manufacturers in the settlement process. At several crucial stages during the course of this litigation, Mikal Watts assisted Plaintiffs' Liaison counsel by meeting with or negotiating agreements with Defense Liaison Counsel. With regard to the database, due to the incompatibility of the data, Mikal Watts expended the time effort and expense to have the data reentered in a uniform fashion. Although the Court ordered that this effort was to be reimbursed, this was an example of the work that Mikal Watts was willing to incur to advance this litigation.

Watts Hilliard, more than any other firm, took the lead in working with the plaintiff experts in reviewing their reports and producing them for deposition and in deposing the defense experts. Chris Pinedo took over 100 depositions, most of which were expert depositions and all of which involved travel. In addition, Mr. Pinedo conducted over 200 client interviews to select bellwether candidates and then later to prepare plaintiffs for deposition.

Finally, Mikal Watts, Bob Hilliard and Chris Pinedo attended numerous settlement conferences and mediations with multiple manufacturers.

### (2) The Novelty and Difficulty of the Questions

It is important to consider that the thorniest legal and factual issues in this case largely were addressed and handled on plaintiffs' behalf by the Gainsburgh Benjamin firm and/or the

Watts/Hilliard group. Virtually every important or complex legal matter was subject to final analysis and disposition on plaintiffs' behalf by the Gainsburgh Benjamin firm, as reflected in both written and oral arguments for which that firm ultimately was responsible (principally through Gerald Meunier). Similarly, the most challenging case management and administrative questions in the case were addressed and resolved by the Gainsburgh Benjamin firm. Every case management order proposed and submitted on plaintiffs' behalf was an order fashioned and/or finalized by common benefit counsel in the Gainsburgh Benjamin firm.

Of course, one of the most challenging administrative and case management issues was the matching of every plaintiff to an appropriate manufacturer/contractor. After the Gainsburgh Benjamin firm took primary responsibility to address the pleading and legal aspects of this matching problem, the Watts/Hilliard group did the heavy lifting which carried to the finish line, on behalf of all plaintiffs, the enormous project of creating a database and claim-based analysis for matching purposes. There would have been no settlement discussions, much less settlement agreements, without this effort. The initial question posed by defendants in every settlement discussion invariably was: How many matched claims are there?

Finally, while it is not true that the Gainsburgh Benjamin firm and Watts/Hilliard group exclusively addressed every technical or scientific evidentiary question in the case, it nonetheless can be said that most of the challenging issues in this regard were either the subject of *Daubert* motion practice handled by either the Gainsburgh Benjamin firm or the Watts/Hilliard group, or were the subject of presentations made by these counsel (including Chris Pinedo) through expert reports and expert testimony at trial. Indeed, Mr. Pinedo of the Watts/Hilliard group was beyond question the single most active trial attorney for plaintiffs in this MDL.

In sum, it is submitted that the Gainsburgh Benjamin firm and the Watts/Hillard group were given, and continually assumed, leadership roles in addressing and resolving the most challenging case management, procedural, legal and evidentiary common issues which confronted plaintiffs.[6]

### (3) The Skill Requisite to Perform Legal Services

The undersigned hope it is not necessary to "self-promote" on the matter of the skill levels they demonstrated in this litigation.  Suffice it to say that the attorneys in both Gainsburgh Benjamin and the Watts/Hilliard group carried out important common benefit responsibilities at a professional level which, we respectfully submit, was not surpassed by other plaintiffs' counsel in this matter.

### (4) Preclusion of Other Employment

Gerald Meunier and Mikal Watts are fortunate to have available to them a number of opportunities for involvement in mass tort and complex litigation, including multi-district litigation proceedings.  Over the course of this case, both of these attorneys were obliged because of their responsibilities herein to either forego or diminish their roles in other business which may well have proved more profitable for their respective firms.

In the case of Mr. Meunier, for example, the BP Oil Spill presented an outstanding opportunity for his and his firm's involvement in a key common benefit role.  In fact, Mr. Meunier was asked by the Plaintiffs' Steering Committee in that matter to assume a role in taking important discovery depositions and preparing for the trial of certain common issues.  However,

---

[6]It might be noted that there remains pending in the Fifth Circuit the Louisiana plaintiffs' appeal from this Court's dismissal of FEMA as a defendant.  The entire responsibility for briefing and arguing that appeal rests with the Gainsburgh Benjamin firm.

because of his position as Co-Liaison Counsel in this MDL, Mr. Meunier had to limit the amount of common benefit work he was able to do in response to this invitation. The same is true of another, more recent MDL pending in the section of the Honorable Sarah Vance, *In Re: Pool Products Distribution Market Antitrust Litigation*, MDL No. 2328, EDLA. In that matter, Mr. Meunier thus far has had to significantly curtail his activities and responsibilities because of the settlement class negotiation and approval process, and other matters pressing upon him as Co-Liaison Counsel in attempting to conclude the instant MDL.

In the case of Mr. Watts, he is frequently asked to take on matters around the nation and is in demand as a trial attorney. Due to his significant involvement in this case and the time requirements, he had to turn down a number of other opportunities which, in retrospect, represented much more lucrative legal business for his firm.

(5) <u>Time Limitations Imposed by Circumstances</u>

This case proceeded to a settlement conclusion in approximately five years, despite the fact that it involved the claims of as many as 60,000 individuals against more than 60 defendant manufacturers, four major defendant contractors, a number of defendant sub-contractors, and the Federal Government (FEMA). Obviously, there were formidable procedural hurdles to overcome before such an MDL could be "ripe" for settlement discussion, most notably, the need to "match" all plaintiffs, the testing of a sufficient number of travel trailers even though they had been repossessed by FEMA, the organization of a complete and global claims database, etc. The only way this case was able to be settled within five years was through the diligent efforts of this Court to keep counsel on a fairly strict schedule in terms of case management, discovery, common issue motion practice, merits trials, summary jury trials, mediation, and, ultimately, a

-14-

class settlement process.  In other words, the circumstances of the litigation did impose significant time restraints on counsel; and, while it can be said this is a factor applying across the board to all common benefit fee applicants, it is especially noteworthy in the case of the Gainsburgh Benjamin and Watts/Hilliard.  To the extent their responsibilities were carried out in the most intense and significant areas of activity (case management, claims data organization/matching, merit trials, and settlement negotiations), the time constraints on their performance weighs as a meaningful factor.

### (6) Experience, Reputation and Ability of Counsel

As with the aforementioned "attorney skill" factor, the undersigned hopes not to be overly self-promoting in regard to this factor; but, whereas the "skill" factor discussed above relates to what counsel demonstrated in terms of professional ability in the course of the litigation, this "experience/reputation" consideration gives weight to the "gravitas" brought to the table on plaintiffs' behalf by Gainsburgh Benjamin and Watts/Hilliard.  The undersigned would daresay that, if questioned, opposing counsel who faced plaintiffs in trial and who ultimately faced plaintiffs across the negotiating table in settlement, would identify Gainsburgh Benjamin and Watts/Hilliard as formidable opposing counsel.  It is submitted that the background, experience and reputations of both Gainsburgh Benjamin and Watts/Hilliard, ultimately gave much-needed credibility to the plaintiffs' common cause, and should be weighed as an added consideration in fee allocation.

For all these reasons, the undersigned respectfully moves the Court for the entry of the attached Order, approving the common benefit fee allocation proposed by Co-Liaison Counsel

for plaintiffs.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE**
**PRODUCT LIABILITY LITIGATION**

BY:         *[signature]*

GERALD E. MEUNIER, #9471
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
gmeunier@gainsben.com


JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier &
Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
jwoods@gainsben.com

**PLAINTIFFS' STEERING COMMITTEE**
**MEMBERS**
MIKAL C. WATTS, Texas #20981820
ROBERT C. HILLIARD, Texas #09677700