**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: FEMA TRAILER FORMALDEHYDE          MDL NO. 1873
      PRODUCT LIABILITY LITIGATION

                                         SECTION "N-5"

                                         JUDGE ENGELHARDT
                                         MAG. JUDGE CHASEZ

THIS DOCUMENT IS RELATED TO ALL CASES

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF PSC MOTION TO**
**APPROVE ALLOCATION OF COMMON BENEFIT FEES**

MAY IT PLEASE THE COURT:

The Plaintiffs' Steering Committee ("PSC") and associated common benefit counsel have reached agreement on a proposed allocation of the Court-approved common benefit fee resulting from the settlement of all claims against the settling defendant manufacturers and contractors, and now request that Your Honor review and approve this proposed allocation.  It is respectfully submitted that the approval is justified pursuant to both the Fifth Circuit's *Johnson* analysis and this Court's "independent duty…to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Products Liab. Litig.*, 517 F.3d 220, 227-28 (5th Cir. 2008) (internal citations omitted).

I.      **BACKGROUND**

On December 11, 2007, the Court appointed certain attorneys to the PSC, and these attorneys thereby assumed the responsibility of prosecuting all of the numerous plaintiffs' claims in this MDL. *See* Order of Dec. 12, 2007 (Rec. Doc. 49).[1] The functions of such Court-appointed

---

[1] Based upon the final Joint Reported filed by Liaison Counsel for the parties prior to global settlement, there were "4721 cases…associated with this MDL [and] 3999 cases of those [were] currently pending . . . ." Joint Report No. 29 (Rec. Doc. 24394).

committees, as recognized in the Manual for Complex Litigation, include developing plaintiffs' proof of liability, anticipating defenses, gathering expertise to prove causation and damages, coordinating pleadings, managing discovery, and conducting trial activity. *See* MANUAL FOR COMPLEX LITIGATION, Fourth, §22.62.

In the course of this MDL, the PSC rendered significant service for the common benefit of all plaintiffs. PSC members, assisted by counsel who subscribed to a working relationship with the PSC, tested thousands of temporary housing units, retained liability, causation and damage experts, prepared pleadings (including, in the case of certain bankrupt defendants, pleadings in the bankruptcy proceedings associated with those defendants), presented arguments on class certification and important case management issues, responded to defenses asserted under FRCP 12, pursued a laborious process to help claimants identify and "match" with the manufacturers of the units they occupied and with the contractors which installed, maintained and/or refurbished the units they occupied, conducted weekly telephone conferences with PSC members and other plaintiffs' counsel, attended status conferences with the Court, prepared (or helped prepare) joint reports to the Court, created/staffed a claims office and data organization protocol to assist claimants in completing Plaintiff Fact Sheets ("PFSs"), tried several bellwether cases to verdict, and conducted several summary jury trials.

Based on these efforts, and after approximately five years of active litigation, the PSC entered into global settlement negotiations with the defendant interests. These proved to be challenging discussions from plaintiffs' standpoint for a number of reasons: More than a few of the defendant manufacturers had insurance coverage issues and/or significant self-insured policy limits. Some had instituted bankruptcy proceedings, making it necessary – and at times difficult – to secure the needed participation of insurers in the negotiations. Claim census and matching

questions unique to each defendant were dominant concerns and necessary to resolve in the negotiations; and virtually all of the settlement meetings (conducted for the most part on a defendant-by-defendant basis) were lengthy and intensive. Finally, the successful defense of every bellwether merits trial on the threshold question of fault understandably enabled defendants to negotiate from a position of strength, and also left the parties without verdict precedents on the issues of causation and damages.

Ultimately the PSC was able to negotiate proposed class settlements with the four main defendant contractors and with most of the defendant manufacturers, which settlements were approved by the Court under Federal Rule of Civil Procedure 23(e) after separate manufacturer and contractor settlement Fairness Hearings on September 27, 2012. Since not all defendants in the MDL wished to proceed with class settlements, the PSC separately negotiated eight non-class settlements with all remaining defendant manufacturers and contractors.

The total common benefit fee previously approved by the Court in connection with these settlements is a fixed percentage (i.e., 14.25%) of the settlement funds now on deposit in the Court registry pending distribution. *See* Orders of 9/27/12 & 10/3/12, (Rec. Docs. 25885, 25886 & 25900). The dollar amount of this fee is $6,196,159.95.[2]

In late October 2012, Plaintiffs' Co-Liaison Counsel circulated among common benefit counsel a proposed fee allocation. Efforts to achieve unanimous agreement among counsel as to this proposal were unsuccessful; and the undersigned then filed a motion to seal all motions and

---

[2] Since the Order of October 3, 2012 which approved the non-class reserves for attorney fees and common benefit costs, the PSC has secured two additional non-class settlements which, adhering to the Court-approved percentage, are estimated to yield $3,705.00 in common benefit fees. In addition, the PSC has earned fees based on retainer agreements with certain plaintiffs who hired the PSC collectively. Such "private" or contract fees have been limited by the Court to the same percentage of recovery as the common benefit fee, i.e., 14.25% of recovery. The PSC estimates it will derive an estimated $80,000.00 in such fees, which will be included as part of the common benefit fee for allocation purposes.

memoranda related to the allocation of common benefit fees, in anticipation of the contested proceedings that would follow.  However, based on the Fifth Circuit decision in the *High Sulfur* case discouraging the sealing of records in matters such as this (*see* 517 F.3d at 230), Your Honor reconsidered an initial Order granting this motion, and unsealed all documents related to common benefit fee allocation.  The Court also ordered that each common benefit attorney or firm file memoranda and/or objections to the Co-Liaison Counsel's allocation proposal no later than November 14, 2012, and scheduled a hearing on fee allocation for December 12, 2012.  See Order of 11/6/12 (Rec. Doc. 25931).  Various pleadings were filed in response to this order, including two competing fee allocation proposals by members of the PSC.  *See* Motions of 10/30/12 (Rec. Docs. 25932 & 25933).

On December 13, 2012 Your Honor appointed F.A. Little, Jr. (retired United States District Court Judge of Alexandria, Louisiana) as Special Master to assist the Court with the allocation of common benefit attorney's fees.  See Order of 12/13/12 (Rec. Doc. 25994).  On December 21, 2012 Special Master Little entered a Case Management Order setting deadlines for the submission of common benefit fee affidavits, challenge affidavits, written discovery, and depositions, and also providing for a settlement conference if requested by at least 85% of the fee applicants.  *See* Case Management Order of 12/21/12 (Rec. Doc. 26000).  Thereafter, on January 7, 2013, Special Master Little entered an Order suspending the date to file common benefit fund affidavits, having received requests for mediation from over 85% of the fee applicants.  *See* Order of 1/7/13 (Rec. Doc. 26001).

Common benefit counsel attended a settlement conference on February 14, 2013, with John Perry serving as mediator.  All counsel were adequately represented and given a full and fair opportunity to be heard.  Following the February 14 mediation, there were numerous follow-

4

up discussions and negotiations.  Based upon these exhaustive efforts of Mr. Perry and interested counsel, the PSC now is in a position to propose an allocation of the available common benefit fee funds which is agreeable to, and considered fair and reasonable by, all common benefit fee applicant attorneys and firms.

## II.    LAW AND ARGUMENT

### A.  Authoritative Guidance and Precedent Exist for the Review and Approval of Counsel's Agreed-Upon Allocation of Common Benefit Attorney's Fees.

Federal jurisprudence generally recognizes that any apportionment of common benefit fees is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of the other counsel." *Turner v. Murphy Oil USA, Inc.*, 582 F.Supp.2d 797, 812 (E.D. La. 2008) (citing *In re High Sulfur Content Gasoline Prods. Liab. Litigation*, 517 F.3d 220, 232 (5th Cir. 2008); *In re Copley Pharmaceutical, Inc.*, 50 F.Supp.2d 1141, 1149 (D.Wyo. 1999); Derfner & Wolf, Court Awarded Attorney Fees, ¶ 17.02 at 17-7 & n. 23 (1998)).  Moreover, from a procedural standpoint, this analysis is to be consistent with both "well-established class action principles and basic judicial standards of transparency and fairness."  *See Id.*

In terms of methodology, the Fifth Circuit opinion in the *High Sulfur* case sets forth more specific guidance:

> This circuit requires district courts to use the "lodestar method" to "assess attorneys' fees in class action suits." *Strong,* 137 F.3d at 850. The district court must first determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating attorney. *Id.* The lodestar is then computed by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Id.* The district court may adjust the lodestar upward or downward after a review of the twelve factors set forth in *Johnson. Forbush* [*v. J.C. Penney Co.*], 98 F.3d [817] at 821 [(5th Cir. 1996)]. After the court calculates the lodestar, it must scrutinize a fee award under the *Johnson* factors and not

> merely "ratify a pre-arranged compact." *Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir.1980) (holding that by summarily approving attorneys' fees presented in an unopposed settlement agreement, the district court "abdicated its responsibility to assess the reasonableness of the attorneys' fees proposed under a settlement of a class action, and its approval of the settlement must be reversed on this ground alone").
>
> When a district court awards attorneys' fees it must explain how each of the *Johnson* factors affects its award. *See Longden* [*v. Sunderman*], 979 F.2d [1095] at 1099–1100 [(5th Cir. 1992)]. Its *Johnson* analysis "need not be meticulously detailed to survive appellate review." *Forbush,* 98 F.3d at 823. If the district court has articulated and clearly applied the correct criteria, "we will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose." *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 331 (5th Cir. 1995) (internal quotations and citations omitted). Nonetheless, the district court's findings and reasons must be "complete enough to assume a review which can determine whether the court has used proper factual criteria in exercising its discretion to fix just compensation." *Brantley v. Surles,* 804 F.2d 321, 325–26 (5th Cir. 1986).

*See Id.* at 227-229.

As reiterated often in the jurisprudence, the "*Johnson* factors" include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*See Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 859 (E.D. La. 2007) (referencing

*Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974)).

In what follows, therefore, the PSC will set forth in the case of each proposed fee allocation both the reported total of common benefit hours logged by the attorney/firm, and a

discussion of how the so-called *Johnson* factors may be applied as a multiplier of whatever rate(s) may be deemed appropriate.

In doing so, the PSC is mindful that this Court occupies a unique position in the overview and analysis of evaluation of counsel's work product; for, while it is true not every common benefit counsel performed all of his/her services before the Court, Your Honor nonetheless exercised "hands-on" management of the processes by which this MDL was litigated, and eventually settled.   Based upon experience with numerous hearings, discovery disputes, substantive motions, litigation/settlement class certification proceedings, bellwether trials, and the process of mediation for settlement purposes, this Court therefore approaches the question of fee allocation with first-hand awareness of the work done by most of the common benefit counsel in this matter.

The PSC also is mindful of the degree of specificity required in this analysis.  The Fifth Circuit's invitation to combine a lodestar and *Johnson*-factor approach was linked in *High Sulfur* to a caution against the need to be "excruciatingly explicit…"   *See* 517 F.3d at 229.   In this regard, reference is made to the opinion of the Honorable Eldon Fallon in his post-*High Sulfur* review and approval of a common benefit fee allocation in the *Vioxx* MDL.   *See In re Vioxx Products Liability Litigation* [MDL No. 1657], 802 F.Supp.2d 740 (E.D.La. 2011).   It is respectfully submitted that his firm-by-firm analysis in that reported opinion is a useful reference as to both the substance and degree of specificity required in the matter at hand.  Notably, Judge Fallon recited the total hours logged by each applicant and the relevant Johnson factors applicable to that counsel's services, without need to express precise mathematical calculations of hourly rates and the effect of multipliers; and he explained his reasons for proceeding in this

fashion.  *See id.* at 772.  The PSC perceives this as consistent with the Fifth Circuit holding in *High Sulfur*.

Finally, in terms of the minimal due process requirements of the Fifth Circuit (517 F.3d at 231), it is important to note that the  pre-hearing allocation process in this case can and should be factually distinguished from that in *High Sulfur*.  There the Fifth Circuit found that the allocation of fees proposed by a five-person fee committee and approved after an *ex parte* hearing with the district judge (based on sealed pleadings), fell short of the procedural and substantive safeguards for a fair and reasonable outcome.  Here, in contrast, each and every common benefit fee applicant has submitted affidavits attesting to, and describing, the common benefit work of that firm.  Each counsel was given a full and fair opportunity in mediation to challenge these affidavits.  Each applicant has submitted time and expenses to the CPA firm of Bourgeois Bennett, which has reported on these submissions for the record.  The proposal now submitted, therefore, is the product of a process in no way comparable to the confidential decision-making of a select group of counsel, which gave rise to the Fifth Circuit's procedural concerns in *High Sulfur*.

### B. The Proposed Common Benefit Fee Allocations are Fair and Reasonable when Scrutinized both under the Lodestar Method and in light of the *Johnson* Factors.

Since the inception of this litigation, and pursuant to Court-ordered protocol, the PSC and associated common benefit counsel regularly have submitted to Bourgeois Bennett both timesheets reflecting their common benefit service hours and records of the common-benefit expenses that counsel and their firms have incurred, and/or are holding, as unreimbursed costs. Through March 21, 2013, and based upon a current report received from Bourgeois Bennett, these records reflect that common benefit counsel have expended more than 168,400 hours of attorney and staff time for the benefit of all plaintiffs. *See* Bourgeois Bennett report, [Attachment

I].[3]   In addition, counsel for plaintiffs have expended a total of $6,379,449.10 in assessments to satisfy shared costs for the common benefit of plaintiffs, and a total of $2,439,316.27 in unaudited "held" common benefit costs. *See Id.*[4]

The attached table sets forth what all common benefit counsel now agree upon and propose to the Court as percentage allocations of the total common benefit fee, as well as the corresponding dollar amounts based on the presently-estimated amount of that fee (inclusive of fees in "PSC cases," as described in footnote 2 *supra*). *See* Attachment II. The attorneys/firms applying for a share of the common benefit fee are discussed in the order reflected in the table:

### *Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC*

The Court is referred to the common benefit fee narrative submitted by Gainsburgh Benjamin, *et al*. *See* Doc. 25933. The firm of Gainsburgh Benjamin, *et al.* contributed over 20,746 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members who were with the firm over the course of the litigation. Of these hours, more than 9,400 committee-member hours were contributed. The firm advanced $502,500.00 in PSC assessment payments and $156,968.82 in shared/held costs. The firm provided switchboard services for calls from thousands of plaintiffs, bookkeeping services for the PSC litigation account maintained by the firm, law clerk research activity, and a series of contract attorneys

---

[3] It should be noted that some of the counsel/firms submitting common benefit hours to Bourgeois Bennett have elected not to come forward as applicants for a share of the common benefit fee. Moreover, based on the total hours, the common benefit fees earned in this litigation are well within the parameters of any reasonable lodestar analysis. *See* Rec. Doc. 25840-1 at n.6 (calculated overall rate of approximately $37 per hour of common benefit time submitted).

[4] This Court has already approved a reimbursement of common benefit costs. *See* Rec. Docs. 25885, 25886 & 25900.

whose salaries were paid by the firm but not submitted as "held" costs. The firm assumed the lead role regarding the claims against FEMA as a defendant and also assumed the lead role in the Fifth Circuit appeals related to governmental immunity.

Gerald E. Meunier of the firm of Gainsburgh Benjamin, *et al.*, was appointed by the Court as Co-Liaison Counsel for plaintiffs (and, *de facto*, as Co-Lead Counsel for plaintiffs) during all litigation and settlement activity in the MDL. He was directly involved in all major areas of prosecuting and resolving the consolidated claims of plaintiffs. His principal activities included: (1) drafting and finalization of all important pleadings, motions and briefs on plaintiffs' behalf, including the finalization of legal research and analysis on all key issues effecting plaintiffs; (2) negotiation and crafting of language for all case management, scheduling and pretrial orders submitted to the Court in all phases of the litigation; (3) serving as a lead spokesman for plaintiffs in most of the MDL status conferences and meetings in chambers with the Court; (4) serving as a lead spokesman for plaintiffs in virtually all key interactions with opposing counsel; (5) serving as lead spokesman for plaintiffs in most of the major press coverage of the litigation; (6) arguing on plaintiffs' behalf virtually all important motions before the Court, and orally arguing in the Fifth Circuit on an appeal from the dismissal of a bellwether plaintiff; (7) serving as lead questioner in some of the key depositions made available for use at all bellwether trials (e.g., FEMA officials, Chris DeRosa, a designated representative of The Formaldehyde Council); (8) serving as lead questioner in several 30(b)(6) depositions of the Thor/Keystone family of manufacturers; (9) serving as one of trial counsel in the first bellwether trial (*Alexander v. Gulf Stream*) and as lead trial counsel in a SJT involving Keystone/Dutchmen; (10) serving as lead (and often sole) negotiator in settlement mediations with manufacturers (including the Fleetwood and "non-lit" class settlements); (11) serving as lead negotiator in the

class settlement with contractors; (12) serving as lead counsel at all three settlement class fairness hearings (non-lit, manufacturer and contractor); and (13) continuing to manage and oversee the daily administrative, procedural and financial aspects of the MDL, including during the current, post-settlement phase.

Justin I. Woods, as Co-Liaison Counsel for plaintiffs, also has been involved in almost every aspect of the litigation on a daily basis since his appointment in December of 2007.  He was required to limit his involvement in other matters that were assigned to him as an associate in order to devote at least ninety-five percent of his time to this litigation.  His specific duties included: involvement in the establishment of the PSC's claim's office; maintaining constant contact with each of the defendant liaison counsel appointed by the Court; attendance and participation in all but for one of the Court's regularly scheduled status conferences and making presentations to the Court; attending numerous trailer formaldehyde testing events with experts in New Orleans and the Gulf Coast region; direct responsibility for and communication with numerous experts hired regarding testing and data presentation; participation in numerous trial plaintiff home inspections; responsibility for the drafting of numerous motions that were beneficial to the litigation as a whole; serving as co-chair of the discovery committee established by the PSC with Linda Nelson --  the discovery committee was responsible for the coordination of discovery with more than fifty-six different defendants;  regular contact with the Court's law clerks assigned to this litigation; coordinating discovery related to the tedious matching process; communicating with non-PSC member lawyers to provide litigation updates and information; providing members of the press with information regarding the litigation for public dissemination; serving as lead questioner in, and defended, numerous depositions for trial purposes including fact witnesses, experts and individual trial plaintiffs; serving as trial counsel

in the Summary Jury Trial involving Keystone/Dutchmen; participation in almost all of the numerous manufacturer and contractor mediations/settlement negotiation sessions; participation in each of the fairness hearings that have been held including drafting and finalizing the motions and supporting documents for each (along with defendants); taking a lead role in the drafting and finalization of settling documents with non-class settlors; serving as one of the primary liaisons with the Court appointed Special Master and Disbursing Agent for the various settlements; serving as the primary liaison with the retained firm responsible for Medicare/Medicaid resolution and reporting for plaintiffs; and management of the day-to-day activities necessary for the efficient resolution of many aspects of the litigation.

Denise Martin, legal assistant to Messrs. Meunier and Woods, has been actively involved in this MDL since its inception, on a daily basis.  She not only was tasked with filing all pleadings on behalf of the PSC, but has assumed responsibility for circulating all pleadings by all plaintiffs' counsel, pursuant to this Court's directives.[5]  She has served effectively as a "case administrator," bookkeeper and secretary/paralegal, scheduling and taking minutes at all PSC meetings, attending many of the Court's status conferences, maintaining and making disbursements from the PSC litigation account, and responding to virtually-daily requests for information and assistance from plaintiffs and various counsel.

The total hours of the firm, multiplied by appropriate market rates for each firm participant, yield a lodestar fee within any reasonable parameters the Court may identify; and, using an appropriate multiplier under the *Johnson* factors, the PSC proposes that Gainsburgh

---

[5] In this connection, Ms. Martin has circulated literally tens of thousands of e-mails and pleadings, and has been responsible for the electronic filing of a vast majority of more than 26,000 pleadings (and attachments) in this MDL.

Benjamin be allocated 27.10% of the available common benefit fee funds, or approximately $1,700,000, as a fair and reasonable share of the common benefit fee.

### Watts-Hilliard (Pinedo)

The Court is referred to the common benefit services affidavit submitted by Watts Hilliard ("WH") attorneys as part of Doc. 25933.  WH attorneys and staff played a substantial role in bringing about the resolution of this long, protracted and expensive litigation. Led by Mikal Watts ("Watts") and Bob Hilliard ("Hilliard"), along with Chris Pinedo ("Pinedo"), the WH team of attorneys expended over 16,800 hours of attorney and staff time, 2,100 committee member hours, and advanced $351,990.19 in assessment payments [6] and $727,892.74 in shared/held costs. WH participated in virtually every bellwether trial.

In the first trial, *Alexander v. Gulfstream,* Watts took a lead role in locating experts and securing their reports. Subsequent to the exchange of the expert reports, WH prepared and presented numerous witnesses for deposition. Hilliard presented Chris Cooper for deposition. Hilliard also prepared for a mock trial and tried the case in front of a jury to get their views on the case. Watts presented expert witnesses for deposition and deposed some of the defendants' experts. Pinedo met with, prepared for deposition and presented sixteen (16) plaintiffs experts. Pinedo also deposed two (2) defense experts and five (5) defendant fact witnesses. During the trial, Watts, and Hilliard played a leading role in presenting plaintiffs' expert witnesses, crossing defendants' expert witnesses and presenting the case against the contractor. Additional WH attorneys who assisted in the trial were Pinedo, Jeffcott, and Pena. WH also assisted extensively in the motion practice and in crafting responses to numerous *Daubert* motions. Watts also took

---

[6] The actual total of assessed costs paid by WH is $502,500; the firm received a credit from the PSC in the amount of $150,509.81, based on its payment of certain expert common benefit and other costs.

the lead on the *Batson* issues and filing and arguing the appeal which kept pressure on Gulfstream.

WH participated, took or prepared numerous depositions, and/or assisted in: the second bellwether trial (*Dubuclet v. Fleetwood*) which was to be held in December of 2009 but settled prior to trial; the third bellwether trial (*Wright v. Forest River*) which was held in March 2010; the fourth bellwether trial (*Castanel v. Recreation by Design*) which was held in May 2010; the fifth bellwether (*Lewis v. Gulfstream*), a summary jury trial, which was held in August 2010; the sixth bellwether trial which was a "composite plaintiff" against Dutchmen held in March 2011; the seventh bellwether (*Dixon v. Coachmen*), trial team led by Hilliard, which was to be held in June 2011 but settled days prior to trial; and, the eighth bellwether trial (*Lambert-Dolliole v. Jayco*), a summary jury trial, which was held in January 2012.

After the conclusion of the bellwether trails in January 2012, the Court set several other cases for trial, ten of which were WH cases. Although all these cases were settled, they were worked up to various stages prior to settlement. Over 100 IME's and client interviews were scheduled as these were multiple plaintiff cases. The pressure of these trials against Sunline, Pilgrim, Jayco, Starcraft and Monaco, and WH's willingness to prepare for trial was a significant factor in bringing about a resolution.

In addition to the trials the WH team participated in, Watts was instrumental in meeting with defense counsel and reaching agreement on a database that contained key fields of the PFS data in a searchable format to assist in settlement. This database took a substantial amount of work in negotiating and reaching agreement with defendants on the format and content. The database was used by all parties in crafting a settlement and in ascertaining the total population of vehicles for a given manufacturer. Further, Watts was instrumental in negotiating extension to

14

the PFS deadlines, and a shortened list of key items necessary information so as to forestall the deficiency process.

Watts, Hilliard and Pinedo attended numerous settlement conferences and mediations to negotiate the cases. Watts played a key role in reaching settlement agreements and interfacing with defense counsel at various critical stages of this litigation. Given the foregoing, the PSC proposes that 19.92% of the available common benefit fee funds, or approximately $1,250,000, be awarded as a fair and reasonable common benefit fee to Watts-Hilliard.

### *Buzbee Law Firm*

The common benefit services affidavit of The Buzbee Law Firm is filed as Doc. 25964. The Buzbee Law Firm contributed over 10,300 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members. Of these hours, more than 1,600 committee-member hours were contributed. The firm advanced $149,822.68 in PSC assessment payments[7] and $326,899.73 in shared/held costs.

In the summer of 2007, The Buzbee Law Firm was contacted by several former clients, Louisiana residents, about news that "FEMA trailers" contained excessive amounts of formaldehyde. Peter Taaffe ("Taaffe"), a senior lawyer at the firm, spent weeks in Louisiana meeting with clients and assisting with coordination of testing trailers in Louisiana and Mississippi. This included testing services provided by DeVany Industrial Consultants and TES of Louisiana. During this time, Tony Buzbee ("Buzbee") and Taaffe met several times with members of the press leading to several nationally-distributed news articles about the excessive

---

[7] The actual total of assessed costs paid by The Buzbee Law Firm is $502,500; the firm received a credit from the PSC in the amount of $352,677.32, based on its payment of certain expert common benefit and other costs.

levels of formaldehyde in travel trailers.  Taaffe later traveled several times to Hope, Arkansas to test trailers and mobile homes, with testing experts.

Buzbee was appointed to serve on the Plaintiffs' Steering Committee. In 2008, as the MDL focus was on class certification, the firm focused on identifying its clients who would best serve as class representative plaintiffs and then presenting clients for numerous class representative depositions. Buzbee deposed several Gulf Stream Coach corporate representatives relative to the class certification issue.  Taaffe also took the deposition of Coachmen corporate representatives in August 2008 for class certification purposes.  Taaffe served as an associate member of the discovery committee and sent third party subpoenas to several industry groups including the Formaldehyde Council, the RVIA, RVDA, IMHA, MHI, and IWPA, and sent FOIA requests to Texas governmental agencies.

The firm also assisted the "Law Committee" in responding to defendants' various 12(b)(6) motions and on other issues.  The firm also set up and maintained a public information website on the litigation.  Taaffe attended congressional hearings in July 2008, and Buzbee worked with a Congressional office to prepare favorable questioning at a separate congressional hearing.  The firm provided additional information to other congressional offices as well.  Taaffe and Buzbee also worked with the Expert Committee to help identify and retain experts.  Buzbee headed the PR Committee with Raul Bencomo and developed several news stories relating to the case.

After the Court denied plaintiffs' motion for class certification, Buzbee took all of the Gulf Stream employee depositions in preparation for the first bellwether trial (*Alexander v. Gulf Stream*). The firm hired an investigator, placed ads, identified and obtained statements from several former Gulf Stream employees. The firm worked with the plaintiff and her family, and

defense counsel, with respect to testing the trailer, preparing for deposition and IME's. The firm propounded and responded to discovery. The firm continued its work developing experts and reports, presenting experts for deposition and taking expert depositions in the case. The firm coordinated and conducted an initial focus group and then a mock trial related to this first bellwether trial. The firm was extensively involved in pre-trial motion practice and responses, and trial preparation. The firm participated extensively in the trial, handling opening statement, the second closing, directs of the plaintiffs, and crosses of most of the witnesses. The firm participated extensively in post-trial briefing as well.

In 2010, the firm was extensively involved in the Gulf Stream bellwether "summary jury trial." This time, there were three plaintiffs, a primary and two backups. The firm took the lead on working with each of the plaintiffs, including preliminary investigation, prepping and presenting for deposition, handling trailer and home inspections, working with experts, preparing and presenting experts for deposition, deposing numerous Gulf Stream employees, and identifying, taking statements from and deposing several former Gulf Stream employees. The firm propounded and responded to discovery. The firm was extensively involved in all pretrial matters and participated extensively at the trial.

In 2011, the firm did preliminary work on a Palm Harbor bellwether trial, before the manufactured housing class settlement was reached. The firm provided several class representatives to support the manufactured home settlement.

After the conclusion of the bellwether trails in January 2012, the Court set several of the firm's cases for trial, involving approximately 99 clients. Although all these cases were settled, they were worked up to various stages prior to settlement. Discovery was issued by the firm, and IME's and client interviews were scheduled as these were multiple plaintiff cases. The pressure

of these trials against Forest River, Gulf Stream, and Sunline, and the firm's willingness to prepare for trial was a significant factor in bringing about a resolution. In the spring of 2012, the PSC reached preliminary settlement agreements with several defendants, and the firm again assisted with providing class representatives to assist with the settlement process.

In addition to litigation activities, the firm, along with two others, purchased a building to act as the Claims Office. The building was used by the group for a long period of time, rent free. The firm was also called upon to loan a significant amount of money to the PSC, which was eventually repaid.

Given the foregoing, the PSC proposes that 9.88% of the available common benefit fee funds, or approximately $619,616, be awarded as a fair and reasonable common benefit fee to The Buzbee Law Firm.

### Bencomo & Associates

The common benefit services affidavit of Bencomo & Associates is filed as part of Doc. 25932 and 25959. Bencomo & Associates contributed over 9,900 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members. Of these hours, more than 2,900 committee-member hours were contributed. The firm advanced $502,500.00 in PSC assessment payments and $91,545 in shared/held costs.

Raul Bencomo ("Bencomo") was appointed as a member of the PSC. Bencomo and Buzbee lead the Public Relations team for the PSC. Bencomo was intricately involved in PR efforts related to the formaldehyde issue before Congress in Washington, DC. Bencomo also participated in local press conferences and community informational meetings, and he also assisted with editing of a number of press releases that were being circulated on plaintiffs' behalf.

Bencomo provided staffing, Elaine Bates and Elise Borruano, to work at the Claims Office on behalf of plaintiffs. These two individuals logged a combined 1,921 hours at the Claims office, and at no time did Bencomo claim payments made to either individual as "held costs." Bencomo paid all PSC-voted assessments, since their inception, on or before the Committee-imposed deadlines.

Bencomo was tasked with review and research regarding defendants' insurance policies. Bencomo performed (and provided to the PSC) a comprehensive review of the (approximately 39) policies provided by defendants (primary/excess/umbrella), specifically identifying the various potentially applicable exclusions (i.e., pollution, formaldehyde-specific). The only other research that was conducted on insurance policies occurred towards the latter part of the litigation and was performed by the offices of Liaison Counsel.

Bencomo personally monitored and/or participated in approximately forty-six (46) depositions of corporate representatives, witnesses, medical doctors, and other experts retained by various defendants. Of the depositions that he took or defended, approximately one dozen or more required out-of-state travel, including several trips to Riverside, California (Fleetwood), South Bend, Indiana (Recreation by Design and Jayco), Houston (Recreation by Design), Austin, Texas (Recreation by Design), and Birmingham, Alabama (Circle B Enterprises).

Bencomo took the lead on preparation of the following cases for trial: *Dubuclet v. Fleetwood*, *Castanel v. Recreation by Design*, and *Lambert-Dolliole v. Jayco*. Bencomo personally prepared and argued numerous pleadings leading up to the conclusion of those matters. In connection with Bencomo's preparations for the Fleetwood Trial, he traveled to Lottie, Louisiana, where he met and consulted with experts who were conducting the inspection of the Dubuclet trailer. Bencomo was designated as lead trial counsel in *Castanel*, took the

19

majority of the depositions, and was prepared to try the case; however, Watts was called on to assume the lead trial counsel role on the eve of trial.  Several of Bencomo's depositions were played to the jury by the plaintiffs' team in lieu of live testimony.

Bencomo was lead trial counsel on the *Lambert-Dolllole v. Jayco* summary jury trial with Pinedo.  This was the final bellwether trial to take place in connection with this litigation, and the testimony and outcome were beneficial in settlement negotiations and, ultimately, settlement with all outstanding defendants.

Bencomo was also part of the PSC's "Settlement Team" led by Liaison Counsel that negotiated with Manufacturers, Contractors, and their Insurers. Bencomo participated in at least ninety-three (93) conference calls and numerous in-person PSC meetings. Bencomo appeared in Court for Court-ordered conferences or other conferences regarding specific trials on at least twenty-four (24) occasions.

As a sole practitioner, Bencomo assumed great risk in this litigation in terms of dollars and hours invested.  He was precluded from undertaking other significant employment during the course of this litigation, and continued to participate in any and all responsibilities assigned to him in this case in spite of the fact that this litigation soon became a "can't win" proposition.

Given the foregoing, the PSC proposes that 6.69% of the available common benefit fee funds, or approximately $420,000, be awarded as a fair and reasonable common benefit fee to Bencomo & Associates.

### *The Lambert Firm (formerly Lambert & Nelson, PLC)*

The common benefit services affidavit of Lambert & Nelson, PLC ("L&N") is filed as Doc. 25940.  L & N contributed over 12,200 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members.   Of these hours, more than 4,400

committee-member hours were contributed, second only to Gainsburgh Benjamin. The firm advanced $454,537 in PSC assessment payments[8] and $120,034.12 in held costs.

Linda J. Nelson ("Nelson") was appointed by the Court to serve as a PSC member, and served as Co-Chair of the Discovery Committee, on the Experts Committee and Trial Committee. Nelson dedicated the vast majority of her time to this litigation until leaving the PSC for personal reasons unrelated to the MDL in December 2010. Hugh P. Lambert ("Lambert") also dedicated a considerable amount of time to this litigation, serving on the Expert Committee (Co-Chair), the Audit and Finance, and the Trial Committee. Additionally, L&N dedicated an associate attorney, two contract attorneys and its staff of paralegals, secretaries, and couriers who assisted members of the PSC and Trial Teams during all phases of discovery, depositions, class certification and trial preparation. L&N associate attorney Alexis Bevis and contract attorney Jonathan Adams both served on the Law Committee, and Bevis served on the Discovery Committee.

Lambert and Nelson were primarily responsible for working with in excess of seventeen experts in different fields of expertise to prepare the experts for depositions and trials and their reports for the class certification hearing and bellwether trials. Much of the crucial testimony used in preparation for class certification and bellwether trials was elicited during these essential depositions. L&N researched and read various scientific journals and textbooks to learn the science related to formaldehyde off-gassing and the engineering related to the construction and jacking-up of Emergency Housing Units/Travel Trailers ("EHUs"). Additionally, Lambert

---

[8] The actual total of assessed costs paid by L & N is $475,000; the firm received a credit from the PSC in the amount of $20,463, based on its payment of certain expert common benefit and other costs. Nelson withdrew from the PSC prior to the final assessment owed by committee members.

worked with experts to create an animation and demonstrative exhibits showing both properly and improperly built walls of an EHU. These exhibits were used in the bellwether trials. The development of this scientific/technical testimony/evidence was time consuming and required a great deal of knowledge of the subject matter, and such evidence was essential to demonstrate to jurors how the EHUs were manufactured and how formaldehyde off-gassing occurred.

L&N worked with experts to draft and finalize the testing protocols to measure formaldehyde levels in EHUs and coordinated the PSC's testing of occupied and stored/unoccupied EHUs.  Contract attorney Candice Sirmon ("Sirmon") worked with Dr. Hewett to ensure that a statistically significant number of each manufacturers' EHUs were tested prior to the Federal Government's disposal of their EHU inventory. This testing required coordination of schedules of three groups of the PSC's testers, the Federal Government's staff and defendants' testers at fifty sites across various states.  The firm worked with Marco Kaltofen to create and maintain the testing database.  Nelson worked with experts to create the statistical model used during the Class Certification Hearing and bellwether trials.  During the bellwether trials the office also coordinated the experts' inspections of the plaintiffs' EHUs.

L&N drafted and propounded numerous Requests for Production of Documents, Interrogatories, Third Party Subpoenas and Freedom of Information Act requests during the class certification phase and noticed depositions for the vast majority of class certification depositions and for numerous bellwether trial depositions.  Nelson, Sirmon, and firm staff created binders and brought all relevant documents to sixty-one of the class certification depositions (including both expert and fact witnesses) and prepared questions for all of these deponents.  Lambert participated in eleven class certification depositions (six fact and five expert) and was first chair

on three of them. For the *Alexander* and *Dubuclet* bellwether trials, L&N took a lead role on expert depositions with Lambert first chairing a number of them.

L&N organized and created the Class Certification Hearing binders and drafted the Pre-Trial Order for the Class Certification Hearing, which was 411 pages long. Furthermore, the firm compiled the extensive witness and exhibit lists that were used for the Class Certification Hearing and bellwether trials that followed.

Sirmon also coordinated the matching process for all plaintiffs' counsel and maintained the responses and data. Additionally, Sirmon coordinated the Individual Assistance ("IA") file requests with FEMA for all plaintiffs' counsel. The firm reviewed the Defendant Profile Forms and noticed defendants of any deficiencies and maintained these documents. The firm was the document depository for class certification and bellwether documents. L&N maintained copies of documents electronically and in hard copy as well. Whenever the PSC needed documents in this case, L&N was the "go to" law firm. Additionally, because L&N maintained the testing database, they fielded innumerable telephone calls and email requests for individual and manufacturer specific testing results.

Firm staff organized, bates numbered and produced all expert files and plaintiffs' documents used during class certification and bellwether trials. L&N reviewed the entire database of all documents obtained from defendants and third parties and identified "hot" exhibits to use during depositions, the Class Certification Hearing and bellwether trials. L&N staff also received, organized and maintained the deposition transcript library. Furthermore, the firm's staff made the travel and hotel arrangements for the majority of the plaintiffs' experts in this MDL.

Nelson participated in each and every PSC telephone conference and attended virtually every status conference/motion hearing/trial, up to her departure. The firm also drafted and filed pleadings including bellwether plaintiff Raymond Bell's appeal of his dismissal with prejudice to the Fifth Circuit Court of Appeals and Plaintiffs' Opposition to Bechtel National Inc.'s Rule 12(b)(6) Motion to Dismiss on grounds of government contractor immunity.

The firm's staff made approximately 150,000 copies, organized documents, drafted numerous pleadings and maintained the entire document file in an extremely organized manner, which was relied upon by the Trial Teams.  The firm volunteered its offices for numerous depositions, PSC meetings, executive committee meetings, trial team meetings, and as a place for out-of-town attorneys to work.  During the settlement process the firm continued to provide support by creating the testing cost analysis for all EHUs manufactured by Fleetwood and for all manufactured homes.

As a small firm, L&N was precluded from pursuing other employment due to its significant time and financial commitment to this litigation.

Given the foregoing, the PSC proposes that 6.69% of the available common benefit fee funds, or approximately $420,000, be awarded as a fair and reasonable common benefit fee to The Lambert Firm.

### The Law Offices of Frank J. D'Amico, Jr.

The common benefit services affidavit of The Law Offices of Frank J. D'Amico, Jr. is filed as part of Doc. 25932 and 25966.  The Law Offices of Frank J. D'Amico contributed over 20,100 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members.   Of these hours, more than 4,227 committee-member hours were

contributed.  The firm advanced $416,938.23 in PSC assessment payments[9] and $377,191.01 in shared/held costs.

Frank J. D'Amico, Jr. ("D'Amico") was appointed as a member of the PSC and has been heavily involved in all phases since the inception of this litigation.  The firm jointly purchased a building to serve as the Claims Office.  Ten (10) staff members were assigned to work on claims, such as intake, gathering all necessary medical and trailer related documentation, assisting clients in filling out PFSs, and mail-outs to clients.  D'Amico and PSC member Matt Mooreland ran the claims office for two years.

D'Amico was responsible for locating and selecting a number of plaintiffs' experts. He took the depositions of various witnesses (both expert and fact).  He expended hundreds of hours personally and traveled to Atlanta, South Bend, and Seattle for depositions.

D'Amico was lead counsel on the *Wright v. Forest River*, which was the only bellwether case that was tried with a contractor defendant.  His firm prepared this case for trial over six (6) months, conducting depositions of Forest River and Shaw representatives.  The case lasted two weeks, and D'Amico advanced nearly $500,000 in trial-related expenses.

Either individually, or jointly with other attorneys, the firm represented approximately 8,000 clients.  The case required significant attention from D'Amico.  He estimates that his firm has incurred $3.2 million in expenses related to this litigation.  This financial commitment precluded his firm from various other opportunities during the course of this litigation.

---

[9] The actual total of assessed costs paid by Frank D'Amico is $495,663.76; the firm received a credit from the PSC in the amount of $78,725.53, based on its payment of certain expert common benefit and other costs.

D'Amico attended every status conference and the vast majority of PSC conference calls and meetings. He participated in various settlement mediations and settlement-related discussions. He has been ready and willing to perform every task called upon.

Given the foregoing, the PSC proposes that 6.69% of the available common benefit fee funds, or approximately $420,000, be awarded as a fair and reasonable common benefit fee to The Law Offices of Frank J. D'Amico, Jr.

### Reich & Binstock, LLP

The common benefit services affidavit of Reich & Binstock, LLP is filed as Doc. 25932 and 25976. Reich & Binstock, LLP contributed over 14,700 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members. Of these hours, more than 2,600 committee-member hours were contributed. The firm advanced $505,261.00 in PSC assessment payments and $391,181.36 in shared/held costs.

Dennis Reich ("Reich") is a Court-appointed as a member of the PSC and played a pivotal role in the development of the medical causation case for the FEMA litigation. He worked extensively with all of the medical, toxicological, and epidemiological experts retained by the PSC. At the class certification hearing, he cross-examined Dr. Wedner, the only expert called by the Defendants. He deposed the principal epidemiological, toxicological, and medical experts retained by the defendants for the bellwether cases. He also deposed numerous treating physicians and independent medical examiners hired by the defendants. As trial counsel in the *Wright v. Forest River* case, Reich was responsible for medical causation, presenting and cross-examining the medical and scientific expert witnesses, and delivering the scientific evidence portion of the final argument. As lead counsel in the *Castanel v. Recreation By Design* case, he presented and/or cross-examined the medical experts.

26

For the *Alexander v. Gulf Stream Coach* trial, Reich, together with Meunier, travelled to Atlanta to depose Christopher De La Rosa, a prominent toxicologist at the CDC. Reich also accompanied Meunier to Washington, DC to participate in the deposition of the corporate representative for the Formaldehyde Institute. Additionally, Reich argued the appeal to the Fifth Circuit of the dismissal of the United States as a defendant in the Alexander case.

Associate attorney Shari Wright and Reich drafted pleadings, served and responded to discovery requests, and took and defended numerous depositions. Ultimately, the combined efforts of Woods, Meunier, and. Reich led Sun Valley and the other manufacturers insured by the same carriers to settlement. Wright was an active member of the briefing teams for the *Alexander*, *Dubuclet*, *Wright*, and *Castanel* cases, as well as coordinator and lead drafter of the *Castanel* trial and appellate briefing. In the Sun Valley case, she participated in every aspect of the litigation, including presenting and deposing fact and expert witnesses.

In addition to the above, the firm hired and paid staff for the Claims Office. The firm hired Cynthia Wallace and David McClendon, who were full-time attorneys were hired by Reich & Binstock to work on several of the bellwether cases and also to work in the Claims Office.

Given the foregoing, the PSC proposes that 6.69% of the available common benefit fee funds, or approximately $420,000, be awarded as a fair and reasonable common benefit fee to Reich & Binstock, LLP.

### Becnel Law Firm, LLC / Diane Zink

The common benefit services affidavit of The Becnel Law Firm, LLC, including PSC members Matthew Moreland ("Moreland") and Robert Becnel ("Becnel"), along with Diane Zink ("Zink") is filed as part of Doc. 25933. They collectively contributed over 9,100 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff

members.  Of these hours, more than 1,800 committee-member hours were contributed.  The firm advanced $1,005,000.00 in PSC assessment payments and $3,912.60 in shared/held costs.

The firm was the second firm to file a FEMA Trailer lawsuit.  From then forward the office continually worked in the common benefit process, first moving for the establishment of an MDL, and then proceeding to work as a uniform team with the PSC.  Moreland and Becnel attended virtually all PSC meetings and calls and worked on numerous projects. The firm worked on initial discovery to defendants and assisted with answering discovery on behalf of the first filed clients.  Moreland worked diligently with other members of the PSC to develop the PFS, which included several meet and confers with defense counsel, to draft the consolidated amended complaints, and to assist with the trailer matching project.  He personally filed suits on behalf of, and was made counsel for, numerous lawsuits on behalf of the PSC's shared clients.

The firm, along with two other members of the PSC, purchased a building to house the Claims Office.  With the help of D'Amico, the firm hired staff to work the entire litigation's PFS intake at the Claims Office.  Moreland was responsible for leading the Claims Office with D'Amico and managed the office on a daily basis, overseeing the data entry and coordinating with the paralegal in charge of scheduling and staff hours.  The firm also provided and paid several attorneys to work at the claims office, and their time was submitted as common benefit time (i.e., their pay was not submitted as held costs).  The claims office work was essential to the plaintiffs' obtaining a critical mass that eventually influenced settlement.  The Claims Office work included client intake, PFS completion, Form 95 completion and submission, client screening for bellwether participation, client interview and background evaluation and medical records request and review.  Moreland worked with the PSC's IT specialist to develop a program

and database system that is still used to this day to store plaintiffs' PFS data.  He was instrumental in ensuring electronic copies of all PFSs were provided to lead defense counsel.

Moreland personally prepared for, and participated in, two mock trials.  He often was called upon to provide critical information for hearings and motion practice both on the review side of the motion practice and the numerical breakdown side of the clients.  Moreland attended and assisted in depositions of some defense parties, and he defended several plaintiffs' depositions.  He served as an auditor for the PSC, reviewing everything from PSC time to Mary Devany's hotel bills.

Becnel was part of the litigation from the very beginning, attending the initial meeting at the home of my brother, Daniel E. Becnel, Jr., in LaPlace.  Zink was co-manager of the Claims Office with Moreland.  At the request of the PSC, Becnel traveled to Washington, DC to attend congressional hearings and lobbied the Consumer Products Safety Commission on behalf of the plaintiffs.  Becnel reviewed numerous PFSs, culling these forms for potential bellwether plaintiffs and class representatives.  Becnel prepared and defended a number of expert and plaintiff depositions.  All of the above work was performed under the direction of the PSC by work orders signed by Meunier, Bencomo and/or Moreland.  Zink performed a detailed audit of Mary DeVany's billing records and invoices to the PSC.

Given the foregoing, the PSC proposes that 7.89% of the available common benefit fee funds, or approximately $495,000, be awarded as a fair and reasonable common benefit fee to Becnel Law Firm, LLC/Diane Zink.

### *The Penton Law Firm*

The common benefit services affidavit of The Penton Law Firm is filed as Doc. 25929.  The Penton Law Firm contributed over 2,700 hours of common benefit time in this MDL

through a number of attorneys and non-attorney staff members.  Of these hours, more than 1,300 committee-member hours were contributed.  The firm advanced $165,000.00 in PSC and subscribing member assessment payments and $34,161.49 in held costs.

Ronnie G. Penton ("Penton") was appointed to the original PSC in this case, but was forced to withdraw in the 2nd year of his appointment due to personal matters unrelated to this MDL.  Penton played a major role in initial fact and expert investigation and discovery.  He participated in numerous depositions in several states with Lambert and Buzbee.  Penton provided expert witness research and interviews, and his office coordinated, set and prepared/defended depositions.  His firm contributed the services of its litigation staff including three (3) lawyers, four (4) paralegals, two (2) legal assistants and two (2) legal secretaries to the investigation and discovery effort.

Additionally, his firm was fully engaged in the review, summarization, and organization of thousands of documents.  Penton was assigned to assist with inspection of hundreds of trailers in an effort to identify manufacturers and installers of trailers in each geographic area.  Penton participated regularly in PSC meetings and telephone conferences.  Because he was initially assigned a major role on the trial team, Penton participated in regular meetings in chambers with the Judge and defense counsel.

Given the foregoing, the PSC proposes that 1.28% of the available common benefit fee funds, or approximately $80,000, be awarded as a fair and reasonable common benefit fee to the Penton Law Firm.

### *Rodney & Etter, LLC*

The common benefit services affidavit of Rodney & Etter, LLC ("R&E") is filed as Doc. 25936.  R&E contributed over 1,700 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members.  The firm advanced no subscribing member assessment payments and advanced $10,563.15 in held costs.

R&E initiated the first class action complaint on behalf of those claiming injury from formaldehyde exposure in FEMA-provided housing units after Hurricanes Katrina and Rita, naming some of the travel trailer, mobile home, and contractor entities.  R&E actively litigated this initial class action complaint from the time of its filing on August 4, 2006 in Civil District Court through removal and up to the time it was consolidated into this MDL.  The firm filed two of the four cases that were pending in multiple jurisdictions when the parties requested consolidation before the Judicial Panel on Multi-District Litigation.  R&E's efforts resulted in the Court ordering FEMA to appear in this litigation, which was a critical step for plaintiffs to be able to identify and match the manufacturers and contractors to individual trailer residents.  *See* Rec. Docs. 26 & 104.

R&E conferred and worked with the other plaintiffs' law firms to identify and retain experts and develop the initial strategy for this litigation.  Etter applied for a position on the PSC; however, he was not appointed by the Court.  After the FEMA trailer cases were consolidated and the PSC members were appointed by the Court, Etter and R&E associates and paralegals continued to support the PSC's efforts, monitored the scientific developments and the litigation, attended status conferences, filed additional cases, and submitted PFSs for individual clients.

R&E's efforts and expenditures in investigating, preparing, filing and litigating cases were necessary for this consolidated action and benefitted all of the FEMA trailer claimants.  The

Court has recognized that the attorneys who file the first lawsuits are entitled to common benefit fees, even if they do not handle a large number of claimants, because a "critical mass" of cases is required for consolidation into a single proceeding and for the litigation to have sufficient momentum to result in substantial settlements. *See Turner v. Murphy Oil USA. Inc.*, 582 F.Supp.2d 797, 809 (E.D. La. 2008).

Given the foregoing, the PSC proposes that 0.64% of the available common benefit fee funds, or approximately $40,000, be awarded as a fair and reasonable common benefit fee to Rodney & Etter.

### The Law Offices of Sidney D. Torres, III, A.P.L.C.

The common benefit services affidavit of The Law Offices of Sidney D. Torres, III, A.P.L.C. is filed as Doc. 25928. The firm contributed over 500 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members, advanced $251,250.00 in subscribing member assessment payments, and incurred $15,647.26 in shared/held costs.

As an early subscribing member to the PSC, the firm contributed significantly in three major areas associated with the litigation and ultimate successful class resolution: financial support, class member participation, and legal work. The firm provided critical funding by timely paying all financial assessments as these were made by the PSC from the very beginning of the litigation. Additionally, as a consequence of Hurricane Katrina's destruction of nearly 100 percent of the housing stock in St. Bernard parish, and the resultant response by FEMA in supplying the subject emergency housing units to parish residents, the firm was responsible for one of the largest pools of plaintiff class members. As of the time the settlement was consummated, the firm represented approximately 3,597 clients with claims in the manufacturers' and contractors' class settlements.

During the first two years of the litigation, senior firm attorney Roberta L. Bums ("Burns") was heavily involved in the drafting of several important pleadings with Meunier and Woods.  Burns was appointed to the Law Subcommittee at the very beginning of the litigation. Burns was assigned the primary responsibility of drafting the administrative master complaint. This project required extensive research concerning not only the substantive factual allegations regarding the defects in the EHU's and the liability of the Government and private defendants, but also the legal allegations for claims arising under the laws of four states.  In addition, substantial research went into uncovering the identities of all EHU manufacturers, as well as their domiciles and service of process information.  In addition to the original master complaint, Burns was responsible for co-drafting (with Meunier) amendments to it, drafting numerous oppositions on behalf of the PSC, and assisting in the preparation of pleadings regarding depositions and discovery.

Given the foregoing, the PSC proposes that 0.89% of the available common benefit fee funds, or approximately $55,990, be awarded as a fair and reasonable common benefit fee to The Law Offices of Sidney D. Torres, III, A.P.L.C.

### Hurricane Legal Center, L.L.C.

The common benefit services affidavit of Hurricane Legal Center, L.L.C. ("HLC") is filed as Doc. 25978.  The Center contributed 70 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members, and advanced $251,250.00 in subscribing member assessment payments.

As a subscribing member, HLC paid all PSC-voted assessments. As the Court is likely aware, not all subscribing members were punctual and/or current with their assessment responsibilities.  At the time of settlement, HLC had over 7,500 clients (roughly 10% of all

plaintiffs in the MDL.  In addition to representing a large percentage of MDL plaintiffs, HLC was continuously called upon to screen their clients for potential bellwether plaintiffs.  The firm designated three (3) individuals to manually screen and review PFSs.  Every man-hour (approximately 700 hours) spent in this bellwether screening process was paid directly by HLC and not submitted as a "shared" or "held" cost.

Of the approximate six (6) scheduled bellwether trials and three (3) scheduled summary jury trials, HLC had multiple clients who progressed to the advanced stages of consideration.  As advanced stage candidates, these individuals were put through complete background checks and a comprehensive in home (or telephone) evaluation was undertaken. Of this pool, several candidates required that their complete medical history be obtained and evaluated.  At least one (1) HLC client was selected as a bellwether plaintiff. Although counsel for another firm acted as trial counsel, HLC nonetheless participated as a liaison, obtaining discovery responses and medical records.  Again, the expenses incurred in this process were paid directly by HLC and not submitted as "shared" or "held" costs.

In an effort to best serve our clients, HLC hired an attorney who had previously worked as a contract attorney for the PSC in the Claims Office.  Having worked with the other PSC attorneys on the Gulfstream, Fleetwood, and Forest River trials, he was often called upon to undertake specific tasks for PSC member firms.  Because many of the other plaintiffs' attorneys involved in the MDL were based primarily in Texas, HLC's attorney often acted as a local foot soldier, meeting clients on a variety of issues such as for interviews and depositions.  Again, the expenses incurred in this process were paid directly by HLC and not submitted as "shared" or "held" costs.

HLC assisted Bencomo and Pinedo on the *Lambert-Dolliole v. Jayco* summary jury trial. Although invoices were submitted for a portion of the time spent in assisting in the trial preparation, countless (uncompensated) hours were spent advancing the litigation for the common benefit of all claimants.  Toward the latter part of the MDL, three (3) HLC cases were set for non-bellwether trials for nine (9) clients.  The pressure of these trials against various defendants, and the firm's willingness to prepare for trial was a significant factor in bringing about a resolution.

Given the foregoing, the PSC proposes that 1.27% of the available common benefit fee funds, or approximately $79,980, be awarded as a fair and reasonable common benefit fee to Hurricane Legal Center, L.L.C.

### Jim S. Hall & Associates, LLC

The common benefit services affidavit of Jim S. Hall & Associates, LLC ("Hall") is filed as part of Doc. 25933.  The firm contributed more than 11,600 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members.  Of this time, 11,300 hours were non-attorney and non-paralegal hours.   The firm advanced $244,375.00 in subscribing member assessment payments and $32,861.07 in shared/held costs.

The firm employed Shirley Arceneaux to work at the Claims Office from June 2008 through April 2010 and paid her $34,043.45.  Additionally, Hall jointly represented, and assisted with the drafting of complaints for, 900 PSC clients.  The firm's common benefit work consisted of interviewing, screening and enrolling new clients, gathering required data and completing PFSs, as well as investigating all aspects of the claims, both liability and damages/medicals.

Given the foregoing, the PSC proposes that 0.93% of the available common benefit fee funds, or approximately $58,170, be awarded as a fair and reasonable common benefit fee to Jim S. Hall & Associates, LLC.

### Young & Husain PLLC

The common benefit services affidavit of Young & Husain, PLLC ("Y&H") is filed as part of Doc. 25933.   The firm advanced $142,500.00 in subscribing member assessment payments.

At the request of the PSC, Y&H hired attorneys Heather Munoz and Melissa DeBarbieris to perform common benefit work out of the Baton Rouge field office, where they completed PFSs for numerous clients.  Additionally, at the request of D'Amico, DeBarbieris was assigned to work on trial preparation efforts for the *Wright v. Forest River* trial. This work was pre-approved as a common benefit by the PSC.  The firm paid the aforementioned attorneys, $36,872.44, which is an expense incurred for the common benefit of all parties and which was not submitted as a "shared" or "held" cost.  PFSs were required to be completed by the Court, and the execution of these PFSs aided in screening of potential bellwethers and class representatives.

Given the foregoing, the PSC proposes that 0.46% of the available common benefit fee funds, or approximately $29,080, be awarded as a fair and reasonable common benefit fee to Young & Husain, PLLC.

### Nexsen Pruet, LLC

The common benefit services affidavit of Nexsen Pruet, LLC ("Nexsen") is filed as Doc. 25942.  Nexsen contributed more than 5,100 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members.   Of this time, 1,537 hours were

subscribing attorney hours.  The firm advanced $251,250.00 in subscribing member assessment payments and $132,480.48 in shared/held costs.

Nexsen filed one of the first cases in this litigation and was actively involved throughout the litigation as a subscribing member of the PSC.  As one of the first class action filings, the statute of limitations was tolled for the benefit of all members of the settlement class. The firm was tasked with the following: participated in discovery of fact and expert witnesses in the *Fleetwood* matter, including depositions of expert witnesses in Atlanta, GA; assisted with class certification research, briefing, and arguments related to the property damages subclass; assisted with general class certification briefing and presentation; acted as one of the trial counsel in the *Wright v. Forest River* case, providing briefing of limine and Daubert motions, legal research, legal assistant support, direct- and cross-examination of witnesses, and deposition designations; and, took depositions of experts in Raleigh, North Carolina in preparation for the *Castenel v. Recreation By Design* case.

Given the foregoing, the PSC proposes that 0.81% of the available common benefit fee funds, or approximately $50,900, be awarded as a fair and reasonable common benefit fee to Nexsen Pruet, LLC.

### *Keith A. Doley and Catrice Johnson-Reid*

The common benefit services affidavit of Keith A. Doley and Catrice Johnson-Reid ("Doley-Reid") is filed as part of Doc. 25933.  They contributed more than 1,800 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members.  Of this time, 1,592 hours were subscribing attorney hours.  The firm advanced $172,775.00 in subscribing member assessment payments.

As subscribing members, Doley-Reid hired staff to support the efforts of the Claims Office.  The firm paid this staff a total of $3,600.00 for services rendered at the claims office. Catrice Johnson-Reid personally worked at the Claims Office to support these efforts.  Doley and/or Reid attended all Status Conferences held with the court, attended all subscribing committee meetings either in-person or by telephone, reviewed all pleadings filed in this matter, and attended virtually all hearings and trials. The office also assisted, and was prepared to assist, with any hearing or trial held in this matter.

Given the foregoing, the PSC proposes that 0.58% of the available common benefit fee funds, or approximately $36,350, be awarded as a fair and reasonable common benefit fee to Keith A. Doley and Catrice Johnson-Reid.


### *Bruno & Bruno, LLP*

The common benefit services affidavit of Bruno & Bruno, LLP ("B&B") is filed as Doc. 25991.  B&B advanced $251,250.00 in subscribing member assessment payments, and contributed 500 hours of common benefit time.

As subscribing members of the PSC, B&B paid all PSC-voted assessments. Although the firm advised of their interest and availability to work on this litigation, B&B was given very few assignments. The only assignments received were in connection with the preparation of our client, Stephanie Pizani's, case for trial and with the selection of class representatives. The defendant in the Pizani case reached a global settlement with the PSC prior to trial. As such, the firm does not have as many hours as other firms in this case.

The financial contribution to a case like this is as important as the contribution of time. Most of the funds advanced in this case by B&B were at risk for the duration of this six-year MDL.

Given the foregoing, the PSC proposes that 0.48% of the available common benefit fee funds, or approximately $30,000, be awarded as a fair and reasonable common benefit fee to Bruno & Bruno, LLP.

### Douglas M. Schmidt

The common benefit services affidavit of Douglas M. Schmidt ("Schmidt") is filed as part of Doc. 25933.  Schmidt contributed 645 hours of common benefit time in this MDL through a number of attorneys and non-attorney staff members.  Of this time, 135 hours were subscribing attorney hours.  The firm advanced $127,500.00 in subscribing member assessment payments.

Early in 2008, Schmidt worked many days at the PSC's Claims Office filing claims for PSC clients.  Schmidt's staff, Loretta Orlando and Roberta Williams, also worked at the Claims Office assisting common benefit clients and working to identify potential bellwether plaintiffs. Two of Schmidt's clients were identified as bellwether plaintiffs, Carrie Smith and Lyndon Wright.  Schmidt obtained medical records for each of them, reviewed their documents, met with them in person on numerous occasions, and had many telephone consultations with each of them. He also spoke with Your Honor in open court about Mrs. Smith.  Lyndon Wright's case went to trial, and Schmidt assisted with trial preparation, submitted questions, and advised D'Amico at trial.  Schmidt attended the trial and had several meetings with the plaintiff, D'Amico, and other trial counsel during the week of the trial.

Given the foregoing, the PSC proposes that 0.58% of the available common benefit fee funds, or approximately $36,360, be awarded as a fair and reasonable common benefit fee to Douglas M. Schmidt.

### Woodfill Law Firm (formerly Woodfill & Pressler)

The common benefit services affidavit of The Woodfill Law Firm ("Woodfill") is filed as part of Doc. 25933.  Woodfill contributed more than 900 hours of attorney time in this MDL. The firm also advanced $157,500.00 in subscribing member assessment payments.  The firm, like all others, spent significant hours completing Court-ordered PFSs.

Given the foregoing, the PSC proposes that 0.52% of the available common benefit fee funds, or approximately $32,720, be awarded as a fair and reasonable common benefit fee to the Woodfill Law Firm.

## III.   CONCLUSION

The PSC is pleased that all plaintiffs' counsel performing common benefit work in this MDL have been able to arrive at a unanimous proposal to Your Honor regarding allocation of the approved common benefit fee.  This unanimity results from a process that was both thorough and transparent; and the PSC, joined by all counsel asserting a common benefit fee interest, submit to Your Honor that the proposed allocation is fair, reasonable and supported by the record.

Accordingly, following the hearing on this motion to be held on April 17, 2013, the Court respectfully is asked to enter the Order submitted herewith, approving the requested allocation of the common benefit fee which has been earned by counsel in the global settlement of claims against all defendant manufacturers and contractors.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:   s/Gerald E. Meunier
       GERALD E. MEUNIER, #9471
       **PLAINTIFFS' CO-LIAISON COUNSEL**
       Gainsburgh, Benjamin, David, Meunier &
       Warshauer, L.L.C.
       2800 Energy Centre, 1100 Poydras Street
       New Orleans, Louisiana 70163
       Telephone:     504/522-2304
       Facsimile:     504/528-9973
       gmeunier@gainsben.com

BY:   s/Justin I. Woods
       JUSTIN I. WOODS, #24713
       **PLAINTIFFS' CO-LIAISON COUNSEL**
       Woods, Bowers & Woods, L.L.C.
       1610 Oretha Castle Haley Boulevard, Suite B
       New Orleans, Louisiana 70113
       Telephone:     504/309-4177
       Facsimile:     504/309-4377
       jwoods@wbw-law.com


       **COURT-APPOINTED PLAINTIFFS'
       STEERING COMMITTEE**
       ROBERT M. BECNEL #14072
       RAUL BENCOMO, #2932
       ANTHONY BUZBEE, Texas #24001820
       FRANK D'AMICO, JR., #17519
       ROBERT C. HILLIARD, Texas #09677700
       MATT MORELAND, #24567
       DENNIS C. REICH Texas #16739600
       MIKAL C. WATTS, Texas #20981820


**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2013, I electronically filed the foregoing with the Clerk

of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel

of record who are CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471