
SOUTHERN DISTRICT OF MISSISSIPPI
FILED
MAY 0 6 2010
J.T. NOBLIN, CLERK
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**STARLETT M. KING, as wrongful death**
**beneficiary and representative of, JEFF**
**SHETTERLY, DECEASED, together with all**
**individuals and entities whose**
**names appear on the attached Exhibit "A"**

**PLAINTIFFS**

**versus**

**DOCKET NO:** 1: 10 cv 199 HSO - JMR

**DEFENDANTS**

**CH2M HILL CONSTRUCTORS, INC., BECHTEL**
**NATIONAL, INC., SHAW ENVIRONMENTAL, INC**
**and THE UNITED STATES OF AMERICA**
**through the FEDERAL EMERGENCY**
**MANAGEMENT AGENCY**

---

### COMPLAINT FOR DAMAGES

---

This Complaint of certain persons of the full age of majority, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Named Plaintiffs"), who are all named in the annexed listing of the Named Plaintiffs (attached hereto as "Exhibit A"), respectfully represents through undersigned counsel that:

### I. PARTIES

1.     Each Named Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the state(s) in which Defendants are citizens.

2.     Named Plaintiffs are those individuals and entities listed on the attached Exhibit "A", which is incorporated herein. In addition to Plaintiffs who bring their own

individual claims, Exhibit "A" identifies the Plaintiffs who bring this action in their representative

capacities for those Plaintiffs who are unable to sue in their individual capacity. Further, Plaintiff

Starlett M. King brings this action on behalf of the wrongful death beneficiaries of Jeff Shetterly

pursuant to Miss. Code Ann. §11-7-13.

3.      The Defendant United States of America is sued herein as acting through the

Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein

as the "Federal Government," "Government" and "FEMA".

4.      Defendant CH2M Hill Constructors, Inc. ("CH2M"), a Delaware corporation

with its principal place of business in Colorado, licensed to do business in the State of Mississippi

and in good standing, received a No-Bid contract from FEMA and was tasked with, amongst other

things, performing significant functions in the transportation, delivery, installation, maintenance and

repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the

victims of Hurricane Katrina, including Jeff Shetterly, and those Plaintiffs so identified in Exhibit

"A".

5.      Defendant Bechtel National, Inc., ("Bechtel"), a Nevada corporation with its

principal place of business in California, licensed to do business in the State of Mississippi and in

good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things,

performing significant functions in the transportation, delivery, installation, maintenance and repair,

de-installation and refurbishment of the temporary housing units provided by FEMA

to the victims of Hurricane Katrina, including those Plaintiffs so identified in Exhibit "A".

6.      Defendant Shaw Environmental, Inc, ("Shaw"), a Louisiana corporation with its

principal place of business in Louisiana, licensed to do business in the State of Mississippi and in

good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things,

performing significant functions in the transportation, delivery, installation, maintenance

and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of Hurricane Katrina, including those Plaintiffs so identified in Exhibit "A".

## II. **JOINDER OF PARTIES**

7.      Plaintiffs are joined pursuant to Rule 20(a) of the Federal Rules of Civil Procedure. The Named Plaintiffs possess a right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences, and there will be common questions of law and fact which will arise in the action.

8.      Specifically, the following non-exclusive list illustrates the propriety of joinder in this matter:

a.      All Plaintiffs resided in temporary housing units located within the Southern District of Mississippi (hereafter the Southern District).

b.      All Named Plaintiffs were exposed to the formaldehyde while residing within the temporary housing units.

c.      Every Named Plaintiff's exposure to formaldehyde occurred within the same window of time- between the Fall of 2005 and the Fall of 2009.

d.      The Named Plaintiffs- all occupants of the temporary housing units in the Southern District and exposed to formaldehyde sometime between the Fall of 2005 and the Fall of 2009- experienced the exposure to formaldehyde in similar weather conditions.

e.      The temporary housing units in which the Named Plaintiffs resided were all manufactured by Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc.

f.   The temporary housing units in which the Named Plaintiffs resided were all installed, maintained, repaired, etc. by one of three no-bid Defendant contractors: Defendant Bechtel, Defendant CH2M or Defendant Shaw.

g.   All Named Plaintiffs have experienced adverse health effects which are caused and/or made worse by exposure to formaldehyde.

h.   The Defendants committed the same or similar wrongful acts- described hereinafter- as to each Named Plaintiff.

i.   Defendants' wrongful acts occurred close in time- in the aftermath of Hurricane Katrina- and close in space- within the Southern District.

### III. JURISDICTION AND VENUE

9.   This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§ 1346 and 2671, *et seq.*

10.   All Named Plaintiffs herein have exhausted their administrative remedies against the United States of America and FEMA and bring their claims timely by filing this Complaint.

11.   Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over the claims asserted herein against the Defendant(s) with citizenship other than that of Plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

12.   Pursuant to 28 U.S.C. § 1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

13.     CH2M is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

14.     Bechtel is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

15.     Shaw is subject to the *in personam* jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

16.     Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. §1391, because the emergency housing units were provided to the Plaintiffs in this district, the Named Plaintiffs were exposed to the formaldehyde in this district, and Named Plaintiffs' injuries were sustained in this district.

## IV. <u>FACTS AND GENERAL ALLEGATIONS</u>

17.     The Named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") manufactured by Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc. were provided these housing units by FEMA after the landfall of Hurricane Katrina in August of 2005.

18.     Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc. is a material party to the litigation but has not been named as a Defendant pursuant to 11 USCA §362, upon information that Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc. has filed for bankruptcy protection.

19.     Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet. They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* CENTER FOR DISEASE CONTROL AND PREVENTION, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

20.     Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

21.     Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area). They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. *Id.*

22.     The residence of each Named Plaintiff was rendered unhabitable following Hurricanes Katrina, leaving each Plaintiff homeless and in need of housing assistance.

23.     FEMA contracted with Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc. to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

24.     On information and belief, Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc.'s production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Named Plaintiff containing higher than normal levels of formaldehyde.

25.     On information and belief, the housing unit of each Named Plaintiff, including those units which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

26.     Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

27.     Named Plaintiffs submit that each of the housing units at issue, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc.'s use of certain materials in

their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc. failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

28. Named Plaintiffs submit that Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc. ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc.'s use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc.'s products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

29. Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc. and provided to Plaintiffs in the Southern District by the Federal Government. As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

30.     Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

### IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

> If you have any questions regarding the health
> effects of formaldehyde, consult your doctor or local
> health department.

*See* 24 C.F.R. §3280.309.

31.     According to the National Cancer Institute, formaldehyde has been classified as a

human carcinogen (cancer-causing substance) by the International Agency for Research on

Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency

("EPA").  Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has

reported to FEMA and members of Congress that not only is formaldehyde classified as

"reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level

of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of

duration.

32.     Most published exposure standards for formaldehyde address protective levels for

the adult working population in the workplace, based upon a 40-hour work week, and specifically

do not address chronic exposure levels or protective levels for the more susceptible population,

for instance, the very young, the elderly and those with respiratory, skin and other chronic

diseases.  Nonetheless, reference to the levels established by the Occupational Safety and Health

Administration ("OSHA") evidences formaldehyde's harmful effects.  In 1987, OSHA reduced

the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm

to1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

33.     HUD regulates formaldehyde levels in certain construction materials to include

the pressed wood products used in manufactured housing (such as prefabricated mobile homes).

HUD has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All

plywood and particle board materials bonded with a resin system or coated with a surface finish

containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

     34.     Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. §206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
|  | 0.03 ppm – exposure durations between 15 and 364 days |
|  | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

     35.     Fleetwood Canada, LTD., Fleetwood Enterprises, Inc., and/or Fleetwood Homes of North Carolina, Inc. knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

36.     FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, §408 (1988). Under the Stafford Act, at 42 U.S.C.A. §5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

37.     In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Shaw, Bechtel and CH2M with No-Bid contracts, eventually amounting to billions of dollars.  The Federal Government also relied on the expertise and knowledge of Shaw, Bechtel and CH2M to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

38.     The provision of temporary housing to Named Plaintiffs created a duty on the part of the Federal Government to insure that such housing was habitable in a safe and sanitary condition.  However, the housing provided is and was, at all times pertinent hereto, unsafe and presented a clear and present danger to the health and well-being of the Named Plaintiffs and their families by exposing them to elevated and hazardous levels of formaldehyde.

39. Upon information and belief, Shaw, Bechtel and CH2M were the only contractors engaged by FEMA to assist with the implementation of the Stafford Act in Mississippi in the aftermath of Hurricane Katrina, from the pickup of a unit at a FEMA staging area through the decommissioning and de-installation of the units at the end of the contracts.

40. Shaw, Bechtel and CH2M were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

41. Under the terms of their contracts, Shaw, Bechtel and CH2M were obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same. Further, under their No-Bid contracts with FEMA, Shaw, Bechtel and CH2M were obligated to advise and instruct FEMA regarding the implementation of those contracts. Shaw, Bechtel and CH2M failed to properly fulfill either of these tasks.

42. Shaw, Bechtel and CH2M contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Shaw, Bechtel and CH2M were tasked with operating. These new areas included staging areas to be managed and maintained as assigned to either Shaw, Bechtel or CH2M or individual locations and addresses where Shaw, Bechtel or CH2M assigned that temporary housing unit would have obligations to manage and maintain it.

43. To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Shaw, Bechtel and CH2M entered into numerous sub-contracts, but at all

times retained supervisory capacity and responsibility under their individual contracts with
FEMA.

44.     Shaw, Bechtel and CH2M were tasked under their contracts with FEMA to
identify and prepare the infrastructure for the various group site locations. This included,
amongst other things, ensuring there would be adequate water, sewage, electricity, etc. Shaw,
Bechtel and CH2M knew or should have known that these preparations were for long-term
occupancy of the temporary housing units.

45.     Once the temporary housing unit(s) occupied by the Plaintiff(s) were transported
and delivered to a particular location, Shaw, Bechtel and CH2M had the responsibility for
installing that temporary housing unit. Shaw, Bechtel and CH2M installed the temporary
housing units by "blocking" the unit. This meant raising the Plaintiff's unit several feet into the
air and off of its wheel base, and setting it on concrete blocks.

46.     By blocking the temporary housing unit(s) of each Plaintiff, Shaw, Bechtel and
CH2M created stress and flexing on the frames of the unit as it were not designed to be lifted off
of the wheel base. In fact, the manufacturers of the temporary housing units warned in the
various owners' manuals provided with the units, that units should not be jacked so that the
vehicle's weight is no longer supported by the wheels.

47.     The stress and flexing of temporary housing units' frames caused by Shaw,
Bechtel and CH2M "blocking" them with weight off of the wheels created distortion in the travel
trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde
exposures.

48.     The temporary housing unit(s) occupied by the Plaintiff(s) which were provided by FEMA were for the most part travel trailers.  The travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation.  By installing the travel trailers on concrete blocks for extended occupancy, Shaw, Bechtel and CH2M  knowingly and intentionally modified the design and the actual use of these units occupied by the Plaintiff(s) by converting them into a temporary housing unit to be used as a residence for long term occupancy in some instances exceeding 18 months.

49.     Shaw, Bechtel and CH2M failed to consult with the manufacturers of the temporary housing units, including Monaco, with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation.  Shaw, Bechtel and CH2M took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

50.     Once Shaw, Bechtel and CH2M had completed the transportation, delivery and installation of the temporary housing unit(s) occupied by the Plaintiff(s), Shaw, Bechtel and CH2M were tasked with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the Plaintiff(s).  Upon information and belief, Shaw, Bechtel and CH2M failed to adequately inspect the temporary housing units occupied by the Plaintiff(s) to ensure that the units were safe and suitable for their intended use – the long-term occupancy by individuals and families displaced by Hurricane Katrina.  This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

51.     In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the Plaintiff(s) provided in response to Hurricane Katrina were also managed, maintained and repaired by Shaw, Bechtel and CH2M, or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, Shaw, Bechtel and CH2M failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the Plaintiff(s).

52.     Parallel to their duty to manage, maintain and repair each temporary housing unit, Shaw, Bechtel and CH2M failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the Plaintiff-occupant(s) of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

53.     Following the Plaintiffs' occupancy of each temporary housing unit, Shaw,Bechtel and CH2M were tasked with its de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Shaw, Bechtel and CH2M failed to identify the unsuitability of the temporary housing units for long-term occupancy.

54.     In addition to de-installation of the temporary housing units, Shaw, Bechtel and CH2M were tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to Hurricane Katrina or for use in the future. By restoring and refurbishing these temporary housing units, Shaw, Bechtel and CH2M warranted that the units were fit for their intended use, long term occupancy in response to disaster related displacement. By restoring and refurbishing these temporary housing units, Shaw, Bechtel and CH2M created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units. Further, in

thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by Hurricane Katrina, and who were then directly exposed to hazardous levels of formaldehyde.

55.     Shaw, Bechtel and CH2M, at every stage of their involvement, failed to warn the Plaintiff-occupant(s) of each temporary housing unit of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the Plaintiffs.

56.     Through their actions and omissions, Shaw, Bechtel and CH2M created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Shaw, Bechtel and CH2M negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

57.     Shaw, Bechtel and CH2M failed to warn the occupants of temporary housing unit(s) of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

58.     By restoring and refurbishing the trailer for future habitation, Shaw, Bechtel and CH2M improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

59.     Finally, despite these failures, Shaw, Bechtel and CH2M received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Plaintiff-occupant(s) of the temporary housing units who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

60.     The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See,* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

61.     Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

62.     In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly

every trailer exceeded the ATSDR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels. *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a Plaintiff herein, November 16, 2007.

63.     Nevertheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Plaintiffs. *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

64.     The Federal Government also continued to supply the defective and dangerous housing units to the Plaintiffs after March of 2006.

65.     The Federal Government continued to  supply the defective and dangerous housing units to the Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

66.     The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government, through FEMA, in March of 2006,

conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging

area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006,

which reflected the presence of formaldehyde at twelve times the EPA's value. Union of

Concerned Scientists, *supra*, and Exhibits B (*available at*

http://oversight.house.gov/documents/20070719113015.pdf) and D (*available at*

http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

      67.     The Federal Government continued to supply the defective and dangerous housing

units to the Plaintiffs even though the Federal Government had been notified on a number of

occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in

their housing units. Union of Concerned Scientists, *supra*, and Exhibits E (*available at*

http://oversight.house.gov/documents/20070719113322.pdf), I (*available at*

http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at*

http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

      68.     While complaints of formaldehyde exposure continued to be reported to the

Federal Government and evidence supporting the existence of dangerous levels of formaldehyde

present in the housing units was uncovered, the Federal Government intentionally avoided

undertaking any comprehensive testing of their own because it wanted to avoid liability for the

problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006,

"Do not initiate any testing until we give the OK. While I agree that we should conduct testing,

we should not do so until we are fully prepared to respond to the results. Once you get results and

should they indicate some problem, the clock is ticking on our duty to respond to them." Another

email repeats these concerns, reading "OGC has advised that we do not do testing, which would

imply FEMA's ownership of the issue." Union of Concerned Scientists, *supra*, and Supplemental

A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and

Supplemental B (various emails *available at*

http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

69.     Named Plaintiffs aver that, even as each Named Plaintiff was being placed at risk

in unsafe temporary housing, the Federal Government had reviewed the results of all earlier

testing and complaints of formaldehyde associated with the housing units and were actively

conferring with one or more of the manufacturers concerning formaldehyde exposure in the

housing units and how best to deal with the publicity fall-out as the media reports of same

increased.

70.     Evidence of communications between Defendant FEMA and members of the

trailer manufacturing indusrty exists by way of emails emanating from the FEMA Office of

General Counsel (OGC).  For example, in June 16, 2006 the same email which states "OGC has

advised that we do not do testing," states that "Gulfstream (Gulf Stream Coach, Inc.) is working

closely with FEMA to resolve the formaldehyde problem in smaller travel trailer (Cavalier)

units."  A later email reflects relief of the FEMA OGC at the "good news" that "one of the major

manufacturers of national housing units (Gulfstream I think)...wanted to get with External Affairs

so they could get on the same page...we may get the benefit of the manufacturer's 'science' and

'public relations' approaches."  *See* U.S. House of Representatives, Committee on Oversight and

Government Reform, FEMA's Travel Trailers: Litigation Considerations v. Health and Safety

Considerations, And the Winner Is?, July 19, 2007, *available at*

http://republicans.oversight.house.gov/Media/PDFs/20070719FEMAEmails.pdf.

71.     FEMA participated in an inter-agency meeting with the EPA and the Centers for

Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials

advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light. Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

72.     FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra. See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at* http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report_0507.pdf

73.     This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years. Union of Concerned Scientists, *supra*.

74.     FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the Plaintiffs supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein as a

result of their exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

75.     FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review. FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

76.     FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. *See* The Serious Public Health Issues Resulting from

Formaldehyde Exposures Within FEMA Travel Trailers Issued Hurricane Disaster Victims, and

Recommended Action Items, Testimony of Mary C. DeVany before the Committee on Oversight

and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at*

http://oversight.house.gov/documents/20070719102502.pdf.

77.     Indeed, in testimony before Congress, independent industrial hygienist Mary

DeVany described the FEMA testing and analysis process by stating "All I can say, in my

professional opinion, is that they did this in order to minimize the actual extent of the problems

in these trailers.  I have no other conclusion I can draw... I think it was a complete violation of

our professional code of ethics."  Oral testimony of Mary C. DeVany before the House

Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing

transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

78.     On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr.

Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health

Consultation was "possibly misleading and a threat to public health" for failure to disclose the

carcinogenic status of formaldehyde and that there are no safe exposure levels.

79.     Despite this information, FEMA and the ATSDR did not revise the original

Health Consultation until October of 2007 to include the warning that the original Health

Consultation" did not sufficiently discuss the health implications of formaldehyde exposure and

included language that may have been unclear, leading to potentially incorrect or inappropriate

conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation:

Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana,

September-October, 2006, *available at*

http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

80.     The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

81.     It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

82.     The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit

(mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

83.     The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

84.     As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

85.     The Federal Government's actions with regard to these Plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

86.    Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

## COUNT I

## CAUSES OF ACTION AGAINST THE FEDERAL GOVERNMENT

87.    At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to each and all of the Named Plaintiffs herein.

88.    The Federal Government was obligated to promptly warn each Named Plaintiff of any defects in the housing units which could cause harm and of which the Federal Government was aware.

89.    The Federal Government, after becoming aware of the potential for such harm, violated this duty to each Named Plaintiff, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

90.    As a direct and proximate result of the acts and omissions of the Federal Government, as well as its violations of state and federal laws, each Named Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

91.    Further, since each Plaintiff is within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiffs specifically plead the application of the doctrine of negligence *per se.*

92.     The Federal Government was negligent and at fault in the following non-exclusive particulars:

    a.     In failing to warn each of the Named Plaintiffs of the unreasonably dangerous nature of the housing unit which that Plaintiff occupied;

    b.     In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit;

    c.     In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of each Named Plaintiff, on becoming aware of the formaldehyde danger associated with the unit;

    d.     Such other actions of negligence and fault as will be shown at the trial of this matter.

## COUNT II

### NEGLIGENCE OF DEFENDANT NO-BID CONTRACTORS CH2M, BECHTEL AND SHAW UNDER MISSISSIPPI LAW

93.     Each Named Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

94.     At all relevant times, CH2M, Bechtel and Shaw were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Plaintiffs' injuries.

95.     CH2M, Bechtel and Shaw owed a duty to each Named Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

96.     CH2M, Bechtel and Shaw knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by each Plaintiff, and that the temporary housing units would be used in the manner that each Plaintiff herein used the temporary housing units.

97.     CH2M, Bechtel and Shaw breached its duty to each Named Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

      a.     Failing to sufficiently warn the Plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy; and

      b.     Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units;

98.     CH2M, Bechtel and Shaw's actions were the proximate cause of the increased exposure of formaldehyde to the each Named Plaintiff.

99.     CH2M, Bechtel and Shaw contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COUNT III

### STRICT PRODUCTS LIABILITY OF DEFENDANT NO-BID CONTRACTOR
### MS CODE ANNOTATED §11-1-63

100.    Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

101.    Defendants CH2M, Bechtel and Shaw, at the time that each subject housing unit left their control, knew or should have known that each product was defective because it deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications and/or manufacturers' warnings.

102.    Defendants CH2M, Bechtel and Shaw, by installing the housing units on concrete blocks for extended occupancy, knowingly and intentionally modified the design and the actual use of the housing units.

103.    Defendants CH2M, Bechtel and Shaw knew or should have known that the defective condition rendered each subject housing unit unreasonably dangerous tot he user or consumer or others.

104.    The defective and unreasonably dangerous condition of each product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by each Named Plaintiff.

105.    At all relative times, each Named Plaintiff lacked actual or constructive knowledge of the defective condition of their respective housing units and that each defective product was inconsistent with their safety.

106.    At all relevant times, each Named Plaintiff did not appreciate the danger of their housing unit's defective condition.

107.    At all relevant times, each Named Plaintiff did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

108.    Each subject housing unit in question failed to function as expected as a result of their design characteristics.

109.    An alternative design existed at the time that each housing unit left the control of the Manufacturer which would have not impaired the product's usefulness or desirability.

110.    The alternative design would have to a reasonable probability prevented the toxic exposure of each Named Plaintiff.

111.    Each product (housing unit) was defective because it failed to contain adequate warnings or instructions.

112.    Defendants CH2M, Bechtel and Shaw failed to warn the Named Plaintiffs of the inherently dangerous properties for the foreseeable conditions of the subject housing units when used for long term occupancy.

113.    Defendants CH2M, Bechtel and Shaw failed to warn the Named Plaintiffs of the presence of excessive levels of formaldehyde present in the housing units they installed, maintained and supervised.

114.    Furthermore, Defendants CH2M, Bechtel and Shaw breached the implied warranty of habitability due to the Named Plaintiffs.  The subject housing units were installed

and maintained with an expectation of habitability and a clear implied warranty that such housing

would be safe and free of any toxic dangers.

## COUNT IV

### BREACH OF CONTRACT BY DEFENDANT NO-BID CONTRACTORS

115.    All paragraphs of this Complaint are incorporated by reference as if fully set forth

herein.

116.    Defendants CH2M and Bechtel entered into contracts with FEMA, contracting to

provide the following service, among others: "The contractor will do maintenance necessary to

maintain the temporary housing units in a safe, working, and livable, condition." See excerpts of

Defendant Bechtel's contract with FEMA attached as Exhibit "B" at page 7 of Exhibit 10 and

Defendant CH2M's contract with FEMA attached as Exhibit "C" at page 7 of Exhibit 10.

117.    The Plaintiffs constitute third party beneficiaries to the subject contracts. The

contracts were entered into for the Plaintiffs' benefit as residents of the temporary housing units,

or alternatively, the benefit to the Plaintiffs as residents of the temporary housing units was the

direct result of the performance within the contemplation of the parties to the contract as

demonstrated by the terms of the contracts.

118.    The Defendants breached said contract by failing to maintain the Named

Plaintiffs' temporary housing units in a safe, working, and livable condition. Defendant's acts

and omissions, which constitute its failure to honor its contractual obligation, has caused damage

to the Plaintiffs for which Plaintiffs are entitled to recover money damages.

## COMPENSATORY DAMAGES

119.    In addition to and by way of summarizing the compensatory damages prayed for herein, each Named Plaintiff avers that the defendants, CH2M, Bechtel, Shaw and the United States of America, individually and/or jointly are responsible for all damages which each Named Plaintiff herein has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

120.    The damages sought herein by Named Plaintiffs on behalf of deceased family members were caused by decedent's exposure to formaldehyde as set forth herein, which damages include, but are not limited to, those available to Named Plaintiffs in wrongful death and survival actions, including loss of society, loss of support, survivor's grief, and incidental damages such as funeral and burial expenses.

## PUNITIVE / EXEMPLARY DAMAGES

121.    Pursuant to Miss. Code Ann. §11-1-65, inasmuch as the conduct of CH2M, Bechtel and Shaw and their servant/employees constitutes willful, wanton, egregious and reckless disregard for the rights and safety of the Plaintiffs, an award of punitive damages is appropriate and necessary under these facts.

## REQUEST FOR JURY TRIAL

Each Named Plaintiff is entitled to and demands a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs pray that CH2M, Bechtel, Shaw, and the United States of America be served with a copy of this Complaint, and that, after due proceedings:

1. There be a judgment herein in favor of each Named Plaintiff and against Defendants for all compensatory damages and punitive damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the Defendants are liable for all applicable damages and thereafter;

2. There be specially included in the judgment in each Named Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   a. Past and future physical injuries,

   b. Past and future mental and physical pain and suffering,

   c. Past and future physical impairments and disability,

   d. Past and future reasonable and necessary medical expenses,

   e. Past and future loss of earning capacity,

   f. Past and future loss of enjoyment and quality of life,

   g. Loss of consortium and/or society,

   h. Compensable out-of-pocket expenses related to Defendants' wrongdoing,

   i. Costs of court, and

          j.      Punitive damages,

    3.      All other general, equitable, and further relief as the Court may deem just and proper.

        Respectfully submitted, this the ____ day of May, 2010.

> **STARLETT M. KING, as wrongful death beneficiary and representative of, JEFF SHETTERLY, DECEASED, et al**
>
> By: _____
>
>       EDWARD GIBSON
>       ROSE M. HURDER

**OF COUNSEL:**

John Hawkins, Esq., MS Bar No. 9556
Edward Gibson, Esq., MS Bar No. 100640
Rose M. Hurder, Esq., MS Bar No. 103040
HAWKINS, STRACENER & GIBSON, PLLC
153 Main Street
Bay St. Louis, MS 39520
Ph.(228) 469-0785; Fx. (228) 467-4212

**PLEASE SERVE:**

1.     Bechtel National, Inc.
   **Through its registered agent:**
   CT Corporation System
   645 Lakeland East Dr. Ste. 101
   Flowood, MS 39232

2.     CH2M Hill Constructors, Inc.
   **Through its registered agent**:
   CT Corporation System
   645 Lakeland East Dr. Ste. 101
   Flowood, MS 39232

3.     Shaw Environmental, Inc.
   **Through its registered agent:**
   CT Corporation System
   5615 Corporate Blvd., Ste. 400B
   Baton Rouge, LA 70808

4.     The United States Government
   **Through:**
   U.S. Attorney's Office, Southern District of Mississippi
   188 East Capitol Street # 500
   Jackson, MS 39201
   **And through:**
   Attorney General of the United States
   U.S. Department of Justice
   950 Pennsylvania Ave., NW
   Washington, DC 20530-0001
   **And through**:
   Federal Emergency Management Agency
   Office of the Director, Office of the General Counsel
   500 C Street, SW
   Washington, DC 20472

## NAMED PLAINTIFFS
### STARLETT M. KING, as wrongful death Beneficiary and Representative of,
### JEFF SHETTERLY, DECEASED, et al  v. CH2M HILL CONSTRUCTORS, INC., ET AL

| No | Last Name | First Name | M | Representative | Address of THU | County | Contractor |
|----|-----------|-----------|-----|----------------|----------------|--------|-----------|
| 1. | Acevedo | Authur | P. | | 395 Braun Street Biloxi, MS 39520 | Harrison | CH2M HILL |
| 2. | A | B | C. | Tiffany S. James (Mother) | 2101 Ladnier Road #114 Gautier, MS 39553 | Jackson | Unknown |
| 3. | Ash | Mary | L | | Fox RV Park, Lot 90, 190 B. Beauvoir Rd., Biloxi, MS 39531 | Harrison | Shaw |
| 4. | B | B | M | Rachel Lee (Mother) | 9280 Canal Rd., Lot 82, Gulfport, MS 39503 | Harrison | Bechtel |
| 5. | Bishop | James | M | | 11244 Helen Dr. Gulfport, MS 39503 | Harrison | Bechtel |
| 6. | Bishop | Jan | F | | 11244 Helen Dr. Gulfport, MS 39503 | Harrison | Bechtel |
| 7. | Blackmon | Barbara | B | | 2101 Ladnier Rd Lot 192 Gautier, MS 39553 | Jackson | CH2M HILL |
| 8. | Blackmon-Thompson | Cornelius | R | | 2101 Ladnier Rd Lot 192 Gautier, MS 39553 | Jackson | CH2M HILL |
| 9. | B | D | J | Cornelius Blackmon-Thompson (Mother) | 2101 Ladnier Rd Lot 192 Gautier, MS 39553 | Jackson | CH2M HILL |
| 10. | Bowers | Stanley | B | | 16111 Kiln VFW Rd., Kiln, MS 39556 | Hancock | Bechtel |
| 11. | Brumbelow | George | T | | 120 W. 3rd St. Long Beach, MS 39532 | Harrison | Bechtel |
| 12. | Brumbelow | Mary | V | | 120 W. 3rd St. Long Beach, MS 39532 | Harrison | Bechtel |
| 13. | Burge | Elesha | M | | 18106 Commission Road Long Beach, MS 39560 | Harrison | CH2M HILL |
| 14. | B | H | E M | Elesha M. Burge (Mother) | 18106 Commission Road Long Beach, MS 39560 | Harrison | CH2M HILL |

Page 1 of 9

EXHIBIT "A"

**NAMED PLAINTIFFS**
**STARLETT M. KING, as wrongful death Beneficiary and Representative of,**
**JEFF SHETTERLY, DECEASED, et al  v. CH2M HILL CONSTRUCTORS, INC., ET AL**

| No | Last Name | First Name | M | Representative | Address of THU | County | Contractor |
|----|-----------|------------|---|----------------|----------------|--------|------------|
| 15. | Burkhart | Mary Ann | | | 816 Ingals Ave. Lot 110, Pascagoula, MS 39567 | Jackson | Bechtel |
| 16. | Case | Deborah | | | 1510 Laurel Glenn Rd Gautier, MS 39553 | Jackson | Bechtel |
| 17. | Christenberry | Dianne | W | | Shady Acres Bay St. Louis, MS 39520 | Hancock | Bechtel |
| 18. | C | C | J. H. | Lorrie Tolito-Clark (Mother) | 6017 Lower Bay Road, Lot 51 Bay St. Louis, MS 39520 | Hancock | CH2M HILL |
| 19. | C | K | E. D. | Lorrie Tolito-Clark (Mother) | 6017 Lower Bay Road, Lot 51 Bay St. Louis, MS 39520 | Hancock | CH2M HILL |
| 20. | Clark, Jr. | Robert | | | 6017 Lower Bay Road, Lot 51 Bay St. Louis, MS 39520 | Hancock | CH2M HILL |
| 21. | Clinton | Wendy | K | | 304 Keller St. Bay St. Louis, MS 39520 | Hancock | CH2M HILL |
| 22. | Colson | Chadwick | P | | 10210 Chapman Rd. Bay St. Louis, MS 39520 | Hancock | Bechtel |
| 23. | C, II. | C | P | Amanda M. Meyer (Mother) | 10210 Chapman Rd. Bay St. Louis, MS 39520 | Hancock | Bechtel |
| 24. | Creagh | Gwendolyn | M | | 254 Nichols Dr. Biloxi, MS 39530 | Harrison | Bechtel |
| 25. | Cuevas | Charlotte | A | | 17061 N. Cuevas Rd., Gulfport, MS 39503 | Harrison | CH2M HILL |
| 26. | Cuevas | Lloyd | W | | 17061 N. Cuevas Rd., Gulfport, MS 39503 | Harrison | CH2M HILL |

## NAMED PLAINTIFFS
### STARLETT M. KING, as wrongful death Beneficiary and Representative of,
### JEFF SHETTERLY, DECEASED, et al  v. CH2M HILL CONSTRUCTORS, INC., ET AL

| No | Last Name | First Name | M | Representative | Address of THU | County | Contractor |
|----|-----------|-----------|---|----------------|----------------|--------|------------|
| 27. | Cuevas | Roy | B | | 5230 Kiln-Delisle Rd., Kiln, MS 39556 | Hancock | CH2M HILL |
| 28. | Easton | David | A. | | 18344 Dogwood Lane Saucier, MS 39574 | Harrison | CH2M HILL |
| 29. | Easton | Linda | K | | 18344 Dogwood Lane Saucier, MS 39574 | Harrison | CH2M HILL |
| 30. | Estrade | Margaret | E | | 1260 Rd. 326 # 316 Spring Trail Scenic Camp Ground Perkinston, MS 39576 | Stone | Bechtel |
| 31. | Frantz | Theresa | J | | 9045 S. McGeHee Lot 13 Poplarville, MS 39470 | Pearl River | Bechtel |
| 32. | Fountain | Blanche | B | | 4544 Laurelwood Dr., D'Iberville, MS 39540 | Harrison | CH2M HILL |
| 33. | F | D | P A | Blanche B. Fountain (Mother) | 4544 Laurelwood Dr., D'Iberville, MS 39540 | Harrison | CH2M HILL |
| 34. | G | K | H | Iris A. Wilner (Mother) | 7201 Big Island Rd. Moss Point, MS 39562 | Jackson | CH2M HILL |
| 35. | Gillum | Thomas | | | 1003 Hwy 90 Bay St. Louis, MS 39520 | Hancock | Unknown |
| 36. | Graham | Dawn | L | | 4292 Firetower Rd. Kiln, MS 39556 | Hancock | Unknown |
| 37. | G | D | D | Dawn L. Graham (Mother) | 4292 Firetower Rd. Kiln, MS 39556 | Hancock | Unknown |
| 38. | Guidry | Lawrence | P | | 29494 N. Ladner Rd., Pass Christian, MS 39571 | Harrison | Bechtel |
| 39. | H | A | N | Ruby S. Hearty | 9489 Hwy 11 Poplarville, MS 39470 | Pearl River | Bechtel |
| 40. | Hearty | Louis | L | | 9489 Hwy 11 Poplarville, MS 39470 | Pearl River | Bechtel |

## NAMED PLAINTIFFS
### STARLETT M. KING, as wrongful death Beneficiary and Representative of,
### JEFF SHETTERLY, DECEASED, et al v. CH2M HILL CONSTRUCTORS, INC., ET AL

| No | Last Name | First Name | M | Representative | Address of THU | County | Contractor |
|----|-----------|-----------|---|----------------|----------------|--------|------------|
| 41. | Hearty | Ruby | S | | 9489 Hwy 11 Poplarville, MS 39470 | Pearl River | Bechtel |
| 42. | Hollins | Jules | E | | 1813 Lima Dr., Lot 174, Gautier, MS 39553 | Jackson | Bechtel |
| 43. | H | L | A | Sabrina Hollins (Mother) | 1813 Lima Dr., Lot 174, Gautier, MS 39553 | Jackson | Bechtel |
| 44. | Hollins | Sabrina | | | 1813 Lima Dr., Lot 174, Gautier, MS 39553 | Jackson | Bechtel |
| 45. | J | J | J | Twylett L. Williams (Mother) | 2800 19th Ave. Gulfport, MS 39501 | Harrison | Bechtel |
| 46. | Jenkins | Billy | | | 4544 Laurelwood Dr. D'Iberville, MS 39540 | Harrison | CH2M HILL |
| 47. | King | Alexander | L | | 6831 Holly Ave., Lot 10 Moss Point, MS 39563 | Jackson | Bechtel |
| 48. | King | Mary | E | | 6831 Holly Ave., Lot 10 Moss Point, MS 39563 | Jackson | Bechtel |
| 49. | Lee | Rachel | | | 9280 Canal Rd., Lot 82, Gulfport, MS 39503 | Harrison | Bechtel |
| 50. | Lewis | Alexander | | | 2101 Ladnier Rd. # 114 Gautier, MS 39553 | Jackson | Unknown |
| 51. | Lyons | Carol | | | 23098 Freddie Frank Rd. Lot 33A, Pass Christian, MS 39571 | Harrison | Bechtel |
| 52. | Madden | Vickie | M | | 103 Cleve St. Gulfport, MS 39503 | Harrison | Bechtel |
| 53. | Martin | Pauline | H | Theresa Walker (Daughter) | 10461 Hunter Road Gulfport, MS 39503 | Harrison | Bechtel |
| 54. | Maston | Deloris | L | | 224 Clarence Ave. Pass Christian, MS 39571 | Harrison | Bechtel |
| 55. | McCann | Marcella | E | | 4318 Wisteria Dr. Moss Point, MS 39562 | Jackson | Bechtel |

**NAMED PLAINTIFFS**
**STARLETT M. KING, as wrongful death Beneficiary and Representative of,**
**JEFF SHETTERLY, DECEASED, et al v. CH2M HILL CONSTRUCTORS, INC., ET AL**

| No | Last Name | First Name | M | Representative | Address of THU | County | Contractor |
|----|-----------|------------|---|----------------|----------------|--------|------------|
| 56. | Miller | Kevin | B | | 7201 Big Island Rd. N., Moss Point, MS 39562 | Jackson | CH2M HILL |
| 57. | Mills | Marion | H | | 2008 Lazy Lane Bay St. Louis, MS 39521 | Hancock | Bechtel |
| 58. | Mills | William | R | | 2008 Lazy Lane Bay St. Louis, MS 39521 | Hancock | Bechtel |
| 59. | Moore | Carmen | E | | Short Cut Rd., Moss Point, MS 39563 | Jackson | Bechtel |
| 60. | Moore | James | | | Short Cut Rd., Moss Point, MS 39563 | Jackson | Bechtel |
| 61. | Moore | Rebecca | L | | Short Cut Rd., Moss Point, MS 39563 | Jackson | Bechtel |
| 62. | Meyer | Amanda | M | | 10210 Chapman Rd. Bay St. Louis, MS 39520 | Hancock | Bechtel |
| 63. | M | K | J | Amanda M. Meyer (Mother) | 10210 Chapman Rd. Bay St. Louis, MS 39520 | Hancock | Bechtel |
| 64. | N | V | R | Toni J. Palmisano (Mother) | 1260 Rd. 326, Lot 257, Perkinston, MS 39373 | Stone | Bechtel |
| 65. | Neese | Carolyn | W | | 10034 Batia Ave. D'Iberville, MS 39540 | Harrison | Bechtel |
| 66. | Palmisano | Toni | J | | 1260 Rd. 326, Lot 257, Perkinston, MS 39373 | Stone | Bechtel |
| 67. | Parker | Annie | R. | | 2101 Ladnier Rd. # 114 Gautier, MS 39553 | Jackson | Unknown |
| 68. | Pendergrass | Johnny | E. | | 9524 Highway 613, Lot 21 Escatawpa, MS 39552 | Jackson | CH2M HILL |
| 69. | Powell | Manuel | G | | 12205 Mount Pleasant Rd Vancleave, MS | Jackson | CH2M HILL |

**NAMED PLAINTIFFS**
**STARLETT M. KING, as wrongful death Beneficiary and Representative of,**
**JEFF SHETTERLY, DECEASED, et al v. CH2M HILL CONSTRUCTORS, INC., ET AL**

| No | Last Name | First Name | M | Representative | Address of THU | County | Contractor |
|---|---|---|---|---|---|---|---|
| 70. | Romain, III. | Walter | J | | 247 Clark St. Pass Christian, MS 39571 | Harrison | CH2M HILL |
| 71. | Runnels | Thomas | A | Christian Miller (Daughter) | 15170 Hwy 603 Kiln, MS 39556 | Hancock | Bechtel |
| 72. | Sanders | Shirley | S | | 491 Gay Ave. Gulfport, MS 39507 | Harrison | Bechtel |
| 73. | Sayles | Cynthia | R | | 150 Katie Eubanks Rd. Lucedale, MS 39452 | George | Becthel |
| 74. | Shetterly | Jeff (deceased) | A | Starlett M. King (Sister) | 627 W. Old Pass Rd. Long Beach, MS 39560 | Harrison | CH2M HILL |
| 75. | S | J | Y | Elesha M. Burge (Mother) | 18106 Commission Road Long Beach, MS 39560 | Harrison | CH2M HILL |
| 76. | Smith | John | A | | 1614 21st St. Gulfport, MS 39501 | Harrison | Bechtel |
| 77. | S | J | W | Elesha M. Burge (Mother) | 18106 Commission Road Long Beach, MS 39560 | Harrison | CH2M HILL |
| 78. | Smith | Melvin | L. | | 365 Bowen Rd. Biloxi, MS 39530 | Harrison | Bechtel |
| 79. | S | E | S | Stafinee` R. Spears (Mother) | 427 Reynoir St. Biloxi, MS 39530 | Harrison | Bechtel |
| 80. | S | G | C | Stafinee` R. Spears (Mother) | 427 Reynoir St. Biloxi, MS 39530 | Harrison | Bechtel |
| 81. | S | S | G | Stafinee` R. Spears (Mother) | 427 Reynoir St. Biloxi, MS 39532 | Hancock | Bechtel |
| 82. | Spiers | Joyce | S | | 1294 Rock Ranch Rd. Carriere, MS 39426 | Pearl River | Bechtel |
| 83. | Stiles | Krystle | | | 9221A Pollock Ferry Rd., Moss Point, MS 39562 | Jackson | Bechtel |

**NAMED PLAINTIFFS**
**STARLETT M. KING, as wrongful death Beneficiary and Representative of,**
**JEFF SHETTERLY, DECEASED, et al v. CH2M HILL CONSTRUCTORS, INC., ET AL**

| No | Last Name | First Name | M | Representative | Address of THU | County | Contractor |
|----|-----------|------------|---|----------------|----------------|--------|------------|
| 84. | S | M | G | Krystle Stiles (Mother) | 9221A Pollock Ferry Rd., Moss Point, MS 39562 | Jackson | Bechtel |
| 85. | Stubbs | Delphine | L | | 101 East Chipwood Cr. Gulfport, MS 39503 | Harrison | Bechtel |
| 86. | Stubbs | Dennis | M | | 101 East Chipwood Cr. Gulfport, MS 39503 | Harrison | Bechtel |
| 87. | S | M | J B | Delphine L. Stubbs (Mother) | 101 East Chipwood Cr. Gulfport, MS 39503 | Harrison | Bechtel |
| 88. | Tallman | Lawrence | S | | 5151 1st St. Bay St. Louis, MS 39520 | Hancock | CH2M HILL |
| 89. | Thompson | Brian | E | | 2101 Ladnier Rd Lot 192 Gautier, MS 39553 | Jackson | CH2M HILL |
| 90. | Tillman | Timothy | T | | 501 Hibiscus Dr Bay St. Louis, MS 39520 | Hancock | Bechtel |
| 91. | Tillman | Yvonne | M | | 501 Hibiscus Dr Bay St. Louis, MS 39520 | Hancock | Bechtel |
| 92. | T | M | L. K. | Lorrie Tolito-Clark (Mother) | 6017 Lower Bay Road, Lot 51 Bay St. Louis, MS 39520 | Hancock | CH2M HILL |
| 93. | Tolito | Lorrie | J. C. | | 6017 Lower Bay Road, Lot 51 Bay St. Louis, MS 39520 | Hancock | CH2M HILL |

**NAMED PLAINTIFFS**
**STARLETT M. KING, as wrongful death Beneficiary and Representative of,**
**JEFF SHETTERLY, DECEASED, et al v. CH2M HILL CONSTRUCTORS, INC., ET AL**

| No | Last Name | First Name | M | Representative | Address of THU | County | Contractor |
|----|-----------|------------|---|----------------|----------------|--------|------------|
| 94. | T | V | L. L.A. | Lorrie Tolito-Clark (Mother) | 6017 Lower Bay Road, Lot 51 Bay St. Louis, MS 39520 | Hancock | CH2M HILL |
| 95. | Vardin | Jeffrey | D | | 904 South McGeehee Poplarville, MS 39470 | Pearl River | Bechtel |
| 96. | Walker | James | E. | | 10461 Hutter Rd. Gulfport, MS 39503 | Harrison | Bechtel |
| 97. | Walker | Theresa | P M | | 10461 Hunter Road Gulfport, MS 39503 | Harrison | Bechtel |
| 98. | Waller | Isaac | R | | 19527 Linda Ln. Saucier, MS 39574 | Harrison | Bechtel |
| 99. | Waller | Regina | F | | 19527 Linda Ln. Saucier, MS 39574 | Harrison | Bechtel |
| 100. | Welch | Jack | | | 6040 W. Benton St. Bay St. Louis, MS 39520 | Hancock | Bechtel |
| 101. | W | D | D. A. R. | Portia White (Mother) | 254 Nichols Dr. Biloxi, MS 39530 | Harrison | Bechtel |
| 102. | W | J | J | Twylett L. Williams (Mother) | 2800 19th Ave. Gulfport, MS 39501 | Harrison | Bechtel |
| 103. | W | A | D | Sabrina Hollins (Mother) | 1813 Lima Dr., Lot 174, Gautier, MS 39553 | Jackson | Bechtel |
| 104. | W | L | D | Sabrina Hollins (Mother) | 1813 Lima Dr., Lot 174, Gautier, MS 39553 | Jackson | Bechtel |
| 105. | W | P | C | Sabrina Hollins (Mother) | 1813 Lima Dr., Lot 174, Gautier, MS 39553 | Jackson | Bechtel |
| 106. | Williams | Twylett | L | | 2800 19th Ave. Gulfport, MS 39501 | Harrison | Bechtel |
| 107. | Wilner | Iris | A | | 7201 Big Island Rd. Moss Point, MS 39562 | Jackson | CH2M HILL |

**NAMED PLAINTIFFS**
**STARLETT M. KING, as wrongful death Beneficiary and Representative of,**
**JEFF SHETTERLY, DECEASED, et al v. CH2M HILL CONSTRUCTORS, INC., ET AL**

| No | Last Name | First Name | M | Representative | Address of THU | County | Contractor |
|----|-----------|------------|---|----------------|----------------|--------|------------|
| 108. | Wooley | Laura | L | | 7095 Lower Bay Rd. Bay St. Louis, MS 39576 | Hancock | Bechtel |

Case 2:07-md-01873-KDE-MBN Document 26128-1 Filed 10/09/13 Page 46 of 85
Case 1:11-cv-00799-HSO-JMR Document 61-3 Filed 05/06/13 Page 1 of 19
Case 2:07-md-01873-KDE-ALC    Document 2721-7    Filed 08/17/2009    Page 21 of 82

**CONFORMED COPY**

**CONTRACT NUMBER:**

HSFEHQ-05-D-0572

**ISSUED BY:**

Department of Homeland Security
Federal Emergency Management Agency
Financial & Acquisition Management Division
Flood, Fire and Mitigation Branch
500 C Street, S.W., Room 350
Washington DC  20472

**NAME AND ADDRESS OF CONTRACTOR:**

Bechtel National, Inc.
5275 Westview Drive
Frederick, MD 21703-8306

**LETTER CONTRACT FOR:**

Pursuant to Federal Acquisition Regulation (FAR) 16.603, the following agreement is hereby
entered into on behalf of the Government.

**TERM OF CONTRACT**

The contract term shall be for a period commencing upon effective date of this contract and
ending January 15, 2006.

The following and attached clauses (Sections B-J) to this letter contract apply:

**52.216-23, EXECUTION AND COMMENCEMENT OF WORK  (APR 1984)**

The Contractor shall indicate acceptance of this letter contract by signing three copies of the
contract and returning them to the Contracting Officer not later than September 30, 2005.  Upon
acceptance by both parties, the Contractor shall proceed with performance of the work, including
purchase of necessary materials.

Page 1 of 4

**EXHIBIT**

**"B"**

tabbies®

BNIF 00000285

**52.216-24, LIMITATION OF GOVERNMENT LIABILITY (APR 1984)**

(a) In performing this contract, the Contractor is not authorized to make expenditures or incur obligations exceeding the amount obligated under individual task orders.

(b) The maximum amount for which the Government shall be liable if this contract is terminated is equal to the cumulative amount obligated under individual task orders.

**52.216-25, CONTRACT DEFINITIZATION  (OCT 1997)**

(a) An Indefinite Delivery/Indefinite Quantity (IDIQ) type definitive contract with firm fixed price/cost/time and materials task orders is contemplated.  The Contractor agrees to begin promptly negotiating with the Contracting Officer the terms of a definitive contract that will include (1) all clauses required by the Federal Acquisition Regulation (FAR) on the date of execution of the letter contract, (2) all clauses required by law on the date of execution of the definitive contract, and (3) any other mutually agreeable clauses, terms, and conditions.  The Contractor agrees to submit a proposal and cost or pricing data supporting its proposal.

(b) The schedule for definitizing this contract is:

(1)    Proposal due September 30, 2005;
(2)    Negotiations on or before October 21, 2005;
(3)    Definitization within 5 days of agreement;

(c) If agreement on a definitive IDIQ contract to supersede this letter contract is not reached by the target date in paragraph (b) above, or within any extension of it granted by the Contracting Officer, the Contracting Officer may, with the approval of the head of the contracting activity, determine a reasonable price or fee in accordance with Subpart 15.8 and Part 31 of the FAR, subject to Contractor appeal as provided in the Disputes clause.  In any event, the Contractor shall proceed with completion of the contract, subject only to the Limitation of Government Liability clause.

(1) After the Contracting Officer's determination of price or fee, the contract shall be governed by--

(i) All clauses required by the FAR on the date of execution of this letter contract for either fixed-price or cost-reimbursement contracts, as determined by the Contracting Officer under this paragraph (c);

(ii) All clauses required by law as of the date of the Contracting Officer's determination; and

(iii) Any other clauses, terms, and conditions mutually agreed upon.

(2) To the extent consistent with subparagraph (c)(1) above, all clauses, terms, and conditions included in this letter contract shall continue in effect, except those that by their nature apply only to a letter contract.

BNIF 00000286

**52.216-26 PAYMENTS OF ALLOWABLE COSTS BEFORE DEFINITIZATION  (DEC 2002)**

This clause applies to Cost Reimbursement Task Orders only.

(a) Reimbursement rate.  Pending the placing of the definitive contract referred to in this letter contract, the Government will promptly reimburse the Contractor for all allowable costs under this contract at the following rates:

(1) One hundred percent of approved costs representing financing payments to subcontractors under fixed-price subcontracts, provided that the Government's payments to the Contractor will not exceed 80 percent of the allowable costs of those subcontractors.

(2) One hundred percent of approved costs representing cost-reimbursement subcontracts; provided, that the Government's payments to the Contractor shall not exceed 85 percent of the allowable costs of those subcontractors.

(3) Eighty-five percent of all other approved costs.

(b) Limitation of reimbursement.  To determine the amounts payable to the Contractor under this letter contract, the Contracting Officer shall determine allowable costs in accordance with the applicable cost principles in Part 31 of the Federal Acquisition Regulation (FAR).  The total reimbursement made under this paragraph shall not exceed 85 percent of the maximum amount of the Government's liability, as stated in this contract.

(c) Invoicing.  Payments shall be made promptly to the Contractor when requested as work progresses, but (except for small business concerns) not more often than every 2 weeks, in amounts approved by the Contracting Officer.  The Contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as the representative may require, an invoice or voucher supported by a statement of the claimed allowable cost incurred by the Contractor in the performance of this contract.

(d) Allowable costs.  For the purpose of determining allowable costs, the term "costs" includes--

(1) Those recorded costs that result, at the time of the request for reimbursement, from payment by cash, check, or other form of actual payment for items or services purchased directly for the contract;

(2) When the Contractor is not delinquent in payment of costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for-

(i) Supplies and services purchased directly for the contract and associated financing payments to subcontractors, provided payments determined due will be made-

(A) In accordance with the terms and conditions of a subcontract or invoice; and

(B) Ordinarily within 30 days of the submission of the Contractor's payment request to the Government;

BNIF 00000287

(ii) Materials issued from the Contractor's stores inventory and placed in the production process for use on the contract;

(iii) Direct labor;

(iv) Direct travel;

(v) Other direct in-house costs; and

(vi) Properly allocable and allowable indirect costs as shown on the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts; and

(3) The amount of financing payments that the Contractor has paid by cash, check, or other forms of payment to subcontractors.

(e) Small business concerns. A small business concern may receive more frequent payments than every 2 weeks.

(f) Audit. At any time before final payment, the Contracting Officer may have the Contractor's invoices or vouchers and statements of costs audited. Any payment may be (1) reduced by any amounts found by the Contracting Officer not to constitute allowable costs or (2) adjusted for overpayments or underpayments made on preceding invoices or vouchers.

**1.  SCOPE OF WORK:**

See attached, Section C.

**2.  WAGE DECISION NO.:**

See attached, Section H.10, Wage Determination (Various).

**3.  Suspension of Davis-Bacon Act.** On September 8, 2005, the President signed a proclamation suspending the Davis-Bacon Act, 40 U.S.C. 3141, in those areas of the country seriously affected by Hurricane Katrina. The suspension applies to various counties/parishes in the states of Louisiana, Mississippi, Alabama and Florida to contracts awarded on or after September 8, 2005. The determination as to whether the Davis-Bacon Act applies to a particular Task Order under this contract will be determined upon the receipt of the contractor's Task Order proposal(s) and subsequent negotiations. The appropriate clauses will, then, be included in the negotiated Task Order(s).

**SIGNATURES:**

Contractor                                    30 SEP 05
                                              Date

Nancy A. Costello                             9/30/05
Contracting Officer                           Date

Page 4 of 4

BNIF 00000288

EXHIBIT 10
MAINTENANCE-TEMPORARY HOUSING UNITS

# 1. General

This specification establishes the minimum requirements for disaster area maintenance of temporary housing units.

This contractor at a minimum will:

a) Provide maintenance services of units assigned by FEMA. This maintenance services contract includes performing monthly preventative maintenance inspections, responding to routine and emergency maintenance calls and making repairs as required for units assigned to the contractor and/or identified by FEMA.

b) Maintain records pertaining to tasks assigned to include monthly preventative maintenance inspection, routine and emergency maintenance and will make those records available for review upon request by FEMA. The records shall be saved and provided to FEMA when the units are deactivated, and/or upon request by FEMA. All records will be saved and provided on a CD-ROM in Microsoft Word or Excel and provided to FEMA. The contractor will maintain a back-up copy for three years after the contract is terminated.

c) Perform other tasks as required by the COTR and / or the COTR's designee, and as described in the Additional Cost Line Items portion of this document. FEMA will notify the contractor of the requirement for these tasks.

d) Demonstrate professionalism when performing contract-associated tasks. The Contractor must have approval from the occupant or, in case of an emergency, the project monitor (PM) prior to entering the temporary housing unit. This shall include notifying commercial site management or Operations and Management personnel when performing duties within their properties.

e) The Contractor at no time will leave unattended, or otherwise unprotected, any excavation or safety hazard that might cause injury to any person. Access to and from all exterior doors shall be maintained at all times.

f) Contact the manufacturer, dealer or temporary housing unit source for warranty maintenance issues as approved by FEMA. FEMA will not pay any co-payment or deductions if they are required. If the contractor is paid by the manufacturer, dealer, or temporary housing unit source to perform warranty maintenance, the contractor shall reimburse FEMA of the amount received.

g) Have resources (including staff) available or on-call for 24 hours a day, 7 days a week (24/7), to include having a toll-free number available within 48 hours upon contract award to report emergency (day and after-hours), and routine issues.

h) Make repairs identified by FEMA. Generally the Contractor will be expected to correct problems that the occupants are not expected to correct. These problems are not limited to tasks that require the professional services of an experienced electrician, carpenter, plumber, or appliance repairman.

i) Obtain approval from the COTR prior to performing any miscellaneous or unusual requirements. Written documentation must be submitted for reimbursement.

j) Inform FEMA of any trends associated with the upkeep and maintenance of the unit such as excessive service calls.

Exhibit 10 – Page 1 of 15

BNIF 00000404

Case 2:07-md-01873-KDE-MBN Document 26128-1 Filed 10/09/13 Page 51 of 85
Case 1:10-cv-00399-HSO-JMR Document 6128-1 Filed 05/06/13 Page 96 of 10
Case 2:07-md-01873-KDE-ALC     Document 2721-7     Filed 08/17/2009     Page 69 of 82

EXHIBIT 10
MAINTENANCE-TEMPORARY HOUSING UNITS

k)  Respect applicant privacy and protect their information. The applicant
information must not be used for any reasons other than the intended purpose. No
applicant information will be provided to other entities without FEMA and the
applicant's approval.

# 2.  Maintenance Areas of Responsibility

The Contractor's area of responsibility is for all interior and exterior components of the unit
which includes the:

## 2.1  Plumbing System

Plumbing includes all water and sewer lines and tanks inside the temporary housing unit
and all external lines from the temporary housing unit to the utility main or the park
owner's connection.

## 2.2  Electrical System

Electrical includes all wiring and associated parts from the Power Company's connection
on the meter loop pole or pedestal, to and throughout the manufactured unit, including
underground entrance cable. When connecting to an approved power source the
responsibility shall include all installed components up to the approved power source.

## 2.3  Heating and Cooling System

This includes all major components to include wiring and associated parts

## 2.4  Replacement of Components

Unless it is associated with the repair and/or replacement of a related component the
Contractor is not responsible for replacing such items as light bulbs, stoppers, drain
baskets, extra door keys, light covers, etc.

## 2.5  Entrance/Exit components

This includes all panels, sidings, windows, screens and doors.

# 3.  Function (tasks) Descriptions.

## 3.1  Maintenance – Emergency

Repairs that are authorized under Emergency Maintenance may be requested by the
temporary housing unit occupant (the contractor needs to report this to FEMA
immediately) and are defined as those necessary to eliminate a serious health, safety, or
security hazard. All emergency work orders received after hours, weekends, or holidays
from the occupant shall be reported to the COTR by 10:00 a.m. on the following normal
workday.

The Contractor shall initiate repairs to eliminate these healths, safety, or security
hazards within six (6) hours of receipt (7 days per week) of an emergency request and
complete the work as soon as possible. This may include temporary repairs, in which

Exhibit 10 – Page 2 of 15

BNIF 00000405

EXHIBIT 10
MAINTENANCE-TEMPORARY HOUSING UNITS

case the Contractor shall notify the COTR or designee. Permanent repairs must be completed within the routine repair time frame.

Emergency maintenance is typically required in response to, but not limited to, one of the following problems:
a) Gas leak
b) Major water leak, where a shut off valve cannot be located
c) Actual sewage leak (Health concern)
d) No heat (when outside temperature is, or is expected to go below 50 degrees Fahrenheit)
e) No A/C (when outside temperature is, or is expected to go above 85 degrees Fahrenheit)
f) No electricity (excluding local power company failure), or major electrical malfunction.

## 3.2 Maintenance – Routine

Maintenance not defined as emergency maintenance is defined as routine maintenance, unless identified by FEMA. All routine repairs shall be completed within 48 hours after receipt of the requirement. When such 48-hour completion time would expire on Saturdays, Sundays, or holidays, the 48-hour time period shall extend to the following Monday or Tuesday, as appropriate.

The Contractor shall complete routine maintenance items requested by the occupant that were not listed on the work order when performing a service call or preventive maintenance visit, as long as the total cost of material does not exceed $250. **For items and materials considered as Major Material Items the contractor must notify and obtain approval from the COTR prior to performing the work.** It is the contractor's responsibility to obtain the name of the person and the time of the decision.

<u>Failure of the Contractor to contact FEMA for authority to proceed could result in the deduction of such costs from the work order prior to payment.</u> If payment has been made the amount may be deducted from subsequent payments.

Priority shall be given during routine maintenance to:
a) Heating (winter) and cooling (summer) problems not corrected under the emergency maintenance definition
b) Problems that could be a health concern, such as stopped-up sewer or water lines
c) Permanent correction of temporary repairs that were performed under emergency maintenance; and
d) Other such tasks where earlier correction could lessen the extent of the problem.

## 3.3 Maintenance – Staging

This is related to the units located at the staging areas or other designated areas identified by FEMA. This function includes performing maintenance of units identified by FEMA. Maintenance tasks on these units will by identified and assigned by the COTR or his designee.

Exhibit 10 – Page 3 of 15

BNIF 00000406

Case 2:07-md-01873-KDE-MBN Document 26128-1 Filed 10/09/13 Page 53 of 85
Case 1:10-cv-00799-LFS-UNR Document 6123-1 Filed 05/06/13 Page 53 of 10
Case 2:07-md-01873-KDE-ALC     Document 2721-7     Filed 08/17/2009     Page 71 of 82

## EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

### 3.4 *Major Material Item Replacement*

The Contractor shall provide all necessary replacement parts and materials to repair manufactured units under this Contract, except those identified as Major Material Items.

Major Material Items are identified as, but not limited to, refrigerators, water heaters, ranges, axles, exterior doors, temporary housing unit tires, complete furnace, complete A/C, or any other component valued at over $250. The Contractor may replace these items only after prior inspection and approval by the COTR or CO.

If the Contractor determines, after an inspection by a certified mechanic, that repair of a Major Material Item(s) is impractical, the Contractor shall promptly provide the COTR with a written report. This written report needs to address identifying the item(s) by make, model number, part number, identification number and location, condition of the item, and itemized material cost to replace the item(s).

*Note: This is for the actual item costs. Labor costs are covered under the monthly maintenance fee. Any additional labor cost must be itemized and approved by the COTR prior to performing the work. The COTR shall investigate and determine the practicality of repair versus replacement, and then shall instruct the Contractor to proceed with repairs, provide the Contractor with the Major Material Item for replacement, or authorize the Contractor to purchase and replace the item*

Any parts valued at over $250 each that are replaced by the Contractor shall be returned with the completed work order to the COTR, if requested. Replaced parts shall be individually identified with a wire-on tag that contains the work order number, unit number, replacement date, and description of defect. Unit components replaced as defective and later determined by the COTR to have been repairable at a reasonable cost shall result in a back-charge to the Contractor for any associated material costs

The Contractor shall, at all times, make a reasonable effort to acquire all parts at prices favorable to the Government. If the COTR determines that the Contractor could have reasonably obtained the materials at significantly lower prices, the COTR may authorize payment based on the lower prices. Purchase receipts shall be provided to the COTR with the completed work order for all (each) parts costing over $250. The Contractor will be compensated for the actual purchase costs of materials used, as documented on the receipt.

When the Contractor must backorder repair parts for the furnace, A/C, refrigerator, or range, or is otherwise unable to repair these appliances within 48 hours of receiving the work request (within 6 hours for the furnace (winter) and A/C (summer)), the Contractor shall provide a temporary appliance for the occupant. The temporary heating appliance shall be equipped with an automatic shut-off that activates if the heater is accidentally tipped over. Such temporary appliances shall be provided, at no additional cost to the Government or the occupant, until such time as the permanent appliances are fully operational

Exhibit 10 – Page 4 of 15

BNIF 00000407

# EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

All parts replaced shall be new and shall be of a quality equal to or better than the part being replaced.

## 4. Issuance of Work.

FEMA reserves the right to issue work to staff and other resources to perform the mission. The contractor will be assigned units after the units have been installed. The contractor will perform monthly maintenance service visits for each unit assigned. These visits must be at least 14 days apart.

The contractor may also be tasked to perform service calls for routine, emergency, staging maintenance and other tasks during normal duty hours. All service calls will have a follow-up visit scheduled.

The follow-up to a service call may serve as a monthly maintenance service visit if it is performed in the next month and the 14-day spread is met. The purpose of the maintenance service visit is to see if there were any maintenance issues related to the unit that need to be addressed and to make repairs as needed.

The contractor must provide the COTR a monthly schedule of planned visits on the first duty day of the month and a summary of findings for the units assigned at the end of the month.

The contractor will contact the applicant at least 24 hours prior to the scheduled maintenance visit. The contractor will also leave the occupant a summary of the findings and work performed for all visits and service calls.

The summary will include the unit information, date of the visit, the summary of findings and work performed, and the tentative date for the next scheduled maintenance service visit. A copy of the summary of each unit assigned shall be forwarded to FEMA on a monthly basis.

Routine, emergency, and staging work may be issued to the contractor via maintenance work orders. Maintenance work orders will be used for documenting all maintenance calls regardless of the nature. Generally FEMA will use a FEMA Form 90-38, "Mobile Home Maintenance Work Order" or other appropriate documentation. At the completion of the work the contractor shall:

    a) Complete the work order prior to requesting the occupant's signature (excluding cost).
    b) Attach a signed statement explaining the omission of occupant's signature when the occupant is unavailable to sign the completed work order.

When the unit is identified by FEMA as currently vacant the maintenance service visit will include inspecting the unit for safety hazards, damages and reporting the condition of the unit.

The contractor will perform a unit cleaning to prepare the unit for occupancy as assigned by FEMA. The LP tank of the mobile home or the travel trailer's LP bottles shall be filled for re-occupancy. The contractor will not replace appliances, furnishing, furnace, A/C, or water heater prior to COTR approval. If it is determined that these items need to be replaced for the

Exhibit 10 – Page 5 of 15

BNIF 00000408

**EXHIBIT 10**
**MAINTENANCE-TEMPORARY HOUSING UNITS**

unit to be ready to occupy the contractor will submit in writing the items that need to be replaced and the estimated amount of replacement cost. The COTR must concur prior to items being replaced.

For billing purposes the contractor must submit the actual receipts for items replaced with the Work Order. Based on the concurrence or approval of the COTR, FEMA will reimburse the contractor the actual cost of the replacement items not to exceed the fair market value of the item.

## 5. Contractor Responsibilities

### 5.1 Work Hours

Normal work (duty) hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday, excluding holidays. Emergency after-hours calls are considered as emergencies that occur anytime outside the above-mentioned hours and days. The completion time of service calls that would expire on Saturdays, Sundays, or holidays, shall extend to the following duty day, as appropriate

### 5.2 Phone Service

The 24-hour telephone numbers(s) shall be a toll-free number and shall be provided to the Contracting Officer and FEMA COTR within 48 hours of contract award. The telephone number(s) will be provided to the unit occupants.

### 5.3 Facilities

The Contractor shall maintain an office and adequate storage and shop facilities to efficiently provide for the Government's maintenance obligation and requirements. Identification
The contractor personnel must wear an identification badge. The badge must include a contractor identification number, name, company name, and phone number. This badge must be visible when the contractor is working. The contractor is responsible for obtaining badges for all the employees working the tasks associated with this contract. This includes temporary, sub-contractors, etc.. The contractor is responsible for monitoring their staff.

### 5.4 Resources

The Contractor shall furnish all necessary labor, tools, equipment, and materials to perform temporary housing unit maintenance services. The contractor must obtain all appropriate permits and licenses needed to fulfill the tasks of this contract. The contractor must use certified and licensed personnel to perform the work needed (i.e. plumber, electrician, heating and air).

### 5.5 Contractor Expectations

All contractor staff is expected to carry themselves in a professional manner. It is the contractor's responsibility to monitor and supervise their staff work, professionalism,

Exhibit 10 – Page 6 of 15

BNIF 00000409

Case 2:07-md-01873-KDE-MBN Document 26128-1 Filed 10/09/13 Page 56 of 85
Case 2:07-md-01873-KDE-MBN Document 9128-1 Filed 06/09/13 Page 56 of 85
Case 2:07-md-01873-KDE-ALC     Document 2721-7     Filed 08/17/2009     Page 74 of 82

**EXHIBIT 10**
**MAINTENANCE-TEMPORARY HOUSING UNITS**

and behavior. The contractor must be able to provide a background check of employees as requested.

## 5.6 Qualification of Personnel

Work performed under this task shall be completed by professionally certified mechanics with expertise in heating and air conditioning (HVAC), refrigeration, range, electrical, and/or plumbing repairs.

    a) The Contractor must be able to provide documentation of each mechanic's professional certification (such as certificates of training course completion, letters from previous employers certifying experience, resumes, membership affiliations to professional organizations, or other such documentation), if requested by FEMA, which, in the COTR's opinion, attests to the mechanic's qualifications.

    b) For unusually complex maintenance problems, the Contractor must have access to licensed/certified technicians in the areas of electrical, plumbing, furnace, air condition, and appliance repair. Utilization of licensed/certified personnel shall be at no additional cost to FEMA. Availability of licensed technicians shall be (a) on a 24-hour basis, if needed, (b) maintained throughout the period of this contract, and (c) the contractor may be required to provide documentation to the COTR that substantiates that licensed/certified technicians are being used.

    c) The contractor will identify a primary and alternate point-of-contact within 48 hours of contract award.

## 5.7 Warranty

All work performed under this contract shall be warranted for a period of 90 days from the acceptance of the work, as indicated by the Contracting Officer's Technical Representative's (COTR's) signature and date on the work order form

## 5.8 Problem Reporting

Any maintenance problems, which in the Contractor's opinion were manufacturer warranty issues, or caused by the installation Contractor (particularly towing damage which will affect removal) and/or negligence or abuse by the occupant shall be reported to the COTR (in writing) with the completed work order.

# 6. Tasks

## 6.1 MH / TT Maintenance Specifications

| | |
|---|---|
| **Task** | THM-01 |
| **Task Title** | MH / TT Maintenance Specifications |
| **Task Description** | The contractor will do maintenance necessary to maintain the temporary housing units in a safe, working, and livable, condition. The contractor shall perform only those corrective actions that |

*Exhibit 10 – Page 7 of 15*

BNIF 00000410

## EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

require the effort of skilled technicians or labors. FEMA will identify to the contractor all units that belong to and / or are maintained by FEMA.

| | |
|---|---|
| **Response Time** | The contractor will provide maintenance services of units assigned and identified by FEMA. Maintenance service includes performing monthly preventative maintenance inspections, routine and emergency maintenance and repairs for units assigned to the contractor. |
| **Compensation** | Monthly Maintenance – For each FEMA temporary housing unit still assigned (RFO) as of close of business (COB) of the last day of the month the contractor will be compensated a flat fee that covers: any repairs, labor, parts and emergency service, re-leveling, and monthly preventive maintenance inspections. |
| | This includes the move-out inspection and clean and make ready of the unit when the unit is vacant. |
| | If there are excessive emergency service calls the contractor shall inform the COTR of the trend and provide a log of events during the billing cycle. |
| **Unit of Issue** | Per Assigned Unit Per Month |

### 6.2 Staging Maintenance

| | |
|---|---|
| **Task** | THM-02 |
| **Task Title** | Staging Maintenance |
| **Task Description** | This is for maintaining units in staging locations, as identified by the COTR or designee. |
| **Response Time** | 48 hours after the issuance of the work order. |
| **Compensation** | A work order will be issued for the unit needing the maintenance work. Compensation is by time and materials |
| **Unit of Issue** | Per unit |

### 6.3 Miscellaneous for TT Maintenance

| | |
|---|---|
| **Task** | TTM-05 |
| **Task Title** | Miscellaneous for TT Maintenance |

Exhibit 10 – Page 8 of 15

BNIF 00000411

## EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

**Task Description**   Miscellaneous tasks associated with the on-site unit maintenance of installed travel trailer units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. Includes key replacement and associated locksmith tasks when there are no keys available when unit is Ready For Occupancy.

Excludes key replacement and associated locksmith tasks for occupied units due to occupant loss of keys or requests for additional keys.

This line item also excludes tasks that are associated with refurbishment of units at Staging or other FEMA facilities.

**Response Time**   As appropriate

**Compensation**   Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. If others performed the task a receipt for the actual cost of the task will be submitted to FEMA for reimbursement.

**Unit of Issue**   Each

Exhibit 10 – Page 9 of 15

BNIF 00000412

EXHIBIT 10
MAINTENANCE-TEMPORARY HOUSING UNITS

## 6.4 *Install power pole and meter loop 30 AMP service*

| | |
|---|---|
| **Task** | TTM- 07A |
| **Task Title** | Install power pole and meter loop 30 AMP service |
| **Task Description** | Furnish and install temporary power pole and 30AMP meter-base. Contractor will meet all local and State codes. |
| | <u>The contractor must have all appropriate permits and licenses.</u> |
| **Compensation** | Direct wiring of a 30 AMP RV outlet and disconnect will be invoiced as time and materials. The contractor will be compensated for power pole and 30 AMP meter-bases on a per-unit basis separate from the maintenance portion of the contract, after installation and inspection is complete. Permits are invoiced for cost of the permit only. Receipt required. |
| **Unit of Issue** | Each |

## 6.5 *Install power pole and meter loop 50 AMP service*

| | |
|---|---|
| **Task** | TTM- 07B |
| **Task Title** | Install power pole and meter loop 50 AMP service |
| **Task Description** | Furnish and install temporary power pole and 50AMP meter-base. Contractor will meet all local and State codes. |
| | <u>The contractor must have all appropriate permits and licenses.</u> |
| **Compensation** | Direct wiring of a 30 AMP RV outlet and disconnect will be invoiced as time and materials. The contractor will be compensated for power pole and 30 AMP meter-bases on a per-unit basis separate from the maintenance portion of the contract, after installation and inspection is complete. Permits are invoiced for cost of the permit only. Receipt required. |
| **Unit of Issue** | Each |

Exhibit 10 – Page 10 of 15

BNIF 00000413

Case 2:07-md-01873-KDE-MBN Document 26138-1 Filed 12/09/13 Page 60 of 85
Case 2:07-md-01873-KDE-MBN Document 6138-1 Filed 05/08/13 Page 96 of 99
Case 2:07-md-01873-KDE-ALC    Document 2721-7    Filed 08/17/2009    Page 78 of 82

EXHIBIT 10
MAINTENANCE-TEMPORARY HOUSING UNITS

## 6.6 *Manufactured Homes Tasks*

### 6.6.1    Miscellaneous for MH Maintenance

| | |
|---|---|
| **Task** | MHM-05A |
| **Task Title** | Miscellaneous for MH Maintenance |
| **Task Description** | Miscellaneous tasks associated with the on-site unit maintenance of installed mobile home units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. Includes key replacement and associated locksmith tasks when there are no keys available when unit is Ready For Occupancy. |
| | Excludes key replacement and associated locksmith tasks for occupied units due to occupant loss of keys or requests for additional keys. |
| | This line item also excludes tasks that are associated with refurbishment of units at Staging or other FEMA facilities. |
| **Response Time** | As appropriate |
| **Compensation** | Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. If others performed the task a receipt for the actual cost of the task will be submitted to FEMA for reimbursement. |
| **Unit of Issue** | Each |

### 6.6.2    Miscellaneous for MH Maintenance

| | |
|---|---|
| **Task** | MHM-05B |
| **Task Title** | Miscellaneous for MH Maintenance |
| **Task Description** | Miscellaneous tasks associated with the on-site unit maintenance of installed mobile home units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. Includes key replacement and associated locksmith tasks when there are no keys available when unit is Ready For Occupancy. |
| | Excludes key replacement and associated locksmith tasks for occupied units due to occupant loss of keys or requests for additional keys. |

Exhibit 10 – Page 11 of 15

BNIF 00000414

Case 2:07-md-01873-KDE-MBN Document 26138-1 Filed 10/09/13 Page 61 of 85
Case 2:07-cv-00199-HSO-JMR Document 913 Filed 05/06/10 Page 96 of 95
Case 2:07-md-01873-KDE-ALC     Document 2721-7     Filed 08/17/2009     Page 79 of 82

EXHIBIT 10
MAINTENANCE-TEMPORARY HOUSING UNITS

This line item also excludes tasks that are associated with refurbishment of units at Staging or other FEMA facilities.

| | |
|---|---|
| **Response Time** | As appropriate |
| **Compensation** | Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. If others performed the task a receipt for the actual cost of the task will be submitted to FEMA for reimbursement. |
| **Unit of Issue** | Each |

### 6.6.3     Install power pole and meter loop 100 AMP service

| | |
|---|---|
| **Task** | MHM- 07A |
| **Task Title** | Install power pole and meter loop 100 AMP service |
| **Task Description** | Furnish and install temporary power pole and 100AMP meter-base. Contractor will meet all local and State codes. |
| | The contractor must have all appropriate permits and licenses. |
| **Response Time** | As appropriate |
| **Compensation** | Direct wiring of the mobile home will be invoiced as time and materials. The contractor will be compensated for power pole and 100 AMP meter-bases on a per-unit basis separate from the maintenance portion of the contract, after installation and inspection is complete. Permits are invoiced for the cost of the permit only. Receipt required. |
| **Unit of Issue** | Each |

### 6.6.4     Install power pole and meter loop 200 AMP service

| | |
|---|---|
| **Task** | MHM- 07B |
| **Task Title** | Install power pole and meter loop 200 AMP service |
| **Task Description** | Furnish and install temporary power pole and 200AMP meter-base. Contractor will meet all local and State codes. |
| | The contractor must have all appropriate permits and licenses. |

Exhibit 10 – Page 12 of 15

BNIF 00000415

EXHIBIT 10
MAINTENANCE-TEMPORARY HOUSING UNITS

| | |
|---|---|
| **Compensation** | Direct wiring of the mobile home will be invoiced as time and materials. The contractor will be compensated for power pole and 100 AMP meter-bases on a per-unit basis separate from the maintenance portion of the contract, after installation and inspection is complete. Permits are invoiced for the cost of the permit only. Receipt required. |
| **Unit of Issue** | Each |

### 6.6.5    Refurbish MH

| | |
|---|---|
| **Task** | RMHR-01A |
| **Task Title** | Refurbish MH |
| **Task Description** | Refurbishment tasks associated with the repair and refurbishment manufactured home or park model (installed or staging) units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. |
| | Include mattress replacement, and key replacement. |
| **Response Time** | As defined by the COTR or designee |
| **Compensation** | Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. |
| **Unit of Issue** | Each |

### 6.6.6    Refurbish TT

| | |
|---|---|
| **Task** | RTTR-01B |
| **Task Title** | Refurbish TT |
| **Task Description** | Refurbishment tasks associated with the repair and refurbishment travel trailer (installed or staging) units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. |
| | Include mattress replacement, and key replacement. |
| **Response Time** | As defined by the COTR or designee |
| **Compensation** | Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. |
| **Unit of Issue** | Each |

Exhibit 10 – Page 13 of 15

BNIF 00000416

Case 2:07-md-01873-KDE-MBN   Document 26138-1   Filed 12/09/13   Page 63 of 85
Case 2:07-md-01873-KDE-MBN   Document 26138-1   Filed 05/06/11   Page 98 of 98
Case 2:07-md-01873-KDE-ALC   Document 2721-7   Filed 08/17/2009   Page 81 of 82

## EXHIBIT 10
### MAINTENANCE-TEMPORARY HOUSING UNITS

# 7. Septic Bladder

### *7.1 Pump Septic Bladder up to 210 gallon*
(Line Item PU-1)

Pump septic waste from two-hundred-ten (210) gallon septic bladder as required. The septic bladder shall be pumped when the bladder contents are at ninety to ninety five percent of capacity, except when the unit is deactivated. The contractor will observe all local, state, and federal regulations while performing this service. Requests for bladder pumping service may be initiated by the unit occupant, assigned maintenance contractor, FEMA DHOPs field staff, FEMA DHOPs Maintenance staff, or septic pumping contractor personnel.

### *7.2 Pump Septic Bladder up to 260 gallon*
(Line Item PU-2)

Pump septic waste from two-hundred-sixty (260) gallon septic bladder as required. The septic bladder shall be pumped when the bladder contents are at ninety to ninety five percent of capacity, except when the unit is deactivated. The contractor will observe all local and state regulations while performing this service. Requests for bladder pumping service may be initiated by the unit occupant, assigned maintenance contractor, FEMA DHOPs field staff, FEMA DHOPs Maintenance staff, or septic pumping contractor personnel.

### *7.3 Transport and Dispose of Pumped Septic Waste up to 210 gallon*
(Line Item PU-3)

The contractor shall properly transport and dispose of septic waste collected from assigned FEMA DHOPs unit site equipped with two-hundred-ten (210) gallon septic bladder. The contractor will observe all local, state, and federal regulations while performing this service.

### *7.4 Transport and Dispose of Pumped Septic Waste up to 260 gallon*
(Line Item PU-4)

The contractor shall properly transport and dispose of septic waste collected from assigned FEMA DHOPs unit site equipped with two-hundred-sixty (260) gallon septic bladder. The contractor will observe all local, state, and federal regulations while performing this service.

Exhibit 10 – Page 14 of 15

BNIF 00000417

**EXHIBIT 10**
**MAINTENANCE-TEMPORARY HOUSING UNITS**

### 7.5 Dump Station Fees

(Line Item PU-5)

The contractor shall be compensated for dump station fees. The contractor must submit the date performed, site addresses pumped, capacity of the pump truck in gallons, and dated receipt for dump station fees. In instances where the capacity of the pump truck is greater than the combined capacity of the pumped septic bladders serviced by the pump truck the receipt must be document.

Exhibit 10 – Page 15 of 15

BNIF 00000418

**CONTRACT NUMBER:**

HSFEHQ-05-D-0592

**ISSUED BY:**
Department of Homeland Security
Federal Emergency Management Agency
Financial & Acquisition Management Division
Flood, Fire and Mitigation Branch
500 C Street, S.W., Room 350
Washington DC 20472

**NAME AND ADDRESS OF CONTRACTOR:**
CH2M Hill Constructors, Inc.
9191 South Jamaica Street
Englewood, CO 80112-5946

**LETTER CONTRACT FOR:**

Pursuant to Federal Acquisition Regulation (FAR) 16.603, the following agreement is hereby
entered into on behalf of the Government.

**TERM OF CONTRACT**

The contract term shall be for a period commencing upon effective date of this contract and
ending January 15, 2006.

The following and attached clauses (Sections B-J) to this letter contract apply:

**52.216-23, EXECUTION AND COMMENCEMENT OF WORK (APR 1984)**

The Contractor shall indicate acceptance of this letter contract by signing three copies of the
contract and returning them to the Contracting Officer not later than September 30, 2005. Upon
acceptance by both parties, the Contractor shall proceed with performance of the work, including
purchase of necessary materials.

Page 1 of 5



EXHIBIT

"C"

## 52.216-24, LIMITATION OF GOVERNMENT LIABILITY (APR 1984)

(a) In performing this contract, the Contractor is not authorized to make expenditures or incur obligations exceeding the amount obligated under individual task orders.

(b) The maximum amount for which the Government shall be liable if this contract is terminated is equal to the cumulative amount obligated under individual task orders.

## 52.216-25, CONTRACT DEFINITIZATION (OCT 1997)

(a) An Indefinite Delivery/Indefinite Quantity (IDIQ) type definitive contract with firm fixed price/cost/time and materials task orders is contemplated. The Contractor agrees to begin promptly negotiating with the Contracting Officer the terms of a definitive contract that will include (1) all clauses required by the Federal Acquisition Regulation (FAR) on the date of execution of the letter contract, (2) all clauses required by law on the date of execution of the definitive contract, and (3) any other mutually agreeable clauses, terms, and conditions. The Contractor agrees to submit a proposal and cost or pricing data supporting its proposal.

(b) The schedule for definitizing this contract is:

(1)     Proposal due September 30, 2005;
(2)     Negotiations on or before October 21, 2005;
(3)     Definitization within 5 days of agreement;

(c) If agreement on a definitive IDIQ contract to supersede this letter contract is not reached by the target date in paragraph (b) above, or within any extension of it granted by the Contracting Officer, the Contracting Officer may, with the approval of the head of the contracting activity, determine a reasonable price or fee in accordance with Subpart 15.8 and Part 31 of the FAR, subject to Contractor appeal as provided in the Disputes clause. In any event, the Contractor shall proceed with completion of the contract, subject only to the Limitation of Government Liability clause.

(1) After the Contracting Officer's determination of price or fee, the contract shall be governed by—

(i) All clauses required by the FAR on the date of execution of this letter contract for either fixed-price or cost-reimbursement contracts, as determined by the Contracting Officer under this paragraph (c);

(ii) All clauses required by law as of the date of the Contracting Officer's determination; and

(iii) Any other clauses, terms, and conditions mutually agreed upon.

(2) To the extent consistent with subparagraph (c)(1) above, all clauses, terms, and conditions included in this letter contract shall continue in effect, except those that by their nature apply only to a letter contract.

## 52.216-26  PAYMENTS OF ALLOWABLE COSTS BEFORE DEFINITIZATION  (DEC 2002)

This clause applies to Cost Reimbursement Task Orders only.

(a) Reimbursement rate.  Pending the placing of the definitive contract referred to in this letter contract, the Government will promptly reimburse the Contractor for all allowable costs under this contract at the following rates:

(1) One hundred percent of approved costs representing financing payments to subcontractors under fixed-price subcontracts, provided that the Government's payments to the Contractor will not exceed 80 percent of the allowable costs of those subcontractors.

(2) One hundred percent of approved costs representing cost-reimbursement subcontracts; provided, that the Government's payments to the Contractor shall not exceed 85 percent of the allowable costs of those subcontractors.

(3) Eighty-five percent of all other approved costs.

(b) Limitation of reimbursement.  To determine the amounts payable to the Contractor under this letter contract, the Contracting Officer shall determine allowable costs in accordance with the applicable cost principles in Part 31 of the Federal Acquisition Regulation (FAR).  The total reimbursement made under this paragraph shall not exceed 85 percent of the maximum amount of the Government's liability, as stated in this contract.

(c) Invoicing.  Payments shall be made promptly to the Contractor when requested as work progresses, but (except for small business concerns) not more often than every 2 weeks, in amounts approved by the Contracting Officer.  The Contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as the representative may require, an invoice or voucher supported by a statement of the claimed allowable cost incurred by the Contractor in the performance of this contract.

(d) Allowable costs.  For the purpose of determining allowable costs, the term "costs" includes--

(1) Those recorded costs that result, at the time of the request for reimbursement, from payment by cash, check, or other form of actual payment for items or services purchased directly for the contract;

(2) When the Contractor is not delinquent in payment of costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for-

(i) Supplies and services purchased directly for the contract and associated financing payments to subcontractors, provided payments determined due will be made-

(A) In accordance with the terms and conditions of a subcontract or invoice; and

(B) Ordinarily within 30 days of the submission of the Contractor's payment request to the Government;

(ii) Materials issued from the Contractor's stores inventory and placed in the production process for use on the contract;

(iii) Direct labor;

(iv) Direct travel;

(v) Other direct in-house costs; and

(vi) Properly allocable and allowable indirect costs as shown on the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts; and

(3) The amount of financing payments that the Contractor has paid by cash, check, or other forms of payment to subcontractors.

(e) Small business concerns. A small business concern may receive more frequent payments than every 2 weeks.

(f) Audit. At any time before final payment, the Contracting Officer may have the Contractor's invoices or vouchers and statements of costs audited. Any payment may be (1) reduced by any amounts found by the Contracting Officer not to constitute allowable costs or (2) adjusted for overpayments or underpayments made on preceding invoices or vouchers.

## 1. SCOPE OF WORK:

See attached, Section C.

## 2. WAGE DECISION NO.:

See attached, Section H.10, Wage Determination (Various).

## 3. Suspension of Davis-Bacon Act.
On September 8, 2005, the President signed a proclamation suspending the Davis-Bacon Act, 40 U.S.C. 3141, in those areas of the country seriously affected by Hurricane Katrina. The suspension applies to various counties/parishes in the states of Louisiana, Mississippi, Alabama and Florida to contracts awarded on or after September 8, 2005. The determination as to whether the Davis-Bacon Act applies to a particular Task Order under this contract will be determined upon the receipt of the contractor's Task Order proposal(s) and subsequent negotiations. The appropriate clauses will, then, be included in the negotiated Task Order(s).

**SIGNATURES:**

_____

Contractor

_____ 9/30/05 _____
Date

Nancy A. Costello
Contracting Officer

9/30/05
Date

# EXHIBIT 10
# MAINTENANCE-TEMPORARY HOUSING UNITS

## 1. General

This specification establishes the minimum requirements for disaster area maintenance of temporary housing units.

This contractor at a minimum will:

a) Provide maintenance services of units assigned by FEMA. This maintenance services contract includes performing monthly preventative maintenance inspections, responding to routine and emergency maintenance calls and making repairs as required for units assigned to the contractor and/or identified by FEMA.

b) Maintain records pertaining to tasks assigned to include monthly preventative maintenance inspection, routine and emergency maintenance and will make those records available for review upon request by FEMA. The records shall be saved and provided to FEMA when the units are deactivated, and/or upon request by FEMA. All records will be saved and provided on a CD-ROM in Microsoft Word or Excel and provided to FEMA. The contractor will maintain a back-up copy for three years after the contract is terminated.

c) Perform other tasks as required by the COTR and / or the COTR's designee, and as described in the Additional Cost Line Items portion of this document. FEMA will notify the contractor of the requirement for these tasks.

d) Demonstrate professionalism when performing contract-associated tasks. The Contractor must have approval from the occupant or, in case of an emergency, the project monitor (PM) prior to entering the temporary housing unit. This shall include notifying commercial site management or Operations and Management personnel when performing duties within their properties.

e) The Contractor at no time will leave unattended, or otherwise unprotected, any excavation or safety hazard that might cause injury to any person. Access to and from all exterior doors shall be maintained at all times.

f) Contact the manufacturer, dealer or temporary housing unit source for warranty maintenance issues as approved by FEMA. FEMA will not pay any co-payment or deductions if they are required. If the contractor is paid by the manufacturer, dealer, or temporary housing unit source to perform warranty maintenance, the contractor shall reimburse FEMA of the amount received.

g) Have resources (including staff) available or on-call for 24 hours a day, 7 days a week (24/7), to include having a toll-free number available within 48 hours upon contract award to report emergency (day and after-hours), and routine issues.

h) Make repairs identified by FEMA. Generally the Contractor will be expected to correct problems that the occupants are not expected to correct. These problems are not limited to tasks that require the professional services of an experienced electrician, carpenter, plumber, or appliance repairman.

i) Obtain approval from the COTR prior to performing any miscellaneous or unusual requirements. Written documentation must be submitted for reimbursement.

j) Inform FEMA of any trends associated with the upkeep and maintenance of the unit such as excessive service calls.

Exhibit 10 – Page 1 of 15

# EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

k) Respect applicant privacy and protect their information. The applicant information must not be used for any reasons other than the intended purpose. No applicant information will be provided to other entities without FEMA and the applicant's approval.

# 2. Maintenance Areas of Responsibility

The Contractor's area of responsibility is for all interior and exterior components of the unit which includes the:

## 2.1 Plumbing System

Plumbing includes all water and sewer lines and tanks inside the temporary housing unit and all external lines from the temporary housing unit to the utility main or the park owner's connection.

## 2.2 Electrical System

Electrical includes all wiring and associated parts from the Power Company's connection on the meter loop pole or pedestal, to and throughout the manufactured unit, including underground entrance cable. When connecting to an approved power source the responsibility shall include all installed components up to the approved power source.

## 2.3 Heating and Cooling System

This includes all major components to include wiring and associated parts

## 2.4 Replacement of Components

Unless it is associated with the repair and/or replacement of a related component the Contractor is not responsible for replacing such items as light bulbs, stoppers, drain baskets, extra door keys, light covers, etc.

## 2.5 Entrance/Exit components

This includes all panels, sidings, windows, screens and doors.

# 3. Function (tasks) Descriptions.

## 3.1 Maintenance – Emergency

Repairs that are authorized under Emergency Maintenance may be requested by the temporary housing unit occupant (the contractor needs to report this to FEMA immediately) and are defined as those necessary to eliminate a serious health, safety, or security hazard. All emergency work orders received after hours, weekends, or holidays from the occupant shall be reported to the COTR by 10:00 a.m. on the following normal workday.

The Contractor shall initiate repairs to eliminate these healths, safety, or security hazards within six (6) hours of receipt (7 days per week) of an emergency request and complete the work as soon as possible. This may include temporary repairs, in which

Exhibit 10 – Page 2 of 15

## EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

case the Contractor shall notify the COTR or designee. Permanent repairs must be completed within the routine repair time frame.

Emergency maintenance is typically required in response to, but not limited to, one of the following problems:
a)  Gas leak
b)  Major water leak, where a shut off valve cannot be located
c)  Actual sewage leak (Health concern)
d)  No heat (when outside temperature is, or is expected to go below 50 degrees Fahrenheit)
e)  No A/C (when outside temperature is, or is expected to go above 85 degrees Fahrenheit)
f)  No electricity (excluding local power company failure), or major electrical malfunction.

## 3.2  Maintenance – Routine

Maintenance not defined as emergency maintenance is defined as routine maintenance, unless identified by FEMA. All routine repairs shall be completed within 48 hours after receipt of the requirement. When such 48-hour completion time would expire on Saturdays, Sundays, or holidays, the 48-hour time period shall extend to the following Monday or Tuesday, as appropriate.

The Contractor shall complete routine maintenance items requested by the occupant that were not listed on the work order when performing a service call or preventive maintenance visit, as long as the total cost of material does not exceed $250. **For items and materials considered as Major Material Items the contractor must notify and obtain approval from the COTR prior to performing the work.** It is the contractor's responsibility to obtain the name of the person and the time of the decision.

Failure of the Contractor to contact FEMA for authority to proceed could result in the deduction of such costs from the work order prior to payment. If payment has been made the amount may be deducted from subsequent payments.

Priority shall be given during routine maintenance to:
a)  Heating (winter) and cooling (summer) problems not corrected under the emergency maintenance definition
b)  Problems that could be a health concern, such as stopped-up sewer or water lines
c)  Permanent correction of temporary repairs that were performed under emergency maintenance; and
d)  Other such tasks where earlier correction could lessen the extent of the problem.

## 3.3  Maintenance – Staging

This is related to the units located at the staging areas or other designated areas identified by FEMA. This function includes performing maintenance of units identified by FEMA. Maintenance tasks on these units will by identified and assigned by the COTR or his designee.

Exhibit 10 – Page 3 of 15

## 3.4 Major Material Item Replacement

The Contractor shall provide all necessary replacement parts and materials to repair manufactured units under this Contract, except those identified as Major Material Items.

Major Material Items are identified as, but not limited to, refrigerators, water heaters, ranges, axles, exterior doors, temporary housing unit tires, complete furnace, complete A/C, or any other component valued at over $250. The Contractor may replace these items only after prior inspection and approval by the COTR or CO.

If the Contractor determines, after an inspection by a certified mechanic, that repair of a Major Material Item(s) is impractical, the Contractor shall promptly provide the COTR with a written report. This written report needs to address identifying the item(s) by make, model number, part number, identification number and location, condition of the item, and itemized material cost to replace the item(s).

*Note: This is for the actual item costs. Labor costs are covered under the monthly maintenance fee. Any additional labor cost must be itemized and approved by the COTR prior to performing the work. The COTR shall investigate and determine the practicality of repair versus replacement, and then shall instruct the Contractor to proceed with repairs, provide the Contractor with the Major Material Item for replacement, or authorize the Contractor to purchase and replace the item*

Any parts valued at over $250 each that are replaced by the Contractor shall be returned with the completed work order to the COTR, if requested. Replaced parts shall be individually identified with a wire-on tag that contains the work order number, unit number, replacement date, and description of defect. Unit components replaced as defective and later determined by the COTR to have been repairable at a reasonable cost shall result in a back-charge to the Contractor for any associated material costs

The Contractor shall, at all times, make a reasonable effort to acquire all parts at prices favorable to the Government. If the COTR determines that the Contractor could have reasonably obtained the materials at significantly lower prices, the COTR may authorize payment based on the lower prices. Purchase receipts shall be provided to the COTR with the completed work order for all (each) parts costing over $250. The Contractor will be compensated for the actual purchase costs of materials used, as documented on the receipt.

When the Contractor must backorder repair parts for the furnace, A/C, refrigerator, or range, or is otherwise unable to repair these appliances within 48 hours of receiving the work request (within 6 hours for the furnace (winter) and A/C (summer)), the Contractor shall provide a temporary appliance for the occupant. The temporary heating appliance shall be equipped with an automatic shut-off that activates if the heater is accidentally tipped over. Such temporary appliances shall be provided, at no additional cost to the Government or the occupant, until such time as the permanent appliances are fully operational

Exhibit 10 – Page 4 of 15

**EXHIBIT 10**
**MAINTENANCE-TEMPORARY HOUSING UNITS**

All parts replaced shall be new and shall be of a quality equal to or better than the part being replaced.

# 4. Issuance of Work.

FEMA reserves the right to issue work to staff and other resources to perform the mission. The contractor will be assigned units after the units have been installed. The contractor will perform monthly maintenance service visits for each unit assigned. These visits must be at least 14 days apart.

The contractor may also be tasked to perform service calls for routine, emergency, staging maintenance and other tasks during normal duty hours. All service calls will have a follow-up visit scheduled.

The follow-up to a service call may serve as a monthly maintenance service visit if it is performed in the next month and the 14-day spread is met. The purpose of the maintenance service visit is to see if there were any maintenance issues related to the unit that need to be addressed and to make repairs as needed.

The contractor must provide the COTR <u>a monthly schedule of planned visits on the first duty day of the month and a summary of findings for the units assigned at the end of the month</u>.

The contractor will contact the applicant at least 24 hours prior to the scheduled maintenance visit. The contractor will also leave the occupant a summary of the findings and work performed for all visits and service calls.

The summary will include the unit information, date of the visit, the summary of findings and work performed, and the tentative date for the next scheduled maintenance service visit. A copy of the summary of each unit assigned shall be forwarded to FEMA on a monthly basis.

Routine, emergency, and staging work may be issued to the contractor via maintenance work orders. Maintenance work orders will be used for documenting all maintenance calls regardless of the nature. Generally FEMA will use a FEMA Form 90-38, "Mobile Home Maintenance Work Order" or other appropriate documentation. At the completion of the work the contractor shall:
   a) Complete the work order prior to requesting the occupant's signature (excluding cost).
   b) Attach a signed statement explaining the omission of occupant's signature when the occupant is unavailable to sign the completed work order.

When the unit is identified by FEMA as currently vacant the maintenance service visit will include inspecting the unit for safety hazards, damages and reporting the condition of the unit.

The contractor will perform a unit cleaning to prepare the unit for occupancy as assigned by FEMA. The LP tank of the mobile home or the travel trailer's LP bottles shall be filled for re-occupancy. The contractor will not replace appliances, furnishing, furnace, A/C, or water heater prior to COTR approval. If it is determined that these items need to be replaced for the

Exhibit 10 – Page 5 of 15

EXHIBIT 10
MAINTENANCE-TEMPORARY HOUSING UNITS

unit to be ready to occupy the contractor will submit in writing the items that need to be replaced and the estimated amount of replacement cost. The COTR must concur prior to items being replaced.

For billing purposes the contractor must submit the actual receipts for items replaced with the Work Order. Based on the concurrence or approval of the COTR, FEMA will reimburse the contractor the actual cost of the replacement items not to exceed the fair market value of the item.

## 5. Contractor Responsibilities

### 5.1 Work Hours

Normal work (duty) hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday, excluding holidays. Emergency after-hours calls are considered as emergencies that occur anytime outside the above-mentioned hours and days. The completion time of service calls that would expire on Saturdays, Sundays, or holidays, shall extend to the following duty day, as appropriate

### 5.2 Phone Service

The 24-hour telephone numbers(s) shall be a toll-free number and shall be provided to the Contracting Officer and FEMA COTR within 48 hours of contract award. The telephone number(s) will be provided to the unit occupants.

### 5.3 Facilities

The Contractor shall maintain an office and adequate storage and shop facilities to efficiently provide for the Government's maintenance obligation and requirements. Identification
The contractor personnel must wear an identification badge. The badge must include a contractor identification number, name, company name, and phone number. This badge must be visible when the contractor is working. The contractor is responsible for obtaining badges for all the employees working the tasks associated with this contract. This includes temporary, sub-contractors, etc.. The contractor is responsible for monitoring their staff.

### 5.4 Resources

The Contractor shall furnish all necessary labor, tools, equipment, and materials to perform temporary housing unit maintenance services. The contractor must obtain all appropriate permits and licenses needed to fulfill the tasks of this contract. The contractor must use certified and licensed personnel to perform the work needed (i.e. plumber, electrician, heating and air).

### 5.5 Contractor Expectations

All contractor staff is expected to carry themselves in a professional manner. It is the contractor's responsibility to monitor and supervise their staff work, professionalism,

Exhibit 10 – Page 6 of 15

**EXHIBIT 10**
**MAINTENANCE-TEMPORARY HOUSING UNITS**

and behavior. The contractor must be able to provide a background check of employees as requested.

## 5.6 Qualification of Personnel

Work performed under this task shall be completed by professionally certified mechanics with expertise in heating and air conditioning (HVAC), refrigeration, range, electrical, and/or plumbing repairs.

    a) The Contractor must be able to provide documentation of each mechanic's professional certification (such as certificates of training course completion, letters from previous employers certifying experience, resumes, membership affiliations to professional organizations, or other such documentation), if requested by FEMA, which, in the COTR's opinion, attests to the mechanic's qualifications.

    b) For unusually complex maintenance problems, the Contractor must have access to licensed/certified technicians in the areas of electrical, plumbing, furnace, air condition, and appliance repair. Utilization of licensed/certified personnel shall be at no additional cost to FEMA. Availability of licensed technicians shall be (a) on a 24-hour basis, if needed, (b) maintained throughout the period of this contract, and (c) the contractor may be required to provide documentation to the COTR that substantiates that licensed/certified technicians are being used.

    c) The contractor will identify a primary and alternate point-of-contact within 48 hours of contract award.

## 5.7 Warranty

All work performed under this contract shall be warranted for a period of 90 days from the acceptance of the work, as indicated by the Contracting Officer's Technical Representative's (COTR's) signature and date on the work order form

## 5.8 Problem Reporting

Any maintenance problems, which in the Contractor's opinion were manufacturer warranty issues, or caused by the installation Contractor (particularly towing damage which will affect removal) and/or negligence or abuse by the occupant shall be reported to the COTR (in writing) with the completed work order.

# 6. Tasks

## 6.1 MH / TT Maintenance Specifications

**Task**          THM-01

**Task Title**        MH / TT Maintenance Specifications

**Task Description**    The contractor will do maintenance necessary to maintain the temporary housing units in a safe, working, and livable, condition. The contractor shall perform only those corrective actions that

Exhibit 10 – Page 7 of 15

# EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

require the effort of skilled technicians or labors. FEMA will identify to the contractor all units that belong to and / or are maintained by FEMA.

**Response Time**      The contractor will provide maintenance services of units assigned and identified by FEMA. Maintenance service includes performing monthly preventative maintenance inspections, routine and emergency maintenance and repairs for units assigned to the contractor.

**Compensation**      Monthly Maintenance – For each FEMA temporary housing unit still assigned (RFO) as of close of business (COB) of the last day of the month the contractor will be compensated a flat fee that covers: any repairs, labor, parts and emergency service, re-leveling, and monthly preventive maintenance inspections.

This includes the move-out inspection and clean and make ready of the unit when the unit is vacant.

If there are excessive emergency service calls the contractor shall inform the COTR of the trend and provide a log of events during the billing cycle.

**Unit of Issue**      Per Assigned Unit Per Month

## 6.2 Staging Maintenance

**Task**      THM-02

**Task Title**      Staging Maintenance

**Task Description**      This is for maintaining units in staging locations, as identified by the COTR or designee.

**Response Time**      48 hours after the issuance of the work order.

**Compensation**      A work order will be issued for the unit needing the maintenance work. Compensation is by time and materials

**Unit of Issue**      Per unit

## 6.3 Miscellaneous for TT Maintenance

**Task**      TTM-05

**Task Title**      Miscellaneous for TT Maintenance

Exhibit 10 – Page 8 of 15

# EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

| | |
|---|---|
| **Task Description** | Miscellaneous tasks associated with the on-site unit maintenance of installed travel trailer units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. Includes key replacement and associated locksmith tasks when there are no keys available when unit is Ready For Occupancy. |
| | Excludes key replacement and associated locksmith tasks for occupied units due to occupant loss of keys or requests for additional keys. |
| | This line item also excludes tasks that are associated with refurbishment of units at Staging or other FEMA facilities. |
| **Response Time** | As appropriate |
| **Compensation** | Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. If others performed the task a receipt for the actual cost of the task will be submitted to FEMA for reimbursement. |
| **Unit of Issue** | Each |

Exhibit 10 – Page 9 of 15

**EXHIBIT 10**
**MAINTENANCE-TEMPORARY HOUSING UNITS**

## 6.4 *Install power pole and meter loop 30 AMP service*

| | |
|---|---|
| **Task** | TTM- 07A |
| **Task Title** | Install power pole and meter loop 30 AMP service |
| **Task Description** | Furnish and install temporary power pole and 30AMP meter-base. Contractor will meet all local and State codes. |
| | <u>The contractor must have all appropriate permits and licenses.</u> |
| **Compensation** | Direct wiring of a 30 AMP RV outlet and disconnect will be invoiced as time and materials. The contractor will be compensated for power pole and 30 AMP meter-bases on a per-unit basis separate from the maintenance portion of the contract, after installation and inspection is complete. Permits are invoiced for cost of the permit only. Receipt required. |
| **Unit of Issue** | Each |

## 6.5 *Install power pole and meter loop 50 AMP service*

| | |
|---|---|
| **Task** | TTM- 07B |
| **Task Title** | Install power pole and meter loop 50 AMP service |
| **Task Description** | Furnish and install temporary power pole and 50AMP meter-base. Contractor will meet all local and State codes. |
| | <u>The contractor must have all appropriate permits and licenses.</u> |
| **Compensation** | Direct wiring of a 30 AMP RV outlet and disconnect will be invoiced as time and materials. The contractor will be compensated for power pole and 30 AMP meter-bases on a per-unit basis separate from the maintenance portion of the contract, after installation and inspection is complete. Permits are invoiced for cost of the permit only. Receipt required. |
| **Unit of Issue** | Each |

**Exhibit 10 – Page 10 of 15**

### EXHIBIT 10
### MAINTENANCE-TEMPORARY HOUSING UNITS

## *6.6 Manufactured Homes Tasks*

### 6.6.1    Miscellaneous for MH Maintenance

| | |
|---|---|
| **Task** | MHM-05A |
| **Task Title** | Miscellaneous for MH Maintenance |
| **Task Description** | Miscellaneous tasks associated with the on-site unit maintenance of installed mobile home units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. Includes key replacement and associated locksmith tasks when there are no keys available when unit is Ready For Occupancy. |
| | Excludes key replacement and associated locksmith tasks for occupied units due to occupant loss of keys or requests for additional keys. |
| | This line item also excludes tasks that are associated with refurbishment of units at Staging or other FEMA facilities. |
| **Response Time** | As appropriate |
| **Compensation** | Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. If others performed the task a receipt for the actual cost of the task will be submitted to FEMA for reimbursement. |
| **Unit of Issue** | Each |

### 6.6.2    Miscellaneous for MH Maintenance

| | |
|---|---|
| **Task** | MHM-05B |
| **Task Title** | Miscellaneous for MH Maintenance |
| **Task Description** | Miscellaneous tasks associated with the on-site unit maintenance of installed mobile home units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. Includes key replacement and associated locksmith tasks when there are no keys available when unit is Ready For Occupancy. |
| | Excludes key replacement and associated locksmith tasks for occupied units due to occupant loss of keys or requests for additional keys. |

Exhibit 10 – Page 11 of 15

# EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

This line item also excludes tasks that are associated with refurbishment of units at Staging or other FEMA facilities.

| | |
|---|---|
| **Response Time** | As appropriate |
| **Compensation** | Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. If others performed the task a receipt for the actual cost of the task will be submitted to FEMA for reimbursement. |
| **Unit of Issue** | Each |

## 6.6.3    Install power pole and meter loop 100 AMP service

| | |
|---|---|
| **Task** | MHM- 07A |
| **Task Title** | Install power pole and meter loop 100 AMP service |
| **Task Description** | Furnish and install temporary power pole and 100AMP meter-base. Contractor will meet all local and State codes. |
| | The contractor must have all appropriate permits and licenses. |
| **Response Time** | As appropriate |
| **Compensation** | Direct wiring of the mobile home will be invoiced as time and materials. The contractor will be compensated for power pole and 100 AMP meter-bases on a per-unit basis separate from the maintenance portion of the contract, after installation and inspection is complete. Permits are invoiced for the cost of the permit only. Receipt required. |
| **Unit of Issue** | Each |

## 6.6.4    Install power pole and meter loop 200 AMP service

| | |
|---|---|
| **Task** | MHM- 07B |
| **Task Title** | Install power pole and meter loop 200 AMP service |
| **Task Description** | Furnish and install temporary power pole and 200AMP meter-base. Contractor will meet all local and State codes. |
| | The contractor must have all appropriate permits and licenses. |

Exhibit 10 – Page 12 of 15

**EXHIBIT 10**
**MAINTENANCE-TEMPORARY HOUSING UNITS**

| | |
|---|---|
| **Compensation** | Direct wiring of the mobile home will be invoiced as time and materials. The contractor will be compensated for power pole and 100 AMP meter-bases on a per-unit basis separate from the maintenance portion of the contract, after installation and inspection is complete. Permits are invoiced for the cost of the permit only. Receipt required. |
| **Unit of Issue** | Each |

### 6.6.5    Refurbish MH

| | |
|---|---|
| **Task** | RMHR-01A |
| **Task Title** | Refurbish MH |
| **Task Description** | Refurbishment tasks associated with the repair and refurbishment manufactured home or park model (installed or staging) units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. |
| | Include mattress replacement, and key replacement. |
| **Response Time** | As defined by the COTR or designee |
| **Compensation** | Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. |
| **Unit of Issue** | Each |

### 6.6.6    Refurbish TT

| | |
|---|---|
| **Task** | RTTR-01B |
| **Task Title** | Refurbish TT |
| **Task Description** | Refurbishment tasks associated with the repair and refurbishment travel trailer (installed or staging) units as assigned by the COTR or designee that are not addressed by the other descriptions and line items. |
| | Include mattress replacement, and key replacement. |
| **Response Time** | As defined by the COTR or designee |
| **Compensation** | Time and materials or actual cost. A receipt for materials must be submitted along with the time the task required. |
| **Unit of Issue** | Each |

Exhibit 10 – Page 13 of 15

**EXHIBIT 10**
**MAINTENANCE-TEMPORARY HOUSING UNITS**

# 7. Septic Bladder

## 7.1 Pump Septic Bladder up to 210 gallon
(Line Item PU-1)

Pump septic waste from two-hundred-ten (210) gallon septic bladder as required. The septic bladder shall be pumped when the bladder contents are at ninety to ninety five percent of capacity, except when the unit is deactivated. The contractor will observe all local, state, and federal regulations while performing this service. Requests for bladder pumping service may be initiated by the unit occupant, assigned maintenance contractor, FEMA DHOPs field staff, FEMA DHOPs Maintenance staff, or septic pumping contractor personnel.

## 7.2 Pump Septic Bladder up to 260 gallon
(Line Item PU-2)

Pump septic waste from two-hundred-sixty (260) gallon septic bladder as required. The septic bladder shall be pumped when the bladder contents are at ninety to ninety five percent of capacity, except when the unit is deactivated. The contractor will observe all local and state regulations while performing this service. Requests for bladder pumping service may be initiated by the unit occupant, assigned maintenance contractor, FEMA DHOPs field staff, FEMA DHOPs Maintenance staff, or septic pumping contractor personnel.

## 7.3 Transport and Dispose of Pumped Septic Waste up to 210 gallon
(Line Item PU-3)

The contractor shall properly transport and dispose of septic waste collected from assigned FEMA DHOPs unit site equipped with two-hundred-ten (210) gallon septic bladder. The contractor will observe all local, state, and federal regulations while performing this service.

## 7.4 Transport and Dispose of Pumped Septic Waste up to 260 gallon
(Line Item PU-4)

The contractor shall properly transport and dispose of septic waste collected from assigned FEMA DHOPs unit site equipped with two-hundred-sixty (260) gallon septic bladder. The contractor will observe all local, state, and federal regulations while performing this service.

Exhibit 10 – Page 14 of 15

## EXHIBIT 10
## MAINTENANCE-TEMPORARY HOUSING UNITS

### 7.5 Dump Station Fees
(Line Item PU-5)

The contractor shall be compensated for dump station fees. The contractor must submit the date performed, site addresses pumped, capacity of the pump truck in gallons, and dated receipt for dump station fees. In instances where the capacity of the pump truck is greater than the combined capacity of the pumped septic bladders serviced by the pump truck the receipt must be document.

Exhibit 10 – Page 15 of 15

℀JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Starlett M. King, as wrongful death beneficiary and representative of, Jeff Shetterly, Deceased, et al | CH2M Hill Constructors, Inc., et al. |

**(b)** County of Residence of First Listed Plaintiff  Harrison
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Hawkins, Stracener & Gibson, PLLC, 153 Main Street, Bay Saint Louis, MS 39520, (228) 469-0785

Attorneys (If Known)

SOUTHERN DISTRICT OF MISSISSIPPI
**F I L E D**

MAY 0 6 2010

J.T. NOBLIN, CLERK
BY_____ DEPUTY

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC s 1332 and 28 USC s 1346(b)
Brief description of cause:
Personal injury claims arising from formaldehyde exposure in temporary housing provided by FEMA

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE  May 5, 2010

SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

**FOR OFFICE USE ONLY**

RECEIPT # 14643002804  AMOUNT 350.00  APPLYING IFP ____  JUDGE ____  MAG. JUDGE ____